# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

State Farm Mutual Automobile Insurance Company
and State Farm Fire and Casualty Company,

Plaintiffs,

v.

| | |
|---|---|
| Jules Parisien, M.D., | Case No. 1:18-cv-00289-ILG-ST |
| Luqman Dabiri, M.D., | |
| Ksenia Pavlova, D.O., | |
| Noel Blackman, M.D., | |
| Frances Lacina, D.O., | |
| Allay Medical Services, P.C., | |
| FJL Medical Services P.C., | |
| JFL Medical Care P.C., | |
| JPF Medical Services, P.C., | |
| KP Medical Care P.C., | |
| PFJ Medical Care P.C., | |
| RA Medical Services P.C., | |
| Darren Mollo, D.C., | **PLAINTIFFS DEMAND** |
| Darren Mollo D.C., P.C., | **TRIAL BY JURY** |
| ACH Chiropractic, P.C., | |
| Energy Chiropractic, P.C., | |
| Island Life Chiropractic Pain Care, PLLC, | |
| Charles Deng, L.A.c., | |
| Charles Deng Acupuncture, P.C., | |
| David Mariano, P.T., | |
| MSB Physical Therapy P.C., | |
| Maiga Products Corporation, | |
| Madison Products of USA, Inc., | |
| Quality Custom Medical Supply, Inc., | |
| Quality Health Supply Corp., | |
| Personal Home Care Products Corp., and | |
| AB Quality Health Supply Corp., | |

Defendants.

<u>**AMENDED COMPLAINT**</u>

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State

Farm Fire and Casualty Company ("State Farm Fire"), for their Amended Complaint against

Defendants, allege as follows:

## I.    NATURE OF THE ACTION

1.    This action seeks to recover money fraudulently obtained from State Farm Mutual and State Farm Fire through the submission of bills and supporting documentation that are fraudulent for examinations, treatment, testing, injections, and durable medical equipment provided to individuals who were involved in motor vehicle accidents and were eligible for No-Fault Benefits under State Farm Mutual or State Farm Fire insurance policies.  The bills and supporting documentation that defendants submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire were fraudulent because the services were not eligible for reimbursement, were not provided, and/or were not medically necessary.

2.    The bills and supporting documentation are the product of a fraudulent, predetermined treatment protocol (the "Predetermined Treatment Protocol") administered to patients by providers at 1786 Flatbush Avenue in Brooklyn, New York ("1786 Flatbush"). Defendants did not design the Predetermined Treatment Protocol to legitimately examine, diagnose, and treat patients, but instead to enrich Defendants financially by exploiting the patients' No-Fault Benefits.

3.    The Predetermined Treatment Protocol involves:

(a)    initial examinations that are not legitimately performed to determine the true nature and extent of patient injuries, but rather are performed, if at all, as a pretext to report substantially similar and in some instances nearly identical examination findings to justify a variety of unnecessary treatment and services;

(b)    a treatment plan consisting of a combination of purported physical therapy modalities, chiropractic manipulations, and acupuncture, provided to almost every patient on almost every visit and often on the same dates of service, regardless of the unique circumstances and needs of each patient;

(c)    employing particular treatments, modalities and services not because they are clinically beneficial to the patients, but to maximize charges and avoid limitations on the amounts that can be charged under the applicable fee schedule;

(d)     subjecting patients to medically unnecessary diagnostic tests, which include digital range of motion tests ("ROM Tests"), computerized muscle strength tests ("Muscle Tests"), Nerve Conduction Velocity Tests ("NCVs"), Electromyography Tests ("EMGs"), somatosensory evoked potential tests ("SSEPs"), brainstem auditory evoked potential tests ("BEPs"), Functional Capacity Evaluations, and pain fiber nerve conduction studies ("V-sNCT") (collectively the "Tests");

(e)     recommending and performing medically unnecessary trigger point injections and dry needling procedures;

(f)     recommending and providing virtually identical bundles of medically unnecessary durable medical equipment ("DME") and orthotic devices (collectively "Supplies"); and

(g)     submitting documents to State Farm falsely representing that the examinations, treatment, Tests, injections, and Supplies purportedly rendered were medically necessary when, in fact, they either were not performed or were performed to exploit patients' No-Fault Benefits and not because they were medically necessary.

4.      The Predetermined Treatment Protocol was rendered by a variety of providers: (1) by physicians, Jules Parisien, M.D. ("Parisien"), Noel Blackman, M.D. ("Blackman"), Luqman Dabiri, M.D. ("Dabiri"), Ksenia Pavlova, D.O. ("Pavlova"), and Frances Lacina, D.O. ("Lacina") and through a series of entities purportedly owned by those providers, Allay Medical Services, P.C. ("Allay"), JFL Medical Care P.C. ("JFL Medical"), FJL Medical Services P.C. ("FJL Medical"), JPF Medical Services, P.C. ("JPF Medical"), KP Medical Care P.C. ("KP Medical"), PFJ Medical Care P.C. ("PFJ Medical"), and RA Medical Services ("RA Medical") (collectively the "Physician Defendants") who purportedly examined patients, diagnosed injuries to support treatment, and purportedly provided medically unnecessary medical care and Tests, and who, for some patients, administered medically unnecessary trigger point injections and dry needling procedures; (2) by chiropractors – Darren T. Mollo, D.C., ("Mollo") and others employed by or associated with him, or entities purportedly owned by Mollo – Darren Mollo D.C., P.C. ("Mollo P.C."), ACH Chiropractic, P.C. ("ACH Chiropractic"), Energy Chiropractic, P.C. ("Energy Chiropractic"), Island Life Chiropractic Pain Care, PLLC ("Island Life") (collectively the

"Chiropractor Defendants") – who purportedly examined patients, diagnosed injuries to support treatment, and purportedly provided medically unnecessary chiropractic care and Tests; (3) by acupuncturists – Charles Deng, L.A.c, ("Deng") and others employed by or associated with him and Charles Deng Acupuncture, P.C. (the "Acupuncture Defendants") – who purportedly examined patients, diagnosed injuries to support treatment, and purportedly provided medically unnecessary acupuncture treatment, including cupping; (4) by physical therapists working for the Physician Defendants, David Mariano, P.T. ("Mariano"), MSB Physical Therapy P.C**.** ("MSB") and others, who administered medically unnecessary physical therapy services, including synaptic treatments and cold laser therapy (collectively, the "Physical Therapy Defendants"); and (6) by suppliers of DME and orthotics – Maiga Products Corporation ("Maiga"), Madison Products of USA, Inc. ("Madison"), Quality Custom Medical Supply, Inc. ("Quality Custom"), Quality Health Supply Corp. ("Quality Health"), AB Quality Health Supply Corp. ("AB Quality"), and Personal Home Care Products Corp. ("PHCP") (collectively, the "DME Defendants") – who provided and billed for Supplies based on prescriptions issued by the Physician Defendants.

5.      As a result of the Predetermined Treatment Protocol, as well as the medically unnecessary examinations, treatment, testing, injections, Supplies, and the improper conduct described above: (a) patients were not legitimately examined, diagnosed, and/or appropriately treated for conditions which they may have had; (b) patients were subjected to treatments for conditions that they may not have had; and (c) patients' limited No-Fault Benefits were reduced and therefore not available for legitimate treatment that they may have needed as a result of their automobile accident.

6.      Defendants' scheme began in August 2013 and has continued uninterrupted since that time.  As a result of their scheme, State Farm Mutual and State Farm Fire have incurred damages of more than $1 million.

## II.    JURISDICTION AND VENUE

7.      Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq. ("RICO") because they arise under the laws of the United States. Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state law claims and non-RICO claims because they are so related to the RICO claims as to form part of the same case and controversy.

8.      In addition, pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over State Farm Mutual's and State Farm Fire's claims based on state law because the matter is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Defendants acted in concert pursuant to a common plan to commit the fraud alleged herein and are jointly and severally liable for the damages caused to State Farm Mutual and State Farm Fire in the amount of at least $1 million.

9.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

## III.    PARTIES

### A.    Plaintiffs

10.      State Farm Mutual is a corporation organized under the laws of Illinois, with its principal place of business in Illinois, and issues automobile insurance policies in New York.

11.      State Farm Fire is a corporation organized under the laws of Illinois, with its principal place of business in Illinois, and issues automobile insurance policies in New York.

B.    **Defendants**

1.    **The Physician Defendants**

12.    Parisien resides in and is a citizen of New York.  Parisien is a licensed physician in New York.  Parisien's services at 1786 Flatbush were billed to State Farm under his own tax identification number, and through Allay, PFJ Medical and JPF Medical.

13.    Blackman resides in and is a citizen of New York.  Blackman is a licensed physician in New York.  Blackman's services at 1786 Flatbush were billed to State Farm under his own tax identification number.

14.    Blackman has a history of professional misconduct.  Blackman was charged by the New York Board of Medicine with repeated negligence and failure to maintain accurate patient records relating to his treatment of three patients.  As the result of Blackman's negligence, the right arm of one of his patients had to be amputated.  On June 25, 2004 the Board placed Blackman on probation for two years, a condition of which required Blackman to practice medicine only when monitored by a board-certified physician approved by the New York State Department of Health Office of Professional Medical Conduct, and to take a course in medical record keeping.

15.    More recently, on August 24, 2016, Blackman pled guilty to conspiracy to distribute oxycodone in violation of 21 U.S.C. § 841(a)(1) following his arrest by federal law enforcement officers for illegally prescribing vast amounts of painkillers, specifically prescribing 365,000 pills of the Schedule II narcotic oxycodone in 2015 alone.  Federal authorities removed Blackman from an international flight bound for Guyana and arrested him at John F. Kennedy Airport after they ordered the plane back to the terminal.  According to Blackman's prescription records, the 365,000 pills came from 2,487 prescriptions he wrote from multiple clinics in Franklin Square, Elmhurst, Queens, and Brooklyn from approximately June 2015 to February

2016.  Blackman waived his *Miranda* rights and told law enforcement agents that he saw 100 patients per day at a clinic for which he charged $300 per patient, and estimated that he saw one patient every six minutes.  Blackman's secretary Eva Torres was also arrested on the same narcotics conspiracy charge and she advised federal agents that an unnamed person would give her a list of names and Blackman would then write oxycodone prescriptions without examining the patients, for which Blackman received $300 for each prescription.  In light of these charges, the New York Board of Medicine initiated an investigation during which Blackman agreed to an Interim Order of Conditions precluding him from practicing medicine in New York during the investigation.  Blackman pled guilty to conspiracy to distribute and possess with intent to distribute oxycodone and on May 15, 2017 a judgment was entered against him sentencing him to, among other things, 50 months imprisonment, and he was ordered to forfeit approximately $536,000.

16.     Dabiri resides in and is a citizen of New York.  Dabiri's services at 1786 Flatbush were billed to State Farm under his own tax identification number.

17.     Dabiri is a physician specializing in obstetrics and gynecology whose license to practice medicine has been suspended in at least three jurisdictions, including New York.

18.     Dabiri started to practice medicine in England, where he obtained a restricted medical license in 1999 requiring that he practice under the supervision of a licensed physician. His restricted license in England was later suspended on two separate occasions in 2000.  Dabiri then moved to the United States and obtained a restricted license to practice medicine in Florida in February 2009, which also required him to work under the supervision of a supervising physician.  In February 2013, the Florida Department of Health brought disciplinary proceedings against Dabiri for violating the terms of his limited license.  In June 2013, Dabiri entered into a

consent agreement with the Florida Board of Medicine under which he was reprimanded for professional misconduct, ordered to pay a fine and costs, and his Florida license to practice medicine was suspended until he applied for reinstatement following an evaluation.

19.    Approximately eight months after his Florida license was suspended, and before the State of New York took any action against his New York license, as a result of the Florida suspension, Dabiri's license to practice medicine in New York was eventually suspended on January 12, 2015 through July 30, 2015.  Following an evidentiary hearing, the State of New York Board of Professional Medical Conduct found that Dabiri committed professional misconduct based on the Florida suspension under New York Education Law 6530(9)(d), which provides for disciplinary action if a licensee is subject to a disciplinary action in another state and the underlying conduct would give rise to disciplinary action in New York, and ordered that Dabiri's New York license be suspended until his Florida medical license was reinstated.  The New York Department of Health appealed the hearing committee's decision to the Administrative Review Board ("ARB"), stating that the committee's penalty was "insufficient and places the public at risk."   On May 27, 2015, the ARB ordered that Dabiri's New York license be suspended indefinitely "until such time as the Director of the Office of Professional Medical Conduct . . . determines [that Dabiri] can practice safely in New York" and also placed Dabiri on probation for five years following his reinstatement.  The ARB noted that Dabiri had previously been disciplined in both England and Florida, and then left both jurisdictions to practice elsewhere, finding "such conduct presents a pattern and we find that pattern troubling." The ARB also noted that Dabiri had been practicing in New York in an unlicensed office setting, which permitted him to "practice with no supervision or oversight in [an office] setting, unlike

practice in a licensed medical facility subject to State and Federal inspections and regulations requiring lines of supervision."

20.    Pavlova resides in and is a citizen of Brooklyn, New York.  Pavlova has been a licensed osteopathic physician in New York since 2009.  While Pavlova is a doctor of osteopathic medicine and has never had an M.D. degree or held a license as a Medical Doctor, beginning in approximately April 2014, Pavlova began to falsely represent in some of her claims documentation submitted to State Farm that she held a M.D. license.  *See* Ex. 9 (example "Ksenia Pavlova, M.D." claim). Pavlova's services at 1786 Flatbush were billed to State Farm under her own tax identification number, her social security number, Allay, and KP Medical and under Blackman's name.

21.    Lacina resides in and is a citizen of Florida.  Lacina is an osteopathic physician licensed to practice in Florida and New York.  Lacina's services at 1786 Flatbush were billed to State Farm under his own tax identification number, and through FJL Medical Services P.C., JFL Medical, RA Medical, and MSB.

22.    Allay is a domestic professional corporation organized under the laws of New York, with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  Allay was formed on June 29, 2015.  Pavlova is the sole original shareholder, director, officer, and incorporator of Allay.  Since its formation, Allay has submitted bills to State Farm for services purportedly performed at 1786 Flatbush by Parisien, Renee Denobrega, N.P., and Sujanta Rangrao Dhone, P.T.

23.    FJL Medical is a domestic professional corporation organized under the laws of New York, with its principal place of business at 2609 E. 14th Street, Ste. 323, Brooklyn, New York.  FJL Medical was formed on June 24, 2016.  Lacina is the sole original shareholder,

director, officer, and incorporator of FJL Medical. Since its formation, FJL Medical has submitted bills to State Farm for services purportedly performed at 1786 Flatbush by Lacina.

24.     JFL Medical is a domestic professional corporation organized under the laws of New York, with its principal place of business at 2609 E. 14th Street, Ste. 323, Brooklyn, New York. JFL Medical was formed on September 23, 2016. Lacina is the sole original shareholder, director, officer, and incorporator of JFL Medical. Since its formation, JFL Medical has submitted bills to State Farm for services purportedly performed at 1786 Flatbush by Lacina and Renee Denobrega, N.P.

25.     JPF Medical is a domestic professional corporation organized under the laws of New York, with its principal place of business at 329 Surrey Drive, New Rochelle, New York. JPF Medical was formed on September 23, 2016. Since its formation, JPF Medical has submitted bills to State Farm for services purportedly performed at 1786 Flatbush by Parisien and Renee Denobrega, N.P.

26.     KP Medical is a domestic professional corporation organized under the laws of New York, with its principal place of business at 3000 Ocean Parkway, Ste. 8G, Brooklyn, New York. KP Medical was formed on October 28, 2016. Pavlova is the sole original shareholder, director, officer, and incorporator of KP Medical. Since its formation, KP Medical has submitted bills to State Farm for services purportedly performed by Parisien and Renee Denobrega, N.P.

27.     PFJ Medical is a domestic professional corporation organized under the laws of New York, with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York. PFJ Medical was formed on July 31, 2015. Parisien is the sole original shareholder, director, officer, and incorporator of PFJ Medical. Since its formation, PFJ Medical has submitted bills to

State Farm for services purportedly performed at 1786 Flatbush by Parisien, Renee Denobrega, N.P. and others.

28.     RA Medical is a domestic professional corporation organized under the laws of New York, with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York. RA Medical was formed on November 9, 2015.  Lacina is the sole original shareholder, director, officer, and incorporator of RA Medical.  Since its formation, RA Medical has submitted bills to State Farm for services purportedly performed at 1786 Flatbush by Lacina.

**2.     The Chiropractor Defendants**

29.     Mollo resides in and is a citizen of New York.  Mollo is a licensed chiropractor in New York.   Mollo is the purported owner of Mollo P.C., ACH Chiropractic, Energy Chiropractic, and Island Life.

30.     Mollo P.C. is a domestic professional corporation organized under the laws of New York, with its principal place of business in East Northport, Suffolk County, New York. Mollo P.C. was formed on May 15, 2001.  Mollo is the sole original shareholder, director, and officer of Mollo P.C.

31.     ACH Chiropractic is a domestic professional corporation organized under the laws of New York, with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  ACH Chiropractic was formed on September 28, 2015.  Mollo is the sole original shareholder, director, officer and incorporator of ACH Chiropractic.

32.     Energy Chiropractic is a domestic professional corporation organized under the laws of New York, with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  Energy Chiropractic was formed on October 26, 2016.  Mollo is the sole original shareholder, director, officer and incorporator of Energy Chiropractic.

33.     Island Life is a domestic professional service limited liability company organized under the laws of New York, with its principal place of business in Deer Park, Suffolk County, New York.  Island Life was formed on September 2, 2010.   Mollo is the sole original member and manager of Island Life.

### 3.     The Acupuncture Defendants

34.     Deng resides in and is a citizen of New York.   Deng is licensed as an acupuncturist in New York and owns Charles Deng Acupuncture, P.C.

35.     Deng Acupuncture, P.C. is a domestic professional corporation organized under the laws of New York, with its principal place of business in New York, New York.  It was formed on October 24, 2000.

### 4.     The Physical Therapist Defendants

36.     Mariano resides in and is a citizen of New York.  Mariano is a licensed physical therapist and owns DM Physical Therapy, P.C.  Mariano's services at 1786 Flatbush are billed to State Farm under the names and tax identification numbers of one or more of the Physician Defendants.

37.     MSB Physical Therapy is a domestic professional corporation organized under the laws of New York, with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  It was formed on April 1, 2016.  Maria Masiglia, a/k/a Maria Shiela B. Buslon, is the sole original shareholder, director, officer and incorporator of MSB Physical Therapy.

### 5.     The DME Defendants

38.     Maiga is a domestic business corporation organized under the laws of New York, with its principal place of business in New York, New York. Maiga was formed on July 9, 2012 and is purportedly owned by Maiga Borisevica.

12

39.     Madison is a domestic business corporation organized under the laws of New York, with its principal place of business in New York, New York.  Madison was formed on November 7, 2013.  Oleksandr Semenov is the incorporator of Madison.

40.     Quality Custom is a domestic business corporation organized under the laws of New York, with its principal place of business in New York, New York.  Quality Custom was formed on March 31, 2011.  Sharan Babala is the incorporator of Quality Custom.

41.     Quality Health is a domestic business corporation organized under the laws of New York, with its principal place of business in New York, New York.  Quality Health was formed on June 3, 2015.  Allan L. Buslon is the incorporator of Quality Health.

42.     PHCP is a domestic business corporation organized under the laws of New York, with its principal place of business in New York, New York.  PHCP was formed on March 26, 2015.  Valentyna Diker is the incorporator of PHCP.

43.     AB Quality is a domestic business corporation organized under the laws of New York, with its principal place of business in New York, New York.  AB Quality was formed on July 19, 2016.  Allan L. Buslon is the incorporator of AB Quality Health.

IV.     **ALLEGATIONS COMMON TO ALL COUNTS**

    A.     **Claims for Payment under the No-Fault Laws**

44.     State Farm Mutual and State Farm Fire underwrite automobile insurance in New York.

45.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, et seq.) and the regulations promulgated thereto (11 N.Y.C.R.R. § 65, et seq.) (collectively "the No-Fault Laws"), automobile insurers are required to provide No-Fault Benefits to insureds.

46.     No-Fault Benefits include up to $50,000 per insured for necessary expenses incurred for various healthcare goods and services.

47.     An insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to insurance companies and receive payment for necessary medical services.

48.     Pursuant to § 403 of the New York State Insurance Law, the verification of treatment form submitted by healthcare providers to State Farm Mutual, State Farm Fire, and all other insurers must be signed by the healthcare providers subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

49.     Under New York law, it is unlawful for a licensed physician, chiropractor, acupuncturist, or physical therapist to exercise undue influence on a patient, including the promotion or the sale of goods or services in such a manner as to exploit the patient for the financial gain of the physician or of a third party.  *See* N.Y. Education Law § 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

50.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), states in relevant part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

51.     Thus, any violation of a licensing law in connection with services provided to patients would render the provider ineligible for reimbursement under the No-Fault Laws, and

under the circumstances, it would be unlawful and inequitable to allow any party to any arrangement that violated such licensing laws to retain any benefit from such arrangement.  See 11 N.Y.C.R.R. § 65-3.16(a)(12).

52.     If any defendant violated any of the licensing laws described above in connection with the services at issue in the claim described herein, then such defendant would be ineligible for reimbursement under the No-Fault Laws, and under the circumstances, it would be unlawful and inequitable to allow such defendant or any defendant who was a party to such arrangement to retain any benefits from such arrangement.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

53.     Also, New York Law allows an insurer to request that a provider appear for an examination under oath ("EUO"), and the failure of a provider to appear for a timely requested EUO constitutes a breach of a condition precedent to coverage, rendering it ineligible for No-Fault Benefits.  *See* 11 N.Y.C.R.R. § 65-1.1 (providing that the Mandatory Personal Injury Protection Endorsement shall contain the following language:  "upon request by the [insurer] the eligible injured person or that person's assignee … shall: … (b) as may reasonably be required, submit to an examination under oath"); *Hertz Corp. v. Active Care Med. Supply Corp.*, 124 A.D.3d 411; 1 N.Y.S.3d 43, 45 (App. Div. 1st Dep't 2015) ("defendants' failure to attend the EUOs is a violation of a condition precedent to coverage that vitiates the policy").

**B.      Many of the Automobile Accidents Which Led to Treatment at 1786 Flatbush Appear to Have Been Deliberately Staged or Caused**

54.     In addition to the fraudulent patterns in diagnoses, treatment, and documentation present at 1786 Flatbush, many of the automobile accidents that preceded the treatment at 1786 Flatbush bear indicia of being deliberately staged collisions designed to support claims for No-Fault Benefits.  These indicia include: (a) accidents occurring shortly after insurance coverage was obtained, often within two weeks after coverage was obtained; (b) accidents involving older

15

vehicles with minimal value; (c) multiple injured parties involved in the accident who sought treatment at 1786 Flatbush; (d) multiple injured parties seeking treatment at 1786 Flatbush shortly following the accident; (e) little to no physical damage to the insured vehicles; (f) no emergency room or hospital treatment sought immediately following the accident; and (g) other improbable connections between seemingly unrelated individuals and accidents, including accidents occurring at the same locations and individuals in different accidents purporting to reside at the same addresses.

55.     The vast majority of State Farm Mutual and State Farm Fire insureds who treated at 1786 Flatbush were involved in collisions in which at least three different individuals involved all sought care at 1786 Flatbush.  In virtually every instance, the individuals involved in these accidents began treatment at 1786 Flatbush on the same day, usually the very next day after the accident.  Indeed, more than half of the State Farm Mutual or State Farm Fire insured accidents that led to claims identified on Exhibit 1 involved four or more individuals, all of whom treated at 1786 Flatbush.

56.     The accidents reflect other improbable patterns.  For example, 12 different individuals insured by State Farm Mutual or State Farm Fire each sought treatment at 1786 Flatbush following three separate accidents which occurred at the same exact intersection in Brooklyn on different dates but at the same time of day.  In each case, the passengers in each of the three State Farm Mutual or State Farm Fire-insured vehicles were also represented by the same law firm, the Rybak Law Firm, PLLC.  On February 26, 2014 at 11:00 p.m., a 1996 Mitsubishi Galant insured by State Farm Fire purportedly struck a 2000 Honda Civic at the intersection of Newkirk Avenue and Westminster Road in Brooklyn after running through a stop sign.  Three occupants of the Mitsubishi sought treatment at 1786 Flatbush the following day.

The State Farm Fire insurance policy for the Mitsubishi had been purchased 9 days earlier on February 26, 2014. Motor vehicle records show the Mitsubishi was registered to a different individual than the named insured on the policy. Two weeks later, on March 9, 2014 at 11 p.m., a 1997 Mercury Sable insured by State Farm Fire purportedly ran through a stop sign at the same intersection of Newkirk and Westminster. All five occupants of the Mercury sought treatment at 1786 Flatbush the following day. The State Farm Fire policy for the Mercury was purchased 13 days earlier on February 24, 2014, again listing a different named insured than the registered owner of the vehicle. On June 2, 2014 at 11 p.m., a 1993 Honda Accord insured by State Farm Fire ran through a stop sign at the same intersection, with all four occupants seeking treatment at 1786 Flatbush the following day. The policy for the Honda Accord was purchased on May 27, 2014 (six days before the accident) and listed a named insured who was not the registered owner of the vehicle.

57.     In addition to common locations of accidents across different claims, many of the individuals involved in different accidents are connected. Such connections include common residential addresses. For example, insured passenger T.W. listed his address as an apartment in a building on 94th Street in Brooklyn in his claim arising out of the February 26, 2014 accident discussed above. Insured passenger T.N. listed an address in the same 94th Street apartment building in Brooklyn as T.W. (just a different apartment number) on her claim for a July 21, 2015 accident. Both individuals were represented by the Rybak Law Firm in connection with their claims. The frequency with which this commonality occurs in 1786 Flatbush patients is not credible. For example, insured passenger A.D. listed an address on 94th Street in Brooklyn after his June 2, 2014 accident, which is the exact same address used by insured passenger R.W.F. in his claim arising out of his February 4, 2014 accident. Both A.D. and R.W.F. were represented

by the Rybak Law Firm.  Passenger M.W., who sought care at 1786 Flatbush on the day after her December 1, 2013 accident, listed her address as an apartment in a building on Kings Highway, Brooklyn, which appears to be down the hall from the Kings Highway apartment address used by insured passenger I.N. following his January 6, 2014 accident for which he sought treatment at 1786 Flatbush on the following day.

58.    In addition to common residential addresses, similarities in email addresses used by State Farm Mutual or State Farm Fire insureds who treated at 1786 Flatbush also reveal connections between seemingly unconnected individuals.  For example, two individuals who treated at 1786 Flatbush following separate accidents that occurred one week apart both used the identical email address in submitting their claims to State Farm Fire, while another individual who treated at 1786 Flatbush provided a closely similar address in a claim arising out of a separate accident.  Three other individuals, with no apparent relationship to each other, all of whom resided at different physical addresses, each submitted separate claims using an identical email address in connection with two separate accidents which occurred two weeks apart in April 2016.  Both accidents involved insured vehicles more than 15 years old at the time of the accident.

59.    As noted above, many of the individuals involved in automobile accidents which appear to have been staged were represented by the Rybak Law Firm, PLLC.  Indeed, more than half of the State Farm Mutual or State Farm Fire insureds who treated at 1786 Flatbush following their accident and who were represented by an attorney were represented by the Rybak Law Firm.  The Rybak Firm has also represented many of the Defendants directly in lawsuits against State Farm Mutual and State Farm Fire.

**C.      The Defendants Create Entities to Conceal the Scheme's Existence**

60.      Over the course of the scheme, the Defendants created new business entities with separate tax identification numbers to submit bills to State Farm Mutual and State Farm Fire for services at 1786 Flatbush.  Defendants do so because they know that payers such as State Farm Mutual and State Farm Fire process claims from healthcare providers using names and tax identification numbers to identify billing activity, and by submitting multiple claims utilizing different entity names and tax identification numbers, Defendants are able to conceal that they are, in fact, claims from the same individuals for the same fraudulent services.

61.      From August 2013 until June 2015, the Physician Defendants submitted bills to State Farm Mutual and State Farm Fire under the individual tax identification numbers, and on occasion social security numbers, of sole proprietorships of Parisien, Blackman, Dabiri, Pavlova and Lacina.  Beginning in June 2015, however, the Physician Defendants began submitting claims for the same services to State Farm Mutual and State Farm Fire under a variety of entities. For example, Parisien's services were billed (a) under his own taxpayer identification number beginning in August 2013, (b) by Allay from June 2015 through October 2016, (c) by PFJ Medical from May 2015 through September 2016, and (d) by JPF Medical from September 2016 through October 2016.  Lacina's services were billed under (a) his taxpayer identification number beginning in January 2014, (b) by RA Medical from January 2015 through June 2016, (c) FJL Medical from June 2016 through October 2016; and (d) by JFL Medical from October 2016 through January 2017.

62.      Other facts suggest that the Defendants' use of multiple entities was part of a coordinated scheme.  For example, although JPF Medical is purportedly owned by Parisien and JFL Medical owned by Lacina, both entities were formed on the same day.  Many of the entities' formation documents were filed with New York Department of State by the same attorney,

Alexander Almonte, Esq., who filed the incorporation documents for FJL Medical, JFL Medical, KP Medical, PFJ Medical, RA Medical, MSB, Quality Health, and AB Quality.  Despite the use of this web of entities, the form documentation used by virtually all of the Physician Defendants, Chiropractor Defendants, and the DME Defendants remained the same, except for the provider's name on the letterhead, and the treatment provided by the entities was virtually identical.

**D.    The Legitimate Treatment of Patients with Strains and Sprains**

63.    Defendants purport to examine, diagnose, and treat patients who have been in motor vehicle accidents, and complain of neck and back pain.

64.    For patients who have been in motor vehicle accidents and have complaints of neck and back pain, a detailed patient history and a legitimate examination must be performed to arrive at a legitimate diagnosis.

65.    Based upon a legitimate diagnosis, a licensed professional must engage in medical decision making to design a legitimate treatment plan that is tailored to the unique circumstances of each patient.  During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

66.    Legitimate treatment plans for patients with strains and sprains may involve no treatment at all because many of these kinds of injuries heal without any intervention, or a variety of interventions including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

67.    Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities including hot and cold packs, ultrasound, diathermy, traction, manual therapy, massage, and traction.  Active modalities require patients to affirmatively participate in their treatment, and include many different kinds of stretching, exercising, and strengthening therapies.

20

68.    In legitimate treatment plans, active modalities are necessary to rehabilitate and heal soft tissue injuries, while passive modalities are typically used only to the extent necessary to reduce pain and to facilitate the patient's ability to perform active modalities, which should be introduced into a patient's treatment plan as soon as practicable.

69.    While one or more passive modalities may be appropriate on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the same combination of passive modalities on nearly every visit regardless of whether the patient improved would rarely be appropriate for one patient, let alone almost every patient, on almost every visit.

70.    The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary depending on the unique circumstances of each patient, including:  (a) the patient's age, social, family, and medical history; (b) the patients physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

71.    Treatment plans should be periodically reassessed and modified based upon the progress of the patient, or the lack thereof.

72.    Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the patient.

73.    The above-described process of examination, diagnosis, and treatment must be documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care and condition necessarily depends on the documentation

of this information; and (d) payers such as State Farm so that they can pay for reasonable and necessary treatment.

### E.   Defendants' Predetermined Treatment Protocol

74.   The Predetermined Treatment Protocol at 1786 Flatbush exploits patients' No-Fault Benefits, and does not legitimately treat patients according to their true needs.  As detailed below, the Predetermined Treatment Protocol includes medically unnecessary and fraudulent: (1) examinations, diagnoses, and treatment plans by the Physician Defendants; (2) physical therapy treatment; (3) chiropractic examinations, diagnoses, and treatment; (4) acupuncture examinations and treatment; (4) diagnostic Tests (including ROM Tests, Muscle Tests, NCVs, EMGs, SSEPs, BEPs, functional capacity evaluations, and V-sNCT testing); (5) injections (including trigger point injections and dry needling); and (6) Supplies (including DME and orthotics).

75.   This medically unnecessary treatment typically continues for months on end. Almost none of the patients at 1786 Flatbush are discharged from care based on their purported clinical conditions.   To the extent the medical records of patients at 1786 Flatbush contain references to discharges, they routinely show (a) the patient made the decision to stop treating; (b) the patient continued to undergo treatment after the date of the purported discharge; or (c) the discharge came shortly after State Farm Mutual or State Farm Fire requested one of the defendant providers appear for an EUO and submit to questioning about the patients' treatment. For example, State Farm Mutual requested that Mollo appear on July 15, 2014 for an EUO to answer questions about the treatment of patient G.P.  Mollo failed to appear as requested and on the very next day, Parisien noted in patient G.P.'s chart, "Patient has completed all services from the office.  He feels better.  He wants to be discharged."  Similarly, State Farm Fire requested that Mollo appear for an EUO on August 5, 2014 relating to patient P.O., for which Mollo failed

to appear.  That same day, Parisien noted in the chart, "Patient stated he feels well but wants to stop.  He has completed all services from the office."

76.    The applicable fee schedule governing No-Fault claims imposes limits on the amount of physical therapy and chiropractic treatment that can be provided to a patient on any single date of service.   Under that schedule, certain medical services are assigned "relative values," and a provider cannot bill for more than 8 "relative units" of identified physical therapy modalities and chiropractic manipulations for an individual patient on a single date of service. To exploit patients' No-Fault Benefits to the greatest extent possible, while seeking to avoid the limitations imposed by the fee schedule, Defendants:  (a) routinely provided particular physical therapy modalities not because they were beneficial to the patients, but because that combination of modalities allowed each provider to bill for close to 8 relative units per day thereby maximizing the amount that could be collected; (b) purported to provide those same modalities to nearly every patient on nearly every date of service regardless of the particular needs of any patient; and (c) added services regardless of whether they were necessary that were not subject to the unit limitation.  Moreover, patients were often subjected on the same day to physical therapy services and to chiropractic manipulations and although all such treatment should have been limited to a total of 8 units per day, Defendants billed the physical therapy and chiropractic care separately to maximize the amount that could be billed while hiding the fact that excessive treatment in excess of 8 units per day was provided.  Additionally, since acupuncture services, including "cupping" are not included in the applicable 8-unit daily limit, Defendants routinely added both acupuncture services and cupping to the Predetermined Treatment Protocol as yet another means to increase their bills without running afoul of the fee schedule's restrictions.

77.    Another aspect of the Predetermined Treatment Protocol is Defendants' circumvention of the otherwise applicable fee schedule by avoiding the use of certain CPT billing codes which provide for a fixed reimbursement.  Instead Defendants, on occasion, use "By-Report" or "BR" codes, which do not provide for fixed levels of reimbursement and are not subject to the 8-unit-per-day limitation described above.    According to the New York Department of Financial Services, which promulgated the applicable fee schedule, BR codes are meant to reflect services that are relatively unique in nature and do not have a specific unit value indicated within the fee schedule.  Fees for such services are set by the provider and must be justified by the submission of a written report.  Defendants do not use the "BR" code legitimately to document a necessary unique procedure, but rather to circumvent the fee schedule and inflate charges.  For example, on dates of service when they purportedly provided trigger point injections, which are listed on the fee schedule, the Physician Defendants also frequently bill State Farm Mutual and State Farm Fire for multiple instances of "dry needling" using the "BR" CPT code 20999 ("unlisted procedure, musculoskeletal system, general") for many of the same patients.  Although 20999 is a BR code, Defendants provide no explanation why these services are unique or necessary in addition to or in lieu of the trigger point injections, even when the needling was provided to the same areas of the body on the same day.

### 1.    Physician Examinations, Diagnoses, and Treatment Plans

78.    As part of the Predetermined Treatment Protocol, patients received initial evaluations from one of the Physician Defendants.  Initial examinations were performed at 1786 Flatbush by Parisien from approximately September 2013 through at least June 2015, by Blackman from approximately June 2014 through at least July 2016, by Dabiri from approximately January 2014 through at least May 2014, by Pavlova from approximately September 2013 through at least October 2016, and by Lacina from approximately January 2014

through at least March 2016. The Physician Defendants' initial examinations were billed to State Farm Mutual and State Farm Fire under the tax identification numbers and/or social security numbers of Parisien, Blackman, Dabiri, Pavlova, and Lacina, and under the tax identification numbers of Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, and RA Medical.

79.    Each of the Physician Defendants almost always diagnoses patients with sprains and strains in the cervical and lumbar regions of the back as well as other conditions. Based on these predetermined diagnoses, the Physician Defendants usually conclude that patients require the Predetermined Treatment Protocol – a treatment plan that includes physical therapy, consultations with a chiropractor and an acupuncturist, a variety of diagnostic Tests, Supplies, and in some instances, injections.

80.    The documentation of initial examinations, diagnoses, and treatment plans by Parisien, Blackman, Dabiri, Pavlova, and Lacina is not credible and is fraudulent. Each of the Physician Defendants at 1786 Flatbush consistently use nearly identical examination forms (the "Initial Evaluation Report"), which differ only in the name of the particular Physician Defendant listed on the top of the first page. Indeed, the Initial Evaluation Reports contain the same typographical errors and misspellings regardless of the Physician Defendant whose name appears.

81.    Not only do the Physician Defendants use nearly identical forms to document initial examinations; they also employ those forms in a way that makes it difficult to impossible for Defendants, other providers, or payers like State Farm Mutual and State Farm Fire to assess the true nature of patient complaints, examination findings, and diagnoses, or to know if examinations are being performed at all. The forms contain prepopulated typed findings, pre-

typed narrative discussions, and spaces for handwritten comments or notations.  On some forms, the Physician Defendants underline or circle preprinted items, apparently representing specific findings.  On other forms, none of the preprinted findings is underlined or circled.  On yet other forms, some sections contain underlining or circling of preprinted items and some sections are without any markings.  On some occasions, markings are inconsistent with other findings.  For example, Parisien checked the box for "normal" with respect to a patient's cervical spine examination, and then underlined certain positive examination findings that would indicate cervical pathology.  Given this variability, it is almost impossible to discern the meaning of markings or their absence or to interpret the findings being made, the examinations performed, or the conclusions reached.

82.    Further, the Initial Evaluation Reports contain the following, or nearly identical, affirmative representation regarding specific positive findings from various tests performed during the patient examination:

> Tender points were also elicited at C3, C4, C5, C6, C7 levels.  The soto hall (force flexion of the head and neck upon the sternum) elicited pain.  Cervical distraction test was positive indicating the presence of a spinal nerve root compression.  Manual testing of muscle strength was also positive.  Pinprick and touch was abnormally decreased over the right left arm.  The patient had difficulties looking up to the ceiling because of spasm and stiffness of the cervical musculature.

Ex. 10.  While in some instances, various portions of this paragraph may be underlined, this preprinted language is rarely, if ever, crossed out entirely, suggesting these findings were present in every patient.  The forms themselves and Defendants' use of them advance the scheme because they prevent others from assessing the true nature of patient complaints, examination findings, and diagnoses, while allowing Defendants to claim patients suffer from a wide variety of conditions to justify treatment.

83.     Despite the inconsistencies and ambiguity in the Initial Evaluation Reports, certain patterns emerge when they are viewed as a group.  While the Initial Evaluation Reports reflect some variation in certain objective findings, some tests performed during evaluations, and responses to those tests, the Initial Evaluation Reports routinely include certain findings and diagnoses common to most of the reports, which are then used to support nearly identical treatment plans for almost every patient.  Specifically, the Initial Evaluation Reports find:  (a) most patients complain of neck pain; (b) most patients complain of low back pain; (c) most patients report significant frequency of pain in the affected area with the vast majority of patients purportedly suffering pain on a daily basis; and (d) most of the range of motion measurements are reported as abnormal.  *See* Ex. 2.

84.     Based on these common findings, and in apparent disregard of such variation as is noted in some forms, the Initial Evaluation Reports purport to diagnose nearly every patient with cervical sprain, strain cervicalgia, or myofascitis and/or lumbar sprain, strain, or myofacsitis and sometimes conditions in one or more other regions.  *See* Ex. 2.

85.     Also purportedly based on these common findings and diagnoses, the Physician Defendants' initial treatment plan generally recommends to: (a) commence physical therapy; (b) order x-rays of multiple regions of the spine; (c) order MRIs of the cervical and lumbar spines; and often other extremities, (d) prescribe a common laundry list of Supplies; and (e) sometimes send patients for other consultations, services, and testing including neurological consultations. *See* Ex. 10. (Example Initial Evaluation Report).  While the forms provide an option for the Physician Defendants to order "Synaptic therapy" and "computerized ROM/M MT" (range of motion/muscle testing), these entries are almost never checked, yet patients are routinely provided with these services.  *See* Ex. 2.

86.    The Physician Defendants and the Chiropractor Defendants at 1786 Flatbush also routinely order medically unnecessary MRI exams and refer patients to a handful of MRI providers, including Avalon Radiology, P.C., in Brooklyn, Doshi Diagnostic, and New York Radiology and Middle Village Diagnostic, in Elmhurst, New York, the results of which are not discussed with the patients and do not impact the diagnoses or course of treatment.  Additionally, the Physician Defendants and Chiropractor Defendants routinely refer patients for medically unnecessary x-ray imaging which is performed in a van parked outside of 1786 Flatbush, the charges for which are billed to State Farm Mutual and State Farm Fire by Prompt Medical Services, Inc.

87.    Approximately four weeks after their initial examination, patients purportedly undergo follow-up examinations, which may be performed by the same or a different Physician Defendant.  Regardless of who performs the follow-up examination, like the initial examinations, these follow-up examinations involve, at most, cursory examinations of patients – the purpose of which appears to be to support the continuation of the Predetermined Treatment Protocol – and are documented using the same, preprinted forms as the initial examinations (the "Follow-Up Reports").  *See* Ex. 11.  While some of the Follow-Up Reports purport to comment on x-ray or MRI results, there is no reported indication of a change in treatment based on these studies or that findings are communicated to other providers involved in the treatment.

88.    The Follow-Up Reports indicate some patients' conditions have improved and some are the same, but regardless of their clinical status at the time of the follow-up examination, the reports order the continuation of physical therapy and additional services, including additional diagnostic testing such as x-rays and MRIs, additional Supplies, and for many patients, neurological consultations, pain management, or injections.  In many instances, the

Physician Defendants also perform trigger point injections and/or dry needling procedures during their follow-up examinations. *See infra* Part IV.E.6.

### 2.    Physical Therapy Treatment

89.    Physical therapy is ordered as part of the Physician Defendants' initial treatment plan. It is then performed by Mariano and other physical therapists, and billed to State Farm Mutual and State Farm Fire by MSB, the Physician Defendants and others. The physical therapy treatments which patients purportedly receive at 1786 Flatbush are almost identical, do not change regardless of whether the patients purportedly improve or get worse, and typically involve at least three and very often five passive modalities on every visit from the first to last date of service. When therapeutic exercise is billed, the particular exercises purportedly performed are not identified much less documented and, in at least some instances, were not actually performed.

90.    In some instances, patients have testified they received physical therapy even before being examined by one of the Physician Defendants. As physical therapy services are not compensable under New York's No-Fault laws unless they are pursuant to a doctor's prescription or referral, *see* N.Y. Ins. Law § 5102(a)(1)(ii), such treatment was not lawfully rendered and was not reimbursable.

91.    Physical therapy treatment at 1786 Flatbush typically begins with patients purportedly being examined by a physical therapist, in many instances on the same day as the initial examination purportedly performed by one of the Physician Defendants. To support their treatment, Mariano or some other physical therapist working for one of the Physical Therapy Defendants creates reports of these purported examinations that include treatment plans ("PT Examination Reports"). Portions of many of these reports are illegible, rendering it difficult if not impossible for Defendants, other providers, patients, or payers like State Farm Mutual and

State Farm Fire to know the nature of the treatment recommended or the patients' condition. To the extent the PT Examination Reports are legible, they routinely record patients as suffering neck and/or back pain, report high pain levels, often 9 on a scale of 1 to 10, and state patients have a favorable "[r]ehabilitation potential for functional improvement" and would benefit from and/or are good candidates for physical therapy. The reports then routinely conclude patients should begin a course of physical therapy three times per week, usually for four weeks, involving specifically: (a) application of moist heat packs; (b) therapeutic massage; (c) therapeutic exercise; (d) synaptic therapy; and (e) home exercise. The reports do not detail the type of exercise contemplated or its duration.

92.    Thereafter, as set forth on Exhibit 3, nearly every patient at 1786 Flatbush is subjected to the same physical therapy services purportedly performed on nearly every visit: application of hot packs, therapeutic massage, exercise, bioelectric therapy, and, although it is not mentioned or prescribed in the PT Examination Reports, a treatment called low level laser therapy. Physical therapy treatment is purportedly documented in daily notes, which consist of preprinted forms with check boxes, and which lack any description of treatment such as the location of the body where hot packs were applied or massages provided. Defendants provide the foregoing modalities (if provided at all) pursuant to the Predetermined Treatment Protocol, which maximizes the charges they can collect from State Farm Mutual and State Farm Fire. Indeed, while any one of these treatments may conceivably be medically necessary for a particular patient on a particular day, the comprehensive combination of treatments is seldom, if ever, medically necessary for any patient on any day, let alone on almost every visit.

93.    Defendants also purport to provide and bill for providing therapeutic exercise to patients on nearly every visit. But the records rarely indicate what exercises are provided, how

long the exercises are performed, or how the patients responded. Moreover, some patients have testified they never underwent any exercise at 1786 Flatbush even though State Farm Mutual and State Farm Fire received numerous bills for exercise and reimbursed Defendants for such services.

94.     Among the passive modalities purportedly provided at 1786 Flatbush and billed to State Farm Mutual and State Farm Fire is bioelectric therapy. *See* Ex. 3. Bioelectric therapy is simply another form of electrical stimulation in which the patient is typically given some control of the intensity. Defendants do not bill for bioelectric therapy using CPT Code 97014, the physical therapy code for electric stimulation. Rather, Defendants misrepresent the service they purport to provide using the CPT Code 64550, a code commonly used for the initial application and instruction of a TENS (Transcutaneous Electrical Nerve Stimulator) unit. While electrical stimulation correctly billed under CPT Code 97014 would be included in the 8-unit per day limitations on physical therapy under the New York No-Fault regulations, *see supra* ¶ 76, the CPT Code 64550 Defendants use for bioelectric therapy charges is *not* included in the 8-unit limit. Thus, by billing for bioelectrical therapy under CPT Code 64550, Defendants avoid the limitations on physical therapy contained in the fee schedule and thereby fraudulently induce State Farm Mutual and State Farm Fire to pay for excessive and unnecessary passive physical therapy modalities for which it would not have otherwise paid.

95.     The Physician Defendants also routinely bill State Farm Mutual and State Farm Fire for another passive modality called "low level laser therapy" using CPT Code 97799, the code for an unlisted physical therapy procedure, which is also excluded from the otherwise applicable 8-unit daily limitations on physical therapy modalities.

96.     Further, in some instances, patients for whom Defendants have submitted bills for bioelectric therapy and low level laser therapy to State Farm Mutual or State Farm Fire have testified they did not receive such treatment.

97.     Moreover, although Defendants administer bioelectric therapy and low level laser on the same day as other passive modalities, Defendants submit separate bills and supporting documentation on separate days for such treatment.  Such documentation consists of preprinted forms with numbers that can be circled to indicate a patient's purported pain levels before and after the procedures.  Defendants' treatment forms routinely report patients experienced slight improvement following the procedures, for example pain reduced from a score of 7 to a score of 6.

98.     Defendants' submission of separate bills and supporting documentation for bioelectric therapy and low level laser therapy conceals the full extent of passive modalities provided on any single day and, in an apparent attempt by Defendants to limit the total number of services included in any one submission for any single date of service to avoid detection of their scheme.

**3.    Chiropractic Initial Exams, Diagnoses, and Treatment**

99.     Most patients treated at 1786 Flatbush were subjected to chiropractic examinations and treatment by Mollo or a chiropractor working for Mollo P.C., ACH Chiropractic, Energy Chiropractic or Island Life (collectively, the "Mollo Entities").  Patients purportedly underwent initial examinations that led to reports of nearly identical conditions, included findings that were internally inconsistent or inconsistent with findings purportedly made by the Physician Defendants on the same day or within a few days of the chiropractic initial examination, made no sense, or were highly improbable and, regardless of the purported findings, resulted in common diagnoses and recommendations.  Following these examinations,

patients were subjected to chiropractic manipulations that did not vary in time, frequency, or type regardless of whether the patient got better or worse.

### a.    Fraudulent Chiropractic Initial Exams and Diagnoses

100.    Chiropractic treatment at 1786 Flatbush begins with initial examinations performed by Mollo or another chiropractor working on behalf of one of the Mollo Entities.  The chiropractic examinations are often conducted on the same day or within days of examinations purportedly performed by one of the Physician Defendants.   The initial chiropractic examinations routinely report patient complaints of cervical, mid back, or low back pain and diagnose the patient with a common set of conditions.  Based on these predetermined diagnoses, the chiropractors conclude that patients require a treatment plan typically consisting of chiropractic adjustments three to four times per week often for four to six weeks, followed by a re-examination, and often referrals for an MRI or an x-ray and to undergo a v-sNCT test.

101.    The documentation of the initial examinations, diagnoses, and treatment plans by the chiropractors submitted to State Farm Mutual and State Farm Fire include Chiropractic Initial Evaluation Reports ("Chiropractic Initial Reports").   The Chiropractic Initial Reports are preprinted, form documents that contain fields to be circled, and fill-in-the-blank spaces allowing for minimal entries.  The narratives on the Chiropractic Initial Reports are preprinted with places to circle, such as the patients' gender, whether the accident was due to a motor vehicle accident or work-related, the patients' position in the automobile, and the patients' complaints.

102.    In most instances, these Chiropractic Initial Reports, reflect: (a) complaints of pain in the cervical, thoracic, and lumber spine; (b) pain levels that are often either not recorded or when they are recorded are reported as 7 or higher on a scale of 1 to 10; (c) positive findings on at least one of a variety of orthopedic tests; and (d) tenderness of the paraspinal muscles at the cervical, thoracic, and lumbar regions of the spine.  *See* Ex. 4 (Chiro Appendix).

103.     Based upon these purported histories, examinations, and findings, the Chiropractic Initial Reports record diagnoses of multiple spinal conditions, including sprains in the cervical, thoracic, and/or lumbar regions of the spine, muscle spasms, and segmented joint dysfunction in the cervical, thoracic, and/or lumbar regions of the spine and the hip.  These findings that patients purportedly suffer from conditions in so many regions serve to justify more extensive manipulations for which Defendants can submit a higher charge under the applicable fee schedule.  The chiropractors typically report patients' prognosis as "guarded."  *See* Ex. 4 (Chiro Appendix).

104.     The Chiropractic Initial Reports also contain a preprinted treatment plan with 17 treatment "options" that can be checked as well as room to identify "Other" options.  "Other" options are rarely, if ever, identified.  Rather, Mollo and the other chiropractors routinely select the same treatment options:  (1) chiropractic manipulative therapy for 3x/week, often for 4-6 weeks, followed by a re-examination; and (2) v-sNCTs, which they describe as "small pain fiber studies of the cervical/lumbar spine to evaluate pathology to the A-delta, A-Beta, and C sensory nerve fibers."  The treatment plan also typically includes referrals for x-rays and/or MRIs of the cervical, thoracic, and/or lumbar spine "to R/O [rule out] discogenic injury if symptoms persist for 3-4 weeks."  *See* Ex. 4.  The chiropractic treatment plan rarely includes active therapy or exercise.  *Id.*

105.     When viewed as a group, the Chiropractic Defendants' referrals of patients for x-rays and MRIs also reveal other non-credible patterns.  From August 2013 until July 2014, the initial examination forms reflect a referral for MRIs and/or x-rays.  Beginning in July 2014 until September 2015, however, the Chiropractor Defendants' initial examination reports rarely, if ever, reflect referrals of patients for x-rays or MRIs, even though at least some of the patients

received initial examinations during this period. The Chiropractor Defendants resumed recommending x-rays and/or MRIs in November 2015 for virtually every patient. It makes no sense that (a) nearly every patient would receive a referral for x-rays and/or MRIs over the course of one-year period; (b) then no patients receive any referrals for x-rays or MRIs for a 14-month period; and (c) then nearly every patient again receives referrals for x-rays and MRIs following their initial examination. In May, 2016, ACH Chiropractic itself began billing for x-rays performed on patients at 1786 Flatbush.

### b.    Fraudulent Chiropractic Treatments

106.    Following the initial chiropractic exams, patients are scheduled to receive chiropractic manipulations at 1786 Flatbush three to four times per week. The predetermined chiropractic treatment patients purportedly receive on almost every visit is almost identical, and does not change regardless of whether the patient improves or gets worse.

107.    Daily chiropractic progress or SOAP notes ("Chiropractic Daily Notes") purport to reflect chiropractic manipulations provided to each patient on each visit and the assessments of the patients' conditions; but, at most, they reflect cursory evaluations of patients to support the continuation of the Predetermined Treatment Protocol. The Chiropractic Daily Notes consist of pre-typed worksheets with spaces to circle findings. The forms routinely report patients' complaints of "NP" (neck pain), "MBP" (mid-back pain); and "LBP" (low-back pain) and that the patients present with purported objective findings of "hypertonic" or "spasm" in the spine and/or joint dysfunction in multiple regions of the spine. *See* Ex. 13. The Chiropractic Daily Notes often reflect "No Change" to the patient's condition, and that the chiropractic treatment should "Continue as planned." *Id.* While the form includes a space to allow the chiropractor to "Modify" the treatment plan, modifications are rarely indicated.

108.    Regardless of the outcome of the purported assessment, the Chiropractic Daily Notes reflect that each patient typically receives basically the same treatment: chiropractic manipulations of the spine, most frequently for 3 to 4 regions of the spine.  *See* Summary Appendix, Ex. 1.  Following these manipulations, the Chiropractic Daily Notes routinely reflect that the "patient[s] felt . . . [b]etter."

109.    In addition, while a variety of potential chiropractic manipulation options and techniques are potentially available in a legitimate setting, the documentation at 1786 Flatbush does not describe the kind of chiropractic manipulations purportedly provided, and thus does not indicate that there is any variation in the time, frequency or type of chiropractic manipulations regardless of whether the patients improve or get worse.  Further, although it is a common practice in a legitimate health care setting to document the name of the professional providing the service on any given day, the Chiropractic Daily Notes contain only illegible scrawled signatures, making it difficult if not impossible to identity the chiropractor or other individual who purportedly provided the manipulation.

110.    The chiropractors do not conduct meaningful follow-up examinations, if they conduct them at all.  In those instances in which they purport to conduct follow-up examinations, the examinations involve, at most, cursory exams of patients to support continuation of the predetermined chiropractic treatment.  In particular, reports of follow-up examinations, which consist of single-page sheets with preprinted content, routinely indicate that, despite having undergone a course of purported chiropractic care, patients continue to complain of cervical and/or lower back pain.  Even when patients purportedly have no range of motion deficits upon re-examination, the re-examination report recommends continuation of the same treatment plan

and the patient thereafter continues the Predetermined Treatment Protocol, often including several more weeks of chiropractic manipulations. *See* Ex. 14 (example re-evaluation).

111.    Although patients receive evaluations and chiropractic manipulations from the chiropractors on the same visits to 1786 Flatbush when they purportedly also receive hot packs, electrical stimulation, massage, exercise, and acupuncture, the documentation provided to State Farm Mutual and State Farm Fire contains no indication of any communication between or among any of the professionals rendering services that would suggest any attempt to coordinate their treatment.

### 4.    Defendants' Fraudulent Acupuncture Treatment

112.    Defendants Deng and Deng Acupuncture also purport to perform acupuncture treatment on most State Farm Mutual and State Farm Fire insureds treated at 1786 Flatbush on the same days the patients also receive the above-described physical therapy and chiropractic manipulations.  As discussed below, this acupuncture treatment is medically unnecessary and not legitimately provided.

### a.    Legitimate Acupuncture Treatment

113.    Acupuncture services are premised upon the theory that there are twelve primary meridians with matching sinew channels and ten extraordinary meridians ("the Meridians") in the human body through which energy flows.  Under the principles of acupuncture or Chinese medicine, every individual has a unique energy flow, also referred to as "Chi."  When that Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and thereby restore the patient's Chi.

114.    In addition to inserting needles into Acupuncture Points, in appropriate circumstances acupuncture can include a procedure known as "cupping."  Cupping involves the

37

application of suction to the skin using a small, open mouth plastic vacuum jar or "cup" or a pneumatic device to create a vacuum over the skin. Cupping is premised on the theory that suction at appropriate locations removes pain-inducing stagnant blood by bringing it to the surface. During cupping, the cup is usually applied to the lower back, shoulders and neck, and then left on the skin for about 10 minutes. While cupping may be appropriate for some patients in some circumstances, in a legitimate acupuncture setting it is performed infrequently as it usually produces noticeably visible bruises or welts on the skin. Also, due to the high likelihood of bruising, cupping is generally contraindicated for people who bruise easily or are obese. Moreover, even when cupping is indicated, it should not be repeated on the same patient regularly and it would be highly unusual to include cupping as part of each acupuncture session.

115.    Legitimate acupuncture treatment begins with an examination of the patient. In addition to taking a detailed patient history on a variety of topics, such as the patient's reactions to heat and cold, perspiration patterns, thirst and appetite, pain type and location, and general medical history, a physical examination is also performed. Two critical components of this examination are the appearance of the patient's tongue (i.e., color, shape, texture, etc.) including the veins underneath the tongue, and various measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.). The information gleaned from these components of the physical examination is necessary to accurately diagnose the patient and determine an individualized acupuncture treatment plan designed to benefit the patient by restoring their unique Chi.

116.    Next, a specific acupuncture treatment plan is developed. This generally requires the insertion of needles into particular Acupuncture Points along the Meridians. There are over 360 Meridian Acupuncture Points, numerous "extra" points and countless "Ah Shi" points from which an acupuncturist may choose. Ah Shi points can only be detected by touch and palpation,

often feel like a pea-size nodule under the skin, and are treated similarly to an acupuncture point. The location of Ah Shi points will necessarily vary from patient to patient, and can often vary in a single patient over the course of multiple visits. This requires the practitioner to conduct a thorough examination and to properly document the location of the Ah Shi points in the particular patient. Any legitimate acupuncture treatment plan should typically include local points at the injury sites, proximal points (i.e., near the affected areas of the involved Meridian(s)), distal Acupuncture Points (i.e., distant from the affected areas of the involved Meridian(s)), and also address any Ah Shi points.

117. Finally, an acupuncture treatment plan is implemented. Treatment involves insertion of generally 10, but more typically 20 or more acupuncture needles, for a minimum of approximately twenty minutes into each of the selected Acupuncture Points. The number and location of the Acupuncture Points generally varies based each patient's unique circumstances as the patient's documented therapeutic response to each prior acupuncture treatment. Generally, more severe conditions are treated with greater frequency and more acupuncture points. As patients improve, treatment frequency and the number of points used should decrease.

118. The goal of legitimate acupuncture treatment is to effectively treat and benefit patients by restoring their unique Chi, relieve symptoms, and return them to normal activity.

119. Further, a legitimate acupuncture treatment plan may permit frequent treatment sessions for the first two weeks of treatment. After this initial stage, the frequency of weekly treatment sessions typically decreases, leaving more time between treatments to assess how long the patient remains pain free and/or how long the therapeutic effect of such treatments can be maintained.

120.    Legitimate acupuncture treatment also requires meaningful documentation of the: (a) patient's history; (b) physical examination; (c) diagnosis; (d) treatment plan; (e) results of each session; and (f) the patient's progress throughout the course of treatment.

121.    Finally, legitimate acupuncture therapy requires continuous assessment of the patient's condition and energy flow as well as the therapeutic effect of previous treatments. Acupuncture treatment plans, like most treatments, are fluid and should evolve over time as a patient responds to care.  The goal of any legitimate acupuncture treatment plan is to return the patient to maximum health by restoring his or her unique Chi.

### b.    Defendants' Fraudulent Acupuncture Treatment

122.    The Acupuncture Defendants' protocol treatment at 1786 Flatbush does not comport with any of the above basic tenets of legitimate acupuncture treatment.  Instead, at best, it consists of inserting needles or cupping in an assembly line fashion that bears little, if any, relation to the patient's condition and is not designed to effectively treat or otherwise benefit the patient.  As such, the acupuncture services as performed by the Acupuncture Defendants at 1786 Flatbush are not medically necessary.  Instead, they enrich the Acupuncture Defendants through the submission of fraudulent charges to State Farm Mutual and State Farm Fire.

123.    The Acupuncture Defendants purport to support their fraudulent charges with initial examination reports and treatment notes.  With minor exceptions, these documents reveal the following pervasive patterns in the initial examinations, diagnoses, and treatment recommendations, patterns which are not credible across a large sample of individuals:

(a)    Most patients present with an unremarkable family history, but complain of neck and/or back pain and pain in another region of the body.  Although Deng's initial examination form provides several other possible pain descriptions which can be circled, in almost all cases, the pain is described as "persistent" and "sharp."  Although Mollo, the Mollo Entities, and the Mollo Chiropractors often find patients complain of thoracic pain, Deng rarely does, even though he purportedly examines patients on the same visits or within days of the chiropractors' visits.

(b)     While Deng's examinations are billed to State Farm Mutual and State Farm Fire using CPT billing code 99203 which should be used for a thorough examination usually taking 30 minutes, Deng's examination forms do not reflect the taking of sufficient histories or adequate examinations, let alone a thorough examination that could take 30 minutes.  Deng's initial examination reports contain almost no information about the patients, with the majority of patients' past medical histories reported as "None."  Even when other providers at 1786 Flatbush note significant aspects of patients' medical history, such as prior surgery or cancer, Deng's reports rarely, if ever, mention such conditions or events.

(c)     Nearly every patient on initial examination has the tongue assessed as "light red" in color and "normal" shape with a "thick white" coating.  *See* Ex. 5.

(d)     Although Deng's initial examination reports provide for more than 13 options of pulse characteristics, patients' pulses are routinely described as either "normal" or "floating."  *See* Ex. 5.

(e)     Following their initial examination, patients are almost always diagnosed with Chi-blood stagnation, which is preprinted on the boilerplate form.  Although there are more than 18 channels among the preprinted options on Deng's initial examination form, Deng routinely finds that the patient has stagnation of the blood at two channels: (1) "The Small Intestine Channel of Hand-Taiyong" ("SI Channel"), and/or (2) "The Urinary Bladder Channel of Foot-Taiyang" ("UB Channel").

(f)     In addition to the Chi diagnoses, Deng diagnoses most patients with a condition in one or more regions of the spine, most commonly (1) cervical sprain/strain; (2) lumbar myofascitis; and (3) lumbar sprain/strain, in addition to other diagnoses such as knee, or shoulder issues, or headaches.

(g)     Deng's reports routinely conclude with boilerplate language that the treatment of acupuncture would be appropriate and necessary for several reasons, including to: (1) "[p]rovide symptomatic pain relief in acute and sub-acute stages of injury condition; (2) [a]ssist to reduce inflammatory response to affected areas; and (3) [r]eflexively subside painful muscle contraction and reactive spasm of the injured joint's intrinsic musculature, thereby reversing the pain-spams-muscle cycle."

(h)     Deng's initial examination reports routinely contain a conclusion (in pre-printed, boilerplate language) that there is "a direct causal relationship between the accident described and the patient's current injuries."

(i)     Most patients receive an acupuncture treatment plan calling for acupuncture two to three times per week for four weeks.

(j)     In the initial exam, the size, type, and sometimes the quantity of needles to be used is predetermined and described in pre-printed template language.  Specifically, the reports state the needles to be used are "[d]isposable and sterile, individually packed with guided PVC tube.  Size 36# x 1.0 (0.20mm x 25mm) or 34# x 1.5 (.22mm x 40mm). 15 [minutes] for initial insertion or reinsertion."  *See* Ex. 15.  It is simply not credible that

it would be appropriate for the Acupuncture Defendants to use the same size and types of needles on every insertion point for every patient at almost every acupuncture session regardless of their individual conditions, as different body types and conditions require the use of different sizes and types of needles, or that the Acupuncture Defendants would almost always make that determination during the initial visit.

(k)     While Deng's acupuncture initial examination reports provide a blank space for a "Prognosis" to be filled in, it is nearly always left blank.

(l)     There are often inconsistencies between the purported findings of the Acupuncture Defendants, the Physician Defendants, and Chiropractor Defendants who purportedly examined the same patients on or about the same day.  For example, Deng's reports of patients' complaints, range of motion in the neck and back, and even pulse often differ from the reported findings of the Physician Defendants and Chiropractor Defendants.

124.   Based upon these purported examinations, diagnoses, and treatment recommendations, the Acupuncture Defendants subject patients to acupuncture treatment.  With minor exceptions, documentation reveals the following pervasive, non-credible patterns in the treatment:

(a)     The daily acupuncture SOAP note consists of a brief, preprinted form with areas for the provider to circle certain information and identify the Acupuncture Points at which acupuncture is purportedly performed.  The handwriting on the form is often illegible, making it difficult if not impossible to determine what treatment is being provided.

(b)     Based on the circles on the forms, patients are nearly always documented as presenting with neck and/or low back pain and tenderness and spasms in their cervical and/or lumbar spine.

(c)     Despite the importance of tongue characteristics and pulse to evaluating a patient's condition and Chi as discussed above, in most instances, the daily acupuncture SOAP notes do not document the condition of the tongue or pulse.

(d)     Needles are inserted into a small range of common Acupuncture Points (almost always points along the UB channel), which address only some, and never all, of the patients' purported conditions, and which appear to be determined only for the sake of expediency.  The forms do not identify the number of needles used.

(e)     If patients do, in fact, suffer from Chi-blood stagnation, Defendants do not use the most commonly recognized needle combinations to address this condition.

(f)     Other than circling or checking "Yes" as to whether the patient tolerated treatment, there is no discussion of the patients' response to treatment.

(g)     Treatment continues without change in frequency and without any indication of change in patients' conditions and therapeutic responses to treatment after any treatment session, or from the beginning through the end of the patients' entire treatment plans.

(h)     Most treatment sessions are billed using CPT 97810, which purports to indicate that each session involved personal, one-on-one contact with the patient and an interval exam regarding the patient's condition, but there is no documentation any interval examination was done.  Since no information is obtained or recorded regarding how the patient is responding to treatment, there is no documented basis for continuing treatment.

(i)     Although the patients receive physical therapy and chiropractic care from other Defendants on the same visits, there is no record provided to State Farm of communications among the professionals rendering these services or an attempt to coordinate their treatment.

125.    In addition to treating patients with needles, the Acupuncture Defendants subject patients to cupping.  Cupping is included in patient treatment although it is almost never mentioned in the initial examination reports let alone identified as part of the acupuncture treatment plan.  And, although, for the reasons discussed above, cupping should be relatively rare and not repeatedly performed, cupping is performed both frequently and repeatedly at 1786 Flatbush.  As reflected on the chart attached as Exhibit 5, the Acupuncture Defendants administered cupping to many patients repeatedly over multiple visits, on nearly every visit, and more often than ordinary needle-based acupuncture.  Ex. 5.  In several cases, cupping was used exclusively.  *Id.*

126.    The Acupuncture Defendants' documentation provides no justification for cupping or any explanation as to why it is being used as opposed to, or in addition to, routine acupuncture.  There is also no indication that anyone inquires whether a patient would bruise easily or considers whether patients' weight or body characteristics might render them inappropriate candidates for the procedure.

127.    Among the reasons the Acupuncture Defendants administer cupping and do so with such frequency is because they know that cupping is not a listed treatment modality under the fee schedule applicable to New York No-Fault claims, and therefore not subject to certain limitations.  Acupuncture involving the insertion of needles is typically billed under CPT codes 97810 and 97811, which under the New York fee schedule limit reimbursement to one charge for the first 15 minutes of treatment and a second charge for the next 15 minutes of treatment, respectively, regardless of the number of needles inserted.  The Acupuncture Defendants bill for cupping under CPT code 99199 as an "unlisted special service, procedure or report," which enables the Acupuncture Defendants to set their own reimbursement charges, increase the amount they charge on a daily visit, and circumvent the fee schedules applicable to more common acupuncture treatments.

### 5.    Fraudulent Diagnostic Tests

128.    As set forth in Exhibits 1 and 6, patients were also subjected to unnecessary diagnostic Tests ordered by the Physician Defendants and the Chiropractor Defendants, including ROM Tests, Muscle Tests, NCVs, EMGs, SSEPs, BEPs, Functional Capacity Evaluations, and V-sNCT Tests.  Even if these Tests as administered had any clinical value, which as discussed next they did not, Defendants' medical records do not document or reflect that the results of such tests altered or affected patient treatment in any way.

### a.    Fraudulent Computerized ROM Tests and Muscle Tests

129.    Most patients treated at 1786 Flatbush are subjected to medically unnecessary ROM Tests and Muscle Tests ordered by the Physician Defendants, most often performed on multiple occasions three to four weeks apart, and billed by each of the Physician Defendants and by Allay, KP Medical, JPF Medical, and PFJ Medical.  *See* Ex. 1.  As discussed above, although the Physician Defendants' initial evaluation form contains an option for "computerized

44

ROM/MMT," which is hardly every checked, they perform such testing and submit charges to State Farm for virtually every patient.

130.    The measurement of a particular joint's full mobility is that joint's range of motion.  Charts listing generally agreed upon full ranges of motion for each joint are available in many standard text books.    A traditional, or manual, range of motion test consists of a non-electronic measurement of a joint's ability to move through its arc of motion which then can be compared to an unimpaired or ideal joint.  Active range of motion testing is effectuated by a doctor asking the person to move a joint to its full extent and this testing may be measured by a manual inclinometer or goniometer (devices used to measure angles).  Active range of motion can be inaccurate if the patient does not provide full effort.  Passive range of motion testing is performed by the clinician moving a patient's joints to identify anatomic restrictions of movement.

131.    A traditional, or manual, muscle strength test consists of a non-electronic measurement of muscle strength, using a generally accepted scale of 0 to 5, accomplished by having the person move a joint against resistance applied by a physician or clinician.  For example, if a physician were to measure a person's knee flexion strength, he or she would apply resistance against the person's posterior foreleg while having him/her flex the knee.

132.    A physical examination performed on a person with soft-tissue trauma will typically require manual range of motion testing and muscle strength testing to assess injury in order to make a diagnosis and develop a program to address any limitations in that person's motion and strength limitations.  Doctors document range of motion and strength impairment to provide an objective frame of reference as it pertains to functional tasks, which allows the doctor to monitor progress.  Manual range of motion and strength tests are regularly done as part of the

initial evaluation of a patient and any reevaluation of the patient and are billed as part of the overall evaluation charge; they are not billed separately.

133.    The ROM Test is purportedly performed through the placement of a digital inclinometer (typically affixed by Velcro straps) on various parts of a patient's body while the patient is asked to move the related joint through its available motion.  The ROM Test is almost identical to the traditional or manual range of motion testing except that a digital reading is gained rather than a manual one.  This test is also dependent upon patient cooperation and effort, as well as the skill of the examiner.

134.    The Muscle Test is purportedly performed through the placement of an accelometric measurement apparatus against a stationary object, against which the patient contracts a particular muscle 3-4 separate times.  The Muscle Test is almost identical to the traditional or manual muscle strength testing performed by physicians during an examination, except that a digital reading is gained identifying the pounds of pressure that the patient exerts as opposed to a 0 to 5 scale.  The electronic data gathered does not take into account whether the patient is applying full effort, and its accuracy is therefore also dependent upon patient cooperation, effort, and the skill of the examiner.

135.    When the ROM Test and the Muscle Test are performed, the decision of which joints to test in a ROM Test and which muscles to test in the Muscle Test should be tailored to each patient's unique injury and the clinical findings of that individual patient.  As a result, the particular joints and muscles tested should be individualized for each patient.

136.    While the ROM Tests and the Muscle Tests could be useful tools in some circumstances, for example, as part of a medical research study, under the circumstances

46

employed at 1786 Flatbush, they were medically unnecessary and were part and parcel of the fraudulent Predetermined Treatment Protocol to maximize profits.

137.    In particular, msot patients at 1786 Flatbush purportedly underwent traditional, manual range of motion testing and muscle strength testing as part of their initial and follow-up examinations with, at least, the Physician Defendants, Chiropractor Defendants, and Physical Therapy Defendants.  Nevertheless, patients were also unnecessarily subjected to ROM Tests and Muscle Tests.  The ROM Tests and Muscle Tests were not tailored to patients' individual needs, did not provide any additional data over the manual range of motion and muscle strength tests that were allegedly performed, and were irrelevant to the monitoring of the restoration of function for purposes of treatment.  In the relatively minor soft-tissue injuries allegedly sustained by the patients, the difference of a few degrees in the patients' range of motion reading or pounds of resistance in the patients' muscle strength testing is unimportant to the diagnosis or treatment of such patients.

138.    Even if there were a reason to perform ROM Tests or the Muscle Tests, the methods in which the tests are performed are not tailored to individual patients, are not intended to identify or diagnose particular conditions, and do not facilitate treatment or result in change in treatment program.  While a variety of measurements can be recorded in each test, many joints in the body are never tested in Defendants' tests, and other joints in the body are tested repeatedly regardless of each patient's specific complaints or conditions.  In addition, many patients are tested in joints as to which they have not previously been diagnosed as having an issue.

139.    Finally, many bills for Muscle Tests submitted by the Physician Defendants used multiple charges of CPT Code 95831 to represent that as many as five separate measurements had been performed on each patient, as well as a separate charge for CPT Code 95833, and that

47

therefore Defendants were entitled to bill State Farm Mutual and State Farm Fire for each measurement, separate and independent from one another. In some cases, these Defendants claim to have taken as many as six separate measurements, resulting in total charges of $332.32 per patient. According to the applicable fee schedule, however, a healthcare provider seeking reimbursement for Muscle Tests may only use CPT Code 95831 and bill 5.16 relative units (translating into $43.60) for each "extremity" or "trunk section" which is tested, but should use CPT Code 95833 and bill a maximum of 14.88 relative units ($125.73) if the entire body is tested. As a result of the misrepresentations, even if the Muscle Tests had value and were properly reimbursable (which they were not), on each of the bills seeking payment for the testing of more than three separate muscles, Defendants defrauded State Farm Mutual and State Farm Fire into paying more than they were entitled to be paid.

### b.      Fraudulent NCV and EMG Testing

140.    Most patients at 1786 Flatbush are also routinely subjected to medically unnecessary NCVs and EMGs performed by Parisien, Dabiri, Blackman, Lacina, Pavlova, and persons working under their direction, and billed by Parisien, Dabiri, Blackman, Pavlova, Allay, KP Medical, ACH Chiropractic, Island Life, JPF Medical, RA Medical, and PFJ Medical.

### i.      Neurological Testing

141.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body. Sensory nerves are responsible for collecting and relaying sensory

information to the brain.  Motor nerves are responsible for transmitting signals from the brain to initiate muscle activity throughout the body.

142.    Peripheral nerves consist of both sensory and motor nerves.   They travel throughout the body and come together at specific points along the spine before traveling up the spinal cord to the brain.  The segments of nerve closest to the spine, and through which impulses travel between the peripheral nerves and the spinal cord, are called nerve roots.  Injury to a nerve root is called radiculopathy, and can cause various symptoms including pain, altered sensation, and weakness.

143.    Legitimate EDX Tests can be performed on patients who report symptoms that may suggest neurological pathology, such as pain in the neck and/or lower back region that radiates to the arms or legs, abnormal weakness in limbs, or significant changes in sensation in limbs.

144.    If properly performed and interpreted, NCVs and EMGs can be used to diagnose the existence, nature, extent, and specific location of nerve abnormalities that may be causing the purported symptoms, including peripheral nerve injuries (e.g., injuries to the nerves in the arms and legs) and radiculopathies (pinched nerve roots that run along both sides of the spine at each vertebra level).

### ii.    NCV Tests

145.    NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents.  The velocities, amplitudes, and shape of the response are then recorded by electrodes attached to the surface of the skin and compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of the peripheral nerves in the arms and legs.

146.    Several peripheral nerves in the arms and legs can be tested with NCVs. Moreover, many of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested.  The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both in any such peripheral nerve should be tailored to each person's unique circumstances.  In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual as well as the real-time results obtained as the NCVs are performed on the sensory and/or motor fibers of each peripheral nerve.  As a result, the nature and number of the peripheral nerves and the types of nerve fibers tested with NCVs should vary by individual.

### iii.    EMG Tests

147.    EMGs involve inserting needles into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs and measuring electrical activity in each such muscle.  The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

148.    Many different muscles and nerves in the arms and legs can be tested with EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each individual's unique circumstances.  In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual, patient, the presenting symptoms, the real-time results of NCVs which are typically performed in conjunction with EMGs, and the real-time results obtained from the EMGs as they are performed on each specific muscle.  As a result, the number of limbs tested, as well as the nature and number of the muscles tested, should vary by patient.  Moreover, legitimate EMG testing will

likely show significant differences in results across patients because of the inherent variability among patients in both presenting symptoms and in real-time EMG results.

149.    NCVs and EMGs should be performed together in the same session by the same healthcare provider.  Among other things, real-time results obtained during the tests can and should influence how each is performed and interpreted, and results from both are typically necessary to diagnose and localize injury.  Thus, it is impossible to diagnose radiculopathy without an EMG.

### iv.    The AANEM Recommended Policy

150.    The American Association of Neuromuscular & Electrodiagnostic Medicine ("AANEM"), founded in 1953, is the largest organization worldwide dedicated solely to the scientifically based advancement of neuromuscular medicine.  AANEM membership is comprised of over 5,000 physicians, primarily neurologists and physiatrists.  AANEM's primary goal is to increase the quality of care for patients with neurological disorders through programs in education, research, and quality assurance.  AANEM has issued a Recommended Policy ("Recommended Policy") regarding the optimal use of EDX tests, including NCV and EMG tests, to diagnose various forms of nerve abnormalities, including peripheral nerve injuries and radiculopathies.  *See* AANEM Recommended Policy, Ex. 16.  The Recommended Policy has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

151.    The Recommended Policy arises out of the recognition that EDX studies "have occasionally been abused by some providers, resulting in overutilization and inappropriate consumption of scarce health resources."  AANEM's Recommended Policy accurately reflects the demonstrated utility of various forms of EDX studies, including NCVs and EMGs, for diagnosing radiculopathies and other disorders of the central and peripheral nervous systems.

152.    The Recommended Policy correctly recognizes that "EDX studies are individually designed by the EDX consultant for each Patient" and that "[t]he examination design is dynamic and often changes during the course of the study in response to new information obtained."  Therefore, the decision of which nerves and muscles, if any, should be tested with NCVs and EMGs should be individually tailored by a physician to address each patient's unique circumstances based upon a history and examination of the patient, as well as the real-time results as the NCVs and EMGs are performed.   The Current Procedural Terminology guide which sets forth codes (CPT Codes) used by health care providers to describe and bill for services similarly reminds admonishes that "Nerve tests *must* be limited to the specific nerves needed for the particular clinical question being investigated."   (Emphasis added).

153.    According to the Recommended Policy, the maximum number of EDX tests that should be required to diagnose radiculopathy in more than 90% of patients is:  (a) NCVs of three motor nerves and two sensory nerves, and (2) EMGs of two limbs.  These maximum numbers "are to be used as a tool to detect outliers so as to prevent abuse and overutilization."

### v.    Defendants' Fraudulent NCVs and EMGs

154.    Defendants use NCVs and EMGs not to legitimately diagnose the patients' conditions but to maximize profits and to attempt to document conditions, whether they exist or not, to justify further treatment.   Specifically, this includes: (i) testing patients without indications that tests are necessary; (ii) performing NCVs without EMGs or performing NCVs and EMGs separately on different dates that are often days or even weeks apart;  (iii) performing tests in a formulaic fashion to maximize charges; and (iv) making diagnoses based on insufficient information and information that is not credible.

155.    *First*, in most instances, tests are performed without any indication patients need them.  Defendants typically purport to provide NCVs and EMGs to diagnose or rule out radiculopathy.  In a legitimate setting, a patient suspected of suffering from radiculopathy would show signs of neck or back pain accompanied by numbness, tingling, and/or pain radiating to an extremity.  However, according to the Initial Evaluation Reports of the Prescribing Physicians more than half the patients subjected to NCVs and EMGs had none of these indications.  *See* Ex. 6.

156.    *Second*, as set forth in Exhibit 6, in many instances Parisien, Dabiri, and Blackman performed NCVs without EMGs, EMGs without NCVs, and NCVs and EMGs on different days.  In some instances, NCVs and EMGs were performed weeks apart.  But, for the reasons alleged above (¶ 149), performing tests in this manner substantially undermines their value.  Defendants purport to use the tests to diagnose radiculopathy, but diagnosing radiculopathy typically requires a normal NCV and an abnormal EMG, and both components are necessary to diagnose the condition and identify the levels of the spine at which it is occurring.

157.    The vast majority of Defendants' NCVs and EMGs yield normal results or no evidence of a radiculopathy, suggesting there was no need to perform such tests in the first place.

158.    *Third*, Parisien, Dabiri, and Blackman do not tailor the NCVs and EMGs to patients' unique circumstances but perform them in a formulaic fashion that maximizes the charges they can submit to State Farm.  Specifically, these defendants perform NCVs on the same peripheral nerves and nerve fibers for almost every patient, and perform EMGs on the same muscles in all four limbs in almost every patient.  Parisien, Dabiri, and Blackman perform the tests in this fashion without regard to patients' individual symptoms or what the data shows as the tests proceed.  In marked contrast to the standards recognized by the Recommended Policy,

Defendants perform for most patients: (a) NCVs of the same four motor nerves, and (b) NCVs of the same five sensory nerves.  *See* Ex. 6.  Further, it is unusual for patients to be symptomatic in four separate limbs and require EMGs in four limbs, yet Defendants performed four limb EMGs in almost every patient, and they often tested as many as 36 separate muscles in a single patient. *See* Ex. 6.

159.    Patients at 1786 Flatbush are also routinely tested bilaterally even if only one side is symptomatic.  *See* Ex. 6.  Similarly, upper limbs and lower limbs are both tested regardless of whether the patient's symptoms are localized in the upper or lower extremities.  *See* Ex. 6.

160.    Defendants also either missed or ignored actual conditions that the documented results of the NCVs identified.  For example, in one patient purportedly tested by Blackman, NCV results indicated the patient suffered from a conduction block in a left median nerve, which would denote demyelination, a potentially serious condition that Blackman's report simply ignored.

### c.    Fraudulent SSEPs and BEPs

161.    Patients at 1786 Flatbush were also subjected to medically unnecessary SSEPs and BEPs.  From October 2013 through at least October 2015, evoked potentials were ordered, performed, and billed by the Physician Defendants and by Allay, Island Life, JPF Medical, KP Medical, and PFJ Medical.

### i.    SSEPs

162.    SSEPs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents.  The potentials evoked by this electrical stimulation are then recorded by electrodes attached to the scalp.  SSEPs are most often used in conjunction with spinal surgery to alert surgeons to potential problems during surgery.  SSEPs have little to no value in diagnosing and localizing radiculopathy.  The test involves stimulating major "mixed"

nerves at the wrist (median nerve) and ankle (tibial nerve). "Mixed" nerves contain nerve fibers that travel to more than one nerve root (e.g., the median nerve contains sensory fibers that run through the C6 and C7 nerve root). Thus, it is impossible to know from an abnormal result which nerve root is an issue, and a normal result does not rule out a nerve root issue because the SSEP signal could simply have bypassed the abnormal root. Additionally, SSEP signals travel along the peripheral nerves and the spinal cord to the brain. As a result, any slowed or abnormal SSEP can be caused by a problem at any point along the path of the signal – in the peripheral nerve, the nerve root, the spinal cord, or the brain.

163. The AANEM has produced a report as to the clinical use of SSEPs, which is attached in Exhibit 16 (the "SSEP Recommended Policy"). According to the SSEP Recommended Policy, SSEPs "are generally not useful in the evaluation of acute radiculopathies," and the amount of information gained from SSEPs as to radiculopathies is "low compared to information obtained from the neurological examinations, needle electromyography (EMG), and H-Reflex studies."

164. The SSEPs performed on patients of Parisien, Dabiri, and Blackman were medically unnecessary. SSEPs were performed on over 100 patients at 1786 Flatbush. *See* Ex. 1. They were purportedly ordered and performed for the purpose of diagnosing radiculopathy, yet as noted above they cannot reliably do so. The patient files fail to document why patients allegedly needed SSEPs, and, regardless of what the test results showed, the results are not mentioned again in the patients' records and have no effect on treatment. Moreover, the Physician Defendants performed SSEPs in a formulaic fashion on both the upper limbs and lower limbs for patients without regard to individual patients' particular needs. The SSEP reports, regardless of whether they bear the signature of Parisien, Dabiri, or Blackman, virtually

always conclude with the same sentence indicating a normal SSEP result: "The above electrodiagnostic study revealed no evidence of delayed nerve conduction throughout the spinal nerve roots, spinal cord or brain stem."

### ii.    BEPs

165.    BEPs measure responses in brain waves that are stimulated by a clicking sound to evaluate the central auditory pathways of the brain.  The test is accomplished by placing the individual in a chair or bed, and requesting that the patient relax and remain still.  Electrodes are placed on the individual's scalp and on each earlobe.  Clicking noises or tone bursts are then piped through earphones, and the electrodes pick up the brain's response and record it on a graph.

166.    The indications for a BEP are extremely limited and thus their use should be rare. Legitimate clinical applications of BEPs include assessing hearing in newborns and identifying tumors of the auditory nerve (i.e., acoustic neuroma); intraoperative monitoring during neurosurgery of the brainstem; assessing hearing in individuals incapable of giving voluntary responses (e.g., young children, non-cooperative, or non-communicative patients); and diagnosing neurological conditions affecting the brainstem (principally multiple sclerosis and, less often, brainstem tumors).

167.    While none of the patients treated by Parisien, Dabiri, and Blackman reportedly had any of these conditions, Parisien, Dabiri, and Blackman routinely performed or supervised a technician who performed BEPs on at least 160 patients at 1786 Flatbush.  *See* Ex. 1.  The test reports are form documents containing no indication any effort was made to tailor the BEP to the individual patient.  Indeed, many reports purportedly authored by different Physician Defendants document the same "chief complaint" with the same typographical error which describes a patient "who presents who presents [sic] with well as [sic] general dizziness and balance

56

problems." Patient records do not indicate why the BEP was performed, and the documented results of the BEP for every patient of which State Farm Mutual and State Farm Fire are aware were normal in both the right and left ear.

###### d.    Functional Capacity Evaluations

168.    Additional medically unnecessary tests most patients at 1786 Flatbush undergo include Functional Capacity Evaluations.  *See* Ex. 1.  Functional Capacity Evaluations were performed at 1786 Flatbush and billed by Parisien, Dabiri, Pavlova, Blackman, Lacina, Allay, JPF Medical, KP Medical, and PFJ Medical.

169.    Functional Capacity Evaluations are meant to gauge whether a patient has sufficient strength, endurance, and ability to perform the patient's job, to assist in vocational rehabilitation, to determine a patient's maximal functional level at the time they are fully improved, and to assist in setting any limits on job tasks a patient can perform.  In accordance with the applicable fee schedule, Functional Capacity Evaluations should only be used "at the point of maximal medical improvement," and only when the patient:  1) is preparing to return to a previous job; 2) has been offered a new job; or 3) is working with a rehabilitation provider and a vocational objective is established.  The reasons for the Functional Capacity Evaluations must be documented and reports must include patient demographics including work history, indications for the evaluation, and a narrative with recommendations.  Because these tests are most often used to evaluate work tolerance and the necessity for work restrictions, they should be individually tailored for each patient and geared toward a specific diagnostic goal, such as determining if the patient can go back to their specific job or needs work restrictions or even a different job.

170.    The Functional Capacity Evaluations performed by Parisien, Dabiri, Pavlova, Lacina, and Blackman at 1786 Flatbush were medically unnecessary, were not individually

tailored, and were given in a formulaic fashion, involving the same sets of tasks, to almost every patient regardless of their unique complaints, response to treatment, work status, or work type. It is not claimed or documented that tested patients are "at the point of maximal medical improvement," but nonetheless tests are administered, often multiple times, after which the Predetermined Treatment Protocol continues. The records likewise do not indicate any patient is preparing to return to a previous job, has been offered a new job, is working with a rehabilitation provider, or has had a vocational objective established. Nor do the records document how, if at all, test results impacted patient treatment.

171. Documentation of the Functional Capacity Evaluations submitted to State Farm Mutual and State Farm Fire consists of Functional Capacity Evaluation Reports. Patients purportedly perform six types of lifts, wherein the pounds of force they exert is recorded on a handwritten form. At some point thereafter, these measurements are imported into a software program which generates an eight page Functional Capacity Evaluation Report with bar graphs and the patients' rating as compared to a normative average. These Functional Capacity Evaluation Reports reflect pervasive patterns that are not credible. For example, strength measurements for most patients are purportedly worse than the lowest 10th percentile, indicating a level of impairment that would be unusual in one patient with the types of injuries purportedly documented, let alone for a large number of patients. Additionally, in many cases patients do worse on subsequent tests without any discussion as to why patients purportedly undergoing treatment are not getting better.

172. Further, Parisien, Dabiri, Pavlova, Blackman, Lacina, Allay, JPF Medical, KP Medical, and PFJ Medical submit charges for the Functional Capacity Evaluations using CPT code 97750, the code for physical performance testing, not Functional Capacity Evaluations

which would properly be billed using CPT code 97800. In this way, they fraudulently conceal that they are, in fact, performing Functional Capacity Evaluations and that their tests are ineligible for reimbursement because they have not met the reimbursement requirements for Functional Capacity Evaluations in the applicable fee schedule.

### e.    Fraudulent V-sNCT Testing

173.    Mollo and the Mollo Entities also order yet another medically unnecessary diagnostic test – the V-sNCT Test – which is ordered for nearly every patient during chiropractic initial examinations. Mollo and the Mollo entities record in the Chiropractic Initial Reports that they are ordering "small pain fiber studies of the cervical/lumbar spine to evaluate pathology to the A-delta, A-Beta, and C sensory nerve fibers." *See* Ex. 12. Based on these orders, Mollo and the Mollo Entities subject many patients to V-sNCT Tests, which are then billed to State Farm Mutual and State Farm Fire by Island Life and Penn Chiropractic. On at least one occasion, Parisien submitted a bill to State Farm Mutual for a V-sNCT test purportedly performed by chiropractor Sweet Ehigiegba at 1786 Flatbush.

174.    V-sNCT Tests are non-invasive tests that, according to proponents of V-sNCT testing, purport to diagnose abnormalities only in the sensory nerves and sensory nerve roots. They do not and cannot provide any diagnostic information regarding the motor nerves and motor nerve roots. V-sNCT Tests are performed by administering electrical voltage through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet, and face. The intensity of the electrical voltage is increased until the patient reportedly perceives a sensation from the stimulus caused by the voltage. "Findings" are then made by comparing the minimum intensity of electrical voltage at which the patient announces he or she perceives some sensation to the purported normal ranges.

175.    The sensory nerves are comprised of several different kinds of nerve fibers, including the A-beta fibers, the A-delta fibers, and the C fibers.  According to proponents of V-sNCT testing, the V-sNCT Tests allegedly can diagnose the existence, nature, extent, and location of any abnormal condition in each of these noted nerve fibers by using three different frequencies of electrical current.

176.    Mollo and the Mollo Entities know however, that V-sNCT Tests are unable to truly diagnose the existence, nature, severity, or specific location of any abnormalities in the sensory nerves or any of the nerve fibers.  Among other things, Defendants know that V-sNCT Tests cannot localize sensory loss to any specific place within the nervous system.  Electrical current or voltage must travel between two points and complete a circuit.  V-sNCT Tests involve electrical current or voltage traveling from a probe placed at the test site through the limb being tested, through the torso to a ground electrode placed under the patient's back.  Because the electrical current or voltage can affect any nerve in proximity to the electrical path from the probe to the ground electrode, there is no way to know that the electrical stimuli are producing a sensation in any particular nerve.  Moreover, even if electrical current or voltage were stimulating a particular nerve, and a patient's statement of diminished sensation were indicative of an injury, there would be no ability to determine where along the path of that nerve from the limb to the brain – which includes the peripheral nerve, nerve roots, nerves in the spinal cord and nerves in the brain – an injury existed.  As a result, V-sNCT Tests cannot diagnose radiculopathies (injury at the nerve root) as any statement of diminished or heightened sensation could just as easily imply nerve injury somewhere along the nerve pathway other than at the nerve root.  Additionally, no reliable evidence proves that valid normal ranges of intensity

required to evoke a sensation in fact exist to compare with the unique results from an individual's V-sNCT Tests to arrive at a legitimate finding.

177.   Moreover, data from administration of the V-sNCT Tests can be manipulated in a number of ways to produce any desired result, undermining any claim that the test is objective. In particular, "findings" at each site are either plotted by hand on a graph or analyzed by computer to draw conclusions and make diagnoses.  The data, however, can be adjusted by a variety of factors, including a belief (which has no support in medical science) that a particular patient is naturally hypoesthetic or hyperesthetic, and a "correction factor."  Even if the V-sNCT Tests had some medical or diagnostic value, no reliable evidence proves any of these adjustments is necessary or appropriate or anything more than an opportunity for the individual analyzing the test results to reach a predetermined conclusion and use a manufactured finding of an abnormal condition to justify additional treatment that can be billed to insurers.

178.   Additionally, contrary to documents submitted to State Farm Mutual and State Farm Fire by Mollo and the Mollo Entities, (a) despite an explicit representation in the Chiropractic Initial Reports that the tests are ordered to "evaluate pathology to the A-delta, check and C sensory nerve fibers," no reliable evidence proves the different frequencies of electrical current used by the test can in fact stimulate and reliably test any or all of these three nerve fibers; (b) even if valid normal ranges of intensity required to evoke a sensation existed, no reliable evidence proves that a current perception threshold greater than the normal range would indicate a hypoesthetic condition (the sensory nerves have decreased function) or that current perception threshold less than the normal range would indicate a hyperesthetic condition (the sensory nerves are in a hypersensitive state); (c) even if an abnormal current perception threshold indicated either a hypoesthetic or hyperesthetic condition, no reliable evidence proves that the

extent or cause of any such conditions could be identified from the V-sNCT Test (indeed, numerous pathological and physiological conditions other than peripheral nerve damage can cause hyperesthesia and hypoesthesia); (d) no reliable evidence proves V-sNCT Tests provide any information that would have any value beyond that which could be gleaned from a routine history and physical examination of the patient; (e) no reliable evidence proves V-sNCT Tests provide any information that would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots; (f) the V-sNCT Tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an automobile accident; (g) at most the test would amount to a quantitative sensory test that has no clinical value; and (h) there would be no diagnostic advantage to using the V-sNCT Tests to obtain information regarding the sensory nerve fibers where, as here, patients were also subjected at about the same time to NCVs and EMGs which are well-established in the medical, neurological and radiological communities for diagnosing the existence, nature, severity, and specific location of any abnormalities in both the sensory and motor nerves as well as the nerve roots.

179.    Consistent with the conclusion no reliable evidence supports the validity of V-sNCT tests, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of procedure codes ("CPT Codes") for physicians to use in describing their services for billing purposes, does not recognize a CPT Code for V-sNCT Tests.  Further, the Center for Medicare and Medicaid Services ("Medicare") reviewed the efficacy of current perception threshold tests, which are essentially the same as V-sNCT Tests, and issued a national coverage determination concluding current perception threshold tests are

not medically reasonable and necessary for diagnosing sensory neuropathies (i.e. abnormalities in the sensory nerves) or radiculopathies and therefore are not compensable.

180.    Nonetheless, to support the fraudulent charges, Mollo and the Mollo Entities submit forms reflecting the data purportedly recorded during the test and boilerplate Electrodiagnostic Examination Reports (the "V-sNCT Reports").  Mollo and the Mollo Entities know they are all false and misleading in several material respects including: (a) there is no valid basis or support for many of the statements and claims about the V-sNCT; (b) there is no valid basis or support for many of the statements and claims about NCVs and EMGs; (c) there is no valid basis or support for many of the statements and claims about human physiology, the human nervous system, or the response of the human nervous system to injury; and (d) there is no valid basis or support for many of the statements and claims about electricity and the science of electrical engineering.

181.    The V-sNCT Reports purport to set forth findings.  In most instances, they conclude that "[f]indings suggesting pathology" exists at a specific nerve, and in a relatively small number of cases that a hyperesthetic condition exists.  *See* Ex. 17.  Regardless, almost every test reaches the conclusion that the patients' results are abnormal, either with results that are "higher than average" or "lower than average."  *See* Ex. 17.

182.    Finally, Mollo and the Mollo Entities bill State Farm for V-sNCT Tests under the CPT code 95999, which under the New York fee schedule governing No-Fault claims, is an "Unlisted neurological or neuromuscular diagnostic procedure."  A separate charge using this code is submitted for each nerve purportedly tested.  Defendants' bills purport to report testing of at least 14 nerves, and often as many as 32 separate nerves, resulting in charges from $1,022 to $2,360 for a single test.

### 6. Injections

183.    Many patients treated at 1786 Flatbush are also subjected to medically unnecessary trigger point injections and dry needling procedures purportedly provided by the Physician Defendants and billed by the Physician Defendants, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, and RA Medical.

#### a. Trigger Point Injections

184.    Trigger points, also known as trigger sites or muscle knots, are irritable portions of an individual's muscle associated with palpable nodules in taut bands of the muscle fibers. They may cause local pain at the site of the trigger point, can cause referred pain to another area of the body in well-documented referral patterns, and can result in reduced range of motion. Trigger points can also generate a local twitch response or spasm upon palpation of the affected area.  Trigger points may be caused by a number of factors, including acute or chronic muscle overload and acute trauma.

185.    A trigger point injection involves inserting a needle into the muscle knot or trigger point and injecting medication into the affected area.  The medication injected typically contains a local anesthetic and sometimes a corticosteroid, which is meant to anesthetize and relax the muscle in the trigger point, decrease inflammation, and provide pain relief.

186.    Multiple trigger point injections for any one patient may be appropriate depending on the patient's particular symptoms, but injections should be limited to the least number necessary.  Limiting the number and frequency of trigger point injections is particularly important when the injections include a corticosteroid because the side-effects and dangers of corticosteroids are dose and frequency dependent.  Among these dangers, repeated administration of corticosteroids can cause adrenal suppression in which the body shuts down its own production of cortisone.  Corticosteroids can also suppress the body's immune system and

64

increase the risk of infections, result in changes in blood sugar, changes in blood pressure, depression, mania, bone thinning, bone fractures, and osteonecrosis of the hip and shoulder. For all of these potentially dangerous complications, the level of risk to an individual patient is directly related to both the dose of corticosteroids given, and to the frequency of administration. As such, the amount of corticosteroids used during trigger point injections and the frequency of administering trigger points injections with corticosteroids should be limited to the minimum amount medically necessary considering the risks to the patient.

187.    Risks of trigger point injections also include risks from the procedure itself, which involves inserting needles into patients, such as local and systemic infection, hematoma, pneumothorax and local and systemic effects of the medications delivered. Moreover, any use of local anesthetic can involve risks, particularly in increased volumes, including central nervous system toxicity which can lead to seizures and cardiac toxicity which can lead to arrhythmia and even death.

188.    In most circumstances, trigger point injections should only be repeated if the patient has experienced substantial pain relief with a prior injection. Because of the dangers associated with corticosteroids in particular, subsequent trigger point injections that include corticosteroids should generally not be performed until several weeks have passed and the number of administrations limited to no more than three times in any six month period. Any treatments in excess of this should not be performed without documentation of the medical rationale to justify the risks to the patient and the documented, informed consent of the patient to these risks.

### b.    Dry Needling

189.    Dry needling is intended to address the same conditions as trigger point injections – trigger points or muscle knots. It involves inserting a small gauge needle into the muscle knot

or trigger point and mechanically breaking up the muscle tightness with rapid needle insertion in and out of the muscle.  Unlike trigger point injections, dry needling does not include injecting a solution into the muscle by needle.  The purported rationale for dry needling is that movement of the needle can irritate the "knot" in the affected muscle fibers and cause it to break up, thereby permitting the patient to experience pain relief and increased range of motion.  Dry needling is similar to acupuncture, in that both involve the use of needles placed in the body for treatment.  But while acupuncture usually involves the insertion of multiple needles at the same time which are then left in the body for minutes, dry needling involves a single needle which is briefly inserted into the skin and then removed, and if necessary, inserted into a different area after being wiped with an alcohol swab.

190.    Dry needling is considered by Medicare and most insurance carriers to be experimental and unproven, and no peer-reviewed clinical studies support its use.

191.    As dry needling and trigger point injections typically treat the same conditions and represent alternative treatment options, even dry needling proponents recognize it would rarely be appropriate to perform dry needling at the same time as trigger point injections.  Furthermore, dry needling insertions should be limited to the least number necessary.  And before subjecting a patient to repeated administration of dry needling there should be documentation indicating the patient benefited from earlier dry needling procedures.

c.    **Defendants' Trigger Points and Dry Needling**

192.    At 1786 Flatbush, contrary to the practices described above, Parisien, Blackman, Pavlova, Dabiri, and Lacina subjected some patients to excessive numbers of trigger point injections, almost always combined trigger point injections with excessive dry needling insertions, and inadequately documented those procedures, thereby exposing patients to unnecessary risks.  They failed to document patients' responses to prior procedures or frequently

66

failed to identify indications that additional procedures could benefit patients. They also failed to obtain informed consent from patients by failing to disclose the above-described risks. In short, these treatments were medically unnecessary and potentially harmful.

193. Although Parisien, Blackman, Dabiri, Pavlova, and Lacina treated different patients at different periods of time at 1786 Flatbush, they administered trigger point and dry needling injections in the same fashion. Further, they collectively recommended and performed trigger point injections and dry needling on over one-third of the State Farm Mutual and State Farm Fire Insureds treated at 1786 Flatbush. The procedures were often recommended during patients' initial examinations or during a follow-up examination early in the course of treatment. They would typically then be performed the same day they were recommended.

194. The recommendations and performance of trigger point injections and dry needling were documented in Injection/Needling Treatment Forms, which purport to reflect diagnoses supporting injections and dry needling. The forms recorded that most patients purportedly suffered from pain in two or more regions and that their pain was a 7 on a scale of 1 to 10. *See* Ex. 18.

195. Additionally, the forms contain preprinted checkboxes of various diagnosis codes, known as ICD-9 codes, along with brief descriptions of those codes. But, among other things, the Injection/Needling Treatment Forms contain erroneous descriptions of the diagnosis codes. For example, one of the frequently checked diagnoses on the Injection/Needling Treatment Forms at 1786 Flatbush is for ICD-9 code 724.4, which the forms describe as "Acute Traumatic Lumbosacral Radiculitis." *See* Ex. 18. The actual description for ICD-9 code 724.4, however, is "Thoracic or lumbosacral neuritis or radiculitis, unspecified." Similarly, the Injection Treatment form used at 1786 Flatbush states that ICD-9 code 723.4, another diagnosis code frequently

checked by Parisien, Blackman, Dabiri, Pavlova, and Lacina to support their claims for trigger point injections is "Post Traumatic Cervice-Thoracic Myofascitis," but the actual ICD-9 code description is "Brachial neuritis or radiculitis," a completely distinct diagnosis. In any event, none of these diagnoses would clinically warrant trigger point injections or dry needling as such procedures are intended to treat trigger points or taut bands of muscle fibers, not radiculopathy or pinched nerves. Regardless, the Injection/Treatment Forms routinely conclude: "The patient is advised to start on a course of Therapeutic Injections."

196.    While there are many different types of injections and the Injection/Needling Treatment Forms themselves provide check boxes for five different injection options with space to identify other alternatives (e.g., nerve block injections, facet injections), Parisien, Blackman, Dabiri, Pavlova, and Lacina frequently select only trigger point injections. It is inconceivable that so many patients had identical findings and needed injections of any kind, and even more inconceivable that such a high proportion needed trigger point injections but none was considered or recommended for any other type of injection or procedure.

197.    When performing these procedures, Parisien, Blackman, Dabiri, Pavlova, and Lacina also often billed for unusually high numbers of trigger point injections. *See* Ex. 7. On average, these defendants billed State Farm for 12 or more different trigger point injections for each patient, with some patients allegedly receiving as many as 34 injections on a single visit. *See* Ex. 7. Trigger points are often administered bilaterally without any indication patients required them on both sides of the body. *See* Ex. 7.

198.    Further, as described above, doctors should also typically allow sufficient time between each set of injections to (a) avoid rapid, repeated doses of corticosteroids; and (b) gauge if the injection is indeed giving long-lasting relief as opposed to short-term relief. But patients at

1786 Flatbush are often injected on multiple occasions with little to no documentation that they experienced *any* relief from a prior set of injections, let alone long lasting relief.

199.    Documentation of patient responses to injections is important for the licensed professionals involved in a patient's care, other licensed professionals who may treat the patient contemporaneously or subsequently, the patients themselves, and payers, and is particularly critical to decisions about whether to subject patients to the risks of subsequent procedures. But at 1786 Flatbush, often the only record of patient response to an injection procedure is a check box in the Injection/Needling Treatment Form indicating that the "[p]atient tolerated the procedure well." The patient is routinely reported to tolerate the procedure well without complications and no other report is made of the patients' response to the procedure. *See* Ex. 7. Thus, the Physician Defendants often fail completely to note the patients' self-reported pain levels, rendering it impossible to determine whether the injections are benefiting these patients. Finally, to the extent there is any record of patient responses to the injections, they indicate that most patients continue to have pain after the injections and are not experiencing relief. *See* Ex. 7.

200.    The risks of Defendants' injection procedures are exacerbated by the fact that the Physician Defendants do not sufficiently document the amount of corticosteroid provided to each patient. The Injection/Needling Treatment Forms contain what appears to be a preprinted, boilerplate notation that "each area/trigger point [is] injected with 0.5cc of 0.5% Marcaine via a 3cc syringe with a 1-1/2 x 25G sterile hypodermic needle." Yet many of the same Injection/Needling Treatment Forms also reflect that patients are injected with completely different types and/or doses of corticosteroid, such as 1% Lidocaine and 0.25% Marcaine. These inconsistencies make it impossible to determine the amount of drugs provided to patients.

Clearly understanding and documenting the dose and frequency of administered medications is critical, particularly with potentially dangerous dose-related side effects like corticosteroids. Recording the medication dose is not only necessary for patient safety; it is also required to track patient responses to prescribed treatment, make medically informed decisions about changes in medication selection or dosage, evaluate and address any adverse and potentially life threatening reactions, and monitor the total amount of medication over time.

201.    In some instances, trigger point injections are performed on patients at 1786 Flatbush in a manner that increases the risk of injury.  For example, Blackman ordered an MRI to rule out a left knee torn ligament for a patient who presented with severe knee pain, yet proceeded to inject trigger points into her quadriceps.  Numbing the quadriceps muscles around the knee made the knee even more unstable and increased the risk of injury.

202.    Parisien, Blackman, Dabiri, Pavlova, and Lacina also subject many patients at 1786 Flatbush to dry needling procedures during the same treatment sessions in which they perform the trigger point injections.

203.    These dry needling procedures are medically unnecessary and make no sense in light of the trigger point injections which are performed on the same date, for at least six reasons. *First*, it is questionable whether the experimental and unproven technique can provide any benefit.  *Second*, even if it could, while dry needling and trigger point injections typically treat the same conditions and represent alternative treatment options supported by the same clinical rationales, dry needling is often performed at the same time and on the same muscles as the trigger points.  *Third*, the Physician Defendants frequently administer more than 20 separate dry needling insertions during a single treatment session with several patients receiving as many as 60 separate dry needling insertions.  It is inconceivable that any one patient would need so many

dry needling insertions, and even more inconceivable that so many patients would need such a high number. *Fourth*, dry needling insertions are often made bilaterally without any indication they are required on both sides of the body. *Fifth*, dry needling is performed repeatedly on patients over multiple visits without any indication that patients experienced any improvement from a prior procedure. *Sixth*, the records do not document the type or gauge of needles being used or how the procedure is performed other than to identify the muscles to which it is applied.

204.    Further, unlike trigger point injections, which are a recognized therapeutic procedure and have a designated CPT code, dry needling does not have a specific CPT code for billing purposes. At 1786 Flatbush, dry needling is billed to State Farm using CPT Code 20999, the code for an "unlisted procedure, musculoskeletal system, general." Unlike the CPT code used for trigger point injections, which is limited to a single unit of CPT code 20553 regardless of how many muscles are injected, there are no such limitations for CPT code 20999. For example, patient J.H. purportedly received a staggering 60 dry needle insertions from Lacina on a single date of service, for which Lacina submitted charges to State Farm totaling $4,575, in addition to other charges submitted by him on that same day. *See* J.H. bill, attached as Ex. 19. Parisien, Blackman, Dabiri, and Pavlova perform dry needling on patients at 1786 Flatbush and subject patients to excessive insertions not because the procedures are medically necessary, but in order to submit multiple charges for inordinate amounts.

205.    Similarly, Parisien, Blackman, Dabiri, Pavlova, and Lacina frequently inflate their charges for trigger point injections by representing they are performed using ultrasonic guidance, allowing them to submit a charge for CPT code 76942. But needle placement for trigger point injections is a routine and fairly simple aspect of the procedure and it would be extremely unusual for ultrasonic guidance to be necessary to assist trigger point procedures. Nor do

Defendants' medical records document why such ultrasonic guidance was necessary. Moreover, even if there were a clinical need for ultrasonic guidance (which there is not), in order to bill CPT Code 76942 one must prepare a separate written report which Defendants fail to create and/or submit.

### 7. Durable Medical Equipment and Orthotics

206. Patients treated at 1786 Flatbush are also prescribed and provided medically unnecessary Supplies, including DME and Orthotics, provided by the DME Defendants. At 1786 Flatbush, the Physician Defendants routinely prescribe a common laundry list of items, often include many items that could not possibly be needed by the many patients for whom such prescriptions are written, and prescribe the Supplies in a way that allows the DME Defendants to circumvent applicable fee-schedule limitations and inflate their charges. Medically unnecessary supplies for patients of the Physician Defendants are then provided by the DME Defendants. These DME Defendants (i) purport to deliver to patients and bill for different and more expensive items than prescribed; (ii) fraudulently inflate charges for items for which there was no established charge under the applicable fee schedule; and (iii) at least in some instances, bill for items that are not provided at all.

### a. Claims for Supplies under the No-Fault Laws

207. DME generally consists of items that can withstand repeated use, and are primarily used for medical purposes by individuals in their homes. Orthotic devices generally consist of supports for the neck, back, and other body parts, such as cervical collars and lumbar supports ("LSOs").

208. Since October 2004, the fee schedule applicable to New York No-Fault claims for DME and orthotic devices has provided, in pertinent part, that "the maximum permissible charge for the purchase of [DME], . . . and orthotic . . . appliances shall be the fee payable . . . under the

New York State Medicaid program at the time such equipment and supplies are provided. . . [I]f the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of: (1) the acquisition cost (i.e., the line item costs from a manufacturer or wholesaler, net of any rebates, discounts, or other valuable consideration, mailing, shipping, handling, insurance costs, or any sales tax) to the provider plus 50%, or (2) the usual and customary price charged to the public." 12 N.Y.C.R.R. § 442.2.

### b. The DME Defendants are Interconnected

209.   Although purporting to be separate and independent companies, Maiga, Madison, Quality Custom, Quality Health, AB Quality, and PHCP appear to be related.  In addition to providing the same Supplies, providing Supplies to patients at the same location, 1786 Flatbush, and engaging in the same fraudulent billing patterns discussed below, Maiga, Madison, Quality Custom, Quality Health, AB Quality and PHCP each use nearly identical delivery receipt forms which purport to reflect the delivery of Supplies to the patients at 1786 Flatbush.  All six companies' forms utilize identical language, including spelling and grammar errors, stating the patient has "received equipments [*sic*][1] and supplies listed above along with instructions on use case [sic] of it.  I indicate that [company] cannot be held responsible for any inappropriate use of this equipment or supplies."  *See* Ex. 20.  Indeed, Maiga and Madison's delivery receipt forms use an identical font.  *See* Ex. 20.

### c. The Physician Defendants Prescribe Medically Unnecessary Supplies

210.   The Physician Defendants and others routinely prescribed medically unnecessary Supplies.

---

[1] Quality Health, AB Quality, and PHCP's delivery receipts correct this error, stating that the patient has "received equipment," but otherwise contain the identical language quoted above. *See* Ex. 20.

211.    Prescriptions are typically issued for two and sometimes three separate bundles of supplies.  A first bundle of supplies ("Bundle A") is prescribed at the initial visit and typically includes at least the following:  (a) mattress; (b) heating pad; (c) bed board; (d) at least one and sometimes two cervical collars; (e) at least one and sometimes two lumbar sacroiliac orthotics ("LSO"); (f) a lumbar cushion and sometimes also a cervical pillow; and (g) other items.  *See* Ex. 21.  Often, only a few days later, a second bundle of supplies ("Bundle B") is prescribed and typically includes at least the following:  (a) electrical muscle stimulation device ("EMS Unit"); (b) a whirlpool; (c) massager, and (d) other items.  *See* Ex. 22.  Beginning in around April 2014, patients were also prescribed, a few days after the second bundle, a third bundle of supplies ("Bundle C") that would typically include at least the following:  (a) a pneumatic compressor; (b) a cervical traction unit with pump; and (c) other items.  Bundle C is purportedly delivered to the 1786 Flatbush patients by Quality Custom.  *See* Ex. 23.

212.    As shown in the chart attached as Exhibit 8, the Physician Defendants routinely prescribe, on average, 12 or more Supplies, with some patients prescribed as many as 18 Supplies.  It is inconceivable that so many patients would need so many articles of DME and orthotics, would need precisely the same Supplies, and would need these identical Supplies at the same moment in their course of treatment.

213.    In addition, the types and amount of orthotics ordered do not make sense particularly given the patient population of fully ambulatory individuals who have purportedly suffered relatively minor soft-tissue injuries and are being sent by their health care providers for, among other things, physical therapy, acupuncture, and chiropractic manipulations.  Among the purposes of lower back supports, LSOs, cervical collars, and knee, wrist, elbow, and shoulder orthoses is to restrict and limit movement.  Physicians typically prescribe such devices to restrict

movement when a patient is in intense pain that is aggravated by movement or there is a concern about stability. Appropriate treatment for patients who are trying to heal and rehabilitate soft tissue injuries, however, requires movement of the injured tissues, and even the Predetermined Treatment Protocol purports to include treatment for precisely that purpose, including physical therapy and chiropractic manipulations. Under such circumstances, it should be unnecessary, and in fact contraindicated, to provide restrictive orthotics for any region of the body, yet the Physician Defendants routinely prescribe orthotics for multiple regions. *See* Ex. 8.

214. Moreover, it does not make sense that many patients would be prescribed and provided two cervical collars, two LSOs, or two cushions. *See* Ex. 8.

215. Prescriptions were also written in a way to conceal the true volume and nature of Supplies prescribed and provided. First, each bundle of Supplies was usually the result of not one but several separate prescription documents and submissions, sometimes written on the same day or only days apart. The typical Initial Examination Reports contain preprinted language stating that after the examination, "[t]he patient [was] advised to use at home" certain supplies. The form contains a list of 22 possible supplies which the Physician Defendants checked to designate particular items prescribed. *See* Ex. 10. The standard Initial Examination Report does not contain an option for "other" or a blank for the physician to prescribe any supplies not on the list. The Physician Defendants at 1786 Flatbush also used a form entitled Medical Supply Prescription ("DME Prescription Form"), which contains a list of 25 items of items with check boxes. *See* Ex. 24. The use of multiple prescriptions, sometimes signed by different physicians, and sometimes involving a separate prescription for each item on a single day and spreading of submissions into bundles over time served to hide the significant volume, as well as the nature of the supplies that were being prescribed and provided.

216.    In addition, in some instances, the Physician Defendants purport to support the medical necessity of Supplies by signing letters of medical necessity.  But these boilerplate letters use standard language to describe the purported need for and benefits of the Supplies.  *See* Ex. 25.  The documentation does not indicate that any patient was instructed in use of the Supplies, how any patient responded to the Supplies, or even whether any of the patients used the Supplies.

217.    Finally, a series of DME companies were utilized to submit charges to State Farm Mutual and State Farm Fire at different periods of time.  From April 2013 to approximately March 2014, Maiga submitted bills to State Farm for Bundle A and Bundle B.  Thereafter, from March 2014 until April 2015, Madison submitted bills for Bundle A.  Around the same time that Maiga ceased billing State Farm Mutual and State Farm Fire in March 2014, Defendants began to submit bills for Bundle C through Quality Custom.  In April 2015, State Farm Mutual and State Farm Fire began receiving bills for Bundle A from PHCP and Quality Health.  Ex. 8.  In July 2016, Quality Health ceased billing State Farm Mutual and State Farm Fire for Supplies provided to patients 1786 Flatbush.  At the same time, State Farm Mutual and State Farm Fire began receiving bills from AB Quality for the same Supplies previously provided by Quality Health, which were supported by nearly identical form documentation.

### d.    The DME Defendants Fraudulently Inflated Their Charges for Supplies

218.    Each DME Defendant used the prescriptions written by the Physician Defendants to exploit the No-Fault Laws and charge inflated amounts for medically unnecessary Supplies.

### e.    Fraudulent Charges for Orthotics

219.    The DME Defendants also routinely purported to provide and bill for more expensive orthotics to fill generic prescriptions, rather than more basic and less expensive items,

without any support or documentation as to why the more expensive and elaborate orthotics were necessary to fill these prescriptions for basic orthotics.

220.    Cervical collars are among the most common orthotic devices purportedly provided by the DME Defendants and prescribed by the Physician Defendants.  They are worn around the neck to restrict movement and relieve muscle tension.  Various types of cervical collars are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $6.80 to $357 for eight specific types of cervical collars, each of which is described by a particular HCPCS Code ranging from L0120 to L0174.  Absent some express indication in a prescription form or other documentation that a more sophisticated cervical collar is necessary, prescriptions for a cervical collar should be filled with a flexible, non-adjustable foam cervical collar and billed under Code L0120 at $6.80 (hereinafter a "basic cervical collar").  If a two-piece collar is prescribed, the prescription can be filled with several different devices including a semi-rigid thermoplastic, two-piece collar and billed under HCPCS Code L0172 for $75.

221.    The Physician Defendants prescribe cervical collars and remarkably, for some patients, Defendants prescribe two cervical collars – one typically designated as a "cervical collar (2ps)" and the other as "Advanced Cervical Collar."  The Physician Defendants typically prescribe the two collars in separate prescriptions and bill for them with separate submissions. The prescriptions provide no detail or explanation as to what type of two piece collar should be provided or what is meant by an "Advanced" cervical collar.  As a result, State Farm Mutual and State Farm Fire have not been provided with documentation indicating that anything more than a basic cervical collar was necessary for any given patient.  Absent an indication to the contrary, the DME Defendants should have filled these prescriptions with a basic cervical collar under

HCPCS Code L0120 and billed $6.80, or at most provided a two piece collar under Code L0172 and billed $75.

222.   Nevertheless, the DME Defendants routinely purported to provide and billed using HCPCS code L0174 which is for a "cervical collar, semi-rigid thermoplastic foam, two-piece with thoracic extension" and using HCPCS Code L0190 which is for a "cervical multiple post collar."  Both collars are more sophisticated and expensive.  It is extremely uncommon to use both L0174 and L0190, yet the DME Defendants routinely charged for both items.  The DME Defendants billed State Farm between $130 and $362.34 for the L0174 and $311.75 for the L0190.

223.   Lumbar-sacral (lower back) supports ("LSOs") are another common orthotic device purportedly provided by the DME Defendants.  They are worn around the torso and extend below and above the waist to restrict movement and relieve muscle tension in the lower back. Various types of LSOs are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $43 to $1,150 for sixteen specific types of LSOs, each of which is described by a particular Code ranging from L0625 to L0640.  Absent some express indication in a prescription form or other documentation that a more sophisticated LSO is necessary, prescriptions for a LSO should be filled with a flexible LSO and billed under HCPCS Code L0625 at $43 (hereafter a "basic LSO").  The Physician Defendants routinely prescribe two LSOs for almost every patient – one typically designated simply "LSO" and the other as "LSO APL (Custom Fitted)."  The Physician Defendants typically prescribe the two collars in separate prescriptions and the DME Defendants bill for them with separate submissions.  Regardless of whether it was appropriate in some circumstances to prescribe and provide two LSOs, State Farm Mutual and State Farm Fire have

not been provided with documentation indicating anything more than a basic LSO was necessary. Thus, the DME Defendants should have filled prescriptions with a basic LSO under HCPCS Code L0625 and billed $43, or with a custom fit LSO under HCPCS Code L0630 and billed $127.26. Nevertheless, the DME Defendants each routinely purported to provide a Lumbar orthosis, under HCPCS Code L0627 and bill $322.64, and also "customized" LSO under HCPCS Code L0631 and bill $806.64. Moreover, the use of the applicable HCPCS Code L0631 and/or the prescription from one of the Physician Defendants for a "custom fitted" LSO, indicated to State Farm Mutual and State Farm Fire that the device was in fact "customized to fit a specific patient by an individual with expertise." But, even if the DME Defendants actually provided custom fitted LSOs the charges would be fraudulent because: (a) the devices were not medically necessary; (b) the charges are substantially more than the amount to which the DME Defendants would have been entitled under the No-Fault Laws for the basic orthotics; and (c) it is unlikely that any custom fitted LSOs were medically necessary in that there is little, if any, indication in Defendants' documentation that they performed any of the necessary fitting or adjustments for custom fittings, or had the expertise to do so.

224. The DME Defendants also purported to provide knee orthotics to some patients. They are worn around the knee to restrict movement and relieve muscle tension. Various types of knee orthoses are available depending on the unique circumstances of each patient. During the relevant period, the applicable fee schedule established prices ranging from $65 to $1,107.70 for fifteen specified knee orthoses, each described by a particular HCPCS Code ranging from L1810 to L1860. Absent some express indication in a prescription form or other documentation that a more sophisticated knee orthosis is necessary, prescriptions for a knee orthosis should be filled with an elastic knee orthosis with joints and billed under HCPCS Code L1830 at $65 (a

"basic knee orthosis").  The Physician Defendants' prescriptions typically say no more than "Knee Support" or "Knee Brace," and State Farm Mutual and State Farm Fire have not been provided with documentation indicating that anything more than the most basic knee orthosis was necessary.  Thus, the DME Defendants should have filled prescriptions with a basic knee orthosis under Code L1830 and billed $65.  Nevertheless, the DME Defendants often purported to provide a knee orthosis with adjustable knee joints under Code L1832 for $549.18 and for $607.55.

225.    The DME Defendants also purported to provide shoulder orthosis to some patients.  These are worn around the shoulder to restrict movement and relieve muscle tension. Various types of shoulder orthoses are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $40 to $896.92 for seven specific types of shoulder orthoses, each of which is described by a particular HCPCS Code ranging from L3650 to L3677.  Absent some express indication in a prescription form or other documentation that a more sophisticated shoulder orthosis is necessary, prescriptions for a shoulder orthoses should be filled with a prefabricated, off-the-shelf shoulder orthosis under HCPCS Code L3650 or L3660 at $40 (hereafter a "basic shoulder orthosis").  The Physician Defendants' prescriptions typically say no more than "Shoulder Support," and State Farm Mutual and State Farm Fire have not been provided with any documentation indicating that anything more than the most basic shoulder orthosis is necessary. Thus, Defendants should have filled prescriptions with a basic shoulder orthosis under L3650 or L3660 and billed $40.  Nevertheless, the DME Defendants purported to provide shoulder orthosis under HCPCS Code L3965 (which represents a mobile arm support designed to be

attached to a wheelchair) for $806.64.  This HCPCS Code used was not even on the fee schedule at the time it was billed.

### f.   The DME Defendants Purported to Deliver and Bill for Other, Different and More Expensive Items than Were Prescribed

226.   The DME Defendants also routinely provide other, different and more expensive DME than the items actually prescribed.

227.   The Physician Defendants prescribe mattresses, which should be fulfilled by supplying foam pads that can be placed on top of a regular mattress and billing $19.48 per foam pad using Code E0199.  The DME Defendants, however, routinely purport to provide and bill for dry pressure mattresses charging $204.24 or $306.26 under Code E0184.  Code E0184 indicates the mattress is being used for a patient who is either completely immobile or has limited mobility, pressure ulcers and impaired nutritional status, incontinence, altered sensory perception, or compromised circulatory status.

228.   Similarly, the Prescribing Physicians prescribe bed boards for which the DME Defendants provided different and substantially more expensive items.  Bed boards are not on the applicable fee schedule, but can be easily acquired for no more than $35 from any legitimate DME wholesaler.  Thus, even if a bed board was necessary and provided it would not be appropriate to charge more than $52.50 (i.e., no more than 150% of the acquisition cost; *see also* ¶ 230, below).  Yet, the DME Defendants did not bill for providing bed boards but for over-the-bed tables – devices placed over a bed-ridden individual to allow that person to eat in bed – and billed $101.75 or $101.85 under Code E0274.

229.   Similarly, the Physician Defendants prescribe lumbar cushions and often also either cervical pillows or back positioning cushions, without any support that patients need multiple support cushions.  Regardless, the DME Defendants should have filled prescriptions for

lumbar cushions and back position cushions with cushions billed at $22.04 under Code E0190. The DME Defendants, however, purport to fill prescriptions for back positioning cushions with a wheelchair back cushion under E2614 for $491.77 and purport to fill prescriptions for lumbar cushions with a positioning car seat under Code T5001 for $513.75 (a device intended for use in a vehicle by persons with special orthotic needs such as muscular dystrophy or cerebral palsy that cannot be met by less costly alternatives).  There is no justification for patients to be prescribed and provided multiple cushions and car seats.  In addition, there is no documentation establishing that the patients for whom these expensive and unusual devices are purportedly provided are wheelchair bound or suffer from special orthotic conditions such that standard devices would be insufficient.

### g.      Fraudulent Charges for Items Not on Fee Schedule

230.    The DME Defendants also purport to provide a number of items that are not on the applicable fee schedule, for which they fraudulently inflate their charges.  Under the No-Fault Laws, if an item is not on the fee schedule, a DME provider may charge no more than the *lesser of* 150% of its acquisition cost or its usual and customary charge to the public. 12 N.Y.C.R.R. § 442.2.

231.    The DME Defendants routinely charge between $699 and $735.25 for an EMS unit, $408 for a whirlpool, and $79.95 or $179.95 for a massager.  These submissions constitute representations that these amounts are the lesser of either 150% of their acquisition costs or their usual and customary charge to the public.  But the DME Defendants' true costs to acquire these items are a small fraction of what these submissions represent and the DME Defendants' true acquisition costs do not support their charges under the fee schedule.  In fact:

(a)      EMS units for which the DME Defendants routinely charge between $699 and $735.25, are typically available from many legitimately DME wholesalers for

between $30 to $65, and therefore 150% of such acquisitions costs should have been no more than $97.50.

(b)    Whirlpool units for which the DME Defendants routinely charge $408 are typically available from many legitimate DME wholesalers for about $56 and therefore 150% of such acquisition costs should have been no more than $84.

(c)    Massager units for which the DME Defendants routinely charge $79.95 or $179.95 are typically available from many legitimate DME wholesalers for between $25 to $35 and therefore 150% of such acquisition costs should have been no more than $52.50.

Thus, even if these Supplies were medically necessary (which they were not), appropriate charges for such Supplies should have been only a fraction of the charges the DME Defendants submitted for these items.

### h.    The DME Defendants' Documentation

232.    The DME Defendants also do not provide any documentation as to their acquisition costs for those items that are not on the fee schedule.  The documents the DME Defendants do submit omit basic information about the Supplies, like the manufacturer, make, model, size, features, and functions.  This prevents State Farm Mutual and State Farm Fire from determining the true kind and quality of the items provided, whether those specific items are medically necessary, and the appropriate charges for them.

233.    When State Farm Mutual or State Farm Fire have asked for information regarding acquisition costs or usual and customary charges, the DME Defendants have refused to provide it, have claimed they do not keep such records, and have refused to attend requested EUOs at which they would be required to provide such information.  For example, on many occasions State Farm Mutual and State Farm Fire have requested that certain DME Defendants attend examinations under oath and yet only Quality Custom has ever appeared for an EUO.  Indeed, DME Defendant Maiga has gone so far as to submit false affidavits in state court lawsuits to avoid the consequences of its failure to appear for EUOs.  On at least three occasions, following

State Farm Fire and State Farm Mutual's denial of Maiga's bills after Maiga failed to appear for the EUO, Maiga submitted boilerplate affidavits from its purported owner, Maiga Borisevica, in which Borisevica asserts she attempted to schedule EUOs by calling State Farm Fire and State Farm Mutual, but no one ever called her back.  *See* Ex. 26.  State Farm Fire and State Farm Mutual have no records of receiving any such phone calls.  Each of these affidavits were notarized by Maiga's attorney, Oleg Rybak.  *Id.*

### F.    Defendants' Further Efforts to Advance the Fraudulent Scheme

234.    Defendants are obligated legally and ethically to act honestly and with integrity. Nonetheless, Defendants submitted or caused to be submitted, bills and supporting documentation that are fraudulent in that they represent that services were performed and were medically necessary when, in fact, they were not.

235.    The Physician Defendants, the Physical Therapy Defendants, the Chiropractor Defendants, and the Acupuncture Defendants submitted, or caused to be submitted bills, and supporting documentation to State Farm Mutual and State Farm Fire for the examinations, Tests, and treatment detailed above. These bills and supporting documentation are fraudulent because the services were not medically necessary, the pervasive patterns in these documents are not credible, and they do not reflect legitimate findings, diagnoses, testing, or treatment.

236.    The DME Defendants have submitted or caused to be submitted bills and supporting documentation to State Farm Mutual and State Farm Fire for Supplies.  These bills and supporting documentation are fraudulent because the Supplies were not medically necessary and the DME Defendants are not entitled to reimbursement as they purported to deliver to patients and bill for different and more expensive items than were prescribed, exploited language in prescriptions to bill for more expensive items when less expensive items were all that were

prescribed, billed for different items than were actually provided and fraudulently inflated charges for items for which there was no established charge under the applicable fee schedule.

237.    Further, the success of Defendants' scheme depends on concealing the existence of the Predetermined Treatment Protocol from State Farm Mutual, State Farm Fire, and other insurers to induce insurers to pay Defendants' fraudulent charges.  Defendants take affirmative steps to conceal the scheme by, among other things, submitting multiple bills for services purportedly rendered by the same providers on the same date of service.  Defendants submit bills in this manner because they know that insurers like State Farm Mutual and State Farm Fire rely on the contents of each individual bill and related supporting documentation to make a payment determination.

238.    To verify some of the claims that it had received, State Farm Mutual and State Farm Fire timely requested, on multiple occasions, EUOs from all Defendants.  Most defendants failed and refused to comply with their legal obligations to provide State Farm Mutual and State Farm Fire with the properly and timely requested EUOs which constituted a breach of a condition of coverage under the State Farm Mutual and State Farm Fire insurance policies. Defendants also failed to appear for EUOs to continue to conceal the above-described fraudulent conduct from State Farm Mutual and State Farm Fire.

### G.    Justifiable Reliance by State Farm Mutual and State Farm Fire

239.    State Farm Mutual and State Farm Fire are under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The bills and supporting documents that Defendants submitted, and caused to be submitted, to State Farm Mutual and State Farm Fire in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual and State Farm Fire to justifiably and reasonably rely on them.

240.    As a result, State Farm Mutual and State Farm Fire have incurred damages of at least $1 million.

241.    Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature.  Only when the bills and supporting documentation are viewed together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

## V.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against all Defendants)

242.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

243.    Defendants, acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting, and causing to be submitted, bills and supporting documentation that contained false representations of material fact concerning patients treated at 1786 Flatbush.

244.    The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1 through 8  that:  (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when these Defendants did not legitimately reach such conclusions; and (c) the services and Supplies were performed, were provided, were medically necessary and/or were reimbursable, when, in fact, they either were not performed, not provided, not medically necessary and/or not reimbursable.

245.    Defendants knew that the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, testing, injections, and Supplies were false and fraudulent when they were made.

246.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

247.    As a result of their justifiable reliance on Defendants' misrepresentations, State Mutual and State Farm Fire Farm have incurred damages of at least $1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Against All Defendants)

248.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

249.    Defendants constitute an association-in-fact "enterprise" ("the 1786 Flatbush Fraudulent Treatment Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the 1786 Flatbush Fraudulent Treatment Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurance companies by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for services and supplies that were not provided, were not medically necessary, and/or were not legitimately entitled to reimbursement for patients treated at 1786 Flatbush.  Although different members have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common

purpose—to defraud State Farm Mutual and State Farm Fire through fraudulent insurance claims—with sufficient longevity to accomplish that common purpose. Specifically, Parisien, Dabiri, Blackman, Pavlova, and Lacina purported to legitimately examine patients at 1786 Flatbush, diagnose them with conditions to support the alleged need of the Predetermined Protocol of services that they could perform, or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and then ordered and performed additional injections and other services, which were billed by the Physician Defendants. Mollo, Mollo P.C., Island Life, Action Chiropractic, and Energy Chiropractic purported to provide chiropractic care, and tests and diagnosed patients with conditions requiring additional services that they could perform, or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and then ordered and performed additional services. Deng and Deng Acupuncture purported to provide acupuncture treatment based, in part, on diagnoses, findings and recommendations of other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and diagnosed patients with conditions requiring additional services that they could perform, or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise. Mariano purported to provide physical therapy and other services based on diagnoses, findings and recommendations of other members of the 1786 Flatbush Fraudulent Treatment Enterprise. The DME Defendants provided Supplies based on prescriptions written by Parisien, Dabiri, Blackman, Pavlova, and Lacina for patients at 1786 Flatbush. Each Defendant's participation and role was necessary to the success of the scheme. No one Defendant was capable of carrying out the scheme without the participation of the other Defendants. The 1786 Flatbush Defendants have acted with sufficient longevity to achieve their common goal of defrauding State Farm through fraudulent insurance claims.

250.    Each Defendant is or has been employed by and associated with the 1786 Flatbush Fraudulent Treatment Enterprise.

251.    Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 1786 Flatbush Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent in that:  (a) patients were not legitimately examined and tested to determine the true nature and extent of their injuries; (b) each patient's condition was represented to be related to an automobile accident and no other contributing factors, when Defendants did not legitimately reach such conclusions; and (c) the examinations, diagnoses, treatment, testing and Supplies which were medically unnecessary, were not performed, were not provided, and/or were not properly reimbursable, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual or State Farm Fire for claims referenced in Exhibits 1 through 8.

252.    State Farm Mutual and State Farm Fire have been injured in their business and property because of the above described conduct in that they collectively have paid more than $1 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Against All Defendants)

253.   State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

254.   Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 1786 Flatbush Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent for examinations, treatments, testing, injections, and Supplies which were medically unnecessary, were not performed, were not provided, and/or were not properly reimbursable, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual or State Farm Fire for claims referenced in Exhibits 1 through 8.

255.   Each of the Defendants knew of, agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, diagnoses, treatments, testing and Supplies, which were medically unnecessary, were not performed, were not provided, or were not properly reimbursable, to State Farm Mutual, State Farm Fire, and other insurers.

256.   State Farm Mutual and State Farm Fire have been injured in their business and property because of Defendants' above-described conduct in that they have collectively paid more than $1 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, together with treble damages, costs and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(d), plus interest, and any other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
**(Against All Defendants)**

257.   State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

258.   State Farm Mutual and State Farm Fire conferred a benefit upon the Defendants by paying Defendants' claims for services purportedly provided to patients treated at 1786 Flatbush and these Defendants voluntarily accepted and retained the benefit of those payments.

259.   Because the Defendants knowingly billed for services that were not medically necessary, were not rendered, and were not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

260.   As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

## FIFTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT
**(Against All Defendants)**

261.   State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

262.   This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

263.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and, Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB Physical Therapy, Maiga, Madison, Quality Health, Quality Custom, AB Quality and PHCP on the other hand, as to all charges for examinations, treatments, testing, injections, and Supplies that have not been paid to date and through the pendency of this litigation.  State Farm Mutual and State Farm Fire contend these Defendants are not entitled to reimbursement for any of these charges.

264.    Because these Defendants have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm Mutual and State Farm Fire, these Defendants are not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB Physical Therapy, Maiga, Madison, Quality Health, Quality Custom, AB Quality and PHCP, are not entitled to collect No-Fault Benefits for all charges for examinations, treatments, testing, injections, and Supplies that have not been paid to date and through the pendency of this litigation; and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

## SIXTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT BASED ON FAILURE TO APPEAR FOR EXAMINATIONS UNDER OATH
### (Against All Defendants)

265.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 241 above.

266.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

267.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and, Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB Physical Therapy, Maiga, Madison, Quality Health, Quality Custom, AB Quality and PHCP, on the other hand, as to all charges that have not been paid to date and through the pendency of this litigation as a result of these Defendants' failure to appear for properly and timely requested EUOs.

268.    The failure of these Defendants to appear for properly and timely requested EUOs constitutes a breach of a condition of coverage under the State Farm Mutual and State Farm Fire insurance policies.

269.    Accordingly, State Farm Mutual and State Farm Fire contend the Defendants listed above are not entitled to reimbursement for any of these charges.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB Physical Therapy, Maiga, Madison, Quality Health, Quality Custom, AB Quality and PHCP, are not entitled to collect

No-Fault Benefits for charges that have not been paid to date and through the pendency of this litigation for failure to appear for properly and timely requested EUOs; and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury.

Dated: January 19, 2018
Chicago, Illinois

KATTEN MUCHIN ROSENMAN LLP

By: _____
Ross O. Silverman (NY Bar No. 4147922)
Jonathan L. Marks (NY Bar No. 5462874)
Patrick C. Harrigan (motion for *pro hac vice* to be filed)
Anne Raven (motion for *pro hac vice* to be filed)
Silké G. Watson (motion for *pro hac vice* to be filed)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: 312.902.5200
Facsimile: 312.902.1061
ross.silverman@kattenlaw.com
jonathan.marks@kattenlaw.com
patrick.harrigan@kattenlaw.com
anne.raven@kattenlaw.com
silke.watson@kattenlaw.com

Michael M. Rosensaft
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone: 212.940.8800
michael.rosensaft@kattenlaw.com

*Attorneys for Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*