UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
State Farm Mutual Automobile Insurance Company
and State Farm Fire and Casualty Company,                          **Case No.: 18-cv-289 (ILG)(ST)**

                             Plaintiffs,

Jules Parisien, M.D., Luqman Dabiri, M.D.,
Ksenia Pavlova, D.O., Noel Blackman, M.D.,
Frances Lacina, D.O., Allay Medical Services, P.C.,
FJL Medical Services P.C., JFL Medical Care P.C.,
JPF Medical Services, P.C., KP Medical Care P.C.,
PFJ Medical Care P.C., RA Medical Services P.C.,
Darren Mollo, D.C., Darren Mollo D.C., P.C.,
ACH Chiropractic, P.C., Energy Chiropractic, P.C.,
Island Life Chiropractic Pain Care, PLLC,
Charles Deng, L.A.c., Charles Deng Acupuncture, P.C.,
David Mariano, P.T., MSB Physical Therapy P.C.,
Maiga Products Corporation, Madison Products of
USA, Inc., Quality Custom Medical Supply, Inc.,
Quality Health Supply Corp., Personal Home Care
Products Corp., and AB Quality Health Supply Corp.,

                             Defendants.
-----------------------------------------------------------------------x


### CERTAIN DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF STATE FARM'S MOTION FOR A PREMINARY IUNJUNCTION AND STAY OF STATE COURT PROCEEDINGS

**ABRAMS, FENSTERMAN, FENSTERMAN**     **FISHER & FISHER**
**EISMAN FORMATO, FERRARA, WOLF**
**& CARONE, LLP**

*Attorneys for the Professional Defendants*     *Attorneys for the DME Defendants*

1 Metrotech Center, Suite 1701          127 Great Kills Road
Brooklyn, New York 11201             Staten Island New York 10308
Tel.: (718) 215-5300                 (212) 514-8888
Fax: (718) 215-5304

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ........................................................................1

II. COUNTER-STATEMENT OF FACTS ..........................................................3

       The Legitimate Treatment of Patients with Strains and Sprain
       Purported "Predetermined Treatment Protocol" ("PTP")
       Physical Therapy Treatment
       Chiropractic Treatment
       Acupuncture Treatment
       Range of Motion and Muscle Testing
       Electro-Diagnostic ("EDX") Testing

III. STATE FARM'S REQUEST TO ENJOIN PENDING AND FUTURE
STATE PROCEEDINGS SHOULD BE IN ALL RESPECTS DENIED ............................10

1. Summary of Our Opposition .............................................................................10

    A.  STATE FARM'S REQUEST FOR A STAY OF PENDING
        ARBITRATIONS IS INAPPLICABLE BECAUSE THERE
        ARE NO ARBITRATIONS BY THE PROVIDERS PENDING
        AGAINST STATE FARM, AND THE AUTHORITIES CITED
        ARE PREMISED UPON THE FEDERAL ARBITRATION ACT ................11

    B.  THE ANTI-INJUNCTION ACT BARS THE COURT FROM
        ENJOINING DEFENDANT-PROVIDERS' PENDING STATE
        COURT LITIGATION; THE STATUTORY EXCEPTION,
        "WHERE NECESSARY TO AID ITS JURISDICTION" DOES
        NOT APPLY ......................................................................................12

        (1) Inapplicability of the "Necessary to Aid Jurisdiction" Exception ..............12
        (2) Enjoinment of the State Court Suits Pending on
            January 16, 2018 is Barred ...........................................................15
        (3) The AIA Bar Against Pending State Court Suits Includes the
            State Court Actions That Were Commenced After State Farm's
            Initial Complaint was Filed And that Remain Pending Until
            the Time that the Instant Motion is Decided ...................................17

    C.  STATE FARM CANNOT SHOW ANY OF THE REQUIREMENTS
        TO JUSTIFY AN INJUNCTION AGAINST FUTURE STATE
        PROCEEDINGS ................................................................................19

i

(1) State Farm Will Not Be Irreparably Harmed in
the Absence of Injunctive Relief………………………………………19

(2) There is an Absence of Sufficiently Serious
Questions Going to the Merits of State Farm's
Claims to Make Them a Fair Ground for Litigation………………........23

(3) The Balance of Hardships is Not Even Close, Much
Less Decidedly, in Favor of State Farm…………………………………26

IV. THE PROVIDERS' STATE CLAIMS AGAINST STATE FARM ARE NOT
COMPULSORY COUNTERCLAIMS IN THIS FEDERAL ACTION ..............................28

V. CONCLUSION ............................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Aeroquip Corp. v. Chunn,
   526 F.Supp. 1259 (M.D. Ala. 1981) ....................................................................... 29

Allstate Ins. Co. v. Elzanaty,
   929 F. Supp. 2d 199 (E.D.N.Y. 2013)............................................................... 11, 23

Allstate Insurance Co. v. Harvey Family Chiropractic,
   677 Fed. Appx. 716 (2d Cir. 2017) ........................................................................ 20

Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers,
   398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970) ............................................ 13

Barancik v. Investors Funding Corp.,
   489 F.2d 933 (7th Cir. 1973)................................................................................... 19

Bruce v. Martin,
   680 F. Supp. 616 (S.D.N.Y. 1988).................................................................... 16, 23

Citigroup Glob. Markets Inc. v. VCG Special Opportunities Master Fund Ltd.,
   2008 WL 4891229 (S.D.N.Y. 2008),
   aff'd, 598 F.3d 30 (2d Cir. 2010)............................................................................ 26

CRP/Extell Parcel I, L.P. v. Cuomo,
   394 Fed. Appx. 779 (2d Cir. 2010) ........................................................................ 21

Fair Price Med. Supply Corp. v. Travelers Indem. Co.,
   10 N.Y.3d 556 (2008) .............................................................................................. 4

Faiveley Transp. Malmo AB v. Wabtec Corp.,
   559 F.3d 110 (2d Cir. 2009).................................................................................... 20

Freedom Holdings, Inc. v. Spitzer,
   408 F.3d 112 (2d Cir. 2005).................................................................................... 22

Grand River Enter. Six Nations, Ltd. v. Pryor,
   481 F.3d 60 (2d Cir. 2007)...................................................................................... 20

Gulf Oil Corp. v. Dep't of Energy,
   514 F.Supp. 1019 (D.D.C. 1981) ........................................................................... 21

Hi–Tech Pharmacal Co., Inc. v. U.S. Food & Drug Admin.,
   587 F.Supp.2d 1 (D.D.C. 2008) .......................................................................... 21

Jacobson v. Sassower,
   66 N.Y.2d 991 (1985) ...................................................................................... 18

Jayaraj v. Scappini,
   66 F.3d 36 (2d Cir. 1995)................................................................................ 21

Kline v. Burke Constr. Co.,
   260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922) .................................................. 14

Liberty Mut. Ins. Co. v. Excel Imaging, P.C.,
   879 F. Supp. 2d 243 (E.D.N.Y. 2012)................................................................ 11

ONBANCORP v. Holtzman,
   1997 WL 381779 (N.D.N.Y. 1997) .................................................................... 15

Presbyterian Hospital v. Maryland Casualty Co.,
   90 N.Y.2d 274 (1997) ....................................................................................... 4

Reines Distributors, Inc v. Admiral Corp,
   182 F. Supp. 226 (S.D.N.Y. 1960)..................................................................... 28

Renegotiation Board v. Bannercraft Clothing Co.,
   415 U.S. 1 (1974) .......................................................................................... 22

Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.,
   386 F.3d 419 (2d Cir. 2004).............................................................................. 22

Roth v. Bank of the Commonwealth,
   583 F.2d 527 (6th Cir. 1978)............................................................................ 18

Rutland Med., P.C. v. State Farm Ins. Co.,
   45 Misc. 3d 1033 (N.Y. Civ. Ct., Kings County, 2014)........................................... 26

Salinger v. Colting,
   607 F.3d 68 (2d Cir. 2010)............................................................................... 20

SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC,
   445 F.Supp. 2d 356 (S.D.N.Y. 2006).................................................................. 14

Standard Microsystems Corp. v. Texas Instruments Inc.,
   916 F.2d 58 (2d Cir. 1990)............................................................................... 19

State Farm Mut. Auto. Ins. Co. v. Jamaica Wellness Med., P.C., et al.,
   Case No. 1:16-cv-04948-FB-SMG ...................................................................... 15

Tahir v. Progressive Cas. Ins. Co.,
   12 Misc.3d 657 (N.Y. Civ. Ct., Kings County, 2006)...................................................... 26

Toxco, Inc. v. Chu,
   724 F.Supp.2d 16 (D.D.C. 2010) ............................................................................. 21

Vendo Co. v. Lektro-Vend Corp.,
   433 U.S. 623, 97 S. Ct. 2881, 53 L. Ed. 2d 1009 (1977) .................................................. 14

Vernitron Corp. v. Benjamin,
   440 F.2d 105 (2d. Cir. 1971) cert. den., 402 U.S. 987 (1971) ................................................ 22

Viviane Etienne Med. Care, P.C. v. Country-Wide Ins. Co.,
   25 N.Y.3d 498 (2015) ................................................................................... 3, 4

Westchester Med. Ctr. v. Progressive Cas. Ins. Co.,
   89 A.D.3d 1081 (2d Dep't, 2011) ................................................................................ 3

Wyly v. Weiss,
   697 F.3d 131 (2d Cir. 2012) ................................................................................ 14

**Statutes & Rules**

11 N.Y.C.R.R., Part 65, et seq. ................................................................................ 1

11 NYCRR § 65-3.8(a) ........................................................................................ 4

28 U.S.C. §1651 ............................................................................................ 12

28 U.S.C. §2283 ............................................................................................ 12

Federal Arbitration Act, 9 U.S.C. § 1 et seq. ................................................................. 11

Federal Rule of Civil Procedure 13(a) ....................................................................... 28

Insurance Law § 5106(a) ...................................................................................... 4

Insurance Law § 5106(b) ..................................................................................... 12

**Other Authorities**

11A Wright & Miller, Federal Practice & Procedure §2948.1 (West 2007) ................................ 20

17A Wright & Miller, Federal Practice and Procedure § 4225 (West 2007) ............................. 14

The Anti-Injunction Act and The Problem Of Federal--State Jurisdictional Overlap,
   92 Tex. L. Rev. 1 (November 2013) ................................................................... 13

Wright & Miller, 6 Federal Practice & Procedure §1418 (West 2007) ....................................... 28

## I.  PRELIMINARY STATEMENT

This Memorandum of Law, together with the accompanying Declaration of Mark L. Furman, dated March 15, 2018, with Exhibits, is submitted on behalf of certain parties-defendant ("Providers")[1] in opposition to Plaintiffs' Motion for Preliminary Injunction and Stay, dated January 19, 2018, in which automobile insurance carriers State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company ("State Farm") seek to temporarily enjoin the Providers from pursuing claims against State Farm in other forums during the pendency of this action.

The Providers are practicing physicians, acupuncturists, physical therapists, chiropractors and companies providing durable medical equipment ("DME"), who furnish health care services and supplies to, among other patients, insureds injured in motor vehicle accidents covered by insurance policies issued by State Farm. In their application, State Farm seeks to enjoin both (1) pending state legal proceedings for services and supplies already rendered to their insureds, and for which the Providers are seeking payment in accordance with the No-Fault Regulatory System promulgated by the New York State legislature, 11 N.Y.C.R.R., Part 65, et seq. ("No-Fault System") and (2) any future state legal proceedings that the Providers would be entitled to bring in order to obtain payments for their services or supplies as furnished by them.

---

[1]  The Providers are: (1) Jules Parisien, M.D. and his professional medical corporations ("PCs") JPF Medical Services, P.C, and PFJ Medical Care P.C. (2) Ksenia Pavlova, D.O., and her PCs, Allay Medical Services, P.C. and KP Medical Care P.C,, (3) Luqman Dabiri, M.D., (4) Frances Lacina, D.O., and his PCs, JFL Medical Care P.C. , FJL Medical Services P.C. and RA Medical Services, P.C., (5) Darren T. Mollo, D.C., and his PCs Darren Mollo D.C., P.C.,  ACH Chiropractic, P.C., Energy Chiropractic, P.C., and Island Life Chiropractic Pain Care, PLLC, (6) Charles Deng, L.A.c, and his PC Charles Deng Acupuncture, P.C., (7) MSB Physical Therapy P.C., (8) David Mariano, P.T., (Nos. 1 through 8 are deemed collectively as  "the Professional Defendants") (9) Maiga Products Corporation, (10) Madison Products of USA, Inc.,  (11) Quality Health Supply Corp., (12) AB Quality Health Supply Corp., and (13) Personal Home Care Products Corp. (Nos. 9 through 13 are deemed collectively as  "the DME Defendants").

In bringing this motion, State Farm completely ignores the existence of the long-standing, comprehensive, state regulatory framework for the adjudication of disputed no-fault insurance claims in New York. This is exemplified by their primary contention that the Providers "know that they face better odds of recovering" payment when each bill is viewed in isolation (Supporting Memorandum of Law dated January 19, 2018 ("SFMOL") at p.2), a circumstance which is precisely what New York's No-Fault System calls for.  State Farm knows full well that it is a bill-specific system[2]. To suggest, as State Farm does, that there is something improper about bringing a proceeding "over a single provider's bill for a single date of service" is the kind of innuendo that should not be permitted to support this application. In fact, in making this application, what State Farm is doing is seeking to avoid well-established rules regarding waivers and preclusion that have been developed through the New York courts specializing in no-fault adjudications.  By attempting to deal with these bills in a wholesale fashion, State Farm is not only trying to avoid its obligations under the promulgated laws and regulations, but is also transparently engaging in forum-shopping.

Worst of all, perhaps, is that State Farm's application is a surprise culmination of **years of voluntary forbearance by the Providers**, who through collection counsel **reasonably believed that they were in a good faith negotiation with State Farm toward a "bulk settlement"** of their long unpaid claims for services and supplies rendered. Not only did the Providers effectively waive any time limitations that State Farm would have had to bring the instant litigation; they sacrificed significant revenue and cash-flow all the while, only to be met with, not only the expense and stigma of a racketeering (RICO) lawsuit, but an attempt to cut-off

---

[2]   Under the system, each bill is permitted to have ten (10) lines of provider services listed per line by date of service and Current Procedural Terminology ("CPT") Code. Thus a bill can be totally or partially disallowed by carrier, which of necessity can result in multiple disputes on just a single bill.

their financial ability to defend these allegations. For a multi-billion dollar corporation like State Farm to now claim that it will somehow be "irreparably harmed" by the resumption of the Providers' ability to proceed under the comprehensive New York regulatory framework for adjudication of these claims, and possibly re-gain the revenue which they forewent in order to avoid this litigation, is simply an outrage. Under these circumstances, the "balancing of hardships" is **decidedly against this insurance carrier,** State Farm Insurance Company.

## II. COUNTER-STATEMENT OF FACTS

The medical facility located at 1786 Flatbush Avenue ("Facility") is one of hundreds of similar multispecialty facilities in the greater New York City area, performing the very same types of services without intervention or allegations of fraud by State Farm. **There is nothing distinguishable about these providers from any other set of local practitioners specializing in rehabilitation of auto accident victims.**

This action putatively arose out of plaintiff's intentional and willful breach of contract in its failure to timely and properly pay or deny the first party no-fault benefits claims of the Defendants after plaintiff had received the Defendants timely and properly submitted claims for No-Fault reimbursement, and did not pay or deny them within 30-days of receipt, thus making the Defendants claims overdue. See Westchester Med. Ctr. v. Progressive Cas. Ins. Co., 89 A.D.3d 1081, 1082 (2d Dep't, 2011) (internal citations omitted). This standard has been adopted by the New York State Court of Appeals. See Viviane Etienne Med. Care, P.C. v. Country-Wide Ins. Co., 25 N.Y.3d 498 (2015). Those claims sought payment for medically necessary and properly billed for medical services and/or durable medical supplies provided by the Defendants to persons entitled to receive benefits under the New York Insurance Law and the No-Fault Implementing Regulations ("Regulations") promulgated thereunder. An insurer is required to

3

either pay or deny a claim for medical services rendered under No-Fault within 30 days from receipt of proof of the claim (e.g., the bill), which proof shall include verification requested by the insurer.  *See* 11 NYCRR § 65-3.8(a); Insurance Law § 5106(a).

The Providers' claims for no fault benefits were received by plaintiff, but were never paid or denied and are overdue in violation of the insurance law and rules and regulation.  *See* Insurance Law § 5106(a); 11 NYCRR 65-3.8; Viviane Etienne Med. Care, P.C. v. Country-Wide Ins. Co., 25 N.Y.3d 498 (2015); Fair Price Med. Supply Corp. v. Travelers Indem. Co., 10 N.Y.3d 556 (2008); Presbyterian Hospital v. Maryland Casualty Co., 90 N.Y.2d 274 (1997). It is this failure to pay No-Fault claims that results in Civil Court litigation and/or arbitration.

### The Legitimate Treatment of Patients with Strains and Sprains

State Farm alleges that patients did not receive legitimate medical treatment since strains and sprains will heal without intervention (¶66); this allegation is contravenes the very purpose of no-fault automobile insurance, and ignores the consequences of pain that follow a traumatic injury even if the injury ultimately heals later on its own and trivializes the vital services the defendants, and hundreds of other similarly situated medical professionals, provide to victims of motor vehicle accidents

The treatments for these injuries include, but are not limited to chiropractic, acupuncture, physical therapy through the application of heat and cold, NSAIDS for pain and other passive modalities mentioned by State Farm.  These modalities are applicable to virtually every one of the above injuries.  Manipulation, massage, hot/cold therapy, acupuncture, and chiropractic are *all* approved by the New York State Worker's Compensation Board Guidelines for neck and back pain.

**State Farm's Purported "Predetermined Treatment Protocol"**

State Farm rails in its Complaint about the identity of treatment under a so-called "Predetermined Treatment Protocol" ("PTP") theory, but its description thereof is riddled with equivocation. To describe the purported PTP, State Farm uses the words "nearly" or "nearly identical" as modifiers twenty-two (22) times (*see, e.g.*, ¶¶79, 82 and 209; the word "virtually" seven (7) times (*see, e.g.*, ¶¶105, 164); and the vague term "almost" (as in "almost every" or "almost identical") at least twenty-eight (28) times (*see, e.g.*, ¶¶79, 123). Indeed, diversity of treatment (assuming, arguendo, that there should be vast diversity in treatment of soft-tissue injuries arising from automobile accidents) is even demonstrated in patient treatment summaries attached as Amended Complaint Exhibit 1, in which only the most basic of treatment methods (i.e. physical therapy, chiropractic, and acupuncture) are consistent. Other than that, the patients' treatments were by no means "identical."

Moreover, there is nothing improper about a protocol. There are published protocols for treatment, and New York has treatment guidelines that one could call a "protocol". If two patients present with neck pain, they may get the same treatment. This is ubiquitous in therapy centers and provides a streamlined tried-and-true method for treating the type of injuries at issue here.

State Farm complains that the documentation is "nearly" identical (*see, e.g.*, ¶¶80-82). This is hardly any surprise. There are certain elements of information that need be collected from the patients; physicians are taught a format to do a history and physical exam and, again, the patients are coming in for the same reasons.

Pre-printed forms are thus not merely acceptable but are a universal practice among medical providers. In fact, they are method of standardization; standardization improves patient

safety.[3]   Further, they have been used at major institutions to improve adherence to hospital billing standards and cited as good practice.[4]

The physical examinations that the Providers performed are also quite typical.  Once the physician determines that the lower back is an issue, most doctors will assess a range of motion, pain with flexion/extension, straight leg raise, strength, and sensation. Physical examination notes, even if they had been written in longhand, would still look the same.

State Farm also takes issue with the "follow-up "examinations (¶87).  Follow-ups are often necessary because physical therapy ("PT") is usually ordered in 4-week intervals.  If the patient does not improve by then, referrals to pain management, orthopedics and other specialists may be needed.  Also, by four (4) weeks the MRI's are necessary and physicians review them with the patients.  Additionally, neck pain from auto accidents can be refractory.  Most patients improve (79%), but less than half are pain free, and nearly one third (32%) have persistent pain.[5]

### Physical Therapy Treatment

State Farm challenges multimodal PT treatment, notwithstanding that studies have shown that multimodal therapy can be helpful.  In a randomized control study, patients were given manual therapy, heat or cold, exercise by range of motion and psychological strategies versus education.  The multimodal group led to statically important better self-reported disability.[6]

---

[3]  Rozich, J Howard, R Standardization as Mechanisms to Improve Safety In Health Care, Joint Commission Journal on Quality and Safety. Vol 30(1) 2004, pages 5-14.

[4]  Sprtel, SJ, Ziabek, JA. Does the Use of Standardized History and Physical Forms Improve Billable Income and Resident Physician Awareness of Billing Codes. South Med J. 2005 May, 98(5):524-7.

[5]  Gore DR, Sepic, Gardner GM, Murray.  Neck Pain: A long term follow up of 205 patients.  Spine 1987: 12:1-5.

[6]  Lamb, SE Williams, Williamson, EM, et al., Managing Injuries of the neck trail: a randomized controlled trial of treatments for whiplash injures.  Health Technology Assess 2012; 16:1-141.

State Farm's allegation that billing for low level laser therapy under CPT Code 97799 (¶95), as an unlisted service or procedure is "fraud" is simply incorrect.[7]  Similarly, the claim regarding the use of bioelectric and cold laser at the same time as PT has no weight.  This is multimodal treatment by definition.  The respective treatments work by different mechanism.  Further, cold laser itself will not generally alleviate pain immediately.  It takes several treatments to start to work.[8]  Further, bioelectric treatments are always used in conjunction with other treatments.[9]  It is not surprising there is only a 10-20% relief in pain because rehabilitation takes time and continuous treatments.  Indeed, the Workers Compensation guidelines state that electrical stimulation is part of the comprehensive rehabilitation plan.

**Chiropractic Treatments**

It is equally of no surprise that the chiropractic treatment (¶99) is largely the same.  Chiropractic treatments are designed to work over time.  If a chiropractor changes the treatment, one cannot evaluate the treatment.  For example, cervical spine manipulation is recommended in section D.11.d for up to 8 to 12 weeks.  Time to see effects can be 1-6 treatments and continue for up to 3-months, and allows for extended duration of care, beyond what may be considered maximum.

"Guarded prognosis", of which State Farm inexplicably whines, is defined as when the patient's outcome is in doubt.[10]  Considering that post-accident patient with whiplash will likely suffer some level of chronic pain in the future and thus a guarded prognosis is appropriate.  Other studies have tried to classify medical prognosis, while often the prognosis is favorable, studies

---

[7]  See http://www.coldlasers.org/therapy/cpt-codes-insurance-reimbursements/index.cfm.

[8]  https://www.spine-health.com/treatment/pain-management/cold-laser-therapy-pain-management-treatment.

[9]  https://www.spine-health.com/treatment/pain-management/all-about-electrotherapy-and-pain-relief.

[10]  http://www.lb7.uscourts.gov/documents/13c49982.pdf.

have found that 50% have chronic conditions one (1) year later.  The prognostic factors are variable, but there is conflicting evidence about the value of prior pain, prior and combined conditions.[11]

The allegations that chiropractic treatment is inappropriate per the chiropractor's scope of practice is contravened by the Workers Compensation guidelines, which allow for manipulation for 3-times per week up to 4-weeks, and can be extended beyond this for 4-additional weeks at a lower rate.[12]   Rarely is modification of the treatment plan necessary unless there is contraindication.  However, State Farm's admission that there were modifications defeats their own innuendo of fraud.  Further, the allegation that chiropractors were manipulating on the same days as the PT applied hot/cold packs (¶111) is meaningless because this is unquestionably part of multimodal treatment and a separate specialty with its own licensing.

**Acupuncture Treatment**

With regard to the acupuncture treatments, allegations that every patient has a tongue that is light red, normal or thick with white coating, have no meaning.  According to once source of tongue diagnosis in acupuncture, one looks at the color of the tongue, shape and coat.[13]  Stating that a tongue is red or has a coat or appears normal is appropriate.  Again, these patients are suffering the same or similar conditions and are usually in the same state of distress.  Therefore, similarities are appropriate.  The same is true regarding similarity in that the pulses are normal or

---

[11]   One study attempted to try to come up with a prognostic value for MVA, but it did not account for treatments other variables.  This study was only a first step in developing a model for prognosis and is not validated.  Bohman, T, C Pierre, Prognosis of Patients with Whiplash-associated Disorders Consulting Physiotherapy: Development of Predictive Model for Recovery.  BMC Musculoskeletal Disorders 2012 13:264.  Therefore, it considering the relative risk, post-MVA patients' conditions are guarded.

[12]   New York State Workers' Compensation Medical Treatment Guidelines: Neck Injury Paragraph D.11.d.i.

[13]   https://theory.yinyanghouse.com/theory/chinese/tongue_diagnosis.

floating. Chi stagnation, of which State Farm also complains, is quite common in acupuncture, particularly when the patients report the same source of injury.[14]

State Farm fails to acknowledge that acupuncturists work on a different level, with words like floating or sinking, slow/rapid, hesitant, slippery, tight, big/thin, etc. [15]  The allegation that the tongue is not re-evaluated (¶124) is of no moment.  The tongue is used in the diagnosis. Unless it provides valuable information, it might not need re-evaluated, especially if it was red and normal.

### Range of Motion And Muscle Testing

Computerized range of motion testing is also necessary.[16]  Indeed, there are many ways to measure range of motion.  However, the inclinometer, such as the one used at 1786 Flatbush, is widely used in orthopedic assessments and many studies have examined the *reliability and validity* of lumbar spine inclinometer measurements.

### Electro-Diagnostic ("EDX") Testing

EDX studies are an important means of diagnosing, motor neuron disease, myopathies, radiculopathies, plexopathies, neuropathies and NMJ disorders.  EDX studies are also useful when evaluating tumors involving an extremity, the spinal cord, and/or the peripheral nerves, and spondylosis and cervical and lumbosacral disc disease.[17]

---

[14]  http://www.acupuncture.com/education/theory/qistagn.htm.

[15]  https://theory.yinyanghouse.com/theory/chinese/pulse_diagnosis.

[16]  Pourahmadi MR, Taqhipour M. Reliability and Validity of an iPhone application for the Measurement of Lumbar Spine Flexion and Extension Range of Motion. Peer J 2016 Aug 23; 4:e2355. Measurement of lumbar spine range of motion is routinely used by clinicians to assess patients with low back pain. The use of this data is to determine whether and so abnormal limitation exists in the lumbar spine mobility. This can be used to monitor how effective a rehabilitation campaign is working.

[17]  American Association of Neuromuscular and Electrodiagnostic Medicine (AANEM) AANEM, policy page 3.

Most auto accidents involve some aspect of radiculopathies, plexopathies from shoulder injuries, spinal cord or disc injuries.  EDX testing is a necessary component for evaluating patients post-accident.[18]

There is no basis for State Farm's purported comparison between the Facility and the language that EDX testing must be "tailored" to each patient's symptoms.  That statistic is based not upon similar specialty clinics, but instead upon emergency room and other hospital-based testing in which the premise for trauma or other potential nerve injury in unknown or variant, unlike auto accident cases.

### III.  STATE FARM'S REQUEST TO ENJOIN PENDING AND FUTURE STATE PROCEEDINGS SHOULD BE IN ALL RESPECTS DENIED

**Summary of Our Opposition**

State Farm makes essentially four (4) arguments in support of this motion, each of which are without merit, on the law.

First, State Farm seeks to stay any no-fault arbitrations.  However, in the case of these providers, there are no such proceedings. In any event, the reasoning of State Farm's authorities, the Federal Arbitration Act, is totally inapplicable to the subject underlying litigations.

Second, State Farm seeks to stay all pending state court litigation proceedings, which now total 2300 lawsuits in various stages of process (including some ready for trial). However, federal law is clear that such request is barred by the Federal Anti-Injunction Act. The cases interpreting the one exception relied upon by State Farm, the "aid-of-jurisdiction" exception, clearly hold that it is not applicable to the instant circumstance.

---

[18]  AANEM's recommendation makes very clear that there is no single policy or set of procedures for diagnosing a patient's condition. Overutilization is not considered until testing was above 90% for a regional norm. AANEM, page 3.

Third, State Farm seeks an injunction under the All Writs Act against future litigation by these Providers. However, State Farm has not, and cannot show that if injunctive relief is not granted , it will be "irreparably harmed", or , as is required, that  the "balance of hardships" if the injunction is declined is "decidedly" in their favor.

Fourth and finally, State Farm claims that any future claims by these providers are "compulsory counterclaims" pursuant to Federal Rule of Civil Procedure 13(a). However, the law is clear that Rule 13(a) is a federal court housekeeping rule, and only applies between federal actions, not federal to state actions.

### A.  STATE FARM'S REQUEST FOR A STAY OF PENDING ARBITRATIONS IS INAPPLICABLE BECAUSE THERE ARE NO ARBITRATIONS BY THE PROVIDERS PENDING AGAINST STATE FARM, AND THE AUTHORITIES CITED ARE PREMISED UPON THE FEDERAL ARBITRATION ACT

State Farm's request for a stay of pending arbitrations (SFMOL pp. 8-10) is inapplicable to these Defendants because there simply are no arbitrations by these Defendant-Providers pending against State Farm.  Exhibit 1 to State Farm's Memoranda, listing eighteen (18) pending arbitrations do not include a single proceeding commenced by any of the instant Defendants. The two authorities cited by State Farm in support of their argument, Allstate Ins. Co. v. Elzanaty, 929 F. Supp. 2d 199 (E.D.N.Y. 2013), Liberty Mut. Ins. Co. v. Excel Imaging, P.C., 879 F. Supp. 2d 243, 264 (E.D.N.Y. 2012) are thus inapposite. Nor is the reasoning of those cases applicable here, since they were expressly premised upon the District Court's power to enjoin arbitrations under the Federal Arbitration Act, 9 U.S.C. § 1 et seq., which statute is inapplicable to private state court litigation proceedings. Furthermore, the concern in that case, e.g. that the claims would "be heard by mix of arbitrators, each of whom would have likely come to her own

independent and potentially contradictory conclusions" is not applicable to a court, the latter being bound by the rule of law and precedent.[19]

**B. THE ANTI-INJUNCTION ACT BARS THE COURT FROM ENJOINING DEFENDANT-PROVIDERS' PENDING STATE COURT LITIGATION; THE STATUTORY EXCEPTION, "WHERE NECESSARY TO AID ITS JURISDICTION" DOES NOT APPLY**

(1)   <u>Inapplicability of the "Necessary to Aid Jurisdiction" Exception</u>

Next, relying upon the All Writs Act ("AWA"), 28 U.S.C. §1651, State Farm contends that this Court is authorized to enjoin some 1,400 state court litigations[20] commenced against State Farm for unpaid claims since approximately 2013 (SFMOL Exhibit 2). Plaintiffs concede that AWA is limited by the Federal Anti-Injunction Act, ("AIA"), 28 U.S.C. §2283, originally

---

[19]   Moreover, by seeking to enjoin the Defendants from bringing arbitration proceedings against State Farm to collect on their outstanding claims, State Farm is improperly attempting to infringe upon the Defendants right to arbitrate claims disputes as provided by the subject insurance policies, New York State Insurance Law and the Federal Arbitration Act. Insurance Law § 5106(b) states in pertinent part, "[e]very insurer *shall* provide a claimant with the option of submitting **any dispute** involving the insurer's liability to pay first party benefits, or additional first party benefits, the amount thereof or any other matter which may arise pursuant to subsection (a) [fig 1] **of this section** to arbitration pursuant to simplified procedures to be promulgated or approved by the superintendent." (Emphasis added). Thus, Insurance Law § 5106(b) grants a claimant, such as the Defendants herein, an **absolute** right to arbitrate disputed claims. Here, it is ineluctable that the claims for reimbursement of no-fault benefits submitted by Defendants to State Farm remain unpaid and overdue. **As such, in accordance with the governing statutory authority, the Providers maintain a clear right to arbitrate any non-litigated claims disputes should they wish to do so in the future.**

[20]   In fact, however, the actual number of such pending lawsuits is a great deal different for two reasons:

First, State Farm's listing of the currently pending state court suits in their Exhibit 2 is incorrect by the Defendant-Provider's collection counsel. Annexed as **Exhibit E** to the accompanying Declaration of Mark L. Furman, dated March 15, 2016 ("Furman Declaration") is a listing of such litigations commenced on or before January 16, 2018 (when the initial (later Amended) Complaint herein was initially filed), showing the total number of such suits to be 1372 and totaling $3,381,762.05 in face value of these unpaid claims, excluding statutory twenty-percent (20%) attorney fees and filing fees if successful.

Second, as described further infra in Part III,  since prior to the initiation of the instant case, the parties terminated a series of long-standing "Tolling and Forbearance Agreements" between them. That termination led to the instant case by State Farm on January 16, 2018, as well as approximately 888 additional state court filings for unpaid claims, three days later, on January 19, 2018. For the reasons cited in Part III, Section (B)(3) , <u>infra</u>, these more recently filed state-court suits are also subject to the AIA.

adopted in 1793, and which, with three exceptions, expressly prohibits a federal court from enjoining a state court proceeding as follows:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

Notwithstanding, State Farm contends that the second exception referred to above, "aid-of-jurisdiction", allows this Court to stay all of these pending New York collection suits. State Farm is incorrect.

The Supreme Court has made it clear that the AIA is an absolute prohibition against any injunction of any state-court proceedings, unless the injunction falls within one of these three specifically defined exceptions.   Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). The Court also issued the admonition that "(a)ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." Id. 398 U.S. at 297.

The "aid-of-jurisdiction" exception is meant to apply to situations in which the federal court has asserted control over property or assets brought before the court for equitable administration and distribution. See The Anti-Injunction Act and The Problem Of Federal--State Jurisdictional Overlap, 92 Tex. L. Rev. 1 (November 2013). Thus, the general rule has been and remains that an injunction cannot issue to restrain a state action in personam involving the same subject matter from going on at the same time. It is immaterial that the state court action involves a question of federal law, or that findings in it may have an issue-preclusion effect in the federal action, or even that the state action may involve a claim that is a compulsory counterclaim in the federal action. The "necessary in aid of its jurisdiction" exception does not allow a federal court

13

to enjoin state proceedings merely because they involve issues presented in a federal in personam action. 17A Wright & Miller, Federal Practice and Procedure § 4225 at 2 (West 2007) (footnotes omitted).

In Wyly v. Weiss, 697 F.3d 131 (2d Cir. 2012), the Second Circuit explained the limited nature of the "aid of jurisdiction" exception:   The exception is generally reserved for state court actions in rem, because the state court's exercise of jurisdiction "necessarily impairs, and may defeat," the federal court's jurisdiction over the res. Id. By contrast, "an in personam action involves a controversy over liability rather than over possession of a thing." [citation omitted]. For that reason, an in personam action generally " 'does not tend to impair or defeat the jurisdiction of the court in which a prior action for the same cause is pending.' " Id. (quoting Kline v. Burke Constr. Co., 260 U.S. 226, 229, 43 S.Ct. 79, 67 L.Ed. 226 (1922). Thus, discussing Kline, supra , some years later the Court stated:

> (A)n action brought to enforce (a personal liability) does not tend to impair or defeat the jurisdiction of the court in which a prior action for the same cause is pending. Each court is free to proceed in its own way and in its own time, without reference to the proceedings in the other court. Whenever a judgment is rendered in one of the courts and pleaded in the other, the effect of that judgment is to be determined by the application of the principles of res judicata . . .." Id., at 230, 43 S.Ct., at 81.  **No case of this Court has ever held that an injunction to "preserve" a case or controversy fits within the "necessary in aid of its jurisdiction" exception; neither have the parties directed us to any other federal court decisions so holding.**

Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 642, 97 S. Ct. 2881, 2893, 53 L. Ed. 2d 1009 (1977) (emphasis added).[21]

---

[21]  Other courts in this Circuit have rejected have rejected such creative notions such as that "insurance proceeds" or  "litigation"  itself, is a *res* so as to incorrectly invoke the "aid-of-jurisdiction" exception to the AIA. See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC, 445 F.Supp. 356, 365 (S.D.N.Y. 2006).

(2)   **Enjoinment of the State Court Suits Pending on January 16, 2018 is**
**Barred**

It comes as no surprise, therefore, that the sole "precedent" cited by State Farm that is
even arguably on point in an unpublished bench ruling by Senior Judge Frederic Block last May
in another State Farm matter, State Farm Mut. Auto. Ins. Co. v. Jamaica Wellness Med., P.C., et
al., Case No. 1:16-cv-04948-FB-SMG ("Jamaica Wellness"), in which the court chose to stay all
of 56 (an infinitesimal number as opposed to the injunction against at least 1400 suits prayed for
here) state court suits (SFMOL, Exhibit 5, p.3, ll. 1-2).

The ruling in Jamaica Wellness is not only highly distinguishable from this case for
numerous reasons explored below, but, in addition, with all due respect to Senior Judge Block,
surely one of this Court's great jurists, the Court incorrectly relied upon inapposite precedent,
and misapplied the Federal Rules of Civil Procedure ("FRCP") regarding compulsory
counterclaims under FRCP 13(a).[22]

The reasons that Jamaica Wellness are distinguishable are as follows. First, unlike here,
Judge Block had already issued a stipulated protective order governing discovery between the
parties (SFMOL, Exhibit 5, pp.9-11), thereby allowing State Farm to argue, as it did (SFMOL,
Exhibit 5, p.8, line 23 to pp.9, ll.1-2), a stay was necessary under a different AIA exception (one
not raised in the instant case), in order for the court to "effectuate its judgment".[23] Second, again
in contrast, the Jamaica Wellness provider-defendants had already interposed a counter-claim
against State Farm in opposition to Plaintiffs' federal complaint, seeking to collect the unpaid

---

[22]   More specifically, as elaborated in Part IV, infra, the Court also based it's ruling upon an erroneous
finding that the then pending state court suits were "compulsory counterclaims". This is contrary to FRCP
13(a)(2), which specifically exempts such claims as being "compulsory" if, when the action was
commenced, the claim was the subject of another pending action.

[23]   In fact, ONBANCORP v. Holtzman, 1997 WL 381779 (N.D.N.Y. 1997), cited by State Farm in its
supporting brief in Jamaica Wellness, actually held that the "aid of jurisdiction" exception, upon which
State Farm now relies was not available ONBANCorp, Inc. v. Holtzman, 1997 WL 381779, at *6
(N.D.N.Y 1997), aff'd sub nom. Onbancorp., Inc. v. Holtzman, 125 F.3d 844 (2d Cir. 1997).

bills (SFMOL, Exhibit 5, p.10, line 16 and p.13, line 16). There are no counterclaims against State Farm in the Defendant-Provider Answers to State Farm's Amended Complaint, which were filed on March 1, 2018 (See Document No. 41, 42, 43 in the instant case). Indeed, doing so would be counterintuitive as the claims at issue here are simply too voluminous to resolve in one (1) action, an elementary fact that State Farm seems to ignore. Third, Judge Block's ruling was also based in part on the default of some of the provider's who did not appear (SFMOL, Exhibit 5, pp.9-10). Finally, as elaborated in the next paragraph, and again with all due respect to a respected senior jurist, the ruling is largely based upon a mis-reading of Southern District case, Bruce v. Martin, 680 F. Supp. 616, 622 (S.D.N.Y. 1988).

In ruling for the five-case stay in Jamaica Wellness, Judge Block relied substantially upon a mis-reading of  Bruce v. Martin, supra, (SFMOL, Exhibit 5, p.12, line, 14 and p.18, line 18).  Bruce v Martin has nothing to do with the instant issue regarding the stay of pending state court suits. The injunctive relief requested by fifteen-state plaintiff-investors in Bruce v. Martin was **against possible future (not pending) litigation**, which was credibly threatened by the defendant general partners and sureties there, 680 F.Supp. at 618. Judge Sweet in Bruce specifically found that the AIA did not bar the requested relief since the defendants there had not yet commenced any suits in state court, and that, therefore the availability of the requested injunction must be determined by traditional standards for injunctive relief. 680 F.Supp at 11. In fact, Judge Sweet even noted that had a collection suit on the underlying promissory notes in that case been already pending in state court, the Anti–Injunction Act would bar such an injunction Id.

In conclusion, here, for the reasons stated above, there can be no question but that the AIA bars an order enjoining the lawsuits previously commenced by the Providers at the time the Complaint in the case at bar was filed.

      (3)    **The AIA Bar Against Pending State Court Suits Includes the State Court Actions that Were Commenced After State Farm's Initial Complaint was Filed and that Remain Pending Until the Time that the Instant Motion is Decided**

For the reasons described in the accompanying Affirmation of Oleg Rybak, dated March 15, 2018 ("Rybak Affirmation") (**Exhibit A** to the Furman Declaration), as the attorney for the Defendant Provider's collection litigation, at various periods over the preceding three (3) years, State Farm, which purported to be negotiating for a "bulk settlement" (i.e. payment to the Providers of a percentage of the claims due), entered into a series' of "Tolling and Forbearance" Agreements ("Agreements")  with counsel for the Defendant-Providers, calling for a tolling of the relevant statute of limitations while the parties refrained from commencing any litigation, including the subject state court collection litigation,  as a way of giving the parties' the time and opportunity to evaluate their relative positions, and to explore the possibility that they could reach an amicable resolution of the subject dispute. These Agreements, which were drafted by State Farm are annexed to the Furman Declaration as **Exhibits B and C.**

In or about January 2018, it was determined by both sides that these efforts were not going to be fruitful, and they were terminated in accordance with the terms thereof. Among the Agreements' terms, the parties had agreed that upon termination, there would be a specific "waiting period" before either side could commence any litigation. State Farm, however, the Agreements' drafters, were given a meaningful advantage, in that the carriers' waiting period was ten (10) days, while the Agreements provided that the Providers   were obliged to refrain from presumably collection suits for an additional 72-hour period following the expiration of

State Farm's ten (10) days.

State Farm initiated this action on January 16, 2018. Three (3) days later, on January 19, 2018, State Farm filed with the Court an Amended Complaint, as well as the instant motion for injunctive relief, absent any return date (see Docket Sheet Nos. 5, 6, and 7). At approximately the same time, the Defendant-Providers, having reached the end of their additional 72-hour waiting period, commenced a series of suits against State Farm for long-awaited payment of denied claims for medical services that were previously rendered by the Defendant-Providers. Annexed to the Furman Declaration as **Exhibit D** is a schedule of the aforementioned suits, totaling 888 in number and $2,350,700.98 in face value, excluding statutory twenty-percent (20%) attorney fees and filing fees if successful ("the post-filing actions").

Under clear Second Circuit precedent, any request by State Farm to enjoin the post-filing actions is also subject to the AIA for the reasons stated above[24].

In Roth v. Bank of the Commonwealth, 583 F.2d 527 (6th Cir. 1978), the Sixth Circuit held that the Anti–Injunction Act prevents a federal district court from enjoining the prosecution by the federal court defendant of in personam state actions where those actions were commenced after the institution of the federal suit but before the preliminary injunction was issued. In reversing the district court, the Court declined to follow Barancik v. Investors Funding Corp.,

---

[24]   To the extent that State Farm has taken the position in the individual state court post-filing actions that those actions were "premature" because they were commenced prior to the expiration of the Defendant-Providers' additional 72-hour waiting period, the question of whether or not those actions should thereby be "dismissed", as State Farm apparently now contends, is also clearly a matter for the state court in which those litigations were commenced. Any motion(s) brought by State Farm in the New York City Civil Court regarding that issue should remain there, and should not be brought into the instant federal litigation, which, among other things, will only serve to complicate and cause protraction of this litigation, having nothing to do with the alleged "merit", or lack of same, of State Farm's RICO allegations. It should be noted, however, that the agreement in question did not provide for dismissal as a consequence of an alleged premature filing. Indeed, the agreement did not provide for *any* penalty whatsoever. As State Farm was the drafting party of the agreement, such an omission must be construed against it. See Jacobson v. Sassower, 66 N.Y.2d 991, 993 (1985).

489 F.2d 933 (7th Cir. 1973), in which the Seventh Circuit held that the Anti–Injunction Act did

not bar an injunction against suits filed in state court while a motion for an injunction was

pending decision in the district court.

Moreover, the Second Circuit has effectively rejected <u>Barancik</u>, holding that

> We have considerable doubt whether the <u>Barancik</u> rule should be adopted in this circuit. We do not find its reasoning compelling. The <u>Barancik</u> court found it "unseemly" that a court's power to rule could be defeated by the quicker action of a litigant. 489 F.2d at 937. But it is axiomatic that one is not disabled from acting merely because an adverse litigant has *applied* for an order to bar such action. **A party that has not been enjoined is ordinarily free to act, notwithstanding the pendency of applications to enjoin the action.** In many circumstances litigants may lawfully moot an application by acting before the court has ruled. To enjoin conduct requires a judge's order, not merely an application for a judge's order. **Where speed is needed, the rules of procedure provide for temporary restraining orders, even without notice, to prevent irreparable harm.** *See* **Fed.R.Civ.Pro. Rule 65. However anomalous it may seem that a party can moot an issue by acting more rapidly than the court, it is far more anomalous and dangerous that a mere application for injunctive relief be deemed equivalent to a court's order issuing an injunction.** (emphasis added).

<u>Standard Microsystems Corp. v. Texas Instruments Inc.</u>, 916 F.2d 58, 62 (2d Cir. 1990).

Here, State Farm had more than ample opportunity to seek a temporary restraining order

under F.R.C.P. 65, as contemplated by the Second Circuit in <u>Standard Microsystems</u>, <u>supra</u>,

(indeed even bargained for the opportunity to do so in the Tolling and Forbearance Agreements

that State Farm drafted), yet failed to do so, plain and simple. Accordingly, an injunction against

the maintenance of the post-filing actions is also barred under the AIA.

### C.  STATE FARM CANNOT SHOW ANY OF THE REQUIREMENTS TO JUSTIFY AN INJUNCTION AGAINST FUTURE STATE PROCEEDINGS

#### (1)  <u>State Farm Will Not Be Irreparably Harmed in the Absence of Injunctive Relief</u>

A showing of irreparable harm is the "single most important prerequisite for the issuance

of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009). "To determine whether [State Farm] has shown irreparable harm, 'the court must actually consider the injury [State Farm] will suffer if [it] loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury. See, Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010), see, generally, 11A Wright & Miller, Federal Practice & Procedure §2948.1, nn. 2 and 14 (West 2007).  Further, State Farm must also demonstrate that, absent injunctive relief, it will suffer an injury that is "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007). State Farm cannot come close to meeting this standard.

Recently, in Allstate Insurance Co. v. Harvey Family Chiropractic, 677 Fed. Appx. 716 (2d Cir. 2017), the Second Circuit in another RICO "clawback" case against a no-fault healthcare provider, in which the carrier, Allstate Insurance Company, sought an injunction against pending and future state court litigations and arbitrations in New York's No-Fault System, clearly held that the necessity to go forward with underlying state claims during the pendency of the federal action was not by any means "irreparable harm" so as to justify that the state proceedings be enjoined:

> We need not reach the question of whether the District Court had the authority to issue an injunction under the AIA and RICO because plaintiffs have failed to establish the irreparable harm necessary for a preliminary injunction. There is no evidence in the record that, upon the conclusion of this matter, the plaintiffs cannot be fully compensated through money damages for the alleged harm suffered from the defendants' fraudulent claims. **Even if the defendants obtain other No-Fault reimbursements in state court and arbitrations while this case is pending, the plaintiffs are free to recover those payments should they prevail on their RICO claim. Moreover, the "mere injuries ... in terms of money, time and energy necessarily expended" absent a stay of ongoing**

20

**state court and arbitration proceedings "are not enough" to establish irreparable harm.** Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (internal quotation marks omitted). Nor is the declaratory relief sought by the plaintiffs threatened by the other proceedings. (Emphasis added)[25]

State Farm offers no proof whatsoever that permitting the Providers to continue to see State Farm patients, make claims for payment, and commence court proceedings if those claims are improperly denied, will cause State Farm irreparable harm. For economic injury to be irreparable, a plaintiff must show that it will suffer harm that is "'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" Toxco, Inc. v. Chu, 724 F.Supp.2d 16, 30 (D.D.C. 2010) (*quoting* Hi–Tech Pharmacal Co., Inc. v. U.S. Food & Drug Admin., 587 F.Supp.2d 1, 11 (D.D.C. 2008)). "Purely economic harm is not considered sufficiently grave under this standard unless it will cause extreme hardship to the business, **or even threaten destruction of the business**.", Id. (*quoting* Gulf Oil Corp. v. Dep't of Energy, 514 F.Supp. 1019, 1026 (D.D.C. 1981) (emphasis added). The possibility that State Farm will be destroyed by defending future claims for payment from these Providers is simply ludicrous.

Defendants, on the other hand, will suffer severe injury to their medical practices if they are not able to continue with their efforts to obtain payment on claims that have already been outstanding for a significant period of time. Medical providers such as Defendants rely on the timely payment of claims to conduct their business; otherwise they will be unable to render treatment to their patients. By wrongfully withholding payment on legitimate claims, forcing Defendants to secure payment through costly and timely litigation, and then attempting to further

---

[25] Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); see also, CRP/Extell Parcel I, L.P. v. Cuomo, 394 Fed. Appx. 779, 781 (2d Cir. 2010) (unpublished) ("We have long held that an injury compensable by money damages is insufficient to establish irreparable harm.").

delay resolution by enjoining their efforts to obtain payment, State Farm seeks to financially strangle Defendants into submission.

Nor can State Farm explain why, even if they are obliged to pay some Provider claims as a result of future state court litigations or arbitrations, they cannot be made whole by any judgment in this action (much less how a company its size would be irreparably harmed). Ordinary compliance costs, for example, the payment of interest on an outstanding debt, even if not recovered, are typically insufficient to constitute irreparable harm. Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 115 (2d Cir. 2005); See also, Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974) ("[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.")

Lest State Farm argue that issues decided in the state proceedings would somehow bind the carrier, the Second Circuit has also held that a district court may not issue an injunction simply to be the first court to reach a judgment and thereby avoid issues of collateral estoppel:

> There is no reason why [a] state court cannot or should not determine issues of fact and state law relevant thereto as they come up in the state litigation. The subsequent effect of collateral estoppel, far from requiring the federal court to stay proceedings in the state court, is a result which should be welcomed to avoid the task of reconsidering issues which have already been settled by another competent tribunal.

Ret. Sys. of Ala. v. J.P. Morgan Chase & Co., 386 F.3d 419, 429 (2d Cir. 2004); See also, Vernitron Corp. v. Benjamin, 440 F.2d 105, (2d. Cir. 1971) cert. den., 402 U.S. 987 (1971). State Farm can raise any defenses in the civil court actions that it believes are valid. As to the resulting cost associated with litigating this action while the civil court actions are pending, it is these Plaintiffs that elected to institute a "second front" in contesting the Provider's claims, and it has not shown why this burden that it created will cause it irreparable harm, especially considering that these Plaintiffs are a multi-billion-dollar corporation.

Allstate Insurance Company v. Elzanaty, supra, 929 F.Supp.2d 199 (E.D.N.Y. 2013), relied upon by State Farm with regard to the injunction against arbitrations, is further distinguishable on the question of irreparable harm.  In Elzanaty, the RICO case had been pending for years, there had been significant procedural history, and the arbitrations which were stayed had been asserted by the defendant as counterclaims in the district court action, so the claims were actually pending in both forums. The instant case, in contrast, case has just begun, and critically, the claims sought to be stayed are not before this Court.

Finally, State Farm's reliance (SFMOL at p.16) on Bruce v. Martin, discussed supra, is misplaced. Bruce v Martin involved an injunction to enjoin prospective suits against the plaintiffs there in approximately fourteen (14) separate states. The court was willing to grant that injunction because it found that "scores of fragmented state actions" in, unlike the instant case, numerous different states would have a "destructive effect" because varying rulings from multiple courts could preclude the court from considering a given claim or factual issue. 680 F.Supp. at 622. Additionally, there was no showing in Bruce v. Martin that the defendants would be prejudiced by the issuance of the injunction. In this case, in sharp contrast, there will be extreme prejudice to the Providers, since the injunction requested by State Farm will unquestionably affect their revenue and ability to defend this case.  See the Balance of Hardships section in Part C (3), infra.

### (2) There Is An Absence Of Sufficiently Serious Questions Going To The Merits of State Farm's Claims To Make Them A Fair Ground For Litigation

State Farm readily concedes that a showing of likelihood of success on the merits of its Amended Complaint is "premature" (SFMOL at p.11), and therefor abandons that requirement for the lower standard that the movant demonstrate "sufficiently serious questions going to the

23

merits to make them a fair ground for litigation **and** a balance of hardships tipping decidedly toward the party requesting the preliminary relief". Both of the latter prongs must be shown; State Farm has not and cannot show either of them.

As explored in Part II, <u>supra</u>, our Counter-Statement of Facts, State Farm's allegations regarding these Providers, there is nothing distinguishable about these providers from any other set of local practitioners specializing in rehabilitation of auto accident victims. Their so called "predetermined treatment protocol" is a fiction, in which they twist everything and anything, however unsuccessfully, in an attempt to fit this rubric (thus the plethora of equivocation-like modifiers noted earlier). State Farm's shotgun approach merely throws everything against the wall, hoping to "see what sticks". In reality, nothing does.

It is impossible in a motion of this nature to demonstrate all of the myriad ways in which to demonstrate that the issues which State Farm attempts to raise are without any merit whatsoever. However, below are listed several examples, with corresponding exhibits that demonstrate that the issues raised do not contain questions that are a "fair ground for litigation"

> ¶76 --".....a provider cannot bill for more than 8 "relative units" of identified physical therapy modalities and chiropractic manipulations for an individual patient on a single date of service.

This sentence entirely misinterprets and fails to properly address the fee schedule. The "8-unit rule" allows for 8-units worth of billing for the specific modalities **per patient, per day** <u>not</u> **per provider**, per day as outlined in that paragraph. See **Exhibit J** to the Furman Affirmation.

> ¶92 --"Indeed, while any one of these treatments [referring to physical therapy modalities] may conceivably be medically necessary for a particular patient on a particular day, the comprehensive combination of treatments is seldom, if ever, medically necessary for any patient on any day, let alone almost every visit."

It is extraordinarily commonplace for physical therapists to use the various modalities in conjunction with one another to improve blood flow and reduce inflammation [electric stimulation/bioelectric stimulation/ synaptic], the electric stimulation is often used with heat packs in order to reduce pain. In order to increase range of motion, therapeutic massages are given to patients prior to their therapeutic exercise regime; and finally, home exercise is often recommended to patients in order to maximize the benefit of their treatment.

¶220—"Absent some express indication in a prescription form or other documentation that a more sophisticated cervical collar is necessary, prescriptions for a cervical collar should be filled with a flexible, non-adjustable foam cervical collar and billed under Code L0120 at $6.80"

Plaintiffs would have this Court believe that the DME Providers  should somehow know that it is the wish of the fee schedule to provide only the most basic of equipment. The fee schedule does not so state. Indeed, with regard to the subject equipment, no portion of the DME fee schedule (**Exhibit L** to the Furman Declaration) indicates which version of any piece of medical equipment should be chosen; nor does it does not indicate preference, ease of use, or even any particular indication which must be applicable to in order to establish which cervical collar is most appropriate.

¶117—"Finally, an acupuncture treatment plan is implemented. Treatment involves insertion of generally 10, but more typically 20 or more acupuncture needles, for a minimum of approximately twenty minutes into each of the selected Acupuncture Points."

However, the Acupuncture Fee Schedule (**Exhibit K** to the Furman Declaration) plainly dictates that needles should be left in for 15 minute increments.

State Farm claims (¶190,) that because Medicare among other carriers will not cover the medical procedure known as "dry needling", because it is "experimental", the procedure is "medically unnecessary" and therefore "fraudulent". However, this reasoning contravenes Tahir

v. Progressive Cas. Ins. Co., 12 Misc.3d 657 (N.Y. Civ. Ct., Kings County, 2006) which clearly holds that nonpayment under Medicare alone is not a reason to disallow payment.  While the Complaint alleges that there is no documentation regarding dry needling (¶ 191), the cited Complaint Exhibit, Exhibit 18, documents moderate improvement with Trigger Points Injections and Dry Needling with physical therapy,  and proves to the contrary.

Finally, State Farm's entire Sixth Claim against all the Defendants (¶¶ 265 to 269) calls for a Declaratory Judgment against them for their purported failure to attend an Examination Under Oath ("EUO") as called for in the Regulations. What State Farm conspicuously omits, however, is that every one of State Farm's letter requests to the Providers to attend an EUO was substantively objected to in writing by the Providers' counsel. Annexed to the Furman Declaration as **Exhibit I** are a series of just sample letters (among hundreds that were timely sent to State Farm regularly in response to their requests) by counsel to make a record as to why their attendance was not appropriate, thereby defeating this declaratory judgment. See Rutland Med., P.C. v. State Farm Ins. Co., 45 Misc. 3d 1033, 1035 (N.Y. Civ. Ct., Kings County, 2014).

### (3)  The Balance of Hardships is Not Even Close, Much Less Decidedly, in Favor of State Farm

The rule in the Second Circuit is clear that when a plaintiff seeking a preliminary injunction can only attempt to demonstrate the lower standard of "serious question going to the merits to make them a fair ground for trial", the "balance of hardships" if the injunction is not granted must tip "decidedly" in plaintiff's favor. Citigroup Glob. Markets Inc. v. VCG Special Opportunities Master Fund Ltd., 2008 WL 4891229, at *2 (S.D.N.Y. 2008) (emphasis added), aff'd, 598 F.3d 30 (2d Cir. 2010). This is certainly not the case here.

First, as explained in more detail in the Affirmation of Oleg Rybak, dated March 15, 2018 (**Exhibit A** to the Furman Declaration)  to which the Court is respectfully referred, State

Farm "sandbagged" the Providers' collection counsel by pretending to negotiate for a "bulk settlement" so that the Providers entered into certain "Tolling and Forbearance Agreements". As Mr. Rybak states, had State Farm counsel threatened or even intimated that a RICO action was the intended consequence if negotiations were not fruitful, he would never have recommended that his clients enter into the Agreements, since so doing would be detrimental to their revenue and financial well-being. Moreover, once it became clear in August 2017 that State Farm would likely commence this RICO action, it was also understood that the Providers, after waiting in good faith (in some instances **years**), would be able to go forward with their claims for payment that they had voluntarily suspended as part of what was believed to be good faith negotiations.

Second, even though State Farm claims that they would be "irreparably harmed" if they are not given injunctive relief, even after this RICO suit was commenced on January 16, 2018, State Farm continued to even settle many of the underlying cases with these providers, agreeing to pay them thousands of dollars notwithstanding the pendency of this action. A schedule of those now settled claims, totaling $37,773, is annexed as **Exhibit G** to the Furman Declaration.

Third, even more recently, State Farm has been seeking stays of the underlying civil court proceedings in the Civil Court itself. Annexed as **Exhibit H** to the Furman Declaration are just two (2) sample Orders to Show Cause submitted by State Farm in which they sought and received a temporary stay of the civil court proceedings, demonstrating that they have the same remedy available to them in the state court as they do here, without violating the AIA.

Under the circumstances, it is hard to see how the balance of hardships is anywhere in favor of this multi-million dollar corporation.

## IV.   THE PROVIDERS' STATE CLAIMS AGAINST STATE FARM ARE NOT COMPULSORY COUNTERCLAIMS IN THIS FEDERAL ACTION

As its last gasp, State Farm desperately argues that any future arbitrations or lawsuits filed the Providers against State Farm[26] for services provided at the Facility should be brought as compulsory counterclaims in this proceeding, pursuant to Federal Rule of Civil Procedure 13(a), which states:

(a) **Compulsory Counterclaim.**

(1) *In General.* A pleading must state as a counterclaim any claim that--at the time of its service--the pleader has against an opposing party if the claim:

(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and

(B) does not require adding another party over whom the court cannot acquire jurisdiction.

(2) *Exceptions.* The pleader need not state the claim if:

(A) when the action was commenced, the claim was the subject of another pending action; or

(B) the opposing party sued on its claim by attachment or other process that did not establish personal jurisdiction over the pleader on that claim, and the pleader does not assert any counterclaim under this rule.

It is well-established that the language of Rule 13(a) cannot be construed as empowering the federal court to restrain state court proceedings. Wright & Miller, 6 Federal Practice & Procedure §1418 (West 2007). Rule 13(a) is simply a federal court housekeeping rule to expedite the courts' business. As such it could not possibly qualify as an exception within the intendment of Section 2283. Reines Distributors, Inc v. Admiral Corp, 182 F. Supp. 226, 230 (S.D.N.Y. 1960). Rule 13(a) does not authorize a federal court to enjoin proceedings in state court on a claim that might have been asserted as a compulsory counterclaim under the rule if both cases were in federal court. It has been held long ago that an injunction to bar state actions on ground that state court claims were compulsory counterclaims in previously settled federal action would be improper where injunction would force application of federal rules of civil procedure in state

---

[26]   At the present juncture, as listed in the schedule annexed as **Exhibit F** to the Furman Affirmation, the amount of those claims is $18,898.22.

actions, contrary to statutory limitations placed upon rules by Rules Enabling Act. <u>Aeroquip</u> <u>Corp. v. Chunn</u>, 526 F.Supp. 1259 (M.D. Ala. 1981). Not surprisingly, all of the cases cited by State Farm in support of this argument involve two conflicting federal, not federal to state, proceedings.

## V.   <u>CONCLUSION</u>

For all of the foregoing reasons, and the reasons in the Declaration Of Mark L. Furman submitted herewith, State Farm's motion for a preliminary injunction and a stay of state court proceedings should in all respects be denied.

Dated: Brooklyn, New York
         March 15, 2018

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN,
FORMATO, FERRARA, WOLF & CARONE, LLP

/s/  Mark L. Furman

By:_____

Mark L. Furman
*Attorneys for the Professional Defendants*
1 MetroTech Center, Suite 1701
Brooklyn, New York 11201
Tel.: (718) 215-5300

FISHER & FISHER

By_____/s/_____
Andrew Fisher
Attorneys for DME Defendants
127 Great Kills Road
  Staten Island, NY 10308
Tel: (212) 514-8888
