# Katten
### Katten Muchin Rosenman LLP

525 W. Monroe Street
Chicago, IL  60661-3693
312.902.5200 tel
www.kattenlaw.com

July 16, 2019

JONATHAN L. MARKS
jonathan.marks@kattenlaw.com
312.902.5337 direct
312.577.1061 fax

**VIA ELECTRONIC FILING**

Magistrate Judge Steven L. Tiscione
United States District Court
225 Cadman Plaza East
Courtroom N504, Chambers Room N503
Brooklyn, NY 11201

Re: State Farm v. Parisien, et al., No. 1:18-cv-00289-ILG-ST – Response to Carlos Pena Motion to Quash (Dkt. 151)

Dear Magistrate Judge Tiscione:

Nonparty Carlos Pena ("Pena") has moved to quash the subpoena issued by Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (together, "State Farm Entities") to JPMorgan Chase Bank, N.A seeking his bank records.  Dkt. 151.  Pena claims that although he received significant payments from numerous defendants and other health care providers operating at 1786 Flatbush Avenue, the subject of this action, there is an innocent explanation.  Based on that explanation for the payments – he works as a "driver" for defendant Jules Parisien, M.D. – he insists his bank records are not relevant.  But the explanation is contradicted by the evidence.  And even if that is his "story," it is not a basis to block disclosure of highly relevant documents.[1]

This case involves fraudulent claims for medically unnecessary treatment provided to automobile accident victims at 1786 Flatbush by more than 20 entities and individuals.  Among the central issues in the case is whether non-physicians controlled the clinic and took for themselves proceeds of the medical professional corporations that provided care.  Discovery indicates that Pena played a role in siphoning proceeds from the clinic to a non-physician that controlled them.

Discovery has established that many Defendants made large payments to businesses and individuals connected to Tatiana Rybak, about whom there is evidence that she owned and controlled the clinic at 1786 Flatbush.  Rybak and others owned and controlled a medical clinic at 1468 Flatbush, Brooklyn.  After a series of lawsuits alleging illegal lay control of that medical clinic, 1468 Flatbush ceased operations and providers and employees at 1468 Flatbush moved to 1786 Flatbush.  At 1786 Flatbush, Tatiana Rybak appears to have controlled the physical space through a relative and run the durable medical equipment suppliers, ordering their supplies under an alias and paying for them with checks drawn on accounts of various providers operating at 1786 Flatbush.  Two employees of 1786 Flatbush asserted the Fifth Amendment at their depositions when asked if Tatiana Rybak owned and controlled the clinic and the providers who operated there.  Among the payments made by multiple providers at 1468 Flatbush and 1786 Flatbush to likely associates of Tatiana Rybak were (a) over $800,000 paid by 20 providers to Clara Pantin, the former concierge at the Fontainebleau luxury

---

[1] Pena's motion exceeds the 3 pages allowed by Court rule.  Rather than move to strike the submission, Plaintiffs respectfully request leave to exceed the page limit in this response.

1

condominium hotel where Rybak and her family own units; (b) over $216,000 paid by 8 providers to a Florida interior design firm, its owner and the owner's wife; (c) over $425,000 paid by 9 providers to a real estate law firm used by Rybak's family to support their real estate investments; and (d) over $221,000 paid by 9 providers to a private investigator who purportedly helped defend a lawsuit that included claims that the Rybak family improperly controlled a medical practice.

Pena may be another associate of Tatiana Rybak who appears to have siphoned proceeds from 1786 Flatbush. Bank records show that 11 different healthcare providers who operated at 1786 Flatbush wrote over 230 checks payable to Pena over a six-year period between January 2013 and December 2018, totaling over $250,000. *See* Ex. 1. In discovery responses, Defendants have stated they have no records related to their payments to or dealings with Pena.

Pena now contends that his bank records are irrelevant because there is an innocent, legitimate explanation for the payments. In an affidavit, he asserts that "a number of years" ago, he was "hired by Dr. Parisien to work as a driver," and that he is "paid for my services weekly, by check" and typically paid a "flat-fee amount." Dkt. 151-2. There are numerous issues with this purported explanation. First, the payments are not consistent with reimbursement for driving services for Dr. Parisien. Contrary to Pena's claims, checks are not paid in regular amounts, representing a "flat-fee" at regular weekly intervals that was only "sometimes increased." *Id.* Rather, checks are paid from numerous different entities, including entities with no direct connection to Dr. Parisien such as durable medical equipment suppliers and medical professional corporations owned on paper by other doctors. Multiple checks are often written on the same day from multiple entities. For example, bank records reflect that on November 5, 2018, AB Quality Health Supply wrote two checks to Pena for $1,750 and $1,020 and Quality Health Supply wrote one check for $1,450. Ex. 2. AB Quality Health Supply and Quality Health Supply are both owned on paper by Allan Buslon.

In response to discovery, ***none*** of the Defendants identified Pena as an employee and none produced a single W-2 or 1099 for a payment to Pena. The absence of any records from Defendants explaining $250,000 in payments raises questions about what they were for, and whether there was any legitimate business reason for them.

Pena's affidavit does not disclose the location of his residence or where he provided driving services for Dr. Parisien. But evidence about where the checks to Pena were issued and deposited, where Dr. Parisien was located, and where Pena was located raise questions about the credibility of Pena's claim that payments were for work as Dr. Parisien's driver. Checks from providers in New York at 1786 Flatbush were written to Pena between at least January 12, 2013 and December 11, 2018. Dr. Parisien was purportedly in New York providing medical services to patients at 1786 Flatbush from at least August, 2013 to August, 2017. *See* Dkt. 5 ¶ 15; Dkt. 5-2. But between at least December, 2014 and November, 2015, at least some of Pena's checks were deposited at TD Bank, N.A. locations in Florida, including in Aventura, Sunny Isles, and Miami Beach. Ex. 2. Thus, either Pena resided in Florida and deposited those checks himself or someone else deposited the checks in Florida. Either way, they would not be payments related to Pena's driving for Parisien in New York.

Moreover, at least in January 2018, when Plaintiffs served Dr. Parisien with the

Summons and Complaint, Dr. Parisien was hospitalized at Memorial Regional Hospital South in Hollywood, Florida and was apparently not mobile or treating patients. *See* Dkt. 17. Yet, the payments to Pena, purportedly for driving Dr. Parisien, continued. Indeed, in January, 2018, Pena received $6,900 in three checks from Dr. Parisien entity PFJ Medical and one check from Allay Medical Services P.C., an entity owned on paper by defendant Ksenia Pavlova, D.O., Tatiana Rybak's daughter-in-law.

Accordingly, the bank records are relevant and Pena's claims to the contrary are not credible. Records will establish how the alleged RICO enterprise operated, including its structure and the relationship among the participants. *See State Farm v. Physiomatrix*, 2013 WL 10572229, at *3 (E.D. Mich. Aug. 13, 2013). The scheme involved generating profits from the provision of services at 1786 Flatbush and siphoning those profits to others. Pena received payments from multiple providers, some of which appeared to have been structured to avoid detection. Indeed, the payments to Pena are strikingly similar to payments to others who are affiliated with the Rybaks. The mechanics of that process are relevant to the claims at issue. *Id*.

Additionally, determining who is responsible for the conduct at issue is always relevant. *See, e.g.*, *U.S. v. Srivastava*, 540 F.3d 277, 292 (4th Cir. 2008) (financial records "highly probative" into whether suspect "conducted and carried out" fraud scheme). Discovery to determine whether others who have not been named as defendants are responsible or should be named is proper. *See State Farm v. McGee*, 2012 WL 8281725, at *2 (E.D.N.Y. Feb. 21, 2012) (bank records relevant to "the control the true owners exerted over [an individual defendant]"); 2013 WL 10572229, at *3 (relevant to "additional potential parties"). Knowing who received the proceeds from the scheme is critical because those persons or entities are most likely responsible for the conduct. *McGee*, 2012 WL 8281725, at *2; 2013 WL 10572229, at *3 (records relevant to "ownership and control"). Assessing whether funds obtained at 1786 Flatbush made their way to others through Pena is thus a proper line of inquiry.

The records are also relevant to how the healthcare providers operated, their motives and why they provided medically unnecessary services. If a significant portion of Defendants' receipts were transferred to others, it would indicate that the providers did not control their practices, were beholden to others, and could have been directed to provide unnecessary services. Pena's bank records are thus critical to understanding Defendants' motives and what they received and kept. Motive is always a relevant issue,[2] and State Farm's unjust enrichment claim turns on how much each defendant received. *See Myun-Uk Choi v. Tower Research Capital, LLC*, 886 F.3d 229, 237 (2d Cir. 2018); *State Farm v. CPT Med. Servs.*, 375 F. Supp. 2d 141, 156 (E.D.N.Y. 2005) (personal financial records relevant to how defendants profited).

Pena's status as a nonparty does not bar disclosure. *E.g.*, *Physiomatrix*, at *3 & n.3 (non-party status "does not automatically shield that information from discovery"). Courts, including courts in this District, have allowed access to financial records of non-parties. *Id.*; *CPT Med. Servs.*, 2006 WL 2460641, at *1 (E.D.N.Y. 2006) (granting "plaintiff's request for certain financial records from nonparties"); *In re Suzuki*, 2014 WL 6908384, at *4 (D. Haw.

---

[2] *See State Farm v. Fayda*, 2015 WL 7871037, at *3 (S.D.N.Y. Dec. 3, 2015) (personal financial records relevant to defendant's motive); *McGee*, 2012 WL 8281725, at *2 (bank records relevant to defendants' "motive in participating in the fraud"); *Physiomatrix*, 2013 WL 10572229, at *3 (records relevant to motive).

Dec. 5, 2014) (denying motion to quash subpoena for non-party's banking information). Pena's claim to a privacy interest to defeat the subpoena is without merit. Pena's cited authorities merely recognize that a person has standing to object to a request for their bank records, and actually permitted their production, or only denied production on relevance grounds, not based on privacy concerns. *Zagroba v. York Restoration*, 2011 WL 2133837, at *2–3 (E.D.N.Y. May 26, 2011); *Arias-Zeballos v. Tan*, 2007 WL 210112 (S.D.N.Y. 2007); *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 2006 WL 2642192 (S.D.N.Y. 2006).

This Court has already recognized that payments like those made to Pena are a relevant. At an October 17, 2018 hearing concerning a subpoena for bank records of third-party Maria Masigla who also received payments from multiple defendants, this Court recognized that discovery of these "suspicious transactions" was "relevant and should be allowed for purposes of discovery." Ex. 3, 10/17/18 Hrg. Tr. at 38:1-7. Following a motion for reconsideration, this Court ultimately granted State Farm access to records for the non-party bank accounts, regardless of whether State Farm could identify particular bank accounts, as these were suspicious transactions relevant to the case. The Court reiterated at a November 28, 2019 hearing that "Those transactions are clearly relevant. They're entitled to them." Ex. 4, 11/28/2018 Hrg. Tr. at 4, 6; *see also* Dkt. 114, 11/30/2018 Civil Minute Entry.

Ultimately, Pena's explanation is a defense, but does not constitute a basis to deny discovery, as this Court has recognized. *See* Ex. 3, 10/17/18 Hrg. Tr. at 30:9-14 (finding "the fact that there might be innocent explanations for the payments [to third parties] is certainly plausible. That might very well be the defense, but there's no question . . . there is enough information that suggests [financial discovery] might lead to relevant evidence."). Indeed, Pena himself admits that he did work for a named defendant medical provider.

Significantly, as an alternative to seeking Pena's bank records in the first instance, the State Farm Entities offered to serve a document subpoena directly to Pena. Counsel for Pena refused to accept service of such a subpoena. Pena's position betrays that his goal is **_not_** to protect the privacy of his bank records, but to prevent the State Farm Entities from obtaining any discovery regarding his connection to the activity at 1786 Flatbush and Dr. Parisien. He should not be heard to complain if he is unwilling to even accept service of a subpoena.

Accordingly, Pena's motion to quash should be denied.

Respectfully submitted,

*/s/ Jonathan L. Marks*

Jonathan L. Marks