# Katten

### Katten Muchin Rosenman LLP

**525 W. Monroe Street**
**Chicago, IL 60661-3693**
**312.902.5200 tel**
**www.kattenlaw.com**

July 16, 2019

**VIA ELECTRONIC FILING**

Magistrate Judge Steven L. Tiscione
United States District Court
225 Cadman Plaza East
Courtroom N504, Chambers Room N503
Brooklyn, NY 11201

**JONATHAN L. MARKS**
jonathan.marks@kattenlaw.com
312.902.5337 direct
312.577.1061 fax

**Re: State Farm v. Parisien, et al., No. 1:18-cv-00289-ILG-ST – Response to Vasila Queen Motion to Quash (Dkt. 153)**

Dear Magistrate Judge Tiscione:

Nonparty Vasila Queen, a/k/a Vasila Atabaeva ("Queen") has moved to quash the subpoena issued by State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (together, "State Farm Entities") to Wells Fargo Bank, N.A seeking her bank records. Dkt. 153. Queen claims that although she received significant payments from numerous defendants and other health care providers operating at 1786 Flatbush Avenue, the subject of this action, and its predecessor location, there is an innocent explanation. Based on that explanation for the payments – she did "cleaning" – she insists her bank records are not relevant. But the explanation is contradicted by the evidence, and is inconsistent with her motion to prevent her deposition pending in Florida. And even if that is her "story," it is not a basis to block disclosure of highly relevant documents.[1]

This case involves fraudulent claims for medically unnecessary treatment provided to automobile accident victims at 1786 Flatbush by more than 20 entities and individuals. Among the central issues in the case is whether non-physicians controlled the clinic and took for themselves proceeds of the medical professional corporations that provided care. Discovery indicates that Queen played a role in siphoning proceeds from the clinic, and its predecessor clinic a few blocks away, to a non-physician that controlled them.

Discovery has established that many Defendants made large payments to businesses and individuals connected to Rybak, about whom there is evidence that she owned and controlled the clinic at 1786 Flatbush. Tatiana Rybak and others owned and controlled a medical clinic at 1468 Flatbush, Brooklyn. After a series of lawsuits alleging illegal lay control of that medical clinic, 1468 Flatbush ceased operations and providers and employees at 1468 Flatbush moved to 1786 Flatbush. At 1786 Flatbush, Tatiana Rybak appears to have controlled the physical space through a relative and run the durable medical equipment suppliers, ordering their supplies under an alias and paying for them with checks drawn on accounts of various providers operating at 1786 Flatbush. Two employees of 1786 Flatbush asserted the Fifth Amendment at their depositions when asked if Tatiana Rybak owned and controlled the clinic and the providers who operated there. Among the payments made by multiple providers at 1468 Flatbush and 1786 Flatbush to likely associates of Tatiana Rybak were (a) over $800,000 paid by 20 providers to Clara Pantin, the former concierge at the Fontainebleau luxury condominium hotel where Rybak and her family own units; (b) over $216,000 paid by 8 providers to a Florida interior design firm, its owner and the owner's wife; (c) over $425,000 paid by 9 providers to a

---

[1] Queen's motion exceeds the 3 pages allowed by Court rule. Rather than move to strike the submission, Plaintiffs respectfully request leave to exceed the page limit in this response.

1

real estate law firm used by Rybak's family to support their real estate investments; and (d) over $221,000 paid by 9 providers to a private investigator who purportedly helped defend a lawsuit that included claims that the Rybak family improperly controlled a medical practice.

Queen is another apparent associate of Tatiana Rybak who appears to have siphoned proceeds from 1468 and 1786 Flatbush. Queen owns a nail and hair salon, Studio by Vasila, located at the Trump International Hotel in Miami. Queen recently filed a motion to quash a subpoena seeking her deposition and documents in the Southern District of Florida. *See* Ex. 1 (the "Florida Motion"). Queen claimed in the Florida Motion that she has no connections to the healthcare or insurance industries. *Id*. Yet, bank records show that 15 different healthcare providers who operated at 1468 and 1786 Flatbush wrote at least 70 checks payable either to Queen, or to "Cash" but deposited into Queen's bank accounts, over a six-year period between February 2012 and February 2018, totaling over $100,000. *See* Ex. 2. Only two of those checks are for less than $1,000, and none is over $10,000. In some instances, large cash withdrawals were made from Queen's account shortly following the deposit of these checks. For example, bank records reflect that checks totaling $7,000 from two different Flatbush Avenue healthcare providers (a 10/2/2012 check for $5,000 from Adelaida Physical Therapy PC payable to Queen and a 10/10/2012 check for $2,000 from JCC Medical P.C. payable to "Cash") were deposited into Queen's bank account on October 2 and October 11, 2012, respectively. Around the same time on October 4, 2012, Queen wrote a check from that account payable to "Cash" in the amount of $7,000. Ex. 3. Queen also wrote at least one $1,000 check to Tatiana Rybak. Ex. 4. At depositions, Defendants' employees asserted the Fifth Amendment and refused to answer questions related to the specific payments to Queen and to whether they were for the purpose of siphoning proceeds to Tatiana Rybak. *See* Ex. 5, Tanglao Dep. Tr., 182:9-23, 183:2-15; Ex. 6, Tuano Dep. Tr., 82:5-18, 83:15-19. In discovery responses, Defendants have stated they have no records related to their payments to or dealings with Queen.

Queen now contends that her bank records are irrelevant because there is an innocent, legitimate explanation for the payments. In an affidavit, she asserts that she was "experiencing great financial difficulty" and a "longtime friend" Dr. Zenaida Arguelles arranged for her to earn money cleaning the offices at 1468 Flatbush and then, in August, 2013 at 1786 Flatbush. There are numerous issues with this purported explanation. According to the Florida Motion, Queen currently resides in Florida where she operates a beauty salon. Public records indicate that she incorporated that salon in June, 2014. *See* Ex. 7. Three years before that, in October 2011, she incorporated Hello-MiamiBaby, Inc., a mobile 3D ultrasound business, at 175 SW 7th Street, Suite 1708, Miami, Florida, a location owned by a trust controlled by Tatiana and Oleg Rybak. *See* Ex. 8. That Florida medical business is still operating. *See* Ex. 9. Bank records also place in her in Florida. Numerous checks from entities at 1468 and 1786 Flatbush were deposited at BankUnited[2] branch 20, located in Sunny Isles, Florida, and Queen's own deposit slip (including one used in February, 2013) includes a Sunny Isles address for her. *See* Ex. 10. Thus, Queen appears to have been in and had businesses in Florida from at least October, 2011 to the present. While Queen is noticeably vague about when she did "cleaning" work, bank records show she received payments from providers at 1468 and 1786 Flatbush between February, 2012 and February, 2018. It makes no sense that she was in Florida operating ongoing businesses there, and simultaneously doing cleaning services to resolve great financial difficulties in New York.

---

[2] Records for Queen's BankUnited account were obtained pursuant to a subpoena issued 4/10/2019 to which no one objected.

Second, the payments are not consistent with reimbursement for cleaning services. Checks are often for significant amounts and are paid from numerous different entities, and sometime multiple checks are written on the same day from multiple entities. Some checks are written to Queen by name, while other are written to "cash." As noted, while Queen claims to have been in financial distress and working in New York, many checks were deposited in Florida. Some checks were written by the DME Defendants which did not even operate offices at 1468 or 1786 Flatbush. In response to discovery requests, Defendants **_did not_** identify Queen as an employee and **_did not_** produce a single W-2 or 1099 for a payment to Queen.

Third, Queen's claims in this motion are contradicted by her claims in the Florida Motion. In the Florida Motion, Queen describes herself as the "operator of a beauty salon," whose deposition is being sought because of the "mere accident that Ms. Queen had transactions with one or more of the Flatbush Defendants." Ex. 1 at ¶ 8. She insists that "[n]othing in Ms. Queen's professional or business background suggests a connection to any medical service business." *Id.* at ¶ 9. Yet here, Queen claims she received payments for services to medical clinics in New York for more than 5 years. And, she has been involved with a 3D Mobile Ultrasound business operated out of a unit controlled by the Rybaks in Florida since 2011.

Fourth, Queen's "story" is consistent with other recurring aspects of the fraud scheme at issue. Queen claims she was offered the cleaning job through Dr. Arguelles. In October, 1999, Tatiana Rybak pled guilty to a variety of state criminal charges involving her illegal operation and control of four No-fault clinics, including one at which Arguelles treated patients. *See* Ex. 11. Arguelles was among the physicians treating patients at 1468 Flatbush when Rybak controlled that location. Arguelles also purportedly orchestrated Allan Buslon's purchase of the DME Defendants' receivables in a pure cash transaction accomplished without any documentation. The DME Defendants have used that transaction to claim they cannot provide any discovery on the operation or activities of the DME Defendants. It should not appear a coincidence that Queen claims Arguelles is the only identified individual involved in her employment at 1468 Flatbush, purportedly occurring when Arguelles would have been 82. Arguelles has been conspiring with Rybak for years, and has played a recent role it assisting Rybak in blocking discovery into her connection to the scheme at issue. Moreover, the claim that Queen got to 1468 Flatbush through Arguelles is not credible given evidence that Queen had been in the 3D mobile ultrasound business with the Rybaks since at least October, 2011.

Accordingly, the bank records are relevant and Queen's claims to the contrary are not credible. Records will establish how the alleged RICO enterprise operated, including its structure and the relationship among the participants. *See State Farm v. Physiomatrix*, 2013 WL 10572229, at *3 (E.D. Mich. Aug. 13, 2013). The scheme involved generating profits from the provision of services at 1786 Flatbush and siphoning those profits to others. Queen received payments from multiple providers, some of which appeared to have been structured to avoid detection. Indeed, the payments to Queen are strikingly similar to payments to others who are affiliated with the Rybaks. The mechanics of that process are relevant to the claims at issue. *Id*.

Additionally, determining who is responsible for the conduct at issue is always relevant. *See, e.g., U.S. v. Srivastava*, 540 F.3d 277, 292 (4th Cir. 2008) (financial records "highly probative" into whether suspect "conducted and carried out" fraud scheme). Discovery to determine whether others who have not been named as defendants are responsible or should be named is proper. *See State Farm v. McGee*, 2012 WL 8281725, at *2 (E.D.N.Y. Feb. 21, 2012) (bank records relevant to "the control the true owners exerted"); 2013 WL 10572229, at *3 (relevant to "additional potential parties"). Knowing who received the proceeds from the scheme is critical because those persons or entities are

most likely responsible for the conduct.  *McGee*, 2012 WL 8281725, at *2; 2013 WL 10572229, at *3 (records relevant to "ownership and control").  Assessing whether funds obtained at 1786 Flatbush made their way to others through Queen is thus a proper line of inquiry.

The records are also relevant to how the healthcare providers operated, their motives and why they provided medically unnecessary services.  If a significant portion of Defendants' receipts were transferred to others, it would indicate that providers did not control their practices, were beholden to others, and could be directed to provide unnecessary services.  Queen's bank records are thus critical to understanding Defendants' motives and what they received.  Motive is always relevant,[3] and State Farm's unjust enrichment claim turns on how much defendants received.  *See Myun-Uk Choi v. Tower Research Capital, LLC*, 886 F.3d 229, 237 (2d Cir. 2018); *State Farm v. CPT Med. Servs.*, 375 F. Supp. 2d 141, 156 (E.D.N.Y. 2005) (personal financial records relevant to how defendants profited).

Queen's status as a nonparty does not bar disclosure.  *E.g.*, *Physiomatrix*, at *3 & n.3 (non-party status "does not automatically shield that information from discovery").  Courts, including courts in this District, have allowed access to financial records of non-parties.  *Id.*; *CPT Med. Servs.*, 2006 WL 2460641, at *1 (E.D.N.Y. 2006) (granting "plaintiff's request for certain financial records from nonparties"); *In re Suzuki*, 2014 WL 6908384, at *4 (D. Haw. Dec. 5, 2014) (denying motion to quash subpoena for non-party's banking information).  Queen's claim to a privacy interest to defeat the subpoena is without merit. Queen's cited authorities merely recognize that a person has standing to object to a request for their bank records, and actually permitted their production, or only denied production on relevance grounds, not based on privacy concerns.  *Zagroba v. York Restoration*, 2011 WL 2133837, at *2–3 (E.D.N.Y. May 26, 2011); *Arias-Zeballos v. Tan*, 2007 WL 210112 (S.D.N.Y. 2007); *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 2006 WL 2642192 (S.D.N.Y. 2006).

This Court has already recognized that payments like those made to Queen are a relevant.  At an October 17, 2018 hearing concerning a subpoena for bank records of third-party Maria Masigla who also received payments from multiple defendants, this Court recognized that discovery of these "suspicious transactions" was "relevant and should be allowed for purposes of discovery."  Ex. 12, 10/17/18 Hrg. Tr. at 38:1-7.  Following a motion for reconsideration, this Court ultimately granted State Farm access to records for the non-party bank accounts, regardless of whether State Farm could identify particular bank accounts, as these were suspicious transactions relevant to the case.  The Court reiterated at a November 28, 2019 hearing that "Those transactions are clearly relevant.  They're entitled to them."  Ex. 13, 11/28/2018 Hrg. Tr. at 4, 6; *see also* Dkt. 114, 11/30/2018 Civil Minute Entry.  As this Court's ruling acknowledges, Queen's explanation is only a defense, not a basis to block discovery.  *See* Ex. 12, 10/17/18 Hrg. Tr. at 30:9-14 (finding "the fact that there might be innocent explanations for the payments [to third parties] is certainly plausible. That might very well be the defense, but there's no question . . . there is enough information that suggests [financial discovery] might lead to relevant evidence.").

Accordingly, Queen's motion to quash should be denied.

Respectfully submitted,

*/s/ Jonathan L. Marks*

---

[3] *See State Farm v. Fayda*, 2015 WL 7871037, at *3 (S.D.N.Y. Dec. 3, 2015) (personal financial records relevant to defendant's motive); *McGee*, 2012 WL 8281725, at *2 (bank records relevant to defendants' "motive in participating in the fraud"); *Physiomatrix*, 2013 WL 10572229, at *3 (records relevant to motive).