1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK

2   ------------------------------------X
                                        :
3   STATE FARM MUTUAL AUTOMOBILE        :
    INSURANCE COMPANY, *et al.*,        :
4                                        :
                     Plaintiffs,        : 18-CV-00289 (ILG)
5                                        :
              v.                         :
6                                        : July 17, 2019
    JULES PARISIEN, M.D., *et al.*,      :
7                                        : Brooklyn, New York
                     Defendants.        :
8   ------------------------------------X

9           TRANSCRIPT OF CIVIL CAUSE FOR HEARING
10         BEFORE THE HONORABLE STEVEN TISCIONE
             UNITED STATES MAGISTRATE JUDGE
11
    APPEARANCES:
12
    For the Plaintiffs:       JONATHAN MARKS, ESQ.
13                            Katten Muchin Rosenman LLP
                              525 West Monroe Street
14                            Chicago, Illinois 60661

15                            CHRISTOPHER COOK, ESQ.
                              Katten Muchin Rosenman LLP
16                            575 Madison Avenue
                              New York, New York 10022
17
    For the Defendants:       MARK L. FURMAN, ESQ.
18                            Abrams, Fensterman, Fensterman,
                              Eisman, Formato, Ferrara & Wolf,
19                            LLP
                              3 Dakota Drive, Suite 300
20                            Lake Success, New York 11042

21                            NICHOLAS BOWERS, ESQ.
                              Gary Tsirelman, P.C.
22                            129 Livingston Street
                              Brooklyn, New York 11201
23
                              (Appearances continued on next
24                            page.)

25

    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service

APPEARANCES (CONTINUED):


For the Defendants:                ANDREW S. FISHER, ESQ.
                                   Fisher & Fisher
                                   1 Whitehall Street, 21st Floor
                                   Staten Island, New York 10004


Court Transcriber:                 SHARI RIEMER, CET-805
                                   TypeWrite Word Processing Service
                                   211 N. Milton Road
                                   Saratoga Springs, New York 12866

3

1          THE COURT:  Be seated.  Civil cause for a motion

2    hearing, 18-CV-0289, <u>State Farm Mutual Automobile Insurance</u>

3    <u>Company, *et al.*, v. Parisien, *et al.*</u>

4          Counsel, please state your appearances for the

5    record.

6          MR. MARKS:  Good afternoon, Your Honor.  Jonathan

7    Marks on behalf of plaintiff State Farm.

8          MR. COOK:  Christopher Cook on behalf of plaintiff

9    State Farm.

10         MR. FURMAN:  On behalf of the professional

11   defendants, I won't go through the list if that's acceptable

12   to Your Honor.

13         THE COURT:  That's fine.

14         MR. FURMAN:  Abrams Fensterman by Mark Furman.

15         MR. BOWERS:  On behalf of defendant Quality Custom

16   Medical Supply, Nicholas Bowers.

17         MR. FISHER:  And on behalf of the other DME

18   defendants, Fisher & Fisher by Andrew S. Fisher.

19         THE COURT:  All right.

20              [Pause in proceedings.]

21         THE COURT:  Well, you were certainly busy while I

22   was out.

23              [Pause in proceedings.]

24         THE COURT:  I don't even know where to start.

25              [Pause in proceedings.]

4

1        THE COURT:  So I have a motion for sanctions for a

2   default judgment against the DME defendants.  What's the story

3   with the production that's never happened?

4        MR. MARKS:  Okay.  So, Your Honor, so with respect

5   to the DME defendants, we're waiting on production of

6   documents.  We're waiting on responses, written responses to

7   document requests.  We're waiting on answers to

8   interrogatories.

9            As the Court will recall, you had ordered that these

10  be completed on four separate occasions setting dates for them

11  to be completed.  You've warned that sanctions would be issued

12  on three separate occasions.  On two separate occasions, you

13  warned that if they are not completed by a date certain, you

14  would enter a default judgment.  You've previously issued an

15  order imposing fees and costs for failure to get those done.

16  You also issued an order -- our brief was actually -- a motion

17  on this was filed on June 20.  You ordered the response to be

18  filed by June 27.  A response hasn't even been filed for that.

19            So, we have just -- we regret finding ourselves in

20  this situation.  And we don't want to be in the situation

21  because, you know, we have a personal relationship with

22  counsel and we understand the dilemma.  But we don't know what

23  to do.  We're trying and trying and it just simply is a

24  complete and total abandonment of any presentation or any

25  response of defense.  And the Court keeps issuing orders,

5

1    keeps issuing warnings that there are going to be consequences

2    including up to default and yet nothing is happening and this

3    is where we are.

4            And so we are really at a point where we don't know

5    what else to do other than seek the entry of a default

6    because, you know, we think that the standards at this point

7    have been met.  You know, we could have this for over a year

8    and so that's why we find ourselves in this situation, Your

9    Honor.

10            MR. FISHER:  Three of the entities as we have

11   discussed previously were owned by individuals who are

12   somewhere in the wind, haven't been able to -- plaintiff

13   hasn't been able to locate them.  We haven't able to locate

14   them.  As I've explained to the Court a couple of times, Mr.

15   Balson [Ph.] who owns AB Quality and another DME thought he

16   was buying the claims of these three through a Dr. Arguelles.

17   He's been operating on that premise.  He was deposed.  He

18   basically said, you know, I was on active military service.

19   My wife was running the business.  I've tried to familiarize

20   myself with what went on, but you're better off talking to my

21   wife.

22            Immediately after that deposition, the plaintiffs

23   moved for a default.  Mr. Balson said I've had enough.  I've

24   had enough.  I can't answer interrogatories.  I can't answer

25   discovery demands with respect to the three companies that are

6

1    gone, with respect to my own companies as he testified in his

2    deposition.  When I shut them down, I didn't retain any paper.

3    I didn't know I had to, and I didn't keep the paper.

4            So we can't comply with the discovery demands.  We

5    have told them we've given you every document that we could

6    conceivably locate.  Mr. Balson's wife did a search.  She

7    found some documents.  We produced every single one of the

8    documents that she was able to find, and Ms. Balson has

9    testified that there are no other documents in his possession

10   or control.  And so he said I've had enough.  I'm tired of all

11   these motions.  I'm tired of being politely threatened because

12   I was a 30(b)(6) witness and I couldn't answer some questions.

13   In fact, I couldn't answer many questions.  But I'm just tired

14   of this, and I don't want to be further indebted because of

15   this.  And I've given up any hope of recovering on any of

16   these claims in the future, so why should I incur more debt to

17   do this.

18           And so if there's going to be a default, so be it is

19   his attitude.  But he's just plain worn out, Judge, and he

20   doesn't see any sense to remaining in this litigation.

21           MR. MARKS:  So, Your Honor, I guess what I'm hearing

22   is that on behalf of the five DME defendants, I'm hearing more

23   or less a concession, go ahead and enter a default against the

24   five DME entities.  That appears to be where we are.  When he

25   says enough, meaning I don't want to do anything more, well,

7

1    that's fine.  You don't have to do anything more, but you're a

2    defendant in the case.  You have obligations to participate in

3    the case.  And if that's your position that you're not going

4    to participate, you're not -- that's fine.  But there are

5    legal consequences of the failure to participate.

6              MR. FISHER:  And I have explained that to Mr. Balson

7    in full detail.  He's getting ready to be deployed again which

8    is another factor in this.  His wife has had enough.  He's had

9    enough, and so if there's going to be a default judgment

10   against the five entities -- three of them he cares nothing at

11   all about and the two defunct companies that he cares very

12   little about -- so be it, Judge.

13             THE COURT:  Okay.  I am going to recommend the

14   district court enter a judgment of default against those five

15   defendants.  And I suppose good luck collecting on.

16             MR. MARKS:  And that's fine.  And let me just raise

17   and now there is a separate issue.  A default judgment does

18   note excuse, and we can proceed through this.  We can do this

19   now by a subpoena as they become nonparty.  But It does not

20   exclude an obligation to comply with a 30(b)(6) deposition.

21   So we noticed a 30(b)(6) deposition.  A witness was produced.

22   At that -- Allen Balson [Ph.].

23             Now under the Rule 30(b)(6), you got to tender a

24   witness with knowledge and if that person doesn't have

25   knowledge, they have to educate themselves.  They have to

8

1  figure out whatever it is the knowledge that they can figure

2  out, and they have to do something.  Mr. Balson did absolutely

3  nothing.  As he testified at his deposition, did you do

4  anything to gather information for this deposition, no.  He

5  didn't know anything, and that's fine.  If Mr. Balson doesn't

6  know anything, that's fine.  But he either had -- they had two

7  choices.  One, he could learn what he needed to learn or he

8  could tender another witness.  And he said at his deposition

9  that other witness is his wife.

10       So the default is fine.  We still need a -- we still

11  -- the conduct, however, of the Durable Medical Equipment

12  entities is still relevant to the rest of the case because the

13  professional defendants --

14       THE COURT:  Have you tried to depose her?

15       MR. MARKS:  We have not tried to depose her.  So

16  we're happy to go ahead and we will make an attempt to depose

17  her, and if that's --

18       THE COURT:  I mean he's the one who said that she

19  knows more about the company, so if you want somebody who

20  knows something about the company, it sounds like she might be

21  the person to depose.

22       MR. FISHER:  And, Your Honor, in fairness and I

23  think Jonathan will agree with this, we discussed the fact

24  that we would produce Ms. Balson for the deposition, but then

25  they made the motion for the default.  And he said why am I

9

1  being nice about anything.  You know, why should I offer up my

2  wife.

3          And as far as his role as a 30(b)(6) witness which,

4  frankly, Mr. Marks took many attempts to convince him that he

5  should know more than he does by telling him he's a 30(b)(6)

6  witness, but the truth of the matter is he looked at the

7  subpoena, he didn't know the answers to the questions so he

8  ascertained the facts as best as he could and the facts that

9  he could ascertain were in the possession of his wife.  So

10  they jumped the gun by making the motion for the default.

11  They pushed him to making a decision as to whether to proceed

12  further or not.  And, you know, if they now want to serve Ms.

13  Balson as a nonparty witness, I presume that she'll do

14  whatever her legal rights entitle her to do at the time they

15  serve that subpoena.

16          MR. MARKS:  Well, we have attempted to arrange the

17  deposition of -- to continue the deposition of the 30(b)(6)

18  witness and to take the deposition of Ms. Ksenia and we were

19  told not going to do it because you've moved for a default.

20          MR. FISHER:  Right.

21          MR. MARKS:  So, all right.  So if what I'm hearing

22  is that we intend to go forward then the deposition of Ms.

23  Ksenia and then we'll -- will counsel accept service of the

24  subpoena on her behalf?

25          MR. FISHER:  I'll have to find out if I'm authorized

10

1  on that.  I don't represent her individually yet, but I expect

2  I will.  But I don't yet have authority.

3          MR. MARKS:  All right.  We'll go forward with that

4  deposition.

5          MR. FISHER:  Are you going to do that before or

6  after you try to take the deposition of the guy who owns a

7  barber shop?  I mean, Judge, there's a point at which State

8  Farm's discovery approach becomes rather absurd.  As Mr.

9  Furman pointed out --

10          THE COURT:  It's easy to say that and yet I look at

11  the transactions and none of them make any sense.

12          MR. FISHER:  Which transactions are you talking

13  about?

14          THE COURT:  The transactions where your -- well, and

15  that's not your witness, but, you know, you have a nonparty

16  who claims she has no connection to any health care entities

17  and then later says that she worked for them cleaning.

18          MR. FISHER:  And filing papers.

19          THE COURT:  And yet makes $200,000.

20          MR. FISHER:  No, sir; not 200,000.  I believe it's

21  100,000 and I believe it's over seven years.  Seven years.

22          THE COURT:  Well, someone who had seven years of

23  contact with multiple health care agencies should never have

24  represented that she had no connection to any health care

25  agencies.

1          MR. FISHER:  No connection other than.  I mean she's

2    not involved in the health care agency.  She's a functionary.

3          THE COURT:  Okay.

4          MR. FISHER:  She cleaned toilets.  She was

5    desperately in need of money, Judge.  It's a single mother

6    with two children approaching college age.  Her own business

7    was nonexistent.  They've raised something about a company --

8          THE COURT:  Well, then why did none of the

9    defendants have any of those records?

10         MR. FISHER:  Excuse me.

11         THE COURT:  Why do none of the defendants have any

12   of those records?

13         MR. FISHER:  I don't know what the professional

14   defendants did or didn't do, have or didn't have.  What I'm

15   talking about, Your Honor, are the facts related to some of

16   these allegations that have been made by State Farm in which

17   they say significant amounts of money.  Significant amounts of

18   money over a seven, eight, ten-year period are much less

19   significant.  If somebody got $200,000 over seven years, so

20   they got what, a basic $15 an hour salary?

21         I mean you're talking about claims --

22         THE COURT:  I don't know.  Maybe if your client's --

23   no, again, not your clients.  This is the problem.  There's

24   too many defendants.

25         MR. FISHER:  Just theoretically, Your Honor --

12

1        THE COURT:  But, you know, they're not identified as

2  employees.

3        MR. FISHER:  Right.

4        THE COURT:  If there are employment records, maybe

5  some of this would make any sense.

6        MR. FISHER:  Maybe they're independent contractors.

7        THE COURT:  I don't know.  But none of this stuff is

8  making any sense, that's my point.

9        MR. FISHER:  But has State Farm put forward a single

10  fact that demonstrates this unpleaded theory of the case that

11  they're pursuing because they're not pursuing the complaint.

12  They're pursuing some other kind of case that they may or may

13  not bring in the future for some purpose.

14        THE COURT:  They're pursuing a RICO claim which is

15  in the complaint.

16        MR. FISHER:  They say the target of all of this

17  discovery is a woman by the name of Tatiana Rybak.  She's not

18  a party to the action, and they've got I believe one check

19  that predates the allegations of the complaint for a thousand

20  dollars that was paid to her by another nonparty, a thousand

21  dollars.  And then they premise everything on we suspect, we

22  think, we allege.

23        But you asked the question once other than the fact

24  that so-and-so got paid, what evidence do you have that he was

25  involved in the fraud.  You could ask that same question about

13

1   each and every person who was served with a third-party

2   subpoena.  They've gotten all the bank records.  They know

3   where the checks are.  They've issued lists and lists of

4   checks that they want people to explain, and they refuse to

5   allow for the fact that there's something going on here that's

6   different than what they imagined.

7          And they refuse to recognize the fact that there is

8   a connection point other than Tatiana Rybak between and among

9   all of these people and it's a Dr. Arguelles.  And, in fact,

10  Mr. Balson testified at his deposition, at his 30(b)(6)

11  deposition, that he was asked to purchase the claims by Dr.

12  Arguelles, that he dealt through Dr. Arguelles.  Dr. Arguelles

13  is a house doctor at the Fountain Blue Hotel.  So that

14  explains the relation -- and used to live in an apartment

15  house I believe with some of the other nonparties.

16         So that explains a connection point that's so

17  different from what they keep throwing forth in the Court that

18  somehow this boogeyman Tatiana Rybak is behind all of this,

19  and yet they haven't gotten any evidence that a single dollar

20  passed between any of the persons that they got bank records

21  from and Tatiana Rybak except I believe for a thousand dollars

22  that predates the allegations of the complaint and has an

23  innocent explanation.

24         And parenthetically, they made much ado in their

25  recent letter about a 3D company that was started by Vasila

14

1  Queen.  Yeah, she did.  It was a concierge birth business, and

2  she tanked its base from Tatiana Rybak or from an entity that

3  Tatiana Rybak has an interest in.  That company did absolutely

4  zero business and was never dissolved as far as I know because

5  Vasila Queen didn't want to waste the money that was hard-

6  earned by her to dissolve the company.  Big -- I almost said a

7  bad word.

8           It's mind-boggling, Judge, that based on no evidence

9  that they're pursuing this case in a direction that is

10 alienated from the complaint and at some point I would think

11 that the Court would want to rein them in a little bit, but

12 that's just me, Judge.

13          MR. MARKS:  Judge, I don't know how much of that you

14 need me to respond to.  But no evidence.  We have piled on the

15 evidence that establishes that there is a scheme here clearly

16 to funnel money very likely of Tatiana Rybak.  He says are you

17 going to depose the barber now.  We're not trying to depose

18 the barber.  We're trying to depose the defendants, the named

19 defendants, the Durable Medical Equipment providers.

20          And what do we get?  We get an individual who walks

21 in who is 30(b)(6) witness despite his obligations under the

22 Federal Rules of Civil Procedure 30(b)(6) in which he's

23 supposed to know something about the Durable Medical Equipment

24 providers he's there to testify on behalf of, two of which he

25 claims to own on paper.  And he doesn't know anything.  He

1  doesn't know who the employees are.  He doesn't know who their

2  shareholders are.  He doesn't know where the mailboxes are.

3  He doesn't know anything whatsoever about durable medical

4  equipment.  He couldn't pick out a piece of durable medical

5  equipment if it were sitting in front of me.  He has no idea,

6  okay.

7        What he does know is that Dr. Arguelles, everybody

8  points to Dr. Arguelles because Dr. Arguelles has been doing

9  business with Tatiana Rybak back since 1999 when Tatiana Rybak

10  admitted in a guilty plea to conspiring with Tatiana Rybak in

11  the illegal ownership and control of a medical clinic.  So --

12        MR. FISHER:  Your Honor, that case --

13        MR. MARKS:  I'm speaking now.  I let you speak.

14  It's my turn.

15        MR. FISHER:  Okay, John.

16        MR. MARKS:  Thank you.

17        MR. FISHER:  I'll wait for you.

18        MR. MARKS:  All right.

19        MR. FISHER:  Just I want to clear up your

20  misrepresentation to the Court.

21        THE COURT:  I'll give you an opportunity to speak.

22  I don't typically cut anybody off.

23        MR. MARKS:  Thank you.  All right.  And so what we

24  -- and so every time we turn around, everybody trots out

25  Tatiana Rybak who right now is in her nineties, right.

1          MR. FISHER:  No.  You said Tatiana Rybak.  You mean

2  --

3          MR. MARKS:  I'm sorry, Dr. Arguelles who's now in

4  her nineties, right.  Dr. Arguelles is the doctor we brought

5  out to say, okay, Dr. Arguelles is the one we're going to trot

6  on and say, oh, it's Dr. Arguelles.  So Dr. Arguelles called

7  and said do you want to buy these receivables for $2,000 and

8  Balson pays $2,000 in cash.  There's not a scrap of paper to

9  reflect these transactions.  It made absolutely no sense

10  whatsoever.

11          And now, Vasila Queen who's got all this money,

12  what's her story?  Oh, her story is, yeah, it's Dr. Arguelles.

13  So now Dr. Arguelles is going to be the fall person.  Look,

14  all of this at the end of the day is interesting arguments

15  that we may here one day in a courtroom at trial, but that's

16  not the point.  The point is this is discovery.

17          And what we have here is we have the Durable Medical

18  Equipment defendants who have produced nothing.  If they have

19  a defense, if this is his story, answer an interrogatory, come

20  into a deposition and say what Mr. Fisher is saying in here

21  under oath.  Mr. Balson could say it.  Somebody can say it

22  under oath.  Put up your evidence, but they've put up nothing.

23  Nobody's producing everything.  The professional defendants

24  haven't produced, have not produced anything that establishes

25  any of this.  Where is this evidence?

1          So I say look, at the end of the day, this isn't

2   about proving our case.  This is about where is our discovery

3   right now.  That's what we're talking about.  We're entitled

4   to this.  This is called for by the complaint that we have

5   filed.  We have heaped on this Court in numerous pleadings

6   demonstrating all of the issues that are associated with these

7   payments.  We have more than established the basis to be

8   entitled to this discovery, and we should be allowed to go

9   forward with it.

10          MR. FISHER:  Judge, let me clear on thing up

11  immediately because it's a matter of public record.  Whatever

12  happened back in 1990 when Ms. Rybak admitted to certain

13  conduct is no longer of any moment because her conviction was

14  vacated approximately two years ago, two and a half years ago

15  on constitutional grounds, failure to have the assistance of

16  effective counsel.  So she's no longer a convicted felon.

17  She's a misdemeanant of a B misdemeanor, a B misdemeanor.

18          She has acquired U.S. citizenship despite that

19  minimal conviction.  She waited to apply for citizenship until

20  after we were successful in vacating her conviction, and then

21  she applied for citizenship immediately and has, as I said,

22  been awarded citizenship.  That's number one.

23          Number two, Mr. Balson prepared himself as best as

24  he could.  As I said, he looked at that subpoena and he came

25  prepared to tell them where they could find the information.

18

1   And I know I'm repeating myself, but they jumped the gun.

2   They made this motion for a default and they pushed him into a

3   corner.  And now they're saying, oh poor us, we need this

4   discovery.  Well, they could have had it if they had

5   cooperated, but instead they came running to you fourth time,

6   fifth time, ninth time.  And that's where Mr. Balson said I'm

7   going away, I'm going back on active duty and I'm going to

8   have to deal with motions in this stupid case where I really

9   have an almost insignificant financial interest at this point.

10  To hell with it.

11          And that's it simply.  They want to -- and as I

12  said, if they want to subpoena Ms. Ksenia, I guess she'll do

13  what she can do, whether it's me or some other lawyer.  And

14  with respect to -- you know, but the main point is, Judge,

15  they keep coming back to you with four-page letters, five-page

16  letters in which they make all of these inflammatory

17  allegations, none of which relate to the complaint and none of

18  which they have a scintilla of evidence to establish.  It's

19  just we think.

20          And they have all the bank records of everybody.

21  They've subpoenaed banks.  Some people have given their tax

22  return -- their bank account information voluntarily.  They

23  got tax returns through subpoenaing an accountant who gave

24  them records that they now I think are complaining to Mr.

25  Furman that he didn't produce what they already have.

1        I mean come on, Judge.  When does it get abusive?

2   When is it enough -- when is enough enough when they have

3   nothing?  Ask them point blank, what evidence do you have to

4   keep going down this path, and I bet you dollars against

5   doughnuts that the only answer they're going to have is these

6   people got money.  Where did the money go?  They don't know

7   that.  Maybe it went for their living expenses.

8        They talked about two witnesses who took the Fifth

9   Amendment.  Yes, they took the Fifth Amendment on advice of

10  their counsel for whatever reason he decided that they needed

11  to protect themselves.  But when you look at the amount of

12  money that those people got over a ten-year period of time,

13  you're talking about a modest salary for a clerical worker.

14       I mean it's as plain as -- I hate to say noses on

15  faces because some of them are not plain, but it's as plain as

16  -- you know, as anything could be that they're chasing around

17  doing all this discovery, discovery, discovery, discovery,

18  discovery.  And I challenge them -- I challenge them to make

19  an offering of proof at this point as to why they should be

20  allowed to continue down that path.

21       And may I remind the Court we made a submission of

22  papers with respect to Les Levine [Ph.], which they also refer

23  to in one of their letters.  And we're waiting on your with

24  respect to that.

25       MR. MARKS:  I can respond to that.  We can go back

20

1   and forth.  It's not constructive.  The only point is speeches

2   from Mr. Fisher on why there's evidence or no evidence are

3   irrelevant.  His clients have decided to take a default.

4          MR. FISHER:  Yeah.

5          MR. MARKS:  Meaning there's going to be a judgment

6   against them, meaning there's going to be a judgment against

7   them based on the allegations in the complaint, meaning the

8   complaint, the facts alleged in the complaint are going to be

9   accepted as true and we're going to have a default against

10  them.  So he can howl at the moon all he wants, but as of

11  right now, his clients have decided not to defend the

12  complaint.

13         Now, maybe they've decided not to defend the

14  complaint because they've had enough.  Maybe they've decided

15  not to defend the complaint because Mr. Balson's going back to

16  wherever he's going back to.  Maybe they've decided not to

17  defend the complaint because they've got no defense.  Maybe

18  they've decided not to defend the complaint because this is

19  part of a strategy to prevent us from getting any more

20  information.  It doesn't matter.

21         All that matters is the case as to Mr. Fisher and

22  his clients is over.  And [indiscernible] -- well, there is

23  going to be a judgment as to liability based on the

24  allegations of this complaint against his clients.  And so the

25  liability portion of the case as to his clients is over.  His

1   time for speeches, his time for evidence, his chance to

2   present that, he's giving it up.  It's done.  So it's all well

3   and good, but it's done.

4           MR. FISHER:  And I'm looking forward to the damages

5   phase of the case because I think that State Farm will be

6   hard-pressed to establish that they were damaged one dollar by

7   virtue of the conduct of the Balson-related DMEs.  The other

8   three, they've been out of business for so many years, there's

9   no principals involved.  It's just silly to pursue them, but

10  you know what, I guess that's what makes horse racing.

11          THE COURT:  I'm recommending default against the

12  five entities.  If you want to subpoena Mr. Balson's wife

13  since she appears to have some information about the

14  companies, go ahead and do that.

15          Moving on, you also asked for an order to show cause

16  against Alexander Almonte for failure to comply with the

17  subpoena and the Court's order.  What's still outstanding?

18          MR. MARKS:  So, and, Your Honor, this may be

19  premature because we just filed -- our motion has not been

20  served on him yet, so let me just sort of remind the Court

21  there were four or five nonparties that were the subject of a

22  motion.  All of the other ones that were -- and you issued an

23  order saying they all needed to comply by a date certain.  All

24  of the others fully complied.  Mr. Almonte is the only one who

25  has not, and then he went radio silent, okay.

22

1          We filed the motion I guess yesterday, the day

2     before.  We have not yet had a chance to serve him with that.

3     So what I would suggest that the Court do is set a -- so I

4     mean I'm happy to advise the Court of what's missing, but we

5     sent a letter to Mr. Almonte saying these are the specific

6     things that are missing.  It includes communication, and it

7     includes records of payments and invoices which we know exist

8     because another witness has told us they should exist.  We

9     sent a letter to Mr. Almonte saying please get us these

10    things, a number of letters, please do it by this date certain

11    or we'll have to file a motion.  We then filed a motion.

12          So what I would suggest to the Court, if the Court

13    wants to set a date for a hearing for an order to show cause,

14    we'll serve that order in our motion at the same time and come

15    back on a date when Mr. Almonte will be aware of the hearing

16    and appear.

17          THE COURT:  I'm going to set a hearing for all three

18    of those motions.

19          MR. MARKS:  Okay.  Yeah, right, Your Honor, because

20    the other -- there's also the motion with respect to Carlos

21    Pena and a motion with respect to Vasila Queen.  We just filed

22    those responses, and so we need a hearing for those three,

23    Your Honor.

24                    [Pause in proceedings.]

25          THE COURT:  So that's the motion for a protective

23

1    order by Carlos Pena and it's the motion for a protective

2    order by Vasila Queen and the order to show cause against

3    Alexander Almonte or a motion for an order to show cause.

4              MR. MARKS:  We -- I'm happy to pick a date.  I only

5    caution that the attorney on the Queen and Pena motion is an

6    attorney from Florida, so we should pick a date but he may

7    need to change that date.  And we'll work --

8              THE COURT:  I'll just ask you to reach out and

9    forward a copy of the order.

10             MR. MARKS:  Okay.

11             THE COURT:  And if you need to pick a new date, just

12   see if you can agree on one.

13                      [Pause in proceedings.]

14             THE COURT:  All right.  Let's pick a date.

15             MR. MARKS:  I'm fairly flexible, Your Honor.

16             THE COURT:  August 20th?

17                      [Pause in proceedings.]

18             MR. MARKS:  Is the 21st possible, Your Honor?

19             THE COURT:  I can't do the 21st.  How about the

20   22nd?

21             MR. MARKS:  I can do, yes, the 22nd.  Twelve

22   o'clock?

23             THE COURT:  That's fine, Your Honor.

24             MR. MARKS:  And I'll reach out to -- we'll reach out

25   to counsel, and we'll file the Queen and Pena motion if it

24

1   needs to be revised.  We'll reach out to your chambers.

2             THE COURT:  That's fine.

3             MR. FISHER:  I'm going to have dinner with one or

4   both of them down in Miami this weekend.  I'll tell them,

5   also.

6                       [Pause in proceedings.]

7             THE COURT:  All right.  I think that deals with four

8   of the motions.

9                       [Pause in proceedings.]

10            THE COURT:  Now as to the motion to compel.

11                      [Pause in proceedings.]

12            THE COURT:  So what exactly is still outstanding?

13            MR. MARKS:  So, Your Honor?

14            THE COURT:  As opposed to stuff that they're

15   objecting to and we'll talk about that, but --

16            MR. MARKS:  So and I think this starts to get a

17   little dense and the paper starts to get a little bit

18   confusing.  And so I think the simplest way to think about

19   this, Your Honor, is so on April 19th, we sent a letter to

20   counsel for the professional defendants in which we wrote in

21   great detail each of the things that were missing and with

22   broad brushes.  There are certain categories of documents that

23   are missing.  There are interrogatory responses in which

24   they've answered some part but not the other part.  There are

25   interrogatory answers that either don't make sense or where

1  the interrogatory answer says one thing, and Mr. Furman is

2  telling us something slightly different in a meet and confer.

3          There are, as I say, there are interrogatory answers

4  in which some subparts are answered and other subparts aren't.

5  There are instances where sometimes they say documents don't

6  exist, but the document responses aren't clear that the

7  documents don't exist, and we've said, look, if they don't

8  exist, they don't exist.  That's fine.  We just need

9  confirmation that they don't exist or who doesn't have them.

10          And so, we could get into the excruciating detail,

11  but here's really what I think it sort of comes down to when I

12  sort of say, you know, what are the issues with respect to

13  professional defendants any sort of need, number one, to the

14  extent that there are documents that they say that they're

15  going to produce, we just need them produced by whatever that

16  date certain.

17          So if they've got documents, whatever they are, you

18  know, and they are what they are, just give them to us and

19  give them to us by a date certain.  And we've just never had

20  that clarity, and we've been attempting to get that clarity,

21  but just give them to us.  We got some -- we started to get

22  some documents on Monday of this week, fine.  But we just need

23  a date certain to produce them.

24          The second thing we'd need is to the extent that we

25  have written document responses, we need the defendants to go

26

1    back, and we've asked them to do this, and look at them and

2    revise those responses to just be clear.  Look, just tell us

3    you're producing the documents, you're not producing the

4    documents, or you're objecting.  And I don't think that's

5    clear.  In some instances, it's clear but in some instances,

6    it's just simply not clear and we can't tell.  So just go back

7    and do that just so we know what we're getting and what we're

8    not getting.

9         With respect to the interrogatories, we need the

10   defendants to go back and we need them to revise their

11   interrogatories.  Now I understood from a meet and confer back

12   in April that counsel was evaluating whether to revise those

13   interrogatories and even had suggested that he was going to

14   revise some of those interrogatories.  I don't know whatever

15   happened to that.  They went sort of radio silent on it, but

16   we need those interrogatories revised so that, for example --

17   let me just give you an example.  One of the interrogatories

18   asks about billing software.  The interrogatories right now

19   say we don't know anything about billing software, but the

20   response that's been filed with the Court says, of course,

21   State Farm knows there's no billing software.

22        Well, we don't care what the response is.  It is

23   what it is.  Just get the response right.  And, you know, Mr.

24   Furman has also told us things in the meet and confer.  For

25   example, one of the things we said is are there lease

1  agreements and they've said, no, there's only one written

2  lease agreement, okay, and -- but they're oral agreements and

3  the terms of the oral agreement are sort of random.  And the

4  amounts fluctuate up and down.  Well, that's something Mr.

5  Furman told us in a meet and confer, and that's fine.  That

6  may be the truth, but Mr. Furman isn't a party.  He can't

7  testify to that.  We just need that in a response.  So we just

8  need the interrogatory and responses answered.

9          In some instances, we've been told, the

10  interrogatory answer's look at the documents.  Okay, that's

11  fine.  Sometimes the documents do provide answers.  So, for

12  example, we've said who owns the defendant entities and when

13  did they acquire an interest in the defendant entities and

14  what percent interest do they own in the defendant entities.

15  And the defendants have said look at the documents we've

16  produced.

17          Well, the documents that are produced are the

18  incorporation documents.  That maybe tells us who owned it

19  when it was incorporated, but it doesn't answer the percentage

20  ownership, when they acquired that interest.  And Mr. Furman

21  has said to us, well, I think all of the defendants owned it a

22  hundred percent.  Again, that may be true and that's fine if

23  that's true, but let's get the answers revised so that we can

24  get that in an interrogatory answer so we can get it responded

25  to.

1          So, and we can get in a second to the ones where we

2   have disagreement, but essentially, what we're seeking then

3   is, one, get us the documents that you're going to get us and

4   just pick a date certain by which we're going to get them,

5   whatever they are; two, revise the documents responses to tell

6   us what we're going to get, what we're not going to get, and

7   what you're objecting to and just make sure it's sort of

8   crystal clear so we don't have any disagreement; and then

9   three, we need revised interrogatory responses that answer all

10  the subparts and are clear and correct and clear up all the

11  confusion, back and forth that we've had through the meet and

12  confer and we need that by a date certain.

13         I think if we get that done -- and, again, we can go

14  through some of the specifics if you'd like, but I think if we

15  get those three things done, that will alleviate -- and by a

16  date certain, that ought to alleviate a lot of the issues that

17  I think we have.

18         THE COURT:  What three things, the interrogatory

19  responses --

20         MR. MARKS:  Produce --

21         THE COURT:  -- the documents?

22         MR. MARKS:  Produce all the documents, revise the

23  document responses, revise the interrogatory responses.  I

24  think that ought to -- if we can get those three things done

25  and we can get them done by a date certain -- and when I say

29

1   revised interrogatory responses, sort of include -- you know,

2   including that we get responses for all these subparts.  And

3   assuming we get that done, I think that ought to resolve a lot

4   of the issues, again, with the exception of I think there are

5   only three or four things about which we actually disagree,

6   and we can go through those if you'd like.

7              THE COURT:  All right.

8              MR. FURMAN:  Before we get to that, Your Honor, can

9   I be heard on that?

10             THE COURT:  Sure.

11             MR. FURMAN:  First of all, and I said this all in my

12   letter, there were seven categories of relief that he wanted.

13   I've responded to each of the seven categories.  But so now,

14   from this, it sort of boiled down to three for this aspect of

15   it, so I'll speak to those.

16             We have produced every document that we have.  It's

17   just that simple.  We scrounged a few days ago from one party

18   defendant to find some older things that he had found either

19   in a trunk or underneath a pile of papers because they were

20   insistent on it.  And by the way, these are not particularly

21   [indiscernible] documents we're talking about.  It is

22   certifications of incorporation, licenses.

23             The other thing that I think is critical here, they

24   have issued subpoenas to every financial institution that

25   could possibly give them any documents that they are now

1  saying they want.  Why are we being harassed to produce those

2  same documents.  And in response to the April 19th letter, I

3  asked and it's in my letter, can you please tell us what you

4  have already because I don't see the point in us giving

5  documents that you already have.  And us giving you bank

6  records, I mean, you've got them from the bank.  You're going

7  to get a much better picture from the bank records than you

8  will from our records that we have and to be able to -- that

9  we've retained or we can get.

10        I don't understand why we should be compelled to

11  give them the same documents that they already have, and they

12  won't even tell us what they have.  But I will tell you that

13  one of my clients said to me the other day I've got -- and I

14  didn't produce them -- I've got letters from all these banks

15  telling me that they're getting my documents and they can have

16  them.  But now you're asking me to produce them again.  Why am

17  I having to do that?  It really, really seems unfair.

18        And the statute -- the standard is proportional to

19  the needs of the case.  So how is duplicate production

20  proportional to the needs of this case, which by the way has

21  taken a left turn from the very beginning from the allegations

22  in the complaint.  So -- and we're past that perhaps, but to

23  produce the same documents that they have, if we could --

24  assuming that we even have them.  I don't believe we do.  We

25  gave them from the get-go --

31

1          THE COURT:  You're talking about bank records.  Is

2     that what you're looking for?

3          MR. MARKS:  I'm not sure what he's saying because

4     I'm hearing a couple of things and that's why I'm confused.

5     He began by saying we've produced every document that we have,

6     and now he's saying I don't want to produce anything else,

7     which gives me some confusion.  So I don't know what he's

8     saying.  I don't know whether he's saying they have more

9     documents that they don't want to produce because if he's

10    saying that, that's the first thing I've ever -- it's the

11    first time I've ever heard that.

12          If he's saying he doesn't know what we have in terms

13    of third party production, he made that assertion in his

14    letter that's absolutely false and I have an email exchange in

15    which we told him what we have and we've made available our

16    third party production.  So that's not true.  But so I'm not

17    sure.  So here's --

18          THE COURT:  But just as a basic premise, I don't

19    think, you know, there's any reason at this point to be

20    compelling them to produce documents you already have.  So if

21    there's something specific that you are looking for that you

22    don't already have, tell me what it is.

23          MR. MARKS:  Well, so there is -- so, look, there is

24    one -- if what I'm hearing is -- and again, I only need to

25    understand -- if what he's saying is, look, the bank records

1   is one category of records that I don't want to have to

2   produce again, let's assume that's what he's -- and I need to

3   know what he's talking about because I don't know what he has,

4   right.  So if he's saying to me I don't have bank -- I don't

5   want to produce the bank records again, okay.  That's fine.

6              But as we've said in our April 19th letter and as we

7   have pleaded with them to tell us is we've said, look, just

8   confirm for us that you have identified all of your clients'

9   bank accounts in response to interrogatories just so we know

10  what they are, okay.  And we can't get an answer to that.

11  Just tell us what they are.

12             Now, maybe you'll give us a list of five and we'll

13  say we're entitled to four of them and then we'll fight about

14  -- but at least give us a list of what they are because we

15  have found through the course of discovery we've had one

16  account and then suddenly there's another account that we

17  didn't know about for which a lot of relevant money is moved.

18  So we said to him just confirm, just confirm that you've

19  identified all the accounts.  We'll look at all the accounts

20  that exist, and then if we've got them from the banks, that's

21  fine.  He doesn't need to produce them, but he's got to do the

22  first thing which we've been waiting for several months for

23  him to do.

24             MR. FURMAN:  Your Honor, if they're telling us that

25  they know of another bank account, please -- and I do not have

33

1  any response to that -- tell me what the bank is.  Tell me the

2  bank account number, I'll confirm it or not.  But I haven't

3  heard it.

4         THE COURT:  I don't think that's what they're

5  saying.  I think they're -- look, clearly, they have records

6  from a number of bank accounts.  I'm not going to ask you to

7  reproduce those same records.  The only thing that they're

8  asking for that I would be inclined to give them is if there

9  are other accounts that they don't have records for.  That's

10  what we're talking about.  I don't know whether there are

11  other accounts.  Only your clients would know that.

12         MR. FURMAN:  We have given them obviously all the PC

13  accounts and we have given them personal accounts.  Now, I

14  don't know.

15         THE COURT:  What else is there?

16         MR. FURMAN:  Okay.  I'm not aware that there are.  I

17  mean people have -- sometimes have more than one personal

18  account.  I mean it's not uncommon.

19         THE COURT:  That's entirely true.  I have more than

20  one personal account.  But they're asking for the account

21  number so that they can verify they have everything.

22         MR. FURMAN:  Well, let me say this.  I would think

23  that just by way of the account that they do have, that they

24  could see everything that they need to see.

25         THE COURT:  Maybe yes, maybe no.  I don't know.

1          MR. FURMAN:  Well, Judge, I think it's beyond

2   proportional to say give me every personal bank account that

3   you have.  They have accounts with their spouses.  They may

4   have accounts with family members.  I mean at what point in

5   time do we say, okay -- you know, they've got a lot of

6   material here.  I mean they're looking like they're going to

7   find this, you know, golden egg.  It's not going to ever be

8   there -- and smoking gun, I should say.  It's just not.  It's

9   not going to be in some, you know, municipal union record

10  including those of -- including which they've already

11  subpoenaed.

12          I mean so I am not clear what more they want me to

13  say.  They want to say that we have no other bank accounts --

14          THE COURT:  At the initial stage, at this point,

15  what they're asking for and what the Court is asking for is

16  are there other accounts beyond what has already been

17  produced, whether it's been produced by you or produced by the

18  bank.  If the answer to that question is yes, then we could

19  talk about the propriety of subpoenaing those extra accounts,

20  but at the first stage, you have to know whether there are

21  other accounts.

22          MR. FISHER:  May I make a suggestion, Judge?

23          MR. MARKS:  And I'm going to object to Mr. Fisher

24  saying anything.  He's not a party to this motion.  His

25  clients have defaulted.  He is out of the case.

35

1          MR. FISHER:  That's why I asked if I might make a

2    suggestion.

3          THE COURT:  I'd rather hear from Mr. Furman since

4    it's his clients.

5          MR. FURMAN:  But let counsel provide me with a list

6    of what it is that he believes he is missing.

7          MR. MARKS:  We did that on April 19th and then they

8    went and then they went radio silent which is -- and despite

9    numerous emails and phone calls to say please come talk to us

10   about what's missing in our April 19th letter and that's why

11   we had to file a motion and that's why we're here.

12          So if we're talking about the -- let's -- and for a

13   moment, the bank accounts is sort of a -- is a simple example

14   of sort of what we're talking about which is what I'm hearing

15   is they're arguing sort of five different things, right, which

16   is, one, they're arguing I don't know; two, they're arguing

17   State Farm ought to know; three, they're arguing State Farm's

18   not entitled to this; four, they're -- what it clearly comes

19   down to is they just don't want to do it.  They just don't

20   want to bother.  It's just sort of just too much work.  They

21   just don't want to have to deal with it.  And so --

22          THE COURT:  I don't see a lot of work just

23   identifying what the bank accounts are.

24          MR. FURMAN:  Judge, I hear what the Court is saying.

25   And --

36

```
 1              THE COURT:  I just wanted to know whether there are
 2      extra other accounts.
 3              MR. FURMAN:  And I mean I don't -- I know that there
 4      are no more PC bank accounts.  And I have given them personal
 5      bank accounts.  But if there are other personal bank accounts,
 6      I will identify them.  However, before there's a subpoena
 7      issued to them, I'd like to meet and confer with counsel
 8      because there may be personal things in there.
 9              THE COURT:  Identify for him all of the accounts,
10      all of them.  And if there are accounts that you don't already
11      have the records for, see if you can agree on whether or not
12      they should be produced.  And if not, then you could bring it
13      to me.  But you have to at least let them know what the
14      accounts are.  You can't just say they have everything if they
15      don't know whether they have all the accounts or not.
16              MR. FURMAN:  So understood.  On the other records
17      that they say that we have outstanding records, since this
18      letter was written, I've given them some additional tax
19      returns.  And they keep asking for records of Darran Marlow,
20      DCPC, which was dissolved in 2006 before the years -- six
21      years before they allege in the complaint.  My client is
22      screaming why are you asking me for this.  So I would like
23      everything about Darran Marlow, every request for DCPC to just
24      be ignored at this point because it's ancient and it has
25      nothing to do with this case.  The guy's got three other PCs
```

1   who are active, so it's not like he's walking out of the case.

2           Thirdly, incorporation records, whatever we have,

3   we've given.  What do we have?  We have no more, and I can say

4   that.  I'm making that representation in open court.

5           Now, let me go on to a couple of other things.

6   That's -- he's just asked for three things, documents produced

7   by a date certain.  We've perhaps resolved that in terms of

8   what will be next.

9           THE COURT:  I don't know have you?  And what else is

10  out there?

11          MR. MARKS:  Well, there's all kinds of things that

12  are out there, Judge.  We don't have all the bank records,

13  okay.  We --

14          THE COURT:  We dealt with that issue.  What's the

15  other thing?

16          MR. MARKS:  We don't have all the tax returns.  Now,

17  he said go ask the accountant, so we did ask the accountant

18  and we've got some records from the accountants.  But we don't

19  have all the tax returns.  We're mossing some tax returns, and

20  we've told them which ones were missing.  We were very

21  specific.  We put it in a letter, and we want them.  We --

22          THE COURT:  What's the other tax returns?

23          MR. MARKS:  Okay.

24          MR. FURMAN:  If I have them.

25          THE COURT:  Just one issue at a time.

1          MR. FURMAN:  I'm not familiar with his letter, but

2     if he --

3          THE COURT:  Do you have a copy of the letter?

4          MR. FURMAN:  -- resent it to me, I will --

5          MR. MARKS:  It's an exhibit, and it's the April 19th

6     letter.

7          MR. FURMAN:  Oh, that's sitting in front of me.

8          MR. MARKS:  It's our April 19th letter.  It's an

9     exhibit to our motion.

10          MR. FURMAN:  Yeah.  It asks for tax returns of

11     Darran Marlow, PC, and Energy Chiropractic, PC, one of

12     Marlow's -- I gave them Energy Chiropractic, PC.  It was just

13     the other day.  And I'm saying that Darran Marlow, PC, is not

14     relevant.

15          THE COURT:  That's the one that's -- that you're

16     arguing is --

17          MR. FURMAN:  Other than that, I don't see anything

18     else in the tax returns that they don't have.

19          MR. MARKS:  Well, no, there's a list of ten missing

20     tax returns in the April 19th letter which is at Exhibit -- we

21     can go through these one by one.

22          MR. FURMAN:  I know what's in the exhibit.  I have

23     it in front of me.

24          MR. MARKS:  Okay.  It's --

25          THE COURT:  I think we got to be specific because

1   the more we talk in generalities, the more --

2           MR. MARKS:  Okay, that's fine.

3           THE COURT:  -- the parties just cross each other.

4           MR. MARKS:  That's fine.  Okay.

5           THE COURT:  You're just along for the ride today,

6   huh?

7           MR. COOK:  I make it a practice to appear when all

8   counsel is ordered to appear.

9           MR. MARKS:  Okay.  So --

10          THE COURT:  That's all right.  I'm sure at the next

11  one you'll be up and --

12          MR. FURMAN:  What I'm seeing here is not only the

13  two chiropractic returns here, it's on Page 5 of their letter,

14  Item No. 15.  And they go through certain years of certain

15  returns that they say weren't produced.

16          THE COURT:  Okay.

17          MR. FURMAN:  You know, 2015 of one and 2016 of

18  another.  The only person who would have those would be the

19  party defendant or the party defendant's accountant.

20          THE COURT:  Okay.

21          MR. FURMAN:  They subpoenaed the party defendant's

22  accountant.  I don't know exactly what he's produced because I

23  don't have it, but I could get it and find out what's there.

24  But I am given to believe that he has given them everything

25  that he has.

40

1          THE COURT:  Look, if they already have it from the

2  accountant, then they don't need it again.

3          MR. MARKS:  That's fine, but --

4          THE COURT:  The only thing they need is what they

5  don't have.

6          MR. MARKS:  Which is what we put in the letter on

7  April 19th of this year, and we said please -- and in fact, in

8  advance -- and after the April 19 -- at the time of the April

9  19th conference, as this letter confirms, you agreed to

10  produce the missing tax returns.  You agreed to do this.  So

11  why counsel is standing there now and saying he's not going

12  to, I'm not sure.

13          THE COURT:  When did you subpoena the accountant?

14          MR. MARKS:  We did, and we got -- and so we did get

15  tax returns from the accountant.

16          THE COURT:  Okay.

17          MR. MARKS:  And there are tax returns -- and to the

18  extent we got them from the accountant, I'm not -- we're not

19  going to ask him to reproduce.

20          MR. FURMAN:  Okay.

21          MR. MARKS:  That's fine.

22          MR. FURMAN:  So that was done after this April 19th

23  letter.

24          THE COURT:  That's what I'm trying to figure out,

25  what -- you got stuff from the accountant so some of those on

41

1   the list are crossed off now, right?

2           MR. MARKS:  I can get -- I'll tell you what's

3   missing.

4           MR. FURMAN:  Well, if you would -- and I mean we can

5   make it on the record, but if you just send me --

6           THE COURT:  I'd rather just do it on the record

7   because --

8           MR. FURMAN:  Okay, whatever.

9           THE COURT:  -- I tell the parties to deal with this

10  stuff on your own and you just end up back before me in a

11  couple of months anyway.

12          MR. FURMAN:  No problem, Judge.  I don't think it's

13  a very big list.

14                      [Pause in proceedings.]

15          MR. MARKS:  I thought I had it but it does not

16  appear that I do.  Hold on, if you'd just give me -- yes, I

17  do.  All right.  So from the accountant, so here's the ones

18  that were missing.  We're missing -- in the letter, we're

19  missing Darran Marlow, DCPC's tax returns.  We're missing

20  Energy Chiropractic's tax returns.  We're missing ACH

21  Chiropractic's tax returns.  We're missing the 2017 tax return

22  of Island Life Chiropractic.  We're missing the 2017 tax

23  return of RA but not the 2015.  We're missing the 2017 tax

24  return of Allay Medical Services but not the 2015.  And those

25  are the only ones that we're missing.

42

1          MR. FURMAN:  Of those, and I'll ask counsel to

2    verify that all of the first few we talked about Darran

3    Marlow, DCPC.  But Energy, ACH, and Island Life were all given

4    to me and I forwarded them from the client in the preparation

5    of this letter.  So with that, that's all from the same

6    chiropractic PC.

7          The last things that they are saying they don't have

8    are two sets of 2017 PC returns, one for one RA Medical and

9    one Allay Medical.  We will produce them if they exist.  My

10   suspicion is that they haven't filed for 2017 which is the

11   reason that Mr. --

12         THE COURT:  If that's true, that's fine.  But, you

13   know, you got to let them know --

14         MR. FURMAN:  Okay.

15         THE COURT:  -- one way or the other.

16         MR. FURMAN:  I'll find out if they filed.  If they

17   have filed, I will have the returns produced.

18                    [Pause in proceedings.]

19         THE COURT:  Does that cover all of the tax returns?

20         MR. MARKS:  That covers the tax returns.

21         THE COURT:  All right.  What's next?

22         MR. MARKS:  Financial information.  So we sought

23   business records, so and -- and were told by the accountants

24   that they were given financial information to prepare tax

25   returns.  Mr. Furman was going to confirm that professional

43

1  defendants did not have any documents responsive to this

2  request and advise us.  And we need him to do that.  This goes

3  to the point that I made to your earlier which is if we can

4  get essentially revisions to the responses to the document

5  requests confirming that there are no documents, that should

6  in theory resolve this issue.

7          If, as Mr. Furman, represented to us in the meet and

8  confer that these documents do not exist for all of

9  defendants, that should resolve this issue, assuming that

10  continues to be accurate.

11          MR. FURMAN:  I believe it is accurate, but could you

12  just point out to me which one it is?  It

13          MR. MARKS:  This is --

14          MR. FURMAN:  -- Item 16, No. 7 and 8.

15          MR. MARKS:  Yep.

16          MR. FURMAN:  Okay.  You mean balance sheets and

17  general ledgers, right?

18          MR. MARKS:  Okay.

19          MR. FURMAN:  I'll make that confirmation.

20          THE COURT:  Okay.

21          MR. MARKS:  Okay.

22          MR. FURMAN:  But may I add that he's also saying

23  that he has some of those documents.  He has documents, and I

24  don't want to be put in a position where I say I don't have

25  documents and he's already got them.  I don't want to be in a

44

1   trap like that.

2          THE COURT:  Well, if you don't have them, that

3   doesn't necessarily mean they don't exist.  It just means your

4   client doesn't have it.

5          MR. FURMAN:  I don't have them.  I could have given

6   them to the accountant, that's true, and not retained copies.

7   Entirely possible.

8          MR. MARKS:  All the document response says is that

9   the documents are in your possession, custody, and control.

10  That's --

11         THE COURT:  Yeah.

12         MR. MARKS:  -- all we're asking him to certify.  If

13  that's the case, that's the case.

14         THE COURT:  Unless they answer is these documents

15  never existed, I don't think you have any problem.  You're

16  just either producing it or saying my client -- you know --

17         MR. FURMAN:  Yeah, I mean I don't think --

18         THE COURT:  -- we don't have possession of them.

19         MR. FURMAN:  These are not -- these are mom and pop

20  businesses.  I mean they don't have profit and loss and

21  shareholder distributions.

22         THE COURT:  Okay.

23         MR. FURMAN:  Balance sheets, general ledgers.  Come

24  on, I mean --

25         THE COURT:  If they don't have it, they don't have

45

1   it.

2          MR. FURMAN:  Well --

3          THE COURT:  I mean I'm not surprised if they don't

4   have that, but just say they don't have it.

5          MR. FURMAN:  Well, right.  I mean I don't know.

6   Okay, I'll have to speak.  He says he received financial

7   records, the accountant.  I don't know what financial records

8   he received.  I would assume he just received checks, which is

9   most accountants get.

10                    [Pause in proceedings.]

11         THE COURT:  All right.  Next?

12         MR. MARKS:  All right.  Item 15 is that we asked

13  that they produce all records of lease payments, and in the

14  meet and confer, Mr. Furman said that what he meant by this

15  response was that all the lease payments were reflected in the

16  bank records.  But it meant that all lease payments were the

17  bank payments from every bank payment to Ksenia Pavlova was a

18  rent payment, and every payment from Pavlova to Kings and

19  Queens was a rent payment.  That's what he told us and that's

20  fine and that may be true and those may be all of the records

21  that are responsive to the request.  But, again, I think as

22  I've noted, I'd love to put Mr. Furman on the stand to testify

23  to this fact, but I can't.  We just need him to confirm what

24  he sort of -- and as he says here, he agreed to confirm that

25  what he told us in the meet and confer was true and put that

46

1    in his response.  If he does that, we're fine.

2              THE COURT:  Okay.

3              MR. MARKS:  The next item is billing data.  We've

4    asked them to produce their billing data, and they haven't.

5    He agreed to determine whether they had billing data and, if

6    so, to produce it.

7              MR. FURMAN:  There's no billing data.  I've gone

8    over this with them verbally and in writing more than once.

9    They think that there's some program or something that just

10   generates out these form things.  There isn't one.  I mean I

11   can't say it any other way.  They have the bills.  They have

12   the records.  What else can I give them?  I don't know.

13             THE COURT:  I don't know what exists.  You tell me.

14   If there's nothing else, then say that.

15             MR. FURMAN:  I've said it.

16             MR. MARKS:  This was the first time he's ever said

17   it, so, one, I'm glad to hear it.  I'm surprised to hear it

18   given that they've submitted millions and millions of dollars

19   of bills, and I'm surprised that there is no data somewhere

20   that captures that, but that's the answer that, that's the

21   answer.  But put it --

22             THE COURT:  Other than the bills themselves?

23             MR. MARKS:  Other than the bills -- then put it in

24   an answer because as we said in our April letter, you agreed

25   to find out if any such billing that exists and, if so, to

47

1    discuss a proposal with your clients to produce it.  Again,

2    today's the first I've ever heard a response.  Give us a

3    response, put it in the answer, and give it to us.

4              MR. FURMAN:  I have.

5              MR. MARKS:  That's all we're asking for.

6              MR. FURMAN:  I have responded to that.  I certainly

7    know that I have verbally and I'm fairly certain that I have

8    in an email of some nature.

9              MR. MARKS:  If you'd like to show us what there is,

10   I'm --

11             MR. FURMAN:  Well, I'm not going to take the time if

12   you don't mind.  I don't think the judge needs to take time

13   for that.

14             THE COURT:  Just give him the answer.

15             MR. FURMAN:  But this is not the first time that I

16   remember formulating the response as it will be in a writing,

17   so.  But I'm not going to even find it.  I will just give you

18   the answer.

19             THE COURT:  Just give him the answer.  Next?

20             MR. MARKS:  Equipment, all right.  So this is both a

21   document request and an interrogatory.  And essentially, what

22   we've asked with respect to equipment is the equipment that

23   they used to treat the patients, we want to know when was it

24   purchased, when was it rented, when was it calibrated, when

25   was it maintained.  We want essentially the information

48

1  associated with, you know, does it work, okay, is it

2  effective, right.  What we got was the instruction manuals

3  which would tell us how to operate it which would be great if

4  we wanted to operate it.  We don't want to know how to operate

5  it.  We want to know the information we asked was whether --

6  were these fairly specific things that are asked for in the

7  document request and interrogatory.

8          If the answer is simply I don't have anything, and

9  that's fine, if there's not a scrap of paper that shows that

10  they ever calibrated a single machine that tested our

11  patients, that's great evidence for us, and we'd love to have

12  that.  We'd love to know that.  But that's why we just simply

13  need an answer, tell us that -- and I believe we got manuals.

14  We got -- I think some instruction manuals were produced on

15  Monday.  So two days ago we got some instruction manuals.  If

16  that's the universe, if it's just instruction manuals, that's

17  fine.  Just confirm it that that's what we've got.  Then we're

18  good.

19          THE COURT:  Okay.

20          MR. FURMAN:  I'll confirm --

21          THE COURT:  That that's it.

22          MR. FURMAN:  -- that that's it.

23          THE COURT:  Okay.

24          MR. FURMAN:  I don't know -- I could tell you now it

25  doesn't mean to me that -- I don't even know which machines

49

1  need calibration, but --

2          THE COURT:  Look, I'm not a doctor.  I don't know

3  anything about it, so.

4          MR. FURMAN:  -- let the experts if they ever get to

5  experts talk about that.  But it doesn't mean that we

6  continued to keep the calibration records anyway.  But

7  whatever we have --

8          THE COURT:  Whatever you have, turn over.  If you

9  don't have it, then say you don't have it.

10          MR. FURMAN:  Whatever we have.  I will tell you

11  whatever was there collected showed up in a box in my office

12  and at my -- to my request.  And to be honest, it got sort of

13  lost among the boxes, and I kept saying I got to get that

14  done, and the months went, you know, beyond these.  But I did

15  do it now, and this is all I have and this is all I've been

16  given.

17          We also gave them -- and correct me if I'm wrong

18  because I remember doing this at the beginning, we gave them a

19  comprehensive list of all of the equipment that was in the

20  location and I believe it included dates of purchase,

21  approximate dates of purchase.  It doesn't mean we have the

22  bills because they're -- and some of them were imported from

23  earlier practices.  But I -- correct me if I'm wrong, I know

24  that I prepared such a list.

25          MR. MARKS:  Okay.  So we're going to get -- what I'm

50

1   hearing is we're going to get produced whatever they have and,

2   again, as to my point, we'll get confirmation but that's it.

3   And if that's it, that's it.   Okay?   It is what it is.

4           MR. FURMAN:   I just want the record to reflect that

5   we didn't ignore it, that we gave them -- what's really

6   important to them is what equipment do you have --

7           THE COURT:   Yep.

8           MR. FURMAN:   -- and when did you get it.   And I

9   think we've provided that at the outset.   I know we did

10  because it was the only thing that had any relationship to the

11  complaint.

12          MR. MARKS:   Okay.   The next category is what I'll

13  call solicitation documents.   All but one of the defendants

14  responded that they don't have responsive documents.   One

15  defendant, Charles Deng Acupuncture, said that he did have

16  responsive documents.   We were told during the meet and confer

17  that that was a mistake, that he really didn't have responsive

18  documents.   And we will get confirmation as to whether he did

19  or he didn't, and if he did, we're going to get documents.   So

20  somebody needs to confirm whether there are documents.   If

21  there are, they need to be produced.   If there aren't, they

22  need to amend their answer and clarify that he doesn't have

23  responsive documents.

24          THE COURT:   Okay.

25          MR. MARKS:   All right.   The next item in the letter,

1    and I don't know whether you wanted to deal with the contested

2    items.  The next item is telephone records, so now that is an

3    item that about which we -- there seems to -- the parties

4    disagree.  Would you like to address that now or do you want

5    to move through the noncontested ones?

6                    THE COURT:  Sure, let's talk about it now.  Why do

7    you need telephone records?

8                    MR. MARKS:  Okay.  So, first, let me say that it's

9    our position and the Court can deal with this as it likes,

10   that the defendants waived their ability to make any

11   substantive objections to these discovery requests back in May

12   of 2018.  And I'll remind the Court of the procedural history

13   here.  When we served these discovery requests, the defendants

14   filed a motion for a protective order.  That motion for a

15   protective order sought to block our discovery requests on the

16   grounds that they sought financial information.  The requests

17   for financial information was not proportional to the needs of

18   the case.

19            As a result of that, the Court may recall that it

20   issued a ruling that said we could have the tax returns of the

21   corporate defendants.  We couldn't have the tax returns of the

22   individual defendants, okay.  So at that point, they had the

23   opportunity to raise any issues they had with respect to the

24   scope of the discovery requests that they had.  And it was our

25   position and we raised it back in May of 2018 that you get

52

1  sort of one bite at the apple to raise all of your issues with

2  respect to the substance at least of the discovery requests.

3  And to come up with new substantive objections at this point

4  down the road, we believe, is improper and waived, okay.

5  That's sort of point one.

6        But even if you sort of say, all right, well, fine,

7  we'll let them hear -- you know, you're going to go ahead and

8  hear this objection.  We're not -- as their letter suggests,

9  we're not looking for nor are we going to get the content of

10 telephone communications, okay, because that's not -- they

11 don't have that, right.  We're going to get bills that are at

12 most going to show who the telephones belonged to and who made

13 calls from whom, to whom, and when they made them.

14       We're prepared to limit this request to telephones

15 that were used associated with the businesses that operate at

16 1786, okay.  It doesn't say that in the -- it may say that in

17 the request.  I'm not sure whether it does or it doesn't, but

18 we're certainly prepared to limit it to those phones.  And it

19 is relevant because we think --

20       THE COURT:  For what period of time are you looking

21 for?

22       MR. MARKS:  Well, for the period of time that's

23 alleged that's at issue in the complaint.  And I don't have

24 the complaint in front of me, and I don't remember offhand --

25       MR. FURMAN:  I believe it's from 2012.

53

1          MR. MARKS:  I think it's 2012 to the present, so it

2     would be whatever te period is of the complaint.

3          And because I think -- I mean and as the Court will

4     remember, the telephone records have proved to be a important

5     piece of evidence.  I know Mr. Fisher is going to want to jump

6     up -- jump all over this particular piece of evidence, but it

7     is in fact a piece of evidence.  We do know that one of the

8     issues is who controls the Durable Medical Equipment

9     providers.  And what we found was that the Durable Medical

10    Equipment providers had their supplies ordered from an entity

11    called Precision Medical Supply which is located I think in

12    Kansas, maybe Iowa.  It's somewhere out in the Midwest.

13          UNIDENTIFIED SPEAKER:  Missouri.

14          MR. MARKS:  Missouri, okay.  And the person they

15    dealt with on the phone was a person by the name of Barbara

16    who spoke with a Russian accent.  The only person and we said,

17    well, who is Barbara, do you know anything about Barbara and

18    who is the person who ordered the supplies, they said, well,

19    here's the phone number of the person I dealt with every

20    single time when I ordered the supplies.  That phone number

21    links back to Tatiana Rybak.  It's Tatiana's Rybak's phone

22    number because Tatiana Rybak ultimately moved to quash access

23    to her T-Mobile records that would link that phone number to

24    her.

25          And, also, the checks that were written for those

54

1  supplies were these multiple checks.  You know, how we have

2  nine or ten entities, different entities operating at 1786?

3  That's how they're paying for the supplies from Precision.

4  So, again, it's an incident in which the fact that we're able

5  to link a phone, participate in the activity shows that the

6  telephone records have proved to be in one very specific

7  instance that we've been able to identify a critical piece of

8  evidence for our case.  And for that very reason, we think the

9  telephone records, the calls that are made and frankly, the

10 absence of calls that are made -- if the doctors are not

11 participating in any way, shape, or form in making calls that

12 are associated with the business, we think that's relevant,

13 too.

14            And as I say, we're prepared to limit it.  If

15 they've got a phone that they say they never used whatsoever

16 for any business related to 1786, we'll agree you don't have

17 to give us those records.  If it's a phone that they used for

18 business related to 1786, we'll limit it to those phones.

19            MR. FISHER:  Judge, may I speak to that since Mr.

20 Marks brought me up talking about it?  And to put a little

21 clarity to that particular --

22            MR. FURMAN:  Well, before you do --

23            UNIDENTIFIED SPEAKER:  -- subject --

24            MR. FURMAN:  -- if you don't mind, my co-counsel,

25 may I just remind the Court I'm not one of the DME defendants.

55

1    I'm a professional defendant.  So whatever he's got that he

2    thinks he has that's so important with the DME defendants,

3    what does it have to do with the professional defendants?  I

4    don't know.  He hasn't made any showing that there's a basis

5    for that.  So I'll speak more about it, but I just wanted to

6    make that clear because I don't want to get mixed up with --

7            THE COURT:  Just so I understand it, it seems what

8    you're suggesting is the phone call shows Tatiana Rybak's

9    ownership or at least involvement in the DME business because

10   she's ordering supplies on their behalf.

11           MR. MARKS:  More than that.

12           MR. FISHER:  But it doesn't, Judge.

13           MR. MARKS:  More than that.  And to the extent that

14   counsel -- more than that, to the extent counsel's suggesting

15   there's no connection to the professional defendants, bank

16   accounts of professionals defendants, okay, were used to pay

17   for supplies for the DME defendants.  So they didn't just pay

18   for supplies out of the accounts of the DME defendants.  They

19   used bank accounts of the professional defendants.  And what

20   that tells us, at least our theory and at least it supports

21   our theory, is that there was control over this location and

22   of all the accounts that were at this location, and they were

23   all mingled together.

24           In fact, Tatiana Rybak has testified that the

25   account -- we used whatever accounts just happen to be around.

56

1    And if it's an account associated with a provider at 1786,

2    they're using all the accounts, the DME accounts, the

3    professional defendant accounts, the physical therapy

4    accounts, the acupuncture accounts, the medical -- the MD

5    accounts, it doesn't matter.  Those were the accounts that

6    were used, but doctors' accounts were used to buy DME

7    supplies.  So there is a connection to the Durable Medical.

8    There is a connection to the professional defendants.

9          And now, we can argue over what it means, and maybe

10   there's a wonderful innocent explanation that someone can

11   present at trial.  But that's not what this is about.  This is

12   about is there enough smoke to say that this is a relevant

13   issue for discovery.

14         MR. FISHER:  Now may I be heard on that one

15   particular issue?

16         THE COURT:  Sure.

17         MR. FISHER:  Tatiana Rybak was employed by Medical

18   Spa, an anti-aging spa in Florida.  The general manager of

19   that business at the time that supplies were ordered from one

20   of some fourteen or fifteen manufacturers that they did

21   business with was a woman by the name of Barbara who doesn't

22   have a Russian accent.  She has a Latin accent because she's

23   Cuban.  And they happened to use that phone number in the

24   business in Florida which was a lawfully incorporated business

25   that has nothing to do with this case, but they have this one

57

1  DME who says I spoke to somebody named Barbara, she had an

2  accent that might have been Russian, period.

3          So there's evidence of who the Barbara was and why

4  they used the phone number and it was in the legitimate

5  pursuit of a business in Florida.  And the fact that the

6  professional defendant -- and I don't know this to be the case

7  -- but if the professional defendants paid for medical

8  supplies, durable medical goods for their patients, I don't

9  think that there's anything improper about that.  They made

10 ado about this one manufacturer talking about one person named

11 Barbara who's not a party to the case.

12         MR. MARKS:  That's the most -- that answer was worth

13 --

14         THE COURT:  What is the business in Florida doing

15 ordering equipment?

16         MR. MARKS:  That's what -- that answer was worth the

17 trip to New York, Judge, because --

18         UNIDENTIFIED SPEAKER:  Yeah.

19         MR. MARKS:  -- because every time we hear an

20 explanation, the explanations fall apart.  The equipment

21 wasn't shipped to Florida.  The equipment was shipped to the

22 Durable Medical Equipment defendants.  The invoices for the

23 equipment show as the equipment that was shipped to New York.

24 And we have the invoices, Judge.  They've been attached to

25 pleadings.  It wasn't anybody in Florida.

58

1            The anti-aging spa, by the way, is owned by Olen

2    Rybak down in Florida.  The equipment was shipped to New York

3    and was shipped to the Durable Medical Equipment defendants in

4    New York and provided to patients.

5            MR. FISHER:  That may well be, Your Honor.

6            THE COURT:  And paid for by the professional

7    defendants?

8            MR. MARKS:  Paid for by some Durable Medical

9    Equipment.  It's a hodgepodge.  It's mixed up.  Some -- it's

10   paid for by some Durable Medical Equipment providers, some

11   professional defendants.  But when it's paid for by a Durable

12   Medical Equipment defendant, it may not be the Durable Medical

13   Equipment provider who is actually ordering the supplies or

14   getting the supplies.  It's a mix.  So maybe AB Medical Supply

15   writes the check, but the equipment's going to, you know, a

16   different Durable Medical Equipment provider or maybe, you

17   know, a PFJ, one of the doctor's PC is writing it and it's all

18   mixed up.  And then there's a phone that's being used and it's

19   always the same phone.  And that's how we got to the phone.

20   And --

21           THE COURT:  Okay.  That explains why you need those

22   records.  And you're asking for all telephone records for --

23   actually, I'm not entirely clear what you're asking for.

24   Whose phones are you asking for records from?

25           MR. MARKS:  We're asking for the phone records of

59

1    any defendant regarding any phone that was used to conduct

2    business at 1786 Flatbush.

3              MR. FURMAN:  May I be heard?  First, in my letter I

4    cite -- well, no, let me go back for a second.  I'll be brief

5    upon this, but this is the first I've heard that they think we

6    waived the opportunity to object to this.  I believe we

7    objected to it -- the waiver occurs when you don't object to

8    it in response, not, you know, move about it.  The next step

9    is, well, okay, now you're going to move to compel me and

10   we're here today.  So there's no waiver.

11             And in fact, I've cited three of I believe many

12   cases where courts have found that it's basically

13   disproportional, burdensome to have somebody to give them

14   their phone records.  There's a privacy aspect under the

15   Storage of Electronic Communications Act against the carriers

16   giving them.  And what we have now is one phone number, and

17   now he wants anything related to the business.  But how am I

18   going to -- how's that -- how do I make that decision?  Like

19   what's related to the business?

20             I mean let's assume -- I know with me, my phone

21   calls -- I have one cell phone, okay.  I have some business

22   calls.  There are some non-business calls.  There are a

23   combination business calls.  I think it's burdensome to ask

24   them to go through them and decide.  They have enough here.

25   They don't need this minutia.  This is disproportional.  And

60

1   the cases so indicate.  And it's just disproportional, and I

2   don't see any other way of determining it.  They haven't been

3   specific.  They just say business.  Now we're limiting it to

4   business use.  I still don't think that's a limitation that we

5   can live with.  So I would ask that this aspect of the motion

6   to compel be denied.

7          MR. MARKS:  Let me just speak briefly if you'd like,

8   Your Honor, to the cases.  One, the case law actually is that

9   there is not -- the privacy interest and the content of your

10  communications which is what's protected by the communications

11  act.  And the communication act also speaks to what

12  telecommunications organizations can disclose.  It doesn't

13  govern what may be obtained by subpoenas, so it's not really

14  an appropriate standard.

15         The cases that counsel has cited, in those cases,

16  the reason it was either telephone records were deemed not

17  necessary is because the connections had already been

18  established.  We have a world here, Your Honor, in which they

19  don't have any business records.  They got nothing.  We have

20  -- we don't have -- they don't have a general ledger.  They

21  don't have billing software.  They don't have anything that

22  establishes -- that we brought Mr. Balson in.  He doesn't know

23  anything, as an example.

24         We're going to find that we're basically trying to

25  piece together from these various pieces.  And you've seen how

1  these pieces have had to have been to figure out what was

2  going on in 1786.  And so, that's why this situation is very

3  different from the situation of the cases that have been cited

4  by --

5          THE COURT:  Other than Mr. Balson, have you deposed

6  any of the other people?

7          MR. MARKS:  I'm sorry.

8          THE COURT:  Have you deposed any of the other

9  defendants?

10         MR. MARKS:  We have not yet, Your Honor; no.

11         THE COURT:  Okay.

12         MR. FURMAN:  Your Honor, you know, I have to say one

13  thing briefly.  I'm not sure counsel appreciates that when he

14  says we have nothing, they have nothing, they say they have

15  nothing.  And I said this to one of the State Farm attorneys.

16  That's the whole point.  I mean we're telling you we don't

17  have it.  We don't have any backup for checks that are going

18  out.  You can use that.  I mean use what you have.  You keep

19  wanting more and more stuff that we don't have, number one.

20  And number two, our answers stand so use it.  Take a

21  deposition, do what it is that you want to do with it.  Let's

22  -- we'll go to trial.  We'll be bound by it.  That's all we

23  can say.

24         And telephone records, first of all, counsel is

25  incorrect.  The Storage Communication Act does -- it has

62

1   certain exceptions.  Civil subpoenas are not an exception to

2   the Storage Communications Act.  And one of the cases so

3   cites.

4          And while there are each case has no particular

5   facts, I went into some in my letter.  At the end, the court

6   held in and in particular, the Jones v. Montgomery County,

7   forced disclosure of irrelevant personal information in order

8   to secure a minimally relevant information poses a undue

9   burden.  I don't know what else there is to say.

10         Here's another one.  It was skeptical -- this court

11  was skeptical -- I'm not even giving you the cites here.  This

12  court was skeptical that cell records were relevant to any

13  claim or defense.  Let's remember that we're talking about a

14  pleading here.  The claim is in the pleading.  The defendant

15  is to the pleading, so why -- I mean this whole issue is about

16  medical necessity.  Why are the phone records even relevant?

17         And that court, which is in a case called Howard v.

18  Seadrill, 216 WL 7012275, also says that discovery is limited

19  to matters that are proportional and the court determined that

20  the disclosure was not proportional, just like I'm saying

21  here.  This goes beyond appeal [Ph.].  And there's just no

22  way.  I mean the bank records, financial records, that makes

23  sense.  And the court, you know, didn't, understandably so,

24  not order personal tax returns.  It has ordered personal bank

25  accounts.   So I think this goes on the side of the personal

63

1    tax returns.  And it's just not proportional.  I appreciate

2    it.

3              THE COURT:  I guess my first question for you is

4    what do you actually expect to get from them in terms of phone

5    records?  Because while I understand your position that the

6    phone records, meaning the toll records, could show

7    connections between people, you're not going to get toll

8    records from them.  People don't have toll records for their

9    telephone numbers.  You may get a bill, but that's just going

10   to tell you, you know, how much they paid for their phone and

11   who the subscriber on the phone is.

12             MR. MARKS:  That's correct, Your Honor.  It will

13   tell us who the subscriber is on the phone.  And it should --

14             THE COURT:  So just ask them an interrogatory

15   question what phone numbers are associated with any business

16   related conversations.

17             MR. MARKS:  We have, and we've not received

18   responses back.

19             THE COURT:  Okay.  Well, that's a different issue.

20             MR. FURMAN:  And I'm going to -- I don't know -- he

21   says he doesn't receive a response.  I don't believe that

22   there was anything I didn't respond to one way or the other.

23   However, if he wants to ask us who -- I guess if he wants to

24   know a cell phone number, I don't know what he'd do with that,

25   but -- and why doesn't he ask who the -- why doesn't he ask

64

1  who the subscriber is.  That must be what he's looking for.

2          THE COURT:  I mean I'm not sure what else he could

3  get from the records that you would have.  I mean subpoenaing

4  a telephone company would get toll records, but I think it's

5  perfectly legitimate to specify what phone were used for

6  purposes of the businesses and by who or who they're

7  subscribed to.  So if you limit the request to that, I think

8  that's a valid request.

9          MR. FURMAN:  Okay.  I'm sure counsel will formulate

10 a request, and we'll respond based upon Your Honor's

11 instructions.

12         MR. MARKS:  So, Your Honor, that's Interrogatory --

13 so Interrogatories 2 and 3 asked for emails and phone numbers

14 used by the professional defendants, and these were objected

15 to.  And counsel said he was going to consider providing

16 amended responses to those interrogatories.  So if he'll

17 provide amended responses to those interrogatories identifying

18 emails and phone numbers that were used, we'll take that and

19 we'll go from that.  The only thing that we won't get -- and

20 look, if they have telephone records, it would show

21 potentially numbers dialed, because sometimes phone records do

22 contain that information and the length of those calls.

23         THE COURT:  You're also talking about stuff that

24 happened years ago.  I don't know anybody who keeps their

25 phone records that long.

65

1              MR. FURMAN:  Yeah,  I mean how much of that do we

2     retain.

3              THE COURT:  Well --

4              MR. FURMAN:  If you ask me where my phone records

5     were from two years ago, I would have a hard time.

6              MR. MARKS:  But, look --

7              THE COURT:  Even the phone companies don't keep

8     their records that long.

9              MR. MARKS:  And that's very true, which is why one

10    of the reasons we said, look, when we met and conferred, said,

11    look, if you don't have these records, tell us whether you

12    have them or not because if you don't have them, then we're

13    wasting our time fighting about them, right.  We've asked

14    that.  So might I suggest this.  Why doesn't -- if he answers

15    Interrogatories 2 and 3, okay, which ask for emails and phone

16    numbers, and then why doesn't he tell us whether telephone

17    records exist or not and if they don't exist, then this, you

18    know, becomes a non-issue.  And if they do -- we'll take a

19    look at the list of phone numbers that they've identified and

20    then we'll confer with him on whether we want to move it to

21    the next step.

22             MR. FURMAN:  Your Honor, I can't help but note that

23    counsel has snuck in there the concept and word of emails.  We

24    never talked about emails.  There's no emails mentioned in his

25    letter.  I have not briefed the issue of emails.  And I would

66

1    like that opportunity if he's going to press that.  And I will

2    tell you now I'm not giving them, and I know a little bit

3    about the law but I don't have cites in front of me.  He's not

4    getting email addresses from us.

5           MR. MARKS:  Well, then let's talk about it right now

6    because that is --

7           MR. FURMAN:  No, I want to brief the issue.  You're

8    raising it for the first time today, and I want to brief the

9    issue.

10          MR. MARKS:  It is not -- we're not raising it for

11   the first time.  It's in our letter.  It was raised on April

12   19th.  We raised it with you on April 19th.  We asked for a

13   response.  It's attached to our letter in which we say we want

14   full responses to our interrogatories.  It's there.  It's

15   before the Court now.  Let's do it right now.

16          THE COURT:  The April letter wasn't to me.

17          MR. FURMAN:  Your Honor, I would like to be heard by

18   letter brief that it's hidden in a letter in an exhibit, okay.

19   He had every opportunity to put it up-front in his primary

20   letter which is -- which lists the telephone records.  And I

21   think it's disingenuous to have now raised emails.

22          MR. MARKS:  We had --

23          MR. FURMAN:  Why didn't he even talk about this when

24   he opened up today for god's sake?

25          MR. MARKS:  Because we had no idea he had an issue

1  with emails because he wouldn't return a phone call or answer

2  an email since April 19th, which is why --

3          UNIDENTIFIED SPEAKER:  That's why --

4          MR. MARKS:  -- which is why we --

5          MR. FURMAN:  That's absolutely untrue.

6          MR. MARKS:  -- which is why we had to file a motion

7  to compel and which is why we're here.  The only issues we

8  knew he had were the issues that we raised in our letter

9  because those are the only issues he identified for us.  We

10 couldn't hear from him.  He went radio silent, and that's the

11 reason --

12         MR. FURMAN:  I did not go radio silent.

13         MR. MARKS:  -- we had to file a motion --

14         MR. FURMAN:  It is for that reason that they -- we

15 responded to the second set of interrogatories in --

16         MR. MARKS:  We couldn't even schedule a meet and

17 confer.

18         MR. FURMAN:  -- in the month of May.

19         MR. MARKS:  We couldn't even schedule a meet and

20 confer with him.

21         THE COURT:  Look, I'm not going to deal with the

22 email issue right now because, frankly, there's nothing in

23 front of me and I'm not going to just address that issue

24 without looking at it.

25         For the telephone records, limit the request to a

68

1    telephone number and subscriber for any phones used in the

2    business during the relevant time period and you'll produce

3    that.  But just as an aside, I don't see what the problem is

4    with them asking for any email addresses that were used for

5    purposes of the business.  Now you can object if they try to

6    get, you know, the content of emails, but actually asking for

7    what email accounts were used for purposes of the business is

8    perfectly a legitimate discovery request.

9            MR. MARKS:  Well --

10            THE COURT:  Isn't that what you're asking for?

11    You're not asking for emails.

12            MR. MARKS:  Well --

13            MR. FURMAN:  That would be next.

14            THE COURT:  Not in that request anyway.

15            MR. MARKS:  Well, we certainly are asking for

16    communications.  So to the extent that there are email

17    communications responsive to the discovery, are there email

18    communications that are responsible to this discovery that

19    have not been produced and are not going to be produced?

20            MR. FURMAN:  I'm going to want to brief the issue

21    because they're not --

22            MR. MARKS:  Well, do they exist?

23            MR. FURMAN:  Pardon me.

24            MR. MARKS:  Do they exist?

25            THE COURT:  I think we're talking about two totally

69

1  different things.

2          MR. FURMAN:  I'm not -- I can't tell you if they

3  exist.  I'm assuming that the clients have email addresses or

4  multiple email addresses, for all I know.  And --

5          THE COURT:  Look, first of all --

6          MR. FURMAN:  This is whole other area.

7          THE COURT:  -- the requests you're talking about are

8  not the requests that are in front of me right now, so.

9          MR. MARKS:  And here's why this is an issue, Your

10  Honor, okay, because we have filed a motion to compel

11  production of documents responsive to all of our document

12  requests. We served document requests in this case in April of

13  2019, so it's been more than a year.  To the extent that there

14  are documents responsive to that document request that are

15  emails, those should have been produced in June of 2018, okay.

16          Now, if they exist and they haven't been produced,

17  we ought to know.  Now, counsel has said we gave them

18  everything back in June.  I've supplemented with a few more

19  things on Monday, but I've produced everything that's

20  responsive.  What I'm hearing now about emails gives me some

21  cause for concern that they have not produced everything.  The

22  relief that I've asked for today is for them to produce all

23  documents responsive to our document requests that were issued

24  in April of 2019.  If a document is an email and it's

25  responsive to a document request, it should be produced.

1          MR. FURMAN:  And I objected to that request, and it

2     was not reiterated in today's motion.  As Your Honor has

3     noted, it's not in front of Your Honor at this point.  And by

4     just incorporating it in reference from a ten-page letter in

5     April 19th, okay, if they wanted that done today, they should

6     have sat down and written a motion to compel that said this is

7     it, this is what we want.

8          And I'll go even back further.  I didn't -- on April

9     19th, there wasn't even a -- I didn't even know it was going

10    to be -- there was a phone call that said we'd like to talk to

11    you about a few things.  And before I knew it, I was on the

12    phone for two hours.  And then when I got a letter, I was

13    informed that it was a meet and confer.  And so it wasn't even

14    done in that fashion.

15          THE COURT:  A meet and confer doesn't have to be

16    formal.  But the problem with this is, you know, electronic

17    discovery is a lot more complicated than just asking for

18    documents.  You know, there's protocols that need to be in

19    place.  You need to identify where information might be

20    located, custodians.  You can't just have an all-documents

21    request that is supposed to also apply to emails because

22    there's no way to comply with that other than physically

23    searching every single email within the company.

24          So if you want electronic documents like emails or

25    texts, you have to make specific requests, see if you can

71

1    agree on search terms, and do electronic discovery the right

2    way.

3                MR. MARKS:  Correct, Your Honor, but the way this

4    works is so we got document requests.  Some of the documents

5    that we have are emails, and we've begun the process of

6    searching and reviewing our emails because we are -- we did --

7    it's not like we got a document request that said produce

8    emails, right.  So we're going to go through them and do the

9    review and see that they're produced.  We don't need email --

10               MR. FURMAN:  That's right.  And they asked me --

11               MR. MARKS:  We don't need a --

12               MR. FURMAN:  -- for the search --

13               MR. MARKS:  I'm speaking.

14               MR. FURMAN:  -- if I agreed on the search terms.

15               MR. MARKS:  I'm speaking.  So, if I've asked -- if

16   we've asked for a document request -- for example, among our

17   documents requests is produce all communications between and

18   among the defendants.  And that's a perfectly legitimate

19   request, and I even think they're included but not limited to

20   the following subjects: the treatment of patients at 1786.

21   Now if there's an email that's responsive to that request,

22   then it was incumbent upon defendant to say to us, you know

23   what, there are emails responsive to that request and we're

24   going to need to talk about a protocol to produce those

25   emails.  Otherwise, they just have to produce them.

72

1           So if what I'm hearing -- so the fact that we didn't

2   get them left us under the impression that there weren't any.

3   I'm now hearing in court for the first time that they may

4   exist.  If they do exist, then they should be produced.  And

5   it's not -- he hasn't been -- it's not like we say give us a -

6   -- we issued a document request that said produce emails.

7   It's produce communications.  And so those need to be

8   produced.

9           THE COURT:  I don't know what your response to the

10  --

11          MR. FURMAN:  Judge?

12          THE COURT:  -- request for communications was.

13          MR. FURMAN:  Look, I mean we've responded.  This is

14  the first I've --

15          THE COURT:  What other documents do you think there

16  would be if they're asking for communications?  I mean I

17  assume they weren't asking for oral recordings.  What other

18  communications, what other documents would exist if somebody

19  asked for communications?  It's going to be text messages or

20  emails.

21          MR. FURMAN:  But I believe I've responded to that.

22          THE COURT:  Well, what was your response?

23          MR. FURMAN:  I have to go back and look, but I think

24  it's that there are no responsive documents.

25          THE COURT:  But that's not right because if somebody

1   asked for a communications and there's emails, that's a

2   communication.

3           MR. FURMAN:  I don't know that there are emails.

4           THE COURT:  I don't know either, but you're just

5   telling me you didn't search so how do you know?

6           MR. FURMAN:  Because I've spoken to the defendants.

7           THE COURT:  And the defendants have represented to

8   you that they don't have any emails between themselves at all?

9           MR. FURMAN:  Themselves, yes.

10          THE COURT:  And any of the other defendants?

11          MR. FURMAN:  Yes.

12          THE COURT:  Okay.  Well, if that's true, then that's

13  your answer.  It is what it is.  You can ask him about it at

14  deposition if you want.

15          MR. MARKS:  Then under the circumstances, and we can

16  -- if you want -- if we want to brief this and argue it on

17  another date, I'm happy to --

18          THE COURT:  You don't have to argue it.  I'm --

19          MR. MARKS:  Well we -- right.

20          THE COURT:  You've asked for communications.  We're

21  all on the same page here as to what communications mean.  If

22  there are communications in the form of emails or text

23  messages that are responsive to your request and they haven't

24  produced them, then they're in violation of the court order.

25  They're represented that there are no such documents.  You can

74

1  believe them or not, but that's the answer.  And you can

2  certainly ask about it when you depose them.  You might want

3  to expand that to every possible method of communication since

4  I have other cases where people communicate only by things

5  I've never heard of like WeChat.

6          MR. FURMAN:  I'm sorry, by what?

7          UNIDENTIFIED SPEAKER:  WeChat.

8          THE COURT:  WeChat.  You have no idea what I'm

9  talking about, do you?  See, I was in the same position as you

10  a few months ago.

11          MR. FISHER:  The only way you know about all the

12  methods of communication is if you have a teenage child.

13          THE COURT:  That's exactly right.  And my kids are

14  not old enough yet, so.

15          MR. FISHER:  I was stuck in an airport recently and

16  my laptop froze.  There was a woman across from me who had a

17  kid who was about nine or ten years old.

18          THE COURT:  And he fixed your laptop for you, didn't

19  he?

20          MR. FISHER:  I said can I borrow your kid for a

21  minute.  She said why.  I said because he's going to know how

22  to solve this problem on this iMac for me.

23          THE COURT:  Yeah.  I'll give you a very funny

24  example of that.  Remember all that litigation that was going

25  on when, you know, the government was trying to break into

1    those Apple iPhones.  They couldn't break into it?  My three-

2    year-old daughter can somehow always get into my wife's iPhone

3    despite not having the password.  I have no idea how she does

4    it.  I can't do it.  But somehow she manages to get into the

5    phone without entering the password.  I don't know.  I'm like

6    clearly the FBI just needed a three-year-old to get around the

7    password.

8              MR. FISHER:  Well, this nine- or ten-year-old, it

9    took him literally two minutes to unfreeze my laptop.

10             THE COURT:  I thought I was tech savvy, but clearly

11   I'm not.

12             All right.  So, look, I mean it's a straightforward

13   request.  Communications clearly includes things like emails,

14   so if the answer is there's none, there's none.  But, you

15   know, I don't want there to be any misunderstanding as to

16   what, you know, that means.

17             MR. MARKS:  The next is we've asked for -- so this

18   is another area in which we appear to be in dispute, and

19   that's records related to malpractice and negligence claims.

20   We believe that those records are relevant for a variety of

21   reasons.  If someone has made a malpractice or a negligence

22   claims against any of the professional defendants, that would

23   be relevant in a variety of ways.  We've argued the telephone

24   records so I'll keep myself very brief, Your Honor.

25             Number one, to the extent the case is about medical

76

1    necessary, if there's any issue about malpractice or

2    negligence, that could go to certainly competence or ability

3    of any of the providers.  And while there may -- you know,

4    they may have a very good defense in those claims and there

5    may be no merit whatsoever to those claims.  At this point,

6    we're not testing whether there's merit to those claims.

7    We're testing as to whether they exist.  And if they exist,

8    that might provide some evidence that might have bearing on

9    the ability or skill of these providers to provide the medical

10    treatment that is the subject of this case.  That's number

11    one.

12            Number two, if any of the providers are under or

13    have been subject to these suits or proceedings or a lot of

14    them, for example, that would make them more susceptible or

15    more likely to be pliable or necessary to work for a

16    layperson.  That is a very common pattern that we see, and

17    laypeople are able to get doctors to work for them who are

18    having a tough time getting a job somewhere else.  And that

19    would be an indication that they would work for someone, and

20    that person would be in a position to give the direction and

21    control about the kind of care they render should they render

22    care the patient needs or should they render care that puts

23    money in the pocket of the person who owns, controls, and

24    therefore, that would also be relevant as well.

25            And so, for all of those reasons, it would be -- and

1   it would be relevant and for those reason, we think that it's

2   appropriate.  And in other cases, this kind of evidence has

3   routinely been allowed, again, for purposes of discovery at

4   this point.

5           MR. FURMAN:  May I be heard, please?

6           THE COURT:  Sure.

7           MR. FURMAN:  This is yet another example of this

8   duality, just in that argument along.  And I think you

9   probably know what I'm going to say, so I'll be brief.  But

10  first off is he starts off with, well, the issue is going to

11  be medical necessity so the knowledge and competence of the

12  provider is important.  Let's assume that's the case, but you

13  know that that's not really what they've been pursuing in this

14  case.  They've been pursuing there's somebody else in control.

15          THE COURT:  Well, it's not exclusively what they've

16  been -- so.

17          MR. FURMAN:  So -- and I don't see how -- you know,

18  the classic thing, they can't really have it both ways.  You

19  know, I didn't mention this in my papers, but there's an

20  appeal.  We have an appeal in the Second Circuit on this case.

21          THE COURT:  I'm sorry; we have an appeal of what?

22          MR. FURMAN:  We have an appeal in the Second Circuit

23  on this case, on the collateral issue.

24          THE COURT:  In this case?

25          MR. FURMAN:  Yes.  And we're just finishing --

78

1          MR. MARKS:  The district court's injunctive relief

2    has been appealed to the Second Circuit.

3          MR. FURMAN:  And in that appeal, they actually

4    distinguish because they need to -- they distinguish this case

5    from the cases that they say, well, that's a case that has

6    nothing to do with -- and I have to read you the portion of

7    the brief -- with someone that's alleged to be in control of

8    the PC.

9          So, you know, I don't think you can play it fairly

10   when you're playing it on both sides.  And malpractice -- and

11   I think that's -- people have insurance.  Why don't they ask

12   us if we have malpractice insurance?  I mean that would be

13   more important.  I mean if they have malpractice, then --

14   insurance, then the motivation argument goes out the window.

15   And --

16          THE COURT:  Well --

17          MR. FURMAN:  And then --

18          THE COURT:  -- maybe you have, maybe no.

19          MR. FURMAN:  And then let me say this.

20          THE COURT:  If you have enough malpractice claims

21   against you, your insurance goes through the roof, assuming

22   you can even get it.

23          MR. FURMAN:  This motivation argument is just all

24   over the place.  I'm hearing it all the time from them.  It's

25   motivation, it's motivation, it's motivation.  I mean

1  everything's motivation.  You want to earn a dollar from

2  legitimate medical services, you have motivation to do the

3  services.  And I say this in my letter, motivation is not an

4  element of a RICO case.  And so why they keep --

5         THE COURT:  It may not be an element, but it's

6  always --

7         MR. FURMAN:  Pardon me.

8         THE COURT:   Motivation -- motive is always a

9  relevant issue, whether it's an element or not.  You know,

10  there's plenty of crimes where motive is not a requirement but

11  that doesn't mean it's irrelevant.  I'm not saying I

12  necessarily agree that this is motive evidence, but I don't

13  think you can say just because it's not an element of the

14  offense, it's not relevant for the claim.

15         MR. FURMAN:  Well, you can -- it's the most elastic

16  thing that will give you just about anything you'd like to

17  say.  It'll open up every financial record.

18         THE COURT:  But as you keep pointing out, the

19  allegations in the complaint relate to medical necessity.  So

20  asking for any prior instances of, you know, allegations of

21  malpractice or negligence on the behest of the doctors, I mean

22  I don't see how that's not relevant.  I'm not saying it's

23  going to necessarily be admissible.  I guess it depends what's

24  there.  But, you know --

25         MR. FURMAN:  But how come we're going back to the

80

1   discovery now on the complaint when we didn't have the

2   discovery on anything else that has to do with the complaint?

3          THE COURT:  I don't think that the theories that

4   they are articulating are mutually exclusive.  There is

5   clearly an element here of medical necessity.  I mean as you

6   point out, that's the primary contention in the complaint.

7   But that doesn't mean that there can't also be an issue in

8   terms of, you know, ownership of these entities or control of

9   these entities by a non-doctor, which is one of the issues.

10  They're not mutually exclusive.  There could be issues with

11  both, you know.  And more than any of the other issues, I mean

12  this one directly relates to the allegations in the complaint

13  so I'm not really sure what your objection is to it.

14         MR. FURMAN:  My objection is that malpractice

15  history does not provide motivation because they may be

16  insured and they haven't even asked about insurance.  So I

17  don't see the motive aspect of that.  And --

18         THE COURT:  Put aside the motive aspect of it.  I

19  mean it's the same as if, you know, you have a police

20  brutality case and they're asking for a prior disciplinary

21  history of the police officers.  It doesn't mean it's going to

22  necessarily be admissible, but it's certainly relevant for

23  discovery purposes.

24         MR. FURMAN:  Medical necessity and medical

25  competence are two different things.  Negligence is not

81

1   evidence that somebody did something that was medically

2   unnecessary.

3             THE COURT:  Yeah, but it could be.

4             MR. FURMAN:  Well, their allegation is that it's not

5   negligence.  It's intentional.

6             THE COURT:  And maybe some of the prior malpractice

7   claims were intentional.  I don't know.  I don't know what's

8   there, if there is anything.

9             MR. FURMAN:  I mean I'm not so sure by definition a

10  malpractice claim could be intentional.  I mean it's medical

11  negligence.

12            THE COURT:  Well, look, if somebody does a

13  procedure, I mean you can -- maybe you can argue it's, you

14  know --

15            MR. FURMAN:  An assault?

16            THE COURT:  No.  You can argue that it's negligent.

17  Maybe they did it -- obviously they're doing a procedure

18  deliberately, so it's not a question of mistakenly doing

19  something.  Whether it's medically necessary or not, I mean

20  there's -- I guess you can make the argument that, you know,

21  performing a medically unnecessary procedure could be a

22  deliberate act in order to benefit or it could be negligence

23  on the part of a doctor who performs something that he didn't

24  need to perform because he didn't know any better.  It could

25  theoretically be either/or.

82

1    I mean they're making the allegations that these are

2  deliberate, you know, acts but I don't know what -- I don't

3  know what the prior malpractice -- assuming there even are

4  any.  I don't know if there are or not.  But if there are

5  prior malpractice claims --

6         MR. FURMAN:  Well, I don't either except I mean does

7  the word phishing expedition come to mind?

8         THE COURT:  Look, I think of all of the arguments

9  you've made, this is the one category that I think that

10  argument makes the lease amount of sense.  I'll give you some

11  of the other instances where, you know, you can make a

12  coverable argument that things are going far afield, but this

13  one I think is directly relevant to the specific allegations

14  in the complaint.  So I don't think you can make that argument

15  here.

16         MR. FURMAN:  All right.  I hear you, Judge.  I just

17  wish that we would have all of the discovery rulings based

18  just upon the allegations in the complaint.  And I'm not so

19  sure that they have been.

20                 [Pause in proceedings.]

21         THE COURT:  All right.

22         UNIDENTIFIED SPEAKER:  I'm not going to respond --

23         THE COURT:  Next issue.

24         MR. MARKS:  Okay.  All right.  They've -- we've

25  asked for diary and calendars of the defendants and we've told

1  that -- we were told that all but one of the defendants didn't

2  have any.  We were told that one defendant did, and then we

3  were told that maybe this was an error, that maybe he didn't.

4  And we were told we were going to get confirmation on whether

5  he did or he didn't.  And if he did have it, we were told we

6  were going to get it.  And if he didn't have it, we were told

7  they were going to amend their answer.

8         So this seems to be a relatively straightforward

9  one.

10         MR. FURMAN:  I'll amend the answer as need be.

11         THE COURT:  All right.

12         MR. MARKS:  Okay.  We asked for information

13  regarding licenses.  I believe that it asked for both

14  information related to licenses and documents related to

15  license applications.  I believe we were told that they have

16  no documents responsive regarding the applications, but we

17  were going to be told that we were going to get confirmation

18  of that and we were going to be given all licenses.  I believe

19  as of Monday, we have been given all licenses, but we need

20  confirmation that we have all licenses and that there are no

21  application documents.  If that happens, we'll be done with

22  that.

23         MR. FURMAN:  No problem.

24         THE COURT:  All right.  Next issue.

25         MR. MARKS:  Fine.  All right.  We were told that

84

1    there are -- that they have no possession, custody, and

2    control of transcripts.  However, there have been various

3    mentions over the course of these proceedings of transcripts.

4            THE COURT:  Transcript of what?

5            MR. MARKS:  Transcripts or summaries related to

6    testimony of any of the defendants or related to treatment at

7    1786.  So the deposition, the EO transcripts, we were told

8    that there aren't any, that they don't have any.  And we --

9    and but we raised, for example, that there may be an EO

10   transcript or some -- basically the prior statements of the

11   defendants or concerning the activity oat 1786.  We were told

12   that he was going to confirm whether they existed or not.

13           MR. FURMAN:  No, I don't believe I said that.  I

14   said that there were none.  I said in writing that there are

15   none, and that's the end of it.  Now I'm hearing in their

16   response that at the hearing on April 17th in this court, Mr.

17   Fisher described testimony by a Jaime [Ph.] Gutierrez, Dr.

18   Gutierrez in connection with the lawsuit in which Les Levine

19   did work.  And it was Les Levine's work on that lawsuit was

20   apparently paid for by some of the professional defendants.

21   At a minimum, the transcripts in that case would be the

22   responses.

23           I'm not sure that that follows.  I mean it's not

24   them testifying if there were transcripts.  If the --

25           THE COURT:  I'm totally confused now.

85

1          MR. FURMAN:  Pardon me.

2          THE COURT:  What transcripts from what proceedings

3    are we talking about here?

4          MR. FISHER:  There is a case pending that was

5    brought by a doctor by the name of Jamie Gutierrez who is

6    seeking to avoid paying me and Oleg Rybak for services that we

7    provided.  That case is pending in Bronx County.  It was

8    brought as a special proceeding some three and a half, almost

9    four years ago.  So under [indiscernible] in the state court,

10   the case is about four years, three and a half, four years

11   beyond the time when it was supposed to be resolved.

12         THE COURT:  Makes me feel a little bit better about

13   how long this case has been going on.

14         MR. FISHER:  So in that case, the defendants were

15   afforded the opportunity to take Dr. Gutierrez's deposition,

16   and that's the transcript that I was referring to in this

17   unrelated case that has zero to do with this case and this

18   complaint.  That's the only transcript that I'm personally

19   aware of that exists with -- and that's a case in which none

20   of the providers, neither the professional defendants nor the

21   DME defendants are a party to or -- and it's a single-issue

22   case basically -- well, actually it's a two-issue case.  The

23   first question is are we entitled to be paid, and the second

24   question is how much, who gets what out of an escrow fund

25   that's being maintained.  And that's all the case is about.

86

1    It's a fight over that.

2            MR. MARKS:  That's not quite exactly right, Your

3    Honor.  That case -- in that -- Dr. Gutierrez is a doctor

4    operated at 1468 Flatbush.  That's the predecessor location to

5    1786.  Among the things that Dr. Gutierrez has claimed is that

6    his practice was owned and controlled by Oleg Rybak and maybe

7    others, okay.  And as you may remember, one of the interesting

8    things that we learned in this courtroom was that Les Levine

9    was a private investigator who was hired to help defend the

10   Gutierrez lawsuit.  Les Levine was paid for his services by

11   the defendants who operated at 1768 Flatbush.

12           THE COURT:  Aren't those the same defendants, the

13   named moved from one to the other?

14           MR. MARKS:  Some did, some didn't.

15           MR. FISHER:  And in that case, under oath, Dr.

16   Gutierrez testified that neither Tatiana Rybak nor Oleg Rybak

17   controlled this practice, that he didn't fee-split with either

18   one of them, that he controlled his own billing, that he

19   controlled his own mailbox, and that they had absolutely

20   nothing to do with his practice, even though it had been

21   alleged in the complaint that there was this outside

22   interference.  He had four or five lawyers in that case

23   starting with the Kasowitz firm which withdrew the complaint.

24   And in 35 minutes, he responded to all of my direct questions

25   allegedly related to -- well, not allegedly.  They were

87

1  directly related to the subject matter that Mr. Marks just

2  referred to.  And the transcript so reflects that.

3          MR. MARKS:  That's the transcript he referred to.

4  After he referred to it, we went and read the transcript.  Mr.

5  Fisher has not accurately represented the transcript, and if

6  we need to tender the transcript to the Court, we can.  I

7  don't think it's necessary.  That's not an accurate reflection

8  of what happened in the transcript.  We can deal with it at a

9  different point.

10          I think for present purposes, the appropriate point

11  -- the really only relevant issue is this.  Here's the

12  document request: "All transcripts or summaries of testimony

13  concerning any of the defendants in the case or concerning

14  treatment that occurred at 1786 Flatbush," okay, "concerning

15  any defendant or treatment that occurred at 1786 Flatbush."

16  That's all it asks for.  So either he's got it or he doesn't.

17  Answer the document request, provide -- he's previously told

18  us Dr. Lacina has documents responsive to this request.  If he

19  does, produce them.  If he doesn't revise his answer.  That's

20  it.

21          MR. FISHER:  Just to finish up on the Gutierrez

22  subject, Gutierrez never practiced at 1786.  And I sincerely

23  doubt that any of the professional defendants -- I've got a

24  copy of the transcript in that particular case in which

25  they're not involved.

1                THE COURT:  All right.

2                MR. FURMAN:  I can't find my response here, and I'm

3        surprised to hear that there was anything affirmative.  But

4        I'll clarify it.

5                THE COURT:  Okay.  Well, check.  If there's nothing,

6        clarify it.  If there is, then produce it.

7                MR. FURMAN:  And there were a couple of scrivener's

8        errors in there, I know.

9                THE COURT:  All right.

10               MR. FURMAN:  I can't exactly -- there were 38 sets

11       of document requests, and I'm sure I made a mistake or two.

12               THE COURT:  Okay.  Next issue.

13               MR. MARKS:  Next is documents related to cash

14       transactions.  And so we have served documents requests that

15       says give us documents related to all -- to transactions that

16       were engaged in involving cash or currency.  The objection

17       that we got back was, well, everything relates to cash because

18       sooner or later everything turns into cash.  And as we

19       attempted to convey in the conversations that we had pursuant

20       to a meet and confer is no, no, no, no.  We're talking about

21       -- you -- it's the common understanding of what --

22               THE COURT:  Talking about bags of -- brown bags of

23       cash being exchanged.

24               MR. MARKS:  Brown bags of money.  So you can play --

25       we can play lawyer games about, oh, everything sooner or later

89

1   relates to -- that's a lawyer game that we can play.  We know

2   what cash is.

3              MR. FURMAN:  It's not a lawyer game.  It's a poorly

4   worded --

5              MR. MARKS:  Excuse me.  I'm speaking.

6              MR. FURMAN:  It's not a lawyer game.  It's a poorly

7   worded question.

8              MR. MARKS:  I'm speaking.  I didn't interrupt you.

9   As long as you've gone on, I haven't interrupted you.

10             MR. FURMAN:  You've gone on longer than me.

11             MR. MARKS:  And so we said you know what the cash

12  is, okay.  And here's the reason there are cash transactions

13  because there's been a lot of evidence of cash transactions.

14  Number one, we have a number of different defendants have used

15  United Check Cashing, okay.  It's a check cashing service, and

16  they used a particular individual who's cashed all their

17  checks, a man by the name of Roman Winetrout [Ph.].  Vasila

18  Queen who you're going to hear is the subject of the motion

19  that we're going to be dealing with at a later hearing, Vasila

20  Queen received checks written from the defendants including

21  the professional defendants that were written payable to cash

22  that she took and deposited into her account.

23             Natasha Toecarr [Ph.] testified that she told Dr.

24  Gutierrez, the doctor that we've heard about, that Tatiana

25  Rybak took providers' checks when she was in 1468 and cashed

1  them and had a relationship with a Lister [Ph.] Moore who was

2  a bank officer at HSBC Bank who she used to cash checks for

3  her.  Les Levine, another individual that we've been talking

4  about, received checks from the defendants payable to cash

5  that he deposited into his account.

6         So we have and so we've got checks written to cash.

7  Now, if the only documents they have related to cash are

8  checks that say written to so-and-so payable to cash, that's

9  fine, produce that and say that's the universe, okay.  Then we

10  know there are no other documents related to cash and that's

11  probably all there is because the reason you engage in cash

12  transactions is so that there isn't any other paperwork.  And

13  that's fine.  That may be the answer, and we'll accept that

14  answer and that's fine.

15         But if they're going to claim down the road that,

16  yeah, I generated cash and I used it for some legitimate

17  purpose, I bought something legitimate with my cash when I

18  created a cash -- I did something -- well, now's the time to

19  put up and show us what it is you did with that cash, the

20  legitimate purposes you made with that cash.  I'm assuming

21  there's nothing, and if there's nothing, that's consistent

22  with our theory.

23         But if they're going to claim as a defense down the

24  road, yeah, I had a legitimate use of my cash, well, then

25  let's see it now.  What's the documents that you have that

91

1   supported your use of cash?  Why do you buy that thing?  Why

2   did you pay that person in cash as opposed to not?  What's the

3   documentation that establishes that?  Again, if there's

4   nothing, I suspect there's nothing, and that's what we've

5   asked for.  It's a legitimate request.  It's very common in

6   cases like this.  Let's get them.

7           MR. FURMAN:  And the answer is ask it at a

8   deposition.  You have the checks, you have these going to the

9   check cash.  Ask them what they did with it.  I mean their

10  concern at some point in time was that, well, we used -- I

11  used some cash to buy equipment.  Okay, fine.  Ask them at a

12  deposition.  It's not appropriate to ask them in an

13  interrogatory.  And I've referred them to the checks, and they

14  took the checks.  So at this point, we're beyond written

15  discovery.  I mean ask the question.

16          MR. MARKS:  It's not an interrogatory.  It's a

17  document request.

18          THE COURT:  It's a document request, yeah.  They're

19  asking for any documents.

20          MR. FURMAN:  Even worse.

21          THE COURT:  Well, I don't know.  I mean if there's

22  nothing, then that's the answer.  I would expect that there

23  would be nothing because if it's in cash, there wouldn't be

24  documents unless somebody's got a handwritten ledger

25  somewhere.

1              [Pause in proceedings.]

2         THE COURT:  I mean you've got the bank records, so I

3    think what they're asking for is if there's any records of

4    cash transactions that's not reflected in the bank records.

5         MR. FURMAN:  If they'd asked that question, I would

6    have been able to answer it more succinctly.  But that's not

7    the question they asked.  They asked all documents related to

8    any transactions was generated cash or currency.  That's

9    overbroad by definition.  And, you know, this question is such

10   a poorly worded --

11        THE COURT:  Look, I'm not going to disagree with

12   you.  It's a badly worded question, but I don't think you need

13   to have litigation over every badly worded interrogatory

14   question or, quite frankly, I would be out of a job because I

15   wouldn't be able to handle the volume of hearings I'd have to

16   have.  I mean frankly, I look at interrogatories that people

17   file as exhibits and I think at least half the questions are

18   badly worded.

19        So you pick up the phone and you clarify what the

20   issue is, what do you really want, what do you really need

21   here.

22        MR. FURMAN:  Well, we heard that so can you --

23        THE COURT:  And if there's a dispute, then bring it

24   to me.  But like, you know --

25        MR. FURMAN:  Well, can you then reword the question

1  and I'll respond?

2           MR. MARKS:  No.  Answer -- the document request says

3  produce documents -- he understands what cash is.  He's

4  playing games here.  Just respond to the document request that

5  says produce documents, and I don't have the exact words in

6  front of me.  It is not as he has phrased it.  If you've got

7  documents that are related to cash or cash transactions, I

8  think it says related to your business, produce them.  And if

9  there aren't anything else, then just say I've produced

10 everything.  It's the bank records, you got them.  And then

11 we're done and we can move on.

12                      [Pause in proceedings.]

13          MR. FURMAN:  I don't see why the question should not

14 be worded so we can intelligently respond.

15          THE COURT:  I don't have the question in front of

16 me, so --

17          MR. FURMAN:  Sorry.

18          THE COURT:  I don't have the question in front of

19 me, so I'm not --

20                      [Pause in proceedings.]

21          MR. FURMAN:  I have the question in front of me,

22 Judge.  It's in my --

23          THE COURT:  Okay.  What is it?

24          MR. FURMAN:  I mean I have it sitting here.

25          THE COURT:  I see.

94

1          UNIDENTIFIED SPEAKER:  Is there any chance we could

2     take a five-minute break so --

3          THE COURT:  We can if you want.  You don't even need

4     to be here anymore.

5          UNIDENTIFIED SPEAKER:  I'd like to keep --

6          UNIDENTIFIED SPEAKER:  Well, I'm totally amused,

7     Your Honor.

8          MR. MARKS:  All documents relating to any

9     transactions which generated cash or currency to be used in

10    any way by or for your business including but not limited to

11    any transaction with any check casher or any entity which

12    involved the exchange of a check for cash.

13         THE COURT:  Honestly, here's why I think this

14    question's overbroad.  All documents related to any

15    transactions generated cash to be used for your business would

16    technically apply to every single business transaction that

17    company engaged in which the purpose of which is to generate

18    cash for use in the business.  That's not what you want.  I

19    know what you're asking for, but the question as worded is

20    overbroad.

21                    [Pause in proceedings.]

22         MR. MARKS:  All right.  Well --

23         THE COURT:  Just hold one for a few minutes.  We can

24    take a break.

25         MR. MARKS:  Are we taking a break?

95

1            THE COURT:  Yeah.

2   (Off the record at 2:21 p.m.)

3   (Back on the record at 2:35 p.m.)

4            THE COURT:  Okay.  Where were we?

5            MR. COOK:  Yeah, I let him know that we were here

6   and ready to proceed.

7            THE COURT:  Sorry, what was that?  Oh, Mr. Furman's

8   not here yet.

9            MR. COOK:  Yeah, counsel for the professional

10  defendants, I let him know that we were here and ready to

11  proceed.

12           THE COURT:  Okay.  We'll just wait for him.

13           MR. COOK:  He should be here in a minute.

14           MR. FISHER:  Thanks for the break, Judge.

15           THE COURT:  No problem.

16                    [Pause in proceedings.]

17           MR. MARKS:  Ready, Your Honor.

18           THE COURT:  Okay.  Where did we leave off?

19           MR. MARKS:  So a couple of things, Your Honor.

20  First, I do want to correct the record because I believe I

21  misspoke about something earlier, and I do want to clarify the

22  record.  Earlier when I mentioned that I had reviewed the

23  transcript in the proceedings involving Gutierrez and his suit

24  against Olen Rybak and Fisher, I actually have not seen that

25  transcript.  There is another transcript.  So to the extent I

96

1    referenced that transcript, that was I was mistaken.  There

2    may be -- this transcript obviously I'd like to see, but to

3    the extent I've referenced what was in that transcript, I may

4    have misspoken.  So I retract what I said there.

5         MR. FISHER:  And if I could be helpful to Mr. Marks,

6    I would tell him if you're looking at the final transcript,

7    the second day transcript, for the matters that I referred to,

8    it's the last 30 to 35 minutes of the day.  And it could not

9    be any clearer.

10        MR. MARKS:  We'll see and I'll review, but that's

11   not -- all right.  So, let me address --

12        MR. FURMAN:  [Inaudible].

13        MR. MARKS:  No.

14        MR. FURMAN:  May I have my letter back?

15        MR. MARKS:  All right.  So --

16        MR. FURMAN:  Also, if I may?

17        MR. MARKS:  So --

18        MR. FURMAN:  [Inaudible].  Excuse me.

19        MR. MARKS:  I'm --

20        MR. FURMAN:  Excuse me.  I just want to be certain

21   that the transcript is going to be effective ordered.  Can we

22   order it today because this is a lengthy proceeding?

23        THE COURT:  You can order it, yeah.

24        MR. FURMAN:  No, because I think one of the more

25   recent appearances, the reason I mention it is I wanted to

97

1   order the transcript and I was told it didn't come out.  So if

2   there's a way of confirming.  Because I have not taken or I

3   stopped taking notes some time ago, and I think I'm going to

4   need to refer to the transcript in order to respond to a lot

5   of these things.

6              THE COURT:  Okay.  Well --

7              MR. FURMAN:  We'll order it tomorrow, but --

8              THE COURT:  I think to the extent you want to make

9   sure the transcript comes out, I would suggest that everyone

10  sit down and make sure you're talk into the microphones and

11  you'll have a better chance of having a better transcript.

12             MR. MARKS:  We've been taking very good notes as

13  well, and we'll be happy to confer as well.  And I am sure

14  we'll find a way to work it out.  So with respect to the cash

15  transactions, Your Honor, I guess I'd like to propose an

16  amendment to the language which I hope will clarify the issue

17  and maybe address Mr. Furman's concerns is that the revised

18  request read as follows: "All documents relating to any

19  transactions that involved the generation of cash or currency

20  to be used in any way by or for your business and documents

21  reflecting the purpose for which such cash or currency was

22  generated, including but not limited to any transaction with

23  any check cash or any entity which involved the exchange of a

24  check for cash."

25             I think -- phrased that way, I think it addresses

98

1   the concern that Your Honor identified his focus.  I think

2   it's consistent with what Mr. Furman has said he's prepared to

3   provide.  And I think the answer may be nothing more than the

4   documents he's already produced, but if that's the answer,

5   that's the answer.  So that would be my proposal.

6          MR. FURMAN:  And I don't see a difference between

7   that.  I'm trying to expedite things here, but I don't see a

8   difference between that and the other -- the initial question.

9   The word "involved" is another elastic term.  Before when we

10  were talking, Your Honor asked him a question isn't this what

11  you want, and I think he said yes.  And I don't remember what

12  the wording of the question was, and I said that I can respond

13  to.  But this other question is just a duplicative one of the

14  other one.

15                    [Pause in proceedings.]

16          THE COURT:  Repeat your question again.

17          MR. MARKS:  So the Court's concern was transactions

18  which generated cash, so transactions generated cash.  So what

19  we're -- what I'm proposed is that the transaction involved

20  the generation of cash or currency.  In other words, if the

21  transaction itself, the purpose of the transaction was to

22  generate cash or currency, that's why you give the

23  transaction.

24          THE COURT:  I don't see how that's any better.

25          MR. FISHER:  It's not any better.

99

1          THE COURT:  I mean I guess I have two questions or

2   really one question for you which is are you looking for the

3   check-cashing documents?

4          MR. MARKS:  Yes.

5          THE COURT:  Or are you looking for what you were

6   talking about before which was transactions where somebody

7   spent the cash that they generated?

8          MR. MARKS:  Both, Your Honor.

9          THE COURT:  Because I think those are two separate

10  things, and you're trying to conflate them all into one

11  request.  And I think that's your problem.  I think you really

12  have to break it up into two parts because it's two separate

13  issues.

14         MR. MARKS:  Okay.  So I'm open to -- well, look,

15  Judge, we can [indiscernible] with the language, but what we

16  want, I assume we're in --

17         THE COURT:  But aren't the check-cashing things,

18  wouldn't that be in the bank records or at least the checks

19  made out to cash?

20         MR. MARKS:  I assume so.  I assume that's

21  everything.  But we've got people going to check cashers.

22  Maybe we've got communications with check cashers.  Maybe -- I

23  don't know what else there is.  Maybe there's nothing else.

24  If that's all there is, that's all there is.  What I'm looking

25  -- what we're looking for are the documents associated with

the creation of currency, cash. You know, so that's one set. And to the extent that they're engaging in transactions purely that are cash transactions, look, we don't need every scrap of paper, but we need the documents that support the purpose of those transactions.

MR. FURMAN: The last portion seems to me I could respond to, documents relating to any cash transactions in the course of your business. Okay, I can live with that. And except for -- you know, except for the checks which I assume -- I haven't looked at every one of the checks and I haven't seen the bank records, but I assume that there are checks that go to cash -- to check cashers. I'm not going to reproduce those. He has them already. In fact, I'd like to know what they are.

MR. MARKS: So what I'm hearing is all documents related to cash transactions.

MR. FURMAN: Right.

MR. MARKS: And documents reflecting the purpose -- well, that's what you just said, right?

MR. FURMAN: I said any documents referring or involving cash transactions in the course of your business.

MR. FISHER: Can I make a suggestion?

MR. FURMAN: That's pretty simple.

MR. MARKS: Fine. All documents -- fine, that request, fine. Okay, done. And then the other piece of that

101

1   is all documents reflecting the purpose of such cash

2   transactions or such documents as reflect the purpose of such

3   cash transactions.

4        MR. FURMAN:  I think that's where it gets elastic

5   [Ph.].

6        MR. FISHER:  Suppose they sent out for lunch and

7   paid for lunch with cash.  But does he want to know that?  All

8   transactions related to cash.

9        MR. FURMAN:  Yeah, I get it.

10       MR. FISHER:  It gives you a list of the checks that

11  went through the check casher and say all documents related to

12  these checks.

13       MR. MARKS:  Judge, why don't we hear it this way, if

14  he answers that and he produces that, then we'll look at what

15  he produces and if we have specific cash transactions we want

16  to ask about, we'll send him a list of cash transactions and

17  we'll say give us the documents related to these transactions.

18       THE COURT:  There you go.  Do it that way.

19       MR. FURMAN:  All right.  That's fine.

20       MR. MARKS:  Okay.

21       MR. FISHER:  That's fine.

22       MR. MARKS:  Okay.  All right.  Next issue.

23       MR. FURMAN:  I'm worried about -- you know, I'm

24  worried about the lunch check.  I guess we didn't retain

25  those.

1          MR. FISHER:  Well, if they send out for a pizza,

2    they didn't -- they pay in cash, they don't keep a record of

3    that.  You know what he's looking for.

4          THE COURT:  My dad keeps records for like 15 years.

5          MR. FURMAN:  I think I know what he's looking for.

6          THE COURT:  Like every receipt he's probably ever

7    had, it's ridiculous.

8          UNIDENTIFIED SPEAKER:  They fade after two years.

9    You can't read like --

10          THE COURT:  Don't ask me.  I don't --

11          MR. MARKS:  I keep my condo association deposit

12    receipts and they --

13          THE COURT:  I throw out my receipt before I even

14    leave the restaurant.

15          MR. FISHER:  I've had a case once, Judge, involving

16    a plumbing contractor.  When the DA's office did a sweep on

17    managers of co-ops in condominiums, he got immunity because he

18    had a register of every time he made a payoff to a city

19    employee, where the payoff took place, where they had lunch,

20    how much it was, and what denomination the bills were down to

21    I gave him $1,156.37 when he counted in lunch.  And the DA's

22    office, who does this, but we got an immunity bath.

23          MR. MARKS:  Okay.  All right, Judge.  So let me try

24    and cut this next one short, I'm hoping.  So we have a dispute

25    over -- we've asked for documents relating to ownership

103

1  interests and income that defendants received from other

2  health care businesses, okay.  I understand the disagreement.

3  I understand how much time we spent going back and forth.

4         So what I'd like to do is I'd like to propose an

5  alternative to maybe short-circuit this is rather than phrase

6  this as a document request, why don't we -- what I would

7  propose as a solution is that we ask the defendants to simply

8  identify the businesses that they have owned that have engaged

9  in the health care or supply business during the period

10  covered by the complaint, what the businesses that they've

11  owned, the dates that they've owned them, and then we can then

12  have a discussion with counsel over whether we think it

13  appropriate to get more discovery or less discovery about

14  those entities and we can fight about it.

15         But it would seem to be a relatively simple thing

16  for them to identify that list and then we look at the list

17  and then we can fight about whether we're entitled to more or

18  less.  I think it would be our position we'd be entitled to

19  more, but at least we can get a universe of what we're --

20  counsel's position is going to be we're not entitled to any of

21  it, but at least we have a universe of what we're talking

22  about.  So that's my proposal.

23         MR. FURMAN:  Your Honor, this complaint and

24  everything about it and everything that was said today is

25  keyed to the address of 1786 Flatbush.  Their whole theory is

1  that there's someone who controls 1786 Flatbush.  If I --

2  that's the adjunct non-pled theory.

3       I don't see why other businesses, medical

4  businesses, health care businesses that these doctors are

5  involved in have anything to do with this complaint.  He's

6  going to argue, well, that's their motivation.  They may be --

7  you know, whatever.  I mean, again, it's this elastic concept

8  that makes everything discoverable.  And they took pais to

9  limit this to 1786 Flatbush Avenue.  And now we want -- now

10 they're asking about other PCs, and they just -- now they're

11 saying they just want those PCs.  You know what they're going

12 to do with that.

13      And third of all, I may add, you didn't give them

14 tax -- we didn't give them individual tax returns, and one of

15 the reasons was because it would give personal information

16 about other businesses and other PCs.  Now this is just a back

17 door way of just getting the same information.  So I think

18 it's in effect been ruled on already.  This is just gone just

19 far afield.  There isn't anything more imaginable that they

20 could ask for.  And I urge you to not compel an answer more

21 than I've given on this and sustain the objection.

22      MR. MARKS:  I was hoping that my compromise was

23 going to save us having to address this issue, but apparently

24 it's not.  All right.  And I'm still going to stand on my

25 offer with the compromise.  But here's what this position.  I

105

1  understand the way in which they've hammered away at their

2  view of the complaint but, Your Honor, this is a RICO case,

3  okay, in which we allege that a RICO enterprise, okay, in

4  which all of these defendants together orchestrated a scheme

5  to defraud insurance companies, and they did it.

6          And the scheme in the complaint includes allegations

7  that start all the way back with the provision of care to

8  individuals who have been in staged accidents.  The complaint

9  talks about patients who've been in staged accidents and these

10  patients in staged accidents all represented by the same law

11  firm.  They end up at this clinic all receiving the same care.

12  And that care carries all the way through to the lawsuits that

13  are filed by the same law firm, and this law firm files these

14  lawsuits to carry on and collect on that.

15          Among the allegations of the complaint is that each

16  one of these individual doctors own a series of different

17  professional corporations, and the complaint specifically

18  alleges that they changed corporations.  They changed the name

19  of the corporation again and again and again.  And they do

20  this to further the scheme.  This is alleged in the complaint

21  in order to hide who's involved and to change it over and to

22  submit a series of fraudulent claims over the life of the

23  scheme.

24          Now at the time that Your Honor limited us to the

25  corporate tax returns and not the individual tax returns, that

 1  was when this case just started.  That was long before we

 2  amassed the significant volume of financial information that

 3  we now have about the movement of hundreds of thousands of

 4  dollars.  Hundreds of thousands of dollars in money that's

 5  moved out of these professional corporations operating at 1786

 6  down to providers that are associated with we believe the

 7  Rybaks down in Florida for reasons that can't be explained.

 8  And there are all of these transactions and they're a whole

 9  variety of providers and it's all kinds of money moving all

10  over the place in ways that can't be explained.  We think we

11  have a reason for it, but we think it's in part to further the

12  scheme, the RICO enterprise, the RICO conspiracy that we have

13  alleged in the complaint.  And this is all part and parcel of

14  that story.

15          So, what else did these individuals -- what other

16  professional corporations, what other businesses did they own

17  or operated or were they involved in where money was moved to

18  or where they were -- have a relationship that crossed paths

19  with other members of the RICO enterprise or other parts of

20  this RICO conspiracy that we've alleged because we've seen all

21  this money and all this activity that we've learned about?  In

22  fact, at some point soon we're going to be back in front of

23  the Court asking you to reconsider its ruling on allowing us

24  access to the individual defendants' tax returns because of

25  everything that we've learned.  Since the time you issued that

107

1  ruling, you said at least at this point, that was the ruling

2  because it was very early in the case and we know a lot more

3  than we know -- knew then.

4          But let me add this.  One of the issues, and let's

5  go back to medical necessity.  As the Court correctly

6  observes, medical necessity is one part of the story.  But we

7  have a variety -- we have a theory here, and it's a coherent

8  theory, which is that this RICO enterprise, its scheme was to

9  submit claims that represented that these services were

10  medical and necessary when they're not.  And so medical

11  necessity's a piece of our story, but it's part of a larger

12  story and a larger theory.

13          So if Provider A is treating his or her patients at

14  1786 one way and is treating his or her patients in another

15  location a different way, okay -- perhaps those patients are

16  not no-fault patients.  Perhaps, they're private pay patients.

17  Perhaps, those patients are being treated in a different way.

18  That something that may be arguably relevant would be a

19  comparison that we would be allowed to make.

20          Now I'm not saying we're going to go there, which is

21  why I've offered a compromise, a first step to figure that out

22  is let's see what they are.  That's all we're asking.  Just

23  give us the list of what they are and then we can decide what

24  is the next step.  Now I think we're probably entitled to make

25  this comparison to consider other entities just because of the

108

1   sheer volume of money that is moving back and forth among

2   these entities and it's a lot of money that's moving back and

3   forth across a lot of entities.  If they're writing -- you

4   know, if each one of these professional corporations is

5   writing money to all -- where else is the money going?

6           Case law has held that where individuals have

7   closely-held corporations and there's a free flow of money

8   between and among those entities, that discovery into their

9   other entities is appropriate.  So for those reasons --

10          THE COURT:  Have you identified other companies that

11  you think these defendants own based on the money transactions

12  that you've identified?

13          MR. MARKS: We -- I don't -- as I stand here, I don't

14  know the answer to that.  And I think part of the reason why

15  we -- why we are asking this discovery is to find out if there

16  are other entities.  I mean one of the things I think we have

17  found is that we've got a lot of money going to entities that

18  we don't know what they are.  So we have records of the money,

19  but we don't know -- it's, you know, ABC entity, XYZ entity

20  and we don't know what those entities are.  So some of this

21  may shed light on that.  That's the reason to ask the

22  question.  Only they're likely to know what entities are

23  there.

24          MR. FISHER:  That's a deposition question.

25          MR. MARKS:  And the burden of telling us, look, this

109

1  is our entity -- what conceivable burden are we imposing on

2  them by saying give us a list of your entities?  That's all

3  we're asking for at this point.  There's no burden from that

4  other than they've got to give us a list of the entities.

5          MR. FURMAN:  That's not a question for burden.  Your

6  Honor, if I can be heard?  The name of the enterprise in this

7  RICO case is the 1786 Flatbush fraudulent treatment

8  enterprise.  So everything is keyed to 1786 Flat -- Exhibit 1

9  of the complaint which lists all of the claims are 1789

10 Flatbush treatment.  Now they want to speculatively say, well,

11 let's see if they treat people the same way.  They have no

12 basis to ask that.  That is -- I'm sorry to --

13         THE COURT:  Look, I'm not allowing that at all.  To

14 the extent that there might be money being shifted between

15 companies, other entities owned by the defendants, you know,

16 that could be potentially relevant.  But at this point, I

17 don't know whether there's been any money.  You've identified

18 certain companies that have received money.  That sounds like

19 you want to know whether the defendants had any connection to

20 them.  So I think you need to do it in reverse.  I think you

21 need to identify what companies or entities you have these

22 suspicious transactions with and ask the defendants if they

23 have any connection to them.

24         Because otherwise, if they give you an entity and

25 there's no transactions associated with that entity, then

110

1    you're going to want to look into that entity.  And, you know,

2    I don't buy your argument for the comparison at this point.  I

3    agree that there's potential relevance to these transactions

4    if there's other entities that they own that are receiving

5    money or moving money.  So that's what we're going to focus

6    on.  So if there's other entities that you've identified

7    through the financial records, ask them if they have any

8    interest in those entities.

9              MR. MARKS:  Okay.  All right.  Thank you, Your

10   Honor.

11             Okay.  The Court says we're not addressing emails at

12   this time.  So now we have --

13             THE COURT:  It doesn't sound like we needed to

14   address emails.

15             MR. MARKS:  Well --

16             THE COURT:  We're all on the same page.

17             MR. MARKS: Well, no.

18             MR. FURMAN:  Yes, for communications, email

19   communications between the parties defendant.  And what I

20   believe you ruled is if you have any, you'll produce them.

21   Okay, other emails is a whole -- that's the electronic

22   discovery issue which --

23             THE COURT:  Which he hasn't asked for.  What he's

24   asking for us communications that --

25             MR. FURMAN:  Well, and I said if --

111

1           THE COURT:  -- you know, would include emails.

2           MR. MARKS:  Well, no.  So I'm not --

3           THE COURT:  Okay.  So what's the --

4           MR. MARKS:  -- so we've been through document

5    requests.  We now have some interrogatories, so I'm now

6    turning to interrogatories.  So among the interrogatories that

7    we have asked that counsel that we discussed at the April

8    conference and that he agreed to consider providing amending

9    responses is he was going to provide -- was for phone numbers

10   and emails.  I understand we've asked them to identify emails.

11   I understand we're not addressing that issue now.  So I'm

12   happy to move on.  I just want to just to confirm I'm not

13   addressing that issue now.  But I'm not waive -- okay.

14           All right.  We've asked the defendants to identify

15   their ownership interest in the defendant entities.  We've

16   been told to look at the incorporation documents, but that

17   doesn't answer the subparts of the interrogatory which

18   include, you know, what percent interest do you own, which

19   defendants own the interest, and what are the dates you

20   acquired it, and what did you pay for that interest.  Counsel

21   has told us, well, I think it's owned only by this guy and he

22   has a hundred percent ownership and nobody -- that's fine if

23   that's true.  But he's got to put it in an answer.  We can't

24   have Mr. Furman telling us what he thinks the answer is in a

25   telephone call.  So we just simply need that interrogatory

112

1  responded to in the interrogatory.

2          MR. FURMAN:  I don't believe I would have ever said

3  that I would identify how much they paid for it.  I'm not even

4  sure that I -- that that information is a sort they did pay

5  for it.  If he wants to know that they're a hundred percent

6  owners, I'll put that in writing.  I have no idea why he wants

7  to know that because he knows full well that they have a

8  hundred percent.

9          And as far as the corporation is concerned, public

10  record how long they've been in existence.

11          THE COURT:  But that doesn't necessarily mean your

12  client owned them.

13          MR. FURMAN:  What my client's probably going to do

14  is go on the public record and --

15          THE COURT:  Look, if the answer is your client

16  stated the company, owns the company a hundred percent, and

17  it's never changed ownership, then that's a simple answer.  I

18  think --

19          MR. FURMAN:  Well, that's what -- if he is just to

20  say that, we'll say it.

21          THE COURT:  Yeah.  I think what he wants to know is

22  are there entities here that, you know, changed ownership.

23          MR. FURMAN:  They didn't but I'll put it in writing.

24  I mean they're the initials of the parties.

25          THE COURT:  I don't know.  And if that's the answer,

113

1   that's the answer.  But --

2           MR. FURMAN:  Okay.  But this is a waste of time.

3           MR. MARKS:  This waste of time, this aw-shucks

4   nonsense is a waste of time.  Look, we've asked an

5   interrogatory.  It has subparts.  What I want, I want them to

6   answer the interrogatory, and I want them to answer the

7   subparts.  He said he would.  He said he should.

8           MR. FURMAN:  No, I didn't say that I would or

9   should.

10          MR. MARKS:  He was asked in April of 2018.  Why

11  we're here asking him to respond to it, I don't know.  But

12  what I'm hearing is I'm asking that the Court -- I'm asking

13  that he answer that interrogatory and its subparts.  That's

14  all.

15          THE COURT:  Just revise and answer the -- unless you

16  have a specific objection.

17          MR. FURMAN:  I'm looking to see what he wrote.

18                      [Pause in proceedings.]

19          MR. FURMAN:  Well, I'm sure I -- I don't have any

20  problem with the date of the ownership.  I mean it's just busy

21  work to say the length of time they maintained their ownership

22  interest.  The amount paid or other consideration is not

23  something that -- I object to that.  I don't think -- I didn't

24  agree to it and I don't think that's germane to this case in

25  any way.

114

1          THE COURT:  All of these people are a hundred

2   percent owners and they've never changed ownership in the

3   companies.

4          MR. FURMAN:  He can have that.

5          THE COURT:  But then the answer's going to be they

6   didn't pay for it because they were the ones who started it,

7   so why fight over something that's not an issue?

8          MR. FURMAN:  You know what?  I didn't realize that.

9   You're right.  You're right, Judge.  Thank you much.  You make

10  a good point.  I just didn't think it out.

11         THE COURT:  All right.  Next?

12         MR. MARKS:  Next, we asked an interrogatory for him

13  to identify the individuals who provided services to the

14  defendants.  What we were told is go look at the NF-3s which

15  are the bills submitted to State Farm, okay.  That is -- those

16  are -- will tell us who provided services to the patients.

17  It's not what we asked.  We asked who provided services to the

18  defendants.  I want him to answer the interrogatory and its

19  subparts, who provided services to the defendants.

20         He agreed to amend his response.  I'm assuming he's

21  going to do that.

22         MR. FURMAN:  Well, I don't know that I agreed to

23  amend my response.

24         MR. MARKS:  Well, we sent a letter on April 19th

25  which summarized our conversation and we received --

115

 1                MR. FURMAN:  And you said if you disagree with any

 2    of this 20-page letter, then you'll let us know.

 3                MR. MARKS:  Right.  And you didn't.

 4                MR. FURMAN:  Okay.

 5                THE COURT:  Okay.

 6                MR. FURMAN:  So that was my opportunity to speak to

 7    go through a 20-page letter that I didn't even know was coming

 8    and, you know, I mean --

 9                THE COURT:  Just tell me what your objection is.

10                MR. FURMAN:  Pardon me.

11                THE COURT:  If you have an objection to something,

12    tell me what it is.

13                MR. FURMAN:  I have an objection with -- because

14    it's -- I've given this to them.  Here's an interrogatory,

15    it's answerable by the documents.  I wrote, okay, W-2, tax

16    returns, bank records, okay.  They've got it.  They want to

17    know who gave services to the defendants.  It's their

18    employees.  And they may be people identified in the NF-3 who

19    were employees, professional employees who performed the

20    services or they have themselves documents that were submitted

21    with the billing that indicates who performed the services to

22    the patients.  So what else is there?  Why do I have to answer

23    this?

24                THE COURT:  I don't know.  Maybe it has something to

25    do with the fact that you have people who are nonparties that

116

1   are responding to subpoenas saying that they have no

2   connection and then claiming to be employees.  Perhaps, that's

3   why they're asking questions like that.

4           MR. FURMAN:  Well, I don't think that we're going to

5   identify the woman who cleaned the bathroom either way.

6           MR. MARKS:  They haven't identified Deng Glao [Ph.].

7           THE COURT:  When you're paying them over $100,000,

8   perhaps you should have records of who they are.

9                      [Pause in proceedings.]

10          MR. FURMAN:  Well, if we did, we would give them.

11  We've given them everything that we have.

12          MR. MARKS:  No, they haven't.  They've given us

13  documents and they have been too lazy to sit down and answer

14  the interrogatory.  And that's what they need to.  They need

15  to answer the interrogatory.

16          MR. FURMAN:  I object to him saying too lazy.  If

17  you want to stop pointing fingers about laziness.  You opened

18  the door.  You don't want me to do that [indiscernible] a

19  three-page motion and a twenty-page letter that's incorporated

20  by reference.

21          MR. MARKS:  [Indiscernible].

22          MR. FURMAN:  I am nice.  I'm not screaming.

23          THE COURT:  What is the issue with just giving them

24  a list of whoever -- I mean who provided services is a pretty

25  broad category.  Is there anything specific you can narrow it

117

1   down to?

2        MR. FURMAN:  Why doesn't he ask who provided

3   services that are not in the documents you've produced so far?

4   That would be a great question.

5        THE COURT:  To actually answer that accurately, you

6   would have to go back and check out what documents you've

7   already produced and identify which people were listed in them

8   and which people weren't.  I don't see how that's easier than

9   just sitting down with your client and figuring out a list of

10  people who provided services.

11       MR. MARKS:  We were -- identify who was provided

12  management, collection, administrative, secretarial,

13  consulting, legal, marketing, accounting, tax preparation, or

14  scheduling services for any of the defendants and for each

15  state the name, last known address, type of service provided,

16  dates where such services was provided, and the amount paid.

17  It's a pretty standard, straightforward interrogatory.

18       MR. FURMAN:  Right.  And you got an answer, correct?

19       MR. MARKS:  The answer is look at the bills that we

20  submitted to State Farm.

21       MR. FURMAN:  No, what was the answer to the

22  interrogatory?

23                 [Pause in proceedings.]

24       MR. MARKS:  "The answer can be found in documents

25  produced on June 25th."  It cannot.

118

1          MR. FURMAN:  That's right.  And that would include

2    accountants' names because we produced tax records.  I mean it

3    would include -- why don't they just look at the documents

4    that they have.

5          THE COURT:  I'm sure they have.  What they want to

6    know is whether there's anyone else.

7          MR. FURMAN:  Then ask -- then notice a deposition

8    and ask.

9          THE COURT:  I don't see why that's a deposition

10   question.  Just because something can be asked in a deposition

11   doesn't mean it's an improper question for an interrogatory.

12   Look, you have people claiming to be employees or I guess

13   contractors of defendants receiving large amounts of money.  I

14   don't think it's inappropriate for them to ask who else is

15   going to come out of the woodwork claiming they worked for the

16   company.

17         MR. FURMAN:  Well, I think anything that they're

18   going to say in response to that is going to come from a

19   document that's been produced.

20         THE COURT:  But here's --

21         MR. FURMAN:  Just because Ms. Queen does not have a

22   W-2, if that's the case --

23         THE COURT:  So what document that you've already

24   produced mentions her name?

25         MR. FURMAN:  Well, I can't tell you -- I mean he

119

1    says --

2              THE COURT:  Yeah, because there probably isn't one.

3              MR. FURMAN:  -- he says that there isn't any.

4              MR. MARKS:  I can tell you that there isn't any.

5              THE COURT:  Okay.  So right there, if your answer is

6    it's all in the documents, that's not true because you have at

7    least one person who provided services that's not in the

8    documents.  So give them a list.

9              MR. FURMAN:  Okay.

10             MR. MARKS:  So that addresses -- so there are two

11   interrogatories that deal with that issue.  One is who

12   provided services, and Interrogatory 7 asks them to identify

13   employees and independent contractors.  So I assume address

14   both the same way.  Am I correct that we could address both

15   the same?

16             THE COURT:  Technically, the employees would be

17   covered by the first question, but --

18             MR. FURMAN:  Yeah.  Judge, the only thing is about

19   the addresses.

20             THE COURT:  I don't think you need to give

21   addresses.

22             MR. FURMAN:  Pardon me.  Their home addresses?

23             THE COURT:  No.  At this point, just identify them.

24             MR. FURMAN:  Okay.

25             MR. MARKS:  The only reason we asked for that

120

1   information is that we've had, as the Court knows, a hell of a

2   time getting service on people, finding them --

3           THE COURT:  First, find out who these people are.  I

4   mean you're not going to go serve subpoenas on somebody unless

5   it's, you know -- if it's somebody of interest that you're

6   going to actually subpoena, then ask them for the address.

7   And if you have a fight over it, then we can talk about it,

8   but --

9           MR. MARKS:  Okay.  All right.  The next one is we've

10  asked about billing software.  We were told in the

11  interrogatory response that they aren't familiar with the

12  software used for billing, so they don't know anything about

13  it.  We've been told in counsel's pleading that he just filed

14  that, of course, State Farms knows they don't have any billing

15  software.  But we didn't, I guess, until we got the letter.

16  They just got to answer whatever the answer it.

17          MR. FURMAN:  I told them.

18          MR. MARKS:  And I don't care what the answer is.

19  Just amend the answer, that's all.  .  Whatever the answer is,

20  it is.

21          THE COURT:  If there's no billing software, just say

22  that.

23          MR. MARKS:  Huh?

24          THE COURT:  If there's no billing software, just say

25  it.

121

1          MR. FURMAN:  No.  As far as he knows or she knows,

2    they don't know.

3          THE COURT:  What do you mean they don't know?

4          MR. FURMAN:  I mean that doesn't mean there's

5    billing software.  I mean do they know the intricacies of how

6    the people are doing?  Do they know all that stuff?  No,

7    they're doctors.  They're not going to look at that

8    information.

9          THE COURT:  How does the practice bill?

10          MR. FURMAN:  They pay people to do their bills.  How

11    do those people do the bills?  You have to ask them.

12          THE COURT:  Okay.  What people?

13          MR. FURMAN:  I don't think that they get into that

14    detail.  You know, I mean I have to tell you, you know --

15          THE COURT:  Who's doing the billing?  Is there a

16    third party company?

17          MR. FURMAN:  There's no billing -- there's not a

18    billing party.

19          THE COURT:  Is the billing -- so who's doing the

20    billing?

21          MR. FURMAN:  Pardon me.

22          THE COURT:  So who's doing the billing?

23          MR. FURMAN:  Their employees.  Do you want the names

24    of the --

25          THE COURT:  How do you say we don't know?  You

122

1   represent the company.

2          MR. FURMAN:  Yeah, I can say -- I can tell who -- I

3   can state who's doing the billing.  That wasn't this

4   interrogatory.

5          THE COURT:  Yeah.  But you represent the company.

6   If you don't personally know the answer, you can go to the

7   employee who works for your client and ask them.

8          MR. FURMAN:  Okay.

9          THE COURT:  Somebody at the company knows what

10  billing software, if any, they're using.  The fact that you

11  don't is not an answer.  Somebody in the company knows.  You

12  have to ask.  The fact that the doctor doesn't know is not an

13  answer, at least with respect to the company.  It might be an

14  answer with respect to the individual.

15         MR. FURMAN:  Right.

16         THE COURT:  But if the company is asked what billing

17  software do you use, there's an answer to that and somebody at

18  the company knows the answer.

19         MR. MARKS:  Okay.  I think we're getting to the end

20  here, Judge.  The next one I think we should have a -- I think

21  we've talked about this, but we've asked them to identify

22  leases and to explain the terms to the extent there aren't

23  documents of all lease agreements.  Mr. Furman has told us

24  orally in telephone conversations what he thinks those terms

25  are.  We just need them to provide an interrogatory answer

123

1  that lays out what those terms are.  So he needs to answer the

2  interrogatory telling us what the terms are.

3          THE COURT:  This is all for leases at that location?

4          MR. MARKS:  It's -- yes.

5          THE COURT:  Okay.

6          MR. MARKS:  It's for --

7          UNIDENTIFIED SPEAKER:  [Inaudible].

8          MR. MARKS:  Yes, leases spaced to conduct -- it's

9  for lease with space to conduct business and provide health

10 care services.

11         MR. FURMAN:  They're asking them how much rent they

12 pay.

13         MR. MARKS:  Yes, we are.  And we're asking for the

14 terms of the lease.

15         MR. FURMAN:  Well, that's a different story.

16         THE COURT:  Well, the terms of the lease includes

17 how much they're paying, I would assume.

18                    [Pause in proceedings.]

19         MR. MARKS:  Look, one of the things he said to us is

20 that what the sublessees pay is random, okay, and it varies

21 from month to month depending on how much money they have

22 around, okay.  Now, we're going to argue about whether that's

23 a lease or whether that's payments to somebody who actually

24 controls the location, right, because what's really going on

25 is if one month you pay $10,000 for your use of space and the

124

1  next month you pay 50-, when you pay to your landlord how much

2  money you happen to have around, that's in our view not a rent

3  of space.  That's the money you pay to someone that controls

4  your space.  Therefore, we just need to know what the terms

5  are.  They can argue about what they are.

6           But what Mark Furman said to us was he said,

7  "Pavlova says according to him they're random and they vary

8  from month to month based upon how much cash they happen to

9  have around."  Okay, if that's the answer, put it in an

10  interrogatory and we'll argue about what it means.  But don't

11  just say there's no lease or say there's no agreement or say

12  the terms are 50 bucks a month.  We want to know what the

13  terms are.  Put the terms of the agreement in and then we'll

14  argue about what those terms mean.  They've got their story;

15  we have our story.  We're pretty clear about what we think

16  that story means because there's actually case law on what

17  that arrangement means and we'll argue about it, just

18  considered by the New York Supreme Court so we'll talk about

19  it.

20           THE COURT:  Just put it into the revised thing.

21           MR. FURMAN:  Will do.

22           MR. MARKS:  All right.  To the extent that we're

23  getting revised interrogatory responses, I assume we'll get

24  them from everybody.  One of responses we're getting is David

25  Mariano, P.T., who is a defendant, has said I don't have to

125

1  respond to interrogatories or document requests because my

2  physical therapy entity is not a party to this.  That may be

3  true, but that's not a basis for an individual to refuse to

4  answer discovery.  You have to answer discovery.  You have to

5  provide the information you know.  Just because an entity you

6  own isn't a party doesn't mean you don't get to respond.  That

7  --

8            THE COURT:  No, but it might mean they don't have to

9  produce documents depending on who actually has custody and

10 control of it.

11           MR. FURMAN:  But he's an employee of one of the PCs.

12           THE COURT:  Okay.

13           MR. FURMAN:  That's what he is, a physical therapist

14 is employed by --

15           THE COURT:  What's why I said that doesn't mean he

16 doesn't have to answer interrogatories.  It just means he

17 might not have to produce documents.

18           MR. FURMAN:  Well, I don't know what he's doing.  I

19 don't know what he's doing in this case.

20           MR. MARKS:  Or he may have to produce documents that

21 are in possession, custody, or control.  And it may not be in

22 his possession.  He could argue that.  But if it's in his

23 possession, custody, and control under the law, he's got to

24 produce it.  Fine, but he's got to at least answer.

25           THE COURT:  No, I agree.

126

1          MR. MARKS:  Okay.  Fine.  All right.

2          THE COURT:  If the answer is that the documents are

3    not in his custody and control, then that's the answer.

4          MR. MARKS:  Fine.  Okay.  All right.

5          THE COURT:  Which if he's an employee and not an

6    owner would be the case.

7          MR. MARKS:  Absolutely true.  All right.  Okay.  All

8    right.  Just a second.

9                    [Pause in proceedings.]

10         MR. MARKS:  Okay.  Judge, I think there's one final

11   issue, okay.

12         THE COURT:  Uh-huh.

13         MR. MARKS:  And that is this is a discretionary call

14   that the Court needs to make on the management of discovery

15   and the allegation of expenses associated with costs of

16   reproducing the medical records that are in the possession of

17   1786.  And it's a pretty straightforward question that again

18   is completely in the Court's discretion, which is they've got

19   about 80,000 pages worth of documents.  We propose that what

20   we do is we send in a highly-regarded internationally-

21   recognized copy service.  They pick up small batches of

22   documents, they take them out, they photocopy them, they

23   return them the next day or the day after, okay.

24         They want to say, no, you can't do that.  You need

25   to come in.  We'll set you up in a room, and you can photocopy

127

1  them on site and do it that way, okay.  Two different ways to

2  do it, okay.  We'd be fine.  I wouldn't care, but for the fact

3  that we're supposed to be moving fast, okay.  It took us

4  months just to get an answer in terms of what the volume was.

5  We finally got an answer on the volume on June 4th.  The

6  difference in time and cost is substantial to do versus one

7  way.  In fact, it's twice as much and we're talking about

8  five-figure numbers here, okay.

9              So cost substantial and time substantial.  Under one

10  version, a version we propose is five business days.  Under

11  the version they propose is 29 business days.  Those are

12  estimates.  So that's about a month and a half of business

13  time.  There is as far as we could tell the burden on their

14  side is roughly the same.  They've still got to pull the

15  records.  They've still got to segregate them out.  Burden our

16  side --

17              THE COURT:  I'm not so concerned with the burden as

18  much as I am concerned about having original medical records

19  leave the premises.  You know, these are not -- for example,

20  these aren't like their business records.  These are

21  somebody's medical records, some patient now.  You know, you

22  may argue that some of those patients are not legitimate

23  patients, but you know that's yet to be proven and I'm sure

24  there are some that are legitimate patients even if your

25  allegations are proven to be correct.

128

1          So, you know, I'm a little concerned about having

2   original medical records leave to go to a third party vendor.

3   I would assume that they're professional and nothing

4   untoward's going to happen, but any time you have something

5   leave, you know, the custody of the person that's supposed to

6   maintain custody of them, there's always a chance that things

7   could get lost.  And I don't necessarily want to futz with

8   somebody's medical records, the original medical records, you

9   know.

10          If they were, you know, in 2019 like everybody else

11   and had their records saved electronically, we wouldn't have

12   this issue.  But if all they have are the original paper

13   records, then I just -- I am --

14          MR. FURMAN:  That's all I've ever seen.

15          THE COURT:  -- I'm not comfortable ordering them to

16   allow somebody to take the original medical records out of the

17   premises to copy them for that purpose.  I understand your

18   concerns and, you know, I'm not unsympathetic to them.  But if

19   it was something other than medical records, maybe I would do

20   it.  But, you know, these aren't their records.  They're

21   really the patient's records.

22          MR. MARKS:  Fine then.  Okay.  Well then, I just --

23   I only ask this then.  And I just think that we need to be

24   sensitive in terms of scheduling.  So at some point, I'm

25   probably going to be -- have to be back in front of the Court

129

1  to ask for some modification of scheduling based on this --

2          THE COURT:  That's fine, especially for this

3  purpose.

4          MR. MARKS:  And we'll have to proceed accordingly,

5  but based on the Court's ruling, that's how we'll proceed and

6  we'll address it at that time.

7          And the only other things that I would mention is

8  that I believe that on the Court's docket is the Les Levine

9  records that [indiscernible].  I remember you have -- I just

10 want to make sure for the record that you have only a sampling

11 which is not all of the records that are responsive to the

12 subpoena.  And I believe the way we left it was that you were

13 going to look at a sampling and then essentially give guidance

14 to Mr. Levine of I'm assuming presumably, this looks like it

15 might be privileged, this looks like it might -- in other

16 words, issue some sort of guidance that he could follow in

17 terms of what he does and what he doesn't do when he

18 ultimately complies with his subpoena so that we'll be hanging

19 out there.

20         So, that's --

21         MR. FISHER:  And you'll also recall the records

22 assurance, it's all confidential because he was working for me

23 and conducting an investigation under my direction and

24 control.  And, therefore, the documents are all privileged.

25         MR. MARKS:  I'm not going to start talking about

130

1  this again.  We disagree, but obviously not going to -- we've

2  taken enough of Your Honor's time so I'm not going to burden

3  you with that again other than we disagree.

4          So the only other thing I ask is so to the extent

5  that we have identified things that the professional

6  defendants are going to do, I'd ask that the Court set a date

7  by which those things will be done.  I'd like it to be shorter

8  rather than longer because we've been waiting a long time for

9  it, but I'm certainly -- it certainly needs to be a reasonable

10 amount of time because we'd like it to be done and not have to

11 be back here again so --

12         MR. FURMAN:  We agree we should not be back here

13 again.  However, as Mr. Marks well knows --

14         THE COURT:  Give me a date you can do it by.

15         MR. FURMAN:  I'm sorry; pardon me.

16         THE COURT:  Give me a date that you can do it by.

17         MR. FURMAN:  Third week in September.

18         THE COURT:  Okay.  Give me a realistic date that you

19 can do it by.

20         MR. FURMAN:  That is the realistic date, Your Honor.

21 That's how booked I am through at least the beginning of

22 September.  I'm not taking a vacation this year because I

23 don't have the time for it.  I have -- it's going to take me

24 some time.  We're talking about amending 38 sets of papers

25 here, and it didn't take me -- it took me a long time to do

1   all of these sets of interrogatories and I've said that to the

2   Court.  I'm just as interested in moving this along, believe

3   it or not.  This case has been pending a very long time.  But

4   I have to take into account my own personal schedule, and I

5   don't have anyone in my office working on this case with me or

6   willing.  Unlike Mr. Marks, I only have one person, so I'd

7   appreciate the consideration.

8           I mean I suppose we could do it the second week in

9   September, the 14th.  But I want it to go into September, and

10  I have just arranged yesterday to have a substantial brief due

11  on August 30th.  So I'm just -- I'm sorry, but I'm just very

12  booked up.

13          MR. MARKS:  Your Honor, I believe we have -- I don't

14  recall.  I think we currently have fact discovery cutoff

15  that's in September.  That's obviously going to have to be

16  adjusted --

17          UNIDENTIFIED SPEAKER:  No, I believe it's October.

18          MR. MARKS:  Is it October?

19          THE COURT:  I think it's October.

20          MR. MARKS:  I'm sorry.

21          THE COURT:  That's fine.  I think it might be very

22  early October.  To the extent -- look, obviously, we're going

23  to have to move things.  So why don't you confer and come up

24  with a new schedule and you can propose it because you're

25  still going to have to do all the depositions at this point,

132

1   so.

2           I'll give you September 13th, but I really don't

3   want to be back here in this.  So whatever you have, make sure

4   it's done by September 13th.

5           MR. FURMAN:  After spending four hours on this, let

6   me tell you that I have no desire to be back here on this.

7           THE COURT:  Not that I don't appreciate seeing all

8   of you, but how about coming back here for a settlement

9   conference or something --

10          MR. FURMAN:  Right.

11          THE COURT:  -- as opposed to this.

12          MR. FURMAN:  I appreciate your judicious rulings

13  today.

14          THE COURT:  Until the next time.

15          MR. FURMAN:  We will try to be -- we will make every

16  effort to be as cooperative as we can.  We normally do

17  cooperate with each other.

18          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

19          MR. MARKS:  Yeah.  I'll give you whatever you --

20          THE COURT:  Just do your best.  I understand

21  sometimes parties have [indiscernible].

22          MR. FURMAN:  And by the way, I mean, the next

23  skirmish is the Second Circuit with that, so.

24          THE COURT:  With what?

25          MR. FURMAN:  We're in the Second Circuit on the

133

1   appeal.

2           THE COURT:  Oh, yeah, yeah, yeah.

3           MR. FURMAN:  So my reply brief is now due April --

4   August 6th.  So I have a lot of State Farm of this case, State

5   Farm.

6   (Proceedings concluded at 3:34 p.m.)

7                       * * * * * *

134

1       I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                                                 _____

6                                    Shari Riemer, CET-805

7   Dated:   July 21, 2019

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25