## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

State Farm Mutual Automobile Insurance Company
and State Farm Fire and Casualty Company,

$\qquad$ Plaintiffs,

v.

Francois Jules Parisien, M.D.,                           Case No. 1:18-cv-00289-ILG-ST
Luqman Dabiri, M.D.,
Ksenia Pavlova, D.O.,
Noel Blackman, M.D.,
Frances Lacina, D.O.,
Allay Medical Services, P.C.,
FJL Medical Services P.C.,
JFL Medical Care P.C.,
JPF Medical Services, P.C.,
KP Medical Care P.C.,
PFJ Medical Care P.C.,
RA Medical Services P.C.,
Darren Mollo, D.C.,                                      **PLAINTIFFS DEMAND**
Darren Mollo D.C., P.C.,                                 **TRIAL BY JURY**
ACH Chiropractic, P.C.,
Energy Chiropractic, P.C.,
Island Life Chiropractic Pain Care, PLLC,
Charles Deng, L.A.c.,
Charles Deng Acupuncture, P.C.,
David Mariano, P.T.,
Maria Masigla a/k/a Maria Shiela Buslon, P.T.,
MSB Physical Therapy P.C.,
Maiga Products Corporation,
Madison Products of USA, Inc.,
Quality Custom Medical Supply, Inc.,
Allan L. Buslon,
Quality Health Supply Corp.,
Personal Home Care Products Corp.,
AB Quality Health Supply Corp.,
Tatiana M. Rybak, and
Oleg Rybak,

$\qquad$ Defendants.

## <u>SECOND AMENDED COMPLAINT</u>

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire"), for their Second Amended Complaint against Defendants, allege as follows:

## I.    NATURE OF THE ACTION

1.    This action seeks to recover money fraudulently obtained from State Farm Mutual and State Farm Fire through the submission of bills and supporting documentation that are fraudulent for examinations, treatment, testing, injections, and durable medical equipment provided to individuals who were involved in motor vehicle accidents and eligible for No-Fault benefits under State Farm Mutual or State Farm Fire insurance policies ("No-Fault Benefits"). The bills and supporting documentation that Defendants submitted or caused to be submitted to State Farm Mutual and State Farm Fire were fraudulent because the services were not eligible for reimbursement, not provided, and/or not medically necessary.

2.    The bills and supporting documentation are the product of a fraudulent, predetermined treatment protocol (the "Predetermined Treatment Protocol") administered to patients by providers at 1786 Flatbush Avenue in Brooklyn, New York ("1786 Flatbush"). Defendants did not design the Predetermined Treatment Protocol to legitimately examine, diagnose, and treat patients, but instead to enrich Defendants financially by exploiting the patients' No-Fault Benefits.

3.    The Predetermined Treatment Protocol involves:

(a)    initial examinations that are not legitimately performed to determine the true nature and extent of patient injuries, but rather are performed, if at all, as a pretext to report substantially similar and in some instances nearly identical examination findings to justify a variety of unnecessary treatment and services;

(b)    a treatment plan consisting of a combination of purported physical therapy modalities, chiropractic manipulations, and acupuncture, provided to almost every patient on almost every visit and often on the same dates of service, regardless of the unique circumstances and needs of each patient;

(c) employing particular treatments, modalities, and services not because they are clinically beneficial to the patients, but to maximize charges and avoid limitations on the amounts that can be charged under the applicable fee schedule;

(d) subjecting patients to medically unnecessary diagnostic tests, which include digital range of motion tests ("ROM Tests"), computerized muscle strength tests ("Muscle Tests"), nerve conduction velocity tests ("NCVs"), electromyography tests ("EMGs"), somatosensory evoked potential tests ("SSEPs"), brainstem auditory evoked potential tests ("BEPs"), functional capacity evaluations, and pain fiber nerve conduction studies ("V-sNCTx") (collectively, the "Tests");

(e) recommending and performing medically unnecessary trigger point injections and dry needling procedures;

(f) recommending and providing virtually identical bundles of medically unnecessary durable medical equipment ("DME") and orthotic devices (collectively, "Supplies"); and

(g) submitting documents to State Farm Mutual and State Farm Fire falsely representing that the examinations, treatment, Tests, injections, and Supplies purportedly rendered were medically necessary when, in fact, they either were not performed or were performed to exploit patients' No-Fault Benefits and not because they were medically necessary.

4. The Predetermined Treatment Protocol was rendered by a variety of providers, including:  (1) physicians — Francois Jules Parisien, M.D. ("Parisien"), Noel Blackman, M.D. ("Blackman"), Luqman Dabiri, M.D. ("Dabiri"), Ksenia Pavlova, D.O. ("Pavlova"), and Frances Lacina, D.O. ("Lacina"), and a series of entities purportedly owned by those providers, including Allay Medical Services, P.C. ("Allay"), JFL Medical Care P.C. ("JFL Medical"), FJL Medical Services P.C. ("FJL Medical"), JPF Medical Services, P.C. ("JPF Medical"), KP Medical Care P.C. ("KP Medical"), PFJ Medical Care P.C. ("PFJ Medical"), and RA Medical Services ("RA Medical") (collectively, the "Physician Defendants") who purportedly examined patients, diagnosed injuries to support treatment, and provided medically unnecessary medical care and Tests and who, for some patients, administered medically unnecessary trigger point injections and dry needling procedures; (2) chiropractors — Darren T. Mollo, D.C. ("Mollo") and others employed by or associated with him or entities purportedly owned by Mollo, including Darren

Mollo D.C., P.C. ("Mollo P.C."), ACH Chiropractic, P.C. ("ACH Chiropractic"), Energy Chiropractic, P.C. ("Energy Chiropractic"), and Island Life Chiropractic Pain Care, PLLC ("Island Life") (collectively, the "Chiropractor Defendants"), who purportedly examined patients, diagnosed injuries to support treatment, and provided medically unnecessary chiropractic care and Tests; (3) acupuncturists — Charles Deng, L.A.c. ("Deng") and others employed by or associated with him and Charles Deng Acupuncture, P.C. ("Deng Acupuncture") (collectively, the "Acupuncture Defendants"), who purportedly examined patients, diagnosed injuries to support treatment, and provided medically unnecessary acupuncture treatment, including cupping; (4) physical therapists working for the Physician Defendants, including David Mariano, P.T. ("Mariano"), Maria Masigla a/k/a Maria Shiela Buslon, P.T. ("Masigla"), MSB Physical Therapy P.C. ("MSB"), and others who administered medically unnecessary physical therapy services, including synaptic treatments and cold laser therapy (collectively, the "Physical Therapy Defendants"); and (5) providers of Supplies — Maiga Products Corporation ("Maiga"), Madison Products of USA, Inc. ("Madison"), Quality Health Supply Corp. ("Quality Health"), AB Quality Health Supply Corp. ("AB Quality"), Personal Home Care Products Corp. ("PHCP"), Quality Custom Medical Supply, Inc. ("Quality Custom"), and Allan L. Buslon ("Buslon") who purportedly owns Quality Health and AB Quality (collectively, the "DME Defendants"), which provided and billed for Supplies based on prescriptions issued by the Physician Defendants.

5.     As a result of the Predetermined Treatment Protocol, as well as the medically unnecessary examinations, treatment, Tests, injections, Supplies, and the improper conduct described above: (a) patients were not legitimately examined, diagnosed, and/or appropriately treated for conditions which they may have had; (b) patients were subjected to treatments for

conditions that they may not have had; and (c) patients' limited No-Fault Benefits were reduced and therefore not available for legitimate treatment that they may have needed as a result of their automobile accident.

6.     The professional service corporations through which healthcare services, including physician, chiropractic, and acupuncture services, Tests, and procedures were rendered and billed were owned on paper by licensed healthcare professionals.  Supplies were purportedly provided and billed by the DME Defendants owned on paper by Buslon, Maiga Borisevica ("Borisevica"), Oleksandr Semenov ("Semenov"), and others.  In fact, at all times, layperson Tatiana Rybak directed activity at 1786 Flatbush and orchestrated a scheme to:  (a) secretly and unlawfully own and control professional service corporations operating at 1786 Flatbush, (b) receive kickbacks from providers of healthcare goods and services at 1786 Flatbush disguised as payments for services or rent, (c) fraudulently bill for goods and services purportedly provided to patients at 1786 Flatbush that were not eligible for reimbursement and goods and services that were not medically necessary or not provided, and (d) cause profits generated by these fraudulent bills to be covertly funneled to or for the benefit of herself, Oleg Rybak, and other family members to conceal that they controlled and were the primary beneficiaries of these fraudulently obtained funds.

7.     Tatiana Rybak's son, Oleg Rybak, was admitted to the New York Bar in 2009 and from that time forward knowingly participated in, facilitated, supported, furthered, and profited from this scheme.  To facilitate, support, and further these common objectives, Oleg Rybak's actions and participation included:  (a) controlling the medical practice of a physician at 1468 Flatbush Avenue, the direct predecessor to 1786 Flatbush ("1468 Flatbush"), (b) covertly funneling the proceeds of activity at 1468 Flatbush to or for the benefit of himself, Tatiana

Rybak, and other family members, (c) exercising sufficient ownership and control over the activities and professional service corporations operating at 1786 Flatbush that two employees who worked there asserted the Fifth Amendment in response to questions about his ownership and control, (d) forming two of the DME Defendants with foreign-national nominee owners who may reside outside the United States and arranging to have their mail forwarded to his law office, (e) exercising control over the physical space in which the clinic at 1786 Flatbush operated through a lease that on paper was with one of his family members, (f) representing individuals who treated at 1786 Flatbush and who were in staged accidents to recover No-Fault Benefits and pursue claims and lawsuits for bodily injuries arising out of automobile accidents, (g) covertly funneling the proceeds of activity at 1786 Flatbush and the professional service corporations that operated there to or for the benefit of himself, Tatiana Rybak, and other family members, and (h) bringing thousands of claims and suits against insurers to recover payment for services provided to patients of 1786 Flatbush, supporting suits with fraudulent affidavits, and employing other tactics intended to disguise the scheme and the fraudulent nature of the claims, and to reap substantial profits.

8.    The professional corporations through which healthcare services were rendered and billed were owned on paper by licensed healthcare professionals, and the DME Defendants, which purportedly provided and billed for Supplies, were owned on paper by Buslon, Borisevica, and Semenov, among others.  In fact, at all times, layperson Tatiana Rybak owned, controlled, and/or profited from the medical professional corporations and DME Defendants, directed activity at 1786 Flatbush, and orchestrated the submission of fraudulent claims for healthcare services.  At all times, Tatiana Rybak's son, Oleg Rybak, a principal in the Rybak Law Firm, PLLC (the "Rybak Law Firm") participated in, advanced, enforced, and profited from the

scheme to submit fraudulent claims for healthcare services rendered at 1786 Flatbush. Both Tatiana Rybak and Oleg Rybak reaped substantial financial profits from activity at 1786 Flatbush, which they siphoned to themselves using intermediaries.

9.     Defendants' scheme began in August 2013 and has continued uninterrupted since that time. As a result of their scheme, State Farm Mutual and State Farm Fire have incurred damages of more than $1 million.

## II.     JURISDICTION AND VENUE

10.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq*. ("RICO") because they arise under the laws of the United States. Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

11.     In addition, pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over State Farm Mutual's and State Farm Fire's claims based on state law because the matter is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Defendants acted in concert pursuant to a common plan to commit the fraud alleged herein and are jointly and severally liable for the damages caused to State Farm Mutual and State Farm Fire in the amount of at least $1 million.

12.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

## III.     PARTIES

### A.     Plaintiffs

13.     State Farm Mutual is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York.

14.     State Farm Fire is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York.

**B.      Defendants**

**1.      The Rybak Defendants**

15.     Tatiana M. Rybak ("Tatiana Rybak" or "Tatiana") resides in and is a citizen of Florida.   Tatiana Rybak secretly and unlawfully owned, controlled, and profited from professional service corporations and DME Defendants that rendered services at 1786 Flatbush, directed activity at 1786 Flatbush, including determining the services that were rendered and who rendered them, and orchestrated the submission of fraudulent claims for healthcare services.

16.     Oleg Rybak is an attorney who resides in and is a citizen of New York.  Oleg Rybak is the founder and managing member of The Rybak Law Firm, PLLC, a law firm with its principal place of business in Brooklyn, New York.  Oleg Rybak became licensed to practice law in New York in 2009 and, from that time forward, knowingly participated in, facilitated, supported, furthered, and profited from the scheme to submit fraudulent claims for healthcare services rendered at clinics secretly and unlawfully owned and controlled by Tatiana Rybak, including 1786 Flatbush.

**2.      The Physician Defendants**

17.     Parisien resides in and is a citizen of New York.  Parisien is a licensed physician in New York.  Parisien's services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under his own tax identification number and through Allay, PFJ Medical, and JPF Medical.

18.     Blackman resides in and is a citizen of New York and is currently in the custody of the Federal Bureau of Prisons.  Blackman is a licensed physician in New York.  Blackman's

services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under his own tax identification number.

19.     Blackman has a history of professional misconduct.  Blackman was charged by the New York Board of Medicine with repeated negligence and failure to maintain accurate patient records relating to his treatment of three patients.  As the result of Blackman's negligence, the right arm of one of his patients had to be amputated.  On June 25, 2004, the Board placed Blackman on probation for two years, a condition of which required Blackman to practice medicine only when monitored by a board-certified physician approved by the New York State Department of Health Office of Professional Medical Conduct and to take a course in medical record keeping.

20.     More recently, on August 24, 2016, Blackman pled guilty to conspiracy to distribute oxycodone in violation of 21 U.S.C. § 841(a)(1) following his arrest by federal law enforcement officers for illegally prescribing vast amounts of painkillers, specifically prescribing 365,000 pills of the Schedule II narcotic oxycodone in 2015 alone.  Federal authorities removed Blackman from an international flight bound for Guyana and arrested him at John F. Kennedy Airport after they ordered the plane back to the terminal.  According to Blackman's prescription records, the 365,000 pills came from 2,487 prescriptions he wrote from multiple clinics in Franklin Square, Elmhurst, Queens, and Brooklyn from approximately June 2015 to February 2016.  Blackman waived his *Miranda* rights and told law enforcement agents that he saw 100 patients per day at a clinic for which he charged $300 per patient and estimated that he saw one patient every six minutes.  Blackman's secretary, Eva Torres, was also arrested on the same narcotics conspiracy charge, and she advised federal agents that an unnamed person would give her a list of names and Blackman would then write oxycodone prescriptions without examining

the patients, for which Blackman received $300 for each prescription.  In light of these charges, the New York Board of Medicine initiated an investigation during which Blackman agreed to an Interim Order of Conditions precluding him from practicing medicine in New York during the investigation.  Blackman pled guilty to conspiracy to distribute and possess with intent to distribute oxycodone and, on May 15, 2017, a judgment was entered against him sentencing him to, among other things, imprisonment for 50 months, and he was ordered to forfeit approximately $536,000.

21.     Dabiri resides in and is a citizen of New York.  Dabiri's services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under his own tax identification number.

22.     Dabiri is a physician specializing in obstetrics and gynecology whose license to practice medicine has been suspended in at least three jurisdictions, including New York.

23.     Dabiri started to practice medicine in England, where he obtained a restricted medical license in 1999 requiring that he practice under the supervision of a licensed physician. His restricted license in England was later suspended on two separate occasions in 2000.  Dabiri then moved to the United States and, in February 2009, obtained a restricted license to practice medicine that also required him to work under the supervision of a supervising physician.  In February 2013, the Florida Department of Health brought disciplinary proceedings against Dabiri for violating the terms of his limited license.  In June 2013, Dabiri entered into a consent agreement with the Florida Board of Medicine under which he was reprimanded for professional misconduct, ordered to pay a fine and costs, and his Florida license to practice medicine was suspended until he applied for reinstatement following an evaluation.

24.     On January 12, 2015, approximately eight months after his Florida license was suspended, Dabiri's license to practice medicine in New York was suspended through July 30,

2015, as a result of the Florida suspension. Following an evidentiary hearing, the State of New York Board for Professional Medical Conduct ("BPMC") found that Dabiri committed professional misconduct based on the Florida suspension under New York Education Law 6530(9)(d), which provides for disciplinary action if a licensee is subject to a disciplinary action in another state and the underlying conduct would give rise to disciplinary action in New York, and ordered that Dabiri's New York license be suspended until his Florida medical license was reinstated. The New York Department of Health appealed the hearing committee's decision to the Administrative Review Board ("ARB"), stating that the committee's penalty was "insufficient and places the public at risk." On May 27, 2015, the ARB ordered that Dabiri's New York license be suspended indefinitely "until such time as the Director of the Office of Professional Medical Conduct . . . determines [that Dabiri] can practice safely in New York" and also placed Dabiri on probation for five years following his reinstatement. The ARB noted that Dabiri had previously been disciplined in both England and Florida, and then left both jurisdictions to practice elsewhere, finding "such conduct presents a pattern and we find that pattern troubling." The ARB also noted that Dabiri had been practicing in New York in an unlicensed office setting, which permitted him to "practice with no supervision or oversight in [an office] setting, unlike practice in a licensed medical facility subject to State and Federal inspections and regulations requiring lines of supervision."

25.    Pavlova resides in and is a citizen of New York. Pavlova has been a licensed osteopathic physician in New York since 2009. While Pavlova is a doctor of osteopathic medicine and has never had an M.D. degree or held a license as a Medical Doctor, beginning in approximately April 2014, Pavlova began to falsely represent in some of her claims documentation submitted to State Farm Mutual or State Farm Fire that she held an M.D. license.

*See* Ex. 9.  Pavlova's services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under her own tax identification number, her social security number, Allay, and KP Medical and under Blackman's name.  Pavlova is married to Sergey Rybak, who is Tatiana Rybak's son and Oleg Rybak's brother.

26.     Lacina resides in and is a citizen of Florida.  Lacina is an osteopathic physician licensed to practice in Florida and New York.  Lacina's services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under his own tax identification number and through FJL Medical Services P.C., JFL Medical, RA Medical, and MSB.

27.     Allay is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  Allay was formed on June 29, 2015.  Pavlova is the sole original shareholder, director, officer, and incorporator of Allay.  Since its formation, Allay has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Parisien, Renee Denobrega, N.P. ("Denobrega"), and Sujanta Rangrao Dhone, P.T.

28.     FJL Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 2609 E. 14th Street, Ste. 323, Brooklyn, New York.  FJL Medical was formed on June 24, 2016.  Lacina is the sole original shareholder, director, officer, and incorporator of FJL Medical.  Since its formation, FJL Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Lacina.

29.     JFL Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 2609 E. 14th Street, Ste. 323, Brooklyn, New York.  JFL Medical was formed on September 23, 2016.  Lacina is the sole original shareholder,

director, officer, and incorporator of JFL Medical.   Since its formation, JFL Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Lacina and Denobrega.

30.     JPF Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 329 Surrey Drive, New Rochelle, New York. JPF Medical was formed on September 23, 2016.   Since its formation, JPF Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Parisien and Denobrega.

31.     KP Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 3000 Ocean Parkway, Ste. 8G, Brooklyn, New York.   KP Medical was formed on October 28, 2016.   Pavlova is the sole original shareholder, director, officer, and incorporator of KP Medical.   Since its formation, KP Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed by Parisien and Denobrega.

32.     PFJ Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York. PFJ Medical was formed on July 31, 2015.   Parisien is the sole original shareholder, director, officer, and incorporator of PFJ Medical.   Since its formation, PFJ Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Parisien, Denobrega, and others.

33.     RA Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York. RA Medical was formed on November 9, 2015.   Lacina is the sole original shareholder, director,

officer, and incorporator of RA Medical.  Since its formation, RA Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Lacina.

### 3.    The Chiropractor Defendants

34.    Mollo resides in and is a citizen of New York.  Mollo is a licensed chiropractor in New York.   Mollo is the purported owner of Mollo P.C., ACH Chiropractic, Energy Chiropractic, and Island Life.

35.    Mollo P.C. is a domestic professional corporation organized under the laws of New York with its principal place of business in East Northport, New York.  Mollo P.C. was formed on May 15, 2001.  Mollo is the sole original shareholder, director, and officer of Mollo P.C.

36.    ACH Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  ACH Chiropractic was formed on September 28, 2015.  Mollo is the sole original shareholder, director, officer, and incorporator of ACH Chiropractic.

37.    Energy Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  Energy Chiropractic was formed on October 26, 2016.  Mollo is the sole original shareholder, director, officer, and incorporator of Energy Chiropractic.

38.    Island Life is a domestic professional service limited liability company organized under the laws of New York with its principal place of business in Deer Park, New York.  Island Life was formed on September 2, 2010.  Mollo is the sole original member and manager of Island Life.

### 4.     The Acupuncture Defendants

39.     Deng resides in and is a citizen of New York.   Deng is licensed as an acupuncturist in New York and owns Deng Acupuncture.

40.     Deng Acupuncture is a domestic professional corporation organized under the laws of New York with its principal place of business in New York, New York.  It was formed on October 24, 2000.

### 5.     The Physical Therapist Defendants

41.     Mariano resides in and is a citizen of New York.  Mariano is a licensed physical therapist and owns DM Physical Therapy, P.C.  Mariano's services at 1786 Flatbush are billed to State Farm Mutual or State Farm Fire under the names and tax identification numbers of one or more of the Physician Defendants.

42.     Masigla resides in and is a citizen of Florida.  Masigla is a licensed physical therapist and owns MSB.  Masigla's services at 1786 Flatbush are billed to State Farm Mutual or State Farm Fire under the names and tax identification numbers of one or more of the Physician Defendants.

43.     MSB is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  It was formed on April 1, 2016.  Masigla is the sole original shareholder, director, officer, and incorporator of MSB.

### 6.     The DME Defendants

44.     Maiga is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  Maiga was formed on July 9, 2012, and is purportedly owned by Borisevica.

45.     Madison is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  Madison was formed on November 7, 2013, and is purportedly owned by Semenov.

46.     Quality Custom is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  Quality Custom was formed on March 31, 2011, and is purportedly owned by Vladimir Verbitsky.

47.     Buslon resides in and is a citizen of Florida.  Buslon owns on paper at least two DME Defendants, Quality Health and AB Quality, and has also purportedly acquired an ownership interest in any outstanding unpaid claims of Maiga, Madison, and PHCP.  Buslon is married to Masigla.

48.     Quality Health is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  Quality Health was formed on June 3, 2015, and is purportedly owned by Buslon.

49.     PHCP is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  PHCP was formed on March 26, 2015.  Valentyna Diker is the incorporator of PHCP.

50.     AB Quality is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  AB Quality was formed on July 19, 2016, and is purportedly owned by Buslon.

IV.     **ALLEGATIONS COMMON TO ALL COUNTS**

    A.     **The New York No-Fault Laws**

        1.     **Claims for Payment Under the No-Fault Laws**

51.     State Farm Mutual and State Farm Fire underwrite automobile insurance in New York.

52.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101 *et seq.*) and the regulations promulgated thereto (11 N.Y.C.R.R. § 65 *et seq.*) (collectively, the "No-Fault Laws"), automobile insurers are required to provide No-Fault Benefits to insureds.

53.     No-Fault Benefits include up to $50,000 per insured for necessary expenses incurred for various healthcare goods and services.

54.     An insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to insurance companies and receive payment for necessary medical services.

55.     Pursuant to Section 403 of the New York State Insurance Law, the verification of treatment form submitted by healthcare providers to State Farm Mutual, State Farm Fire, and all other insurers must be signed by the healthcare providers subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**2.     The No-Fault Laws Prohibit Ownership of Professional Service Corporations by Unlicensed Laypersons**

56.     The New York Legislature has established a comprehensive statutory framework, including the Business Corporation, Education, and Public Health Laws, to ensure that professional healthcare services are rendered only by individuals who are duly licensed to practice those professions and that such individuals are employed only by entities that are themselves lawfully licensed or otherwise legally authorized to provide such services.  This legal framework bars individuals who are not subject to state professional licensing requirements and

ongoing regulatory oversight from controlling, exercising undue influence over, or deriving economic benefit from the practice of a profession.

57.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they are fraudulently incorporated.  In New York, only a licensed healthcare professional may practice an applicable healthcare profession; own and control a professional service corporation authorized to practice healthcare services including medicine, chiropractic, acupuncture, and physical therapy; employ and supervise other healthcare professionals; and, absent statutory exceptions, derive economic benefit from the services.

58.     Recognizing the fundamental importance of these laws prohibiting the corporate practice of medicine in safeguarding the public health, safety, and welfare, the New York Legislature has made it a felony offense for anyone to deliberately circumvent these laws, as well as an act of professional misconduct for any licensed individual or professional service corporation to do so.  *See* N.Y. Bus. Corp. Law §§ 1203(b), 1503(b), 1507, 1508, 1511; N.Y. Educ. Law §§ 6507(4)(c), 6512, 6530(1) & (21); 8 N.Y.C.R.R. § 29.1(b)(6); Penal Law Article 175; N.Y. Ltd. Liab. Co. Law § 1201 *et seq.*

59.     Consistent with the public policies underlying New York's ban on the corporate practice of medicine, the No-Fault Laws also prohibit professional corporations that are secretly owned and controlled by laypersons from receiving No-Fault Benefits for professional health services.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

### 3.     The No-Fault Laws Prohibit Kickbacks

60.     Under New York law, it is unlawful for any physician, chiropractor, acupuncturist, or physical therapist, directly or indirectly, to offer, give, solicit, receive, or agree to receive any fee or other consideration to or from a third party for the referral of a patient or in

connection with the performance of professional services. *See* N.Y. Educ. Law § 6530(18); 8 N.Y.C.R.R.  § 29.1(b)(3).

61.     Under New York law, it is unlawful for a licensed physician, chiropractor, acupuncturist, or physical therapist to exercise undue influence on a patient, including the promotion or sale of goods or services in such a manner as to exploit the patient for the financial gain of the physician or of a third party. *See* N.Y. Educ. Law § 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

62.     Under New York law, it is unlawful for a physician, chiropractor, acupuncturist, or physical therapist to share professional fees, including arrangements where payments are made in exchange for furnishing space, facilities, equipment, or personal services, including any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment, or personal services used is dependent upon the income or receipts of the licensee from such practice. *See* N.Y. Educ. Law § 6530(19); 8 N.Y.C.R.R. § 29.1(b)(4).

63.     Under New York Public Health Law Section 238-a, a practitioner authorized to order physical therapy services may not make a referral for such services to a healthcare provider authorized to provide such services where such practitioner has a financial relationship with such healthcare provider. *See also* 10 N.Y.C.R.R. § 34-1.3; N.Y. Pub. Health Law § 238(6) ("'Health care provider' shall mean a practitioner in an individual practice, group practice, partnership, professional corporation or other authorized form of association, . . . and any other purveyor of health or health related items or services . . . a purveyor of health or health related supplies, appliances or equipment . . . ."). A financial relationship includes a compensation arrangement and includes an arrangement with a healthcare provider that is in excess of fair market value or

which provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties. *See* N.Y. Pub. Health Law §§ 238(3) & 238-d.

64.     Under New York law, it is unlawful for a physician, chiropractor, or physical therapist to make a referral for certain services to a healthcare provider where the physician or chiropractor has a compensation arrangement with the healthcare provider that either exceeds fair market value or that provides compensation that varies directly or indirectly on the value of referrals without disclosing the relationship to the patient. *See id.* § 238-d(1)(b).  Any disclosure must not only reveal to the patient the existence of the financial relationship, but must also inform the patient of her right to use a "specifically identified alternative" healthcare provider. *See id.*   § 238-d(2).   Any violation of Public Health Law Section 238-d by physicians also constitutes professional misconduct under New York Education Law Section 6530(48).

**4.     Services Rendered in Violation of New York Law Are Not Reimbursable**

65.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), states in relevant part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

66.     Thus, any violation of a licensing law in connection with services provided to patients would render the provider ineligible for reimbursement under the No-Fault Laws, and under the circumstances, it would be unlawful and inequitable to allow any party to any arrangement that violated such licensing laws to retain any benefit from such arrangement. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

67.     If any defendant violated any of the licensing laws described above in connection with the services at issue in the claim described herein, then such defendant would be ineligible

for reimbursement under the No-Fault Laws, and under the circumstances, it would be unlawful and inequitable to allow such defendant or any defendant who was a party to such arrangement to retain any benefits from such arrangement.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

### 5.    New York Law Authorizes Taking Examinations Under Oath

68.    Also, New York Law allows an insurer to request that a provider appear for an examination under oath ("EUO"), and the failure of a provider to appear for a timely requested EUO constitutes a breach of a condition precedent to coverage, rendering it ineligible for No-Fault Benefits.  *See* 11 N.Y.C.R.R. § 65-1.1 (providing that the Mandatory Personal Injury Protection Endorsement shall contain the following language:  "upon request by the [insurer] the eligible injured person or that person's assignee . . . shall: . . . (b) as may reasonably be required, submit to an examination under oath"); *Hertz Corp. v. Active Care Med. Supply Corp.*, 1 N.Y.S. 3d 43, 45 (N.Y. App. Div. 2015) ("defendants' failure to attend the EUOs is a violation of a condition precedent to coverage that vitiates the policy").

### B.    The Rybaks' Involvement in Medical Clinics in New York

69.    In 1994, Tatiana Rybak moved to the United States from Ukraine — where she and her former husband owned a business that provided supplies to hospitals and employed over 2,000 people — after becoming wanted for arrest on embezzlement charges.

70.    Shortly after moving to the United States, in the mid-to-late 1990s, Tatiana Rybak became involved with medical clinics that provide services to individuals who have been injured in automobile accidents ("No-Fault Clinics") and that submit fraudulent claims for reimbursement to insurance carriers.  Later, by at least 2009, her son Oleg Rybak became involved as well.  The history of these earlier clinics run by the Rybaks is notable because 1786 Flatbush was their successor and the same methods employed to unlawfully own, control, and

21

profit from the earlier clinics were used to unlawfully own, control, and profit from 1786 Flatbush.

71.     As described next, from approximately 1996 through 1999, Tatiana Rybak and others unlawfully owned and controlled No-Fault Clinics that operated out of at least four New York locations.  From approximately 2000 until the fall of 2013, Tatiana Rybak and others unlawfully owned and controlled a No-Fault Clinic at 1468 Flatbush Avenue in Brooklyn.  Oleg Rybak participated in, facilitated, and profited from the operation of 1468 Flatbush.  When 1468 Flatbush ceased operations, its activities moved to 1786 Flatbush.

### 1.     Tatiana Rybak Owned and Controlled Clinics at Multiple New York Locations in the Late 1990s

72.     After arriving in New York, Tatiana Rybak met Paul Schneider ("Schneider") and together they opened several businesses, including a grocery store, an imported fashion boutique, and two healthcare businesses — TMR Medibill, Inc. ("TMR") and Paultat Alert Management Corp. ("Paultat").   TMR, formed in 1996, purportedly provided billing and collection services to healthcare providers.   Paultat, according to an affidavit signed by Schneider, provided "management support services" for healthcare professionals, which included operating healthcare facilities, paying rent and utility costs, supplying personnel, recruiting and hiring staff, patient intake, "appointments, scheduling of patients, storage of patient records, assistance in developing fee schedules as well as the development and implementation of computerized billing systems," communicating "with all suppliers, third-party payors," and "collect[ing] . . . funds on behalf of the doctors for all professional services performed by the doctors."  "In short," Schneider stated, "Paultat assists the physicians in the general management of medical facilities, and deals with all business aspects therein."

73.     TMR and Paultat purported to provide services to professional corporations operating at 1300 Flatbush Avenue, Brooklyn, and 2320 Avenue U, Brooklyn.  In addition, Schneider and Tatiana Rybak also operated clinics at 1932 Rockaway Parkway, Brooklyn, and 190-02 Jamaica Avenue, Hollis, New York.  The clinics operating at 1300 Flatbush Avenue, 2320 Avenue U, 1932 Rockaway Parkway, and 190-02 Jamaica Avenue are referred to as the "Original Clinic Locations."

74.     Schneider and Tatiana Rybak owned the real estate at the Original Clinic Locations.  By February 1999, however, Schneider had transferred his interest in all but one of the four properties to Tatiana Rybak.  Tatiana Rybak's ability to control the physical space at which a No-Fault Clinic operated was an important component of her schemes over the years, and a feature that would be repeated, though with modifications, at later clinics.

75.     Yet another component of the scheme was the establishment of professional service corporations through which services could be rendered and billed to insurers. The professional corporations appeared to be owned on paper by licensed healthcare professionals. Operating at the Original Clinic Locations were a series of medical professional corporations owned on paper by Dr. Robert Mallela and Dr. Jatindr Bakshi.

76.     According to an affidavit signed by Tatiana Rybak, almost all of the revenues of Paultat and TMR (the purported healthcare management businesses owned by Tatiana Rybak and Schneider) came from the professional corporations owned by Dr. Bakshi and Dr. Mallela.  In his affidavit, Schneider stated that medical practices managed by Paultat produced gross billings of $20 million per year, resulting in income to Paultat for its services of $4 million per year.

77.     The activity at the Original Clinic Locations between approximately 1996 to approximately 1999 resulted in a series of criminal, disciplinary, and other legal proceedings that

established, among other things, that professional healthcare corporations operating at these addresses had submitted fraudulent insurance claims and that professional healthcare corporations at these addresses were not owned and controlled by the licensed healthcare professionals who purportedly owned them on paper but by laypersons, including Tatiana Rybak. These proceedings included:  (a) a civil suit between Tatiana Rybak and Schneider over the ownership and control of Paultat (*Paul Schneider v. Tatiana Rybak, et al.*, Index No. 98-018835 (Nassau Cty., N.Y. Aug. 14, 1998)); (b) disciplinary proceedings in which the New York Office of Professional Medical Conduct ("OPMC") restricted Dr. Bakshi's medical license based on multiple "failures to take adequate patient histories, keep accurate records and record information regarding referrals" (*In re Jatinder S. Bakshi v. N.Y. State Dep't of Health*, Case No. 505720 (N.Y. App. Div. Mar. 11, 2010)); (c) OPMC disciplinary proceedings against Dr. Mallela in which he was required to surrender his medical license in June 2005 after he admitted to fraudulently incorporating his professional corporation and allowing it to be controlled by non-licensed individuals (*see* Jan. 8, 2005 Surrender Order, *In re Robert Chandran Mallela, M.D.*, No. 05-07, N.Y. Bd. Prof'l Med. Conduct); (d) a June 1999 140-count indictment returned by a Kings County Grand Jury against Tatiana Rybak, and several others, based, among other things, on activity at the Original Clinic Locations that charged Tatiana Rybak with Enterprise Corruption, insurance fraud, and fraudulently billing for medically unnecessary evaluations and therapy services, DME, and diagnostic testing services; (e) an October 1999 guilty plea by Tatiana Rybak to charges of attempted Enterprise Corruption in violation of N.Y. Penal Law 460.20(1)(a), participation in a scheme to defraud in the first degree in violation of N.Y. Penal Law 190.65(1)(a), and twelve counts of insurance fraud in violation of N.Y. Penal Law 176.05(1); (f) a January 2000 lawsuit by Allstate Insurance Company and other insurers alleging

RICO and other claims against Tatiana Rybak, Schneider, Dr. Bakshi, Dr. Mallela, and several other healthcare providers to recover more than $5 million arising out of activity at the Original Clinic Locations (*Allstate Ins. Co., et al. v. TMR Medibill Inc., et al.*, No. 2000-cv-00002-NGG-VVP (E.D.N.Y.)) (the "Allstate Case"); and (g) an August 2000 lawsuit by State Farm Mutual against Tatiana Rybak, Schneider, Dr. Mallela, and several others alleging that unlicensed defendants Tatiana Rybak and Schneider falsely used the names of the licensed defendants to fraudulently incorporate professional corporations and, as a result, the professional corporations were not entitled to reimbursement.  *State Farm Mut. Auto. Ins. Co. v. Robert Mallela, et al.*, Case No. 2000-cv-04923-CPS (E.D.N.Y.); *see State Farm Mut. Auto. Ins. Co. v. Mallela*, 175 F. Supp. 2d 401 (E.D.N.Y. 2001).

78.    These proceedings established that Tatiana Rybak had orchestrated what the District Judge in the Allstate Case called an "elaborate and sophisticated insurance fraud scheme."  The news media, in commenting on the proceedings, described Tatiana Rybak as the "city's reigning czarina of auto-insurance fraud" who "was motivated by money, and everything she did was intended to generate more and more cash" to furnish her lavish lifestyle of luxury apartments, yachts, Mercedes Benz automobiles, and expensive diamond jewelry.  *Czarina' Reigned Over Insure Scams – Rip-Offs Kept Her in Gems & Yachts*, N.Y. Post (June 26, 2000).

79.    As Tatiana Rybak admitted in her criminal guilty plea and as several courts found in civil proceedings, Tatiana Rybak along with others unlawfully owned and controlled the professional corporations operating at the Original Clinic Locations.  *State Farm Mut. Auto. Ins. Co. v. Mallela*, 175 F. Supp. 2d 401, 405 (E.D.N.Y. 2001) ("On October 27, 1999, Rybuk [*sic*] pled guilty in New York State court to the felonies of attempted enterprise corruption, a scheme to defraud, and twelve counts of insurance fraud and admitted that she owned and controlled

several unlawfully licensed professional service corporations, including defendants Avenue U [Medical Services, P.C.], Canarsie [Medical Services, P.C.], and Flatbush [Medical Services, P.C.]"); Jan. 8, 2005 Surrender Order at 3, *In re Robert Chandran Mallela, M.D.*, No. 05-07, N.Y. Bd. Prof'l Med. Conduct ("Respondent directed and/or allowed non-physicians to establish, control, and operate Avenue U Medical Services, P.C., unlawfully"); *Allstate Ins. Co. v. TMR Medibill Inc.*, 2000 WL 34011895, at *4 (E.D.N.Y. July 13, 2000).  When he surrendered his license in January 2005, Dr. Mallela admitted to practicing medicine with intent to defraud insurance companies in proceedings that included charges that he had engaged in "concerted actions with non-physicians to allegedly establish, control and operate . . . professional medical corporation[s]."  He also signed an affidavit stating that Tatiana Rybak "owned" three medical professional corporations at the Original Clinic Locations.

80.     In particular, Tatiana Rybak entered into arrangements with doctors like Dr. Bakshi, Dr. Mallela, and Dr. Zenaida Amayo Reyes-Arguelles ("Dr. Arguelles"), who were not board certified in any specialty.  These physicians formed professional medical corporations that they purported to own on paper.  Paultat and TMR, or other entities, would purport to perform services for the professional service corporations in exchange for fees, but payments to Paultat and TMR far exceeded the value of any services.

81.     Tatiana Rybak and others used Paultat and TMR to secretly siphon to themselves profits from the professional medical corporations that they unlawfully owned and controlled. Some profits were siphoned under the guise of management agreements between purported managers and the professional healthcare corporations owned on paper by licensed physicians or purportedly to pay for the "rent" of space at the No-Fault Clinic.  Thus, for example, Paultat and TMR had entered into Management and Assistant Agreements with, at least, Mallela Robert

26

Chandran Radiological Services, P.C., Mallela Chandran Radiology Services, P.C., and Bakshi Medical Services.   Under these agreements, and according to Schneider's affidavit, the professional corporations paid for services under a fee schedule in which they were charged an hourly rate for all services, as well as an hourly rate for rent.  There is no legitimate reason why professional corporations would pay rent on an hourly basis.

82.     The district court in the Allstate Case, in granting a preliminary injunction to block the dissipation of assets pending trial, observed that a significant amount of money flowed from the medical clinics operating at the Original Clinic Locations to realty companies controlled by Tatiana Rybak.  *TMR Medibill*, 2000 WL 34011895, at *11.  The district court found that Tatiana Rybak's explanation that these payments were for rent was "suspect," because cancelled checks indicated that the amounts paid in "rent" could fluctuate as much as $5,000 from month to month and none of the clinics had lease agreements with the realty companies. *Id.*  In reaching this conclusion, the district court considered that Tatiana Rybak arranged for checks from insurers payable to the professional corporations to be delivered to a post office box she controlled, and then deposited into the professional corporations' respective bank accounts, which were all maintained at the same branch of Chase bank.  *Id.* at *4.  The court also found that after Tatiana Rybak became aware of the criminal case against her, she caused the professional corporations she controlled to "funnel[] money from the fraud scheme into the realty companies' coffers."  *Id*. at *16.  Similarly, the district court found that Tatiana Rybak had engaged in suspicious transactions to conceal her assets to avoid the insurers' efforts to attach those properties.   For example, Tatiana Rybak sold her apartment "under suspicious circumstances."

83.     An element of the scheme charged in the indictment involved the use of multiple professional healthcare corporations that operated under different names and "changed [their] names to defraud insurance carriers into believing that newly named clinics were independent of each other." *New York v. Tatiana Rybuk, et al*., Indictment No. 427099 (Kings Cty. N.Y. June 20, 1999) ¶ 6 ("Indictment").  The practice of setting up multiple corporations in the names of licensed healthcare professionals and then rendering healthcare services through multiple corporations with different names and tax identification numbers to conceal their connections was a component of the scheme that would be repeated through later No-Fault Clinics, including 1786 Flatbush.

84.     According to the Indictment and Tatiana Rybak's guilty plea, patients were obtained through payments to persons known as "steerers" who brought individuals who had purportedly been in automobile accidents to the clinics to be treated as patients.

85.     The clinics, as Tatiana Rybak admitted in her guilty plea, submitted fraudulent insurance claims that included, among other things, falsified physical therapy progress notes and false bills and records for nerve block injections and DME.  As the district court described in the Allstate Case, "defendants billed patients for medical visits, procedures, and diagnostic tests that were either never rendered or were medically unnecessary; altered test dates and results to justify extensive physical therapy and diagnostic testing; created false physical therapy progress notes reflecting treatments that were never rendered; and submitted fraudulent wholesale invoices to verify DME sales." *TMR Medibill*, 2000 WL 34011895, at *4.

86.     In October 1999, Tatiana Rybak entered a guilty plea in the criminal case, was sentenced to five years' probation, was ordered, among other things, to pay $1 million in restitution, and agreed she would "not engage in any employment related to the insurance

industry, including no-fault insurance, personal injury or health insurance" for a period of five years.  Ex. 10.

### 2. Tatiana Rybak Secretly and Unlawfully Owned and Controlled 1468 Flatbush Avenue

87.    Although Tatiana Rybak's criminal sentence prohibited any employment related to the No-Fault insurance industry for five years, within months of her 1999 guilty plea, Tatiana Rybak began to secretly and unlawfully own and control another clinic treating patients eligible for No-Fault Benefits located at 1468 Flatbush, Brooklyn, just a few blocks from the 1300 Flatbush Avenue location charged in the indictment.  The clinic at 1468 Flatbush operated from at least early 2000 until approximately August 2013.  By at least 2009, Oleg Rybak knowingly participated in, facilitated, and profited from activity at 1468 Flatbush.

88.    As at the Original Clinic Locations, at 1468 Flatbush, services were rendered through professional service corporations owned on paper by licensed healthcare professionals. In fact, those licensed healthcare professionals did not own or control their practices.  Rather, Tatiana Rybak secretly and unlawfully owned and controlled the professional corporations operating out of 1468 Flatbush with the support of Oleg Rybak, and profits were siphoned to Tatiana and Oleg Rybak through a variety of means.  The licensed physicians who operated at 1468 Flatbush included Dr. Jaime Gabriel Gutierrez ("Dr. Gutierrez"), Dr. Jean-Claude Compas ("Dr. Compas"), and Dr. Arguelles, who was one of the physicians who Tatiana Rybak admitted to criminally conspiring with in her 1999 guilty plea.

a.   **The Rybaks Controlled the Practice of Dr. Gutierrez at 1468 Flatbush**

89.     As Dr. Gutierrez explained in testimony[1] regarding his medical practice at 1468 Flatbush, his medical professional corporations billed for services there, and the proceeds they generated were controlled by the Rybaks.

90.     Dr. Gutierrez was trained as a plastic surgeon, and from 2006 to 2009, performed Botox injections, laser, and other cosmetic surgery procedures at Miami health spas.  *See* BPMC Hr'g Tr., Nov. 21, 2016, *In the Matter of Jaime Gabriel Gutierrez*.

91.     One Miami cosmetic surgery spa at which Dr. Gutierrez worked was the Anti-Aging Aesthetic and Laser Center Inc., ("Anti-Aging Spa") which was owned by Oleg Rybak. Tatiana Rybak worked there as a facial specialist.  Dr. Arguelles was the medical director.

92.     At the Anti-Aging Spa, Dr. Gutierrez met Tatiana Rybak and Dr. Compas, who was also treating patients at 1468 Flatbush in Brooklyn.  Dr. Compas encouraged Dr. Gutierrez to come to New York to treat automobile accident patients at 1468 Flatbush.

93.     Although Dr. Gutierrez's training and background were in plastic surgery, in January 2011, Dr. Gutierrez began traveling from Miami to Brooklyn to treat automobile accident patients at 1468 Flatbush.  Initially, he treated patients and submitted bills under his own name and social security number, but in April 2011 and September 2011, respectively, formed Alleviation Medical Services P.C. ("Alleviation") and JGG Medical Care P.C., both of which Dr. Gutierrez owned on paper.  Dr. Gutierrez began submitting bills to insurance companies through Alleviation.

---

[1] Dr. Gutierrez offered sworn testimony both before the BPMC and in a separate civil lawsuit in Bronx County Supreme Court (*see infra* ¶¶ 95–101) in which he detailed the operations at 1468 Flatbush and described the roles of Tatiana Rybak and her son, attorney Oleg Rybak.

94.     Dr. Gutierrez testified that he did not know how to prepare New York No-Fault bills because he had been practicing a different field of medicine in a different state.  Thus, Dr. Compas directed him to speak to the Rybak Law Firm, for which Oleg Rybak was the principal.  Dr. Gutierrez entered into a billing arrangement with the Rybak Law Firm.   Under the arrangement, the Rybak Law Firm handled Dr. Gutierrez's billing in exchange for 7% of his collections.  Dr. Gutierrez said he worked with a Rybak Law Firm employee, Natasha a/k/a Natalya Tokar ("Tokar").  According to Dr. Gutierrez, Tokar was responsible for managing and overseeing the billing operations on behalf of the Rybak Law Firm.

95.     Dr. Gutierrez testified that, at some point, the "Rybak Firm . . . pretty much ended up being controlling [*sic*] my whole practice, and that's not okay."  When asked if he owned his professional healthcare corporation Alleviation, Dr. Gutierrez testified, "I was under the impression that I had full control of the corporation when in reality I was not in full control.  And I was living under an illusion of control, meaning that Natasha [Tokar, an employee of the Rybak Law Firm] was actually overseeing my billing and making decisions on my behalf without informing me what she was doing . . . by the order of Oleg Rybak, as I had been assured by Natasha herself."

96.     Dr. Gutierrez explained that the Rybak Law Firm prepared his bills and both the firm and Tatiana Rybak exercised control over the reimbursements he received from insurers for the healthcare services provided to patients.  Checks from insurers were sent to a mailbox at Mailboxes, Etc., in Brooklyn, which Dr. Gutierrez established with Tatiana Rybak.   Dr. Gutierrez said he drove with Tatiana Rybak and her son Sergey to rent the mailbox, which Dr. Gutierrez paid for using an HSBC credit card that an HSBC Bank branch manager with whom Tatiana Rybak had a relationship, Lystra Moore-Besson ("Moore-Besson"), had helped him

open.  Dr. Gutierrez testified that he gave keys to the mailbox to Tokar and that the Rybak Law Firm had access to the mailbox and collected and deposited his checks.

97.     In 2011, Dr. Gutierrez opened a billing office for what was purportedly his healthcare corporation, Alleviation, that was adjacent to the office of the Rybak Law Firm. Alleviation's employees were supervised by Tokar.  In summer 2012, when the Rybak Law Firm moved its office, Dr. Gutierrez allowed the firm to take his medical practice's records to the firm's new offices.  Tatiana Rybak and Oleg Rybak also arranged for CPA Norman Weisman to serve as the accountant and prepare the tax returns for Dr. Gutierrez and his professional corporations, which Weisman did using information provided by Tokar.

### b.    Dr. Gutierrez Testified that the Rybaks Controlled the Proceeds of His Practice at 1468 Flatbush

98.     Dr. Gutierrez also testified about how Tatiana Rybak, Oleg Rybak, and the Rybak Law Firm exercised control over the funds received by his practice.  Specifically, Tokar, an employee of the Rybak Law Firm, instructed Dr. Gutierrez to write checks to various individuals purportedly for employee payroll or other practice expenses.  Dr. Gutierrez agreed to provide Tokar with a checkbook containing checks that Dr. Gutierrez had already pre-signed with his signature.  Dr. Gutierrez also testified that many of the checks he wrote were given by Tokar to Tatiana Rybak, who used her connection at HSBC Bank, branch manager Moore-Besson, to arrange for tellers to cash the checks.  Branch manager Moore-Besson testified in her deposition that she has known Tatiana Rybak since the 1990s.  According to records from the securities regulatory agency FINRA, Moore-Besson was terminated by HSBC in 2016 and later permanently barred from the securities industry for failing to respond to a FINRA inquiry after HSBC reported that it "determined that [she] exercised poor judgment in failing to escalate

suspicious activities engaged in by these bank clients to which she was aware." Moore-Besson testified that the HSBC investigation that led to her termination concerned the Rybak family.

99.     Dr. Gutierrez testified that Oleg Rybak requested that Dr. Gutierrez write checks as gifts, including to another attorney with whom Oleg Rybak was associated. He also stated that Tokar mailed checks drawn on accounts of Dr. Gutierrez's professional corporations to Tatiana Rybak in Florida. At one point, Dr. Gutierrez testified that he saw Tatiana Rybak with Dr. Compas's checkbook and that she evaded his questions about why she had it.

100.     In September 2012, Dr. Gutierrez testified that while vacationing in Aruba with the office manager of 1468 Flatbush, Pavel Soltanov, and a TD Bank employee and their respective spouses, he was told by Soltanov that checks from insurance companies payable to healthcare providers for services at 1468 Flatbush were flown from New York to Florida and cashed there. At that point, after flying back from Aruba to New York, Dr. Gutierrez began taking steps to disassociate himself from Tatiana Rybak and Oleg Rybak.

101.     On April 7, 2014, Dr. Gutierrez filed a civil lawsuit against Oleg Rybak, the Rybak Law Firm, and others in Bronx County Supreme Court. *See Jaime Gutierrez, et al. v. Oleg Rybak, et al.*, Index No. 260257-0214 (Bronx Cty. N.Y.) (hereinafter "*Gutierrez v. Rybak*"). Dr. Gutierrez sought an accounting of any escrow funds held by the Rybak Law Firm, a return of any business records, and an order voiding any liens over funds asserted by Rybak. The *Gutierrez v. Rybak* lawsuit alleged that between 2011 and 2012, the Rybak Law Firm filed numerous lawsuits on behalf of Dr. Gutierrez and collected "millions" of dollars, but had not paid the funds to Dr. Gutierrez. The suit also alleged that when the Rybak Law Firm moved offices in 2012, it took Dr. Gutierrez's patient records and never returned them. According to the docket, the case was dismissed in December 2018.

        c.        **Tatiana Rybak Controlled the Practice of Dr. Arguelles at 1468 Flatbush and the Rybaks Siphoned the Proceeds of that Practice to Themselves**

102.    In addition to Dr. Gutierrez, another physician who treated patients at 1468 Flatbush was Dr. Arguelles.  As noted above, in the mid-1990s, Dr. Arguelles had treated patients at least at one of the Original Clinic Locations secretly and unlawfully owned and controlled by Tatiana Rybak, was one of the physicians with whom Tatiana Rybak admitted to criminally conspiring in her 1999 guilty plea, and was the medical director of the Anti-Aging Spa owned by Oleg Rybak.

103.    Dr. Arguelles owned on paper three professional healthcare corporations that purported to treat patients at 1468 Flatbush, but, in fact, these entities were secretly and unlawfully owned and controlled by Tatiana Rybak and the profits siphoned to Tatiana Rybak and Oleg Rybak.  Dr. Arguelles was the paper owner of (a) Uptodate Medical Services P.C. ("Uptodate Medical"), formed in August 1999, (b) Vincent Medical Services P.C. ("Vincent Medical"), formed in July 2004, and (c) Arguelles M.D., P.C. ("Arguelles P.C."), formed in July 2006.

104.    Dr. Arguelles was approximately 68 years old in 1999 when she began treating patients at 1468 Flatbush, and approximately 75 years old by 2006 when the last of these three professional corporations was formed.

105.    In 2011, the OPMC disciplined Dr. Arguelles for billing for services not rendered, billing unwarranted and excessive medical services, making false reports, and improper record keeping at 1468 Flatbush.  In October 2011, Dr. Arguelles surrendered her license for five years based on 54 counts of misconduct.

106.    In a 2012 lawsuit, GEICO alleged that on June 30, 2011 and July 19, 2011, Dr. Arguelles gave testimony reflecting that she was unaware of many facts she should know if she

actually owned and controlled her professional service corporations operating at 1468 Flatbush, Arguelles P.C. and Vincent Medical.  In particular, she testified that she did not know when her businesses at 1468 Flatbush opened, who incorporated them, whether they had written leases for the use of space, the amount of rent they paid, whether other providers operated at the location, the amount of overhead costs, the names of employees, the amount of profits, the location of the checkbook, or the names of the chiropractors who operated at the location and how much they paid in rent.  *See Gov't Emps. Ins. Co. v. Zenaida Reyes-Arguelles, M.D. et al.*, Case No. 1:12-cv-01953-CBA-RLM (E.D.N.Y.), Compl. ¶¶ 41, 58 (Dkt 1).

### d.    Dr. Compas Was Forced to Surrender His Medical License Over Practices at 1468 Flatbush

107.    Dr. Compas was also disciplined by OPMC and forced to surrender his license in January 2015 for his work at 1468 Flatbush based on his having submitted insurance claims for NCVs that deviated from medically accepted standards.

### e.    Bank Records Reflect that Tatiana and Oleg Rybak Siphoned Proceeds from the Medical Practices at 1468 Flatbush

108.    Bank records reflect that Tatiana Rybak, Oleg Rybak, and others siphoned to themselves the proceeds from the professional service corporations that operated at 1468 Flatbush.  In particular, Tatiana and Oleg Rybak owned and own residences, businesses, and real estate in Florida, including units at the Fontainebleu Hotel in Miami, units at the Oceania V in Sunny Isles, Florida, the Anti-Aging Spa, and a restaurant in Florida known as the Rybak Café.  Multiple professional service corporations operating at 1468 Flatbush made payments to or, on information and belief, for the benefit of these ventures and to individuals who were associated either with these ventures or the Rybaks.  There is no justification for these payments and no apparent reason multiple businesses operating out of 1468 Flatbush in New York would make them, unless they were covert methods for Tatiana and Oleg Rybak to siphon the profits of 1468

Flatbush to themselves and to conceal Tatiana Rybak's control. Indeed, the same types of transfers — from multiple professional service corporations to businesses and individuals in Florida — including to some of the very same individuals, would later be made by multiple professional corporations operating at 1786 Flatbush.

109.   These transactions from 1468 Flatbush providers included the following:

a)   Money from Dr. Arguelles's professional corporation Vincent Medical went to the Fontainebleu Hotel in Miami. In particular, between February and June 2006, Vincent Medical wrote checks to the Fontainebleu Hotel. Tatiana Rybak, Oleg Rybak, and Sergey Rybak, who is Tatiana's son and Oleg's brother, each owned condominium units at the Fontainebleu Hotel at the time of the transactions, and from at least 2015 to 2018 Oleg Rybak was vice president and secretary of the condominium association. Ex. 11 at 1.

b)   Money from Dr. Arguelles's professional corporation Uptodate Medical went to Mayya Kushnir, an individual associated with the Rybaks' holdings at the Fontainebleu Hotel. In particular, between January and June 2004, Uptodate Medical wrote over $45,000 in checks to Mayya Kushnir. Kushnir was an officer of OR, LLC and was the President of MOR Properties Inc. until at least March 2016. OR, LLC was owned by Oleg and Tatiana Rybak and used to purchase three units at the Fontainebleu Hotel in August 2008, which then were subsequently sold to MOR Properties, Inc. between May and July 2012. The president and director of MOR Properties, Inc. is Maximillian Kostyashkin, the youngest son of Tatiana Rybak. Ex. 12.

c)   Money from Dr. Arguelles's professional corporations Uptodate Medical and Vincent Medical went to the Oceania V condominium, where Oleg Rybak and later Tatiana Rybak owned a unit. In particular, between February and May 2004, four checks drawn on the

account of Uptodate Medical were written to Oceania, and between May 2006 and October 2008, at least 14 checks drawn on the account of Vincent Medical were written to Oceania. Several of these checks were deposited into the account of the Oceania Property Ownership Association, the condominium association of the Oceania V condominium building at 19370 Collins Avenue, Sunny Isles Florida (the "Oceania V"). In November 2002, when they were still in college, Oleg and Sergey Rybak purchased a unit at the Oceania V and transferred it to Tatiana Rybak, who sold the unit in December 2011. Ex. 13.

      d)     Money from Dr. Arguelles's professional corporation Vincent Medical went to an individual who was associated with the Rybaks' Miami restaurant, the Rybak Café. In particular, between July 2008 and January 2009, Vincent Medical wrote almost $5,000 in checks to Olga Sanchez, who worked at the Rybak Café and, according to Oleg Rybak's testimony, was paid for her work as a notary public and an "expediter." Ex. 11 at 1.

      e)     Money from Dr. Arguelles's professional corporations Uptodate Medical and Vincent Medical went to a company and an individual who did design work on Tatiana Rybak's residence, Oleg Rybak's Anti-Aging Spa, and the Rybak Café. In particular, between July and November 2008, Uptodate Medical wrote over $14,000 in checks to CMG International Design Group ("CMG"), a Miami design firm, and Milda Gutierrez, one of the principals of CMG, and between June and November 2008, Vincent Medical wrote over $14,000 in checks to CMG and Milda Gutierrez. CMG and Milda Gutierrez decorated Tatiana Rybak's personal residence in Miami, the Anti-Aging Spa owned by Oleg Rybak, and the Rybak Café. *Id.*.

      f)     Money from Dr. Arguelles's professional corporation Vincent Medical went to Garrette Gray, in individual associated with the Rybak Café restaurant venture. In particular, between September 22, 2008 and December 6, 2008, Vincent Medical wrote over

$5,000 in checks to Garrette Gray, the Rybak Café chef who assisted with the restaurant buildout.  *Id.*

110.    Bank records reflect payments from Dr. Arguelles's professional corporations that appear to be for education expenses for Tatiana Rybak's children, Oleg Rybak and Sergey Rybak.  In particular, between December 28, 2003 and December 28, 2008, at least $67,045 in checks drawn on the accounts of Uptodate Medical and Vincent Medical, each owned on paper by Dr. Arguelles, were written to a 529 college savings plan, and at least $7,500 in checks drawn on the account of Uptodate Medical were written to New York University.  During this same period, Oleg Rybak and Sergey Rybak were students at New York University.  *Id.*

111.    Bank records reflect that accounts of Clara Pantin, an employee of the Fontainebleau Hotel, were used to siphon proceeds from providers at 1468 Flatbush to Tatiana Rybak and Oleg Rybak.  Pantin worked at the Fontainebleau Hotel condo in Miami Beach, Florida from March 2002 through June 2016 as an Office Manager for the sales department, and as the Director of Owner Services, where, according to her public LinkedIn profile, she was the "liaison between our Condo Owners and our Hotel Management," and "provide[d] VIP Services."   Tatiana, Oleg, and Sergey Rybak each owned condominium units at the Fontainebleau Hotel.  Pantin had bank accounts in Florida and at all times, on information and belief, resided in Florida.  Nevertheless, at least some checks payable to Pantin from 1468 Flatbush providers were deposited in New York.

112.    At least 17 providers who operated at 1468 Flatbush — Allay, Deng Acupuncture, Parisien, PFJ Medical, Pavlova, Island Life, Pierre Renelique, M.D., Adelaida Physical Therapy, P.C., Adelaida M. Laga, Amayao Medical, P.C., Arguelles P.C., Compas Medical, P.C., JCC Medical, P.C., Maiga, Masigla, Masigla Physical Therapy, P.C, and Vincent Medical — wrote

checks to Clara Pantin totaling over $500,000 between April 2009 and April 2017.   Over $177,000 in checks were written by these entities to Pantin before August 2013, while the clinic at 1468 Flatbush was active.   No check ever exceeded $10,000.   Checks were sometimes sequentially numbered or written on the same day or consecutive days.   In June 2009, the Anti-Aging Spa in Miami owned by Oleg Rybak, issued a check to "Klara Pantin" for $5,800, signed by Oleg Rybak.  Ex. 14.

113.    Remarkably, almost all of the deposits into one of Pantin's accounts at TD Bank from May 2009 to November 2016 were from healthcare providers who treated patients at 1468 Flatbush and/or 1786 Flatbush.    Pantin withdrew cash from her account through cash withdrawals or by writing checks payable to herself totaling at least $60,000.   Enormous sums were also charged on a Visa debit card linked to her account.

114.    Multiple providers operating at 1468 Flatbush wrote checks to Vasila Queen, an associate of Tatiana Rybak and the owner of a hair and nail salon in Florida, which was located on the same street as the Oceania V condominium owned by Tatiana Rybak.   In particular, at least 11 providers who operated at 1468 Flatbush — Adelaida M. Laga, Masigla, Adelaida Physical Therapy, P.C., Compas Medical, P.C., Parisien, JCC Medical, P.C., Pavlova, Allay, Masigla Physical Therapy, P.C., PFJ Medical, and Pierre J. Renelique, M.D. — wrote at least 59 checks that were deposited into the account of Vasila Queen totaling more than $80,000 between February 1, 2012 and February 24, 2018.  *See* Ex. 11 at 3.  Over $32,000 of these checks were deposited into Vasila Queen's account before August 2013, while the clinic at 1468 Flatbush was active.  Vasila Queen a/k/a Vasila Atabeva is the owner of Vasila Beauty & Health, Inc., which operates Studio By Vasila, a hair and nail salon spa located at the Trump International Hotel in Miami Beach, Florida, 18001 Collins Ave, Sunny Isles Beach, Florida.  Vasila Beauty & Health

was involuntarily dissolved for failure to file its annual report on September 28, 2018.  Queen was charged with petit larceny and theft in Dade County, Florida in 1996 and felony grand theft in 2000.  In March 2012, Queen wrote a check for $1,000 to Tatiana Rybak.

115.    The ability of the Rybaks to control the proceeds of the professional corporations operating at 1468 Flatbush was reflected in an action brought by a Miami interior design firm against Tatiana Rybak, businesses owned by Tatiana, Oleg, and Sergey Rybak, and two of Dr. Arguelles's professional corporations, Arguelles P.C. and Vincent Medical.  *See CMGINTD, Inc. d/b/a/ CMG Int'l Design Grp., Carlos Gutierrez & Milda Gutierrez v. Tatiana Rybak, Arguelles M.D., P.C., Fl. Storm Props., LLC, Rybak's Café, LLC, Vincent Med. Servs., P.C., & Anti-Aging Aesthetic Laser Ctr., Inc*., Case No. 09-053480 CA 04 (11th Jud. Cir. Ct. Miami Dade Cty. Fl. Nov. 19, 2009) (the "CMG Lawsuit").  The plaintiffs in the CMG Lawsuit were hired to build out and furnish the Rybak Café, the Miami restaurant owned by Tatiana, Oleg, and Sergey Rybak and to do design work on Tatiana Rybak's personal apartment in Bal Harbor, Florida. Plaintiffs had been paid for that work with checks drawn on the bank accounts of a number of entities, including seven checks totaling more than $51,000 from Arguelles P.C. and a $5,000 check from Vincent Medical, both owned on paper by Dr. Arguelles.  When the checks were returned for insufficient funds or stop payment orders, the interior design firm sued.  In the lawsuit, Tatiana Rybak testified that Dr. Arguelles signed Arguelles P.C. and Vincent Medical checks at Tatiana Rybak's direction to satisfy a loan that Tatiana Rybak had made to Dr. Arguelles, but admitted that there was no documentation of the loan and she could not even remember the amount.  Tatiana Rybak further testified that Dr. Arguelles would frequently provide her with pre-signed checks from Dr. Arguelles's bank accounts for Tatiana to use and that some of the checks at issue in the CMG Lawsuit were pre-signed by Dr. Arguelles and later

completed by Tatiana Rybak.  When asked why she paid the design firm from the accounts of so many different entities, Tatiana Rybak testified, "wherever we have money we pay," and "whenever we have money we pay, whatever company. . . . Personal money, business money. Business money is my money."  The jury returned a verdict for plaintiffs in April 2013, and the case settled during post-judgment proceedings.

116.    In April 2012 and March 2013, GEICO filed two lawsuits based on activity at 1468 Flatbush against doctors and other healthcare professionals, medical professional corporations, and the office manager.  *See Gov't Emps. Ins. Co. v. Zenaida Reyes-Arguelles, M.D., et al.*, Case No. 1:12-cv-01953-CBA-RLM (E.D.N.Y.); *Gov't Emps Ins. Co. v. Jean Claude Compas, M.D., et al.*, Case No. 1:13-cv-01290-CBA-RLM (E.D.N.Y.).  Among other things, these lawsuits alleged that healthcare professionals were not the true owners of their medical professional corporations, management, billing and lease agreements were used to siphon the proceeds of the clinic and control the medical professional corporations, and substantial payments were made out of the accounts of the medical professional corporations, including some discussed above, to secure the proceeds of the practice.  Shortly after discovery commenced in the actions, on October 7, 2013, GEICO filed a letter advising the Court of a settlement, and the cases were dismissed without prejudice in October 2013.

### C.    The Rybaks Establish 1786 Flatbush Avenue

117.    With the two GEICO lawsuits in 2012 and 2013 and the Gutierrez suit in 2014 drawing attention to activity at 1468 Flatbush, Tatiana and Oleg Rybak needed a new location. They moved to 1786 Flatbush, which was only a few blocks down the street from 1468 Flatbush. By fall 2013, services rendered at 1468 Flatbush had slowed.  Beginning in approximately August 2013, services rendered at 1786 Flatbush began to be billed regularly to State Farm Mutual and State Farm Fire.

### 1. The Rybaks Controlled the Physical Space at 1786 Flatbush Through a Family Member

118.    As at prior No-Fault Clinics, the Rybaks' scheme depended on the control of the physical space at which 1786 Flatbush would operate.  The Rybaks, however, had learned through Tatiana Rybak's prior criminal conviction and prior civil litigation that they could not be directly or publicly linked to real estate where they operated their No-Fault Clinics.  Thus, neither Tatiana Rybak nor Oleg Rybak were publicly identified with the property at 1786 Flatbush.  Rather, clinic space at 1786 Flatbush was leased from the building owner, Kings & Queens Holdings, LLC, by a relative — Ksenia Pavlova — though the lease documentation reflects their connections to the property.  Pavlova, a physician who purports to treat patients at 1786 Flatbush, is married to Tatiana's son Sergey Rybak, is Tatiana's daughter-in-law, and is Oleg's sister-in-law.  Pavlova appears to have applied to lease space at 1786 Flatbush in approximately July 2013.  But Pavlova had only been licensed to practice medicine in New York since May 2013, two months earlier.  The application states that Pavlova had been a tenant at the 1468 Flatbush clinic for 13 years, but that tenancy would have begun 13 years before she was licensed to practice medicine in New York.  The application cites as references "Sergey Rybach [*sic*] at 1810 Voorhies Avenue Suite 7."  Sergey Rybak is Tatiana Rybak's son and Oleg Rybak's brother, and the address is the address of the Rybak Law Firm.  The application identifies Natalia Tokar, Oleg Rybak's employee, as an emergency contact.

119.    On the 1786 Flatbush lease itself, Pavlova's signature was notarized by Inna Shapovalova, then a legal assistant at the Rybak Law Firm, according to Shapovalova's LinkedIn profile.  The 1786 Flatbush lease provided for Pavlova to pay $3,300 per month in rent, increasing over the following years to $3,606 per month.

120.     As at the Original Clinic Locations, the "rent" arrangements with other providers operating at 1786 Flatbush appear to be designed to siphon profits to the Rybaks.  In particular, Pavlova sublet space to providers and their professional corporations who rendered services at 1786 Flatbush, including Defendants Blackman, Dabiri, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng Acupuncture, and MSB.  However, Pavlova and the Defendants who purportedly sublet space from her at 1786 Flatbush did not have written subleases, and none have been able to describe the terms of their leases.

121.     Moreover, as at the Original Clinic Locations, the checks from purported subtenants of Pavlova do not have the indicia of legitimate sublease payments.  In some instances, payments vary from month to month.  Other purported subtenants wrote multiple "rent" checks on the same day or consecutive days.  And in some instances Pavlova received more in sublease payments than the $3,300 to $3,600 per month she was paying under her lease with the owner of the 1786 Flatbush building.

**2.     Providers from 1468 Flatbush Moved to 1786 Flatbush**

122.     1786 Flatbush was the successor to 1468 Flatbush, which had been controlled by Tatiana Rybak and used to covertly funnel proceeds from professional corporations operating from that location to or for the benefit of herself and Oleg Rybak.

123.     First, at least seven providers who treated patients at 1468 Flatbush treated patients at 1786 Flatbush.

| Rendering Physician | 1468 Flatbush Ave | 1786 Flatbush Ave |
|---|---|---|
| Ksenia Pavlova, D.O. | X | X |
| Charles Deng, L.A.c. | X | X |
| Darren Mollo, D.C. | X | X |
| David Mariano, D.C. | X | X |
| Maria Shiela Masigla, P.T. | X | X |
| Jules Francois Parisien, M.D. | X | X |
| Pierre J. Renelique, M.D. | X | X |

124.    Second, at least eight professional corporations that submitted bills for services at 1468 Flatbush continued to treat patients and bill for services at 1786 Flatbush.

| Professional Corporation | 1468 Flatbush Ave | 1786 Flatbush Ave |
|---|---|---|
| Allay Medical Services, P.C. | X | X |
| Maiga Products Corporation | X | X |
| PFJ Medical Care P.C. | X | X |
| Charles Deng Acupuncture, P.C. | X | X |
| ACH Chiropractic, P.C. | X | X |
| Energy Chiropractic, P.C. | X | X |
| Island Life Chiropractic Pain Care, PLLC | X | X |
| Quality Custom Medical Supply, Inc. | X | X |

125.    Third, at least two office employees who worked at 1468 Flatbush also worked at 1786 Flatbush.  Office manager Susan Tuano and receptionist Wilma Tanglao appear to have worked at both locations.  Bank records confirm that office manager Susan Tuano was paid by providers rendering services at 1468 Flatbush, including receiving regular checks from Uptodate Medical and Vincent Medical, both owned on paper by Dr. Arguelles, between 2004 and 2009, and was paid by providers rendering services at 1786 Flatbush, including receiving checks from AB Quality, Allay, Deng Acupuncture, Parisien, Island Life, JPF Medical, Pavlova, Madison, Maiga, MSB, Blackman, PFJ Medical, and Quality Health between 2012 and 2018.

126.    Fourth, healthcare providers at 1468 Flatbush and 1786 Flatbush used some of the same vendors, such as CPA Norman Weisman and payroll accountant Elina Shusterman.

### 3.    Nurse Practitioner Renee Denobrega's Affidavit Describes Rybak Control

127.    Denobrega was a nurse practitioner who Tatiana Rybak hired to treat patients at 1786 Flatbush, and who worked there from approximately September 2016 to approximately March 2017.  In a May 22, 2018 affidavit, Denobrega describes how "Barbara," who is Tatiana Rybak, managed hiring and activity at 1786 Flatbush, directed care that was provided to patients, and controlled the funds of the professional corporations that purported to treat patients at 1786 Flatbush.  *See* Ex. 15.

128.    Specifically, Denobrega explained that she was referred by a recruiter to an office manager at 1786 Flatbush named "Susie" (Susan Tuano) for an interview.  "Susie" told her she needed to meet "Barbara," the ultimate decision maker regarding hiring.  A few days later, Denobrega met with "Barbara" at 1786 Flatbush, who Denobrega described as being approximately 60 years old and speaking with a Russian accent.  "Barbara" is Tatiana Rybak. Barbara would later tell Denobrega that Barbara had a daughter who was a physician at 1786 Flatbush, and Tatiana Rybak's daughter-in-law, Pavlova, was a physician who purported to treat patients at 1786 Flatbush.  Denobrega was made aware that "Barbara was the boss" at 1786 Flatbush.  *Id.* ¶ 12.  It became clear to Denobrega that "Barbara was in charge of the Flatbush Clinic and that everyone [] reported to her."  *Id.* ¶ 15.

129.    Denobrega also met "Wilma," who she understood to be responsible for billing, and Lacina, who had been a physician in Florida before he began to treat patients at 1786 Flatbush.  At one point, Lacina told Denobrega that the 1786 Flatbush clinic was "off the radar type of work."

130.    Denobrega's affidavit further establishes that doctors who purported to treat patients at 1786 Flatbush did not exercise supervision or control over the activity at 1786

Flatbush.  In particular, she swore that after being hired, she learned that her services were billed to insurance companies through professional corporations, including PFJ Medical and JPF Medical (owned on paper by defendant Parisien) and KP Medical (owned on paper by a person she knew as Dr. Rybak, but who on information and belief was defendant Pavlova).  *Id.* ¶ 14. Yet, Denobrega never met Parisien or "Dr. Rybak" and never saw them at 1786 Flatbush. Denobrega swore that they had no role in the day-to-day operations of the clinic or in any of the healthcare practices at 1786 Flatbush.  *Id*. ¶ 15.   The only doctor Denobrega met at 1786 Flatbush was Lacina.  But Denobrega "rarely met with Dr. Lacina, and he did not really supervise [her] work"; rather, "[m]ost of [her] dealings were with Barbara and Susie." *Id.* ¶ 12. Denobrega "believed [herself] to be an independent contractor" at 1786 Flatbush who "was not supervised at the Flatbush Clinic . . . in any way by Dr. Parisien, Dr. Rybak, or any other licensed healthcare professional." *Id.* ¶ 21.

131.   Denobrega examined patients at 1786 Flatbush.  She swore in her affidavit that the "majority of patients [she] saw had minor medical issues such as sprains or strains that required straightforward medical decision-making." *Id.* ¶ 28.  Denobrega used preprinted forms provided to her by the staff at 1786 Flatbush to conduct evaluations. *Id.*  Denobrega stated that she was instructed by the staff at 1786 Flatbush to perform initial evaluations on every patient even if the patient had already been seen by a medical doctor or another nurse practitioner at the clinic.  Denobrega also performed trigger point injections and dry needling on patients.  Prior to working at 1786 Flatbush, she had never performed dry needling.  At one point, Barbara and Susie insisted that Denobrega perform more dry needling because trigger points only paid $100 and were not considered treatment.  Another worker who worked at the front desk, "Dovie," who

upon information and belief is Dovie Silvestre, insisted that she order MRIs that Denobrega did not consider necessary. *Id.* ¶ 26.

132.    Denobrega was paid for her work at 1786 Flatbush with checks drawn on the accounts of JPF Medical and PFJ Medical (owned on paper by Parisien), Parisien, and Allay and KP Medical (owned on paper by Pavlova).   But Denobrega stated that she did not believe she worked for these professional corporations and had never met or spoken to Parisien or Pavlova. Bank records reflect that Denobrega was often paid on the same day with multiple checks and with checks from multiple professional corporations.   For example, on April 21, 2017, Denobrega received a check from Allay for $840, a second check from Allay for $420, and a third check from PFJ Medical for $367.48, although she had never met the paper owner of Allay (Pavlova) or of PFJ Medical (Parisien).

133.    Denobrega stated that on numerous occasions checks for her work at 1786 Flatbush would bounce.   Denobrega would be told by Barbara and Susie that funds were low because insurance had not been paying on time, and Barbara would exclaim, "It's not our fault." Barbara or Susie would then prepare and provide another check that was often from a different account or business entity.

134.    Denobrega stopped working at 1786 Flatbush in March 2017 over her concerns about the dry needling and the bounced checks.

### 4.    Office Staff Asserted the Fifth Amendment Regarding Control of 1786 Flatbush

135.    Two office employees of 1786 Flatbush asserted the Fifth Amendment at their depositions in response to questions about who controlled 1786 Flatbush, whether Tatiana Rybak controlled the activity at 1786 Flatbush, and whether Oleg Rybak participated in the activity at 1786 Flatbush.

136.    The employees respectively worked as an office manager and as a receptionist at both 1468 Flatbush and 1786 Flatbush, bank records reflect that the office manager received payments from providers at both locations, and nurse practitioner Denobrega stated that the office manager had a role in hiring and directing care at 1786 Flatbush.

137.    In depositions, both office employees asserted the Fifth Amendment and refused to answer whether "Barbara" was Tatiana Rybak.

138.    When asked if Tatiana Rybak "was ultimately in charge of all the operations at 1786 Flatbush" and whether all "the professional corporations that treated patients and billed for services at 1786 Flatbush were actually owned by Tatiana Rybak," the office manager asserted her Fifth Amendment privilege and refused to answer.  Similarly, the receptionist asserted the Fifth Amendment and refused to answer when asked if Tatiana Rybak made all fundamental business decisions for and had ultimate control over the Defendant providers at 1786 Flatbush, including who they would hire and fire, what healthcare services they would provide to patients at 1786 Flatbush, what services they would bill insurers for, the billing codes, and amounts submitted to State Farm Mutual, State Farm Fire, and other insurers.

139.    As to Oleg Rybak, the receptionist asserted the Fifth Amendment when asked if Oleg Rybak made all fundamental business decisions for and had ultimate control over the Defendant providers at 1786 Flatbush, including who they would hire and fire, what healthcare services they would provide to patients at 1786 Flatbush, what services they would bill insurers for, the billing codes, and amounts submitted to State Farm Mutual, State Farm Fire, and other insurers.  She also asserted the Fifth Amendment and refused to answer if Oleg Rybak controlled her activity at 1786 Flatbush.  *Id.* at 107.  The receptionist asserted the Fifth Amendment when asked if Oleg Rybak directed medical providers to form new business entities with new tax

identification numbers at 1786 Flatbush to avoid connection to the fraudulent activity at 1468 Flatbush, if Oleg Rybak used Maiga Borisevica's name to establish Maiga, and if Oleg Rybak used Oleksandr Semenov's name to establish Madison. *See also infra* ¶¶ 142–44. Similarly, the office manager asserted the Fifth Amendment when asked if Oleg Rybak directed medical providers to form new business entities with new tax identification numbers at 1786 Flatbush to avoid connection to the fraudulent activity at 1468 Flatbush and if Oleg Rybak and Tatiana Rybak are the true owners of Madison and Maiga. She also asserted the Fifth Amendment when asked if proceeds from billings at 1786 Flatbush were funneled to Oleg and Tatiana Rybak.

140.    Given the quantity and quality of evidence independent of these Fifth Amendment assertions demonstrating the level of control over the activities and the proceeds flowing from these entities at 1786 Flatbush, an adverse inference should be drawn and it should be assumed that if these questions were answered truthfully these witnesses would have acknowledged that Tatiana Rybak controlled the activities at 1786 Flatbush and that Oleg Rybak knowingly participated in facilitating and profiting from these activities.

## 5.    The DME Defendants' Formation and Operation Reflect How They Were Controlled by Tatiana Rybak with the Support of Oleg Rybak

141.    Although the DME Defendants purport to be owned on paper by different individuals, Tatiana Rybak controlled them, ordered their Supplies, and controlled their funds, and Oleg Rybak assisted her by forming the entities using foreign-national nominee owners who may reside outside the United States and having their mail forwarded to his office.

142.    Supplies were provided at 1786 Flatbush by at least the six DME Defendants that purported to be independent and owned on paper by different individuals — Maiga (owned on paper by Borisevica), Madison (owned on paper by Semenov), Quality Custom (owned on paper by Alexander Verbitsky prior to 2015, and his father Vladimir Verbitsky since 2015), Quality

Health and AB Quality (owned on paper by Buslon), and PHCP.  Yet, each provided the same Supplies to patients at 1786 Flatbush, engaged in similar fraudulent billing patterns discussed below (*see infra* ¶¶ 315–41), and used nearly identical delivery receipt forms that purport to reflect the delivery of Supplies to the patients.  All six companies' forms utilize identical language, including spelling and grammar errors, stating the patient has "received equipments [*sic*][2] and supplies listed above along with instructions on use case [*sic*] of it.  I indicate that [company] cannot be held responsible for any inappropriate use of this equipment or supplies." *See* Ex. 16.  Indeed, Maiga and Madison's delivery receipt forms use an identical font. *See id.* at 1–2.

143.     Maiga, which was owned on paper by Borisevica, a Latvian national, was formed on July 9, 2012.  Maiga's business address was established as 100 Church Street, 8th Floor, New York, New York, the address of a virtual office operated by Regus Management Group LLC. Three days before Maiga was formed, however, on July 6, 2012, an Online Virtual Office Agreement was executed between Maiga and Regus pursuant to which all of Maiga's mail and faxes were to be forwarded to the Rybak Law Firm at its office on Voorhies Avenue in Brooklyn.  While a VISA credit card in Borisevica's name was used to pay Regus for its services, neither the credit card charge nor the Online Virtual Office Agreement were signed for Maiga by Borisevica.  Rather, both were signed by "Natalia," likely Natalia Tokar, an employee of the Rybak Law Firm.  A United States Postal Service Form 1583, Application for Delivery of Mail Through Agent, which is required by law for mail to be forwarded, dated July 16, 2012, and

---

[2] Quality Health, AB Quality, and PHCP's delivery receipts correct this error, stating that the patient has "received equipment," but otherwise contain the identical language quoted above. *See* Ex. 16.

which purported to authorize the forwarding of Maiga's mail to the Rybak Law Firm, does bear a signature of Maiga Borisevica. That signature is notarized by Oleg Rybak.

144. Similarly, Madison, which was owned on paper by Semenov, a Ukrainian national, was formed on November 7, 2013. Madison's business address was established as 747 Third Avenue, New York, the address of a virtual office operated by Regus Management Group LLC. Eight days before Madison was formed, however, on October 30, 2013, an Online Virtual Office Agreement was executed between Madison and Regus pursuant to which all of Madison's mail was to be forwarded to the Voorhies Avenue office of the Rybak Law Firm in Brooklyn. Semenov did not sign the agreement. Rather, the agreement was signed by "madison products." The charges for Regus's services were paid for with the same credit card used to pay for Maiga's arrangement. The only contact number left on file with Regus was a phone number registered to the Rybak Law Firm.

145. Five of the DME Defendants, (1) Maiga, (2) Madison, (3) PHCP, (4) Quality Health, and (5) AB Quality, purchased braces and other items from Precision Medical Supply LLC ("Precision"), a Missouri orthotics wholesaler, over a nearly seven-year period between June 2012 and February 2019. Precision's owner has stated that every order from these five DME Defendants was placed over the phone by a woman named "Barbara," Tatiana Rybak, who spoke with a possible Russian or Eastern European accent, and always used the phone number (786) 246-6960. That cell phone number was registered to Tatiana Rybak's son, Sergey Rybak, until at least June 2015. The cell phone was billed to a Florida office suite owned by a limited liability company managed by a partnership, which was, in turn, managed by a partnership controlled by Tatiana Rybak and Oleg Rybak. In this action, Tatiana Rybak moved to quash a subpoena to wireless carrier T-Mobile for the records related to that number in which she

acknowledged that it was her phone number.  *See* T. Rybak Mot. to Quash (Dkt. 132 at 3). These DME Defendants sometimes paid for the Supplies using checks drawn on the accounts from other businesses operating at 1786 Flatbush.  *See* Ex. 17.  Thus, for example, invoices for Supplies provided to Maiga were paid for with checks on the accounts of Masigla, Parisien, and Madison; invoices for Supplies provided to PHCP were paid for with checks drawn on the accounts of Madison, Maiga, and Quality Health; invoices for Supplies provided to Quality Health were paid for with checks drawn on the accounts of Madison and AB Quality; and invoices for Supplies provided to AB Quality were paid for with checks drawn on the accounts of Quality Health, KP Medical, JPF Medical, Parisien, and M Buslon Physical Therapy, P.C.  *Id.* Thus, over a period of nearly seven years, Tatiana Rybak was ordering Supplies for five DME Defendants and using the bank accounts of the DME Defendants and other healthcare providers operating at 1786 Flatbush interchangeably to pay Precision.

146.    At his deposition as the corporate representative of Maiga, Madison, PHCP, Quality Health, and AB Quality (the "Five Buslon DMEs"), pursuant to Federal Rule of Civil Procedure 30(b)(6), Buslon stated that he owned Quality Health and AB Quality and acquired an interest in the unpaid claims of Madison, Maiga, and PHCP.  Buslon admitted that he and his wife knew Tatiana Rybak, but claimed they never had any business dealings.  Nevertheless, Buslon has a long history with clinics associated with Tatiana Rybak.  Bank records confirm that Uptodate Medical and Vincent Medical, owned on paper by Dr. Arguelles, wrote 20 checks to Buslon totaling $38,900 over a four-month period in 2004, some of which were issued on the same or consecutive days.

147.    At his deposition as corporate representative of the Five Buslon DMEs, Buslon could not explain why checks from different providers were used to pay Precision, who dealt with Precision, or even who "Barbara" was.

148.    Buslon testified regarding the circumstances by which he and his wife Maria Masigla came to own an interest in the unpaid claims of Maiga, Madison, and PHCP.  Buslon could not recall when the transaction took place, though it was certainly after this action was filed in January 2018.  According to Buslon, he and his wife were contacted by Dr. Arguelles, whom they had known for years and who was familiar with the principals of the three DME entities.  Dr. Arguelles would have been almost 90 years old at the time.  Dr. Arguelles purportedly conveyed that the Buslons could purchase the right to collect unpaid claims for Maiga, Madison, and PHCP.  Buslon agreed and purchased the receivables for $6,000 — $2,000 for the claims of each entity.  Buslon testified that he made the purchase in single, lump sum cash payments given to Dr. Arguelles, that there is no documentation of the transactions, that he does not know who the principals of the entities were that sold him the receivables, and that he acquired nothing to indicate that he was obtaining anything of value.  Buslon stated that he then entered into an agreement with Oleg Rybak in which Oleg Rybak would seek to collect on the claims in exchange for a portion of the amounts recovered.  At one point, Buslon testified that Oleg Rybak was to receive between 25% to 50% of amounts recovered, but he later purported to correct himself and stated that Oleg Rybak was to receive only 5-10% of amounts recovered. Regardless of the amount purportedly to be retained by Oleg Rybak, Buslon admitted that to date he has received nothing on any of the claims and is unware of the results of any efforts to collect on the receivables by Oleg Rybak or the Rybak Law Firm.

149.    Although Maiga, Madison, and PHCP purport to have ceased operations, as recently as March 16, 2019, an affidavit was signed by Doby Nonez as the purported Billing Manager of Maiga in which Nonez claims to have called State Farm Mutual on April 8, 2014 and April 30, 2014, and left messages that the proposed date for an EUO was inconvenient.  State Farm Mutual's telephone records indicate that no such call was received and no such messages were left.  Buslon, who purports to own the rights to this claim, has no knowledge regarding this affidavit, does not know who Doby Nonez is, and was unaware whether Maiga has any employees, let alone a billing manager.

150.    Although he testified as the corporate representative of the Five Buslon DMEs, Buslon had no knowledge regarding their operation, their records, how they acquired Supplies, the Supplies they provided to patients, how they billed, and who owned or was employed by Maiga, Madison, and PHCP.

### 6.      Bank Records of Entities Operating at 1786 Flatbush Reflect Proceeds Transferred for the Benefit of Tatiana Rybak and Oleg Rybak

151.    As at 1468 Flatbush, bank records reflect that Tatiana Rybak, Oleg Rybak, and others siphoned proceeds from the providers that operated at 1786 Flatbush.

152.    Clara Pantin, the employee of the Fontainebleau Hotel where Tatiana and Oleg Rybak own residential units and who received over $105,000 from providers who operated at 1468 Flatbush prior to August 2013, also received considerable sums from providers who operated at 1786 Flatbush.  At least eleven defendant providers who operated at 1786 Flatbush — Parisien, PFJ Medical, Deng Acupuncture, Pavlova, Allay, Blackman, Dabiri, Island Life, and three DME Defendants — wrote checks to Clara Pantin totaling over $506,000 between September 2013 and April 2017.  *See* Ex. 18.  No check ever exceeded $10,000.  Checks were sometimes sequentially numbered or written on the same or consecutive days.

153.    In addition, Pantin's two sons received checks from Defendants operating at 1786 Flatbush.  Her son Khristopher Salado received two checks from Parisien and one from Madison between January 2014 and December 2014 totaling $8,692.  Her son Nicholas Salado received two checks from Parisien, one check from Pavlova, and three checks from Madison between December 2014 and April 2016 totaling $8,625.  *See id.* at 1.

154.    Similarly, Vasila Queen, an associate of Tatiana Rybak, received money from providers who operated at 1468 Flatbush, operated a nail salon up the street from one of Tatiana Rybak's condominiums in Sunny Isles Florida, and received money from providers who operated at 1786 Flatbush.  In particular, at least eleven providers who operated at 1786 Flatbush — Parisien, PFJ Medical, Pavlova, Allay, Masigla Physical Therapy, P.C., Blackman, Pierre Renelique, M.D., MSB, and two DME Defendants — wrote at least 56 checks to Vasila Queen, the owner of Studio By Vasila, a hair and nail salon spa at the Trump International Hotel in Miami Beach, Florida totaling more than $74,000 between January 2013 and February 2018. *See id.* at 1.

155.    Similarly, providers who operated at 1786 Flatbush wrote checks to an interior design business located 15 minutes from one of Tatiana Rybak's condominiums in Sunny Isles, Florida, and midway between that condominium and the Fontainebleau Hotel where Tatiana and Oleg Rybak owned residential units.   In particular, eight providers who operated at 1786 Flatbush — Parisien, JPF Medical, PFJ Medical, Pavlova, Allay, MSB, and two DME Defendants — wrote at least 54 checks to Voldymyr Maistrenko, his wife Olga Maistrenko, and his business Art Glass International LLC totaling over $216,000.  *See id.* at 2.  Parisien also wrote a check for $4,000 to Kristina Kalitskaya, an employee of Voldymyr Maistrenko.  *Id.*  Art Glass International, LLC purports to be an interior design business located in North Miami,

Florida. No check ever exceeded $10,000. Checks were sometimes sequentially numbered or written on the same or consecutive days, and on occasion multiple checks written on the same or consecutive days for less than $10,000 totaled $10,000 or more.

156.    Similarly, providers who operated at 1786 Flatbush wrote checks to a private investigator, Les Levine, who was purportedly hired to help Oleg Rybak and others defend the lawsuit brought by Dr. Gutierrez in which Dr. Gutierrez alleged that Tatiana and Oleg Rybak improperly controlled Dr. Gutierrez's medical practice at 1468 Flatbush. In particular, providers operating at 1786 Flatbush — Parisien, JFP Medical, PFJ Medical, Pavlova, Allay, KP Medical, MSB, and two DME Defendants — wrote at least 150 checks to Les Levine totaling more than $221,000 between April 2016 and April 2018. *See id.* Les Levine is a former New York City detective and the owner of Les Levine Investigations, a private investigations firm in Mineola, New York. On February 10, 1989, Levine pleaded guilty to bribery charges based on allegations that he paid an investigator to reveal the whereabouts of a government informant hidden in the witness protection program on behalf of a client linked to organized crime. In a high-profile federal prosecution in a police torture case, prosecutors alleged in a motion filed in the EDNY that "Levine has a known track record of using methods of bribery, harassment and deceit in connection with criminal trials in this city." The motion described how Levine pleaded guilty to bribing an investigator to learn the whereabouts of a federally protected witness. Levine was sentenced to five years' probation and 150 hours of community services.

157.    On multiple occasions Defendants wrote multiple checks to Levine on the same date and in many instances Levine deposited payments he received on the same day into two different accounts. Levine also endorsed and negotiated checks from Defendants that were written to cash. *See* Ex. 19. During proceedings in this case, it was claimed that the payments to

Levine were for work he purportedly did to assist the Rybak Law Firm, Oleg Rybak, and others with the lawsuit brought by Dr. Gutierrez discussed above, "*Gutierrez v. Rybak.*"  In that lawsuit, Dr. Gutierrez sought an accounting of any escrow funds held by the Rybak Law Firm, a return of any business records, and an order voiding any liens over funds asserted by Rybak and others, and made claims this his medical practice at 1468 Flatbush had been improperly controlled by the Rybak Law Firm.

158.   Providers who operated at 1786 Flatbush also made payments to a real estate law firm that represented a real estate development firm owned by Sergey Rybak, the husband of defendant Pavlova and the brother of Oleg Rybak, in a variety of real estate ventures.   In particular, 1786 Flatbush providers — Parisien, JFP Medical, PFJ Medical, Pavlova, Allay, Deng Acupuncture, Island Life, MSB, and Quality Health — wrote at least 59 checks to the law firm totaling more than $425,000 between August 2014 and May 2018.  *See id.* at 2.  On some occasions, multiple checks were written on the same date or consecutive days, and the law firm often received checks from different Defendants dated on the same day or consecutive days.  *See id.*  Thus, for example, Deng wrote two checks numbered 1591 and 1592 on August 6, 2014, each for $3,000 to the law firm, and the law firm received four checks from three Defendants dated February 14, 2017 — a check numbered 786 for $5,000 from Allay, a check numbered 787 for $10,000 from Allay, a check for $5,000 from MSB, and a check for $10,000 from PFJ Medical.  According to its website, the law firm "is a real estate, construction, and litigation law firm, serving as counsel to real estate developers, individual and institutional owners, financial institutions, and corporations and other business entities.   [The] firm services include condominium offering plans, financings, workouts, acquisitions, leasing, design and construction agreements, land use, claims, and litigation."   According to a search of the New York Civil

Supreme Court online docket, the law firm and one of its attorneys has represented Tatiana Rybak's son and Oleg Rybak's brother, Sergey Rybak, or Rybak Development in three cases filed in 2009, 2015, and 2017.

159.    Publicly recorded real estate records also confirm that one of the law firm's lawyers represented Rybak Development in connection with several real estate deals in 2017 and 2018.

160.    There is no legitimate reason for providers rendering services to patients at 1786 Flatbush to make any of the above-described payments.  In fact, at his deposition as the corporate representative for the Five Buslon DMEs, Buslon could not explain payments to Clara Pantin and her children, Art Glass International, the real estate law firm, Les Levine, or Vasila Queen. Rather, the above-described sums could only have been for the benefit of Tatiana Rybak and Oleg Rybak and to siphon to them the proceeds of activity at 1786 Flatbush.

**D.    The Defendants Create Entities to Conceal the Scheme's Existence**

161.    Over the course of the scheme, the Defendants created new business entities with separate tax identification numbers to submit bills to State Farm Mutual and State Farm Fire for services at 1786 Flatbush.  Defendants do so because they know that payors such as State Farm Mutual and State Farm Fire process claims from healthcare providers using names and tax identification numbers to identify billing activity, and by submitting multiple claims utilizing different entity names and tax identification numbers, Defendants are able to conceal that they are, in fact, claims from the same individuals for the same fraudulent services.

162.    From August 2013 until June 2015, the Physician Defendants submitted bills to State Farm Mutual and State Farm Fire under the individual tax identification numbers, and on occasion social security numbers, of sole proprietorships of Parisien, Blackman, Dabiri, Pavlova, and Lacina.  Beginning in June 2015, however, the Physician Defendants began submitting

claims for the same services to State Farm Mutual and State Farm Fire under a variety of entities. For example, Parisien's services were billed (a) under his own taxpayer identification number beginning in August 2013, (b) by Allay from June 2015 through October 2016, (c) by PFJ Medical from May 2015 through September 2016, and (d) by JPF Medical from September 2016 through October 2016.   Lacina's services were billed (a) under his taxpayer identification number beginning in January 2014, (b) by RA Medical from January 2015 through June 2016, (c) by FJL Medical from June 2016 through October 2016, and (d) by JFL Medical from October 2016 through January 2017.

163.   Other facts suggest that the Defendants' use of multiple entities was part of a coordinated scheme.  For example, although JPF Medical is purportedly owned by Parisien and JFL Medical is owned by Lacina, both entities were formed on the same day.  Many of the entities' formation documents were filed with the New York Department of State by the same attorney, Alexander Almonte, Esq., who filed the incorporation documents for FJL Medical, JFL Medical, KP Medical, PFJ Medical, RA Medical, MSB, Quality Health, and AB Quality. Despite the use of this web of entities, the form documentation used by virtually all of the Physician Defendants, Chiropractor Defendants, and the DME Defendants remained the same, except for the provider's name on the letterhead, and the treatment provided by the entities was virtually identical.

### E.   Many of the Automobile Accidents Which Led to Treatment at 1786 Flatbush Appear to Have Been Deliberately Staged or Caused

164.   In addition to the fraudulent patterns in diagnoses, treatment, and documentation present at 1786 Flatbush, many of the automobile accidents that preceded the treatment at 1786 Flatbush bear indicia of being deliberately staged collisions designed to support claims for No-Fault Benefits.  These indicia include: (a) accidents occurring shortly after insurance coverage

was obtained, often within two weeks after coverage was obtained; (b) accidents involving older vehicles with minimal value; (c) multiple injured parties involved in the accident who sought treatment at 1786 Flatbush; (d) multiple injured parties seeking treatment at 1786 Flatbush shortly following the accident; (e) little to no physical damage to the insured vehicles; (f) no emergency room or hospital treatment sought immediately following the accident; and (g) other improbable connections between seemingly unrelated individuals and accidents, including accidents occurring at the same locations and individuals in different accidents purporting to reside at the same addresses.

165.    The vast majority of State Farm Mutual and State Farm Fire insureds who treated at 1786 Flatbush were involved in collisions in which at least three different individuals involved all sought care at 1786 Flatbush.  In virtually every instance, the individuals involved in these accidents began treatment at 1786 Flatbush on the same day, usually the very next day after the accident.  Indeed, more than half of the State Farm Mutual or State Farm Fire insured accidents that led to claims identified on Exhibit 1 involved four or more individuals, all of whom treated at 1786 Flatbush.

166.    Significantly, Oleg Rybak and his law firm, the Rybak Law Firm, represented many of the individuals who treated at 1786 Flatbush and many of the individuals who were in what appear to have been staged accidents.  More than half of the State Farm Mutual or State Farm Fire insureds who were treated at 1786 Flatbush and who were represented by an attorney were represented by Oleg Rybak.  As noted, one of the indicia of a staged accident is when at least three and sometimes four or more individuals who were in the same accident sought care at 1786 Flatbush, often on the same day or within a few days of the accident.  More than two-thirds of the patients identified on Exhibit 1 were involved in accidents in which at least three

individuals in the vehicle sought care at 1786 Flatbush.  Of these patients, Oleg Rybak and the Rybak Law Firm represented more than 100 of them, constituting more than half of the 1786 Flatbush patients in multi-person accidents.  Oleg Rybak and the Rybak Law Firm almost always represented the purportedly injured passengers in these likely staged accidents, who would be in a position to bring bodily injury claims against the drivers.

167.    The accidents reflect other improbable patterns.  For example, 12 different individuals insured by State Farm Mutual or State Farm Fire each sought treatment at 1786 Flatbush following three separate accidents which occurred at the same exact intersection in Brooklyn on different dates but at the same time of day.  In each case, the passengers in each of the three State Farm Mutual- or State Farm Fire-insured vehicles were also represented by the same law firm, the Rybak Law Firm.  On February 26, 2014 at 11:00 p.m., a 1996 Mitsubishi Galant insured by State Farm Fire purportedly struck a 2000 Honda Civic at the intersection of Newkirk Avenue and Westminster Road in Brooklyn after running through a stop sign.  Three occupants of the Mitsubishi sought treatment at 1786 Flatbush the following day.  The State Farm Fire insurance policy for the Mitsubishi had been purchased 9 days earlier on February 26, 2014.  Motor vehicle records show the Mitsubishi was registered to a different individual than the named insured on the policy.  Two weeks later, on March 9, 2014 at 11 p.m., a 1997 Mercury Sable insured by State Farm Fire purportedly ran through a stop sign at the same intersection of Newkirk and Westminster.  All five occupants of the Mercury sought treatment at 1786 Flatbush the following day.  The State Farm Fire policy for the Mercury was purchased 13 days earlier on February 24, 2014, again listing a different named insured than the registered owner of the vehicle.  On June 2, 2014 at 11 p.m., a 1993 Honda Accord insured by State Farm Fire ran through a stop sign at the same intersection, with all four occupants seeking treatment at 1786

Flatbush the following day.  The policy for the Honda Accord was purchased on May 27, 2014 (six days before the accident) and listed a named insured who was not the registered owner of the vehicle.

168.    In addition to common locations of accidents across different claims, many of the individuals involved in different accidents are connected.  Such connections include common residential addresses.  For example, insured passenger T.W. listed his address as an apartment in a building on 94th Street in Brooklyn in his claim arising out of the February 26, 2014 accident discussed above.  Insured passenger T.N. listed an address in the same 94th Street apartment building in Brooklyn as T.W. (just a different apartment number) on her claim for a July 21, 2015 accident.  Both individuals were represented by the Rybak Law Firm in connection with their claims.  The frequency with which this commonality occurs in 1786 Flatbush patients is not credible.  For example, insured passenger A.D. listed an address on 94th Street in Brooklyn after his June 2, 2014 accident, which is the exact same address used by insured passenger R.W.F. in his claim arising out of his February 4, 2014 accident.  Both A.D. and R.W.F. were represented by the Rybak Law Firm.  Passenger M.W., who sought care at 1786 Flatbush on the day after her December 1, 2013 accident, listed her address as an apartment in a building on Kings Highway, Brooklyn, which appears to be down the hall from the Kings Highway apartment address used by insured passenger I.N. following his January 6, 2014 accident for which he sought treatment at 1786 Flatbush on the following day.

169.    In addition to common residential addresses, similarities in email addresses used by State Farm Mutual or State Farm Fire insureds who treated at 1786 Flatbush also reveal connections between seemingly unconnected individuals.  For example, two individuals who treated at 1786 Flatbush following separate accidents that occurred one week apart both used the

identical email address in submitting their claims to State Farm Fire, while another individual who treated at 1786 Flatbush provided a closely similar email address in a claim arising out of a separate accident.  Three other individuals, with no apparent relationship to each other, all of whom resided at different physical addresses, each submitted separate claims using an identical email address in connection with two separate accidents which occurred two weeks apart in April 2016.  Both accidents involved insured vehicles which were more than 15 years old at the time of the accident.

170.    Even more improbable, unrelated individuals with no apparent connection to one another have treated at 1786 Flatbush following different accidents involving the exact same vehicle which was insured under different policies.  For example, injured passengers S.B. (age 19), S.L. (age 36), and D.F. (age 47) were involved in a collision in a 1995 Honda Accord on March 5, 2016, that occurred nine days after an insurance policy was purchased for the vehicle, and each treated at 1786 Flatbush within three days after the accident.  The very same Honda Accord was involved in a different rear-end accident less than two months later on May 24, 2016, the claims for which were submitted under a different insurance policy obtained 27 days earlier.  The May 24, 2016 accident involved the same 1995 Honda Accord but a completely different set of unrelated drivers and passengers, with the driver C.H. (age 57) and injured passengers H.B. (age 38), T.O. (age 23), and K.T. (age 19) all treating at 1786 Flatbush within two days of the accident.  In both of the claims, Oleg Rybak and the Rybak Law Firm represented all of the injured passengers in the 1995 Honda Accord.

171.    As attorney for so many of these individuals, Oleg Rybak, at a minimum, was in a position to know the facts and circumstances of their accidents, that multiple parties claimed injuries from individual accidents, that there were connections among accidents, and that

accidents were staged.  Oleg Rybak, however, profited from bringing and collecting claims, suits, and proceedings on behalf of the purportedly injured individuals through collection of fees, likely as a result of a contingency fee arrangements in which he obtained some portion of the recovery.

**F.     The Legitimate Treatment of Patients with Strains and Sprains**

172.    Defendants purport to examine, diagnose, and treat patients who have been in motor vehicle accidents and complain of neck and back pain.

173.    For patients who have been in motor vehicle accidents and have complaints of neck and back pain, a detailed patient history and a legitimate examination must be performed to arrive at a legitimate diagnosis.

174.    Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique circumstances of each patient.  During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

175.    Legitimate treatment plans for patients with strains and sprains may involve no treatment at all because many of these kinds of injuries heal without any intervention, or a variety of interventions including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

176.    Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities including hot and cold packs, ultrasound, diathermy, traction, manual therapy, massage, and traction.  Active modalities require patients to affirmatively participate in their treatment and include many different kinds of stretching, exercising, and strengthening therapies.

177.    In legitimate treatment plans, active modalities are necessary to rehabilitate and heal soft-tissue injuries, while passive modalities are typically used only to the extent necessary to reduce pain and to facilitate the patient's ability to perform active modalities, which should be introduced into a patient's treatment plan as soon as practicable.

178.    While one or more passive modalities may be appropriate on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the same combination of passive modalities on nearly every visit regardless of whether the patient improved would rarely be appropriate for one patient, let alone almost every patient, on almost every visit.

179.    The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary depending on the unique circumstances of each patient, including:  (a) the patient's age, social, family, and medical history; (b) the patients physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

180.    Treatment plans should be periodically reassessed and modified based upon the progress of the patient, or the lack thereof.

181.    Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the patient.

182.    The above-described process of examination, diagnosis, and treatment must be documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care and condition necessarily depends on the documentation

of this information; and (d) payers such as State Farm Mutual and State Farm Fire so that they can pay for reasonable and necessary treatment.

### G.     Defendants' Predetermined Treatment Protocol

183.    The Predetermined Treatment Protocol at 1786 Flatbush exploits patients' No-Fault Benefits and does not legitimately treat patients according to their true needs.  As detailed below, the Predetermined Treatment Protocol includes medically unnecessary and fraudulent: (1) examinations, diagnoses, and treatment plans by the Physician Defendants; (2) physical therapy treatment; (3) chiropractic examinations, diagnoses, and treatment; (4) acupuncture examinations and treatment; (5) diagnostic Tests (including ROM Tests, Muscle Tests, NCVs, EMGs, SSEPs, BEPs, functional capacity evaluations, and V-sNCT testing); (6) injections (including trigger point injections and dry needling); and (7) Supplies (including DME and orthotics).

184.    This medically unnecessary treatment typically continues for months on end. Almost none of the patients at 1786 Flatbush are discharged from care based on their purported clinical conditions.  To the extent the medical records of patients at 1786 Flatbush contain references to discharges, they routinely show (a) the patient made the decision to stop treating; (b) the patient continued to undergo treatment after the date of the purported discharge; or (c) the discharge came shortly after State Farm Mutual or State Farm Fire requested one of the defendant providers appear for an EUO and submit to questioning about the patients' treatment. For example, State Farm Mutual requested that Mollo appear on July 15, 2014 for an EUO to answer questions about the treatment of patient G.P.  Mollo failed to appear as requested and on the very next day, Parisien noted in patient G.P.'s chart, "Patient has completed all services from the office.  He feels better.  He wants to be discharged."  Similarly, State Farm Fire requested that Mollo appear for an EUO on August 5, 2014 relating to patient P.O., for which Mollo failed

to appear.  That same day, Parisien noted in the chart, "Patient stated he feels well but wants to stop.  He has completed all services from the office."

185.    The applicable fee schedule governing No-Fault claims imposes limits on the amount of physical therapy and chiropractic treatment that can be provided to a patient on any single date of service.  Under that schedule, certain medical services are assigned "relative values," and a provider cannot bill for more than eight "relative units" of identified physical therapy modalities and chiropractic manipulations for an individual patient on a single date of service.  To exploit patients' No-Fault Benefits to the greatest extent possible, while seeking to avoid the limitations imposed by the fee schedule, Defendants:  (a) routinely provided particular physical therapy modalities not because they were beneficial to the patients, but because that combination of modalities allowed each provider to bill for close to eight relative units per day thereby maximizing the amount that could be collected; (b) purported to provide those same modalities to nearly every patient on nearly every date of service regardless of the particular needs of any patient; and (c) added services regardless of whether they were necessary that were not subject to the unit limitation.  Moreover, patients were often subjected on the same day to physical therapy services and to chiropractic manipulations, and although all such treatment should have been limited to a total of eight units per day, Defendants billed the physical therapy and chiropractic care separately to maximize the amount that could be billed while hiding the fact that treatment in excess of eight units per day was provided.  Additionally, since acupuncture services, including "cupping" are not included in the applicable eight-unit daily limit, Defendants routinely added both acupuncture services and cupping to the Predetermined Treatment Protocol as yet another means to increase their bills without running afoul of the fee schedule's restrictions.

186.    Another aspect of the Predetermined Treatment Protocol is Defendants' circumvention of the otherwise applicable fee schedule by avoiding the use of certain CPT billing codes which provide for a fixed reimbursement.  Instead Defendants, on occasion, use "By-Report" or "BR" codes, which do not provide for fixed levels of reimbursement and are not subject to the eight-unit-per-day limitation described above.  According to the New York Department of Financial Services, which promulgated the applicable fee schedule, BR codes are meant to reflect services that are relatively unique in nature and do not have a specific unit value indicated within the fee schedule.  Fees for such services are set by the provider and must be justified by the submission of a written report.  Defendants do not use the "BR" code legitimately to document a necessary unique procedure, but rather to circumvent the fee schedule and inflate charges.  For example, on dates of service when they purportedly provided trigger point injections, which are listed on the fee schedule, the Physician Defendants also frequently bill State Farm Mutual and State Farm Fire for multiple instances of "dry needling" using the "BR" CPT Code 20999 ("unlisted procedure, musculoskeletal system, general") for many of the same patients.  Although 20999 is a BR code, Defendants provide no explanation why these services are unique or necessary in addition to or in lieu of the trigger point injections, even when the needling was provided to the same areas of the body on the same day.

### 1.    Physician Examinations, Diagnoses, and Treatment Plans

187.    As part of the Predetermined Treatment Protocol, patients received initial evaluations from one of the Physician Defendants.  Initial examinations were performed at 1786 Flatbush by Parisien from approximately September 2013 through at least June 2015, by Blackman from approximately June 2014 through at least July 2016, by Dabiri from approximately January 2014 through at least May 2014, by Pavlova from approximately September 2013 through at least October 2016, and by Lacina from approximately January 2014

through at least March 2016.  The Physician Defendants' initial examinations were billed to State Farm Mutual and State Farm Fire under the tax identification numbers and/or social security numbers of Parisien, Blackman, Dabiri, Pavlova, and Lacina, and under the tax identification numbers of Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, and RA Medical.

188.    Each of the Physician Defendants almost always diagnoses patients with sprains and strains in the cervical and lumbar regions of the back as well as other conditions.  Based on these predetermined diagnoses, the Physician Defendants usually conclude that patients require the Predetermined Treatment Protocol — a treatment plan that includes physical therapy, consultations with a chiropractor and an acupuncturist, a variety of diagnostic Tests, Supplies, and in some instances injections.

189.    The documentation of initial examinations, diagnoses, and treatment plans by Parisien, Blackman, Dabiri, Pavlova, and Lacina is not credible and is fraudulent.  Each of the Physician Defendants at 1786 Flatbush consistently use nearly identical examination forms (the "Initial Evaluation Report"), which differ only in the name of the particular Physician Defendant listed on the top of the first page.  Indeed, the Initial Evaluation Reports contain the same typographical errors and misspellings regardless of the Physician Defendant whose name appears.

190.    Not only do the Physician Defendants use nearly identical forms to document initial examinations, they also employ those forms in a way that makes it difficult to impossible for Defendants, other providers, or payers like State Farm Mutual and State Farm Fire to assess the true nature of patient complaints, examination findings, and diagnoses, or to know if examinations are being performed at all.  The forms contain prepopulated typed findings, pre-

typed narrative discussions, and spaces for handwritten comments or notations.  On some forms, the Physician Defendants underline or circle preprinted items, apparently representing specific findings.  On other forms, none of the preprinted findings is underlined or circled.  On yet other forms, some sections contain underlining or circling of preprinted items and some sections are without any markings.  On some occasions, markings are inconsistent with other findings.  For example, Parisien checked the box for "normal" with respect to a patient's cervical spine examination, and then underlined certain positive examination findings that would indicate cervical pathology.  Given this variability, it is almost impossible to discern the meaning of markings or their absence or to interpret the findings being made, the examinations performed, or the conclusions reached.

191.    Further, the Initial Evaluation Reports contain the following, or nearly identical, affirmative representation regarding specific positive findings from various tests performed during the patient examination:

> Tender points were also elicited at C3, C4, C5, C6, C7 levels.  The soto hall (force flexion of the head and neck upon the sternum) elicited pain.  Cervical distraction test was positive indicating the presence of a spinal nerve root compression.  Manual testing of muscle strength was also positive.  Pinprick and touch was abnormally decreased over the right left arm.  The patient had difficulties looking up to the ceiling because of spasm and stiffness of the cervical musculature.

Ex. 20.  While in some instances, various portions of this paragraph may be underlined, this preprinted language is rarely, if ever, crossed out entirely, suggesting these findings were present in every patient.  The forms themselves and Defendants' use of them advance the scheme because they prevent others from assessing the true nature of patient complaints, examination findings, and diagnoses, while allowing Defendants to claim patients suffer from a wide variety of conditions to justify treatment.

192.     Despite the inconsistencies and ambiguity in the Initial Evaluation Reports, certain patterns emerge when they are viewed as a group.  While the Initial Evaluation Reports reflect some variation in certain objective findings, some tests performed during evaluations, and responses to those tests, the Initial Evaluation Reports routinely include certain findings and diagnoses common to most of the reports, which are then used to support nearly identical treatment plans for almost every patient.  Specifically, the Initial Evaluation Reports find:  (a) most patients complain of neck pain; (b) most patients complain of low back pain; (c) most patients report significant frequency of pain in the affected area with the vast majority of patients purportedly suffering pain on a daily basis; and (d) most of the range of motion measurements are reported as abnormal.  *See* Ex. 2.

193.     Based on these common findings, and in apparent disregard of such variation as is noted in some forms, the Initial Evaluation Reports purport to diagnose nearly every patient with cervical sprain, strain cervicalgia, or myofascitis and/or lumbar sprain, strain, or myofascitis and sometimes conditions in one or more other regions.  *See* Ex. 2.

194.     Also purportedly based on these common findings and diagnoses, the Physician Defendants' initial treatment plan generally recommends to:  (a) commence physical therapy; (b) order x-rays of multiple regions of the spine; (c) order MRIs of the cervical and lumbar spine and often other extremities; (d) prescribe a common laundry list of Supplies; and (e) sometimes send patients for other consultations, services, and testing including neurological consultations.  *See* Ex. 20.  While the forms provide an option for the Physician Defendants to order "Synaptic therapy" and "computerized ROM/M MT" (range of motion/muscle testing), these entries are almost never checked, yet patients are routinely provided with these services.  *See* Ex. 2.

195.    The Physician Defendants and the Chiropractor Defendants at 1786 Flatbush also routinely order medically unnecessary MRI exams and refer patients to a handful of MRI providers, including Avalon Radiology, P.C., in Brooklyn, Doshi Diagnostic, and New York Radiology and Middle Village Diagnostic, in Elmhurst, New York, the results of which are not discussed with the patients and do not impact the diagnoses or course of treatment.  Additionally, the Physician Defendants and Chiropractor Defendants routinely refer patients for medically unnecessary x-ray imaging which is performed in a van parked outside of 1786 Flatbush, the charges for which are billed to State Farm Mutual and State Farm Fire by Prompt Medical Services, Inc.

196.    Approximately four weeks after their initial examination, patients purportedly undergo follow-up examinations, which may be performed by the same or a different Physician Defendant.  Regardless of who performs the follow-up examination, like the initial examinations, these follow-up examinations involve, at most, cursory examinations of patients — the purpose of which appears to be to support the continuation of the Predetermined Treatment Protocol — and are documented using the same, preprinted forms as the initial examinations (the "Follow-Up Reports").  *See* Ex. 21.  While some of the Follow-Up Reports purport to comment on x-ray or MRI results, there is no reported indication of a change in treatment based on these studies or that findings are communicated to other providers involved in the treatment.

197.    The Follow-Up Reports indicate some patients' conditions have improved and some are the same, but regardless of their clinical status at the time of the follow-up examination, the reports order the continuation of physical therapy and additional services, including additional diagnostic testing such as x-rays and MRIs, additional Supplies, and for many patients, neurological consultations, pain management, or injections.  In many instances, the

Physician Defendants also perform trigger point injections and/or dry needling procedures during their follow-up examinations.  *See infra* ¶¶ 292–314.

### 2. Physical Therapy Treatment

198.  Physical therapy is ordered as part of the Physician Defendants' initial treatment plan.  It is then performed by Mariano and other physical therapists and billed to State Farm Mutual and State Farm Fire by MSB, the Physician Defendants, and others.  The physical therapy treatments which patients purportedly receive at 1786 Flatbush are almost identical, do not change regardless of whether the patients purportedly improve or get worse, and typically involve at least three and very often five passive modalities on every visit from the first to last date of service.  When therapeutic exercise is billed, the particular exercises purportedly performed are not identified much less documented and, in at least some instances, were not actually performed.

199.  In some instances, patients have testified they received physical therapy even before being examined by one of the Physician Defendants.  As physical therapy services are not compensable under the No-Fault Laws unless they are pursuant to a doctor's prescription or referral, *see* N.Y. Ins. Law § 5102(a)(1)(ii), such treatment was not lawfully rendered and was not reimbursable.

200.  Physical therapy treatment at 1786 Flatbush typically begins with patients purportedly being examined by a physical therapist, in many instances on the same day as the initial examination purportedly performed by one of the Physician Defendants.  To support their treatment, Mariano or some other physical therapist working for one of the Physical Therapy Defendants creates reports of these purported examinations that include treatment plans ("PT Examination Reports").  Portions of many of these reports are illegible, rendering it difficult if not impossible for Defendants, other providers, patients, or payers like State Farm Mutual and

State Farm Fire to know the nature of the treatment recommended or the patients' condition.  To the extent the PT Examination Reports are legible, they routinely record patients as suffering neck and/or back pain, report high pain levels, often 9 on a scale of 1 to 10, and state patients have a favorable "[r]ehabilitation potential for functional improvement" and would benefit from and/or are good candidates for physical therapy.  The reports then routinely conclude patients should begin a course of physical therapy three times per week, usually for four weeks, involving specifically: (a) application of moist heat packs; (b) therapeutic massage; (c) therapeutic exercise; (d) synaptic therapy; and (e) home exercise.  The reports do not detail the type of exercise contemplated or its duration.

201.    Thereafter, as set forth on Exhibit 3, nearly every patient at 1786 Flatbush is subjected to the same physical therapy services purportedly performed on nearly every visit: application of hot packs, therapeutic massage, exercise, bioelectric therapy, and, although it is not mentioned or prescribed in the PT Examination Reports, a treatment called low-level laser therapy.  Physical therapy treatment is purportedly documented in daily notes, which consist of preprinted forms with check boxes, and which lack any description of treatment such as the location of the body where hot packs were applied or massages provided.  Defendants provide the foregoing modalities (if provided at all) pursuant to the Predetermined Treatment Protocol, which maximizes the charges they can collect from State Farm Mutual and State Farm Fire.  Indeed, while any one of these treatments may conceivably be medically necessary for a particular patient on a particular day, the comprehensive combination of treatments is seldom, if ever, medically necessary for any patient on any day, let alone on almost every visit.

202.    Defendants also purport to provide and bill for providing therapeutic exercise to patients on nearly every visit.  But the records rarely indicate what exercises are provided, how

long the exercises are performed, or how the patients responded.  Moreover, some patients have testified they never underwent any exercise at 1786 Flatbush even though State Farm Mutual and State Farm Fire received numerous bills for exercise and reimbursed Defendants for such services.

203.    Among the passive modalities purportedly provided at 1786 Flatbush and billed to State Farm Mutual and State Farm Fire is bioelectric therapy.  *See* Ex. 3.  Bioelectric therapy is simply another form of electrical stimulation in which the patient is typically given some control of the intensity.  Defendants do not bill for bioelectric therapy using CPT Code 97014, the physical therapy code for electric stimulation.  Rather, Defendants misrepresent the service they purport to provide using the CPT Code 64550, a code commonly used for the initial application and instruction of a TENS (Transcutaneous Electrical Nerve Stimulator) unit.  While electrical stimulation correctly billed under CPT Code 97014 would be included in the eight-unit per day limitations on physical therapy under the New York No-Fault regulations, *see supra* ¶ 185, the CPT Code 64550 Defendants use for bioelectric therapy charges is *not* included in the eight-unit limit.  Thus, by billing for bioelectrical therapy under CPT Code 64550, Defendants avoid the limitations on physical therapy contained in the fee schedule and thereby fraudulently induce State Farm Mutual and State Farm Fire to pay for excessive and unnecessary passive physical therapy modalities for which it would not have otherwise paid.

204.    The Physician Defendants also routinely bill State Farm Mutual and State Farm Fire for another passive modality called "low level laser therapy" using CPT Code 97799, the code for an unlisted physical therapy procedure, which is also excluded from the otherwise applicable eight-unit daily limitations on physical therapy modalities.

205.    Further, in some instances, patients for whom Defendants have submitted bills for bioelectric therapy and low level laser therapy to State Farm Mutual or State Farm Fire have testified they did not receive such treatment.

206.    Moreover, although Defendants administer bioelectric therapy and low-level laser therapy on the same day as other passive modalities, Defendants submit separate bills and supporting documentation on separate days for such treatment.  Such documentation consists of preprinted forms with numbers that can be circled to indicate a patient's purported pain levels before and after the procedures.  Defendants' treatment forms routinely report patients experienced slight improvement following the procedures, for example pain reduced from a score of 7 to a score of 6.

207.    Defendants' submission of separate bills and supporting documentation for bioelectric therapy and low-level laser therapy conceals the full extent of passive modalities provided on any single day and is an apparent attempt by Defendants to limit the total number of services included in any one submission for any single date of service to avoid detection of their scheme.

### 3.    Chiropractic Initial Exams, Diagnoses, and Treatment

208.    Most patients treated at 1786 Flatbush were subjected to chiropractic examinations and treatment by Mollo or a chiropractor working for Mollo P.C., ACH Chiropractic, Energy Chiropractic, or Island Life (collectively, the "Mollo Entities").  Patients purportedly underwent initial examinations that led to reports of nearly identical conditions, included findings that were internally inconsistent or inconsistent with findings purportedly made by the Physician Defendants on the same day or within a few days of the chiropractic initial examination, made no sense, or were highly improbable and, regardless of the purported findings, resulted in common diagnoses and recommendations.  Following these examinations,

patients were subjected to chiropractic manipulations that did not vary in time, frequency, or type regardless of whether the patient got better or worse.

### a. Fraudulent Chiropractic Initial Exams and Diagnoses

209. Chiropractic treatment at 1786 Flatbush begins with initial examinations performed by Mollo or another chiropractor working on behalf of one of the Mollo Entities. The chiropractic examinations are often conducted on the same day or within days of examinations purportedly performed by one of the Physician Defendants. The initial chiropractic examinations routinely report patient complaints of cervical, mid-back, or low-back pain and diagnose the patient with a common set of conditions. Based on these predetermined diagnoses, the chiropractors conclude that patients require a treatment plan typically consisting of chiropractic adjustments three to four times per week often for four to six weeks, followed by a re-examination, and often referrals for an MRI or an x-ray and to undergo a V-sNCT test.

210. The documentation of the initial examinations, diagnoses, and treatment plans by the chiropractors submitted to State Farm Mutual and State Farm Fire include Chiropractic Initial Evaluation Reports ("Chiropractic Initial Reports"). The Chiropractic Initial Reports are preprinted, form documents that contain fields to be circled and fill-in-the-blank spaces allowing for minimal entries. The narratives on the Chiropractic Initial Reports are preprinted with places to circle, such as the patients' gender, whether the accident was due to a motor vehicle accident or work related, the patients' position in the automobile, and the patients' complaints.

211. In most instances, these Chiropractic Initial Reports reflect: (a) complaints of pain in the cervical, thoracic, and lumber spine; (b) pain levels that are often either not recorded or when they are recorded are reported as 7 or higher on a scale of 1 to 10; (c) positive findings on at least one of a variety of orthopedic tests; and (d) tenderness of the paraspinal muscles at the cervical, thoracic, and lumbar regions of the spine. *See* Ex. 4.

212.   Based upon these purported histories, examinations, and findings, the Chiropractic Initial Reports record diagnoses of multiple spinal conditions, including sprains in the cervical, thoracic, and/or lumbar regions of the spine, muscle spasms, and segmented joint dysfunction in the cervical, thoracic, and/or lumbar regions of the spine and the hip.  These findings that patients purportedly suffer from conditions in so many regions serve to justify more extensive manipulations for which Defendants can submit a higher charge under the applicable fee schedule.  The chiropractors typically report patients' prognosis as "guarded."  *See id.*

213.   The Chiropractic Initial Reports also contain a preprinted treatment plan with 17 treatment "options" that can be checked as well as room to identify "Other" options.  "Other" options are rarely, if ever, identified.  Rather, Mollo and the other chiropractors routinely select the same treatment options:  (1) chiropractic manipulative therapy for three times per week, often for four to six weeks, followed by a re-examination; and (2) V-sNCTs, which they describe as "small pain fiber studies of the cervical/lumbar spine to evaluate pathology to the A-delta, A-Beta, and C sensory nerve fibers."  The treatment plan also typically includes referrals for x-rays and/or MRIs of the cervical, thoracic, and/or lumbar spine "to R/O [rule out] discogenic injury if symptoms persist for 3-4 weeks."  *See id.*  The chiropractic treatment plan rarely includes active therapy or exercise.  *Id.*

214.   When viewed as a group, the Chiropractic Defendants' referrals of patients for x-rays and MRIs also reveal other non-credible patterns.  From August 2013 until July 2014, the initial examination forms reflect a referral for MRIs and/or x-rays.  Beginning in July 2014 until September 2015, however, the Chiropractor Defendants' initial examination reports rarely, if ever, reflect referrals of patients for x-rays or MRIs, even though at least some of the patients received initial examinations during this period.   The Chiropractor Defendants resumed

recommending x-rays and/or MRIs in November 2015 for virtually every patient.  It makes no sense that (a) nearly every patient would receive a referral for x-rays and/or MRIs over the course of a one-year period; (b) then no patients receive any referrals for x-rays or MRIs for a 14-month period; and (c) then nearly every patient again receives referrals for x-rays and MRIs following their initial examination.  In May 2016, ACH Chiropractic itself began billing for x-rays performed on patients at 1786 Flatbush.

### b.     Fraudulent Chiropractic Treatments

215.    Following the initial chiropractic exams, patients are scheduled to receive chiropractic manipulations at 1786 Flatbush three to four times per week.  The predetermined chiropractic treatment patients purportedly receive on almost every visit is almost identical and does not change regardless of whether the patient improves or gets worse.

216.    Daily chiropractic progress or SOAP notes ("Chiropractic Daily Notes") purport to reflect chiropractic manipulations provided to each patient on each visit and the assessments of the patients' conditions; but, at most, they reflect cursory evaluations of patients to support the continuation of the Predetermined Treatment Protocol.  The Chiropractic Daily Notes consist of pre-typed worksheets with spaces to circle findings.  The forms routinely report patients' complaints of "NP" (neck pain), "MBP" (mid-back pain); and "LBP" (low-back pain) and that the patients present with purported objective findings of "hypertonic" or "spasm" in the spine and/or joint dysfunction in multiple regions of the spine.  *See* Ex. 22.  The Chiropractic Daily Notes often reflect "No Change" to the patient's condition, and that the chiropractic treatment should "Continue as planned."  *Id.*  While the form includes a space to allow the chiropractor to "Modify" the treatment plan, modifications are rarely indicated.

217.    Regardless of the outcome of the purported assessment, the Chiropractic Daily Notes reflect that each patient typically receives basically the same treatment: chiropractic

manipulations of the spine, most frequently for three to four regions of the spine.  *See* Ex. 1. Following these manipulations, the Chiropractic Daily Notes routinely reflect that the "patient[s] felt . . . [b]etter."

218.    In addition, while a variety of potential chiropractic manipulation options and techniques are potentially available in a legitimate setting, the documentation at 1786 Flatbush does not describe the kind of chiropractic manipulations purportedly provided, and thus does not indicate that there is any variation in the time, frequency or type of chiropractic manipulations regardless of whether the patients improve or get worse.  Further, although it is a common practice in a legitimate healthcare setting to document the name of the professional providing the service on any given day, the Chiropractic Daily Notes contain only illegible scrawled signatures, making it difficult if not impossible to identity the chiropractor or other individual who purportedly provided the manipulation.

219.    The chiropractors do not conduct meaningful follow-up examinations, if they conduct them at all.  In those instances in which they purport to conduct follow-up examinations, the examinations involve, at most, cursory exams of patients to support continuation of the predetermined chiropractic treatment.  In particular, reports of follow-up examinations, which consist of single-page sheets with preprinted content, routinely indicate that, despite having undergone a course of purported chiropractic care, patients continue to complain of cervical and/or lower back pain.  Even when patients purportedly have no range of motion deficits upon re-examination, the re-examination report recommends continuation of the same treatment plan and the patient thereafter continues the Predetermined Treatment Protocol, often including several more weeks of chiropractic manipulations.  *See* Ex. 23.

220. Although patients receive evaluations and chiropractic manipulations from the chiropractors on the same visits to 1786 Flatbush when they purportedly also receive hot packs, electrical stimulation, massage, exercise, and acupuncture, the documentation provided to State Farm Mutual and State Farm Fire contains no indication of any communication between or among any of the professionals rendering services that would suggest any attempt to coordinate their treatment.

### 4. Defendants' Fraudulent Acupuncture Treatment

221. Defendants Deng and Deng Acupuncture also purport to perform acupuncture treatment on most State Farm Mutual and State Farm Fire insureds treated at 1786 Flatbush on the same days the patients also receive the above-described physical therapy and chiropractic manipulations. As discussed below, this acupuncture treatment is medically unnecessary and not legitimately provided.

### a. Legitimate Acupuncture Treatment

222. Acupuncture services are premised upon the theory that there are twelve primary meridians with matching sinew channels and ten extraordinary meridians ("the Meridians") in the human body through which energy flows. Under the principles of acupuncture or Chinese medicine, every individual has a unique energy flow, also referred to as "Chi." When that Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and thereby restore the patient's Chi.

223. In addition to inserting needles into Acupuncture Points, in appropriate circumstances acupuncture can include a procedure known as "cupping." Cupping involves the application of suction to the skin using a small, open mouth plastic vacuum jar or "cup" or a pneumatic device to create a vacuum over the skin. Cupping is premised on the theory that

suction at appropriate locations removes pain-inducing stagnant blood by bringing it to the surface. During cupping, the cup is usually applied to the lower back, shoulders, and neck, and then left on the skin for about 10 minutes. While cupping may be appropriate for some patients in some circumstances, in a legitimate acupuncture setting it is performed infrequently as it usually produces noticeably visible bruises or welts on the skin. Also, due to the high likelihood of bruising, cupping is generally contraindicated for people who bruise easily or are obese. Moreover, even when cupping is indicated, it should not be repeated on the same patient regularly and it would be highly unusual to include cupping as part of each acupuncture session.

224.   Legitimate acupuncture treatment begins with an examination of the patient. In addition to taking a detailed patient history on a variety of topics, such as the patient's reactions to heat and cold, perspiration patterns, thirst and appetite, pain type and location, and general medical history, a physical examination is also performed. Two critical components of this examination are the appearance of the patient's tongue (i.e., color, shape, texture, etc.) including the veins underneath the tongue, and various measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.). The information gleaned from these components of the physical examination is necessary to accurately diagnose the patient and determine an individualized acupuncture treatment plan designed to benefit the patient by restoring their unique Chi.

225.   Next, a specific acupuncture treatment plan is developed. This generally requires the insertion of needles into particular Acupuncture Points along the Meridians. There are over 360 Meridian Acupuncture Points, numerous "extra" points and countless "Ah Shi" points from which an acupuncturist may choose. Ah Shi points can only be detected by touch and palpation, often feel like a pea-size nodule under the skin, and are treated similarly to an Acupuncture Point. The location of Ah Shi points will necessarily vary from patient to patient, and can often

vary in a single patient over the course of multiple visits. This requires the practitioner to conduct a thorough examination and to properly document the location of the Ah Shi points in the particular patient. Any legitimate acupuncture treatment plan should typically include local points at the injury sites, proximal points (i.e., near the affected areas of the involved Meridian(s)), distal Acupuncture Points (i.e., distant from the affected areas of the involved Meridian(s)), and also address any Ah Shi points.

226. Finally, an acupuncture treatment plan is implemented. Treatment involves insertion of generally 10, but more typically 20 or more acupuncture needles, for a minimum of approximately 20 minutes into each of the selected Acupuncture Points. The number and location of the Acupuncture Points generally varies based each patient's unique circumstances as the patient's documented therapeutic response to each prior acupuncture treatment. Generally, more severe conditions are treated with greater frequency and more Acupuncture Points. As patients improve, treatment frequency and the number of points used should decrease.

227. The goal of legitimate acupuncture treatment is to effectively treat and benefit patients by restoring their unique Chi, relieving symptoms, and returning them to normal activity.

228. Further, a legitimate acupuncture treatment plan may permit frequent treatment sessions for the first two weeks of treatment. After this initial stage, the frequency of weekly treatment sessions typically decreases, leaving more time between treatments to assess how long the patient remains pain free and/or how long the therapeutic effect of such treatments can be maintained.

229.    Legitimate acupuncture treatment also requires meaningful documentation of the: (a) patient's history; (b) physical examination; (c) diagnosis; (d) treatment plan; (e) results of each session; and (f) the patient's progress throughout the course of treatment.

230.    Finally, legitimate acupuncture therapy requires continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans, like most treatments, are fluid and should evolve over time as a patient responds to care.  The goal of any legitimate acupuncture treatment plan is to return the patient to maximum health by restoring his or her unique Chi.

### b.    Defendants' Fraudulent Acupuncture Treatment

231.    The Acupuncture Defendants' protocol treatment at 1786 Flatbush does not comport with any of the above basic tenets of legitimate acupuncture treatment.  Instead, at best, it consists of inserting needles or cupping in an assembly line fashion that bears little, if any, relation to the patient's condition and is not designed to effectively treat or otherwise benefit the patient.  As such, the acupuncture services as performed by the Acupuncture Defendants at 1786 Flatbush are not medically necessary.  Instead, they enrich the Acupuncture Defendants through the submission of fraudulent charges to State Farm Mutual and State Farm Fire.

232.    The Acupuncture Defendants purport to support their fraudulent charges with initial examination reports and treatment notes.  With minor exceptions, these documents reveal the following pervasive patterns in the initial examinations, diagnoses, and treatment recommendations, patterns which are not credible across a large sample of individuals:

> (a)    Most patients present with an unremarkable family history, but complain of neck and/or back pain and pain in another region of the body.  Although Deng's initial examination form provides several other possible pain descriptions which can be circled, in almost all cases, the pain is described as "persistent" and "sharp."  Although Mollo, the Mollo Entities, and the Mollo Chiropractors often find patients complain of thoracic pain, Deng rarely does, even though he purportedly examines patients on the same visits or within days of the chiropractors' visits.

(b)     While Deng's examinations are billed to State Farm Mutual and State Farm Fire using CPT Code 99203, which should be used for a thorough examination usually taking 30 minutes, Deng's examination forms do not reflect the taking of sufficient histories or adequate examinations, let alone a thorough examination that could take 30 minutes.  Deng's initial examination reports contain almost no information about the patients, with the majority of patients' past medical histories reported as "None." Even when other providers at 1786 Flatbush note significant aspects of patients' medical history, such as prior surgery or cancer, Deng's reports rarely, if ever, mention such conditions or events.

(c)     Nearly every patient on initial examination has the tongue assessed as "light red" in color and "normal" shape with a "thick white" coating.  *See* Ex. 5.

(d)     Although Deng's initial examination reports provide for more than 13 options of pulse characteristics, patients' pulses are routinely described as either "normal" or "floating."  *See id.*

(e)     Following their initial examination, patients are almost always diagnosed with Chi-blood stagnation, which is preprinted on the boilerplate form.  Although there are more than 18 channels among the preprinted options on Deng's initial examination form, Deng routinely finds that the patient has stagnation of the blood at two channels: (1) "The Small Intestine Channel of Hand-Taiyong," and/or (2) "The Urinary Bladder Channel of Foot-Taiyang" ("UB Channel").

(f)     In addition to the Chi diagnoses, Deng diagnoses most patients with a condition in one or more regions of the spine, most commonly (1) cervical sprain/strain; (2) lumbar myofascitis; and (3) lumbar sprain/strain, in addition to other diagnoses such as knee, or shoulder issues, or headaches.

(g)     Deng's reports routinely conclude with boilerplate language that the treatment of acupuncture would be appropriate and necessary for several reasons, including to: (1) "[p]rovide symptomatic pain relief in acute and sub-acute stages of injury condition; (2) [a]ssist to reduce inflammatory response to affected areas; and (3) [r]eflexively subside painful muscle contraction and reactive spasm of the injured joint's intrinsic musculature, thereby reversing the pain-spams-muscle cycle."

(h)     Deng's initial examination reports routinely contain a conclusion (in preprinted, boilerplate language) that there is "a direct causal relationship between the accident described and the patient's current injuries."

(i)     Most patients receive an acupuncture treatment plan calling for acupuncture two to three times per week for four weeks.

(j)     In the initial exam, the size, type, and sometimes the quantity of needles to be used is predetermined and described in preprinted template language.  Specifically, the reports state the needles to be used are "[d]isposable and sterile, individually packed with guided PVC tube.  Size 36# x 1.0 (0.20mm x 25mm) or 34# x 1.5 (.22mm x 40mm). 15 [minutes] for initial insertion or reinsertion."  *See* Ex. 24.  It is simply not credible that

it would be appropriate for the Acupuncture Defendants to use the same size and types of needles on every insertion point for every patient at almost every acupuncture session regardless of their individual conditions, as different body types and conditions require the use of different sizes and types of needles, or that the Acupuncture Defendants would almost always make that determination during the initial visit.

(k)     While Deng's acupuncture initial examination reports provide a blank space for a "Prognosis" to be filled in, it is nearly always left blank.

(l)     There are often inconsistencies between the purported findings of the Acupuncture Defendants, the Physician Defendants, and Chiropractor Defendants who purportedly examined the same patients on or about the same day.  For example, Deng's reports of patients' complaints, range of motion in the neck and back, and even pulse often differ from the reported findings of the Physician Defendants and Chiropractor Defendants.

233.   Based upon these purported examinations, diagnoses, and treatment recommendations, the Acupuncture Defendants subject patients to acupuncture treatment.  With minor exceptions, documentation reveals the following pervasive, non-credible patterns in the treatment:

(a)     The daily acupuncture SOAP note consists of a brief, preprinted form with areas for the provider to circle certain information and identify the Acupuncture Points at which acupuncture is purportedly performed.  The handwriting on the form is often illegible, making it difficult if not impossible to determine what treatment is being provided.

(b)     Based on the circles on the forms, patients are nearly always documented as presenting with neck and/or low-back pain and tenderness and spasms in their cervical and/or lumbar spine.

(c)     Despite the importance of tongue characteristics and pulse to evaluating a patient's condition and Chi as discussed above, in most instances, the daily acupuncture SOAP notes do not document the condition of the tongue or pulse.

(d)     Needles are inserted into a small range of common Acupuncture Points (almost always points along the UB Channel), which address only some, and never all, of the patients' purported conditions, and which appear to be determined only for the sake of expediency.  The forms do not identify the number of needles used.

(e)     If patients do, in fact, suffer from Chi-blood stagnation, Defendants do not use the most commonly recognized needle combinations to address this condition.

(f)     Other than circling or checking "Yes" as to whether the patient tolerated treatment, there is no discussion of the patients' response to treatment.

(g)    Treatment continues without change in frequency and without any indication of change in patients' conditions and therapeutic responses to treatment after any treatment session, or from the beginning through the end of the patients' entire treatment plans.

(h)    Most treatment sessions are billed using CPT Code 97810, which purports to indicate that each session involved personal, one-on-one contact with the patient and an interval exam regarding the patient's condition, but there is no documentation any interval examination was done.  Since no information is obtained or recorded regarding how the patient is responding to treatment, there is no documented basis for continuing treatment.

(i)    Although the patients receive physical therapy and chiropractic care from other Defendants on the same visits, there is no record provided to State Farm Mutual or State Farm Fire of communications among the professionals rendering these services or an attempt to coordinate their treatment.

234.    In addition to treating patients with needles, the Acupuncture Defendants subject patients to cupping.  Cupping is included in patient treatment although it is almost never mentioned in the initial examination reports, let alone identified as part of the acupuncture treatment plan.  And, although, for the reasons discussed above, cupping should be relatively rare and not repeatedly performed, cupping is performed both frequently and repeatedly at 1786 Flatbush.  As reflected on the chart attached as Exhibit 5, the Acupuncture Defendants administered cupping to many patients repeatedly over multiple visits, on nearly every visit, and more often than ordinary needle-based acupuncture. Ex. 5.  In several cases, cupping was used exclusively. *Id.*

235.    The Acupuncture Defendants' documentation provides no justification for cupping or any explanation as to why it is being used as opposed to, or in addition to, routine acupuncture.  There is also no indication that anyone inquires whether a patient would bruise easily or considers whether patients' weight or body characteristics might render them inappropriate candidates for the procedure.

236.     Among the reasons the Acupuncture Defendants administer cupping and do so with such frequency is because they know that cupping is not a listed treatment modality under the fee schedule applicable to New York No-Fault claims, and therefore is not subject to certain limitations.  Acupuncture involving the insertion of needles is typically billed under CPT Codes 97810 and 97811, which under the New York fee schedule limit reimbursement to one charge for the first 15 minutes of treatment and a second charge for the next 15 minutes of treatment, respectively, regardless of the number of needles inserted.  The Acupuncture Defendants bill for cupping under CPT Code 99199 as an "unlisted special service, procedure or report," which enables the Acupuncture Defendants to set their own reimbursement charges, increase the amount they charge on a daily visit, and circumvent the fee schedules applicable to more common acupuncture treatments.

### 5.     Fraudulent Diagnostic Tests

237.     As set forth in Exhibits 1 and 6, patients were also subjected to unnecessary diagnostic Tests ordered by the Physician Defendants and the Chiropractor Defendants, including ROM Tests, Muscle Tests, NCVs, EMGs, SSEPs, BEPs, Functional Capacity Evaluations, and V-sNCT tests.  Even if these Tests as administered had any clinical value, which as discussed next they did not, Defendants' medical records do not document or reflect that the results of such tests altered or affected patient treatment in any way.

### a.     Fraudulent Computerized ROM Tests and Muscle Tests

238.     Most patients treated at 1786 Flatbush are subjected to medically unnecessary ROM Tests and Muscle Tests ordered by the Physician Defendants, most often performed on multiple occasions three to four weeks apart, and billed by each of the Physician Defendants and by Allay, KP Medical, JPF Medical, and PFJ Medical.  *See* Ex. 1.  As discussed above, although the Physician Defendants' initial evaluation form contains an option for "computerized

ROM/MMT," which is hardly every checked, they perform such testing and submit charges to State Farm Mutual or State Farm Fire for virtually every patient.

239.   The measurement of a particular joint's full mobility is that joint's range of motion.  Charts listing generally agreed upon full ranges of motion for each joint are available in many standard textbooks.   A traditional, or manual, range of motion test consists of a non-electronic measurement of a joint's ability to move through its arc of motion which then can be compared to an unimpaired or ideal joint.  Active range of motion testing is effectuated by a doctor asking the person to move a joint to its full extent and this testing may be measured by a manual inclinometer or goniometer (devices used to measure angles).   Active range of motion can be inaccurate if the patient does not provide full effort.  Passive range of motion testing is performed by the clinician moving a patient's joints to identify anatomic restrictions of movement.

240.   A traditional, or manual, muscle strength test consists of a non-electronic measurement of muscle strength, using a generally accepted scale of 0 to 5, accomplished by having the person move a joint against resistance applied by a physician or clinician.   For example, if a physician were to measure a person's knee flexion strength, he or she would apply resistance against the person's posterior foreleg while having him/her flex the knee.

241.   A physical examination performed on a person with soft-tissue trauma will typically require manual range of motion testing and muscle strength testing to assess injury in order to make a diagnosis and develop a program to address any limitations in that person's motion and strength limitations.   Doctors document range of motion and strength impairment to provide an objective frame of reference as it pertains to functional tasks, which allows the doctor to monitor progress.  Manual range of motion and strength tests are regularly done as part of the

initial evaluation of a patient and any reevaluation of the patient and are billed as part of the overall evaluation charge; they are not billed separately.

242.   The ROM Test is purportedly performed through the placement of a digital inclinometer (typically affixed by Velcro straps) on various parts of a patient's body while the patient is asked to move the related joint through its available motion.  The ROM Test is almost identical to the traditional or manual range of motion testing except that a digital reading is gained rather than a manual one.  This test is also dependent upon patient cooperation and effort, as well as the skill of the examiner.

243.   The Muscle Test is purportedly performed through the placement of an accelometric measurement apparatus against a stationary object, against which the patient contracts a particular muscle three to four separate times.  The Muscle Test is almost identical to the traditional or manual muscle strength testing performed by physicians during an examination, except that a digital reading is gained identifying the pounds of pressure that the patient exerts as opposed to a 0 to 5 scale.  The electronic data gathered does not take into account whether the patient is applying full effort, and its accuracy is therefore also dependent upon patient cooperation, effort, and the skill of the examiner.

244.   When the ROM Test and the Muscle Test are performed, the decision of which joints to test in a ROM Test and which muscles to test in the Muscle Test should be tailored to each patient's unique injury and the clinical findings of that individual patient.  As a result, the particular joints and muscles tested should be individualized for each patient.

245.   While the ROM Tests and the Muscle Tests could be useful tools in some circumstances, for example, as part of a medical research study, under the circumstances

employed at 1786 Flatbush, they were medically unnecessary and were part and parcel of the fraudulent Predetermined Treatment Protocol to maximize profits.

246.     In particular, most patients at 1786 Flatbush purportedly underwent traditional, manual range of motion testing and muscle strength testing as part of their initial and follow-up examinations with, at least, the Physician Defendants, Chiropractor Defendants, and Physical Therapy Defendants.   Nevertheless, patients were also unnecessarily subjected to ROM Tests and Muscle Tests.   The ROM Tests and Muscle Tests were not tailored to patients' individual needs, did not provide any additional data over the manual range of motion and muscle strength tests that were allegedly performed, and were irrelevant to the monitoring of the restoration of function for purposes of treatment.   In the relatively minor soft-tissue injuries allegedly sustained by the patients, the difference of a few degrees in the patients' range of motion reading or pounds of resistance in the patients' muscle strength testing is unimportant to the diagnosis or treatment of such patients.

247.     Even if there was a reason to perform ROM Tests or the Muscle Tests, the methods in which the tests are performed are not tailored to individual patients, are not intended to identify or diagnose particular conditions, and do not facilitate treatment or result in change in treatment program.   While a variety of measurements can be recorded in each test, many joints in the body are never tested in Defendants' tests, and other joints in the body are tested repeatedly regardless of each patient's specific complaints or conditions.   In addition, many patients are tested in joints as to which they have not previously been diagnosed as having an issue.

248.     Finally, many bills for Muscle Tests submitted by the Physician Defendants used multiple charges of CPT Code 95831 to represent that as many as five separate measurements had been performed on each patient, as well as a separate charge for CPT Code 95833, and that

Defendants were therefore entitled to bill State Farm Mutual and State Farm Fire for each measurement, separate and independent from one another. In some cases, these Defendants claim to have taken as many as six separate measurements, resulting in total charges of $332.32 per patient. According to the applicable fee schedule, however, a healthcare provider seeking reimbursement for Muscle Tests may only use CPT Code 95831 and bill 5.16 relative units (translating into $43.60) for each "extremity" or "trunk section" which is tested, but should use CPT Code 95833 and bill a maximum of 14.88 relative units ($125.73) if the entire body is tested. As a result of the misrepresentations, even if the Muscle Tests had value and were properly reimbursable (which they were not), on each of the bills seeking payment for the testing of more than three separate muscles, Defendants defrauded State Farm Mutual and State Farm Fire into paying more than they were entitled to be paid.

### b. Fraudulent NCV and EMG Testing

249. Most patients at 1786 Flatbush are also routinely subjected to medically unnecessary NCVs and EMGs performed by Parisien, Dabiri, Blackman, Lacina, Pavlova, and persons working under their direction, and billed by Parisien, Dabiri, Blackman, Pavlova, Allay, KP Medical, ACH Chiropractic, Island Life, JPF Medical, RA Medical, and PFJ Medical.

### i. Neurological Testing

250. The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body. Sensory nerves are responsible for collecting and relaying sensory

information to the brain. Motor nerves are responsible for transmitting signals from the brain to initiate muscle activity throughout the body.

251. Peripheral nerves consist of both sensory and motor nerves. They travel throughout the body and come together at specific points along the spine before traveling up the spinal cord to the brain. The segments of nerve closest to the spine, and through which impulses travel between the peripheral nerves and the spinal cord, are called nerve roots. Injury to a nerve root is called radiculopathy, and can cause various symptoms including pain, altered sensation, and weakness.

252. Legitimate EDX tests can be performed on patients who report symptoms that may suggest neurological pathology, such as pain in the neck and/or lower back region that radiates to the arms or legs, abnormal weakness in limbs, or significant changes in sensation in limbs.

253. If properly performed and interpreted, NCVs and EMGs can be used to diagnose the existence, nature, extent, and specific location of nerve abnormalities that may be causing the purported symptoms, including peripheral nerve injuries (e.g., injuries to the nerves in the arms and legs) and radiculopathies (pinched nerve roots that run along both sides of the spine at each vertebra level).

### ii.     NCV Tests

254. NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The velocities, amplitudes, and shape of the response are then recorded by electrodes attached to the surface of the skin and compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of the peripheral nerves in the arms and legs.

255.     Several peripheral nerves in the arms and legs can be tested with NCVs. Moreover, many of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested.  The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both in any such peripheral nerve should be tailored to each person's unique circumstances.  In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual as well as the real-time results obtained as the NCVs are performed on the sensory and/or motor fibers of each peripheral nerve.  As a result, the nature and number of the peripheral nerves and the types of nerve fibers tested with NCVs should vary by individual.

### iii.     EMG Tests

256.     EMGs involve inserting needles into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs and measuring electrical activity in each such muscle.  The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

257.     Many different muscles and nerves in the arms and legs can be tested with EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each individual's unique circumstances.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual, patient, the presenting symptoms, the real-time results of NCVs which are typically performed in conjunction with EMGs, and the real-time results obtained from the EMGs as they are performed on each specific muscle.  As a result, the number of limbs tested, as well as the nature and number of the muscles tested, should vary by patient.  Moreover, legitimate EMG testing will

likely show significant differences in results across patients because of the inherent variability among patients in both presenting symptoms and in real-time EMG results.

258.    NCVs and EMGs should be performed together in the same session by the same healthcare provider.   Among other things, real-time results obtained during the tests can and should influence how each is performed and interpreted, and results from both are typically necessary to diagnose and localize injury.   Thus, it is impossible to diagnose radiculopathy without an EMG.

### iv.    The AANEM Recommended Policy

259.    The American Association of Neuromuscular & Electrodiagnostic Medicine ("AANEM"), founded in 1953, is the largest organization worldwide dedicated solely to the scientifically based advancement of neuromuscular medicine.   AANEM membership is comprised of over 5,000 physicians, primarily neurologists and physiatrists.   AANEM's primary goal is to increase the quality of care for patients with neurological disorders through programs in education, research, and quality assurance.   AANEM has issued a Recommended Policy ("Recommended Policy") regarding the optimal use of EDX tests, including NCV and EMG tests, to diagnose various forms of nerve abnormalities, including peripheral nerve injuries and radiculopathies. *See* Ex. 25.  The Recommended Policy has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

260.    The Recommended Policy arises out of the recognition that EDX studies "have occasionally been abused by some providers, resulting in overutilization and inappropriate consumption of scarce health resources."   AANEM's Recommended Policy accurately reflects the demonstrated utility of various forms of EDX studies, including NCVs and EMGs, for diagnosing radiculopathies and other disorders of the central and peripheral nervous systems.

261.   The Recommended Policy correctly recognizes that "EDX studies are individually designed by the EDX consultant for each Patient" and that "[t]he examination design is dynamic and often changes during the course of the study in response to new information obtained."  Therefore, the decision of which nerves and muscles, if any, should be tested with NCVs and EMGs should be individually tailored by a physician to address each patient's unique circumstances based upon a history and examination of the patient, as well as the real-time results as the NCVs and EMGs are performed.   The Current Procedural Terminology guide which sets forth codes (CPT Codes) used by healthcare providers to describe and bill for services similarly reminds that "[n]erve tests ***must*** be limited to the specific nerves needed for the particular clinical question being investigated."  (Emphasis added).

262.   According to the Recommended Policy, the maximum number of EDX tests that should be required to diagnose radiculopathy in more than 90% of patients is:  (a) NCVs of three motor nerves and two sensory nerves, and (b) EMGs of two limbs.  These maximum numbers "are to be used as a tool to detect outliers so as to prevent abuse and overutilization."

### v.   Defendants' Fraudulent NCVs and EMGs

263.   Defendants use NCVs and EMGs not to legitimately diagnose the patients' conditions but to maximize profits and to attempt to document conditions, whether they exist or not, to justify further treatment.   Specifically, this includes: (i) testing patients without indications that tests are necessary; (ii) performing NCVs without EMGs or performing NCVs and EMGs separately on different dates that are often days or even weeks apart; (iii) performing tests in a formulaic fashion to maximize charges; and (iv) making diagnoses based on insufficient information and information that is not credible.

264.   *First*, in most instances, tests are performed without any indication patients need them.   Defendants typically purport to provide NCVs and EMGs to diagnose or rule out

radiculopathy.  In a legitimate setting, a patient suspected of suffering from radiculopathy would show signs of neck or back pain accompanied by numbness, tingling, and/or pain radiating to an extremity.  However, according to the Initial Evaluation Reports of the Prescribing Physicians more than half the patients subjected to NCVs and EMGs had none of these indications.  *See* Ex. 6.

265.    *Second*, as set forth in Exhibit 6, in many instances Parisien, Dabiri, and Blackman performed NCVs without EMGs, EMGs without NCVs, and NCVs and EMGs on different days.  In some instances, NCVs and EMGs were performed weeks apart.  But, for the reasons alleged above (*see supra* ¶ 258), performing tests in this manner substantially undermines their value.  Defendants purport to use the tests to diagnose radiculopathy, but diagnosing radiculopathy typically requires a normal NCV and an abnormal EMG, and both components are necessary to diagnose the condition and identify the levels of the spine at which it is occurring.

266.    The vast majority of Defendants' NCVs and EMGs yield normal results or no evidence of a radiculopathy, suggesting there was no need to perform such tests in the first place.

267.    *Third*, Parisien, Dabiri, and Blackman do not tailor the NCVs and EMGs to patients' unique circumstances but perform them in a formulaic fashion that maximizes the charges they can submit to State Farm Mutual and State Farm Fire.  Specifically, these Defendants perform NCVs on the same peripheral nerves and nerve fibers for almost every patient, and perform EMGs on the same muscles in all four limbs in almost every patient. Parisien, Dabiri, and Blackman perform the tests in this fashion without regard to patients' individual symptoms or what the data shows as the tests proceed.  In marked contrast to the standards recognized by the Recommended Policy, Defendants perform for most patients: (a)

NCVs of the same four motor nerves, and (b) NCVs of the same five sensory nerves. *See* Ex. 6. Further, it is unusual for patients to be symptomatic in four separate limbs and require EMGs in four limbs, yet Defendants performed four limb EMGs in almost every patient, and they often tested as many as 36 separate muscles in a single patient. *See id.*

268.    Patients at 1786 Flatbush are also routinely tested bilaterally even if only one side is symptomatic. *See id.* Similarly, upper limbs and lower limbs are both tested regardless of whether the patient's symptoms are localized in the upper or lower extremities. *See id.*

269.    Defendants also either missed or ignored actual conditions that the documented results of the NCVs identified. For example, in one patient purportedly tested by Blackman, NCV results indicated the patient suffered from a conduction block in a left median nerve, which would denote demyelination, a potentially serious condition that Blackman's report simply ignored.

### c.    Fraudulent SSEPs and BEPs

270.    Patients at 1786 Flatbush were also subjected to medically unnecessary SSEPs and BEPs. From October 2013 through at least October 2015, evoked potentials were ordered, performed, and billed by the Physician Defendants and by Allay, Island Life, JPF Medical, KP Medical, and PFJ Medical.

### i.    SSEPs

271.    SSEPs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The potentials evoked by this electrical stimulation are then recorded by electrodes attached to the scalp. SSEPs are most often used in conjunction with spinal surgery to alert surgeons to potential problems during surgery. SSEPs have little to no value in diagnosing and localizing radiculopathy. The test involves stimulating major "mixed" nerves at the wrist (median nerve) and ankle (tibial nerve). "Mixed" nerves contain nerve fibers

that travel to more than one nerve root (e.g., the median nerve contains sensory fibers that run through the C6 and C7 nerve root). Thus, it is impossible to know from an abnormal result which nerve root is an issue, and a normal result does not rule out a nerve root issue because the SSEP signal could simply have bypassed the abnormal root. Additionally, SSEP signals travel along the peripheral nerves and the spinal cord to the brain. As a result, any slowed or abnormal SSEP can be caused by a problem at any point along the path of the signal — in the peripheral nerve, the nerve root, the spinal cord, or the brain.

272. The AANEM has produced a report as to the clinical use of SSEPs, which is attached as Exhibit 25. *See* Ex. 25 at 17. According to the SSEP Recommended Policy, SSEPs "are generally not useful in the evaluation of acute radiculopathies," and the amount of information gained from SSEPs as to radiculopathies is "low compared to information obtained from the neurological examinations, needle electromyography (EMG), and H-Reflex studies."

273. The SSEPs performed on patients of Parisien, Dabiri, and Blackman were medically unnecessary. SSEPs were performed on over 100 patients at 1786 Flatbush. *See* Ex. 1. They were purportedly ordered and performed for the purpose of diagnosing radiculopathy, yet, as noted above, they cannot reliably do so. The patient files fail to document why patients allegedly needed SSEPs, and, regardless of what the test results showed, the results are not mentioned again in the patients' records and have no effect on treatment. Moreover, the Physician Defendants performed SSEPs in a formulaic fashion on both the upper limbs and lower limbs for patients without regard to individual patients' particular needs. The SSEP reports, regardless of whether they bear the signature of Parisien, Dabiri, or Blackman, virtually always conclude with the same sentence indicating a normal SSEP result: "The above

electrodiagnostic study revealed no evidence of delayed nerve conduction throughout the spinal nerve roots, spinal cord or brain stem."

## ii.     BEPs

274.    BEPs measure responses in brain waves that are stimulated by a clicking sound to evaluate the central auditory pathways of the brain.  The test is accomplished by placing the individual in a chair or bed, and requesting that the patient relax and remain still.  Electrodes are placed on the individual's scalp and on each earlobe.  Clicking noises or tone bursts are then piped through earphones, and the electrodes pick up the brain's response and record it on a graph.

275.    The indications for a BEP are extremely limited and thus their use should be rare. Legitimate clinical applications of BEPs include assessing hearing in newborns and identifying tumors of the auditory nerve (i.e., acoustic neuroma); intraoperative monitoring during neurosurgery of the brainstem; assessing hearing in individuals incapable of giving voluntary responses (e.g., young children, non-cooperative, or non-communicative patients); and diagnosing neurological conditions affecting the brainstem (principally multiple sclerosis and, less often, brainstem tumors).

276.    While none of the patients treated by Parisien, Dabiri, and Blackman reportedly had any of these conditions, Parisien, Dabiri, and Blackman routinely performed or supervised a technician who performed BEPs on at least 160 patients at 1786 Flatbush.  *See* Ex. 1.  The test reports are form documents containing no indication any effort was made to tailor the BEP to the individual patient.  Indeed, many reports purportedly authored by different Physician Defendants document the same "chief complaint" with the same typographical error which describes a patient "who presents who presents [sic] with well as [sic] general dizziness and balance problems."  Patient records do not indicate why the BEP was performed, and the documented

100

results of the BEP for every patient of which State Farm Mutual and State Farm Fire are aware were normal in both the right and left ear.

**d.**      **Functional Capacity Evaluations**

277.    Additional medically unnecessary tests most patients at 1786 Flatbush undergo include Functional Capacity Evaluations. *See* Ex. 1. Functional Capacity Evaluations were performed at 1786 Flatbush and billed by Parisien, Dabiri, Pavlova, Blackman, Lacina, Allay, JPF Medical, KP Medical, and PFJ Medical.

278.    Functional Capacity Evaluations are meant to gauge whether a patient has sufficient strength, endurance, and ability to perform the patient's job, to assist in vocational rehabilitation, to determine a patient's maximal functional level at the time they are fully improved, and to assist in setting any limits on job tasks a patient can perform. In accordance with the applicable fee schedule, Functional Capacity Evaluations should only be used "at the point of maximal medical improvement," and only when the patient: 1) is preparing to return to a previous job; 2) has been offered a new job; or 3) is working with a rehabilitation provider and a vocational objective is established. The reasons for the Functional Capacity Evaluations must be documented and reports must include patient demographics including work history, indications for the evaluation, and a narrative with recommendations. Because these tests are most often used to evaluate work tolerance and the necessity for work restrictions, they should be individually tailored for each patient and geared toward a specific diagnostic goal, such as determining if the patient can go back to their specific job or needs work restrictions or even a different job.

279.    The Functional Capacity Evaluations performed by Parisien, Dabiri, Pavlova, Lacina, and Blackman at 1786 Flatbush were medically unnecessary, were not individually tailored, and were given in a formulaic fashion, involving the same sets of tasks, to almost every

patient regardless of their unique complaints, response to treatment, work status, or work type.  It is not claimed or documented that tested patients are "at the point of maximal medical improvement," but nonetheless tests are administered, often multiple times, after which the Predetermined Treatment Protocol continues.  The records likewise do not indicate any patient is preparing to return to a previous job, has been offered a new job, is working with a rehabilitation provider, or has had a vocational objective established.  Nor do the records document how, if at all, test results impacted patient treatment.

280.    Documentation of the Functional Capacity Evaluations submitted to State Farm Mutual and State Farm Fire consists of Functional Capacity Evaluation Reports.  Patients purportedly perform six types of lifts, wherein the pounds of force they exert is recorded on a handwritten form.  At some point thereafter, these measurements are imported into a software program which generates an eight-page Functional Capacity Evaluation Report with bar graphs and the patients' rating as compared to a normative average.  These Functional Capacity Evaluation Reports reflect pervasive patterns that are not credible.  For example, strength measurements for most patients are purportedly worse than the lowest 10th percentile, indicating a level of impairment that would be unusual in one patient with the types of injuries purportedly documented, let alone for a large number of patients.  Additionally, in many cases patients do worse on subsequent tests without any discussion as to why patients purportedly undergoing treatment are not getting better.

281.    Further, Parisien, Dabiri, Pavlova, Blackman, Lacina, Allay, JPF Medical, KP Medical, and PFJ Medical submit charges for the Functional Capacity Evaluations using CPT Code 97750, the code for physical performance testing, not Functional Capacity Evaluations, which would properly be billed using CPT Code 97800.  In this way, they fraudulently conceal

that they are, in fact, performing Functional Capacity Evaluations and that their tests are ineligible for reimbursement because they have not met the reimbursement requirements for Functional Capacity Evaluations in the applicable fee schedule.

### e.       Fraudulent V-sNCT Testing

282.    Mollo and the Mollo Entities also order yet another medically unnecessary diagnostic test — the V-sNCT test — which is ordered for nearly every patient during chiropractic initial examinations.  Mollo and the Mollo Entities record in the Chiropractic Initial Reports that they are ordering "small pain fiber studies of the cervical/lumbar spine to evaluate pathology to the A-delta, A-Beta, and C sensory nerve fibers."  *See* Ex. 26.  Based on these orders, Mollo and the Mollo Entities subject many patients to V-sNCT tests, which are then billed to State Farm Mutual and State Farm Fire by Island Life and Penn Chiropractic P.C.  On at least one occasion, Parisien submitted a bill to State Farm Mutual for a V-sNCT test purportedly performed by chiropractor Sweet Ehigiegba at 1786 Flatbush.

283.    V-sNCT tests are non-invasive tests that, according to proponents of V-sNCT testing, purport to diagnose abnormalities only in the sensory nerves and sensory nerve roots.  They do not and cannot provide any diagnostic information regarding the motor nerves and motor nerve roots.  V-sNCT tests are performed by administering electrical voltage through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet, and face.  The intensity of the electrical voltage is increased until the patient reportedly perceives a sensation from the stimulus caused by the voltage.  "Findings" are then made by comparing the minimum intensity of electrical voltage at which the patient announces he or she perceives some sensation to the purported normal ranges.

284.    The sensory nerves are comprised of several different kinds of nerve fibers, including the A-beta fibers, the A-delta fibers, and the C fibers.  According to proponents of V-

sNCT testing, V-sNCT tests allegedly can diagnose the existence, nature, extent, and location of any abnormal condition in each of these noted nerve fibers by using three different frequencies of electrical current.

285.    Mollo and the Mollo Entities know however, that V-sNCT tests are unable to truly diagnose the existence, nature, severity, or specific location of any abnormalities in the sensory nerves or any of the nerve fibers.  Among other things, Defendants know that V-sNCT tests cannot localize sensory loss to any specific place within the nervous system.  Electrical current or voltage must travel between two points and complete a circuit.  V-sNCT tests involve electrical current or voltage traveling from a probe placed at the test site through the limb being tested, through the torso to a ground electrode placed under the patient's back.  Because the electrical current or voltage can affect any nerve in proximity to the electrical path from the probe to the ground electrode, there is no way to know that the electrical stimuli are producing a sensation in any particular nerve.  Moreover, even if electrical current or voltage were stimulating a particular nerve, and a patient's statement of diminished sensation were indicative of an injury, there would be no ability to determine where along the path of that nerve from the limb to the brain — which includes the peripheral nerve, nerve roots, nerves in the spinal cord, and nerves in the brain — an injury existed.  As a result, V-sNCT tests cannot diagnose radiculopathies (injury at the nerve root) as any statement of diminished or heightened sensation could just as easily imply nerve injury somewhere along the nerve pathway other than at the nerve root.  Additionally, no reliable evidence proves that valid normal ranges of intensity required to evoke a sensation in fact exist to compare with the unique results from an individual's V-sNCT tests to arrive at a legitimate finding.

286.     Moreover, data from administration of the V-sNCT tests can be manipulated in a number of ways to produce any desired result, undermining any claim that the test is objective. In particular, "findings" at each site are either plotted by hand on a graph or analyzed by computer to draw conclusions and make diagnoses.  The data, however, can be adjusted by a variety of factors, including a belief (which has no support in medical science) that a particular patient is naturally hypoesthetic or hyperesthetic, and a "correction factor."  Even if the V-sNCT tests had some medical or diagnostic value, no reliable evidence proves any of these adjustments is necessary or appropriate or anything more than an opportunity for the individual analyzing the test results to reach a predetermined conclusion and use a manufactured finding of an abnormal condition to justify additional treatment that can be billed to insurers.

287.     Additionally, contrary to documents submitted to State Farm Mutual and State Farm Fire by Mollo and the Mollo Entities, (a) despite an explicit representation in the Chiropractic Initial Reports that the tests are ordered to "evaluate pathology to the A-delta, A-Beta and C sensory nerve fibers," no reliable evidence proves the different frequencies of electrical current used by the test can in fact stimulate and reliably test any or all of these three nerve fibers; (b) even if valid normal ranges of intensity required to evoke a sensation existed, no reliable evidence proves that a current perception threshold greater than the normal range would indicate a hypoesthetic condition (the sensory nerves have decreased function) or that current perception threshold less than the normal range would indicate a hyperesthetic condition (the sensory nerves are in a hypersensitive state); (c) even if an abnormal current perception threshold indicated either a hypoesthetic or hyperesthetic condition, no reliable evidence proves that the extent or cause of any such conditions could be identified from the V-sNCT test (indeed, numerous pathological and physiological conditions other than peripheral nerve damage can

cause hyperesthesia and hypoesthesia); (d) no reliable evidence proves V-sNCT tests provide any information that would have any value beyond that which could be gleaned from a routine history and physical examination of the patient; (e) no reliable evidence proves V-sNCT tests provide any information that would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots; (f) the V-sNCT tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an automobile accident; (g) at most the test would amount to a quantitative sensory test that has no clinical value; and (h) there would be no diagnostic advantage to using the V-sNCT tests to obtain information regarding the sensory nerve fibers where, as here, patients were also subjected at about the same time to NCVs and EMGs which are well established in the medical, neurological, and radiological communities for diagnosing the existence, nature, severity, and specific location of any abnormalities in both the sensory and motor nerves as well as the nerve roots.

288.    Consistent with the conclusion no reliable evidence supports the validity of V-sNCT tests, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of procedure codes ("CPT Codes") for physicians to use in describing their services for billing purposes, does not recognize a CPT Code for V-sNCT tests.   Further, the Center for Medicare and Medicaid Services ("Medicare") reviewed the efficacy of current perception threshold tests, which are essentially the same as V-sNCT tests, and issued a national coverage determination concluding current perception threshold tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) or radiculopathies and therefore are not compensable.

289.    Nonetheless, to support the fraudulent charges, Mollo and the Mollo Entities submit forms reflecting the data purportedly recorded during the test and boilerplate Electrodiagnostic Examination Reports (the "V-sNCT Reports").  Mollo and the Mollo Entities know they are all false and misleading in several material respects including: (a) there is no valid basis or support for many of the statements and claims about the V-sNCT; (b) there is no valid basis or support for many of the statements and claims about NCVs and EMGs; (c) there is no valid basis or support for many of the statements and claims about human physiology, the human nervous system, or the response of the human nervous system to injury; and (d) there is no valid basis or support for many of the statements and claims about electricity and the science of electrical engineering.

290.    The V-sNCT Reports purport to set forth findings.  In most instances, they conclude that "[f]indings suggesting pathology" exist at a specific nerve and, in a relatively small number of cases, that a hyperesthetic condition exists.  *See* Ex. 27.  Regardless, almost every test reaches the conclusion that the patients' results are abnormal, either with results that are "higher than average" or "lower than average."  *See id.*

291.    Finally, Mollo and the Mollo Entities bill State Farm Mutual and State Farm Fire for V-sNCT tests under the CPT Code 95999, which under the New York fee schedule governing No-Fault claims, is an "Unlisted neurological or neuromuscular diagnostic procedure."  A separate charge using this code is submitted for each nerve purportedly tested.  Defendants' bills purport to report testing of at least 14 nerves, and often as many as 32 separate nerves, resulting in charges from $1,022 to $2,360 for a single test.

### 6.    Injections

292.    Many patients treated at 1786 Flatbush are also subjected to medically unnecessary trigger point injections and dry needling procedures purportedly provided by the

Physician Defendants and billed by the Physician Defendants, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, and RA Medical.

### a.      Trigger Point Injections

293.    Trigger points, also known as trigger sites or muscle knots, are irritable portions of an individual's muscle associated with palpable nodules in taut bands of the muscle fibers. They may cause local pain at the site of the trigger point, can cause referred pain to another area of the body in well-documented referral patterns, and can result in reduced range of motion. Trigger points can also generate a local twitch response or spasm upon palpation of the affected area.  Trigger points may be caused by a number of factors, including acute or chronic muscle overload and acute trauma.

294.    A trigger point injection involves inserting a needle into the muscle knot or trigger point and injecting medication into the affected area.  The medication injected typically contains a local anesthetic and sometimes a corticosteroid, which is meant to anesthetize and relax the muscle in the trigger point, decrease inflammation, and provide pain relief.

295.    Multiple trigger point injections for any one patient may be appropriate depending on the patient's particular symptoms, but injections should be limited to the least number necessary.  Limiting the number and frequency of trigger point injections is particularly important when the injections include a corticosteroid because the side effects and dangers of corticosteroids are dose and frequency dependent.  Among these dangers, repeated administration of corticosteroids can cause adrenal suppression in which the body shuts down its own production of cortisone.  Corticosteroids can also suppress the body's immune system and increase the risk of infections, result in changes in blood sugar, changes in blood pressure, depression, mania, bone thinning, bone fractures, and osteonecrosis of the hip and shoulder.  For all of these potentially dangerous complications, the level of risk to an individual patient is

directly related to both the dose of corticosteroids given and to the frequency of administration. As such, the amount of corticosteroids used during trigger point injections and the frequency of administering trigger points injections with corticosteroids should be limited to the minimum amount medically necessary considering the risks to the patient.

296.    Risks of trigger point injections also include risks from the procedure itself, which involves inserting needles into patients, such as local and systemic infection, hematoma, pneumothorax, and local and systemic effects of the medications delivered.  Moreover, any use of local anesthetic can involve risks, particularly in increased volumes, including central nervous system toxicity which can lead to seizures and cardiac toxicity which can lead to arrhythmia and even death.

297.    In most circumstances, trigger point injections should only be repeated if the patient has experienced substantial pain relief with a prior injection.  Because of the dangers associated with corticosteroids in particular, subsequent trigger point injections that include corticosteroids should generally not be performed until several weeks have passed and the number of administrations limited to no more than three times in any six-month period.  Any treatments in excess of this should not be performed without documentation of the medical rationale to justify the risks to the patient and the documented, informed consent of the patient to these risks.

### b.    Dry Needling

298.    Dry needling is intended to address the same conditions as trigger point injections — trigger points or muscle knots.  It involves inserting a small gauge needle into the muscle knot or trigger point and mechanically breaking up the muscle tightness with rapid needle insertion in and out of the muscle.  Unlike trigger point injections, dry needling does not include injecting a solution into the muscle by needle.  The purported rationale for dry needling is that movement of

the needle can irritate the "knot" in the affected muscle fibers and cause it to break up, thereby permitting the patient to experience pain relief and increased range of motion.  Dry needling is similar to acupuncture in that both involve the use of needles placed in the body for treatment. But while acupuncture usually involves the insertion of multiple needles at the same time which are then left in the body for minutes, dry needling involves a single needle which is briefly inserted into the skin and then removed, and if necessary, inserted into a different area after being wiped with an alcohol swab.

299.    Dry needling is considered by Medicare and most insurance carriers to be experimental and unproven, and no peer-reviewed clinical studies support its use.

300.    As dry needling and trigger point injections typically treat the same conditions and represent alternative treatment options, even dry needling proponents recognize it would rarely be appropriate to perform dry needling at the same time as trigger point injections. Furthermore, dry needling insertions should be limited to the least number necessary.  And before subjecting a patient to repeated administration of dry needling, there should be documentation indicating the patient benefited from earlier dry needling procedures.

### c.    Defendants' Trigger Points and Dry Needling

301.    At 1786 Flatbush, contrary to the practices described above, Parisien, Blackman, Pavlova, Dabiri, and Lacina subjected some patients to excessive numbers of trigger point injections, almost always combined trigger point injections with excessive dry needling insertions, and inadequately documented those procedures, thereby exposing patients to unnecessary risks.  They failed to document patients' responses to prior procedures or frequently failed to identify indications that additional procedures could benefit patients.  They also failed to obtain informed consent from patients by failing to disclose the above-described risks.  In short, these treatments were medically unnecessary and potentially harmful.

302.    Although Parisien, Blackman, Dabiri, Pavlova, and Lacina treated different patients at different periods of time at 1786 Flatbush, they administered trigger point and dry needling injections in the same fashion.  Further, they collectively recommended and performed trigger point injections and dry needling on over one-third of the State Farm Mutual and State Farm Fire Insureds treated at 1786 Flatbush.  The procedures were often recommended during patients' initial examinations or during a follow-up examination early in the course of treatment.  They would typically then be performed the same day they were recommended.

303.    The recommendations and performance of trigger point injections and dry needling were documented in on forms that purport to reflect diagnoses supporting injections and dry needling (the "Injection/Needling Treatment Forms").  The Injection/Needling Treatment Forms recorded that most patients purportedly suffered from pain in two or more regions and that their pain was a 7 on a scale of 1 to 10.  *See* Ex. 28.

304.    Additionally, the Injection/Needling Treatment Forms contain preprinted checkboxes of various diagnosis codes, known as ICD-9 codes, along with brief descriptions of those codes.   But, among other things, the Injection/Needling Treatment Forms contain erroneous descriptions of the diagnosis codes.  For example, one of the frequently checked diagnoses on the Injection/Needling Treatment Forms at 1786 Flatbush is for ICD-9 code 724.4, which the forms describe as "Acute Traumatic Lumbosacral Radiculitis."  *See id.*  The actual description for ICD-9 code 724.4, however, is "Thoracic or lumbosacral neuritis or radiculitis, unspecified."  Similarly, the Injection/Needling Treatment Forms used at 1786 Flatbush state that ICD-9 code 723.4, another diagnosis code frequently checked by Parisien, Blackman, Dabiri, Pavlova, and Lacina to support their claims for trigger point injections is "Post Traumatic Cervical-Thoracic Myofascitis," but the actual ICD-9 code description is "Brachial neuritis or

radiculitis," a completely distinct diagnosis.   In any event, none of these diagnoses would clinically warrant trigger point injections or dry needling as such procedures are intended to treat trigger points or taut bands of muscle fibers, not radiculopathy or pinched nerves.   Regardless, the Injection/Treatment Forms routinely conclude:  "The patient is advised to start on a course of Therapeutic Injections."

305.    While there are many different types of injections and the Injection/Needling Treatment Forms themselves provide checkboxes for five different injection options with space to identify other alternatives (e.g., nerve block injections, facet injections), Parisien, Blackman, Dabiri, Pavlova, and Lacina frequently select only trigger point injections.   It is inconceivable that so many patients had identical findings and needed injections of any kind, and even more inconceivable that such a high proportion needed trigger point injections but none was considered or recommended for any other type of injection or procedure.

306.    When performing these procedures, Parisien, Blackman, Dabiri, Pavlova, and Lacina also often billed for unusually high numbers of trigger point injections.   *See* Ex. 7.   On average, these Defendants billed State Farm Mutual and State Farm Fire for 12 or more different trigger point injections for each patient, with some patients allegedly receiving as many as 34 injections on a single visit.   *See id.*   Trigger point injections are often administered bilaterally without any indication patients required them on both sides of the body.   *See id.*

307.    Further, as described above, doctors should also typically allow sufficient time between each set of injections to (a) avoid rapid, repeated doses of corticosteroids; and (b) gauge if the injection is indeed giving long-lasting relief as opposed to short-term relief.   But patients at 1786 Flatbush are often injected on multiple occasions with little to no documentation that they experienced ***any*** relief from a prior set of injections, let alone long-lasting relief.

308.     Documentation of patient responses to injections is important for the licensed professionals involved in a patient's care, other licensed professionals who may treat the patient contemporaneously or subsequently, the patients themselves, and payers, and is particularly critical to decisions about whether to subject patients to the risks of subsequent procedures. But at 1786 Flatbush, often the only record of patient response to an injection procedure is a check box in the Injection/Needling Treatment Form indicating that the "[p]atient tolerated the procedure well." The patient is routinely reported to tolerate the procedure well without complications and no other report is made of the patients' response to the procedure. *See* Ex. 7. Thus, the Physician Defendants often fail completely to note the patients' self-reported pain levels, rendering it impossible to determine whether the injections are benefiting these patients. Finally, to the extent there is any record of patient responses to the injections, they indicate that most patients continue to have pain after the injections and are not experiencing relief. *See id.*

309.     The risks of Defendants' injection procedures are exacerbated by the fact that the Physician Defendants do not sufficiently document the amount of corticosteroid provided to each patient. The Injection/Needling Treatment Forms contain what appears to be a preprinted, boilerplate notation that "each area/trigger point [is] injected with 0.5cc of 0.5% Marcaine via a 3cc syringe with a 1-1/2 x 25G sterile hypodermic needle." Yet many of the same Injection/Needling Treatment Forms also reflect that patients are injected with completely different types and/or doses of corticosteroid, such as 1% Lidocaine and 0.25% Marcaine. These inconsistencies make it impossible to determine the amount of drugs provided to patients. Clearly understanding and documenting the dose and frequency of administered medications is critical, particularly with potentially dangerous dose-related side effects like corticosteroids. Recording the medication dose is not only necessary for patient safety; it is also required to track

patient responses to prescribed treatment, make medically informed decisions about changes in medication selection or dosage, evaluate and address any adverse and potentially life-threatening reactions, and monitor the total amount of medication over time.

310.    In some instances, trigger point injections are performed on patients at 1786 Flatbush in a manner that increases the risk of injury.  For example, Blackman ordered an MRI to rule out a left knee torn ligament for a patient who presented with severe knee pain, yet proceeded to perform trigger point injections on her quadriceps.  Numbing the quadriceps muscles around the knee made the knee even more unstable and increased the risk of injury.

311.    Parisien, Blackman, Dabiri, Pavlova, and Lacina also subject many patients at 1786 Flatbush to dry needling procedures during the same treatment sessions in which they perform the trigger point injections.

312.    These dry needling procedures are medically unnecessary and make no sense in light of the trigger point injections which are performed on the same date, for at least six reasons. *First*, it is questionable whether the experimental and unproven technique can provide any benefit.  *Second*, even if it could, while dry needling and trigger point injections typically treat the same conditions and represent alternative treatment options supported by the same clinical rationales, dry needling is often performed at the same time and on the same muscles as the trigger points.  *Third*, the Physician Defendants frequently administer more than 20 separate dry needling insertions during a single treatment session with several patients receiving as many as 60 separate dry needling insertions.  It is inconceivable that any one patient would need so many dry needling insertions, and even more inconceivable that so many patients would need such a high number.  *Fourth*, dry needling insertions are often made bilaterally without any indication they are required on both sides of the body.  *Fifth*, dry needling is performed repeatedly on

patients over multiple visits without any indication that patients experienced any improvement from a prior procedure. *Sixth*, the records do not document the type or gauge of needles being used or how the procedure is performed other than to identify the muscles to which it is applied.

313.    Further, unlike trigger point injections, which are a recognized therapeutic procedure and have a designated CPT Code, dry needling does not have a specific CPT Code for billing purposes. At 1786 Flatbush, dry needling is billed to State Farm Mutual and State Farm Fire using CPT Code 20999, the code for an "unlisted procedure, musculoskeletal system, general." Unlike the CPT Code used for trigger point injections, which is limited to a single unit of CPT Code 20553 regardless of how many muscles are injected, there are no such limitations for CPT Code 20999. For example, patient J.H. purportedly received a staggering 60 dry needle insertions from Lacina on a single date of service, for which Lacina submitted charges to State Farm Fire totaling $4,575, in addition to other charges submitted by him on that same day. *See* Ex. 29. Parisien, Blackman, Dabiri, and Pavlova perform dry needling on patients at 1786 Flatbush and subject patients to excessive insertions not because the procedures are medically necessary, but in order to submit multiple charges for inordinate amounts.

314.    Similarly, Parisien, Blackman, Dabiri, Pavlova, and Lacina frequently inflate their charges for trigger point injections by representing they are performed using ultrasonic guidance, allowing them to submit a charge for CPT Code 76942. But needle placement for trigger point injections is a routine and fairly simple aspect of the procedure and it would be extremely unusual for ultrasonic guidance to be necessary to assist trigger point procedures. Nor do Defendants' medical records document why such ultrasonic guidance was necessary. Moreover, even if there were a clinical need for ultrasonic guidance (which there is not), in order to bill

CPT Code 76942 one must prepare a separate written report which Defendants fail to create and/or submit.

### 7.   Durable Medical Equipment and Orthotics

315.    Patients treated at 1786 Flatbush are also prescribed and provided medically unnecessary Supplies, including DME and Orthotics, provided by the DME Defendants.   At 1786 Flatbush, the Physician Defendants routinely prescribe a common laundry list of items, often include many items that could not possibly be needed by the many patients for whom such prescriptions are written, and prescribe the Supplies in a way that allows the DME Defendants to circumvent applicable fee-schedule limitations and inflate their charges.   Medically unnecessary Supplies for patients of the Physician Defendants are then provided by the DME Defendants. These DME Defendants (i) purport to deliver to patients and bill for different and more expensive items than prescribed; (ii) fraudulently inflate charges for items for which there was no established charge under the applicable fee schedule; and (iii) at least in some instances, bill for items that are not provided at all.

### a.   Claims for Supplies under the No-Fault Laws

316.    DME generally consists of items that can withstand repeated use and are primarily used for medical purposes by individuals in their homes.   Orthotic devices generally consist of supports for the neck, back, and other body parts, such as cervical collars and lumbar supports ("LSOs").

317.    Since October 2004, the fee schedule applicable to New York No-Fault claims for DME and orthotic devices has provided, in pertinent part, that "the maximum permissible charge for the purchase of [DME], . . . and orthotic . . . appliances shall be the fee payable . . . under the New York State Medicaid program at the time such equipment and supplies are provided. . . [I]f the New York State Medicaid program has not established a fee payable for the specific item,

then the fee payable shall be the lesser of: (1) the acquisition cost (i.e., the line item costs from a manufacturer or wholesaler, net of any rebates, discounts, or other valuable consideration, mailing, shipping, handling, insurance costs, or any sales tax) to the provider plus 50%, or (2) the usual and customary price charged to the public."  12 N.Y.C.R.R. § 442.2.

> **b.  The Physician Defendants Prescribe Medically Unnecessary Supplies**

318.   The Physician Defendants and others routinely prescribed medically unnecessary Supplies.

319.   Prescriptions are typically issued for two and sometimes three separate bundles of Supplies.  A first bundle of Supplies ("Bundle A") is prescribed at the initial visit and typically includes at least the following:  (a) mattress; (b) heating pad; (c) bed board; (d) at least one and sometimes two cervical collars; (e) at least one and sometimes two LSOs; (f) a lumbar cushion and sometimes also a cervical pillow; and (g) other items.  *See* Ex. 30.  Often, only a few days later, a second bundle of Supplies ("Bundle B") is prescribed and typically includes at least the following:  (a) electrical muscle stimulation device ("EMS Unit"); (b) a whirlpool; (c) massager; and (d) other items.  *See* Ex. 31.  Beginning in around April 2014, patients were also prescribed, a few days after the second bundle, a third bundle of Supplies ("Bundle C") that would typically include at least the following:  (a) a pneumatic compressor; (b) a cervical traction unit with pump; and (c) other items.  Bundle C is purportedly delivered to the 1786 Flatbush patients by Quality Custom.  *See* Ex. 32.

320.   As shown in the chart attached as Exhibit 8, the Physician Defendants routinely prescribe, on average, 12 or more Supplies, with some patients prescribed as many as 18 Supplies.  It is inconceivable that so many patients would need so many articles of DME and

orthotics, would need precisely the same Supplies, and would need these identical Supplies at the same moment in their course of treatment.

321.   In addition, the types and amount of orthotics ordered do not make sense particularly given the patient population of fully ambulatory individuals who have purportedly suffered relatively minor soft-tissue injuries and are being sent by their healthcare providers for, among other things, physical therapy, acupuncture, and chiropractic manipulations.  Among the purposes of lower back supports, LSOs, cervical collars, and knee, wrist, elbow, and shoulder orthoses is to restrict and limit movement.  Physicians typically prescribe such devices to restrict movement when a patient is in intense pain that is aggravated by movement or there is a concern about stability.  Appropriate treatment for patients who are trying to heal and rehabilitate soft-tissue injuries, however, requires movement of the injured tissues, and even the Predetermined Treatment Protocol purports to include treatment for precisely that purpose, including physical therapy and chiropractic manipulations.  Under such circumstances, it should be unnecessary, and in fact contraindicated, to provide restrictive orthotics for any region of the body, yet the Physician Defendants routinely prescribe orthotics for multiple regions.  *See* Ex. 8.

322.   Moreover, it does not make sense that many patients would be prescribed and provided two cervical collars, two LSOs, or two cushions.  *See id.*

323.   Prescriptions were also written in a way to conceal the true volume and nature of Supplies prescribed and provided.  First, each bundle of Supplies was usually the result of not one but several separate prescription documents and submissions, sometimes written on the same day or only days apart.  The typical Initial Examination Reports contain preprinted language stating that after the examination, "[t]he patient [was] advised to use at home" certain Supplies. The form contains a list of 22 possible Supplies that the Physician Defendants checked to

118

designate particular items prescribed.  *See* Ex. 20 at 7 & 14.  The standard Initial Examination Report does not contain an option for "other" or a blank for the physician to prescribe any Supplies not on the list.  The Physician Defendants at 1786 Flatbush also used a form entitled Medical Supply Prescription, which contains a list of 25 items with check boxes.  *See* Ex. 33.  The use of multiple prescriptions, sometimes signed by different physicians and sometimes involving a separate prescription for each item on a single day, and spreading of submissions into bundles over time served to hide the significant volume, as well as the nature of the Supplies that were being prescribed and provided.

324.    In addition, in some instances, the Physician Defendants purport to support the medical necessity of Supplies by signing letters of medical necessity.  But these boilerplate letters use standard language to describe the purported need for and benefits of the Supplies.  *See* Ex. 34.  The documentation does not indicate that any patient was instructed in use of the Supplies, how any patient responded to the Supplies, or even whether any of the patients used the Supplies.

325.    Finally, a series of DME companies were utilized to submit charges to State Farm Mutual and State Farm Fire at different periods of time.  From April 2013 to approximately March 2014, Maiga submitted bills to State Farm Mutual and State Farm Fire for Bundle A and Bundle B.  Thereafter, from March 2014 until April 2015, Madison submitted bills for Bundle A.  Around the same time that Maiga ceased billing State Farm Mutual and State Farm Fire in March 2014, Defendants began to submit bills for Bundle C through Quality Custom.  In April 2015, State Farm Mutual and State Farm Fire began receiving bills for Bundle A from PHCP and Quality Health.  Ex. 8.  In July 2016, Quality Health ceased billing State Farm Mutual and State Farm Fire for Supplies provided to patients at 1786 Flatbush.  At the same time, State Farm

Mutual and State Farm Fire began receiving bills from AB Quality for the same Supplies previously provided by Quality Health, which were supported by nearly identical form documentation.

### c. The DME Defendants Fraudulently Inflated Their Charges for Supplies

326.    Each DME Defendant used the prescriptions written by the Physician Defendants to exploit the No-Fault Laws and charge inflated amounts for medically unnecessary Supplies.

### d. Fraudulent Charges for Orthotics

327.    The DME Defendants also routinely purported to provide and bill for more expensive orthotics to fill generic prescriptions, rather than more basic and less expensive items, without any support or documentation as to why the more expensive and elaborate orthotics were necessary to fill these prescriptions for basic orthotics.

328.    Cervical collars are among the most common orthotic devices purportedly provided by the DME Defendants and prescribed by the Physician Defendants.  They are worn around the neck to restrict movement and relieve muscle tension.  Various types of cervical collars are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $6.80 to $357 for eight specific types of cervical collars, each of which is described by a particular HCPCS Code ranging from L0120 to L0174.  Absent some express indication in a prescription form or other documentation that a more sophisticated cervical collar is necessary, prescriptions for a cervical collar should be filled with a flexible, non-adjustable foam cervical collar and billed under HCPCS Code L0120 at $6.80 (a "basic cervical collar").  If a two-piece collar is prescribed, the prescription can be filled with several different devices including a semi-rigid thermoplastic, two-piece collar and billed under HCPCS Code L0172 for $75.

329.    The Physician Defendants prescribe cervical collars and remarkably, for some patients, Defendants prescribe two cervical collars — one typically designated as a "cervical collar (2ps)" and the other as "Advanced Cervical Collar."  The Physician Defendants typically prescribe the two collars in separate prescriptions and bill for them with separate submissions. The prescriptions provide no detail or explanation as to what type of two-piece collar should be provided or what is meant by an "Advanced" cervical collar.  As a result, State Farm Mutual and State Farm Fire have not been provided with documentation indicating that anything more than a basic cervical collar was necessary for any given patient.  Absent an indication to the contrary, the DME Defendants should have filled these prescriptions with a basic cervical collar under HCPCS Code L0120 and billed $6.80, or at most provided a two-piece collar under Code L0172 and billed $75.

330.    Nevertheless, the DME Defendants routinely purported to provide and bill using HCPCS Code L0174 which is for a "cervical collar, semi-rigid thermoplastic foam, two-piece with thoracic extension" and using HCPCS Code L0190 which is for a "cervical multiple post collar."  Both collars are more sophisticated and expensive.  It is extremely uncommon to use both L0174 and L0190, yet the DME Defendants routinely charged for both items.  The DME Defendants billed State Farm Mutual and State Farm Fire between $130 and $362.34 for the L0174 and $311.75 for the L0190.

331.    LSOs are another common orthotic device purportedly provided by the DME Defendants.  They are worn around the torso and extend below and above the waist to restrict movement and relieve muscle tension in the lower back. Various types of LSOs are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $43 to $1,150 for sixteen specific types

of LSOs, each of which is described by a particular HCPCS Code ranging from L0625 to L0640. Absent some express indication in a prescription form or other documentation that a more sophisticated LSO is necessary, prescriptions for a LSO should be filled with a flexible LSO and billed under HCPCS Code L0625 at $43 (a "basic LSO"). The Physician Defendants routinely prescribe two LSOs for almost every patient — one typically designated simply "LSO" and the other as "LSO APL (Custom Fitted)." The Physician Defendants typically prescribe the two collars in separate prescriptions and the DME Defendants bill for them with separate submissions. Regardless of whether it was appropriate in some circumstances to prescribe and provide two LSOs, State Farm Mutual and State Farm Fire have not been provided with documentation indicating anything more than a basic LSO was necessary. Thus, the DME Defendants should have filled prescriptions with a basic LSO under HCPCS Code L0625 and billed $43, or with a custom-fit LSO under HCPCS Code L0630 and billed $127.26. Nevertheless, the DME Defendants each routinely purported to provide an LSO under HCPCS Code L0627 and bill $322.64 and also "customized" LSO under HCPCS Code L0631 and bill $806.64. Moreover, the use of the applicable HCPCS Code L0631 and/or the prescription from one of the Physician Defendants for a "custom fitted" LSO, indicated to State Farm Mutual and State Farm Fire that the device was in fact "customized to fit a specific patient by an individual with expertise." But, even if the DME Defendants actually provided custom fitted LSOs, the charges would be fraudulent because: (a) the devices were not medically necessary; (b) the charges are substantially more than the amount to which the DME Defendants would have been entitled under the No-Fault Laws for the basic orthotics; and (c) it is unlikely that any custom fitted LSOs were medically necessary in that there is little, if any, indication in Defendants'

documentation that they performed any of the necessary fitting or adjustments for custom fittings or had the expertise to do so.

332.   The DME Defendants also purported to provide knee orthotics to some patients. They are worn around the knee to restrict movement and relieve muscle tension.  Various types of knee orthoses are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $65 to $1,107.70 for fifteen specified knee orthoses, each described by a particular HCPCS Code ranging from L1810 to L1860.  Absent some express indication in a prescription form or other documentation that a more sophisticated knee orthosis is necessary, prescriptions for a knee orthosis should be filled with an elastic knee orthosis with joints and billed under HCPCS Code L1830 at $65 (a "basic knee orthosis").  The Physician Defendants' prescriptions typically say no more than "Knee Support" or "Knee Brace," and State Farm Mutual and State Farm Fire have not been provided with documentation indicating that anything more than the most basic knee orthosis was necessary.  Thus, the DME Defendants should have filled prescriptions with a basic knee orthosis under HCPCS Code L1830 and billed $65.  Nevertheless, the DME Defendants often purported to provide a knee orthosis with adjustable knee joints under Code L1832 for $549.18 and for $607.55.

333.   The DME Defendants also purported to provide shoulder orthosis to some patients.  These are worn around the shoulder to restrict movement and relieve muscle tension.  Various types of shoulder orthoses are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $40 to $896.92 for seven specific types of shoulder orthoses, each of which is described by a particular HCPCS Code ranging from L3650 to L3677.  Absent some express indication in a

prescription form or other documentation that a more sophisticated shoulder orthosis is necessary, prescriptions for a shoulder orthoses should be filled with a prefabricated, off-the-shelf shoulder orthosis under HCPCS Code L3650 or L3660 at $40 (a "basic shoulder orthosis"). The Physician Defendants' prescriptions typically say no more than "Shoulder Support," and State Farm Mutual and State Farm Fire have not been provided with any documentation indicating that anything more than the most basic shoulder orthosis is necessary.   Thus, Defendants should have filled prescriptions with a basic shoulder orthosis under L3650 or L3660 and billed $40.  Nevertheless, the DME Defendants purported to provide shoulder orthosis under HCPCS Code L3965 (which represents a mobile arm support designed to be attached to a wheelchair) for $806.64.  This HCPCS Code used was not even on the fee schedule at the time it was billed.

### e. The DME Defendants Purported to Deliver and Bill for Other, Different and More Expensive Items than Were Prescribed

334.   The DME Defendants also routinely provide other, different and more expensive DME than the items actually prescribed.

335.   The Physician Defendants prescribe mattresses, which should be fulfilled by supplying foam pads that can be placed on top of a regular mattress and billing $19.48 per foam pad using HCPCS Code E0199.  The DME Defendants, however, routinely purport to provide and bill for dry pressure mattresses charging $204.24 or $306.26 under HCPCS Code E0184. HCPCS Code E0184 indicates the mattress is being used for a patient who is either completely immobile or has limited mobility, pressure ulcers and impaired nutritional status, incontinence, altered sensory perception, or compromised circulatory status.

336.   Similarly, the Prescribing Physicians prescribe bed boards for which the DME Defendants provided different and substantially more expensive items.  Bed boards are not on

the applicable fee schedule, but can be easily acquired for no more than $35 from any legitimate DME wholesaler.  Thus, even if a bed board was necessary and provided it would not be appropriate to charge more than $52.50 (i.e., no more than 150% of the acquisition cost.  *See infra* ¶ 338.  Yet, the DME Defendants did not bill for providing bed boards but for over-the-bed tables — devices placed over a bed-ridden individual to allow that person to eat in bed — and billed $101.75 or $101.85 under HCPCS Code E0274.

337.    Similarly, the Physician Defendants prescribe lumbar cushions and often also either cervical pillows or back-positioning cushions, without any support that patients need multiple support cushions.  Regardless, the DME Defendants should have filled prescriptions for lumbar cushions and back-position cushions with cushions billed at $22.04 under HCPCS Code E0190.  The DME Defendants, however, purport to fill prescriptions for back-positioning cushions with a wheelchair back cushion under E2614 for $491.77 and purport to fill prescriptions for lumbar cushions with a positioning car seat under HCPCS Code T5001 for $513.75 (a device intended for use in a vehicle by persons with special orthotic needs such as muscular dystrophy or cerebral palsy that cannot be met by less costly alternatives).  There is no justification for patients to be prescribed and provided multiple cushions and car seats.   In addition, there is no documentation establishing that the patients for whom these expensive and unusual devices are purportedly provided are wheelchair bound or suffer from special orthotic conditions such that standard devices would be insufficient.

### f.    Fraudulent Charges for Items Not on Fee Schedule

338.    The DME Defendants also purport to provide a number of items that are not on the applicable fee schedule, for which they fraudulently inflate their charges.  Under the No-Fault Laws, if an item is not on the fee schedule, a DME provider may charge no more than the

*lesser of* 150% of its acquisition cost or its usual and customary charge to the public. 12 N.Y.C.R.R. § 442.2.

339.    The DME Defendants routinely charge between $699 and $735.25 for an EMS Unit, $408 for a whirlpool, and $79.95 or $179.95 for a massager.  These submissions constitute representations that these amounts are the lesser of either 150% of their acquisition costs or their usual and customary charge to the public.  But the DME Defendants' true costs to acquire these items are a small fraction of what these submissions represent and the DME Defendants' true acquisition costs do not support their charges under the fee schedule.  In fact:

> (a)    EMS Units for which the DME Defendants routinely charge between $699 and $735.25 are typically available from many legitimate DME wholesalers for between $30 to $65, and therefore 150% of such acquisitions costs should have been no more than $97.50.

> (b)    Whirlpool units for which the DME Defendants routinely charge $408 are typically available from many legitimate DME wholesalers for about $56, and therefore 150% of such acquisition costs should have been no more than $84.

> (c)    Massager units for which the DME Defendants routinely charge $79.95 or $179.95 are typically available from many legitimate DME wholesalers for between $25 to $35, and therefore 150% of such acquisition costs should have been no more than $52.50.

Thus, even if these Supplies were medically necessary (which they were not), appropriate charges for such Supplies should have been only a fraction of the charges the DME Defendants submitted for these items.

### g.    The DME Defendants' Documentation

340.    The DME Defendants also do not provide any documentation as to their acquisition costs for those items that are not on the fee schedule.  The documents the DME Defendants do submit omit basic information about the Supplies, like the manufacturer, make, model, size, features, and functions.  This prevents State Farm Mutual and State Farm Fire from

determining the true kind and quality of the items provided, whether those specific items are medically necessary, and the appropriate charges for them.

341.    When State Farm Mutual or State Farm Fire have asked for information regarding acquisition costs or usual and customary charges, the DME Defendants have refused to provide it, have claimed they do not keep such records, and have refused to attend requested EUOs at which they would be required to provide such information.  For example, on many occasions State Farm Mutual and State Farm Fire have requested that certain DME Defendants attend examinations under oath and yet only Quality Custom has ever appeared for an EUO.

**H.    Defendants' Further Efforts to Advance the Fraudulent Scheme**

342.    Defendants are obligated legally and ethically to act honestly and with integrity. Nonetheless, Defendants submitted or caused to be submitted, bills and supporting documentation that are fraudulent in that they represent that services were performed and were medically necessary and reimbursable when, in fact, they were not.

343.    The Physician Defendants, the Physical Therapy Defendants, the Chiropractor Defendants, and the Acupuncture Defendants submitted, or caused to be submitted bills, and supporting documentation to State Farm Mutual and State Farm Fire for the examinations, Tests, and treatment detailed above. These bills and supporting documentation are fraudulent because the services were not medically necessary and/or reimbursable, the pervasive patterns in these documents are not credible, and they do not reflect legitimate findings, diagnoses, testing, or treatment.

344.    The DME Defendants have submitted or caused to be submitted bills and supporting documentation to State Farm Mutual and State Farm Fire for Supplies.  These bills and supporting documentation are fraudulent because the Supplies were not medically necessary and the DME Defendants are not entitled to reimbursement as they purported to deliver to

patients and bill for different and more expensive items than were prescribed, exploited language in prescriptions to bill for more expensive items when less expensive items were all that were prescribed, billed for different items than were actually provided and fraudulently inflated charges for items for which there was no established charge under the applicable fee schedule.

345.    Further, the success of Defendants' scheme depends on concealing the existence of the Predetermined Treatment Protocol from State Farm Mutual, State Farm Fire, and other insurers to induce insurers to pay Defendants' fraudulent charges.  Defendants take affirmative steps to conceal the scheme by, among other things, submitting multiple bills for services purportedly rendered by the same providers on the same date of service.  Defendants submit bills in this manner because they know that insurers like State Farm Mutual and State Farm Fire rely on the contents of each individual bill and related supporting documentation to make a payment determination.

346.    To verify some of the claims that it had received, State Farm Mutual and State Farm Fire timely requested, on multiple occasions, EUOs from all Defendants.  Most Defendants failed and refused to comply with their legal obligations to provide State Farm Mutual and State Farm Fire with the properly and timely requested EUOs, which constituted a breach of a condition of coverage under the State Farm Mutual and State Farm Fire insurance policies. Defendants also failed to appear for EUOs to continue to conceal the above-described fraudulent conduct from State Farm Mutual and State Farm Fire.

**I.    Oleg Rybak and the Rybak Law Firm's Role Enforcing Collections**

347.    Among the elements of the fraudulent scheme is for Defendants to bring lawsuits in state courts or arbitrations under the No-Fault Laws to seek reimbursement on claims that insurers have not paid.  Almost all of the suits and arbitrations brought for providers operating at 1786 Flatbush are brought by Oleg Rybak and the Rybak Law Firm.

348.    Less than two months after being admitted to practice law in New York, Oleg Rybak formed the Rybak Law Firm in June 2009.  By the end of 2009, the Rybak Law Firm had filed over 2,200 civil lawsuits to collect No-Fault benefits on behalf of providers.  Since 2009, the Rybak Law Firm has filed almost 90,000 lawsuits to collect No-Fault benefits on behalf of providers.  Of those lawsuits, almost 50,000 were on behalf of providers who rendered services either at 1468 Flatbush or 1786 Flatbush.  *See* Ex. 35.  Bank records reflect that Defendants have paid the Rybak Law Firm over $850,000 between 2011 and 2018.

349.    Many of these proceedings involve insurers denying reimbursement because a provider failed to verify its claim by failing to appear for an EUO.  Oleg Rybak and the Rybak Law Firm respond to these assertions through tactics intended to disguise the fraud scheme and the fraudulent nature of the claims and reap substantial profits.

350.    Oleg Rybak and the Rybak Law Firm pursued these claims through thousands of individual separate suits in state court.  Indeed as noted, between 2009 and 2018, the Rybak Law Firm filed almost 50,000 lawsuits on behalf of providers at 1468 Flatbush and 1786 Flatbush. Even after this action was filed, the Rybak Law Firm filed over 3,500 lawsuits on behalf of 1786 Flatbush providers.  The multiplicity of proceedings served several purposes, including hiding connections between providers and claims, making it more difficult to discern that providers were under common control, increasing the difficulty for insurers and the courts to discern the fraudulent patterns in treatment that only became apparent when multiple claims were viewed together, and imposing litigation burdens and costs on insurers to increase the likelihood that they would not fight but settle the claims.

351.    Oleg Rybak and the Rybak Law Firm also submitted false affidavits on behalf of providers who operated at 1468 Flatbush, 1786 Flatbush, and other locations associated with the

Rybaks,[3] including on behalf of at least Maiga, Deng Acupuncture, Mollo, and Pavlova.  In these boilerplate affidavits, the affiant asserts that they attempted to schedule an EUO by calling State Farm Mutual and State Farm Fire, but no one ever called back.  *See* Ex. 36.  State Farm Mutual and State Farm Fire have either no record and/or no awareness of any such calls.  Moreover, it is inconceivable that so many different providers contacted so many different individuals at State Farm Mutual and State Farm Fire on so many occasions over so many years and not a single referenced phone call was returned.  Almost all of these affidavits were notarized by Oleg Rybak.  That they are boilerplate indicates that either he or members of the Rybak Law Firm prepared them.

352.    Oleg Rybak took other actions to block insurers from taking EUOs through which they might uncover the scheme, the relationships among the participants and the fraudulent nature of the claims.  Oleg Rybak and the Rybak Law Firm represent almost all of the providers operating at 1786 Flatbush, and represented many operating at 1468 Flatbush in responding to requests for EUOs by State Farm Mutual and State Farm Fire.  Oleg Rybak and the Rybak Law Firm often oppose these requests with letters containing unsupported objections, and insisting that proposed dates are inconvenient without offering alternatives.  Such letters are not intended to resolve disagreement or to cooperate with insurers' efforts to verify claims, but rather serve to thwart insurers' ability to take EUOs.

353.    Similarly, Oleg Rybak and the Rybak Law Firm engage in litigation tactics intended to obtain the proceeds of the fraudulent claims and increase the burden on insurers.  For

---

[3]   For example, affidavits were submitted on behalf of Chapa Products Corporation, which provided Supplies to patients at 552 East 180th Street, Bronx, New York.  Denobrega affirmed in an affidavit that "Barbara" sent her to work at 552 East 180th Street, that Denobrega negotiated her compensation for this work with Barbara, and that the circumstances of Denobrega's employment at 552 East 180th Street were the same as at 1786 Flatbush.  *See* Ex. 15.

example, Oleg Rybak and the Rybak Law Firm have served numerous complaints to collect benefits by mail under a rule that allows mail service only if the recipient acknowledges receipt. *See* N.Y. C.P.L.R. § 312-a.  Oleg Rybak and the Rybak Law Firm mailed numerous complaints to State Farm Mutual and State Farm Fire and although the insurers never acknowledged receipt, Oleg Rybak and the Rybak Law Firm moved for default judgments, and in some instances pressed for such defaults despite objection, knowing that the practice was a violation of the rule. On other occasions, Oleg Rybak and the Rybak Law Firm filed and pursued lawsuits to collect on bills that had already been paid or that already had been adjudicated knowing that recovery was barred.  Indeed, Oleg Rybak filed at least 27 lawsuits against another insurance carrier that did not issue insurance policies covering the accidents at issue, despite the facts that the courts, including an appellate court had ruled that the carrier was the wrong party.  *See, e.g.*, *Great Health Care Chiropractic, P.C. v. Omni Indem. Co*., 977 N.Y.S. 2d 667 (N.Y. App. Div. 2013).

**J.      Justifiable Reliance by State Farm Mutual and State Farm Fire**

354.    State Farm Mutual and State Farm Fire are under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The bills and supporting documents that Defendants submitted, and caused to be submitted, to State Farm Mutual and State Farm Fire in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual and State Farm Fire to justifiably and reasonably rely on them.

355.    As a result, State Farm Mutual and State Farm Fire have incurred damages of at least $1 million.

356.    Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature.  Only when the bills and supporting documentation are viewed

together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

## V.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against all Defendants)

357.   State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

358.   Defendants, acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning patients treated at 1786 Flatbush.

359.   The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1 through 8 that:  (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when these Defendants did not legitimately reach such conclusions; and (c) the services and Supplies were performed, provided, medically necessary, and/or reimbursable, when, in fact, they either were not provided, not medically necessary, and/or not reimbursable.

360.   Defendants knew that the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, testing, injections, and Supplies were false and fraudulent when they were made.

361.   Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

362.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

**SECOND CLAIM FOR RELIEF**
**AIDING AND ABETTING FRAUD**
**(Against All Defendants)**

363.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

364.    Defendants conspired, agreed to, and acted in concert to defraud State Farm Mutual and State Farm Fire, and did defraud State Farm Mutual and State Farm Fire, through the submission of false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire as described above in the First Claim for Relief.

365.    Defendants substantially assisted in defrauding State Farm Mutual and State Farm Fire.  Defendants submitted or caused to be submitted bills and supporting documentation that contained false and fraudulent misrepresentations of material fact to State Farm Mutual and State Farm Fire.

366.    The false and fraudulent statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1 through 8 that:  (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when these Defendants did not legitimately reach such conclusions; and (c) the services and Supplies were performed, were provided, were medically

necessary and/or were reimbursable, when, in fact, they either were not provided, not medically necessary, and/or not reimbursable.

367.    Defendants knew that the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, testing, injections, and Supplies were false and fraudulent when they were made.

368.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

369.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### THIRD CLAIM FOR RELIEF
### RICO VIOLATION OF 18 U.S.C. § 1962(c)
### (Against All Defendants)

370.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

371.    Defendants constitute an association-in-fact "enterprise" ("the 1786 Flatbush Fraudulent Treatment Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the 1786 Flatbush Fraudulent Treatment Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurance companies by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for services and Supplies that were not provided, were not medically necessary, and/or were not legitimately entitled to reimbursement for patients treated at 1786 Flatbush.  Although different members

have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud State Farm Mutual and State Farm Fire through fraudulent insurance claims — with sufficient longevity to accomplish that common purpose. Specifically, Parisien, Dabiri, Blackman, Pavlova, and Lacina purported to legitimately examine patients at 1786 Flatbush, diagnose them with conditions to support the alleged need of the Predetermined Treatment Protocol of services that they could perform, or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and then ordered and performed additional injections and other services, which were billed by the Physician Defendants. Mollo, Mollo P.C., Island Life, ACH Chiropractic, and Energy Chiropractic purported to provide chiropractic care and tests and diagnosed patients with conditions requiring additional services that they could perform or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and then ordered and performed additional services. Deng and Deng Acupuncture purported to provide acupuncture treatment based, in part, on diagnoses, findings and recommendations of other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and diagnosed patients with conditions requiring additional services that they could perform or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise. Masigla and Mariano purported to provide physical therapy and other services based on diagnoses, findings and recommendations of other members of the 1786 Flatbush Fraudulent Treatment Enterprise. The DME Defendants provided Supplies based on prescriptions written by Parisien, Dabiri, Blackman, Pavlova, and Lacina for patients at 1786 Flatbush. Tatiana Rybak secretly and unlawfully owned and controlled the professional corporations operating at 1786 Flatbush,

received kickbacks from providers of healthcare goods and services at 1786 Flatbush disguised as payments for services or rent, fraudulently billed for goods and services purportedly provided to patients at 1786 Flatbush that were not eligible for reimbursement and goods and services that were not medically necessary or not provided, and caused profits generated from these fraudulent bills to be covertly funneled to, or for the benefit of herself, Oleg Rybak, and other family members to conceal that they controlled and were the primary beneficiaries of these fraudulently obtained funds.  Oleg Rybak participated in, facilitated, supported, furthered, and profited from this scheme by, among other things, controlling the medical practice of a physician at 1468 Flatbush, the direct predecessor to 1786 Flatbush; covertly funneling the proceeds of activity at 1468 Flatbush to or for the benefit of himself, Tatiana Rybak, and other family members; exercising sufficient ownership and control over the activities and professional service corporations operating at 1786 Flatbush such that two employees who worked there asserted the Fifth Amendment in response to questions about his ownership and control; forming the DME Defendants with foreign-national nominee owners who may reside outside the United States and arranging to have their mail forwarded to his law office; exercising control over the physical space in which the clinic at 1786 Flatbush operated through a lease that on paper was with one of his family members; representing individuals who treated at 1786 Flatbush and who were in staged accidents to recover No-Fault Benefits and pursue claims and lawsuits for bodily injuries arising out of automobile accidents; covertly funneling the proceeds of activity at 1786 Flatbush and the professional service corporations that operated there to or for the benefit of himself, Tatiana Rybak, and other family members; and bringing thousands of claims and suits against insurers to recover payment for services provided to patients of 1786 Flatbush and supporting suits with fraudulent affidavits and employing other tactics intended to disguise the scheme and

the fraudulent nature of the claims, and to reap substantial profits.   Each Defendant's participation and role was necessary to the success of the scheme.   No one Defendant was capable of carrying out the scheme without the participation of the other Defendants.   The 1786 Flatbush Defendants have acted with sufficient longevity to achieve their common goal of defrauding State Farm Mutual and State Farm Fire through fraudulent insurance claims.

372.   Each Defendant is or has been employed by and associated with the 1786 Flatbush Fraudulent Treatment Enterprise.

373.   Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 1786 Flatbush Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent in that:  (a) patients were not legitimately examined and tested to determine the true nature and extent of their injuries; (b) each patient's condition was represented to be related to an automobile accident and no other contributing factors, when Defendants did not legitimately reach such conclusions; and (c) the examinations, diagnoses, treatment, testing and Supplies which were medically unnecessary, not provided, and/or not reimbursable, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual or State Farm Fire for claims referenced in Exhibits 1 through 8.

374.   State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $1 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(c) for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), plus interest, and any other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
## RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1962(d)
### (Against All Defendants)

375.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 and Paragraphs 371 through 374 above.

376.    Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 1786 Flatbush Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent for examinations, treatments, testing, injections, and Supplies which were medically unnecessary, not provided, and/or not reimbursable, including, but not limited to, all bills and supporting documentation submitted to State Farm Mutual or State Farm Fire for claims referenced in Exhibits 1 through 8.

377.    Each of the Defendants knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, diagnoses, treatments, testing, and Supplies, which were medically unnecessary, not provided, and/or not reimbursable, to State Farm Mutual, State Farm Fire, and other insurers.

378.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $1 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(d) for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

379.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

380.    State Farm Mutual and State Farm Fire conferred a benefit upon the Defendants by paying Defendants' claims for services purportedly provided to patients treated at 1786 Flatbush and these Defendants voluntarily accepted and retained the benefit of those payments.

381.    Because the Defendants knowingly billed for or received money for services that were not medically necessary, not provided, and/or not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

382.    As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Defendants for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

**SIXTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(Against All Provider Defendants)**

383.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

384.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

385.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB, Masigla, Maiga, Madison, Quality Health, Quality Custom, AB Quality, and PHCP on the other hand, as to all charges for examinations, treatments, testing, injections, and Supplies that have not been paid to date and through the pendency of this litigation.  State Farm Mutual and State Farm Fire contend these Defendants are not entitled to reimbursement for any of these charges.

386.    Because these Defendants have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm Mutual and State Farm Fire, these Defendants are not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB, Masigla, Maiga, Madison, Quality Health, Quality Custom, Buslon, AB Quality, and PHCP are not entitled to collect No-Fault Benefits for all charges for examinations, treatments, testing, injections, and

Supplies that have not been paid to date and through the pendency of this litigation; and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

### SEVENTH CLAIM FOR RELIEF
### DECLARATORY JUDGMENT BASED ON FAILURE TO APPEAR FOR EXAMINATIONS UNDER OATH
### (Against All Provider Defendants)

387.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

388.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

389.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB, Masigla, Maiga, Madison, Quality Health, Quality Custom, AB Quality and PHCP, on the other hand, as to all charges that have not been paid to date and through the pendency of this litigation as a result of these Defendants' failure to appear for properly and timely requested EUOs.

390.    The failure of these Defendants to appear for properly and timely requested EUOs constitutes a breach of a condition of coverage under the State Farm Mutual and State Farm Fire insurance policies.

391.    Accordingly, State Farm Mutual and State Farm Fire contend the Defendants listed above are not entitled to reimbursement for any of these charges.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy

Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB, Masigla, Maiga, Madison, Quality Health, Quality Custom, Buslon, AB Quality, and PHCP are not entitled to collect No-Fault Benefits for charges that have not been paid to date and through the pendency of this litigation for failure to appear for properly and timely requested EUOs; and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury.

Dated: July 29, 2019
     Chicago, Illinois

           KATTEN MUCHIN ROSENMAN LLP

        By:  */s/  Jonathan L. Marks*

           Ross O. Silverman (NY Bar No. 4147922)
           Jonathan L. Marks (NY Bar No. 5462874)
           Anne Raven (Admitted *pro hac vice*)
           KATTEN MUCHIN ROSENMAN LLP
           525 West Monroe Street
           Chicago, Illinois 60661-3693
           Telephone:  312.902.5200
           Facsimile:  312.902.1061
           ross.silverman@kattenlaw.com
           jonathan.marks@kattenlaw.com
           anne.raven@kattenlaw.com

           Christopher T. Cook
           KATTEN MUCHIN ROSENMAN LLP
           575 Madison Avenue
           New York, NY 10022-2585
           Telephone:  212.940.8800
           christopher.cook@kattenlaw.com

           *Attorneys for Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*