# *Exhibit B*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

State Farm Mutual Automobile Insurance Company
and State Farm Fire and Casualty Company,

<div align="center">Plaintiffs,</div>

v.

Francois Jules Parisien, M.D.,                    Case No. 1:18-cv-00289-ILG-ST
Luqman Dabiri, M.D.,
Ksenia Pavlova, D.O.,
Noel Blackman, M.D.,
Frances Lacina, D.O.,
Allay Medical Services, P.C.,
FJL Medical Services P.C.,
JFL Medical Care P.C.,
JPF Medical Services, P.C.,
KP Medical Care P.C.,
PFJ Medical Care P.C.,
RA Medical Services P.C.,
Darren Mollo, D.C.,                               **PLAINTIFFS DEMAND**
Darren Mollo D.C., P.C.,                          **TRIAL BY JURY**
ACH Chiropractic, P.C.,
Energy Chiropractic, P.C.,
Island Life Chiropractic Pain Care, PLLC,
Charles Deng, L.A.c.,
Charles Deng Acupuncture, P.C.,
David Mariano, P.T.,
Maria Masigla a/k/a Maria Shiela Buslon, P.T.,
MSB Physical Therapy P.C.,
Maiga Products Corporation,
Madison Products of USA, Inc.,
Quality Custom Medical Supply, Inc.,
Allan L. Buslon,
Quality Health Supply Corp.,
Personal Home Care Products Corp.,
AB Quality Health Supply Corp.,
Tatiana M. Rybak, and
Oleg Rybak,

<div align="center">Defendants.</div>

<div align="center">

**<u>SECOND AMENDED COMPLAINT</u>**

</div>

State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire"), for their Second Amended Complaint against Defendants, allege as follows:

## I.      NATURE OF THE ACTION

1.      This action seeks to recover money fraudulently obtained from State Farm Mutual and State Farm Fire through the submission of bills and supporting documentation that are fraudulent for examinations, treatment, testing, injections, and durable medical equipment provided to individuals who were involved in motor vehicle accidents and eligible for No-Fault benefits under State Farm Mutual or State Farm Fire insurance policies ("No-Fault Benefits"). The bills and supporting documentation that Defendants submitted or caused to be submitted to State Farm Mutual and State Farm Fire were fraudulent because the services were not eligible for reimbursement, not provided, and/or not medically necessary.

2.      The bills and supporting documentation are the product of a fraudulent, predetermined treatment protocol (the "Predetermined Treatment Protocol") administered to patients by providers at 1786 Flatbush Avenue in Brooklyn, New York ("1786 Flatbush"). Defendants did not design the Predetermined Treatment Protocol to legitimately examine, diagnose, and treat patients, but instead to enrich Defendants financially by exploiting the patients' No-Fault Benefits.

3.      The Predetermined Treatment Protocol involves:

(a)      initial examinations that are not legitimately performed to determine the true nature and extent of patient injuries, but rather are performed, if at all, as a pretext to report substantially similar and in some instances nearly identical examination findings to justify a variety of unnecessary treatment and services;

(b)      a treatment plan consisting of a combination of purported physical therapy modalities, chiropractic manipulations, and acupuncture, provided to almost every patient on almost every visit and often on the same dates of service, regardless of the unique circumstances and needs of each patient;

(c)      employing particular treatments, modalities, and services not because they are clinically beneficial to the patients, but to maximize charges and avoid limitations on the amounts that can be charged under the applicable fee schedule;

(d)      subjecting patients to medically unnecessary diagnostic tests, which include digital range of motion tests ("ROM Tests"), computerized muscle strength tests ("Muscle Tests"), nerve conduction velocity tests ("NCVs"), electromyography tests ("EMGs"), somatosensory evoked potential tests ("SSEPs"), brainstem auditory evoked potential tests ("BEPs"), functional capacity evaluations, and pain fiber nerve conduction studies ("V-sNCTx") (collectively, the "Tests");

(e)      recommending and performing medically unnecessary trigger point injections and dry needling procedures;

(f)      recommending and providing virtually identical bundles of medically unnecessary durable medical equipment ("DME") and orthotic devices (collectively, "Supplies"); and

(g)      submitting documents to State Farm Mutual and State Farm Fire falsely representing that the examinations, treatment, Tests, injections, and Supplies purportedly rendered were medically necessary when, in fact, they either were not performed or were performed to exploit patients' No-Fault Benefits and not because they were medically necessary.

4.      The Predetermined Treatment Protocol was rendered by a variety of providers, including:  (1) physicians — Francois Jules Parisien, M.D. ("Parisien"), Noel Blackman, M.D. ("Blackman"), Luqman Dabiri, M.D. ("Dabiri"), Ksenia Pavlova, D.O. ("Pavlova"), and Frances Lacina, D.O. ("Lacina"), and a series of entities purportedly owned by those providers, including Allay Medical Services, P.C. ("Allay"), JFL Medical Care P.C. ("JFL Medical"), FJL Medical Services P.C. ("FJL Medical"), JPF Medical Services, P.C. ("JPF Medical"), KP Medical Care P.C. ("KP Medical"), PFJ Medical Care P.C. ("PFJ Medical"), and RA Medical Services ("RA Medical") (collectively, the "Physician Defendants") who purportedly examined patients, diagnosed injuries to support treatment, and provided medically unnecessary medical care and Tests and who, for some patients, administered medically unnecessary trigger point injections and dry needling procedures; (2) chiropractors — Darren T. Mollo, D.C. ("Mollo") and others employed by or associated with him or entities purportedly owned by Mollo, including Darren

Mollo D.C., P.C. ("Mollo P.C."), ACH Chiropractic, P.C. ("ACH Chiropractic"), Energy Chiropractic, P.C. ("Energy Chiropractic"), and Island Life Chiropractic Pain Care, PLLC ("Island Life") (collectively, the "Chiropractor Defendants"), who purportedly examined patients, diagnosed injuries to support treatment, and provided medically unnecessary chiropractic care and Tests; (3) acupuncturists — Charles Deng, L.A.c. ("Deng") and others employed by or associated with him and Charles Deng Acupuncture, P.C. ("Deng Acupuncture") (collectively, the "Acupuncture Defendants"), who purportedly examined patients, diagnosed injuries to support treatment, and provided medically unnecessary acupuncture treatment, including cupping; (4) physical therapists working for the Physician Defendants, including David Mariano, P.T. ("Mariano"), Maria Masigla a/k/a Maria Shiela Buslon, P.T. ("Masigla"), MSB Physical Therapy P.C. ("MSB"), and others who administered medically unnecessary physical therapy services, including synaptic treatments and cold laser therapy (collectively, the "Physical Therapy Defendants"); and (5) providers of Supplies — Maiga Products Corporation ("Maiga"), Madison Products of USA, Inc. ("Madison"), Quality Health Supply Corp. ("Quality Health"), AB Quality Health Supply Corp. ("AB Quality"), Personal Home Care Products Corp. ("PHCP"), Quality Custom Medical Supply, Inc. ("Quality Custom"), and Allan L. Buslon ("Buslon") who purportedly owns Quality Health and AB Quality (collectively, the "DME Defendants"), which provided and billed for Supplies based on prescriptions issued by the Physician Defendants.

5.     As a result of the Predetermined Treatment Protocol, as well as the medically unnecessary examinations, treatment, Tests, injections, Supplies, and the improper conduct described above: (a) patients were not legitimately examined, diagnosed, and/or appropriately treated for conditions which they may have had; (b) patients were subjected to treatments for

conditions that they may not have had; and (c) patients' limited No-Fault Benefits were reduced and therefore not available for legitimate treatment that they may have needed as a result of their automobile accident.

6.     The professional service corporations through which healthcare services, including physician, chiropractic, and acupuncture services, Tests, and procedures were rendered and billed were owned on paper by licensed healthcare professionals.  Supplies were purportedly provided and billed by the DME Defendants owned on paper by Buslon, Maiga Borisevica ("Borisevica"), Oleksandr Semenov ("Semenov"), and others.  In fact, at all times, layperson Tatiana Rybak directed activity at 1786 Flatbush and orchestrated a scheme to:  (a) secretly and unlawfully own and control professional service corporations operating at 1786 Flatbush, (b) receive kickbacks from providers of healthcare goods and services at 1786 Flatbush disguised as payments for services or rent, (c) fraudulently bill for goods and services purportedly provided to patients at 1786 Flatbush that were not eligible for reimbursement and goods and services that were not medically necessary or not provided, and (d) cause profits generated by these fraudulent bills to be covertly funneled to or for the benefit of herself, Oleg Rybak, and other family members to conceal that they controlled and were the primary beneficiaries of these fraudulently obtained funds.

7.     Tatiana Rybak's son, Oleg Rybak, was admitted to the New York Bar in 2009 and from that time forward knowingly participated in, facilitated, supported, furthered, and profited from this scheme.  To facilitate, support, and further these common objectives, Oleg Rybak's actions and participation included:  (a) controlling the medical practice of a physician at 1468 Flatbush Avenue, the direct predecessor to 1786 Flatbush ("1468 Flatbush"), (b) covertly funneling the proceeds of activity at 1468 Flatbush to or for the benefit of himself, Tatiana

5

Rybak, and other family members, (c) exercising sufficient ownership and control over the activities and professional service corporations operating at 1786 Flatbush that two employees who worked there asserted the Fifth Amendment in response to questions about his ownership and control, (d) forming two of the DME Defendants with foreign-national nominee owners who may reside outside the United States and arranging to have their mail forwarded to his law office, (e) exercising control over the physical space in which the clinic at 1786 Flatbush operated through a lease that on paper was with one of his family members, (f) representing individuals who treated at 1786 Flatbush and who were in staged accidents to recover No-Fault Benefits and pursue claims and lawsuits for bodily injuries arising out of automobile accidents, (g) covertly funneling the proceeds of activity at 1786 Flatbush and the professional service corporations that operated there to or for the benefit of himself, Tatiana Rybak, and other family members, and (h) bringing thousands of claims and suits against insurers to recover payment for services provided to patients of 1786 Flatbush, supporting suits with fraudulent affidavits, and employing other tactics intended to disguise the scheme and the fraudulent nature of the claims, and to reap substantial profits.

8.      The professional corporations through which healthcare services were rendered and billed were owned on paper by licensed healthcare professionals, and the DME Defendants, which purportedly provided and billed for Supplies, were owned on paper by Buslon, Borisevica, and Semenov, among others.  In fact, at all times, layperson Tatiana Rybak owned, controlled, and/or profited from the medical professional corporations and DME Defendants, directed activity at 1786 Flatbush, and orchestrated the submission of fraudulent claims for healthcare services.  At all times, Tatiana Rybak's son, Oleg Rybak, a principal in the Rybak Law Firm, PLLC (the "Rybak Law Firm") participated in, advanced, enforced, and profited from the

scheme to submit fraudulent claims for healthcare services rendered at 1786 Flatbush.  Both Tatiana Rybak and Oleg Rybak reaped substantial financial profits from activity at 1786 Flatbush, which they siphoned to themselves using intermediaries.

9.      Defendants' scheme began in August 2013 and has continued uninterrupted since that time.  As a result of their scheme, State Farm Mutual and State Farm Fire have incurred damages of more than $1 million.

## II.     JURISDICTION AND VENUE

10.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq*. ("RICO") because they arise under the laws of the United States. Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

11.     In addition, pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over State Farm Mutual's and State Farm Fire's claims based on state law because the matter is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Defendants acted in concert pursuant to a common plan to commit the fraud alleged herein and are jointly and severally liable for the damages caused to State Farm Mutual and State Farm Fire in the amount of at least $1 million.

12.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred here.

## III.    PARTIES

### A.     Plaintiffs

13.     State Farm Mutual is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York.

14.    State Farm Fire is a corporation organized under the laws of Illinois with its principal place of business in Illinois, and it issues automobile insurance policies in New York.

**B.    Defendants**

**1.    The Rybak Defendants**

15.    Tatiana M. Rybak ("Tatiana Rybak" or "Tatiana") resides in and is a citizen of Florida.    Tatiana Rybak secretly and unlawfully owned, controlled, and profited from professional service corporations and DME Defendants that rendered services at 1786 Flatbush, directed activity at 1786 Flatbush, including determining the services that were rendered and who rendered them, and orchestrated the submission of fraudulent claims for healthcare services.

16.    Oleg Rybak is an attorney who resides in and is a citizen of New York.    Oleg Rybak is the founder and managing member of The Rybak Law Firm, PLLC, a law firm with its principal place of business in Brooklyn, New York.    Oleg Rybak became licensed to practice law in New York in 2009 and, from that time forward, knowingly participated in, facilitated, supported, furthered, and profited from the scheme to submit fraudulent claims for healthcare services rendered at clinics secretly and unlawfully owned and controlled by Tatiana Rybak, including 1786 Flatbush.

**2.    The Physician Defendants**

17.    Parisien resides in and is a citizen of New York.    Parisien is a licensed physician in New York.    Parisien's services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under his own tax identification number and through Allay, PFJ Medical, and JPF Medical.

18.    Blackman resides in and is a citizen of New York and is currently in the custody of the Federal Bureau of Prisons.    Blackman is a licensed physician in New York.    Blackman's

services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under his own tax

identification number.

19.    Blackman has a history of professional misconduct.  Blackman was charged by

the New York Board of Medicine with repeated negligence and failure to maintain accurate

patient records relating to his treatment of three patients.   As the result of Blackman's

negligence, the right arm of one of his patients had to be amputated.  On June 25, 2004, the

Board placed Blackman on probation for two years, a condition of which required Blackman to

practice medicine only when monitored by a board-certified physician approved by the New

York State Department of Health Office of Professional Medical Conduct and to take a course in

medical record keeping.

20.    More recently, on August 24, 2016, Blackman pled guilty to conspiracy to

distribute oxycodone in violation of 21 U.S.C. § 841(a)(1) following his arrest by federal law

enforcement officers for illegally prescribing vast amounts of painkillers, specifically prescribing

365,000 pills of the Schedule II narcotic oxycodone in 2015 alone.  Federal authorities removed

Blackman from an international flight bound for Guyana and arrested him at John F. Kennedy

Airport after they ordered the plane back to the terminal.  According to Blackman's prescription

records, the 365,000 pills came from 2,487 prescriptions he wrote from multiple clinics in

Franklin Square, Elmhurst, Queens, and Brooklyn from approximately June 2015 to February

2016.  Blackman waived his *Miranda* rights and told law enforcement agents that he saw 100

patients per day at a clinic for which he charged $300 per patient and estimated that he saw one

patient every six minutes.  Blackman's secretary, Eva Torres, was also arrested on the same

narcotics conspiracy charge, and she advised federal agents that an unnamed person would give

her a list of names and Blackman would then write oxycodone prescriptions without examining

the patients, for which Blackman received $300 for each prescription.  In light of these charges, the New York Board of Medicine initiated an investigation during which Blackman agreed to an Interim Order of Conditions precluding him from practicing medicine in New York during the investigation.  Blackman pled guilty to conspiracy to distribute and possess with intent to distribute oxycodone and, on May 15, 2017, a judgment was entered against him sentencing him to, among other things, imprisonment for 50 months, and he was ordered to forfeit approximately $536,000.

21.   Dabiri resides in and is a citizen of New York.  Dabiri's services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under his own tax identification number.

22.   Dabiri is a physician specializing in obstetrics and gynecology whose license to practice medicine has been suspended in at least three jurisdictions, including New York.

23.   Dabiri started to practice medicine in England, where he obtained a restricted medical license in 1999 requiring that he practice under the supervision of a licensed physician. His restricted license in England was later suspended on two separate occasions in 2000.  Dabiri then moved to the United States and, in February 2009, obtained a restricted license to practice medicine that also required him to work under the supervision of a supervising physician.  In February 2013, the Florida Department of Health brought disciplinary proceedings against Dabiri for violating the terms of his limited license.  In June 2013, Dabiri entered into a consent agreement with the Florida Board of Medicine under which he was reprimanded for professional misconduct, ordered to pay a fine and costs, and his Florida license to practice medicine was suspended until he applied for reinstatement following an evaluation.

24.   On January 12, 2015, approximately eight months after his Florida license was suspended, Dabiri's license to practice medicine in New York was suspended through July 30,

2015, as a result of the Florida suspension.  Following an evidentiary hearing, the State of New York Board for Professional Medical Conduct ("BPMC") found that Dabiri committed professional misconduct based on the Florida suspension under New York Education Law 6530(9)(d), which provides for disciplinary action if a licensee is subject to a disciplinary action in another state and the underlying conduct would give rise to disciplinary action in New York, and ordered that Dabiri's New York license be suspended until his Florida medical license was reinstated.  The New York Department of Health appealed the hearing committee's decision to the Administrative Review Board ("ARB"), stating that the committee's penalty was "insufficient and places the public at risk."  On May 27, 2015, the ARB ordered that Dabiri's New York license be suspended indefinitely "until such time as the Director of the Office of Professional Medical Conduct . . . determines [that Dabiri] can practice safely in New York" and also placed Dabiri on probation for five years following his reinstatement.  The ARB noted that Dabiri had previously been disciplined in both England and Florida, and then left both jurisdictions to practice elsewhere, finding "such conduct presents a pattern and we find that pattern troubling."  The ARB also noted that Dabiri had been practicing in New York in an unlicensed office setting, which permitted him to "practice with no supervision or oversight in [an office] setting, unlike practice in a licensed medical facility subject to State and Federal inspections and regulations requiring lines of supervision."

25.     Pavlova resides in and is a citizen of New York.  Pavlova has been a licensed osteopathic physician in New York since 2009.  While Pavlova is a doctor of osteopathic medicine and has never had an M.D. degree or held a license as a Medical Doctor, beginning in approximately April 2014, Pavlova began to falsely represent in some of her claims documentation submitted to State Farm Mutual or State Farm Fire that she held an M.D. license.

*See* Ex. 9.  Pavlova's services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under her own tax identification number, her social security number, Allay, and KP Medical and under Blackman's name.  Pavlova is married to Sergey Rybak, who is Tatiana Rybak's son and Oleg Rybak's brother.

26.     Lacina resides in and is a citizen of Florida.  Lacina is an osteopathic physician licensed to practice in Florida and New York.  Lacina's services at 1786 Flatbush were billed to State Farm Mutual or State Farm Fire under his own tax identification number and through FJL Medical Services P.C., JFL Medical, RA Medical, and MSB.

27.     Allay is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  Allay was formed on June 29, 2015.  Pavlova is the sole original shareholder, director, officer, and incorporator of Allay.  Since its formation, Allay has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Parisien, Renee Denobrega, N.P. ("Denobrega"), and Sujanta Rangrao Dhone, P.T.

28.     FJL Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 2609 E. 14th Street, Ste. 323, Brooklyn, New York.  FJL Medical was formed on June 24, 2016.  Lacina is the sole original shareholder, director, officer, and incorporator of FJL Medical.  Since its formation, FJL Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Lacina.

29.     JFL Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 2609 E. 14th Street, Ste. 323, Brooklyn, New York.  JFL Medical was formed on September 23, 2016.  Lacina is the sole original shareholder,

director, officer, and incorporator of JFL Medical.  Since its formation, JFL Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Lacina and Denobrega.

30.     JPF Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 329 Surrey Drive, New Rochelle, New York. JPF Medical was formed on September 23, 2016.  Since its formation, JPF Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Parisien and Denobrega.

31.     KP Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 3000 Ocean Parkway, Ste. 8G, Brooklyn, New York.  KP Medical was formed on October 28, 2016.  Pavlova is the sole original shareholder, director, officer, and incorporator of KP Medical.  Since its formation, KP Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed by Parisien and Denobrega.

32.     PFJ Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York. PFJ Medical was formed on July 31, 2015.  Parisien is the sole original shareholder, director, officer, and incorporator of PFJ Medical.  Since its formation, PFJ Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Parisien, Denobrega, and others.

33.     RA Medical is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York. RA Medical was formed on November 9, 2015.  Lacina is the sole original shareholder, director,

officer, and incorporator of RA Medical.  Since its formation, RA Medical has submitted bills to State Farm Mutual or State Farm Fire for services purportedly performed at 1786 Flatbush by Lacina.

### 3.     The Chiropractor Defendants

34.     Mollo resides in and is a citizen of New York.  Mollo is a licensed chiropractor in New York.  Mollo is the purported owner of Mollo P.C., ACH Chiropractic, Energy Chiropractic, and Island Life.

35.     Mollo P.C. is a domestic professional corporation organized under the laws of New York with its principal place of business in East Northport, New York.  Mollo P.C. was formed on May 15, 2001.  Mollo is the sole original shareholder, director, and officer of Mollo P.C.

36.     ACH Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  ACH Chiropractic was formed on September 28, 2015.  Mollo is the sole original shareholder, director, officer, and incorporator of ACH Chiropractic.

37.     Energy Chiropractic is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  Energy Chiropractic was formed on October 26, 2016.  Mollo is the sole original shareholder, director, officer, and incorporator of Energy Chiropractic.

38.     Island Life is a domestic professional service limited liability company organized under the laws of New York with its principal place of business in Deer Park, New York.  Island Life was formed on September 2, 2010.  Mollo is the sole original member and manager of Island Life.

#### 4.     The Acupuncture Defendants

39.     Deng resides in and is a citizen of New York.   Deng is licensed as an acupuncturist in New York and owns Deng Acupuncture.

40.     Deng Acupuncture is a domestic professional corporation organized under the laws of New York with its principal place of business in New York, New York.  It was formed on October 24, 2000.

#### 5.     The Physical Therapist Defendants

41.     Mariano resides in and is a citizen of New York.  Mariano is a licensed physical therapist and owns DM Physical Therapy, P.C.  Mariano's services at 1786 Flatbush are billed to State Farm Mutual or State Farm Fire under the names and tax identification numbers of one or more of the Physician Defendants.

42.     Masigla resides in and is a citizen of Florida.  Masigla is a licensed physical therapist and owns MSB.  Masigla's services at 1786 Flatbush are billed to State Farm Mutual or State Farm Fire under the names and tax identification numbers of one or more of the Physician Defendants.

43.     MSB is a domestic professional corporation organized under the laws of New York with its principal place of business at 1786 Flatbush Avenue, Brooklyn, New York.  It was formed on April 1, 2016.   Masigla is the sole original shareholder, director, officer, and incorporator of MSB.

#### 6.     The DME Defendants

44.     Maiga is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  Maiga was formed on July 9, 2012, and is purportedly owned by Borisevica.

45.     Madison is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  Madison was formed on November 7, 2013, and is purportedly owned by Semenov.

46.     Quality Custom is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  Quality Custom was formed on March 31, 2011, and is purportedly owned by Vladimir Verbitsky.

47.     Buslon resides in and is a citizen of Florida.  Buslon owns on paper at least two DME Defendants, Quality Health and AB Quality, and has also purportedly acquired an ownership interest in any outstanding unpaid claims of Maiga, Madison, and PHCP.  Buslon is married to Masigla.

48.     Quality Health is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  Quality Health was formed on June 3, 2015, and is purportedly owned by Buslon.

49.     PHCP is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  PHCP was formed on March 26, 2015.  Valentyna Diker is the incorporator of PHCP.

50.     AB Quality is a domestic business corporation organized under the laws of New York with its principal place of business in New York, New York.  AB Quality was formed on July 19, 2016, and is purportedly owned by Buslon.

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

### A.     The New York No-Fault Laws

#### 1.     Claims for Payment Under the No-Fault Laws

51.     State Farm Mutual and State Farm Fire underwrite automobile insurance in New York.

52.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101 *et seq.*) and the regulations promulgated thereto (11 N.Y.C.R.R. § 65 *et seq.*) (collectively, the "No-Fault Laws"), automobile insurers are required to provide No-Fault Benefits to insureds.

53.     No-Fault Benefits include up to $50,000 per insured for necessary expenses incurred for various healthcare goods and services.

54.     An insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to insurance companies and receive payment for necessary medical services.

55.     Pursuant to Section 403 of the New York State Insurance Law, the verification of treatment form submitted by healthcare providers to State Farm Mutual, State Farm Fire, and all other insurers must be signed by the healthcare providers subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

### 2.     The No-Fault Laws Prohibit Ownership of Professional Service Corporations by Unlicensed Laypersons

56.     The New York Legislature has established a comprehensive statutory framework, including the Business Corporation, Education, and Public Health Laws, to ensure that professional healthcare services are rendered only by individuals who are duly licensed to practice those professions and that such individuals are employed only by entities that are themselves lawfully licensed or otherwise legally authorized to provide such services.  This legal framework bars individuals who are not subject to state professional licensing requirements and

17

ongoing regulatory oversight from controlling, exercising undue influence over, or deriving economic benefit from the practice of a profession.

57.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they are fraudulently incorporated.  In New York, only a licensed healthcare professional may practice an applicable healthcare profession; own and control a professional service corporation authorized to practice healthcare services including medicine, chiropractic, acupuncture, and physical therapy; employ and supervise other healthcare professionals; and, absent statutory exceptions, derive economic benefit from the services.

58.     Recognizing the fundamental importance of these laws prohibiting the corporate practice of medicine in safeguarding the public health, safety, and welfare, the New York Legislature has made it a felony offense for anyone to deliberately circumvent these laws, as well as an act of professional misconduct for any licensed individual or professional service corporation to do so.  *See* N.Y. Bus. Corp. Law §§ 1203(b), 1503(b), 1507, 1508, 1511; N.Y. Educ. Law §§ 6507(4)(c), 6512, 6530(1) & (21); 8 N.Y.C.R.R. § 29.1(b)(6); Penal Law Article 175; N.Y. Ltd. Liab. Co. Law § 1201 *et seq.*

59.     Consistent with the public policies underlying New York's ban on the corporate practice of medicine, the No-Fault Laws also prohibit professional corporations that are secretly owned and controlled by laypersons from receiving No-Fault Benefits for professional health services.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

### 3.     The No-Fault Laws Prohibit Kickbacks

60.     Under New York law, it is unlawful for any physician, chiropractor, acupuncturist, or physical therapist, directly or indirectly, to offer, give, solicit, receive, or agree to receive any fee or other consideration to or from a third party for the referral of a patient or in

connection with the performance of professional services.  *See* N.Y. Educ. Law § 6530(18); 8 N.Y.C.R.R.   § 29.1(b)(3).

61.    Under New York law, it is unlawful for a licensed physician, chiropractor, acupuncturist, or physical therapist to exercise undue influence on a patient, including the promotion or sale of goods or services in such a manner as to exploit the patient for the financial gain of the physician or of a third party.  *See* N.Y. Educ. Law § 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

62.    Under New York law, it is unlawful for a physician, chiropractor, acupuncturist, or physical therapist to share professional fees, including arrangements where payments are made in exchange for furnishing space, facilities, equipment, or personal services, including any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment, or personal services used is dependent upon the income or receipts of the licensee from such practice.  *See* N.Y. Educ. Law § 6530(19); 8 N.Y.C.R.R. § 29.1(b)(4).

63.    Under New York Public Health Law Section 238-a, a practitioner authorized to order physical therapy services may not make a referral for such services to a healthcare provider authorized to provide such services where such practitioner has a financial relationship with such healthcare provider.  *See also* 10 N.Y.C.R.R. § 34-1.3; N.Y. Pub. Health Law § 238(6) ("'Health care provider' shall mean a practitioner in an individual practice, group practice, partnership, professional corporation or other authorized form of association, . . . and any other purveyor of health or health related items or services . . . a purveyor of health or health related supplies, appliances or equipment . . . .").  A financial relationship includes a compensation arrangement and includes an arrangement with a healthcare provider that is in excess of fair market value or

which provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties. *See* N.Y. Pub. Health Law §§ 238(3) & 238-d.

64.    Under New York law, it is unlawful for a physician, chiropractor, or physical therapist to make a referral for certain services to a healthcare provider where the physician or chiropractor has a compensation arrangement with the healthcare provider that either exceeds fair market value or that provides compensation that varies directly or indirectly on the value of referrals without disclosing the relationship to the patient. *See id.* § 238-d(1)(b).  Any disclosure must not only reveal to the patient the existence of the financial relationship, but must also inform the patient of her right to use a "specifically identified alternative" healthcare provider. *See id.* § 238-d(2).  Any violation of Public Health Law Section 238-d by physicians also constitutes professional misconduct under New York Education Law Section 6530(48).

### 4.    Services Rendered in Violation of New York Law Are Not Reimbursable

65.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), states in relevant part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

66.    Thus, any violation of a licensing law in connection with services provided to patients would render the provider ineligible for reimbursement under the No-Fault Laws, and under the circumstances, it would be unlawful and inequitable to allow any party to any arrangement that violated such licensing laws to retain any benefit from such arrangement. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

67.    If any defendant violated any of the licensing laws described above in connection with the services at issue in the claim described herein, then such defendant would be ineligible

for reimbursement under the No-Fault Laws, and under the circumstances, it would be unlawful and inequitable to allow such defendant or any defendant who was a party to such arrangement to retain any benefits from such arrangement.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

### 5. New York Law Authorizes Taking Examinations Under Oath

68.     Also, New York Law allows an insurer to request that a provider appear for an examination under oath ("EUO"), and the failure of a provider to appear for a timely requested EUO constitutes a breach of a condition precedent to coverage, rendering it ineligible for No-Fault Benefits.  *See* 11 N.Y.C.R.R. § 65-1.1 (providing that the Mandatory Personal Injury Protection Endorsement shall contain the following language:  "upon request by the [insurer] the eligible injured person or that person's assignee . . . shall: . . . (b) as may reasonably be required, submit to an examination under oath"); *Hertz Corp. v. Active Care Med. Supply Corp.*, 1 N.Y.S. 3d 43, 45 (N.Y. App. Div. 2015) ("defendants' failure to attend the EUOs is a violation of a condition precedent to coverage that vitiates the policy").

### B. The Rybaks' Involvement in Medical Clinics in New York

69.     In 1994, Tatiana Rybak moved to the United States from Ukraine — where she and her former husband owned a business that provided supplies to hospitals and employed over 2,000 people — after becoming wanted for arrest on embezzlement charges.

70.     Shortly after moving to the United States, in the mid-to-late 1990s, Tatiana Rybak became involved with medical clinics that provide services to individuals who have been injured in automobile accidents ("No-Fault Clinics") and that submit fraudulent claims for reimbursement to insurance carriers.  Later, by at least 2009, her son Oleg Rybak became involved as well.  The history of these earlier clinics run by the Rybaks is notable because 1786 Flatbush was their successor and the same methods employed to unlawfully own, control, and

profit from the earlier clinics were used to unlawfully own, control, and profit from 1786 Flatbush.

71.     As described next, from approximately 1996 through 1999, Tatiana Rybak and others unlawfully owned and controlled No-Fault Clinics that operated out of at least four New York locations.  From approximately 2000 until the fall of 2013, Tatiana Rybak and others unlawfully owned and controlled a No-Fault Clinic at 1468 Flatbush Avenue in Brooklyn.  Oleg Rybak participated in, facilitated, and profited from the operation of 1468 Flatbush.  When 1468 Flatbush ceased operations, its activities moved to 1786 Flatbush.

### 1.     Tatiana Rybak Owned and Controlled Clinics at Multiple New York Locations in the Late 1990s

72.     After arriving in New York, Tatiana Rybak met Paul Schneider ("Schneider") and together they opened several businesses, including a grocery store, an imported fashion boutique, and two healthcare businesses — TMR Medibill, Inc. ("TMR") and Paultat Alert Management Corp. ("Paultat").  TMR, formed in 1996, purportedly provided billing and collection services to healthcare providers.  Paultat, according to an affidavit signed by Schneider, provided "management support services" for healthcare professionals, which included operating healthcare facilities, paying rent and utility costs, supplying personnel, recruiting and hiring staff, patient intake, "appointments, scheduling of patients, storage of patient records, assistance in developing fee schedules as well as the development and implementation of computerized billing systems," communicating "with all suppliers, third-party payors," and "collect[ing] . . . funds on behalf of the doctors for all professional services performed by the doctors."  "In short," Schneider stated, "Paultat assists the physicians in the general management of medical facilities, and deals with all business aspects therein."

73.     TMR and Paultat purported to provide services to professional corporations operating at 1300 Flatbush Avenue, Brooklyn, and 2320 Avenue U, Brooklyn.  In addition, Schneider and Tatiana Rybak also operated clinics at 1932 Rockaway Parkway, Brooklyn, and 190-02 Jamaica Avenue, Hollis, New York.  The clinics operating at 1300 Flatbush Avenue, 2320 Avenue U, 1932 Rockaway Parkway, and 190-02 Jamaica Avenue are referred to as the "Original Clinic Locations."

74.     Schneider and Tatiana Rybak owned the real estate at the Original Clinic Locations.  By February 1999, however, Schneider had transferred his interest in all but one of the four properties to Tatiana Rybak.  Tatiana Rybak's ability to control the physical space at which a No-Fault Clinic operated was an important component of her schemes over the years, and a feature that would be repeated, though with modifications, at later clinics.

75.     Yet another component of the scheme was the establishment of professional service corporations through which services could be rendered and billed to insurers. The professional corporations appeared to be owned on paper by licensed healthcare professionals. Operating at the Original Clinic Locations were a series of medical professional corporations owned on paper by Dr. Robert Mallela and Dr. Jatindr Bakshi.

76.     According to an affidavit signed by Tatiana Rybak, almost all of the revenues of Paultat and TMR (the purported healthcare management businesses owned by Tatiana Rybak and Schneider) came from the professional corporations owned by Dr. Bakshi and Dr. Mallela.  In his affidavit, Schneider stated that medical practices managed by Paultat produced gross billings of $20 million per year, resulting in income to Paultat for its services of $4 million per year.

77.     The activity at the Original Clinic Locations between approximately 1996 to approximately 1999 resulted in a series of criminal, disciplinary, and other legal proceedings that

established, among other things, that professional healthcare corporations operating at these addresses had submitted fraudulent insurance claims and that professional healthcare corporations at these addresses were not owned and controlled by the licensed healthcare professionals who purportedly owned them on paper but by laypersons, including Tatiana Rybak. These proceedings included:  (a) a civil suit between Tatiana Rybak and Schneider over the ownership and control of Paultat (*Paul Schneider v. Tatiana Rybak, et al.*, Index No. 98-018835 (Nassau Cty., N.Y. Aug. 14, 1998)); (b) disciplinary proceedings in which the New York Office of Professional Medical Conduct ("OPMC") restricted Dr. Bakshi's medical license based on multiple "failures to take adequate patient histories, keep accurate records and record information regarding referrals" (*In re Jatinder S. Bakshi v. N.Y. State Dep't of Health*, Case No. 505720 (N.Y. App. Div. Mar. 11, 2010)); (c) OPMC disciplinary proceedings against Dr. Mallela in which he was required to surrender his medical license in June 2005 after he admitted to fraudulently incorporating his professional corporation and allowing it to be controlled by non-licensed individuals (*see* Jan. 8, 2005 Surrender Order, *In re Robert Chandran Mallela, M.D.*, No. 05-07, N.Y. Bd. Prof'l Med. Conduct); (d) a June 1999 140-count indictment returned by a Kings County Grand Jury against Tatiana Rybak, and several others, based, among other things, on activity at the Original Clinic Locations that charged Tatiana Rybak with Enterprise Corruption, insurance fraud, and fraudulently billing for medically unnecessary evaluations and therapy services, DME, and diagnostic testing services; (e) an October 1999 guilty plea by Tatiana Rybak to charges of attempted Enterprise Corruption in violation of N.Y. Penal Law 460.20(1)(a), participation in a scheme to defraud in the first degree in violation of N.Y. Penal Law 190.65(1)(a), and twelve counts of insurance fraud in violation of N.Y. Penal Law 176.05(1); (f) a January 2000 lawsuit by Allstate Insurance Company and other insurers alleging

RICO and other claims against Tatiana Rybak, Schneider, Dr. Bakshi, Dr. Mallela, and several other healthcare providers to recover more than $5 million arising out of activity at the Original Clinic Locations (*Allstate Ins. Co., et al. v. TMR Medibill Inc., et al.*, No. 2000-cv-00002-NGG-VVP (E.D.N.Y.)) (the "Allstate Case"); and (g) an August 2000 lawsuit by State Farm Mutual against Tatiana Rybak, Schneider, Dr. Mallela, and several others alleging that unlicensed defendants Tatiana Rybak and Schneider falsely used the names of the licensed defendants to fraudulently incorporate professional corporations and, as a result, the professional corporations were not entitled to reimbursement.  *State Farm Mut. Auto. Ins. Co. v. Robert Mallela, et al*., Case No. 2000-cv-04923-CPS (E.D.N.Y.); *see State Farm Mut. Auto. Ins. Co. v. Mallela*, 175 F. Supp. 2d 401 (E.D.N.Y. 2001).

78.     These proceedings established that Tatiana Rybak had orchestrated what the District Judge in the Allstate Case called an "elaborate and sophisticated insurance fraud scheme."  The news media, in commenting on the proceedings, described Tatiana Rybak as the "city's reigning czarina of auto-insurance fraud" who "was motivated by money, and everything she did was intended to generate more and more cash" to furnish her lavish lifestyle of luxury apartments, yachts, Mercedes Benz automobiles, and expensive diamond jewelry.  *Czarina' Reigned Over Insure Scams – Rip-Offs Kept Her in Gems & Yachts*, N.Y. Post (June 26, 2000).

79.     As Tatiana Rybak admitted in her criminal guilty plea and as several courts found in civil proceedings, Tatiana Rybak along with others unlawfully owned and controlled the professional corporations operating at the Original Clinic Locations.  *State Farm Mut. Auto. Ins. Co. v. Mallela*, 175 F. Supp. 2d 401, 405 (E.D.N.Y. 2001) ("On October 27, 1999, Rybuk [*sic*] pled guilty in New York State court to the felonies of attempted enterprise corruption, a scheme to defraud, and twelve counts of insurance fraud and admitted that she owned and controlled

several unlawfully licensed professional service corporations, including defendants Avenue U [Medical Services, P.C.], Canarsie [Medical Services, P.C.], and Flatbush [Medical Services, P.C.]"); Jan. 8, 2005 Surrender Order at 3, *In re Robert Chandran Mallela, M.D.*, No. 05-07, N.Y. Bd. Prof'l Med. Conduct ("Respondent directed and/or allowed non-physicians to establish, control, and operate Avenue U Medical Services, P.C., unlawfully"); *Allstate Ins. Co. v. TMR Medibill Inc.*, 2000 WL 34011895, at *4 (E.D.N.Y. July 13, 2000).   When he surrendered his license in January 2005, Dr. Mallela admitted to practicing medicine with intent to defraud insurance companies in proceedings that included charges that he had engaged in "concerted actions with non-physicians to allegedly establish, control and operate . . . professional medical corporation[s]."   He also signed an affidavit stating that Tatiana Rybak "owned" three medical professional corporations at the Original Clinic Locations.

80.     In particular, Tatiana Rybak entered into arrangements with doctors like Dr. Bakshi, Dr. Mallela, and Dr. Zenaida Amayo Reyes-Arguelles ("Dr. Arguelles"), who were not board certified in any specialty.  These physicians formed professional medical corporations that they purported to own on paper.  Paultat and TMR, or other entities, would purport to perform services for the professional service corporations in exchange for fees, but payments to Paultat and TMR far exceeded the value of any services.

81.     Tatiana Rybak and others used Paultat and TMR to secretly siphon to themselves profits from the professional medical corporations that they unlawfully owned and controlled. Some profits were siphoned under the guise of management agreements between purported managers and the professional healthcare corporations owned on paper by licensed physicians or purportedly to pay for the "rent" of space at the No-Fault Clinic.  Thus, for example, Paultat and TMR had entered into Management and Assistant Agreements with, at least, Mallela Robert

Chandran Radiological Services, P.C., Mallela Chandran Radiology Services, P.C., and Bakshi Medical Services. Under these agreements, and according to Schneider's affidavit, the professional corporations paid for services under a fee schedule in which they were charged an hourly rate for all services, as well as an hourly rate for rent. There is no legitimate reason why professional corporations would pay rent on an hourly basis.

82. The district court in the Allstate Case, in granting a preliminary injunction to block the dissipation of assets pending trial, observed that a significant amount of money flowed from the medical clinics operating at the Original Clinic Locations to realty companies controlled by Tatiana Rybak. *TMR Medibill*, 2000 WL 34011895, at *11. The district court found that Tatiana Rybak's explanation that these payments were for rent was "suspect," because cancelled checks indicated that the amounts paid in "rent" could fluctuate as much as $5,000 from month to month and none of the clinics had lease agreements with the realty companies. *Id.* In reaching this conclusion, the district court considered that Tatiana Rybak arranged for checks from insurers payable to the professional corporations to be delivered to a post office box she controlled, and then deposited into the professional corporations' respective bank accounts, which were all maintained at the same branch of Chase bank. *Id.* at *4. The court also found that after Tatiana Rybak became aware of the criminal case against her, she caused the professional corporations she controlled to "funnel[] money from the fraud scheme into the realty companies' coffers." *Id*. at *16. Similarly, the district court found that Tatiana Rybak had engaged in suspicious transactions to conceal her assets to avoid the insurers' efforts to attach those properties. For example, Tatiana Rybak sold her apartment "under suspicious circumstances."

83. An element of the scheme charged in the indictment involved the use of multiple professional healthcare corporations that operated under different names and "changed [their] names to defraud insurance carriers into believing that newly named clinics were independent of each other." *New York v. Tatiana Rybuk, et al.*, Indictment No. 427099 (Kings Cty. N.Y. June 20, 1999) ¶ 6 ("Indictment").  The practice of setting up multiple corporations in the names of licensed healthcare professionals and then rendering healthcare services through multiple corporations with different names and tax identification numbers to conceal their connections was a component of the scheme that would be repeated through later No-Fault Clinics, including 1786 Flatbush.

84. According to the Indictment and Tatiana Rybak's guilty plea, patients were obtained through payments to persons known as "steerers" who brought individuals who had purportedly been in automobile accidents to the clinics to be treated as patients.

85. The clinics, as Tatiana Rybak admitted in her guilty plea, submitted fraudulent insurance claims that included, among other things, falsified physical therapy progress notes and false bills and records for nerve block injections and DME.  As the district court described in the Allstate Case, "defendants billed patients for medical visits, procedures, and diagnostic tests that were either never rendered or were medically unnecessary; altered test dates and results to justify extensive physical therapy and diagnostic testing; created false physical therapy progress notes reflecting treatments that were never rendered; and submitted fraudulent wholesale invoices to verify DME sales." *TMR Medibill*, 2000 WL 34011895, at *4.

86. In October 1999, Tatiana Rybak entered a guilty plea in the criminal case, was sentenced to five years' probation, was ordered, among other things, to pay $1 million in restitution, and agreed she would "not engage in any employment related to the insurance

industry, including no-fault insurance, personal injury or health insurance" for a period of five years.  Ex. 10.

### 2. Tatiana Rybak Secretly and Unlawfully Owned and Controlled 1468 Flatbush Avenue

87.     Although Tatiana Rybak's criminal sentence prohibited any employment related to the No-Fault insurance industry for five years, within months of her 1999 guilty plea, Tatiana Rybak began to secretly and unlawfully own and control another clinic treating patients eligible for No-Fault Benefits located at 1468 Flatbush, Brooklyn, just a few blocks from the 1300 Flatbush Avenue location charged in the indictment.  The clinic at 1468 Flatbush operated from at least early 2000 until approximately August 2013.  By at least 2009, Oleg Rybak knowingly participated in, facilitated, and profited from activity at 1468 Flatbush.

88.     As at the Original Clinic Locations, at 1468 Flatbush, services were rendered through professional service corporations owned on paper by licensed healthcare professionals. In fact, those licensed healthcare professionals did not own or control their practices.  Rather, Tatiana Rybak secretly and unlawfully owned and controlled the professional corporations operating out of 1468 Flatbush with the support of Oleg Rybak, and profits were siphoned to Tatiana and Oleg Rybak through a variety of means.  The licensed physicians who operated at 1468 Flatbush included Dr. Jaime Gabriel Gutierrez ("Dr. Gutierrez"), Dr. Jean-Claude Compas ("Dr. Compas"), and Dr. Arguelles, who was one of the physicians who Tatiana Rybak admitted to criminally conspiring with in her 1999 guilty plea.

a. **The Rybaks Controlled the Practice of Dr. Gutierrez at 1468 Flatbush**

89. As Dr. Gutierrez explained in testimony[1] regarding his medical practice at 1468 Flatbush, his medical professional corporations billed for services there, and the proceeds they generated were controlled by the Rybaks.

90. Dr. Gutierrez was trained as a plastic surgeon, and from 2006 to 2009, performed Botox injections, laser, and other cosmetic surgery procedures at Miami health spas. *See* BPMC Hr'g Tr., Nov. 21, 2016, *In the Matter of Jaime Gabriel Gutierrez*.

91. One Miami cosmetic surgery spa at which Dr. Gutierrez worked was the Anti-Aging Aesthetic and Laser Center Inc., ("Anti-Aging Spa") which was owned by Oleg Rybak. Tatiana Rybak worked there as a facial specialist. Dr. Arguelles was the medical director.

92. At the Anti-Aging Spa, Dr. Gutierrez met Tatiana Rybak and Dr. Compas, who was also treating patients at 1468 Flatbush in Brooklyn. Dr. Compas encouraged Dr. Gutierrez to come to New York to treat automobile accident patients at 1468 Flatbush.

93. Although Dr. Gutierrez's training and background were in plastic surgery, in January 2011, Dr. Gutierrez began traveling from Miami to Brooklyn to treat automobile accident patients at 1468 Flatbush. Initially, he treated patients and submitted bills under his own name and social security number, but in April 2011 and September 2011, respectively, formed Alleviation Medical Services P.C. ("Alleviation") and JGG Medical Care P.C., both of which Dr. Gutierrez owned on paper. Dr. Gutierrez began submitting bills to insurance companies through Alleviation.

---

[1] Dr. Gutierrez offered sworn testimony both before the BPMC and in a separate civil lawsuit in Bronx County Supreme Court (*see infra* ¶¶ 95–101) in which he detailed the operations at 1468 Flatbush and described the roles of Tatiana Rybak and her son, attorney Oleg Rybak.

94.     Dr. Gutierrez testified that he did not know how to prepare New York No-Fault bills because he had been practicing a different field of medicine in a different state.  Thus, Dr. Compas directed him to speak to the Rybak Law Firm, for which Oleg Rybak was the principal. Dr. Gutierrez entered into a billing arrangement with the Rybak Law Firm.   Under the arrangement, the Rybak Law Firm handled Dr. Gutierrez's billing in exchange for 7% of his collections.  Dr. Gutierrez said he worked with a Rybak Law Firm employee, Natasha a/k/a Natalya Tokar ("Tokar").  According to Dr. Gutierrez, Tokar was responsible for managing and overseeing the billing operations on behalf of the Rybak Law Firm.

95.     Dr. Gutierrez testified that, at some point, the "Rybak Firm . . . pretty much ended up being controlling [*sic*] my whole practice, and that's not okay."  When asked if he owned his professional healthcare corporation Alleviation, Dr. Gutierrez testified, "I was under the impression that I had full control of the corporation when in reality I was not in full control.  And I was living under an illusion of control, meaning that Natasha [Tokar, an employee of the Rybak Law Firm] was actually overseeing my billing and making decisions on my behalf without informing me what she was doing . . . by the order of Oleg Rybak, as I had been assured by Natasha herself."

96.     Dr. Gutierrez explained that the Rybak Law Firm prepared his bills and both the firm and Tatiana Rybak exercised control over the reimbursements he received from insurers for the healthcare services provided to patients.  Checks from insurers were sent to a mailbox at Mailboxes, Etc., in Brooklyn, which Dr. Gutierrez established with Tatiana Rybak.   Dr. Gutierrez said he drove with Tatiana Rybak and her son Sergey to rent the mailbox, which Dr. Gutierrez paid for using an HSBC credit card that an HSBC Bank branch manager with whom Tatiana Rybak had a relationship, Lystra Moore-Besson ("Moore-Besson"), had helped him

open.  Dr. Gutierrez testified that he gave keys to the mailbox to Tokar and that the Rybak Law Firm had access to the mailbox and collected and deposited his checks.

97.     In 2011, Dr. Gutierrez opened a billing office for what was purportedly his healthcare corporation, Alleviation, that was adjacent to the office of the Rybak Law Firm. Alleviation's employees were supervised by Tokar.  In summer 2012, when the Rybak Law Firm moved its office, Dr. Gutierrez allowed the firm to take his medical practice's records to the firm's new offices.  Tatiana Rybak and Oleg Rybak also arranged for CPA Norman Weisman to serve as the accountant and prepare the tax returns for Dr. Gutierrez and his professional corporations, which Weisman did using information provided by Tokar.

### b.     Dr. Gutierrez Testified that the Rybaks Controlled the Proceeds of His Practice at 1468 Flatbush

98.     Dr. Gutierrez also testified about how Tatiana Rybak, Oleg Rybak, and the Rybak Law Firm exercised control over the funds received by his practice.  Specifically, Tokar, an employee of the Rybak Law Firm, instructed Dr. Gutierrez to write checks to various individuals purportedly for employee payroll or other practice expenses.  Dr. Gutierrez agreed to provide Tokar with a checkbook containing checks that Dr. Gutierrez had already pre-signed with his signature.  Dr. Gutierrez also testified that many of the checks he wrote were given by Tokar to Tatiana Rybak, who used her connection at HSBC Bank, branch manager Moore-Besson, to arrange for tellers to cash the checks.  Branch manager Moore-Besson testified in her deposition that she has known Tatiana Rybak since the 1990s.  According to records from the securities regulatory agency FINRA, Moore-Besson was terminated by HSBC in 2016 and later permanently barred from the securities industry for failing to respond to a FINRA inquiry after HSBC reported that it "determined that [she] exercised poor judgment in failing to escalate

suspicious activities engaged in by these bank clients to which she was aware." Moore-Besson testified that the HSBC investigation that led to her termination concerned the Rybak family.

99.     Dr. Gutierrez testified that Oleg Rybak requested that Dr. Gutierrez write checks as gifts, including to another attorney with whom Oleg Rybak was associated. He also stated that Tokar mailed checks drawn on accounts of Dr. Gutierrez's professional corporations to Tatiana Rybak in Florida. At one point, Dr. Gutierrez testified that he saw Tatiana Rybak with Dr. Compas's checkbook and that she evaded his questions about why she had it.

100.    In September 2012, Dr. Gutierrez testified that while vacationing in Aruba with the office manager of 1468 Flatbush, Pavel Soltanov, and a TD Bank employee and their respective spouses, he was told by Soltanov that checks from insurance companies payable to healthcare providers for services at 1468 Flatbush were flown from New York to Florida and cashed there. At that point, after flying back from Aruba to New York, Dr. Gutierrez began taking steps to disassociate himself from Tatiana Rybak and Oleg Rybak.

101.    On April 7, 2014, Dr. Gutierrez filed a civil lawsuit against Oleg Rybak, the Rybak Law Firm, and others in Bronx County Supreme Court. *See Jaime Gutierrez, et al. v. Oleg Rybak, et al.*, Index No. 260257-0214 (Bronx Cty. N.Y.) (hereinafter "*Gutierrez v. Rybak*"). Dr. Gutierrez sought an accounting of any escrow funds held by the Rybak Law Firm, a return of any business records, and an order voiding any liens over funds asserted by Rybak. The *Gutierrez v. Rybak* lawsuit alleged that between 2011 and 2012, the Rybak Law Firm filed numerous lawsuits on behalf of Dr. Gutierrez and collected "millions" of dollars, but had not paid the funds to Dr. Gutierrez. The suit also alleged that when the Rybak Law Firm moved offices in 2012, it took Dr. Gutierrez's patient records and never returned them. According to the docket, the case was dismissed in December 2018.

        **c.**      **Tatiana Rybak Controlled the Practice of Dr. Arguelles at 1468 Flatbush and the Rybaks Siphoned the Proceeds of that Practice to Themselves**

102. In addition to Dr. Gutierrez, another physician who treated patients at 1468 Flatbush was Dr. Arguelles. As noted above, in the mid-1990s, Dr. Arguelles had treated patients at least at one of the Original Clinic Locations secretly and unlawfully owned and controlled by Tatiana Rybak, was one of the physicians with whom Tatiana Rybak admitted to criminally conspiring in her 1999 guilty plea, and was the medical director of the Anti-Aging Spa owned by Oleg Rybak.

103. Dr. Arguelles owned on paper three professional healthcare corporations that purported to treat patients at 1468 Flatbush, but, in fact, these entities were secretly and unlawfully owned and controlled by Tatiana Rybak and the profits siphoned to Tatiana Rybak and Oleg Rybak. Dr. Arguelles was the paper owner of (a) Uptodate Medical Services P.C. ("Uptodate Medical"), formed in August 1999, (b) Vincent Medical Services P.C. ("Vincent Medical"), formed in July 2004, and (c) Arguelles M.D., P.C. ("Arguelles P.C."), formed in July 2006.

104. Dr. Arguelles was approximately 68 years old in 1999 when she began treating patients at 1468 Flatbush, and approximately 75 years old by 2006 when the last of these three professional corporations was formed.

105. In 2011, the OPMC disciplined Dr. Arguelles for billing for services not rendered, billing unwarranted and excessive medical services, making false reports, and improper record keeping at 1468 Flatbush. In October 2011, Dr. Arguelles surrendered her license for five years based on 54 counts of misconduct.

106. In a 2012 lawsuit, GEICO alleged that on June 30, 2011 and July 19, 2011, Dr. Arguelles gave testimony reflecting that she was unaware of many facts she should know if she

actually owned and controlled her professional service corporations operating at 1468 Flatbush, Arguelles P.C. and Vincent Medical.  In particular, she testified that she did not know when her businesses at 1468 Flatbush opened, who incorporated them, whether they had written leases for the use of space, the amount of rent they paid, whether other providers operated at the location, the amount of overhead costs, the names of employees, the amount of profits, the location of the checkbook, or the names of the chiropractors who operated at the location and how much they paid in rent.  *See Gov't Emps. Ins. Co. v. Zenaida Reyes-Arguelles, M.D. et al.*, Case No. 1:12-cv-01953-CBA-RLM (E.D.N.Y.), Compl. ¶¶ 41, 58 (Dkt 1).

### d.    Dr. Compas Was Forced to Surrender His Medical License Over Practices at 1468 Flatbush

107.    Dr. Compas was also disciplined by OPMC and forced to surrender his license in January 2015 for his work at 1468 Flatbush based on his having submitted insurance claims for NCVs that deviated from medically accepted standards.

### e.    Bank Records Reflect that Tatiana and Oleg Rybak Siphoned Proceeds from the Medical Practices at 1468 Flatbush

108.    Bank records reflect that Tatiana Rybak, Oleg Rybak, and others siphoned to themselves the proceeds from the professional service corporations that operated at 1468 Flatbush.  In particular, Tatiana and Oleg Rybak owned and own residences, businesses, and real estate in Florida, including units at the Fontainebleu Hotel in Miami, units at the Oceania V in Sunny Isles, Florida, the Anti-Aging Spa, and a restaurant in Florida known as the Rybak Café. Multiple professional service corporations operating at 1468 Flatbush made payments to or, on information and belief, for the benefit of these ventures and to individuals who were associated either with these ventures or the Rybaks.  There is no justification for these payments and no apparent reason multiple businesses operating out of 1468 Flatbush in New York would make them, unless they were covert methods for Tatiana and Oleg Rybak to siphon the profits of 1468

Flatbush to themselves and to conceal Tatiana Rybak's control.  Indeed, the same types of transfers — from multiple professional service corporations to businesses and individuals in Florida — including to some of the very same individuals, would later be made by multiple professional corporations operating at 1786 Flatbush.

109.    These transactions from 1468 Flatbush providers included the following:

a)    Money from Dr. Arguelles's professional corporation Vincent Medical went to the Fontainebleu Hotel in Miami.  In particular, between February and June 2006, Vincent Medical wrote checks to the Fontainebleu Hotel.  Tatiana Rybak, Oleg Rybak, and Sergey Rybak, who is Tatiana's son and Oleg's brother, each owned condominium units at the Fontainebleu Hotel at the time of the transactions, and from at least 2015 to 2018 Oleg Rybak was vice president and secretary of the condominium association.  Ex. 11 at 1.

b)    Money from Dr. Arguelles's professional corporation Uptodate Medical went to Mayya Kushnir, an individual associated with the Rybaks' holdings at the Fontainebleu Hotel.  In particular, between January and June 2004, Uptodate Medical wrote over $45,000 in checks to Mayya Kushnir.  Kushnir was an officer of OR, LLC and was the President of MOR Properties Inc. until at least March 2016.  OR, LLC was owned by Oleg and Tatiana Rybak and used to purchase three units at the Fontainebleu Hotel in August 2008, which then were subsequently sold to MOR Properties, Inc. between May and July 2012.  The president and director of MOR Properties, Inc. is Maximillian Kostyashkin, the youngest son of Tatiana Rybak.  Ex. 12.

c)    Money from Dr. Arguelles's professional corporations Uptodate Medical and Vincent Medical went to the Oceania V condominium, where Oleg Rybak and later Tatiana Rybak owned a unit.  In particular, between February and May 2004, four checks drawn on the

account of Uptodate Medical were written to Oceania, and between May 2006 and October 2008, at least 14 checks drawn on the account of Vincent Medical were written to Oceania.  Several of these checks were deposited into the account of the Oceania Property Ownership Association, the condominium association of the Oceania V condominium building at 19370 Collins Avenue, Sunny Isles Florida (the "Oceania V").  In November 2002, when they were still in college, Oleg and Sergey Rybak purchased a unit at the Oceania V and transferred it to Tatiana Rybak, who sold the unit in December 2011.  Ex. 13.

d)      Money from Dr. Arguelles's professional corporation Vincent Medical went to an individual who was associated with the Rybaks' Miami restaurant, the Rybak Café. In particular, between July 2008 and January 2009, Vincent Medical wrote almost $5,000 in checks to Olga Sanchez, who worked at the Rybak Café and, according to Oleg Rybak's testimony, was paid for her work as a notary public and an "expediter."  Ex. 11 at 1.

e)      Money from Dr. Arguelles's professional corporations Uptodate Medical and Vincent Medical went to a company and an individual who did design work on Tatiana Rybak's residence, Oleg Rybak's Anti-Aging Spa, and the Rybak Café.  In particular, between July and November 2008, Uptodate Medical wrote over $14,000 in checks to CMG International Design Group ("CMG"), a Miami design firm, and Milda Gutierrez, one of the principals of CMG, and between June and November 2008, Vincent Medical wrote over $14,000 in checks to CMG and Milda Gutierrez.  CMG and Milda Gutierrez decorated Tatiana Rybak's personal residence in Miami, the Anti-Aging Spa owned by Oleg Rybak, and the Rybak Café.  *Id.*.

f)      Money from Dr. Arguelles's professional corporation Vincent Medical went to Garrette Gray, in individual associated with the Rybak Café restaurant venture.  In particular, between September 22, 2008 and December 6, 2008, Vincent Medical wrote over

$5,000 in checks to Garrette Gray, the Rybak Café chef who assisted with the restaurant buildout. *Id.*

110.    Bank records reflect payments from Dr. Arguelles's professional corporations that appear to be for education expenses for Tatiana Rybak's children, Oleg Rybak and Sergey Rybak.  In particular, between December 28, 2003 and December 28, 2008, at least $67,045 in checks drawn on the accounts of Uptodate Medical and Vincent Medical, each owned on paper by Dr. Arguelles, were written to a 529 college savings plan, and at least $7,500 in checks drawn on the account of Uptodate Medical were written to New York University.  During this same period, Oleg Rybak and Sergey Rybak were students at New York University. *Id.*

111.    Bank records reflect that accounts of Clara Pantin, an employee of the Fontainebleau Hotel, were used to siphon proceeds from providers at 1468 Flatbush to Tatiana Rybak and Oleg Rybak.  Pantin worked at the Fontainebleau Hotel condo in Miami Beach, Florida from March 2002 through June 2016 as an Office Manager for the sales department, and as the Director of Owner Services, where, according to her public LinkedIn profile, she was the "liaison between our Condo Owners and our Hotel Management," and "provide[d] VIP Services."    Tatiana, Oleg, and Sergey Rybak each owned condominium units at the Fontainebleau Hotel.  Pantin had bank accounts in Florida and at all times, on information and belief, resided in Florida.  Nevertheless, at least some checks payable to Pantin from 1468 Flatbush providers were deposited in New York.

112.    At least 17 providers who operated at 1468 Flatbush — Allay, Deng Acupuncture, Parisien, PFJ Medical, Pavlova, Island Life, Pierre Renelique, M.D., Adelaida Physical Therapy, P.C., Adelaida M. Laga, Amayao Medical, P.C., Arguelles P.C., Compas Medical, P.C., JCC Medical, P.C., Maiga, Masigla, Masigla Physical Therapy, P.C, and Vincent Medical — wrote

checks to Clara Pantin totaling over $500,000 between April 2009 and April 2017.   Over $177,000 in checks were written by these entities to Pantin before August 2013, while the clinic at 1468 Flatbush was active.   No check ever exceeded $10,000.   Checks were sometimes sequentially numbered or written on the same day or consecutive days.   In June 2009, the Anti-Aging Spa in Miami owned by Oleg Rybak, issued a check to "Klara Pantin" for $5,800, signed by Oleg Rybak.   Ex. 14.

113.   Remarkably, almost all of the deposits into one of Pantin's accounts at TD Bank from May 2009 to November 2016 were from healthcare providers who treated patients at 1468 Flatbush and/or 1786 Flatbush.   Pantin withdrew cash from her account through cash withdrawals or by writing checks payable to herself totaling at least $60,000.   Enormous sums were also charged on a Visa debit card linked to her account.

114.   Multiple providers operating at 1468 Flatbush wrote checks to Vasila Queen, an associate of Tatiana Rybak and the owner of a hair and nail salon in Florida, which was located on the same street as the Oceania V condominium owned by Tatiana Rybak.   In particular, at least 11 providers who operated at 1468 Flatbush — Adelaida M. Laga, Masigla, Adelaida Physical Therapy, P.C., Compas Medical, P.C., Parisien, JCC Medical, P.C., Pavlova, Allay, Masigla Physical Therapy, P.C., PFJ Medical, and Pierre J. Renelique, M.D. — wrote at least 59 checks that were deposited into the account of Vasila Queen totaling more than $80,000 between February 1, 2012 and February 24, 2018.   *See* Ex. 11 at 3.   Over $32,000 of these checks were deposited into Vasila Queen's account before August 2013, while the clinic at 1468 Flatbush was active.   Vasila Queen a/k/a Vasila Atabeva is the owner of Vasila Beauty & Health, Inc., which operates Studio By Vasila, a hair and nail salon spa located at the Trump International Hotel in Miami Beach, Florida, 18001 Collins Ave, Sunny Isles Beach, Florida.   Vasila Beauty & Health

was involuntarily dissolved for failure to file its annual report on September 28, 2018.  Queen was charged with petit larceny and theft in Dade County, Florida in 1996 and felony grand theft in 2000.  In March 2012, Queen wrote a check for $1,000 to Tatiana Rybak.

115.    The ability of the Rybaks to control the proceeds of the professional corporations operating at 1468 Flatbush was reflected in an action brought by a Miami interior design firm against Tatiana Rybak, businesses owned by Tatiana, Oleg, and Sergey Rybak, and two of Dr. Arguelles's professional corporations, Arguelles P.C. and Vincent Medical.  *See CMGINTD, Inc. d/b/a/ CMG Int'l Design Grp., Carlos Gutierrez & Milda Gutierrez v. Tatiana Rybak, Arguelles M.D., P.C., Fl. Storm Props., LLC, Rybak's Café, LLC, Vincent Med. Servs., P.C., & Anti-Aging Aesthetic Laser Ctr., Inc*., Case No. 09-053480 CA 04 (11th Jud. Cir. Ct. Miami Dade Cty. Fl. Nov. 19, 2009) (the "CMG Lawsuit").  The plaintiffs in the CMG Lawsuit were hired to build out and furnish the Rybak Café, the Miami restaurant owned by Tatiana, Oleg, and Sergey Rybak and to do design work on Tatiana Rybak's personal apartment in Bal Harbor, Florida. Plaintiffs had been paid for that work with checks drawn on the bank accounts of a number of entities, including seven checks totaling more than $51,000 from Arguelles P.C. and a $5,000 check from Vincent Medical, both owned on paper by Dr. Arguelles.  When the checks were returned for insufficient funds or stop payment orders, the interior design firm sued.  In the lawsuit, Tatiana Rybak testified that Dr. Arguelles signed Arguelles P.C. and Vincent Medical checks at Tatiana Rybak's direction to satisfy a loan that Tatiana Rybak had made to Dr. Arguelles, but admitted that there was no documentation of the loan and she could not even remember the amount.  Tatiana Rybak further testified that Dr. Arguelles would frequently provide her with pre-signed checks from Dr. Arguelles's bank accounts for Tatiana to use and that some of the checks at issue in the CMG Lawsuit were pre-signed by Dr. Arguelles and later

completed by Tatiana Rybak.  When asked why she paid the design firm from the accounts of so many different entities, Tatiana Rybak testified, "wherever we have money we pay," and "whenever we have money we pay, whatever company. . . . Personal money, business money. Business money is my money."  The jury returned a verdict for plaintiffs in April 2013, and the case settled during post-judgment proceedings.

116.    In April 2012 and March 2013, GEICO filed two lawsuits based on activity at 1468 Flatbush against doctors and other healthcare professionals, medical professional corporations, and the office manager.  *See Gov't Emps. Ins. Co. v. Zenaida Reyes-Arguelles, M.D., et al.*, Case No. 1:12-cv-01953-CBA-RLM (E.D.N.Y.); *Gov't Emps Ins. Co. v. Jean Claude Compas, M.D., et al.*, Case No. 1:13-cv-01290-CBA-RLM (E.D.N.Y.).  Among other things, these lawsuits alleged that healthcare professionals were not the true owners of their medical professional corporations, management, billing and lease agreements were used to siphon the proceeds of the clinic and control the medical professional corporations, and substantial payments were made out of the accounts of the medical professional corporations, including some discussed above, to secure the proceeds of the practice.  Shortly after discovery commenced in the actions, on October 7, 2013, GEICO filed a letter advising the Court of a settlement, and the cases were dismissed without prejudice in October 2013.

### C.    The Rybaks Establish 1786 Flatbush Avenue

117.    With the two GEICO lawsuits in 2012 and 2013 and the Gutierrez suit in 2014 drawing attention to activity at 1468 Flatbush, Tatiana and Oleg Rybak needed a new location. They moved to 1786 Flatbush, which was only a few blocks down the street from 1468 Flatbush. By fall 2013, services rendered at 1468 Flatbush had slowed.  Beginning in approximately August 2013, services rendered at 1786 Flatbush began to be billed regularly to State Farm Mutual and State Farm Fire.

### 1.   The Rybaks Controlled the Physical Space at 1786 Flatbush Through a Family Member

118.    As at prior No-Fault Clinics, the Rybaks' scheme depended on the control of the physical space at which 1786 Flatbush would operate.   The Rybaks, however, had learned through Tatiana Rybak's prior criminal conviction and prior civil litigation that they could not be directly or publicly linked to real estate where they operated their No-Fault Clinics.   Thus, neither Tatiana Rybak nor Oleg Rybak were publicly identified with the property at 1786 Flatbush.   Rather, clinic space at 1786 Flatbush was leased from the building owner, Kings & Queens Holdings, LLC, by a relative — Ksenia Pavlova — though the lease documentation reflects their connections to the property.   Pavlova, a physician who purports to treat patients at 1786 Flatbush, is married to Tatiana's son Sergey Rybak, is Tatiana's daughter-in-law, and is Oleg's sister-in-law.   Pavlova appears to have applied to lease space at 1786 Flatbush in approximately July 2013.   But Pavlova had only been licensed to practice medicine in New York since May 2013, two months earlier.   The application states that Pavlova had been a tenant at the 1468 Flatbush clinic for 13 years, but that tenancy would have begun 13 years before she was licensed to practice medicine in New York.   The application cites as references "Sergey Rybach [*sic*] at 1810 Voorhies Avenue Suite 7."   Sergey Rybak is Tatiana Rybak's son and Oleg Rybak's brother, and the address is the address of the Rybak Law Firm.   The application identifies Natalia Tokar, Oleg Rybak's employee, as an emergency contact.

119.    On the 1786 Flatbush lease itself, Pavlova's signature was notarized by Inna Shapovalova, then a legal assistant at the Rybak Law Firm, according to Shapovalova's LinkedIn profile.   The 1786 Flatbush lease provided for Pavlova to pay $3,300 per month in rent, increasing over the following years to $3,606 per month.

120.    As at the Original Clinic Locations, the "rent" arrangements with other providers operating at 1786 Flatbush appear to be designed to siphon profits to the Rybaks.  In particular, Pavlova sublet space to providers and their professional corporations who rendered services at 1786 Flatbush, including Defendants Blackman, Dabiri, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng Acupuncture, and MSB.  However, Pavlova and the Defendants who purportedly sublet space from her at 1786 Flatbush did not have written subleases, and none have been able to describe the terms of their leases.

121.    Moreover, as at the Original Clinic Locations, the checks from purported subtenants of Pavlova do not have the indicia of legitimate sublease payments.  In some instances, payments vary from month to month.  Other purported subtenants wrote multiple "rent" checks on the same day or consecutive days.  And in some instances Pavlova received more in sublease payments than the $3,300 to $3,600 per month she was paying under her lease with the owner of the 1786 Flatbush building.

**2.    Providers from 1468 Flatbush Moved to 1786 Flatbush**

122.    1786 Flatbush was the successor to 1468 Flatbush, which had been controlled by Tatiana Rybak and used to covertly funnel proceeds from professional corporations operating from that location to or for the benefit of herself and Oleg Rybak.

123.    First, at least seven providers who treated patients at 1468 Flatbush treated patients at 1786 Flatbush.

| Rendering Physician | 1468 Flatbush Ave | 1786 Flatbush Ave |
|---|:---:|:---:|
| Ksenia Pavlova, D.O. | X | X |
| Charles Deng, L.A.c. | X | X |
| Darren Mollo, D.C. | X | X |
| David Mariano, D.C. | X | X |
| Maria Shiela Masigla, P.T. | X | X |
| Jules Francois Parisien, M.D. | X | X |
| Pierre J. Renelique, M.D. | X | X |

124.    Second, at least eight professional corporations that submitted bills for services at 1468 Flatbush continued to treat patients and bill for services at 1786 Flatbush.

| Professional Corporation | 1468 Flatbush Ave | 1786 Flatbush Ave |
|---|:---:|:---:|
| Allay Medical Services, P.C. | X | X |
| Maiga Products Corporation | X | X |
| PFJ Medical Care P.C. | X | X |
| Charles Deng Acupuncture, P.C. | X | X |
| ACH Chiropractic, P.C. | X | X |
| Energy Chiropractic, P.C. | X | X |
| Island Life Chiropractic Pain Care, PLLC | X | X |
| Quality Custom Medical Supply, Inc. | X | X |

125.    Third, at least two office employees who worked at 1468 Flatbush also worked at 1786 Flatbush.  Office manager Susan Tuano and receptionist Wilma Tanglao appear to have worked at both locations.  Bank records confirm that office manager Susan Tuano was paid by providers rendering services at 1468 Flatbush, including receiving regular checks from Uptodate Medical and Vincent Medical, both owned on paper by Dr. Arguelles, between 2004 and 2009, and was paid by providers rendering services at 1786 Flatbush, including receiving checks from AB Quality, Allay, Deng Acupuncture, Parisien, Island Life, JPF Medical, Pavlova, Madison, Maiga, MSB, Blackman, PFJ Medical, and Quality Health between 2012 and 2018.

126.    Fourth, healthcare providers at 1468 Flatbush and 1786 Flatbush used some of the same vendors, such as CPA Norman Weisman and payroll accountant Elina Shusterman.

### 3.    Nurse Practitioner Renee Denobrega's Affidavit Describes Rybak Control

127.    Denobrega was a nurse practitioner who Tatiana Rybak hired to treat patients at 1786 Flatbush, and who worked there from approximately September 2016 to approximately March 2017.  In a May 22, 2018 affidavit, Denobrega describes how "Barbara," who is Tatiana Rybak, managed hiring and activity at 1786 Flatbush, directed care that was provided to patients, and controlled the funds of the professional corporations that purported to treat patients at 1786 Flatbush.  *See* Ex. 15.

128.    Specifically, Denobrega explained that she was referred by a recruiter to an office manager at 1786 Flatbush named "Susie" (Susan Tuano) for an interview.  "Susie" told her she needed to meet "Barbara," the ultimate decision maker regarding hiring.  A few days later, Denobrega met with "Barbara" at 1786 Flatbush, who Denobrega described as being approximately 60 years old and speaking with a Russian accent.  "Barbara" is Tatiana Rybak. Barbara would later tell Denobrega that Barbara had a daughter who was a physician at 1786 Flatbush, and Tatiana Rybak's daughter-in-law, Pavlova, was a physician who purported to treat patients at 1786 Flatbush.  Denobrega was made aware that "Barbara was the boss" at 1786 Flatbush.  *Id.* ¶ 12.  It became clear to Denobrega that "Barbara was in charge of the Flatbush Clinic and that everyone [] reported to her."  *Id.* ¶ 15.

129.    Denobrega also met "Wilma," who she understood to be responsible for billing, and Lacina, who had been a physician in Florida before he began to treat patients at 1786 Flatbush.  At one point, Lacina told Denobrega that the 1786 Flatbush clinic was "off the radar type of work."

130.    Denobrega's affidavit further establishes that doctors who purported to treat patients at 1786 Flatbush did not exercise supervision or control over the activity at 1786

Flatbush.  In particular, she swore that after being hired, she learned that her services were billed to insurance companies through professional corporations, including PFJ Medical and JPF Medical (owned on paper by defendant Parisien) and KP Medical (owned on paper by a person she knew as Dr. Rybak, but who on information and belief was defendant Pavlova).  *Id.* ¶ 14. Yet, Denobrega never met Parisien or "Dr. Rybak" and never saw them at 1786 Flatbush. Denobrega swore that they had no role in the day-to-day operations of the clinic or in any of the healthcare practices at 1786 Flatbush.  *Id*. ¶ 15.   The only doctor Denobrega met at 1786 Flatbush was Lacina.   But Denobrega "rarely met with Dr. Lacina, and he did not really supervise [her] work"; rather, "[m]ost of [her] dealings were with Barbara and Susie." *Id.* ¶ 12. Denobrega "believed [herself] to be an independent contractor" at 1786 Flatbush who "was not supervised at the Flatbush Clinic . . . in any way by Dr. Parisien, Dr. Rybak, or any other licensed healthcare professional." *Id.* ¶ 21.

131.   Denobrega examined patients at 1786 Flatbush.  She swore in her affidavit that the "majority of patients [she] saw had minor medical issues such as sprains or strains that required straightforward medical decision-making." *Id.* ¶ 28.  Denobrega used preprinted forms provided to her by the staff at 1786 Flatbush to conduct evaluations. *Id.*  Denobrega stated that she was instructed by the staff at 1786 Flatbush to perform initial evaluations on every patient even if the patient had already been seen by a medical doctor or another nurse practitioner at the clinic.  Denobrega also performed trigger point injections and dry needling on patients.  Prior to working at 1786 Flatbush, she had never performed dry needling.  At one point, Barbara and Susie insisted that Denobrega perform more dry needling because trigger points only paid $100 and were not considered treatment.  Another worker who worked at the front desk, "Dovie," who

upon information and belief is Dovie Silvestre, insisted that she order MRIs that Denobrega did not consider necessary. *Id.* ¶ 26.

132.     Denobrega was paid for her work at 1786 Flatbush with checks drawn on the accounts of JPF Medical and PFJ Medical (owned on paper by Parisien), Parisien, and Allay and KP Medical (owned on paper by Pavlova).   But Denobrega stated that she did not believe she worked for these professional corporations and had never met or spoken to Parisien or Pavlova. Bank records reflect that Denobrega was often paid on the same day with multiple checks and with checks from multiple professional corporations.   For example, on April 21, 2017, Denobrega received a check from Allay for $840, a second check from Allay for $420, and a third check from PFJ Medical for $367.48, although she had never met the paper owner of Allay (Pavlova) or of PFJ Medical (Parisien).

133.     Denobrega stated that on numerous occasions checks for her work at 1786 Flatbush would bounce.  Denobrega would be told by Barbara and Susie that funds were low because insurance had not been paying on time, and Barbara would exclaim, "It's not our fault." Barbara or Susie would then prepare and provide another check that was often from a different account or business entity.

134.     Denobrega stopped working at 1786 Flatbush in March 2017 over her concerns about the dry needling and the bounced checks.

### 4.     Office Staff Asserted the Fifth Amendment Regarding Control of 1786 Flatbush

135.     Two office employees of 1786 Flatbush asserted the Fifth Amendment at their depositions in response to questions about who controlled 1786 Flatbush, whether Tatiana Rybak controlled the activity at 1786 Flatbush, and whether Oleg Rybak participated in the activity at 1786 Flatbush.

136.    The employees respectively worked as an office manager and as a receptionist at both 1468 Flatbush and 1786 Flatbush, bank records reflect that the office manager received payments from providers at both locations, and nurse practitioner Denobrega stated that the office manager had a role in hiring and directing care at 1786 Flatbush.

137.    In depositions, both office employees asserted the Fifth Amendment and refused to answer whether "Barbara" was Tatiana Rybak.

138.    When asked if Tatiana Rybak "was ultimately in charge of all the operations at 1786 Flatbush" and whether all "the professional corporations that treated patients and billed for services at 1786 Flatbush were actually owned by Tatiana Rybak," the office manager asserted her Fifth Amendment privilege and refused to answer.  Similarly, the receptionist asserted the Fifth Amendment and refused to answer when asked if Tatiana Rybak made all fundamental business decisions for and had ultimate control over the Defendant providers at 1786 Flatbush, including who they would hire and fire, what healthcare services they would provide to patients at 1786 Flatbush, what services they would bill insurers for, the billing codes, and amounts submitted to State Farm Mutual, State Farm Fire, and other insurers.

139.    As to Oleg Rybak, the receptionist asserted the Fifth Amendment when asked if Oleg Rybak made all fundamental business decisions for and had ultimate control over the Defendant providers at 1786 Flatbush, including who they would hire and fire, what healthcare services they would provide to patients at 1786 Flatbush, what services they would bill insurers for, the billing codes, and amounts submitted to State Farm Mutual, State Farm Fire, and other insurers.  She also asserted the Fifth Amendment and refused to answer if Oleg Rybak controlled her activity at 1786 Flatbush.  *Id.* at 107.  The receptionist asserted the Fifth Amendment when asked if Oleg Rybak directed medical providers to form new business entities with new tax

identification numbers at 1786 Flatbush to avoid connection to the fraudulent activity at 1468 Flatbush, if Oleg Rybak used Maiga Borisevica's name to establish Maiga, and if Oleg Rybak used Oleksandr Semenov's name to establish Madison. *See also infra* ¶¶ 142–44.  Similarly, the office manager asserted the Fifth Amendment when asked if Oleg Rybak directed medical providers to form new business entities with new tax identification numbers at 1786 Flatbush to avoid connection to the fraudulent activity at 1468 Flatbush and if Oleg Rybak and Tatiana Rybak are the true owners of Madison and Maiga.  She also asserted the Fifth Amendment when asked if proceeds from billings at 1786 Flatbush were funneled to Oleg and Tatiana Rybak.

140.    Given the quantity and quality of evidence independent of these Fifth Amendment assertions demonstrating the level of control over the activities and the proceeds flowing from these entities at 1786 Flatbush, an adverse inference should be drawn and it should be assumed that if these questions were answered truthfully these witnesses would have acknowledged that Tatiana Rybak controlled the activities at 1786 Flatbush and that Oleg Rybak knowingly participated in facilitating and profiting from these activities.

### 5.    The DME Defendants' Formation and Operation Reflect How They Were Controlled by Tatiana Rybak with the Support of Oleg Rybak

141.    Although the DME Defendants purport to be owned on paper by different individuals, Tatiana Rybak controlled them, ordered their Supplies, and controlled their funds, and Oleg Rybak assisted her by forming the entities using foreign-national nominee owners who may reside outside the United States and having their mail forwarded to his office.

142.    Supplies were provided at 1786 Flatbush by at least the six DME Defendants that purported to be independent and owned on paper by different individuals — Maiga (owned on paper by Borisevica), Madison (owned on paper by Semenov), Quality Custom (owned on paper by Alexander Verbitsky prior to 2015, and his father Vladimir Verbitsky since 2015), Quality

Health and AB Quality (owned on paper by Buslon), and PHCP.  Yet, each provided the same Supplies to patients at 1786 Flatbush, engaged in similar fraudulent billing patterns discussed below (*see infra* ¶¶ 315–41), and used nearly identical delivery receipt forms that purport to reflect the delivery of Supplies to the patients.  All six companies' forms utilize identical language, including spelling and grammar errors, stating the patient has "received equipments [*sic*][2] and supplies listed above along with instructions on use case [*sic*] of it.  I indicate that [company] cannot be held responsible for any inappropriate use of this equipment or supplies." *See* Ex. 16.  Indeed, Maiga and Madison's delivery receipt forms use an identical font. *See id.* at 1–2.

143.    Maiga, which was owned on paper by Borisevica, a Latvian national, was formed on July 9, 2012.  Maiga's business address was established as 100 Church Street, 8th Floor, New York, New York, the address of a virtual office operated by Regus Management Group LLC. Three days before Maiga was formed, however, on July 6, 2012, an Online Virtual Office Agreement was executed between Maiga and Regus pursuant to which all of Maiga's mail and faxes were to be forwarded to the Rybak Law Firm at its office on Voorhies Avenue in Brooklyn.  While a VISA credit card in Borisevica's name was used to pay Regus for its services, neither the credit card charge nor the Online Virtual Office Agreement were signed for Maiga by Borisevica.  Rather, both were signed by "Natalia," likely Natalia Tokar, an employee of the Rybak Law Firm.  A United States Postal Service Form 1583, Application for Delivery of Mail Through Agent, which is required by law for mail to be forwarded, dated July 16, 2012, and

---

[2] Quality Health, AB Quality, and PHCP's delivery receipts correct this error, stating that the patient has "received equipment," but otherwise contain the identical language quoted above. *See* Ex. 16.

which purported to authorize the forwarding of Maiga's mail to the Rybak Law Firm, does bear a signature of Maiga Borisevica.  That signature is notarized by Oleg Rybak.

144.    Similarly, Madison, which was owned on paper by Semenov, a Ukrainian national, was formed on November 7, 2013.  Madison's business address was established as 747 Third Avenue, New York, the address of a virtual office operated by Regus Management Group LLC.  Eight days before Madison was formed, however, on October 30, 2013, an Online Virtual Office Agreement was executed between Madison and Regus pursuant to which all of Madison's mail was to be forwarded to the Voorhies Avenue office of the Rybak Law Firm in Brooklyn.  Semenov did not sign the agreement.  Rather, the agreement was signed by "madison products."  The charges for Regus's services were paid for with the same credit card used to pay for Maiga's arrangement.  The only contact number left on file with Regus was a phone number registered to the Rybak Law Firm.

145.    Five of the DME Defendants, (1) Maiga, (2) Madison, (3) PHCP, (4) Quality Health, and (5) AB Quality, purchased braces and other items from Precision Medical Supply LLC ("Precision"), a Missouri orthotics wholesaler, over a nearly seven-year period between June 2012 and February 2019.  Precision's owner has stated that every order from these five DME Defendants was placed over the phone by a woman named "Barbara," Tatiana Rybak, who spoke with a possible Russian or Eastern European accent, and always used the phone number (786) 246-6960.  That cell phone number was registered to Tatiana Rybak's son, Sergey Rybak, until at least June 2015.  The cell phone was billed to a Florida office suite owned by a limited liability company managed by a partnership, which was, in turn, managed by a partnership controlled by Tatiana Rybak and Oleg Rybak.  In this action, Tatiana Rybak moved to quash a subpoena to wireless carrier T-Mobile for the records related to that number in which she

acknowledged that it was her phone number.  *See* T. Rybak Mot. to Quash (Dkt. 132 at 3). These DME Defendants sometimes paid for the Supplies using checks drawn on the accounts from other businesses operating at 1786 Flatbush.  *See* Ex. 17.  Thus, for example, invoices for Supplies provided to Maiga were paid for with checks on the accounts of Masigla, Parisien, and Madison; invoices for Supplies provided to PHCP were paid for with checks drawn on the accounts of Madison, Maiga, and Quality Health; invoices for Supplies provided to Quality Health were paid for with checks drawn on the accounts of Madison and AB Quality; and invoices for Supplies provided to AB Quality were paid for with checks drawn on the accounts of Quality Health, KP Medical, JPF Medical, Parisien, and M Buslon Physical Therapy, P.C.  *Id.* Thus, over a period of nearly seven years, Tatiana Rybak was ordering Supplies for five DME Defendants and using the bank accounts of the DME Defendants and other healthcare providers operating at 1786 Flatbush interchangeably to pay Precision.

146.    At his deposition as the corporate representative of Maiga, Madison, PHCP, Quality Health, and AB Quality (the "Five Buslon DMEs"), pursuant to Federal Rule of Civil Procedure 30(b)(6), Buslon stated that he owned Quality Health and AB Quality and acquired an interest in the unpaid claims of Madison, Maiga, and PHCP.  Buslon admitted that he and his wife knew Tatiana Rybak, but claimed they never had any business dealings.  Nevertheless, Buslon has a long history with clinics associated with Tatiana Rybak.  Bank records confirm that Uptodate Medical and Vincent Medical, owned on paper by Dr. Arguelles, wrote 20 checks to Buslon totaling $38,900 over a four-month period in 2004, some of which were issued on the same or consecutive days.

147.   At his deposition as corporate representative of the Five Buslon DMEs, Buslon could not explain why checks from different providers were used to pay Precision, who dealt with Precision, or even who "Barbara" was.

148.   Buslon testified regarding the circumstances by which he and his wife Maria Masigla came to own an interest in the unpaid claims of Maiga, Madison, and PHCP.  Buslon could not recall when the transaction took place, though it was certainly after this action was filed in January 2018.  According to Buslon, he and his wife were contacted by Dr. Arguelles, whom they had known for years and who was familiar with the principals of the three DME entities.  Dr. Arguelles would have been almost 90 years old at the time.  Dr. Arguelles purportedly conveyed that the Buslons could purchase the right to collect unpaid claims for Maiga, Madison, and PHCP.  Buslon agreed and purchased the receivables for $6,000 — $2,000 for the claims of each entity.  Buslon testified that he made the purchase in single, lump sum cash payments given to Dr. Arguelles, that there is no documentation of the transactions, that he does not know who the principals of the entities were that sold him the receivables, and that he acquired nothing to indicate that he was obtaining anything of value.  Buslon stated that he then entered into an agreement with Oleg Rybak in which Oleg Rybak would seek to collect on the claims in exchange for a portion of the amounts recovered.  At one point, Buslon testified that Oleg Rybak was to receive between 25% to 50% of amounts recovered, but he later purported to correct himself and stated that Oleg Rybak was to receive only 5-10% of amounts recovered. Regardless of the amount purportedly to be retained by Oleg Rybak, Buslon admitted that to date he has received nothing on any of the claims and is unaware of the results of any efforts to collect on the receivables by Oleg Rybak or the Rybak Law Firm.

149.    Although Maiga, Madison, and PHCP purport to have ceased operations, as recently as March 16, 2019, an affidavit was signed by Doby Nonez as the purported Billing Manager of Maiga in which Nonez claims to have called State Farm Mutual on April 8, 2014 and April 30, 2014, and left messages that the proposed date for an EUO was inconvenient.  State Farm Mutual's telephone records indicate that no such call was received and no such messages were left.  Buslon, who purports to own the rights to this claim, has no knowledge regarding this affidavit, does not know who Doby Nonez is, and was unaware whether Maiga has any employees, let alone a billing manager.

150.    Although he testified as the corporate representative of the Five Buslon DMEs, Buslon had no knowledge regarding their operation, their records, how they acquired Supplies, the Supplies they provided to patients, how they billed, and who owned or was employed by Maiga, Madison, and PHCP.

### 6.    Bank Records of Entities Operating at 1786 Flatbush Reflect Proceeds Transferred for the Benefit of Tatiana Rybak and Oleg Rybak

151.    As at 1468 Flatbush, bank records reflect that Tatiana Rybak, Oleg Rybak, and others siphoned proceeds from the providers that operated at 1786 Flatbush.

152.    Clara Pantin, the employee of the Fontainebleau Hotel where Tatiana and Oleg Rybak own residential units and who received over $105,000 from providers who operated at 1468 Flatbush prior to August 2013, also received considerable sums from providers who operated at 1786 Flatbush.  At least eleven defendant providers who operated at 1786 Flatbush — Parisien, PFJ Medical, Deng Acupuncture, Pavlova, Allay, Blackman, Dabiri, Island Life, and three DME Defendants — wrote checks to Clara Pantin totaling over $506,000 between September 2013 and April 2017.  *See* Ex. 18.  No check ever exceeded $10,000.  Checks were sometimes sequentially numbered or written on the same or consecutive days.

153.    In addition, Pantin's two sons received checks from Defendants operating at 1786 Flatbush.  Her son Khristopher Salado received two checks from Parisien and one from Madison between January 2014 and December 2014 totaling $8,692.  Her son Nicholas Salado received two checks from Parisien, one check from Pavlova, and three checks from Madison between December 2014 and April 2016 totaling $8,625.  *See id.* at 1.

154.    Similarly, Vasila Queen, an associate of Tatiana Rybak, received money from providers who operated at 1468 Flatbush, operated a nail salon up the street from one of Tatiana Rybak's condominiums in Sunny Isles Florida, and received money from providers who operated at 1786 Flatbush.  In particular, at least eleven providers who operated at 1786 Flatbush — Parisien, PFJ Medical, Pavlova, Allay, Masigla Physical Therapy, P.C., Blackman, Pierre Renelique, M.D., MSB, and two DME Defendants — wrote at least 56 checks to Vasila Queen, the owner of Studio By Vasila, a hair and nail salon spa at the Trump International Hotel in Miami Beach, Florida totaling more than $74,000 between January 2013 and February 2018. *See id.* at 1.

155.    Similarly, providers who operated at 1786 Flatbush wrote checks to an interior design business located 15 minutes from one of Tatiana Rybak's condominiums in Sunny Isles, Florida, and midway between that condominium and the Fontainebleau Hotel where Tatiana and Oleg Rybak owned residential units.  In particular, eight providers who operated at 1786 Flatbush — Parisien, JPF Medical, PFJ Medical, Pavlova, Allay, MSB, and two DME Defendants — wrote at least 54 checks to Voldymyr Maistrenko, his wife Olga Maistrenko, and his business Art Glass International LLC totaling over $216,000.  *See id.* at 2.  Parisien also wrote a check for $4,000 to Kristina Kalitskaya, an employee of Voldymyr Maistrenko.  *Id.*  Art Glass International, LLC purports to be an interior design business located in North Miami,

Florida.  No check ever exceeded $10,000.  Checks were sometimes sequentially numbered or written on the same or consecutive days, and on occasion multiple checks written on the same or consecutive days for less than $10,000 totaled $10,000 or more.

156.    Similarly, providers who operated at 1786 Flatbush wrote checks to a private investigator, Les Levine, who was purportedly hired to help Oleg Rybak and others defend the lawsuit brought by Dr. Gutierrez in which Dr. Gutierrez alleged that Tatiana and Oleg Rybak improperly controlled Dr. Gutierrez's medical practice at 1468 Flatbush.  In particular, providers operating at 1786 Flatbush — Parisien, JFP Medical, PFJ Medical, Pavlova, Allay, KP Medical, MSB, and two DME Defendants — wrote at least 150 checks to Les Levine totaling more than $221,000 between April 2016 and April 2018.  *See id.*  Les Levine is a former New York City detective and the owner of Les Levine Investigations, a private investigations firm in Mineola, New York.  On February 10, 1989, Levine pleaded guilty to bribery charges based on allegations that he paid an investigator to reveal the whereabouts of a government informant hidden in the witness protection program on behalf of a client linked to organized crime.  In a high-profile federal prosecution in a police torture case, prosecutors alleged in a motion filed in the EDNY that "Levine has a known track record of using methods of bribery, harassment and deceit in connection with criminal trials in this city."  The motion described how Levine pleaded guilty to bribing an investigator to learn the whereabouts of a federally protected witness.  Levine was sentenced to five years' probation and 150 hours of community services.

157.    On multiple occasions Defendants wrote multiple checks to Levine on the same date and in many instances Levine deposited payments he received on the same day into two different accounts.  Levine also endorsed and negotiated checks from Defendants that were written to cash.  *See* Ex. 19.  During proceedings in this case, it was claimed that the payments to

Levine were for work he purportedly did to assist the Rybak Law Firm, Oleg Rybak, and others with the lawsuit brought by Dr. Gutierrez discussed above, "*Gutierrez v. Rybak*."  In that lawsuit, Dr. Gutierrez sought an accounting of any escrow funds held by the Rybak Law Firm, a return of any business records, and an order voiding any liens over funds asserted by Rybak and others, and made claims this his medical practice at 1468 Flatbush had been improperly controlled by the Rybak Law Firm.

158.    Providers who operated at 1786 Flatbush also made payments to a real estate law firm that represented a real estate development firm owned by Sergey Rybak, the husband of defendant Pavlova and the brother of Oleg Rybak, in a variety of real estate ventures.   In particular, 1786 Flatbush providers — Parisien, JFP Medical, PFJ Medical, Pavlova, Allay, Deng Acupuncture, Island Life, MSB, and Quality Health — wrote at least 59 checks to the law firm totaling more than $425,000 between August 2014 and May 2018.  *See id.* at 2.  On some occasions, multiple checks were written on the same date or consecutive days, and the law firm often received checks from different Defendants dated on the same day or consecutive days.  *See id.*  Thus, for example, Deng wrote two checks numbered 1591 and 1592 on August 6, 2014, each for $3,000 to the law firm, and the law firm received four checks from three Defendants dated February 14, 2017 — a check numbered 786 for $5,000 from Allay, a check numbered 787 for $10,000 from Allay, a check for $5,000 from MSB, and a check for $10,000 from PFJ Medical.  According to its website, the law firm "is a real estate, construction, and litigation law firm, serving as counsel to real estate developers, individual and institutional owners, financial institutions, and corporations and other business entities.   [The] firm services include condominium offering plans, financings, workouts, acquisitions, leasing, design and construction agreements, land use, claims, and litigation."   According to a search of the New York Civil

Supreme Court online docket, the law firm and one of its attorneys has represented Tatiana Rybak's son and Oleg Rybak's brother, Sergey Rybak, or Rybak Development in three cases filed in 2009, 2015, and 2017.

159.   Publicly recorded real estate records also confirm that one of the law firm's lawyers represented Rybak Development in connection with several real estate deals in 2017 and 2018.

160.   There is no legitimate reason for providers rendering services to patients at 1786 Flatbush to make any of the above-described payments.  In fact, at his deposition as the corporate representative for the Five Buslon DMEs, Buslon could not explain payments to Clara Pantin and her children, Art Glass International, the real estate law firm, Les Levine, or Vasila Queen. Rather, the above-described sums could only have been for the benefit of Tatiana Rybak and Oleg Rybak and to siphon to them the proceeds of activity at 1786 Flatbush.

**D.      The Defendants Create Entities to Conceal the Scheme's Existence**

161.   Over the course of the scheme, the Defendants created new business entities with separate tax identification numbers to submit bills to State Farm Mutual and State Farm Fire for services at 1786 Flatbush.  Defendants do so because they know that payors such as State Farm Mutual and State Farm Fire process claims from healthcare providers using names and tax identification numbers to identify billing activity, and by submitting multiple claims utilizing different entity names and tax identification numbers, Defendants are able to conceal that they are, in fact, claims from the same individuals for the same fraudulent services.

162.   From August 2013 until June 2015, the Physician Defendants submitted bills to State Farm Mutual and State Farm Fire under the individual tax identification numbers, and on occasion social security numbers, of sole proprietorships of Parisien, Blackman, Dabiri, Pavlova, and Lacina.  Beginning in June 2015, however, the Physician Defendants began submitting

claims for the same services to State Farm Mutual and State Farm Fire under a variety of entities. For example, Parisien's services were billed (a) under his own taxpayer identification number beginning in August 2013, (b) by Allay from June 2015 through October 2016, (c) by PFJ Medical from May 2015 through September 2016, and (d) by JPF Medical from September 2016 through October 2016. Lacina's services were billed (a) under his taxpayer identification number beginning in January 2014, (b) by RA Medical from January 2015 through June 2016, (c) by FJL Medical from June 2016 through October 2016, and (d) by JFL Medical from October 2016 through January 2017.

163. Other facts suggest that the Defendants' use of multiple entities was part of a coordinated scheme. For example, although JPF Medical is purportedly owned by Parisien and JFL Medical is owned by Lacina, both entities were formed on the same day. Many of the entities' formation documents were filed with the New York Department of State by the same attorney, Alexander Almonte, Esq., who filed the incorporation documents for FJL Medical, JFL Medical, KP Medical, PFJ Medical, RA Medical, MSB, Quality Health, and AB Quality. Despite the use of this web of entities, the form documentation used by virtually all of the Physician Defendants, Chiropractor Defendants, and the DME Defendants remained the same, except for the provider's name on the letterhead, and the treatment provided by the entities was virtually identical.

**E. Many of the Automobile Accidents Which Led to Treatment at 1786 Flatbush Appear to Have Been Deliberately Staged or Caused**

164. In addition to the fraudulent patterns in diagnoses, treatment, and documentation present at 1786 Flatbush, many of the automobile accidents that preceded the treatment at 1786 Flatbush bear indicia of being deliberately staged collisions designed to support claims for No-Fault Benefits. These indicia include: (a) accidents occurring shortly after insurance coverage

was obtained, often within two weeks after coverage was obtained; (b) accidents involving older vehicles with minimal value; (c) multiple injured parties involved in the accident who sought treatment at 1786 Flatbush; (d) multiple injured parties seeking treatment at 1786 Flatbush shortly following the accident; (e) little to no physical damage to the insured vehicles; (f) no emergency room or hospital treatment sought immediately following the accident; and (g) other improbable connections between seemingly unrelated individuals and accidents, including accidents occurring at the same locations and individuals in different accidents purporting to reside at the same addresses.

165.    The vast majority of State Farm Mutual and State Farm Fire insureds who treated at 1786 Flatbush were involved in collisions in which at least three different individuals involved all sought care at 1786 Flatbush.  In virtually every instance, the individuals involved in these accidents began treatment at 1786 Flatbush on the same day, usually the very next day after the accident.  Indeed, more than half of the State Farm Mutual or State Farm Fire insured accidents that led to claims identified on Exhibit 1 involved four or more individuals, all of whom treated at 1786 Flatbush.

166.    Significantly, Oleg Rybak and his law firm, the Rybak Law Firm, represented many of the individuals who treated at 1786 Flatbush and many of the individuals who were in what appear to have been staged accidents.  More than half of the State Farm Mutual or State Farm Fire insureds who were treated at 1786 Flatbush and who were represented by an attorney were represented by Oleg Rybak.  As noted, one of the indicia of a staged accident is when at least three and sometimes four or more individuals who were in the same accident sought care at 1786 Flatbush, often on the same day or within a few days of the accident.  More than two-thirds of the patients identified on Exhibit 1 were involved in accidents in which at least three

individuals in the vehicle sought care at 1786 Flatbush.  Of these patients, Oleg Rybak and the Rybak Law Firm represented more than 100 of them, constituting more than half of the 1786 Flatbush patients in multi-person accidents.  Oleg Rybak and the Rybak Law Firm almost always represented the purportedly injured passengers in these likely staged accidents, who would be in a position to bring bodily injury claims against the drivers.

167.    The accidents reflect other improbable patterns.  For example, 12 different individuals insured by State Farm Mutual or State Farm Fire each sought treatment at 1786 Flatbush following three separate accidents which occurred at the same exact intersection in Brooklyn on different dates but at the same time of day.  In each case, the passengers in each of the three State Farm Mutual- or State Farm Fire-insured vehicles were also represented by the same law firm, the Rybak Law Firm.  On February 26, 2014 at 11:00 p.m., a 1996 Mitsubishi Galant insured by State Farm Fire purportedly struck a 2000 Honda Civic at the intersection of Newkirk Avenue and Westminster Road in Brooklyn after running through a stop sign.  Three occupants of the Mitsubishi sought treatment at 1786 Flatbush the following day.  The State Farm Fire insurance policy for the Mitsubishi had been purchased 9 days earlier on February 26, 2014.  Motor vehicle records show the Mitsubishi was registered to a different individual than the named insured on the policy.  Two weeks later, on March 9, 2014 at 11 p.m., a 1997 Mercury Sable insured by State Farm Fire purportedly ran through a stop sign at the same intersection of Newkirk and Westminster.  All five occupants of the Mercury sought treatment at 1786 Flatbush the following day.  The State Farm Fire policy for the Mercury was purchased 13 days earlier on February 24, 2014, again listing a different named insured than the registered owner of the vehicle.  On June 2, 2014 at 11 p.m., a 1993 Honda Accord insured by State Farm Fire ran through a stop sign at the same intersection, with all four occupants seeking treatment at 1786

Flatbush the following day.  The policy for the Honda Accord was purchased on May 27, 2014 (six days before the accident) and listed a named insured who was not the registered owner of the vehicle.

168.    In addition to common locations of accidents across different claims, many of the individuals involved in different accidents are connected.  Such connections include common residential addresses.  For example, insured passenger T.W. listed his address as an apartment in a building on 94th Street in Brooklyn in his claim arising out of the February 26, 2014 accident discussed above.  Insured passenger T.N. listed an address in the same 94th Street apartment building in Brooklyn as T.W. (just a different apartment number) on her claim for a July 21, 2015 accident.  Both individuals were represented by the Rybak Law Firm in connection with their claims.  The frequency with which this commonality occurs in 1786 Flatbush patients is not credible.  For example, insured passenger A.D. listed an address on 94th Street in Brooklyn after his June 2, 2014 accident, which is the exact same address used by insured passenger R.W.F. in his claim arising out of his February 4, 2014 accident.  Both A.D. and R.W.F. were represented by the Rybak Law Firm.  Passenger M.W., who sought care at 1786 Flatbush on the day after her December 1, 2013 accident, listed her address as an apartment in a building on Kings Highway, Brooklyn, which appears to be down the hall from the Kings Highway apartment address used by insured passenger I.N. following his January 6, 2014 accident for which he sought treatment at 1786 Flatbush on the following day.

169.    In addition to common residential addresses, similarities in email addresses used by State Farm Mutual or State Farm Fire insureds who treated at 1786 Flatbush also reveal connections between seemingly unconnected individuals.  For example, two individuals who treated at 1786 Flatbush following separate accidents that occurred one week apart both used the

identical email address in submitting their claims to State Farm Fire, while another individual who treated at 1786 Flatbush provided a closely similar email address in a claim arising out of a separate accident.  Three other individuals, with no apparent relationship to each other, all of whom resided at different physical addresses, each submitted separate claims using an identical email address in connection with two separate accidents which occurred two weeks apart in April 2016.  Both accidents involved insured vehicles which were more than 15 years old at the time of the accident.

170.  Even more improbable, unrelated individuals with no apparent connection to one another have treated at 1786 Flatbush following different accidents involving the exact same vehicle which was insured under different policies.  For example, injured passengers S.B. (age 19), S.L. (age 36), and D.F. (age 47) were involved in a collision in a 1995 Honda Accord on March 5, 2016, that occurred nine days after an insurance policy was purchased for the vehicle, and each treated at 1786 Flatbush within three days after the accident.  The very same Honda Accord was involved in a different rear-end accident less than two months later on May 24, 2016, the claims for which were submitted under a different insurance policy obtained 27 days earlier.  The May 24, 2016 accident involved the same 1995 Honda Accord but a completely different set of unrelated drivers and passengers, with the driver C.H. (age 57) and injured passengers H.B. (age 38), T.O. (age 23), and K.T. (age 19) all treating at 1786 Flatbush within two days of the accident.  In both of the claims, Oleg Rybak and the Rybak Law Firm represented all of the injured passengers in the 1995 Honda Accord.

171.  As attorney for so many of these individuals, Oleg Rybak, at a minimum, was in a position to know the facts and circumstances of their accidents, that multiple parties claimed injuries from individual accidents, that there were connections among accidents, and that

accidents were staged.  Oleg Rybak, however, profited from bringing and collecting claims, suits, and proceedings on behalf of the purportedly injured individuals through collection of fees, likely as a result of a contingency fee arrangements in which he obtained some portion of the recovery.

F.     **The Legitimate Treatment of Patients with Strains and Sprains**

172.    Defendants purport to examine, diagnose, and treat patients who have been in motor vehicle accidents and complain of neck and back pain.

173.    For patients who have been in motor vehicle accidents and have complaints of neck and back pain, a detailed patient history and a legitimate examination must be performed to arrive at a legitimate diagnosis.

174.    Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique circumstances of each patient.  During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

175.    Legitimate treatment plans for patients with strains and sprains may involve no treatment at all because many of these kinds of injuries heal without any intervention, or a variety of interventions including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

176.    Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities including hot and cold packs, ultrasound, diathermy, traction, manual therapy, massage, and traction.  Active modalities require patients to affirmatively participate in their treatment and include many different kinds of stretching, exercising, and strengthening therapies.

177.    In legitimate treatment plans, active modalities are necessary to rehabilitate and heal soft-tissue injuries, while passive modalities are typically used only to the extent necessary to reduce pain and to facilitate the patient's ability to perform active modalities, which should be introduced into a patient's treatment plan as soon as practicable.

178.    While one or more passive modalities may be appropriate on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the same combination of passive modalities on nearly every visit regardless of whether the patient improved would rarely be appropriate for one patient, let alone almost every patient, on almost every visit.

179.    The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary depending on the unique circumstances of each patient, including:  (a) the patient's age, social, family, and medical history; (b) the patients physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

180.    Treatment plans should be periodically reassessed and modified based upon the progress of the patient, or the lack thereof.

181.    Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the patient.

182.    The above-described process of examination, diagnosis, and treatment must be documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care and condition necessarily depends on the documentation

of this information; and (d) payers such as State Farm Mutual and State Farm Fire so that they can pay for reasonable and necessary treatment.

### G.   Defendants' Predetermined Treatment Protocol

183.   The Predetermined Treatment Protocol at 1786 Flatbush exploits patients' No-Fault Benefits and does not legitimately treat patients according to their true needs.  As detailed below, the Predetermined Treatment Protocol includes medically unnecessary and fraudulent: (1) examinations, diagnoses, and treatment plans by the Physician Defendants; (2) physical therapy treatment; (3) chiropractic examinations, diagnoses, and treatment; (4) acupuncture examinations and treatment; (5) diagnostic Tests (including ROM Tests, Muscle Tests, NCVs, EMGs, SSEPs, BEPs, functional capacity evaluations, and V-sNCT testing); (6) injections (including trigger point injections and dry needling); and (7) Supplies (including DME and orthotics).

184.   This medically unnecessary treatment typically continues for months on end. Almost none of the patients at 1786 Flatbush are discharged from care based on their purported clinical conditions.  To the extent the medical records of patients at 1786 Flatbush contain references to discharges, they routinely show (a) the patient made the decision to stop treating; (b) the patient continued to undergo treatment after the date of the purported discharge; or (c) the discharge came shortly after State Farm Mutual or State Farm Fire requested one of the defendant providers appear for an EUO and submit to questioning about the patients' treatment. For example, State Farm Mutual requested that Mollo appear on July 15, 2014 for an EUO to answer questions about the treatment of patient G.P.  Mollo failed to appear as requested and on the very next day, Parisien noted in patient G.P.'s chart, "Patient has completed all services from the office.  He feels better.  He wants to be discharged."  Similarly, State Farm Fire requested that Mollo appear for an EUO on August 5, 2014 relating to patient P.O., for which Mollo failed

to appear.  That same day, Parisien noted in the chart, "Patient stated he feels well but wants to stop.  He has completed all services from the office."

185.   The applicable fee schedule governing No-Fault claims imposes limits on the amount of physical therapy and chiropractic treatment that can be provided to a patient on any single date of service.   Under that schedule, certain medical services are assigned "relative values," and a provider cannot bill for more than eight "relative units" of identified physical therapy modalities and chiropractic manipulations for an individual patient on a single date of service.  To exploit patients' No-Fault Benefits to the greatest extent possible, while seeking to avoid the limitations imposed by the fee schedule, Defendants:  (a) routinely provided particular physical therapy modalities not because they were beneficial to the patients, but because that combination of modalities allowed each provider to bill for close to eight relative units per day thereby maximizing the amount that could be collected; (b) purported to provide those same modalities to nearly every patient on nearly every date of service regardless of the particular needs of any patient; and (c) added services regardless of whether they were necessary that were not subject to the unit limitation.  Moreover, patients were often subjected on the same day to physical therapy services and to chiropractic manipulations, and although all such treatment should have been limited to a total of eight units per day, Defendants billed the physical therapy and chiropractic care separately to maximize the amount that could be billed while hiding the fact that treatment in excess of eight units per day was provided.   Additionally, since acupuncture services, including "cupping" are not included in the applicable eight-unit daily limit, Defendants routinely added both acupuncture services and cupping to the Predetermined Treatment Protocol as yet another means to increase their bills without running afoul of the fee schedule's restrictions.

186.    Another aspect of the Predetermined Treatment Protocol is Defendants' circumvention of the otherwise applicable fee schedule by avoiding the use of certain CPT billing codes which provide for a fixed reimbursement.  Instead Defendants, on occasion, use "By-Report" or "BR" codes, which do not provide for fixed levels of reimbursement and are not subject to the eight-unit-per-day limitation described above.  According to the New York Department of Financial Services, which promulgated the applicable fee schedule, BR codes are meant to reflect services that are relatively unique in nature and do not have a specific unit value indicated within the fee schedule.  Fees for such services are set by the provider and must be justified by the submission of a written report.  Defendants do not use the "BR" code legitimately to document a necessary unique procedure, but rather to circumvent the fee schedule and inflate charges.  For example, on dates of service when they purportedly provided trigger point injections, which are listed on the fee schedule, the Physician Defendants also frequently bill State Farm Mutual and State Farm Fire for multiple instances of "dry needling" using the "BR" CPT Code 20999 ("unlisted procedure, musculoskeletal system, general") for many of the same patients.  Although 20999 is a BR code, Defendants provide no explanation why these services are unique or necessary in addition to or in lieu of the trigger point injections, even when the needling was provided to the same areas of the body on the same day.

### 1.    Physician Examinations, Diagnoses, and Treatment Plans

187.    As part of the Predetermined Treatment Protocol, patients received initial evaluations from one of the Physician Defendants.  Initial examinations were performed at 1786 Flatbush by Parisien from approximately September 2013 through at least June 2015, by Blackman from approximately June 2014 through at least July 2016, by Dabiri from approximately January 2014 through at least May 2014, by Pavlova from approximately September 2013 through at least October 2016, and by Lacina from approximately January 2014

through at least March 2016.  The Physician Defendants' initial examinations were billed to State Farm Mutual and State Farm Fire under the tax identification numbers and/or social security numbers of Parisien, Blackman, Dabiri, Pavlova, and Lacina, and under the tax identification numbers of Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, and RA Medical.

188.    Each of the Physician Defendants almost always diagnoses patients with sprains and strains in the cervical and lumbar regions of the back as well as other conditions.  Based on these predetermined diagnoses, the Physician Defendants usually conclude that patients require the Predetermined Treatment Protocol — a treatment plan that includes physical therapy, consultations with a chiropractor and an acupuncturist, a variety of diagnostic Tests, Supplies, and in some instances injections.

189.    The documentation of initial examinations, diagnoses, and treatment plans by Parisien, Blackman, Dabiri, Pavlova, and Lacina is not credible and is fraudulent.  Each of the Physician Defendants at 1786 Flatbush consistently use nearly identical examination forms (the "Initial Evaluation Report"), which differ only in the name of the particular Physician Defendant listed on the top of the first page.  Indeed, the Initial Evaluation Reports contain the same typographical errors and misspellings regardless of the Physician Defendant whose name appears.

190.    Not only do the Physician Defendants use nearly identical forms to document initial examinations, they also employ those forms in a way that makes it difficult to impossible for Defendants, other providers, or payers like State Farm Mutual and State Farm Fire to assess the true nature of patient complaints, examination findings, and diagnoses, or to know if examinations are being performed at all.  The forms contain prepopulated typed findings, pre-

typed narrative discussions, and spaces for handwritten comments or notations.  On some forms, the Physician Defendants underline or circle preprinted items, apparently representing specific findings.  On other forms, none of the preprinted findings is underlined or circled.  On yet other forms, some sections contain underlining or circling of preprinted items and some sections are without any markings.  On some occasions, markings are inconsistent with other findings.  For example, Parisien checked the box for "normal" with respect to a patient's cervical spine examination, and then underlined certain positive examination findings that would indicate cervical pathology.  Given this variability, it is almost impossible to discern the meaning of markings or their absence or to interpret the findings being made, the examinations performed, or the conclusions reached.

191.   Further, the Initial Evaluation Reports contain the following, or nearly identical, affirmative representation regarding specific positive findings from various tests performed during the patient examination:

> Tender points were also elicited at C3, C4, C5, C6, C7 levels.  The soto hall (force flexion of the head and neck upon the sternum) elicited pain.  Cervical distraction test was positive indicating the presence of a spinal nerve root compression.  Manual testing of muscle strength was also positive.  Pinprick and touch was abnormally decreased over the right left arm.  The patient had difficulties looking up to the ceiling because of spasm and stiffness of the cervical musculature.

Ex. 20.  While in some instances, various portions of this paragraph may be underlined, this preprinted language is rarely, if ever, crossed out entirely, suggesting these findings were present in every patient.  The forms themselves and Defendants' use of them advance the scheme because they prevent others from assessing the true nature of patient complaints, examination findings, and diagnoses, while allowing Defendants to claim patients suffer from a wide variety of conditions to justify treatment.

192.     Despite the inconsistencies and ambiguity in the Initial Evaluation Reports, certain patterns emerge when they are viewed as a group.  While the Initial Evaluation Reports reflect some variation in certain objective findings, some tests performed during evaluations, and responses to those tests, the Initial Evaluation Reports routinely include certain findings and diagnoses common to most of the reports, which are then used to support nearly identical treatment plans for almost every patient.  Specifically, the Initial Evaluation Reports find:  (a) most patients complain of neck pain; (b) most patients complain of low back pain; (c) most patients report significant frequency of pain in the affected area with the vast majority of patients purportedly suffering pain on a daily basis; and (d) most of the range of motion measurements are reported as abnormal.  *See* Ex. 2.

193.     Based on these common findings, and in apparent disregard of such variation as is noted in some forms, the Initial Evaluation Reports purport to diagnose nearly every patient with cervical sprain, strain cervicalgia, or myofascitis and/or lumbar sprain, strain, or myofascitis and sometimes conditions in one or more other regions.  *See* Ex. 2.

194.     Also purportedly based on these common findings and diagnoses, the Physician Defendants' initial treatment plan generally recommends to:  (a) commence physical therapy; (b) order x-rays of multiple regions of the spine; (c) order MRIs of the cervical and lumbar spine and often other extremities; (d) prescribe a common laundry list of Supplies; and (e) sometimes send patients for other consultations, services, and testing including neurological consultations.  *See* Ex. 20.  While the forms provide an option for the Physician Defendants to order "Synaptic therapy" and "computerized ROM/M MT" (range of motion/muscle testing), these entries are almost never checked, yet patients are routinely provided with these services.  *See* Ex. 2.

195.    The Physician Defendants and the Chiropractor Defendants at 1786 Flatbush also routinely order medically unnecessary MRI exams and refer patients to a handful of MRI providers, including Avalon Radiology, P.C., in Brooklyn, Doshi Diagnostic, and New York Radiology and Middle Village Diagnostic, in Elmhurst, New York, the results of which are not discussed with the patients and do not impact the diagnoses or course of treatment.  Additionally, the Physician Defendants and Chiropractor Defendants routinely refer patients for medically unnecessary x-ray imaging which is performed in a van parked outside of 1786 Flatbush, the charges for which are billed to State Farm Mutual and State Farm Fire by Prompt Medical Services, Inc.

196.    Approximately four weeks after their initial examination, patients purportedly undergo follow-up examinations, which may be performed by the same or a different Physician Defendant.  Regardless of who performs the follow-up examination, like the initial examinations, these follow-up examinations involve, at most, cursory examinations of patients — the purpose of which appears to be to support the continuation of the Predetermined Treatment Protocol — and are documented using the same, preprinted forms as the initial examinations (the "Follow-Up Reports").  *See* Ex. 21.  While some of the Follow-Up Reports purport to comment on x-ray or MRI results, there is no reported indication of a change in treatment based on these studies or that findings are communicated to other providers involved in the treatment.

197.    The Follow-Up Reports indicate some patients' conditions have improved and some are the same, but regardless of their clinical status at the time of the follow-up examination, the reports order the continuation of physical therapy and additional services, including additional diagnostic testing such as x-rays and MRIs, additional Supplies, and for many patients, neurological consultations, pain management, or injections.  In many instances, the

Physician Defendants also perform trigger point injections and/or dry needling procedures during their follow-up examinations. *See infra* ¶¶ 292–314.

### 2. Physical Therapy Treatment

198. Physical therapy is ordered as part of the Physician Defendants' initial treatment plan. It is then performed by Mariano and other physical therapists and billed to State Farm Mutual and State Farm Fire by MSB, the Physician Defendants, and others. The physical therapy treatments which patients purportedly receive at 1786 Flatbush are almost identical, do not change regardless of whether the patients purportedly improve or get worse, and typically involve at least three and very often five passive modalities on every visit from the first to last date of service. When therapeutic exercise is billed, the particular exercises purportedly performed are not identified much less documented and, in at least some instances, were not actually performed.

199. In some instances, patients have testified they received physical therapy even before being examined by one of the Physician Defendants. As physical therapy services are not compensable under the No-Fault Laws unless they are pursuant to a doctor's prescription or referral, *see* N.Y. Ins. Law § 5102(a)(1)(ii), such treatment was not lawfully rendered and was not reimbursable.

200. Physical therapy treatment at 1786 Flatbush typically begins with patients purportedly being examined by a physical therapist, in many instances on the same day as the initial examination purportedly performed by one of the Physician Defendants. To support their treatment, Mariano or some other physical therapist working for one of the Physical Therapy Defendants creates reports of these purported examinations that include treatment plans ("PT Examination Reports"). Portions of many of these reports are illegible, rendering it difficult if not impossible for Defendants, other providers, patients, or payers like State Farm Mutual and

State Farm Fire to know the nature of the treatment recommended or the patients' condition.  To the extent the PT Examination Reports are legible, they routinely record patients as suffering neck and/or back pain, report high pain levels, often 9 on a scale of 1 to 10, and state patients have a favorable "[r]ehabilitation potential for functional improvement" and would benefit from and/or are good candidates for physical therapy.  The reports then routinely conclude patients should begin a course of physical therapy three times per week, usually for four weeks, involving specifically: (a) application of moist heat packs; (b) therapeutic massage; (c) therapeutic exercise; (d) synaptic therapy; and (e) home exercise.  The reports do not detail the type of exercise contemplated or its duration.

201.   Thereafter, as set forth on Exhibit 3, nearly every patient at 1786 Flatbush is subjected to the same physical therapy services purportedly performed on nearly every visit: application of hot packs, therapeutic massage, exercise, bioelectric therapy, and, although it is not mentioned or prescribed in the PT Examination Reports, a treatment called low-level laser therapy.  Physical therapy treatment is purportedly documented in daily notes, which consist of preprinted forms with check boxes, and which lack any description of treatment such as the location of the body where hot packs were applied or massages provided.  Defendants provide the foregoing modalities (if provided at all) pursuant to the Predetermined Treatment Protocol, which maximizes the charges they can collect from State Farm Mutual and State Farm Fire. Indeed, while any one of these treatments may conceivably be medically necessary for a particular patient on a particular day, the comprehensive combination of treatments is seldom, if ever, medically necessary for any patient on any day, let alone on almost every visit.

202.   Defendants also purport to provide and bill for providing therapeutic exercise to patients on nearly every visit.  But the records rarely indicate what exercises are provided, how

long the exercises are performed, or how the patients responded.  Moreover, some patients have testified they never underwent any exercise at 1786 Flatbush even though State Farm Mutual and State Farm Fire received numerous bills for exercise and reimbursed Defendants for such services.

203.    Among the passive modalities purportedly provided at 1786 Flatbush and billed to State Farm Mutual and State Farm Fire is bioelectric therapy.  *See* Ex. 3.  Bioelectric therapy is simply another form of electrical stimulation in which the patient is typically given some control of the intensity.  Defendants do not bill for bioelectric therapy using CPT Code 97014, the physical therapy code for electric stimulation.  Rather, Defendants misrepresent the service they purport to provide using the CPT Code 64550, a code commonly used for the initial application and instruction of a TENS (Transcutaneous Electrical Nerve Stimulator) unit.  While electrical stimulation correctly billed under CPT Code 97014 would be included in the eight-unit per day limitations on physical therapy under the New York No-Fault regulations, *see supra* ¶ 185, the CPT Code 64550 Defendants use for bioelectric therapy charges is *not* included in the eight-unit limit.  Thus, by billing for bioelectrical therapy under CPT Code 64550, Defendants avoid the limitations on physical therapy contained in the fee schedule and thereby fraudulently induce State Farm Mutual and State Farm Fire to pay for excessive and unnecessary passive physical therapy modalities for which it would not have otherwise paid.

204.    The Physician Defendants also routinely bill State Farm Mutual and State Farm Fire for another passive modality called "low level laser therapy" using CPT Code 97799, the code for an unlisted physical therapy procedure, which is also excluded from the otherwise applicable eight-unit daily limitations on physical therapy modalities.

205.    Further, in some instances, patients for whom Defendants have submitted bills for bioelectric therapy and low level laser therapy to State Farm Mutual or State Farm Fire have testified they did not receive such treatment.

206.    Moreover, although Defendants administer bioelectric therapy and low-level laser therapy on the same day as other passive modalities, Defendants submit separate bills and supporting documentation on separate days for such treatment.  Such documentation consists of preprinted forms with numbers that can be circled to indicate a patient's purported pain levels before and after the procedures.  Defendants' treatment forms routinely report patients experienced slight improvement following the procedures, for example pain reduced from a score of 7 to a score of 6.

207.    Defendants' submission of separate bills and supporting documentation for bioelectric therapy and low-level laser therapy conceals the full extent of passive modalities provided on any single day and is an apparent attempt by Defendants to limit the total number of services included in any one submission for any single date of service to avoid detection of their scheme.

**3.      Chiropractic Initial Exams, Diagnoses, and Treatment**

208.    Most patients treated at 1786 Flatbush were subjected to chiropractic examinations and treatment by Mollo or a chiropractor working for Mollo P.C., ACH Chiropractic, Energy Chiropractic, or Island Life (collectively, the "Mollo Entities").  Patients purportedly underwent initial examinations that led to reports of nearly identical conditions, included findings that were internally inconsistent or inconsistent with findings purportedly made by the Physician Defendants on the same day or within a few days of the chiropractic initial examination, made no sense, or were highly improbable and, regardless of the purported findings, resulted in common diagnoses and recommendations.  Following these examinations,

patients were subjected to chiropractic manipulations that did not vary in time, frequency, or type regardless of whether the patient got better or worse.

### a.   Fraudulent Chiropractic Initial Exams and Diagnoses

209.   Chiropractic treatment at 1786 Flatbush begins with initial examinations performed by Mollo or another chiropractor working on behalf of one of the Mollo Entities.  The chiropractic examinations are often conducted on the same day or within days of examinations purportedly performed by one of the Physician Defendants.   The initial chiropractic examinations routinely report patient complaints of cervical, mid-back, or low-back pain and diagnose the patient with a common set of conditions.  Based on these predetermined diagnoses, the chiropractors conclude that patients require a treatment plan typically consisting of chiropractic adjustments three to four times per week often for four to six weeks, followed by a re-examination, and often referrals for an MRI or an x-ray and to undergo a V-sNCT test.

210.   The documentation of the initial examinations, diagnoses, and treatment plans by the chiropractors submitted to State Farm Mutual and State Farm Fire include Chiropractic Initial Evaluation Reports ("Chiropractic Initial Reports").   The Chiropractic Initial Reports are preprinted, form documents that contain fields to be circled and fill-in-the-blank spaces allowing for minimal entries.  The narratives on the Chiropractic Initial Reports are preprinted with places to circle, such as the patients' gender, whether the accident was due to a motor vehicle accident or work related, the patients' position in the automobile, and the patients' complaints.

211.   In most instances, these Chiropractic Initial Reports reflect: (a) complaints of pain in the cervical, thoracic, and lumber spine; (b) pain levels that are often either not recorded or when they are recorded are reported as 7 or higher on a scale of 1 to 10; (c) positive findings on at least one of a variety of orthopedic tests; and (d) tenderness of the paraspinal muscles at the cervical, thoracic, and lumbar regions of the spine.  *See* Ex. 4.

212.    Based upon these purported histories, examinations, and findings, the Chiropractic Initial Reports record diagnoses of multiple spinal conditions, including sprains in the cervical, thoracic, and/or lumbar regions of the spine, muscle spasms, and segmented joint dysfunction in the cervical, thoracic, and/or lumbar regions of the spine and the hip.  These findings that patients purportedly suffer from conditions in so many regions serve to justify more extensive manipulations for which Defendants can submit a higher charge under the applicable fee schedule.  The chiropractors typically report patients' prognosis as "guarded."  *See id.*

213.    The Chiropractic Initial Reports also contain a preprinted treatment plan with 17 treatment "options" that can be checked as well as room to identify "Other" options.  "Other" options are rarely, if ever, identified.  Rather, Mollo and the other chiropractors routinely select the same treatment options:  (1) chiropractic manipulative therapy for three times per week, often for four to six weeks, followed by a re-examination; and (2) V-sNCTs, which they describe as "small pain fiber studies of the cervical/lumbar spine to evaluate pathology to the A-delta, A-Beta, and C sensory nerve fibers."  The treatment plan also typically includes referrals for x-rays and/or MRIs of the cervical, thoracic, and/or lumbar spine "to R/O [rule out] discogenic injury if symptoms persist for 3-4 weeks."  *See id.*  The chiropractic treatment plan rarely includes active therapy or exercise.  *Id.*

214.    When viewed as a group, the Chiropractic Defendants' referrals of patients for x-rays and MRIs also reveal other non-credible patterns.  From August 2013 until July 2014, the initial examination forms reflect a referral for MRIs and/or x-rays.  Beginning in July 2014 until September 2015, however, the Chiropractor Defendants' initial examination reports rarely, if ever, reflect referrals of patients for x-rays or MRIs, even though at least some of the patients received initial examinations during this period.  The Chiropractor Defendants resumed

recommending x-rays and/or MRIs in November 2015 for virtually every patient.  It makes no sense that (a) nearly every patient would receive a referral for x-rays and/or MRIs over the course of a one-year period; (b) then no patients receive any referrals for x-rays or MRIs for a 14-month period; and (c) then nearly every patient again receives referrals for x-rays and MRIs following their initial examination.  In May 2016, ACH Chiropractic itself began billing for x-rays performed on patients at 1786 Flatbush.

### b.  Fraudulent Chiropractic Treatments

215.    Following the initial chiropractic exams, patients are scheduled to receive chiropractic manipulations at 1786 Flatbush three to four times per week.  The predetermined chiropractic treatment patients purportedly receive on almost every visit is almost identical and does not change regardless of whether the patient improves or gets worse.

216.    Daily chiropractic progress or SOAP notes ("Chiropractic Daily Notes") purport to reflect chiropractic manipulations provided to each patient on each visit and the assessments of the patients' conditions; but, at most, they reflect cursory evaluations of patients to support the continuation of the Predetermined Treatment Protocol.  The Chiropractic Daily Notes consist of pre-typed worksheets with spaces to circle findings.   The forms routinely report patients' complaints of "NP" (neck pain), "MBP" (mid-back pain); and "LBP" (low-back pain) and that the patients present with purported objective findings of "hypertonic" or "spasm" in the spine and/or joint dysfunction in multiple regions of the spine.  *See* Ex. 22.  The Chiropractic Daily Notes often reflect "No Change" to the patient's condition, and that the chiropractic treatment should "Continue as planned."  *Id.*  While the form includes a space to allow the chiropractor to "Modify" the treatment plan, modifications are rarely indicated.

217.    Regardless of the outcome of the purported assessment, the Chiropractic Daily Notes reflect that each patient typically receives basically the same treatment: chiropractic

manipulations of the spine, most frequently for three to four regions of the spine.  *See* Ex. 1. Following these manipulations, the Chiropractic Daily Notes routinely reflect that the "patient[s] felt . . . [b]etter."

218.    In addition, while a variety of potential chiropractic manipulation options and techniques are potentially available in a legitimate setting, the documentation at 1786 Flatbush does not describe the kind of chiropractic manipulations purportedly provided, and thus does not indicate that there is any variation in the time, frequency or type of chiropractic manipulations regardless of whether the patients improve or get worse.  Further, although it is a common practice in a legitimate healthcare setting to document the name of the professional providing the service on any given day, the Chiropractic Daily Notes contain only illegible scrawled signatures, making it difficult if not impossible to identity the chiropractor or other individual who purportedly provided the manipulation.

219.    The chiropractors do not conduct meaningful follow-up examinations, if they conduct them at all.  In those instances in which they purport to conduct follow-up examinations, the examinations involve, at most, cursory exams of patients to support continuation of the predetermined chiropractic treatment.  In particular, reports of follow-up examinations, which consist of single-page sheets with preprinted content, routinely indicate that, despite having undergone a course of purported chiropractic care, patients continue to complain of cervical and/or lower back pain.  Even when patients purportedly have no range of motion deficits upon re-examination, the re-examination report recommends continuation of the same treatment plan and the patient thereafter continues the Predetermined Treatment Protocol, often including several more weeks of chiropractic manipulations.  *See* Ex. 23.

220.     Although patients receive evaluations and chiropractic manipulations from the chiropractors on the same visits to 1786 Flatbush when they purportedly also receive hot packs, electrical stimulation, massage, exercise, and acupuncture, the documentation provided to State Farm Mutual and State Farm Fire contains no indication of any communication between or among any of the professionals rendering services that would suggest any attempt to coordinate their treatment.

### 4.     Defendants' Fraudulent Acupuncture Treatment

221.     Defendants Deng and Deng Acupuncture also purport to perform acupuncture treatment on most State Farm Mutual and State Farm Fire insureds treated at 1786 Flatbush on the same days the patients also receive the above-described physical therapy and chiropractic manipulations.  As discussed below, this acupuncture treatment is medically unnecessary and not legitimately provided.

### a.     Legitimate Acupuncture Treatment

222.     Acupuncture services are premised upon the theory that there are twelve primary meridians with matching sinew channels and ten extraordinary meridians ("the Meridians") in the human body through which energy flows.  Under the principles of acupuncture or Chinese medicine, every individual has a unique energy flow, also referred to as "Chi."  When that Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and thereby restore the patient's Chi.

223.     In addition to inserting needles into Acupuncture Points, in appropriate circumstances acupuncture can include a procedure known as "cupping."  Cupping involves the application of suction to the skin using a small, open mouth plastic vacuum jar or "cup" or a pneumatic device to create a vacuum over the skin.  Cupping is premised on the theory that

suction at appropriate locations removes pain-inducing stagnant blood by bringing it to the surface.  During cupping, the cup is usually applied to the lower back, shoulders, and neck, and then left on the skin for about 10 minutes.  While cupping may be appropriate for some patients in some circumstances, in a legitimate acupuncture setting it is performed infrequently as it usually produces noticeably visible bruises or welts on the skin.  Also, due to the high likelihood of bruising, cupping is generally contraindicated for people who bruise easily or are obese.  Moreover, even when cupping is indicated, it should not be repeated on the same patient regularly and it would be highly unusual to include cupping as part of each acupuncture session.

224.    Legitimate acupuncture treatment begins with an examination of the patient.  In addition to taking a detailed patient history on a variety of topics, such as the patient's reactions to heat and cold, perspiration patterns, thirst and appetite, pain type and location, and general medical history, a physical examination is also performed.  Two critical components of this examination are the appearance of the patient's tongue (i.e., color, shape, texture, etc.) including the veins underneath the tongue, and various measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.).  The information gleaned from these components of the physical examination is necessary to accurately diagnose the patient and determine an individualized acupuncture treatment plan designed to benefit the patient by restoring their unique Chi.

225.    Next, a specific acupuncture treatment plan is developed.  This generally requires the insertion of needles into particular Acupuncture Points along the Meridians.  There are over 360 Meridian Acupuncture Points, numerous "extra" points and countless "Ah Shi" points from which an acupuncturist may choose.  Ah Shi points can only be detected by touch and palpation, often feel like a pea-size nodule under the skin, and are treated similarly to an Acupuncture Point.  The location of Ah Shi points will necessarily vary from patient to patient, and can often

vary in a single patient over the course of multiple visits. This requires the practitioner to conduct a thorough examination and to properly document the location of the Ah Shi points in the particular patient. Any legitimate acupuncture treatment plan should typically include local points at the injury sites, proximal points (i.e., near the affected areas of the involved Meridian(s)), distal Acupuncture Points (i.e., distant from the affected areas of the involved Meridian(s)), and also address any Ah Shi points.

226.    Finally, an acupuncture treatment plan is implemented. Treatment involves insertion of generally 10, but more typically 20 or more acupuncture needles, for a minimum of approximately 20 minutes into each of the selected Acupuncture Points. The number and location of the Acupuncture Points generally varies based each patient's unique circumstances as the patient's documented therapeutic response to each prior acupuncture treatment. Generally, more severe conditions are treated with greater frequency and more Acupuncture Points. As patients improve, treatment frequency and the number of points used should decrease.

227.    The goal of legitimate acupuncture treatment is to effectively treat and benefit patients by restoring their unique Chi, relieving symptoms, and returning them to normal activity.

228.    Further, a legitimate acupuncture treatment plan may permit frequent treatment sessions for the first two weeks of treatment. After this initial stage, the frequency of weekly treatment sessions typically decreases, leaving more time between treatments to assess how long the patient remains pain free and/or how long the therapeutic effect of such treatments can be maintained.

229.   Legitimate acupuncture treatment also requires meaningful documentation of the: (a) patient's history; (b) physical examination; (c) diagnosis; (d) treatment plan; (e) results of each session; and (f) the patient's progress throughout the course of treatment.

230.   Finally, legitimate acupuncture therapy requires continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans, like most treatments, are fluid and should evolve over time as a patient responds to care.  The goal of any legitimate acupuncture treatment plan is to return the patient to maximum health by restoring his or her unique Chi.

### b.   Defendants' Fraudulent Acupuncture Treatment

231.   The Acupuncture Defendants' protocol treatment at 1786 Flatbush does not comport with any of the above basic tenets of legitimate acupuncture treatment.  Instead, at best, it consists of inserting needles or cupping in an assembly line fashion that bears little, if any, relation to the patient's condition and is not designed to effectively treat or otherwise benefit the patient.  As such, the acupuncture services as performed by the Acupuncture Defendants at 1786 Flatbush are not medically necessary.  Instead, they enrich the Acupuncture Defendants through the submission of fraudulent charges to State Farm Mutual and State Farm Fire.

232.   The Acupuncture Defendants purport to support their fraudulent charges with initial examination reports and treatment notes.  With minor exceptions, these documents reveal the following pervasive patterns in the initial examinations, diagnoses, and treatment recommendations, patterns which are not credible across a large sample of individuals:

(a)   Most patients present with an unremarkable family history, but complain of neck and/or back pain and pain in another region of the body.  Although Deng's initial examination form provides several other possible pain descriptions which can be circled, in almost all cases, the pain is described as "persistent" and "sharp."  Although Mollo, the Mollo Entities, and the Mollo Chiropractors often find patients complain of thoracic pain, Deng rarely does, even though he purportedly examines patients on the same visits or within days of the chiropractors' visits.

(b)     While Deng's examinations are billed to State Farm Mutual and State Farm Fire using CPT Code 99203, which should be used for a thorough examination usually taking 30 minutes, Deng's examination forms do not reflect the taking of sufficient histories or adequate examinations, let alone a thorough examination that could take 30 minutes.  Deng's initial examination reports contain almost no information about the patients, with the majority of patients' past medical histories reported as "None." Even when other providers at 1786 Flatbush note significant aspects of patients' medical history, such as prior surgery or cancer, Deng's reports rarely, if ever, mention such conditions or events.

(c)     Nearly every patient on initial examination has the tongue assessed as "light red" in color and "normal" shape with a "thick white" coating.  *See* Ex. 5.

(d)     Although Deng's initial examination reports provide for more than 13 options of pulse characteristics, patients' pulses are routinely described as either "normal" or "floating."  *See id.*

(e)     Following their initial examination, patients are almost always diagnosed with Chi-blood stagnation, which is preprinted on the boilerplate form.  Although there are more than 18 channels among the preprinted options on Deng's initial examination form, Deng routinely finds that the patient has stagnation of the blood at two channels: (1) "The Small Intestine Channel of Hand-Taiyong," and/or (2) "The Urinary Bladder Channel of Foot-Taiyang" ("UB Channel").

(f)     In addition to the Chi diagnoses, Deng diagnoses most patients with a condition in one or more regions of the spine, most commonly (1) cervical sprain/strain; (2) lumbar myofascitis; and (3) lumbar sprain/strain, in addition to other diagnoses such as knee, or shoulder issues, or headaches.

(g)     Deng's reports routinely conclude with boilerplate language that the treatment of acupuncture would be appropriate and necessary for several reasons, including to: (1) "[p]rovide symptomatic pain relief in acute and sub-acute stages of injury condition; (2) [a]ssist to reduce inflammatory response to affected areas; and (3) [r]eflexively subside painful muscle contraction and reactive spasm of the injured joint's intrinsic musculature, thereby reversing the pain-spams-muscle cycle."

(h)     Deng's initial examination reports routinely contain a conclusion (in preprinted, boilerplate language) that there is "a direct causal relationship between the accident described and the patient's current injuries."

(i)     Most patients receive an acupuncture treatment plan calling for acupuncture two to three times per week for four weeks.

(j)     In the initial exam, the size, type, and sometimes the quantity of needles to be used is predetermined and described in preprinted template language.  Specifically, the reports state the needles to be used are "[d]isposable and sterile, individually packed with guided PVC tube.  Size 36# x 1.0 (0.20mm x 25mm) or 34# x 1.5 (.22mm x 40mm). 15 [minutes] for initial insertion or reinsertion."  *See* Ex. 24.  It is simply not credible that

it would be appropriate for the Acupuncture Defendants to use the same size and types of needles on every insertion point for every patient at almost every acupuncture session regardless of their individual conditions, as different body types and conditions require the use of different sizes and types of needles, or that the Acupuncture Defendants would almost always make that determination during the initial visit.

(k)     While Deng's acupuncture initial examination reports provide a blank space for a "Prognosis" to be filled in, it is nearly always left blank.

(l)     There are often inconsistencies between the purported findings of the Acupuncture Defendants, the Physician Defendants, and Chiropractor Defendants who purportedly examined the same patients on or about the same day.  For example, Deng's reports of patients' complaints, range of motion in the neck and back, and even pulse often differ from the reported findings of the Physician Defendants and Chiropractor Defendants.

233.   Based upon these purported examinations, diagnoses, and treatment recommendations, the Acupuncture Defendants subject patients to acupuncture treatment.  With minor exceptions, documentation reveals the following pervasive, non-credible patterns in the treatment:

(a)     The daily acupuncture SOAP note consists of a brief, preprinted form with areas for the provider to circle certain information and identify the Acupuncture Points at which acupuncture is purportedly performed.  The handwriting on the form is often illegible, making it difficult if not impossible to determine what treatment is being provided.

(b)     Based on the circles on the forms, patients are nearly always documented as presenting with neck and/or low-back pain and tenderness and spasms in their cervical and/or lumbar spine.

(c)     Despite the importance of tongue characteristics and pulse to evaluating a patient's condition and Chi as discussed above, in most instances, the daily acupuncture SOAP notes do not document the condition of the tongue or pulse.

(d)     Needles are inserted into a small range of common Acupuncture Points (almost always points along the UB Channel), which address only some, and never all, of the patients' purported conditions, and which appear to be determined only for the sake of expediency.  The forms do not identify the number of needles used.

(e)     If patients do, in fact, suffer from Chi-blood stagnation, Defendants do not use the most commonly recognized needle combinations to address this condition.

(f)     Other than circling or checking "Yes" as to whether the patient tolerated treatment, there is no discussion of the patients' response to treatment.

(g)     Treatment continues without change in frequency and without any indication of change in patients' conditions and therapeutic responses to treatment after any treatment session, or from the beginning through the end of the patients' entire treatment plans.

(h)     Most treatment sessions are billed using CPT Code 97810, which purports to indicate that each session involved personal, one-on-one contact with the patient and an interval exam regarding the patient's condition, but there is no documentation any interval examination was done.  Since no information is obtained or recorded regarding how the patient is responding to treatment, there is no documented basis for continuing treatment.

(i)     Although the patients receive physical therapy and chiropractic care from other Defendants on the same visits, there is no record provided to State Farm Mutual or State Farm Fire of communications among the professionals rendering these services or an attempt to coordinate their treatment.

234.    In addition to treating patients with needles, the Acupuncture Defendants subject patients to cupping.  Cupping is included in patient treatment although it is almost never mentioned in the initial examination reports, let alone identified as part of the acupuncture treatment plan.  And, although, for the reasons discussed above, cupping should be relatively rare and not repeatedly performed, cupping is performed both frequently and repeatedly at 1786 Flatbush.  As reflected on the chart attached as Exhibit 5, the Acupuncture Defendants administered cupping to many patients repeatedly over multiple visits, on nearly every visit, and more often than ordinary needle-based acupuncture.  Ex. 5.  In several cases, cupping was used exclusively.  *Id.*

235.    The Acupuncture Defendants' documentation provides no justification for cupping or any explanation as to why it is being used as opposed to, or in addition to, routine acupuncture.  There is also no indication that anyone inquires whether a patient would bruise easily or considers whether patients' weight or body characteristics might render them inappropriate candidates for the procedure.

236.    Among the reasons the Acupuncture Defendants administer cupping and do so with such frequency is because they know that cupping is not a listed treatment modality under the fee schedule applicable to New York No-Fault claims, and therefore is not subject to certain limitations.  Acupuncture involving the insertion of needles is typically billed under CPT Codes 97810 and 97811, which under the New York fee schedule limit reimbursement to one charge for the first 15 minutes of treatment and a second charge for the next 15 minutes of treatment, respectively, regardless of the number of needles inserted.  The Acupuncture Defendants bill for cupping under CPT Code 99199 as an "unlisted special service, procedure or report," which enables the Acupuncture Defendants to set their own reimbursement charges, increase the amount they charge on a daily visit, and circumvent the fee schedules applicable to more common acupuncture treatments.

### 5.    Fraudulent Diagnostic Tests

237.    As set forth in Exhibits 1 and 6, patients were also subjected to unnecessary diagnostic Tests ordered by the Physician Defendants and the Chiropractor Defendants, including ROM Tests, Muscle Tests, NCVs, EMGs, SSEPs, BEPs, Functional Capacity Evaluations, and V-sNCT tests.  Even if these Tests as administered had any clinical value, which as discussed next they did not, Defendants' medical records do not document or reflect that the results of such tests altered or affected patient treatment in any way.

### a.    Fraudulent Computerized ROM Tests and Muscle Tests

238.    Most patients treated at 1786 Flatbush are subjected to medically unnecessary ROM Tests and Muscle Tests ordered by the Physician Defendants, most often performed on multiple occasions three to four weeks apart, and billed by each of the Physician Defendants and by Allay, KP Medical, JPF Medical, and PFJ Medical.  *See* Ex. 1.  As discussed above, although the Physician Defendants' initial evaluation form contains an option for "computerized

ROM/MMT," which is hardly every checked, they perform such testing and submit charges to State Farm Mutual or State Farm Fire for virtually every patient.

239.    The measurement of a particular joint's full mobility is that joint's range of motion.  Charts listing generally agreed upon full ranges of motion for each joint are available in many standard textbooks.   A traditional, or manual, range of motion test consists of a non-electronic measurement of a joint's ability to move through its arc of motion which then can be compared to an unimpaired or ideal joint.  Active range of motion testing is effectuated by a doctor asking the person to move a joint to its full extent and this testing may be measured by a manual inclinometer or goniometer (devices used to measure angles).  Active range of motion can be inaccurate if the patient does not provide full effort.  Passive range of motion testing is performed by the clinician moving a patient's joints to identify anatomic restrictions of movement.

240.    A traditional, or manual, muscle strength test consists of a non-electronic measurement of muscle strength, using a generally accepted scale of 0 to 5, accomplished by having the person move a joint against resistance applied by a physician or clinician.  For example, if a physician were to measure a person's knee flexion strength, he or she would apply resistance against the person's posterior foreleg while having him/her flex the knee.

241.    A physical examination performed on a person with soft-tissue trauma will typically require manual range of motion testing and muscle strength testing to assess injury in order to make a diagnosis and develop a program to address any limitations in that person's motion and strength limitations.  Doctors document range of motion and strength impairment to provide an objective frame of reference as it pertains to functional tasks, which allows the doctor to monitor progress.  Manual range of motion and strength tests are regularly done as part of the

initial evaluation of a patient and any reevaluation of the patient and are billed as part of the overall evaluation charge; they are not billed separately.

242.   The ROM Test is purportedly performed through the placement of a digital inclinometer (typically affixed by Velcro straps) on various parts of a patient's body while the patient is asked to move the related joint through its available motion.  The ROM Test is almost identical to the traditional or manual range of motion testing except that a digital reading is gained rather than a manual one.  This test is also dependent upon patient cooperation and effort, as well as the skill of the examiner.

243.   The Muscle Test is purportedly performed through the placement of an accelometric measurement apparatus against a stationary object, against which the patient contracts a particular muscle three to four separate times.  The Muscle Test is almost identical to the traditional or manual muscle strength testing performed by physicians during an examination, except that a digital reading is gained identifying the pounds of pressure that the patient exerts as opposed to a 0 to 5 scale.  The electronic data gathered does not take into account whether the patient is applying full effort, and its accuracy is therefore also dependent upon patient cooperation, effort, and the skill of the examiner.

244.   When the ROM Test and the Muscle Test are performed, the decision of which joints to test in a ROM Test and which muscles to test in the Muscle Test should be tailored to each patient's unique injury and the clinical findings of that individual patient.  As a result, the particular joints and muscles tested should be individualized for each patient.

245.   While the ROM Tests and the Muscle Tests could be useful tools in some circumstances, for example, as part of a medical research study, under the circumstances

employed at 1786 Flatbush, they were medically unnecessary and were part and parcel of the fraudulent Predetermined Treatment Protocol to maximize profits.

246.    In particular, most patients at 1786 Flatbush purportedly underwent traditional, manual range of motion testing and muscle strength testing as part of their initial and follow-up examinations with, at least, the Physician Defendants, Chiropractor Defendants, and Physical Therapy Defendants.  Nevertheless, patients were also unnecessarily subjected to ROM Tests and Muscle Tests.  The ROM Tests and Muscle Tests were not tailored to patients' individual needs, did not provide any additional data over the manual range of motion and muscle strength tests that were allegedly performed, and were irrelevant to the monitoring of the restoration of function for purposes of treatment.  In the relatively minor soft-tissue injuries allegedly sustained by the patients, the difference of a few degrees in the patients' range of motion reading or pounds of resistance in the patients' muscle strength testing is unimportant to the diagnosis or treatment of such patients.

247.    Even if there was a reason to perform ROM Tests or the Muscle Tests, the methods in which the tests are performed are not tailored to individual patients, are not intended to identify or diagnose particular conditions, and do not facilitate treatment or result in change in treatment program.  While a variety of measurements can be recorded in each test, many joints in the body are never tested in Defendants' tests, and other joints in the body are tested repeatedly regardless of each patient's specific complaints or conditions.  In addition, many patients are tested in joints as to which they have not previously been diagnosed as having an issue.

248.    Finally, many bills for Muscle Tests submitted by the Physician Defendants used multiple charges of CPT Code 95831 to represent that as many as five separate measurements had been performed on each patient, as well as a separate charge for CPT Code 95833, and that

Defendants were therefore entitled to bill State Farm Mutual and State Farm Fire for each measurement, separate and independent from one another.  In some cases, these Defendants claim to have taken as many as six separate measurements, resulting in total charges of $332.32 per patient.  According to the applicable fee schedule, however, a healthcare provider seeking reimbursement for Muscle Tests may only use CPT Code 95831 and bill 5.16 relative units (translating into $43.60) for each "extremity" or "trunk section" which is tested, but should use CPT Code 95833 and bill a maximum of 14.88 relative units ($125.73) if the entire body is tested.  As a result of the misrepresentations, even if the Muscle Tests had value and were properly reimbursable (which they were not), on each of the bills seeking payment for the testing of more than three separate muscles, Defendants defrauded State Farm Mutual and State Farm Fire into paying more than they were entitled to be paid.

### b.     Fraudulent NCV and EMG Testing

249.    Most patients at 1786 Flatbush are also routinely subjected to medically unnecessary NCVs and EMGs performed by Parisien, Dabiri, Blackman, Lacina, Pavlova, and persons working under their direction, and billed by Parisien, Dabiri, Blackman, Pavlova, Allay, KP Medical, ACH Chiropractic, Island Life, JPF Medical, RA Medical, and PFJ Medical.

### i.     Neurological Testing

250.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including the arms and legs and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.  Sensory nerves are responsible for collecting and relaying sensory

information to the brain.  Motor nerves are responsible for transmitting signals from the brain to initiate muscle activity throughout the body.

251.    Peripheral nerves consist of both sensory and motor nerves.   They travel throughout the body and come together at specific points along the spine before traveling up the spinal cord to the brain.  The segments of nerve closest to the spine, and through which impulses travel between the peripheral nerves and the spinal cord, are called nerve roots.  Injury to a nerve root is called radiculopathy, and can cause various symptoms including pain, altered sensation, and weakness.

252.    Legitimate EDX tests can be performed on patients who report symptoms that may suggest neurological pathology, such as pain in the neck and/or lower back region that radiates to the arms or legs, abnormal weakness in limbs, or significant changes in sensation in limbs.

253.    If properly performed and interpreted, NCVs and EMGs can be used to diagnose the existence, nature, extent, and specific location of nerve abnormalities that may be causing the purported symptoms, including peripheral nerve injuries (e.g., injuries to the nerves in the arms and legs) and radiculopathies (pinched nerve roots that run along both sides of the spine at each vertebra level).

### ii.    NCV Tests

254.    NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents.  The velocities, amplitudes, and shape of the response are then recorded by electrodes attached to the surface of the skin and compared with well-defined normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers of the peripheral nerves in the arms and legs.

255.    Several peripheral nerves in the arms and legs can be tested with NCVs. Moreover, many of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested.  The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both in any such peripheral nerve should be tailored to each person's unique circumstances.  In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual as well as the real-time results obtained as the NCVs are performed on the sensory and/or motor fibers of each peripheral nerve.  As a result, the nature and number of the peripheral nerves and the types of nerve fibers tested with NCVs should vary by individual.

### iii.    EMG Tests

256.    EMGs involve inserting needles into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs and measuring electrical activity in each such muscle.  The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

257.    Many different muscles and nerves in the arms and legs can be tested with EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each individual's unique circumstances.  In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual, patient, the presenting symptoms, the real-time results of NCVs which are typically performed in conjunction with EMGs, and the real-time results obtained from the EMGs as they are performed on each specific muscle.  As a result, the number of limbs tested, as well as the nature and number of the muscles tested, should vary by patient.  Moreover, legitimate EMG testing will

likely show significant differences in results across patients because of the inherent variability among patients in both presenting symptoms and in real-time EMG results.

258.    NCVs and EMGs should be performed together in the same session by the same healthcare provider.  Among other things, real-time results obtained during the tests can and should influence how each is performed and interpreted, and results from both are typically necessary to diagnose and localize injury.  Thus, it is impossible to diagnose radiculopathy without an EMG.

### iv.    The AANEM Recommended Policy

259.    The American Association of Neuromuscular & Electrodiagnostic Medicine ("AANEM"), founded in 1953, is the largest organization worldwide dedicated solely to the scientifically based advancement of neuromuscular medicine.  AANEM membership is comprised of over 5,000 physicians, primarily neurologists and physiatrists.  AANEM's primary goal is to increase the quality of care for patients with neurological disorders through programs in education, research, and quality assurance.  AANEM has issued a Recommended Policy ("Recommended Policy") regarding the optimal use of EDX tests, including NCV and EMG tests, to diagnose various forms of nerve abnormalities, including peripheral nerve injuries and radiculopathies.  *See* Ex. 25.  The Recommended Policy has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

260.    The Recommended Policy arises out of the recognition that EDX studies "have occasionally been abused by some providers, resulting in overutilization and inappropriate consumption of scarce health resources."  AANEM's Recommended Policy accurately reflects the demonstrated utility of various forms of EDX studies, including NCVs and EMGs, for diagnosing radiculopathies and other disorders of the central and peripheral nervous systems.

261.   The Recommended Policy correctly recognizes that "EDX studies are individually designed by the EDX consultant for each Patient" and that "[t]he examination design is dynamic and often changes during the course of the study in response to new information obtained."  Therefore, the decision of which nerves and muscles, if any, should be tested with NCVs and EMGs should be individually tailored by a physician to address each patient's unique circumstances based upon a history and examination of the patient, as well as the real-time results as the NCVs and EMGs are performed.  The Current Procedural Terminology guide which sets forth codes (CPT Codes) used by healthcare providers to describe and bill for services similarly reminds that "[n]erve tests *must* be limited to the specific nerves needed for the particular clinical question being investigated."  (Emphasis added).

262.   According to the Recommended Policy, the maximum number of EDX tests that should be required to diagnose radiculopathy in more than 90% of patients is:  (a) NCVs of three motor nerves and two sensory nerves, and (b) EMGs of two limbs.  These maximum numbers "are to be used as a tool to detect outliers so as to prevent abuse and overutilization."

### v.   Defendants' Fraudulent NCVs and EMGs

263.   Defendants use NCVs and EMGs not to legitimately diagnose the patients' conditions but to maximize profits and to attempt to document conditions, whether they exist or not, to justify further treatment.   Specifically, this includes: (i) testing patients without indications that tests are necessary; (ii) performing NCVs without EMGs or performing NCVs and EMGs separately on different dates that are often days or even weeks apart; (iii) performing tests in a formulaic fashion to maximize charges; and (iv) making diagnoses based on insufficient information and information that is not credible.

264.   *First*, in most instances, tests are performed without any indication patients need them.   Defendants typically purport to provide NCVs and EMGs to diagnose or rule out

radiculopathy.  In a legitimate setting, a patient suspected of suffering from radiculopathy would show signs of neck or back pain accompanied by numbness, tingling, and/or pain radiating to an extremity.  However, according to the Initial Evaluation Reports of the Prescribing Physicians more than half the patients subjected to NCVs and EMGs had none of these indications.  *See* Ex. 6.

265.    *Second*, as set forth in Exhibit 6, in many instances Parisien, Dabiri, and Blackman performed NCVs without EMGs, EMGs without NCVs, and NCVs and EMGs on different days.  In some instances, NCVs and EMGs were performed weeks apart.  But, for the reasons alleged above (*see supra* ¶ 258), performing tests in this manner substantially undermines their value.  Defendants purport to use the tests to diagnose radiculopathy, but diagnosing radiculopathy typically requires a normal NCV and an abnormal EMG, and both components are necessary to diagnose the condition and identify the levels of the spine at which it is occurring.

266.    The vast majority of Defendants' NCVs and EMGs yield normal results or no evidence of a radiculopathy, suggesting there was no need to perform such tests in the first place.

267.    *Third*, Parisien, Dabiri, and Blackman do not tailor the NCVs and EMGs to patients' unique circumstances but perform them in a formulaic fashion that maximizes the charges they can submit to State Farm Mutual and State Farm Fire.  Specifically, these Defendants perform NCVs on the same peripheral nerves and nerve fibers for almost every patient, and perform EMGs on the same muscles in all four limbs in almost every patient.  Parisien, Dabiri, and Blackman perform the tests in this fashion without regard to patients' individual symptoms or what the data shows as the tests proceed.  In marked contrast to the standards recognized by the Recommended Policy, Defendants perform for most patients: (a)

NCVs of the same four motor nerves, and (b) NCVs of the same five sensory nerves.  *See* Ex. 6. Further, it is unusual for patients to be symptomatic in four separate limbs and require EMGs in four limbs, yet Defendants performed four limb EMGs in almost every patient, and they often tested as many as 36 separate muscles in a single patient.  *See id.*

268.    Patients at 1786 Flatbush are also routinely tested bilaterally even if only one side is symptomatic.  *See id.*  Similarly, upper limbs and lower limbs are both tested regardless of whether the patient's symptoms are localized in the upper or lower extremities.  *See id.*

269.    Defendants also either missed or ignored actual conditions that the documented results of the NCVs identified.  For example, in one patient purportedly tested by Blackman, NCV results indicated the patient suffered from a conduction block in a left median nerve, which would denote demyelination, a potentially serious condition that Blackman's report simply ignored.

### c.    Fraudulent SSEPs and BEPs

270.    Patients at 1786 Flatbush were also subjected to medically unnecessary SSEPs and BEPs.  From October 2013 through at least October 2015, evoked potentials were ordered, performed, and billed by the Physician Defendants and by Allay, Island Life, JPF Medical, KP Medical, and PFJ Medical.

### i.    SSEPs

271.    SSEPs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents.  The potentials evoked by this electrical stimulation are then recorded by electrodes attached to the scalp.  SSEPs are most often used in conjunction with spinal surgery to alert surgeons to potential problems during surgery.  SSEPs have little to no value in diagnosing and localizing radiculopathy.  The test involves stimulating major "mixed" nerves at the wrist (median nerve) and ankle (tibial nerve).  "Mixed" nerves contain nerve fibers

that travel to more than one nerve root (e.g., the median nerve contains sensory fibers that run through the C6 and C7 nerve root).  Thus, it is impossible to know from an abnormal result which nerve root is an issue, and a normal result does not rule out a nerve root issue because the SSEP signal could simply have bypassed the abnormal root.  Additionally, SSEP signals travel along the peripheral nerves and the spinal cord to the brain.  As a result, any slowed or abnormal SSEP can be caused by a problem at any point along the path of the signal — in the peripheral nerve, the nerve root, the spinal cord, or the brain.

272.   The AANEM has produced a report as to the clinical use of SSEPs, which is attached as Exhibit 25.  *See* Ex. 25 at 17.  According to the SSEP Recommended Policy, SSEPs "are generally not useful in the evaluation of acute radiculopathies," and the amount of information gained from SSEPs as to radiculopathies is "low compared to information obtained from the neurological examinations, needle electromyography (EMG), and H-Reflex studies."

273.   The SSEPs performed on patients of Parisien, Dabiri, and Blackman were medically unnecessary.  SSEPs were performed on over 100 patients at 1786 Flatbush.  *See* Ex. 1.  They were purportedly ordered and performed for the purpose of diagnosing radiculopathy, yet, as noted above, they cannot reliably do so.  The patient files fail to document why patients allegedly needed SSEPs, and, regardless of what the test results showed, the results are not mentioned again in the patients' records and have no effect on treatment.  Moreover, the Physician Defendants performed SSEPs in a formulaic fashion on both the upper limbs and lower limbs for patients without regard to individual patients' particular needs.  The SSEP reports, regardless of whether they bear the signature of Parisien, Dabiri, or Blackman, virtually always conclude with the same sentence indicating a normal SSEP result: "The above

electrodiagnostic study revealed no evidence of delayed nerve conduction throughout the spinal nerve roots, spinal cord or brain stem."

## ii.    BEPs

274.    BEPs measure responses in brain waves that are stimulated by a clicking sound to evaluate the central auditory pathways of the brain.  The test is accomplished by placing the individual in a chair or bed, and requesting that the patient relax and remain still.  Electrodes are placed on the individual's scalp and on each earlobe.  Clicking noises or tone bursts are then piped through earphones, and the electrodes pick up the brain's response and record it on a graph.

275.    The indications for a BEP are extremely limited and thus their use should be rare. Legitimate clinical applications of BEPs include assessing hearing in newborns and identifying tumors of the auditory nerve (i.e., acoustic neuroma); intraoperative monitoring during neurosurgery of the brainstem; assessing hearing in individuals incapable of giving voluntary responses (e.g., young children, non-cooperative, or non-communicative patients); and diagnosing neurological conditions affecting the brainstem (principally multiple sclerosis and, less often, brainstem tumors).

276.    While none of the patients treated by Parisien, Dabiri, and Blackman reportedly had any of these conditions, Parisien, Dabiri, and Blackman routinely performed or supervised a technician who performed BEPs on at least 160 patients at 1786 Flatbush.  *See* Ex. 1.  The test reports are form documents containing no indication any effort was made to tailor the BEP to the individual patient.  Indeed, many reports purportedly authored by different Physician Defendants document the same "chief complaint" with the same typographical error which describes a patient "who presents who presents [sic] with well as [sic] general dizziness and balance problems."  Patient records do not indicate why the BEP was performed, and the documented

results of the BEP for every patient of which State Farm Mutual and State Farm Fire are aware were normal in both the right and left ear.

### d.   Functional Capacity Evaluations

277.   Additional medically unnecessary tests most patients at 1786 Flatbush undergo include Functional Capacity Evaluations.  *See* Ex. 1.  Functional Capacity Evaluations were performed at 1786 Flatbush and billed by Parisien, Dabiri, Pavlova, Blackman, Lacina, Allay, JPF Medical, KP Medical, and PFJ Medical.

278.   Functional Capacity Evaluations are meant to gauge whether a patient has sufficient strength, endurance, and ability to perform the patient's job, to assist in vocational rehabilitation, to determine a patient's maximal functional level at the time they are fully improved, and to assist in setting any limits on job tasks a patient can perform.  In accordance with the applicable fee schedule, Functional Capacity Evaluations should only be used "at the point of maximal medical improvement," and only when the patient:  1) is preparing to return to a previous job; 2) has been offered a new job; or 3) is working with a rehabilitation provider and a vocational objective is established.  The reasons for the Functional Capacity Evaluations must be documented and reports must include patient demographics including work history, indications for the evaluation, and a narrative with recommendations.  Because these tests are most often used to evaluate work tolerance and the necessity for work restrictions, they should be individually tailored for each patient and geared toward a specific diagnostic goal, such as determining if the patient can go back to their specific job or needs work restrictions or even a different job.

279.   The Functional Capacity Evaluations performed by Parisien, Dabiri, Pavlova, Lacina, and Blackman at 1786 Flatbush were medically unnecessary, were not individually tailored, and were given in a formulaic fashion, involving the same sets of tasks, to almost every

patient regardless of their unique complaints, response to treatment, work status, or work type. It is not claimed or documented that tested patients are "at the point of maximal medical improvement," but nonetheless tests are administered, often multiple times, after which the Predetermined Treatment Protocol continues. The records likewise do not indicate any patient is preparing to return to a previous job, has been offered a new job, is working with a rehabilitation provider, or has had a vocational objective established. Nor do the records document how, if at all, test results impacted patient treatment.

280.    Documentation of the Functional Capacity Evaluations submitted to State Farm Mutual and State Farm Fire consists of Functional Capacity Evaluation Reports. Patients purportedly perform six types of lifts, wherein the pounds of force they exert is recorded on a handwritten form. At some point thereafter, these measurements are imported into a software program which generates an eight-page Functional Capacity Evaluation Report with bar graphs and the patients' rating as compared to a normative average. These Functional Capacity Evaluation Reports reflect pervasive patterns that are not credible. For example, strength measurements for most patients are purportedly worse than the lowest 10th percentile, indicating a level of impairment that would be unusual in one patient with the types of injuries purportedly documented, let alone for a large number of patients. Additionally, in many cases patients do worse on subsequent tests without any discussion as to why patients purportedly undergoing treatment are not getting better.

281.    Further, Parisien, Dabiri, Pavlova, Blackman, Lacina, Allay, JPF Medical, KP Medical, and PFJ Medical submit charges for the Functional Capacity Evaluations using CPT Code 97750, the code for physical performance testing, not Functional Capacity Evaluations, which would properly be billed using CPT Code 97800. In this way, they fraudulently conceal

that they are, in fact, performing Functional Capacity Evaluations and that their tests are ineligible for reimbursement because they have not met the reimbursement requirements for Functional Capacity Evaluations in the applicable fee schedule.

### e. Fraudulent V-sNCT Testing

282.  Mollo and the Mollo Entities also order yet another medically unnecessary diagnostic test — the V-sNCT test — which is ordered for nearly every patient during chiropractic initial examinations.  Mollo and the Mollo Entities record in the Chiropractic Initial Reports that they are ordering "small pain fiber studies of the cervical/lumbar spine to evaluate pathology to the A-delta, A-Beta, and C sensory nerve fibers."  *See* Ex. 26.  Based on these orders, Mollo and the Mollo Entities subject many patients to V-sNCT tests, which are then billed to State Farm Mutual and State Farm Fire by Island Life and Penn Chiropractic P.C.  On at least one occasion, Parisien submitted a bill to State Farm Mutual for a V-sNCT test purportedly performed by chiropractor Sweet Ehigiegba at 1786 Flatbush.

283.  V-sNCT tests are non-invasive tests that, according to proponents of V-sNCT testing, purport to diagnose abnormalities only in the sensory nerves and sensory nerve roots. They do not and cannot provide any diagnostic information regarding the motor nerves and motor nerve roots.  V-sNCT tests are performed by administering electrical voltage through specific skin sites to stimulate sensory nerves in the arms, legs, hands, feet, and face.  The intensity of the electrical voltage is increased until the patient reportedly perceives a sensation from the stimulus caused by the voltage.  "Findings" are then made by comparing the minimum intensity of electrical voltage at which the patient announces he or she perceives some sensation to the purported normal ranges.

284.  The sensory nerves are comprised of several different kinds of nerve fibers, including the A-beta fibers, the A-delta fibers, and the C fibers.  According to proponents of V-

sNCT testing, V-sNCT tests allegedly can diagnose the existence, nature, extent, and location of any abnormal condition in each of these noted nerve fibers by using three different frequencies of electrical current.

285.    Mollo and the Mollo Entities know however, that V-sNCT tests are unable to truly diagnose the existence, nature, severity, or specific location of any abnormalities in the sensory nerves or any of the nerve fibers.  Among other things, Defendants know that V-sNCT tests cannot localize sensory loss to any specific place within the nervous system.  Electrical current or voltage must travel between two points and complete a circuit.  V-sNCT tests involve electrical current or voltage traveling from a probe placed at the test site through the limb being tested, through the torso to a ground electrode placed under the patient's back.  Because the electrical current or voltage can affect any nerve in proximity to the electrical path from the probe to the ground electrode, there is no way to know that the electrical stimuli are producing a sensation in any particular nerve.  Moreover, even if electrical current or voltage were stimulating a particular nerve, and a patient's statement of diminished sensation were indicative of an injury, there would be no ability to determine where along the path of that nerve from the limb to the brain — which includes the peripheral nerve, nerve roots, nerves in the spinal cord, and nerves in the brain — an injury existed.  As a result, V-sNCT tests cannot diagnose radiculopathies (injury at the nerve root) as any statement of diminished or heightened sensation could just as easily imply nerve injury somewhere along the nerve pathway other than at the nerve root.  Additionally, no reliable evidence proves that valid normal ranges of intensity required to evoke a sensation in fact exist to compare with the unique results from an individual's V-sNCT tests to arrive at a legitimate finding.

286.    Moreover, data from administration of the V-sNCT tests can be manipulated in a number of ways to produce any desired result, undermining any claim that the test is objective. In particular, "findings" at each site are either plotted by hand on a graph or analyzed by computer to draw conclusions and make diagnoses.  The data, however, can be adjusted by a variety of factors, including a belief (which has no support in medical science) that a particular patient is naturally hypoesthetic or hyperesthetic, and a "correction factor."  Even if the V-sNCT tests had some medical or diagnostic value, no reliable evidence proves any of these adjustments is necessary or appropriate or anything more than an opportunity for the individual analyzing the test results to reach a predetermined conclusion and use a manufactured finding of an abnormal condition to justify additional treatment that can be billed to insurers.

287.    Additionally, contrary to documents submitted to State Farm Mutual and State Farm Fire by Mollo and the Mollo Entities, (a) despite an explicit representation in the Chiropractic Initial Reports that the tests are ordered to "evaluate pathology to the A-delta, A-Beta and C sensory nerve fibers," no reliable evidence proves the different frequencies of electrical current used by the test can in fact stimulate and reliably test any or all of these three nerve fibers; (b) even if valid normal ranges of intensity required to evoke a sensation existed, no reliable evidence proves that a current perception threshold greater than the normal range would indicate a hypoesthetic condition (the sensory nerves have decreased function) or that current perception threshold less than the normal range would indicate a hyperesthetic condition (the sensory nerves are in a hypersensitive state); (c) even if an abnormal current perception threshold indicated either a hypoesthetic or hyperesthetic condition, no reliable evidence proves that the extent or cause of any such conditions could be identified from the V-sNCT test (indeed, numerous pathological and physiological conditions other than peripheral nerve damage can

cause hyperesthesia and hypoesthesia); (d) no reliable evidence proves V-sNCT tests provide any information that would have any value beyond that which could be gleaned from a routine history and physical examination of the patient; (e) no reliable evidence proves V-sNCT tests provide any information that would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots; (f) the V-sNCT tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an automobile accident; (g) at most the test would amount to a quantitative sensory test that has no clinical value; and (h) there would be no diagnostic advantage to using the V-sNCT tests to obtain information regarding the sensory nerve fibers where, as here, patients were also subjected at about the same time to NCVs and EMGs which are well established in the medical, neurological, and radiological communities for diagnosing the existence, nature, severity, and specific location of any abnormalities in both the sensory and motor nerves as well as the nerve roots.

288.    Consistent with the conclusion no reliable evidence supports the validity of V-sNCT tests, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of procedure codes ("CPT Codes") for physicians to use in describing their services for billing purposes, does not recognize a CPT Code for V-sNCT tests.   Further, the Center for Medicare and Medicaid Services ("Medicare") reviewed the efficacy of current perception threshold tests, which are essentially the same as V-sNCT tests, and issued a national coverage determination concluding current perception threshold tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) or radiculopathies and therefore are not compensable.

289.     Nonetheless, to support the fraudulent charges, Mollo and the Mollo Entities submit forms reflecting the data purportedly recorded during the test and boilerplate Electrodiagnostic Examination Reports (the "V-sNCT Reports").  Mollo and the Mollo Entities know they are all false and misleading in several material respects including: (a) there is no valid basis or support for many of the statements and claims about the V-sNCT; (b) there is no valid basis or support for many of the statements and claims about NCVs and EMGs; (c) there is no valid basis or support for many of the statements and claims about human physiology, the human nervous system, or the response of the human nervous system to injury; and (d) there is no valid basis or support for many of the statements and claims about electricity and the science of electrical engineering.

290.     The V-sNCT Reports purport to set forth findings.  In most instances, they conclude that "[f]indings suggesting pathology" exist at a specific nerve and, in a relatively small number of cases, that a hyperesthetic condition exists.  *See* Ex. 27.  Regardless, almost every test reaches the conclusion that the patients' results are abnormal, either with results that are "higher than average" or "lower than average."  *See id.*

291.     Finally, Mollo and the Mollo Entities bill State Farm Mutual and State Farm Fire for V-sNCT tests under the CPT Code 95999, which under the New York fee schedule governing No-Fault claims, is an "Unlisted neurological or neuromuscular diagnostic procedure."  A separate charge using this code is submitted for each nerve purportedly tested.  Defendants' bills purport to report testing of at least 14 nerves, and often as many as 32 separate nerves, resulting in charges from $1,022 to $2,360 for a single test.

### 6.     Injections

292.     Many patients treated at 1786 Flatbush are also subjected to medically unnecessary trigger point injections and dry needling procedures purportedly provided by the

Physician Defendants and billed by the Physician Defendants, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, and RA Medical.

### a.  Trigger Point Injections

293.   Trigger points, also known as trigger sites or muscle knots, are irritable portions of an individual's muscle associated with palpable nodules in taut bands of the muscle fibers. They may cause local pain at the site of the trigger point, can cause referred pain to another area of the body in well-documented referral patterns, and can result in reduced range of motion. Trigger points can also generate a local twitch response or spasm upon palpation of the affected area.  Trigger points may be caused by a number of factors, including acute or chronic muscle overload and acute trauma.

294.   A trigger point injection involves inserting a needle into the muscle knot or trigger point and injecting medication into the affected area.  The medication injected typically contains a local anesthetic and sometimes a corticosteroid, which is meant to anesthetize and relax the muscle in the trigger point, decrease inflammation, and provide pain relief.

295.   Multiple trigger point injections for any one patient may be appropriate depending on the patient's particular symptoms, but injections should be limited to the least number necessary.  Limiting the number and frequency of trigger point injections is particularly important when the injections include a corticosteroid because the side effects and dangers of corticosteroids are dose and frequency dependent.  Among these dangers, repeated administration of corticosteroids can cause adrenal suppression in which the body shuts down its own production of cortisone.  Corticosteroids can also suppress the body's immune system and increase the risk of infections, result in changes in blood sugar, changes in blood pressure, depression, mania, bone thinning, bone fractures, and osteonecrosis of the hip and shoulder.  For all of these potentially dangerous complications, the level of risk to an individual patient is

directly related to both the dose of corticosteroids given and to the frequency of administration. As such, the amount of corticosteroids used during trigger point injections and the frequency of administering trigger points injections with corticosteroids should be limited to the minimum amount medically necessary considering the risks to the patient.

296.   Risks of trigger point injections also include risks from the procedure itself, which involves inserting needles into patients, such as local and systemic infection, hematoma, pneumothorax, and local and systemic effects of the medications delivered.  Moreover, any use of local anesthetic can involve risks, particularly in increased volumes, including central nervous system toxicity which can lead to seizures and cardiac toxicity which can lead to arrhythmia and even death.

297.   In most circumstances, trigger point injections should only be repeated if the patient has experienced substantial pain relief with a prior injection.  Because of the dangers associated with corticosteroids in particular, subsequent trigger point injections that include corticosteroids should generally not be performed until several weeks have passed and the number of administrations limited to no more than three times in any six-month period.  Any treatments in excess of this should not be performed without documentation of the medical rationale to justify the risks to the patient and the documented, informed consent of the patient to these risks.

### b.      Dry Needling

298.   Dry needling is intended to address the same conditions as trigger point injections — trigger points or muscle knots.  It involves inserting a small gauge needle into the muscle knot or trigger point and mechanically breaking up the muscle tightness with rapid needle insertion in and out of the muscle.  Unlike trigger point injections, dry needling does not include injecting a solution into the muscle by needle.  The purported rationale for dry needling is that movement of

the needle can irritate the "knot" in the affected muscle fibers and cause it to break up, thereby permitting the patient to experience pain relief and increased range of motion.  Dry needling is similar to acupuncture in that both involve the use of needles placed in the body for treatment. But while acupuncture usually involves the insertion of multiple needles at the same time which are then left in the body for minutes, dry needling involves a single needle which is briefly inserted into the skin and then removed, and if necessary, inserted into a different area after being wiped with an alcohol swab.

299.   Dry needling is considered by Medicare and most insurance carriers to be experimental and unproven, and no peer-reviewed clinical studies support its use.

300.   As dry needling and trigger point injections typically treat the same conditions and represent alternative treatment options, even dry needling proponents recognize it would rarely be appropriate to perform dry needling at the same time as trigger point injections. Furthermore, dry needling insertions should be limited to the least number necessary.  And before subjecting a patient to repeated administration of dry needling, there should be documentation indicating the patient benefited from earlier dry needling procedures.

### c.   Defendants' Trigger Points and Dry Needling

301.   At 1786 Flatbush, contrary to the practices described above, Parisien, Blackman, Pavlova, Dabiri, and Lacina subjected some patients to excessive numbers of trigger point injections, almost always combined trigger point injections with excessive dry needling insertions, and inadequately documented those procedures, thereby exposing patients to unnecessary risks.  They failed to document patients' responses to prior procedures or frequently failed to identify indications that additional procedures could benefit patients.  They also failed to obtain informed consent from patients by failing to disclose the above-described risks.  In short, these treatments were medically unnecessary and potentially harmful.

302.    Although Parisien, Blackman, Dabiri, Pavlova, and Lacina treated different patients at different periods of time at 1786 Flatbush, they administered trigger point and dry needling injections in the same fashion.  Further, they collectively recommended and performed trigger point injections and dry needling on over one-third of the State Farm Mutual and State Farm Fire Insureds treated at 1786 Flatbush.  The procedures were often recommended during patients' initial examinations or during a follow-up examination early in the course of treatment. They would typically then be performed the same day they were recommended.

303.    The recommendations and performance of trigger point injections and dry needling were documented in on forms that purport to reflect diagnoses supporting injections and dry needling (the "Injection/Needling Treatment Forms").  The Injection/Needling Treatment Forms recorded that most patients purportedly suffered from pain in two or more regions and that their pain was a 7 on a scale of 1 to 10.  *See* Ex. 28.

304.    Additionally, the Injection/Needling Treatment Forms contain preprinted checkboxes of various diagnosis codes, known as ICD-9 codes, along with brief descriptions of those codes.   But, among other things, the Injection/Needling Treatment Forms contain erroneous descriptions of the diagnosis codes.  For example, one of the frequently checked diagnoses on the Injection/Needling Treatment Forms at 1786 Flatbush is for ICD-9 code 724.4, which the forms describe as "Acute Traumatic Lumbosacral Radiculitis."  *See id.*  The actual description for ICD-9 code 724.4, however, is "Thoracic or lumbosacral neuritis or radiculitis, unspecified."  Similarly, the Injection/Needling Treatment Forms used at 1786 Flatbush state that ICD-9 code 723.4, another diagnosis code frequently checked by Parisien, Blackman, Dabiri, Pavlova, and Lacina to support their claims for trigger point injections is "Post Traumatic Cervical-Thoracic Myofascitis," but the actual ICD-9 code description is "Brachial neuritis or

radiculitis," a completely distinct diagnosis.   In any event, none of these diagnoses would clinically warrant trigger point injections or dry needling as such procedures are intended to treat trigger points or taut bands of muscle fibers, not radiculopathy or pinched nerves.   Regardless, the Injection/Treatment Forms routinely conclude:  "The patient is advised to start on a course of Therapeutic Injections."

305.   While there are many different types of injections and the Injection/Needling Treatment Forms themselves provide checkboxes for five different injection options with space to identify other alternatives (e.g., nerve block injections, facet injections), Parisien, Blackman, Dabiri, Pavlova, and Lacina frequently select only trigger point injections.   It is inconceivable that so many patients had identical findings and needed injections of any kind, and even more inconceivable that such a high proportion needed trigger point injections but none was considered or recommended for any other type of injection or procedure.

306.   When performing these procedures, Parisien, Blackman, Dabiri, Pavlova, and Lacina also often billed for unusually high numbers of trigger point injections.  *See* Ex. 7.  On average, these Defendants billed State Farm Mutual and State Farm Fire for 12 or more different trigger point injections for each patient, with some patients allegedly receiving as many as 34 injections on a single visit.  *See id.*  Trigger point injections are often administered bilaterally without any indication patients required them on both sides of the body.  *See id.*

307.   Further, as described above, doctors should also typically allow sufficient time between each set of injections to (a) avoid rapid, repeated doses of corticosteroids; and (b) gauge if the injection is indeed giving long-lasting relief as opposed to short-term relief.  But patients at 1786 Flatbush are often injected on multiple occasions with little to no documentation that they experienced ***any*** relief from a prior set of injections, let alone long-lasting relief.

308.    Documentation of patient responses to injections is important for the licensed professionals involved in a patient's care, other licensed professionals who may treat the patient contemporaneously or subsequently, the patients themselves, and payers, and is particularly critical to decisions about whether to subject patients to the risks of subsequent procedures.  But at 1786 Flatbush, often the only record of patient response to an injection procedure is a check box in the Injection/Needling Treatment Form indicating that the "[p]atient tolerated the procedure well."   The patient is routinely reported to tolerate the procedure well without complications and no other report is made of the patients' response to the procedure.  *See* Ex. 7.  Thus, the Physician Defendants often fail completely to note the patients' self-reported pain levels, rendering it impossible to determine whether the injections are benefiting these patients.  Finally, to the extent there is any record of patient responses to the injections, they indicate that most patients continue to have pain after the injections and are not experiencing relief.  *See id.*

309.    The risks of Defendants' injection procedures are exacerbated by the fact that the Physician Defendants do not sufficiently document the amount of corticosteroid provided to each patient.   The Injection/Needling Treatment Forms contain what appears to be a preprinted, boilerplate notation that "each area/trigger point [is] injected with 0.5cc of 0.5% Marcaine via a 3cc syringe with a 1-1/2 x 25G sterile hypodermic needle." Yet many of the same Injection/Needling Treatment Forms also reflect that patients are injected with completely different types and/or doses of corticosteroid, such as 1% Lidocaine and 0.25% Marcaine.  These inconsistencies make it impossible to determine the amount of drugs provided to patients.  Clearly understanding and documenting the dose and frequency of administered medications is critical, particularly with potentially dangerous dose-related side effects like corticosteroids.  Recording the medication dose is not only necessary for patient safety; it is also required to track

patient responses to prescribed treatment, make medically informed decisions about changes in medication selection or dosage, evaluate and address any adverse and potentially life-threatening reactions, and monitor the total amount of medication over time.

310.   In some instances, trigger point injections are performed on patients at 1786 Flatbush in a manner that increases the risk of injury.  For example, Blackman ordered an MRI to rule out a left knee torn ligament for a patient who presented with severe knee pain, yet proceeded to perform trigger point injections on her quadriceps.  Numbing the quadriceps muscles around the knee made the knee even more unstable and increased the risk of injury.

311.   Parisien, Blackman, Dabiri, Pavlova, and Lacina also subject many patients at 1786 Flatbush to dry needling procedures during the same treatment sessions in which they perform the trigger point injections.

312.   These dry needling procedures are medically unnecessary and make no sense in light of the trigger point injections which are performed on the same date, for at least six reasons. *First*, it is questionable whether the experimental and unproven technique can provide any benefit.  *Second*, even if it could, while dry needling and trigger point injections typically treat the same conditions and represent alternative treatment options supported by the same clinical rationales, dry needling is often performed at the same time and on the same muscles as the trigger points.  *Third*, the Physician Defendants frequently administer more than 20 separate dry needling insertions during a single treatment session with several patients receiving as many as 60 separate dry needling insertions.  It is inconceivable that any one patient would need so many dry needling insertions, and even more inconceivable that so many patients would need such a high number.  *Fourth*, dry needling insertions are often made bilaterally without any indication they are required on both sides of the body.  *Fifth*, dry needling is performed repeatedly on

patients over multiple visits without any indication that patients experienced any improvement from a prior procedure. *Sixth*, the records do not document the type or gauge of needles being used or how the procedure is performed other than to identify the muscles to which it is applied.

313. Further, unlike trigger point injections, which are a recognized therapeutic procedure and have a designated CPT Code, dry needling does not have a specific CPT Code for billing purposes. At 1786 Flatbush, dry needling is billed to State Farm Mutual and State Farm Fire using CPT Code 20999, the code for an "unlisted procedure, musculoskeletal system, general." Unlike the CPT Code used for trigger point injections, which is limited to a single unit of CPT Code 20553 regardless of how many muscles are injected, there are no such limitations for CPT Code 20999. For example, patient J.H. purportedly received a staggering 60 dry needle insertions from Lacina on a single date of service, for which Lacina submitted charges to State Farm Fire totaling $4,575, in addition to other charges submitted by him on that same day. *See* Ex. 29. Parisien, Blackman, Dabiri, and Pavlova perform dry needling on patients at 1786 Flatbush and subject patients to excessive insertions not because the procedures are medically necessary, but in order to submit multiple charges for inordinate amounts.

314. Similarly, Parisien, Blackman, Dabiri, Pavlova, and Lacina frequently inflate their charges for trigger point injections by representing they are performed using ultrasonic guidance, allowing them to submit a charge for CPT Code 76942. But needle placement for trigger point injections is a routine and fairly simple aspect of the procedure and it would be extremely unusual for ultrasonic guidance to be necessary to assist trigger point procedures. Nor do Defendants' medical records document why such ultrasonic guidance was necessary. Moreover, even if there were a clinical need for ultrasonic guidance (which there is not), in order to bill

CPT Code 76942 one must prepare a separate written report which Defendants fail to create and/or submit.

### 7. Durable Medical Equipment and Orthotics

315. Patients treated at 1786 Flatbush are also prescribed and provided medically unnecessary Supplies, including DME and Orthotics, provided by the DME Defendants. At 1786 Flatbush, the Physician Defendants routinely prescribe a common laundry list of items, often include many items that could not possibly be needed by the many patients for whom such prescriptions are written, and prescribe the Supplies in a way that allows the DME Defendants to circumvent applicable fee-schedule limitations and inflate their charges. Medically unnecessary Supplies for patients of the Physician Defendants are then provided by the DME Defendants. These DME Defendants (i) purport to deliver to patients and bill for different and more expensive items than prescribed; (ii) fraudulently inflate charges for items for which there was no established charge under the applicable fee schedule; and (iii) at least in some instances, bill for items that are not provided at all.

### a. Claims for Supplies under the No-Fault Laws

316. DME generally consists of items that can withstand repeated use and are primarily used for medical purposes by individuals in their homes. Orthotic devices generally consist of supports for the neck, back, and other body parts, such as cervical collars and lumbar supports ("LSOs").

317. Since October 2004, the fee schedule applicable to New York No-Fault claims for DME and orthotic devices has provided, in pertinent part, that "the maximum permissible charge for the purchase of [DME], . . . and orthotic . . . appliances shall be the fee payable . . . under the New York State Medicaid program at the time such equipment and supplies are provided. . . [I]f the New York State Medicaid program has not established a fee payable for the specific item,

then the fee payable shall be the lesser of: (1) the acquisition cost (i.e., the line item costs from a manufacturer or wholesaler, net of any rebates, discounts, or other valuable consideration, mailing, shipping, handling, insurance costs, or any sales tax) to the provider plus 50%, or (2) the usual and customary price charged to the public."  12 N.Y.C.R.R. § 442.2.

> **b.     The Physician Defendants Prescribe Medically Unnecessary Supplies**

318.    The Physician Defendants and others routinely prescribed medically unnecessary Supplies.

319.    Prescriptions are typically issued for two and sometimes three separate bundles of Supplies.  A first bundle of Supplies ("Bundle A") is prescribed at the initial visit and typically includes at least the following:  (a) mattress; (b) heating pad; (c) bed board; (d) at least one and sometimes two cervical collars; (e) at least one and sometimes two LSOs; (f) a lumbar cushion and sometimes also a cervical pillow; and (g) other items.  *See* Ex. 30.  Often, only a few days later, a second bundle of Supplies ("Bundle B") is prescribed and typically includes at least the following:  (a) electrical muscle stimulation device ("EMS Unit"); (b) a whirlpool; (c) massager; and (d) other items.  *See* Ex. 31.  Beginning in around April 2014, patients were also prescribed, a few days after the second bundle, a third bundle of Supplies ("Bundle C") that would typically include at least the following:  (a) a pneumatic compressor; (b) a cervical traction unit with pump; and (c) other items.  Bundle C is purportedly delivered to the 1786 Flatbush patients by Quality Custom.  *See* Ex. 32.

320.    As shown in the chart attached as Exhibit 8, the Physician Defendants routinely prescribe, on average, 12 or more Supplies, with some patients prescribed as many as 18 Supplies.  It is inconceivable that so many patients would need so many articles of DME and

orthotics, would need precisely the same Supplies, and would need these identical Supplies at the same moment in their course of treatment.

321.    In addition, the types and amount of orthotics ordered do not make sense particularly given the patient population of fully ambulatory individuals who have purportedly suffered relatively minor soft-tissue injuries and are being sent by their healthcare providers for, among other things, physical therapy, acupuncture, and chiropractic manipulations.  Among the purposes of lower back supports, LSOs, cervical collars, and knee, wrist, elbow, and shoulder orthoses is to restrict and limit movement.  Physicians typically prescribe such devices to restrict movement when a patient is in intense pain that is aggravated by movement or there is a concern about stability.  Appropriate treatment for patients who are trying to heal and rehabilitate soft-tissue injuries, however, requires movement of the injured tissues, and even the Predetermined Treatment Protocol purports to include treatment for precisely that purpose, including physical therapy and chiropractic manipulations.  Under such circumstances, it should be unnecessary, and in fact contraindicated, to provide restrictive orthotics for any region of the body, yet the Physician Defendants routinely prescribe orthotics for multiple regions.  *See* Ex. 8.

322.    Moreover, it does not make sense that many patients would be prescribed and provided two cervical collars, two LSOs, or two cushions.  *See id.*

323.    Prescriptions were also written in a way to conceal the true volume and nature of Supplies prescribed and provided.  First, each bundle of Supplies was usually the result of not one but several separate prescription documents and submissions, sometimes written on the same day or only days apart.  The typical Initial Examination Reports contain preprinted language stating that after the examination, "[t]he patient [was] advised to use at home" certain Supplies. The form contains a list of 22 possible Supplies that the Physician Defendants checked to

designate particular items prescribed.  *See* Ex. 20 at 7 & 14.  The standard Initial Examination Report does not contain an option for "other" or a blank for the physician to prescribe any Supplies not on the list.  The Physician Defendants at 1786 Flatbush also used a form entitled Medical Supply Prescription, which contains a list of 25 items with check boxes.  *See* Ex. 33. The use of multiple prescriptions, sometimes signed by different physicians and sometimes involving a separate prescription for each item on a single day, and spreading of submissions into bundles over time served to hide the significant volume, as well as the nature of the Supplies that were being prescribed and provided.

324.    In addition, in some instances, the Physician Defendants purport to support the medical necessity of Supplies by signing letters of medical necessity.  But these boilerplate letters use standard language to describe the purported need for and benefits of the Supplies.  *See* Ex. 34.  The documentation does not indicate that any patient was instructed in use of the Supplies, how any patient responded to the Supplies, or even whether any of the patients used the Supplies.

325.    Finally, a series of DME companies were utilized to submit charges to State Farm Mutual and State Farm Fire at different periods of time.  From April 2013 to approximately March 2014, Maiga submitted bills to State Farm Mutual and State Farm Fire for Bundle A and Bundle B.  Thereafter, from March 2014 until April 2015, Madison submitted bills for Bundle A. Around the same time that Maiga ceased billing State Farm Mutual and State Farm Fire in March 2014, Defendants began to submit bills for Bundle C through Quality Custom.  In April 2015, State Farm Mutual and State Farm Fire began receiving bills for Bundle A from PHCP and Quality Health.  Ex. 8.  In July 2016, Quality Health ceased billing State Farm Mutual and State Farm Fire for Supplies provided to patients at 1786 Flatbush.  At the same time, State Farm

Mutual and State Farm Fire began receiving bills from AB Quality for the same Supplies previously provided by Quality Health, which were supported by nearly identical form documentation.

### c.      The DME Defendants Fraudulently Inflated Their Charges for Supplies

326.    Each DME Defendant used the prescriptions written by the Physician Defendants to exploit the No-Fault Laws and charge inflated amounts for medically unnecessary Supplies.

### d.      Fraudulent Charges for Orthotics

327.    The DME Defendants also routinely purported to provide and bill for more expensive orthotics to fill generic prescriptions, rather than more basic and less expensive items, without any support or documentation as to why the more expensive and elaborate orthotics were necessary to fill these prescriptions for basic orthotics.

328.    Cervical collars are among the most common orthotic devices purportedly provided by the DME Defendants and prescribed by the Physician Defendants.  They are worn around the neck to restrict movement and relieve muscle tension.  Various types of cervical collars are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $6.80 to $357 for eight specific types of cervical collars, each of which is described by a particular HCPCS Code ranging from L0120 to L0174.  Absent some express indication in a prescription form or other documentation that a more sophisticated cervical collar is necessary, prescriptions for a cervical collar should be filled with a flexible, non-adjustable foam cervical collar and billed under HCPCS Code L0120 at $6.80 (a "basic cervical collar").  If a two-piece collar is prescribed, the prescription can be filled with several different devices including a semi-rigid thermoplastic, two-piece collar and billed under HCPCS Code L0172 for $75.

329.    The Physician Defendants prescribe cervical collars and remarkably, for some patients, Defendants prescribe two cervical collars — one typically designated as a "cervical collar (2ps)" and the other as "Advanced Cervical Collar."  The Physician Defendants typically prescribe the two collars in separate prescriptions and bill for them with separate submissions. The prescriptions provide no detail or explanation as to what type of two-piece collar should be provided or what is meant by an "Advanced" cervical collar.  As a result, State Farm Mutual and State Farm Fire have not been provided with documentation indicating that anything more than a basic cervical collar was necessary for any given patient.  Absent an indication to the contrary, the DME Defendants should have filled these prescriptions with a basic cervical collar under HCPCS Code L0120 and billed $6.80, or at most provided a two-piece collar under Code L0172 and billed $75.

330.    Nevertheless, the DME Defendants routinely purported to provide and bill using HCPCS Code L0174 which is for a "cervical collar, semi-rigid thermoplastic foam, two-piece with thoracic extension" and using HCPCS Code L0190 which is for a "cervical multiple post collar."  Both collars are more sophisticated and expensive.  It is extremely uncommon to use both L0174 and L0190, yet the DME Defendants routinely charged for both items.  The DME Defendants billed State Farm Mutual and State Farm Fire between $130 and $362.34 for the L0174 and $311.75 for the L0190.

331.    LSOs are another common orthotic device purportedly provided by the DME Defendants.  They are worn around the torso and extend below and above the waist to restrict movement and relieve muscle tension in the lower back. Various types of LSOs are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $43 to $1,150 for sixteen specific types

of LSOs, each of which is described by a particular HCPCS Code ranging from L0625 to L0640. Absent some express indication in a prescription form or other documentation that a more sophisticated LSO is necessary, prescriptions for a LSO should be filled with a flexible LSO and billed under HCPCS Code L0625 at $43 (a "basic LSO"). The Physician Defendants routinely prescribe two LSOs for almost every patient — one typically designated simply "LSO" and the other as "LSO APL (Custom Fitted)." The Physician Defendants typically prescribe the two collars in separate prescriptions and the DME Defendants bill for them with separate submissions. Regardless of whether it was appropriate in some circumstances to prescribe and provide two LSOs, State Farm Mutual and State Farm Fire have not been provided with documentation indicating anything more than a basic LSO was necessary. Thus, the DME Defendants should have filled prescriptions with a basic LSO under HCPCS Code L0625 and billed $43, or with a custom-fit LSO under HCPCS Code L0630 and billed $127.26. Nevertheless, the DME Defendants each routinely purported to provide an LSO under HCPCS Code L0627 and bill $322.64 and also "customized" LSO under HCPCS Code L0631 and bill $806.64. Moreover, the use of the applicable HCPCS Code L0631 and/or the prescription from one of the Physician Defendants for a "custom fitted" LSO, indicated to State Farm Mutual and State Farm Fire that the device was in fact "customized to fit a specific patient by an individual with expertise." But, even if the DME Defendants actually provided custom fitted LSOs, the charges would be fraudulent because: (a) the devices were not medically necessary; (b) the charges are substantially more than the amount to which the DME Defendants would have been entitled under the No-Fault Laws for the basic orthotics; and (c) it is unlikely that any custom fitted LSOs were medically necessary in that there is little, if any, indication in Defendants'

documentation that they performed any of the necessary fitting or adjustments for custom fittings or had the expertise to do so.

332.    The DME Defendants also purported to provide knee orthotics to some patients. They are worn around the knee to restrict movement and relieve muscle tension.  Various types of knee orthoses are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $65 to $1,107.70 for fifteen specified knee orthoses, each described by a particular HCPCS Code ranging from L1810 to L1860.  Absent some express indication in a prescription form or other documentation that a more sophisticated knee orthosis is necessary, prescriptions for a knee orthosis should be filled with an elastic knee orthosis with joints and billed under HCPCS Code L1830 at $65 (a "basic knee orthosis").  The Physician Defendants' prescriptions typically say no more than "Knee Support" or "Knee Brace," and State Farm Mutual and State Farm Fire have not been provided with documentation indicating that anything more than the most basic knee orthosis was necessary.  Thus, the DME Defendants should have filled prescriptions with a basic knee orthosis under HCPCS Code L1830 and billed $65.  Nevertheless, the DME Defendants often purported to provide a knee orthosis with adjustable knee joints under Code L1832 for $549.18 and for $607.55.

333.    The DME Defendants also purported to provide shoulder orthosis to some patients.  These are worn around the shoulder to restrict movement and relieve muscle tension. Various types of shoulder orthoses are available depending on the unique circumstances of each patient.  During the relevant period, the applicable fee schedule established prices ranging from $40 to $896.92 for seven specific types of shoulder orthoses, each of which is described by a particular HCPCS Code ranging from L3650 to L3677.  Absent some express indication in a

prescription form or other documentation that a more sophisticated shoulder orthosis is necessary, prescriptions for a shoulder orthoses should be filled with a prefabricated, off-the-shelf shoulder orthosis under HCPCS Code L3650 or L3660 at $40 (a "basic shoulder orthosis"). The Physician Defendants' prescriptions typically say no more than "Shoulder Support," and State Farm Mutual and State Farm Fire have not been provided with any documentation indicating that anything more than the most basic shoulder orthosis is necessary.   Thus, Defendants should have filled prescriptions with a basic shoulder orthosis under L3650 or L3660 and billed $40.  Nevertheless, the DME Defendants purported to provide shoulder orthosis under HCPCS Code L3965 (which represents a mobile arm support designed to be attached to a wheelchair) for $806.64.  This HCPCS Code used was not even on the fee schedule at the time it was billed.

### e. The DME Defendants Purported to Deliver and Bill for Other, Different and More Expensive Items than Were Prescribed

334.    The DME Defendants also routinely provide other, different and more expensive DME than the items actually prescribed.

335.    The Physician Defendants prescribe mattresses, which should be fulfilled by supplying foam pads that can be placed on top of a regular mattress and billing $19.48 per foam pad using HCPCS Code E0199.  The DME Defendants, however, routinely purport to provide and bill for dry pressure mattresses charging $204.24 or $306.26 under HCPCS Code E0184. HCPCS Code E0184 indicates the mattress is being used for a patient who is either completely immobile or has limited mobility, pressure ulcers and impaired nutritional status, incontinence, altered sensory perception, or compromised circulatory status.

336.    Similarly, the Prescribing Physicians prescribe bed boards for which the DME Defendants provided different and substantially more expensive items.  Bed boards are not on

the applicable fee schedule, but can be easily acquired for no more than $35 from any legitimate DME wholesaler.  Thus, even if a bed board was necessary and provided it would not be appropriate to charge more than $52.50 (i.e., no more than 150% of the acquisition cost.  *See infra* ¶ 338.  Yet, the DME Defendants did not bill for providing bed boards but for over-the-bed tables — devices placed over a bed-ridden individual to allow that person to eat in bed — and billed $101.75 or $101.85 under HCPCS Code E0274.

337.    Similarly, the Physician Defendants prescribe lumbar cushions and often also either cervical pillows or back-positioning cushions, without any support that patients need multiple support cushions.  Regardless, the DME Defendants should have filled prescriptions for lumbar cushions and back-position cushions with cushions billed at $22.04 under HCPCS Code E0190.  The DME Defendants, however, purport to fill prescriptions for back-positioning cushions with a wheelchair back cushion under E2614 for $491.77 and purport to fill prescriptions for lumbar cushions with a positioning car seat under HCPCS Code T5001 for $513.75 (a device intended for use in a vehicle by persons with special orthotic needs such as muscular dystrophy or cerebral palsy that cannot be met by less costly alternatives).  There is no justification for patients to be prescribed and provided multiple cushions and car seats.  In addition, there is no documentation establishing that the patients for whom these expensive and unusual devices are purportedly provided are wheelchair bound or suffer from special orthotic conditions such that standard devices would be insufficient.

### f.    Fraudulent Charges for Items Not on Fee Schedule

338.    The DME Defendants also purport to provide a number of items that are not on the applicable fee schedule, for which they fraudulently inflate their charges.  Under the No-Fault Laws, if an item is not on the fee schedule, a DME provider may charge no more than the

*lesser of* 150% of its acquisition cost or its usual and customary charge to the public. 12 N.Y.C.R.R. § 442.2.

339. The DME Defendants routinely charge between $699 and $735.25 for an EMS Unit, $408 for a whirlpool, and $79.95 or $179.95 for a massager. These submissions constitute representations that these amounts are the lesser of either 150% of their acquisition costs or their usual and customary charge to the public. But the DME Defendants' true costs to acquire these items are a small fraction of what these submissions represent and the DME Defendants' true acquisition costs do not support their charges under the fee schedule. In fact:

     (a)    EMS Units for which the DME Defendants routinely charge between $699 and $735.25 are typically available from many legitimate DME wholesalers for between $30 to $65, and therefore 150% of such acquisitions costs should have been no more than $97.50.

     (b)    Whirlpool units for which the DME Defendants routinely charge $408 are typically available from many legitimate DME wholesalers for about $56, and therefore 150% of such acquisition costs should have been no more than $84.

     (c)    Massager units for which the DME Defendants routinely charge $79.95 or $179.95 are typically available from many legitimate DME wholesalers for between $25 to $35, and therefore 150% of such acquisition costs should have been no more than $52.50.

Thus, even if these Supplies were medically necessary (which they were not), appropriate charges for such Supplies should have been only a fraction of the charges the DME Defendants submitted for these items.

       **g.**    **The DME Defendants' Documentation**

340. The DME Defendants also do not provide any documentation as to their acquisition costs for those items that are not on the fee schedule. The documents the DME Defendants do submit omit basic information about the Supplies, like the manufacturer, make, model, size, features, and functions. This prevents State Farm Mutual and State Farm Fire from

determining the true kind and quality of the items provided, whether those specific items are medically necessary, and the appropriate charges for them.

341.   When State Farm Mutual or State Farm Fire have asked for information regarding acquisition costs or usual and customary charges, the DME Defendants have refused to provide it, have claimed they do not keep such records, and have refused to attend requested EUOs at which they would be required to provide such information.  For example, on many occasions State Farm Mutual and State Farm Fire have requested that certain DME Defendants attend examinations under oath and yet only Quality Custom has ever appeared for an EUO.

**H.    Defendants' Further Efforts to Advance the Fraudulent Scheme**

342.   Defendants are obligated legally and ethically to act honestly and with integrity. Nonetheless, Defendants submitted or caused to be submitted, bills and supporting documentation that are fraudulent in that they represent that services were performed and were medically necessary and reimbursable when, in fact, they were not.

343.   The Physician Defendants, the Physical Therapy Defendants, the Chiropractor Defendants, and the Acupuncture Defendants submitted, or caused to be submitted bills, and supporting documentation to State Farm Mutual and State Farm Fire for the examinations, Tests, and treatment detailed above. These bills and supporting documentation are fraudulent because the services were not medically necessary and/or reimbursable, the pervasive patterns in these documents are not credible, and they do not reflect legitimate findings, diagnoses, testing, or treatment.

344.   The DME Defendants have submitted or caused to be submitted bills and supporting documentation to State Farm Mutual and State Farm Fire for Supplies.  These bills and supporting documentation are fraudulent because the Supplies were not medically necessary and the DME Defendants are not entitled to reimbursement as they purported to deliver to

patients and bill for different and more expensive items than were prescribed, exploited language in prescriptions to bill for more expensive items when less expensive items were all that were prescribed, billed for different items than were actually provided and fraudulently inflated charges for items for which there was no established charge under the applicable fee schedule.

345.    Further, the success of Defendants' scheme depends on concealing the existence of the Predetermined Treatment Protocol from State Farm Mutual, State Farm Fire, and other insurers to induce insurers to pay Defendants' fraudulent charges.  Defendants take affirmative steps to conceal the scheme by, among other things, submitting multiple bills for services purportedly rendered by the same providers on the same date of service.  Defendants submit bills in this manner because they know that insurers like State Farm Mutual and State Farm Fire rely on the contents of each individual bill and related supporting documentation to make a payment determination.

346.    To verify some of the claims that it had received, State Farm Mutual and State Farm Fire timely requested, on multiple occasions, EUOs from all Defendants.  Most Defendants failed and refused to comply with their legal obligations to provide State Farm Mutual and State Farm Fire with the properly and timely requested EUOs, which constituted a breach of a condition of coverage under the State Farm Mutual and State Farm Fire insurance policies. Defendants also failed to appear for EUOs to continue to conceal the above-described fraudulent conduct from State Farm Mutual and State Farm Fire.

## I.     Oleg Rybak and the Rybak Law Firm's Role Enforcing Collections

347.    Among the elements of the fraudulent scheme is for Defendants to bring lawsuits in state courts or arbitrations under the No-Fault Laws to seek reimbursement on claims that insurers have not paid.  Almost all of the suits and arbitrations brought for providers operating at 1786 Flatbush are brought by Oleg Rybak and the Rybak Law Firm.

348.     Less than two months after being admitted to practice law in New York, Oleg Rybak formed the Rybak Law Firm in June 2009.  By the end of 2009, the Rybak Law Firm had filed over 2,200 civil lawsuits to collect No-Fault benefits on behalf of providers.  Since 2009, the Rybak Law Firm has filed almost 90,000 lawsuits to collect No-Fault benefits on behalf of providers.  Of those lawsuits, almost 50,000 were on behalf of providers who rendered services either at 1468 Flatbush or 1786 Flatbush.  *See* Ex. 35.  Bank records reflect that Defendants have paid the Rybak Law Firm over $850,000 between 2011 and 2018.

349.     Many of these proceedings involve insurers denying reimbursement because a provider failed to verify its claim by failing to appear for an EUO.  Oleg Rybak and the Rybak Law Firm respond to these assertions through tactics intended to disguise the fraud scheme and the fraudulent nature of the claims and reap substantial profits.

350.     Oleg Rybak and the Rybak Law Firm pursued these claims through thousands of individual separate suits in state court.  Indeed as noted, between 2009 and 2018, the Rybak Law Firm filed almost 50,000 lawsuits on behalf of providers at 1468 Flatbush and 1786 Flatbush.  Even after this action was filed, the Rybak Law Firm filed over 3,500 lawsuits on behalf of 1786 Flatbush providers.  The multiplicity of proceedings served several purposes, including hiding connections between providers and claims, making it more difficult to discern that providers were under common control, increasing the difficulty for insurers and the courts to discern the fraudulent patterns in treatment that only became apparent when multiple claims were viewed together, and imposing litigation burdens and costs on insurers to increase the likelihood that they would not fight but settle the claims.

351.     Oleg Rybak and the Rybak Law Firm also submitted false affidavits on behalf of providers who operated at 1468 Flatbush, 1786 Flatbush, and other locations associated with the

Rybaks,[3] including on behalf of at least Maiga, Deng Acupuncture, Mollo, and Pavlova.  In these boilerplate affidavits, the affiant asserts that they attempted to schedule an EUO by calling State Farm Mutual and State Farm Fire, but no one ever called back.  *See* Ex. 36.  State Farm Mutual and State Farm Fire have either no record and/or no awareness of any such calls.  Moreover, it is inconceivable that so many different providers contacted so many different individuals at State Farm Mutual and State Farm Fire on so many occasions over so many years and not a single referenced phone call was returned.  Almost all of these affidavits were notarized by Oleg Rybak.  That they are boilerplate indicates that either he or members of the Rybak Law Firm prepared them.

352.    Oleg Rybak took other actions to block insurers from taking EUOs through which they might uncover the scheme, the relationships among the participants and the fraudulent nature of the claims.  Oleg Rybak and the Rybak Law Firm represent almost all of the providers operating at 1786 Flatbush, and represented many operating at 1468 Flatbush in responding to requests for EUOs by State Farm Mutual and State Farm Fire.  Oleg Rybak and the Rybak Law Firm often oppose these requests with letters containing unsupported objections, and insisting that proposed dates are inconvenient without offering alternatives.  Such letters are not intended to resolve disagreement or to cooperate with insurers' efforts to verify claims, but rather serve to thwart insurers' ability to take EUOs.

353.    Similarly, Oleg Rybak and the Rybak Law Firm engage in litigation tactics intended to obtain the proceeds of the fraudulent claims and increase the burden on insurers.  For

---

[3]   For example, affidavits were submitted on behalf of Chapa Products Corporation, which provided Supplies to patients at 552 East 180th Street, Bronx, New York.  Denobrega affirmed in an affidavit that "Barbara" sent her to work at 552 East 180th Street, that Denobrega negotiated her compensation for this work with Barbara, and that the circumstances of Denobrega's employment at 552 East 180th Street were the same as at 1786 Flatbush.  *See* Ex. 15.

example, Oleg Rybak and the Rybak Law Firm have served numerous complaints to collect benefits by mail under a rule that allows mail service only if the recipient acknowledges receipt. *See* N.Y. C.P.L.R. § 312-a.  Oleg Rybak and the Rybak Law Firm mailed numerous complaints to State Farm Mutual and State Farm Fire and although the insurers never acknowledged receipt, Oleg Rybak and the Rybak Law Firm moved for default judgments, and in some instances pressed for such defaults despite objection, knowing that the practice was a violation of the rule. On other occasions, Oleg Rybak and the Rybak Law Firm filed and pursued lawsuits to collect on bills that had already been paid or that already had been adjudicated knowing that recovery was barred.  Indeed, Oleg Rybak filed at least 27 lawsuits against another insurance carrier that did not issue insurance policies covering the accidents at issue, despite the facts that the courts, including an appellate court had ruled that the carrier was the wrong party.  *See, e.g.*, *Great Health Care Chiropractic, P.C. v. Omni Indem. Co.*, 977 N.Y.S. 2d 667 (N.Y. App. Div. 2013).

**J.    Justifiable Reliance by State Farm Mutual and State Farm Fire**

354.    State Farm Mutual and State Farm Fire are under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The bills and supporting documents that Defendants submitted, and caused to be submitted, to State Farm Mutual and State Farm Fire in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual and State Farm Fire to justifiably and reasonably rely on them.

355.    As a result, State Farm Mutual and State Farm Fire have incurred damages of at least $1 million.

356.    Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature.  Only when the bills and supporting documentation are viewed

together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

## V.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against all Defendants)

357.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

358.    Defendants, acting in concert and with a common purpose or plan, intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire by submitting or causing to be submitted bills and supporting documentation that contained false representations of material fact concerning patients treated at 1786 Flatbush.

359.    The false statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1 through 8 that:  (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when these Defendants did not legitimately reach such conclusions; and (c) the services and Supplies were performed, provided, medically necessary, and/or reimbursable, when, in fact, they either were not provided, not medically necessary, and/or not reimbursable.

360.    Defendants knew that the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, testing, injections, and Supplies were false and fraudulent when they were made.

361.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

362.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## SECOND CLAIM FOR RELIEF
## AIDING AND ABETTING FRAUD
### (Against All Defendants)

363.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

364.    Defendants conspired, agreed to, and acted in concert to defraud State Farm Mutual and State Farm Fire, and did defraud State Farm Mutual and State Farm Fire, through the submission of false and fraudulent statements of material fact to State Farm Mutual and State Farm Fire as described above in the First Claim for Relief.

365.    Defendants substantially assisted in defrauding State Farm Mutual and State Farm Fire.  Defendants submitted or caused to be submitted bills and supporting documentation that contained false and fraudulent misrepresentations of material fact to State Farm Mutual and State Farm Fire.

366.    The false and fraudulent statements of material fact include the representations in each and every claim described in the charts attached hereto as Exhibits 1 through 8 that:  (a) patients were legitimately examined and tested to determine the true nature and extent of their injuries, when they were not; (b) each patient's condition was related to an automobile accident and no other contributing factors, when these Defendants did not legitimately reach such conclusions; and (c) the services and Supplies were performed, were provided, were medically

necessary and/or were reimbursable, when, in fact, they either were not provided, not medically necessary, and/or not reimbursable.

367.    Defendants knew that the above-described misrepresentations made to State Farm Mutual and State Farm Fire relating to the purported examinations, treatment, testing, injections, and Supplies were false and fraudulent when they were made.

368.    Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

369.    As a result of their justifiable reliance on Defendants' misrepresentations, State Farm Mutual and State Farm Fire have incurred damages of at least $1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### THIRD CLAIM FOR RELIEF
### RICO VIOLATION OF 18 U.S.C. § 1962(c)
### (Against All Defendants)

370.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

371.    Defendants constitute an association-in-fact "enterprise" ("the 1786 Flatbush Fraudulent Treatment Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.  The members of the 1786 Flatbush Fraudulent Treatment Enterprise are and have been joined in a common purpose, namely to defraud State Farm Mutual, State Farm Fire, and other insurance companies by submitting, and causing to be submitted, bills and supporting documentation that are fraudulent for services and Supplies that were not provided, were not medically necessary, and/or were not legitimately entitled to reimbursement for patients treated at 1786 Flatbush.  Although different members

have performed different roles at different times, they have operated as a continuing unit with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose — to defraud State Farm Mutual and State Farm Fire through fraudulent insurance claims — with sufficient longevity to accomplish that common purpose.  Specifically, Parisien, Dabiri, Blackman, Pavlova, and Lacina purported to legitimately examine patients at 1786 Flatbush, diagnose them with conditions to support the alleged need of the Predetermined Treatment Protocol of services that they could perform, or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and then ordered and performed additional injections and other services, which were billed by the Physician Defendants.  Mollo, Mollo P.C., Island Life, ACH Chiropractic, and Energy Chiropractic purported to provide chiropractic care and tests and diagnosed patients with conditions requiring additional services that they could perform or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and then ordered and performed additional services.  Deng and Deng Acupuncture purported to provide acupuncture treatment based, in part, on diagnoses, findings and recommendations of other members of the 1786 Flatbush Fraudulent Treatment Enterprise, and diagnosed patients with conditions requiring additional services that they could perform or that could be performed or provided by other members of the 1786 Flatbush Fraudulent Treatment Enterprise.  Masigla and Mariano purported to provide physical therapy and other services based on diagnoses, findings and recommendations of other members of the 1786 Flatbush Fraudulent Treatment Enterprise.  The DME Defendants provided Supplies based on prescriptions written by Parisien, Dabiri, Blackman, Pavlova, and Lacina for patients at 1786 Flatbush.  Tatiana Rybak secretly and unlawfully owned and controlled the professional corporations operating at 1786 Flatbush,

received kickbacks from providers of healthcare goods and services at 1786 Flatbush disguised as payments for services or rent, fraudulently billed for goods and services purportedly provided to patients at 1786 Flatbush that were not eligible for reimbursement and goods and services that were not medically necessary or not provided, and caused profits generated from these fraudulent bills to be covertly funneled to, or for the benefit of herself, Oleg Rybak, and other family members to conceal that they controlled and were the primary beneficiaries of these fraudulently obtained funds.  Oleg Rybak participated in, facilitated, supported, furthered, and profited from this scheme by, among other things, controlling the medical practice of a physician at 1468 Flatbush, the direct predecessor to 1786 Flatbush; covertly funneling the proceeds of activity at 1468 Flatbush to or for the benefit of himself, Tatiana Rybak, and other family members; exercising sufficient ownership and control over the activities and professional service corporations operating at 1786 Flatbush such that two employees who worked there asserted the Fifth Amendment in response to questions about his ownership and control; forming the DME Defendants with foreign-national nominee owners who may reside outside the United States and arranging to have their mail forwarded to his law office; exercising control over the physical space in which the clinic at 1786 Flatbush operated through a lease that on paper was with one of his family members; representing individuals who treated at 1786 Flatbush and who were in staged accidents to recover No-Fault Benefits and pursue claims and lawsuits for bodily injuries arising out of automobile accidents; covertly funneling the proceeds of activity at 1786 Flatbush and the professional service corporations that operated there to or for the benefit of himself, Tatiana Rybak, and other family members; and bringing thousands of claims and suits against insurers to recover payment for services provided to patients of 1786 Flatbush and supporting suits with fraudulent affidavits and employing other tactics intended to disguise the scheme and

the fraudulent nature of the claims, and to reap substantial profits.  Each Defendant's participation and role was necessary to the success of the scheme.  No one Defendant was capable of carrying out the scheme without the participation of the other Defendants.  The 1786 Flatbush Defendants have acted with sufficient longevity to achieve their common goal of defrauding State Farm Mutual and State Farm Fire through fraudulent insurance claims.

372.    Each Defendant is or has been employed by and associated with the 1786 Flatbush Fraudulent Treatment Enterprise.

373.    Defendants have knowingly conducted and/or participated, directly or indirectly, in the conduct of the 1786 Flatbush Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm Mutual and State Farm Fire bills and supporting documentation that are fraudulent in that:  (a) patients were not legitimately examined and tested to determine the true nature and extent of their injuries; (b) each patient's condition was represented to be related to an automobile accident and no other contributing factors, when Defendants did not legitimately reach such conclusions; and (c) the examinations, diagnoses, treatment, testing and Supplies which were medically unnecessary, not provided, and/or not reimbursable, including but not limited to, all bills and supporting documentation submitted to State Farm Mutual or State Farm Fire for claims referenced in Exhibits 1 through 8.

374.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $1 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(c) for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), plus interest, and any other relief the Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**RICO CONSPIRACY VIOLATION OF 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

375.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 and Paragraphs 371 through 374 above.

376.     Defendants have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 1786 Flatbush Fraudulent Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit to State Farm Mutual, State Farm Fire, and other insurers bills and supporting documentation that are fraudulent for examinations, treatments, testing, injections, and Supplies which were medically unnecessary, not provided, and/or not reimbursable, including, but not limited to, all bills and supporting documentation submitted to State Farm Mutual or State Farm Fire for claims referenced in Exhibits 1 through 8.

377.     Each of the Defendants knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission of bills and supporting documentation that are fraudulent for examinations, diagnoses, treatments, testing, and Supplies, which were medically unnecessary, not provided, and/or not reimbursable, to State Farm Mutual, State Farm Fire, and other insurers.

378.    State Farm Mutual and State Farm Fire have been injured in their business and property by reason of Defendants' above-described conduct in that they collectively have paid more than $1 million based upon the fraudulent charges.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for violations of 18 U.S.C. § 1962(d) for compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), plus interest, and any other relief the Court deems just and proper.

### FIFTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against All Defendants)

379.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

380.    State Farm Mutual and State Farm Fire conferred a benefit upon the Defendants by paying Defendants' claims for services purportedly provided to patients treated at 1786 Flatbush and these Defendants voluntarily accepted and retained the benefit of those payments.

381.    Because the Defendants knowingly billed for or received money for services that were not medically necessary, not provided, and/or not reimbursable, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

382.    As a direct and proximate result of the above-described conduct of Defendants, State Farm Mutual and State Farm Fire have been damaged and Defendants have been enriched by more than $1 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Defendants for compensatory damages, plus interest and costs, and for such other relief as the Court deems equitable, just, and proper.

## SIXTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
### (Against All Provider Defendants)

383.    State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

384.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

385.    There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB, Masigla, Maiga, Madison, Quality Health, Quality Custom, AB Quality, and PHCP on the other hand, as to all charges for examinations, treatments, testing, injections, and Supplies that have not been paid to date and through the pendency of this litigation.  State Farm Mutual and State Farm Fire contend these Defendants are not entitled to reimbursement for any of these charges.

386.    Because these Defendants have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm Mutual and State Farm Fire, these Defendants are not entitled to any coverage for No-Fault Benefits for any of the claims at issue.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB, Masigla, Maiga, Madison, Quality Health, Quality Custom, Buslon, AB Quality, and PHCP are not entitled to collect No-Fault Benefits for all charges for examinations, treatments, testing, injections, and

Supplies that have not been paid to date and through the pendency of this litigation; and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

## SEVENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT BASED ON FAILURE TO APPEAR FOR EXAMINATIONS UNDER OATH
### (Against All Provider Defendants)

387.     State Farm Mutual and State Farm Fire incorporate, adopt, and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 356 above.

388.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

389.     There is an actual case and controversy between State Farm Mutual and State Farm Fire, on the one hand, and Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB, Masigla, Maiga, Madison, Quality Health, Quality Custom, AB Quality and PHCP, on the other hand, as to all charges that have not been paid to date and through the pendency of this litigation as a result of these Defendants' failure to appear for properly and timely requested EUOs.

390.     The failure of these Defendants to appear for properly and timely requested EUOs constitutes a breach of a condition of coverage under the State Farm Mutual and State Farm Fire insurance policies.

391.     Accordingly, State Farm Mutual and State Farm Fire contend the Defendants listed above are not entitled to reimbursement for any of these charges.

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request a judgment declaring that Parisien, Dabiri, Blackman, Pavlova, Lacina, Allay, FJL Medical, JFL Medical, JPF Medical, KP Medical, PFJ Medical, RA Medical, Mollo, Mollo P.C., ACH Chiropractic, Energy

Chiropractic, Island Life, Deng, Deng Acupuncture, Mariano, MSB, Masigla, Maiga, Madison, Quality Health, Quality Custom, Buslon, AB Quality, and PHCP are not entitled to collect No-Fault Benefits for charges that have not been paid to date and through the pendency of this litigation for failure to appear for properly and timely requested EUOs; and for supplementary relief, attorneys' fees, interest, and costs as this Court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury.

Dated: July 29, 2019
      Chicago, Illinois

<div align="center">

KATTEN MUCHIN ROSENMAN LLP

By:  */s/  Jonathan L. Marks*

</div>

Ross O. Silverman (NY Bar No. 4147922)
Jonathan L. Marks (NY Bar No. 5462874)
Anne Raven (Admitted *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone:  312.902.5200
Facsimile:  312.902.1061
ross.silverman@kattenlaw.com
jonathan.marks@kattenlaw.com
anne.raven@kattenlaw.com

Christopher T. Cook
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Telephone:  212.940.8800
christopher.cook@kattenlaw.com

*Attorneys for Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

State Farm Mutual Automobile Insurance Company
and State Farm Fire and Casualty Company,

<div align="center">Plaintiffs,</div>

v.

Francois Jules Parisien, M.D., et al.                    Case No. 1:18-cv-00289-ILG-ST

<div align="center">Defendants.</div>

## INDEX OF EXHIBITS TO SECOND AMENDED COMPLAINT

| Exhibit No. | Description |
|---|---|
| 1 | Patient Treatment Summary Appendix |
| 2 | Patient Initial M.D. Evaluation Treatment Summary Appendix |
| 3 | PT Treatment Summary Appendix |
| 4 | Chiro Treatment Summary Appendix |
| 5 | Patient Acupuncture Evaluation Appendix |
| 6 | Patient NCV/EMG Evaluation Appendix |
| 7 | Trigger Point Injections Appendix |
| 8 | DME and Supplies Appendix |
| 9 | "Dr. Ksenia Pavlova M.D." Sample Bills |
| 10 | NY vs. T. Rybuk October 27, 1999 Plea |
| 11 | Summary of Checks Written By Entities Operating at 1468 Flatbush |
| 12 | FL Division of Corporations MOR Properties, Inc. Filing Information Summary |
| 13 | Oceania V Deeds |
| 14 | Anti-Aging Spa Check Written to "Klara Pantin" Dated June 22, 2009 |
| 15 | Renee Denobrega Affidavit Dated May 22, 2018 |
| 16 | Sample DME Defendants' Delivery Receipts |
| 17 | Precision Medical Supply Invoices and Payments Chart |
| 18 | Summary of Checks Written By Entities Operating at 1786 Flatbush |
| 19 | Checks Written by Defendants to "Cash" Deposited into Les Levine Accounts |
| 20 | Sample M.D. Initial Evaluation Reports |
| 21 | Sample M.D. Follow Up Reports |
| 22 | Sample Chiro Daily Notes |
| 23 | Sample Chiro Re-Evaluation |
| 24 | Sample Acupuncture Initial Exam Reports |
| 25 | AANEM Policy with SSEP Report |
| 26 | Chiro Initial Evaluations |
| 27 | V-sNCT Testing |
| 28 | Trigger Point treatment form |
| 29 | J.H. Bill |
| 30 | DME Bundle A |

| Exhibit No. | Description |
|---|---|
| 31 | DME Bundle B |
| 32 | DME Bundle C |
| 33 | Sample DME Prescription form |
| 34 | Sample Letters of Medical Necessity |
| 35 | Rybak Lawsuit Summary |
| 36 | Rybak Affidavits |

# *Exhibit 1*

## Exhibit 1 - 1786 Flatbush Treatment Summary

| RICO NO. | Claim No. | Date of Loss | Date of Birth | State Farm Fire/Auto | 1st DOS | Age | Patient Treatment Modalities | | | | Patient Testing | | | | | | | | | | | Date of Mailing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Chiropractic | Chiro 3-4 | Physical Therapy | Acupuncture | Muscle Testing | ROM | Functional Capacity | NCV/EMG | SSEP | BEP | V-sKCT | Dry Needling | Trigger Point | DME | | |
| 1 | 323CT1912 | 8/8/2013 | 8/16/1980 | STATE FARM FIRE | 8/19/2013 | 33 | X | X | X | X | X | X | X | X | X | X | | | X | X | X | 10/8/2013 |
| 2 | 323B18738 | 9/1/2013 | 5/19/1961 | STATE FARM MUTUAL | 9/4/2013 | 52 | X | X | X | X | X | X | X | X | X | | | | X | X | X | 10/7/2013 |
| 3 | 323B49716 | 9/2/2013 | 12/29/1962 | STATE FARM MUTUAL | 9/4/2013 | 51 | X | X | X | X | X | X | X | X | X | | | X | X | X | X | 10/10/2013 |
| 4 | 322X54166 | 8/4/2013 | 7/31/1984 | STATE FARM FIRE | 9/5/2013 | 29 | X | X | X | X | X | X | X | X | | | | | X | X | X | 9/27/2013 |
| 5 | 523545324 | 10/11/2013 | 5/20/1981 | STATE FARM FIRE | 10/15/2013 | 32 | X | X | X | X | X | X | X | X | | | | | X | X | X | 11/13/2013 |
| 6 | 323C65724 | 10/15/2013 | 3/14/1992 | STATE FARM FIRE | 10/17/2013 | 22 | X | X | X | X | X | X | X | X | | | | | X | X | X | 10/28/2013 |
| 7 | 323C66024 | 10/15/2013 | 11/9/1991 | STATE FARM FIRE | 10/17/2013 | 22 | X | X | X | X | X | X | X | X | | | | | X | X | X | 10/28/2013 |
| 8 | 323H77198 | 10/28/2013 | 2/12/1964 | STATE FARM MUTUAL | 10/29/2013 | 50 | X | X | X | X | X | X | X | X | | | | | X | X | X | 11/15/2013 |
| 9 | 383H10451 | 10/19/2013 | 3/20/1990 | STATE FARM FIRE | 10/30/2013 | 24 | X | X | X | X | X | X | X | X | | | | | X | X | X | 11/13/2013 |
| 10 | 323G36036 | 10/28/2013 | 9/26/1944 | STATE FARM MUTUAL | 10/31/2013 | 69 | X | X | X | X | X | X | X | X | X | | | | X | X | X | 11/25/2013 |
| 11 | 323G26528 | 10/6/2013 | 3/6/1956 | STATE FARM MUTUAL | 10/12/2013 | 58 | X | X | X | X | X | X | X | X | | | | | X | X | X | 11/15/2013 |
| 12 | 323627628 | 10/26/2013 | 11/27/1982 | STATE FARM MUTUAL | 11/1/2013 | 31 | X | X | X | X | X | X | X | X | | | | | X | X | X | 11/25/2013 |
| 13 | 323H00098 | 10/20/2013 | 12/27/1964 | STATE FARM FIRE | 11/5/2013 | 49 | X | X | X | X | X | X | X | X | | | | | X | X | X | 11/25/2013 |
| 14 | 323688061 | 11/9/2013 | 12/17/1981 | STATE FARM FIRE | 11/19/2013 | 31 | X | X | X | X | X | X | X | X | | | | | X | X | X | 12/9/2013 |
| 15 | 523773565 | 11/26/2013 | 11/9/1991 | STATE FARM MUTUAL | 12/1/2013 | 22 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/7/2014 |
| 16 | 52377C165 | 12/1/2013 | 7/31/1982 | STATE FARM MUTUAL | 12/2/2013 | 31 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/6/2014 |
| 17 | 52377C165 | 12/1/2013 | 6/4/1989 | STATE FARM MUTUAL | 12/2/2013 | 25 | X | X | X | X | X | X | X | X | | | | | X | X | X | 12/24/2013 |
| 18 | 52377C165 | 12/1/2013 | 11/16/1985 | STATE FARM MUTUAL | 12/2/2013 | 28 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/7/2014 |
| 19 | 523812124 | 12/1/2013 | 4/27/1962 | STATE FARM MUTUAL | 12/2/2013 | 51 | X | X | X | X | X | X | X | X | | | | | X | X | X | 12/20/2013 |
| 20 | 52380H917 | 11/21/2013 | 7/5/1985 | STATE FARM FIRE | 12/11/2013 | 28 | X | X | X | X | X | X | X | X | | | | | X | X | X | 12/23/2013 |
| 21 | 52BH04546 | 12/11/2013 | 10/10/1975 | STATE FARM FIRE | 12/13/2013 | 38 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/15/2014 |
| 22 | 52BH04546 | 12/11/2013 | 5/11/1984 | STATE FARM FIRE | 12/13/2013 | 30 | X | X | X | X | X | X | X | X | X | | | X | X | X | X | 1/15/2014 |
| 23 | 323750349 | 11/26/2013 | 8/21/1979 | STATE FARM MUTUAL | 12/20/2013 | 34 | X | X | X | X | X | X | X | X | | | | X | X | X | X | 1/16/2014 |
| 24 | 323750349 | 11/26/2013 | 7/19/2004 | STATE FARM MUTUAL | 12/26/2013 | 9 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/17/2014 |
| 25 | 323PG6669 | 12/23/2013 | 10/20/1986 | STATE FARM MUTUAL | 12/27/2013 | 27 | X | X | X | X | X | X | X | X | X | | | X | X | X | X | 1/27/2014 |
| 26 | 523G65866 | 1/6/2014 | 4/23/1990 | STATE FARM FIRE | 1/7/2014 | 24 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/20/2014 |
| 27 | 523G65866 | 1/6/2014 | 4/6/1991 | STATE FARM FIRE | 1/7/2014 | 22 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/20/2014 |
| 28 | 523G65866 | 1/6/2014 | 10/29/1985 | STATE FARM FIRE | 1/7/2014 | 28 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/20/2014 |
| 29 | 523G65866 | 1/6/2014 | 9/13/1988 | STATE FARM FIRE | 1/7/2014 | 25 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/20/2014 |
| 30 | 325J44494 | 1/3/2014 | 1/19/2002 | STATE FARM FIRE | 1/15/2014 | 12 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/28/2015 |
| 31 | 323H55096 | 12/20/2013 | 8/6/1994 | STATE FARM MUTUAL | 1/16/2014 | 19 | X | X | X | X | X | X | X | X | | | | | X | X | X | 1/27/2014 |
| 32 | 1139G6333 | 1/17/2014 | 5/24/1973 | STATE FARM FIRE | 1/17/2014 | 40 | X | X | X | X | X | X | X | X | | | | | X | X | X | 2/17/2014 |
| 33 | 1139G6333 | 1/17/2014 | 5/24/1973 | STATE FARM FIRE | 1/17/2014 | 41 | X | X | X | X | X | X | X | X | | | | | X | X | X | 2/17/2014 |
| 34 | 523580225 | 1/23/2014 | 1/8/1992 | STATE FARM FIRE | 1/24/2014 | 22 | X | X | X | X | X | X | X | X | | | | | X | X | X | 2/24/2014 |
| 35 | 523580225 | 1/23/2014 | 5/14/1990 | STATE FARM FIRE | 1/24/2014 | 24 | X | X | X | X | X | X | X | X | | | | | X | X | X | 2/17/2014 |
| 36 | 523580225 | 1/23/2014 | 6/24/1989 | STATE FARM FIRE | 1/24/2014 | 23 | X | X | X | X | X | X | X | X | | | | | X | X | X | 2/17/2014 |
| 37 | 523580225 | 1/23/2014 | 8/17/1982 | STATE FARM FIRE | 1/27/2014 | 31 | X | X | X | X | X | X | X | X | | | | | X | X | X | 2/15/2014 |
| 38 | 523T18096 | 1/31/2014 | 7/7/1985 | STATE FARM FIRE | 2/5/2014 | 28 | X | X | X | X | X | X | X | X | | | | | X | X | X | 2/17/2014 |
| 39 | 523T18096 | 1/31/2014 | 4/23/1991 | STATE FARM FIRE | 2/27/2014 | 22 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/5/2014 |
| 40 | 523T18096 | 1/31/2014 | 2/26/1974 | STATE FARM FIRE | 2/27/2014 | 40 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/17/2014 |
| 41 | 523T18096 | 1/31/2014 | 4/23/1991 | STATE FARM FIRE | 2/5/2014 | 22 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/17/2014 |
| 42 | 523T79830 | 2/4/2014 | 9/23/1972 | STATE FARM MUTUAL | 3/10/2014 | 41 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/31/2014 |
| 43 | 523T79830 | 2/4/2014 | 4/26/1976 | STATE FARM MUTUAL | 3/10/2014 | 38 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/31/2014 |
| 44 | 523T79830 | 2/4/2014 | 4/20/1994 | STATE FARM MUTUAL | 3/10/2014 | 20 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/21/2014 |
| 45 | 523T79830 | 2/4/2014 | 11/9/1965 | STATE FARM MUTUAL | 3/13/2014 | 48 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/3/2014 |
| 46 | 523632839 | 2/26/2014 | 4/28/1994 | STATE FARM FIRE | 2/27/2014 | 20 | X | X | X | X | X | X | X | X | X | | | X | X | X | X | 4/3/2014 |
| 47 | 523632839 | 2/26/2014 | 4/8/1982 | STATE FARM FIRE | 3/13/2014 | 32 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/17/2014 |
| 48 | 523632839 | 2/26/2014 | 2/8/2003 | STATE FARM FIRE | 2/27/2014 | 11 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/3/2014 |
| 49 | 523632839 | 2/26/2014 | 4/23/1991 | STATE FARM FIRE | 2/27/2014 | 23 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/1/2014 |
| 50 | 523263858 | 3/9/2014 | 1/28/1989 | STATE FARM FIRE | 3/10/2014 | 25 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/31/2014 |
| 51 | 523263858 | 3/9/2014 | 9/23/1972 | STATE FARM MUTUAL | 3/20/2014 | 41 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/31/2014 |
| 52 | 523263858 | 3/9/2014 | 10/8/1989 | STATE FARM FIRE | 3/20/2014 | 55 | X | X | X | X | X | X | X | X | | | | | X | X | X | 3/31/2014 |
| 53 | 523263858 | 3/9/2014 | 9/22/1988 | STATE FARM FIRE | 3/31/2014 | 25 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/9/2014 |
| 54 | 324235191 | 3/11/2014 | 11/9/1965 | STATE FARM MUTUAL | 4/8/2014 | 48 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/18/2014 |
| 55 | 523263858 | 3/9/2014 | 4/8/1982 | STATE FARM FIRE | 3/13/2014 | 32 | X | X | X | X | X | X | X | X | | | | | X | X | X | 5/1/2014 |
| 56 | 324353191 | 3/11/2014 | 2/16/2003 | STATE FARM MUTUAL | 3/17/2014 | 11 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/2/2014 |
| 57 | 324858071 | 3/15/2014 | 2/16/2003 | STATE FARM MUTUAL | 3/17/2014 | 11 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/1/2014 |
| 58 | 324858071 | 3/15/2014 | 6/28/1989 | STATE FARM MUTUAL | 3/20/2014 | 24 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/14/2014 |
| 59 | 324858071 | 3/15/2014 | 10/8/1989 | STATE FARM MUTUAL | 3/20/2014 | 55 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/9/2014 |
| 60 | 324858071 | 3/15/2014 | 9/22/1988 | STATE FARM MUTUAL | 3/31/2014 | 26 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/18/2014 |
| 61 | 324806720 | 4/2/2014 | 6/4/1984 | STATE FARM MUTUAL | 5/1/2014 | 29 | X | X | X | X | X | X | X | X | | | | | X | X | X | 5/1/2015 |
| 62 | 334062333 | 4/1/2014 | 8/12/1984 | STATE FARM MUTUAL | 4/9/2014 | 30 | X | X | X | X | X | X | X | X | | | | | X | X | X | 4/24/2014 |

Exhibit 1 - 1786 Flatbush Treatment Summary

| RICO NO. | Claim No. | Date of Loss | Date of Birth | State Farm Fire/Auto | 1st DOS | Age | Chiropractic | Chiro 3-4 | Physical Therapy | Acupuncture | Muscle Testing | ROM | Functional Capacity | NCV/EMG | SSEP | BEP | V-nKCT | Dry Needling | Trigger Point | DME | Date of Mailing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 63 | 334062333 | 7/25/1986 | 7/25/1986 | STATE FARM MUTUAL | 4/9/2014 | 28 | X | | X | X | X | X | X | X | X | X | X | | | X | 5/5/2014 |
| 64 | 523340233 | 7/9/2014 | 6/21/1992 | STATE FARM FIRE | 4/9/2014 | 22 | X | X | X | X | X | X | X | X | X | X | X | | | X | 5/14/2015 |
| 65 | 524F22910 | 4/9/2014 | 9/22/1988 | STATE FARM FIRE | 4/9/2014 | 25 | X | X | X | X | X | X | X | X | X | X | X | | | X | 5/6/2014 |
| 66 | 524F22910 | 4/9/2014 | 12/5/1989 | STATE FARM FIRE | 4/10/2014 | 24 | X | X | X | X | X | X | X | X | X | X | X | X | | X | 5/5/2014 |
| 67 | 524F22910 | 4/9/2014 | 9/27/1986 | STATE FARM FIRE | 4/10/2014 | 28 | X | | X | X | X | X | X | X | X | X | X | | | X | 5/6/2014 |
| 68 | 524F22910 | 4/9/2014 | 1/9/1987 | STATE FARM FIRE | 4/10/2014 | 27 | X | | X | X | X | X | X | X | X | X | X | | | X | 5/6/2014 |
| 69 | 524F22910 | 4/9/2014 | 4/21/1990 | STATE FARM FIRE | 4/28/2014 | 24 | X | | X | X | X | X | X | X | X | X | X | | | X | 5/15/2014 |
| 70 | 324F26382 | 4/14/2014 | 2/10/1988 | STATE FARM MUTUAL | 4/29/2014 | 26 | X | | X | X | X | X | X | X | X | X | X | X | | X | 5/15/2014 |
| 71 | 324477G112 | 4/25/2014 | 9/29/1963 | STATE FARM MUTUAL | 5/16/2014 | 51 | X | | X | X | X | X | X | X | X | X | X | | | X | 6/2/2014 |
| 72 | 324477G112 | 4/25/2014 | 10/11/1962 | STATE FARM MUTUAL | 5/19/2014 | 52 | X | | X | X | X | X | X | X | X | X | X | | | X | 6/2/2014 |
| 73 | 324477G112 | 4/25/2014 | 9/7/1975 | STATE FARM MUTUAL | 5/21/2014 | 38 | X | | X | X | X | X | X | X | X | X | X | X | X | X | 6/2/2014 |
| 74 | 384650K081 | 5/20/2014 | 10/8/1973 | STATE FARM FIRE | 5/28/2014 | 41 | X | | X | X | X | X | X | X | X | X | X | X | X | X | 6/16/2014 |
| 75 | 384650K081 | 5/20/2014 | 2/10/1993 | STATE FARM FIRE | 5/29/2014 | 21 | X | | X | X | X | X | X | X | X | X | X | | | X | 6/23/2014 |
| 76 | 384650K081 | 5/20/2014 | 11/9/1990 | STATE FARM FIRE | 6/2/2014 | 24 | X | | X | X | X | X | X | X | X | X | X | X | X | X | 6/24/2014 |
| 77 | 524M43414 | 6/2/2014 | 6/6/1991 | STATE FARM FIRE | 6/6/2014 | 22 | X | | X | X | X | X | X | X | X | X | X | | | X | 6/23/2014 |
| 78 | 524M43414 | 6/2/2014 | 2/5/1992 | STATE FARM FIRE | 6/9/2014 | 22 | X | | X | X | X | X | X | X | X | X | X | | | X | 6/23/2014 |
| 79 | 524M43414 | 6/2/2014 | 2/6/1992 | STATE FARM FIRE | 6/3/2014 | 22 | X | | X | X | X | X | X | X | X | X | X | | | X | 6/27/2014 |
| 80 | 524M43414 | 6/2/2014 | 3/23/1988 | STATE FARM MUTUAL | 6/6/2014 | 26 | X | | X | X | X | X | X | X | X | X | X | | | X | 6/24/2014 |
| 81 | 324480K058 | 6/6/2014 | 5/13/1957 | STATE FARM MUTUAL | 6/13/2014 | 57 | X | | X | X | X | X | X | X | X | X | X | | | X | 7/18/2014 |
| 82 | 324T1W735 | 6/6/2014 | 4/19/1978 | STATE FARM MUTUAL | 6/13/2014 | 36 | X | | X | X | X | X | X | X | X | X | X | | | X | 7/18/2014 |
| 83 | 326T4F018 | 4/28/1994 | 4/28/1994 | STATE FARM FIRE | 7/3/2014 | 20 | X | | X | X | X | X | X | X | X | X | X | | X | X | 8/3/2015 |
| 84 | 523340233 | 7/9/2014 | 2/13/1994 | STATE FARM FIRE | 7/9/2014 | 20 | X | | X | X | X | X | X | X | X | X | X | | X | X | 7/21/2014 |
| 85 | 523340233 | 7/9/2014 | 9/11/1993 | STATE FARM FIRE | 7/9/2014 | 20 | X | | X | X | X | X | X | X | X | X | X | | | X | 7/21/2014 |
| 86 | 523340233 | 7/9/2014 | 8/22/1990 | STATE FARM FIRE | 7/9/2014 | 24 | X | | X | X | X | X | X | X | X | X | X | | | X | 7/21/2014 |
| 87 | 524941799 | 7/16/2014 | 11/24/1989 | STATE FARM FIRE | 7/17/2014 | 25 | X | | X | X | X | X | X | X | X | X | X | | | X | 8/25/2014 |
| 88 | 324R32658 | 7/15/2014 | 10/23/1980 | STATE FARM FIRE | 7/18/2014 | 34 | X | | X | X | X | X | X | X | X | X | X | | | X | 7/28/2014 |
| 89 | 524941799 | 7/16/2014 | 5/21/1982 | STATE FARM FIRE | 7/21/2014 | 32 | X | | X | X | X | X | X | X | X | X | X | | | X | 8/4/2014 |
| 90 | 524941799 | 7/16/2014 | 6/14/1995 | STATE FARM FIRE | 7/22/2014 | 26 | X | | X | X | X | X | X | X | X | X | X | | | X | 8/4/2014 |
| 91 | 324966216 | 7/10/2014 | 6/14/1995 | STATE FARM FIRE | 7/25/2014 | 19 | X | | X | X | X | X | X | X | X | X | X | | | X | 8/12/2014 |
| 92 | 304559176 | 1/28/1988 | 1/28/1988 | 0087 | 8/6/2014 | 27 | X | | X | X | X | X | X | X | X | X | X | | | X | 8/19/2014 |
| 93 | 324T59622 | 8/5/2014 | 7/29/1949 | STATE FARM FIRE | 8/12/2014 | 65 | X | | X | X | X | X | X | X | X | X | X | | | X | 8/22/2014 |
| 94 | 324V88507 | 8/18/2014 | 8/20/1992 | STATE FARM FIRE | 8/20/2014 | 21 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/15/2014 |
| 95 | 324V88507 | 8/18/2014 | 12/23/1994 | STATE FARM FIRE | 8/20/2014 | 19 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/15/2014 |
| 96 | 525182981 | 8/24/2014 | 2/15/1994 | STATE FARM FIRE | 8/25/2014 | 21 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/29/2014 |
| 97 | 525182981 | 8/24/2014 | 5/3/1988 | STATE FARM FIRE | 8/25/2014 | 26 | X | | X | X | X | X | X | X | X | X | X | X | | X | 9/29/2014 |
| 98 | 525182981 | 8/24/2014 | 9/21/1988 | STATE FARM FIRE | 8/26/2014 | 26 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/29/2014 |
| 99 | 525182981 | 8/24/2014 | 9/27/1954 | STATE FARM FIRE | 8/26/2014 | 60 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/29/2014 |
| 100 | 325168592 | 8/24/2014 | 12/11/1988 | STATE FARM FIRE | 8/27/2014 | 26 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/12/2014 |
| 101 | 325168592 | 8/24/2014 | 5/20/1968 | STATE FARM FIRE | 8/27/2014 | 46 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/12/2014 |
| 102 | 525801180 | 9/11/2014 | 12/25/1984 | STATE FARM FIRE | 9/16/2014 | 30 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/30/2014 |
| 103 | 525801180 | 9/11/2014 | 9/10/1986 | STATE FARM FIRE | 9/17/2014 | 28 | X | | X | X | X | X | X | X | X | X | X | | | X | 9/30/2014 |
| 104 | 525802180 | 9/11/2014 | 12/9/1994 | STATE FARM FIRE | 9/18/2014 | 20 | X | | X | X | X | X | X | X | X | X | X | | | X | 10/3/2014 |
| 105 | 525323845 | 9/20/2014 | 7/30/1994 | STATE FARM FIRE | 9/22/2014 | 20 | X | | X | X | X | X | X | X | X | X | X | | | X | 10/10/2014 |
| 106 | 525323845 | 9/20/2014 | 1/29/1974 | STATE FARM FIRE | 9/22/2014 | 40 | X | | X | X | X | X | X | X | X | X | X | | X | X | 10/9/2014 |
| 107 | 525323845 | 9/20/2014 | 12/1/1993 | STATE FARM FIRE | 9/22/2014 | 22 | X | | X | X | X | X | X | X | X | X | X | | | X | 10/10/2014 |
| 108 | 525323845 | 9/20/2014 | 4/14/1996 | STATE FARM FIRE | 9/22/2014 | 18 | X | | X | X | X | X | X | X | X | X | X | | | X | 10/10/2014 |
| 109 | 525C25767 | 9/23/2014 | 4/9/1992 | STATE FARM FIRE | 9/24/2014 | 22 | X | | X | X | X | X | X | X | X | X | X | | | X | 10/9/2014 |
| 110 | 525C25767 | 9/23/2014 | 6/26/1994 | STATE FARM FIRE | 9/24/2014 | 20 | X | | X | X | X | X | X | X | X | X | X | | | X | 10/9/2014 |
| 111 | 525C25767 | 9/23/2014 | 11/5/1995 | STATE FARM FIRE | 9/24/2014 | 19 | X | | X | X | X | X | X | X | X | X | X | | | X | 10/10/2014 |
| 112 | 525C25767 | 9/23/2014 | 11/4/1993 | STATE FARM FIRE | 9/24/2014 | 21 | X | | X | X | X | X | X | X | X | X | X | | | X | 10/9/2014 |
| 113 | 325368146 | 9/23/2014 | 10/7/1994 | STATE FARM MUTUAL | 9/29/2014 | 20 | X | | X | X | X | X | X | X | X | X | X | | X | X | 10/23/2014 |
| 114 | 594576396 | 9/20/2014 | 12/19/1974 | STATE FARM MUTUAL | 9/29/2014 | 40 | X | | X | X | X | X | X | X | X | X | X | | X | X | 10/16/2014 |
| 115 | 075508951 | 11/7/2014 | 4/14/1996 | STATE FARM FIRE | 11/7/2014 | 18 | X | | X | X | X | X | X | X | X | X | X | | | X | 12/19/2014 |
| 116 | 525573V85 | 12/15/2014 | 6/3/1991 | STATE FARM FIRE | 11/7/2014 | 23 | X | | X | X | X | X | X | X | X | X | X | | | X | 11/24/2014 |
| 117 | 075508951 | 11/7/2014 | 4/11/1993 | STATE FARM FIRE | 11/7/2014 | 21 | X | | X | X | X | X | X | X | X | X | X | | | X | 11/24/2014 |
| 118 | 075508951 | 11/7/2014 | 6/3/1993 | STATE FARM FIRE | 11/7/2014 | 21 | X | | X | X | X | X | X | X | X | X | X | | | X | 11/24/2014 |
| 119 | 355650607 | 12/12/2014 | 2/19/1964 | STATE FARM FIRE | 12/15/2014 | 50 | X | | X | X | X | X | X | X | X | X | X | | X | X | 1/2/2015 |
| 120 | 325484664 | 12/10/2014 | 3/10/1968 | STATE FARM FIRE | 12/12/2014 | 46 | X | | X | X | X | X | X | X | X | X | X | | X | X | 1/29/2015 |
| 121 | 525573V85 | 12/15/2014 | 6/24/1991 | STATE FARM FIRE | 12/15/2014 | 23 | X | | X | X | X | X | X | X | X | X | X | | | X | 1/2/2015 |
| 122 | 525573V85 | 12/15/2014 | 12/17/1992 | STATE FARM FIRE | 12/16/2014 | 22 | X | | X | X | X | X | X | X | X | X | X | | | X | 1/2/2015 |
| 123 | 525573V85 | 12/15/2014 | 5/7/1982 | STATE FARM FIRE | 12/16/2014 | 33 | X | | X | X | X | X | X | X | X | X | X | | X | X | 1/2/2015 |
| 124 | 327N88812 | 11/6/2015 | 8/16/1995 | STATE FARM FIRE | 1/4/2015 | 19 | X | | X | X | X | X | X | X | X | X | X | | | X | 1/25/2016 |

Exhibit 1 -1786 Flatbush Treatment Summary

| RICO NO. | Claim No. | Date of Loss | State Farm Fire/Auto | 1stDOS | Age | Date of Birth | Chiropractic | Chiro 3-4 | Physical Therapy | Acupuncture | Muscle Testing | ROM | Functional Capacity | NCV/EMG | SSEP | BEP | V-nKCT | Dry Needling | Trigger Point | DME | Date of Mailing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 125 | 325747018 | 6/3/2015 | STATE FARM MUTUAL | 1/5/2015 | 37 | 12/2/1977 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | 1/14/2016 |
| 126 | 327971215 | 12/15/2015 | STATE FARM FIRE | 1/6/2015 | 18 | 7/15/1996 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | 1/11/2016 |
| 127 | 327290275 | 9/14/2015 | STATE FARM FIRE | 1/6/2015 | 23 | 5/14/1992 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | 4/15/2016 |
| 128 | 325818460 | 1/15/2015 | STATE FARM MUTUAL | 1/16/2015 | 19 | 4/14/1996 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | 2/3/2015 |
| 129 | 325818460 | 1/15/2015 | STATE FARM MUTUAL | 1/16/2015 | 20 | 4/7/1995 | X | X | X | X | X | | | | | | | X | X | X | 2/6/2015 |
| 130 | 325818460 | 1/15/2015 | STATE FARM MUTUAL | 1/16/2015 | 19 | 6/26/1996 | X | X | X | X | X | | | | | | | X | X | X | 2/6/2015 |
| 131 | 325818460 | 1/15/2015 | STATE FARM MUTUAL | 1/16/2015 | 19 | 5/21/1995 | X | X | X | X | X | | | | | | | X | X | X | 2/6/2015 |
| 132 | 325896193 | 1/17/2015 | STATE FARM MUTUAL | 2/6/2015 | 62 | 11/6/1952 | X | X | X | X | X | X | | X | X | X | X | X | X | X | 3/16/2015 |
| 133 | 326080280 | 2/5/2015 | STATE FARM MUTUAL | 2/6/2015 | 35 | 2/25/1980 | X | X | X | X | X | X | X | | | | | X | X | X | 3/3/2015 |
| 134 | 326080280 | 2/5/2015 | STATE FARM FIRE | 2/11/2015 | 26 | 8/29/1988 | X | X | X | X | X | X | | | | | | X | X | X | 3/17/2015 |
| 135 | 326040209 | 2/17/2015 | STATE FARM MUTUAL | 2/18/2015 | 44 | 6/21/1970 | X | X | X | X | X | X | | | | | | X | X | X | 3/4/2015 |
| 136 | 326040209 | 2/17/2015 | STATE FARM MUTUAL | 2/18/2015 | 49 | 12/26/1965 | X | X | X | X | X | X | | X | X | X | X | | X | X | 3/4/2015 |
| 137 | 325V58127 | 2/18/2015 | STATE FARM MUTUAL | 2/19/2015 | 29 | 12/9/1985 | X | X | X | X | X | X | | | | | | X | X | X | 3/24/2015 |
| 138 | 325V58127 | 2/18/2015 | STATE FARM MUTUAL | 2/20/2015 | 41 | 8/30/1974 | X | X | X | X | X | X | | | | | | | X | X | 4/6/2015 |
| 139 | 325V58127 | 2/18/2015 | STATE FARM MUTUAL | 2/20/2015 | 19 | 7/9/1995 | X | X | X | X | X | X | | | | | | | X | X | 4/6/2015 |
| 140 | 325V58127 | 2/18/2015 | STATE FARM MUTUAL | 2/24/2015 | 42 | 9/30/1972 | X | X | X | X | X | X | | X | X | X | X | | X | X | 3/23/2015 |
| 141 | 326080780 | 2/22/2015 | STATE FARM FIRE | 2/22/2015 | 32 | 9/17/1982 | X | X | X | X | X | X | | | | | | | X | X | 3/23/2015 |
| 142 | 326080780 | 2/22/2015 | STATE FARM FIRE | 2/26/2015 | 25 | 11/9/1989 | X | X | X | X | X | X | | | | | | | X | X | 3/23/2015 |
| 143 | 326080780 | 2/22/2015 | STATE FARM FIRE | 2/26/2015 | 38 | 6/29/1976 | X | X | X | X | X | X | | | | | | | X | X | 3/23/2015 |
| 144 | 326V1W385 | 2/25/2015 | STATE FARM MUTUAL | 2/26/2015 | 19 | 9/24/1995 | X | X | X | X | X | X | | | | | | X | X | X | 3/17/2015 |
| 145 | 326V1W385 | 2/25/2015 | STATE FARM MUTUAL | 2/26/2015 | 20 | 12/10/1995 | X | X | X | X | X | X | | | | | | | X | X | 3/18/2015 |
| 146 | 326V1W385 | 2/25/2015 | STATE FARM MUTUAL | 2/26/2015 | 19 | 9/2/1994 | X | X | X | X | X | X | | | | | | | X | X | 3/7/2015 |
| 147 | 326115593 | 2/26/2015 | STATE FARM MUTUAL | 2/27/2015 | 19 | 4/25/1996 | X | X | X | X | X | X | | | | | | | X | X | 3/20/2015 |
| 148 | 326115593 | 2/26/2015 | STATE FARM MUTUAL | 2/27/2015 | 20 | 12/6/1994 | X | X | X | X | X | X | | X | X | X | X | | X | X | 3/16/2015 |
| 149 | 326115593 | 2/26/2015 | STATE FARM MUTUAL | 2/27/2015 | 24 | 5/3/1991 | X | X | X | X | X | X | X | | | | | | X | X | 3/16/2015 |
| 150 | 326079419 | 2/21/2015 | STATE FARM FIRE | 3/4/2015 | 32 | 5/31/1982 | X | X | X | X | X | X | | | | | | | X | X | 3/17/2015 |
| 151 | 326079419 | 2/21/2015 | STATE FARM FIRE | 3/2/2015 | 37 | 8/21/1977 | X | X | X | X | X | X | | | | | | X | X | X | 3/19/2016 |
| 152 | 326079419 | 2/21/2015 | STATE FARM FIRE | 3/10/2015 | 42 | 2/23/1973 | X | X | X | X | X | X | | | | | | X | X | X | 4/15/2015 |
| 153 | 326379672 | 4/16/2015 | STATE FARM MUTUAL | 4/22/2015 | 62 | 7/27/1953 | X | X | X | X | X | X | | X | X | X | X | X | X | X | 5/23/2015 |
| 154 | 326V1W385 | 4/27/2015 | STATE FARM MUTUAL | 4/28/2015 | 40 | 10/9/1975 | X | X | X | X | X | X | | | | | | | X | X | 7/7/2015 |
| 155 | 326474889 | 4/27/2015 | STATE FARM MUTUAL | 4/29/2015 | 27 | 7/22/1988 | X | X | X | X | X | X | | X | X | X | X | X | X | X | 5/23/2015 |
| 156 | 326474889 | 4/27/2015 | STATE FARM MUTUAL | 4/29/2015 | 49 | 5/21/1966 | X | X | X | X | X | X | | | | | | | X | X | 8/17/2015 |
| 157 | 326444091 | 4/28/2015 | STATE FARM MUTUAL | 4/30/2015 | 43 | 12/28/1971 | X | X | X | X | X | X | | | | | | | X | X | 12/27/2016 |
| 158 | 326474889 | 4/27/2015 | STATE FARM MUTUAL | 5/4/2015 | 28 | 7/11/1987 | X | X | X | X | X | X | | | | | | X | X | X | 5/23/2015 |
| 159 | 326480594 | 5/1/2015 | STATE FARM MUTUAL | 5/8/2015 | 24 | 11/13/1990 | X | X | X | X | X | X | | | | | | | X | X | 6/8/2015 |
| 160 | 326590350 | 5/1/2015 | STATE FARM MUTUAL | 5/20/2015 | 24 | 8/20/1990 | X | X | X | X | X | X | | X | X | X | X | | X | X | 8/17/2015 |
| 161 | 326165297 | 5/1/2015 | STATE FARM MUTUAL | 5/20/2015 | 27 | 4/22/1988 | X | X | X | X | X | X | | | | | | X | X | X | 6/15/2015 |
| 162 | 326480594 | 5/3/2015 | STATE FARM MUTUAL | 5/26/2015 | 34 | 12/12/1980 | X | X | X | X | X | X | | | | | | | X | X | 6/29/2015 |
| 163 | 326747018 | 6/3/2015 | STATE FARM MUTUAL | 6/4/2015 | 34 | 11/25/1980 | X | X | X | X | X | X | | | | | | | X | X | 7/3/2015 |
| 164 | 326747018 | 6/3/2015 | STATE FARM MUTUAL | 6/5/2015 | 49 | 6/4/1966 | X | X | X | X | X | X | | | | | | | X | X | 7/6/2015 |
| 165 | 326519662 | 6/17/2015 | STATE FARM FIRE | 7/8/2015 | 32 | 7/8/1983 | X | X | X | X | X | X | | | | | | | X | X | 8/17/2015 |
| 166 | 326534433 | 6/24/2015 | STATE FARM MUTUAL | 7/8/2015 | 55 | 8/3/1960 | X | X | X | X | X | X | | | | | | X | X | X | 8/17/2015 |
| 167 | 326534433 | 6/24/2015 | STATE FARM MUTUAL | 7/8/2015 | 63 | 6/21/1952 | X | X | X | X | X | X | | | | | | | X | X | 11/17/2015 |
| 168 | 326590350 | 7/10/2015 | STATE FARM MUTUAL | 7/17/2015 | 24 | 8/29/1990 | X | X | X | X | X | X | | | | | | X | X | X | #N/A |
| 169 | 327088746 | 7/21/2015 | STATE FARM MUTUAL | 7/22/2015 | 24 | 11/16/1991 | X | X | X | X | X | X | | X | X | X | X | X | X | X | 9/8/2015 |
| 170 | 327088746 | 7/26/2015 | STATE FARM MUTUAL | 7/31/2015 | 35 | 6/6/1980 | X | X | X | X | X | X | | | | | | X | X | X | 8/28/2015 |
| 171 | 327088746 | 7/26/2015 | STATE FARM MUTUAL | 8/3/2015 | 21 | 2/19/1994 | X | X | X | X | X | X | | | | | | | X | X | 9/5/2015 |
| 172 | 327290275 | 8/1/2015 | STATE FARM FIRE | 8/11/2015 | 21 | 2/10/1995 | X | X | X | X | X | X | | | | | | | X | X | 9/28/2015 |
| 173 | 327290275 | 8/1/2015 | STATE FARM FIRE | 8/17/2015 | 23 | 12/8/1987 | X | X | X | X | X | X | | | | | | | X | X | 9/28/2015 |
| 174 | 326506571 | 8/1/2015 | STATE FARM FIRE | 8/11/2015 | 28 | 12/31/1986 | X | X | X | X | X | X | | | | | | X | X | X | 9/5/2015 |
| 175 | 327289275 | 9/14/2015 | STATE FARM FIRE | 9/15/2015 | 23 | 5/30/1992 | X | X | X | X | X | X | | | | | | X | X | X | 10/19/2015 |
| 176 | 327290275 | 9/14/2015 | STATE FARM FIRE | 9/15/2015 | 21 | 4/28/1994 | X | X | X | X | X | X | | X | X | X | X | | X | X | 9/28/2015 |
| 177 | 327290275 | 9/14/2015 | STATE FARM FIRE | 10/9/2015 | 30 | 7/24/1985 | X | X | X | X | X | X | | | | | | | X | X | 9/28/2015 |
| 178 | 327412744 | 10/3/2015 | STATE FARM FIRE | 10/9/2015 | 30 | 7/24/1985 | X | X | X | X | X | X | | | | | | | X | X | 10/23/2015 |
| 179 | 387450280 | 10/19/2015 | STATE FARM FIRE | 10/10/2015 | 33 | 12/31/1982 | X | X | X | X | X | X | | | | | | | X | X | 11/17/2015 |
| 180 | 387450280 | 10/19/2015 | STATE FARM FIRE | 10/10/2015 | 57 | 7/6/1958 | X | X | X | X | X | X | | | | | | | X | X | 11/18/2015 |
| 181 | 327040812 | 11/6/2015 | STATE FARM FIRE | 11/9/2015 | 25 | 8/20/1990 | X | X | X | X | X | X | | | | | | | X | X | 11/18/2015 |
| 182 | 327040812 | 11/6/2015 | STATE FARM FIRE | 11/9/2015 | 18 | 10/19/1997 | X | X | X | X | X | X | | | | | | | X | X | 11/30/2015 |
| 183 | 327M08812 | 11/6/2015 | STATE FARM FIRE | 11/9/2015 | 18 | 10/19/1997 | X | X | X | X | X | X | | | | | | | X | X | 11/50/2015 |
| 184 | 327666550 | 11/14/2015 | STATE FARM FIRE | 11/16/2015 | 32 | 10/20/1983 | X | X | X | X | X | X | | | | | | | X | X | 11/30/2015 |
| 185 | 327666550 | 11/14/2015 | STATE FARM FIRE | 11/16/2015 | 30 | 4/30/1985 | X | X | X | X | X | X | | | | | | | X | X | 11/30/2015 |
| 186 | 327666550 | 11/14/2015 | STATE FARM FIRE | 11/16/2015 | 26 | 7/3/1989 | X | X | X | X | X | X | | | | | | | X | X | 11/30/2015 |

Exhibit 1 - 1786 Flatbush Treatment Summary

| RICO NO. | Claim No. | Date of Loss | Date of Birth | State Farm Fire/Auto | 1st DOS | Age | Chiropractic | Chiro 3-4 | Physical Therapy | Acupuncture | Muscle Testing | ROM | Functional Capacity | NCV/EMG | SSEP | BEP | V-nKCT | Dry Needling | Trigger Point | DME | Date of Mailing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 187 | 327666550 | 11/14/2015 | 10/7/1993 | STATE FARM FIRE | 11/18/2015 | 22 | X | X | X | X | X | X | X | X | X | | | X | X | X | 11/30/2015 |
| 188 | 327999563 | 11/22/2015 | 5/31/1993 | STATE FARM MUTUAL | 11/27/2015 | 22 | X | X | X | X | X | X | X | X | X | | | X | X | X | 12/17/2015 |
| 189 | 327999563 | 11/22/2015 | 4/6/1993 | STATE FARM MUTUAL | 11/25/2015 | 23 | X | X | X | X | X | X | X | X | X | | | X | X | X | 1/11/2016 |
| 190 | 327R71015 | 12/15/2015 | 9/18/1996 | STATE FARM FIRE | 12/16/2015 | 19 | X | X | X | X | X | X | X | X | X | | | X | X | X | 1/25/2016 |
| 191 | 327R71015 | 12/15/2015 | 2/15/1973 | STATE FARM FIRE | 12/17/2015 | 43 | X | X | X | X | X | X | X | X | X | | | X | X | X | 12/29/2015 |
| 192 | 327761384 | 1/5/2016 | 10/20/1994 | STATE FARM FIRE | 1/7/2016 | 21 | X | X | X | X | X | X | X | X | X | | | X | X | X | 1/15/2016 |
| 193 | 327761384 | 1/5/2016 | 5/9/1994 | STATE FARM FIRE | 1/7/2016 | 21 | X | X | X | X | X | X | X | X | X | | | X | X | X | 1/25/2016 |
| 194 | 327V11153 | 1/7/2016 | 5/24/1997 | STATE FARM FIRE | 1/8/2016 | 19 | X | X | X | X | X | X | X | X | X | | | X | X | X | 1/25/2016 |
| 195 | 327V11153 | 1/7/2016 | 6/27/1996 | STATE FARM MUTUAL | 1/8/2016 | 20 | X | X | X | X | X | X | X | X | X | | | X | X | X | 1/25/2016 |
| 196 | 327V11153 | 1/7/2016 | 11/28/1992 | STATE FARM MUTUAL | 1/8/2016 | 23 | X | X | X | X | X | X | X | X | X | | | X | X | X | 1/25/2016 |
| 197 | 327V11153 | 1/7/2016 | 1/10/1994 | STATE FARM FIRE | 1/8/2016 | 22 | X | X | X | X | X | X | X | X | X | | | X | X | X | 1/25/2016 |
| 198 | 327907434 | 12/31/2015 | 12/24/1979 | STATE FARM FIRE | 1/19/2016 | 36 | X | X | X | X | X | X | X | X | X | | | X | X | X | 2/1/2016 |
| 199 | 527WS7472 | 1/17/2016 | 9/15/1993 | STATE FARM FIRE | 1/22/2016 | 22 | X | X | X | X | X | X | X | X | X | | | X | X | X | 2/1/2016 |
| 200 | 527WS7472 | 1/17/2016 | 12/22/1995 | STATE FARM FIRE | 1/22/2016 | 20 | X | X | X | X | X | X | X | X | X | | | X | X | X | 2/1/2016 |
| 201 | 527WS7472 | 1/17/2016 | 12/10/1988 | STATE FARM FIRE | 1/22/2016 | 27 | X | X | X | X | X | X | X | X | X | | | X | X | X | 2/8/2016 |
| 202 | 320553880 | 12/31/2016 | 7/14/1996 | STATE FARM FIRE | 1/23/2016 | 19 | X | X | X | X | X | X | X | X | X | | | X | X | X | 2/6/2017 |
| 203 | 327W93650 | 1/20/2016 | 4/26/1993 | STATE FARM FIRE | 1/25/2016 | 23 | X | X | X | X | X | X | X | X | X | | | X | X | X | 2/16/2016 |
| 204 | 327907434 | 12/31/2015 | 11/12/2002 | STATE FARM FIRE | 1/26/2016 | 13 | X | X | X | X | X | X | X | X | X | | | X | X | X | 2/19/2016 |
| 205 | 327W93650 | 1/20/2016 | 6/20/1994 | STATE FARM FIRE | 1/26/2016 | 22 | X | X | X | X | X | X | X | X | X | | | X | X | X | 2/16/2016 |
| 206 | 528209841 | 2/21/2016 | 1/11/1996 | STATE FARM FIRE | 2/22/2016 | 20 | X | X | X | X | X | X | X | X | X | | | X | X | X | 3/14/2016 |
| 207 | 528209841 | 2/21/2016 | 2/2/1994 | STATE FARM FIRE | 2/22/2016 | 22 | X | X | X | X | X | X | X | X | X | | | X | X | X | 3/4/2016 |
| 208 | 528209841 | 2/21/2016 | 3/26/1996 | STATE FARM FIRE | 2/22/2016 | 20 | X | X | X | X | X | X | X | X | X | | | X | X | X | 3/4/2016 |
| 209 | 528209841 | 2/21/2016 | 6/6/1994 | STATE FARM FIRE | 2/22/2016 | 22 | X | X | X | X | X | X | X | X | X | | | X | X | X | 3/4/2016 |
| 210 | 328091488 | 3/5/2016 | 7/9/1997 | STATE FARM FIRE | 3/7/2016 | 19 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/1/2016 |
| 211 | 328091488 | 3/5/2016 | 7/11/1980 | STATE FARM FIRE | 3/7/2016 | 36 | X | X | X | X | X | X | X | X | X | | | X | X | X | 3/25/2016 |
| 212 | 328091488 | 3/5/2016 | 7/5/1991 | STATE FARM FIRE | 3/7/2016 | 25 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/4/2016 |
| 213 | 328091488 | 3/5/2016 | 1/20/1993 | STATE FARM FIRE | 3/7/2016 | 23 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/25/2016 |
| 214 | 328683739 | 3/13/2016 | 12/6/1992 | STATE FARM FIRE | 3/15/2016 | 23 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/25/2016 |
| 215 | 328683739 | 3/13/2016 | 10/19/1993 | STATE FARM FIRE | 3/15/2016 | 22 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/12/2016 |
| 216 | 328683779 | 3/13/2016 | 9/24/1992 | STATE FARM FIRE | 3/15/2016 | 23 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/11/2016 |
| 217 | 328384851 | 3/19/2016 | 2/15/1993 | STATE FARM FIRE | 3/21/2016 | 23 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/25/2016 |
| 218 | 328384851 | 3/19/2016 | 6/19/1990 | STATE FARM FIRE | 3/21/2016 | 25 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/25/2016 |
| 219 | 328384851 | 3/19/2016 | 3/2/1997 | STATE FARM FIRE | 3/21/2016 | 19 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/18/2016 |
| 220 | 328384851 | 3/19/2016 | 7/31/1965 | STATE FARM FIRE | 3/23/2016 | 51 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/28/2016 |
| 221 | 528454271 | 3/28/2016 | 10/29/1985 | STATE FARM FIRE | 3/29/2016 | 30 | X | X | X | X | X | X | X | | | | | X | X | X | 4/15/2016 |
| 222 | 328683785 | 3/28/2016 | 12/8/1993 | STATE FARM FIRE | 3/29/2016 | 22 | X | X | X | X | X | X | X | | | | | X | X | X | 4/15/2016 |
| 223 | 528454271 | 3/28/2016 | 7/6/1997 | STATE FARM FIRE | 3/31/2016 | 19 | X | X | X | X | X | X | X | | | | | X | X | X | 4/15/2016 |
| 224 | 528454271 | 3/28/2016 | 7/6/1993 | STATE FARM FIRE | 4/1/2016 | 23 | X | X | X | X | X | X | X | | | | | X | X | X | 4/19/2016 |
| 225 | 328452979 | 3/29/2016 | 7/22/1965 | STATE FARM FIRE | 4/4/2016 | 51 | X | X | X | X | X | X | X | X | X | | | X | X | X | 5/2/2016 |
| 226 | 328534708 | 3/31/2016 | 1/3/1989 | STATE FARM FIRE | 4/6/2016 | 27 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/26/2016 |
| 227 | 328534708 | 3/31/2016 | 6/25/1983 | STATE FARM FIRE | 4/13/2016 | 33 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/25/2016 |
| 228 | 3283534585 | 4/13/2016 | 5/9/1982 | STATE FARM MUTUAL | 4/14/2016 | 34 | X | X | X | X | X | X | X | X | X | | | X | X | X | 5/25/2016 |
| 229 | 3283534585 | 4/13/2016 | 10/19/1981 | STATE FARM MUTUAL | 4/14/2016 | 34 | X | X | X | X | X | X | X | X | X | | | X | X | X | 5/25/2016 |
| 230 | 3283534585 | 4/13/2016 | 8/9/1982 | STATE FARM MUTUAL | 4/14/2016 | 33 | X | X | X | X | X | X | X | X | X | | | X | X | X | 4/25/2016 |
| 231 | 3283534585 | 4/13/2016 | 8/10/1968 | STATE FARM MUTUAL | 4/19/2016 | 47 | X | X | X | X | X | X | X | X | X | | | X | X | X | 5/31/2016 |
| 232 | 328R71038 | 4/15/2016 | 2/12/1969 | STATE FARM FIRE | 4/19/2016 | 47 | X | X | X | X | X | X | X | X | X | | | X | X | X | 5/2/2016 |
| 233 | 328R82272 | 4/13/2016 | 12/9/1996 | STATE FARM FIRE | 5/16/2016 | 19 | X | X | X | X | X | X | X | X | X | | | X | X | X | 5/25/2016 |
| 234 | 328R82272 | 5/14/2016 | 10/19/1982 | STATE FARM FIRE | 5/16/2016 | 34 | X | X | X | X | X | X | X | X | X | | | X | X | X | 5/25/2016 |
| 235 | 328M88300 | 5/6/2016 | 8/9/1982 | STATE FARM FIRE | 5/18/2016 | 33 | X | X | X | X | X | X | X | X | X | | | X | X | X | 5/31/2016 |
| 236 | 328P73985 | 5/24/2016 | 6/21/1977 | STATE FARM MUTUAL | 5/25/2016 | 39 | X | X | X | X | X | X | X | X | X | | | X | X | X | 6/7/2016 |
| 237 | 328P73985 | 5/24/2016 | 8/22/1992 | STATE FARM MUTUAL | 5/25/2016 | 23 | X | X | X | X | X | X | X | X | X | | | X | X | X | 6/9/2016 |
| 238 | 328P73985 | 5/24/2016 | 11/21/1958 | STATE FARM MUTUAL | 5/26/2016 | 58 | X | X | X | X | X | X | X | X | X | | | X | X | X | 6/7/2016 |
| 239 | 328P73985 | 5/24/2016 | 2/12/1969 | STATE FARM MUTUAL | 5/26/2016 | 47 | X | X | X | X | X | X | X | X | X | | | X | X | X | 6/7/2016 |
| 240 | 328P76538 | 5/13/2016 | 12/31/1982 | STATE FARM MUTUAL | 6/1/2016 | 33 | X | X | X | X | X | X | X | X | X | | | X | X | X | 6/21/2016 |
| 241 | 328P76538 | 5/13/2016 | 12/15/2003 | STATE FARM MUTUAL | 6/3/2016 | 12 | X | X | X | X | X | X | X | X | X | | | X | X | X | 7/1/2016 |
| 242 | 328F13826 | 6/21/2016 | 10/24/1966 | STATE FARM FIRE | 6/20/2016 | 50 | X | X | X | X | X | X | X | X | X | | | X | X | X | 10/3/2016 |
| 243 | 328S55153 | 6/21/2016 | 5/14/1959 | STATE FARM FIRE | 6/20/2016 | 56 | X | X | X | X | X | X | X | X | X | | | X | X | X | 7/21/2016 |
| 244 | 328S31793 | 6/21/2016 | 3/9/1980 | STATE FARM FIRE | 6/22/2016 | 36 | X | X | X | X | X | X | X | X | X | | | X | X | X | 7/21/2016 |
| 245 | 3291D0489 | 6/23/2016 | 6/28/1987 | STATE FARM FIRE | 6/27/2016 | 29 | X | X | X | X | X | X | X | X | X | | | X | X | X | 8/9/2016 |
| 246 | 3291D0489 | 6/23/2016 | 12/22/1986 | STATE FARM FIRE | 6/28/2016 | 30 | X | X | X | X | X | X | X | X | X | | | X | X | X | 7/25/2016 |
| 247 | 3291B4685 | 5/13/2016 | 6/20/1986 | STATE FARM FIRE | 6/21/2016 | 30 | X | X | X | X | X | X | X | X | X | | | X | X | X | 7/22/2016 |
| 248 | 3291B4685 | 7/7/2016 | 11/24/1989 | STATE FARM FIRE | 7/8/2016 | 27 | X | X | X | X | X | X | X | X | X | | | X | X | X | 7/21/2016 |

Exhibit 1 - 1786 Flatbush Treatment Summary

| RICO NO. | Claim No. | Date of Loss | Date of Birth | State Farm Fire/Auto | 1st DOS | Age | Chiropractic | Chiro 3-4 | Physical Therapy | Acupuncture | Muscle Testing | ROM | Functional Capacity | NCV/EMG | SSEP | BEP | V-sKCT | Dry Needling | Trigger Point | DME | Date of Mailing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 249 | 329189685 | 7/7/2016 | 10/21/1986 | STATE FARM FIRE | 7/8/2016 | 30 | | | X | X | X | X | | X | X | X | | X | | X | 7/22/2016 |
| 250 | 329172379 | 7/7/2016 | 2/26/1980 | STATE FARM MUTUAL | 7/11/2016 | 36 | X | | X | X | X | X | | X | X | X | | X | | X | 7/15/2016 |
| 251 | 329172379 | 7/7/2016 | 2/26/1980 | STATE FARM MUTUAL | 7/12/2016 | 30 | | | X | X | X | X | | | | | | X | X | | 7/28/2016 |
| 252 | 328682272 | 5/24/2016 | 12/28/1995 | STATE FARM MUTUAL | 7/13/2016 | 21 | | | X | X | X | X | | | | | | | | | #N/A |
| 253 | 329172379 | 7/7/2016 | 12/1/1991 | STATE FARM FIRE | 7/15/2016 | 25 | | | X | X | X | X | | X | X | X | | X | | X | 7/25/2016 |
| 254 | 329360386 | 8/23/2016 | 8/23/2016 | STATE FARM FIRE | 8/12/2016 | 30 | | | X | X | X | X | | X | X | X | | | X | X | 9/19/2016 |
| 255 | 329360386 | 8/23/2016 | 2/22/1995 | STATE FARM FIRE | 8/12/2016 | 21 | | | X | X | X | X | | X | X | X | | | X | X | 9/2/2016 |
| 256 | 329406191 | 2/17/1989 | 2/17/1989 | STATE FARM MUTUAL | 8/16/2016 | 28 | X | | X | X | X | X | X | X | X | X | | X | | X | 9/2/2016 |
| 257 | 329406191 | 8/12/2016 | 3/24/1989 | STATE FARM FIRE | 8/16/2016 | 27 | | | X | X | X | X | | X | X | X | | X | | X | 9/2/2016 |
| 258 | 329406191 | 8/12/2016 | 7/1/1996 | STATE FARM MUTUAL | 8/16/2016 | 20 | X | | X | X | X | X | | | | | | X | X | X | 9/12/2016 |
| 259 | 329586386 | 8/23/2016 | 8/23/2016 | STATE FARM FIRE | 8/24/2016 | 24 | X | | X | X | X | X | | X | X | X | X | X | | X | 9/16/2016 |
| 260 | 329586386 | 8/23/2016 | 10/2/1990 | STATE FARM FIRE | 8/24/2016 | 26 | X | | X | X | X | X | | X | X | X | | | X | X | 9/7/2016 |
| 261 | 329586386 | 8/23/2016 | 5/17/1984 | STATE FARM FIRE | 8/31/2016 | 32 | | | X | X | X | X | | | | | | X | | X | #N/A |
| 262 | 329560982 | 8/24/2016 | 10/7/1993 | STATE FARM FIRE | 9/7/2016 | 23 | | | X | X | X | X | | X | X | X | | | | X | 9/20/2016 |
| 263 | 329542584 | 9/24/2016 | 10/6/1994 | STATE FARM FIRE | 9/24/2016 | 22 | X | | X | X | X | X | | X | X | X | | X | | X | 10/10/2016 |
| 264 | 329542584 | 9/24/2016 | 4/18/1994 | STATE FARM FIRE | 9/26/2016 | 22 | X | | X | X | X | X | | X | X | X | | X | | X | 10/10/2016 |
| 265 | 329542584 | 9/24/2016 | 8/12/1996 | STATE FARM FIRE | 9/26/2016 | 20 | | | X | X | X | X | | X | X | X | | | | X | 10/10/2016 |
| 266 | 329842772 | 9/27/2016 | 8/24/1995 | STATE FARM FIRE | 10/3/2016 | 21 | | | X | X | X | X | | X | X | X | | X | | X | 10/17/2016 |
| 267 | 329842772 | 9/27/2016 | 12/1/1994 | STATE FARM MUTUAL | 10/4/2016 | 23 | X | | X | X | X | X | | X | X | X | | | X | X | 10/17/2016 |
| 268 | 329890552 | 10/3/2016 | 1/10/1993 | STATE FARM MUTUAL | 10/5/2016 | 24 | X | | X | X | X | X | | X | X | X | | X | | X | 10/24/2016 |
| 269 | 329890552 | 10/3/2016 | 12/9/1985 | STATE FARM FIRE | 10/5/2016 | 31 | | | X | X | X | X | | | | | | X | | X | #N/A |
| 270 | 329890552 | 10/3/2016 | 7/9/1998 | STATE FARM FIRE | 10/6/2016 | 18 | X | | X | X | X | X | | X | X | X | | X | | X | 10/24/2016 |
| 271 | 329679288 | 10/6/2016 | 8/21/1995 | STATE FARM FIRE | 10/7/2016 | 21 | X | | X | X | X | X | | X | X | X | | | X | X | 10/24/2016 |
| 272 | 329679288 | 10/6/2016 | 8/25/1981 | STATE FARM FIRE | 10/10/2016 | 35 | X | | X | X | X | X | | X | X | X | | X | | X | 10/24/2016 |
| 273 | 329890552 | 10/3/2016 | 12/7/1956 | STATE FARM FIRE | 10/17/2016 | 60 | | | X | X | X | X | | | | | | X | | X | 11/3/2016 |
| 274 | 329434271 | 11/28/2016 | 1/26/1988 | STATE FARM FIRE | 11/17/2016 | 29 | | | X | X | X | X | | X | X | X | | X | | X | 12/19/2016 |
| 275 | 320296394 | 11/28/2016 | 11/4/1951 | STATE FARM FIRE | 11/21/2016 | 66 | | | X | X | X | X | | X | X | X | | X | | X | 12/12/2016 |
| 276 | 320275556 | 11/28/2016 | 3/24/1978 | STATE FARM FIRE | 11/28/2016 | 38 | | | X | X | X | X | | X | X | X | | | X | X | 12/12/2016 |
| 277 | 320296394 | 11/22/2016 | 12/10/1979 | STATE FARM FIRE | 11/28/2016 | 37 | X | | X | X | X | X | | X | X | X | | X | | X | 1/5/2017 |
| 278 | 320296394 | 11/22/2016 | 11/16/1981 | STATE FARM FIRE | 11/28/2016 | 35 | | | X | X | X | X | | X | X | X | | X | | X | 1/3/2017 |
| 279 | 320296394 | 11/22/2016 | 10/20/1976 | STATE FARM FIRE | 11/28/2016 | 40 | | | X | X | X | X | | X | X | X | | X | | X | 1/3/2017 |
| 280 | 320434271 | 11/28/2016 | 12/13/1988 | STATE FARM FIRE | 11/29/2016 | 28 | X | | X | X | X | X | | X | X | X | | X | | X | 12/12/2016 |
| 281 | 320275556 | 11/28/2016 | 5/7/1978 | STATE FARM FIRE | 11/30/2016 | 39 | | | X | X | X | X | | X | X | X | | | X | X | 12/12/2016 |
| 282 | 320275556 | 11/28/2016 | 11/20/1992 | STATE FARM FIRE | 11/30/2016 | 24 | | | X | X | X | X | | X | X | X | | X | | X | 12/12/2016 |
| 283 | 320275556 | 11/28/2016 | 8/16/1979 | STATE FARM FIRE | 11/30/2016 | 37 | | | X | X | X | X | | X | X | X | | X | | X | 12/12/2016 |
| 284 | 320392145 | 12/10/2016 | 1/28/1993 | STATE FARM FIRE | 12/6/2016 | 23 | | | X | X | X | X | | X | X | X | | | X | X | 12/23/2016 |
| 285 | 320393145 | 12/10/2016 | 10/20/1985 | STATE FARM FIRE | 12/14/2016 | 31 | X | | X | X | X | X | | X | X | X | | X | | X | 12/27/2016 |
| 286 | 320393145 | 12/10/2016 | 7/15/1993 | STATE FARM FIRE | 12/14/2016 | 23 | | | X | X | X | X | | X | X | X | | X | | X | 12/23/2016 |
| 287 | 320393145 | 12/10/2016 | 8/26/1995 | STATE FARM FIRE | 12/14/2016 | 21 | | | X | X | X | X | | | | | | | X | X | 12/27/2016 |
| 288 | 320393145 | 12/10/2016 | 9/20/1984 | STATE FARM FIRE | 12/27/2016 | 32 | X | | X | X | X | X | | | | | | | X | X | 1/3/2017 |
| 289 | 320960100 | 12/24/2016 | 10/25/1993 | STATE FARM FIRE | 12/27/2016 | 23 | | | X | X | X | X | | X | X | X | | X | | X | 1/31/2017 |
| 290 | 329960100 | 12/24/2016 | 2/4/1999 | STATE FARM FIRE | 12/27/2016 | 18 | X | | X | X | X | X | | X | X | X | | | X | X | 1/27/2017 |
| 291 | 329960100 | 12/24/2016 | 7/29/1988 | STATE FARM FIRE | 12/27/2016 | 28 | | | X | X | X | X | | X | X | X | | X | | X | 1/27/2017 |
| 292 | 329960100 | 12/24/2016 | 1/4/1977 | STATE FARM FIRE | 1/4/2017 | 40 | | | X | X | X | X | | | | | | X | | X | 1/9/2017 |
| 293 | 320553880 | 12/31/2016 | 9/12/1991 | STATE FARM FIRE | 1/6/2017 | 25 | | | X | X | X | X | | X | X | X | | X | | X | 1/17/2017 |
| 294 | 320553880 | 12/31/2016 | 10/27/1954 | STATE FARM FIRE | 1/3/2017 | 62 | | | X | X | X | X | | X | X | X | | X | | X | 1/18/2017 |
| 295 | 320553880 | 12/31/2016 | 4/30/1986 | STATE FARM FIRE | 1/3/2017 | 31 | X | | X | X | X | X | | X | X | X | | X | | X | 1/17/2017 |
| 296 | 320608181 | 1/8/2017 | 7/31/1985 | STATE FARM FIRE | 1/9/2017 | 31 | | | X | X | X | X | | X | X | X | | X | | X | 1/23/2017 |
| 297 | 320608181 | 1/8/2017 | 3/14/1991 | STATE FARM MUTUAL | 1/9/2017 | 26 | | | X | X | X | X | | X | X | X | | X | | X | 1/23/2017 |
| 298 | 320608181 | 1/8/2017 | 8/24/1995 | STATE FARM MUTUAL | 1/12/2017 | 21 | | | X | X | X | X | | | | | | | X | X | 1/23/2017 |
| 299 | 320608181 | 1/8/2017 | 5/9/1975 | STATE FARM MUTUAL | 1/12/2017 | 42 | | | X | X | X | X | | | | | | X | | X | 1/23/2017 |
| 300 | 320714974 | 1/17/2017 | 9/20/1994 | STATE FARM MUTUAL | 1/25/2017 | 22 | | | X | X | X | X | | | | | | | | X | 2/6/2017 |

Page 5

# *Exhibit 2*

# Exhibit 2 - Medical Doctor Initial Evaluations

| RICO NO. | Date of Service | Provider | Patient Complaints: Neck Pain | Lower Back Pain | Pain Every Day | Cervical Sprain/Strain, Cervicalgia, Myofascitis | Lumbar Sprain/Strain, Low Back Pain, Myofascitis | Other Region | Treatment Therapy: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synaptic NM Block | Billed Services: Synaptic TX | Treatment Plan: Computerized ROM/MMT | Billed Services: Computerized ROM/MT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 9/4/2013 | JULES FRANCOIS PARISIEN MD | X | X |  | X | X | X | X | X |  | X |  | X | 2 |  | 10 |
| 3 | 9/18/2013 | KSENIA PAVLOVA |  | X | X | X | X |  | X | X |  | X |  | X | 2 |  | 10 |
| 3 | 9/4/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 1 | 9 |
| 3 | 10/11/2013 | KSENIA PAVLOVA | X | X | X | X | X |  | X | X |  | X |  | X |  |  | 9 |
| 4 | 9/6/2013 | KSENIA PAVLOVA | X | X | X | X | X |  | X | X |  | X |  | X | 2 | 1 | 10 |
| 4 | 9/13/2013 | KSENIA PAVLOVA | X | X | X | X |  | X | X | X |  | X |  | X |  |  | 13 |
| 5 | 10/16/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | X | X |  | X | 4 | 4 | 11 |
| 6 | 10/17/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | X | X |  | X | 5 | 4 | 11 |
| 7 | 12/2/2013 | JULES FRANCOIS PARISIEN MD | X | X |  |  | X | X | X | X |  | X |  | X |  | 1 | 11 |
| 7 | 10/17/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | X | X |  | X | 2 | 3 | 9 |
| 8 | 10/29/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 6 | 7 | 12 |
| 8 | 10/25/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 12 |
| 9 | 10/24/2013 | PIERRE J RENILDE | X |  | X |  | X | X | X | X |  | X |  | X |  |  | 11 |
| 10 | 10/30/2013 | JULES FRANCOIS PARISIEN MD | X | X | X |  | X | X | X | X |  | X |  | X | 1 | 1 | 10 |
| 10 | 11/1/2013 | KSENIA PAVLOVA | X | X | X |  | X | X | X | X |  | X |  | X | 3 | 3 | 10 |
| 10 | 3/10/2014 | LIUDMAN DABIRI | X | X | X |  | X | X | X | X |  | X |  | X |  |  | 10 |
| 10 | 8/29/2014 | NOEL E BLACKMAN MD | X | X | X | X | X |  | X | X | X | X |  | X |  |  | 10 |
| 11 | 10/31/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 5 | 4 | 11 |
| 11 | 11/1/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 11 |
| 11 | 2/24/2014 | LIUDMAN DABIRI | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 11 |
| 12 | 11/7/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 11 |
| 13 | 11/5/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 10 |
| 13 | 1/31/2014 | KSENIA PAVLOVA | X | X |  | X | X | X | X | X |  | X |  | X |  |  | 10 |
| 13 | 4/7/2014 | LIUDMAN DABIRI | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 10 |
| 14 | 11/19/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 10 |
| 15 | 12/2/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X | 6 | 6 | 12 |
| 16 | 12/2/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 12 |
| 17 | 12/2/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 11 |
| 18 | 12/2/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X | 5 | 5 | 11 |
| 19 | 12/11/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 5 | 5 | 9 |
| 20 | 12/12/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 9 |
| 21 | 12/13/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 6 | 6 | 11 |
| 22 | 12/19/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 11 |
| 23 | 12/20/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 9 |
| 23 | 1/2/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | X | X |  |  | 2 | 2 | 9 |
| 24 | 12/26/2013 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X | X |  | 2 | 2 |  |
| 24 | 12/30/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  |  |  |  |  |  |  |
| 25 | 12/27/2013 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 11 |
| 26 | 1/7/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 11 |
| 27 | 1/7/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 9 |
| 28 | 1/7/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 9 |
| 28 | 1/31/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 9 |
| 29 | 1/7/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 12 |
| 31 | 1/24/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X |  | X | X |  | X | X |  | 4 | 3 | 8 |
| 31 | 1/24/2014 | LIUDMAN DABIRI | X | X | X | X | X |  | X | X |  | X |  | X |  | 4 | 13 |
| 31 | 2/14/2014 | KSENIA PAVLOVA | X | X | X | X | X |  | X | X |  | X |  | X | 3 | 4 | 12 |
| 32 | 1/17/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 5 | 12 |
| 33 | 1/17/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X |  | X | X |  | X |  | X | 3 | 4 | 12 |
| 34 | 1/24/2014 | KSENIA PAVLOVA | X | X | X | X | X |  | X | X |  | X |  | X | 3 | 4 | 6 |
| 34 | 3/3/2014 | LIUDMAN DABIRI | X | X | X | X | X |  | X | X |  | X |  | X |  | 4 | 15 |
| 35 | 1/24/2014 | KSENIA PAVLOVA | X | X | X | X | X |  | X | X |  | X |  | X | 4 | 4 | 12 |
| 36 | 1/24/2014 | KSENIA PAVLOVA | X | X | X | X | X |  | X | X |  | X |  | X |  |  | 12 |
| 36 | 1/24/2014 | KSENIA PAVLOVA | X | X | X | X | X |  | X | X |  | X |  | X |  | 3 | 12 |
| 37 | 1/23/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X |  | X | X |  | X |  | X | 3 |  | 12 |
| 38 | 1/17/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X |  |  |  |
| 41 | 2/5/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 12 |
| 41 | 2/24/2014 | LIUDMAN DABIRI | X | X | X | X | X |  | X | X |  | X |  | X |  |  | 12 |
| 41 | 4/3/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X |  | X |  | X |  |  |  |

Page 1

**Exhibit 2 - Medical Doctor Initial Evaluations**

| RICO NO. | Date of Service | Provider | Patient Complaints: Neck Pain | Patient Complaints: Lower Back Pain | Patient Complaints: Pain Every Day | Cervical Sprain/Strain, Cervicalgia, Myofasciitis | Lumbar Sprain/Strain, Low Back Pain, Myofasciitis | Other Region | Treatment Plan: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synaptic NM Block | Billed Services: Synaptic TX | Treatment Plan: Computerized ROM/MMT | Billed Services: Computerized ROM/MT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 42 | 2/5/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 6 | 6 | 15 |
| 42 | 2/10/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 43 | 2/6/2014 | JULES FRANCOIS PARSEN MD | X | | | X | | X | X | X | | X | | X | 4 | 3 | 13 |
| 39 | 2/6/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 2 | 3 | 10 |
| 44 | 2/6/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 8 |
| 45 | 2/7/2014 | LUQMAN DABIRI | | | | X | X | X | X | X | | X | | X | 3 | 3 | 11 |
| 46 | 2/27/2014 | JULES FRANCOIS PARSEN MD | X | X | | X | X | X | X | X | | X | | X | 5 | 4 | 10 |
| 46 | 4/7/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | X | X | | | 10 |
| 47 | 2/27/2014 | JULES FRANCOIS PARSEN MD | X | X | | X | X | X | X | X | | X | | X | 5 | 3 | 10 |
| 47 | 4/3/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | X | X | | | 10 |
| 48 | 2/27/2014 | JULES FRANCOIS PARSEN MD | X | X | | X | X | X | X | X | | X | X | X | 3 | 2 | 9 |
| 50 | 3/10/2014 | LUQMAN DABIRI | X | X | X | X | X | | X | X | | X | | X | 2 | 2 | 8 |
| 49 | 3/10/2014 | LUQMAN DABIRI | X | | | X | X | X | X | X | | X | | X | 2 | 2 | 11 |
| 51 | 3/10/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | 2 | 1 | 2 |
| 51 | 2/27/2015 | NOELE BLACKMAN MD | X | X | | X | | | X | X | | X | | X | | 3 | 2 |
| 52 | 3/12/2014 | LUQMAN DABIRI | X | X | | X | | | X | X | | X | | X | 1 | 2 | 11 |
| 52 | 4/21/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | | | 11 |
| 52 | 5/14/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | | | 11 |
| 53 | 3/12/2014 | LUQMAN DABIRI | X | X | X | X | X | | X | X | | X | | X | 4 | 3 | 13 |
| 53 | 4/7/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | | | 11 |
| 54 | 3/13/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 13 |
| 55 | 3/13/2014 | LUQMAN DABIRI MD | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 11 |
| 56 | 3/17/2014 | LUQMAN DABIRI | X | | X | X | | | X | X | | X | | X | | | 10 |
| 57 | 3/17/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 7 |
| 58 | 3/24/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | 3 | 4 | 8 |
| 59 | 3/24/2014 | LUQMAN DABIRI | X | X | X | X | X | | X | X | | X | | X | 3 | 3 | 11 |
| 59 | 6/19/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | | | 11 |
| 60 | 3/31/2014 | LUQMAN DABIRI | X | X | X | X | X | | X | X | | X | | X | 4 | 4 | 13 |
| 62 | 4/9/2014 | LUQMAN DABIRI | X | X | X | X | X | | X | X | | X | | X | 4 | 4 | 12 |
| 62 | 5/22/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | | | 12 |
| 62 | 6/11/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | | X | | | 12 |
| 62 | 8/7/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 13 |
| 63 | 4/9/2014 | LUQMAN DABIRI | X | X | X | X | X | | X | X | | X | | X | | | 13 |
| 65 | 4/10/2014 | LUQMAN DABIRI | X | X | X | X | X | | X | X | | X | | X | | | 11 |
| 66 | 4/10/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 2 | 11 |
| 66 | 5/21/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | | | 11 |
| 67 | 4/10/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 12 |
| 67 | 7/18/2014 | NOELE BLACKMAN MD | X | X | X | X | X | | X | X | X | X | | X | | | 12 |
| 68 | 4/10/2014 | LUQMAN DABIRI | | | | X | X | X | X | X | | X | | X | | | 12 |
| 69 | 4/28/2014 | LUQMAN DABIRI | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 11 |
| 70 | 5/12/2014 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | | X | | X | 4 | 3 | 14 |
| 70 | 6/6/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 71 | 5/16/2014 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | | X | | X | 4 | 3 | 12 |
| 72 | 5/19/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 12 |
| 73 | 5/23/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | 3 | 14 |
| 73 | 8/7/2014 | NOELE BLACKMAN MD | X | X | X | X | X | | X | X | | X | | X | | | 14 |
| 74 | 5/28/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 75 | 5/30/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | | X | 2 | 4 | 8 |
| 78 | 6/3/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | | X | 4 | 4 | 15 |
| 78 | 6/27/2014 | KSENIA PAVLOVA | X | | X | X | X | X | X | X | | X | | X | | | 14 |
| 79 | 6/3/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | X | X | 2 | 2 | 13 |
| 80 | 6/27/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 2 | 3 | 14 |
| 80 | 6/27/2014 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | | X | | X | | | 14 |
| 76 | 6/4/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 4 | 6 | 13 |
| 76 | 6/9/2014 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | | X | | X | | | 13 |
| 81 | 6/9/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 6 | 4 | 15 |
| 81 | 6/25/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 1 | 15 |

Page 2

## Exhibit 2 - Medical Doctor Initial Evaluations

| RICO NO. | Date of Service | Provider | Patient Complaints | | | Cervical Sprain/Strain, Cervialgia, Myofascitis | Lumbar Sprain/Strain, Low Back Pain, Myofascitis | Other Region | Treatment Plan: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synaptic NM Block | Billed Services: Synaptic TX | Treatment Plan | | Billed Services: Computerized ROM/MMT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Neck Pain | Lower Back Pain | Pain Every Day | | | | | | | | Treatment Plan: Computerized ROM/MMT | Billed Services: Computerized ROM/MMT | | | | |
| 81 | 6/25/2014 | KSENIA PAVLOVA | X | X | X | | X | X | | X | | X | | X | 4 | 3 | 15 |
| 81 | 2/2/2015 | FRANCS J LACINA | X | X | X | | | X | | X | | X | | X | | | 15 |
| 82 | 6/17/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | | X | X | X | | X | | X | 4 | | 14 |
| 82 | 6/27/2014 | NOELE BLACKMAN MD | X | X | X | X | | X | X | X | | X | | X | 2 | 6 | 14 |
| 82 | 7/25/2014 | KSENIA PAVLOVA | X | X | X | X | | X | X | X | | X | | X | | | 14 |
| 84 | 7/9/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | | X | X | X | | X | | X | 4 | 4 | 14 |
| 84 | 7/9/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | | X | X | X | | X | | X | 4 | 4 | 14 |
| 85 | 7/9/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | | X | X | X | | X | | X | 4 | 4 | 15 |
| 86 | 7/9/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | | X | X | X | | X | | X | | | 15 |
| 86 | 9/18/2014 | KSENIA PAVLOVA | X | X | X | | X | X | | X | | X | | X | 5 | 4 | 14 |
| 64 | 7/9/2014 | JULES FRANCOIS PARSEN MD | X | X | X | | X | X | | X | | X | | X | 2 | 5 | 14 |
| 64 | 7/9/2014 | KSENIA PAVLOVA | X | X | X | | X | X | | X | | X | | X | | 2 | 16 |
| 88 | 7/11/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | | 1 | 16 |
| 88 | 8/13/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | | 4 | 16 |
| 88 | 8/19/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | | | 16 |
| 88 | 1/19/2015 | FRANCS J LACINA | X | X | X | X | X | X | | X | | X | | X | | | 17 |
| 87 | 7/18/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 7 | 7 | 17 |
| 87 | 10/20/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | | | 17 |
| 87 | 1/19/2015 | FRANCS J LACINA | X | X | X | X | X | X | | X | | X | | X | | 7 | 17 |
| 89 | 7/18/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | | 17 |
| 89 | 10/20/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | | | 17 |
| 89 | 1/15/2015 | FRANCS J LACINA | X | X | X | X | X | X | | X | | X | | X | | | 17 |
| 89 | 2/6/2015 | NOELE BLACKMAN MD | X | X | X | X | | X | X | X | | X | | X | | 6 | 17 |
| 90 | 7/22/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 91 | 7/25/2014 | NOELE BLACKMAN MD | X | X | X | | X | X | X | X | | X | | X | 3 | 4 | 16 |
| 92 | 8/6/2014 | JULES FRANCOIS PARSEN MD | X | X | X | | X | X | X | X | | X | | X | 2 | 2 | 14 |
| 93 | 8/27/2014 | JULES FRANCOIS PARSEN MD | X | X | X | | X | X | X | X | | X | | X | | | 14 |
| 93 | 8/27/2014 | NOELE BLACKMAN MD | X | X | X | | X | X | X | X | | X | | X | 6 | 6 | 17 |
| 94 | 8/20/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 6 | 6 | 17 |
| 95 | 8/20/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 15 |
| 96 | 8/26/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 96 | 10/27/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 16 |
| 97 | 8/26/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | | | 16 |
| 97 | 9/19/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | | | 16 |
| 98 | 8/26/2014 | NOELE BLACKMAN MD | X | X | X | | X | X | X | X | | X | | X | 4 | | 13 |
| 100 | 8/27/2014 | NOELE BLACKMAN MD | X | X | X | | X | X | X | X | | X | | X | 3 | 2 | 15 |
| 100 | 10/9/2014 | KSENIA PAVLOVA | X | X | X | | X | X | X | X | | X | | X | | | 15 |
| 101 | 8/27/2014 | FRANCS J LACINA | X | X | X | | X | X | X | X | | X | | X | 3 | 2 | 15 |
| 99 | 8/27/2014 | NOELE BLACKMAN MD | X | X | X | | X | X | X | X | | X | | X | 3 | 3 | 16 |
| 99 | 9/22/2014 | KSENIA PAVLOVA | X | X | X | | X | X | X | X | | X | | X | | | 16 |
| 99 | 1/14/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 2 | | 16 |
| 99 | 1/16/2015 | FRANCS J LACINA | X | X | X | | X | X | | X | | X | | X | | 6 | 15 |
| 102 | 9/16/2014 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | | X | 6 | | 15 |
| 102 | 9/18/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 6 | 6 | 15 |
| 103 | 10/20/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 6 | 6 | 15 |
| 103 | 9/17/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 6 | 6 | 13 |
| 104 | 8/27/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 12 |
| 105 | 9/22/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 14 |
| 106 | 9/22/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 106 | 1/15/2015 | FRANCS J LACINA | X | X | X | X | X | X | | X | | X | | X | 3 | 3 | 14 |
| 107 | 1/21/2015 | FRANCS J LACINA | X | X | X | X | X | X | | X | | X | | X | | | 14 |
| 107 | 9/22/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 108 | 9/22/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 15 |
| 107 | 10/1/2014 | KSENIA PAVLOVA | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 15 |
| 108 | 10/1/2014 | NOELE BLACKMAN MD | X | X | X | X | X | X | X | X | | X | | X | | | 15 |

## Exhibit 2 - Medical Doctor Initial Evaluations

| RICO NO. | Date of Service | Provider | Neck Pain | Lower Back Pain | Pain Every Day | Cervical Sprain/Strain, Cervicalgia, Myofascitis | Lumbar Sprain/Strain, Low Back Pain, Myofascitis | Other Region | Treatment Therapy: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synoptic: NM Block | Billed Services: Synaptic TX | Treatment Plan: Computerized ROM/MMT | Billed Services: Computerized ROM/MMT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 109 | 9/24/2014 | NOEL E BLACKMAN MD | X | X | X | X | | X | X | X | | X | | | | 4 | 13 |
| 109 | 10/16/2014 | KSENIA PAVLOVA | X | X | X | X | | X | X | X | | X | | | | | 13 |
| 109 | 1/15/2015 | FRANCIS J LACINA | X | X | X | X | X | X | X | X | | X | | | | | 13 |
| 110 | 9/24/2014 | NOEL E BLACKMAN MD | X | X | X | X | | X | X | X | | X | | | | | 15 |
| 110 | 9/24/2014 | NOEL E BLACKMAN MD | X | X | X | X | | X | X | X | | X | | | 3 | | 15 |
| 110 | 1/15/2015 | FRANCIS J LACINA | X | X | X | X | X | X | X | X | | X | | | | | 15 |
| 111 | 9/24/2014 | NOEL E BLACKMAN MD | X | X | X | X | | X | X | X | | X | | | | | 2 |
| 112 | 9/24/2014 | NOEL E BLACKMAN MD | X | X | X | X | | | X | | X | X | | X | 6 | 6 | 16 |
| 112 | 12/5/2014 | KSENIA PAVLOVA | X | X | X | X | | | X | | | X | | X | 4 | 4 | 16 |
| 112 | 1/15/2015 | FRANCIS J LACINA | X | X | X | X | | X | X | | | X | | X | | | 16 |
| 113 | 9/29/2014 | NOEL E BLACKMAN MD | X | X | X | X | X | | X | | X | X | | X | 4 | 4 | 16 |
| 113 | 11/14/2014 | NOEL E BLACKMAN MD | X | X | X | X | X | | X | | | X | | X | 5 | | 16 |
| 113 | 1/7/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | 2 | 2 | 11 |
| 114 | 2/5/2015 | FRANCIS J LACINA | X | X | X | X | X | X | X | | | X | | X | 2 | 2 | 11 |
| 114 | 11/7/2014 | KSENIA PAVLOVA | X | X | X | X | | X | X | | | X | | X | | | 11 |
| 114 | 1/15/2015 | FRANCIS J LACINA | X | X | X | X | | X | X | | | X | | X | 4 | 4 | 14 |
| 115 | 3/11/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | | X | | | X | | X | | | 14 |
| 115 | 11/7/2014 | KSENIA PAVLOVA | X | X | X | X | | | X | | | X | | X | | | 14 |
| 115 | 1/13/2015 | FRANCIS J LACINA | X | X | X | X | X | X | X | | | X | | X | 3 | 3 | 15 |
| 116 | 11/7/2014 | KSENIA PAVLOVA | X | X | X | X | | | X | | | X | | X | | | 15 |
| 116 | 1/15/2015 | FRANCIS J LACINA | X | X | X | X | | X | X | | | X | | X | 6 | 6 | 14 |
| 117 | 11/7/2014 | KSENIA PAVLOVA | X | X | X | X | X | | X | | | X | | X | 2 | | 14 |
| 117 | 1/15/2015 | FRANCIS J LACINA | X | X | X | X | | | X | | | X | | X | 2 | 2 | 18 |
| 30 | 11/28/2014 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | | X | | | X | | X | 2 | 5 | 18 |
| 30 | 11/28/2014 | NOEL E BLACKMAN MD | X | X | X | X | | | X | | | X | | X | 2 | 2 | 18 |
| 30 | 11/26/2014 | FRANCIS J LACINA | X | X | X | X | | X | X | | | X | | X | | | 11 |
| 30 | 11/16/2014 | FRANCIS J LACINA | X | X | X | X | | | X | | | X | | X | | | 11 |
| 118 | 12/3/2014 | NOEL E BLACKMAN MD | X | X | X | X | X | X | X | | | X | | X | 3 | 3 | 14 |
| 118 | 2/13/2015 | NOEL E BLACKMAN MD | X | X | X | X | | | X | | | X | | X | 6 | 3 | 14 |
| 119 | 12/11/2014 | KSENIA PAVLOVA | X | X | X | X | | X | X | | | X | | X | 3 | 3 | 14 |
| 119 | 12/11/2014 | NOEL E BLACKMAN MD | X | X | X | X | X | X | X | | | X | | X | 3 | 3 | 14 |
| 121 | 12/6/2014 | NOEL E BLACKMAN MD | X | X | X | X | | | X | | | X | | X | 4 | 4 | 16 |
| 120 | 12/16/2014 | NOEL E BLACKMAN MD | X | X | X | X | X | | X | | | X | | X | 4 | 4 | 16 |
| 122 | 12/26/2014 | NOEL E BLACKMAN MD | X | X | X | X | | X | X | | | X | | X | 6 | 6 | 16 |
| 122 | 1/12/2015 | FRANCIS J LACINA | X | X | X | X | | | X | | | X | | X | 6 | 6 | 16 |
| 122 | 1/12/2015 | NOEL E BLACKMAN MD | X | X | X | X | | | X | | | X | | X | 4 | 4 | 16 |
| 122 | 1/19/2015 | FRANCIS J LACINA | X | X | X | X | X | X | X | | | X | | X | | | 16 |
| 123 | 1/16/2015 | NOEL E BLACKMAN MD | X | X | X | X | | | X | | | X | | X | 4 | 4 | 13 |
| 123 | 1/16/2015 | FRANCIS J LACINA | X | X | X | X | | | X | | | X | | X | | | 13 |
| 128 | 1/21/2015 | FRANCIS J LACINA | X | X | X | X | X | | X | | | X | | X | | | 13 |
| 128 | 1/21/2015 | FRANCIS J LACINA | X | X | X | X | | X | X | | | X | | X | | | 13 |
| 129 | 3/4/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | X | X | | | X | | X | 4 | 4 | 14 |
| 129 | 1/16/2015 | FRANCIS J LACINA | X | X | X | X | | | X | | | X | | X | | | 16 |
| 130 | 1/16/2015 | FRANCIS J LACINA | X | X | X | X | | | X | | | X | | X | | | 17 |
| 130 | 1/19/2015 | FRANCIS J LACINA | X | X | X | X | | | X | | | X | X | X | 6 | 8 | 17 |
| 131 | 1/28/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | X | X | | X | 2 | 2 | 17 |
| 131 | 2/6/2015 | FRANCIS J LACINA | X | X | X | X | | | X | | | X | | X | 4 | 4 | 2 |
| 131 | 2/25/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | | X | | | X | | X | 6 | 6 | 16 |
| 131 | 2/9/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | 6 | 2 | 16 |
| 132 | 2/9/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | X | X | | | X | | X | 6 | 6 | 17 |
| 133 | 2/18/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | 4 | 4 | 16 |
| 135 | 2/18/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | 4 | 4 | 16 |
| 136 | 2/18/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | | | X | | X | 3 | 3 | 16 |
| 134 | 2/27/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | | | 16 |
| 139 | 2/25/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | 6 | 6 | 17 |
| 140 | 2/25/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | 8 | 8 | 16 |
| 137 | 2/25/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | X | X | | | X | | X | 4 | 4 | 16 |
| 137 | 10/13/2015 | KSENIA PAVLOVA | X | X | X | X | X | X | X | | | X | | X | | | 16 |
| 141 | 2/25/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | 4 | 4 | 12 |
| 141 | 8/20/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | | | X | X | X | | | 12 |
| 138 | 2/27/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | 2 | 2 | 14 |
| 138 | 4/24/2015 | JULES FRANCOIS PARISIEN MD | X | X | X | X | | | X | | | X | | X | | | 14 |
| 147 | 2/27/2015 | NOEL E BLACKMAN MD | X | X | X | X | | X | X | | | X | | X | 2 | 2 | 14 |

## Exhibit 2 - Medical Doctor Initial Evaluations

| RICO NO. | Date of Service | Provider | Patient Complaints: Neck Pain | Lower Back Pain | Pain Every Day | Cervical Sprain/Strain, Cervicalgia, Myofascitis | Lumbar Sprain/Strain, Low Back Pain, Myofascitis | Other Region | Treatment Plan: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synaptic NM Block | Billed Services: Synaptic TX | Billed Services: Completed ROM/MT | Treatment Plan: Computerized ROM/MMT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 147 | 3/5/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | X | X | X | | X | X | | 3 | 3 | 14 |
| 148 | 2/27/2015 | NOEL E BLACKMAN MD | X | X | X | X | X | | | | | X | X | | 4 | 4 | 17 |
| 148 | 3/4/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | | | | | | | 2 | | 17 |
| 149 | 2/27/2015 | NOEL E BLACKMAN MD | X | X | X | X | | X | | | | X | X | | 4 | 4 | 16 |
| 149 | 3/4/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | | | | X | | | 4 | 4 | 16 |
| 143 | 2/27/2015 | NOEL E BLACKMAN MD | X | X | X | X | X | | X | X | | X | X | | 1 | | 16 |
| 143 | 2/27/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | X | | 4 | 4 | 16 |
| 144 | 2/27/2015 | NOEL E BLACKMAN MD | X | X | X | X | | | X | X | | X | X | | 4 | 4 | 16 |
| 145 | 2/27/2015 | NOEL E BLACKMAN MD | X | X | X | X | | | X | X | | X | X | | 4 | 4 | 16 |
| 145 | 2/27/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | 2 | 2 | 16 |
| 145 | 3/2/2015 | NOEL E BLACKMAN MD | X | X | X | X | | | | | | X | X | | 2 | 2 | 16 |
| 146 | 2/27/2015 | NOEL E BLACKMAN MD | X | X | X | X | | | X | X | | X | X | | 4 | 4 | 16 |
| 146 | 4/8/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | X | X | X | | X | X | | | | 16 |
| 61 | 3/6/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | | | 2 | 2 | 14 |
| 150 | 3/4/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | 2 | 2 | 13 |
| 142 | 3/5/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | | | 4 | 4 | 16 |
| 142 | 7/28/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | | | 16 |
| 142 | 8/17/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | | | 16 |
| 151 | 3/5/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | | | | | 15 |
| 152 | 3/10/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | | | | 4 | 4 | |
| 153 | 4/22/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | | | X | 3 | 3 | |
| 154 | 4/29/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | | | X | 5 | 5 | 2 |
| 155 | 4/29/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | | | X | 6 | 6 | 3 |
| 156 | 4/29/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | | | X | 4 | 4 | 3 |
| 157 | 5/1/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | | X | 5 | 5 | 4 |
| 157 | 8/13/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | | X | X | | X | X | | 7 | 7 | 4 |
| 158 | 5/4/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | | X | 6 | 6 | |
| 159 | 5/8/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | | X | 5 | 5 | 6 |
| 159 | 8/4/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | X | | | | 6 |
| 161 | 5/20/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | X | | 6 | 6 | 17 |
| 161 | 5/8/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | | | 2 |
| 160 | 5/22/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | 4 | 4 | 17 |
| 162 | 5/26/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | X | | X | X | | X | X | | 6 | 6 | 17 |
| 162 | 6/1/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | | | 17 |
| 164 | 6/5/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | 4 | 4 | 12 |
| 164 | 10/6/2015 | KSENIA PAVLOVA | X | X | X | X | | | X | X | | X | X | | | | 12 |
| 163 | 6/5/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | | | |
| 125 | 6/9/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | | | |
| 83 | 6/12/2015 | JULES FRANCOIS PARSEN MD | X | X | X | X | | | X | X | | X | X | | 6 | 6 | 13 |
| 83 | 8/13/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | 3 | 3 | 11 |
| 166 | 7/9/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | | X | X | | X | X | | | | 11 |
| 166 | 9/17/2015 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | X | X | X | | 3 | 4 | 16 |
| 169 | 7/23/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | 4 | 4 | 16 |
| 169 | 8/26/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | | X | X | | X | X | | 3 | 3 | 16 |
| 168 | 8/14/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | 4 | 4 | 10 |
| 170 | 7/31/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | 4 | 4 | 16 |
| 170 | 8/4/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | | X | X | | X | X | | 4 | 4 | 16 |
| 172 | 8/7/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | 3 | 3 | 14 |
| 172 | 8/25/2015 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | | X | X | | 3 | 3 | 14 |
| 171 | 8/5/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | 5 | 5 | 14 |
| 171 | 8/17/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | | X | X | | X | X | | 4 | 5 | 13 |
| 173 | 8/7/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | | | 13 |
| 174 | 8/17/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | | X | X | | X | X | | | | 13 |
| 176 | 9/9/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | X | X | | X | X | | 5 | 5 | 17 |
| 177 | 9/15/2015 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | | X | X | | 5 | 5 | 15 |
| 127 | 9/15/2015 | KSENIA PAVLOVA | X | X | X | X | | | X | X | | X | | X | | | 14 |
| 175 | 9/15/2015 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | | X | X | | 3 | 3 | 15 |
| 175 | 10/9/2015 | KSENIA PAVLOVA | X | X | X | X | X | | X | X | | X | X | | | | 15 |

## Exhibit 2 - Medical Doctor Initial Evaluations

| RICO NO. | Date of Service | Provider | Patient Complaints: Neck Pain | Lower Back Pain | Pain Every Day | Cervical Sprain/Strain, Cervialgia, Myofascitis | Lumbar Sprain/Strain, Low Back Pain, Myofascitis | Other Region | Treatment Plan: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synaptic NM Block | Billed Services: Synaptic TX | Treatment Plan: Computerized ROM/MMT | Billed Services: Computerized ROM/MT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 178 | 10/9/2015 | KSENIA PAVLOVA | X | X | X |  |  | X | X |  |  |  |  |  | 3 | 3 | 10 |
| 179 | 10/20/2015 | RA MEDICAL SERVICES | X | X | X |  |  | X | X |  |  |  |  |  | 4 | 4 |  |
| 180 | 10/30/2015 | RA MEDICAL SERVICES | X | X | X |  |  | X | X |  |  |  |  |  | 5 | 5 |  |
| 182 | 12/10/2015 | FRANCIS JOSEPH LACINA MD | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 15 |
| 182 | 12/11/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 181 | 12/11/2015 | FRANCIS JOSEPH LACINA MD | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 181 | 11/24/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 15 |
| 181 | 12/11/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 183 | 12/11/2015 | FRANCIS JOSEPH LACINA MD | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 15 |
| 183 | 11/24/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 183 | 11/24/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 183 | 1/8/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 184 | 1/7/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 5 | 11 |
| 185 | 11/16/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  |  |  |  | 14 |
| 185 | 11/24/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 14 |
| 186 | 1/6/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 14 |
| 186 | 11/6/2015 | RA MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 14 |
| 186 | 11/24/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 14 |
| 186 | 1/5/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 14 |
| 187 | 11/18/2015 | FRANCIS JOSEPH LACINA MD | X | X | X | X | X | X | X | X |  | X |  | X | 1 | 1 | 14 |
| 187 | 11/24/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 14 |
| 187 | 12/11/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 1 | 1 | 14 |
| 188 | 11/27/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  |  | 3 | 3 | 13 |
| 188 | 12/4/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  |  | 4 | 4 | 13 |
| 190 | 12/17/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 16 |
| 190 | 12/29/2015 | RA MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 16 |
| 190 | 1/5/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 5 | 5 | 16 |
| 191 | 12/17/2015 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 5 | 5 | 16 |
| 191 | 1/7/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 3 | 16 |
| 191 | 12/12/2016 | RA MEDICAL SERVICES |  |  |  |  |  | X | X | X |  | X |  | X |  |  | 16 |
| 189 | 1/8/2016 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 15 |
| 189 | 1/6/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 192 | 1/7/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 15 |
| 192 | 1/6/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 193 | 1/7/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 14 |
| 193 | 1/8/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 14 |
| 194 | 1/8/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 14 |
| 194 | 1/6/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 14 |
| 195 | 1/6/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 4 | 15 |
| 195 | 1/21/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 195 | 1/6/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 15 |
| 196 | 1/19/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 14 |
| 196 | 1/8/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 1 | 1 | 14 |
| 197 | 1/8/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 11 |
| 197 | 1/14/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 11 |
| 198 | 1/15/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 16 |
| 199 | 1/22/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 7 |
| 199 | 1/25/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 7 |
| 200 | 1/19/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 5 | 5 | 15 |
| 201 | 1/22/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 15 |
| 201 | 1/26/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 1 | 1 | 15 |
| 203 | 1/25/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 2 | 2 | 15 |
| 204 | 1/26/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 14 |
| 205 | 2/5/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 16 |
| 206 | 2/23/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 15 |
| 206 | 1/25/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 15 |
| 207 | 2/23/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 4 | 4 | 16 |
| 207 | 4/5/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X |  | X |  | X |  |  | 16 |
| 208 | 2/23/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X |  | X |  | X | 3 | 3 | 14 |

## Exhibit 2 - Medical Doctor Initial Evaluations

| RICO NO. | Date of Service | Provider | Patient Complaints: Neck Pain | Lower Back Pain | Pain Every Day | Cervical Sprain/Strain, Cervialgia, Myofasciitis | Lumbar Sprain/Strain, Low Back Pain, Myofasciitis | Other Region | Treatment Plan: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synaptic NM Block | Billed Services: Synaptic TX | Treatment Plan: Computerized ROM/MMT | Billed Services: Computerized ROM/MT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 209 | 2/25/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 12 |
| 209 | 2/26/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 12 |
| 204 | 3/3/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 210 | 3/8/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 210 | 3/10/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 210 | 3/11/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 15 |
| 211 | 3/25/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 16 |
| 212 | 3/8/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 16 |
| 212 | 3/8/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 16 |
| 213 | 3/11/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 16 |
| 215 | 3/15/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 15 |
| 215 | 5/3/2016 | RA MEDICAL SERVICES | X | X | X | missing | | X | X | X | | X | | X | | | 15 |
| 216 | 3/15/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | missing | X | X | X | X | | X | | X | 2 | 2 | 15 |
| 216 | 5/5/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 217 | 3/22/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 15 |
| 217 | 4/12/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 217 | 10/4/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | 1 | 1 | 15 |
| 218 | 3/22/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 218 | 5/19/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 15 |
| 220 | 3/24/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 10 |
| 220 | 4/12/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 1 | 1 | 10 |
| 221 | 3/29/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 2 | 10 |
| 221 | 4/5/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | 3 | 10 |
| 222 | 3/29/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 10 |
| 219 | 3/31/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 13 |
| 219 | 5/5/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 13 |
| 223 | 3/31/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 10 |
| 224 | 4/1/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | |
| 224 | 4/7/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | |
| 224 | 4/12/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | |
| 226 | 4/7/2016 | JULES FRANCOIS PARISIEN MD | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 11 |
| 226 | 5/13/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 11 |
| 225 | 4/12/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 5 | 4 | 14 |
| 225 | 5/10/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 14 |
| 225 | 9/29/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 227 | 4/14/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 13 |
| 228 | 4/20/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | 5 | 13 |
| 228 | 4/26/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | | 13 |
| 229 | 4/14/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 14 |
| 229 | 5/2/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 1 | | 14 |
| 229 | 5/2/2016 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 231 | 4/19/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 16 |
| 231 | 5/10/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 1 | 2 | 16 |
| 231 | 5/16/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 15 |
| 232 | 5/17/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 232 | 5/17/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 5 | 15 |
| 233 | 5/17/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 234 | 6/1/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 234 | 9/22/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 235 | 5/18/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 235 | 9/19/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 236 | 5/25/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 236 | 5/27/2016 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 237 | 5/25/2016 | PFJ MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 237 | 5/27/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | 1 | 14 |

# Exhibit 2 - Medical Doctor Initial Evaluations

| RICO NO. | Date of Service | Provider | Patient Complaints: Neck Pain | Lower Back Pain | Pain Every Day | Cervical Sprain/Strain, Cervicalgia, Myofasciitis | Lumbar Sprain/Strain, Low Back Pain, Myofascitis | Other Region | Treatment Plan: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synaptic NM Block | Billed Services: Synaptic TX | Treatment Plan: Computerized ROM/NMT | Billed Services: Computerized ROM/NMT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 238 | 5/26/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 238 | 6/2/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | 1 | 2 | 14 |
| 239 | 5/26/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | | | | 10 |
| 239 | 5/27/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | | 4 | 4 | 10 |
| 240 | 6/2/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | | | 1 | 10 |
| 240 | 6/7/2016 | RA MEDICAL SERVICES | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 241 | 6/7/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 247 | 7/8/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 248 | 7/8/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 13 |
| 249 | 7/8/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 13 |
| 250 | 7/11/2016 | P3 MEDICAL CARE PC | X | X | | X | X | X | X | X | | X | | X | 3 | 3 | 13 |
| 244 | 7/19/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 5 | | 15 |
| 253 | 7/25/2016 | P3 MEDICAL CARE PC | X | X | | X | X | X | X | X | | X | | X | 5 | | 15 |
| 245 | 8/5/2016 | P3 MEDICAL CARE PC | X | X | | X | X | X | X | X | | X | | X | 3 | 3 | 13 |
| 251 | 8/5/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 5 | 15 |
| 256 | 8/19/2016 | P3 MEDICAL CARE PC | X | X | | X | X | | X | X | | X | | X | | | 15 |
| 256 | 9/15/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 5 | 5 | 15 |
| 257 | 8/19/2016 | P3 MEDICAL CARE PC | X | X | | X | X | X | X | X | | X | | X | | | 14 |
| 257 | 9/15/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 258 | 8/19/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 258 | 10/3/2016 | JP3 MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 243 | 8/22/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 10 |
| 259 | 8/26/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 15 |
| 259 | 9/16/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 254 | 8/26/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 254 | 10/7/2016 | JP3 MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 260 | 9/19/2016 | JP3 MEDICAL SERVICES PC | X | X | | X | X | X | X | X | | X | | X | | | 15 |
| 260 | 9/19/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 15 |
| 255 | 9/2/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 1 | 1 | 14 |
| 255 | 9/9/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 242 | 9/16/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 242 | 11/1/2016 | JP3 MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 242 | 10/4/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 263 | 9/26/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | | X | X | | X | | X | | | 15 |
| 263 | 9/26/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 264 | 11/16/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 15 |
| 264 | 9/26/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 4 | 4 | 14 |
| 265 | 9/26/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 15 |
| 266 | 11/16/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | | X | X | | X | | X | | | 15 |
| 266 | 10/3/2016 | P3 MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 266 | 11/9/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 267 | 10/4/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 15 |
| 268 | 10/21/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | 1 | 1 | 14 |
| 270 | 10/7/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 14 |
| 270 | 10/7/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | 1 | 1 | 15 |
| 271 | 10/7/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 271 | 11/1/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 272 | 10/10/2016 | JFP MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 15 |
| 272 | 10/11/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 1 | 1 | 15 |
| 273 | 10/21/2016 | ALLAY MEDICAL SERVICES PC | X | X | X | X | X | X | X | X | | X | | X | | | 14 |
| 273 | 11/15/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 2 | 2 | 14 |
| 246 | 11/10/2016 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 1 | 1 | 9 |
| 274 | 12/14/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 275 | 11/23/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 275 | 12/1/2016 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 15 |
| 281 | 11/30/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 281 | 12/2/2016 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 282 | 11/30/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |
| 282 | 12/1/2016 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | |
| 276 | 11/30/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X | | X | | X | 3 | 3 | 14 |

## Exhibit 2 - Medical Doctor Initial Evaluations

| RICO NO. | Date of Service | Provider | Patient Complaints: Neck Pain | Lower Back Pain | Pain Every Day | Cervical Sprain/Strain, Cervialgia, Myofacitis | Lumbar Sprain/Strain, Low Back Pain, Myofacitis | Other Region | Treatment Plan: Physical Therapy | Billed Services: Physical Therapy | Treatment Plan: Synoptic NM Block | Billed Services: Synaptic TX | Treatment Plan: Computerized ROM/MMT | Billed Services: Computerized ROM/MT | Treatment Plan: X-Ray Regions Referred | Treatment Plan: MRI Regions Referred | Billed Services: DME Items |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 276 | 12/5/2016 | KP MEDICAL CARE PC | X | X | X | X |  | X | X | X |  | X |  | X |  | 3 | 14 |
| 283 | 11/30/2016 | JFL MEDICAL CARE PC | X | X | X | X |  | X | X | X |  | X |  | X |  | 3 | 14 |
| 283 | 12/5/2016 | KP MEDICAL CARE PC | X | X | X | X |  | X | X | X |  | X |  | X |  | 3 | 14 |
| 280 | 11/30/2016 | JFL MEDICAL CARE PC | X | X | X | X |  | X | X | X |  | X |  | X |  | 2 | 15 |
| 280 | 12/1/2016 | KP MEDICAL CARE PC | X | X | X |  | X | X | X | X |  | X |  | X |  | 2 | 15 |
| 280 | 1/12/2015 | JFL MEDICAL CARE PC | X | X | X |  | X | X | X | X |  | X |  | X |  | 2 | 15 |
| 278 | 12/12/2016 | KP MEDICAL CARE PC |  | X | X |  | X | X | X | X |  | X |  | X |  | 1 | 15 |
| 278 | 12/12/2016 | JFL MEDICAL CARE PC | X | X | X |  | X | X | X | X |  | X |  | X |  | 1 | 15 |
| 279 | 12/12/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X |  | X |  | X |  | 1 | 9 |
| 277 | 12/5/2016 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X |  | X |  | X |  | 3 | 9 |
| 284 | 12/8/2016 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X |  | X |  | X |  | 3 | 14 |
| 284 | 12/21/2016 | JFL MEDICAL CARE PC | X | X | X |  | X | X | X | X |  | X |  | X |  | 1 | 14 |
| 285 | 12/14/2016 | JFL MEDICAL CARE PC | X | X | X | X | X |  | X | X |  | X |  | X |  | 1 | 15 |
| 286 | 12/14/2016 | JFL MEDICAL CARE PC |  | X | X |  | X |  | X | X |  | X |  | X |  |  | 1 |
| 287 | 12/14/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X |  | X |  | X |  | 3 | 15 |
| 287 | 12/15/2016 | KP MEDICAL CARE PC | X | X | X |  | X | X | X | X |  | X |  | X |  | 2 | 15 |
| 288 | 12/21/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X |  | X |  | X |  | 2 | 14 |
| 288 | 12/28/2016 | JFL MEDICAL CARE PC | X | X | X | X | X |  | X | X | X | X |  |  | X | 3 | 9 |
| 289 | 12/28/2016 | JFL MEDICAL CARE PC | X | X | X | X | X |  | X | X |  | X |  |  | X | 3 | 9 |
| 289 | 12/28/2016 | JFL MEDICAL CARE PC | X | X | X | X | X |  | X | X |  | X |  |  | X | 2 | 9 |
| 290 | 1/11/2017 | KP MEDICAL CARE PC | X | X | X | X | X | X | X | X |  |  |  | X |  | 2 | 9 |
| 290 | 12/28/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X |  |  |  | X |  | 2 | 14 |
| 292 | 12/28/2016 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X |  |  |  | X |  | 3 | 12 |
| 292 | 1/4/2017 | KP MEDICAL CARE PC | X | X | X |  |  | X | X | X |  |  |  | X |  | 2 | 12 |
| 291 | 1/12/2017 | KP MEDICAL CARE PC | X | X | X |  |  | X |  | X |  | X |  | X |  | 3 | 13 |
| 291 | 1/4/2017 | KP MEDICAL CARE PC | X | X | X | X |  | X | X | X |  | X |  | X |  | 3 | 13 |
| 293 | 1/25/2017 | JFL MEDICAL CARE PC | X | X | X |  | X | X |  | X |  | X |  | X |  | 1 | 13 |
| 293 | 1/3/2017 | JFL MEDICAL CARE PC | X | X | X |  | X | X |  | X |  | X |  | X |  | 3 | 14 |
| 294 | 1/3/2017 | JFL MEDICAL CARE PC | X | X | X | X | X | X |  | X |  | X |  | X |  | 3 | 10 |
| 295 | 1/4/2017 | KP MEDICAL CARE PC | X | X | X |  | X | X |  | X |  | X |  | X |  | 3 | 14 |
| 202 | 1/9/2017 | JFL MEDICAL CARE PC | X | X | X | X | X |  |  | X |  | X |  | X |  | 2 | 14 |
| 202 | 1/6/2017 | KP MEDICAL CARE PC |  | X | X |  | X | X | X | X |  | X |  | X |  | 2 | 10 |
| 296 | 1/25/2017 | JFL MEDICAL CARE PC | X | X | X | X | X | X | X | X |  | X |  | X |  | 1 | 10 |
| 297 | 1/9/2017 | JFL MEDICAL CARE PC | X | X | X |  | X | X | X | X |  | X |  | X |  | 3 | 13 |
| 297 | 1/9/2017 | KP MEDICAL CARE PC | X | X | X |  | X | X | X | X |  | X |  | X |  | 3 | 14 |
| 298 | 1/12/2017 | KP MEDICAL CARE PC | X | X | X | X | X | X |  | X |  | X |  | X |  | 3 | 9 |
| 299 | 1/25/2017 | JFL MEDICAL CARE PC | X | X | X | X | X | X |  | X |  | X |  | X |  | 2 | 13 |

(A) Missing or incomplete initial evaluation.

*Exhibit 3*

**Exhibit 3 - Physical Therapy Summary**

| RICO NO. | Physical Therapy Treatment | | | Hot Pack | Massage | Ther Ex | Bio | Laser |
|---|---|---|---|---|---|---|---|---|
| | 1st DOS | Last DOS | DOS Count | 97010 | 97124 | 97110 | 64550 | 97799 |
| 1 | 8/22/2013 | 10/16/2013 | 8 | 8 | 8 | 8 | 8 | 8 |
| 2 | 9/6/2013 | 2/26/2014 | 45 | 45 | 44 | 45 | 37 | 34 |
| 4 | 9/9/2013 | 12/9/2013 | 13 | 13 | 13 | 13 | 13 | 13 |
| 3 | 9/13/2013 | 2/7/2014 | 41 | 41 | 41 | 41 | 26 | 34 |
| 6 | 10/18/2013 | 4/24/2014 | 32 | 32 | 32 | 32 | 32 | 31 |
| 5 | 10/25/2013 | 3/17/2014 | 39 | 39 | 39 | 39 | 39 | 39 |
| 8 | 10/30/2013 | 3/7/2014 | 44 | 44 | 44 | 44 | 35 | 35 |
| 10 | 10/31/2013 | 8/1/2014 | 75 | 65 | 63 | 65 | 73 | 73 |
| 11 | 11/1/2013 | 4/28/2014 | 50 | 39 | 39 | 39 | 49 | 49 |
| 12 | 11/5/2013 | 5/16/2014 | 34 | 33 | 33 | 32 | 33 | 33 |
| 13 | 11/7/2013 | 4/23/2014 | 44 | 44 | 44 | 44 | 44 | 44 |
| 9 | 11/7/2013 | 11/27/2013 | 6 | 5 | 5 | 5 | 6 | 6 |
| 14 | 11/20/2013 | 12/10/2013 | 6 | 6 | 6 | 6 | 6 | 6 |
| 15 | 12/3/2013 | 4/8/2014 | 25 | 25 | 25 | 25 | 25 | 25 |
| 16 | 12/3/2013 | 5/7/2014 | 38 | 38 | 38 | 38 | 38 | 36 |
| 17 | 12/4/2013 | 1/7/2014 | 8 | 8 | 8 | 8 | 8 | 7 |
| 19 | 12/13/2013 | 12/13/2013 | 1 | 1 | 1 | 1 | 1 | 1 |
| 20 | 12/16/2013 | 1/7/2014 | 4 | 4 | 4 | 4 | 4 | 4 |
| 21 | 12/18/2013 | 2/20/2014 | 15 | 14 | 14 | 14 | 14 | 14 |
| 22 | 12/18/2013 | 2/20/2014 | 14 | 14 | 14 | 14 | 10 | 10 |
| 18 | 12/20/2013 | 1/15/2014 | 8 | 8 | 8 | 8 | 8 | 8 |
| 25 | 12/31/2013 | 2/6/2014 | 14 | 14 | 14 | 14 | 14 | 14 |
| 24 | 1/2/2014 | 3/24/2014 | 6 | 5 | 6 | 6 | | |
| 23 | 1/7/2014 | 3/24/2014 | 8 | 8 | 8 | 8 | 7 | 8 |
| 26 | 1/8/2014 | 2/20/2014 | 14 | 13 | 14 | 13 | 13 | 14 |
| 27 | 1/8/2014 | 7/2/2014 | 22 | 22 | 22 | 22 | 22 | 22 |
| 29 | 1/8/2014 | 5/27/2014 | 37 | 37 | 36 | 36 | 37 | 37 |
| 30 | 1/15/2014 | 6/16/2015 | 69 | 68 | 68 | 68 | 61 | 69 |
| 31 | 1/17/2014 | 2/21/2014 | 9 | 9 | 9 | 9 | 9 | 9 |
| 32 | 1/20/2014 | 2/21/2014 | 12 | 12 | 12 | 12 | 9 | 9 |
| 33 | 1/20/2014 | 2/20/2014 | 12 | 12 | 12 | 12 | 12 | 12 |
| 35 | 1/27/2014 | 3/24/2014 | 18 | 18 | 18 | 18 | 18 | 18 |
| 36 | 1/27/2014 | 4/14/2014 | 23 | 23 | 23 | 23 | 20 | 23 |
| 34 | 1/28/2014 | 4/8/2014 | 16 | 16 | 16 | 16 | 16 | 16 |
| 28 | 1/29/2014 | 2/14/2014 | 5 | 5 | 5 | 5 | 5 | 5 |
| 37 | 1/29/2014 | 3/11/2014 | 12 | 12 | 12 | 12 | 12 | 12 |
| 41 | 2/6/2014 | 7/29/2014 | 29 | 29 | 29 | 29 | 29 | 29 |
| 40 | 2/7/2014 | 6/11/2014 | 37 | 23 | 23 | 23 | 37 | 37 |
| 38 | 2/10/2014 | 2/20/2014 | 4 | 4 | 4 | 4 | 4 | 4 |
| 43 | 2/10/2014 | 5/12/2014 | 19 | 19 | 19 | 18 | 19 | 19 |
| 44 | 2/10/2014 | 3/27/2014 | 15 | 15 | 15 | 15 | 15 | 15 |
| 39 | 2/12/2014 | 2/28/2014 | 7 | 7 | 7 | 7 | 7 | 7 |
| 45 | 2/28/2014 | 4/14/2014 | 11 | 11 | 11 | 11 | 11 | 11 |
| 46 | 2/28/2014 | 4/7/2014 | 12 | 12 | 12 | 12 | 12 | 12 |

Exhibit 3 - Physical Therapy Summary

| RICO NO. | Physical Therapy Treatment | | | Hot Pack | Massage | Ther Ex | Bio | Laser |
|---|---|---|---|---|---|---|---|---|
| | 1st DOS | Last DOS | DOS Count | 97010 | 97124 | 97110 | 64550 | 97799 |
| 47 | 2/28/2014 | 4/14/2014 | 13 | 13 | 13 | 13 | 13 | 13 |
| 48 | 3/3/2014 | 3/28/2014 | 7 | 7 | 7 | 7 | 7 | 7 |
| 42 | 3/4/2014 | 6/18/2014 | 24 | 24 | 24 | 24 | 24 | 24 |
| 50 | 3/11/2014 | 6/30/2014 | 17 | 17 | 17 | 17 | 9 | 9 |
| 51 | 3/11/2014 | 9/25/2014 | 35 | 30 | 30 | 30 | 32 | 35 |
| 49 | 3/12/2014 | 3/26/2014 | 5 | 5 | 5 | 5 | 5 | 5 |
| 55 | 3/14/2014 | 4/1/2014 | 8 | 8 | 8 | 8 | 8 | 8 |
| 54 | 3/17/2014 | 4/3/2014 | 6 | 6 | 6 | 6 | 6 | 6 |
| 52 | 3/18/2014 | 10/21/2014 | 23 | 18 | 18 | 18 | 23 | 23 |
| 57 | 3/18/2014 | 4/3/2014 | 6 | 6 | 6 | 6 | 6 | 6 |
| 53 | 3/18/2014 | 5/14/2014 | 10 | 10 | 10 | 10 | 10 | 10 |
| 56 | 3/21/2014 | 4/1/2014 | 2 | 2 | 2 | 2 | | |
| 58 | 3/25/2014 | 6/2/2014 | 13 | 13 | 13 | 13 | 13 | 10 |
| 59 | 3/25/2014 | 6/20/2014 | 15 | 14 | 15 | 15 | 15 | 15 |
| 60 | 4/1/2014 | 4/14/2014 | 5 | 5 | 5 | 5 | 5 | 5 |
| 61 | 4/8/2014 | 11/2/2015 | 24 | 24 | 24 | 24 | 22 | 24 |
| 62 | 4/11/2014 | 6/9/2015 | 58 | 41 | 41 | 40 | 53 | 49 |
| 67 | 4/11/2014 | 8/14/2015 | 35 | 35 | 35 | 35 | 14 | 34 |
| 63 | 4/15/2014 | 5/9/2014 | 10 | 10 | 10 | 10 | 10 | 10 |
| 65 | 4/29/2014 | 5/5/2014 | 2 | 2 | 2 | 2 | 2 | 2 |
| 66 | 4/30/2014 | 8/15/2014 | 17 | 14 | 14 | 14 | 14 | 14 |
| 70 | 5/1/2014 | 12/17/2014 | 19 | 19 | 19 | 19 | 19 | 19 |
| 71 | 5/19/2014 | 9/16/2014 | 31 | 31 | 31 | 31 | 21 | 30 |
| 72 | 5/22/2014 | 7/18/2014 | 16 | 10 | 10 | 10 | 16 | 16 |
| 73 | 5/23/2014 | 12/2/2014 | 32 | 10 | 10 | 10 | 20 | 29 |
| 74 | 5/29/2014 | 9/12/2014 | 25 | 25 | 25 | 25 | 25 | 25 |
| 77 | 6/4/2014 | 8/26/2014 | 13 | 11 | 11 | 11 | 12 | 11 |
| 78 | 6/4/2014 | 10/22/2014 | 38 | 37 | 38 | 38 | 38 | 38 |
| 79 | 6/4/2014 | 7/9/2014 | 9 | 8 | 9 | 9 | 9 | 7 |
| 75 | 6/5/2014 | 6/11/2014 | 3 | 3 | 3 | 3 | 3 | 3 |
| 76 | 6/6/2014 | 11/25/2014 | 23 | 22 | 23 | 23 | 18 | 19 |
| 81 | 6/12/2014 | 7/29/2015 | 28 | 28 | 28 | 28 | 28 | 28 |
| 82 | 6/23/2014 | 11/21/2014 | 13 | 13 | 13 | 13 | 13 | 13 |
| 69 | 7/3/2014 | 1/7/2015 | 16 | 16 | 16 | 16 | 15 | 13 |
| 83 | 7/3/2014 | 12/16/2015 | 23 | 22 | 22 | 22 | 21 | 22 |
| 84 | 7/10/2014 | 8/8/2014 | 12 | 12 | 12 | 12 | 12 | 12 |
| 85 | 7/11/2014 | 8/6/2014 | 12 | 12 | 12 | 12 | 12 | 12 |
| 87 | 7/21/2014 | 1/16/2015 | 41 | 41 | 41 | 41 | 35 | 35 |
| 89 | 7/21/2014 | 3/11/2015 | 42 | 42 | 42 | 42 | 40 | 32 |
| 92 | 8/11/2014 | 9/4/2014 | 11 | 9 | 9 | 9 | 6 | 6 |
| 86 | 8/11/2014 | 9/18/2014 | 5 | 5 | 5 | 5 | 5 | 5 |
| 93 | 8/13/2014 | 11/14/2014 | 24 | 24 | 24 | 24 | 24 | 24 |
| 96 | 8/27/2014 | 2/23/2015 | 29 | 29 | 29 | 29 | 29 | 29 |
| 97 | 8/27/2014 | 11/10/2014 | 18 | 17 | 17 | 17 | 17 | 17 |

Exhibit 3 - Physical Therapy Summary

| RICO NO. | Physical Therapy Treatment | | | Hot Pack | Massage | Ther Ex | Bio | Laser |
|---|---|---|---|---|---|---|---|---|
| | 1st DOS | Last DOS | DOS Count | 97010 | 97124 | 97110 | 64550 | 97799 |
| 98 | 8/27/2014 | 10/2/2014 | 17 | 16 | 16 | 16 | 16 | 16 |
| 99 | 8/28/2014 | 4/22/2015 | 34 | 33 | 34 | 34 | 33 | 28 |
| 94 | 9/2/2014 | 10/8/2014 | 10 | 10 | 10 | 10 | 10 | 10 |
| 95 | 9/2/2014 | 10/8/2014 | 10 | 10 | 10 | 10 | 10 | 10 |
| 100 | 9/2/2014 | 2/18/2016 | 15 | 13 | 14 | 13 | 7 | 7 |
| 101 | 9/3/2014 | 11/4/2014 | 11 | 11 | 11 | 11 | 11 | 11 |
| 90 | 9/17/2014 | 9/17/2014 | 1 | 1 | 1 | 1 | 1 | 1 |
| 103 | 9/18/2014 | 11/28/2014 | 16 | 16 | 16 | 16 | 11 | 16 |
| 104 | 9/19/2014 | 1/13/2015 | 31 | 31 | 30 | 31 | 31 | 31 |
| 105 | 9/23/2014 | 10/24/2014 | 9 | 9 | 9 | 9 | 9 | 9 |
| 107 | 9/23/2014 | 1/30/2015 | 10 | 10 | 10 | 10 | 10 | 10 |
| 108 | 9/23/2014 | 11/25/2014 | 13 | 13 | 11 | 13 | 13 | 13 |
| 109 | 9/25/2014 | 1/15/2015 | 12 | 12 | 12 | 12 | 12 | 12 |
| 110 | 9/25/2014 | 1/21/2015 | 11 | 11 | 11 | 11 | 9 | 9 |
| 112 | 9/26/2014 | 12/5/2014 | 13 | 10 | 10 | 10 | 9 | 12 |
| 111 | 10/2/2014 | 10/22/2014 | 8 | 8 | 8 | 8 | 8 | 8 |
| 88 | 10/6/2014 | 7/16/2015 | 69 | 68 | 67 | 68 | 69 | 69 |
| 113 | 10/16/2014 | 12/4/2014 | 14 | 14 | 14 | 14 | 14 | 14 |
| 106 | 10/17/2014 | 2/3/2015 | 15 | 15 | 15 | 15 | 15 | 15 |
| 115 | 11/11/2014 | 1/8/2015 | 15 | 15 | 15 | 15 | 15 | 5 |
| 117 | 11/11/2014 | 1/8/2015 | 15 | 15 | 15 | 15 | 15 | 15 |
| 116 | 11/17/2014 | 1/20/2015 | 14 | 14 | 14 | 14 | 14 | 14 |
| 102 | 11/18/2014 | 12/10/2014 | 6 | 6 | 6 | 6 | 6 | 6 |
| 114 | 11/19/2014 | 2/12/2015 | 11 | 11 | 11 | 11 | 9 | 9 |
| 118 | 12/4/2014 | 2/24/2015 | 29 | 29 | 29 | 29 | 29 | 28 |
| 121 | 12/17/2014 | 1/21/2015 | 14 | 14 | 14 | 14 | 14 | 14 |
| 120 | 12/17/2014 | 1/12/2015 | 10 | 10 | 10 | 10 | 9 | 10 |
| 122 | 12/17/2014 | 3/2/2015 | 23 | 11 | 11 | 11 | 23 | 23 |
| 123 | 12/17/2014 | 1/23/2015 | 16 | 16 | 16 | 16 | 16 | 16 |
| 119 | 12/22/2014 | 1/19/2015 | 5 | 5 | 5 | 5 | 5 | 5 |
| 128 | 1/19/2015 | 2/25/2015 | 10 | 10 | 10 | 10 | 10 | 10 |
| 129 | 1/19/2015 | 3/5/2015 | 15 | 15 | 15 | 15 | 15 | 15 |
| 130 | 1/19/2015 | 2/19/2015 | 10 | 10 | 10 | 10 | 10 | 10 |
| 132 | 2/10/2015 | 6/10/2015 | 25 | 25 | 25 | 25 | 25 | 25 |
| 131 | 2/10/2015 | 5/15/2015 | 8 | 8 | 8 | 8 | 6 | 8 |
| 133 | 2/13/2015 | 4/29/2015 | 7 | 7 | 7 | 7 | 7 | 7 |
| 136 | 2/19/2015 | 5/20/2015 | 13 | 13 | 13 | 13 | 12 | 13 |
| 134 | 2/19/2015 | 2/25/2015 | 3 | 3 | 3 | 3 | 3 | 3 |
| 139 | 2/25/2015 | 10/7/2015 | 16 | 16 | 16 | 16 | 15 | 16 |
| 140 | 2/26/2015 | 7/22/2015 | 21 | 20 | 20 | 20 | 14 | 10 |
| 137 | 2/26/2015 | 12/8/2015 | 47 | 46 | 46 | 46 | 46 | 46 |
| 148 | 3/2/2015 | 3/26/2015 | 10 | 10 | 10 | 10 | 10 | 10 |
| 147 | 3/3/2015 | 3/26/2015 | 11 | 11 | 11 | 11 | 11 | 11 |
| 149 | 3/3/2015 | 3/26/2015 | 11 | 11 | 11 | 11 | 11 | 11 |

**Exhibit 3 - Physical Therapy Summary**

| RICO NO. | Physical Therapy Treatment | | | Hot Pack | Massage | Ther Ex | Bio | Laser |
|---|---|---|---|---|---|---|---|---|
| | 1st DOS | Last DOS | DOS Count | 97010 | 97124 | 97110 | 64550 | 97799 |
| 146 | 3/3/2015 | 4/22/2015 | 10 | 10 | 10 | 10 | 10 | 10 |
| 143 | 3/4/2015 | 4/1/2015 | 11 | 11 | 11 | 11 | 11 | 11 |
| 151 | 3/6/2015 | 3/25/2015 | 5 | 5 | 5 | 5 | 5 | 5 |
| 150 | 3/10/2015 | 3/27/2015 | 9 | 9 | 9 | 9 | 9 | 9 |
| 145 | 3/30/2015 | 4/9/2015 | 5 | 5 | 5 | 5 | 5 | 5 |
| 138 | 4/2/2015 | 5/8/2015 | 5 | 5 | 5 | 5 | 5 | 5 |
| 135 | 4/2/2015 | 5/20/2015 | 6 | 6 | 6 | 6 | 6 | 6 |
| 142 | 4/21/2015 | 9/3/2015 | 21 | 21 | 20 | 21 | 21 | 17 |
| 141 | 4/21/2015 | 8/20/2015 | 20 | 20 | 20 | 20 | 19 | 20 |
| 153 | 4/23/2015 | 5/1/2015 | 5 | 5 | 5 | 5 | 5 | 5 |
| 154 | 4/30/2015 | 7/15/2015 | 16 | 16 | 16 | 16 | 16 | 16 |
| 156 | 4/30/2015 | 5/21/2015 | 8 | 7 | 7 | 7 | 7 | 7 |
| 158 | 5/7/2015 | 6/8/2015 | 4 | 4 | 4 | 4 | 4 | 4 |
| 159 | 5/11/2015 | 9/16/2015 | 38 | 38 | 38 | 38 | 37 | 33 |
| 157 | 5/19/2015 | 9/25/2015 | 33 | 31 | 32 | 32 | 33 | 32 |
| 161 | 5/20/2015 | 12/11/2015 | 28 | 26 | 26 | 26 | 25 | 28 |
| 160 | 5/26/2015 | 12/4/2015 | 54 | 49 | 49 | 49 | 49 | 54 |
| 162 | 5/27/2015 | 10/27/2015 | 31 | 31 | 31 | 31 | 31 | 31 |
| 164 | 6/9/2015 | 10/26/2015 | 26 | 23 | 23 | 23 | 24 | 25 |
| 125 | 7/1/2015 | 1/11/2016 | 57 | 57 | 57 | 57 | 52 | 56 |
| 166 | 7/13/2015 | 10/20/2015 | 16 | 16 | 16 | 16 | 16 | 12 |
| 167 | 7/9/2015 | 9/8/2015 | 18 | 18 | 18 | 18 | 18 | 19 |
| 165 | 7/20/2015 | 7/20/2015 | 1 | 1 | 1 | 1 | 1 | 1 |
| 169 | 7/24/2015 | 10/7/2015 | 28 | 21 | 21 | 21 | 28 | 28 |
| 170 | 8/3/2015 | 10/28/2015 | 10 | 10 | 10 | 10 | 10 | 10 |
| 172 | 8/11/2015 | 9/24/2015 | 14 | 14 | 14 | 14 | 14 | 13 |
| 174 | 8/25/2015 | 10/30/2015 | 10 | 10 | 10 | 10 | 10 | 10 |
| 173 | 9/8/2015 | 3/24/2016 | 13 | 13 | 13 | 13 | 13 | 13 |
| 176 | 9/14/2015 | 1/26/2016 | 43 | 43 | 43 | 43 | 43 | 43 |
| 177 | 9/16/2015 | 10/9/2015 | 8 | 8 | 8 | 8 | 8 | 8 |
| 127 | 9/16/2015 | 6/23/2016 | 95 | 95 | 95 | 95 | 95 | 95 |
| 175 | 9/16/2015 | 10/15/2015 | 8 | 8 | 8 | 8 | 7 | 8 |
| 178 | 10/14/2015 | 7/28/2016 | 87 | 84 | 84 | 84 | 85 | 86 |
| 124 | 11/11/2015 | 1/12/2016 | 11 | 11 | 11 | 11 | 11 | 11 |
| 182 | 11/11/2015 | 11/11/2015 | 1 | 1 | 1 | 1 | 1 | 1 |
| 181 | 11/16/2015 | 3/1/2016 | 18 | 18 | 18 | 18 | 18 | 18 |
| 183 | 11/16/2015 | 3/15/2016 | 19 | 19 | 19 | 19 | 19 | 19 |
| 184 | 11/17/2015 | 12/2/2015 | 5 | 5 | 5 | 5 | 5 | 5 |
| 185 | 11/17/2015 | 2/24/2016 | 22 | 22 | 22 | 22 | 22 | 22 |
| 186 | 11/17/2015 | 1/6/2016 | 16 | 16 | 16 | 16 | 16 | 16 |
| 187 | 11/19/2015 | 2/18/2016 | 29 | 29 | 29 | 29 | 29 | 29 |
| 188 | 12/3/2015 | 12/28/2015 | 8 | 8 | 8 | 8 | 8 | 3 |
| 190 | 12/18/2015 | 3/3/2016 | 23 | 21 | 22 | 22 | 22 | 22 |
| 191 | 12/18/2015 | 5/20/2016 | 38 | 38 | 38 | 38 | 38 | 38 |

Exhibit 3 - Physical Therapy Summary

| RICO NO. | Physical Therapy Treatment | | | Hot Pack | Massage | Ther Ex | Bio | Laser |
|---|---|---|---|---|---|---|---|---|
| | 1st DOS | Last DOS | DOS Count | 97010 | 97124 | 97110 | 64550 | 97799 |
| 126 | 12/22/2015 | 3/1/2016 | 19 | 11 | 11 | 11 | 19 | 19 |
| 189 | 12/23/2015 | 3/3/2016 | 17 | 17 | 17 | 17 | 16 | 17 |
| 192 | 1/8/2016 | 5/20/2016 | 18 | 18 | 18 | 18 | 8 | 18 |
| 193 | 1/8/2016 | 5/20/2016 | 20 | 13 | 13 | 13 | 18 | 9 |
| 194 | 1/11/2016 | 3/11/2016 | 21 | 21 | 21 | 21 | 21 | 21 |
| 196 | 1/11/2016 | 3/31/2016 | 21 | 21 | 21 | 21 | 21 | 21 |
| 197 | 1/11/2016 | 3/15/2016 | 19 | 19 | 19 | 19 | 19 | 19 |
| 195 | 1/13/2016 | 4/6/2016 | 25 | 25 | 25 | 24 | 15 | 25 |
| 199 | 1/25/2016 | 3/23/2016 | 19 | 19 | 19 | 19 | 19 | 19 |
| 200 | 1/25/2016 | 2/10/2016 | 8 | 8 | 8 | 8 | 8 | 8 |
| 201 | 1/25/2016 | 4/6/2016 | 32 | 32 | 31 | 32 | 32 | 32 |
| 198 | 1/26/2016 | 3/16/2016 | 11 | 11 | 11 | 11 | 10 | 11 |
| 203 | 1/26/2016 | 4/8/2016 | 20 | 20 | 20 | 20 | 20 | 20 |
| 205 | 1/28/2016 | 5/12/2016 | 27 | 27 | 27 | 27 | 27 | 27 |
| 204 | 1/29/2016 | 3/16/2016 | 7 | 7 | 7 | 7 | | |
| 206 | 2/24/2016 | 4/13/2016 | 15 | 15 | 15 | 15 | 15 | 15 |
| 207 | 2/24/2016 | 4/13/2016 | 15 | 15 | 15 | 15 | 15 | 15 |
| 208 | 2/24/2016 | 4/11/2016 | 17 | 17 | 17 | 17 | 17 | 17 |
| 209 | 2/26/2016 | 3/9/2016 | 6 | 6 | 6 | 6 | 6 | 6 |
| 211 | 3/9/2016 | 5/11/2016 | 18 | 18 | 18 | 18 | 18 | 18 |
| 212 | 3/11/2016 | 6/10/2016 | 16 | 16 | 16 | 16 | 16 | 16 |
| 210 | 3/14/2016 | 6/2/2016 | 28 | 27 | 27 | 27 | 27 | 27 |
| 216 | 3/16/2016 | 8/5/2016 | 21 | 21 | 21 | 21 | 21 | 21 |
| 213 | 3/17/2016 | 4/13/2016 | 11 | 11 | 11 | 11 | 11 | 11 |
| 215 | 3/17/2016 | 7/13/2016 | 34 | 34 | 34 | 34 | 34 | 34 |
| 217 | 3/23/2016 | 1/26/2017 | 36 | 35 | 36 | 36 | 36 | 36 |
| 218 | 3/23/2016 | 7/27/2016 | 20 | 20 | 20 | 20 | 20 | 20 |
| 220 | 3/25/2016 | 5/19/2016 | 17 | 17 | 17 | 17 | 17 | 16 |
| 219 | 4/7/2016 | 5/12/2016 | 5 | 5 | 5 | 5 | 5 | 5 |
| 228 | 4/15/2016 | 5/3/2016 | 8 | 8 | 8 | 8 | | 8 |
| 227 | 4/18/2016 | 4/26/2016 | 5 | 5 | 5 | 5 | 4 | 5 |
| 229 | 4/18/2016 | 1/18/2017 | 41 | 37 | 37 | 37 | 41 | 41 |
| 226 | 4/18/2016 | 6/2/2016 | 13 | 13 | 13 | 13 | 13 | 13 |
| 230 | 4/19/2016 | 5/2/2016 | 6 | 6 | 6 | 6 | 6 | 6 |
| 225 | 4/20/2016 | 10/10/2016 | 22 | 22 | 22 | 22 | 22 | 22 |
| 231 | 4/21/2016 | 1/18/2017 | 26 | 26 | 26 | 26 | 26 | 26 |
| 232 | 5/17/2016 | 8/25/2016 | 26 | 25 | 26 | 26 | | |
| 233 | 5/17/2016 | 8/17/2016 | 16 | 16 | 16 | 16 | 16 | 16 |
| 234 | 5/18/2016 | 10/18/2016 | 24 | 17 | 17 | 17 | 17 | 24 |
| 235 | 5/19/2016 | 12/20/2016 | 87 | 86 | 86 | 86 | 85 | 85 |
| 236 | 5/26/2016 | 1/11/2017 | 52 | 52 | 52 | 52 | 52 | 52 |
| 239 | 5/27/2016 | 6/3/2016 | 4 | 4 | 4 | 4 | 4 | 4 |
| 237 | 5/27/2016 | 7/12/2016 | 17 | 17 | 16 | 17 | 17 | 17 |
| 238 | 5/31/2016 | 6/30/2016 | 15 | 15 | 15 | 15 | 15 | 15 |

Exhibit 3 - Physical Therapy Summary

| RICO NO. | Physical Therapy Treatment | | | Hot Pack | Massage | Ther Ex | Bio | Laser |
|---|---|---|---|---|---|---|---|---|
| | 1st DOS | Last DOS | DOS Count | 97010 | 97124 | 97110 | 64550 | 97799 |
| 241 | 6/10/2016 | 7/15/2016 | 9 | 9 | 9 | 9 | | |
| 240 | 6/10/2016 | 7/15/2016 | 9 | 9 | 9 | 9 | 9 | 9 |
| 245 | 6/30/2016 | 10/25/2016 | 20 | 20 | 20 | 20 | 20 | 20 |
| 246 | 6/30/2016 | 11/23/2016 | 22 | 22 | 22 | 22 | 16 | 22 |
| 247 | 7/12/2016 | 7/19/2016 | 4 | 4 | 4 | 4 | 4 | 4 |
| 248 | 7/12/2016 | 9/7/2016 | 16 | 16 | 16 | 16 | 16 | 16 |
| 249 | 7/12/2016 | 7/22/2016 | 4 | 4 | 4 | 4 | 4 | 4 |
| 250 | 7/12/2016 | 8/9/2016 | 11 | 11 | 11 | 11 | 7 | 7 |
| 251 | 7/13/2016 | 7/19/2016 | 4 | 4 | 4 | 4 | 4 | 4 |
| 253 | 7/18/2016 | 9/14/2016 | 26 | 25 | 26 | 25 | 26 | 26 |
| 244 | 7/27/2016 | 9/19/2016 | 9 | 9 | 9 | 9 | 9 | 9 |
| 254 | 8/12/2016 | 11/17/2016 | 33 | 32 | 32 | 32 | 32 | 32 |
| 255 | 8/17/2016 | 10/10/2016 | 15 | 15 | 15 | 15 | 15 | 15 |
| 256 | 8/19/2016 | 10/14/2016 | 22 | 22 | 22 | 22 | 22 | 22 |
| 257 | 8/19/2016 | 9/28/2016 | 15 | 14 | 14 | 14 | 14 | 14 |
| 258 | 8/22/2016 | 10/10/2016 | 8 | 8 | 8 | 8 | 2 | 8 |
| 243 | 8/25/2016 | 9/29/2016 | 3 | 3 | 3 | 3 | 3 | 3 |
| 260 | 8/26/2016 | 11/23/2016 | 24 | 24 | 24 | 24 | 24 | 24 |
| 259 | 8/29/2016 | 10/3/2016 | 10 | 10 | 10 | 10 | 10 | 10 |
| 262 | 9/8/2016 | 11/21/2016 | 17 | 17 | 17 | 17 | 17 | 17 |
| 242 | 9/12/2016 | 1/26/2017 | 39 | 39 | 39 | 39 | 39 | 32 |
| 263 | 9/28/2016 | 1/23/2017 | 20 | 20 | 20 | 20 | 20 | 20 |
| 265 | 9/28/2016 | 11/21/2016 | 15 | 15 | 15 | 15 | 15 | 15 |
| 264 | 9/29/2016 | 1/16/2017 | 16 | 16 | 16 | 16 | 16 | 16 |
| 266 | 10/4/2016 | 1/13/2017 | 21 | 21 | 21 | 21 | 21 | 21 |
| 267 | 10/5/2016 | 10/10/2016 | 2 | 2 | 2 | 2 | 2 | 2 |
| 268 | 10/6/2016 | 12/5/2016 | 15 | 15 | 15 | 15 | 15 | 15 |
| 270 | 10/7/2016 | 11/16/2016 | 9 | 9 | 9 | 9 | 9 | 9 |
| 271 | 10/10/2016 | 1/20/2017 | 40 | 40 | 40 | 40 | 40 | 40 |
| 272 | 10/12/2016 | 1/6/2017 | 29 | 29 | 29 | 29 | 29 | 29 |
| 273 | 10/24/2016 | 1/18/2017 | 38 | 38 | 38 | 38 | 38 | 38 |
| 275 | 11/25/2016 | 12/29/2016 | 10 | 10 | 10 | 10 | 10 | 10 |
| 281 | 12/1/2016 | 1/18/2017 | 18 | 17 | 18 | 16 | 17 | 17 |
| 282 | 12/1/2016 | 12/27/2016 | 4 | 1 | 1 | 1 | 4 | 1 |
| 283 | 12/1/2016 | 1/17/2017 | 16 | 16 | 16 | 16 | 15 | 16 |
| 280 | 12/1/2016 | 1/25/2017 | 13 | 13 | 13 | 13 | 13 | 13 |
| 276 | 12/2/2016 | 1/26/2017 | 24 | 24 | 24 | 24 | 24 | 24 |
| 278 | 12/5/2016 | 1/16/2017 | 10 | 10 | 10 | 10 | 10 | 10 |
| 279 | 12/5/2016 | 1/13/2017 | 9 | 9 | 9 | 9 | 9 | 9 |
| 277 | 12/6/2016 | 12/19/2016 | 4 | 4 | 4 | 4 | 3 | 3 |
| 274 | 12/7/2016 | 12/28/2016 | 6 | 6 | 6 | 6 | 6 | 6 |
| 284 | 12/12/2016 | 1/19/2017 | 16 | 16 | 16 | 16 | 16 | 16 |
| 285 | 12/15/2016 | 1/24/2017 | 12 | 12 | 12 | 12 | 12 | 12 |
| 286 | 12/15/2016 | 1/27/2017 | 10 | 10 | 10 | 10 | 10 | 10 |

**Exhibit 3 - Physical Therapy Summary**

| RICO NO. | Physical Therapy Treatment | | | Hot Pack | Massage | Ther Ex | Bio | Laser |
|---|---|---|---|---|---|---|---|---|
| | 1st DOS | Last DOS | DOS Count | 97010 | 97124 | 97110 | 64550 | 97799 |
| 287 | 12/15/2016 | 1/26/2017 | 8 | 8 | 8 | 8 | 8 | 8 |
| 288 | 12/20/2016 | 1/27/2017 | 7 | 7 | 7 | 7 | 7 | 7 |
| 289 | 12/29/2016 | 1/9/2017 | 6 | 6 | 6 | 6 | 6 | 6 |
| 292 | 12/30/2016 | 1/18/2017 | 8 | 7 | 8 | 7 | 7 | 7 |
| 290 | 1/3/2017 | 1/23/2017 | 8 | 8 | 8 | 8 | | |
| 291 | 1/3/2017 | 1/27/2017 | 12 | 12 | 12 | 12 | 12 | 12 |
| 294 | 1/4/2017 | 1/26/2017 | 10 | 10 | 10 | 10 | 10 | 10 |
| 293 | 1/5/2017 | 1/25/2017 | 10 | 10 | 10 | 10 | 10 | 10 |
| 295 | 1/5/2017 | 1/26/2017 | 8 | 8 | 8 | 8 | 8 | 8 |
| 202 | 1/6/2017 | 1/26/2017 | 8 | 8 | 8 | 8 | 8 | 8 |
| 296 | 1/10/2017 | 1/25/2017 | 8 | 2 | 2 | 2 | 8 | 8 |
| 297 | 1/10/2017 | 1/26/2017 | 7 | 7 | 7 | 7 | 7 | 7 |
| 298 | 1/11/2017 | 1/26/2017 | 6 | 6 | 6 | 6 | 6 | 6 |
| 299 | 1/13/2017 | 1/25/2017 | 5 | 5 | 5 | 5 | 5 | 5 |

# *Exhibit 4*

**Exhibit 4 - Chiropractic Initial Evaluations**

| RICO NO. | Provider | Date of Service | Neck Pain | Middle Back Pain | Low Back Pain | No Numbness Tingling Weakness | Paraspinal Tenderness | Positive Ortho Tests | Cervical | Thoracic | Lumbar | Hip | Cervical | Thoracic | Lumbar | Chiro Manipulative Therapy 3 times per week | Re-Exam | Small Pain Fiber Test | Ther Ex. | Referral for X-Ray/MRI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Patient Complaints | | | Physical Exam Findings | | | Segmental Joint Dysfunction DX | | | | Sprain Diagnosis | | | Treatment Plan Recommendations | | | | |
| 3 | DARREN T MOLLO | 9/4/2013 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x |
| 4 | DARREN T MOLLO | 9/5/2013 | x | | x | x | x | x | x | x | x | x | x | | x | x | x | x | | x |
| 2 | DARREN T MOLLO | 9/12/2013 | | | x | | x | x | x | x | x | x | | x | x | x | x | | | x |
| 5 | DARREN T MOLLO | 10/15/2013 | x | x | x | x | x | x | x | x | x | x | x | | x | x | | | | x |
| 6 | DARREN T MOLLO | 10/21/2013 | x | x | x | | x | x | x | x | x | x | x | | x | x | x | x | | x |
| 7 | DARREN T MOLLO | 10/22/2013 | x | x | x | | x | x | x | x | x | x | x | | x | x | | x | | x |
| 8 | DARREN T MOLLO | 10/30/2013 | x | | x | | x | x | x | x | x | | x | | x | x | | | | x |
| 9 | DARREN T MOLLO | 10/30/2013 | x | x | x | | x | x | x | x | x | x | | | x | x | x | x | | x |
| 10 | DARREN T MOLLO | 11/1/2013 | x | | x | x | x | x | x | x | x | x | | x | x | x | x | x | | x |
| 12 | DARREN T MOLLO | 11/1/2013 | x | | x | x | x | x | x | x | x | x | x | | x | x | | | | x |
| 11 | DARREN T MOLLO | 11/4/2013 | x | x | x | | x | x | x | x | x | x | x | x | x | x | x | x | | x |
| 13 | DARREN T MOLLO | 11/8/2013 | x | | x | x | x | x | x | x | x | x | | | x | x | | | | x |
| 14 | DARREN T MOLLO | 11/26/2013 | x | x | x | | x | x | x | x | x | | | x | x | x | x | x | | x |
| 15 | DARREN T MOLLO | 12/5/2013 | x | | x | x | x | x | x | x | x | | | x | x | x | x | x | | x |
| 16 | DARREN T MOLLO | 12/5/2013 | x | x | x | | x | x | x | x | x | | | x | x | x | x | x | | x |
| 18 | DARREN T MOLLO | 12/9/2013 | x | | x | x | x | x | x | x | x | x | | x | x | x | x | x | | x |
| 19 | DARREN T MOLLO | 12/11/2013 | x | | x | | x | x | | | x | | | | x | x | x | | | x |
| 20 | DARREN T MOLLO | 12/16/2013 | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | | | |
| 21 | DARREN T MOLLO | 12/18/2013 | x | x | x | | x | x | x | x | x | x | x | | x | x | x | | | |
| 22 | DARREN T MOLLO | 12/18/2013 | x | x | x | x | x | x | | | x | | | | x | x | x | | | |
| 23 | DARREN T MOLLO | 12/26/2013 | | | x | | x | x | x | x | x | x | x | | x | x | x | | | x |
| 25 | DARREN T MOLLO | 12/31/2013 | x | | x | x | x | x | x | x | x | x | x | | x | x | x | x | | x |
| 17 | DARREN T MOLLO | 1/7/2014 | x | | x | x | x | x | x | x | x | | x | | x | x | x | | | x |
| 26 | DARREN T MOLLO | 1/7/2014 | x | x | x | x | x | x | x | x | x | x | x | | x | x | x | x | | x |
| 27 | DARREN T MOLLO | 1/7/2014 | x | x | x | | x | x | x | x | x | x | x | | x | x | x | x | | x |
| 29 | DARREN T MOLLO | 1/7/2014 | x | | x | x | x | x | x | x | x | | x | x | x | x | x | x | | x |
| 33 | DARREN T MOLLO | 1/17/2014 | x | x | x | x | x | x | x | x | x | | x | x | x | x | x | x | | x |
| 31 | DARREN T MOLLO | 1/17/2014 | x | x | x | x | x | x | x | x | x | | x | x | x | x | x | x | | x |
| 28 | DARREN T MOLLO | 1/20/2014 | x | ⌐ | ⌐ | ⌐ | x | x | ⌐ | x | x | ⌐ | ⌐ | x | x | x | x | ⌐ | ⌐ | ⌐ |
| 32 | DARREN T MOLLO | 1/23/2014 | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | ⌐ | x |
| 35 | DARREN T MOLLO | 1/24/2014 | x | ⌐ | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 36 | DARREN T MOLLO | 1/24/2014 | x | | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 37 | DARREN T MOLLO | 1/28/2014 | x | x | x | x | x | x | | | x | | | x | x | x | x | x | | x |
| 34 | DARREN T MOLLO | 1/29/2014 | x | x | x | x | x | x | x | x | x | | | x | x | x | x | x | x | x |
| 39 | DARREN T MOLLO | 2/5/2014 | x | x | x | ⌐ | x | x | x | x | x | x | x | | x | x | x | x | x | x |
| 41 | DARREN T MOLLO | 2/5/2014 | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | | x |
| 40 | DARREN T MOLLO | 2/5/2014 | x | x | x | ⌐ | x | x | ⌐ | x | x | ⌐ | ⌐ | x | x | x | x | x | | x |
| 42 | DARREN T MOLLO | 2/5/2014 | x | ⌐ | x | ⌐ | x | x | ⌐ | x | x | ⌐ | ⌐ | x | x | x | ⌐ | ⌐ | ⌐ | ⌐ |
| 44 | DARREN T MOLLO | 2/10/2014 | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 38 | DARREN T MOLLO | 2/11/2014 | x | | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x |
| 43 | DARREN T MOLLO | 2/11/2014 | x | x | x | x | x | x | | | x | | | x | x | x | x | x | x | x |
| 46 | DARREN T MOLLO | 2/27/2014 | x | x | | x | x | x | x | x | x | x | x | | x | x | ⌐ | ⌐ | ⌐ | ⌐ |
| 47 | DARREN T MOLLO | 2/27/2014 | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | | x |

**Exhibit 4 - Chiropractic Initial Evaluations**

| RICO NO. | Provider | Date of Service | Patient Complaints Neck Pain | Middle Back Pain | Low Back Pain | Physical Exam Findings No Numbness Tingling Weakness | Paraspinal Tenderness | Positive Ortho Tests | Segmental Joint Dysfunction DX Cervical | Thoracic | Lumbar | Hip | Spain Diagnosis Cervical | Thoracic | Lumbar | Chiro Manipulative Therapy 3 times per week | Treatment Plan Recommendations Re-Exam | Small Pain Fiber Test | Ther Ex. | Referral for X-Ray/MRI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 48 | DARREN T MOLLO | 2/27/2014 | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | | X |
| 45 | DARREN T MOLLO | 2/27/2014 | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X |
| 51 | DARREN T MOLLO | 3/10/2014 | | | | X | X | X | | X | X | X | | | | X | X | X | | X |
| 49 | DARREN T MOLLO | 3/11/2014 | X | | | X | X | X | | X | X | X | | | | X | | X | | X |
| 53 | DARREN T MOLLO | 3/12/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 50 | DARREN T MOLLO | 3/12/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 55 | DARREN T MOLLO | 3/14/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 57 | DARREN T MOLLO | 3/17/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 52 | ISLAND LIFE CHIROPRACTIC | 3/19/2014 | X | | X | | X | X | X | X | X | X | X | X | X | X | | X | X | X |
| 59 | DARREN T MOLLO | 3/20/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 58 | DARREN T MOLLO | 3/20/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 54 | DARREN T MOLLO | 3/21/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 60 | DARREN T MOLLO | 4/1/2014 | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 65 | DARREN T MOLLO | 4/10/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 67 | DARREN T MOLLO | 4/10/2014 | X | | | X | X | X | X | X | X | X | X | | | X | X | X | | X |
| 62 | DARREN T MOLLO | 4/11/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 63 | DARREN T MOLLO | 4/11/2014 | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 68 | DARREN T MOLLO | 4/11/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 66 | DARREN T MOLLO | 4/16/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 52 | DARREN T MOLLO | 4/22/2014 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X |
| 69 | DARREN T MOLLO | 5/1/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 71 | DARREN T MOLLO | 5/20/2014 | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 73 | DARREN T MOLLO | 5/27/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 75 | DARREN T MOLLO | 6/3/2014 | X | | X | X | X | X | X | X | X | X | X | | | X | X | X | | X |
| 78 | DARREN T MOLLO | 6/3/2014 | | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 80 | DARREN T MOLLO | 6/3/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 76 | DARREN T MOLLO | 6/10/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 74 | DARREN T MOLLO | 6/17/2014 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 70 | DARREN T MOLLO | 7/10/2014 | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| 64 | DARREN T MOLLO | 7/10/2014 | | X | ✓ | X | X | X | X | X | X | X | X | X | X | X | X | X | ✓ | ✓ |
| 85 | DARREN T MOLLO | 7/15/2014 | | ✓ | X | X | X | X | X | X | X | X | X | X | X | X | ✓ | X | ✓ | ✓ |
| 81 | DARREN T MOLLO | 7/15/2014 | | ✓ | ✓ | ✓ | X | X | X | X | X | X | X | X | X | X | ✓ | X | ✓ | ✓ |
| 87 | DARREN T MOLLO | 7/17/2014 | | | X | | X | X | X | X | X | X | X | X | X | X | | X | | |
| 90 | DARREN T MOLLO | 7/22/2014 | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 88 | DARREN T MOLLO | 7/31/2014 | X | X | | X | X | X | X | X | X | X | X | | | X | X | X | | |
| 92 | DARREN T MOLLO | 8/21/2014 | X | X | | | X | X | X | X | X | X | X | | | X | X | X | | |
| 94 | DARREN T MOLLO | 8/21/2014 | | | | X | | X | X | X | X | X | | | | X | X | X | | |
| 95 | DARREN T MOLLO | 8/21/2014 | X | X | X | X | X | X | X | X | X | X | X | | | X | | X | | ✓ |
| 86 | DARREN T MOLLO | 8/21/2014 | | ✓ | X | ✓ | X | X | X | ✓ | X | X | X | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| 96 | DARREN T MOLLO | 8/26/2014 | | | X | X | X | X | X | X | X | X | X | | | X | X | X | | |
| 97 | DARREN T MOLLO | 8/26/2014 | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 98 | DARREN T MOLLO | 8/26/2014 | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 93 | DARREN T MOLLO | 9/2/2014 | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | | |

Page 2

**Exhibit 4 - Chiropractic Initial Evaluations**

| RICO NO. | Provider | Date of Service | Patient Complaints | | | Physical Exam Findings | | | Segmental Joint Dysfunction DX | | | | Sprain Diagnosis | | | Chiro Manipulative Therapy 3 times per week | Treatment Plan Recommendations | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Neck Pain | Middle Back Pain | Low Back Pain | No Numbness Tingling Weakness | Paraspinal Tenderness | Positive Ortho Tests | Cervical | Thoracic | Lumbar | Hip | Cervical | Thoracic | Lumbar | | Re-Exam | Small Pain Fiber Test | Ther Ex. | Referral for X-Ray/MRI |
| 100 | DARREN T MOLLO | 9/2/2014 | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | | |
| 101 | DARREN T MOLLO | 9/3/2014 | X | X | | X | X | X | X | X | X | | X | | X | X | X | X | | |
| 102 | DARREN T MOLLO | 9/16/2014 | X | | | | X | | X | X | X | | X | X | | X | X | X | | |
| 105 | DARREN T MOLLO | 9/22/2014 | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | | |
| 106 | DARREN T MOLLO | 9/22/2014 | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | | |
| 107 | DARREN T MOLLO | 9/22/2014 | | X | X | X | X | X | X | X | X | X | X | | X | X | X | | | |
| 108 | DARREN T MOLLO | 9/22/2014 | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | | |
| 104 | DARREN T MOLLO | 9/25/2014 | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | | |
| 114 | DARREN T MOLLO | 9/30/2014 | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | | |
| 103 | DARREN T MOLLO | 10/1/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | |
| 111 | DARREN T MOLLO | 10/1/2014 | X | | X | X | X | X | | | X | X | X | | X | X | X | X | | |
| 99 | DARREN T MOLLO | 10/2/2014 | X | | | X | X | X | X | X | X | | X | X | X | X | X | X | | |
| 113 | DARREN T MOLLO | 10/27/2014 | | X | | X | X | X | X | X | X | | X | | X | | | | | |
| 112 | DARREN T MOLLO | 10/29/2014 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 115 | DARREN T MOLLO | 11/7/2014 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 116 | DARREN T MOLLO | 11/12/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | |
| 117 | DARREN T MOLLO | 11/12/2014 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 30 | DARREN T MOLLO | 12/12/2014 | | | | | X | | | | | | | | | | | | | |
| 121 | DARREN T MOLLO | 12/17/2014 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 122 | DARREN T MOLLO | 12/17/2014 | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | | |
| 123 | DARREN T MOLLO | 12/17/2014 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 120 | DARREN T MOLLO | 12/22/2014 | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 110 | DARREN T MOLLO | 1/15/2015 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 129 | DARREN T MOLLO | 1/16/2015 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 131 | DARREN T MOLLO | 1/16/2015 | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | | |
| 128 | DARREN T MOLLO | 1/16/2015 | X | X | | X | X | X | X | X | X | X | X | | X | X | X | X | | |
| 130 | DARREN T MOLLO | 1/19/2015 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 133 | DARREN T MOLLO | 2/9/2015 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 134 | DARREN T MOLLO | 2/11/2015 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | |
| 135 | DARREN T MOLLO | 2/18/2015 | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 136 | DARREN T MOLLO | 2/18/2015 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | |
| 132 | DARREN T MOLLO | 2/19/2015 | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | |
| 139 | DARREN T MOLLO | 2/23/2015 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | | |
| 141 | DARREN T MOLLO | 2/24/2015 | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | | | |
| 137 | DARREN T MOLLO | 2/25/2015 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | | |
| 142 | DARREN T MOLLO | 2/26/2015 | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | | |
| 143 | DARREN T MOLLO | 2/26/2015 | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | | |
| 144 | DARREN T MOLLO | 2/26/2015 | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 145 | DARREN T MOLLO | 2/26/2015 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 146 | DARREN T MOLLO | 2/27/2015 | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | | |
| 138 | DARREN T MOLLO | 2/27/2015 | X | | X | X | X | X | X | X | X | X | X | X | X | | X | | | |
| 148 | DARREN T MOLLO | 2/27/2015 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | |
| 149 | DARREN T MOLLO | 3/2/2015 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | |
| 150 | DARREN T MOLLO | 3/6/2015 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |

Page 3

**Exhibit 4 - Chiropractic Initial Evaluations**

| RICO NO. | Provider | Date of Service | Patient Complaints | | | Physical Exam Findings | | | Segmental Joint Dysfunction DX | | | | Sprain Diagnosis | | | Treatment Plan Recommendations | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Neck Pain | Middle Back Pain | Low Back Pain | No Numbness Tingling Weakness | Paraspinal Tenderness | Positive Ortho Tests | Cervical | Thoracic | Lumbar | Hip | Cervical | Thoracic | Lumbar | Chiro Manipulative Therapy 3 times per week | Re-Exam | Small Pain Fiber Test | Ther Ex. | Referral for X-Ray/MRI |
| 61 | DARREN T MOLLO | 3/11/2015 | ^ | ^ | ^ | | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ | | | | | ^ |
| 152 | DARREN T MOLLO | 3/12/2015 | X | X | ^ | | X | ^ | X | X | X | ^ | X | X | X | X | ^ | X | | ^ |
| 140 | DARREN T MOLLO | 3/12/2015 | X | ^ | ^ | | ^ | ^ | X | X | X | ^ | X | | X | | | | | ^ |
| 147 | DARREN T MOLLO | 3/18/2015 | ^ | ^ | ^ | | ^ | ^ | ^ | X | X | ^ | ^ | X | ^ | | ^ | | ^ | ^ |
| 153 | DARREN T MOLLO | 4/24/2015 | ^ | X | ^ | X | X | X | X | X | X | ^ | X | | X | X | ^ | X | ^ | |
| 157 | DARREN T MOLLO | 5/1/2015 | X | X | ^ | | X | X | X | X | X | ^ | X | X | ^ | X | ^ | X | | |
| 155 | DARREN T MOLLO | 5/2/2015 | ^ | ^ | ^ | | ^ | ^ | X | ^ | ^ | ^ | ^ | | ^ | | ^ | | ^ | ^ |
| 154 | DARREN T MOLLO | 5/2/2015 | ^ | ^ | ^ | | ^ | ^ | ^ | ^ | ^ | ^ | ^ | | ^ | | ^ | | | ^ |
| 156 | DARREN T MOLLO | 5/8/2015 | ^ | X | ^ | | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ | | ^ | | ^ | ^ |
| 160 | DARREN T MOLLO | 5/27/2015 | X | ^ | X | ^ | ^ | ^ | ^ | ^ | ^ | X | ^ | | X | | ^ | | ^ | ^ |
| 158 | DARREN T MOLLO | 6/7/2015 | ^ | ^ | ^ | ^ | X | ^ | ^ | ^ | ^ | ^ | ^ | | ^ | | X | | ^ | |
| 83 | DARREN T MOLLO | 6/12/2015 | X | ^ | X | X | X | ^ | X | ^ | X | X | ^ | X | X | X | X | | ^ | ^ |
| 164 | DARREN T MOLLO | 7/1/2015 | ^ | ^ | ^ | | ^ | X | ^ | ^ | ^ | ^ | ^ | ^ | ^ | | ^ | X | ^ | ^ |
| 165 | DARREN T MOLLO | 7/8/2015 | ^ | X | X | | X | X | ^ | X | X | X | ^ | ^ | X | X | X | X | ^ | |
| 167 | DARREN T MOLLO | 7/8/2015 | ^ | X | X | | X | X | ^ | X | X | X | ^ | X | X | X | X | X | | |
| 166 | DARREN T MOLLO | 7/10/2015 | X | X | X | | X | X | ^ | X | X | X | X | | X | X | X | X | ^ | |
| 161 | DARREN T MOLLO | 7/13/2015 | ^ | ^ | ^ | | X | ^ | ^ | X | X | ^ | ^ | ^ | ^ | | ^ | X | ^ | |
| 162 | DARREN T MOLLO | 7/15/2015 | ^ | X | X | ^ | X | X | ^ | X | X | X | ^ | ^ | ^ | X | X | X | ^ | |
| 125 | DARREN T MOLLO | 7/20/2015 | ^ | X | X | X | X | X | X | X | X | X | ^ | X | X | X | X | X | ^ | |
| 169 | DARREN T MOLLO | 8/12/2015 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | |
| 172 | DARREN T MOLLO | 8/14/2015 | X | X | X | | X | X | X | X | X | | X | X | | X | X | X | ^ | |
| 173 | DARREN T MOLLO | 8/17/2015 | X | X | X | | X | X | X | X | X | | X | X | X | X | X | X | | |
| 174 | DARREN T MOLLO | 8/17/2015 | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | | |
| 171 | DARREN T MOLLO | 8/26/2015 | X | X | X | | X | X | X | X | X | X | X | | | X | X | X | ^ | |
| 170 | DARREN T MOLLO | 9/4/2015 | | X | X | | X | X | X | X | X | | | | X | X | X | X | | |
| 176 | ISLAND LIFE CHIROPRACTIC | 9/9/2015 | X | | X | | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 177 | DARREN T MOLLO | 9/16/2015 | | X | X | X | X | X | X | X | X | | | | | X | X | X | | |
| 127 | DARREN T MOLLO | 9/16/2015 | | X | X | X | X | X | X | X | X | | X | | | X | X | X | | |
| 175 | DARREN T MOLLO | 9/16/2015 | | X | X | | X | X | X | X | X | X | X | | | X | X | X | | |
| 181 | ACH CHIROPRACTIC | 11/9/2015 | X | X | X | X | X | X | X | X | X | | X | X | | X | X | X | | X |
| 182 | ACH CHIROPRACTIC | 11/9/2015 | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | | X |
| 183 | ACH CHIROPRACTIC | 11/9/2015 | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | | X |
| 186 | ACH CHIROPRACTIC | 11/16/2015 | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 184 | ACH CHIROPRACTIC | 11/16/2015 | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | | X |
| 187 | ACH CHIROPRACTIC | 11/18/2015 | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 188 | ACH CHIROPRACTIC | 11/30/2015 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | | X |
| 189 | ACH CHIROPRACTIC | 12/15/2015 | X | X | X | X | X | X | X | X | X | X | X | | | | X | X | X | X |
| 190 | ACH CHIROPRACTIC | 12/22/2015 | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X |
| 191 | ACH CHIROPRACTIC | 1/7/2016 | | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | | X |
| 194 | ACH CHIROPRACTIC | 1/8/2016 | | | X | X | X | X | X | X | X | | X | | | X | X | X | | X |
| 195 | ACH CHIROPRACTIC | 1/8/2016 | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 197 | ACH CHIROPRACTIC | 1/8/2016 | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 192 | ACH CHIROPRACTIC | 1/8/2016 | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 193 | ACH CHIROPRACTIC | 1/8/2016 | X | | X | X | X | X | | X | X | X | X | | X | X | X | X | | X |
| 198 | ACH CHIROPRACTIC | 1/20/2016 | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |

**Exhibit 4 - Chiropractic Initial Evaluations**

| RICO NO. | Provider | Date of Service | Neck Pain | Middle Back Pain | Low Back Pain | No Numbness Tingling Weakness | Paraspinal Tenderness | Positive Ortho Tests | Seg. Cervical | Seg. Thoracic | Seg. Lumbar | Hip | Sprain Cervical | Sprain Thoracic | Sprain Lumbar | Chiro Manipulative Therapy 3 times per week | Re-Exam | Small Pain Fiber Test | Ther Ex. | Referral for X-Ray/MRI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 196 | ACH CHIROPRACTIC | 1/20/2016 | X | | X | X | X | X | | X | X | X | | X | X | X | | X | | X |
| 199 | ACH CHIROPRACTIC | 1/22/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | | | X |
| 200 | ACH CHIROPRACTIC | 1/22/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 201 | ACH CHIROPRACTIC | 1/22/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 203 | ACH CHIROPRACTIC | 1/27/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 205 | ACH CHIROPRACTIC | 1/28/2016 | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 206 | ACH CHIROPRACTIC | 2/22/2016 | X | X | | X | X | X | X | X | X | | X | | | X | | X | | X |
| 207 | ACH CHIROPRACTIC | 2/22/2016 | X | | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 208 | ACH CHIROPRACTIC | 2/22/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 209 | ACH CHIROPRACTIC | 2/22/2016 | X | X | | X | X | X | X | X | X | | X | X | | X | | X | | X |
| 210 | ACH CHIROPRACTIC | 3/7/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 211 | ACH CHIROPRACTIC | 3/7/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 212 | ACH CHIROPRACTIC | 3/7/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 213 | ACH CHIROPRACTIC | 3/9/2016 | X | | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 215 | ACH CHIROPRACTIC | 3/18/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 217 | ACH CHIROPRACTIC | 3/21/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | | | | X |
| 218 | ACH CHIROPRACTIC | 3/21/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | | | | X |
| 219 | ACH CHIROPRACTIC | 3/21/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | | | | X |
| 220 | ACH CHIROPRACTIC | 3/23/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | | | | X |
| 221 | ACH CHIROPRACTIC | 3/29/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 222 | ACH CHIROPRACTIC | 3/29/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 223 | ACH CHIROPRACTIC | 3/31/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | | X | | X |
| 224 | ACH CHIROPRACTIC | 4/1/2016 | X | | X | X | X | X | X | X | X | X | | X | X | X | | X | | X |
| 225 | ACH CHIROPRACTIC | 4/4/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 228 | ACH CHIROPRACTIC | 4/15/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 229 | ACH CHIROPRACTIC | 4/15/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | | X | | X |
| 226 | ACH CHIROPRACTIC | 4/18/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 231 | ACH CHIROPRACTIC | 4/19/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 227 | ACH CHIROPRACTIC | 4/19/2016 | X | | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 230 | ACH CHIROPRACTIC | 4/19/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 234 | ACH CHIROPRACTIC | 5/16/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | | X | | X |
| 235 | ACH CHIROPRACTIC | 5/18/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 233 | ACH CHIROPRACTIC | 5/18/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | | | X |
| 232 | ACH CHIROPRACTIC | 5/23/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | | | | X |
| 236 | ACH CHIROPRACTIC | 5/25/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 237 | ACH CHIROPRACTIC | 5/25/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 239 | ACH CHIROPRACTIC | 6/2/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 240 | ACH CHIROPRACTIC | 6/2/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | | X | | X |
| 241 | ACH CHIROPRACTIC | 6/3/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | | X | | X |
| 244 | ACH CHIROPRACTIC | 6/22/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 248 | ACH CHIROPRACTIC | 7/8/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 247 | ACH CHIROPRACTIC | 7/15/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| 245 | ACH CHIROPRACTIC | 7/20/2016 | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | | X |
| 246 | ACH CHIROPRACTIC | 7/20/2016 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 249 | ACH CHIROPRACTIC | 7/22/2016 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 255 | ACH CHIROPRACTIC | 8/17/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | | X | | X |
| 256 | ACH CHIROPRACTIC | 8/18/2016 | X | | X | X | X | X | X | X | X | X | X | | X | X | | X | | X |

Page 5

# Exhibit 4 - Chiropractic Initial Evaluations

| RICO NO. | Provider | Date of Service | Patient Complaints | | | Physical Exam Findings | | | Segmental Joint Dysfunction DX | | | | Sprain Diagnosis | | | Treatment Plan Recommendations | | | | Referral for X-Ray/MRI |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Neck Pain | Middle Back Pain | Low Back Pain | No Numbness Tingling Weakness | Paraspinal Tenderness | Positive Ortho Tests | Cervical | Thoracic | Lumbar | Hip | Cervical | Thoracic | Lumbar | Chiro Manipulative Therapy 3 times per week | Re-Exam | Small Pain Fiber Test | Ther Ex. | |
| 257 | ACH CHIROPRACTIC | 8/18/2016 | X | | X | | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 258 | ACH CHIROPRACTIC | 8/18/2016 | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 259 | ACH CHIROPRACTIC | 8/24/2016 | X | | X | | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 254 | ACH CHIROPRACTIC | 8/24/2016 | X | X | X | | X | X | X | X | X | X | | | X | X | X | X | | X |
| 260 | ACH CHIROPRACTIC | 8/29/2016 | X | X | X | | | X | X | X | X | X | X | X | | X | X | X | | X |
| 262 | ACH CHIROPRACTIC | 9/7/2016 | X | | X | X | | X | X | X | X | X | X | X | | X | X | X | | X |
| 242 | ACH CHIROPRACTIC | 9/9/2016 | X | | X | | X | X | X | X | X | X | | | | X | X | X | | X |
| 243 | ACH CHIROPRACTIC | 9/15/2016 | X | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 265 | ACH CHIROPRACTIC | 9/26/2016 | X | X | X | | X | X | X | X | X | X | X | | | X | X | X | | X |
| 263 | ACH CHIROPRACTIC | 9/26/2016 | | | X | blank | X | X | X | X | X | X | | | X | X | X | X | | X |
| 264 | ACH CHIROPRACTIC | 9/29/2016 | | | X | blank | X | X | X | X | X | X | | | | X | X | X | | |
| 266 | ACH CHIROPRACTIC | 10/5/2016 | X | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | | X |
| 267 | ACH CHIROPRACTIC | 10/5/2016 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 268 | ACH CHIROPRACTIC | 10/5/2016 | X | X | X | X | | X | X | X | X | X | X | | | X | X | | | |
| 270 | ACH CHIROPRACTIC | 10/6/2016 | X | | | X | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 271 | ACH CHIROPRACTIC | 10/7/2016 | X | | | | X | X | X | X | X | | | | | X | X | X | | X |
| 272 | ACH CHIROPRACTIC | 10/10/2016 | X | X | X | | X | X | X | X | X | X | X | | | X | X | X | | X |
| 273 | ACH CHIROPRACTIC | 10/21/2016 | X | X | X | | X | X | X | X | X | X | X | | X | X | X | X | | X |
| 276 | ENERGY CHIROPRACTIC | 11/30/2016 | X | | X | X | X | X | X | X | X | | | | X | X | X | X | | X |
| 283 | ENERGY CHIROPRACTIC | 11/30/2016 | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 274 | ENERGY CHIROPRACTIC | 11/30/2016 | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 280 | ENERGY CHIROPRACTIC | 11/30/2016 | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 277 | ENERGY CHIROPRACTIC | 12/5/2016 | X | | | | X | X | X | X | X | | X | | X | X | X | X | | X |
| 278 | ENERGY CHIROPRACTIC | 12/5/2016 | X | X | X | | X | X | X | X | X | | X | X | X | X | X | X | | X |
| 279 | ENERGY CHIROPRACTIC | 12/5/2016 | X | | X | | X | X | X | X | X | | | | | X | X | X | | X |
| 281 | ENERGY CHIROPRACTIC | 12/14/2016 | X | X | X | X | X | X | X | X | X | | X | | | X | X | X | | X |
| 285 | ENERGY CHIROPRACTIC | 12/14/2016 | X | X | X | | X | X | X | X | X | | | | | X | X | X | | X |
| 286 | ENERGY CHIROPRACTIC | 12/14/2016 | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 284 | ENERGY CHIROPRACTIC | 12/14/2016 | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | | X |
| 287 | ENERGY CHIROPRACTIC | 12/21/2016 | X | | X | | X | X | X | X | X | X | X | | | X | X | X | | |
| 288 | ENERGY CHIROPRACTIC | 12/21/2016 | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | | X |
| 291 | ENERGY CHIROPRACTIC | 12/28/2016 | | | X | X | X | X | X | X | X | X | X | | X | | X | X | | X |
| 289 | ENERGY CHIROPRACTIC | 12/28/2016 | X | | X | X | X | X | X | X | X | X | X | | | X | X | X | | X |
| 290 | ENERGY CHIROPRACTIC | 12/30/2016 | | | X | blank | blank | X | X | X | X | X | X | | | X | X | X | | X |

(A) Missing or incomplete initial evaluation.

Page 6

*Exhibit 5*

## Exhibit 5 - Charles Deng Acupuncture Evaluations

| RICO NO. | Date of Initial | Neck Pain | Lower Back Pain | Thoracic Pain | Other Region | Persistent | Sharp | Family History Unremarkable | Light Red Color | Normal Shape | Thick White | Normal | Floating | SI Channel | UB Channel | Cervical Sp/St Cervicalgia | Lumbar Sp/St Low Back Pain Myofascitis | Knee/Headache/ Thoracic/Shoulder | Treatment Plan 3 times/week | Total DOS w Deng | Cupping DOS | Acup DOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/19/2013 | X | X | X | | X | X | X | X | X | X | X | | | X | X | X | X | X | 11 | 11 | 11 |
| 2 | 9/4/2013 | X | X | X | | X | X | X | X | X | X | X | | | X | X | X | X | X | 47 | 46 | 25 |
| 4 | 9/5/2013 | | X | | | X | X | X | X | X | X | X | | | X | X | X | X | X | 12 | 12 | 11 |
| 3 | 10/2/2013 | | X | | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 24 | 22 | 13 |
| 5 | 10/15/2013 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 40 | 40 | 21 |
| 6 | 10/18/2013 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 1 | 1 | 1 |
| 9 | 10/30/2013 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 4 | 4 | 4 |
| 12 | 11/1/2013 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 34 | 34 | 22 |
| 10 | 11/11/2013 | | | | | | | X | X | X | X | X | | | X | X | X | | | 59 | 59 | 16 |
| 14 | 11/19/2013 | X | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | 6 | 6 | 6 |
| 18 | 12/2/2013 | X | | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 14 | 13 | 5 |
| 16 | 12/2/2013 | X | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | 33 | 31 | 9 |
| 17 | 12/2/2013 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 6 | 6 | 15 |
| 15 | 12/3/2013 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 23 | 23 | 4 |
| 20 | 12/12/2013 | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | 2 | 2 | 16 |
| 19 | 12/13/2013 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 1 | 1 | 1 |
| 21 | 12/13/2013 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 10 | 10 | 4 |
| 22 | 12/26/2013 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 10 | 10 | 6 |
| 23 | 12/27/2013 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 12 | 12 | 5 |
| 24 | 12/27/2013 | | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 7 | 7 | 1 |
| 25 | 1/2/2014 | | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 10 | 10 | 14 |
| 26 | 1/7/2014 | | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 15 | 15 | 9 |
| 27 | 1/7/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 21 | 20 | 10 |
| 29 | 1/7/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 26 | 26 | 10 |
| 31 | 1/17/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 13 | 13 | 13 |
| 35 | 1/17/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 7 | 7 | 4 |
| 36 | 1/27/2014 | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | 17 | 14 | 11 |
| 37 | 1/27/2014 | | X | | | X | X | X | X | X | X | X | | | X | X | X | X | | 18 | 18 | 11 |
| 34 | 1/27/2014 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 8 | 8 | 8 |
| 39 | 1/28/2014 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 15 | 15 | 13 |
| 41 | 2/3/2014 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 11 | 11 | 1 |
| 42 | 2/5/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 43 | 43 | 12 |
| 43 | 2/5/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 31 | 29 | 23 |
| 44 | 2/6/2014 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 20 | 20 | 10 |
| 38 | 2/6/2014 | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | 38 | 12 | 14 |
| 45 | 2/17/2014 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 3 | 3 | 2 |
| 46 | 2/27/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 13 | 13 | 5 |
| 47 | 2/27/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 10 | 10 | 8 |
| 48 | 2/27/2014 | X | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | 11 | 9 | 6 |
| 50 | 2/27/2014 | | X | X | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | 7 | 7 | 2 |
| 51 | 3/10/2014 | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | 26 | 26 | 8 |
| 55 | 3/10/2014 | X | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | 8 | 6 | 4 |
| 56 | 3/13/2014 | X | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | 6 | 6 | 2 |
| 49 | 3/13/2014 | | X | | | X | X | X | X | X | X | X | | X | X | X | X | X | X | 3 | 3 | 3 |
| 58 | 3/17/2014 | X | X | X | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 11 | 11 | 10 |
| 59 | 3/20/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 17 | 17 | 7 |
| 57 | 3/24/2014 | X | X | X | X | X | X | X | X | X | X | X | | X | X | X | X | X | X | 3 | 3 | |
| 62 | 4/9/2014 | | | | | | | X | X | X | X | X | | | X | X | X | X | | 50 | 50 | 7 |
| 64 | 4/9/2014 | | X | | | X | X | X | X | X | X | X | | | X | X | X | X | X | 14 | 13 | 9 |

Page 1

**Exhibit 5 - Charles Deng Acupuncture Evaluations**

| RICO NO. | Date of Initial | Neck Pain | Lower Back Pain | Thoracic Pain | Other Region | Persistent | Sharp | Family History Unremarkable | Light Red Color | Normal Shape | Thick White | Normal | Floating | SI Channel | UB Channel | Cervical Sp/St Cervicalgia | Lumbar Sp/St Low Back Pain Myofascitis | Knee/Headache/Thoracic/Shoulder | Treatment Plan 3 times/week | Total DOS w Deng | Cupping DOS | Acup DOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 65 | 4/10/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 10 | 8 | 7 |
| 66 | 4/10/2014 | x | x | | | x | x | x | x | x | | | x | x | x | x | x | | x | 20 | 20 | 4 |
| 67 | 4/10/2014 | x | x | x | | x | x | x | x | x | | | x | x | x | x | x | x | x | 35 | 31 | 12 |
| 63 | 4/15/2014 | x | | | | x | x | x | x | x | | | x | | x | x | x | | x | 9 | 9 | 3 |
| 70 | 4/29/2014 | | x | x | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 13 | 13 | 4 |
| 71 | 5/16/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 14 | 12 | 10 |
| 72 | 5/19/2014 | | x | | | x | x | x | x | x | x | x | | x | x | | x | x | x | 11 | 11 | 6 |
| 73 | 5/21/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 26 | 26 | 2 |
| 75 | 5/29/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 5 | 5 | 3 |
| 74 | 5/30/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 7 | 7 | 6 |
| 76 | 6/2/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 16 | 12 | 5 |
| 79 | 6/3/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 5 | 5 | 4 |
| 78 | 6/3/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 31 | 31 | 7 |
| 80 | 6/9/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 11 | 11 | 7 |
| 82 | 6/13/2014 | x | x | x | x | x | x | x | x | x | x | x | | x | x | | x | | x | 10 | 9 | 9 |
| 87 | 7/18/2014 | x | x | | | x | x | x | x | x | x | x | | | x | x | x | x | x | 30 | 26 | 6 |
| 90 | 7/22/2014 | | x | | | x | x | x | x | x | x | x | x | x | x | x | x | | x | 6 | 6 | 4 |
| 91 | 7/25/2014 | | x | | | x | x | x | x | x | x | x | | x | x | | x | | x | 1 | 1 | 1 |
| 94 | 8/20/2014 | x | | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 10 | 10 | 3 |
| 93 | 8/21/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 19 | 19 | 8 |
| 96 | 8/25/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 12 | 12 | 3 |
| 97 | 8/25/2014 | x | x | x | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 15 | 15 | 7 |
| 98 | 8/25/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 15 | 15 | 10 |
| 99 | 8/26/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 40 | 40 | 17 |
| 101 | 8/27/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 1 | 1 | 1 |
| 100 | 8/27/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 9 | 9 | 2 |
| 103 | 9/17/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 21 | 19 | 10 |
| 105 | 9/22/2014 | x | x | | | x | x | x | x | x | x | x | x | x | x | x | x | | x | 19 | 19 | |
| 106 | 9/22/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 15 | 15 | 5 |
| 102 | 9/22/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 22 | 22 | 11 |
| 104 | 9/25/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 22 | 22 | 6 |
| 109 | 9/25/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 9 | 9 | 1 |
| 110 | 9/25/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 8 | 8 | 1 |
| 112 | 9/25/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 10 | 9 | 4 |
| 114 | 9/30/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 16 | 16 | |
| 111 | 10/1/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 5 | 5 | |
| 111 | 1/7/2015 | x | | | | x | x | x | x | x | x | x | x | x | x | x | x | x | x | 16 | 16 | 1 |
| 30 | 11/17/2014 | x | x | | | x | x | x | x | x | x | x | | | x | | x | x | x | 13 | 3 | 13 |
| 117 | 11/19/2014 | | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 7 | 7 | 2 |
| 121 | 12/16/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 11 | 11 | 1 |
| 120 | 12/16/2014 | x | x | x | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 7 | 7 | 3 |
| 122 | 12/16/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 19 | 19 | 3 |
| 123 | 12/16/2014 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 14 | 14 | 4 |
| 130 | 1/16/2015 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | | x | 8 | 8 | 3 |
| 131 | 1/16/2015 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 17 | 17 | 6 |
| 134 | 2/10/2015 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 3 | 3 | |
| 128 | 2/16/2015 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 2 | 2 | |
| 135 | 2/18/2015 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 15 | 15 | 3 |
| 132 | 2/19/2015 | x | x | | | x | x | x | x | x | x | x | | x | x | x | x | x | x | 25 | 25 | 5 |

Page 2

## Exhibit 5 - Charles Deng Acupuncture Evaluations

| RICO NO. | Date of Initial | Neck Pain | Lower Back Pain | Thoracic Pain | Other Region | Persistent | Sharp | Family History Unremarkable | Light Red Color | Normal Shape | Thick White | Normal | Floating | SI Channel | UB Channel | Cervical Sp/St Cervicalgia | Lumbar Sp/St Low Back Pain Myofascitis | Knee/Headache/Thoracic/Shoulder | Treatment Plan 3 times/week | Total DOS w Deng | Cupping DOS | Acup DOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 137 | 2/19/2015 | x | x |  |  | x | x | x | x | x | x | x |  |  | x | x | x | x | x | x | 42 | 41 | 10 |
| 138 | 2/20/2015 | x | x |  |  | x | x | x | x | x | x | x |  |  | x | x |  |  | x | 8 | 8 | 5 |
| 139 | 2/20/2015 |  | x | x | x | x | x | x | x | x | x |  | x | x | x | x |  |  | x | 15 | 15 |  |
| 140 | 2/20/2015 |  | x | x | x | x | x | x | x | x | x |  | x | x | x | x |  |  | x | 16 | 16 |  |
| 61 | 2/24/2015 | x | x |  |  | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 17 | 17 | 18 |
| 141 | 2/24/2015 | x | x |  | x | x | x | x | x | x | x |  | x | x | x | x | x | x | x | 52 | 40 | 1 |
| 142 | 2/26/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 24 | 24 |  |
| 143 | 2/26/2015 | x | x | x | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 15 | 15 | 8 |
| 144 | 2/26/2015 |  | x | x | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 7 | 7 |  |
| 146 | 2/26/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 10 | 10 | 7 |
| 147 | 2/27/2015 | x | x |  |  | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 12 | 12 | 5 |
| 149 | 2/27/2015 |  | x |  |  | x | x | x | x | x | x | x |  | x | x |  | x | x | x | 10 | 10 | 1 |
| 148 | 3/3/2015 | x | x |  | x | x | x | x | x | x | x |  | x | x | x | x | x | x | x | 4 | 4 | 4 |
| 145 | 3/3/2015 | x | x |  | x | x | x | x | x | x | x |  | x | x | x | x | x | x | x | 15 | 15 | 2 |
| 151 | 3/5/2015 |  | x |  | x | x | x | x | x | x | x |  | x | x | x | x | x | x | x | 6 | 6 |  |
| 152 | 3/10/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 4 | 4 | 1 |
| 136 | 3/17/2015 |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 5 | 3 | 2 |
| 133 | 4/7/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 3 | 3 | 1 |
| 153 | 4/23/2015 |  | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 5 | 5 | 1 |
| 154 | 4/28/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 12 | 10 | 8 |
| 156 | 4/28/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ |  | 5 | 5 |
| 158 | 5/4/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 3 | 3 | 2 |
| 159 | 5/13/2015 | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 24 | 20 | 21 |
| 160 | 5/22/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 44 | 44 | 7 |
| 125 | 6/4/2015 |  | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 57 | 57 | 1 |
| 163 | 6/4/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 1 | 1 |  |
| 161 | 6/9/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 15 | 15 | 4 |
| 162 | 6/12/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 25 | 25 | 9 |
| 164 | 6/16/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 18 | 18 | 8 |
| 83 | 6/16/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 22 | 12 | 12 |
| 155 | 6/17/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 1 | 1 |  |
| 165 | 7/14/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 1 | 1 |  |
| 168 | 7/21/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 8 | 8 | 5 |
| 169 | 7/22/2015 | x | x |  | x | x | x | x | x | x | x |  | x | x | x | x | x | x | x | 27 | 26 | 7 |
| 170 | 7/31/2015 | x | x |  | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | 17 | 17 | 12 |
| 167 | 8/1/2015 |  | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | IN/A | IN/A | IN/A |
| 171 | 8/3/2015 |  | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 15 | 11 | 5 |
| 172 | 8/3/2015 |  | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x |  | 10 | 10 | 5 |
| 173 | 8/11/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x |  | 13 | 12 | 5 |
| 174 | 8/17/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x |  | 10 | 9 | 6 |
| 176 | 9/9/2015 | x | x | x | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 31 | 31 | 3 |
| 177 | 9/15/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x |  | 4 | 4 | 3 |
| 127 | 9/15/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 68 | 68 | 4 |
| 175 | 9/15/2015 | x | x |  | x | x | x | x | x | x | x |  | x | x | x | x | x | x |  | 9 | 6 | 6 |
| 178 | 10/9/2015 |  | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ | ^ |  | ^ | ^ | ^ | ^ | ^ | ^ | 54 | 54 | 9 |
| 179 | 10/30/2015 |  | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x |  | IN/A | IN/A | IN/A |
| 180 | 10/10/2015 | x | x |  | x | x | x | x | x | x | x | x |  | x | x | x | x | x |  | 15 | 11 | 5 |
| 181 | 11/9/2015 | x | x |  | x | x | x | x | x | x | x | x | x | x | x | x | x | x | x | 18 | 18 | 2 |
| 182 | 11/9/2015 | x | x | x | x | x | x | x | x | x | x | x |  | x | x | x | x | x | x | 8 | 8 | 1 |

Page 3

**Exhibit 5 - Charles Deng Acupuncture Evaluations**

| RICO NO. | Date of Initial | Neck Pain | Lower Back Pain | Thoracic Pain | Other Region | Persistent | Sharp | Family History Unremarkable | Light Red Color | Normal Shape | Thick White | Normal | Floating | SI Channel | UB Channel | Cervical Sp/St Cervicalgia | Lumbar Sp/St Low Back Pain Myofascitis | Knee/Headache/Thoracic/Shoulder | Treatment Plan 3 times/week | Total DOS w Deng | Cupping DOS | Acup DOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 183 | 11/9/2015 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 17 | 17 | 2 |
| 184 | 11/17/2015 | X | X |  | X | X | X | X | X | X | X | X |  | X | X | X | X | X | X | 4 | 4 | 2 |
| 185 | 11/17/2015 | X | X | X | X | X | X | X | X | X | X | X |  |  | X | X | X |  | X | 19 | 19 | 1 |
| 187 | 11/17/2015 |  | X |  | X | X | X | X | X | X | X | X |  |  | X |  | X |  | X | 27 | 27 | 1 |
| 186 | 11/30/2015 | X | X |  | X | X | X | X | X | X | X | X |  | X |  | X | X |  | X | 12 | 12 | 2 |
| 188 | 11/30/2015 | X | X |  | X | X | X | X | X | X | X |  | X |  |  | X | X |  | X | 8 | 8 | 1 |
| 189 | 12/15/2015 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 16 | 16 |  |
| 190 | 12/16/2015 | X | X | X | X | X | X | X | X | X | X | X |  | X | X | X | X |  | X | 20 | 20 | 5 |
| 191 | 12/16/2015 | X | X |  | X | X | X | X | X | X | X | X |  | X | X | X | X | X | X | 38 | 37 | 6 |
| 192 | 1/7/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 13 | 13 |  |
| 193 | 1/7/2016 | X | X |  | X | X | X | X | X | X | X |  | X |  | X | X | X | X | X | 17 | 17 | 1 |
| 194 | 1/8/2016 |  | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 19 | 19 |  |
| 195 | 1/8/2016 | X |  | X | X | X | X | X | X | X | X |  | X | X |  | X |  | X | X | 19 | 19 | 2 |
| 196 | 1/8/2016 |  | X |  | X | X | X | X | X | X | X | X | X | X |  | X | X |  | X | 17 | 17 | 2 |
| 197 | 1/11/2016 | X | X | X | X | X | X | X | X | X | X | X |  |  | X | X | X |  | X | 13 | 11 |  |
| 199 | 1/22/2016 | X | X |  | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | 14 | 14 |  |
| 200 | 1/27/2016 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 8 | 8 |  |
| 201 | 1/22/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 30 | 29 | 10 |
| 203 | 1/25/2016 |  | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X |  | X | 16 | 16 | 1 |
| 204 | 1/26/2016 | X | X | X | X | X | X | X | X | X | X | X |  | X | X | X | X | X | X | 6 | 6 |  |
| 205 | 1/26/2016 | X | X | X | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 14 | 9 | 5 |
| 206 | 2/22/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 6 | 6 |  |
| 207 | 2/22/2016 |  | X |  | X | X | X | X | X | X | X | X |  | X | X | X | X |  | X | 13 | 13 | 2 |
| 209 | 4/2/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X |  | X | 11 | 11 | 2 |
| 210 | 3/8/2016 | X |  | X | X | X | X | X | X | X | X | X |  | X |  | X |  | X | X | 6 | 6 | 1 |
| 211 | 3/7/2016 |  | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 16 | 15 | 6 |
| 212 | 3/7/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X |  | X | 12 | 12 | 4 |
| 213 | 3/8/2016 | X | X |  | X | X | X | X | X | X | X |  | X |  | X | X | X | X | X | 15 | 15 | 8 |
| 214 | 3/14/2016 | X | X |  | X | X | X | X | X | X | X | X |  | X | X | X | X |  | X | 25 | 22 | 5 |
| 215 | 3/15/2016 |  | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 1 | 1 | 1 |
| 216 | 3/16/2016 | X | X |  | X | X | X | X | blank | X | X | X |  | X | X | X | X | X | X | 33 | 31 | 5 |
| 217 | 3/21/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 27 | 27 | 5 |
| 218 | 3/21/2016 |  | X |  | X | X | X | X | X | X | X | X |  | X |  | X | X |  | X | 27 | 27 | 1 |
| 219 | 3/22/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X |  | X | 23 | 23 | 2 |
| 220 | 3/23/2016 | X | X | X | X | X | X | X | X | X | X | X |  |  | X | X | X |  | X | 6 | 6 | 2 |
| 221 | 3/29/2016 |  | X |  | X | X | X | X | X | X | X | X |  | X | X | X | X | X | X | 16 | 16 | 3 |
| 222 | 3/29/2016 | X | X | X | X | X | X | X | X | X | X | X | X |  | X | X | X | X | X | 8 | 8 |  |
| 223 | 4/7/2016 | X | X | X | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 8 | 8 | 1 |
| 224 | 4/11/2016 | X | X | X | X | X | X | X | X | X | X | X |  | X |  | X | X | X | X | 7 | 7 | 1 |
| 225 | 4/4/2016 |  | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 5 | 5 | 3 |
| 227 | 4/14/2016 | X | X | X | X | X | X | X | blank | X | X | X |  |  | X | X | X | X | X | 27 | 27 |  |
| 229 | 4/14/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 6 | 5 | 4 |
| 226 | 4/18/2016 | X | X | X | X | X | X | X | X | X | X | X |  | X | X | X | X |  | X | 28 | 28 |  |
| 230 | 4/18/2016 | X | X | X | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 5 | 9 | 2 |
| 228 | 4/20/2016 | X | X |  | X | X | X | X | X | X | X |  | X |  | X | X | X |  | X | 5 | 5 |  |
| 232 | 5/16/2016 | X | X |  | X | X | X | X | blank | X | blank |  | X | X |  | X | X | X | X | 6 | 6 | 1 |
| 233 | 5/16/2016 | X | X | X | X | X | X | X | blank | X | X |  | X |  |  | X | X | X | X | 24 | 24 |  |
| 234 | 5/16/2016 | X | X | X | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 10 | 10 | 5 |
| 235 | 5/18/2016 |  | X |  | X | X | X | X | blank | X | X | X |  | X |  | X |  | X | X | 26 | 33 | 4 |
| 236 | 5/25/2016 | X | X |  | X | X | X | X | X | X | X | X |  |  | X | X | X | X | X | 45 | 43 | 3 |
| 237 | 5/25/2016 | X |  | X | X | X | X | X | X | X | X | X |  | X |  | X |  | X | X | 15 | 15 | 3 |

Page 4

**Exhibit 5 - Charles Deng Acupuncture Evaluations**

| RICO NO. | Date of Initial | Neck Pain | Lower Back Pain | Thoracic Pain | Other Region | Persistent | Sharp | Family History Unremarkable | Light Red Color | Normal Shape | Thick White | Normal | Floating | SI Channel | UB Channel | Cervical Sp/St Cervicalgia | Lumbar Sp/St Low Back Pain Myofascitis | Knee/Headache/Thoracic/Shoulder | Treatment Plan 3 times/week | Total DOS w Deng | Cupping DOS | Acup DOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 239 | 5/26/2016 | X | X | | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 4 | 4 | 9 |
| 238 | 5/31/2016 | X | X | | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 15 | 14 | 1 |
| 240 | 6/2/2016 | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | 12 | 12 | 1 |
| 241 | 6/7/2016 | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | 11 | 11 | 1 |
| 244 | 6/23/2016 | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | 18 | 18 | 2 |
| 245 | 6/27/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 22 | 22 | 4 |
| 246 | 6/28/2016 | X | | | | | | X | X | X | X | X | | | X | X | X | X | X | 20 | 20 | |
| 247 | 7/8/2016 | | | | | | | | | | | | | | | | | | | | 5 | |
| 248 | 7/8/2016 | X | X | | | X | X | X | X | X | X | | X | X | X | X | X | X | X | 18 | 18 | 1 |
| 249 | 7/8/2016 | X | X | X | | X | X | X | X | X | X | | X | | X | X | X | X | X | 5 | 5 | 5 |
| 250 | 7/11/2016 | | X | | | | | X | X | X | X | | | | | X | X | | | 13 | 13 | 1 |
| 251 | 7/12/2016 | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | 14 | 14 | 2 |
| 253 | 7/15/2016 | X | X | | X | X | X | X | X | X | | X | | X | X | X | X | | X | 26 | 22 | 4 |
| 255 | 8/16/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | | X | 8 | 8 | 9 |
| 256 | 8/16/2016 | X | X | | X | X | X | X | X | X | X | X | | X | X | X | X | | X | 11 | 11 | 4 |
| 257 | 8/16/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | | X | 21 | 21 | 1 |
| 258 | 8/16/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | | X | 11 | 11 | 1 |
| 243 | 8/22/2016 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 10 | 10 | |
| 260 | 8/24/2016 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 20 | 22 | 4 |
| 259 | 8/26/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | | X | 22 | 22 | 2 |
| 242 | 9/6/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 11 | 11 | 3 |
| 262 | 9/7/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 29 | 29 | 1 |
| 263 | 9/26/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 16 | 16 | |
| 264 | 9/26/2016 | X | X | | X | X | X | X | X | X | X | | X | X | | X | X | X | X | 11 | 11 | |
| 265 | 9/29/2016 | X | X | | X | X | X | X | X | X | X | | X | | | X | X | X | X | 11 | 12 | 2 |
| 266 | 10/3/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 11 | 11 | |
| 267 | 10/4/2016 | X | X | | X | X | X | X | X | X | X | | X | | | X | X | X | X | 3 | 3 | |
| 268 | 10/5/2016 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 11 | 11 | |
| 270 | 10/6/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 8 | 8 | 2 |
| 272 | 10/10/2016 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | | X | 14 | 14 | |
| 273 | 10/17/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 21 | 19 | 4 |
| 276 | 11/28/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 17 | 17 | 2 |
| 277 | 11/28/2016 | X | X | | X | X | X | X | X | X | X | X | | | X | X | X | X | X | | | 2 |
| 278 | 11/28/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 3 | 3 | 3 |
| 279 | 11/28/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 4 | 4 | 3 |
| 274 | 11/29/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 5 | 5 | 1 |
| 280 | 11/29/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 6 | 6 | 2 |
| 281 | 11/29/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 8 | 8 | |
| 282 | 11/30/2016 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 14 | 14 | |
| 283 | 11/30/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | | X | 4 | 4 | |
| 275 | 11/30/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 13 | 13 | 2 |
| 284 | 12/12/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | | X | 9 | 9 | 1 |
| 285 | 12/14/2016 | X | X | | X | X | X | X | X | X | X | X | | | X | X | X | X | X | 12 | 12 | |
| 286 | 12/14/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 8 | 8 | 5 |
| 287 | 12/14/2016 | X | X | | X | X | X | blank | X | X | X | | X | | X | X | X | | X | 9 | 9 | |
| 288 | 12/14/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | | X | 6 | 6 | 2 |
| 289 | 12/27/2016 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 6 | 6 | 3 |
| 290 | 12/27/2016 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | | X | 4 | 4 | |
| 291 | 12/27/2016 | X | X | X | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 10 | 10 | |
| 292 | 12/28/2016 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 8 | 8 | 2 |
| 294 | 1/3/2017 | X | X | | X | X | X | X | X | X | X | | X | | X | X | X | X | X | 6 | 6 | 4 |

Page 5

## Exhibit 5 - Charles Deng Acupuncture Evaluations

| RICO NO. | Date of Initial | Patient Complaints | | | | | | Family History Unremarkable | Tongue Characteristics | | | Pulse Description | | Acupuncture Diagnosis | | | | | Treatment Plan 3 times/week | Total DOS w Deng | Cupping DOS | Acup DOS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Neck Pain | Lower Back Pain | Thoracic Pain | Other Region | Persistent | Sharp | | Light Red Color | Normal Shape | Thick White | Normal | Floating | SI Channel | UB Channel | Cervical Sp/St Cervicalgia | Lumbar Sp/St Low Back Pain Myofascitis | Knee/Headache/ Thoracic/Shoulder | | | | |
| 293 | 1/5/2017 | X | X | | X | X | | X | X | X | | | X | X | X | X | X | X | X | 5 | 5 | 3 |
| 295 | 1/5/2017 | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | 6 | 6 | |
| 202 | 1/6/2017 | X | X | | X | X | X | X | X | X | X | | X | X | X | X | X | X | X | 3 | 3 | 1 |
| 296 | 1/10/2017 | | X | | X | X | | X | X | X | | | X | | X | | X | X | X | 5 | 5 | 3 |
| 297 | 1/10/2017 | X | X | | X | | | X | X | X | | | X | | X | X | X | X | X | 2 | 2 | |
| 298 | 1/10/2017 | X | X | | | X | X | X | X | X | X | | X | | X | X | X | | X | 3 | 3 | 3 |
| 299 | 1/12/2017 | X | X | | X | X | X | X | X | X | | | X | | X | X | X | X | X | 3 | 3 | 1 |

(A) Missing or incomplete initial evaluation.

Page 6

*Exhibit 6*

## Exhibit 6 - NCV/EMG Testing

| RICO NO. | EMG Only | NCV Only | NCV/EMG different date of service | NCV DOS (Upper) | NCV DOS (Lower) | NCV Provider | Upper - Sensory Median/Radial/Ulnar | Upper - Motor Median/Ulnar | Lower - Sensory Sup Peroneal/Sural | Lower - Motor Peroneal/Tibial | EMG DOS | EMG Provider | 4 Limb | Total Muscles Tested | Bilateral |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | | X | | 9/12/2013 | | PARISEN | X | X | | | | | X | 31 | X |
| 2 | | | X | 10/24/2013 | 9/26/2013 | PARISEN | X | X | X | X | 9/19/2013 | PARISEN | X | 31 | X |
| 1 | | | X | 10/14/2013 | 9/20/2013 | PARISEN | X | X | | X | 9/19/2013 | PARISEN | X | 31 | X |
| 3 | | | X | 11/7/2013 | | PARISEN | X | X | X | X | 10/25/2013 | PARISEN | X | 31 | X |
| 5 | | | X | 11/4/2013 | | PARISEN | X | X | X | | 10/25/2013 | PARISEN | X | 31 | X |
| 11 | | | X | 11/15/2013 | 11/22/2013 | PARISEN | X | X | X | X | 11/29/2013 | PARISEN | X | 31 | X |
| 12 | | | X | 11/15/2013 | 11/15/2013 | PARISEN | X | X | X | X | 11/21/2013 | PARISEN | X | 31 | X |
| 9 | | X | | 11/26/2013 | | PARISEN | X | X | | | | | | | |
| 14 | | X | | | | PARISEN | X | X | | | | | | | |
| 15 | | | X | 12/20/2013 | 12/30/2013 | PARISEN | X | X | X | X | 1/10/2014 | PARISEN | X | 31 | X |
| 21 | | | X | 12/27/2013 | 12/27/2013 | PARISEN | X | X | X | X | 1/10/2014 | PARISEN | X | 31 | X |
| 25 | | | X | 1/9/2014 | 1/17/2014 | PARISEN | X | X | X | X | 1/10/2014 | PARISEN | X | 30 | X |
| 22 | | | X | 2/13/2014 | | PARISEN | X | X | X | X | 1/10/2014 | PARISEN | X | 31 | X |
| 31 | | | X | | 1/31/2014 | PARISEN | X | X | X | X | 1/17/2014 | PARISEN | X | 31 | X |
| 28 | | X | | 1/20/2014 | 2/14/2014 | PARISEN | X | X | X | X | | | | | |
| 29 | | X | | 1/20/2014 | 1/23/2014 | PARISEN | X | X | X | X | | | | | |
| 32 | | X | | 1/23/2014 | 1/23/2014 | PARISEN | X | X | X | X | 2/20/2014 | DABIRI | | | |
| 33 | | X | | 2/3/2014 | | PARISEN | X | X | X | X | | | | | |
| 27 | | X | | 2/3/2014 | 2/14/2014 | PARISEN | X | X | X | X | | | | | |
| 23 | | | X | 2/10/2014 | 3/24/2014 | PARISEN | X | X | X | X | 2/20/2014 | DABIRI | X | 32 | X |
| 35 | | | X | 2/17/2014 | 2/24/2014 | PARISEN | X | X | X | X | 2/13/2014 | PARISEN | X | 31 | X |
| 26 | | X | | 2/20/2014 | | DABIRI | X | X | X | X | | | | | |
| 38 | | X | | 2/20/2014 | | DABIRI | X | X | X | X | | | | | |
| 41 | | | X | 3/10/2014 | 4/23/2014 | DABIRI | X | X | X | X | 2/20/2014 | DABIRI | X | 32 | X |
| 42 | | | X | | 6/9/2014 | DABIRI; PARISEN | X | X | X | X | 2/20/2014 | DABIRI | X | 32 | X |
| 43 | | X | | | 2/27/2014 | DABIRI | X | X | X | X | | | | | |
| 40 | | | X | 3/3/2014 | 3/7/2014 | PARISEN | X | X | X | X | 2/27/2014 | DABIRI | X | 32 | X |
| 44 | X | | | | | | | X | | | 2/28/2014 | DABIRI | X | 32 | X |
| 37 | | X | | 3/8/2014 | | PARISEN | X | X | X | X | | | | | |
| 36 | | | X | 3/6/2014 | | PARISEN | X | X | X | X | 3/13/2014 | DABIRI | X | 32 | X |
| 34 | X | | | | | | | X | | | 3/7/2014 | PARISEN | X | 32 | X |
| 46 | | | X | 4/2/2014 | | DABIRI | X | X | X | X | 3/13/2014 | DABIRI | X | 32 | X |
| 48 | X | | | | | | | X | | | 3/14/2014 | DABIRI | X | 32 | X |
| 47 | | X | | 3/24/2014 | | DABIRI | X | X | X | X | | | | | |
| 51 | | | X | 3/24/2014 | | DABIRI | X | X | X | X | 5/8/2014 | DABIRI | X | 32 | X |
| 60 | | X | | 4/7/2014 | 4/21/2014 | DABIRI | X | X | X | X | | | | | |
| 58 | | | X | 4/7/2014 | | DABIRI | X | X | X | X | 4/11/2014 | DABIRI | X | 32 | X |
| 59 | | | X | 4/7/2014 | | DABIRI | X | X | X | X | 5/9/2014 | DABIRI | X | 32 | X |
| 53 | | X | | 4/7/2014 | 4/7/2014 | DABIRI | X | X | X | X | | | | | |
| 52 | | X | | | 4/23/2014 | DABIRI | X | X | X | X | | | | | |
| 45 | | | X | 4/21/2014 | 4/21/2014 | DABIRI | X | X | X | X | | | | | |
| 50 | | X | | 4/23/2014 | | DABIRI | X | X | X | X | | | | | |
| 67 | | | X | 5/22/2014 | 5/12/2014 | DABIRI; PARISEN | X | X | X | X | 5/8/2014 | DABIRI | X | 32 | X |
| 68 | | X | | 5/22/2014 | 5/19/2014 | DABIRI; PARISEN | X | X | X | X | | | | | |
| 69 | | | X | 5/5/2014 | 5/12/2014 | PARISEN; DABIRI | X | X | X | X | 5/9/2014 | DABIRI | X | 32 | X |

Page 1

## Exhibit 6 - NCV/EMG Testing

| RICO NO. | EMG Only | NCV Only | NCV/EMG different date of service | NCV DOS (Upper) | NCV DOS (Lower) | NCV Provider | Nerve Conduction Testing | | | | EMG Testing | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Upper - Sensory Median/Radial/Ulnar | Upper - Motor Median/Ulnar | Lower - Sensory Sup Peroneal/Sural | Lower - Motor Peroneal/Tibial | EMG DOS | EMG Provider | 4 Limb | Total Muscles Tested | Bilateral |
| 66 | | | X | 5/5/2014 | 8/1/2014 | DABIRI; BLACKMAN | X | X | X | | 6/19/2014 | PARISEN | X | 32 | X |
| 70 | X | | | | | | | | | | 5/23/2014 | PARISEN | X | 32 | X |
| 71 | | X | | 5/28/2014 | | PARISEN | X | X | | | | | | | |
| 73 | | | X | 6/6/2014 | 6/23/2014 | PARISEN | X | X | X | X | 7/18/2014 | PARISEN | X | 32 | X |
| 76 | | X | | 6/6/2014 | 6/7/2014 | PARISEN | X | X | X | X | | | | | |
| 74 | | X | X | 6/9/2014 | 6/20/2014 | PARISEN | X | X | X | X | | | | | |
| 62 | | | X | 6/11/2014 | | PARISEN | X | X | X | X | 8/1/2014 | BLACKMAN | X | 26 | X |
| 81 | | X | | 6/16/2014 | 6/23/2014 | PARISEN | X | X | X | X | | | | | |
| 78 | | X | | 6/16/2014 | 6/20/2014 | PARISEN | X | X | X | X | | | | | |
| 80 | | X | | 6/16/2014 | 6/20/2014 | PARISEN | X | X | X | X | | | | | |
| 77 | | X | | 6/20/2014 | 7/11/2014 | PARISEN | X | X | X | X | | | | | |
| 79 | | X | | 6/20/2014 | | PARISEN | X | X | X | X | | | | | |
| 80 | | X | | 6/20/2014 | | PARISEN | X | X | X | X | | | | | |
| 10 | X | | | | | | | | | | 7/18/2014 | PARISEN | X | 32 | X |
| 84 | | X | | 7/21/2014 | | PARISEN | X | X | | | | | | | |
| 82 | | X | | 7/21/2014 | | PARISEN | X | X | | | | | | | |
| 64 | | X | | | 7/28/2014 | PARISEN | | | X | X | | | | | |
| 85 | | X | | | 7/31/2014 | PARISEN | | | X | X | | | | | |
| 86 | | X | | 8/11/2014 | 8/21/2014 | BLACKMAN | X | X | X | X | | | | | |
| 92 | | | X | 8/21/2014 | 8/21/2014 | BLACKMAN | X | X | X | X | 8/22/2014 | BLACKMAN | X | 38 | X |
| 93 | | | X | 8/21/2014 | 8/25/2014 | BLACKMAN | X | X | X | X | 11/20/2014 | BLACKMAN | X | 26 | X |
| 95 | | | X | 9/26/2014 | 8/26/2014 | BLACKMAN | X | | X | - | 9/11/2014 | BLACKMAN | X | 26 | X |
| 94 | | X | | | 9/26/2014 | BLACKMAN | X | X | X | X | 9/11/2014 | BLACKMAN | X | 26 | X |
| 98 | | | | | 9/11/2014 | BLACKMAN | X | X | X | X | | | | | |
| 99 | | X | X | 9/15/2014 | | BLACKMAN | X | X | X | | 10/17/2014 | BLACKMAN | X | 38 | X |
| 101 | | X | | 9/19/2014 | | BLACKMAN | X | X | X | X | | | | | |
| 96 | | | | 9/19/2014 | | BLACKMAN | X | X | X | X | | | | | |
| 97 | | X | | 9/19/2014 | 10/6/2014 | BLACKMAN | X | X | X | X | 9/25/2014 | BLACKMAN | X | 38 | X |
| 103 | | X | X | 10/6/2014 | | BLACKMAN | X | X | X | | 11/6/2014 | BLACKMAN | X | 38 | X |
| 102 | | X | X | 10/6/2014 | 10/16/2014 | BLACKMAN | X | X | X | | 10/17/2014 | BLACKMAN | X | 38 | X |
| 109 | | | | | 10/16/2014 | BLACKMAN | | | X | X | | | | | |
| 113 | | | | 10/31/2014 | | BLACKMAN | | | | | | | | | |
| 112 | | X | | 11/7/2014 | | BLACKMAN | X | X | | | | | | | |
| 106 | | X | X | 1/15/2015 | | LACINA | X | X | X | | 11/20/2014 | BLACKMAN | X | 38 | X |
| 107 | X | | | | | | | | | | 11/20/2014 | BLACKMAN | X | 38 | X |
| 108 | | | X | | 11/24/2014 | BLACKMAN | | | X | | 11/20/2014 | BLACKMAN | X | 38 | X |
| 116 | X | | | | | | | | | | 12/5/2014 | BLACKMAN | X | 24 | X |
| 117 | X | | | | | | | | | | 11/28/2014 | BLACKMAN | X | 26 | X |
| 8 | | | X | 12/29/2014 | | BLACKMAN | X | X | X | X | 12/31/2014 | BLACKMAN | X | 24 | X |
| 121 | | X | | 12/29/2014 | 1/19/2015 | BLACKMAN; LACINA | X | X | X | X | 2/5/2015 | PARISEN | X | 36 | X |
| 122 | | | X | 12/29/2014 | 1/5/2015 | BLACKMAN | X | X | X | X | | | | | |
| 123 | | X | | 12/29/2014 | 1/19/2015 | BLACKMAN; LACINA | X | X | X | X | | | | | |
| 88 | | X | | 1/5/2015 | 3/16/2015 | BLACKMAN; PARISEN | X | X | X | X | | | | | |

Page 2

## Exhibit 6 - NCV/EMG Testing

| RICO NO. | EMG Only | NCV Only | NCV/EMG different date of service | NCV DOS (Upper) | NCV DOS (Lower) | NCV Provider | Upper - Sensory Median/Radial/Ulnar | Upper - Motor Median/Ulnar | Lower - Sensory Sup Peroneal/Sural | Lower - Motor Peroneal/Tibial | EMG DOS | EMG Provider | 4 Limb | Total Muscles Tested | Bilateral |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 100 | | | X | 9/18/2014; 11/26/2014 | | BLACKMAN | | X | | | 1/8/2015 | BLACKMAN | X | 24 | X |
| 87 | X | | | | | | | | | | 1/9/2015 | BLACKMAN | X | 36 | X |
| 89 | X | | | | | | | | | | 1/9/2015 | BLACKMAN | X | 36 | X |
| 120 | | X | | | 1/12/2015 | BLACKMAN | | | X | X | | | | | |
| 118 | | X | | | 1/15/2015 | LACINA | | | X | X | | | | | |
| 110 | X | | | | | | | | | | 1/15/2015 | LACINA | X | 36 | X |
| 131 | | | X | 5/11/2015 | | PARISIEN | X | X | | | 1/30/2015 | LACINA | X | 36 | X |
| 128 | | X | | 2/9/2015 | 2/9/2015 | PARISIEN | X | X | | | | | | | X |
| 129 | | X | | 2/9/2015 | 2/9/2015 | PARISIEN | X | X | X | | | | | | X |
| 130 | | X | | | 2/9/2015 | PARISIEN | X | X | X | X | 3/5/2015 | PARISIEN | X | 36 | X |
| 132 | | | X | 3/16/2015 | 3/20/2015 | PARISIEN | X | X | X | X | 2/26/2015 | PARISIEN | X | 36 | X |
| 140 | X | | | 3/9/2015 | | PARISIEN | X | X | | | 2/27/2015 | PARISIEN | X | 24 | X |
| 139 | | X | | | 3/16/2015 | PARISIEN | X | X | X | X | 2/27/2015 | PARISIEN | X | 24 | X |
| 141 | | X | | 4/13/2015 | 4/21/2015 | PARISIEN | | X | X | X | 3/5/2015 | PARISIEN | X | 24 | X |
| 147 | X | | | | | PARISIEN | | | | | 3/5/2015 | PARISIEN | X | 36 | X |
| 145 | | X | | | 3/23/2015 | PARISIEN | X | | X | | 3/5/2015 | PARISIEN | X | 36 | X |
| 137 | | | X | 3/16/2015 | 3/20/2015 | PARISIEN | X | X | X | X | 3/6/2015 | PARISIEN | X | 24 | X |
| 144 | X | | | | | PARISIEN | X | X | X | X | 3/6/2015 | PARISIEN | X | 36 | X |
| 143 | | | X | 3/9/2015 | 3/16/2015 | PARISIEN | X | X | X | X | 3/12/2015 | PARISIEN | X | 36 | X |
| 146 | | X | | 3/9/2015 | 3/16/2015 | PARISIEN | X | X | X | | | | | | |
| 150 | | | X | 3/27/2015 | | PARISIEN | X | X | X | X | 3/12/2015 | PARISIEN | X | 36 | X |
| 151 | X | | | | | PARISIEN | | | | | 3/19/2015 | PARISIEN | X | 36 | X |
| 135 | | | X | 3/20/2015 | 3/20/2015 | PARISIEN | X | X | X | X | 4/17/2015 | PARISIEN | X | 36 | X |
| 148 | | X | | | | PARISIEN | X | X | | | | | | | |
| 61 | | X | | 3/23/2015 | | PARISIEN | X | X | X | | | | | | |
| 152 | | X | | 3/27/2015 | | PARISIEN | X | X | X | | | | | | |
| 142 | | X | | 4/9/2015 | | PARISIEN | | X | | | | | | | |
| 138 | | | X | 4/9/2015 | 4/10/2015 | PARISIEN | X | X | X | X | 4/9/2015 | PARISIEN | X | 24 | X |
| 133 | X | | | | | PARISIEN | | | | | 4/16/2015 | PARISIEN | X | 36 | X |
| 153 | X | | | | | PARISIEN | | | | | 5/1/2015 | PARISIEN | X | 24 | X |
| 156 | | X | | 5/15/2015 | | PARISIEN | X | X | | | | | | | |
| 157 | | X | | | 5/26/2015 | PARISIEN | | | X | X | 5/21/2015 | PARISIEN | X | 24 | |
| 154 | X | | | | 7/13/2015 | ALLAY MEDICAL SERVICES PC | | | X | X | 5/21/2015 | PARISIEN | X | 24 | |
| 158 | | | | | | ALLAY MEDICAL SERVICES PC | X | | X | | 5/22/2015 | PARISIEN | X | 24 | |
| 161 | | X | | 6/2/2015 | 6/8/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 5/22/2015 | PARISIEN | X | 24 | |
| 162 | | X | | 6/8/2015 | 6/12/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 5/29/2015 | PARISIEN | X | 24 | |
| 160 | | X | | 6/2/2015 | 6/2/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | | | |
| 83 | | X | | 6/19/2015 | 7/3/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | | | |
| 125 | | | X | 6/30/2015 | 6/30/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 8/21/2015 | ALLAY MEDICAL SERVICES PC | X | 38 | X |
| 167 | | | X | 7/13/2015 | 7/16/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 8/6/2015 | ALLAY MEDICAL SERVICES PC | X | 38 | X |
| 164 | | X | | 7/16/2015 | 7/16/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | | | |
| 166 | | | X | 7/16/2015 | 7/20/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 9/15/2015 | ALLAY MEDICAL SERVICES PC | X | 38 | X |
| 165 | | X | | 7/20/2015 | | PARISIEN | X | X | | X | | | | | |

## Exhibit 6 - NCV/EMG Testing

| RICO NO. | EMG Only | NCV Only | NCV/EMG different date of service | NCV DOS (Upper) | NCV DOS (Lower) | NCV Provider | Upper - Sensory Median/Radial/Ulnar | Upper - Motor Median/Ulnar | Lower - Sensory Sup Peroneal/Sural | Lower - Motor Peroneal/Tibial | EMG DOS | EMG Provider | 4 Limb | Total Muscles Tested | Bilateral |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 159 | | | X | 8/3/2015 | 8/17/2015 | ALLAY MEDICAL SERVICES PC | X | X | | | 8/13/2015 | ALLAY MEDICAL SERVICES PC | X | 38 | X |
| 169 | | | X | 8/4/2015 | 9/4/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 8/13/2015 | ALLAY MEDICAL SERVICES PC | X | 38 | X |
| 168 | | X | | 8/4/2015 | | ALLAY MEDICAL SERVICES PC | X | X | | | | | | | |
| 171 | X | | | 8/17/2015 | 8/7/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | | | X |
| 171 | X | | | | | | | | | | 8/11/2015 | ALLAY MEDICAL SERVICES PC | X | 36 | X |
| 172 | | | X | 8/19/2015 | 9/3/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 8/11/2015 | ALLAY MEDICAL SERVICES PC | X | 36 | X |
| 170 | | X | | 8/19/2015 | 8/21/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 8/11/2015 | ALLAY MEDICAL SERVICES PC | X | 36 | X |
| 174 | | X | | 9/3/2015 | 9/4/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | | | |
| 173 | | | X | 9/21/2015 | 10/2/2015 | ALLAY MEDICAL SERVICES PC / PAVLOVA | X | X | X | X | 10/8/2015 | PAVLOVA | X | 38 | X |
| 176 | | | X | 9/25/2015 | 9/25/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 10/5/2015 | PAVLOVA | X | 38 | X |
| 127 | | X | | 9/25/2015 | 9/28/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | | | | | |
| 175 | | X | | 9/25/2015 | 10/5/2015 | PAVLOVA | X | X | X | X | | | | | |
| 177 | | X | | 10/9/2015 | 10/9/2015 | PAVLOVA | X | X | X | X | | | | | |
| 178 | | | X | 10/19/2015 | 10/26/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 11/19/2015 | LACINA | X | 38 | X |
| 182 | | | X | 11/25/2015 | 12/4/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 11/27/2015 | ALLAY MEDICAL SERVICES PC | X | 34 | X |
| 185 | | | X | 12/4/2015 | 12/4/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 11/27/2015 | LACINA | X | 34 | X |
| 187 | | | X | 12/3/2015 | 12/4/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 12/11/2015 | ALLAY MEDICAL SERVICES PC | X | 38 | X |
| 181 | | | X | 12/3/2015 | 12/30/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 12/10/2015 | ALLAY MEDICAL SERVICES PC | X | 36 | X |
| 183 | | | X | 12/3/2015 | 12/17/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 12/10/2015 | ALLAY MEDICAL SERVICES PC | X | 36 | X |
| 186 | | | X | 12/17/2015 | 12/7/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 12/14/2015 | ALLAY MEDICAL SERVICES PC | X | 38 | X |
| 188 | | X | | | | | | | | | | | | | |
| 190 | | | X | 12/18/2015 | 12/21/2015 | ALLAY MEDICAL SERVICES PC | X | X | X | X | 12/23/2015 | ALLAY MEDICAL SERVICES PC | X | 36 | X |
| 191 | | | X | 1/14/2016 | 12/21/2015 | ALLAY MEDICAL SERVICES PC / | X | X | X | X | 12/29/2015 | ALLAY MEDICAL SERVICES PC | X | 36 | X |
| 189 | | | X | 12/29/2015 | 1/8/2016 | PARISEN | X | X | X | X | 12/23/2015 | ALLAY MEDICAL SERVICES PC | X | 38 | X |
| 197 | | | X | 1/11/2016 | 1/14/2016 | PARISEN | X | X | X | X | 1/18/2016 | PARISEN | X | 38 | X |
| 192 | X | | | 1/15/2016 | 1/18/2016 | PARISEN | X | X | X | X | | | | | |
| 193 | | | X | 1/15/2016 | 1/18/2016 | PARISEN | X | X | X | X | 2/15/2016 | PARISEN | X | incomplete | |
| 196 | | | X | 1/15/2016 | | PARISEN | X | X | X | X | 2/12/2016 | PARISEN | X | 38 | |
| 194 | | | X | 1/18/2016 | 2/1/2016 | PARISEN | X | X | X | X | 2/13/2016 | PARISEN | X | 4 | X |
| 195 | | | X | 1/25/2016 | 1/25/2016 | PARISEN | X | X | X | X | 1/28/2016 | PARISEN | X | 36 | X |
| 199 | | | X | 1/25/2016 | 2/1/2016 | PARISEN | X | X | X | X | 2/8/2016 | PARISEN | X | 38 | X |
| 200 | | | X | 1/25/2016 | 2/1/2016 | PARISEN | X | X | X | X | 2/8/2016 | PARISEN | X | 38 | X |
| 201 | | | X | 1/25/2016 | 2/1/2016 | PARISEN | X | X | X | X | 2/8/2016 | PARISEN | X | 38 | X |
| 198 | | | X | 1/29/2016 | 1/28/2016 | PARISEN | X | X | X | X | 3/3/2016 | PARISEN | X | 38 | X |
| 203 | | | X | 2/5/2016 | 2/19/2016 | PARISEN | X | X | X | X | 2/22/2016 | PARISEN | X | 38 | X |
| 205 | | | X | 2/19/2016 | 3/31/2016 | PARISEN | X | X | X | X | 2/25/2016 | PARISEN | X | 38 | X |
| 206 | | X | | 3/7/2016 | 3/11/2016 | PARISEN | X | X | X | X | | | | | |
| 207 | | X | | 3/7/2016 | 3/10/2016 | PARISEN | X | X | X | X | | | | | |
| 208 | | | X | 3/7/2016 | 3/10/2016 | PARISEN | X | X | X | X | 3/31/2016 | PARISEN | X | 38 | X |
| 209 | | X | | 3/7/2016 | 3/10/2016 | PARISEN | X | X | X | X | | | | | |

Page 4

## Exhibit 6 - NCV/EMG Testing

| RICO NO. | EMG Only | NCV Only | NCV/EMG different date of service | NCV DOS (Upper) | NCV DOS (Lower) | NCV Provider | Median/Radial/Ulnar | Median/Ulnar | Sup Peroneal/Sural | Peroneal/Tibial | EMG DOS | EMG Provider | 4 Limb | Total Muscles Tested | Bilateral |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 213 | | | X | 3/23/2016 | 3/31/2016 | PARISEN | X | X | X | X | 3/29/2016 | PARISEN | X | 38 | X |
| 210 | | | X | 3/23/2016 | 3/31/2016 | PARISEN | X | X | X | X | 4/4/2016 | PARISEN | X | 38 | X |
| 211 | | | X | 3/23/2016 | 4/14/2016 | PARISEN | X | X | X | X | 3/29/2016 | PARISEN | X | 38 | X |
| 212 | | | X | 3/23/2016 | | PARISEN | X | X | X | | 5/11/2016 | PFI MEDICAL CARE PC | | 38 | X |
| 215 | | | X | 3/31/2016 | | PARISEN | X | X | X | | 4/22/2016 | PFI MEDICAL CARE PC | ^ | ^ | ^ |
| 217 | | | X | 4/4/2016 | 4/18/2016 | PARISEN | X | X | X | X | 5/4/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 220 | | | X | 4/7/2016 | 4/14/2016 | PARISEN | X | X | X | X | 4/22/2016 | PFI MEDICAL CARE PC | X | 40 | X |
| 219 | | X | | 4/7/2016 | | PARISEN | X | X | X | X | | | | | |
| 216 | | | X | 4/8/2016 | | PARISEN | X | X | X | X | 4/20/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 230 | | X | | 4/29/2016 | | PFI MEDICAL CARE PC | X | X | | | | | | | |
| 218 | | | X | 5/4/2016 | | PFI MEDICAL CARE PC | X | X | | X | 5/26/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 231 | | | X | 5/11/2016 | 6/27/2016 | PFI MEDICAL CARE PC | X | X | X | X | 6/3/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 235 | | | X | 5/27/2016 | 5/31/2016 | PFI MEDICAL CARE PC | X | X | X | X | 6/1/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 225 | | | X | 5/31/2016 | 6/22/2016 | PFI MEDICAL CARE PC | X | X | X | X | 6/3/2016 | PFI MEDICAL CARE PC | X | 36 | X |
| 232 | | | X | 5/31/2016 | 8/12/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/22/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 233 | | | X | 5/31/2016 | | PFI MEDICAL CARE PC | X | X | X | X | 6/16/2016 | RA MEDICAL SERVICES | X | 38 | X |
| 229 | | X | | 6/1/2016 | 7/22/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 234 | | | X | 6/6/2016 | 7/11/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/5/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 236 | | | X | 6/20/2016 | 6/20/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/5/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 237 | | | X | 6/20/2016 | 6/20/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/5/2016 | PFI MEDICAL CARE PC | X | 36 | X |
| 240 | | | X | 7/22/2016 | | PFI MEDICAL CARE PC | X | X | X | X | 6/27/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 238 | | X | | | 6/29/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 247 | X | | | 7/20/2016 | 7/27/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/19/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 253 | | | X | 7/20/2016 | 8/3/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/19/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 245 | | | X | 7/20/2016 | 8/9/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/22/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 246 | | | X | 7/26/2016 | 8/3/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/27/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 251 | | | X | 7/26/2016 | 8/10/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/27/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 250 | | | X | 8/8/2016 | 8/15/2016 | PFI MEDICAL CARE PC | X | X | X | X | 7/27/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 244 | | | X | 8/8/2016 | 8/12/2016 | PFI MEDICAL CARE PC | X | X | X | X | 8/17/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 248 | | | X | 8/29/2016 | 9/9/2016 | PFI MEDICAL CARE PC | X | X | X | X | 8/10/2016 | PFI MEDICAL CARE PC | X | 38 | X |
| 257 | | X | | 9/6/2016 | 9/21/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 243 | | | X | 9/6/2016 | 9/9/2016 | PFI MEDICAL CARE PC | X | X | X | X | 9/1/2016 | PFI MEDICAL CARE PC | X | 36 | X |
| 256 | | X | | 9/6/2016 | 9/14/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 258 | | X | | 9/8/2016 | 9/21/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 260 | | X | | 9/9/2016 | 9/12/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 259 | | X | | 9/14/2016 | 9/22/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 262 | | X | | 9/16/2016 | 9/19/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 242 | | | X | 9/19/2016 | | PFI MEDICAL CARE PC | X | X | X | X | 1/19/2017 | KP MEDICAL CARE PC | X | 38 | X |
| 255 | | X | | 9/23/2016 | 9/27/2016 | PFI MEDICAL CARE PC | X | X | X | X | | | | | |
| 254 | | | X | 9/23/2016 | | PFI MEDICAL CARE PC | X | X | X | X | 11/14/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 263 | | | X | 10/10/2015 | 10/14/2016 | PAVLOVA | X | X | X | X | 10/17/2016 | PAVLOVA | X | 38 | X |
| 266 | | | X | 10/10/2016 | 10/17/2016 | PAVLOVA | X | X | X | X | 11/3/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 267 | | X | | 10/10/2016 | | PAVLOVA | X | X | X | X | | | | | |
| 265 | | | X | 10/10/2016 | 10/14/2016 | PAVLOVA | X | X | X | X | 11/21/2016 | KP MEDICAL CARE PC | X | 38 | X |

## Exhibit 6 - NCV/EMG Testing

| RICO NO. | EMG Only | NCV Only | NCV/EMG different date of service | NCV DOS (Upper) | NCV DOS (Lower) | NCV Provider | Nerve Conduction Testing — Upper - Sensory — Median/Radial/Ulnar | Upper - Motor — Median/Ulnar | Lower - Sensory — Sup Peroneal/Sural | Lower - Motor — Peroneal/Tibial | EMG DOS | EMG Provider | 4 Limb | Total Muscles Tested | Bilateral |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 268 | | | | 10/19/2016 | 10/31/2016 | ALLAY MEDICAL SERVICES P.C./ KP MEDICAL CARE PC | X | X | X | X | 11/11/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 272 | | | X | 10/19/2016 | 10/31/2016 | KP MEDICAL CARE PC | X | X | X | X | 11/23/2016 | KP MEDICAL CARE PC | X | 36 | X |
| 271 | | | X | 10/24/2016 | 11/14/2016 | KP MEDICAL CARE PC | X | X | X | X | 11/15/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 273 | | | X | 10/27/2016 | 11/14/2016 | KP MEDICAL CARE PC | X | X | X | X | 11/15/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 270 | | | X | 10/28/2016 | | IPP MEDICAL SERVICES PC | X | X | X | X | | KP MEDICAL CARE PC | | 30 | X |
| 275 | | X | | 12/9/2016 | | KP MEDICAL CARE PC | X | | | | | | | | |
| 278 | | | X | 12/9/2016 | 12/23/2016 | KP MEDICAL CARE PC | X | X | X | X | 12/30/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 281 | | X | | 12/12/2016 | 12/13/2016 | KP MEDICAL CARE PC | X | X | X | X | | | | | |
| 274 | | X | | 12/12/2016 | | KP MEDICAL CARE PC | X | X | | | | | | | |
| 280 | | | X | 12/12/2016 | 12/21/2016 | KP MEDICAL CARE PC | X | X | X | X | 12/23/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 282 | | X | | 12/13/2016 | 12/21/2016 | KP MEDICAL CARE PC | X | X | X | X | | | | | |
| 276 | | | X | 12/13/2016 | 12/21/2016 | KP MEDICAL CARE PC | X | X | X | X | 12/21/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 284 | | X | | 12/13/2016 | 12/21/2016 | KP MEDICAL CARE PC | X | X | X | X | | | | | |
| 283 | | | X | 12/19/2016 | 2/6/2017 | KP MEDICAL CARE PC | X | X | X | X | 2/7/2017 | KP MEDICAL CARE PC | X | 38 | X |
| 277 | | X | | 12/19/2016 | | KP MEDICAL CARE PC | X | X | X | X | | | | | |
| 279 | | | X | 12/19/2016 | 12/27/2016 | KP MEDICAL CARE PC | X | X | X | X | 12/30/2016 | KP MEDICAL CARE PC | X | 38 | X |
| 286 | | | X | 12/29/2016 | 12/27/2016 | KP MEDICAL CARE PC | X | X | X | | 1/19/2017 | KP MEDICAL CARE PC | X | 38 | X |
| 292 | | X | | 1/12/2017 | 1/12/2017 | KP MEDICAL CARE PC | X | X | X | X | | | | | |
| 202 | | | X | 1/16/2017 | 1/23/2017 | KP MEDICAL CARE PC | X | X | X | X | 1/26/2017 | KP MEDICAL CARE PC | X | 38 | X |
| 293 | | X | | 1/17/2017 | 1/12/2017 | KP MEDICAL CARE PC | X | X | X | X | | | | | |
| 291 | | X | | 1/17/2017 | | KP MEDICAL CARE PC | X | X | | X | | | | | |
| 285 | | X | | 1/19/2017 | 1/26/2017 | KP MEDICAL CARE PC | X | X | X | X | | | | | |
| 294 | | | X | 1/19/2017 | 1/23/2017 | KP MEDICAL CARE PC | X | X | X | X | 1/26/2017 | KP MEDICAL CARE PC | X | 38 | X |
| 295 | | X | | 1/19/2017 | 1/24/2017 | KP MEDICAL CARE PC | X | X | X | X | | | | | |
| 296 | | X | | 1/23/2017 | 1/24/2017 | KP MEDICAL CARE PC | X | X | X | X | | | | | |

*Exhibit 7*

# Exhibit 7 - Trigger Point Injections

| RICO NO. | Date of Service | Provider | Patient Reported Pain 7 or Higher | Patient Reported Pain 2 + Regions | Total TP Injections | TP Bilateral | Total Dry Needling | Dry Bilateral | Patient tolerated well | Patient No complications |
|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 9/6/2013 | KSENIA PAVLOVA | | X | 5 | | 16 | | X | |
| 3 | 10/11/2013 | KSENIA PAVLOVA | | | 18 | | 18 | | | |
| 3 | 11/29/2013 | KSENIA PAVLOVA | | X | 7 | | 14 | | X | X |
| 2 | 10/28/2013 | KSENIA PAVLOVA | X | X | 10 | X | 32 | X | X | |
| 8 | 10/30/2013 | PIERRE J RENLIIQUE | X | | 34 | X | 25 | X | X | |
| 9 | 10/30/2013 | PIERRE J RENLIIQUE | | X | 16 | | 16 | X | X | |
| 10 | 11/1/2013 | KSENIA PAVLOVA | X | X | 16 | X | 40 | X | X | X |
| 10 | 12/9/2013 | KSENIA PAVLOVA | X | X | 7 | | 14 | | X | X |
| 10 | 1/27/2014 | KSENIA PAVLOVA | | | 16 | X | 32 | X | X | X |
| 11 | 11/29/2013 | KSENIA PAVLOVA | X | X | 7 | | 14 | | X | X |
| 15 | 12/2/2013 | KSENIA PAVLOVA | X | X | 6 | | 12 | | X | X |
| 16 | 12/2/2013 | KSENIA PAVLOVA | X | | 6 | | 12 | | X | X |
| 16 | 1/20/2014 | KSENIA PAVLOVA | | X | 7 | | 14 | | X | X |
| 17 | 12/2/2013 | KSENIA PAVLOVA | | X | 7 | | 14 | | X | X |
| 18 | 12/2/2013 | KSENIA PAVLOVA | X | X | 7 | | 14 | | X | X |
| 5 | 12/4/2013 | JULES FRANCOIS PARSIEN MD | X | X | 26 | X | 18 | X | X | |
| 6 | 12/13/2013 | KSENIA PAVLOVA | X | X | 16 | X | 32 | X | X | X |
| 6 | 1/14/2014 | JULES FRANCOIS PARSIEN MD | X | X | 30 | | 30 | X | X | |
| 6 | 3/28/2014 | LUQMAN DABIRI | X | | 12 | X | 34 | X | X | X |
| 21 | 12/13/2013 | KSENIA PAVLOVA | | X | 14 | X | 28 | X | X | X |
| 23 | 12/20/2013 | KSENIA PAVLOVA | X | | 8 | | 16 | X | X | X |
| 23 | 2/10/2014 | KSENIA PAVLOVA | | X | 9 | | 18 | | X | |
| 25 | 12/27/2013 | KSENIA PAVLOVA | X | X | 7 | | 14 | | X | |
| 32 | 1/17/2014 | KSENIA PAVLOVA | X | X | 14 | X | 28 | X | X | |
| 34 | 1/24/2014 | KSENIA PAVLOVA | X | X | 14 | X | 28 | X | X | |
| 35 | 1/24/2014 | KSENIA PAVLOVA | X | X | 14 | X | 28 | X | X | |
| 36 | 1/24/2014 | KSENIA PAVLOVA | X | X | 16 | X | 32 | X | X | X |
| 37 | 1/27/2014 | KSENIA PAVLOVA | X | X | 14 | X | 28 | X | X | |
| 13 | 1/31/2014 | KSENIA PAVLOVA | X | X | 6 | | 12 | | X | X |
| 28 | 1/31/2014 | KSENIA PAVLOVA | X | X | 14 | X | 28 | X | X | |
| 49 | 3/10/2014 | LUQMAN DABIRI | X | X | 6 | | 14 | | | X |
| 51 | 3/10/2014 | LUQMAN DABIRI | X | X | 10 | X | 24 | X | X | |
| 51 | 7/29/2014 | JULES FRANCOIS PARSIEN MD | X | X | 24 | X | 24 | X | X | X |
| 55 | 3/13/2014 | LUQMAN DABIRI | | X | 7 | | 12 | | X | X |
| 58 | 3/24/2014 | LUQMAN DABIRI | X | X | 4 | | 4 | | X | |
| 59 | 3/24/2014 | LUQMAN DABIRI | X | X | 2 | | 2 | | X | X |
| 53 | 4/7/2014 | LUQMAN DABIRI | X | X | 4 | | 4 | | X | X |
| 46 | 4/7/2014 | LUQMAN DABIRI | X | | 6 | | 6 | | X | X |
| 52 | 5/14/2014 | JULES FRANCOIS PARSIEN MD | | X | 10 | | 10 | X | X | |
| 73 | 5/21/2014 | JULES FRANCOIS PARSIEN MD | X | X | 32 | | 24 | X | X | NA |
| 73 | 8/7/2014 | NOEL E BLACKMAN MD | X | X | 11 | X | 32 | X | X | X |
| 76 | 6/4/2014 | JULES FRANCOIS PARSIEN MD | | X | 20 | | 10 | | X | |
| 76 | 10/3/2014 | KSENIA PAVLOVA | X | | 14 | X | 32 | X | X | X |
| 69 | 6/10/2014 | JULES FRANCOIS PARSIEN MD | | X | 30 | | 29 | X | X | |

Page 1

## Exhibit 7 - Trigger Point Injections

| RICO NO. | Date of Service | Provider | Patient Reported Pain 7 or Higher | Patient Reported Pain 2 + Regions | Total TP Injections | TP Bilateral | Total Dry Needling | Dry Bilateral | Patient tolerated well | Patient No complications |
|---|---|---|---|---|---|---|---|---|---|---|
| 62 | 6/11/2014 | JULES FRANCOIS PARSIEN MD | X | | 30 | | 30 | X | X | |
| 62 | 10/22/2014 | NOEL E BLACKMAN MD | X | | 20 | | 22 | X | X | |
| 82 | 6/17/2014 | JULES FRANCOIS PARSIEN MD | X | | 30 | X | 26 | X | X | |
| 82 | 9/22/2014 | NOEL E BLACKMAN MD | X | X | 6 | | 16 | | X | X |
| 82 | 10/20/2014 | NOEL E BLACKMAN MD | X | X | 6 | | 14 | | X | X |
| 66 | 6/25/2014 | JULES FRANCOIS PARSIEN MD | | X | 30 | X | 24 | X | | |
| 80 | 6/27/2014 | KSENIA PAVLOVA | X | X | 6 | | 14 | | X | X |
| 88 | 8/19/2014 | NOEL E BLACKMAN MD | | X | 4 | | 20 | X | X | |
| 94 | 8/20/2014 | NOEL E BLACKMAN MD | | X | 6 | | 6 | | X | |
| 95 | 8/20/2014 | NOEL E BLACKMAN MD | | X | 6 | | 6 | | X | |
| 78 | 9/18/2014 | NOEL E BLACKMAN MD | X | X | 10 | X | 28 | X | X | X |
| 70 | 9/24/2014 | NOEL E BLACKMAN MD | | X | 13 | | 13 | | X | |
| 99 | 9/25/2014 | NOEL E BLACKMAN MD | X | X | 12 | X | 27 | X | X | X |
| 125 | 11/27/2015 | ALLAY MEDICAL SERVICES PC | | X | 7 | | | | X | |
| 125 | 7/9/2015 | ALLAY MEDICAL SERVICES PC | | X | | | | | | X |
| 125 | 1/5/2016 | JULES FRANCOIS PARSIEN MD | X | X | 11 | | A | | | |
| 122 | 1/12/2015 | FRANCIS J LACINA | X | X | 3 | | 15 | | X | X |
| 116 | 1/13/2015 | FRANCIS J LACINA | X | X | 1 | | 50 | X | X | X |
| 106 | 1/15/2015 | FRANCIS J LACINA | | X | 1 | | 30 | | X | X |
| 109 | 1/15/2015 | FRANCIS J LACINA | | X | 3 | | | | X | X |
| 123 | 1/19/2015 | FRANCIS J LACINA | | X | 2 | | 48 | X | X | X |
| 131 | 1/19/2015 | FRANCIS J LACINA | X | X | 1 | | 30 | | X | X |
| 131 | 1/28/2015 | JULES FRANCOIS PARSIEN MD | | X | 20 | X | 13 | X | X | X |
| 131 | 5/11/2015 | JULES FRANCOIS PARSIEN MD | | X | 8 | | | | X | X |
| 100 | 1/22/2015 | FRANCIS J LACINA | X | X | | | 60 | X | X | X |
| 114 | 2/5/2015 | FRANCIS J LACINA | | X | 2 | | | | X | X |
| 137 | 2/25/2015 | JULES FRANCOIS PARSIEN MD | X | X | 8 | X | | | X | X |
| 61 | 4/20/2015 | JULES FRANCOIS PARSIEN MD | X | X | 16 | X | | | X | X |
| 154 | 6/15/2015 | KSENIA PAVLOVA | X | | 16 | X | | | X | X |
| 140 | 7/9/2015 | ALLAY MEDICAL SERVICES PC | X | X | 16 | X | | | X | X |
| 160 | 7/13/2015 | ALLAY MEDICAL SERVICES PC | X | | 16 | X | | | X | X |
| 169 | 8/20/2015 | ALLAY MEDICAL SERVICES PC | X | X | 7 | | 15 | | X | X |
| 172 | 8/25/2015 | KSENIA PAVLOVA | X | X | 10 | B | 20 | X | X | B |
| 161 | 9/17/2015 | KSENIA PAVLOVA | B | B | B | B | B | B | B | B |
| 166 | 9/17/2015 | KSENIA PAVLOVA | X | X | 10 | X | 20 | X | X | n/a |
| 127 | 10/1/2015 | KSENIA PAVLOVA | X | X | 7 | | 21 | | X | X |
| 164 | 10/6/2015 | KSENIA PAVLOVA | B | B | B | B | B | B | B | B |
| 162 | 10/26/2015 | FRANCIS JOSEPH LACINA MD | X | X | A | | 16 | | X | |
| 164 | 10/26/2015 | FRANCIS JOSEPH LACINA MD | X | X | A | | 24 | | X | |
| 176 | 10/26/2015 | FRANCIS JOSEPH LACINA MD | X | X | A | | 32 | X | X | |
| 179 | 10/30/2015 | RA MEDICAL SERVICES | B | | A | X | 53 | X | X | |
| 182 | 11/10/2015 | FRANCIS JOSEPH LACINA MD | X | X | 10 | X | 20 | X | X | |
| 182 | 11/27/2015 | ALLAY MEDICAL SERVICES PC | X | X | 16 | X | B | B | X | B |

**Exhibit 7 - Trigger Point Injections**

| RICO NO. | Date of Service | Provider | Patient Reported Pain | | Total TP Injections | TP Bilateral | Total Dry Needling | Dry Bilateral | Patient tolerated well | Patient No complications |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 7 or Higher | 2 + Regions | | | | | | |
| 182 | 12/4/2015 | RA MEDICAL SERVICES | X | X | ^ | | 32 | X | X | |
| 184 | 11/16/2015 | RA MEDICAL SERVICES | X | X | ^ | | 35 | | X | |
| 185 | 11/16/2015 | RA MEDICAL SERVICES | X | X | ^ | | 40 | X | X | |
| 185 | 1/8/2016 | RA MEDICAL SERVICES | | X | 2 | X | 16 | X | X | X |
| 186 | 11/16/2015 | RA MEDICAL SERVICES | X | X | ^ | X | 36 | X | X | |
| 186 | 12/29/2015 | ALLAY MEDICAL SERVICES PC | X | X | 7 | | 14 | | X | X |
| 181 | 11/24/2015 | ALLAY MEDICAL SERVICES PC | X | X | 10 | X | 24 | X | X | |
| 183 | 11/24/2015 | ALLAY MEDICAL SERVICES PC | X | X | 8 | X | 16 | X | X | |
| 188 | 11/27/2015 | ALLAY MEDICAL SERVICES PC | X | X | 8 | | | | X | |
| 188 | 12/4/2015 | RA MEDICAL SERVICES | X | X | ^ | X | 40 | X | X | |
| 187 | 12/18/2015 | ALLAY MEDICAL SERVICES PC | | X | 5 | | 10 | | X | |
| 187 | 12/24/2015 | ALLAY MEDICAL SERVICES PC | | X | 8 | | 16 | | X | X |
| 190 | 12/29/2015 | ALLAY MEDICAL SERVICES PC | | | | | | | | |
| 126 | 12/29/2015 | ALLAY MEDICAL SERVICES PC | X | X | 14 | X | 24 | X | X | X |
| 124 | 1/8/2016 | RA MEDICAL SERVICES | X | X | ^ | X | 40 | X | X | |
| 192 | 1/8/2016 | RA MEDICAL SERVICES | | X | ^ | | 40 | X | X | |
| 194 | 1/8/2016 | RA MEDICAL SERVICES | X | X | ^ | | 18 | | X | |
| 199 | 1/22/2016 | RA MEDICAL SERVICES | X | X | | | 39 | | X | |
| 200 | 1/22/2016 | RA MEDICAL SERVICES | X | X | | | 4 | X | X | |
| 201 | 1/22/2016 | RA MEDICAL SERVICES | | | ^ | X | 40 | X | X | |
| 203 | 2/5/2016 | RA MEDICAL SERVICES | X | X | ^ | | 40 | X | X | |
| 198 | 2/16/2016 | JULES FRANCOIS PARISIEN MD | X | X | 6 | | | | X | X |
| 196 | 2/16/2016 | JULES FRANCOIS PARISIEN MD | X | X | 5 | | | | X | X |
| 127 | 2/23/2016 | JULES FRANCOIS PARISIEN MD | | X | 8 | | 18 | | X | X |
| 127 | 5/27/2016 | RA MEDICAL SERVICES | | | ^ | X | 36 | X | X | B |
| 207 | 2/23/2016 | JULES FRANCOIS PARISIEN MD | B | B | B | B | B | B | B | B |
| 207 | 4/5/2016 | RA MEDICAL SERVICES | B | B | B | B | B | B | B | B |
| 173 | 2/25/2016 | JULES FRANCOIS PARISIEN MD | X | X | 7 | | 14 | | X | X |
| 211 | 3/8/2016 | JULES FRANCOIS PARISIEN MD | X | X | 7 | | ^ | | X | X |
| 211 | 3/25/2016 | RA MEDICAL SERVICES | X | | ^ | X | 56 | X | X | X |
| 212 | 3/8/2016 | JULES FRANCOIS PARISIEN MD | X | X | 8 | | ^ | | X | X |
| 213 | 3/11/2016 | RA MEDICAL SERVICES | X | X | ^ | X | 36 | X | X | X |
| 215 | 3/15/2016 | JULES FRANCOIS PARISIEN MD | X | X | 8 | | ^ | | X | X |
| 210 | 3/18/2016 | RA MEDICAL SERVICES | X | X | ^ | X | 40 | X | X | X |
| 210 | 4/14/2016 | RA MEDICAL SERVICES | X | X | ^ | | 36 | X | X | X |
| 195 | 3/24/2016 | JULES FRANCOIS PARISIEN MD | X | X | 8 | | ^ | | X | X |
| 205 | 3/25/2016 | RA MEDICAL SERVICES | | X | ^ | X | 40 | X | X | X |
| 222 | 3/29/2016 | JULES FRANCOIS PARISIEN MD | | X | 8 | | 8 | X | X | X |
| 208 | 3/31/2016 | JULES FRANCOIS PARISIEN MD | X | X | 8 | | ^ | | X | X |
| 221 | 4/5/2016 | RA MEDICAL SERVICES | B | B | B | B | B | B | B | B |

## Exhibit 7 - Trigger Point Injections

| RICO NO. | Date of Service | Provider | Patient Reported Pain | | Total TP Injections | TP Bilateral | Total Dry Needling | Dry Bilateral | Patient tolerated well | Patient No complications |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 7 or Higher | 2 + Regions | | | | | | |
| 227 | 4/14/2016 | RA MEDICAL SERVICES | X | X | ^ | | 38 | | X | X |
| 228 | 4/14/2016 | RA MEDICAL SERVICES | X | X | ^ | X | 40 | X | X | X |
| 228 | 4/26/2016 | PFJ MEDICAL CARE PC | X | X | 8 | | ^ | | X | X |
| 228 | 5/16/2016 | RA MEDICAL SERVICES | X | | ^ | X | 40 | X | X | X |
| 216 | 4/15/2016 | PFJ MEDICAL CARE PC | X | X | 8 | | 16 | | X | X |
| 216 | 7/8/2016 | PFJ MEDICAL CARE PC | X | X | ^ | | 16 | | | |
| 230 | 5/2/2016 | PFJ MEDICAL CARE PC | X | X | 8 | | 20 | | X | X |
| 233 | 5/16/2016 | PFJ MEDICAL CARE PC | B | X | 8 | | 40 | | X | X |
| 233 | 6/16/2016 | RA MEDICAL SERVICES | X | X | | | 40 | X | X | X |
| 234 | 5/16/2016 | PFJ MEDICAL CARE PC | X | X | 8 | | 18 | | X | X |
| 234 | 6/1/2016 | RA MEDICAL SERVICES | X | X | | | 34 | | X | X |
| 234 | 9/22/2016 | PFJ MEDICAL CARE PC | X | X | | | 50 | X | X | |
| 234 | 10/17/2016 | ALLAY MEDICAL SERVICES PC | X | X | | | 20 | | X | |
| 235 | 5/18/2016 | PFJ MEDICAL CARE PC | X | X | 8 | | 16 | | X | X |
| 235 | 9/19/2016 | PFJ MEDICAL CARE PC | X | X | ^ | | 36 | X | X | X |
| 235 | 10/24/2016 | ALLAY MEDICAL SERVICES PC | | X | | | 4 | | X | |
| 236 | 5/25/2016 | PFJ MEDICAL CARE PC | X | X | 8 | | 20 | | X | X |
| 236 | 6/14/2016 | RA MEDICAL SERVICES | X | X | ^ | | 38 | | X | X |
| 236 | 11/3/2016 | KP MEDICAL CARE PC | | X | | | 28 | X | X | |
| 237 | 5/25/2016 | PFJ MEDICAL CARE PC | | X | 6 | | 16 | | X | X |
| 237 | 6/21/2016 | PFJ MEDICAL CARE PC | | X | ^ | X | 10 | | B | B |
| 238 | 5/26/2016 | PFJ MEDICAL CARE PC | X | X | 6 | | 14 | | | |
| 239 | 5/26/2016 | PFJ MEDICAL CARE PC | X | X | 6 | | 14 | | X | X |
| 240 | 6/2/2016 | PFJ MEDICAL CARE PC | X | X | 8 | | 20 | | X | X |
| 240 | 6/7/2016 | RA MEDICAL SERVICES | X | X | | | 38 | | X | X |
| 252 | 6/24/2016 | PFJ MEDICAL CARE PC | | X | ^ | X | 23 | X | X | X |
| 231 | 7/15/2016 | PFJ MEDICAL CARE PC | X | X | ^ | | 16 | | | |
| 248 | 8/19/2016 | PFJ MEDICAL CARE PC | X | X | ^ | | 16 | | | |
| 254 | 8/26/2016 | PFJ MEDICAL CARE PC | X | X | ^ | | 16 | | | |
| 254 | 10/7/2016 | JFP MEDICAL SERVICES PC | X | X | | | 24 | X | X | |
| 254 | 10/7/2016 | JFP MEDICAL SERVICES PC | X | X | | | 24 | X | X | |
| 254 | 11/7/2016 | KP MEDICAL CARE PC | | X | ^ | | 16 | X | X | |
| 254 | 11/17/2016 | KP MEDICAL CARE PC | X | X | | | 28 | X | X | |
| 255 | 9/2/2016 | PFJ MEDICAL CARE PC | X | X | | | 16 | | | |
| 256 | 9/15/2016 | PFJ MEDICAL CARE PC | X | X | 1 | | 24 | X | X | |
| 256 | 10/5/2016 | JFL MEDICAL CARE PC | X | X | | | 82 | X | X | X |
| 257 | 9/15/2016 | PFJ MEDICAL CARE PC | X | | 2 | X | | | X | X |
| 259 | 9/16/2016 | ROSS MEDICAL PC | | X | 2 | | 25 | | X | |
| 259 | 9/21/2016 | PFJ MEDICAL CARE PC | X | X | ^ | | | | | |
| 242 | 9/16/2016 | PFJ MEDICAL CARE PC | | X | | | 20 | X | X | |
| 242 | 10/31/2016 | ALLAY MEDICAL SERVICES PC | | X | | | 36 | X | X | |

Page 4

## Exhibit 7 - Trigger Point Injections

| RICO NO. | Date of Service | Provider | Patient Reported Pain 7 or Higher | 2 + Regions | Total TP Injections | TP Bilateral | Total Dry Needling | Dry Bilateral | Patient tolerated well | Patient No complications |
|---|---|---|---|---|---|---|---|---|---|---|
| 260 | 9/19/2016 | PFJ MEDICAL CARE PC | X | X | ^ | X | | | X | |
| 260 | 10/10/2016 | JFP MEDICAL SERVICES PC | X | X | ^ | | | | X | |
| 260 | 11/10/2016 | KP MEDICAL CARE PC | | X | ^ | | 24 | X | X | |
| 263 | 9/26/2016 | PFJ MEDICAL CARE PC | | X | ^ | X | | | | |
| 263 | 11/21/2016 | KP MEDICAL CARE PC | | X | | | 56 | X | X | |
| 264 | 9/26/2016 | PFJ MEDICAL CARE PC | | | ^ | X | 30 | X | X | |
| 264 | 11/14/2016 | KP MEDICAL CARE PC | X | X | ^ | | 20 | X | X | |
| 264 | 12/15/2016 | KP MEDICAL CARE PC | X | X | ^ | | 40 | | X | |
| 265 | 9/26/2016 | PFJ MEDICAL CARE PC | | | ^ | X | | | X | |
| 265 | 11/21/2016 | KP MEDICAL CARE PC | X | X | | | 56 | X | X | |
| 217 | 10/4/2016 | JFP MEDICAL SERVICES PC | | X | | | 16 | X | X | |
| 261 | 10/4/2016 | JFP MEDICAL SERVICES PC | | X | ^ | | | | X | |
| 267 | 10/4/2016 | JFP MEDICAL SERVICES PC | X | X | ^ | X | | | X | |
| 268 | 10/7/2016 | JFP MEDICAL SERVICES PC | X | X | ^ | | 12 | | X | |
| 268 | 10/31/2016 | JFP MEDICAL SERVICES PC | | X | ^ | | 14 | | X | |
| 268 | 11/4/2016 | JFL MEDICAL CARE PC | | X | ^ | | 40 | | X | X |
| 268 | 11/17/2016 | KP MEDICAL CARE PC | | X | ^ | | | | X | |
| 270 | 10/7/2016 | JFP MEDICAL SERVICES PC | X | X | ^ | | ^ | | X | |
| 270 | 10/31/2016 | ALLAY MEDICAL SERVICES PC | | X | | | 32 | X | X | |
| 271 | 10/7/2016 | JFP MEDICAL SERVICES PC | X | X | ^ | | | | X | |
| 271 | 10/10/2016 | JFP MEDICAL SERVICES PC | | X | ^ | | 4 | | X | |
| 271 | 10/28/2016 | JFP MEDICAL SERVICES PC | | X | | | 16 | X | X | |
| 271 | 10/31/2016 | JFP MEDICAL SERVICES PC | | X | | | 24 | X | X | |
| 271 | 11/1/2016 | JFL MEDICAL CARE PC | X | X | | | 40 | X | X | |
| 271 | 11/17/2016 | KP MEDICAL CARE PC | | X | ^ | | 36 | X | X | X |
| 271 | 11/21/2016 | KP MEDICAL CARE PC | | X | | | 48 | X | X | |
| 271 | 12/29/2016 | KP MEDICAL CARE PC | | X | | | 12 | | X | |
| 271 | 1/20/2017 | KP MEDICAL CARE PC | | | ^ | | | | X | |
| 272 | 10/10/2016 | JFP MEDICAL SERVICES PC | X | X | ^ | | 8 | | | |
| 272 | 11/1/2016 | JFL MEDICAL CARE PC | X | X | | | 40 | X | X | X |
| 272 | 12/1/2016 | KP MEDICAL CARE PC | X | X | ^ | | | | X | |
| 272 | 12/7/2016 | JFL MEDICAL CARE PC | X | X | ^ | X | 40 | X | X | X |

Page 5

## Exhibit 7 - Trigger Point Injections

| RICO NO. | Date of Service | Provider | Patient Reported Pain: 7 or Higher | Patient Reported Pain: 2 + Regions | Total TP Injections | TP Bilateral | Total Dry Needling | Dry Bilateral | Patient tolerated well | Patient No complications |
|---|---|---|---|---|---|---|---|---|---|---|
| 262 | 10/17/2016 | ALLAY MEDICAL SERVICES PC | X | X | | | 16 | X | X | |
| 262 | 10/26/2016 | JFL MEDICAL CARE PC | X | X | | | 40 | X | X | X |
| 273 | 10/21/2016 | ALLAY MEDICAL SERVICES PC | X | X | | | 36 | X | X | |
| 273 | 11/7/2016 | KP MEDICAL CARE PC | | X | | | 40 | X | X | |
| 273 | 12/7/2016 | JFL MEDICAL CARE PC | X | X | A | X | 36 | X | X | X |
| 273 | 12/12/2016 | KP MEDICAL CARE PC | X | X | A | | 36 | X | X | |
| 273 | 1/9/2017 | KP MEDICAL CARE PC | | X | A | | 56 | X | X | |
| 246 | 11/1/2016 | JFL MEDICAL CARE PC | X | X | A | X | 40 | X | X | X |
| 229 | 11/3/2016 | KP MEDICAL CARE PC | X | | | | 52 | | X | |
| 229 | 12/8/2016 | KP MEDICAL CARE PC | X | X | | | 52 | X | X | |
| 266 | 11/3/2016 | KP MEDICAL CARE PC | X | X | | | 28 | X | X | |
| 269 | 11/17/2016 | KP MEDICAL CARE PC | X | X | | | 56 | X | X | |
| 274 | 12/14/2016 | JFL MEDICAL CARE PC | X | X | A | | 36 | | X | X |
| 275 | 11/23/2016 | JFL MEDICAL CARE PC | X | X | A | | 32 | X | X | X |
| 275 | 12/1/2016 | KP MEDICAL CARE PC | X | X | A | | 36 | X | X | |
| 281 | 11/30/2016 | JFL MEDICAL CARE PC | X | X | B | | B | B | B | B |
| 281 | 12/2/2016 | KP MEDICAL CARE PC | X | | | | 44 | X | X | |
| 282 | 11/30/2016 | JFL MEDICAL CARE PC | X | X | A | | 40 | X | X | B |
| 280 | 12/1/2016 | KP MEDICAL CARE PC | X | X | | | 52 | X | X | |
| 276 | 12/5/2016 | KP MEDICAL CARE PC | X | X | | | 64 | X | X | |
| 276 | 1/16/2017 | KP MEDICAL CARE PC | X | X | | | 14 | X | X | |
| 283 | 12/5/2016 | KP MEDICAL CARE PC | X | X | | | 64 | X | X | |
| 277 | 12/5/2016 | KP MEDICAL CARE PC | X | X | A | | 56 | X | X | |
| 284 | 12/8/2016 | KP MEDICAL CARE PC | B | B | B | B | B | B | B | B |
| 278 | 12/12/2016 | KP MEDICAL CARE PC | X | | A | | | | X | |
| 286 | 12/14/2016 | JFL MEDICAL CARE PC | | | A | | 36 | X | X | X |
| 286 | 1/18/2017 | JFL MEDICAL CARE PC | X | X | A | | 36 | X | X | X |
| 287 | 12/15/2016 | KP MEDICAL CARE PC | | | | | 14 | | X | |
| 288 | 12/15/2016 | KP MEDICAL CARE PC | | X | A | | 34 | X | X | |
| 289 | 12/28/2016 | JFL MEDICAL CARE PC | X | X | B | B | B | B | B | B |
| 289 | 12/29/2016 | KP MEDICAL CARE PC | X | X | A | | 60 | X | X | |
| 285 | 12/29/2016 | KP MEDICAL CARE PC | X | X | | | 28 | X | X | |
| 285 | 1/4/2017 | JFL MEDICAL CARE PC | X | X | | | 38 | X | X | blank |
| 285 | 1/23/2017 | KP MEDICAL CARE PC | X | X | A | | 16 | X | X | X |
| 293 | 1/3/2017 | KP MEDICAL CARE PC | X | X | A | | 28 | X | X | |
| 294 | 1/3/2017 | KP MEDICAL CARE PC | | | A | | | | X | |
| 294 | 1/23/2017 | KP MEDICAL CARE PC | | X | | | 20 | X | X | |
| 295 | 1/3/2017 | KP MEDICAL CARE PC | X | X | A | | 56 | X | X | |
| 202 | 1/4/2017 | JFL MEDICAL CARE PC | X | X | A | | 40 | X | X | X |
| 202 | 1/9/2017 | KP MEDICAL CARE PC | X | X | | | 64 | X | X | |
| 296 | 1/9/2017 | KP MEDICAL CARE PC | X | X | | | 36 | X | X | |

## Exhibit 7 - Trigger Point Injections

| RICO NO. | Date of Service | Provider | Patient Reported Pain | | Total TP Injections | TP Bilateral | Total Dry Needling | Dry Bilateral | Patient tolerated well | Patient No complications |
| | | | 7 or Higher | 2 + Regions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 296 | 1/20/2017 | KP MEDICAL CARE PC | X | X | A | | 52 | X | X | X |
| 297 | 1/9/2017 | KP MEDICAL CARE PC | X | X | | | 28 | X | X | |
| 298 | 1/9/2017 | KP MEDICAL CARE PC | X | X | | | 60 | X | X | |
| 290 | 1/12/2017 | KP MEDICAL CARE PC | X | X | A | | 56 | X | X | |
| 291 | 1/12/2017 | KP MEDICAL CARE PC | X | X | A | | 72 | X | X | |
| 299 | 1/12/2017 | KP MEDICAL CARE PC | | X | A | | 52 | X | X | |

(A) Form indicates a trigger point injection or dry needling was performed but does not indicate the number of muscles injected.
(B) Missing or incomplete record.

Page 7

*Exhibit 8*

## Exhibit 8 - 1786 Flatbush DME Providers

| RXID NO. | First DME DOS | DME Provider Name | Prescribing Doctor | Date of Service | Mattress E0184 | Cervical Pillow E0190 | Therapeutic Electric Heating Pad E0215 | Bed Board E0274 | Advanced Cervical Collar L0174 | Cervical Collar 2pc U2190 | LSO L0627 | LSO Contact L0631 | Knee Support L1832 | Shoulder Support L3965 | Lumbar Cushion T5001 | Date of Service | Precursor Disc/Pneum. E0480 | EMS E0762 | Cervical Pneum. E0849 | Hydro Massager E1310 | Whirlpool E1399 | Massager E1399 | Lumbar Traction Unit E2614 | Date of Service | Provider | Pneuma Compressor Non Seg. E0650 | Cervical Traction Unit E0855 | Knee Orthosis L1846 | Shoulder Orthosis L3671 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/17/2013 | MASGA | Kosma Parziwa MD | 9/17/2013 | $204.24 | | $63.16 | $101.75 | | | $522.59 | | | | | 9/24/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 2 | 9/18/2013 | MASGA | Jules François Parisien MD | 9/18/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 9/24/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 3 | 9/19/2013 | MASGA | Jules François Parisien MD | 9/19/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 9/24/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 4 | 9/19/2013 | MASGA | Jules François Parisien MD | 9/19/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 9/24/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 5 | 9/21/2013 | MASGA | Jules François Parisien MD | 9/21/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 9/24/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 6 | 10/22/2013 | MASGA | Jules François Parisien MD | 10/22/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 10/29/2013 | | $735.26 | | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 7 | 10/23/2013 | MASGA | Jules François Parisien MD | 10/23/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 10/29/2013 | | $735.26 | | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 8 | 10/23/2013 | MASGA | Kosma Parziwa MD | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9 | 10/23/2013 | MASGA | Jules François Parisien MD | 10/23/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 11/5/2013 | | $735.26 | | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 10 | 10/30/2013 | MASGA | Jules François Parisien MD | 10/30/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 11/5/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 11 | 10/31/2013 | MASGA | Jules François Parisien MD | 10/31/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 11/12/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 12 | 11/1/2013 | MASGA | Jules François Parisien MD | 11/1/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 11/12/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 13 | 11/6/2013 | MASGA | Jules François Parisien MD | 11/6/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 11/18/2013 | | $735.26 | | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 14 | 11/12/2013 | MASGA | Kosma Parziwa MD | 11/12/2013 | $204.24 | | $63.16 | | | | $522.59 | | | | | 11/18/2013 | | $735.26 | | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 15 | 11/13/2013 | MASGA | Jules François Parisien MD | 11/13/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 11/19/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 16 | 11/26/2013 | MASGA | Jules François Parisien MD | 11/26/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 12/2/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 17 | 12/4/2013 | MASGA | Jules François Parisien MD | 12/4/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 12/10/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 18 | 12/10/2013 | MASGA | Jules François Parisien MD | 12/10/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 12/16/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 19 | 12/11/2013 | MASGA | Jules François Parisien MD | 12/11/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 12/17/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 20 | 12/16/2013 | MASGA | Jules François Parisien MD | 12/16/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 12/24/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 21 | 12/23/2013 | MASGA | Jules François Parisien MD | 12/23/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 12/30/2013 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 22 | 12/27/2013 | MASGA | Kosma Parziwa MD | 12/27/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/6/2014 | | $735.26 | | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 23 | 12/31/2013 | MASGA | Jules François Parisien MD | 12/31/2013 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/6/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 24 | 1/7/2014 | MASGA | Jules François Parisien MD | 1/7/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/13/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 25 | 1/7/2014 | MASGA | Kosma Parziwa MD | 1/7/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/13/2014 | | $735.26 | | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 26 | 1/8/2014 | MASGA | Jules François Parisien MD | 1/8/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/14/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 27 | 1/8/2014 | MASGA | Jules François Parisien MD | 1/8/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/14/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 28 | 1/13/2014 | MASGA | Jules François Parisien MD | 1/13/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/21/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 29 | 1/14/2014 | MASGA | Jules François Parisien MD | 1/14/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/21/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 30 | 1/15/2014 | MASGA | Jules François Parisien MD | 1/15/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/22/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 31 | 1/17/2014 | MASGA | Jules François Parisien MD | 1/17/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/23/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 32 | 1/20/2014 | MASGA | Jules François Parisien MD | 1/20/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/27/2014 | | $735.26 | | | | $408.00 | $1793.95 | | | | | | | |
| 33 | 1/22/2014 | MASGA | Kosma Parziwa MD | 1/22/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 1/28/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 34 | 1/28/2014 | MASGA | Kosma Parziwa MD | 1/28/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/11/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 35 | 2/3/2014 | MASGA | Jules François Parisien MD | 2/3/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/7/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 36 | 2/3/2014 | MASGA | Jules François Parisien MD | 2/3/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/7/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 37 | 2/4/2014 | MASGA | Jules François Parisien MD | 2/4/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/10/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 38 | 2/4/2014 | MASGA | Jules François Parisien MD | 2/4/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/10/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 39 | 2/6/2014 | MASGA | Jules François Parisien MD | 2/6/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/14/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 40 | 2/6/2014 | MASGA | Jules François Parisien MD | 2/6/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/14/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 41 | 2/6/2014 | MASGA/MADISON | Jules François Parisien MD | 2/6/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/14/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 42 | 2/6/2014 | MASGA/MADISON | Jules François Parisien MD | 2/6/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/14/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 43 | 2/7/2014 | MASGA | Jules François Parisien MD | 2/7/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/24/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 44 | 2/7/2014 | MASGA | Jules François Parisien MD | 2/7/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/24/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 45 | 2/10/2014 | MASGA | Jules François Parisien MD | 2/10/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 2/27/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 46 | 3/3/2014 | MASGA | Jules François Parisien MD | 3/3/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 3/11/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 47 | 3/4/2014 | MASGA | Jules François Parisien MD | 3/4/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 3/11/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 48 | 3/5/2014 | MASGA | Jules François Parisien MD | 3/5/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 3/13/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 49 | 3/6/2014 | MASGA/MADISON | Jules François Parisien MD | 3/6/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 3/14/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 50 | 3/6/2014 | MASGA | Jules François Parisien MD | 3/6/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 3/14/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 51 | 3/7/2014 | MADISON | Jules François Parisien MD | 3/7/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 3/24/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 52 | 3/24/2014 | MADISON | Lupman Dakin | 3/24/2014 | $204.24 | | $63.16 | $101.75 | | | $522.59 | | | | | 3/31/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | | | | | | | |
| 53 | 3/24/2014 | MADISON | Lupman Dakin | 3/24/2014 | $204.24 | | $63.16 | $101.75 | | | $522.59 | | | | | 3/31/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | | | | | | | |
| 54 | 3/24/2014 | MADISON | Lupman Dakin | | | | | | | | | | | | | | | | | | | | | | 3/28/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $5515.06 | $502.63 | | |
| 55 | 3/31/2014 | MADISON | Lupman Dakin | 3/31/2014 | $204.24 | | $63.16 | $101.75 | | | $522.59 | | | | | 4/4/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 56 | 3/31/2014 | MADISON | Lupman Dakin | 3/31/2014 | $204.24 | | $63.16 | $101.75 | | | $522.59 | | | | | 4/4/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 57 | 4/2/2014 | MADISON | Lupman Dakin | 4/2/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 4/10/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 58 | 4/2/2014 | MADISON | Lupman Dakin | 4/2/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 4/10/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 59 | 3/31/2014 | MADISON | Lupman Dakin | 3/31/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 4/4/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 60 | 4/2/2014 | MADISON | Lupman Dakin | 4/2/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $522.59 | | $549.18 | | | 4/10/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 61 | 4/15/2014 | MADISON | Kosma Parziwa MD | 4/15/2014 | $204.24 | | $63.16 | $101.75 | | | $522.59 | | | | | 4/25/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 62 | 4/15/2014 | MADISON | Kosma Parziwa MD | 4/15/2014 | $204.24 | | $63.16 | $101.75 | | | $522.59 | | | | | 4/25/2014 | | $735.26 | $371.70 | | | $408.00 | $1793.95 | $491.77 | | | | | | |
| 63 | 4/15/2014 | MADISON | Kosma Parziwa MD | | | | | | | | | | | | | | | | | | | | | | 5/2/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $5515.06 | $502.63 | | |

# Exhibit 8 - 1786 Flatbush DME Providers

| RICO NO. | First DME DOS | DME Provider Name | Prescribing Doctor | Bundle A: Date of Service | Mattress E0184 | Cervical Pillow E0190 | Therapeutic Electric Heating Pad E0215 | Bed Board E0274 | Advanced Cervical Collar L0174 | Cervical Collar 2pc L0190 | LSO L0627 | LSO Control L0631 | Knee Support L1832 | Shoulder Support L3965 | Lumbar Cushion T5001 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68 | **4/16/2014** | MADISON | Ksenia Pavlova MD | 4/16/2014 | $204.24 | | $63.16 | $101.75 | $362.34 | | $322.98 | $806.64 | $549.18 | | $513.75 |
| 63 | **4/17/2014** | MADISON | Luqman Dabiri | 4/17/2014 | $204.24 | | $63.16 | $101.75 | $362.34 | | $522.98 | $806.64 | | $803.55 | $513.75 |
| 51 | **4/21/2014** | MAIGA/MADISON | Luqman Dabiri | 3/13/2014 | $204.24 | | $63.16 | $101.75 | $362.34 | | $522.98 | $806.64 | | | $513.75 |
| 66 | **4/28/2014** | MADISON | Ksenia Pavlova MD | 4/28/2014 | $204.24 | | $63.16 | $101.75 | $130.00 | | $322.98 | $806.64 | | | $513.75 |
| 69 | **4/30/2014** | MADISON | Luqman Dabiri | 4/30/2014 | $204.24 | | $63.16 | $101.75 | $362.34 | | $322.98 | $806.64 | | | $513.75 |
| 70 | **5/2/2014** | MADISON | Noel E Blackman MD | 5/2/2014 | $204.24 | | $63.16 | $101.75 | $362.34 | | $322.98 | $806.64 | $549.18 | $803.55 | $513.75 |
| 71 | **5/19/2014** | MADISON | Ksenia Pavlova MD | 5/19/2014 | $204.24 | | $63.16 | $101.75 | $362.34 | | $322.98 | $806.64 | | | $513.75 |
| 72 | **5/22/2014** | MADISON | Ksenia Pavlova MD | 5/22/2014 | $204.24 | | $63.16 | $101.75 | $362.34 | | $322.98 | $806.64 | | | $513.75 |
| 73 | **5/23/2014** | MADISON | Jules Francois Parisien MD | 5/23/2014 | $204.24 | | $63.16 | $101.75 | $362.34 | | $322.98 | $806.64 | | $803.55 | $513.75 |
| 74 | **5/30/2014** | MADISON | Jules Francois Parisien MD | 5/30/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 75 | **6/4/2014** | MADISON | Jules Francois Parisien MD | 6/4/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 76 | **6/9/2014** | MADISON | Jules Francois Parisien MD | 6/9/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 81 | **6/10/2014** | MADISON | Ksenia Pavlova MD | 6/10/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 79 | **6/11/2014** | MADISON | Jules Francois Parisien MD | 6/11/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 77 | **6/13/2014** | MADISON | Jules Francois Parisien MD | 6/13/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 78 | **6/13/2014** | MADISON | Jules Francois Parisien MD | 6/13/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 80 | **6/16/2014** | MADISON | Jules Francois Parisien MD | 6/16/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 82 | **6/26/2014** | MADISON | Jules Francois Parisien MD | 6/26/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 84 | **7/15/2014** | MADISON | Jules Francois Parisien MD | 7/15/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 85 | **7/15/2014** | MADISON | Jules Francois Parisien MD | 7/15/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 86 | **7/15/2014** | MADISON | Jules Francois Parisien MD | 7/15/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 64 | **7/15/2014** | MADISON | Jules Francois Parisien MD | 7/15/2014 | $153.13 | | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 87 | **7/21/2014** | MADISON | Noel E Blackman MD | 7/21/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 |
| 88 | **7/23/2014** | MADISON | Noel E Blackman MD/Ksenia Pavlova | 7/23/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 89 | **7/24/2014** | MADISON | Noel E Blackman MD | 7/24/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 |
| 90 | **7/30/2014** | MADISON | Jules Francois Parisien MD | 7/30/2014 | $153.13 | $22.04 | $20.93 | $101.85 | | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 92 | **8/8/2014** | MADISON | Jules Francois Parisien MD | 8/8/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 93 | **8/15/2014** | MADISON | Jules Francois Parisien MD | 8/15/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 94 | **9/2/2014** | MADISON | Noel E Blackman MD | 9/2/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 |
| 95 | **9/2/2014** | MADISON | Noel E Blackman MD | 9/2/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 |
| 101 | **9/3/2014** | MADISON | Jules Francois Parisien MD | 9/3/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 96 | **9/3/2014** | MADISON | Jules Francois Parisien MD | 9/3/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 97 | **9/3/2014** | MADISON | Jules Francois Parisien MD | 9/3/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 99 | **9/4/2014** | MADISON | Jules Francois Parisien MD | 9/4/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 98 | **9/4/2014** | MADISON | Jules Francois Parisien MD | 9/4/2014 | $153.13 | | $20.93 | $101.85 | | | $322.98 | $806.64 | | $803.55 | $609.75 |
| 100 | **9/5/2014** | MADISON | Noel E Blackman MD | 9/5/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 102 | **9/22/2014** | MADISON | Jules Francois Parisien MD | 9/22/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 |
| 103 | **9/22/2014** | MADISON | Jules Francois Parisien MD | 9/22/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 |
| 104 | **9/24/2014** | MADISON | Ksenia Pavlova MD | 9/24/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 106 | **10/1/2014** | MADISON | Ksenia Pavlova MD | 10/1/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 107 | **10/1/2014** | MADISON | | 10/1/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 108 | **10/2/2014** | MADISON | | 10/2/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 110 | **10/3/2014** | MADISON | Jules Francois Parisien MD | 10/3/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 105 | **10/10/2014** | MADISON | Ksenia Pavlova MD | 10/10/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 109 | **10/16/2014** | MADISON | Jules Francois Parisien MD | 10/22/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 111 | **10/17/2014** | | Jules Francois Parisien MD | | | | | | | | | | | | |
| 112 | **10/21/2014** | MADISON | Jules Francois Parisien MD | 10/29/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 113 | **10/23/2014** | MADISON | Ksenia Pavlova MD | 10/27/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 115 | **11/11/2014** | MADISON | Ksenia Pavlova MD | 11/11/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | | $607.55 | | $609.75 |
| 117 | **11/11/2014** | MADISON | Ksenia Pavlova MD | 11/11/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | | $607.55 | | $609.75 |
| 30 | **11/18/2014** | MADISON | Jules Francois Parisien MD | 11/18/2014 12/3/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $1,607.10 | $609.75 |
| 116 | **11/21/2014** | MADISON | Ksenia Pavlova MD | 11/21/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 114 | **12/5/2014** | MADISON | Noel E Blackman MD | 1/7/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | | $607.55 | | $609.75 |
| 119 | **12/18/2014** | MADISON | Ksenia Pavlova MD | 12/18/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 121 | **12/23/2014** | MADISON | Noel E Blackman MD | 12/23/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 122 | **12/23/2014** | MADISON | Noel E Blackman MD | 12/23/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 |
| 123 | **12/23/2014** | MADISON | Noel E Blackman MD | 12/23/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 120 | **12/24/2014** | MADISON | Noel E Blackman MD | 12/24/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 118 | **12/29/2014** | MADISON | Noel E Blackman MD | 12/29/2014 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 |
| 126 | **1/6/2015** | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 12/23/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 128 | **1/26/2015** | MAIGA | Noel E Blackman MD | 1/26/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | | | | $803.55 | |
| 129 | **1/26/2015** | MAIGA/MADISON | Francis Joseph Lacina MD | 1/26/2015 | $153.13 | $333.79 | $20.93 | $101.85 | $130.00 | | $322.98 | $806.64 | $607.55 | | $609.75 |
| 130 | **1/26/2015** | MAIGA/MADISON | Francis Joseph Lacina MD | 1/26/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 131 | **1/28/2015** | MAIGA/MADISON | Noel E Blackman MD | 1/28/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 |
| 135 | **2/24/2015** | MADISON | Jules Francois Parisien MD | 2/24/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 136 | **2/25/2015** | MADISON | Jules Francois Parisien MD | 2/25/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 |
| 140 | **3/4/2015** | MADISON/ PERSONAL HOME CARE | Jules Francois Parisien MD | 3/4/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |
| 137 | **3/4/2015** | MADISON/ QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/4/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 |

| RICO NO. | Bundle B: Date of Service | Precurssor Elec/Pneum. E0480 | EMS E0762 | Cervical Pneum. Traction E0849 | Hydro Massagers E1310 | Whirlpool E1399 | Massager E1399 | Lumbar Traction Unit E2614 | Bundle C: Date of Service | Provider | Pneum. Compressor Non Seg. E0650 | Cervical Traction Unit E0855 | Knee Orthosis L1846 | Shoulder Orthosis L3671 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68 | 5/2/2014 | | $735.26 | | | | $179.95 | | 5/5/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 63 | 4/22/2014; 4/24/2014 | | $735.26 | $371.70 | | $408.00 | $179.95 | $491.77 | | | | | | |
| 51 | 4/21/2014 | | | $371.70 | | | | $491.77 | | | | | | |
| 66 | 5/5/2014 | | $735.26 | | | $408.00 | | | 5/5/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 69 | 5/5/2014 | | $735.26 | | | $408.00 | $179.95 | | 5/14/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 70 | 5/7/2014 | | $735.26 | | | $408.00 | $179.95 | | 5/23/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 71 | 5/29/2014 | | $699.00 | | $398.00 | | $79.95 | | 5/28/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 72 | 5/29/2014 | | $699.00 | | $398.00 | | $79.95 | | 5/28/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 73 | 6/4/2014 | | $699.00 | | $398.00 | | $79.95 | | 5/28/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 74 | 6/10/2014 | | $699.00 | | $398.00 | | $79.95 | | 6/17/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 75 | | | | | | | | | | | | | | |
| 76 | 6/11/2014 | | $699.00 | | $398.00 | | $79.95 | | 6/18/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 81 | 6/16/2014 | | $699.00 | | $398.00 | | $79.95 | | 6/18/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 79 | 6/24/2014 | | $699.00 | | $398.00 | | $79.95 | | 6/23/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 77 | 6/26/2014 | | $699.00 | | $398.00 | | $79.95 | | 6/20/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 78 | 6/26/2014 | | $699.00 | | $398.00 | | $79.95 | | 6/20/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 80 | 6/25/2014 | | $699.00 | | $398.00 | | $79.95 | | 6/18/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 82 | 7/7/2014 | | $699.00 | | $398.00 | | $79.95 | | 6/30/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 84 | 7/21/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/5/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 85 | 7/21/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/5/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 86 | 7/21/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/11/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 64 | 7/23/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/6/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 87 | 7/30/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/1/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 88 | 7/27/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/4/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 89 | 7/30/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/1/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 90 | 8/12/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/12/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 92 | 8/18/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/19/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 93 | 8/20/2014 | | $699.00 | | $398.00 | | $79.95 | | 8/20/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 94 | 9/8/2014 | | $699.00 | | $398.00 | | $79.95 | | 9/10/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 95 | 9/8/2014 | | $699.00 | | $398.00 | | $79.95 | | 9/10/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 101 | 9/10/2014 | | $699.00 | | $398.00 | | $79.95 | | 9/10/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 96 | 9/25/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/1/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 97 | 9/10/2014 | | $699.00 | | $398.00 | | $79.95 | | 9/10/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 99 | 9/15/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/8/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 98 | 9/8/2014 | | $699.00 | | $398.00 | | $79.95 | | 9/11/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 100 | 9/8/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/8/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 102 | 10/1/2014 | | $699.00 | | $398.00 | | $79.95 | | | | | | | |
| 103 | 10/6/2014 | | $699.00 | | $398.00 | | $79.95 | | | | | | | |
| 104 | 9/30/2014 | | $699.00 | | $398.00 | | $79.95 | | | | | | | |
| 106 | 10/6/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/22/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 107 | 10/15/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/22/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 108 | 10/7/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/17/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 110 | 10/8/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/21/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 105 | 10/15/2014 | | $699.00 | | $398.00 | | $79.95 | | | | | | | |
| 109 | | | | | | | | | 10/16/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 111 | | | | | | | | | 10/17/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 112 | 11/7/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/21/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 113 | 11/11/2014 | | $699.00 | | $398.00 | | $79.95 | | 10/23/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 115 | 11/20/2014 | | $699.00 | | $398.00 | | $79.95 | | 12/4/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 117 | 11/20/2014 | | $699.00 | | $398.00 | | $79.95 | | 12/4/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 30 | 12/11/2014 | | $699.00 | | $398.00 | | $79.95 | | 12/17/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 116 | 12/1/2014 | | $699.00 | | $398.00 | | $79.95 | | 12/5/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 114 | | | | | | | | | 12/5/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 119 | 12/30/2014 | | $699.00 | | $398.00 | | $79.95 | | 12/24/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 121 | 12/29/2014 | | $699.00 | | $398.00 | | $79.95 | | 12/29/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 122 | 12/29/2014 | | $699.00 | | $398.00 | | | | 12/29/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 123 | 12/29/2014 | | $699.00 | | $398.00 | | $79.95 | | 12/29/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 120 | 1/5/2015 | | $699.00 | | $398.00 | | $79.95 | | 12/30/2014 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 118 | 1/9/2015 | | $699.00 | | $398.00 | | | | | | | | | |
| 126 | 1/6/2015 | $355.56 | $699.00 | | $398.00 | | | | 1/26/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 128 | 2/11/2015 | | $699.00 | | $398.00 | | $79.95 | | 2/11/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 129 | 2/11/2015 | | $699.00 | | $398.00 | | $79.95 | | 2/11/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 130 | 2/11/2015 | | $699.00 | | $398.00 | | $79.95 | | 2/11/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 131 | 2/10/2015 | | $699.00 | | $398.00 | | $79.95 | | 2/10/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 135 | 3/11/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/19/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 136 | 3/11/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/13/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 140 | 3/17/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/17/2015; 4/15/2015 | QUALITY CUSTOM MEDICAL SUPPLY | | $502.63 | $828.15 | |
| 137 | 3/16/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/16/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |

# Exhibit 8 - 1786 Flatbush DME Providers

| | | | | Bundle A | | | | | | | | | | | | Bundle B | | | | | | | | Bundle C | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Date of Service | Mattress | Cervical Pillow | Therapeutic Electric Heating Pad | Bed Board | Advanced Cervical Collar | Cervical Collar 2pc | LSO | LSO Control | Knee Support | Shoulder Support | Lumbar Cushion | Date of Service | Precurssor Elec/Pneum. | EMS | Cervical Pneum. Traction | Hydro Massagers | Whirlpool | Massager | Lumbar Traction Unit | Date of Service | Provider | Pneum. Compressor Non Seg. | Cervical Traction Unit | Knee Orthosis | Shoulder Orthosis |
| RICO NO. | First DME DOS | DME Provider Name | Prescribing Doctor | | E0184 | E0190 | E0215 | E0274 | L0174 | L0190 | L0627 | L0631 | L1832 | L3965 | T5001 | | E0480 | E0762 | E0849 | E1310 | E1399 | E1399 | E2614 | | | E0650 | E0855 | L1846 | L3671 |
| 141 | 3/5/2015 | MADISON | Jules Francois Parisien MD | 3/5/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | | | | | | | | | 3/17/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 139 | 3/6/2015 | MADISON | Jules Francois Parisien MD | 3/6/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 3/13/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/18/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 150 | 3/6/2015 | MADISON | Jules Francois Parisien MD | 3/6/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 3/16/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/16/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | | | |
| 147 | 3/9/2015 | MADISON | Noel E Blackman MD/ Jules Francois Parsien MD | 3/9/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 3/17/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/17/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 148 | 3/9/2015 | MADISON | Noel E Blackman MD | 3/9/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 3/17/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/17/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 149 | 3/9/2015 | MADISON | Noel E Blackman MD | 3/9/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 3/17/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/17/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 151 | 3/10/2015 | MADISON | Jules Francois Parisien MD | 3/10/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 3/19/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/19/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 143 | 3/10/2015 | MADISON | Noel E Blackman MD | 3/10/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 3/17/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/17/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 144 | 3/10/2015 | MADISON | Noel E Blackman MD | 3/10/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 3/17/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/17/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 145 | 3/10/2015 | MADISON | Noel E Blackman MD/ Jules Francois Parsien MD | 3/10/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 3/16/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/16/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 146 | 3/10/2015 | MADISON | Noel E Blackman MD | 3/10/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 3/16/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/16/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 61 | 3/11/2015 | MADISON | Jules Francois Parisien MD | 3/11/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 3/24/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/24/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 142 | 3/11/2015 | MADISON | Jules Francois Parisien MD | 3/11/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 3/17/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/17/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 132 | 3/11/2015 | MADISON | Francis Joseph Lacina MD | 3/11/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 3/18/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/19/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 138 | 3/13/2015 | MADISON | Noel E Blackman MD | 3/13/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 3/26/2015 | | $699.00 | | $398.00 | | $79.95 | | 3/19/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 133 | 4/1/2015 | PERSONAL HOME CARE | Jules Francois Parisien MD | 4/1/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 4/7/2015 | | $699.00 | | $398.00 | | $79.95 | | 4/1/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 153 | 5/1/2015 | PERSONAL HOME CARE | Jules Francois Parisien MD | 5/1/2015 | $153.13 | | $20.93 | $101.85 | $130.00 | | $322.98 | $806.64 | | | $609.75 | | | | | | | | | | | | | | |
| 154 | 5/7/2015 | PERSONAL HOME CARE | Jules Francois Parisien MD | 5/7/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 5/27/2015 | | $699.00 | | $398.00 | | $79.95 | | 5/27/2015 | QUALITY CUSTOM MEDICAL SUPPLY | | $502.63 | $828.15 | |
| 155 | 5/7/2015 | PERSONAL HOME CARE | Jules Francois Parisien MD | 5/7/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 5/19/2015 | | $699.00 | | $398.00 | | $79.95 | | 5/21/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | $386.62 |
| 156 | 5/12/2015 | PERSONAL HOME CARE | Jules Francois Parisien MD | 5/12/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | | | | | | 5/20/2015 | | $699.00 | | $398.00 | | $79.95 | | 5/20/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | | | $386.62 |
| 157 | 5/15/2015 | PERSONAL HOME CARE | Jules Francois Parisien MD | 5/15/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 5/21/2015 | | $699.00 | | $398.00 | | $79.95 | | 6/10/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | $828.15 | $386.62 |
| 159 | 5/21/2015 | PERSONAL HOME CARE/ QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 5/21/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 6/15/2015 | | $699.00 | | $398.00 | | $79.95 | | 6/15/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | $386.62 |
| 158 | 5/22/2015 | PERSONAL HOME CARE | Jules Francois Parisien MD | 5/22/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 6/2/2015 | | $699.00 | | $398.00 | | $79.95 | | 5/22/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | | | $386.62 |
| 83 | 5/29/2015 | PERSONAL HOME CARE/ QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/7/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 5/29/2015 | | $699.00 | | $398.00 | | $79.95 | | 7/7/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | | | |
| 160 | 6/2/2015 | PERSONAL HOME CARE | Jules Francois Parisien MD | 6/2/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | | | | $609.75 | 6/23/2015 | | $699.00 | | $398.00 | | $79.95 | | 6/29/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 161 | 6/5/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 6/5/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 6/15/2015 | | $699.00 | | $398.00 | | $79.95 | | 6/30/2015 | | | $502.63 | | |
| 162 | 6/12/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 6/12/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 7/16/2015 | $355.56 | $699.00 | | $398.00 | | | | 7/20/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 125 | 6/25/2015 | PERSONAL HOME CARE/ QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/9/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 7/9/2015 | | $699.00 | | $398.00 | | $79.95 | | 7/9/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 164 | 6/25/2015 | PERSONAL HOME CARE/ QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/7/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 7/1/2015 | | $699.00 | | $398.00 | | $79.95 | | 7/7/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 166 | 7/20/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/20/2015 | $306.26 | $44.08 | $41.86 | $203.70 | $260.00 | $623.50 | $645.96 | $1,613.28 | | $803.55 | $1,219.50 | 8/14/2015 | $711.12 | $699.00 | | $796.00 | | | | 7/22/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 167 | 7/22/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/22/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 7/28/2015 | $355.56 | $699.00 | | $398.00 | | | | 8/20/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 170 | 8/12/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 8/12/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 8/28/2015 | $355.56 | $699.00 | | $398.00 | | | | 9/9/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 171 | 8/14/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 8/14/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 8/24/2015 | $355.56 | $699.00 | | $398.00 | | | | | | | | | |
| 172 | 8/18/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 8/18/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 8/25/2015 | $355.56 | $699.00 | | $398.00 | | | | 9/14/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 169 | 8/18/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 8/18/2015 | $306.26 | $44.08 | $41.86 | $203.70 | $260.00 | $623.50 | $645.96 | $1,613.28 | | | $1,219.50 | 8/26/2015 | $355.56 | $699.00 | | $796.00 | | | | 9/14/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 168 | 8/19/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 8/19/2015 | $306.26 | $44.08 | $41.86 | $203.70 | $260.00 | $623.50 | $645.96 | $1,613.28 | | | $1,219.50 | | | | | | | | | | | | | | |
| 173 | 9/2/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 9/8/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 9/21/2015 | | $699.00 | | $398.00 | | $79.95 | | 9/2/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 174 | 9/3/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 9/3/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 9/21/2015 | | $699.00 | | $398.00 | | $79.95 | | 9/3/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 175 | 9/5/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 9/23/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 10/5/2015 | $355.56 | $699.00 | | $398.00 | | | | 9/5/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 176 | 9/21/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 9/21/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 10/5/2015 | $355.56 | $699.00 | | $398.00 | | | | 10/5/2015 | QUALITY HEALTH SUPPLY CORP | $531.06 | $502.63 | | |
| 127 | 9/23/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 9/23/2015 | $153.13 | | $20.93 | $101.85 | | | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 10/5/2015 | $355.56 | $699.00 | | $398.00 | | | | 10/5/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 177 | 9/25/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 9/25/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 10/5/2015 | $355.56 | $699.00 | | $398.00 | | | | 10/5/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 178 | 10/14/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 10/14/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 10/29/2015 | $355.56 | $699.00 | | $398.00 | | | | 11/25/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 124 | 11/16/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 11/16/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 11/25/2015 | $355.56 | $699.00 | | $398.00 | | | | 11/25/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 182 | 11/16/2015 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD | 11/16/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 11/25/2015 | $355.56 | $699.00 | | $398.00 | | | | 11/25/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 183 | 11/16/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 11/16/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 11/24/2015 | $355.56 | $699.00 | | $398.00 | | | | 11/24/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 181 | 11/17/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 11/17/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 11/24/2015 | $355.56 | $699.00 | | $398.00 | | | | 11/24/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 187 | 11/20/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 11/20/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 12/1/2015 | $355.56 | $699.00 | | $398.00 | | | | 11/24/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 184 | 11/24/2015 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 11/24/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | | | | | | | | | 11/24/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 185 | 11/27/2015 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 11/27/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 12/11/2015 | $355.56 | $699.00 | | $398.00 | | | | 11/27/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 186 | 12/2/2015 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 12/2/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 12/9/2015 | $355.56 | $699.00 | | $398.00 | | | | 12/2/2015 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 188 | 12/9/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 12/9/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 12/28/2015 | $355.56 | $699.00 | | $398.00 | | | | | | | | | |
| 189 | 12/23/2015 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 12/23/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 1/5/2016 | $355.56 | $699.00 | | $398.00 | | | | 1/19/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 190 | 12/23/2015 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 12/23/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 1/5/2016 | $355.56 | $699.00 | | $398.00 | | | | 1/18/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 191 | 12/29/2015 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 12/29/2015 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 1/5/2016 | $355.56 | $699.00 | | $398.00 | | | | 1/14/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 194 | 1/13/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 1/13/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 1/18/2016 | $355.56 | | | $398.00 | | | | 2/1/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 193 | 1/14/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 1/14/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 1/21/2016 | $355.56 | $699.00 | | $398.00 | | | | 1/14/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 192 | 1/18/2016 | QUALITY HEALTH SUPPLY | Ksenia Pavlova MD/ Jules Francois Parisien MD | 1/18/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | | | | $609.75 | 1/26/2016 | $355.56 | $699.00 | | $398.00 | | | | 1/18/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 197 | 1/18/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | | $153.13 | | $20.93 | $101.85 | | | $322.98 | $806.64 | | | $609.75 | 1/18/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/2/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 195 | 1/19/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 1/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 1/27/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/3/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 196 | 1/19/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 1/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 1/27/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/15/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 200 | 1/26/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 1/26/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 2/1/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/10/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 201 | 1/26/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 1/26/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 2/1/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/15/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 198 | 1/29/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 1/29/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 2/10/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/10/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 199 | 2/1/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | | | | | | | | | | $607.55 | $803.55 | | 2/1/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/10/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |

# Exhibit 8 - 1786 Flatbush DME Providers

| | | | | Bundle A | | | | | | | | | | | | Bundle B | | | | | | | | Bundle C | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Date of Service | Mattress | Cervical Pillow | Therapeutic Electric Heating Pad | Bed Board | Advanced Cervical Collar | Cervical Collar 2pc | LSO | LSO Control | Knee Support | Shoulder Support | Lumbar Cushion | Date of Service | Precurssor Elec/Pneum. | EMS | Cervical Pneum. Traction | Hydro Massagers | Whirlpool | Massager | Lumbar Traction Unit | Date of Service | Provider | Pneum. Compressor Non Seg. | Cervical Traction Unit | Knee Orthosis | Shoulder Orthosis |
| RICO NO. | First DME DOS | DME Provider Name | Prescribing Doctor | | E0184 | E0190 | E0215 | E0274 | L0174 | L0190 | L0627 | L0631 | L1832 | L3965 | T5001 | | E0480 | E0762 | E0849 | E1310 | E1399 | E1399 | E2614 | | | E0650 | E0855 | L1846 | L3671 |
| 205 | 2/3/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 2/3/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 2/16/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/3/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 203 | 2/5/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 2/5/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 2/16/2016 | $355.56 | $699.00 | | $398.00 | | | | 2/5/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 206 | 2/29/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 2/29/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 3/7/2016 | $355.56 | $699.00 | | $398.00 | | | | 3/17/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 208 | 2/29/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 2/29/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 3/7/2016 | $355.56 | $699.00 | | $398.00 | | | | 3/7/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 207 | 3/1/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/1/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 3/7/2016 | $355.56 | $699.00 | | $398.00 | | | | 3/7/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 209 | 3/7/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/7/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | | | | | | | | | 3/7/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 213 | 3/16/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/16/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 3/23/2016 | $355.56 | $699.00 | | $398.00 | | | | 4/6/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 211 | 3/16/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/16/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 3/23/2016 | $355.56 | $699.00 | | $398.00 | | | | 3/31/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 212 | 3/17/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/17/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 3/23/2016 | $355.56 | $699.00 | | $398.00 | | | | 4/5/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 210 | 3/18/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/18/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 4/4/2016 | $355.56 | $699.00 | | | | | | 3/28/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 217 | 3/29/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/29/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 4/11/2016 | $355.56 | $699.00 | | $398.00 | | | | 4/11/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 218 | 3/29/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/29/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 4/5/2016 | $355.56 | $699.00 | | $398.00 | | | | 4/18/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 215 | 3/31/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 3/31/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 4/14/2016 | $355.56 | $699.00 | | $398.00 | | | | 4/14/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 220 | 4/6/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 4/6/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 4/14/2016 | $355.56 | $699.00 | | $398.00 | | | | 4/14/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 216 | 4/6/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 4/6/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 4/13/2016 | $355.56 | $699.00 | | $398.00 | | | | 4/13/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 221 | 4/11/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 4/11/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | | | | | | | | | | | | | | |
| 222 | 4/11/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 4/11/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | | | | | | | | | | | | | | |
| 223 | 4/11/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 4/11/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | | | | | | | | | | | | | | |
| 227 | 4/19/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 4/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 4/28/2016 | $355.56 | $699.00 | | $398.00 | | | | | | | | | |
| 229 | 4/19/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 4/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 4/25/2016 | $355.56 | $699.00 | | $398.00 | | | | 5/16/2016 | QUALITY CUSTOM MEDICAL SUPPLY | | $502.63 | | |
| 230 | 4/19/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 4/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 4/27/2016 | $355.56 | $699.00 | | $398.00 | | | | | | | | | |
| 228 | 4/22/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 4/22/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | $803.55 | $609.75 | 4/25/2016 | $355.56 | $699.00 | | $398.00 | | | | | | | | | |
| 231 | 4/22/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 4/22/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | $803.55 | $609.75 | 5/3/2016 | $355.56 | $699.00 | | $398.00 | | | | 5/17/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 226 | 4/25/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | | $153.13 | | $20.93 | $101.85 | | | $322.98 | $806.64 | $607.55 | | $609.75 | 4/25/2016 | $355.56 | $699.00 | | $398.00 | | | | 5/17/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | | | |
| 219 | 4/28/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 4/28/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 5/12/2016 | $355.56 | $699.00 | | $398.00 | | | | | | | | | |
| 225 | 5/18/2016 | QUALITY HEALTH SUPPLY | Francis Joseph Lacina MD | 5/18/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 6/16/2016 | $355.56 | $699.00 | | $398.00 | | | | 6/16/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 232 | 5/19/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 5/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 5/26/2016 | $355.56 | $699.00 | | $398.00 | | | | 5/26/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 233 | 5/23/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 5/23/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 6/9/2016 | $355.56 | $699.00 | | $398.00 | | | | 5/26/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 234 | 5/23/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 5/23/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 6/14/2016; 6/6/2016 | $355.56 | $699.00 | | $398.00 | | | | 5/26/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 235 | 5/25/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 5/25/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 6/6/2016 | $355.56 | $699.00 | | $398.00 | | | | 5/27/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 239 | 6/3/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 6/3/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | | | | | | | | | | | | | | |
| 238 | 6/6/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 6/6/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 6/22/2016 | $355.56 | $699.00 | | $398.00 | | | | 6/22/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 236 | 6/6/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 6/6/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 6/27/2016 | $355.56 | $699.00 | | $398.00 | | | | 6/27/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 237 | 6/6/2016 | QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 6/6/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 6/21/2016 | $355.56 | $699.00 | | $398.00 | | | | 6/21/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 241 | 6/27/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 6/27/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 7/22/2016 | $355.56 | $699.00 | | $398.00 | | | | 6/27/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 240 | 6/27/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 6/27/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 7/22/2016 | $355.56 | $699.00 | | $398.00 | | | | 6/27/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 251 | 7/19/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Francis Joseph Lacina MD | 7/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 7/27/2016 | $355.56 | $699.00 | | $398.00 | | | | 8/5/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 250 | 7/19/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 7/27/2016 | $355.56 | $699.00 | | $398.00 | | | | | | | | | |
| 248 | 7/20/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/28/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | | | | $609.75 | 8/8/2016 | $355.56 | $699.00 | | $398.00 | | | | 7/20/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 253 | 7/20/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/20/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 8/3/2016 | $355.56 | $699.00 | | $398.00 | | | | 8/16/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 246 | 7/27/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/27/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 8/19/2016 | $355.56 | $699.00 | | $398.00 | | | | 8/19/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 245 | 7/28/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 7/28/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | | | | $609.75 | 8/19/2016 | $355.56 | $699.00 | | $398.00 | | | | 8/19/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 244 | 8/3/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 8/3/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $722.59 | | $609.75 | 8/19/2016 | $355.56 | $699.00 | | $398.00 | | | | 8/5/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 256 | 8/31/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Francis Joseph Lacina MD | 8/31/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 9/6/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/6/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 257 | 8/31/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Francis Joseph Lacina MD | 8/31/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 9/7/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/7/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 259 | 8/31/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 8/31/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 9/8/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/8/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 260 | 8/31/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Francis Joseph Lacina MD | 8/31/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 9/14/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/16/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 254 | 8/31/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 8/31/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 9/6/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/6/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 258 | 9/6/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 9/6/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 10/3/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/6/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 255 | 9/7/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Francis Joseph Lacina MD | 9/7/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 10/3/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/7/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 242 | 9/20/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 9/20/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 9/26/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/26/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 262 | 9/21/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Francis Joseph Lacina MD | 9/21/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 9/27/2016 | $355.56 | $699.00 | | $398.00 | | | | 9/27/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 243 | 9/21/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD | 9/21/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | | | | | | | | | | | | | | |
| 263 | 10/7/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Renee Denobrega NP | 10/7/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 11/9/2016 | $355.56 | $699.00 | | $398.00 | | | | 11/9/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 265 | 10/10/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Renee Denobrega NP | 10/10/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 10/21/2016 | $355.56 | $699.00 | | $398.00 | | | | 10/21/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 266 | 10/11/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Renee Denobrega NP | 10/11/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | $607.55 | | $609.75 | 10/20/2016 | $355.56 | $699.00 | | $398.00 | | | | 10/20/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 264 | 10/12/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Renee Denobrega NP | 10/12/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 11/8/2016 | $355.56 | $699.00 | | $398.00 | | | | 11/8/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 271 | 10/19/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Renee Denobrega NP | 10/19/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 10/31/2016 | $355.56 | $699.00 | | $398.00 | | | | 11/14/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |
| 268 | 10/20/2016 | AB QUALITY HEALTH SUPPLY | Jules Francois Parisien MD/ Francis Joseph Lacina MD | 10/20/2016 | $153.13 | $22.04 | $20.93 | $101.85 | $130.00 | $311.75 | $322.98 | $806.64 | | | $609.75 | 11/2/2016 | $355.56 | $699.00 | | $398.00 | | | | 11/28/2016 | QUALITY CUSTOM MEDICAL SUPPLY | $531.06 | $502.63 | | |

**Exhibit 8 - 1786 Flatbush DME Providers**

| MOD NO. | First DME DOS | DME Provider Name | Prescribing Doctor | Bundle A Date of Service | Mattress E0184 | Cervical Pillow E0190 | Therapeutic Electric Heating Pad E0235 | Bed Board E0274 | Advanced Cervical Collar L0174 | Cervical Collar 2pc L0190 | L0627 | LSO L0637 | LSO Contact L0631 | Knee Support L1832 | Shoulder Support L3905 | Lumbar Cushion T5001 | Bundle B Date of Service | Processor Disc/Neuro E0480 | EMS E0762 | Cervical Pneum. Traction E0849 | Hydro Massager E1310 | Whirlpool E1399 | Massager E1399 | Lumbar Traction Unit E2614 | Bundle C Date of Service | Provider | Pneum. Compressor Neo Kep. E0660 | Cervical Traction Unit E0855 | Knee Orthosis L1846 | Shoulder Orthosis |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 270 | 10/20/2016 | A&I QUALITY HEALTH SUPPLY | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 10/20/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | | | 609.75 | 10/20/2016 | 355.56 | 699.00 | | 398.00 | | | | 12/16/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 272 | 10/20/2016 | A&I QUALITY HEALTH SUPPLY | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 10/20/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | | | 609.75 | 10/21/2016 | 355.56 | 699.00 | | 398.00 | | | | 12/21/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 273 | 10/26/2016 | A&I QUALITY HEALTH SUPPLY | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 10/26/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 660.15 | | 609.75 | 11/9/2016 | 355.56 | 699.00 | | 398.00 | | | | 11/15/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 281 | 12/9/2016 | A&I QUALITY HEALTH SUPPLY | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/9/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | | | 609.75 | 11/9/2016 | 355.56 | 699.00 | | 398.00 | | | | 12/20/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 275 | 12/9/2016 | A&I QUALITY HEALTH SUPPLY / AE QUALITY HEALTH SUPPLY / CUSTOM MEDICAL SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/9/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | | | 609.75 | 12/19/2016 | 355.56 | 699.00 | | 398.00 | | | | 12/16/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 279 | 12/9/2016 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/9/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | 12/19/2016 | 355.56 | 699.00 | | 398.00 | | | | 12/12/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 278 | 12/9/2016 | A&I QUALITY HEALTH SUPPLY / CUSTOM MEDICAL SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/9/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | 12/20/2016 | 355.56 | 699.00 | | 398.00 | | | | 12/19/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 276 | 12/12/2016 | A&I QUALITY HEALTH SUPPLY / AE QUALITY HEALTH / CUSTOM MEDICAL SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/12/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | | | 609.75 | 12/19/2016 | 355.56 | 699.00 | | 398.00 | | | | 12/12/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 283 | 12/12/2016 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/12/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | | | 609.75 | 12/19/2016 | 355.56 | 699.00 | | 398.00 | | | | 12/22/2016 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 277 | 12/12/2016 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/12/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | 12/19/2016 | 355.56 | 699.00 | | 398.00 | | | | | | | | | |
| 274 | 12/12/2016 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/12/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | 12/19/2016 | 355.56 | 699.00 | | 398.00 | | | | | | | | | |
| 280 | 12/14/2016 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/14/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | | | 609.75 | 12/22/2016 | 355.56 | 699.00 | | 398.00 | | | | 1/25/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 284 | 12/20/2016 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/20/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | | | 609.75 | 1/2/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/4/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 287 | 12/21/2016 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/21/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | 1/2/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/30/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 288 | 12/21/2016 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 12/21/2016 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | 1/3/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/3/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 285 | 1/4/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/4/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 660.75 | | 609.75 | 1/13/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/19/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 291 | 1/4/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/4/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 609.75 | | 609.75 | 1/12/2017 | 355.56 | 699.00 | | 398.00 | | | | | | | | | |
| 292 | 1/5/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/5/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 609.75 | | 609.75 | 1/10/2017 | 355.56 | 699.00 | | 398.00 | | | | | | | | | |
| 290 | 1/12/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/12/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 609.75 | | 609.75 | 1/10/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/18/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 293 | 1/16/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/16/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 609.75 | | 609.75 | 1/25/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/19/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 294 | 1/16/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/16/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 660.75 | | 609.75 | 1/25/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/20/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 302 | 1/16/2017 | QUALITY CUSTOM MEDICAL SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/16/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 609.75 | | 609.75 | 1/26/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/26/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 286 | 1/18/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/18/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | 1/30/2017 | 355.56 | 699.00 | | 398.00 | | | | 1/28/2017 | QUALITY CUSTOM MEDICAL SUPPLY | 531.06 | 502.63 | | |
| 299 | 1/18/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/18/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | 1/26/2017 | 355.56 | 699.00 | | 398.00 | | | | | | | | | |
| 298 | 1/18/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/18/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | | 355.56 | 699.00 | | | | | | | | | | | |
| 296 | 1/20/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/20/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | | | | | | | | | | | | | | |
| 295 | 1/24/2017 | A&I QUALITY HEALTH SUPPLY INC | John Francois Parisien MD / Francis Joseph Lucina MD / Renee Drexelnga NP | 1/24/2017 | 153.13 | 22.04 | 20.93 | 103.85 | 130.00 | 311.75 | 322.98 | | 806.64 | 572.59 | | 609.75 | | | | | | | | | | | | | | |

Page 5

*Exhibit 9*

## NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW
## VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
### (This form is not for verification of hospital treatment)

| DATE | POLICYHOLDER | POLICY NUMBER | DATE OF ACCIDENT | CLAIM NUMBER |
|---|---|---|---|---|
| 11/24/2014 | ██████ | 053861607 | 11/1/2014 | 07-550R-951 |

Ksenia Pavlova M.D.
1786 Flatbush Ave
Brooklyn, NY 11210

STATE FARM INSURANCE COMPANIES CLAIM OFFICE
PO Box 106107
Atlanta GA 30348-6107

PHONE NO.  (800) 921-9258 Ext. 59

Melissa Davidson
CLAIM REPRESENTATIVE

**KINDLY COMPLETE AND SUBMIT THIS FORM AS SOON AS POSSIBLE. PLEASE NOTE, THIS COMPLETED FORM MUST BE SUBMITTED TO THE INSURER AS SOON AS REASONABLY POSSIBLE BUT NO LATER THAN 45 DAYS OR 180 DAYS AFTER TREATMENT DATE, DEPENDING UPON THE POLICY ENDORSEMENT IN EFFECT AT THE TIME OF THE ACCIDENT. IF YOU ARE UNSURE OF THE APPLICABLE TIME REQUIREMENT, KINDLY CONTACT THE CLAIMS REPRESENTATIVE TO DETERMINE WHICH DEADLINE IS APPLICABLE TO THIS CLAIM.**

IF YOU HAVE PREVIOUSLY SUBMITTED AN EARLIER REPORT ON THIS ACCIDENT, YOU NEED ONLY NOTE ANY CHANGES FROM THE INFORMATION PREVIOUSLY FURNISHED AND ADDITIONAL CHARGES.

1. Patient's Name and Address
███████████████

2. Date of Birth ███████  3. Sex ☑ M ☐ F  4. Occupation (if known)

5. Diagnosis and Concurrent Conditions
724.2, 717.46, 844.9

6. When did symptoms first appear?
Date: 11-1-14

7. When did patient first consult you for this condition?
Date: 11/5/14

8. Has patient ever had same or similar condition?  ☐ Yes ☑ No    If "Yes", state when and describe:

9. Is condition solely a result of this automobile accident?  ☑ Yes ☐ No    If "No", explain:

10. Is condition due to injury arising out of a patient's employment?  ☐ Yes ☐ No

11. Will injury result in significant disfigurement or permanent disability?  ☐ Yes ☐ No  ☐ Not determinable at this time
If "Yes", describe:

12. Patient was disabled (unable to work)  From:                    Through:

13. If still disabled the patient should be able to return to work on:  (Date)_____

14. Will the patient require rehabilitation and/or occupational therapy as a result of the injuries sustained in this accident?
☑ Yes ☐ No    If "Yes", describe your recommendation below:
Physical Therapy

CONTINUE ON PAGE 2

NYS FORM NF-3 (Rev 1/2004)
Page 1 of 2

12272014

## VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
### PAGE 2

15. Report of Services Rendered - Attach additional sheet if necessary

| Date of Service | Place of Service Including ZIP Code | Description of Treatment or Health Services Rendered | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| / / | / / | *Previously Sent* | / / | / / |
| | | | | |
| | | | | |
| | | | | |
| | | | Total Charges To Date $ | |

16. If treating provider is different than billing provider complete the following:

| Treating Provider's Name | Title | License or Certification Number | Business Relationship (Check Applicable Box) | | |
|---|---|---|---|---|---|
| | | | Employee | Independent Contractor | Other (Specify) |
| Ireana Paulow | DO | 27010 | | | |

17. If the provider of service is a professional service corporation or doing business under an assumed name (DBA), list the owner and professional licensing credentials of all owners (Provide an additional attachment if necessary.)

18. Is patient still under your care for this condition?   ☑ Yes   ☐ No

19. Estimated duration of future treatment   *Undetermined at this time*

**PATIENT:** Your health provider may agree to accept payment for health services performed directly from your insurer (**Authorization to Pay Benefits**) so that you are not required to make payment to the health provider at the time of service. Such agreement is optional on the part of the health provider at the time of service. Such agreement is optional on the part of the health provider and must be signed by both the patient and health provider. You may use the optional authorization language provided below, by checking off the designated spot in item 20 of this form.
20.____ (IF YOU HAVE CHOSEN TO AUTHORIZE THE DIRECT PAYMENT OF BENEFITS BY CHECKING THIS OPTION, **YOU MAY NOT ALSO ENTER INTO AN ASSIGNMENT OF BENEFITS CONTAINED IN #21)**
AUTHORIZATION TO PAY BENEFITS:
I AUTHORIZE PAYMENT OF HEALTH BENEFITS TO THE UNDERSIGNED HEALTH CARE PROVIDER OR SUPPLIER OF SERVICES DESCRIBED BELOW. I RETAIN ALL RIGHTS, PRIVILEGES AND REMEDIES TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT PROVISION) OF THE INSURANCE LAW.

PRINT NAME *On File*                    SIGNED *Previously Sent*
            PATIENT                                    PATIENT                    DATE

**PATIENT:** Your health provider may agree to have you assign your right to No-Fault benefits from your insurer directly to your health provider (**Assignment of Benefits**). If you and your health provider agree to the assignment of benefits, you must both sign the agreement contained in #21 or the prescribed NF-AOB form or its equivalent. The language contained in the assignment of benefits is mandatory and may not be altered or avoided by any other language added to this agreement or other written agreement.
21.____ (IF YOU HAVE CHOSEN TO ASSIGN YOUR BENEFITS TO THE HEALTH PROVIDER BY CHECKING THIS OPTION, **YOU MAY NOT ALSO ENTER INTO AN AUTHORIZATION TO PAY BENEFITS CONTAINED IN ITEM 20 ABOVE)**
ASSIGNMENT OF NO-FAULT BENEFITS:
I HEREBY ASSIGN TO THE HEALTH CARE PROVIDER INDICATED BELOW ALL RIGHTS, PRIVILEGES AND REMEDIES TO PAYMENT FOR HEALTH CARE SERVICES PROVIDED BY THE ASSIGNEE TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT STATUTE) OF THE INSURANCE LAW. THE ASSIGNEE HEREBY CERTIFIES THAT THEY HAVE NOT RECEIVED ANY PAYMENT FROM OR ON BEHALF OF THE ASSIGNOR AND SHALL NOT PURSUE PAYMENT DIRECTLY FROM THE ASSIGNOR FOR SERVICES PROVIDED BY SAID ASSIGNEE FOR INJURIES SUSTAINED DUE TO THE MOTOR VEHICLE ACCIDENT, NOTWITHSTANDING ANY OTHER AGREEMENT TO THE CONTRARY. THIS AGREEMENT MAY BE REVOKED BY THE ASSIGNEE WHEN BENEFITS ARE NOT PAYABLE BASED UPON THE ASSIGNOR'S LACK OF COVERAGE AND/OR VIOLATION OF A POLICY CONDITION DUE TO THE ACTIONS OR CONDUCT OF THE ASSIGNOR.

PRINT NAME _____        SIGNED _____
            PATIENT (Assignor)                        PATIENT                    DATE

PRINT NAME _____        SIGNED _____
      (PROVIDER OF HEALTH CARE SERVICE-Assignee)    (PROVIDER OF HEALTH CARE SERVICE)    DATE

HAS AN ORIGINAL AUTHORIZATION OR ASSIGNMENT PREVIOUSLY BEEN EXECUTED? ☑ Yes   ☐ No
IS THE ORIGINAL SIGNATURE OF THE PARTIES ON FILE? ☑ Yes   ☐ No

| Date 12-22-14 | Provider's Signature | IRS/TN Identification No. 460825836 | WCB Rating Code (If none, specialty) |
|---|---|---|---|

*LANGUAGE TO BE FILLED IN BY INSURER OR SELF-INSURER

12272014

## NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW
### VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
(This form is not for verification of hospital treatment)

| DATE | POLICYHOLDER | POLICY NUMBER | DATE OF ACCIDENT | CLAIM NUMBER |
|------|--------------|---------------|------------------|--------------|
| 4/24/2014 | ▉▉▉▉▉ | 212158352 | 4/9/2014 | 52-4F22-910 |

STATE FARM INSURANCE COMPANIES CLAIM OFFICE
PO Box 106107
Atlanta GA 30348-6107

Dr. K. Povlova MD
1786 Flatbush Ave
BROOKLYN NY 11210

PHONE NO      (800) 921-9258  Ext. 59

Kate Sullivan
CLAIM REPRESENTATIVE

**KINDLY COMPLETE AND SUBMIT THIS FORM AS SOON AS POSSIBLE. PLEASE NOTE, THIS COMPLETED FORM MUST BE SUBMITTED TO THE INSURER AS SOON AS REASONABLY POSSIBLE BUT NO LATER THAN 45 DAYS OR 180 DAYS AFTER TREATMENT DATE, DEPENDING UPON THE POLICY ENDORSEMENT IN EFFECT AT THE TIME OF THE ACCIDENT. IF YOU ARE UNSURE OF THE APPLICABLE TIME REQUIREMENT, KINDLY CONTACT THE CLAIMS REPRESENTATIVE TO DETERMINE WHICH DEADLINE IS APPLICABLE TO THIS CLAIM.**

IF YOU HAVE PREVIOUSLY SUBMITTED AN EARLIER REPORT ON THIS ACCIDENT, YOU NEED ONLY NOTE ANY CHANGES FROM THE INFORMATION PREVIOUSLY FURNISHED AND ADDITIONAL CHARGES

1. Patient's Name and Address
▉▉▉▉▉▉▉▉▉▉

2. Date of Birth ▉▉▉▉▉  3. Sex ☑ M ☐ F  4. Occupation (if known)

5. Diagnosis and Concurrent Conditions
847.0, 847.1, 847.2, 717.46

6. When did symptoms first appear?
Date 4·9·14

7. When did patient first consult you for this condition?
Date: 4·10·14

8. Has patient ever had same or similar condition?  ☐ Yes  ☑ No  If "Yes", state when and describe.

9. Is condition solely a result of this automobile accident?  ☑ Yes  ☐ No  If "No", explain:

10. Is condition due to injury arising out of a patient's employment?  ☐ Yes  ☐ No

11. Will injury result in significant disfigurement or permanent disability?  ☐ Yes  ☐ No  ☐ Not determinable at this time
If "Yes", describe:

12. Patient was disabled (unable to work)  From ____  Through ____

13. If still disabled the patient should be able to return to work on  (Date)_____

14. Will the patient require rehabilitation and/or occupational therapy as a result of the injuries sustained in this accident?
☑ Yes  ☐ No  If "Yes", describe your recommendation below
Physical Therapy
CONTINUE ON PAGE 2

05052014

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**

**PAGE 2**

15  Report of Services Rendered - Attach additional sheet if necessary

| Date of Service | Place of Service Including ZIP Code | Description of Treatment or Health Services Rendered | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | *Previously Sent* | | |
| | | | | |
| | | | | |
| | | | Total Charges To Date $ | |

16.  If treating provider is different than billing provider complete the following

| Treating Provider's Name | Title | License or Certification Number | Business Relationship (Check Applicable Box) | | |
|---|---|---|---|---|---|
| | | | Employee | Independent Contractor | Other (Specify) |
| Irsenia Padooa m.D. | | 270110 | | | |

17  If the provider of service is a professional service corporation or doing business under an assumed name (DBA), list the owner and professional licensing credentials of all owners (Provide an additional attachment if necessary )

18. Is patient still under your care for this condition?  ☑ Yes  ☐ No

19.  Estimated duration of future treatment   *undetermined*

**PATIENT:**  Your health provider may agree to accept payment for health services performed directly from your insurer (**Authorization to Pay Benefits**) so that you are not required to make payment to the health provider at the time of service.  Such agreement is optional on the part of the health provider at the time of service  Such agreement is optional on the part of the health provider and must be signed by both the patient and health provider.  You may use the optional authorization language provided below, by checking off the designated spot in item 20 of this form.

20 ____  (IF YOU HAVE CHOSEN TO AUTHORIZE THE DIRECT PAYMENT OF BENEFITS BY CHECKING THIS OPTION, **YOU MAY NOT ALSO ENTER INTO AN ASSIGNMENT OF BENEFITS** CONTAINED IN #21)

AUTHORIZATION TO PAY BENEFITS.

I AUTHORIZE PAYMENT OF HEALTH BENEFITS TO THE UNDERSIGNED HEALTH CARE PROVIDER OR SUPPLIER OF SERVICES DESCRIBED BELOW  I RETAIN ALL RIGHTS, PRIVILEGES AND REMEDIES TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT PROVISION) OF THE INSURANCE LAW.

PRINT NAME *On File* _____ SIGNED *Previously Sent* _____

PATIENT / PATIENT   DATE

**PATIENT:**  Your health provider may agree to have you assign your right to No-Fault benefits from your insurer directly to your health provider (**Assignment of Benefits**)  If you and your health provider agree to the assignment of benefits, you must both sign the agreement contained in #21 or the prescribed NF-AOB form or its equivalent.  The language contained in the assignment of benefits is mandatory and may not be altered or avoided by any other language added to this agreement or other written agreement.

21 ____  (IF YOU HAVE CHOSEN TO ASSIGN YOUR BENEFITS TO THE HEALTH PROVIDER BY CHECKING THIS OPTION, **YOU MAY NOT ALSO ENTER INTO AN AUTHORIZATION TO PAY BENEFITS** CONTAINED IN ITEM #20 ABOVE)

ASSIGNMENT OF NO-FAULT BENEFITS:

I HEREBY ASSIGN TO THE HEALTH CARE PROVIDER INDICATED BELOW ALL RIGHTS, PRIVILEGES AND REMEDIES TO PAYMENT FOR HEALTH CARE SERVICES PROVIDED BY THE ASSIGNEE TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT STATUTE) OF THE INSURANCE LAW  THE ASSIGNEE HEREBY CERTIFIES THAT THEY HAVE NOT RECEIVED ANY PAYMENT FROM OR ON BEHALF OF THE ASSIGNOR AND SHALL NOT PURSUE PAYMENT DIRECTLY FROM THE ASSIGNOR FOR SERVICES PROVIDED BY SAID ASSIGNEE FOR INJURIES SUSTAINED DUE TO THE MOTOR VEHICLE ACCIDENT, NOTWITHSTANDING ANY OTHER AGREEMENT TO THE CONTRARY.  THIS AGREEMENT MAY BE REVOKED BY THE ASSIGNEE WHEN BENEFITS ARE NOT PAYABLE BASED UPON THE ASSIGNOR'S LACK OF COVERAGE AND/OR VIOLATION OF A POLICY CONDITION DUE TO THE ACTIONS OR CONDUCT OF THE ASSIGNOR.

PRINT NAME _____ SIGNED _____

PATIENT (Assignor)   PATIENT   DATE

PRINT NAME _____ SIGNED _____

(PROVIDER OF HEALTH CARE SERVICE-Assignee)   (PROVIDER OF HEALTH CARE SERVICE)   DATE

HAS AN ORIGINAL AUTHORIZATION OR ASSIGNMENT PREVIOUSLY BEEN EXECUTED? ☑ Yes  ☐ No

IS THE ORIGINAL SIGNATURE O F THE PARTIES ON FILE? ☑ Yes  ☐ No

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR COMMERCIAL INSURANCE OR A STATEMENT OF CLAIM FOR ANY COMMERCIAL OR PERSONAL INSURANCE BENEFITS CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, AND ANY PERSON WHO, IN CONNECTION WITH SUCH APPLICATION OR CLAIM, KNOWINGLY MAKES OR KNOWINGLY ASSISTS, ABETS, SOLICITS OR CONSPIRES WITH ANOTHER TO MAKE A FALSE REPORT OF THE THEFT, DESTRUCTION, DAMAGE OR CONVERSION OF ANY MOTOR VEHICLE TO A LAW ENFORCEMENT AGENCY, THE DEPARTMENT OF MOTOR VEHICLES OR AN INSURANCE COMPANY, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE VALUE OF THE SUBJECT MOTOR VEHICLE OR STATED CLAIM FOR EACH VIOLATION.

| Date | Provider's Signature | IRS/TIN Identification No. | WCB Rating Code (If none, specify) |
|---|---|---|---|
| 4.29.14 | | 46 3292 8 3 G | m.D. |

*LANGUAGE TO BE FILLED IN BY INSURER OR SELF-INSURER

05052014

*Exhibit 10*

1

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF KINGS - CRIMINAL TERM - PART 11
3  --------------------------------------------X
   THE PEOPLE OF THE STATE OF NEW YORK,
4

5                                    Indictment
            -against-               No.4270-99
6
   TATIANA RYBUK,
7

8                    Defendant.

   --------------------------------------------X
9                     360 Adams Street
   PLEA               Brooklyn, New York
10                    October 27, 1999

11  B E F O R E:

12      HONORABLE NEIL JON FIRETOG,

13                        Justice.

14

   A P P E A R A N C E S:

15

16      OFFICE OF CHARLES J. HYNES, ESQ.
        DISTRICT ATTORNEY, KINGS COUNTY
17           Attorney for the People
             BY: ANN SEELY, ESQ.,
18           & ELLEN BURACH, ESQ.,
             Assistant District Attorneys

19

20      DAVID RUCK, ESQ.,
21      Attorney for the Defendant
             One Whitehall Street
22           New York, NY 10004

23
                        Teresa McGrath
24                      Official Court Reporter

25

                        TM

2

Plea

1

THE CLERK:  Calendar number eleven,

Indictment 4270 of 1999, Tatiana Rybuk.

Defendant is present with attorney.

Your appearance, for the record?

MS. SEELY:  Ann Seely, for the Office

of the District Attorney.

MR. RUCK:  Good afternoon, your

Honor.

My appearance is David Ruck, R-u-c-k,

One Whitehall Street, New York City.

MS. BURACH:  Ellen Burach, for the

Office of the District Attorney.

THE COURT:  All right.  I have been

provided with a possible disposition to

this case and in exchange for a plea of

guilty to an attempt to count one, plead

guilty to count three, and a plea of

guilty to twelve other insurance fraud

counts that this will be in full

satisfaction of all charges in this

indictment as well as any other pending or

any other matter stemming out of this

criminal activity and that in exchange for

these pleas that I will sentence the

TM

3

Plea

defendant to five years probation with

five special conditions, including

community service, restitution, waiver of

unpaid claims, signing corporate

resolutions, and refraining from engaging

in certain activities.

THE CLERK:  Community service?

THE COURT:  Yes.

Miss Rybuk, is that what you want to

do?

THE DEFENDANT:  Yes.

THE COURT:  Listen to me carefully.

Raise your right hand.

Do you swear to tell the truth, the

whole truth, and nothing but the truth?

THE DEFENDANT:  Yes.

THE COURT:  Put your hand down.

Listen to me carefully, according to

the facts as I understand them to be, it

is alleged that you, acting in concert

with a number of other individuals

including Paul Schneider, Julia Kofman,

Gene Arbitman, and various medical PC

corporations, including Bakshi Medical

TM

4

<center>Plea</center>

Services, HAS Medical Services, All

Medical Surgical Supply Corp, Jamaica

Avenue Medical Services, PC, Flatbush

Medical Services PC, Bulsara Medical

Services PC, all engaged in the crime of

enterprise corruption in that on or about

and between December 2nd of 1996 and

April 12th of 1999, these dates being

approximate and inclusive, here in the

County of Kings and elsewhere, that you,

acting in concert with these other

defendants, having knowledge of the

existence of this criminal enterprise and

of the nature of its activities, being

employed by or associated with such

enterprise, intentionally conducted and

participated in the affairs of the

enterprise by participating in a pattern

of criminal activity, including making

payoffs to persons known as steerers who

brought individuals, who had purportedly

been in automobile accidents, to medical

clinics as patients so that services could

be billed; fraudulently billing insurance

<center>TM</center>

5

Plea

1
2    companies for unnecessary and/or
3    unperformed medical visits and procedures
4    related to these patient-claimants under
5    the carriers' State of New York No-Fault
6    automobile insurance policies; also
7    fraudulently billing insurance carriers
8    for unnecessary and/or unperformed
9    physical therapy treatment for these
10   patients; fraudulently billed insurance
11   carriers for durable medical equipment
12   using forged doctors' prescriptions and
13   false backup invoices; and fraudulently
14   billed for studies, including nerve
15   conduction studies known as CAT scans --
16   as well as CAT scans, x-rays, MRI's all
17   based upon forged and false medical
18   reports.
19        Are these facts true?
20        THE DEFENDANT:  Yes.
21        THE COURT:  You were engaged in doing
22   this?
23        THE DEFENDANT:  Yes.
24        THE COURT:  Specifically, there are a
25   number of acts that are required to show

TM

6

Plea

the pattern activity, in this case there
are at least sixty some-odd acts alleged
and I want to ask you specifically about
two of them.

On or about and between August 2nd of
1997 and September 17th of 1997, both
dates being approximate and inclusive,
here in Brooklyn, you, Paul Schneider,
Julia Kofman, Gene Arbitman, and the
Jamaica Clinic, acting in concert with
others, with the intent to defraud,
including intent to commit another crime
including Grand Larceny and Insurance
Fraud, you aided and concealed the
commission thereof that crime by making
and causing to be made false entries in
business records of an enterprise, namely
physical therapy progress notes submitted
to the Allcity Insurance Company from the
Jamaica Clinic pursuant to a claim number
413-016-959-8 for services allegedly
rendered on August 2nd of 1997,
August 6th, and August 7th of 1997.

Is that true?

TM

7

Plea

1
2          THE DEFENDANT:  Yes.

3          THE COURT:  It's also alleged that on

4     or about July 17th of 1997 and August 21st

5     of 1997, that you, acting in concert with

6     the same individuals and the Bakshi Clinic

7     did commit the crime of Grand Larceny and

8     Insurance Fraud and aided and concealed

9     the commission of that crime by making

10    false entries in business records of an

11    enterprise, namely physical therapy

12    progress notes submitted to Allcity from

13    Bakshi pursuant to claim 413-016-960-7 for

14    services allegedly rendered and that

15    occurred on July 17th, 19th, and 21st of

16    1997.

17         Are those true, also?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Now I know you have

20    discussed with Mr. Ruck the remaining

21    sixty acts, and in discussing those acts,

22    and I ask you now, are those acts true,

23    that you committed those acts with these

24    other individuals?

25         THE DEFENDANT:  Yes.

TM

8

Plea

1
2     THE COURT:  Now, it's also alleged
3  that you engaged, under count three, with
4  a scheme to defraud.
5     MR. RUCK:  Your Honor, if I may, I may
6  not have been listening attentively, but
7  the allocution on count one is as to
8  Attempted Enterprise Corruption in
9  violation of 110/460-20; is that correct?
10    THE COURT:  Subdivision 1, Subdivision
11  A.
12    MR. RUCK:  Thank you.
13    THE COURT:  Under count three it's
14  alleged that you, acting in concert with
15  the same individuals, committed the crime
16  of a Scheme to Defraud in the First
17  Degree, in that you and others, these
18  defendants, on or about and between
19  December 2nd of 1996 and April 12th of
20  1999, both dates being approximate and
21  inclusive, here in the County of Kings and
22  elsewhere, acting in concert, engaged in a
23  scheme constituting a systematic ongoing
24  course of conduct with the intent to
25  defraud more than one person and to obtain

TM

9

1                              Plea

2       property from more than one person by

3       false and fraudulent pretenses,

4       representations and promises, and so

5       obtained property with a value in excess

6       of $1,000, that is currency, from the

7       various insurance carriers, including

8       Allcity, Progressive, Allstate, Geico,

9       Nationwide, Prudential, State Farm,

10      Integon, New York Central, National

11      Grange, Eagle and American Transit.

12          Are those facts true?

13          THE DEFENDANT:  Yes.

14          THE COURT:  I also want to add at this

15      point before we continue that it has come

16      to my attention that Prudential is one of

17      the insurance companies defrauded.  My

18      wife is a vice-president for Prudential in

19      the compliance area.

20          Does that affect this plea in any

21      way?

22          MR. RUCK:  No, your Honor.

23          THE COURT:  All right.

24          Now, it is alleged that you committed

25      the crimes of Insurance Fraud against

                          TM

10

1        Plea

2        various insurance companies and they have

3        selected twelve different instances where

4        it is alleged that between a particular

5        time and place and date, here being in

6        Brooklyn, that you, acting in concert

7        with Paul Schneider, Julia Kofman, and

8        Gene Arbitman, as well as various of these

9        clinics, did, with the intent to defraud

10       and to commit another crime, excuse me,

11       did commit the crime of Insurance Fraud by

12       committing a fraudulent insurance act in

13       that you knowingly and with intent to

14       defraud, and pursuant to a common scheme

15       or plan, presented or caused to be

16       presented, and prepared with the knowledge

17       and belief that it would be presented to

18       an insurer or to an agent of an insurance

19       company, a written statement as part of

20       and in support of a claim for payment and

21       other benefit pursuant to an insurance

22       policy for commercial or personal

23       insurance, which you knew to contain

24       materially false information concerning a

25       material fact, and that you concealed, for

TM

11

1              Plea

2      the purpose of misleading, information

3      concerning that material fact; namely,

4      various acts.

5          Now I am going to go through these

6      acts and you will tell me whether or not

7      it's true.

8          Under count nineteen it's alleged that

9      this occurred between August 2nd of 1997

10     and September 17th of 1997 where physical

11     therapy progress notes were submitted to

12     Allcity from the Jamaica Clinic pursuant

13     to a claim for services rendered on

14     August 2nd of 1997, the 4th, and the 6th.

15         Is that true?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Under count thirty-five

18     it's alleged that the defendants, acting

19     together, on or about September 19th of

20     1997 and October 24th of 1997 submitted a

21     false medical report to Progressive from

22     the Flatbush Clinic for services allegedly

23     rendered on September 19th of 1997.

24         Is that true?

25         THE DEFENDANT:  Yes.

                    TM

12

1              Plea

2        THE COURT:  It's also alleged in count

3   fifty-nine that between March 23rd of '98

4   and April 16th of 1998 you submitted, with

5   these others, for the purpose of

6   misleading, a medical report to Allstate

7   Insurance from the HAS Clinic for services

8   allegedly rendered on March 23rd of 1998.

9        Is that true?

10       THE DEFENDANT:  Yes.

11       THE COURT:  It's also alleged in count

12  sixty-seven that between December 15th of

13   '97 and February 20th of 1998, that a

14  false medical report was submitted to

15  Geico from the ALL Clinic pursuant to a

16  claim for services allegedly rendered on

17  December 18th of 1997.

18       Is that true?

19       THE DEFENDANT:  Yes.

20       THE COURT:  Under count eighty-three

21  it's alleged that a false medical report

22  was submitted to Nationwide from the

23  Bakshi Clinic for a claim allegedly for

24  services rendered on September 25th of

25  1996 and that this was between that date

TM

13

                              Plea

1

2     and the date of payment of December 19th

3     of '97.

4         Are those facts true?

5         THE DEFENDANT:  Yes.

6         THE COURT:  On the eighty-seventh

7     count it's alleged that between July 12th

8     of '97  and August 21st of '97, that

9     everyone knew about and participated in

10    the filing of false physical therapy

11    progress report notes to the Prudential

12    from Bakshi which alleged services

13    rendered on July 12th.

14        Is that true?

15        THE DEFENDANT:  Yes.

16        THE COURT:  Under the ninety-ninth

17    count of the indictment it's alleged that

18    on or about and between October 16th

19    of '97 and December 1st of '97, that false

20    physical therapy progress reports were

21    submitted to State Farm from the Bakshi

22    Clinic for services allegedly rendered on

23    October 16th, 18th and 20th.

24        Is that true?

25        THE DEFENDANT:  Yes.

                              TM

14

1          Plea

2          THE COURT:  It's also alleged that on

3     October 9th of '97 to January 28th of '98,

4     a Verification of Treatment form for the

5     sciatic nerve block was submitted to Eagle

6     Insurance by HAS pursuant to a claim for

7     services allegedly rendered on October 9th

8     of 1997.

9          Is that true?

10         THE DEFENDANT:  Yes.

11         MR. RUCK:  That's count one hundred

12    one?

13         THE COURT:  One hundred one.

14         On count one hundred three it is

15    alleged that between November 6th

16    of '97 and February 24th of '98, a false

17    medical prescription for durable medical

18    equipment dated November 6th of '97 was

19    submitted to American Transit for or from

20    the ALL Clinic pursuant to claim number

21    604-457-07.

22         Is that true?

23         THE DEFENDANT:  Yes.

24         THE COURT:  And as to the hundred and

25    seventh count it's alleged that on or

                    TM

15

1          Plea

2     about and between November 28th of '97 and

3     February 23rd of '98, that a false medical

4     report was submitted to Integon from

5     Bakshi Clinic for services allegedly

6     rendered on November 28th of 1997.

7          Are those facts true?

8          THE DEFENDANT:  Yes.

9          THE COURT:  As to the hundred and

10    fifteenth count it's alleged that a false

11    Verification of Treatment form for sciatic

12    nerve block was submitted to New York

13    Central from the HAS Clinic for services

14    allegedly rendered on October 10th of 1997

15    for a period covering October 10th to

16    January 19th of '98.

17         Are those facts true?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And last, as to the

20    hundred and thirty-seventh count, it's

21    alleged that on or about and between

22    September 16th of '98 and January 29th of

23    '99, that a false medical prescription

24    for durable medical equipment dated

25    September 16th of 1998 was submitted to

TM

1                          Plea

2          the National Grange from Bulsara Clinic

3          for claim number 71Y-815-46.

4                   Are those facts true?

5                   THE DEFENDANT:  Yes.

6                   THE COURT:  Now, you understand as

7          part of this allocution that it is alleged

8          that you engaged in these fraudulent

9          insurance acts with the knowledge and the

10         participation of the doctors and clinics,

11         including but not limited to an individual

12         by the name of Hussaini, Bulsara,

13         Reyes-Arguelles, Mallela, and Lahiri,

14         and S.L. Medical Services, PC, Canarsie

15         Medical Services, PC, Avenue N Medical

16         Services, PC, Z.A.R.A. Medical Services,

17         PC, and Serenicy Durable and Medical Corp

18         all knew about this.

19                  Is that true?

20                  THE DEFENDANT:  Yes.

21                  THE COURT:  In furtherance of this

22         criminal enterprise and insurance fraud

23         your group submitted false claims to

24         insurance companies, included but not

25         limited to Allstate, Progressive, Geico,

17

1          Plea

2   Travelers, as well.

3        Is this true?

4        THE DEFENDANT:  Yes.

5        THE COURT:  And that part of the

6   falsity was to forge the signatures of

7   these doctors mentioned above on medical

8   reports, progress notes, prescription for

9   durable medical equipment.

10        Is that true?

11        THE DEFENDANT:  Yes.

12        THE COURT:  And that Rabiner owned

13   certain diagnostic centers and was paid

14   for the referrals that were made to these

15   imaging companies; is that right?

16        MR. RUCK:  I think actually, your

17   Honor, it is that those centers made

18   payments rather than received payments.

19        MS. BURACH:  Right.

20        THE COURT:  All right.  They made

21   kickbacks; is that it?

22        MS. BURACH:  Yes.

23        THE COURT:  To the group, and that's

24   Metroscan Imaging, Parkway MRI, Belt

25   Parkway Imaging, Diagnostic Imaging, and

TM

1              Plea

2     Metropolitan Radiological Imaging.

3          Is that true?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right.  Now, you

6     understand you are pleading guilty to a

7     number of very serious crimes.  The

8     promise that I am making you is based upon

9     the agreement that your attorneys worked

10    out with the DA, and I have gone over it

11    and I will go along with it, is that you

12    are going to do five hundred hours

13    community service, you are going to be

14    placed on probation for five years with

15    five special conditions; five hundred

16    hours of community service, restitution of

17    one million dollars to be paid over the

18    five years, and we will work out a

19    schedule, that you will waive all unpaid

20    claims for insurance payments associated

21    with the Avenue U Enterprise, including

22    but not limited to claims related to All

23    Medical Surgical Supply, Corp., Flatbush

24    Medical Services, PC, HAS Medical

25    Services, PC, Avenue U Medical Services,

19

1          Plea

2    Jamaica Avenue Medical Services, PC,

3    Bakshi Medical Services, PC, Bulsara

4    Medical Services, PC, and that you will

5    sign a release for these unpaid claims

6    prior to sentencing.

7        Do you understand that?

8        THE DEFENDANT:  Yes.

9        THE COURT:  And that you will also

10   sign the corporate resolutions for the

11   above mentioned corporations to a plea

12   prior to sentencing so that the

13   corporations can enter pleas; and last,

14   that you will not engage in any employment

15   related to the insurance industry, _____

16   including No-Fault Insurance, personal

17   injury or health insurance during these

18   five years.

19       Do you understand that?

20       THE DEFENDANT:  Yes.

21       THE COURT:  Now, do you also

22   understand, do you also understand that

23   when you plead guilty you give up certain

24   rights, that have to be noted on the

25   record?

TM

20

1          Plea

2          Those include the right to a jury

3    trial.  Because of the nature of the

4    crimes you are entitled to a jury trial in

5    this case.  And that the only way you can

6    give up those rights is to knowingly waive

7    it by pleading guilty.

8          But, associated with the jury trial is

9    the right to have the DA put to the burden

10   of proving your guilt beyond a reasonable

11   doubt to a jury that you and your attorney

12   help select.

13         When you plead guilty you give up the

14   right to see and hear all the witnesses

15   that are accusing you of these crimes; you

16   give up the right to have the DAs put to

17   the burden of proving your guilt beyond a

18   reasonable doubt; and you give up the

19   right to have the jury be the one to make

20   the ultimate decision.

21         Do you understand you are giving that

22   up?

23         THE DEFENDANT:  Yes.

24         THE COURT:  At a jury trial you, too,

25   could testify.  You don't have to, you

                    TM

22

```
1                        Plea
2    guilty?
3              THE DEFENDANT:  Yes.
4              THE COURT:  Listen to the question.
5              THE DEFENDANT:  No.
6              THE COURT:  All right.
7         Are you doing so of your own free
8    will?
9              THE DEFENDANT:  I understand.
10             MR. RUCK:  Are you doing this --
11             THE COURT:  Are you doing it of your
12   own volition?
13             THE DEFENDANT:  Yes.
14             THE COURT:  All right.
15        All right.  Mr. Ruck, you believe that
16   she is going to be able to pay this
17   restitution over five years?
18             MR. RUCK:  Yes, your Honor.
19             THE COURT:  Listen to the clerk of the
20   court as the plea is recorded.
21        Sentence date will be approximately
22   six to eight weeks from today.
23             MR. RUCK:  Your Honor, may I just
24   clarify a matter, and I think it was made
25   part of the record when you first
```

TM

23

Plea

1

2   addressed it, but I have my checklist, it

3   is understood and agreed that the pleas

4   offered to your Honor are in full

5   satisfaction of the entire indictment and

6   all the matters known to the District

7   Attorney's Office that exist in their

8   investigative files with respect to my

9   client as of this point in time.

10          MS. SEELY:  That's correct, your

11   Honor.

12          THE COURT:  All right.

13          Listen to the clerk of the court.

14          THE CLERK:  Miss Tatiana Rybuk, is

15   that your true name?

16          THE DEFENDANT:  Yes.

17          THE CLERK:  And Mr. Ruck, who stands

18   beside you, is your attorney?

19          THE DEFENDANT:  Yes.

20          THE CLERK:  Before accepting your plea

21   of guilty you are advised that if you have

22   previously been convicted of a predicate

23   felony, as defined in Article 70 of the

24   Penal Law, that fact may be established

25   after your plea of guilty in this action

TM

24

1                          Plea

2      now before this court and you may be

3      subject to different or additional

4      punishment.

5           Miss Rybuk, do you now wish to

6      withdraw your pleas of not guilty entered

7      under Indictment 4270 of 1999 and do you

8      now wish to plead guilty to the crimes of

9      Attempted Enterprise Corruption, Class C

10     Felony, as well as Scheme to Defraud in

11     the First Degree, a Class E Felony, and

12     twelve counts of Insurance Fraud in the

13     Fifth Degree, all Class A Misdemeanors, to

14     cover this indictment; is that what you

15     wish to do?

16          THE DEFENDANT:  Yes.

17          THE CLERK:  You are also advised on

18     the date of sentencing a mandatory

19     surcharge of $150.00, a crime victim's

20     assistance fee of $5.00 may be imposed

21     pursuant to 60.35 of the Penal Law.

22          Are you a U.S. citizen, Ms. Rybuk?

23          THE DEFENDANT:  Not a citizen.

24          THE CLERK:  Not a citizen.

25          You are further advised that if you

                        TM

25

1                          Plea

2      are not a U.S. citizen your immigration

3      status may be jeopardized and you may be

4      deported at any time prior to the

5      expiration of your sentence.

6           Also, if you become subject to a final

7      order of deportation you may be paroled to

8      the immigration authorities for

9      deportation at any time subsequent to the

10     commencement of an indeterminate prison

11     sentence.

12          Prison sentence is not an issue.

13          Sentence date, 12/13?

14          THE COURT:  Do you want the same

15     date?

16          MS. SEELY:  I think another date would

17     be better.

18          THE COURT:  All right.

19          Date approximately around 12/13 you

20     would like to do this, 14th, 15th, 16th,

21     17th?

22          MS. BURACH:  The 14th is fine.

23          MS. SEELY:  Whatever is good for

24     Mr. Ruck.

25          MR. RUCK:  December 14th is fine, your

                          TM

26

1                          Plea

2          Honor.

3                 THE COURT:  All right, 12/14.

4          Now you are going to have to report to

5          probation.  Make sure you speak to

6          probation because I need a report in order

7          to sentence you.

8                 THE CLERK:  Bail continued?

9                 THE COURT:  Bail continued.

10                MS. BURACH:  Your Honor, one last

11         thing, I believe you might have said this

12         but I didn't hear that, that if Miss Rybuk

13         violates any of the conditions of

14         probation she will be subject to the

15         minimum jail sentence of one to three

16         years.

17                THE COURT:  That is correct.

18                MS. BURACH:  Thank you.

19                THE COURT:  Anything else?

20                MS. BURACH:  That's it.

21                MR. RUCK:  While I am here and while

22         we are on the record, I am reminded all

23         the terms of the agreement need to be on

24         the record.

25                The District Attorney's Office has

                           TM

27

Plea

1

2      promised that if I called upon them or

3      anyone else on Miss Rybuk's behalf that

4      they will confirm that she has provided

5      substantial information and substantial

6      cooperation to the District Attorney's

7      Office, correct?

8           MS. SEELY:  That's correct,

9      Jay Shapiro of the Rackets Division had

10     made that representation to Mr. Ruck that

11     we will provide a letter stating that

12     there was substantial information

13     provided.

14          THE COURT:  All right.

15          *     *     *     *     *

16          Certified that the foregoing is
            a true and accurate transcript
17          of the original stenographic
            minutes in this case.

18

19          _Teresa McGrath_
            Teresa McGrath
            Official Court Reporter

20

21

22

23

24

25

TM.

# *Exhibit 11*

| | Checks Written By Entities Operating at 1468 Flatbush | | | |
|---|---|---|---|---|
| Payor | Payee | Amount Paid | Dates | Relationship |
| Vincent Medical | Fountainebleau Hotel | > $2,500 | 2/2006 to 6/2006 | Tatiana Rybak, Oleg Rybak, and Sergey Rybak who is Tatiana's son and Oleg's brother, each owned condominium units at the Fountainebleau Hotel at the time of the transactions, and from at least 2015 to 2018 Oleg Rybak was vice president and secretary of the condominium association |
| Uptodate Medical | Mayya Kushnir | > $45,000 | 1/2004 to 6/2004 | Associated with the Rybak's holdings at the Fountainebleau Hotel. Officer of OR, LLC and was President of MOR Properties Inc. until at least March 2016.  OR, LLC was owned by Oleg and Tatiana Rybak and used to purchase three units at the Fountainebleau Hotel in August 2008, which then were subsequently sold to MOR Properties, Inc. between May and July 2012.  The president and director of MOR Properties, Inc. is Maximillian Kostyashkin, the youngest son of Tatiana Rybak. |
| Uptodate Medical | Oceana V Condominium | >$1,250 | 2/2004 to 5/2004 | Oleg Rybak and later Tatiana Rybak owned a unit at the Oceania V. In November 2002, when they were still in college, Oleg and Sergey Rybak purchased a unit at the Oceania V and transferred it to Tatiana Rybak, who sold the unit in December 2011 |
| Vincent Medical | Olga Sanchez | Almost $5,000 | 7/2008 to 1/2009 | Worked at the Rybak Café, a Miami restaurant venture owned by Oleg Rybak and Tatiana Rybak. |
| Uptodate Medical | CMG International Design Group ("CMG") & Milda Gutierrez | > $14,000 | 7/2008 to 11/2008 | Milda Gutierrez, one of the principals of CMG, a Miami design firm. CMG and Milda Gutierrez decorated Tatiana Rybak's personal residence in Miami, the Anti-Aging spa owned by Oleg Rybak, and Rybak's Café |
| Vincent Medical | CMG International Design Group ("CMG") & Milda Gutierrez | > $14,000 | 6/2008 to 11/2008 | Milda Gutierrez, one of the principals of CMG, a Miami design firm. CMG and Milda Gutierrez decorated Tatiana Rybak's personal residence in Miami, the Anti-Aging spa owned by Oleg Rybak, and Rybak's Café |
| Vincent Medical | Garrette Gray | > $5,000 | 9/2008 to 12/2008 | The Rybak Café chef who assisted with the restaurant buildout. |
| Uptodate Medical and Vincent Medical | 529 college savings plan | > $67,000 | 12/2003 to 12/2008 | During this same period, Oleg Rybak was an undergraduate student at New York University |
| Uptodate Medical | New York Univeristy | > $7,500 | 12/2003 to 12/2008 | During this same period, Oleg Rybak was an undergraduate student at New York University |

| Checks Written By Entities Operating at 1468 Flatbush | | | |
|---|---|---|---|
| **Payor** | **Payee** | **Amount Paid** | **Dates** | **Relationship** |
| Uptodate Medical and Vincent Medical | Habika Besson | $16,080 | 12/2003 to 9/2005 | Daughter of Lystra Moore-Besson, Tatiana Rybak's contact at HSBC Bank who Tatiana Rybak used to advance the scheme. Lystra testified that she has known Tatiana Rybak since the 1990s, was described by Dr. Gutierrez as the branch manager who arranged for tellers to cash checks for Tatiana Rybak, and was terminated by HSBC in 2016 and later permanently barred from the securities industry for failing to take action regarding suspicious activity by bank clients. |
| | Clara Pantin | Total: > $767,000.00 | 4/2009 to 4/2017 | Clara Pantin was the employee of the Fountainbleau Hotel where Tatiana and Oleg Rybak owned residential units. |
| Allay Medical Services PC | Clara Pantin | $6,038.00 | 2/16/2016 to 3/1/2016 | |
| Charles Deng Acupuncture, P.C. | Clara Pantin | $10,029.85 | 5/5/2015 to 7/30/2015 | |
| Francois J Parisien | Clara Pantin | $189,764.13 | 9/14/2013 to 4/21/2016 | |
| PFJ Medical Care PC | Clara Pantin | $1,800.00 | 4/5/2017 to 4/5/2017 | |
| Ksenia Pavlova | Clara Pantin | $17,728.00 | 3/4/2015 to 4/21/2016 | |
| Island Life Chiropractic Pain Care PLLC | Clara Pantin | $6,750.00 | 8/6/2014 to 5/20/2015 | |
| Pierre Renelique | Clara Pantin | $7,915.00 | 1/30/2013 to 11/17/2013 | |
| Adelaida Physical Therapy, P.C. | Clara Pantin | $50,961.73 | 3/30/2012 to 8/2/2013 | |
| Adelaida M. Laga | Clara Pantin | $32,267.31 | 6/26/2015 to 1/8/2016 | |
| Amayao Medical, P.C. | Clara Pantin | $20,010.00 | 1/28/2013 to 9/14/2013 | |
| Arguelles M.D., P.C. | Clara Pantin | $7,500.00 | 4/28/2009 to 6/22/2009 | |
| Compas Medical, P.C. | Clara Pantin | $34,832.88 | 4/27/2012 to 11/27/2015 | |
| JCC Medical, P.C. | Clara Pantin | $80,627.47 | 4/2/2012 to 6/27/2013 | |
| Maiga Products Corp. | Clara Pantin | $9,000.00 | 1/23/2015 to 9/25/2015 | |
| Maria Shiela Masigla P.T. | Clara Pantin | $19,421.00 | 5/21/2013 to 9/11/2015 | |
| Masigla Physical Therapy, P.C | Clara Pantin | $6,905.65 | 1/14/2012 to 12/15/2012 | |
| Vincent Medical | Clara Pantin | $1,000.00 | 9/28/2009 to 9/28/2009 | |

| | Checks Written By Entities Operating at 1468 Flatbush | | |
|---|---|---|---|
| **Payor** | **Payee** | **Amount Paid** | **Dates** | **Relationship** |
| | Vasila Queen | Total: > $83,000 | 2/2012 to 2/2018 | Associate of Tatiana Rybak, owner of Studio By Vasila, a nail salon up the street from one of Tatiana Rybak's condominium's in Sunny Isles Florida. |
| Adelaida M Laga Maria Masigla | Vasila Queen | $1,000.00 | 12/30/2015 to 12/30/2015 | |
| Adelaida Physical Therapy PC | Vasila Queen | $13,500.00 | 2/1/2012 to 11/23/2012 | |
| Allay Medical Services PC | Vasila Queen | $1,000.00 | 10/20/2015 to 10/20/2015 | |
| Compas Medical | Vasila Queen | $2,000.00 | 12/10/2015 to 12/10/2015 | |
| Francois J Parisien | Vasila Queen | $17,515.00 | 9/26/2013 to 7/15/2016 | |
| JCC Medical PC | Vasila Queen | $9,300.00 | 10/10/2012 to 6/24/2013 | |
| Ksenia Pavlova | Vasila Queen | $9,700.00 | 1/22/2014 to 4/18/2017 | |
| Maria Shiela Masigla PT | Vasila Queen | $6,000.00 | 3/5/2013 to 4/21/2015 | |
| Masigla Physical Therapy PC | Vasila Queen | $2,500.00 | 12/12/2012 to 1/28/2013 | |
| PFJ Medical Care PC | Vasila Queen | $9,900.00 | 6/20/2016 to 2/24/2018 | |
| Pierre J Renelique MD | Vasila Queen | $10,000.00 | 1/17/2013 to 1/27/2014 | |
| Quality Health Supply Corp | Vasila Queen | $1,000.00 | 6/10/2016 to 6/10/2016 | |

*Exhibit 12*

DIVISION OF CORPORATIONS



Department of State / Division of Corporations / Search Records / Detail By Document Number /

# Detail by Entity Name

Florida Profit Corporation
MOR PROPERTIES, INC.

**Filing Information**

| | |
|---|---|
| **Document Number** | P12000045208 |
| **FEI/EIN Number** | APPLIED FOR |
| **Date Filed** | 05/15/2012 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

4391 COLLINS AVE
UNIT 703
MIAMI BEACH, FL 33140

**Mailing Address**

4391 COLLINS AVE
UNIT 703
MIAMI BEACH, FL 33140

**Registered Agent Name & Address**

ROSENTHAL, KERRY E
20900 NE 30TH AVE
SUITE 600
AVENTURA, FL 33180

**Officer/Director Detail**
**Name & Address**

Title President, Director

KOSTYASHKIN, MAXIMILLIAN
4391 COLLINS AVE
UNIT 704
MIAMI BEACH, FL 33140

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2017 | 01/23/2017 |
| 2017 | 05/12/2017 |
| 2018 | 04/17/2018 |

**Document Images**

| | |
|---|---|
| 04/17/2018 -- ANNUAL REPORT | View image in PDF format |
| 05/12/2017 -- AMENDED ANNUAL REPORT | View image in PDF format |
| 01/23/2017 -- ANNUAL REPORT | View image in PDF format |
| 03/15/2016 -- ANNUAL REPORT | View image in PDF format |
| 04/10/2015 -- ANNUAL REPORT | View image in PDF format |
| 03/21/2014 -- ANNUAL REPORT | View image in PDF format |
| 02/14/2013 -- ANNUAL REPORT | View image in PDF format |
| 05/15/2012 -- Domestic Profit | View image in PDF format |

Florida Department of State, Division of Corporations

*Exhibit 13*

REC. BK.

**20795 PG 3335**

Prepared by and Return to:
Kerry E. Rosenthal, Esq.
Palm Coast Title Company, LLC
Turnberry Plaza, Suite 500
2875 Northeast 191st Street
Aventura, Florida 33180

File No.       3316-1253

02R703585 2002 NOV 12 14:11

DOCSTPDEE 5,340.00 SURTX 0.00
HARVEY RUVIN, CLERK DADE COUNTY, FL

_____[Space Above This Line For Recording Data]_____

# Special Warranty Deed

**This Special Warranty Deed** made this 8th day of November, 2002 between **Tower V Developers, LTD, a Florida limited Partnership**, whose address is c/o Turnberry Associates, 19501 Biscayne Boulevard, Suite 400, Aventura, Florida 33180 of the County of Miami-Dade, State of Florida , Grantor, and **Oleg Rybak, a single man, and Sergey Rybak, a single man, as joint tenants with the right of survivorship, and not as tenants in common**, whose address is 2666 East 24th Street, Unit 1A, Brooklyn, NY 11235, of the County of Miami-Dade, State of Florida, Grantee. Grantor and Grantee are used for singular or plural, as context requires.

**WITNESSETH**, that said Grantor, for and in consideration of the sum of Ten Dollars and other good and valuable considerations to said Grantor in hand paid by said Grantee, the receipt whereof is hereby acknowledged, has granted, bargained and sold to the said Grantee, the Grantee's heirs and assigns forever, the following described land, situate, lying and being in Miami-Dade County, Florida, to-wit:

> **Condominium Unit No. 1253 and 1254, of OCEANIA V, a Condominium, according to the Declaration of Condominium thereof recorded on October 9, 2002 in Official Records Book 20713, Page 808 of the Public Records of Miami-Dade County, Florida together with an undivided share in the common elements appurtenant thereto.**
>
> **Parcel Identification Number: Portion of Folio. 31-2214-005-0010**

**TOGETHER WITH** all the tenements, hereditaments and appurtenances thereunto belong or in anywise appertaining.

**THIS CONVEYANCE** is subject to:

1.       Taxes and assessments for the year 2002 and years subsequent thereto.

2.       Conditions, reservations, restrictions and regulations.

3.       Zoning and other governmental restrictions and regulations

4.       Covenants, conditions, restrictions, exhibits, terms and other provisions of the Declaration of Condominium of Oceania V, a Condominium, as recorded on October 9, 2002 in Official Records Book 20713, Page 808 of the Public Records of Miami-Dade County, Florida.

5.       Covenants, conditions, restrictions, exhibits, terms and other provisions of that certain Master Declaration for Oceania recorded in Official Records Book 14428, Page 1511 of the Public Records of Miami-Dade County, Florida, including all exhibits and amendments thereto.

6.       Covenants, conditions, restrictions, exhibits, terms and other provisions of that certain Club Plan recorded in Official Records Book 14428, Page 1549, including all exhibits and amendments thereto.

**TOGETHER** with all the tenements, hereditaments and appurtenances thereto belonging or in any way appertaining.



:: REC. BK.

20795 PG 3336

THE GRANTOR hereby specially warrants the title to the said real property, and will defend the same, against the lawful claims of all persons claiming by, through or under the said GRANTOR.

THE GRANTEE by acceptance and recordation of this Special Warranty Deed, expressly and specifically approves, accepts, covenants and agrees to be bound by and to assume performance of all the applicable provisions and requirements set forth in the recorded Declaration of Condominium described above and all amendments and/or supplements thereto, and the Declaration of Covenants and Restrictions for Oceania and all amendments and/or supplements thereto, which provisions and requirements are acknowledged by Grantee to be reasonable, fair, and all of which are incorporated herein by this reference.

IN WITNESS WHEREOF, the GRANTOR has caused these presence to be executed by its proper officer thereunto duly authorized, and its seal affixed, the day and year first above written.

Signed, sealed and delivered
in the presence of:

GRANTOR:

TOWER V DEVELOPERS, LTD.,a Florida
limited Partnership

Printed Name: Ana B. Zeigler

BY:     TOWER V DEVELOPERS, L.L.C., a Florida
        limited liability company, as sole
        general partner

Printed Name: Rona Asman

BY: 
    Jeffrey Soffer
    Managing Member

STATE OF FLORIDA          }
COUNTY OF MIAMI-DADE      }

I HEREBY CERTIFY THAT ON THIS 6th DAY OF November, 2002, PERSONALLY APPEARED BEFORE ME JEFFREY SOFFER, MANAGING MEMBER OF TOWER V DEVELOPERS, L.L.C., A FLORIDA LIMITED LIABILITY COMPANY, AS SOLE GENERAL PARTNER OF TOWER V DEVELOPERS, LTD., A FLORIDA LIMITED PARTNERSHIP, TO ME KNOWN TO BE THE PERSON WHO SIGNED THE FOREGOING SPECIAL WARRANTY DEED, AS SUCH OFFICER, AND HE ACKNOWLEDGED THE EXECUTION THEREOF TO BE HIS FREE ACT AND DEED AS SUCH OFFICER, FOR THE USES AND PURPOSES THEREIN MENTIONED, THAT HE AFFIXED THERETO THE OFFICIAL SEAL OF SAID CORPORATION, AND THAT THE SAID INSTRUMENT IS THE ACT AND DEED OF SAID CORPORATION.

WITNESS MY HAND AND OFFICIAL SEAL AT MIAMI-DADE COUNTY, FLORIDA.

NOTARY PUBLIC - STATE OF FLORIDA

Ana B. Zeigler
COMMISSIONED NAME OF NOTARY PUBLIC

PERSONALLY KNOWN ✓ OR PRODUCED IDENTIFICATION _____
TYPE OF IDENTIFICATION_____

RECORDED IN OFFICIAL RECORDS BOOK
OF DADE COUNTY, FLORIDA
RECORD VERIFIED
HARVEY RUVIN
CLERK CIRCUIT COURT

OFFICIAL NOTARY SEAL
ANA B ZEIGLER
COMMISSION NUMBER
DD128308
MY COMMISSION EXPIRES
JUNE 23,2006





CFN 2004R1016309
OR Bk 22827 Pgs 2421 - 2422; (2pgs)
RECORDED 11/16/2004 16:01:20
DEED DOC TAX 0.60
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Prepared by and return to:

Palm Coast Title Company, LLC / SSO

2875 N. E. 191 Street, Suite 500

Aventura, Florida 33180

WITHOUT TITLE REVIEW

_____Space above this line for recording data_____

# QUIT-CLAIM DEED

    **THIS QUIT-CLAIM DEED,** executed this ⟋⟍ day of November, 2004, by **OLEG RYBAK, a single man, and SERGEY RYBAK, a single man,** whose post office address is 16500 Collins Avenue, Unit 1253, Sunny Isles Beach, Florida 33160, first party, to **TATIANA M. RYBAK, a single woman,** whose post office address 16500 Collins Avenue, Unit 1253 and 1254, Sunny Isles Beach, Florida 33160, second party:

(wherever used herein the terms "first party" and "second party" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, wherever the context so admits or requires.)

    WITNESSETH, that the said first party, for and in consideration of the sum of $10.00 in hand paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quit-claim unto the said second party forever, all the right, title, interest, claim and demand which the said first party has in and to the following described lot, piece or parcel of land situate, lying and being in the County of Miami-Dade, State of Florida, to-wit:

        **Condominium Unit No. 1253 and 1254, of OCEANIA V, a Condominium, according to the Declaration of Condominium thereof recorded on October 9, 2002 in Official Records Book 20713, Page 808 of the Public Records of Miami-Dade County, Florida together with an undivided share in the common elements appurtenant thereto.**

        **and ;**

        **Unit No. C35, of OCEANIA V, a Condominium, according to the Declaration of Condominium thereof recorded on October 9, 2002 in Official Records Book 20713, Page 808 of the Public Records of Miami-Dade County, Florida together with an undivided share in the common elements appurtenant thereto.**

    **TO HAVE AND TO HOLD** the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity and claim whatsoever of the said first party, either in law or equity, to the only proper use, benefit and behoof of the said second party forever.



Book22827/Page2421      CFN#20041016309      Page 1 of 2

OR BK 22827 PG 2422
LAST PAGE

**IN WITNESS WHEREOF**, the said first party has signed and sealed these presents the day and year first above written.

Signed, sealed and delivered
in the presence of:

Printed Name: _Stacee Oskolski_     OLEG RYBAK

Printed Name: _Lorry A. Cusack_     SERGEY RYBAK

STATE OF FLORIDA     )
                     :ss
COUNTY OF MIAMI-DADE     )

The foregoing instrument was acknowledged before me this ___ day of November, 2004 by OL EG RYBAK and SERGEY RYBAK, who are personally known to me or produced _____ as identification.

Stacy S. Oskolski
Commission # DD 023156
Expires April 8, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

(Seal)

NOTARY PUBLIC
My Commission Expires:



CFN 2012R0049972
OR Bk 27971 Pgs 4033 - 4035; (3pgs)
RECORDED 01/24/2012 10:52:59
DEED DOC TAX 5,700.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Prepared by and return to:
**Heather A. Scott, Esq.**
**Attorney at Law**
**Rosenthal Rosenthal Rasco Kaplan, LLC**
**20900 NE 30th Avenue Suite 600**
**Aventura, FL 33180**
**305-937-0300**
File Number: **Rybak**
Will Call No.: **3053644848**

Parcel Identification No. **31-2214-030-0850**

_____ [Space Above This Line For Recording Data] _____

# Warranty Deed
### (STATUTORY FORM - SECTION 689.02, F.S.)

**This Indenture** made this **7th** day of **December, 2011** between **Tatiana M. Rybak, a single person** whose post office address is **4401 Collins Avenue, Unit 2812, Aventura, FL 33160** of the County of **Miami-Dade**, State of **Florida**, grantor*, and **Afina Shakhinidi** whose post office address is **16500 Collins Avenue, Units 1253 & 1254, Aventura, FL 33160** of the County of **Miami-Dade**, State of **Florida**, grantee*,

**Witnesseth** that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in **Miami-Dade County, Florida**, to-wit:

> **Condominium Units No. 1253 and 1254, of Oceania V CONDOMINIUM, according to the Declaration of Condominium thereof, as recorded in Official Records Book 20713, Page 808, of the Public Records of Miami-Florida County, Florida, and all amendments thereto, together with its undivided share in common elements.**

and said grantor does hereby fully warrant the title to said land, and will defend the same against lawful claims of all persons whomsoever.

> \* "Grantor" and "Grantee" are used for singular or plural, as context requires.

**In Witness Whereof**, grantor has hereunto set grantor's hand and seal the day and year first above written.

Signed, sealed and delivered in our presence:

Witness Name: _____

Witness Name: _____

_____ (Seal)
Tatiana M Rybak

DoubleTimes

State of Florida
County of Miami-Dade

The foregoing instrument was acknowledged before me this 7th day of December, 2011, by Tatiana M Rybak, (who [ ] is personally known or [X] has produced a driver's license as identification.

[Notary Seal]

Notary Public

Printed Name: _____

My Commission Expires: _____

Notary Public State of Florida
Grisell Vilches-Duran
My Commission DD821854
Expires 10/08/2012

*Warranty Deed (Statutory Form) - Page 2*

**DoubleTime®**

Book27971/Page4034     CFN#20120049972          Page 2 of 3

OR BK 27971 PG 4035
LAST PAGE



**OCEANIA**

Tower V Condominium Association

## CERTIFICATE OF WAIVER OF RIGHT OF FIRST REFUSAL

This shall certify as to the purchase by ___Afina Shakhinidi___ of the following described property, located in Miami-Dade County, Florida.

Condominium Unit # __1253/1254__ in Oceania V, a condominium located at 16500 Collins Avenue, Sunny Isles Beach, Florida, according to the Declaration thereof, recorded October 9, 2002, in Official Record Book 20713, page 808, of the Public Records of Miami-Dade County, Florida together with an undivided share in the common elements appurtenant thereto, as amended and/or supplemented from time to time.

OCEANIA V CONDOMINIUM ASSOCIATION, INC., a Florida not-for-profit corporation has waived and terminated its Right of First Refusal as to the above referenced purchase of the above-described property, pursuant to the provisions of the Declaration of Condominium and the Bylaws of this Association.

Dated this __1st__ day of __December__, 2011.

OCEANIA V CONDOMINIUM ASSOCIATION, INC.,
A Florida Corporation

By: _____
Board of Directors

(AFFIX CORPORATE SEAL)

Oceania V Condominium Association, Inc.
16500 Collins Avenue · Sunny Isles Beach · Fl 33160 · Tel. 305-944-7700 · Fax 305-944-7272

*Exhibit 14*

**ANTI-AGING AESTHETIC AND**
LASER CENTER INC
2222466960 7862466960
175 SW 7TH ST STE 1710
MIAMI, FL 33130-2967

1397
1-108/210

06.22.09
DATE

PAY TO THE
ORDER OF _Klara Pantin_____ | $ 5,800.°°

_- five thousand eight hundred_ DOLLARS

**HSBC** ⟨X⟩
Brooklyn, NY 11226

FOR _____

⑈021001088⑈ ▮▮▮0887⑈ 1397

Account ▮▮▮0887   Check# 0   Amount 5800.00
Date Presented 06-22-2009

TDBCP000098

*Exhibit 15*

Exhibit "1"

AFFIDAVIT OF RENEE ANN DENOBREGA

STATE OF PENNSYLVANIA )
                       ) ss.:
COUNTY OF              )

RENEE ANN DENOBREGA, being duly sworn, deposes and states that the following is true under the penalties of perjury:

1.     I have personal knowledge of the statements that are made in this affidavit and would testify as to them in a court of law if called upon to do so.

2.     I give this affidavit voluntarily and was provided with the opportunity to consult with counsel of my choosing concerning its preparation and execution. However, I do not require counsel in order to tell the truth. This affidavit summarizes my association with Francois Jules Parisien M.D. ("Dr. Parisien"), PFJ Medical Care P.C. ("PFJ Medical"), JPF Medical Services, P.C. ("JPF Medical"), Ksenia Pavlova Rybak, D.O. ("Dr. Rybak"), and KP Medical Care P.C. ("KP Medical"), among others. This affidavit is not intended to be an exhaustive account of my experiences.

I.     **General Background**

3.     I currently reside at 400 Douglass Street, Reading, PA 19601.

4.     I received a Bachelor's of Science in Nursing from Alvernia University in 2007. I received a Master's of Science in Nursing from Widener University in 2013. I received a Doctor of Nursing Practice degree from Walden University in 2016. I received a Post-Master's Certificate in Family Mental Health in or about 2016.

5.     I became a licensed nurse practitioner in New York in 2013.

8

## II.   My Association with Dr. Parisien, PJF Medical, and JPF Medical

6.   In or about early September 2016, I was approached by a recruiter named "Nikki", a friend of a friend who was associated with a staffing agency for nurses. Nikki told me about an opportunity to work two days a week in a medical clinic on Flatbush Avenue in Brooklyn, New York.

7.   After speaking with Nikki, I agreed to speak with the clinic's office manager about the position. Shortly thereafter I was contacted by a woman named "Susie" who asked me to come in for an interview at 1786 Flatbush Avenue, Brooklyn, New York (the "Flatbush Clinic").

8.   I met with Susie – who appeared to me to be of Filipina descent – at the Flatbush Clinic sometime thereafter in or about September 2016. Susie interviewed me and told me she needed me to come back and meet a woman whose name I was told was "Barbara". Susie indicated that Barbara would be the ultimate decision-maker as to whether I would work at the Flatbush Clinic.

9.   A few days later, I met with Barbara at the Flatbush Clinic. Barbara was approximately 60 years old, of medium height, often wore fancy clothes with heavy makeup, and had what appeared to be dyed blonde hair. Barbara spoke with what I believe was a Russian accent. I do not know if Barbara is her real name.

10.   During our meeting, Barbara offered me the opportunity to work at the Flatbush Clinic. Barbara initially offered me $40 per hour, claiming that "the doctor" will likely insist upon this starting salary. However, after a supposed discussion with "the doctor", it was agreed that I would receive $60 per hour and work approximately 14 hours per week. I then met with Dr. Joseph Lacina, who said, "You are worth every bit of $60 per hour," and denied that he was

9

the one that insisted I be paid only $40 per hour.

11.     I also met an individual named "Wilma" at the Flatbush Clinic, whom I understood to be responsible for billing. Wilma, like Susie, appeared to be of Filipina descent.

12.     I never interviewed with any other individuals besides Susie and Barbara before being offered the opportunity to work at the Flatbush Clinic. I did meet with Dr. Lacina before starting at the Flatbush Clinic for less than four hours of training and we discussed the job and my experience. I was not told who owned what, but I was made aware that Barbara was the boss and Dr. Lacina was my supervisor per se. However, I rarely met with Dr. Lacina, and he did not really supervise my work. However, he was available via telephone if I needed him. Most of my dealings were with Barbara and Susie.

13.     After I began working at the Flatbush Clinic, I learned that many of the professional services I performed at the Flatbush Clinic were billed to insurance companies through PFJ Medical and JPF Medical. Though I later learned that PFJ Medical and JPF Medical are owned on paper by Dr. Parisien, I have never met Dr. Parisien, I have never spoken with Dr. Parisien, and I have no idea who he is.

14.     Additionally, I have come to learn that many of the professional services I performed at the Flatbush Clinic and other clinics in the New York metro area were billed to insurance companies through KP Medical. I have never met or spoken with Dr. Rybak, and I have no idea who she is.

15.     I began working at the Flatbush Clinic in mid-September 2016. It became clear to me very early on that Barbara was in charge of the Flatbush Clinic and that everyone at the Flatbush Clinic reported to Barbara. Susie was the day-to-day office manager but she too reported to Barbara. I never saw Dr. Parisien or Dr. Rybak at the Flatbush Clinic when I was

10

working there, and – to my knowledge – they had no role in the day-to-day operations of the Flatbush Clinic or any of the healthcare practices that operated at the Flatbush Clinic while I was there.

16.     When I would work at the Flatbush Clinic, I was provided with an examination room. Susie or one of the front-desk personnel that reported to Susie and Barbara would direct patients back to the examination room to see me.

17.     No licensed healthcare professional ever directly supervised me at the Flatbush Clinic. I am unaware whether any licensed healthcare professional ever reviewed my work by way of chart reviews.

18.     In or about mid-October 2016, Barbara highly insisted that I work 1-2 days per week at a clinic located at 552 E 180th Street, Bronx, New York (the "Bronx Clinic"). I reluctantly agreed, despite the fact that it made my commute more difficult and I was offered no incentives or travel reimbursements. Though it was Barbara who insisted that I work at the Bronx Clinic, the Bronx Clinic appeared to be controlled by a man whose name I do not recall, but who I believe to be Russian, based on his accent and discussions with other people who worked at the Bronx Clinic. Non-professional office staff that worked for this Russian man routed patients to me and other healthcare providers at the Bronx Clinic. Before I would go to work each day at the Bronx Clinic, office staff at the Flatbush Clinic – under the supervision of Barbara – would put together a bag of supplies for me to use at the Bronx Clinic, including dry needles, lidocaine, and steroids. I then would carry these materials with me from the Flatbush Clinic to the Bronx Clinic.

19.     The terms of my compensation at the Bronx Clinic were the same as the terms of my compensation at the Flatbush Clinic. I negotiated my compensation at the Bronx Clinic with

11

Barbara, just as I had at the Flatbush Clinic.

20.    No licensed healthcare professional directly supervised my work at the Bronx Clinic.

21.    I did not have an employment agreement in connection with my work at the Flatbush Clinic or the Bronx Clinic, and I believed myself to be an independent contractor at the Clinics. I was not provided with malpractice insurance. I was not given any paid vacation or other fringe benefits. I was at all times free to seek out and accept other work. Additionally, as discussed above, I was not supervised at the Flatbush Clinic or the Bronx Clinic in any way by Dr. Parisien, Dr. Rybak, or any other licensed healthcare professional. I was paid on both a W-2 and 1099 basis for my work at the Flatbush Clinic and Bronx Clinic. Barbara told me this was for my benefit and that I would earn more money this way, but I thought it was unusual, in that I had never before been paid on a split W-2/1099 basis.

22.    On numerous occasions, checks issued to me for my work at the Flatbush Clinic and the Bronx Clinic bounced. When this would happen I would bring the issue to Susie or Barbara's attention. They would tell me that the Clinics' funds were low because insurance had not been paying them in time. Barbara, in particular, exclaimed "It's not our fault!" in regard to the insurance companies not paying on time. Barbara or Susie would then prepare another check that often times appeared to be from a different account or business entity.

23.    During my time at the Clinics, I performed patient evaluations and administered trigger point injections and "dry-needling." I had never performed dry-needling prior to working at the Clinics. I do not recall performing any services at the Clinics other than patient evaluations, trigger point injections, and dry-needling.

24.    Though I was never really supervised by any licensed healthcare professionals at

12

the Clinics, non-professional office staff – including Barbara and Susie – insisted that I provide particular services or prescribe particular tests or medical equipment at the Clinics.

25.     On at least one occasion, Barbara and Susie entered my assigned office, closed the door behind them, and highly insisted that I perform more dry needling. When I asked why, they told me that dry needling is considered "treatment," while trigger point injections were only $100 and not considered treatment. I was told that I was not performing even the essential duties of my job description unless I performed dry needling.

26.     Additionally, one of the girls who sat at the front desk at the Flatbush Clinic named "Dovie" insisted that I order MRIs that I did not deem necessary.

27.     I was also instructed by non-professional office staff at the Flatbush Clinic to perform initial evaluations – as opposed to follow-up examinations – on every single patient I saw, even if the patient previously had been seen by another medical doctor or nurse practitioner at the Clinics, thus documenting all of the healthcare information that had been previously documented by another doctor or nurse practitioner. I only performed a follow-up examination if I personally performed the initial evaluation.

28.     The initial evaluations I performed at the Clinics took, on average, 15 minutes. The large majority of patients I saw had minor medical issues such as sprains or strains that required straightforward medical decision-making. Oftentimes, I suspected that the patients were malingering, in that their pain complaints were not in line with other aspects of their presentment, including their general appearance and mobility. I used pre-printed evaluation forms to conduct the evaluations, which were provided to me by staff at the Flatbush Clinic, and I also used the same forms at the Bronx Clinic.

29.     I never saw or signed any of the bills submitted to insurance companies.

05/22/2018  05:21PM  14845094462          KLICK FINANCIAL                    PAGE  02/04

In light of the my concerns about the dry-needling services, the bounced paychecks, and various concerns about the Clinics brought to my attention by patients, I decided in or about late March 2017 to stop working at the Clinics.

In April 2018, I learned that I had been named as a defendant in a lawsuit filed by GEICO against Dr. Parisien, PFJ Medical, and JPF Medical, among others. I do not believe I did anything wrong, other than to get mixed up for a short time with the wrong people. In May 2018, shortly after I began cooperating with GEICO, I received multiple phone calls from Barbara and her office staff. I was also informed that another defendant in this action was receiving the same calls.

_____
Renee Ann Denobrega

Sworn to before me this
22nd day of __May__, 2018

_____

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Brittany Lambert, Notary Public
Laureldale Boro, Berks County
My Commission Expires Oct. 17, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

14

# *Exhibit 16*

# MAIGA PRODUCTS CORP

100 CHURCH STREET, 8TH FLOOR, NEW YORK, NY 10007

## DELIVERY RECEIPT



PATIENT NAME:

DATE OF BIRTH:                                    DATE OF ACCIDENT: 3|11|14

ADDRESS:

Number and Street          City          State          Zip Code

## DELIVERY ORDER LIST

| 1 | ADVANCED CERVICAL COLLAR |
|---|---|
|   |   |

I have received equipments and supplies listed above along with instructions on use case of it. I indicate that **Maiga Products Corp.**, cannot be held responsible for any inappropriate use of this equipment or supplies.



SIGNATURE OF PATIENT                    3|14|14   DATE OF SIGNATURE

03252014

# MADISON PRODUCTS OF U.S.A INC

747 3RD AVE FL 2 NEWYORK, NY 10017

## DELIVERY RECEIPT

PATIENT NAME. 

DATE OF BIRTH

DATE OF ACCIDENT: ✗ 3|11|14

ADDRESS. ✗

| Number and Street | City | State | Zip Code |

## DELIVERY ORDER LIST

| 1 | MASSAGER |
|---|----------|
|   |          |

I have received equipments and supplies listed above along with instructions on use case of it  I indicate that **MADISON PRODUCT OF USA INC.**, cannot be held responsible for any inappropriate use of this equipment or supplies.



SIGNATURE OF PATIENT

✗ 3/21/14

DATE OF SIGNATURE

04082014

# Quality Custom Medical Supply, Inc.

**33 Ave U**
**Brooklyn, NY 11223**
Tel:  718-676 5092
Fax:  718-676 5093

## DELIVERY   RECEIPT

**Patient Name:** ███████████████

Address· ████████████

Phone: 

**DOA:**  4/14/2014
Insurance Co:  State Farm Insurance Company
P.O. Box 106107
Atlanta, GA 30348
Claim#:  324F26382
Policy#
PolicyHolder·

### Delivery Order List

| 1 | Cervical Traction Unit w/ pump |
|---|---|
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |

I have received equipments and supplies listed above along with  instructions on use case of it.
I indicate that Quality Custom Medical Supply, Inc. cannot be held responsible for any
inappropriate use of this equipment or supplies.

Signature ████████████████████

05272014

# QUALITY HEALTH SUPPLY CORP.

**2071 FLATBUSH AVE., SUITE 104, BROOKLYN, NY 11234**
**P (347) 409-8189   F (718) 338-7817**

## DELIVERY RECEIPT

PATIENT NAME: ███████████

DATE OF BIRTH: ███████     DATE OF ACCIDENT: 05/01/2015

ADDRESS: ████████████████████████

           Number and Street          City     State    Zip Code

## DELIVERY ORDER LIST

| 1 | CERVICAL COLLAR FOAM – 2 PIECES W/ THOR |
|---|---|
| 1 | CERVICAL PILLOW |
| 1 | LSO |
| 1 | LUMBAR CUSHION |
| 1 | BED BOARD |
| 1 | THERMOPHORE – ELECTRICAL HEAT PAD MOIST |
| 1 | MATTRESS |
|  |  |

I have received all the equipment and supplies listed above along with instructions on use case of it. I indicate that **Quality Health Supply Corp.**, cannot be held responsible for any inappropriate use of this equipment or supplies.



████████████ /Signature of Patient

6/5/2015
Date of Signature

06152015

# AB QUALITY HEALTH SUPPLY CORP.

**2071 FLATBUSH AVE., SUITE 104, BROOKLYN, NY 11234**
**P (347) 409-8189**

## DELIVERY RECEIPT

PATIENT NAME: ███████████

DATE OF BIRTH: ███████   DATE OF ACCIDENT: 06/21/2016

ADDRESS: ███████████████████████████

| | Number and Street | City | State | Zip Code |

## DELIVERY ORDER LIST

| 1 | CERVICAL COLLAR FOAM – 2 PIECES W/ THOR |
|---|---|
| 1 | CERVICAL PILLOW |
| 1 | LSO |
| 1 | LUMBAR CUSHION |
| 1 | BED BOARD |
| 1 | THERMOPHORE – ELECTRICAL HEAT PAD MOIST |
| 1 | MATTRESS |

I have received all the equipment and supplies listed above along with instructions on use case of it. I indicate that **AB Quality Health Supply Corp.**, cannot be held responsible for any inappropriate use of this equipment or supplies.

X ███████████
Signature of Patient

X 8/3/2016
Date of Signature

08152016

# PERSONAL HOME CARE PRODUCTS CORP

300 CADMAN PLAZA FL 12, BROOKLYN, NY 11201

## DELIVERY RECEIPT



PATIENT NAME: X ▮▮▮▮▮

DATE OF BIRTH: ▮▮▮▮   DATE OF ACCIDENT: ➤ 4/27/15

ADDRESS: ▮▮▮▮▮▮▮▮▮▮

Number and Street     City    State    Zip Code

## DELIVERY ORDER LIST

| 1 | CERVICAL COLLAR FOAM – 2 PIECES W/ THOR |
| 1 | CERVICAL PILLOW |
| 1 | LSO |
| 1 | LUMBAR CUSHION |
| 1 | BED BOARD |
| 1 | THERMOPHORE – ELECTRICAL HEAT PAD MOIST |
| 1 | MATTRESS |

I have received all the equipment and supplies listed above along with instructions on use case of it. I indicate that **Personal Home Care Products Corp.**, cannot be held responsible for any inappropriate use of this equipment or supplies.

X ▮▮▮▮▮▮
Signature of Patient

➤ 5-22-15
Date of Signature

00002015

# *Exhibit 17*

**Precision Medical Supply Invoices and Payments**

| | Precision Medical Invoices Addressed to Flatbush Providers | | | Check Payments to Precision Medical Supply | | | | |
|---|---|---|---|---|---|---|---|---|
| Invoice Number | Invoice Date | Invoice Addressee | Invoice Amount | Check Number | Check Date | Check Payor | Check Amount | Payee |
| 1212 | 6/18/2012 | Maiga Products | $4,685.00 | Credit Card | 7/18/2012 | Maiga Products Corp | $4,685.00 | Precision Medical Supply LLC |
| 1230 | 8/8/2012 | Maiga Products | $4,115.00 | 0098 | 8/10/2012 | No Payor Listed on Check | $4,115.00 | Precision Medical Supply LLC |
| 1236 | 8/20/2012 | Maiga Products | $3,130.00 | 101 | 8/22/2012 | Maiga Products Corp | $3,130.00 | Precision Medical Supply LLC |
| 1237 | 8/23/2012 | Maiga Products | $2,430.00 | 102 | 8/29/2012 | Maiga Products Corp | $2,430.00 | Precision Medical Supply LLC |
| 1266 | 10/2/2012 | Maiga Products | $2,206.00 | Unknown | Unknown | Unknown | Unknown | Unknown |
| 1273 | 10/18/2012 | Maiga Products | $2,442.00 | 132 | 10/23/2012 | Maiga Products Corp | $2,442.00 | Tony Pykiet |
| 1297 | 11/14/2012 | Maiga Products | $4,261.00 | 133 | 11/19/2012 | Maiga Products Corp | $4,261.00 | Tony Pykiet |
| 1306 | 11/30/2012 | Maiga Products | $3,277.00 | 134 | 12/5/2012 | Maiga Products Corp | $3,277.00 | Precision Medical Supply LLC |
| 1327 | 1/9/2013 | Maiga Products | $3,239.76 | 140 | 1/14/2013 | Maiga Products Corp | $3,239.76 | Tony Pykiet |
| 1337 | 1/25/2013 | Maiga Products | $1,051.00 | 139 | 1/29/2013 | Maiga Products Corp | $1,051.00 | Tony Pykiet |
| 1365 | 2/18/2013 | Maiga Products | $2,142.00 | 191 | 2/21/2013 | Maria Shiela Masigla PT | $2,142.00 | Tony Pykiet |
| 1372 | 2/21/2013 | Maiga Products | $1,577.00 | 195 | 2/26/2013 | Maria Shiela Masigla PT | $1,577.00 | Tony Pykiet |
| 1384 | 3/14/2013 | Maiga Products | $1,141.00 | 145 | 3/19/2013 | Maiga Products Corp | $1,141.00 | Tony Pykiet |
| 1392 | 3/25/2013 | Maiga Products | $2,528.00 | 174 | 3/28/2013 | Maiga Products Corp | $2,528.00 | Tony Pykiet |
| 1396 | 4/1/2013 | Maiga Products | $2,694.00 | 173 | 4/4/2013 | Maiga Products Corp | $2,694.00 | Tony Pykiet |
| 1411 | 4/23/2013 | Maiga Products | $3,133.00 | Unknown | Unknown | Unknown | Unknown | Unknown |
| 1447 | 5/22/2013 | Maiga Products | $1,178.00 | 189 | 5/28/2013 | Maiga Products Corp | $1,178.00 | Precision Medical Supply LLC |
| 1473 | 6/20/2013 | Maiga Products | $3,092.00 | 201 | 6/25/2013 | Maiga Products Corp | $3,092.00 | Precision Medical Supply LLC |
| 1475 | 6/25/2013 | Maiga Products | $3,158.00 | 207 | 6/28/2013 | Maiga Products Corp | $3,158.00 | Precision Medical Supply LLC |
| 1495 | 7/22/2013 | Maiga Products | $2,494.00 | 213 | 7/25/2013 | Maiga Products Corp | $2,494.00 | Precision Medical Supply LLC |
| 1503 | 7/31/2013 | Maiga Products | $925.00 | 216 | 8/5/2013 | Maiga Products Corp | $925.00 | Precision Medical Supply LLC |
| 1505 | 8/1/2013 | Maiga Products | $3,035.00 | 148 | Unknown | Unknown | $3,035.00 | Unknown |
| 1509 | 8/7/2013 | Maiga Products | $2,037.00 | 174 | 8/9/2013 | Francois J Parisien | $2,037.00 | Precision Medical Supply LLC |
| 1535 | 9/3/2013 | Maiga Products | $1,100.00 | 283 | Unknown | Unknown | $2,666.00 | Unknown |
| 1547 | 9/11/2013 | Maiga Products | $1,566.00 | 283 | Unknown | Unknown | $2,666.00 | Unknown |
| 1581 | 10/10/2013 | Maiga Products | $3,543.00 | 263 | 10/15/2013 | Maiga Products Corp | $3,543.00 | Precision Medical Supply LLC |
| 1601 | 10/28/2013 | Maiga Products | $1,854.00 | 424 | 11/1/2013 | Francois J Parisien | $1,854.00 | Precision Medical Supply LLC |
| 1613 | 11/12/2013 | Maiga Products | $3,709.00 | 158 | 11/15/2013 | Maiga Products Corp | $3,709.00 | Precision Medical Supply LLC |
| 1644 | 12/10/2013 | Maiga Products | $3,984.00 | 315 | 12/13/2013 | Maiga Products Corp | $3,984.00 | Precision Medical Supply LLC |
| 1655 | 12/26/2013 | Maiga Products | $5,007.00 | 603 | 1/2/2014 | Francois J Parisien | $5,007.00 | Precision Medical Supply LLC |
| 1984 | 1/6/2014 | Maiga Products | $2,018.50 | 198 | 1/9/2015 | Madison Products of USA Inc | $2,018.50 | Precision Medical Supply LLC |
| 1994 | 1/12/2014 | Maiga Products | $3,230.80 | 201 | 1/15/2015 | Madison Products of USA Inc | $3,230.80 | Precision Medical Supply LLC |
| 1676 | 1/22/2014 | Maiga Products | $4,254.00 | 324 | 1/27/2014 | Maiga Products Corp | $4,254.00 | Precision Medical Supply LLC |
| 1713 | 3/6/2014 | Maiga Products | $3,975.00 | 334 | 3/12/2014 | Maiga Products Corp | $3,975.00 | Precision Medical Supply LLC |
| 1722 | 3/13/2014 | Maiga Products | $1,402.00 | 336 | 3/17/2014 | Maiga Products Corp | $1,402.00 | Precision Medical Supply LLC |
| 1751 | 4/25/2014 | Maiga Products | $3,117.00 | 376 | 4/30/2014 | Maiga Products Corp | $3,117.00 | Precision Medical Supply LLC |
| 1765 | 5/20/2014 | Maiga Products | $3,675.00 | 382 | 5/23/2014 | Maiga Products Corp | $3,675.00 | Precision Medical Supply LLC |
| 1798 | 6/20/2014 | Maiga Products | $2,567.00 | 388 | 6/25/2014 | Maiga Products Corp | $2,567.00 | Precision Medical Supply LLC |
| 1817 | 7/15/2014 | Maiga Products | $3,009.00 | 393 | 7/18/2014 | Maiga Products Corp | $3,009.00 | Precision Medical Supply LLC |
| 1830 | 8/4/2014 | Maiga Products | $3,118.00 | 396 | 7/7/2014 | Maiga Products Corp | $3,118.00 | Precision Medical Supply LLC |
| 1839 | 8/15/2014 | Maiga Products | $4,681.71 | 135 | 8/21/2014 | Madison Products of USA Inc | $4,681.71 | Precision Medical Supply LLC |
| 1881 | 10/6/2014 | Maiga Products | $4,128.00 | 420 | 10/9/2014 | Maiga Products Corp | $4,128.00 | Precision Medical Supply LLC |
| 1915 | 11/6/2014 | Maiga Products | $4,128.00 | 151 | 11/11/2014 | Madison Products of USA Inc | $4,128.00 | Precision Medical Supply LLC |

**Precision Medical Supply Invoices and Payments**

| | Precision Medical Invoices Addressed to Flatbush Providers | | | Check Payments to Precision Medical Supply | | | | |
|---|---|---|---|---|---|---|---|---|
| Invoice Number | Invoice Date | Invoice Addressee | Invoice Amount | Check Number | Check Date | Check Payor | Check Amount | Payee |
| 1931 | 11/25/2014 | Maiga Products | $4,012.38 | 155 | 12/1/2014 | Madison Products of USA Inc | $4,012.38 | Precision Medical Supply LLC |
| 2009 | 1/26/2015 | Maiga Products | $2,018.00 | 204 | 1/30/2015 | Madison Products of USA Inc | $2,018.00 | Precision Medical Supply LLC |
| 2055 | 2/11/2015 | Maiga Products | $4,684.00 | 213 | 3/16/2015 | Madison Products of USA Inc | $4,684.00 | Precision Medical Supply LLC |
| 2080 | 4/7/2015 | Personal Home Care Products Corp | $2,513.21 | 215 | 4/10/2015 | Madison Products of USA Inc | $2,513.21 | Precision Medical Supply LLC |
| 2119 | 5/8/2015 | Personal Home Care Products Corp | $2,005.77 | 252 | 5/12/2015 | Madison Products of USA Inc | $2,005.77 | Precision Medical Supply LLC |
| 2138 | 5/29/2015 | Personal Home Care Products Corp | $2,017.00 | 633 | 6/2/2015 | Maiga Products Corp | $2,017.00 | Precision Medical Supply LLC |
| 2161 | 6/15/2015 | Personal Home Care Products Corp | $1,518.00 | 259 | 6/18/2015 | Madison Products of USA Inc | $1,518.00 | Precision Medical Supply LLC |
| 2164 | 6/17/2015 | Personal Home Care Products Corp. | $2,578.59 | 218 | Unknown | Unknown | $2,578.79 | Unknown |
| 2180 | 6/29/2015 | Personal Home Care Products Corp | $818.00 | 220 | 7/2/2015 | Madison Products of USA Inc | $818.00 | Precision Medical Supply LLC |
| 2190 | 7/6/2015 | Personal Home Care Products Corp | $1,658.60 | 102 | 8/14/2015 | Quality Health Supply Corp | $1,658.60 | Precision Medical Supply LLC |
| 2191 | 7/8/2015 | Personal Home Care Products Corp | $1,519.00 | 266 | 7/13/2015 | Madison Products of USA Inc | $1,519.00 | Precision Medical Supply LLC |
| 2196 | 7/13/2015 | Personal Home Care Products Corp | $1,020.00 | 100 | 7/16/2015 | Quality Health Supply Corp | $1,020.00 | Precision Medical Supply LLC |
| 2207 | 7/29/2015 | Personal Home Care Products Corp | $1,970.00 | 270 | 8/3/2015 | Madison Products of USA Inc | $1,970.00 | Precision Medical Supply LLC |
| 2239 | 8/27/2015 | Quality Health Supply Corp | $4,009.00 | 274 | 9/1/2015 | Madison Products of USA Inc | $2,009.00 | Precision Medical Supply LLC |
| 2239 | 8/27/2015 | Quality Health Supply Corp. | $4,009.00 | 104 | 9/1/2015 | Quality Health Supply Corp | $2,000.00 | Precision Medical Supply LLC |
| 2299 | 9/29/2015 | Quality Health Supply Corp. | $459.00 | 129 | Unknown | Unknown | $459.00 | Unknown |
| 2319 | 10/14/2015 | Quality Health Supply Corp | $6,234.00 | 105 | 10/19/2015 | Quality Health Supply Corp | $6,234.00 | Precision Medical Supply LLC |
| 2349 | 11/4/2015 | Quality Health Supply Corp | $786.00 | 109 | 11/9/2015 | Quality Health Supply Corp | $786.00 | Precision Medical Supply LLC |
| 2368 | 11/20/2015 | Quality Health Supply Corp | $459.00 | 116 | 11/27/2015 | Quality Health Supply Corp | $459.00 | Precision Medical Supply LLC |
| 2383 | 12/2/2015 | Quality Health Supply Corp. | $3,015.00 | 138 | Unknown | Unknown | $3,015.00 | Unknown |
| 2453 | 1/22/2016 | Quality Health Supply Corp | $2,066.00 | 161 | 1/27/2016 | Quality Health Supply Corp | $2,066.00 | Precision Medical Supply LLC |
| 2499 | 2/19/2016 | Quality Health Supply Corp | $2,509.00 | 170 | 2/24/2016 | Quality Health Supply Corp | $2,509.00 | Precision Medical Supply LLC |
| 2515 | 3/8/2016 | Quality Health Supply Corp | $1,616.00 | 173 | 3/10/2016 | Quality Health Supply Corp | $1,614.00 | Precision Medical Supply LLC |
| 2515 | 3/8/2016 | Quality Health Supply Corp | $1,616.00 | 188 | 5/24/2016 | Quality Health Supply Corp | $2,223.00 | Precision Medical Supply LLC |
| 2545 | 3/25/2016 | Quality Health Supply Corp | $1,811.00 | 180 | 3/20/2016 | Quality Health Supply Corp | $1,811.00 | Precision Medical Supply LLC |
| 2565 | 4/11/2016 | Quality Health Supply Corp | $2,728.00 | 182 | 4/14/2016 | Quality Health Supply Corp | $2,728.00 | Precision Medical Supply LLC |
| 2588 | 4/22/2016 | Quality Health Supply Corp | $1,817.00 | 184 | 4/28/2016 | Quality Health Supply Corp | $1,817.00 | Precision Medical Supply LLC |
| 2632 | 5/25/2016 | Quality Health Supply Corp | $1,201.00 | 195 | 5/31/2016 | Quality Health Supply Corp | $1,201.00 | Precision Medical Supply LLC |
| 2673 | 6/17/2016 | Quality Health Supply Corp | $1,543.00 | 206 | 6/22/2016 | Quality Health Supply Corp | $1,543.00 | Precision Medical Supply LLC |
| 2713 | 7/8/2016 | Quality Health Supply Corp | $2,379.00 | 208 | 7/14/2016 | Quality Health Supply Corp | $2,379.00 | Precision Medical Supply LLC |
| 2719 | 7/11/2016 | Quality Health Supply Corp | $1,128.00 | 209 | 7/14/2016 | Quality Health Supply Corp | $1,128.00 | Precision Medical Supply LLC |
| 2727 | 7/18/2016 | Quality Health Supply Corp | $2,378.00 | 211 | 7/21/2016 | Quality Health Supply Corp | $2,378.00 | Precision Medical Supply LLC |
| 2740 | 7/27/2016 | Quality Health Supply Corp | $544.00 | 214 | 8/1/2016 | Quality Health Supply Corp | $544.00 | Precision Medical Supply LLC |
| 2772 | 8/12/2016 | Quality Health Supply Corp | $2,102.00 | 390 | 8/17/2016 | Madison Products of USA Inc | $2,102.00 | Precision Medical Supply LLC |
| 2808 | 9/7/2016 | Quality Health Supply Corp | $1,206.00 | 225 | 9/12/2016 | Quality Health Supply Corp | $1,206.00 | Precision Medical Supply LLC |
| 2816 | 9/13/2016 | AB Quality Health Supply Corp | $1,774.00 | 201 | 9/16/2016 | AB Quality Health Supply Corp | $1,774.00 | Precision Medical Supply LLC |
| 2856 | 10/10/2016 | Quality Health Supply Corp. | $1,721.00 | 409561 | Unknown | Unknown | $1,721.00 | Unknown |
| 2873 | 10/19/2016 | Quality Health Supply Corp | $1,954.00 | 82340992-1 | 10/24/2015 | Quality Health Supply Corp | $1,954.00 | Precision Medical Supply LLC |
| 2898 | 11/2/2016 | AB Quality Health Supply Corp | $1,594.00 | 210 | 11/10/2016 | AB Quality Health Supply Corp | $1,594.00 | Precision Medical Supply LLC |
| 2940 | 12/4/2016 | AB Quality Health Supply Corp | $2,156.00 | 212 | 12/12/2016 | AB Quality Health Supply Corp | $2,156.00 | Precision Medical Supply LLC |
| 2956 | 12/9/2016 | AB Quality Health Supply Corp | $840.00 | 211 | 12/12/2016 | AB Quality Health Supply Corp | $840.00 | Precision Medical Supply LLC |
| 2965 | 12/21/2016 | AB Quality Health Supply Corp | $2,487.00 | 214 | 12/29/2016 | AB Quality Health Supply Corp | $2,487.00 | Precision Medical Supply LLC |
| 2965 | 12/21/2016 | AB Quality Health Supply Corp | $2,487.00 | 271 | 1/9/2017 | Quality Health Supply Corp | $2,505.00 | Precision Medical Supply LLC |

**Precision Medical Supply Invoices and Payments**

| | Precision Medical Invoices Addressed to Flatbush Providers | | | | Check Payments to Precision Medical Supply | | | |
|---|---|---|---|---|---|---|---|---|
| Invoice Number | Invoice Date | Invoice Addressee | Invoice Amount | Check Number | Check Date | Check Payor | Check Amount | Payee |
| 2994 | 1/6/2017 | AB Quality Health Supply Corp | $1,978.00 | 1167 | 1/11/2017 | KP Medical Care PC | $1,978.00 | Precision Medical Supply LLC |
| 3009 | 1/23/2017 | AB Quality Health Supply Corp | $1,363.00 | 218 | 1/26/2017 | AB Quality Health Supply Corp | $1,363.00 | Precision Medical Supply LLC |
| 3049 | 2/22/2017 | AB Quality Health Supply Corp | $3,099.00 | 258 | 2/27/2017 | AB Quality Health Supply Corp | $3,099.00 | Precision Medical Supply LLC |
| 3106 | 4/5/2017 | AB Quality Health Supply Corp | $2,069.00 | 278 | 4/10/2017 | AB Quality Health Supply Corp | $2,069.00 | Precision Medical Supply LLC |
| 3137 | 4/27/2017 | AB Quality Health Supply Corp | $1,089.00 | 276 | 5/2/2017 | AB Quality Health Supply Corp | $1,089.00 | Precision Medical Supply LLC |
| 3145 | 5/2/2017 | AB Quality Health Supply Corp | $1,860.00 | 283 | 5/5/2017 | Quality Health Supply Corp | $1,860.00 | Precision Medical Supply LLC |
| 3250 | 6/7/2017 | AB Quality Health Supply Corp | $1,734.00 | 301 | 6/14/2017 | Quality Health Supply Corp | $734.00 | Precision Medical Supply LLC |
| 3268 | 6/20/2017 | AB Quality Health Supply Corp | $2,169.00 | 288 | 6/23/2017 | AB Quality Health Supply Corp | $1,000.00 | Precision Medical Supply LLC |
| 3268 | 6/20/2017 | AB Quality Health Supply Corp | $2,169.00 | 294 | 6/23/2017 | Quality Health Supply Corp | $1,169.00 | Precision Medical Supply LLC |
| 3281 | 7/5/2017 | AB Quality Health Supply Corp | $1,260.00 | 399 | 7/10/2017 | JPF Medical Services PC | $1,260.00 | Precision Medical Supply LLC |
| 3286 | 7/17/2017 | AB Quality Health Supply Corp | $1,052.00 | 291 | 7/20/2017 | AB Quality Health Supply Corp | $1,052.00 | Precision Medical Supply LLC |
| 3306 | 8/9/2017 | AB Quality Health Supply Corp | $1,364.00 | 296 | 8/14/2017 | AB Quality Health Supply Corp | $1,364.00 | Precision Medical Supply LLC |
| 3335 | 9/7/2017 | AB Quality Health Supply Corp | $1,449.00 | 330 | 9/7/2017 | Quality Health Supply Corp | $1,449.00 | Precision Medical Supply LLC |
| 3348 | 9/19/2017 | AB Quality Health Supply Corp | $1,050.00 | 304 | 9/22/2017 | AB Quality Health Supply Corp | $1,050.00 | Precision Medical Supply LLC |
| 3373 | 10/17/2017 | AB Quality Health Supply Corp | $1,775.00 | 308 | 10/23/2017 | AB Quality Health Supply Corp | $1,775.00 | Precision Medical Supply LLC |
| 3382 | 10/26/2017 | AB Quality Health Supply Corp | $757.00 | 309 | 10/31/2017 | AB Quality Health Supply Corp | $757.00 | Precision Medical Supply LLC |
| 3385 | 10/27/2017 | AB Quality Health Supply Corp | $1,630.00 | 311 | 11/1/2017 | AB Quality Health Supply Corp | $1,630.00 | Precision Medical Supply LLC |
| 3386 | 10/30/2017 | AB Quality Health Supply Corp | $318.00 | 313 | 11/2/2017 | AB Quality Health Supply Corp | $318.00 | Precision Medical Supply LLC |
| 3388 | 10/31/2017 | AB Quality Health Supply Corp | $910.00 | 314 | 11/3/2017 | AB Quality Health Supply Corp | $910.00 | Precision Medical Supply LLC |
| 3418 | 12/1/2017 | AB Quality Health Supply Corp | $1,890.00 | 321 | 12/7/2017 | AB Quality Health Supply Corp | $1,890.00 | Precision Medical Supply LLC |
| 3447 | 1/9/2018 | AB Quality Health Supply Corp | $296.00 | 368 | 1/12/2018 | Quality Health Supply Corp | $296.00 | Precision Medical Supply LLC |
| 3454 | 1/23/2018 | AB Quality Health Supply Corp | $1,364.00 | 339 | 1/26/2018 | AB Quality Health Supply Corp | $1,364.00 | Precision Medical Supply LLC |
| 3456 | 1/24/2018 | AB Quality Health Supply Corp | $650.00 | 341 | 1/29/2018 | AB Quality Health Supply Corp | $650.00 | Precision Medical Supply LLC |
| 3462 | 1/31/2018 | AB Quality Health Supply Corp | $1,360.00 | 345 | 2/5/2018 | AB Quality Health Supply Corp | $1,360.00 | Precision Medical Supply LLC |
| 3479 | 2/19/2018 | AB Quality Health Supply Corp | $1,105.00 | 381 | 2/23/2018 | Quality Health Supply Corp | $1,105.00 | Precision Medical Supply LLC |
| 3507 | 3/20/2018 | AB Quality Health Supply Corp | $1,398.00 | 364 | 3/26/2018 | AB Quality Health Supply Corp | $1,398.00 | Precision Medical Supply LLC |
| 3536 | 4/11/2018 | AB Quality Health Supply Corp | $911.00 | 395 | 4/16/2018 | Quality Health Supply Corp | $911.00 | Precision Medical Supply LLC |
| 3539 | 4/13/2018 | AB Quality Health Supply Corp | $607.00 | 374 | 5/16/2018 | AB Quality Health Supply Corp | $607.00 | Precision Medical Supply LLC |
| 3551 | 4/24/2018 | AB Quality Health Supply Corp | $1,264.00 | 375 | 5/16/2018 | AB Quality Health Supply Corp | $1,264.00 | Precision Medical Supply LLC |
| 3570 | 5/16/2018 | AB Quality Health Supply Corp. | $841.00 | Unknown | Unknown | Unknown | Unknown | Unknown |
| 3573 | 5/24/2018 | AB Quality Health Supply Corp. | $911.00 | Unknown | Unknown | Unknown | Unknown | Unknown |
| 3601 | 6/26/2018 | AB Quality Health Supply Corp. | $4,050.00 | Unknown | Unknown | Unknown | Unknown | Unknown |
| 3615 | 7/16/2018 | AB Quality Health Supply Corp. | $2,269.00 | Unknown | Unknown | Unknown | Unknown | Unknown |
| 3619 | 7/18/2018 | AB Quality Health Supply Corp | $386.00 | Unknown | Unknown | Unknown | Unknown | Unknown |
| 3639 | 8/15/2018 | Unknown | $1,895.00 | Unknown | Unknown | Unknown | Unknown | Unknown |
| 3651 | 8/30/2018 | AB Quality Health Supply Corp | $2,370.00 | 103 | 9/4/2018 | Francois Parisien | $2,370.00 | Precision Medical Supply LLC |
| 3736 | 1/22/2019 | AB Quality Health Supply Corp. | $815.66 | 1061 | 1/25/2019 | M Buslon Physical Therapy, P.C. | $815.66 | Precision Medical Supply LLC |
| 3743 | 2/8/2019 | AB Quality Health Supply Corp. | $1,808.69 | 1079 | 2/13/2019 | M Buslon Physical Therapy, P.C. | $1,808.69 | Precision Medical Supply LLC |
| Unknown | Unknown | AB Quality Health Supply Corp | Unknown | 262 | 6/14/2017 | AB Quality Health Supply Corp | $1,000.00 | Precision Medical Supply LLC |
| Unknown | Unknown | Unknown | Unknown | 316 | 11/13/2017 | AB Quality Health Supply Corp | $1,105.00 | Precision Medical Supply LLC |
| Unknown | Unknown | Unknown | Unknown | 98 | 8/31/2018 | Francois Parisien | $1,915.00 | Precision Medical Supply LLC |
| Unknown | Unknown | Unknown | Unknown | 137 | 8/21/2014 | Madison Products of USA Inc | $4,700.00 | Precision Medical Supply LLC |
| Unknown | Unknown | Personal Home Care Products Corp | Unknown | 218 | 6/22/2015 | Madison Products of USA Inc | $2,578.79 | Precision Medical Supply LLC |

**Precision Medical Supply Invoices and Payments**

| | Precision Medical Invoices Addressed to Flatbush Providers | | | | Check Payments to Precision Medical Supply | | | | |
| Invoice Number | Invoice Date | Invoice Addressee | Invoice Amount | Check Number | Check Date | Check Payor | Check Amount | Payee |
|---|---|---|---|---|---|---|---|---|
| Unknown | Unknown | Maiga Products | Unknown | 207 | 6/28/2013 | Maiga Products Corp | $3,158.00 | Precision Medical Supply LLC |
| 1535 and 1547 | Unknown | Maiga Products | Unknown | 283 | 9/16/2013 | Maiga Products Corp | $2,666.00 | Precision Medical Supply LLC |
| Unknown | Unknown | Unknown | Unknown | 82448144-8 | 1/23/2017 | Quality Health Supply Corp | $2,525.00 | Precision Medical Supply LLC |

# *Exhibit 18*

| | | Checks Written By Entities Operating at 1786 Flatbush | | |
|---|---|---|---|---|
| Payor | Payee | Amount Paid | Dates | Relationship |
| Allay Medical Services PC | Clara Pantin | Total: > $506,000.00 | 9/2013 to 4/2017 | Clara Pantin was an employee of the Fountainbleau Hotel where Tatiana and Oleg Rybak owned residential units. |
| Charles Deng Acupuncture, P.C. | Clara Pantin | $6,038.00 | 2/16/2016 to 3/1/2016 | |
| Francois J Parisien | Clara Pantin | $10,029.85 | 5/5/2015 to 7/30/2015 | |
| Island Life Chiropractic Pain Care PLLC | Clara Pantin | $189,764.13 | 9/14/2013 to 4/21/2016 | |
| Ksenia Pavlova | Clara Pantin | $6,750.00 | 8/6/2014 to 5/20/2015 | |
| Luqman K Dabiri | Clara Pantin | $17,728.00 | 3/4/2015 to 4/21/2016 | |
| Madison Products of USA Inc | Clara Pantin | $37,553.00 | 4/14/2014 to 7/12/2014 | |
| Majga Products Corp | Clara Pantin | $132,309.00 | 9/30/2014 to 11/7/2016 | |
| Noel Blackman | Clara Pantin | $9,000.00 | 1/23/2015 to 9/25/2015 | |
| PFJ Medical Care PC | Clara Pantin | $57,591.00 | 8/6/2014 to 1/8/2016 | |
| Quality Health Supply Corp | Clara Pantin | $1,800.00 | 4/5/2017 | |
| | Clara Pantin | $38,237.07 | 12/28/2015 to 10/17/2016 | |
| Francois J Parisien | Khristopher Salado | Total: $8,692 | 1/2014 to 12/2014 | Clara Pantin's son. |
| Madison Products of USA Inc | Khristopher Salado | $6,692.00 | 1/14/2014 to 10/5/2014 | |
| | Khristopher Salado | $2,000.00 | 12/9/2014 | |
| Francois J Parisien | Nicholas Salado | Total: $8,625 | 12/2014 to 4/2016 | Clara Pantin's son. |
| Ksenia Pavlova | Nicholas Salado | $2,800.00 | 5/14/2015 to 9/25/2015 | |
| Madison Products of USA Inc | Nicholas Salado | $1,705.00 | 4/15/2016 | |
| | Nicholas Salado | $4,120.00 | 12/5/2014 to 6/11/2015 | |
| Allay Medical Services PC | Vasila Queen | Total: $74,615.00 | 1/2013 to 2/2018 | Associate of Tatiana Rybak, owner of Studio By Vasila, a nail salon up the street from one of Tatiana Rybak's condominium's in Sunny Isles Florida. |
| Francois J Parisien | Vasila Queen | $1,000.00 | 10/20/2015 to 10/20/2015 | |
| Ksenia Pavlova | Vasila Queen | $17,515.00 | 9/26/2013 to 7/15/2016 | |
| Madison Products of USA Inc | Vasila Queen | $9,700.00 | 1/22/2014 to 4/18/2017 | |
| Maria Shiela Masigla PT | Vasila Queen | $14,000.00 | 7/7/2014 to 7/10/2015 | |
| Masigla Physical Therapy PC | Vasila Queen | $6,000.00 | 3/5/2013 to 4/21/2015 | |
| MSB Physical Therapy PC | Vasila Queen | $2,500.00 | 12/12/2012 to 1/28/2013 | |
| Noel Blackman | Vasila Queen | $1,000.00 | 12/26/2017 to 12/26/2017 | |
| PFJ Medical Care PC | Vasila Queen | $2,000.00 | 1/7/2015 to 11/10/2015 | |
| Pierre J Renelique MD | Vasila Queen | $9,900.00 | 6/20/2016 to 2/24/2018 | |
| Quality Health Supply Corp | Vasila Queen | $10,000.00 | 1/17/2013 to 1/27/2014 | |
| | Vasila Queen | $1,000.00 | 6/10/2016 to 6/10/2016 | |

| | | Checks Written By Entities Operating at 1786 Flatbush | | |
|---|---|---|---|---|
| Payor | Payee | Amount Paid | Dates | Relationship |
| Allay Medical Services PC | Voldymyr Maistrenko, Olga Maistrenko, and Art Glass International LLC | Total: > $216,000.00 | 7/2013 to 1/2018 | Interior designer, his wife, and business, located in North Miami, Florida, 15 minutes from one of Tatiana Rybak's condominium's in Sunny Isles, Florida and midway between that condominium and the Fountainbleau Hotel. |
| | Maistrenkos and Art Glass | $34,350.00 | 10/20/2015 to 1/12/2018 | |
| Francois J Parisien | Maistrenkos and Art Glass | $65,700.00 | 7/12/2013 to 5/24/2017 | |
| JPF Medical Services PC | Maistrenkos and Art Glass | $10,000.00 | 5/23/2017 to 6/21/2017 | |
| Ksenia Pavlova | Maistrenkos and Art Glass | $27,848.00 | 2/11/2014 to 1/22/2018 | |
| Madison Products of USA Inc | Maistrenkos and Art Glass | $7,000.00 | 7/9/2014 to 7/9/2014 | |
| MSB Physical Therapy PC | Maistrenkos and Art Glass | $18,500.00 | 12/30/2016 to 10/17/2017 | |
| PFI Medical Care PC | Maistrenkos and Art Glass | $33,545.00 | 9/20/2016 to 1/7/2018 | |
| Quality Health Supply Corp | Maistrenkos and Art Glass | $20,000.00 | 11/15/2015 to 1/12/2018 | |
| | Kristina Kalitskaya | Total: $4,000 | 10/23/2015 to 10/23/2015 | Employee of Voldymyr Maistrenko |
| Francois J Parisien | Kristina Kalitskaya | $4,000.00 | 10/23/2015 to 10/23/2015 | |
| | Les Levine | Total: > $221,000 | 4/2016 to 4/2018 | Private investigator purportedly hired to help Oleg Rybak and others defend the lawsuit brought by Dr. Gutierrez. |
| AB Quality Health Supply Corp | Les Levine | $2,000.00 | 10/26/2016 to 10/27/2016 | |
| Allay Medical Services PC | Les Levine | $20,973.60 | 8/17/2016 to 4/3/2018 | |
| Francois J Parisien | Les Levine | $18,157.75 | 7/12/2016 to 10/4/2016 | |
| JPF Medical Services PC | Les Levine | $37,926.00 | 11/17/2016 to 10/25/2017 | |
| KP Medical Care PC | Les Levine | $650.00 | 1/3/2017 to 1/3/2017 | |
| Ksenia Pavlova | Les Levine | $27,330.35 | 4/6/2016 to 12/16/2016 | |
| MSB Physical Therapy PC | Les Levine | $3,025.00 | 12/20/2016 to 4/4/2018 | |
| PFI Medical Care PC | Les Levine | $98,804.57 | 7/2/2016 to 3/19/2018 | |
| Quality Health Supply Corp | Les Levine | $13,000.00 | 5/26/2016 to 10/26/2016 | |
| | Real Estate Law Firm | Total: > $425,000 | 8/2014 to 5/2018 | Real estate law firm that represented the Rybak family in a variety of real estate ventures. Represented Tatiana Rybak's son and Oleg Rybak's brother, Sergey Rybak or Rybak Development in three cases filed in 2009, 2015 and 2017. |
| Allay Medical Services PC | Real Estate Law Firm | $66,300.00 | 10/27/2015 to 1/31/2018 | |
| Charles Deng Acupuncture, P.C. | Real Estate Law Firm | $70,099.06 | 8/6/2014 to 7/28/2017 | |
| Francois J Parisien | Real Estate Law Firm | $25,000.00 | 11/26/2015 to 11/26/2015 | |
| Island Life Chiropractic Pain Care PLLC | Real Estate Law Firm | $50,300.00 | 1/5/2017 to 11/16/2017 | |
| JPF Medical Services PC | Real Estate Law Firm | $10,000.00 | 3/28/2017 to 4/10/2017 | |
| Ksenia Pavlova | Real Estate Law Firm | $26,000.00 | 11/12/2014 to 1/31/2018 | |
| MSB Physical Therapy PC | Real Estate Law Firm | $53,455.00 | 1/30/2017 to 12/22/2017 | |
| PFI Medical Care PC | Real Estate Law Firm | $104,130.00 | 1/6/2017 to 5/15/2018 | |
| Quality Health Supply Corp | Real Estate Law Firm | $20,000.00 | 11/26/2015 to 11/26/2015 | |

| | | Checks Written By Entities Operating at 1786 Flatbush | | |
|---|---|---|---|---|
| Payor | Payee | Amount Paid | Dates | Relationship |
| | Lystra Moore-Besson | Total: $1,510 | 7/2016 to 7/2016 | HSBC branch manager who testified in 2013 that she has known Tatiana Rybak since the 1990s, was identified by Dr. Gutierrez as Tatiana Rybak's connection at HSBC Bank who could arrange for tellers to cash checks, and had a daughter who received money from Dr. Arguelles' professional corporations that operated at 1468 Flatbush. |
| Allay Medical Services PC | Lystra Moore-Besson | $1,120.00 | 7/8/2016 to 7/22/2016 | |
| PFJ Medical Care PC | Lystra Moore-Besson | $390.00 | 7/1/2016 to 7/1/2016 | |

*Exhibit 19*



Account: 8268
Amount: 4,000.00
PostDate: 20160616
Tran_ID: 511884761
CheckNum: 205
DIN: 511885251
ReturnReasonCode:



Account: 8268
Amount: 4,000.00
PostDate: 20160616
Tran_ID: 511884761
CheckNum: 205
DIN: 511885251
ReturnReasonCode:

TDBAB000045



Account: 8218
Amount: 350.00
PostDate: 20160406
Tran_ID: 500961101
CheckNum: 245
DIN: 500961591
ReturnReasonCode:

Account: 8218
Amount: 2,000.00
PostDate: 20160406
Tran_ID: 500961101
CheckNum: 247
DIN: 500961596
ReturnReasonCode:

Account: 8218
Amount: 350.00
PostDate: 20160406
Tran_ID: 500961101
CheckNum: 245
DIN: 500961591
ReturnReasonCode:

Account: 8218
Amount: 2,000.00
PostDate: 20160406
Tran_ID: 500961101
CheckNum: 247
DIN: 500961596
ReturnReasonCode:



Account: 2041
Amount: 350.00
PostDate: 20161221
Tran_ID: 504674986
CheckNum: 111
DIN: 504675286
ReturnReasonCode:

Account: 2041
Amount: 350.00
PostDate: 20161221
Tran_ID: 504674986
CheckNum: 110
DIN: 504675291
ReturnReasonCode:

Account: 2041
Amount: 350.00
PostDate: 20161221
Tran_ID: 504674986
CheckNum: 111
DIN: 504675286
ReturnReasonCode:

Account: 2041
Amount: 350.00
PostDate: 20161221
Tran_ID: 504674986
CheckNum: 110
DIN: 504675291
ReturnReasonCode:

TDBMSMB000006

*Exhibit 20*



# NOEL E. BLACKMAN M.D

## INITIAL EVALUATION

Re: _____

DOB: _____

DOA: _____ 7-16-14 _____

Date of Evaluation: _____ 7-18-14 _____

## ACCIDENT HISTORY:

Type: ☑MVA   ☐ Work Related   ☐ Slip and Fall   ☐ Other: _____

Where you: ☐ Pedestrian  ☑Passenger  ☐ Driver

Traveling in the: ☑Front seat  ☐Rear seat  Seat belted: ☐Y  ☐N

Injury Happened: ☐ At work  ☐ At home  ☑MVA   EXACT Location: _____

E R Treatment:☑Yes  ☐ No   Hospital Name: Momotril

Date admitted _____   Date discharged _____   ☒Patient was treated and released

Has patient worked since accident? ☑No, ☐ Yes ,returned date: _____   ☐ Light duty   ☐ Regular duty

Has patient been in a prior accident? ☑No, ☐Yes, type & when:  ☐ MVA_____   ☐WC_____

_____

_____

_____

## PRESENT COMPLAINTS:

The patient initially had complaints of headaches, dizziness, vertigo, chest pain, difficulty of breathing, pain in the neck, upper back, lower back, upper extremities, R/L shoulder, R/L elbow, R/L wrist, hand, fingers), lower extremities, (R/L hip, R/L thigh, R/L knee, R/L ankle, R/L foot)

- ○ Headache / Dizziness / Nausea / Vomiting / Insomnia / Nervousness / Anxiety / Depression / Blurring Vision / Balance Disturbance / Fever / Chills / Night Sweats / Weight Gains / Weight Loss / Others

✓○ Chest Pain / Tenderness / Tingling

N∞ Difficulty of breathing

✓○ Neck pain with ( ) upper extremity radiating pain and parasthesia  (R) Plmlder

N○ Tingling sensation in the right/left/both arms/forearms/fingers

✓○ Upper back pain

✓○ Low back pain with (L) lower extremity radiating pain and parenthesia (R) leg

○ Numbness / weakness / tingling  to the right/left/both legs/feet/toes

○ Pain in the Scalp / Face / Chest / Abdomen / (R) Shoulder / ( ) Elbow / ( ) Wrist / ( ) Hand / ( ) Hip / (R) Knee / ( ) Ankle / ( ) Foot / Other _____

## Pain Descriptive:

_sharp; _stabbing; _shooting; _burning ✓aching; _tingling; _numbness: _pulsating; ____

✓constant; _intermittent: _occasional

How many hours per day patient has pain_____ 24 _____

How many days per week patient has pain _____

What activities are most affected by pain lifting, bending, running, exercising.

08057014

Patient Name: _____   Date: _____

Activity level is:
_ unchanged
✓ diminished
✓ significantly restricted
_ pain with manual labor
_ unable to perform manual labor
_ unable to perform daily household chores

**Where is pain worst:**
_ neck; _ back; _ R/L leg; _ R/L arm: _____
(other)

Pain scale (1-10): 0-No Pain: 1 -3 Minimal; 4-6 Moderate; 7-9 Intense; 10 Emergency

Neck _8_
Back _7_
Arm _8_
Leg _8_

**What makes pain worst:**
✓ standing: _ lack of sleep: _ reaching overhead; ✓ sitting; ✓ laying down; _ coughing; _ walking; ✓ lifting; _ sneezing; ✓ bending; _ weather; _ tension; _ driving; ✓ housework activity; ✓ arising from chairs; _____ other

Sever Night time pain (YES)/NO
Waking up in the middle of the night because of pain (YES)/NO if yes how many times ____

**PAST MEDICAL HISTORY:**
✗ There is no significant past medical history
✗ There is a history of (HTN, Diabetes, Asthma, Osteoarthritis) other: _____
✗ Medication _No_ _____

**PAST SURGICAL HISTORY:**
☐ There is no significant past medical history
☐ There is a history of _abdominal trauma_ , _(R) knee_
_pelvis/back_

**PAST FAMILY HISTORY**
_____

**EMPLOYMENT HISTORY:**
The patient had not been employed / The patient has been employed prior to the accident.
The patient has / has not been able to return to work.

**REVIEW OF SYSTEM:**
_ Constitutional Symptoms (_ fever; _ weight loss; _ other) _No_
_ Eyes _w·n·l_
_ Ears _w·n·l_; _ Nose _w·n·l_; _ Mouth _w·n·l_ ; _ Throught _____
_ Cardiovascular _w·n·l_
_ Gastrointestinal _w·n·l_
_ Genitourinary _w·n·l_
_ Musculoskeletal _C-spine tenderness ∠ C-spine tenderness w/(R) d.R.o.m. (R) knee_
_ Integumentary (_ skin _w·n·l_ brest _____)_   _tenderness (R)_
_ Neurological _w·n·l_   _shoulder pain w R.o.m_

08052019

Patient Name: _____     Date: _____

_Psychiatric _____ *w·nl*
_Endocrine _____ *w·w l*
_Hematologic/Lymphatic _____ *w·nl*
_Allergic/Immunologic _____ *w·nl*

### PHYSIAL EXAMINATION

VITAL SIGNS:   BP: _____   WT: *5'9*   HT: *134*   T°: _____   RR: *12*   Pulse: *72*

**HEENT:**
The head is normocephalic. There is full range of extra occular muscle and a normal light reflex. No nystagmus is noted. External canals and tympanic membranes are normal. Hearing is normal. The tongue protrudes in the midline. He/She complained of headaches.

**SKIN:**
The skin is intact. No ecchymosis laceration or abrasions are noted.

**CHEST & LUNGS EXAMINATION:**   *Tenderness over sternum*
The chest was symmetrical on excursion. No wheezing, rales or ronchi was heard on palpation.

**CARDIOVASCULAR EXAMINATION:**
The heart size seemed to be normal. The PMI was normal. No murmur, gallop, thrill or rub was noted. The rhythm was regular. Checked pulses were synchronous and equal bilaterally.

**ABDOMEN:**
The abdomen was flat. No scar was noted. Palpation was normal, non tender in all quadrants. No organomegaly was noted.

**EXAMINATION:**
**Cervical Spine**                        ☐ NORMAL
Examination of the cervical spine showed loss of the normal lordosis. Tenderness, spasm and stiffness were noted on palpation of the posterior occipital, paraspinals and trapezius muscle. Range of motion was limited, restricted and painful.

| Cervical ROM | Normal | Patient | Quantity |
|---|---|---|---|
| Flexion | 50° | 40 | Severe / Moderate |
| Extension | 60° | 50 | Severe / Moderate |
| Right Lateral Flexion | 45° | 30 | Severe / Moderate |
| Left Lateral Flexion | 45° | 30 | Severe / Moderate |
| Right Rotation | 80° | 70 | Severe / Moderate |
| Left Rotation | 80° | 70 | Severe / Moderate |

Tender points were also elicited at C3, C4, C5, C6, C7 levels. The soto hall (force flexion of the head and neck upon the sternum) elicited pain. Cervical distraction test was positive indicating the presence of a spinal nerve root compression. Manual testing of muscle strength was positive. Pinprick and touch was abnormally decreased over the right left arm. The patient had difficulties looking up to the ceiling because of spasm and stiffness of the cervical musculature.

**THORACIC SPINE:**                        ☐ NORMAL
There was pain/no pain on deep inspiration. Tenderness/no tenderness on palpation over the paraspinals and/or the angle of the ribs were noted. Range of motion was / was not limited.

08052014

Patient Name: _____   Date: _____

**LUMBAR SPINE:**                    ☐ NORMAL

Muscle spasm was noted on palpation. Visualized muscle spasm and diffuse tenderness are noted over the paraspinal erector spinalea,iliocostalis lumborum,the Multifundi the gluteus muscles and the lattissimus dorsi, radiating to the sciatic notches , the RIGHT/ LEFT hip,THE LOWER EXTREMITIES, limiting the back range of motion more than _ % of normal.

| Spinal ROM: | Normal | Patient | Quantity |
|---|---|---|---|
| Pelvic Sacral Angle | 45° | 30 | Severe / Moderate |
| Flexion | 90° | 60 | Severe / Moderate |
| Extension | 30° | 20 | Severe / Moderate |
| Right Lateral Flexion | 35° | 20 | Severe / Moderate |
| Left Lateral Flexion | 35° | 20 | Severe / Moderate |

Tender points were elicited at L2, L3, L4, L5-S1 levels.  Straight leg raising test was positiveon the right/left/biteraily.

✓  The Braggard's test was positive indicating the presence of a disc protrusion in the lumbar spine with nerve root irritation.

☐  The Kemp's test (rotation and oblique backward bending of the standing patient) was positive indicating the presence of a disc protrusion, nerve root impingement, sprain or disc herniation of the lumbar spine.

✓  The Lassegue straight leg raising test was positive indication a disc lesion, nerve root impingement or disc herniation of the lumbar spine.

☐  The bilateral leg raise test was positive confirming a severe sprain or a disc pathology in the lumbar spine.

☐  The Ely's heel to buttock test was positive corroborating a lesion of the lumbar nerve roots.

☐  The Naclis heel to contralateral buttock test was positive indicating a lesion of the lumbar nerve root.

☐  The heel walk test was weak when the patient walks several steps on the heel indicating a lesion of the fibers of the L5 nerve root.

☐  The toe walk test was weak on the right side indicating a lesion at L5-S1 root level.

**ELBOW / WRIST / HAND:**          ☐ NORMAL

_____

_____

**SHOULDER:**                    ☐ NORMAL

The left/right shoulder was painful, spastic and restricted on palpation and mobilization of the deltoid muscles and the AC joints. Crepitation was felt on palpation and mobilization of the acromioacetabular joints.  Trigger points were elicited on palpation of the supraspinatus, infraspinatus deltoid, biceps brachii muscles causing severe limitation and pain on motion.  The range of motion was limited and painful.

| Shoulder ROM: | Normal | R | L | Quantity |
|---|---|---|---|---|
| Abduction | 180° | 140 | 180 | Severe / Moderate |
| Forward Flexion | 180° | 140 | 180 | Severe / Moderate |
| Extension | 60° | 30 | 60 | Severe / Moderate |
| Internal Rotation | 90° | 40 | 90 | Severe / Moderate |
| External Rotation | 90° | 40 | 90 | Severe / Moderate |

Hand to shoulder blade test waspositive. Apley's scratch test waspositive.  The patient complains of shoulder pain on the left/right side and was unable to reach behind to a back pocket and in front to comb hair or brush teeth.

Patient Name: _____   Date: _____

**HIP:** ☑NORMAL

Swelling, hematoma and bruises were noted over lateral/anterior aspect of the left/right thigh.  Tenderness was also noted on palpation of the sacroiliacarea.  Trigger points were elicited on palpation of the left/right gluteus medius.  The range of motion was limited and painful.Ely's heel to buttock test waspositive.  Thomas test waspositive.

| HIP ROM: | Normal | R | L | Quantity |
|---|---|---|---|---|
| Flexion | 120° | 120 | 120 | Severe / Moderate |
| Extension | 35° | 35 | 35 | Severe / Moderate |
| Abduction | 50° | 50 | 50 | Severe / Moderate |
| Adduction | 30° | 30 | 30 | Severe / Moderate |
| Internal Rotation | 35° | 35 | 35 | Severe / Moderate |
| External Rotation | 45° | 45 | 45 | Severe / Moderate |

**KNEE:** ☐ NORMAL

Swelling, hematoma and bruises were noted over anterior/posterior/lateral aspect of the left/right knee.  Tenderness was also noted on palpation of the medial/lateral aspect.  Range of motion was limited and painful.

| Knee ROM: | Normal | R | L | Quantity |
|---|---|---|---|---|
| Flexion | 135° | 135 | 135 | Severe / Moderate |
| Extension | 10° | 10 | 10 | Severe / Moderate |
| Internal Tibial Rotation | 30° | 30 | 30 | Severe / Moderate |
| External Tibial Rotation | 45° | 45 | 45 | Severe / Moderate |

**ANKLE:** ☑NORMAL

Swelling, hematoma and bruises were noted over anterior/posterior/malleollar aspect of the left/right ankle.  Tenderness was also noted on palpation of the medial/lateral aspect.  Range of motion was limited and painful.

| Ankle ROM: | Normal | R | L | Quantity |
|---|---|---|---|---|
| Dorsi Flexion | 20° | 20 | 20 | Severe / Moderate |
| Plantar Flexion | 50° | 50 | 50 | Severe / Moderate |
| Inversion | 15° | 15 | 15 | Severe / Moderate |
| Eversion | 15° | 15 | 15 | Severe / Moderate |

**FOOT:** ☑NORMAL

**Diagnostic Impression:**

| | | | |
|---|---|---|---|
| ☑Headaches | 784.0 | ☑Post Traumatic Cervico- Thoracic Myofascitis | 723.4 |
| ☐Chest Pain | 786.50 | ☑Acute Traumatic Cervical Radiculitis | 724.4 |
| ☑Post Concussion Syndrome | 850.9 | ☑Thoracic Sprain/Strain | 847.1 |
| ☑Back Pain Unspecified | 724.5 | ☑Acute Traumatic Lumbrosacral Radiculitis | 724.4 |
| ☑Back Sprain/Strain | 847.9 | ☑R/O Lumbar Disc Herniation | 722.73 |
| ☐Cervical Derangement | 724.9 | ☐Lumbar Derangement | 724.9 |
| ☑Cervical Sprain/Strain | 847.0 | ☑Post-Traumatic Lumbar Myofascitis | 724.2 |
| ☑Cervicalgia | 732.1 | ☑Lumbar Sprain/Strain | 847.2 |

08052014

Patient Name:_____   Date:_____

| | | | | |
|---|---|---|---|---|
| ☑ Acute Traumatic Cervical Radiculitis | 729.1 | ☐ Sacral Sprain/Strain | 847.3 |
| ☐ R/O Cervical Disc Herniation | 722.71 | ☐ Contusion Thigh/Hip | 924.0 |
| ☐ Hip Derangement | 718.95 | ☑ Shoulder Sprain/Strain | 840.8 |
| ☐ Hip Pain Unspecified | 719.45 | ☐ Ankle/Foot Derangement | 718.95 |
| ☐ Wrist Derangement | 718.93 | ☐ Foot Pain Unspecified | 719.47 |
| ☐ Elbow Derangement | 718.92 | ☐ Knee Derangement | 717.9 |
| ☐ Elbow Pain Unspecified | 719.42 | ☐ Knee Pain Unspecified | 717.46 |
| ☐ Hand Derangement | 718.92 | ☐ Knee Sprain/Strain | 844.9 |
| ☐ Hand Pain Unspecified | 729.5 | ☐ Anxiety, Tension and Street Reactive to pain | 308.0 |
| ☐ Shoulder Derangement | 718.91 | ☐ Elevated Blood Pressure | 796.2 |

Others:

---

**Treatment Plan and Recommendation:**

__ Bed Rest
✓ Avoid Physical Activity
__ Physical Therapy
✓ The patient advised to attend a supervised physical therapy program on a regular scheduled basis 3-5 times a week
__ Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15 min.
__ Computerized ROM and MMT examination

**The patient advised to use at home:**

( ✓ ) Cervical collar 2 pc.                    ( ✓ ) EMS unit +kit
( ✓ ) Cervical Traction Kit                    ( ✓ ) EMS Placement Belt
( ✓ ) Orthopedic Pillow                        ( ✓ ) Electric Massager
( ) Thermophore                                 ( ) Orthopedic Elbow support L R
( ) Lumbosacral Orthosi                        ( ✓ ) Orthopedic Knee Support L (R)
( ✓ ) Lumbar cushion                           ( ) Orthopedic Ankle Support L R
( ) Orthopedic Car Seat                        ( ) Orthopedic Wrist Support L R
( ) Orthopedic Bed Board                       ( ✓ ) Orthopedic Shoulder Support L (R)
( ✓ ) Eggcrate Mattress                        ( ) Infrared Heat Lamp
( ) Hot/Cold Pack                               ( ✓ ) Pelvic Traction
( ) Water Circulating Cold/Heat Pad with Pump  ( ) Cane

**The patient is referred to:**

X-Rays of the:                                  MRI's:

Indications:_____           Indications:_____

__ Cervical Spine                               __ Brain
__ Lumbar Spine                                 ✓ Cervical Spine

08052014

Patient Name:_____   Date:_____

__ Thoracic Spine                    ✓ Thoracic Spine
__ Knee (R) L                        ✓ Knee (R) L
__ Shoulder (R) L                    ✓ Shoulder (R) L
__ Wrist  R  L                       __ Wrist  R  L
__ Ankle  R  L                       __ Ankle  R  L
Other:                               L spine

**The patient is prescribed medication:**
_____

Consults;
( ) EKG
Indications:
_____

( ) Neurology
Indications:
_____

( ) _____
Indications:
_____

( ✓ Follow-Up in 3-4 weeks
Prognosis: ___ Excellent; ___ Good; ✓ Fair; ___ Poor; ___ Guarded
Disability:
✓ Patient is partially disabled
__ Mild 25-49%        __ Moderate 50-74%     __ Marked 75-99%
__ Patient is totally disabled
Casualty:
According to my best judgment, if history given by the patient accurate, the above mentioned accident seems to be causative factor of patient's symptomology.

**DISABILITY & PROGNOSIS:**
It is my opinion, based on the history of the patient's symptoms, diagnosis and examination findings, that the above noted injuries were sustained/aggravated in the accident that occurred on 2/16/14 and the disability resulting from it **is/may be** of a **temporary/permanent** nature. The prognosis for a complete recovery is presently (**cautiously optimistic/guarded**).

# JULES F. PARISIEN M.D

## INITIAL EVALUATION

**Re:** ████████████████

**DOB:** ████████████

**DOA:** 2 - 04 - 14

**Date of Evaluation:** 2 - 05 / 14

## ACCIDENT HISTORY:

**Type:** ☐ MVA     ☐ Work Related     ☐ Slip and Fall     ☐ Other: _____

**Where you:** ☐ Pedestrian  ☐ Passenger  ☐ Driver

**Traveling in the:** ☐Front seat   ☐Rear seat   **Seat belted:** ☐Y ☐N

**Injury Happened** ☐ At work ☐ At home ☐ MVA    **EXACT Location:** E 18th Glenwood

**E R Treatment:** ☐ Yes ☐ No   **Hospital Name:** did not go

Date admitted _____ Date discharged _____ ☐ Patient was treated and released

**Has patient worked since accident?** ☐No ☐ Yes ,returned date: _____ ☐ Light duty  ☐ Regular duty

**Has patient been in a prior accident?** ☐No ☐Yes, type & when: ☐ MVA_____ ☐WC _____

_At Knee hit the back of the seat_

## PRESENT COMPLAINTS:

The patient initially had complaints of headaches, dizziness, vertigo, chest pain, difficulty of breathing, pain in the neck, upper back, lower back, upper extremities; (R/L shoulder, R/L elbow, R/L wrist, hand, fingers), lower extremities; (R/L hip, R/L thigh, R/L knee, R/L ankle, R/L foot)

- Headache / Dizziness / Nausea / Vomiting / Insomnia / Nervousness / Anxiety / Depression / Blurring Vision / Balance Disturbance / Fever / Chills / Night Sweats / Weight Gains / Weight Loss / Others _____
- Chest Pain / Tenderness / Tingling
- Difficulty of breathing
- Neck pain with ( ) upper extremity radiating pain and parasthesia
- Tingling sensation in the right/left both arms/forearms/fingers
- Upper back pain
- Low back pain with ( ) lower extremity radiating pain and parenthesia
- Numbness / weakness / tingling  to the right/left/both legs/ feet/toes
- Pain in the Scalp / Face / Chest / Abdomen / ( ) Shoulder / ( ) Elbow / ( ) Wrist / ( ) Hand / ( ) Hip / ( ) Knee / ( ) Ankle / ( ) Foot / Other _____

## Pain Descriptive:

_sharp; _stabbing: _shooting;_ _burning_; _aching; _tingling: _numbness: _pulsating; ____ _constant; _intermittent: _occasional

How many hours per day patient has pain ___ 14 - 16hrs

How many days per week patient has pain _____ daily

What activities are most affected by pain ___ laying down  Writing

Patient Name: _____   Date: _02  05  14_

**Activity level is:**
    _unchanged
    _diminished
    ✓_significantly restricted
    _pain with manual labor
    _unable to perform manual labor
    _unable to perform daily household chores

**Where is pain worst:**
_neck· _back_; _R/L leg; _R/L arm: _____
                                      (other)
Pain scale (1-10): 0-No Pain: 1 -3 Minimal; 4-6 Moderate; 7-9 Intense; 10 Emergency
Neck ___ 7 / 1 0
Back ___ 8 / 1 0
Arm ___
Leg ___

**What makes pain worst:**
_standing: _lack of sleep: _reaching overhead; _sitting; _laying down; _coughing; _walking; _lifting; _sneezing; _bending; _weather; _tension; _driving; _housework activity; _arising from chairs; _Twisting_ other

Sever Night time pain **YES/NO**
Waking up in the middle of the night because of pain **YES/NO** if yes how many times_____

**PAST MEDICAL HISTORY:**
☐ There is no significant past medical history
☐ There is a history of (HTN, Diabetes, Asthma, Osteoarthritis) other: _____
☐ Medication _____

**PAST SURGICAL HISTORY.**
☐ There is no significant past medical history
☐ There is a history of _____

**PAST FAMILY HISTORY**   _Diabetes M._

**EMPLOYMENT HISTORY:**
The patient had not been employed / The patient has been employed prior to the accident.
The patient has / has not been able to return to work.

**REVIEW OF SYSTEM:**
_Constitutional Symptoms (_fever; _weight loss; _ other)
_Eyes_____
_Ears_____; _Nose_____; _Mouth_____; _ Throuht_____
_Cardiovascular_____
_Gastrointestinal_____
_Genitourinary_____
_Musculoskeletal___ Weakness pain
_Integumentary (_skin_____; _brest_____)
_Neurological_____ tingling_____

02172014

Patient Name: _____   Date: 02 / 05 / 18

_Psychiatric_____
_Endocrine_____
_Hematologic/Lymphatic_____
_Allergic/Immunologic_____

## PHYSIAL EXAMINATION

VITAL SIGNS:   BP. 120/60   WT: 180   HT: 59   T°: _____   RR: 16   Pulse: 68

### HEENT:
The head is normocephalic. There is full range of extra occular muscle and a normal light reflex  No nystagmus is noted. External canals and tympanic membranes are normal. Hearing is normal. The tongue protrudes in the midline. He/She complained of headaches.

### SKIN:
The skin is intact. No ecchymosis laceration or abrasions are noted.

### CHEST & LUNGS EXAMINATION:
The chest was symmetrical on excursion. No wheezing, rales or ronchi was heard on palpation.

### CARDIOVASCULAR EXAMINATION:
The heart size seemed to be normal. The PMI was normal. No murmur, gallop, thrill or rub was noted. The rhythm was regular. Checked pulses were synchronous and equal bilaterally

### ABDOMEN:
The abdomen was flat. No scar was noted. Palpation was normal, non tender in all quadrants. No organomegaly was noted

### EXAMINATION:
**Cervical Spine**                     ☐ NORMAL
Examination of the cervical spine showed loss of the normal lordosis. Tenderness, spasm and stiffness were noted on palpation of the posterior occipital, paraspinals and trapezius muscle. Range of motion was limited, restricted and painful.

| Cervical ROM | Normal | Patient | Quantity |
|---|---|---|---|
| Flexion | 50° | 50 | Severe / Moderate |
| Extension | 60° | 20 | Severe / Moderate |
| Right Lateral Flexion | 45° | 30 | Severe / Moderate |
| Left Lateral Flexion | 45° | 30 | Severe / Moderate |
| Right Rotation | 80° | 60 | Severe / Moderate |
| Left Rotation | 80° | 60 | Severe / Moderate |

Tender points were also elicited at C3, C4, C5, C6, C7 levels. The soto hall (force flexion of the head and neck upon the sternum) elicited pain. Cervical distraction test was positive indicating the presence of a spinal nerve root compression. Manual testing of muscle strength was positive. Pinprick and touch was abnormally decreased over the right left arm. The patient had difficulties looking up to the ceiling because of spasm and stiffness of the cervical musculature.

### THORACIC SPINE:                    ☐ NORMAL   mild to moderate
There was pain/no pain on deep inspiration. Tenderness/no tenderness on palpation over the paraspinals and/or the angle of the ribs were noted. Range of motion was / was not limited.

Patient Name: _____   Date: _02/05/14_

**LUMBAR SPINE:**                              ☐ NORMAL

Muscle spasm was noted on palpation. Visualized muscle spasm and diffuse tenderness are noted over the paraspinal erector spinalea,iliocostalis lumborum,the Multifundi the gluteus muscles and  the lattissimus dorsi, radiating to the sciatic notches , the RIGHT/ LEFT hip,THE LOWER EXTREMITIES, limiting the back range of motion more than _ % of normal.

| Spinal ROM: | Normal | Patient | Quantity |
|---|---|---|---|
| Pelvic Sacral Angle | 45° | LfT | Severe / Moderate |
| Flexion | 90° | GO | Severe / Moderate |
| Extension | 30° | 20 | Severe / Moderate |
| Right Lateral Flexion | 35° | 20 | Severe / Moderate |
| Left Lateral Flexion | 35° | 27 | Severe / Moderate |

Tender points were elicited at L2, L3, L4, L5-S1 levels.  Straight leg raising test was positiveon the right/left/biterally.

☐  The Braggard's test was positive indicating the presence of a disc protrusion in the lumbar spine with nerve root irritation.

☐  The Kemp's test (rotation and oblique backward bending of the standing patient) was positive indicating the presence of a disc protrusion, nerve root impingement, sprain or disc herniation of the lumbar spine.

☐  The Lassegue straight leg raising test was positive indication a disc lesion, nerve root impingement or disc herniation of the lumbar spine.

☐  The bilateral leg raise test was positive confirming a severe sprain or a disc pathology in the lumbar spine.

☐  The Ely's heel to buttock test was positive corroborating a lesion of the lumbar nerve roots.

☐  The Naclis heel to contralateral buttock test was positive indicating a lesion of the lumbar nerve root.

☑  The heel walk test was weak when the patient walks several steps on the heel indicating a lesion of the fibers of the L5 nerve root.

☑  The toe walk test was weak on the right side indicating a lesion at L5-S1 root level.

**ELBOW / WRIST / HAND:**              ☐ NORMAL

_____

**SHOULDER:**              ☐ NORMAL   mild pain mov t in Rom

The left/right shoulder was painful, spastic and restricted on palpation and mobilization of the deltoid muscles and the AC joints. Crepitation was felt on palpation and mobilization of the acromioacetabular joints.  Trigger points were elicited on palpation of the supraspinatus, infraspinatus deltoid, biceps brachii muscles causing severe limitation and pain on motion.  The range of motion was limited and painful.

| Shoulder ROM: | Normal | R | L | Quantity |
|---|---|---|---|---|
| Abduction | 180° | | | Severe / Moderate |
| Forward Flexion | 180° | | | Severe / Moderate |
| Extension | 60° | | | Severe / Moderate |
| Internal Rotation | 90° | | | Severe / Moderate |
| External Rotation | 90° | | | Severe / Moderate |

Hand to shoulder blade test waspositive. Apley's scratch test waspositive.  The patient complains of shoulder pain on the left/right side and was unable to reach behind to a back pocket and in front to comb hair or brush teeth.

Patient Name: _____   Date: 2/7/14

**HIP:**                         ☐ NORMAL

Swelling, hematoma and bruises were noted over lateral/anterior aspect of the left/right thigh. Tenderness was also noted on palpation of the sacroiliacarea. Trigger points were elicited on palpation of the left/right gluteus medius. The range of motion was limited and painful.Ely's heel to buttock test waspositive. Thomas test waspositive.

| HIP ROM. | Normal | R | L | Quantity |
|---|---|---|---|---|
| Flexion | 120° | | | Severe / Moderate |
| Extension | 35° | | | Severe / Moderate |
| Abduction | 50° | | | Severe / Moderate |
| Adduction | 30° | | | Severe / Moderate |
| Internal Rotation | 35° | | | Severe / Moderate |
| External Rotation | 45° | | | Severe / Moderate |

**KNEE:**                        ☐ NORMAL   *R Knee Cont of pain 8/10*

Swelling, hematoma and bruises were noted over anterior/posterior/lateral aspect of the left/right knee. Tenderness was also noted on palpation of the medial/lateral aspect. Range of motion was limited and painful.

| Knee ROM: | Normal | R | L | Quantity |
|---|---|---|---|---|
| Flexion | 135° | 60 | | Severe / Moderate |
| Extension | 10° | 0 | | Severe / Moderate |
| Internal Tibial Rotation | 30° | 20 | | Severe / Moderate |
| External Tibial Rotation | 45° | 25 | | Severe / Moderate |

**ANKLE:**                       ☐ NORMAL

Swelling, hematoma and bruises were noted over anterior/posterior/malleollar aspect of the left/right ankle. Tenderness was also noted on palpation of the medial/lateral aspect. Range of motion was limited and painful.

| Ankle ROM: | Normal | R | L | Quantity |
|---|---|---|---|---|
| Dorsi Flexion | 20° | | | Severe / Moderate |
| Plantar Flexion | 50° | | | Severe / Moderate |
| Inversion | 15° | | | Severe / Moderate |
| Eversion | 15° | | | Severe / Moderate |

**FOOT:**                        ☐ NORMAL

_____

**Diagnostic Impression:**

| | | | |
|---|---|---|---|
| ☑ Headaches | 784.0 | ☐ Post Traumatic Cervico- Thoracic Myofascitis | 723.4 |
| ☐ Chest Pain | 786.50 | ☐ Acute Traumatic Cervical Radiculitis | 724.4 |
| ☑ Post Concussion Syndrome | 850.9 | ☐ Thoracic Sprain/Strain | 847.1 |
| ☐ Back Pain Unspecified | 724.5 | ☐ Acute Traumatic Lumbrosacral Radiculitis | 724.4 |
| ☐ Back Sprain/Strain | 847.9 | ☑ R/O Lumbar Disc Herniation | 722.73 |
| ☐ Cervical Derangement | 724.9 | ☐ Lumbar Derangement | 724.9 |
| ☐ Cervical Sprain/Strain | 847.0 | ☑ Post-Traumatic Lumbar Myofascitis | 724.2 |
| ☐ Cervicalgia | 732.1 | ☐ Lumbar Sprain/Strain | 847.2 |

02172014

Patient Name: _____ Date: 2/5/14

| | | | |
|---|---|---|---|
| ☐ Acute Traumatic Cervical Radiculitis | 729.1 | ☐ Sacral Sprain/Strain | 847.3 |
| ☐ R/O Cervical Disc Herniation | 722.71 | ☐ Contusion Thigh/Hip | 924.0 |
| ☐ Hip Derangement | 718.95 | ☐ Shoulder Sprain/Strain | 840.8 |
| ☐ Hip Pain Unspecified | 719.45 | ☐ Ankle/Foot Derangement | 718.95 |
| ☐ Wrist Derangement | 718.93 | ☐ Foot Pain Unspecified | 719.47 |
| ☐ Elbow Derangement | 718.92 | R ☐ Knee Derangement | 717.9 |
| ☐ Elbow Pain Unspecified | 719.42 | ☐ Knee Pain Unspecified | 717.46 |
| ☐ Hand Derangement | 718.92 | ☐ Knee Sprain/Strain | 844.9 |
| ☐ Hand Pain Unspecified | 729.5 | ☐ Anxiety, Tension and Street Reactive to pain | 308.0 |
| ☐ Shoulder Derangement | 718.91 | ☐ Elevated Blood Pressure | 796.2 |

Others: R/o Rt Knee Torn Ligament

**Treatment Plan and Recommendation:**

✓ Bed Rest

✓ Avoid Physical Activity

✓ Physical Therapy

__ The patient advised to attend a supervised physical therapy program on a regular scheduled basis 3-5 times a week

__ Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15 min.

__ Computerized ROM and MMT examination

**The patient advised to use at home:**

( ) Cervical collar 2 pc.                ( ) EMS unit +kit

( ) Cervical Traction Kit            ( ) EMS Placement Belt

(✓) Orthopedic Pillow              (✓) Electric Massager

( ) Thermophore                  ( ) Orthopedic Elbow support L R

( ) Lumbosacral Orthosi         (✓) Orthopedic Knee Support L (R)

(✓) Lumbar cushion             ( ) Orthopedic Ankle Support L R

(✓) Orthopedic Car Seat        ( ) Orthopedic Wrist Support L R

(✓) Orthopedic Bed Board      ( ) Orthopedic Shoulder Support L R

(✓) Eggcrate Mattress          ( ) Infrared Heat Lamp

( ) Hot/Cold Pack              ( ) Pelvic Traction

( ) Water Circulating Cold/Heat Pad with Pump    ( ) Cane

**The patient is referred to:**

**X-Rays of the:**             **MRI's:**

**Indications:** _____    **Indications:** _____

✓ Cervical Spine            __ Brain

✓ Lumbar Spine             ✓ Cervical Spine

                       Lumbar

02172014

Patient Name: _____   Date: 1/25/16

__ Thoracic Spine                    __ Thoracic Spine
__ Knee (R) L                        __ Knee (R) L
__ Shoulder  R  L                    __ Shoulder  R  L
__ Wrist  R  L                       __ Wrist  R  L
__ Ankle  R  L                       __ Ankle  R  L

Other:

_____

**The patient is prescribed medication:**

_____

**Consults;**

( ) EKG

**Indications:**

_____

( ) Neurology

**Indications:**

_____ (R) 7/40 P(E)C 5 _____

( ) _____

**Indications:**

_____

( ) Follow-Up in 3-4 weeks

**Prognosis:** ___ Excellent; ___ Good; ___ Fair; ___ Poor; ___Guarded

**Disability:**

___ Patient is partially disabled

___ Mild 25-49%    ___ Moderate 50-74%    ___ Marked 75-99%

( Patient is totally disabled

**Casualty:**

According to my best judgment, if history given by the patient accurate, the above mentioned accident seems to be causative factor of patient's symptomology.

**DISABILITY & PROGNOSIS:**

It is my opinion, based on the history of the patient's symptoms, diagnosis and examination findings, that the above noted injuries were sustained/aggravated in the accident that occurred on 02/05/16 and the disability resulting from it **is/may be** of a **temporary/permanent** nature.  The prognosis for a complete recovery is presently (**cautiously optimistic/guarded**).

JULES F PARISIEN MD.

02172014

# *Exhibit 21*

**KSENIA PAVLOVA**

Date: 10.9.14                                    1 OF 6

Patient: ▓▓▓▓▓▓▓▓▓▓▓   Age 31  Sex: F/M   D.O.A. 4.25.14

I. HISTORY: This report covers date of services from 10/9 to 10/9 . Secondary to an accident, injury(ies) to the C/T/L Spine was/were reported.

II. LAST RECOMMENDATION/PLAN OF CARE: On the last visit, the following recommendation(s) were made:
  ➤ Consult/Test Results: _____
  ➤ Treatment:  ☑Physical Therapy ☐Medications ☐Orthotics ☑Chiropractic ☑Acupuncture
  ➤ Status:   ☑No Improvement ☐Moderate Improvement ☐Marked Improvement

HPI:

**Subjective:   MUSCULOSKELETAL PLAN**

| | |
|---|---|
| ☐Neck ☐ Radiating to:_____ ☐ Atrophy | |
| ☑Back ☐ Radiating to:_____ ☐ Swelling | |
| ☐ Hand ☐ Wrist ☐ Elbow ☐ Shoulder | |
| ☐ Foot ☐ Ankle ☐ Knee ☐ Hip ☐ Tooth ☐ Jaw | |
| ☐ Other: _____ ☐ _____ | |

**PAST MEDICAL HISTORY**
- ☐ Asthma  ☐ Dizziness
- ☐ Diabetes ☐ Type I
- ☐ Type II
- ☐ Osteoporosis
- ☑Other: HTN

**ALLERGIES**
- ☐ NKDA
- ☐ Local Anesthetic
- ☐ Corticosteroids
- ☑Seasonal/Food
- ☐ Other:_____

**Pain:** ☐ Exacerbated        ☑Same        ☐ Decreased        ☐ No Pain

**Pain Scale:**
☐C spine 5/10   ☐ T spine 7/10   ☐Shoulder R/L ___   ☐L spine 9/10   ☐ Knee R/L ___
**Description:** ☐Sharp  ☐shooting,  ☐ stabbing,  ☑aching  ☐pulsating  ☐ other_____

**Activity Level:** ☐Unchanged        ☑Diminished        ☐ Significantly restricted

I. PHYSICAL EXAMINATION: ☐Ht 5'8   ☐Wt 140   ☐BP ___   ☐P ___   ☐ SpO2 ___

| HEENT: | GU: |
|---|---|
| Skin: | Musculoskeletal: as below |
| Resp: | |
| Cardio: RRN | Other: |
| GI: WNC | |

**Radiology Results:** Disc Herniation C4-C7  S-type Scoliosis  T/S

**Objective:** Pt next examined complaining of lumbar pain. @ trigger points targeted. Pt still awaiting the MRI of the lumbar spine.

**ASSESSMENT/DIAGNOSIS:** _____

12222014

# KSENIA PAVLOVA

2 OF 6

The patient is: ☐totally disabled ☐ partially disabled ☑not disabled from previous work as a/an _____
Permanency is: ☐probable ☐ possible ☐ expected ☐total ☐ marked partial ☐ moderate partial ☐ mild partial

## NEW RECOMMENDED PLAN OF CARE:

☑ The patient was informed in the use of over the counter **NSAID's**, and demonstrates a clear understanding of the indicated usage.
☑ The patient is advised to start on a course of **Therapeutics Injections**_____.
☐ The patient is advised to start on a course of **Platelet Rich Plasma Injections** _____.
☐ _____

Because of the above findings the following are necessary for proper management of the patient:

☐ Orthopedic Consultation        ☐ Neurological Consultation     ☐ Dental Consultation
☐ Internal Medicine Consultation ☐ Ophthalmology Consultation    ☐ HEENT Consultation
☑ Chiropractor                   ☑ Acupuncture                   ☑ Pain Management

√. **AUTHORIZATION REQUEST (Workers Compensation Only):**
This is a formal **Authorization Request** for:
☐ MUA _____  ☐ EMG_____  ☐ MRI _____
☐ THEREPEUTIC INJECTIONS _____  ☐ PLATELET RICH PLASMA INJECTION _____
_____

## TREATMENT:
Patient rate average pain on a comfort level at: _____ base on a scale of 0 to 10. No comfort (zero) to well (ten).
The following treatment modalities are being applied individually of in combination to decreased pain and improve function and quality of life:
☐ Nerve Block Injections:       _____
☐ Trigger Point Injections:     _____
☐ Facet Joint Injections:       _____
☐ Intra-articular Injections:   _____
☐ Platelet Rich Plasma Injections: _____
USING:
After obtaining verbal consent the patient received trigger point/nerve block injections to the following areas:
☐ Surface anatomy technique
☐ Radiologie anatomy technique (C Arm)
Using: ☐ 1% Lidocaine ☐ Depomedrol 40 mg/cc ☐ 0.25% Marcaine ☐ 0.25% Sensorcaine ☐ 0.25% Bupivacaine

| Nerve Block administered to: | Trigger Point is administered to: |
|---|---|
| ☐ Thoracic C7-T1 | ☐ The following muscles: _____ |
| ☐ Lumbar paravertebral sympathetic nerve | ☐ Bilaterally   ☐ Unilaterally |
| ☐ Bilaterally ☐ Unilaterally | |

**Diagnostic Impression:**

12222014

# KSENIA PAVLOVA

| | |
|---|---|
| ☐ Headaches | 784.0 |
| ☐ Chest Pain | 786.50 |
| ☐ Post Concussion Syndrome | 850.9 |
| ☐ Back Pain Unspecified | 724.5 |
| ☐ Back Sprain/Strain | 847.9 |
| ☐ Cervical Derangement | 724.9 |
| ☐ Cervical Sprain/Strain | 847.0 |
| ☐ Cervicalgia | 732.1 |
| ☐ Acute Traumatic Cervical Radiculitis | 729.1 |
| ☐ R/O Cervical Disc Hemiation | 722.71 |
| ☐ Hip Derangement | 718.95 |
| ☐ Hip Pain Unspecified | 719.45 |
| ☐ Wrist Derangement | 718.93 |
| ☐ Elbow Derangement | 718.92 |
| ☐ Elbow Pain Unspecified | 719.42 |
| ☐ Hand Derangement | 718.92 |
| ☐ Hand Pain Unspecified | 729.5 |
| ☐ Shoulder Derangement | 718.91 |

| | |
|---|---|
| ☑ Post Traumatic Cervico- Thoracic Myofascitis | 723.4 |
| ☐ Acute Traumatic Cervical Radiculitis | 724.4 |
| ☐ Thoracic Sprain/Strain | 847.1 |
| ☐ Acute Traumatic Lumbrosacral Radiculitis | 724.4 |
| ☐ R/O Lumbar Disc Hemiation | 722.73 |
| ☐ Lumbar Derangement | 724.9 |
| ☑ Post-Traumatic Lumbar Myofascitis | 724.2 |
| ☐ Lumbar Sprain/Strain | 847.2 |
| ☐ Sacral Sprain/Strain | 847.3 |
| ☐ Contusion Thigh/Hip | 924.0 |
| ☐ Shoulder Sprain/Strain | 840.8 |
| ☐ Ankle/Foot Derangement | 718.95 |
| ☐ Foot Pain Unspecified | 719.47 |
| ☐ Knee Derangement | 717.9 |
| ☐ Knee Pain Unspecified | 717.46 |
| ☐ Knee Sprain/Strain | 844.9 |
| ☐ Anxiety, Tension and Street Reactive to pain | 308.0 |
| ☐ Elevated Blood Pressure | 796.2 |

Others:

☑ Thoracolumbar scoliosis
☑ cervical spondylosis

**Treatment Plan and Recommendation:**

__ Bed Rest

__ Avoid Physical Activity

✓ Physical Therapy

✓ The patient advised to attend a supervised physical therapy program on a regular scheduled basis 3-5 times a week

__ Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15 min.

| RT | LT | Head & Neck Muscles |
|---|---|---|
| | | Trapezius muscle |

**KSENIA PAVLOVA**

4 OF 6

|  |  |  |
|---|---|---|
|  |  | Sternocleidomastoid muscle |
|  |  | Masserter muscle |
|  |  | Temporalis muscle |
|  |  | Medial (Internal) Pterygoid muscle |
|  |  | Lateral (External) Pterygoid muscle |
|  |  | Digastric muscle |
|  |  | Cutaneous II: Occipitofrontalis |
|  |  | Splenius capitis & splenius cervicis muscles |
|  |  | Posterior cervical muscle |
|  |  | Semispinalis capitis, Semispinalis cervicis & multifidi |
|  |  | Subocipital muscles |
|  |  | Recti capitis posterior major & major, obliqi injerior & superior |

| RT | LT | Lumbar Paraspinal Muscles |
|---|---|---|
|  |  | Erectors Spinalae |
|  |  | Iliocostalis thoracics |
|  |  | Iliocostalis Lumborum |
|  |  | Semispinalis |
|  |  | Multifidi muscles |
|  |  | Rotatores muscles |
|  |  | Gluterus muscle |
|  |  | Quadratus Lumborum |
|  |  |  |
|  |  | Longissimus |

| RT | LT | Elbow to Finger Muscles |
|---|---|---|
|  |  | Hand extensor & brachioradialis muscles |
|  |  | Finger extensor muscles |
|  |  | Extensor digitorum & extensor indicis |
|  |  | Supinator muscle |
|  |  | Palmaris Longus muscle |
|  |  | Hand & Finger flexors in the forearm |
|  |  | Flexores carpi radialis & ulnaris, flexores digitorum |
|  |  | Superficialis & profundus, flexor pollicis |
|  |  | Longus (pronator Teres) |
|  |  | Adductor & opponens pollicis muscles; trigger thum |
|  |  | Interrosseous muscles of the hand |

| RT | LT | Upper Back, Shoulder & Arm Muscles |
|---|---|---|
|  |  | Levator Scapulae muscle |
|  |  | Scalene muscles |
|  |  | Supraspinatus muscles |
|  |  | Infraspinatus muscle |
|  |  | Teres minor muscle |
|  |  | Latissimus dorsi muscle |
|  |  | Teres major muscle |
|  |  | Subscapularis muscle |
|  |  | Rhomboideus major & minor muscles |
|  |  | Deltoid muscle |
|  |  | Coracobrachialis muscle |
|  |  | Biceps brachii muscle |
|  |  | Brachialis muscle |
|  |  | Triceps brachii muscle |

| RT | LT | Torso Muscles |
|---|---|---|
|  |  | Pectoralis major muscle (subclavius muscles) |
|  |  | Pectoralis minor muscle |
|  |  | Sternalis muscle |
|  |  | Serratus Posterior superior muscle |
|  |  | Serratus Anterior muscle |
|  |  | Serratus Posterior inferior muscle |
|  |  | Thoracolumbar paraspinal muscles |
|  |  | Abdominal muscles |

12222014

Patient Name: _____   Date: _____

| CODE | Descriptions | RIGHT | LEFT |
|------|-------------|-------|------|
| ☐ 64412 | Injection, anesthetic agent; spinal accessory nerve | | |
| ☐ 64413 | Injection, anesthetic agent; cervical plexus | | |
| ☐ 64405 | Injection, anesthetic agent; occipital nerve | | |
| ☐ 64450 | Injection, anesthetic agent; peripheral nerve or brunch | | |
| ☐ 64418 | Injection, anesthetic agent; suprascapular nerve | | |
| ☐ 64425 | Injection, anesthetic agent; ilioinguinal, iliohypogastric nerves | | |
| ☐ 64421 | Injection, anesthetic agent; intercostal nerves, multiple, regional | | |
| ☐ 20552 | Injection one or two muscles | | |
| ☐ 20553 | Injection three of more muscles | | |
| CODE | Descriptions | RIGHT | LEFT |
| ☐ 20999 | Dry Needling | | |
| ☐ | Ultrasound | | |
| ☐ | Platelet Rich Plasma Injection | | |
| ☐ 20605 | Intra Articular Injection shoulder | | |
| ☐ 20610 | Intra Articular injection Knee | | |
| ☐ 64633 | C – Spine Facet joint injection single | | |
| ☐ 64634 | C Facet joint injection additional | | |
| ☐ 64633 | T- Facet joint injection single | | |
| ☐ 64634 | T Facet joint injection additional | | |
| ☐ 64635 | L- Facet joint injection single | | |
| ☐ 64636 | L Facet joint injection additional | | |
| ☐ 64635 | S- Facet joint injection single | | |
| ☐ 64636 | S Facet joint injection additional | | |
| ☐ | | | |

Number of cartridge injected

A sterile field was created over the regions to be injected. The skin was prepped with Betadine. The areas to be injected were cleaned with alcohol, the patient's skin was sprayed with topical anesthetic ethyl chloride, and each area/trigger point was injected with 0.5cc of 0.5% Marcaine via a 3cc syringe with a 1-1/2 x 25G sterile hypodermic needle. Needling was performed to further breakup the trigger points.

☐ Patient tolerated the procedure well
☐ Patient developed a mild transient lightheadedness of a few minutes duration
☐ No complications, No complaints
☐ Other: _____

KSENIA PAVLOVA, D.O.

1 2 2 2 2 0 1 4

**KSENIA PAVLOVA**

6 OF 6

The p( ) Follow-Up in 2- 3-4 weeks

**Prognosis:** ___ Excellent; ___ Good; ___ Fair; ___ Poor; ___Guarded

atient was instructed on post injection care and reported some decreased muscle stiffness and some decreased pain following the procedure.

**DISABILITY & PROGNOSIS:**
It is my opinion, based on the history of the patient's symptoms, diagnosis and examination findings, that the above noted injuries were sustained/aggravated in the accident that occurred on _____, and the disability resulting from it is/maybe/ of a temporary/permanent nature. **The prognosis for a recovery is presently (cautiously optimistic/ guarded).**

Physician's Signature: _____
Ksenia Pavlova

12222014

Patient Name: _____   Date: _8/6/14_

## Jules F. Parisien, M.D

### Follow-Up Evaluation

Gender: ☐ Male  ☐ Female   _4 – 25 – 14_

Date of Accident: _____

**PRESENT COMPLAINTS:**

The patient initially had complaints of headaches, dizziness, vertigo, chest pain, difficulty of breathing, pain in the neck, upper back, lower back, upper extremities; (R/L shoulder, R/L elbow, R/L wrist, hand, fingers), lower extremities; (R/L hip, R/L thigh, R/L knee, R/L ankle, R/L foot)

- ○  Headache / Dizziness / Nausea / Vomiting / Insomnia / Nervousness / Anxiety / Depression / Blurring Vision / Balance Disturbance / Fever / Chills / Night Sweats / Weight Gains / Weight Loss / Others _____
- ○  Chest Pain / Tenderness / Tingling
- ○  Difficulty of breathing
- ○  Neck pain with ( ) upper extremity radiating pain and parasthesia
- ○  Tingling sensation in the right/left both arms/forearms/fingers
- ○  Upper back pain
- ○  Low back pain with ( ) lower extremity radiating pain and parenthesia
- ○  Numbness / weakness / tingling to the right/left/both legs/ feet/toes
- ○  Pain in the Scalp / Face / Chest / Abdomen / ( ) Shoulder / ( ) Elbow / ( ) Wrist / ( ) Hand / ( ) Hip / ( ) Knee / ( ) Ankle / ( ) Foot / Other _____

**Pain Descriptive:**

_sharp; _stabbing; _shooting; _burning_; _aching; _tingling: _numbness: _pulsating; _____ _constant; _intermittent: _occasional

How many hours per day patient has pain ____ _8 – 10 hrs_

How many days per week patient has pain ____ _7 d_

What activities are most affected by pain ____ _sitting or standing for long period, bending_

**Activity level is:**

_unchanged
_diminished
_significantly restricted
_pain with manual labor
_unable to perform manual labor
_unable to perform daily household chores

**Where is pain worst:**

_neck; _back; _R/L leg; _R/L arm: _L back  10/10_
(other)

**Pain scale (1-10):** 0-No Pain: 1 -3 Minimal; 4-6 Moderate; 7-9 Intense; 10 Emergency

Neck ____

Back ____  _5 – 6/10_

Arm ____

Leg ____

Patient Name: ███████████   Date: 8/6/14

**What makes pain worst:**
_standing: _lack of sleep: _reaching overhead; _sitting; _laying down; _coughing; _walking; _lifting; _sneezing; _bending; _weather; _tension; _driving; _housework activity; _arising from chairs; _____other

*sitting + standing for long period*

Sever Night time pain **YES/NO**

Waking up in the middle of the night because of pain **YES/NO** if yes how many times____

☐  Review of MRI/X-Rays: *C spondylosis Herniation C4 → C7*
     *T spine & type c scoliosis*

☐  Review of Tests: _____

**Review of System:**

| | |
|---|---|
| ☐ HEENT: _____ | ☐ Neurologic: _____ |
| ☐ SKIN: _____ | ☐ Muscoloskeletal: *pain stiffness* |
| ☐ Respiratory: _____ | ☐ GI: _____ |
| ☐ Cardiovascular: _____ | ☐ GU: _____ |
| ☐ Reproductive: _____ | ☐ Other: _____ |
| Other: _____ | |

**Physical Examination**

Vital Signs: BP: 140/80  WT: 140  HT: 5 8'  T°: ____  RR: 16  Pulse: 66

**HEENT:**

☐The head is normocephalic. ☐There is full range of extra ocular muscle and a normal light reflex. ☐No nystagmus is noted. ☐ External canals and tympanic membranes are normal. ☐ Hearing is normal. ☐ The tongue protrudes in the midline. ☐ He/She complained of headaches.

**Skin:**

☐ The skin is intact. ☐ No ecchymosis laceration or abrasions are noted.

Chest and Lungs Examination:

☐ The chest was symmetrical on excursion. ☐ No wheezing, rales, or ronchi was heard on palpation.

**Cardiovascular Examination:**

☐ The heart size seemed to be normal. ☐ The PMI was normal. ☐ No murmur, gallop, thrill, or rub was noted. ☐ The rhythm was regular. ☐ Checked pulses were synchronous and equal bilaterally.

**Abdomen:**

☐ The abdomen was flat. ☐ No scar was noted. ☐ Palpation was normal, non tender in all quadrants. ☐ No organomegaly was noted.

12222014

Patient Name: _____ ██████████ _____   Date: __ 8/6/14 __

**Examination of the Cervical Spine:**   ☐ Normal

Examination of the cervical spine showed loss of the normal lordosis. Tenderness, spasm and stiffness were noted on palpation of the posterior occipital, paraspinal and trapezius muscle. Range of motion was: limited/ restricted and/or painful.

| Cervical ROM | Normal | Patient | Quantity |
|---|---|---|---|
| Flexion | 50° | 30 | Severe/Moderate |
| Extension | 60° | 40 | Severe/Moderate |
| Right Lateral Flexion | 45° | 80 | Severe/Moderate |
| Left Lateral Flexion | 45° | 30 | Severe/Moderate |
| Right Rotation | 80° | 60 | Severe/Moderate |
| Left Rotation | 80° | 60 | Severe/Moderate |

☐Tender points were also elicited at: C3, C4, C5, C6, C7 levels. ☐ The soto hall (force flexion of the head and neck upon the sternum) elicited pain. ☐Cervical distraction test was positive indicating the presence of a spinal nerve root compression. ☐ Manual testing of muscle strength was positive. ☐ Pinprick and touch was abnormally decreased over the right/left arm. ☐ The patient had difficulties looking up to the ceiling because of spasm and stiffness of the cervical musculature.

**Examination of the Thoracic Spine:**   ☐ Normal

Examination of the thoracic spine: ☐ there was pain/no pain on deep inspiration. Tenderness/No Tenderness on palpation over the paraspinals and/or the angle of the ribs were noted. Range of Motion was: limited/ not limited.

**Examination of the Lumbar Spine:**   ☐ Normal

☐Muscle spasm was noted on palpation. ☐Visualized muscle spasm and diffuse tenderness are noted over the paraspinal erector spinalea/ iliocostalis lumborum, the multifundi, the gluteus muscles and the lattisumus dorsi, radiating to: the sciatic notches/ right/left hip/ the lower extremities; limiting the back range of motion more than _____% of normal.

| Spinal ROM | Normal | Patient | Quantity |
|---|---|---|---|
| Pelvic Sacral Angle | 45° | 45 | Severe/Moderate |
| Flexion | 90° | 60 | Severe/Moderate |
| Extension | 30° | 20 | Severe/Moderate |
| Right Lateral Flexion | 35° | 20 | Severe/Moderate |
| Left Lateral Flexion | 35° | 20 | Severe/Moderate |
| Left Rotation | 80° | 60 | Severe/Moderate |

☐Tender points were ilicited at L2, L3, L4, L5-S1 levels. Straight leg raising test was positive on the right/left/bilaterally.

12222014

Patient Name: ▬▬▬▬▬   Date: 8 / 6 / 14

☐ The Braggard's test was positive indicating the presence of disc protrusion in the lumbar spine with nerve root irritation.

☐ The Kemp's test (rotation and oblique backward bending of the standing patient) was positive indicating the presence of a disc protrusion, nerve root impingement, sprain, or disc herniation.

☐ The lassegue straight leg raising test was positive indication a disc lesion, nerve root impingement or disc herniation of the lumbar spine.

☐ The bilateral leg raise test was positive confirming a severe sprain or a disc, pathology in the lumbar spine.

☐ The Ely's heel to buttock test was positive corroborating a lesion of the lumbar nerve roots.

☐ The Naclis heel to contralateral buttock test was positive indicating a lesion of the lumbar nerve root.

☐ The heel walk test was weak when the patient walks several steps on the heel indicating a lesion of the fibers on the L5 nerve root.

☐ The toe walk test was weak on the right side indicating a lesion at L5-S1 root level.

**Examination of the Elbow/Wrist/Hand:**   ☐ Normal

_____

_____

**Examination of the Shoulder(s):**   ☐ Normal

The left/right shoulder was painful, spastic, and restricted on palpation and mobilization of the deltoid muscles and the AC joints. Crepitation was felt on palpation and mobilization of the acromioacetabular joints. Trigger points were elicited on palpation of the supraspinatus, infraspinatus **deltoid, biceps brachii** muscles cause severe limitation and pain on motion.

**Diagnostic Impression:**

| | | | |
|---|---|---|---|
| ☐ Headaches | 784.0 | ☐ Post Traumatic Cervico- Thoracic Myofascitis | 723.4 |
| ☐ Chest Pain | 786.50 | ☐ Acute Traumatic Cervical Radiculitis | 724.4 |
| ☐ Post Concussion Syndrome | 850.9 | ☐ Thoracic Sprain/Strain | 847.1 |
| ☐ Back Pain Unspecified | 724.5 | ☐ Acute Traumatic Lumbrosacral Radiculitis | 724.4 |
| ☐ Back Sprain/Strain | 847.9 | ☐ R/O Lumbar Disc Herniation | 722.73 |
| ☐ Cervical Derangement | 724.9 | ☐ Lumbar Derangement | 724.9 |
| ☐ Cervical Sprain/Strain | 847.0 | ☐ Post-Traumatic Lumbar Myofascitis | 724.2 |
| ☐ Cervicalgia | 732.1 | ☐ Lumbar Sprain/Strain | 847.2 |
| ☐ Acute Traumatic Cervical Radiculitis | 729.1 | ☐ Sacral Sprain/Strain | 847.3 |
| ☐ R/O Cervical Disc Herniation | 722.71 | ☐ Contusion Thigh/Hip | 924.0 |
| ☐ Hip Derangement | 718.95 | ☐ Shoulder Sprain/Strain | 840.8 |
| ☐ Hip Pain Unspecified | 719.45 | ☐ Ankle/Foot Derangement | 718.95 |
| ☐ Wrist Derangement | 718.93 | ☐ Foot Pain Unspecified | 719.47 |
| ☐ Elbow Derangement | 718.92 | ☐ Knee Derangement | 717.9 |

_Thoracic spine sprain & strain_

12222014

Patient Name: _____   Date: 8/6/14

| | | | |
|---|---|---|---|
| ⊔ Elbow Pain Unspecified | 719.42 | ☐ Knee Pain Unspecified | 717.46 |
| ☐ Hand Derangement | 718.92 | ☐ Knee Sprain/Strain | 844.9 |
| ⊔ Hand Pain Unspecified | 729.5 | ☐ Anxiety, Tension and Street Reactive to pain | 308.0 |
| ☐ Shoulder Derangement | 718.91 | ⊔ Elevated Blood Pressure | 796.2 |

Others: ___

---

**Treatment Plan and Recommendation:**

__ Bed Rest

__ Avoid Physical Activity

__ Physical Therapy

__ The patient advised to attend a supervised physical therapy program on a regular scheduled basis 3-5 times a week

__ Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15 min.

__ Computerized ROM and MMT examination

**The patient advised to use at home:**

( ) Cervical collar 2 pc.

( ) Cervical Traction Kit

( ) Orthopedic Pillow

( ) Thermophore

( ) Lumbosacral Orthosi

( ) Lumbar cushion

( ) Orthopedic Car Seat

( ) Orthopedic Bed Board

( ) Eggcrate Mattress

( ) Hot/Cold Pack

( ) Water Circulating Cold/Heat Pad with Pump

( ) EMS unit +kit

( ) EMS Placement Belt

( ) Electric Massager

( ) Orthopedic Elbow support L R

( ) Orthopedic Knee Support L R

( ) Orthopedic Ankle Support L R

( ) Orthopedic Wrist Support L R

( ) Orthopedic Shoulder Support L R

( ) Infrared Heat Lamp

( ) Pelvic Traction

( ) Cane

**The patient is referred to:**

X-Rays of the:

Indications: _____

__ Cervical Spine

__ Lumbar Spine

__ Thoracic Spine

__ Knee  R  L

__ Shoulder  R  L

__ Wrist  R  L

__ Ankle  R  L

MRI's:

Indications: _____

__ Brain

__ Cervical Spine

__ Thoracic Spine

__ Knee  R  L

__ Shoulder  R  L

__ Wrist  R  L

__ Ankle  R  L

12222014

Patient Name:_____    Date:_____

Other:_____

_____          _____

**The patient is prescribed medication:**

**Consults;**

( ) EKG

**Indications:**

_____

( ) Neurology

**Indications:**

_____

( ) Follow-Up in 3-4 weeks

Prognosis: ___ Excellent; ___ Good; ___ Fair; ___ Poor; ___Guarded

**Disability:**

__ Patient is partially disabled

__ Mild 25-49%        __ Moderate 50-74%    __Marked 75-99%

__Patient is totally disabled

Casualty:

According to my best judgment, if history given by the patient accurate, the above mentioned accident seems to be causative factor of patient's symptomology.

Treatment:

Patient rate average pain on a comfort level at:          base on a scale of 0 to 10. No comfort (zero) to well (ten). The following treatment modalities are being applied individually of in combination to decreased pain and improve function and quality of life:

JULES F.PARISIEN MD

12222014

Patient Name: _____   Date: _5 - /3 - / 5_

# Jules F. Parisien, M.D

### Follow-Up Evaluation

Gender: ☐ Male   ☐ Female

Date of Accident: _2 - /7 - / 5_

**PRESENT COMPLAINTS:**
The patient initially had complaints of headaches, dizziness, vertigo, chest pain, difficulty of breathing, pain in the neck, upper back, lower back, upper extremities; (R/L shoulder, R/L elbow, R/L wrist, hand, fingers), lower extremities; (R/L hip, R/L thigh, R/L knee, R/L ankle, R/L foot)

- Headache / Dizziness / Nausea / Vomiting / Insomnia / Nervousness / Anxiety / Depression / Blurring Vision / Balance Disturbance / Fever / Chills / Night Sweats / Weight Gains / Weight Loss / Others _____
- Chest Pain / Tenderness / Tingling
- Difficulty of breathing
- Neck pain with ( ) upper extremity radiating pain and parasthesia
- Tingling sensation in the right/left both arms/forearms/fingers
- Upper back pain
- Low back pain with ( ) lower extremity radiating pain and parenthesia
- Numbness / weakness / tingling to the right/left/both legs/ feet/toes
- Pain in the Scalp / Face / Chest / Abdomen / ( ) Shoulder / ( ) Elbow / ( ) Wrist / ( ) Hand / ( ) Hip / ( ) Knee / ( ) Ankle / ( ) Foot / Other _____

**Pain Descriptive:**
_sharp; _stabbing: _shooting; _burning ; _aching; _tingling: _numbness: _pulsating; _____
_constant; _intermittent: _occasional
How many hours per day patient has pain _8 hrs_
How many days per week patient has pain _daily_
What activities are most affected by pain _bending_

**Activity level is:**
  _unchanged
  _diminished ✓
  _significantly restricted
  _pain with manual labor
  _unable to perform manual labor
  _unable to perform daily household chores

**Where is pain worst:**
_neck: _back; _R/L leg; _R/L arm: _Rt Shoulder   7 /10_
                                    (other)
Pain scale (1-10): 0-No Pain: 1-3 Minimal; 4-6 Moderate; 7-9 Intense; 10 Emergency
Neck ___ _5 / 10_
Back ___
Arm ___ _L arm 5 / 10_
Leg ___

05232915

Patient Name: _____   Date: 5/13/17

**What makes pain worst:**
_standing: _lack of sleep: _reaching overhead; _sitting; _laying down; _coughing; _walking; _lifting; _sneezing; _bending; _weather; _tension; _driving; _housework activity; _arising from chairs; _____other

**Sever Night time pain YES/NO**
Waking up in the middle of the night because of pain **YES/NO** if yes how many times_____

☐ **Review of MRI/X-Rays:** _Herniation C3 - C7_
    _Herniated L4 -5 Bulging L4 - S1_

☐ **Review of Tests:** _Rt Shoulder Supraspinatus interstitial tear_

**Review of System:**

☐ HEENT: _____ (Ø)               ☐ Neurologic: _numbness_
☐ SKIN: _____ (Ø)                ☐ Muscoloskeletal: _pain & stiffness_
☐ Respiratory: _____ (Ø)         ☐ GI: _____
☐ Cardiovascular: _____ (Ø)      ☐ GU: _____
☐ Reproductive: _____ (Ø)        ☐ Other: _____
Other: _____

**Physical Examination**
Vital Signs: BP:_____   WT: 185   HT: 58'   T°:_____   RR: 6   Pulse: 68

**HEENT:**
☐The head is normocephalic. ☐There is full range of extra ocular muscle and a normal light reflex. ☐No nystagmus is noted. ☐ External canals and tympanic membranes are normal. ☐ Hearing is normal. ☐ The tongue protrudes in the midline. ☐ He/She complained of headaches.

**Skin:**
☐ The skin is intact. ☐ No ecchymosis laceration or abrasions are noted.

Chest and Lungs Examination:
☐ The chest was symmetrical on excursion. ☐ No wheezing, rales, or ronchi was heard on palpation.

**Cardiovascular Examination:**
☐ The heart size seemed to be normal. ☐ The PMI was normal. ☐ No murmur, gallop, thrill, or rub was noted. ☐ The rhythm was regular. ☐ Checked pulses were synchronous and equal bilaterally.

**Abdomen:**
☐ The abdomen was flat. ☐ No scar was noted. ☐ Palpation was normal, non tender in all quadrants. ☐ No organomegaly was noted.

05232015

Patient Name: _____   Date: 5 _ /3 _ /5

**Examination of the Cervical Spine:**   ☐ Normal

Examination of the cervical spine showed loss of the normal lordosis. Tenderness, spasm and stiffness were noted on palpation of the posterior occipital, paraspinal and trapezius muscle. Range of motion was: limited/ restricted and/or painful.

| Cervical ROM | Normal | Patient | Quantity |
|---|---|---|---|
| Flexion | 50° | 30 | Severe/Moderate |
| Extension | 60° | 40 | Severe/Moderate |
| Right Lateral Flexion | 45° | 25 | Severe/Moderate |
| Left Lateral Flexion | 45° | 35 | Severe/Moderate |
| Right Rotation | 80° | 60 | Severe/Moderate |
| Left Rotation | 80° | 60 | Severe/Moderate |

☐Tender points were also elicited at: C3, C4, C5, C6, C7 levels. ☐ The soto hall (force flexion of the head and neck upon the sternum) elicited pain. ☐Cervical distraction test was positive indicating the presence of a spinal nerve root compression. ☐ Manual testing of muscle strength was positive. ☐ Pinprick and touch was abnormally decreased over the right/left arm. ☐ The patient had difficulties looking up to the ceiling because of spasm and stiffness of the cervical musculature.

**Examination of the Thoracic Spine:**   ☐ Normal

Examination of the thoracic spine; ☐ there was pain/no pain on deep inspiration.  Tenderness/No Tenderness on palpation over the paraspinals and/or the angle of the ribs were noted. Range of Motion was: limited/ not limited.

**Examination of the Lumbar Spine:**   ☐ Normal

☐Muscle spasm was noted on palpation. ☐Visualized muscle spasm and diffuse tenderness are noted over the paraspinal erector spinalea/ iliocostalis lumborum, the multifundi, the gluteus muscles and the lattisumus dorsi, radiating to: the sciatic notches/ the right/left hip/ the lower extremities; limiting the back range of motion more than ____% of normal.

| Spinal ROM | Normal | Patient | Quantity |
|---|---|---|---|
| Pelvic Sacral Angle | 45° | 45 | Severe/Moderate |
| Flexion | 90° | 70 | Severe/Moderate |
| Extension | 30° | 20 | Severe/Moderate |
| Right Lateral Flexion | 35° | 25 | Severe/Moderate |
| Left Lateral Flexion | 35° | 21 | Severe/Moderate |
| Left Rotation | 80° | 60 | Severe/Moderate |

☐Tender points were ilicited at L2, L3, L4, L5-S1 levels. Straight leg raising test was positive on the right/left/bilaterally

052520 15

Patient Name: _____   Date: _5/73/15_

☐ The Braggard's test was positive indicating the presence of disc protrusion in the lumbar spine with nerve root irritation.

☐ The Kemp's test (rotation and oblique backward bending of the standing patient) was positive indicating the presence of a disc protrusion, nerve root impingement, sprain, or disc herniation.

☐ The lassegue straight leg raising test was positive indication a disc lesion, nerve root impingement or disc herniation of the lumbar spine.

☐ The bilateral leg raise test was positive confirming a severe sprain or a disc, pathology in the lumbar spine.

☐ The Ely's heel to buttock test was positive corroborating a lesion of the lumbar nerve roots.

☐ The Naclis heel to contralateral buttock test was positive indicating a lesion of the lumbar nerve root.

☐ The heel walk test was weak when the patient walks several steps on the heel indicating a lesion of the fibers on the L5 nerve root.

☐ The toe walk test was weak on the right side indicating a lesion at L5-S1 root level.

**Examination of the Elbow/Wrist/Hand:**       ☐ Normal

_____

_____

_____

**Examination of the Shoulder(s):**       ☐ Normal

The left/right shoulder was painful, spastic, and restricted on palpation and mobilization of the deltoid muscles and the AC joints. Crepitation was felt on palpation and mobilization of the acromioacetabular joints. Trigger points were elicited on *palpation of the supraspinatus,* infraspinatus **deltoid, biceps brachii** muscles cause severe limitation and pain on motion.

**Diagnostic Impression:**

| | | | |
|---|---|---|---|
| ☑ Headaches | 784.0 | ☐ Post Traumatic Cervico- Thoracic Myofascitis | 723.4 |
| ☐ Chest Pain | 786.50 | ☑ Acute Traumatic Cervical Radiculitis | 724.4 |
| ☐ Post Concussion Syndrome | 850.9 | ☐ Thoracic Sprain/Strain | 847.1 |
| ☐ Back Pain Unspecified | 724.5 | ☑ Acute Traumatic Lumbrosacral Radiculitis | 724.4 |
| ☐ Back Sprain/Strain | 847.9 | ☐ R/O Lumbar Disc Herniation | 722.73 |
| ☐ Cervical Derangement | 724.9 | ☐ Lumbar Derangement | 724.9 |
| ☐ Cervical Sprain/Strain | 847.0 | ☐ Post-Traumatic Lumbar Myofascitis | 724.2 |
| ☐ Cervicalgia | 732.1 | ☐ Lumbar Sprain/Strain | 847.2 |
| ☐ Acute Traumatic Cervical Radiculitis | 729.1 | ☐ Sacral Sprain/Strain | 847.3 |
| ☐ R/O Cervical Disc Herniation | 722.71 | ☐ Contusion Thigh/Hip | 924.0 |
| ☐ Hip Derangement | 718.95 | ☐ Shoulder Sprain/Strain | 840.8 |
| ☐ Hip Pain Unspecified | 719.45 | ☐ Ankle/Foot Derangement | 718.95 |
| ☐ Wrist Derangement | 718.93 | ☐ Foot Pain Unspecified | 719.47 |
| ☐ Elbow Derangement | 718.92 | ☐ Knee Derangement | 719.46 |

Patient Name: [REDACTED]                          Date: 5/13/15

| | | | |
|---|---|---|---|
| ☐ Elbow Pain Unspecified | 719.42 | ☐ Knee Pain Unspecified | 717.46 |
| ☐ Hand Derangement | 718.92 | ☐ Knee Sprain/Strain | 844.9 |
| ☐ Hand Pain Unspecified | 729.5 | ☐ Anxiety,Tension and Street Reactive to pain | 308.0 |
| ☐ Shoulder Derangement | 718.91 | ☐ Elevated Blood Pressure | 796.2 |

Others:
_Shoulder tendonitis_____

**Treatment Plan and Recommendation:**

__Bed Rest

✓ Avoid Physical Activity

✓ Physical Therapy

__The patient advised to attend a supervised physical therapy program on a regular schedule basis 3-5 times a week

__Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15mins

__Computerized ROM and MMT examination

**The patient advised to use at home:**

( ) Cervical Collar 2 pc.            ( ) EMS unit+kit

( ) Cervical Traction Kit            ( ) EMS Placement Belt

( ) Orthopedic Pillow                ( ) Electric Massager

( ) Thermophore                      ( ) Orthopedic Elbow Support L R

( ) Lumbosacral Orthosi              ( ) Orthopedic Knee Support L R

( ) Lumbar Cushion                   ( ) Orthopedic Ankle Support L R

( ) Orthopedic Car Seat              ( ) Orthopedic Wrist Support L R

( ) Orthopedic Bed Board             ( ) Orthopedic Shoulder Support L R

( ) Eggcrate Mattress                ( ) Infrared Heat Lamp

( ) Hot/Cold Pack                    ( ) Pelvic Traction

( ) Water Circulating Cold/Heat Pad with Pump   ( ) Cane

**The patient is referred to:**
**X-Rays of the:**

Indications: _____

__Cervical Spine
__Lumbar Spine
__Thoracic Spine
__Knee R L
__Shoulder R L            _ordered_
__Wrist R L
__Ankle R L

**MRI'S**

Indications: _____

__Brain
__Cervical Spine
__Thoracic Spine
__Lumbar Spine
__Knee R L
__Shoulder R L
__Wrist R L
__Ankle R L

Patient Name: _____   Date: 5/13/15

Other:

**The patient is prescribed medication:**

**Consults:**

( ) EKG

**Indications:**

(✓) Neurology

**Indications** _orthopedist_

( ) Follow- up in 3-4 weeks

**Prognosis:** ___ Excellent: ____Good____Fair:____(Poor)____Guarded

**Disability:**

___Patient is partially disabled

___Mild (25-49%)    ___Moderate 50-74%    ___Marked 75-99%

___Patient is totally disabled

**Casualty:**

According to  my best  judgment, if history given by the patient is  accurate,  the above mentioned accident  seems to be causative factor of patient's symptomology.

Treatment:

Patient  rate average pain on a comfort level at:          base on a scale of 0 to 10. No comfort (zero) to well (ten). The following treatment modalities are being applied individually of in combination to decreased pain and improve function and quality of life.

JULES F. PARISIEN M.D.

05232015

# *Exhibit 22*

**DAILY CHIROPRACTIC SOAP NOTES**

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

PATIENT: ███████████              DOA: 12/3/13

DATE OF SERVICE: 1/21/14
Patient states they are experiencing:
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp   Dull   Ache   Spasm   Radiating to: _____   Numbness in:_____
Level of Discomfort: 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____
**Objective Findings:**
Hypertonic / spasm: CSP   TSP   LSP   Trap L/R   L-Scap L/R   L-Dorsi L/R   I-Psoas L/R   Q-Lum L/R   Gluteal L/R
Joint dysfunction in the following region(s) Occipital   Cervical   Thoracic   Lumbar   Sacral   Other:_____
Decreased / Increased / No Change ROM: CSP   TSP   LSP   Shldr L/R   Hip L/R   other:_____
**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____
**Plan**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)   Massage (97124)   Neuromuscular re-education (97112)   Other (97139):
Continue as planned   Modify to _____ x's week/_____ weeks   Other:_____
Refer for evaluation with:   MD   Neuro   Ortho   Other:_____
After treatment, patient felt:   Better   Worse   Unchanged

Patient's Signature: ███████████              Dr.'s Initials: _____

DATE OF SERVICE: 1/22/14
Patient states they are experiencing:
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp   Dull   Ache   Spasm   Radiating to: _____   Numbness in:_____
Level of Discomfort: 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____
**Objective Findings:**
Hypertonic / spasm: CSP   TSP   LSP   Trap L/R   L-Scap L/R   L-Dorsi L/R   I-Psoas L/R   Q-Lum L/R   Gluteal L/R
Joint dysfunction in the following region(s) Occipital   Cervical   Thoracic   Lumbar   Sacral   Other:_____
Decreased / Increased / No Change ROM: CSP   TSP   LSP   Shldr L/R   Hip L/R   other:_____
**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____
**Plan**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)   Massage (97124)   Neuromuscular re-education (97112)   Other (97139):
Continue as planned   Modify to _____ x's week/_____ weeks   Other:_____
Refer for evaluation with:   MD   Neuro   Ortho   Other:_____
After treatment, patient felt:   Better   Worse   Unchanged

Patient's Signature: ███████████              Dr.'s Initials: _____

Key: NP=neck pain, MBP=mid back pain, LBP=low back pain, Shldr P= shoulder pain, Arm P=arm pain, Hip P=hip pain, Foot P=foot pain, Hand P=hand pain, L=left, R=right, CSP=cervical spine, TSP=thoracic spine, LSP=lumbar spine , L-Scap=levator scapula, L-Dorsi=latissimus dorsi, I-Psoas=iliopsoas, Q-Lum=quadratus lumborum, R=straight sacroiliac joint, L3r=left sacroiliac joint, T=paratrapezius, Restr=wrestricted, T=therapy, Neuro=neurologist, Ortho=Orthopedist, CMT=Chiropractic Manipulative Therapy, TPT=Trigger point therapy, MT=manual therapy, FWD=forward, REV=reverse, ext=extension, ab=abdominal, ROM=range of motion, EMS=electric muscle stimulation

03042014

# DAILY CHIROPRACTIC SOAP NOTES

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

PATIENT: _____     DOA: _1/14/14_____

DATE OF SERVICE: _1/27/14_____

**Patient states they are experiencing:**
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp   Dull   Ache   Spasm   Radiating to: _____   Numbness in: _____
**Level of Discomfort:** 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____
**Objective Findings:**
Hypertonic / spasm: CSP   TSP   LSP   Trap L/R   L-Scap L/R   L-Dorsi L/R   I-Psoas L/R   Q-Lum L/R   Gluteal L/R
Joint dysfunction in the following region(s) Occipital   Cervical   Thoracic   Lumbar   Sacral   Other:_____
Decreased / Increased / No Change ROM: CSP   TSP   LSP   Shldr L/R   Hip L/R   other:_____
**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____
**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)   Massage (97124)   Neuromuscular re-education (97112)   Other (97139):_____
Continue as planned   Modify to ___ x's week/___ weeks   Other:_____
Refer for evaluation with:   MD   Neuro   Ortho   Other:_____
After treatment, patient felt:   Better   Worse   Unchanged

Patient's Signature: _____   Dr.'s Initials: _____

DATE OF SERVICE: _1/28/14_____

**Patient states they are experiencing:**
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp   Dull   Ache   Spasm   Radiating to: _____   Numbness in: _____
**Level of Discomfort:** 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____
**Objective Findings:**
Hypertonic / spasm: CSP   TSP   LSP   Trap L/R   L-Scap L/R   L-Dorsi L/R   I-Psoas L/R   Q-Lum L/R   Gluteal L/R
Joint dysfunction in the following region(s) Occipital   Cervical   Thoracic   Lumbar   Sacral   Other:_____
Decreased / Increased / No Change ROM: CSP   TSP   LSP   Shldr L/R   Hip L/R   other:_____
**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____
**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)   Massage (97124)   Neuromuscular re-education (97112)   Other (97139):_____
Continue as planned   Modify to ___ x's week/___ weeks   Other:_____
Refer for evaluation with:   MD   Neuro   Ortho   Other:_____
After treatment, patient felt:   Better   Worse   Unchanged

Patient's Signature: _____   Dr.'s Initials: _____

Key: NP=neck pain, MBP=mid back pain, LBP=low back pain, ShldrP= shoulder pain, ArmP=arm pain, HipP=hip pain, FootP=foot pain, HandP=hand pain, L=left, R=right, CSP=cervical spine, TSP=thoracic spine, LSP=lumbar spine, L-Scap=levator scapula, L-Dorsi=latissimus dorsi, I-Psoas=iliopsoas, Q-Lum=quadratus lumborum, RSI=right sacroiliac joint, LSI=left sacroiliac joint, Trap=trapezius, Rest=restricted, Tx=therapy, Neuro=Neurologist, Ortho=Orthopedist, CMT=Chiropractic Manipulative Therapy, TPT=Trigger point therapy, MT=manual therapy, FWD=forward, REV=reverse, ex=extension, a=abdominal, ROM=range of motion, EMS=electric muscle stimulation

03042014

# DAILY CHIROPRACTIC SOAP NOTES
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

PATIENT: ███████████████                                        DOA: 1/22/14

DATE OF SERVICE: 2/19/14

**Patient states they are experiencing:**
(NP)  (MBP)  (LBP)   HA   Shldr P: L / R    Arm P: L / R   Hip P: L / R    Foot P: L / R    Hand P: L / R    Other:
Sharp  (Dull)  (Ache)   Spasm  Radiating to: _____  Numbness in: _____
**Level of Discomfort:** 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
(Improving)   No Change   Worsening   Other notes: _____

**Objective Findings:**
Hypertonic / spasm: CSP  TSP  (LSP)  Trap L/R  L-Scap L/R  L-Dorsi L/R  I-Psoas L/R  Q-Lum L/R  Gluteal L/R
Joint dysfunction in the following region(s) Occipital (Cervical  Thoracic  Lumbar) Sacral  Other: _____
Decreased / Increased / No Change ROM: CSP  TSP  (LSP)  Shldr L/R  Hip L/R  other: _____

**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____

**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____
(Continue as planned)         Modify to _____ x's week/_____ weeks      Other: _____
Refer for evaluation with:    MD      Neuro      Ortho      Other: _____
After treatment, patient felt:   Better      Worse      Unchanged

Patient's Signature: ███████████          Dr.'s Initials: _AM_

DATE OF SERVICE: _____

**Patient states they are experiencing:**
NP   MBP   LBP   HA   Shldr P: L / R    Arm P: L / R   Hip P: L / R    Foot P: L / R    Hand P: L / R    Other:
Sharp  Dull   Ache   Spasm  Radiating to: _____  Numbness in: _____
**Level of Discomfort:** 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____

**Objective Findings:**
Hypertonic / spasm: CSP  TSP  LSP  Trap L/R  L-Scap L/R  L-Dorsi L/R  I-Psoas L/R  Q-Lum L/R  Gluteal L/R
Joint dysfunction in the following region(s) Occipital  Cervical  Thoracic  Lumbar  Sacral  Other: _____
Decreased / Increased / No Change ROM: CSP  TSP  LSP  Shldr L/R  Hip L/R  other: _____

**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____

**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____
Continue as planned         Modify to _____ x's week/_____ weeks      Other: _____
Refer for evaluation with:    MD      Neuro      Ortho      Other: _____
After treatment, patient felt:   Better      Worse      Unchanged

Patient's Signature: _____          Dr.'s Initials: _____

Key: NP=neck pain, MBP=mid back pain, LBP=low back pain, Shldr P= shoulder pain, Arm P=arm pain, Hip P=hip pain, Foot P=foot pain, Hand P=hand pain, L=Left, R=right, CSP=cervical spine, TSP=thoracic spine, LSP=lumbar spine, L-Scap=levator scapula, L-Dorsi=latissimus dorsi, I-Psoas=iliopsoas, Q-Lum=quadratus lumborum, RS=right sacroiliac joint, LS=left sacroiliac joint, Trap=trapezius, Restr=restricted, Tx=therapy, Neuro=Neurologist, Ortho=Orthopedist, CMT=Chiropractic Manipulative Therapy, TPT=Trigger point therapy, MT=manual therapy, FWD=forward, REV=reverse, ext=extension, ab=abdominal, ROM=range of motion, EMS=electric muscle stimulation

03052014

# DAILY CHIROPRACTIC SOAP NOTES

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

PATIENT: _____   DOA: _1/23/14_

DATE OF SERVICE: _2/12/14_

**Patient states they are experiencing:**
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp   Dull   Ache   Spasm  Radiating to: _____   Numbness in:_____
**Level of Discomfort:** 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____

**Objective Findings:**
Hypertonic / spasm: CSP   TSP   LSP   Trap L/R   L-Scap L/R   L-Dorsi L/R   I-Psoas L/R   Q-Lum L/R   Gluteal L/R
Joint dysfunction in the following region(s) Occipital   Cervical   Thoracic   Lumbar   Sacral   Other:_____
Decreased / Increased / No Change ROM: CSP   TSP   LSP   Shldr L/R   Hip L/R   other:_____

**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____

**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____
Continue as planned   Modify to ____ x's week/ ____ weeks   Other:_____
Refer for evaluation with:   MD   Neuro   Ortho   Other:_____
After treatment, patient felt:   Better   Worse   Unchanged

Patient's Signature: _____   Dr.'s Initials: _____

DATE OF SERVICE: _2/17/14_

**Patient states they are experiencing:**
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp   Dull   Ache   Spasm  Radiating to: _____   Numbness in:_____
**Level of Discomfort:** 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes:_____

**Objective Findings:**
Hypertonic / spasm: CSP   TSP   LSP   Trap L/R   L-Scap L/R   L-Dorsi L/R   I-Psoas L/R   Q-Lum L/R   Gluteal L/R
Joint dysfunction in the following region(s) Occipital   Cervical   Thoracic   Lumbar   Sacral   Other:_____
Decreased / Increased / No Change ROM: CSP   TSP   LSP   Shldr L/R   Hip L/R   other:_____

**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____

**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____
Continue as planned   Modify to ____ x's week/ ____ weeks   Other:_____
Refer for evaluation with:   MD   Neuro   Ortho   Other:_____
After treatment, patient felt:   Better   Worse   Unchanged

Patient's Signature: _____   Dr.'s Initials: _____

Key: NP=neck pain, MBP=mid back pain, LBP=low back pain, ShldrP= shoulder pain, ArmP=arm pain, HipP=hip pain, FootP=foot pain, HandP=hand pain, L=Left, R=right, CSP=cervical spine, TSP=thoracic spine, LSP=lumbar spine, L-Scap=levator scapula, L-Dorsi=latissimus dorsi, I-Psoas=iliopsoas, Q-Lum=quadratus lumborum, RS=right sacroiliac joint, LS=left sacroiliac joint, Trap=trapezius, Rest=restricted, Tx=therapy, Neuro=Neurologist, Ortho=Orthopedist, CMT=Chiropractic Manipulative Therapy, TPT=Trigger point therapy, MT=manual therapy, FWD=forward, REV=reverse, ext=extension, abd=abdominal, ROM=range of motion, EMS=electric muscle stimulation

03052014

**DAILY CHIROPRACTIC SOAP NOTES**
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

PATIENT: _____                    DOA: __1/23/14__

DATE OF SERVICE: __2/5/14__
**Patient states they are experiencing:**
NP  (MBP)  (LBP)  HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp (Dull)  Ache   Spasm  Radiating to: _____   Numbness in: _____
**Level of Discomfort: 1** (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   (No Change)   Worsening   Other notes: _____
**Objective Findings:**
Hypertonic / spasm: CSP  (TSP  LSP)  Trap L/R  L-Scap L/R  L-Dorsi L/R  I-Psoas L/R  Q-Lum L/R  Gluteal L/R
Joint dysfunction in the following region(s) Occipital  Cervical (Thoracic (Lumbar (Sacral  Other:_____
Decreased / Increased / No Change ROM: CSP  (TSP  LSP)  Shldr L/R  Hip L/R  other:_____
**Today's Assessment:**
Improving   (No Change)   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es):_____
**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)  (3-4 Regions (98941))  5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____
(Continue as planned)   Modify to _____ x's week/_____ weeks   Other:_____
Refer for evaluation with:   MD   Neuro   Ortho   Other:_____
After treatment, patient felt: (Better)   Worse   Unchanged

Patient's Signature: ████████████                    Dr.'s Initials: _____

DATE OF SERVICE: __2/10/14__
**Patient states they are experiencing:**
NP  (MBP)  (LBP)  HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp (Dull)  Ache   Spasm  Radiating to: _____   Numbness in: _____
**Level of Discomfort: 1** (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   (No Change)   Worsening   Other notes: _____
**Objective Findings:**
Hypertonic / spasm: CSP  (TSP  LSP)  Trap L/R  L-Scap L/R  L-Dorsi L/R  I-Psoas L/R  Q-Lum L/R  Gluteal L/R
Joint dysfunction in the following region(s) Occipital  Cervical (Thoracic (Lumbar (Sacral  Other:_____
Decreased / Increased / No Change ROM: CSP  (TSP  LSP)  Shldr L/R  Hip L/R  other:_____
**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es):_____
**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)  (3-4 Regions (98941))  5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____
(Continue as planned)   Modify to _____ x's week/_____ weeks   Other:_____
Refer for evaluation with:   MD   Neuro   Ortho   Other:_____
After treatment, patient felt: Better   Worse   Unchanged

Patient's Signature: ████████████                    Dr.'s Initials: _____

Key: NP=neck pain, MBP=mid back pain, LBP=low back pain, ShldrP= shoulder pain, ArmP=arm pain, HipP=hip pain, FootP=foot pain, HandP=hand pain, L=Left, R=right, CSP=cervical spine, TSP=thoracic spine, LSP=lumbar spine, L-Scap=levator scapula, L-Dorsi=latissimus dorsi, I-Psoas=iliopsoas, Q-Lum=quadratus lumborum, RSJ=right sacroiliac joint, LSJ=left sacroiliac joint, Trap=trapezius, Rest=restricted, Tx=therapy, Neuro=Neurologist, Ortho=Orthopedist, CMT=Chiropractic Manipulative Therapy, TPT=Trigger point therapy, MT=manual therapy, FWD=forward, REV=reverse, ext=extension, ab=abdominal, ROM=range of motion, EMS=electric muscle stimulation

0305 2014

# DAILY CHIROPRACTIC SOAP NOTES

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

PATIENT: ████████████████     DOA: 1/23/17

DATE OF SERVICE: 1/28/17

Patient states they are experiencing:
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp   Dull   Ache   Spasm   Radiating to: _____ Numbness in: _____
Level of Discomfort: 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____

**Objective Findings:**
Hypertonic / spasm: CSP  TSP  LSP  Trap L/R  L-Scap L/R  L-Dorsi L/R  I-Psoas L/R  Q-Lum L/R  Gluteal L/R
Joint dysfunction in the following region(s) Occipital  Cervical  Thoracic  Lumbar  Sacral  Other: _____
Decreased / Increased / No Change ROM: CSP  TSP  LSP  Shldr L/R  Hip L/R  other: _____

**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es):

**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____
Continue as planned       Modify to ____ x's week/_____ weeks       Other:_____
Refer for evaluation with:       MD       Neuro       Ortho       Other:_____
After treatment, patient felt:   Better       Worse       Unchanged

Patient's Signature: ████████ _____       Dr.'s Initials: _____

DATE OF SERVICE: 2/4/17

Patient states they are experiencing:
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp   Dull   Ache   Spasm   Radiating to: _____ Numbness in: _____
Level of Discomfort: 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____

**Objective Findings:**
Hypertonic / spasm: CSP  TSP  LSP  Trap L/R  L-Scap L/R  L-Dorsi L/R  I-Psoas L/R  Q-Lum L/R  Gluteal L/R
Joint dysfunction in the following region(s) Occipital  Cervical  Thoracic  Lumbar  Sacral  Other: _____
Decreased / Increased / No Change ROM: CSP  TSP  LSP  Shldr L/R  Hip L/R  other: _____

**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es):

**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____
Continue as planned       Modify to ____ x's week/_____ weeks       Other:_____
Refer for evaluation with:       MD       Neuro       Ortho       Other:_____
After treatment, patient felt:   Better       Worse       Unchanged

Patient's Signature: ████████ _____       Dr.'s Initials: _____

Key: NP=neck pain, MBP=mid back pain, LBP=low back pain, Shldr P= shoulder pain, Arm P=arm pain, Hip P=hip pain, Foot P=foot pain, Hand P=hand pain, L=Left, R=right, CSP=cervical spine, TSP=thoracic spine, LSP=lumbar spine, L-Scap=levator scapula, L-Dorsi=latissimus dorsi, I-Psoas=iliopsoas, Q-Lum=quadrates lumborum, RSI=right sacroiliac joint, LSI=left sacroiliac joint, Trap=trapezius, Rstr=restricted, Tx=therapy, Neuro=Neurologist, Ortho=Orthopedist, CMT=Chiropractic Manipulative Therapy, TPT=Trigger point therapy, MT=manual therapy, FWD=forward, REV=reverse, ext=extension, abd=abdominal, ROM=range of motion, EMS=electric muscle stimulation

03052014

**DAILY CHIROPRACTIC SOAP NOTES**
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

PATIENT: ▓▓▓▓▓▓▓          DOA: 1/23/14

DATE OF SERVICE: 1/27/14

Patient states they are experiencing:
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp  Dull  Ache  Spasm  Radiating to: _____   Numbness in: _____
Level of Discomfort: 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____

**Objective Findings:**
Hypertonic / spasm: CSP  TSP  LSP  Trap L/R  L-Scap L/R  L-Dorsi L/R  I-Psoas L/R  Q-Lum L/R  Gluteal L/R
Joint dysfunction in the following region(s) Occipital  Cervical  Thoracic  Lumbar  Sacral  Other: _____
Decreased / Increased / No Change ROM: CSP  TSP  LSP  Shldr L/R  Hip L/R  other: _____

**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____

**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): ____
Continue as planned   Modify to ____ x's week/____ weeks   Other: _____
Refer for evaluation with:   MD   Neuro   Ortho   Other: _____
After treatment, patient felt:  Better   Worse   Unchanged

Patient's Signature: ▓▓▓▓▓▓▓        Dr.'s Initials: _____

DATE OF SERVICE: 1/28/14

Patient states they are experiencing:
NP   MBP   LBP   HA   Shldr P: L / R   Arm P: L / R   Hip P: L / R   Foot P: L / R   Hand P: L / R   Other:
Sharp  Dull  Ache  Spasm  Radiating to: _____   Numbness in: _____
Level of Discomfort: 1 (least discomfort) 2   3   4   5   6   7   8   9   10 (most discomfort)
Improving   No Change   Worsening   Other notes: _____

**Objective Findings:**
Hypertonic / spasm: CSP  TSP  LSP  Trap L/R  L-Scap L/R  L-Dorsi L/R  I-Psoas L/R  Q-Lum L/R  Gluteal L/R
Joint dysfunction in the following region(s) Occipital  Cervical  Thoracic  Lumbar  Sacral  Other: _____
Decreased / Increased / No Change ROM: CSP  TSP  LSP  Shldr L/R  Hip L/R  other: _____

**Today's Assessment:**
Improving   No Change   Worsening   See previous diagnosis(es) Exacerb.
Changed Diagnosis(es): _____

**Plan:**
CMT to the above joint dysfunction regions:   1-2 Regions (98940)   3-4 Regions (98941)   5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): ____
Continue as planned   Modify to ____ x's week/____ weeks   Other: _____
Refer for evaluation with:   MD   Neuro   Ortho   Other: _____
After treatment, patient felt:  Better   Worse   Unchanged

Patient's Signature: ▓▓▓▓▓▓▓        Dr.'s Initials: _____

Key: NP=neck pain, MBP=mid back pain, LBP=low back pain, Shldr P= shoulder pain, ArmP=arm pain, HipP=hip pain, FootP=foot pain, HandP=hand pain, L=left, R=right, CSP=cervical spine, TSP=thoracic spine, LSP=lumbar spine, L-Scap=levator scapula, L-Dorsi=latissimus dorsi, I-Psoas=illiopsoas, Q-Lum=quadrates lumborum, RSI=right sacroiliac joint, LSI=left sacroiliac joint, Trap=trapezius, Restr=restricted, Tx=therapy, Neuro=Neurologist, Ortho=Orthopedist, CMT=Chiropractic Manipulative Therapy, TPT=Trigger point therapy, MT=manual therapy, FWD=forward, REV=reverse, ext=extension, ab=abdominal, ROM=range of motion, EMS=electric muscle stimulation

03052014

*Exhibit 23*

# CHIROPRACTIC RE-EXAMINATION

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

**PATIENT:** _____   **DOA:** 6/2/14   **DATE:** 8/7/14

## SUBJECTIVE COMPLAINTS

Neck: pain/stiffness: _____
Upper Back: pain/stiffness: _____
Pain: L/R Shoulder, L/R Arm, L/R Elbow, L/R Hand; _____
Numbness: L/R Shoulder, L/R Arm, L/R Hand; _____

Mid-Low Back: pain/stiffness: _____
Pain: L/R Hip, L/R Buttock, L/R Leg, L/R Knee, L/R Foot
Numbness: L/R Hip, L/R Buttock, L/R Leg, L/R Foot
Other: _____

## OBJECTIVE FINDINGS

**Cervical ROM**

| | | Results (% of Loss) | | | |
|---|---|---|---|---|---|
| Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Extension | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Left Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Right Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Left Lat. Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Right Lat. Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |

**Lumbar ROM**

| | | Results (% of Loss) | | | |
|---|---|---|---|---|---|
| Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Extension | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Left Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Right Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Left Lat. Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Right Lat. Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |

R / L Cervical Foraminal Compression: _____
R / L Jackson's Compression: _____
R / L Cervical Distraction: _____
R / L Shoulder Depression: _____
Soto-Hall: _____

R / L Straight Leg Raise _____ deg.
R / L Kemp's: LBP
R / L Ely's: _____
R / L Yeoman's: _____
R / L Nachlas: _____

## INTERSEGMENTAL SPINAL DYSFUNCTION AT: CERVICAL, THORACIC, LUMBAR, RSI, LSI

| SPASM: | Cervical | Thoracic | Lumbar | Other: _____ |
|---|---|---|---|---|
| TREATMENT: | TPT | MMS | CMT | Other: _____ |
| AREA: | Cervical | Thoracic | Lumbar | LSI | RSI | Other: _____ |

DIFFICULTY: Lifting   Bending   Twisting   Sleeping   Sitting   Standing   Hygiene
Dressing   Reading   Concentrating   Leisure Activity   Other: _____

WORKING:   Yes   No                          RETURN TO WORK DATE: _____

RECOMMENDATION(S):   CMT (above regions) 2-3x/wk   1-2x/wk   1x/wk   other: _____   Stretch Exercise
MRI: _____   X-Ray: _____   M/D   Neuro   Ortho   Other: _____

ADDITIONAL COMMENTS: _____

DX: _____

PROGNOSIS:   Good   Poor   Guarded        NEXT RE-EVALUATION: 6-8 wk's

Dr.'s Signature: _____   Date: 8/7/14

Patient's Signature: _____   Date: _____

08252014

CHIROPRACTIC RE-EVALUATION:     1786 FLATBUSH AVE- BROOKLYN, NY 11210     PH: (929)333-9955

PATIENT'S NAME: ▮▮▮▮▮▮     DATE: 10/9/14     DATE OF INJURY: 8/24/11

**My pain level today is(0 is no pain, 1 is the least pain and 10 is the most pain): Circle one:**

0    1    2    3    4    5    (6)    7    8    9    10    _____
PATIENT INITIALS

**Overall chiropractic treatment has: HELPED ALOT / HELPED SOMEWHAT / HELPED A LITTLE / NOT HELPED**

| SUBJECTIVE COMPLAINTS: | ORTHOPEDIC TESTS |
|---|---|
| NECK PAIN R / L | + / - SOTO HALL |
| UPPER / MIDDLE BACK PAIN R / L | + / - CERVICAL COMPRESSION R / L |
| LOWER BACK PAIN R / L only | + / - JACKSON'S COMPRESSION R / L |
| HEADACHES _____ | + / - SHOULDER DEPRESSOR R / L |
| L / R SHOULDER PAIN | + / - KEMP' S R / L |
| L / R HIP PAIN | + / - STRAIGHT LEG RAISE @ _____ DEG. R / L |
| NUMBNESS / TINGLING: _____ | + / - ELY'S L / R |
| OTHER: _____ | |

**CERVICAL ROM: PERCENTAGE LOSS**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FLEXION: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| EXTENS: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| L ROT: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| R ROT: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| L L. FLEX: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| R L. FLEX: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |

**LUMBAR ROM: PERCENTAGE LOSS**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FLEXION: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| EXTENS: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| L ROT: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| R ROT: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| L L. FLEX: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |
| R L. FLEX: | WNL | 1-25 | 26-50 | 51-75 | 76-100 | PAIN | NO PAIN |

| HYPERTONIC MUSCLES: | ASSESSMENT: IMPROVED  NO CHANGE  WORSENING |
|---|---|
| CERVICAL PARASPINALS     R / L TRAPEZIUS | PLAN: |
| THORACIC PARASPINALS     R / L RHOMBOID | |
| LUMBAR PARASPINALS     R / L LAT. DORSI | CMT  TRIGGER POINTS  TRACTION  NEURO-MUSC RE-EDU. |
| R / L QUADRATUS LUMBORUM | |
| R / L GLUTEAL | CERVICAL  THORACIC  LUMBAR  OTHER: _____ |
| OTHER: _____ | |
| | 1-2X/WK  2-3X/ WK  AS NEEDED  DISCHARGE  OTHER: _____ |
| RESTRICTED JOINT MOTION: | |
| CERVICAL | NEXT RE- EVALUATION: 4- WKS  6- WKS  8- WKS  OTHER: ___ |
| THORACIC | |
| LUMBAR | REFERRAL: MD  ORTHO  MRI  OTHER: _____  FOR: _____ |
| SACRAL | |
| R / L SACRO- ILIAC | TODAY: 98940  98941  98942  97139  97112  97012 OTHER: |
| OTHER: _____ | CHANGES IN DIAGNOSIS(ES): NO    YES: _____ |

P▮     DATE     DOCTOR'S INITIALS

10302014

## CHIROPRACTIC RE-EXAMINATION

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

PATIENT: _____     DOA: 10/1/13     DATE: 4/11/14

### SUBJECTIVE COMPLAINTS

Neck: pain/stiffness: _____
Upper Back: pain/stiffness: _____
Pain: L/R Shoulder, L/R Arm, L/R Elbow, L/R Hand; _____
Numbness: L/R Shoulder, L/R Arm, L/R Hand; _____

Mid-Low Back: pain/stiffness: _____
Pain: L/R Hip, L/R Buttock, L/R Leg, L/R Knee, L/R Foot
Numbness: L/R Hip, L/R Buttock, L/R Leg, L/R Foot
Other: _____

### OBJECTIVE FINDINGS

**Cervical ROM**

| | | Results (% of Loss) | | | |
|---|---|---|---|---|---|
| Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Extension | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Left Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Right Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Left Lat. Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Right Lat. Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |

**Lumbar ROM**

| | | Results (% of Loss) | | | |
|---|---|---|---|---|---|
| Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Extension | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Left Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Right Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Left Lat. Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |
| Right Lat. Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |

R / L Cervical Foraminal Compression: _____
R / L Jackson's Compression. _____
R / L Cervical Distraction: _____
R / L Shoulder Depression: _____
Soto-Hall: _____

R / L Straight Leg Raise _____ deg. _____
R / L Kemp's: _____
R / L Ely's: _____
R / L Yeoman's: _____
R / L Nachlas: _____

### INTERSEGMENTAL SPINAL DYSFUNCTION AT: CERVICAL THORACIC LUMBAR RSI LSI

| | | | | |
|---|---|---|---|---|
| SPASM: | Cervical | Thoracic | Lumbar | Other: _____ |
| TREATMENT. | TPT | MMS | CMT | Other: _____ |
| AREA: | Cervical | Thoracic | Lumbar | LSI   RSI   Other: _____ |
| DIFFICULTY: | Lifting | Bending | Twisting   Sleeping   Sitting | Standing   Hygiene |
| | Dressing | Reading | Concentrating   Leisure Activity | Other: _____ |

WORKING:   Yes   No          RETURN TO WORK DATE. _____

RECOMMENDATION(S):   CMT (above regions) 2-3x/wk  1-2x/wk  1x/wk  other: _____   Stretch Exercise
MRI: _____   X-Ray: _____   M/D   Neuro   Ortho   Other: _____

ADDITIONAL COMMENTS: _____
_____

DX: _____

PROGNOSIS:   Good   Poor   Guarded          NEXT RE-EVALUATION: 6 week

Dr's Signature: _____   Date. 4/11/14

Patient's Signature. _____   Date: 4/11/14

05122014

*Exhibit 24*

Charles Deng L.ac
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

## INITIAL EVALUATION

DATE OF EXAM: 4/29/14

NAME: _____ ███████

DOB: ██████ AGE: 26 SEX: Female/Male

DOA: 4/14/14 HOME PHONE#: _____ BUSINESS PHONE#: _____

ADDRESS: ██████████████████
Number and Street        City        State        Zip Code

HISTORY OF INJURY (Circle or Fill-out):

0. Date of Accident: 4/14/14 Time of Accident: _____
1. I was (cirle one): Driver (Belted/Unbelted) Passenger-Front Seat (Belted/Unbelted)
2. Passenger-Rear Seat (Belted/Unbelted) Pedestrian Bicyclist
3. Impact on Car: Rear Front Left Side Right Side
4. Did Police arrive on location? Yes / No
5. Did Patient lose consciousness? Yes / No
6. Patient taken to ER: Yes / No
7. Name of Hospital: Methodist Hospital
8. Hospital examination: X-Ray MRI Medication Others: _____

CHIEF COMPLAINTS AND PRESENT MEDICAL HISTORY (Circle or Fill-out):

The patient is complaining of pain after injury sustained in MVA in the following:
Neck, Thoracic Spine, Lower Back, Shoulder (R / L), Elbow (R / L), Wrist (R / L), Knee (R / L), Ankle (R / L),
Hand (R / L), Foot (R / L), Hip (R / L), Leg (R / L), Chest, Face, Pelvis, Other: _____

The Pain is: Persistent/Intermittent and Aggravated with Sitting/Standing/Walking/Lying Down
The Pain is: Sharp/ Dull/ Stabbing/ Shooting/ Distending/ Fixed/ Heavy/ Aching
The Pain radiates to: _____
The Patient is complaining of:
    Headache: Persistent/Intermittent on the Frontal/Occipital/Temporal/Vertex Area/Whole Head
    Dizziness/ Nausea/ Insomnia/ Stress/ Anxiety/ Depression/ Tinnitus/ Vision Change/ Blurred
Vision/Hearing Difficulty/ Memory Deficit/ Other: no
The Patient has had other medical problem: no
The Patient is taking medication: Pain killer

PAST MEDICAL HISTORY (Circle or Fill-out): none

Bleeding    Disease    Anemia    Cancer    Hepatitis    Tuberculosis    Gallstone    Kidney Stone
Diarrhea    Peptic Ulcer    Urinary Tract Infection    Pneumonia _____

Last Car Accident in: no        Surgery: no        Allergies to Medicine. no
Family History: ✓ Unremarkable, or related to: _____
Social History: Smoking: Yes / No        Alcohol: Yes / No        Recreational Drugs: Yes / Denial _____

06022014

Charles Deng L.ac
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

## PHYSICAL EXAMINATION

**General Appearance**
The patient was alert, cooperative and oriental. **Pulse:** 75/m **Height:** 5'9" **Weight:** 185 lbs

**Tongue Characteristics:**
The color of tongue body: Light Red/ Pale/ Reddened/ Crimson Purple/ Other:_____
The shape of tongue body: Swollen/ Emaciated/ Prickled/ Fissured/ Teeth-printed/ Normal
The tongue coating: Thin White/ Thick White/ Light Yellow/Yellow Greasy/ White Greasy/ Exfoliate

**Pulse:**
Normal/ Floating/Deep/ Rapid/ Slow/ Thready/ Slippery/ Uneven/ Freeble/ Wiry/ Knotted/ Intorinlttent
Running
Other: _____

**Head·**
Tenderness on the occipital/forehead/supra-orbital/temple/vertex area at palpitation on the right/left
was present/ not present.
Wound/Scars/Bruises in the area(s) of _____ was present / not present

**Cervical Spine·**
Para vertebral muscles spasm / tenderness was present / not present
Forward bending was **restricted / free**. Backward bending was **restricted / free**
Side bending on the **right / left** side was **restricted / free**
Rotation on the **right / left** side was restricted / free
Foramina Compression Test: (Spurling's Test) showed no increase pain down the **right / left** arms
Soto-Hall Test showed no nerve irritation in the **neck/ mid-back/ low-back**

**Lumbar Spine:**
Para vertebral muscles spasm / tenderness was present / not present on the levels between L to L
Forward bending was restricted / free. Backward bending was restricted / free
Side bending on the **right / left** side was **restricted / free**
Rotation on the **right / left** was restricted / free
Straight Leg Raising Test (SLR) showed no nerve irritation in the lower back with radiation into the
**right/left** leg

**Thoracic Spine:**
Para vertebral muscles spasm / tenderness was present / **not present** on the levels between T to T
Rotation on the **right / left** side was restricted / free

**Shoulder:**
Tenderness/spasm was on the **right / left** side was present / **not present**
Abduction/Adduction/Flexion/Extension on the **right / left** side was **restricted** / free

**Knee:**
Tenderness/spasm was pm the **right / left** side was present / **not present**
Flexion/Extension on the **right / left** side was **restricted** / free

**Other:** _____
_____
_____

06022014

Charles Deng L.ac
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

## INITIAL EVALUATION

DATE OF EXAM: 4/29/14

NAME: _____
DOB: _____   AGE: 26   SEX: Female/Male
DOA: 4/14/14   HOME PHONE#: _____   BUSINESS PHONE#: _____
ADDRESS: _____
Number and Street                          City        State        Zip Code

**HISTORY OF INJURY** (Circle or Fill-out):
0.  Date of Accident: 4/14/14   Time of Accident: _____
1.  I was (cirle one): Driver (Belted/Unbelted)   Passenger-Front Seat (Belted/Unbelted)
2.  Passenger-Rear Seat (Belted/Unbelted)   Pedestrian   Bicyclist
3.  Impact on Car: Rear   Front   Left Side   Right Side
4   Did Police arrive on location?   Yes / No
5.  Did Patient lose consciousness?   Yes / No
6.  Patient taken to ER:   Yes / No
7.  Name of Hospital: Methodist Hospital
8.  Hospital examination: X-Ray   MRI   Medication   Others: _____

**CHIEF COMPLAINTS AND PRESENT MEDICAL HISTORY** (Circle or Fill-out):

The patient is complaining of pain after injury sustained in MVA in the following:
Neck, Thoracic Spine, Lower Back, Shoulder (R / L) Elbow (R / L), Wrist (R / L), Knee (R / L), Ankle (R / L),
Hand (R / L), Foot (R / L), Hip (R / L), Leg (R / L), Chest, Face, Pelvis, Other: _____

The Pain is: Persistent/Intermittent and Aggravated with Sitting/Standing/Walking/Lying Down
The Pain is: Sharp/ Dull/ Stabbing/ Shooting/ Distending/ Fixed/ Heavy/ Aching
The Pain radiates to: _____
The Patient is complaining of:
    Headache: Persistent/Intermittent on the Frontal/Occipital/Temporal/Vertex Area/Whole Head
    Dizziness/ Nausea/ Insomnia/ Stress/ Anxiety/ Depression/ Tinnitus/ Vision Change/ Blurred
Vision/Hearing Difficulty/ Memory Deficit/ Other: no
The Patient has had other medical problem: no
The Patient is taking medication: Pain killer

**PAST MEDICAL HISTORY** (Circle or Fill-out): none

Bleeding   Disease   Anemia   Cancer   Hepatitis   Tuberculosis   Gallstone   Kidney Stone
Diarrhea   Peptic Ulcer   Urinary Tract Infection   Pneumonia _____

Last Car Accident in: no   Surgery: no   Allergies to Medicine: no
Family History: ✓ Unremarkable, or related to: _____
Social History: Smoking: Yes / No   Alcohol: Yes / No   Recreational Drugs: Yes / Denial _____

06022014

Charles Deng L.ac
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

## PHYSICAL EXAMINATION

**General Appearance**
The patient was alert, cooperative and oriental. Pulse: 75/i Height: 5'4" Weight: 185 lbs .

**Tongue Characteristics:**
The color of tongue body: Light Red/ Pale/ Reddened/ Crimson Purple/ Other:_____
The shape of tongue body: Swollen/ Emaciated/ Prickled/ Fissured/ Teeth-printed/ Normal
The tongue coating: Thin White/ Thick White/ Light Yellow/Yellow Greasy/ White Greasy/ Exfoliate

**Pulse.**
Normal/ Floating/Deep/ Rapid/ Slow/ Thready/ Slippery/ Uneven/ Freeble/ Wiry/ Knotted/ Intorinlttent
Running
Other: _____

**Head·**
Tenderness on the occipital/forehead/supra-orbital/temple/vertex area at palpitation on the right/left
was present/ not present.
Wound/Scars/Bruises in the area(s) of _____ was present / not present

**Cervical Spine:**
Para vertebral muscles spasm /tenderness was present / not present
Forward bending was **restricted / free**. Backward bending was **restricted / free**
Side bending on the **right / left** side was restricted / free
Rotation on the **right / left** side was **restricted / free**
Foramina Compression Test: (Spurling's Test) showed no increase pain down the **right / left** arms
Soto-Hall Test showed no nerve irritation in the **neck/ mid-back/ low-back**

**Lumbar Spine:**
Para vertebral muscles spasm / tenderness was present/ not present on the levels between L to L
Forward bending was restricted/ free. Backward bending was restricted / free
Side bending on the **right / left** side was **restricted / free**
Rotation on the **right / left** was restricted / free
Straight Leg Raising Test (SLR) showed no nerve irritation in the lower back with radiation into the
**right/left** leg

**Thoracic Spine:**
Para vertebral muscles spasm / tenderness was present / not present on the levels between T to T
Rotation on the **right / left** side was restricted / free

**Shoulder:**
Tenderness/spasm was on the **right / left** side was present / not present
Abduction/Adduction/Flexion/Extension on the **right / left** side was **restricted / free**

**Knee:**
Tenderness/spasm was pm the **right / left** side was present / not present
Flexion/Extension on the **right / left** side was **restricted / free**

**Other:** _____
_____
_____

Charles Deng L.ac
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

Page **3** of **5**

**Evaluation of the Cervical Spine:**

| Cervical ROM | Normal | Patient's |
|---|---|---|
| Flexion | 60° | 40 |
| Extension | 50° | 30 |
| Right Lateral Flexion | 40° | 30 |
| Left Lateral Flexion | 40° | 40 |
| Right Rotation | 80° | 80 |
| Left Rotation | 80° | 80 |

**Evaluation of the Lumbar Spine:**

| Lumbar ROM | Normal | Patient's |
|---|---|---|
| Flexion | 90° | 70 |
| Extension | 30° | 15 |
| Right Lateral Flexion | 30° | 15 |
| Left Lateral Flexion | 30° | 20 |
| Right Rotation | 30° | 20 |
| Left Rotation | 30° | 20 |

**Evaluation of the Shoulder:**

| Shoulder ROM | Normal | Patient's R | L |
|---|---|---|---|
| Right Lateral Flexion | 150° | 120 | |
| Left Lateral Flexion | 150° | | 150 |
| Abduction | 150° | 130 | 150 |
| Adduction | 30° | 15 | 30 |

**Evaluation of the Elbow**

| Elbow ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 145° | | |
| Extension | 145° | | |

**Evaluation of the Wrist:**

| Wrist ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 60° | | |
| Extension | 70° | | |

**Evaluation of the Knee:**

| Knee ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 135° | 100 | 130 |
| Extension | 0-15° | 0 | 10 |

**Evaluation of the Ankle:**

| Ankle ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 30° | | |
| Extension | 20° | | |



↑ Circle Where You Feel The Pain ↑

**Evaluation of the Hip:**

| Hip ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 100° | | |
| Extension | 100° | | |
| Abduction | 40° | | |

06022014

Charles Deng L.ac

New York State Licensed in Acupuncture

1786 Flatbush Avenue, Brooklyn, NY 11210

Page **4** of 5

## Palpation of Channels and Points; Tenderness and Sensitivity on:

SI: _____ 15 _____

UB: _____ 11, 16, 23, 24 _____

DU: _____

ST: _____ 34 (R) _____

LI: _____

Others: _____

**ACUPUNCTURE DIAGNOSIS:** Stagnation of Qi and Blood in the following Channels:

__LU, The Lung Channel of Hand-Taiyin          __LI, The Large Intestine Channel of Hand-Yangming

__SP, The Spleen Channel of Foot-Taiyin        __ST, The Stomach Channel of Foot-Yanming

__HT, The Heart Channel of Hand- Shaoyin       √SI, The Small Intestine Channel of Hand-Taiyong

__K, The Kidney Channel of Foot- Shaoyin       √UB, The Urinary Bladder Channel of Foot- Taiyang

__PC, The Pericardium Channel of Hand- Jueyin  __SJ, The Sanjiao Channel of Hand-Shaoyang

__LV, The Liver Channel of Foot-Jueyin         __GB, The Gallbladder Channel of Foot- Shaoyang

__DU Channel                                   __REN Channel

## DIAGNOSIS (ICD-9-CM)

| | | |
|---|---|---|
| ☐ 723.1 Cervicalgia | ☐ 723.4 Cervical Radiculitis | ☐ 722.0 Cervical Disc Displacement |
| ☑ 847.0 Cervical: Sprain/Strain | ☑ 780.4 Headaches | ☐ 920 Contusion of Head |
| ☐ 724.2 Lumbar Myofascitis/ Lumbalgia | ☐ 722.10 Lumbar Radiculopathy | ☑ 847.2 Lumbar: Sprain/Strain |
| ☐ 724.3 Sciatica | ☐ 846.1 Sacroiliac: Sprain/Strain | ☐ 847.1 Thoracic: Sprain/Strain |
| ☐ 724.1 Thoracalgia | ☐ 722.11 Thoracic Displacement | ☑ 719.41 Shoulder Pain |
| ☐ 718.90 Shoulder Derangement | ☐ 840.9 Shoulder: Sprain/Strain | ☐ 719.42 Elbow Pain |
| ☐ 841.2 Elbow Sprain/Strain | ☐ 718.32 Elbow Derangement | ☐ 719.43 Wrist Pain |
| ☐ 842.00 Wrist: Sprain/Strain | ☐ 718.93 Wrist Derangement | ☐ 842.00 Hand: Sprain/Strain |
| ☐ 729.5 Hand Pain | ☐ 717.9 Knee Derangement | ☐ 719.46 Knee Pain/ Arthralgia |
| ☑ 844.9 Knee: Sprain/Strain | ☐ 719.47 Ankle Pain | ☐ 845.00 Ankle: Sprain/Strain |
| ☐ 718.97 Ankle Derangement | ☐ 729.5 Leg Pain | ☐ 844.9 Leg: Sprain/Strain |
| ☐ 922.1 Contusion Ribs and Sternum | ☐ 786.52 Chest Wall Pain | ☐ 843.9 Hip and Thigh: Sprain/Strain |
| ☐ 719.45 Hip Pain | ☐ 845.10 Foot: Sprain/Strain | ☐ 729.5 Foot Pain |
| ☐ 308.9 Acute stress Reaction | ☐ | ☐ |

06022014

Charles Deng L.ac
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

Page **5** of **5**

**TREATMENT OF ACUPUNCTURE**

Principals, Purpose and necessity: According to traditional Chinese medicine, the injuries caused by the motor vehicle accident belongs to the pattern of Qi and blood stagnation, which can cause pain, swelling and numbness and other symptoms in some channels and acupoints. Acupuncture can activate Qi and Blood, remove obstruction from the channels and collaterals, resolve blood stasis and stop pain by needling points mainly from the above channels and acupuncture-point. The treating necessity is in the following:

1. Provide symptomatic pain relief in acute and sub-acute stages of injury condition
2. Assist to reduce inflammatory response to affected tissues.
3. Reflexively subside, painful muscle contraction and reactive spasm of injured joint's intrinsic musculature, thereby reversing the pain-spasm-pain-cycle.
4. Decrease irritation of nerve radiation.
5. Relieve headaches, the stress and anxiety.
6. Almost no side effects.

**NEEDLE:**

Type. Disposable and sterile, individually packed with guided PVC tube.
Size: 36# x 1.0 (0.20mm x 25mm) or 34# x 1.5 (0.22mm x 40mm)
Time in Place: 15 minutes for initial insertion or reinsertion

**TREATMENT PLAN:**

1. Patient will be seen 1 or 2 or 3 times a week for acupuncture treatment for 4 weeks.
   Acupuncture treatment along with:
2. Plain / Electro stimulation acupuncture:
   a. Heat (TDP-CQ27)      b. Moxabustion      c. Ear Acupuncture

**COMMENTS:**

I feel that there is a direct casual relationship between the accident described and patient's current injuries if the history was reported correctly. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point the patient remains impaired with regards to some functional capabilities. As such, I would like to provide acupuncture and recommend continue other therapy for the patient to alleviate the patient and prevent any further progression of disability

PROGNOSIS: _____

L.Ac. _____

06022014

Charles Deng L.ac
**New York State Licensed in Acupuncture**
1786 Flatbush Avenue, Brooklyn, NY 11210

Page **1** of **5**

## INITIAL EVALUATION

DATE OF EXAM: 12 - 13 - 2013

**NAME:** ▮▮▮▮▮

**DOB:** ▮▮▮▮   AGE: 30   SEX: Female/Male

**DOA:** 11 - 12 - 2013   HOME PHONE#: ▮▮▮   BUSINESS PHONE#: _____

**ADDRESS:** ▮▮▮
Number and Street                City          State          Zip Code

**HISTORY OF INJURY (Circle or Fill-out):**

0. Date of Accident: 12 / 11 / 13   Time of Accident: 8:15 hreo
1. I was (cirle one): Driver (Belted/Unbelted)   Passenger-Front Seat (Belted/Unbelted)
2. Passenger-Rear Seat (Belted/Unbelted)   Pedestrian          Bicyclist
3. Impact on Car: Rear   Front   Left Side   Right Side
4. Did Police arrive on location?   Yes / No
5. Did Patient lose consciousness?   Yes / No
6. Patient taken to ER:   Yes / No
7. Name of Hospital: The Brooklyn Hospital
8. Hospital examination:   X-Ray   MRI   Medication   Others: _____

**CHIEF COMPLAINTS AND PRESENT MEDICAL HISTORY (Circle or Fill-out):**

The patient is complaining of pain after injury sustained in MVA in the following:
Neck, Thoracic Spine, Lower Back, Shoulder (R / L), Elbow (R / L), Wrist (R / L), Knee (R / L), Ankle (R / L),
Hand (R / L), Foot (R / L), Hip (R / L), Leg (R / L), Chest, Face, Pelvis, Other: _____

The Pain is: Persistent/Intermittent and Aggravated with Sitting/Standing/Walking/Lying Down
The Pain is: Sharp/Dull/ Stabbing/ Shooting/ Distending/ Fixed/ Heavy/ Aching
The Pain radiates to: _____
The Patient is complaining of:
　　　Headache: Persistent/Intermittent on the Frontal/Occipital/Temporal/Vertex Area/Whole Head
　　　Dizziness/ Nausea/ Insomnia/ Stress/ Anxiety/ Depression/ Tinnitus/ Vision Change/ Blurred
Vision/Hearing Difficulty/ Memory Deficit/ Other: no
The Patient has had other medical problem: no
The Patient is taking medication: Motrin Advil

**PAST MEDICAL HISTORY (Circle or Fill-out):** none

Bleeding   Disease   Anemia   Cancer   Hepatitis   Tuberculosis   Gallstone   Kidney Stone
Diarrhea   Peptic Ulcer   Urinary Tract Infection   Pneumonia _____

Last Car Accident in: no   Surgery: no   Allergies to Medicine? no
Family History: __✓__ Unremarkable, or related to: _____
Social History: Smoking: Yes / No   Alcohol: Yes / No   Recreational Drugs: Yes / Denial _____

01152014

Charles Deng L.ac
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

## PHYSICAL EXAMINATION

**General Appearance**
The patient was alert, cooperative and oriental. Pulse: 80/m Height: 5-8 Weight: 160

**Tongue Characteristics:**
The color of tongue body: Light Red/ Pale/ Reddened/ Crimson Purple/ Other:_____
The shape of tongue body: Swollen/ Emaciated/ Prickled/ Fissured/ Teeth-printed/ Normal
The tongue coating: Thin White/ Thick White/ Light Yellow/Yellow Greasy/ White Greasy/ Exfoliate

**Pulse:**
Normal/ Floating/Deep/ Rapid/ Slow/ Thready/ Slippery/ Uneven/ Freeble/ Wiry/ Knotted/ Intorinittent
Running
Other: _____

**Head:**
Tenderness on the occipital/forehead/supra-orbital/temple/vertex area at palpitation on the right/left
was present/ not present.
Wound/Scars/Bruises in the area(s) of _____ was present / not present

**Cervical Spine:**
Para vertebral muscles spasm/ tenderness was present / not present
Forward bending was restricted / free. Backward bending was restricted / free
Side bending on the right / left side was restricted / free
Rotation on the right / left side was restricted / free
Foramina Compression Test: (Spurling's Test) showed (no) increase pain down the right / left arms
Soto-Hall Test showed (no) nerve irritation in the neck/ mid-back/ low-back

**Lumbar Spine:**
Para vertebral muscles spasm / tenderness was present / not present on the levels between L to L
Forward bending was restricted/ free. Backward bending was restricted / free
Side bending on the right / left side was restricted / free
Rotation on the right / left was restricted / free
Straight Leg Raising Test (SLR) showed (no) nerve irritation in the lower back with radiation into the
right/left leg

**Thoracic Spine:**
Para vertebral muscles spasm / tenderness was present / not present on the levels between T to T
Rotation on the right / left side was restricted / free

**Shoulder:**
Tenderness/spasm was on the right / left side was present / not present
Abduction/Adduction/Flexion/Extension on the right / left side was restricted / free

**Knee:**
Tenderness/spasm was pm the right / left side was present / not present
Flexion/Extension on the right / left side was restricted/ free

**Other:** _____
_____
_____

**Charles Deng Lac**
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

## Evaluation of the Cervical Spine:

| Cervical ROM | Normal | Patient's |
|---|---|---|
| Flexion | 60° | 40 |
| Extension | 50° | 30 |
| Right Lateral Flexion | 40° | 20 |
| Left Lateral Flexion | 40° | 20 |
| Right Rotation | 80° | 70 |
| Left Rotation | 80° | 65 |

## Evaluation of the Lumbar Spine:

| Lumbar ROM | Normal | Patient's |
|---|---|---|
| Flexion | 90° | 70 |
| Extension | 30° | 15 |
| Right Lateral Flexion | 30° | 15 |
| Left Lateral Flexion | 30° | 20 |
| Right Rotation | 30° | 25 |
| Left Rotation | 30° | 25 |

## Evaluation of the Shoulder:

| Shoulder ROM | Normal | Patient's R | L |
|---|---|---|---|
| Right Lateral Flexion | 150° | 140 | |
| Left Lateral Flexion | 150° | | 140 |
| Abduction | 150° | 140 | 145 |
| Adduction | 30° | 25 | 30 |

## Evaluation of the Elbow

| Elbow ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 145° | | |
| Extension | 145° | | |

## Evaluation of the Wrist:

| Wrist ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 60° | | |
| Extension | 70° | | |

## Evaluation of the Knee:

| Knee ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 135° | | |
| Extension | 0-15° | | |

## Evaluation of the Ankle:

| Ankle ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 30° | | |
| Extension | 20° | | |



↑ Circle Where You Feel The Pain ↑

## Evaluation of the Hip:

| Hip ROM | Normal | Patient's R | L |
|---|---|---|---|
| Flexion | 100° | | |
| Extension | 100° | | |
| Abduction | 40° | | |

01152014

**Charles Deng L.ac**
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

Page 4 of 5

## Palpation of Channels and Points; Tenderness and Sensitivity on:

SI: _____ 12, 15 _____

UB: _____ 11, 12, 15   23 _____

DU: _____

ST: _____

LI: _____ 15 _____

Others: _____

**ACUPUNCTURE DIAGNOSIS:** Stagnation of Qi and Blood in the following Channels:

__LU, The Lung Channel of Hand-Taiyin          __LI, The Large Intestine Channel of Hand-Yangming

__SP, The Spleen Channel of Foot-Taiyin          __ST, The Stomach Channel of Foot-Yanming

__HT, The Heart Channel of Hand- Shaoyin          ✓SI, The Small Intestine Channel of Hand-Taiyong

__K, The Kidney Channel of Foot- Shaoyin          ✓UB, The Urinary Bladder Channel of Foot- Taiyang

__PC, The Pericardium Channel of Hand- Jueyin          __SJ, The Sanjiao Channel of Hand-Shaoyang

__LV, The Liver Channel of Foot-Jueyin          __GB, The Gallbladder Channel of Foot- Shaoyang

__DU Channel          __REN Channel

## DIAGNOSIS (ICD-9-CM)

| | | |
|---|---|---|
| ☐ 723.1 Cervicalgia | ☐ 723.4 Cervical Radiculitis | ☐ 722.0 Cervical Disc Displacement |
| ☑ 847.0 Cervical: Sprain/Strain | ☑ 780.4 Headaches | ☐ 920 Contusion of Head |
| ☑ 724.2 Lumbar Myofascitis/ Lumbalgia | ☐ 722.10 Lumbar Radiculopathy | ☐ 847.2 Lumbar: Sprain/Strain |
| ☐ 724.3 Sciatica | ☐ 846.1 Sacroiliac: Sprain/Strain | ☑ 847.1 Thoracic: Sprain/Strain |
| ☐ 724.1 Thoracalgia | ☐ 722.11 Thoracic Displacement | ☑ 719.41 Shoulder Pain |
| ☐ 718.90 Shoulder Derangement | ☐ 840.9 Shoulder: Sprain/Strain | ☐ 719.42 Elbow Pain |
| ☐ 841.2 Elbow Sprain/Strain | ☐ 718.32 Elbow Derangement | ☐ 719.43 Wrist Pain |
| ☐ 842.00 Wrist: Sprain/Strain | ☐ 718.93 Wrist Derangement | ☐ 842.00 Hand: Sprain/Strain |
| ☐ 729.5 Hand Pain | ☐ 717.9 Knee Derangement | ☐ 719.46 Knee Pain/ Arthralgia |
| ☐ 844.9 Knee: Sprain/Strain | ☐ 719.47 Ankle Pain | ☐ 845.00 Ankle: Sprain/Strain |
| ☐ 718.97 Ankle Derangement | ☐ 729.5 Leg Pain | ☐ 844.9 Leg: Sprain/Strain |
| ☐ 922.1 Contusion Ribs and Sternum | ☐ 786.52 Chest Wall Pain | ☐ 843.9 Hip and Thigh: Sprain/Strain |
| ☐ 719.45 Hip Pain | ☐ 845.10 Foot: Sprain/Strain | ☐ 729.5 Foot Pain |
| ☐ 308.9 Acute stress Reaction | ☐ | ☐ |

01152014

**Charles Deng L.ac**
New York State Licensed in Acupuncture
1786 Flatbush Avenue, Brooklyn, NY 11210

**TREATMENT OF ACUPUNCTURE**

Principals, Purpose and necessity: According to traditional Chinese medicine, the injuries caused by the motor vehicle accident belongs to the pattern of Qi and blood stagnation, which can cause pain, swelling and numbness and other symptoms in some channels and acupoints. Acupuncture can activate Qi and Blood, remove obstruction from the channels and collaterals, resolve blood stasis and stop pain by needling points mainly from the above channels and acupuncture-point. The treating necessity is in the following:

1. Provide symptomatic pain relief in acute and sub-acute stages of injury condition.
2. Assist to reduce inflammatory response to affected tissues.
3. Reflexively subside, painful muscle contraction and reactive spasm of injured joint's intrinsic musculature, thereby reversing the pain-spasm-pain-cycle.
4. Decrease irritation of nerve radiation.
5. Relieve headaches, the stress and anxiety.
6. Almost no side effects.

**NEEDLE:**

Type: Disposable and sterile, individually packed with guided PVC tube.
Size: 36# x 1.0 (0.20mm x 25mm) or 34# x 1.5 (0.22mm x 40mm)
Time in Place: 15 minutes for initial insertion or reinsertion

**TREATMENT PLAN:**

1. Patient will be seen 1 or 2 or 3 times a week for acupuncture treatment for 4 weeks. Acupuncture treatment along with:
2. Plain / Electro stimulation acupuncture:
   a. Heat (TDP-CQ27)   b. Moxabustion   c. Ear Acupuncture

**COMMENTS:**

I feel that there is a direct casual relationship between the accident described and patient's current injuries if the history was reported correctly. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point the patient remains impaired with regards to some functional capabilities. As such, I would like to provide acupuncture and recommend continue other therapy for the patient to alleviate the patient and prevent any further progression of disability.

**PROGNOSIS:** _____

L.Ac. _____

*Exhibit 25*



**Position Statement**

American Association of Neuromuscular & Electrodiagnostic Medicine

# Recommended Policy
# for Electrodiagnostic Medicine
## American Association of Neuromuscular & Electrodiagnostic Medicine

### Executive Summary

The electrodiagnostic medicine (EDX) evaluation is an important and useful extension of the clinical evaluation of patients with disorders of the peripheral and/or central nervous system. EDX tests are often crucial to evaluating symptoms, arriving at a proper diagnosis, and in following a disease process and its response to treatment in patients with neuromuscular (NM) disorders. Unfortunately, EDX studies are poorly understood by many in the medical and lay communities. Even more unfortunately, these studies have occasionally been abused by some providers, resulting in overutilization and inappropriate consumption of scarce health resources. The American Association of Neuromuscular & Electrodiagnostic Medicine (AANEM) has developed this model policy to improve the quality of patient care, to encourage appropriate utilization of the procedures involved, and to assist public and private insurance carriers in developing policy regarding EDX testing. This document contains recommendations which can be used in developing and revising current reimbursement guidelines.

This document is based on the AANEM's publication, *The Electrodiagnostic Medicine Consultation*, and was further refined by consensus at a conference of 43 experts in the field of EDX medicine. This consensus conference was held to produce guidelines that could be used to identify overutilization. Participants in the conference represented a diversity of practice types and were either neurologists or physiatrists and included the AANEM Board of Directors, committee chairs, Professional Practice Committee members, and other members of the association. Physicians from both academic medical centers and private practice were represented. With the help of the AANEM Professional Practice Committee, the guidelines have continuously been revised to produce this comprehensive policy regarding the optimal use of EDX procedures.

This document provides:
1. An introduction to the mission of the AANEM.
2. An overview of the scope of EDX medicine.
3. Indications for the performance of EDX testing.
4. A list of applicable American Medical Association Current Procedural Terminology (CPT™) codes.
5. A recommended source for a list of ICD-9-CM diagnosis codes that are acceptable indications for needle electromyography (EMG) and nerve conduction procedures.
6. An overview of nerve conduction studies (NCSs).
7. An overview of needle EMG.
8. An overview of late responses, including H-reflex and F-wave studies.
9. An overview of blink reflexes.
10. An overview of neuromuscular junction (NMJ) studies
11. An overview of somatosensory evoked potentials (SEPs).
12. An overview of autonomic nervous system function testing.
13. A recommended maximum number of EDX studies necessary for certain diagnostic categories in 90% of cases.
14. Information regarding the timing of EDX testing after an injury.
15. Recommended reasonable limits on the frequency of EDX testing in individual patients.
16. Recommended minimum standards for EDX testing that must be met under this policy.
17. A list of nerves to assist in coding for NCSs.

Recognizing the critical need for testing individualized to the patient's condition, it is necessary that physicians have flexibility to design and carry out the appropriate EDX studies. However, the peer-review mechanism should be triggered when patterns of EDX test utilization significantly and consistently deviate from established norms for quantity and variety of procedures. Individuals may obtain the names of American Board of Electrodiagnostic Medicine (ABEM) certified physicians from the ABEM directory found on the ABEM website at www.abemexam.org. These physicians can be contacted to review questionable cases, assist in the review process, and advise on claims that appear to be unusually excessive.

### The American Association of Neuromuscular & Electrodiagnostic Medicine

Founded in 1953 and currently numbering over 5,000 physicians, primarily neurologists and physiatrists, the AANEM is the largest organization worldwide dedicated solely to the scientifically based advancement of NM medicine. The primary goal of the AANEM is to increase the quality of patient care, specifically for those patients with disorders of the central and peripheral

nervous systems, the NM junction, and skeletal muscle by contributing to steady improvement in the methods of diagnosing and treating patients with disorders of muscle and nerve. This goal is accomplished through programs in education, research, and quality assurance.

The AANEM publishes a wide range of educational material and sponsors annual didactic programs, symposia, courses, and workshops. The AANEM informs its members about both basic and clinical research activities in EDX medicine and NM diseases through its annual meeting sessions, the journal *Muscle & Nerve*, CD-ROMs, monographs, case reports, and other educational material. In so doing, the AANEM fosters the conduct of and enhances the quality of this research. The AANEM also offers EDX and NM Training Program Self-Assessment Examinations annually. These examinations are educational tools which are often used by training programs for their residents, fellows, and faculty members. The examinations offer an opportunity for individuals to assess their knowledge of EDX or NM medicine.

The ABEM is an independent credentialing body in EDX medicine. Although it is organized and operated as a committee of the AANEM, it is completely autonomous for purposes of credentialing criteria and procedures. The ABEM's goal is to enhance the quality of patient care through a voluntary certification process and thereby serve the public interest. The ABEM holds an annual examination through which candidates are able to assess their level of competence.

The ABEM operates a Maintenance of Certification Program to provide a mechanism for ABEM Diplomates to demonstrate their continuing education in EDX medicine as they keep up-to-date with this medical specialty. Diplomates are expected to demonstrate current medical knowledge and clinical problem-solving skills in periodic recertification examinations. Certification is limited to 10 years. The first time-limited certificates were issued in 1994.

The AANEM is committed to the development of medically sound and clinically relevant guidelines for EDX medicine. This is accomplished through literature review, expert opinion, and consensus of AANEM leaders and committee members, as well as input from the general membership and other experts in the field. Practice guidelines, technology reviews, consensus statements, and position statements are available free of charge at www.aanem.org.

## Scope of Electrodiagnostic Medicine

Patients are referred for EDX studies by neurologists and physiatrists trained in NM diagnosis, as well as by internists, primary care physicians, neurological and orthopaedic surgeons, and other healthcare providers. The AANEM has published *Referral Guidelines for Electrodiagnostic Medicine Consultations* to assist primary care physicians in determining if referral for an EDX evaluation could be useful for their patients. Some patients are referred for EDX testing with a provisional diagnosis; others are not. Many patients are referred with merely symptoms and/or clinical findings and there is an expectation that the EDX physician will be able to arrive at the correct diagnosis only after the completion of the EDX evaluation.

After taking a history and examining the patient, the physician develops a working diagnosis that may modify the referral diagnosis. The physician's working diagnosis may also be modified as the study proceeds. A number of tests may be needed to address the referral and working diagnoses, and to arrive at the correct final diagnosis. A final diagnosis does not reflect either the decision-making process or the work performed that led to the diagnosis being established.

Furthermore, EDX testing does not always establish an etiologic diagnosis. When "rule-out" diagnoses are not accepted, only a symptomatic diagnosis (e.g., ICD-9-CM code 729.5 "pain in limb" or 782.0 "disturbance in skin sensation") can be coded regardless of the work involved in performing the EDX evaluation.

EDX studies are performed by physicians, almost exclusively neurologist and physiatrists,  as part of an EDX evaluation. The AANEM believes that nonphysician providers, including physical therapists, chiropractors physician assistants, and others, lack the appropriate training and knowledge to perform and interpret EMG studies and interpret NCSs.  The AANEM believes that these providers, along with END technologists, may perform NCS with direct physician supervision.  EDX evaluations include history-taking, appropriate physical examination, and the design, performance, and interpretation of EDX studies. These evaluations usually take a minimum of 30 minutes to perform and can take up to 2 hours or more in particularly complicated clinical situations. Other healthcare professionals sometimes participate, either by assisting the EDX physician or by performing the NCSs under direct physician supervision.

EDX medicine includes a variety of EDX studies, including NCSs (CPT codes 95900-95905), EMG (CPT

2

codes 95860-95872), NMJ testing (CPT code 95937), and other specialized studies. EDX studies are an important means of diagnosing motor neuron diseases, myopathies, radiculopathies, plexopathies, neuropathies, and NMJ disorders (e.g., myasthenia gravis and myasthenic syndrome). EDX studies are also useful when evaluating tumors involving an extremity, the spinal cord, and/or the peripheral nervous system, and in neurotrauma, low-back pain, and spondylosis and cervical and lumbosacral disc diseases.

Although a common problem such as tingling and numbness in the hand and arm (which could be due to lesions in the brain, spinal cord, cervical roots, brachial plexus, or nerves in the upper extremities) may be studied in a similar way by many EDX physicians, there is no single universally accepted specific protocol or set of procedures employed for each diagnostic category. Instead, the EDX physician must continually reassess the findings encountered during the performance of the EDX testing; this new information may require modification of the initial study design to include other unplanned procedures and may require consideration of different alternative diagnostic possibilities. The EDX evaluation is not just a standard "test" like an electrocardiogram (EKG). EKG testing involves only recording techniques performed by a set protocol and is routinely delegated to nonphysician technical personnel for later interpretation by the physician. The EDX physician does not "read" needle EMGs; he or she is integrally involved in performing a detailed study.

EDX studies are individually designed by the EDX physician for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained. The accuracy of needle EMG testing is dependent on the skill of the examiner. The diagnostic interpretation of the needle EMG examination takes place during the performance of the test. Thus, this evaluation constitutes the practice of medicine. For these reasons, it is the position of the AANEM, along with the American Medical Association, the American Academy of Neurology, the American Academy of Physical Medicine and Rehabilitation, and the Department of Veterans Affairs (Veteran's Administration), the state legislatures of New Jersey and Michigan, as well as many state medical boards, that only physicians (MD or DO) should perform needle EMG examinations.

EDX physicians receive training during residency and/or in special EDX fellowships after residency devoted to the performance of these studies and their interpretation. Knowledge of EDX medicine is necessary to pass the board examinations given by the American Board of Physical Medicine and Rehabilitation and the American Board of Psychiatry and Neurology. In addition, there are two examinations specifically emphasizing EDX medicine that are available to physicians who are qualified by training and experience: The American Board of Electrodiagnostic Medicine examination and the American Board of Psychiatry and Neurology's subspecialty certification in Clinical Neurophysiology examination.

For these reasons, the AANEM has traditionally held the position that the only person who can responsibly determine the appropriate tests to investigate a particular patient's clinical symptoms is the physician performing the EDX evaluation. The AANEM recognizes, however, that there is potential for overuse of some EDX procedures by individual providers and that judgments and decisions must be made regarding reimbursement policies for EDX testing. The approach of establishing limits on the number of procedures reimbursed per diagnostic category is fraught with difficulty.

A large number of limits are needed since there are many diagnostic categories. There is little relevant scientific literature on such limits; therefore, alternative approaches are preferable. For example, the peer-review mechanism can be triggered when patterns of EDX test utilization significantly and consistently exceed regional norms (for example, utilization of EDX testing above the 90% level).

This latter approach effectively limits abuse while still permitting the physician the latitude to use his or her best clinical judgment in evaluating the patient in order to provide the best, most cost-efficient patient care. It is the AANEM's desire that this model policy will be given serious consideration when revisions are made to reimbursement policies, so that policies recognize the high standards of practice currently existing in the medical community.

## Indications

EDX testing is used to evaluate the integrity and function of the peripheral nervous system (most cranial nerves, spinal roots, plexi, and nerves), NMJ, muscles, and the central nervous system (brain and spinal cord). EDX testing is performed as part of an EDX evaluation for diagnosis or as follow-up of an existing condition. EDX studies can provide information to:

1.  Identify normal and abnormal nerve, muscle, motor or sensory neuron, and NMJ functioning.
2.  Localize region(s) of abnormal function.

3

3. Define the type of abnormal function.
4. Determine the distribution of abnormalities.
5. Determine the severity of abnormalities.
6. Estimate the date of a specific nerve injury.
7. Estimate the duration of the disease.
8. Determine the progression of abnormalities or of recovery from abnormal function.
9. Aid in diagnosis and prognosis of disease.
10. Aid in selecting treatment options.
11. Aid in following response to treatment by providing objective evidence of change in NM function.
12. Localize correct locations for injection of intramuscular agents (e.g., botulinum toxin).

## Current Procedural Terminology Codes in Electrodiagnostic Medicine

This document applies to the following CPT codes:

## Code: Descriptor

51785: Needle electromyography (EMG) studies of anal or urethral sphincter, any technique

51792: Stimulus evoked response (e.g., measurement of bulbocavernosus reflex latency time)

95860: Needle electromyography; one extremity, with or with out related paraspinal areas

95861: Needle electromyography; two extremities, with or without related paraspinal areas

95863: Needle electromyography; three extremities, with or without related paraspinal areas

95864: Needle electromyography; four extremities, with or without related paraspinal areas

95865: Needle electromyography; larynx

95866: Needle electromyography; hemidiaphragm

95867: Needle electromyography; cranial nerve supplied muscle(s), unilateral

95868: Needle electromyography; cranial nerve supplied muscles, bilateral

95869: Needle electromyography; thoracic paraspinal muscles (excluding T1 or T12)

95870: Needle electromyography; limited study of muscles in one extremity or non-limb (axial) muscles (unilateral or bilateral), other than thoracic paraspinal, cranial nerve supplied muscles, or sphincters

95872: Needle electromyography using single fiber electrode, with quantitative measurement of jitter, blocking and/or fiber density, any/all sites of each muscle studied

95873: Electrical stimulation for guidance in conjunction with chemodenervation (List separately in addition to code for primary procedure)

95874: Needle electromyography for guidance in conjunction with chemodenervation (List separately in addition to code for primary procedure)

95900: Nerve conduction, amplitude and latency/velocity study, each nerve; motor, without F-wave study

95903: Nerve conduction, amplitude and latency/velocity study, each nerve; motor, with F-wave study

95904: Nerve conduction, amplitude and latency/velocity study, each nerve; sensory (Use the List of Nerves on pages 15 and 16 to properly code 95900, 95903, and/or 95904)

95905: Motor and/or sensory nerve conduction, using preconfigured electrode array(s), amplitude and latency/velocity study, each limb, includes F-wave study when performed, with interpretation and report

95920: Intraoperative neurophysiology testing, per hour (List separately in addition to code for primary procedure)

95921: Testing of autonomic nervous system function; cardiovagal innervation, (parasympathetic function), including two or more of the following: heart rate response to deep breathing with recorded R-R interval, Valsalva ratio, and 30:15 ratio

95922: Testing of autonomic nervous system function; vasomotor adrenergic innervation, (sympathetic adrenergic function), including beat-to-beat blood pressure and R-R interval changes during Valsalva maneuver and at least 5 minutes of passive tilt

95923: Testing of autonomic nervous system function; sudomotor, including one or more of the following: quantitative sudomotor axon reflex test (QSART), silastic sweat imprint, thermoregulatory sweat test, and changes in sympathetic skin potential.

95925: Short-latency somatosensory evoked potential study, stimulation of any/all peripheral nerves or skin sites, recording from the central nervous system; in upper limbs

95926: Short-latency somatosensory evoked potential study, stimulation of any/all peripheral nerves or skin sites, recording from the central nervous system; in lower limbs

95927: Short-latency somatosensory evoked potential study, stimulation of any/all peripheral nerves or skin sites, recording from the central nervous system; in the trunk or head

95928: Central motor evoked potential study (transcranial motor stimulation); upper limbs

95929: Central motor evoked potential study (transcranial motor stimulation); lower limbs

95933: Orbicularis oculi (blink) reflex, by electrodiagnostic testing

95934: H-reflex, amplitude and latency study; record gastrocnemius/soleus muscle

95936: H-reflex, amplitude and latency study; record muscle other than gastrocnemius/soleus muscle

4

95937: Neuromuscular junction testing (repetitive stimulation, paired stimuli), each nerve, any one method

## Acceptable Diagnostic Codes

The AANEM publishes a coding guide that contains ICD-9-CM codes of relevance to EDX medicine. Because EDX testing in some patients does not establish an etiologic diagnosis, any list of ICD-9-CM codes for EDX testing must include symptom codes (such as weakness, pain, or altered sensation), as well as codes for defined diseases.

## CPT Codes 95900-95904: Nerve Conduction Studies Overview

1. NCSs (CPT codes 95900-95904) are performed to assess the integrity and diagnose diseases of the peripheral nervous system. Specifically, they assess the speed (conduction velocity, and/or latency), size (amplitude), and shape of the response. Pathological findings include conduction slowing, conduction block, no response, and/or low amplitude response. NCS results can assess the degree of demyelination and axon loss in the segments of the nerve studied. This portion of the EDX evaluation is performed by the physician alone or by a trained allied health professional under direct supervision of a physician trained in EDX medicine.

2. A typical NCS examination includes the following:

   a. Development of a differential diagnosis by the EDX physician, based upon appropriate history and physical examination.

   b. NCS of a number of nerves by recording and studying the electrical responses from peripheral nerves or the muscles they innervate, following electrical stimulation of the nerve. Usually surface electrodes are used for both stimulation and recording, though needle electrodes may be required in special cases.

   c. Completion of indicated needle EMG studies (see below) to evaluate the differential diagnosis and to complement the NCSs.

3. Motor, sensory, and mixed NCSs and late responses (F-wave and H-reflex studies) are frequently complementary and performed during the same patient evaluation.

4. Although the stimulation of nerves is similar across all NCSs, the characteristics of motor, sensory, and mixed NCSs are different and are discussed separately below. In each case, an appropriate nerve is stimulated and recording is made either from the appropriate nerves or from muscle supplied by the motor nerve.

   a. Motor NCSs (CPT codes 95900 and 95903) are performed by applying electrical stimulation at various points along the course of a motor nerve while recording the electrical response from an appropriate muscle. Response parameters include amplitude, latency, configuration, and motor conduction velocity.

   b. Sensory NCSs (CPT code 95904) are performed by applying electrical stimulation near a nerve and recording the response from a distant site along the nerve. Response parameters include amplitude, latency, configuration, and sensory conduction velocity.

   c. Mixed NCS (CPT code 95904-this may still be used to code for mixed studies, even though the reference to "mixed" was dropped from the descriptor) are performed by applying electrical stimulation near a nerve containing both motor and sensory fibers (a mixed nerve) and recording from a different location along that nerve that also contains both motor and sensory nerve fibers. Response parameters include amplitude, latency, configuration, and both sensory and motor conduction velocity.

5. NCS reports should document the nerves evaluated, the distance between the stimulation and recording sites, the conduction velocity, latency values, and amplitude. The temperature of the studied limbs may be included. A final diagnosis, which, in some cases, may be a symptom diagnosis or a diagnosis of normal, is then made.

It is possible to include a hard copy of these studies as part of the medical chart; however, in most situations it does not add useful information to the report of the EDX physician. Requiring hard copy as a condition for reimbursement is generally unnecessary and burdensome. A legitimate reason to make a request for the hard copy of neurophysiological data is to permit an independent expert to review the original material to provide an independent interpretation of the findings. There are clinical (second opinion) and medical-legal (dispute over the diagnosis) situations in which this type of review is indicated, although there are limitations to later interpretation of the hard copy. Other reasons for requesting hard copy may be if questions of over-utilization are at issue, or significant concerns exist regarding fraud and abuse. Anyone requiring hard copy of neurophysiologic data must notify the physician ahead of time, as many physicians do not store this data.

6. The number of nerves tested should be the minimum necessary to address the clinical issue. In almost all studies, this will appropriately include evaluation of 1 or more nerves that have normal test results.

7. Because the EDX evaluation is tailored to the individual patient, it is inappropriate to identify set numbers of acceptable studies for a given diagnosis. However, practice parameters and professional

guidelines define general principles, and the AANEM's *The Electrodiagnostic Medicine Consultation* is useful in this regard. One mechanism for gauging utilization is to compare a practitioner's practice patterns against other physicians. Physicians who regularly (>10% of the time) differ from established norms might be asked to provide information about the characteristics of their patient population or practice style.

8. The CPT descriptor language, "Report 95900, 95903, and/or 95904 only once when multiple sites on the same nerve are stimulated or recorded" clarifies that "1 nerve" in the 3 nerve conduction CPT codes includes all different stimulation sites along the individual motor, sensory, or mixed nerves that are tested. To qualify as a single NCS refer to the List of Nerves at the end of the document. Each line on the list of nerves refers to a different nerve and should be billed as an individual unit. It is inappropriate to bill more than one unit for "inching" or studying the same nerve by moving the stimulating electrode closer to the recording electrode. It should be noted that most nerves have a contralateral counterpart; bilateral testing is often necessary for comparison purposes and the nerve on each side may be billed separately. In addition, motor (CPT code 95900 or 95903), sensory (CPT code 95904), and mixed sensory (CPT code 95904) studies on an individual nerve are appropriately carried out and billed separately.

9. CPT codes 95903 and 95900 may appropriately be billed together for the same patient on the same day of service when multiple nerves are tested, some with and some without F waves, because in that case they describe 2 distinct and independent services provided on the same day. However, CPT codes 95903 and 95900 cannot be billed together for the same nerve in a given patient on a given day. It is appropriate to add modifier -59 when billing 95900 and 95903 to indicate separate and distinct procedures on the same patient on the same day.

## CPT Code 95905: Nerve Conduction with Preconfigured Electrode Array(s)

1. Technical and reporting aspects of NCSs described in items 1, 2, and 7 of the NCS Overview above apply to studies performed with preconfigured electrode array(s).

2. 95905 may be reported only once per limb studied and cannot be used in conjunction with codes for nerve conduction or H-reflex studies, as indicated in the parenthetical notes following code 95905.

## CPT Codes 95860-95870: Needle Electromyography Overview

1. Needle EMG (CPT codes 95860-95870) is performed to exclude, diagnose, describe, and follow diseases of the peripheral nervous system and muscle. Needle EMG refers to the recording and study of electrical activity of muscle using a needle electrode. This portion of the EDX evaluation should always be performed by the physician.

2. A typical EMG examination includes the following:
   a. Development of a differential diagnosis by the EDX physician, based upon appropriate history and physical examination.
   b. Completion of indicated NCSs (see above) to evaluate the differential diagnosis and to complement the needle EMG studies.
   c. Needle EMG testing of selected muscles. This is accomplished by inserting a needle electrode into appropriate muscles, one at a time. The needle electrode allows the muscle's electrical characteristics at rest and during activity to be interpreted by the EDX physician. This interpretation includes analysis of oscilloscope tracings and the characteristic sounds produced by electrical potentials. The final interpretation of the study is a synthesis by the EDX physician of the patient's history, physical examination, and the preceding and following portions of the study.

3. The muscles studied will vary depending upon the differential diagnosis and the ongoing synthesis of new information obtained by the EDX physician while the test is being performed.

4. Needle EMG studies are interpreted in real time, as they are being performed. Most electromyographic machines are unable to permanently copy the sounds produced during needle EMG testing. In addition, it is difficult and quite expensive to permanently copy needle EMG oscilloscope tracings. For this reason, these tracings should not be required.

5. Normal findings and abnormalities uncovered during the study are documented and interpreted. Needle EMG reports should document the muscles tested, and report the presence and type of spontaneous activity, as well as the characteristics of the voluntary unit potentials. A final diagnosis, which, in some cases, may be a symptom diagnosis or a diagnosis of normal, is made.

## CPT Codes 95860-95864: Extremity Needle Electromyography Studies

1. One unit of service, billed with any of the codes, 95860-95864 includes all muscles tested in a particular extremity or extremities, with or without related paraspinal muscles. In some instances, evaluation of the paraspinal musculature may either be contraindicated or not feasible. Some examples may include but are not limited to: (1) patients with disorders of coagulation or

6

on anticoagulation medications, (2) history of surgery in paraspinal muscles, (3) infection in the paraspinal muscle region, (4) patient refusal, (5) inability to position a ventilator-dependent patient, and (6) diagnosis of a condition which eliminates the need to evaluate paraspinal muscles.

The ultimate decision about the indication for paraspinal examination should be left to the EDX physician, as is the decision about what other muscles should be examined.
2. Only 1 unit of service of codes 95860-95864 may be reported per patient for a given examination.
3. CPT codes 95860-95864 should be used for reporting complete studies of the extremities. These codes require evaluation of extremity muscles innervated by 3 nerves (for example, radial, ulnar, median, tibial, peroneal, femoral, not sub-branches) or 4 spinal levels, with a minimum of 5 muscles studied per limb.
4. Codes 95860-95864 can appropriately be reported in combination with CPT code 95869 (Needle electromyography; thoracic paraspinal muscles) only if paraspinals between T3-T11 are studied. If this occurs in more than 20% of cases, the payer may wish to consult with the provider in order to better understand the necessity of performing both of these tests. CPT code 95869 may not be billed with CPT codes 95860-95864 if only T1 and/or T2 are studied when an upper extremity was also studied.
5. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above.

## CPT Code 95865: Needle Electromyography, Larynx

1. CPT code 95865 is used to report needle examination of the larynx.
2. Because needle EMG of the larynx is typically performed bilaterally, modifier 50 should not be appended to 95865 for bilateral testing.
3. Modifier 52 should be reported for unilateral testing.

## CPT Code 95866: Needle Electromyography, Hemidiaphragm

1. CPT code 95866 is used to report needle examination of the diaphragm.
2. Modifier 50 should be appended to 95866 when testing is performed bilaterally.

## CPT Codes 95867 and 95868: Needle Electromyography, Cranial Nerve Supplied Muscles

1. CPT code 95867 is used for the needle examination of 1 or more muscles supplied by cranial nerves on 1 side

of the body. CPT code 95868 is used for the needle examination of 1 or more muscles supplied by cranial nerves on both sides of the body. These 2 CPT codes should not be reported together.
2. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above.

## CPT Code 95869: Needle Electromyography; Thoracic Paraspinal Muscles

1. CPT code 95869 should be used when exclusively studying thoracic paraspinal muscles.
2. One unit can be billed, despite the number of levels studied or whether unilateral or bilateral.
3. Characteristics of the examination should be noted as described in the overview of needle EMG above.

## CPT Code 95870: Needle Electromyography; Limited Study of Muscles in One Extremity or Non-limb (Axial) Muscles (Unilateral or Bilateral), Other Than Thoracic Paraspinal, Cranial Nerve Supplied Muscles, or Sphincters

1. Code 95870 is used for limited testing of specific muscles during an examination. This code should be used only when the muscles tested do not fit more appropriately under another CPT code.
2. Code 95870 can be billed at 1 unit per extremity. The code can also be used for muscles on the thorax or abdomen (unilateral or bilateral). One unit may be billed for studying cervical or lumbar  paraspinal muscles (unilateral or bilateral), regardless of the number of levels tested.
3. Multiple units of CPT code 95870 may be billed in a single study. However, if an individual physician's practice pattern reveals that multiple units of this code are used in more than 20% of the provider's needle EMG studies, the payer may wish to consult with the provider in order to better understand the necessity of providing multiple units of this service. In such cases, peer review of this pattern may be appropriate.
4. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above.
5. CPT code 95870 may be billed with 95860-95864 if a limited study is performed in conjunction with a full-limb.

## CPT Code 95872: Single Fiber Electromyography

1. In single-fiber electromyography (SFEMG), a specially designed needle electrode is used to record and identify action potentials (APs) from individual muscle

7

fibers. These recordings are used to calculate the NM jitter and the muscle fiber density (FD). Jitter is the variability in time between activation of the motor nerve and generation of the muscle fiber AP, and reflects the normality of nerve-muscle transmission. Jitter may be assessed by measuring the time variability between APs from 2 muscle fibers in the same voluntarily activated motor unit, or by stimulating the motor axon and measuring the variability between stimulus and APs in the responding muscle fibers.

Normal jitter varies among muscles and among muscle fibers within individual muscles, but is generally in the range of 10 to 50 μs. To determine if jitter is abnormally increased, statistical analysis is performed on the results from recordings from a population of muscle fibers within each tested muscle. When NM transmission is sufficiently abnormal that nerve activation produces no muscle AP, blocking is seen. Increased jitter, blocking, or both, may occur in a variety of conditions, including primary disorders of NM transmission.

2. FD is a measurement of the mean number of muscle fibers belonging to the same motor unit detected by the SFEMG electrode at a number of different insertion sites during voluntary activation of the motor unit.

3. Needle EMG should be performed in at least 1 clinically involved muscle before attributing pathologic jitter or blocking to a NM transmission disorder.

4. The results of jitter testing in each muscle are reported as the mean jitter among all pairs of APs recorded during voluntary activation (or the mean jitter of all APs recorded during axonal stimulation), the percentage of pairs (or APs) in which blocking was seen, and the percentage of pairs (or APs) in which jitter was normal. FD is reported as the mean number of muscle fibers per motor unit at 20 recording sites for each muscle tested.

5. Jitter and FD may be measured in 1 or more muscles depending on the condition being evaluated and the results of testing.

6. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above, as well as specific discussion about the presence or absence of jitter and other abnormalities in the muscles tested.

## CPT Codes 95873 and 95874: Electrical Stimulation and Needle Electromyography for Guidance in Conjunction with Chemodenervation

1. Electrical stimulation and needle EMG for guidance in conjunction with chemodenervation (CPT codes 95873 and 95874) can be medically necessary to determine the precise localization for needle placement before the drug

or biological is injected. Electrical stimulation or needle EMG should always be performed by the physician.

2. A typical electrical stimulation or needle EMG guidance procedure for chemodenervation includes the following:

a. Determine whether precise localization with electrical stimulation or needle EMG is medically necessary to facilitate delivery of the chemodenervation drug or biological to the appropriate target muscle sites.

b. Electrical stimulation localization. This is accomplished by having the physician attach the stimulating needle electrode and syringe containing the drug or biological to be injected to the stimulating apparatus. The target muscles are identified by anatomical surface markers and the needle is advanced through the skin. The stimulating apparatus is activated at low frequency and relatively high intensity, and the needle is relocated until muscle contraction is seen or palpated by the physician. The stimulus is decreased and the needle position is adjusted to achieve the maximal muscle contraction at that intensity. The procedure is repeated until a maximal muscle contraction is achieved at a minimal stimulus intensity.

c. Needle EMG localization. This is accomplished by having the physician attach a recording needle electrode and syringe containing the drug or biological to be injected together. The needle is advanced into the body and a small amount of the drug or biological is injected. The needle is advanced further to spread the drug or biological through the targeted muscle. The presence of persistent EMG motor unit activity confirms that the needle is in the muscle.

3. The electrical stimulation or needle EMG localization procedures may be repeated depending on the number of target muscle sites involved. It is appropriate to report multiple units of 95873 or 95874 when electrical stimulation or needle EMG involves more than one contiguous body part.

4. Codes 95873 and 95874 are add-on codes that should be reported in conjunction with chemodenervation codes 64612-64614, which are reported separately. Codes 95873 and 95874 should not be reported in conjunction with needle electromyography procedure codes 95860-95870. Codes 95873 and 95874 should not be reported together.

## CPT Code 51785: Needle Electromyography of Anal or Urethral Sphincter, Any Technique

1. Under specific circumstances in which there is suspicion of injury to the sacral roots of the spinal cord, separate study of the anal sphincter is required since this is the only muscle accessible to needle EMG

examination which receives its innervation through these roots. This testing may also be performed to assess the innervation and anatomic integrity of the sphincters.

2. In investigations of the function of the sacral roots, needle EMG study of the anal sphincter can be combined with electrically-elicited measurement of the bulbocavernosus reflex latency (CPT code 51792).

3. The physician's report should identify the muscles tested. Characteristics of the examination should be noted as described in the overview of needle EMG above.

## Late Responses: H-Reflex and F-Wave Studies Overview

1. Late responses are performed to evaluate nerve conduction in portions of the nerve more proximal (near the spine) and, therefore, inaccessible to direct assessment using conventional techniques. Electrical stimulation is applied on the skin surface near a nerve site in a manner that sends impulses both proximally and distally. Characteristics of the response are assessed, including latency.

2. F-wave and H-reflex studies provide information in the evaluation of radiculopathies, plexopathies, polyneuropathies (especially with multifocal conduction block or in suspected Guillain-Barré syndrome or chronic inflammatory demyelinating polyneuropathy), and proximal mononeuropathies. In some cases, they may be the only abnormal study.

3. The physician's report should identify the nerves evaluated and the F-wave and H-reflex characteristics, including latency.

## CPT Codes 95934 and 95936: H-Reflex Studies

1. CPT codes 95934 and 95936 are defined as unilateral H-reflex study codes and are intended to be reported per study. Typically, only two H-reflex studies are performed in a given examination.

2. H-reflex studies usually must be performed bilaterally because symmetry of responses is an important criterion for abnormality. When a bilateral H-reflex study is performed, the entire procedure must be repeated, increasing examiner time and effort; there are no economies of scale in multiple H-reflex testing. A bilateral H-reflex study should be reported by appending modifier "-50 Bilateral Procedure," to the CPT code reported.

3. H-reflex studies usually involve assessment of the gastrocnemius/soleus muscle complex in the calf (CPT code 95934). Bilateral gastrocnemius/soleus H-reflex abnormalities are often early indications of spinal stenosis, or bilateral S1 radiculopathies.

4. In rare instances, H-reflexes need to be tested in muscles other than the gastrocnemius/soleus muscle, for example, in the upper limbs. In conditions such as cervical radiculopathies or brachial plexopathies, an H-reflex study can be performed in the arm (flexor carpi radialis muscle). Other muscles that may be tested, although rarely, are the intrinsic small muscles of the hand and foot. These cases would be coded using CPT code 95936.

## CPT Code 95903: Nerve Conduction Study With F-Wave Study

F-wave studies are billed in combination with the motor nerves that are examined (CPT code 95903). Although the set-up for an F-wave study is similar to the set-up for a motor NCS, the testing is performed separately from motor NCSs, utilizing different machine settings and separate stimulation to obtain a larger number of responses (at least 10).

1. The number of F-wave studies which need to be performed on a given patient depends on the working diagnosis and the EDX findings already in evidence. It may be appropriate in the same patient to perform some motor NCSs with an F wave and others without an F wave.

## CPT Code 95933: Blink Reflexes Overview

1. The blink reflex (CPT code 95933) is an electrophysiologic analog of the corneal reflex. The latency of the responses, including side-to-side differences, can help localize pathology in the region of the fifth or seventh cranial nerves, or in the brainstem. The latencies and amplitudes of directly elicited facial motor responses should be determined to exclude a peripheral abnormality if the blink reflexes are abnormal.

2. Recordings should be made bilaterally with both ipsilateral and contralateral stimulation.

3. The report of this study should include the presence or absence of the R1 and R2 components on both sides and the latencies of recorded R1 and R2 components.

## CPT Code 95937: Neuromuscular Junction Studies
### Overview

1. Repetitive stimulation studies (CPT code 95937) are used to identify and to differentiate disorders of the NMJ. This test consists of recording muscle responses to a series of nerve stimuli (at variable rates), both before, and at various intervals after, exercise or transmission of high-frequency stimuli.

2. These codes may be used in association with motor and sensory NCSs of the same nerves and are reimbursed separately.

3. When this study is performed, the physician's report should note characteristics of the test, including the rate

9

of repetition of stimulations, and any significant incremental or decremental response.

## CPT Codes 95925-95927: Somatosensory Evoked Potentials Overview

Somatosensory evoked potentials (SEPs) (CPT codes 95925, 95926, and 95927) are an extension of the EDX evaluation and can be used to test conduction in various sensory fibers of the peripheral and central nervous systems. SEPs may be used to assess the functional integrity of the central and peripheral sensory pathways.

Common diagnoses in EDX medicine where SEPs have demonstrated usefulness include but are not limited to the following: spinal cord trauma, subacute combined degeneration, nontraumatic spinal cord lesions (e.g., cervical spondylosis), multiple sclerosis, spinocerebellar degeneration, myoclonus, coma, and intraoperative monitoring of spinal cord, brainstem, and brain sensory tracts. Intraoperative SEP monitoring is indicated for selected spine surgeries in which there is a risk of additional nerve root or spinal cord injury. Indications for SEP monitoring may include, but are not limited to, complex, extensive, or lengthy procedures, and when mandated by hospital policy. However, intraoperative SEP monitoring may not be indicated for routine lumbar or cervical root decompression.

SEPs are noninvasive studies performed by repetitive submaximal stimulation of a sensory or mixed sensorimotor peripheral nerve and recording the averaged responses from electrodes placed over proximal portions of the nerve stimulated, plexus, spine, and scalp. Amplitude, peak, and interpeak latency measurements with side-to-side comparisons are used to assess abnormalities.
1. The SEP study codes are separated into upper and lower limbs. A maximum of two codes are to be submitted for all upper or lower limb studies performed on a given patient on a given day. SEP study codes are defined as bilateral studies. A unilateral study using CPT codes 95925, 95926, or 95927 should be reported with modifier "-52, Reduced Services."
2. Depending on the clinical condition being investigated, several nerves in 1 extremity may have to be tested and compared with the opposite limb.
3. The physician's SEP report should note which nerves were tested, latencies at various testing points, and an evaluation of whether the resulting values are normal or abnormal.

## Autonomic Nervous System Function Testing Overview

The purpose of autonomic nervous system function testing is to determine the presence of autonomic dysfunction, the site of autonomic dysfunction, and the various autonomic systems which may be disordered.

## CPT Code 95921: Cardiovagal Innervation

Cardiovagal innervation tests provide a standardized quantitative evaluation of vagal innervation to the heart (parasympathetic function). The responses are based on the interpretation of changes in continuous heart rate recordings in response to standardized maneuvers. Impairment occurs in autonomic failure due to diseases such as Shy-Drager syndrome, idiopathic orthostatic hypotension, diabetic neuropathy, and other neuropathies affecting autonomic nerves.

## CPT Code 95922: Vasomotor Adrenergic Innervation

Vasomotor adrenergic innervation evaluates adrenergic innervation of the circulation and of the heart in autonomic failure due to diseases such as Shy-Drager syndrome, idiopathic orthostatic hypotension, diabetic neuropathy, and other neuropathies affecting autonomic nerves.

## CPT Code 95923: Evaluation of Sudomotor Function

Sudomotor function can be evaluated using any of the following methods:
1. A quantitative sudomotor axon reflex test (QSART) is a noninvasive test that evaluates the integrity of the distal postganglionic sympathetic nerve fibers which may be impaired in diabetic and other neuropathies affecting autonomic nerves and in progressive autonomic disorders. This test involves the stimulation of sympathetic nerve fibers to the sweat glands at standard sites by the iontophoresis of acetylcholine and measuring the evoked sweat response by sudorometers. The test is performed optimally on 1 forearm site and 3 sites on the lower extremities in order to determine the severity and distribution of the sympathetic deficit.
2. The silastic sweat imprint differs from QSART in that the recording is an imprint of the sweat droplets appearing as indentations on silastic material.
3. The thermoregulatory sweat test is a test of sympathetic nerves that supply the skin. The skin is dusted with an indicator powder which changes color when the patient sweats in response to raising the patient's temperature by raising the ambient temperature in a heat cabinet.
4. Sympathetic peripheral autonomic skin (or surface) potentials (PASPs) are evoked by electrical stimulation (of the skin) and electric potential recordings are made over the palm and soles of the feet. The PASP change is

10

carried by autonomic nerve fibers and evaluates if these fibers are working normally.

5. When these evaluative tests are conducted, the physician's report should state which test(s) was/were conducted and whether the test results were normal or abnormal.

## Maximum Number of Tests Necessary in 90% of Cases

Table 1, "Maximum Number of Studies," summarizes the AANEM's recommendations regarding a reasonable maximum number of studies per diagnostic category necessary for a physician to arrive at a diagnosis in 90% of patients with that final diagnosis. Each number in the "Maximum Number of Studies Table" represents 1 study or unit. The table is designed as a tool to identify outlier trends and prevent abuse and overutilization; it is not an absolute maximum threshold, and should not be used to automatically deny reimbursement over the maximum.

The maximum numbers, as shown in the table, are designed to apply to a diversity of practice styles, as well as practice types, including those at referral centers where more complex testing is frequently necessary. In simple, straightforward cases, fewer tests will be necessary. This is particularly true when results of the most critical tests are normal. In complex cases, the maximum numbers in the table will be insufficient for the physician to arrive at a complete diagnosis. In cases where there are borderline findings, additional tests may be required to determine if the findings are significant.

The appropriate number of studies to be performed should be left to the judgment of the physician performing the EDX evaluation; however, in the small number of cases which require testing in excess of the numbers listed in the table (the AANEM estimates 10% of cases), the physician should be able to provide supplementary documentation to justify the additional testing. Such documentation should explain what other differential diagnostic problems needed to be ruled out in that particular situation,.

Multiple diagnoses will be established by EDX testing in approximately 25% of patients. When multiple diagnoses are identified, the recommendations listed in Table 1 for a single diagnostic category do not apply.

It should be noted that in some situations it is necessary to test an asymptomatic contralateral limb to establish normative values for an individual patient. Normal values based on the general population alone are less sensitive than this approach, therefore restrictions on contralateral asymptomatic limb testing will reduce the sensitivity of EDX tests.

| Table 1: Maximum Number of Studies Table | | | | | |
|---|---|---|---|---|---|
| | Needle EMG, CPT 95860-95870 | Nerve Conduction Studies, CPT 95900-95904 | | Other Electrodiagnostic Studies, CPT 95934-95937 | |
| Indication | Number of Services (Tests) | Motor NCS with and/or without F-wave | Sensory NCS | H-Reflex | Neuromuscular Junction Testing (Repetitive Stimulation |
| Carpal Tunnel (unilateral) | 1 | 3 | 4 | | |
| Carpal Tunnel (bilateral) | 2 | 5 | 6 | | |
| Radiculopathy | 2 | 3 | 2 | 2 | |
| Mononeuropathy | 1 | 3 | 3 | 2 | |
| Polyneuropathy/Mononeuropathy Multiplex | 3 | 4 | 4 | 2 | |
| Myopathy | 2 | 2 | 2 | | 2 |
| Motor Neuronopathy (e.g., ALS) | 4 | 4 | 2 | | 2 |
| Plexopathy | 2 | 4 | 6 | 2 | |
| Neuromuscular Junction | 2 | 2 | 2 | | 3 |
| Tarsal Tunnel Syndrome (unilateral) | 1 | 4 | 4 | | |
| Tarsal Tunnel Syndrome (bilateral) | 2 | 5 | 6 | | |
| Weakness, Fatigue, Cramps or Twitching (focal) | 2 | 3 | 4 | | 2 |
| Weakness, Fatigue, Cramps or Twitching (general) | 4 | 4 | 4 | | 2 |
| Pain, Numbness, or Tingling (unilateral) | 1 | 3 | 4 | 2 | |
| Pain, Numbness, or Tingling (bilateral) | 2 | 4 | 6 | 2 | |

## Carpal Tunnel Syndrome

For suspected carpal tunnel syndrome (CTS), bilateral median motor and sensory NCSs are often indicated. The studies in the contralateral asymptomatic limb serve as controls in cases where values are borderline and may establish the presence of bilateral CTS, which is a frequent finding. Two to 4 additional sensory or mixed NCSs can be compared to the median sensory NCSs to increase the diagnostic sensitivity of the testing. The additional sensory NCSs and an additional motor NCS (usually ulnar) are indicated to exclude a generalized neuropathy or multiple mononeuropathies.

If 2 sensitive sensory NCSs are performed at the beginning start, additional sensory testing on the same limb is rarely needed. For suspected bilateral CTS, bilateral median motor and sensory NCSs are indicated. Up to 2 additional motor and 2 additional sensory NCSs are often indicated. The extent of the needle EMG examination depends on the results of the NCSs and the differential diagnosis considered in the individual patient.

Additional testing may be indicated in patients with a differential diagnosis which includes peripheral neuropathy, cervical radiculopathy, brachial plexopathy, or more proximal median neuropathy.

## Radiculopathy

A minimal evaluation for radiculopathy includes 1 motor and 1 sensory NCS and a needle EMG examination of the involved limb. However, the EDX testing can include up to 3 motor NCSs (in cases of an abnormal motor NCS, the same nerve in the contralateral limb and another motor nerve in the ipsilateral limb can be studied) and 2 sensory NCSs. Bilateral studies are often necessary to exclude a central disc herniation with bilateral radiculopathies or spinal stenosis or to differentiate between radiculopathy and plexopathy, polyneuropathy, or mononeuropathy. H reflexes and F waves can provide useful complementary information that is helpful in the evaluation of suspected radiculopathy and can add to the certainty of EDX information supporting a diagnosis of root dysfunction.

Radiculopathies cannot be diagnosed by NCS alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by 1 physician supervising and/or performing all aspects of the study

## Polyneuropathy/Mononeuropathy Multiplex

In order to characterize the nature of the polyneuropathy (axonal or demyelinating, diffuse or multifocal) and in order to exclude polyradiculopathy, plexopathy, neuronopathy, or multiple mononeuropathies, it may be necessary to study 4 motor and 4 sensory nerves, consisting of 2 motor and 2 sensory NCSs in 1 leg, 1 motor and 1 sensory NCS in the opposite leg, and 1 motor and 1 sensory NCS in 1 arm. H-reflex studies and F-wave studies from 2 nerves may provide additional diagnostic information. At least 2 limbs should be studied by a needle EMG examination. Studies of related paraspinal muscles are indicated to exclude some conditions such as polyradiculopathy.

## Myopathy

To diagnose a myopathy, a needle EMG examination of 2 limbs is indicated. To help exclude other disorders such as polyneuropathy or neuronopathy, 2 motor and 2 sensory NCSs are indicated. Two repetitive motor nerve stimulation studies may be performed to exclude a disorder of NM transmission.

## Motor Neuronopathy

In order to establish the diagnosis of motor neuronopathy (for example, amyotrophic lateral sclerosis [ALS or Lou Gehrig's disease]) and to exclude other disorders in the differential diagnosis, such as multifocal motor neuropathy or polyneuropathy, up to 4 motor nerves and 2 sensory nerves may be studied.

Needle EMG of up to 4 extremities (or 3 limbs and facial or tongue muscles) is often necessary to document widespread denervation and to exclude a myopathy. One repetitive motor nerve stimulation study may be indicated to exclude a disorder affecting NM transmission.

## Plexopathy

To characterize a brachial plexopathy and to differentiate it from cervical radiculopathy and mononeuropathies, it is often necessary to study all major sensory and motor nerves that can be easily studied in both upper extremities (radial, median, ulnar, and medial and lateral antebrachial cutaneous sensory; radial, median, ulnar, and possibly axillary and musculocutaneous motor) and to perform a needle EMG examination in both upper extremities. To characterize the lumbosacral plexopathy and to differentiate it from lumbar radiculopathy and mononeuropathies, it is often necessary to study all major sensory and motor nerves that can be easily studied in both lower extremities (superficial peroneal and sural sensory; peroneal and posterior tibial motor) and to perform a needle EMG examination in both lower

12

extremities. F-wave studies in the motor nerves and soleus H reflexes also provide useful information.

## Neuromuscular Junction

To demonstrate and characterize abnormal NM transmission, repetitive nerve stimulation studies should be performed in up to 2 nerves and SFEMG in up to 2 muscles. If any of these are abnormal, up to 2 motor and 2 sensory NCSs may be performed to exclude neuropathies that can be associated with abnormal NM transmission. At least 1 motor and 1 sensory NCS should be performed in a clinically involved limb, preferably in the distribution of a nerve studied with repetitive stimulation or SFEMG. At least 1 distal and 1 proximal muscle should be studied by a needle EMG examination to exclude a neuropathy or myopathy that can be associated with abnormal repetitive stimulation studies or SFEMG. At least 1 of the muscles should be clinically involved and both muscles should be in clinically involved limbs.

## Timing of Testing After an Injury

In combination, NCSs and a needle EMG examination may be most helpful when performed several weeks after the injury has occurred. However, NCSs are often useful acutely after nerve injury, for example, if there is concern that a nerve has been severed. In fact, if studies are delayed, the opportunity to precisely identify the region of injury or to intervene may be lost. In some cases, even needle EMG testing performed immediately after a nerve injury may demonstrate abnormal motor unit action potential (MUAP) recruitment and/or provide baseline information that can be helpful to document preexisting conditions, date the injury, or serve as a baseline for comparison with later studies.

Because of the variability of different nerve injuries, a standard rule on the timing of EDX testing cannot easily be established and the AANEM does not have specific recommendations in this regard. In all instances, the AANEM encourages dialogue between physicians and payers and encourages the appropriate use of the physician's clinical judgment in determining when studies are most appropriately performed and what studies should be conducted.

## Frequency of Electrodiagnostic Testing in a Given Patient

There are many clinical situations where good medical management requires repeat testing, such as in the following examples:

1. **Second diagnosis**. Where a single diagnosis is made on the first visit, but the patient subsequently develops a new set of symptoms, further evaluation is required for a second diagnosis that treatment can begin.

2 **Inconclusive diagnosis**. When a serious diagnosis (e.g., ALS) is suspected but the results of the needle EMG/NCS examination are insufficient to be conclusive, follow-up studies are needed to establish or exclude the diagnosis.

3. **Rapidly evolving disease**. Initial EDX testing in some diseases may not show any abnormality (e.g., Guillain-Barré syndrome) in the first 1 to 2 weeks. An early diagnosis confirmed by repeat electrodiagnosis must be made quickly so that treatment can begin. Follow-up testing can be extremely useful in establishing prognosis and monitoring patient status.

4. **Course of the disease**. Certain treatable diseases such as polymyositis and myasthenia gravis follow a fluctuating course with variable response to treatment. The physician treating such patients needs to monitor the disease progress and the response to therapeutic interventions. The results of follow-up evaluations may be necessary to guide treatment decisions.

5. **Unexpected course or change in course of the disease.**
In certain situations, management of a diagnosed condition may not yield expected results or new, questionably related problems may occur (e.g., failure to improve following surgery for radiculopathy). In these instances, reexamination is appropriate.

6. **Recovery from injury**. Repeat evaluations may be needed to monitor recovery, to help establish prognosis, and/or to determine the need for and timing of surgical intervention (e.g., traumatic nerve injury).

Repeat EDX evaluation is therefore sometimes necessary and, when justifiable, should be reimbursed. Reasonable limits can be set concerning the frequency of repeat EDX testing per year in a given patient by a given EDX physician for a given diagnosis. The following numbers of tests per 12-month period per diagnosis per physician are acceptable:

1. **Two** tests for carpal tunnel-unilateral, carpal tunnel-bilateral, radiculopathy, mononeuropathy, polyneuropathy, myopathy, and NMJ disorders.

2. **Three** tests for motor neuronopathy and plexopathy. These limits should **not** apply if the patient requires evaluation by more than 1 EDX physician (i.e., a second opinion or an expert opinion at a tertiary care center) in a given year or if the patient requires evaluation for a second diagnosis in a given year.

Additional studies may be required or appropriate over and above these guidelines. In such situations, the reason for the repeat study should be included in the body of the report or in the patient's chart. Comparison with the

13

previous test results should be documented. This additional documentation from the physician regarding the necessity for the additional repeat testing would be appropriate. Repeat EDX testing should not be necessary in a 12-month period in 80% of all cases.

## Minimum Standards

1. EDX testing should be medically indicated.

2. Testing should be performed using EDX equipment that provides assessment of all parameters of the recorded signals. Studies performed with devices designed only for "screening purposes" rather than diagnosis are not acceptable under this policy.

3. The number of tests performed should be the minimum needed to establish an accurate diagnosis.

4. NCSs should be either (a) performed directly by a physician or (b) performed by a trained individual under the direct supervision of a physician. Direct supervision means that the physician is in close physical proximity to the EDX laboratory while testing is underway, is immediately available to provide the trained individual with assistance and direction, and is responsible for selecting the appropriate NCSs to be performed.

5. The needle EMG examination must be performed by a physician specially trained in EDX medicine, as these tests are simultaneously performed and interpreted. The EDX laboratory must have the ability to perform needle EMG. NCSs should not be performed without needle EMG except in unique circumstances. EMG and NCSs should be performed together in the same EDX evaluation when possible.

6. It is appropriate for only 1 attending physician to perform or supervise all of the components of the EDX testing (e.g., history taking, physical evaluation, supervision and/or performance of the EDX test, and interpretation) for a given patient and for all the testing to occur on the same date of service. The reporting of NCS and needle EMG study results should be integrated into a unifying diagnostic impression.

7. In contrast, dissociation of NCS and needle EMG results into separate reports is inappropriate unless specifically explained by the physician. Performance and/or interpretation of NCSs separately from that of the needle EMG component of the test should clearly be the exception (e.g. when testing an acute nerve injury) rather than an established practice pattern for a given practitioner.

## Conclusion

Well written reimbursement policies will positively impact patient care. On the other hand, poorly written policies may lead to diagnostic judgments based on inadequate information. The quality of patient care will suffer, the risk of patient injury will increase due to incorrect diagnosis, misdiagnosis, or improper treatment (e.g., unnecessary surgery), and the cost of medical care will escalate. In addition, underutilization of needed diagnostic testing may cost payers money. If the physician does not get the full information needed for proper diagnosis from an initial EDX evaluation because the evaluation is inadequate, the evaluation may need to be repeated in a more thorough manner with additional expense. It must also be emphasized that having to justify the reasons behind each CPT unit by separate narrative will be time consuming and expensive for physician and insurance carrier alike, and will not allow for efficient electronic claims submission.

## Looking to the Future

Physicians expect that the development of practice parameters and outcome studies will profoundly influence the practice of medicine. Practice parameter documents, however, may contain hierarchical decision trees that recommend modification of the planned EDX testing during the performance of the study in response to the information obtained as the study proceeds. Such a dynamic study design does not readily lend itself to a reductionistic bottom-line approach to the number of EDX studies allowed to be reimbursed per diagnosis. The AANEM will utilize appropriate practice guidelines to update this policy.

The AANEM will provide additional input in the future to help organizations establish medically appropriate practice guidelines for EDX medicine from which new and improved coding and reimbursement policies could be developed.

Approved by the American Association of Neuromuscular & Electrodiagnostic Medicine: September 1997; updated 1998, 1999, 2000, 2001, 2002, and 2004. Endorsed by the American Academy of Neurology: February 1998, February 2002, and June 2004. Endorsed by the American Academy of Physical Medicine & Rehabilitation: June 1998, March 2002, and June 2004.

14

**Codes 95900 and 95903 involve the following nerves:**

**I. Upper Extremity/Cervical Plexus/Brachial Plexus Motor Nerves**
A. Axillary motor nerve to the deltoid
B. Long thoracic motor nerve to the serratus anterior
C. Median nerve
1. Median motor nerve to the abductor pollicis brevis
2. Median motor nerve, anterior interosseou branch, to the flexor pollicis longus
3 Median motor nerve, anterior interosseous branch, to the pronator quadratus
4. Median motor nerve to the first lumbrical
5. Median motor nerve to the second lumbrical
D. Musculocutaneous motor nerve to the biceps brachii
E. Radial nerve
1. Radial motor nerve to the extensor carpi ulnaris
2. Radial motor nerve to the extensor digitorum communis
3. Radial motor nerve to the extensor indicis proprius
4. Radial motor nerve to the brachioradialis
F. Suprascapular nerve
1. Suprascapular motor nerve to the supraspinatus
2. Suprascapular motor nerve to the infraspinatus
G. Thoracodorsal motor nerve to the latissimus dorsi
H. Ulnar nerve
1. Ulnar motor nerve to the abductor digiti minimi
2. Ulnar motor nerve to the palmar interosseous
3. Ulnar motor nerve to the first dorsal interosseous
4. Ulnar motor nerve to the flexor carpi ulnaris
I. Other

**II. Lower Extremity Motor Nerves**
A. Femoral motor nerve to the quadriceps
1. Femoral motor nerve to vastus medialis
2. Femoral motor nerve to vastus lateralis
3. Femoral motor nerve to vastus intermedialis
4. Femoral motor nerve to rectus femoris.
B. Iloinguinal motor nerve
C. Peroneal nerve
1. Peroneal motor nerve to the extensor digitorum brevis
2. Peroneal motor nerve to the peroneus brevis
3. Peroneal motor nerve to the peroneus longus
4. Peroneal motor nerve to the tibialis anterior
D. Plantar motor nerve
E. Sciatic nerve

F. Tibial nerve
1. Tibial motor nerve, inferior calcaneal branch, to the abductor digiti minimi
2. Tibial motor nerve, medial plantar branch, to the abductor hallucis
3. Tibial motor nerve, lateral plantar branch, to the flexor digiti minimi brevis
G. Other

**II. Cranial Nerves and Trunk**
A. Cranial nerve VII (facial motor nerve)
1. Facial nerve to the frontalis
2 Facial nerve to the nasalis
3. Facial nerve to the orbicularis oculi
4. Facial nerve to the orbicularis oris
B. Cranial nerve XI (spinal accessory motor nerve)
C. Cranial nerve XII (hypoglossal motor nerve)
D. Intercostal motor nerve
E. Phrenic motor nerve to the diaphragm
F. Recurrent laryngeal nerve
G. Other

**IV. Nerve Roots**
A Cervical nerve root stimulation
1. Cervical level 5 (C5)
2. Cervical level 6 (C6)
3. Cervical level 7 (C7)
4. Cervical level 8 (C8)
B. Thoracic nerve root stimulation
1. Thoracic level 1 (T1)
2. Thoracic level 2 (T2)
3. Thoracic level 3 (T3)
4. Thoracic level 4 (T4)
5. Thoracic level 5 (T5)
6. Thoracic level 6 (T6)
7. Thoracic level 7 (T7)
8. Thoracic level 8 (T8)
9. Thoracic level 9 (T9)
10. Thoracic level 10 (T10)
11. Thoracic level 11 (T11)
12. Thoracic level 12 (T12)

**List of Nerves with Added Specificity Appendix A**
C. Lumbar nerve root stimulation
1. Lumbar level 1 (L1)
2. Lumbar level 2 (L2)
3. Lumbar level 3 (L3)
4. Lumbar level 4 (L4)
5. Lumbar level 5 (L5)
D. Sacral nerve root stimulation
1. Sacral level 1 (S1)
2. Sacral level 2 (S2)
3. Sacral level 3 (S3)

15

4. Sacral level 4 (S4)


**Code 95904 involves the following nerves:**
**I. Upper Extremity Sensory and Mixed Nerves**
A. Lateral antebrachial cutaneous sensory nerve
B Medial antebrachial cutaneous sensory nerve
C. Medial brachial cutaneous sensory nerve
D. Median nerve
1. Median sensory nerve to the 1st digit
2. Median sensory nerve to the 2nd digit
3. Median sensory nerve to the 3rd digit
4. Median sensory nerve to the 4th digit
5. Median palmar cutaneous sensory nerve
6. Median palmar mixed nerve
E. Posterior antebrachial cutaneous sensory nerve
F. Radial sensory nerve
1. Radial sensory nerve to the base of the
thumb
2. Radial sensory nerve to digit 1
G. Ulnar nerve
1. Ulnar dorsal cutaneous sensory nerve
2. Ulnar sensory nerve to the 4th digit
3. Ulnar sensory nerve to the 5th digit
4. Ulnar palmar mixed nerve
H. Intercostal sensory nerve
I Other

**II. Lower Extremity Sensory and Mixed Nerves**
A. Lateral femoral cutaneous sensory nerve
B. Medial calcaneal sensory nerve
C. Medial femoral cutaneous sensory nerve
D. Peroneal nerve
1. Deep peroneal sensory nerve
2. Superficial peroneal sensory nerve, medial
dorsal cutaneous branch
3. Superficial peroneal sensory nerve, intermediate
dorsal cutaneous branch
E. Posterior femoral cutaneous sensory nerve
F. Saphenous nerve
1. Saphenous sensory nerve (distal technique)
2. Saphenous sensory nerve (proximal technique)
G. Sural nerve
1. Sural sensory nerve, lateral dorsal cutaneous
branch
2. Sural sensory nerve
H. Tibial sensory nerve (digital nerve to toe 1)
I. Tibial sensory nerve (medial plantar nerve)
J. Tibial sensory nerve (lateral plantar nerve)
K. Other

**III. Head and Trunk Sensory Nerves**
A. Dorsal nerve of the penis

B. Greater auricular nerve
C. Opthalmic branch of the trigeminal nerve
D. Pudendul sensory nerve
E. Suprascapular sensory nerves
F. Other

*This list has also been published in the American Medical
Association's *CPT® Codebook*.

16

# CHAPTER 5
## SOMATOSENSORY EVOKED POTENTIALS:  CLINICAL USES

Introduction ....................................................................................................S111

Brain and Brainstem ......................................................................................S111
   Multiple Sclerosis ......................................................................................S111
   Other Diseases of Myelin ..........................................................................S112
   Hereditary System Degenerations ............................................................S112
   Myoclonus ..................................................................................................S112
   Coma ..........................................................................................................S112
   Intraoperative Indications ........................................................................S112

Spinal Cord ......................................................................................................S112
   Spinal Cord Trauma ..................................................................................S112
   Subacute Combined Degeneration ............................................................S113
   Cervical Spondylosis and Myelopathy ....................................................S113
   Syringomyelia ............................................................................................S113
   Hereditary Spastic Paraplegia ..................................................................S113
   Metabolic Disorders ..................................................................................S113
   Transverse Myelitis and Multiple Sclerosis ............................................S113
   Vascular Lesions ........................................................................................S113
   Spinal Cord Tumors ..................................................................................S113
   Myelomeningocele ......................................................................................S113
   Tethered Cord Syndrome ..........................................................................S113
   Spinal Cord Monitoring ............................................................................S113

Ventral Rootlets and Roots ............................................................................S114
   Lumbosacral Root (Rootlet) Disease:  Radiculopathy and Lumbar Stenosis ............S114
   Thoracic Root Disease ..............................................................................S114
   Cervical Root Diseases ..............................................................................S114

Peripheral Nervous System ..........................................................................S114
   Peripheral Neuropathy ..............................................................................S114
   Focal Neuropathy ......................................................................................S115
   Plexopathy ..................................................................................................S115
   Surgical Neuromonitoring ........................................................................S115

Conclusion ......................................................................................................S115

*Muscle Nerve* 22: Supplement 8: S111-S118, 1999

CHAPTER 5

# SOMATOSENSORY EVOKED POTENTIALS: CLINICAL USES

## INTRODUCTION

Evoked potentials (EPs) are time-locked responses of the nervous system to external stimuli. Somatosensory evoked potentials (SEPs) are one type of EP, which are generated by stimulation of afferent peripheral nerve fibers elicited by electrical, tactile, or other stimuli. Following either mixed nerve or sensory nerve stimulation, SEPs can be recorded over more proximal portions of the peripheral and central nervous system including peripheral nerves, spinal cord, and/or brain. By stimulating the skin in various dermatomal areas, an SEP may also be recorded (dermatomal SEP or DSEP).

"Short-latency" SEP refers to that portion of the waveform of an SEP normally occurring within 25 ms after stimulation of upper limb nerves, 40 ms after stimulation of the peroneal nerve, or 50 ms after stimulation of the tibial nerve. "Long-latency" SEP refers to that portion of the waveform recorded after 100 ms following stimulation; "mid-latency" SEP refers to the portion of the waveforms occurring between those 2 time periods.[1]

SEPs may be useful in studying disorders of the brain and brainstem, spinal cord, dorsal roots, and peripheral nerves. The exact sites of stimulation, and the number of nerves/roots tested is dependent upon the clinical problem presented and the information desired. When possible, recordings should be made from peripheral nerves and over the spinal cord, as well as from the scalp. In order to identify the best cortical waveform, multiple scalp montages are frequently required. In most cases, bilateral recordings are appropriate. At times, special montages may be required.

SEPs are often helpful in localizing the anatomic site of somatosensory pathway lesions. SEPs may be used to identify impaired conduction caused by axonal loss (which may result in a reduced amplitude or absent response) and/or demyelination (which may produce prolonged or absent waveforms).

SEP abnormalities are not disease specific, but can indicate afferent conduction impairments associated with certain disorders. SEPs are useful in identifying clinically inapparent abnormalities and lesions causing only vague or equivocal signs or symptoms, and offer a noninvasive, often quantifiable, method of assessing known lesions. SEPs may also be useful in certain conditions in which the diagnosis is uncertain, by indicating involvement of central somatosensory pathways, as well as suggesting the type of involvement (e.g., demyelination).

In addition, SEPs are useful in confirming nonorganic sensory loss. In such cases, SEPs generated from stimulation of virtually any "numb" area may be compared to recordings obtained from asymptomatic contralateral stimulation.

## BRAIN AND BRAINSTEM

SEP abnormalities may occur in conditions impairing the somatosensory pathways in the brain and brainstem, including both diffuse and focal disorders. Some of the conditions in which SEP testing provides useful clinical information are discussed below.

### Multiple Sclerosis

SEP abnormalities, reflecting pathology in the brain or spinal cord, are present in up to 90% of patients with definite multiple sclerosis (MS) and in approximately 50% of MS patients without current sensory signs or symptoms.[10] Lower limb (e.g., tibial) SEPs are more likely to be abnormal than upper limb (e.g., median) SEPs.[81] However, both upper and lower limb SEP testing are often indicated because patients may demonstrate abnormalities in only one of these regions.

Developed by the American Association of Electrodiagnostic Medicine's (AAEM) Somatosensory Evoked Potentials Subcommittee: Chair: George H. Kraft, MD, MS; Members: Michael J. Aminoff, MD, FRCP; Ernest M. Baran, MD; William J. Litchy, MD; and Walter C. Stolov, MD.

The AAEM would also like to acknowledge the help of the following: Andrew A. Eisen, MD; William W. Campbell, MD, MSHA; and Kevin R. Nelson, MD.

**Key Words:** *evoked potentials • intraoperative • spinal cord • neuropathy • plexopathy*

The most frequently observed SEP change in MS is the prolongation of central latencies. Amplitude reductions or absence of responses may also be seen. SEP abnormalities in MS are sometimes detected only in montages that selectively record subcortically generated potentials, which are more easily recorded following median nerve stimulation than posterior tibial nerve stimulation.

### Other Diseases of Myelin

Other diseases affecting myelin, such as adrenoleukodystrophy,[29] adrenomyeloneuropathy,[92] metachromatic leukodystrophy,[90] and Pelizaeus-Merzbacher disease[18] also produce SEP abnormalities. In adrenoleukodystrophy and adrenomyeloneuropathy, SEPs may be abnormal in asymptomatic heterozygotes.

### Hereditary System Degenerations

Many patients with Friedreich's ataxia have abnormal SEPs, demonstrating delayed central conduction or absent short-latency scalp responses.[42] Similar abnormalities are found in patients with disorders such as hereditary cerebellar ataxias and hereditary spastic paraparesis.[65]

### Myoclonus

SEPs are useful in classifying the type or origin of myoclonus. Abnormally high amplitude SEPs, reflecting enhanced cortical excitability, have been reported in patients with cortical myoclonus.[34] These findings are observed in progressive myoclonic epilepsy, late infantile ceroid lipofuscinosis, and in some patients with photosensitive epilepsy.[45]

### Coma

EPs are useful in evaluating comatose patients in whom the scope of neurological examination is often limited or pharmacologic paralysis is confounding. Although they are sensitive to lesions impinging on the afferent sensory pathways, mixed nerve SEPs are affected only minimally by the patient's level of arousal. SEP abnormalities in the comatose patient can, therefore, be interpreted as reflecting specific lesions affecting neural pathways independent of the comatose state, per se. Caution should be exercised when interpreting SEPs in patients on neurosuppressive medications.

Bilateral SEPs may provide prognostic information in patients with severe cerebral injury resulting in coma.[6,17,27,39,60] Following severe cerebral injury, absence of both right and left cortical response to median nerve stimulation is a dependably poor prognostic sign. Patients in whom there is unilateral preservation of the initial cortical response, however, may still have functional recovery.[32]

### Intraoperative Indications

SEPs can be used to localize the Rolandic fissure, facilitating intraoperative identification of the sensory and motor cortices. This is important clinically in order to avoid excision of the motor cortex, which would be likely to produce clinical deficits.[58,59] Similarly, the primary sensory cortex within the interhemispheric fissure may be identified using cortical SEPs following posterior tibial nerve stimulation. SEPs are also used in some medical centers to monitor for cerebral ischemia during vascular surgery or surgery following aneurysmal subarachnoid hemorrhage.[28,37,53,63,79,87] In addition, SEPs can be used for functional localization of the thalamus prior to thalamotomy.

## Spinal Cord

In many of the disorders affecting the ascending pathways of the spinal cord (e.g., MS), abnormal findings may be recorded over the spinal cord. Where possible, it is useful to record ascending potentials at appropriate standardized sites over the spinal cord, as well as over the somatosensory cortex. This is technically more feasible in children or young people than in older persons, and in slender persons than in obese persons. Spinal recordings can be obtained with mixed nerve or sensory nerve stimulation, but not with dermatomal stimulation.

### Spinal Cord Trauma

The scalp SEP is absent in complete spinal cord injuries when stimulating a nerve below the level of injury, while the SEP is normal or shows a variety of abnormalities in incomplete spinal cord injury.[70,74] Segmental SEPs have been used to localize sensory levels in traumatic cervical spinal cord injury.[57] SEPs have also been shown to have prognostic value in functional outcome of acute spinal cord injury.[41,55,103]

**Subacute Combined Degeneration**

Short- and mid-latency SEP abnormalities have been found in upper- and lower-limb stimulation in patients with vitamin $B_{12}$ deficiency.[26,51] EP delays generally correlate with the degree of neurological dysfunction, although some abnormalities may be present without clinical evidence of involvement.

**Cervical Spondylosis and Myelopathy**

Upper- and lower-limb SEPs may be helpful in assessing cervical spondylosis when spinal cord compression is present.[100] SEPs appear to be more sensitive to sensory pathway involvement than clinical sensory testing in myelopathy; however, the correlation of SEPs with radiographic data may be poor.[101] Additional montages may be required to obtain the most information about cervical spondylotic myelopathy.[71]

**Syringomyelia**

SEPs are useful in evaluating the effect of compression of the posterior columns in syringomyelia.[7] Segmental (i.e., dermatomal [DSEP]) testing may be useful to help delineate the neurophysiologic boundaries of the syrinx.

**Hereditary Spastic Paraplegia**

Abnormal cervical SEPs to median nerve stimulation in hereditary spastic paraplegia with normal peripheral nerve conduction have been reported.[91] These findings indicate selective degeneration of the centripetal processes derived from the dorsal root ganglion cells.

**Metabolic Disorders**

SEP abnormalities have been shown to be helpful in assessing peripheral and central sensory fibers in chronic renal failure[73] and in juvenile diabetes.[13]

**Transverse Myelitis and Multiple Sclerosis**

Spinal cord lesions may produce conduction slowing or block. SEPs elicited by stimulation below the level of the lesions can have prolonged latencies, low amplitudes, or absent responses.[44,80] Lower-limb SEPs have a higher yield for detecting abnormalities in MS[81] (see previous section: Brain and Brainstem).

**Vascular Lesions**

SEPs have been used to help clarify deficits in patients with vascular spinal cord lesions and arteriovenous malformations.[80] Abnormalities typically consist of low amplitude or absent responses, rather than prolonged latencies.[49]

**Spinal Cord Tumors**

SEPs have been used for assessment of spinal cord tumors to determine the impairments in the various physiologic pathways. In addition, DSEP studies can help establish the boundaries of physiological unaffected neural tissue; this assists in surgical management.

**Myelomeningocele**

SEPs have been found useful in patients with myelomeningocele by providing information about physiologic and functional deficits.[77]

**Tethered Cord Syndrome**

Posterior tibial SEPs have been shown to be sensitive indicators of neurological impairment in children and young adults with tethered cord syndrome.[98] Abnormalities in lumbar spine EPs, delayed or reduced amplitude scalp responses, and/or delays in central conduction have been documented.[75] The severity of the SEP responses correlates with the severity of both clinical and intraoperative findings. Changes in pre-operative versus postoperative SEPs correlate with functional outcome after untethering.

**Spinal Cord Monitoring**

In many medical centers, SEP monitoring during spinal surgery is the standard of practice. The purpose is to warn of physiologic compromise of the spinal cord or dorsal nerve roots in an anesthetized patient during scoliosis correction, fracture reduction surgery, or other procedures which might injure neural tissue. Change in waveforms is more reliable when recorded over the cord than over the scalp. The most commonly monitored procedures include surgery for scoliosis and surgery following spinal trauma (e.g., stabilization after cervical fracture).[16,20,56,66] Intraoperative monitoring is not of proven benefit for routine lumbar or cervical laminectomy or fusion.

## VENTRAL ROOTLETS AND ROOTS

SEP and DSEP techniques are still under evaluation for the study of root disease. In some limited situations, they can be useful in studying disorders peripheral to the spinal cord. Although initial evaluations of nerve root dysfunction were conducted using mixed nerve and sensory nerve SEP techniques, they were often not useful because they are never single root pathways.[25] More recent studies have indicated that sensory nerve SEPs and single root DSEPs may provide useful information about rootlet and root dysfunction.[83,84,97] Since cutaneous afferent fibers are smaller in diameter (and therefore conduct more slowly) than the 1A afferent fibers stimulated in standard mixed nerve SEPs, specific reference data are required to analyze the values obtained. Sensory nerve SEP and DSEP latencies are longer than mixed nerve SEP latencies obtained over the same distance.[69,83]

DSEPs have been used to evaluate acute radiculopathies.[3,4,14,21,24,33,46,47,54,57,61,72,76,78,83,89] Generally speaking, these studies indicate that the yield obtained from DSEPs for acute radiculopathies in an otherwise healthy back is low compared to information obtained from the neurological examination, needle electromyography (EMG) and H-reflex studies.

### Lumbosacral Root (Rootlet) Disease: Radiculopathy and Lumbar Stenosis

SEPs and DSEPs are generally not useful in the evaluation of acute radiculopathies, offering no more information than can be obtained by a careful clinical and needle electromyographic evaluation. For this reason, DSEP studies for acute lumbosacral radiculopathy are considered investigational at this time. In the assessment of chronic, multi-level multiple rootlet disease, such as that associated with lumbosacral spinal stenosis (LSSS) resulting in chronic compression of relatively long segments of dorsal rootlets, there is a greater physiologic rationale for expecting abnormal DSEPs.[47,84,86,93] Preliminary data suggest that DSEPs and sensory nerve SEPs may be useful in defining the neurophysiologic deficits of LSSS and, therefore, potentially may be useful to direct further evaluation and treatment.[84,97] Level-by-level waveforms may be absent, prolonged, and/or reduced in amplitude.

### Thoracic Root Disease

While DSEPs may be used to evaluate chronic compressive syndromes at the lumbar and sacral root levels, no data are available for their use in thoracic root disorders. Therefore, DSEP studies for the evaluation of thoracic root disease must be considered investigational at this time.

### Cervical Root Diseases

Although the few studies of DSEP testing for cervical root disease report sensitivities in the range of 65% to 85%, specificities are poor. There is still controversy about whether or not they provide more useful information than does the clinical evaluation and needle EMG examination.[14,54,78,89] Further research is needed to determine their clinical value.

## PERIPHERAL NERVOUS SYSTEM

SEPs can be especially useful in assessing the peripheral nerves when severe peripheral nerve disease is present and nerve conduction study (NCS) techniques are inadequate, or when the afferent nerves to be studied present insurmountable technical difficulties.[2]

### Peripheral Neuropathy

In generalized peripheral neuropathies, SEPs have been useful in measuring the afferent fiber conduction velocity of proximal segments and the presence of central responses when the peripheral responses were absent or low. SEPs have been used to evaluate a variety of peripheral nerve disorders, including hereditary neuropathies,[8,12] diabetic neuropathy,[9,64,102] inflammatory polyradiculoneuropathies,[30,67,68,95] infectious disorders,[62] and toxic neuropathies.[50] The value of SEPs for diagnostic purposes in peripheral nerve disease, particularly acute inflammatory demyelinating polyradiculoneuropathy (AIDP), is not yet established; some reports suggest they are valuable, if the results of conventional electrodiagnostic medicine (EDX) testing methods are normal.[30,67,95]

In addition, SEPs may be useful in peripheral neuropathies with unobtainable peripheral sensory responses. In such circumstances, they may be the only means of obtaining information about the conduction velocity of peripheral afferent fibers. SEPs may also be helpful in the presence of focal lesions, or when it may be important to know if there are both central and peripheral abnormalities.

### Focal Neuropathy

Focal nerve lesions,[23,40] including entrapment neuropathies, have been studied using SEPs. Carpal tunnel syndrome, lateral femoral cutaneous neuropathy,[52] medial and lateral plantar neuropathy,[22] saphenous neuropathy,[94] intercostal neuropathy,[19] and trigeminal neuropathy[85] are examples of focal nerve lesions that have been evaluated. These reports have not provided convincing evidence that SEPs provide information that cannot be better obtained with conventional NCS techniques.

### Plexopathy

Several studies have reported using SEPs to evaluate brachial plexopathy.[5,15] In patients with idiopathic brachial plexopathy, there appears to be little advantage over conventional EDX techniques (needle EMG and NCS) for diagnosis or localization. In traumatic plexopathies,[35,36] however, SEPs may be useful for detecting superimposed root avulsion by identifying a pattern of preserved peripheral nerve action potentials and absent SEPs. SEPs have also been used to evaluate patients with neurogenic and nonneurogenic thoracic outlet syndrome.[11,31,88,96,99] In general, SEPs do not provide additional information beyond that obtained from needle EMG and NCSs.

### Surgical Neuromonitoring

Evidence of the utility of SEPs for monitoring the integrity of the peripheral nervous system during surgery is insufficient. Nevertheless, SEP techniques are useful for evaluating the integrity of very proximal peripheral nerve lesions where peripheral nerve recording methods may not be possible. In such cases, intrafield stimulation with SEP recording is essential for establishing whether continuity of afferent fibers is present through questionable regions of the peripheral nervous system.[48,56,82] The sciatic nerve can be stimulated during hip surgery with SEP recording. This technique may be useful where peripheral nerve recordings are not feasible.[56]

Intraoperative monitoring of the brachial and lumbosacral plexus may be valuable. By stimulation of individual components of the plexus, it may be possible to determine the roots that are in continuity with the spinal cord.[35,38,43]

### CONCLUSION

This summary of the various uses of SEPs is meant to outline the useful indications for these procedures. It is neither meant to serve as an exclusive indicator of recommended uses, nor as a comprehensive source of references. New research is constantly being conducted in this area and, as it is evaluated, indications may change. The physician is therefore urged to closely follow developments in this rapidly changing field.

### DISCLAIMER

The review was undertaken by the AAEM at the request of members and third parties. This report is provided as an educational service of the AAEM. It is based on an assessment of the current scientific and clinical information. It is not intended to include all possible methods of care of a particular clinical problem, or all legitimate criteria for choosing to use a specific procedure. Neither is it intended to exclude any reasonable alternative methodologies. The AAEM recognizes that specific patient care decisions are the prerogative of the patient and his/her physician and are based on all of the circumstances involved. This statement was not written with the intent that it be used as a basis for reimbursement decisions.

Approved by the American Association of Electrodiagnostic Medicine: March 5, 1997.

### REFERENCES

1. AAEE: Glossary of terms in clinical electromyography. *Muscle Nerve* 1987; 10:G12, G18.
2. Aminoff MJ: Use of somatosensory evoked potentials to evaluate the peripheral nervous system. *J Clin Neurophysiol* 1987; 4:135-144.
3. Aminoff MJ, Goodin DS, Barbaro NM: Dermatomal somatosensory evoked potentials in unilateral lumbosacral radiculopathy. *Ann Neurol* 1985; 17:171-182.
4. Aminoff MJ, Goodin DS, Barbaro NM: Electrophysiologic evaluation of lumbosacral radiculopathies: Electromyography, late responses, and somatosensory evoked potentials. *Neurology* 1985; 35:1514-1518.
5. Aminoff MJ, Olney RK, Parry GJ, Raskin NH: Relative utility of different electrophysiologic techniques in the evaluation of the brachial plexus. *Neurology* 1988; 38:546-555.

6.  Anderson D, Bundlie S, Rockswold G: Multimodality evoked potentials in closed head trauma. *Arch Neurol* 1984; 41:369-374.

7.  Anderson NE, Frith RW, Synek VM: Somatosensory evoked potentials in syringomyelia. *J Neurol Neurosurg Psychiatry* 1986; 49:1407-1410.

8.  Aramideh M, Hoogendijk JE, Aalfs CM, Posthumus-Meyjes FE, DeVisser J, Ongerboeer de Visser BW: Somatosensory evoked potentials, sensory nerve potentials and sensory nerve conduction in hereditary motor and sensory neuropathy type I. *J Neurol* 1992; 239:277-283.

9.  Bartholomi L, Leili S, Negrin P: Somatosensory evoked potentials in diabetes type I. *Electromyogr Clin Neurophysiol* 1991; 31:43-46.

10. Chiappa K: Short-latency somatosensory evoked potentials: Interpretation, in Chiappa K (ed): *Evoked Potentials in Clinical Medicine.* New York, Raven Press, 1990, pp 400-407.

11. Chodroff G, Lee DJ, Honet JC: Dynamic approach in the diagnosis of thoracic outlet syndrome using somatosensory evoked responses. *Arch Phys Med Rehabil* 1985; 66:3-6.

12. Cosi V, Lombardi M, Zandrini C, Gerosa E, Callieco R: Somatosensory evoked potentials in Charcot-Marie-Tooth disease. *Neurophysiol Clin* 1989; 19:359-365.

13. Cracco JB, Castells S, Mark E: Spinal somatosensory evoked potentials in juvenile diabetes. *Ann Neurol* 1984; 15:55-58.

14. D-Alpa F, Sallemi G, Triffiletti L: Cervical SEPs from radicular (digital) upper limb nerves stimulation. *Acta Neurol* 1986; 8:602-609.

15. Date ES, Rappaport M, Ortega HR: Dermatomal somatosensory evoked potentials in brachial plexus injuries. *Clin Electroencephalogr* 1991; 22:236-249.

16. Dawson EG, Sherman JE, Kanim LE, Nuwer MR: Spinal cord monitoring. Results of the Scoliosis Research Society and the European Spinal Deformity Society Survey. *Spine* 1991; 16:S361-S364.

17. De Weerd A, Groeneveld C: The use of evoked potentials in the management of patients with severe cerebral trauma. *Acta Neurol Scand* 1985; 72:489-494.

18. DeMeirleir L, Taylor M, Logan W: Multimodal evoked potential studies in leukodystrophies in children. *Can J Neurol Sci* 1988; 15:26-31.

19. Dreyfuss P, Dumitru D, Prewitt-Buchanan L: Intercostal somatosensory evoked potentials. A new technique. *Am J Phys Med Rehabil* 1993; 72:144-150.

20. Ducker TB, Brown RH: *Neurophysiology and Standards of Spinal Cord Monitoring.* New York, Springer-Verlag, 1988.

21. Dumitru D, Dreyfuss P: Dermatomal/segmental somatosensory evoked potential evaluation of L5/S1 unilateral/unilevel radiculopathies. *Muscle Nerve* 1996; 19:442-449.

22. Dumitru D, Kalantri A, Dierschke B: Somatosensory evoked potentials of the medial and lateral plantar and calcaneal nerves. *Muscle Nerve* 1991; 14:665-671.

23. Dumitru D, Maquis S: Posterior femoral cutaneous nerve neuropathy and somatosensory evoked potentials. *Arch Phys Med Rehabil* 1988; 69:44-45.

24. Dvonch V, Scarff T, Bunch WH, Smith D, Boscardin J, Lebarge H, Ibrahim K: Dermatomal somatosensory evoked potentials: Their use in lumbar radiculopathy. *Spine* 1984; 9:291-293.

25. Eisen AA: *AAEE Minimonograph #19: The Somatosensory Evoked Potential.* Rochester, Minnesota, American Association of Electromyography and Electrodiagnosis, 1982: (Renamed American Association of Electrodiagnostic Medicine.)

26. Fine EJ, Hallett M: Neurophysiological study of subacute combined degenertion. *J Neurol Sci* 1980; 45:331-336.

27. Frank L, Murgiuele T, Etheridge J Jr: Prediction of chronic vegetative state in children using evoked potentials. *Neurology* 1985; 35:931-934.

28. Friedman W, Chadwick G, Venhoeven F, Mahla M, Day A: Monitoring of somatosensory evoked potentials during surgery for middle cerebral artery aneurysms. *Neurosurgery* 1991; 29:83-88.

29. Garg B, Markand O, Demyer W, Warren C: Evoked response studies in patient with adrenoleukodystrophy and heterozygous relatives. *Arch Neurol* 1983; 40:356-359.

30. Gilmore RL, Nelson KR: SSEP and F-wave studies in acute inflammatory demyelinating polyradiculoneuropathy. *Muscle Nerve* 1989; 12:538-543.

31. Glover JL, Worth RM, Bendick PJ: Evoked responses in the diagnosis of the thoracic outlet syndrome. *Surgery* 1981; 89:86-93.

32. Goldie W: Brainstem auditory and short latency somatosensory evoked responses in brain death. *Neurology* 1981; 31:248-256.

33. Green J, Gildemeister R, Hazelwood C: Deramatomally stimulated somatosensory cerebral evoked potentials in the clinical diagnosis of lumbar disc disease. *Clin Electroencephalogr* 1983; 14:152-160.

34. Hallett M, Chadwick D, Marsden C: Cortical reflex myoclonus. *Neurology* 1979; 29:1107-1125.

35. Hallikainen H, Partenen J, Mervaala E: The importance of neurophysiologic evaluation of plexus brachial injury. *Electromyogr Clin Neurophysiol* 1993; 33:67-71.

36. Hashimoto T, Mitomo M, Hirabuki N, Miura T, Kawai R, Nakamura H, Kawai H, Oho K, Kozuka T: Nerve root avulsion of birth palsy: Comparison of myelography with CT myelography and somatosensory evoked potential. *Radiology* 1991; 178:841-845.

37. Haupt W, Horsch S: Evoked potential monitoring in carotid surgery. A review of 994 cases. *Neurology* 1992; 42:335-383.

38. Hickey C, Gugiono LD, Aglio LS, Mark JB, Son SL, Maddi R: Intraoperative somatosensory evoked potential monitoring predicts peripheral nerve injury during cardiac surgery. *Anesthesiology* 1993; 78:29-35.

39. Hume A, Cant B: Central somatosensory conduction after head trauma. *Ann Neurol* 1981; 10:411.

40. Ito J, Yamao S, Kameeyama M: Analysis of somatosensory evoked potentials in peroneal palsy. *Acta Neurol Scand* 1987; 75:385-390.

41. Jacobs S, Sarlo F, Baran E, Herbison G, Ditunno J: Extensor carpi radialis recovery predicted by qualitative SEP and clinical examination in quadriplegia. *Arch Phys Med Rehabil* 1992; 73:790-793.

42. Jones P, Carroll W, Halliday A: Peripheral and central somatosensory nerve conduction in Charcot-Marie-Tooth disease and comparison with Friedreich's Ataxia. *J Neurol Sci* 1983; 61:135-146.

43. Jones SJ: Diagnostic and prognostic value of somatosensory evoked potentials in lesions of peripheral nerve and spinal cord. *Electroencephalogr Clin Neurophysiol* 1987; 39:297-301.

44. Jorg J, Dullberg W, Koeppen S: Diagnostic value of segmental somatosensory evoked potentials in cases with chronic progressive para- or tetraspastic syndromes, in Dourjon J, Mauguiere F, Revol M (ed): *Clinical Application of Evoked Potentials in Neurology.* New York, Raven Press, 1982, pp 347-358.

45. Kakigi R, Shibasaki H: Generator mechanisms of giant somatosensory evoked potentials in cortical reflex myoclonus. *Brain* 1987;110:1359-1375.

46. Katifi HA, Sedgwick EM: Somatosensory evoked potentials from posterior tibial nerve and lumbosacral dermatomes. *Electroencephalogr Clin Neurophysiol* 1986; 65:249-259.

47. Katifi HA, Sedgwick EM: Evaluation of the dermatomal somatosensory evoked potentials in the diagnosis of lumbosacral root compression. *J Neurol* 1987; 50:1204-1210.

48. Kline DG, Hudson AR: *Nerve Injuries.* Philadelphia, WB Saunders, 1995.

49. Kraft GH, Janczakowski JJ, Slimp JC: Comparison of MRI and SEP in patients with MS and stroke. *J Clin Neurophysiol* 1993; 10(April):243.

50. Krarup-Hansen A, Fugleholm K, Helweg-Larsen S, Hauge EN, Scmalbruch H, Trojaborg W, Krarup C: Examination of distal involvement in cisplatin-induced neuropathy in man. An electrophysiological and histological study with particular

reference to touch receptor function. *Brain* 1993; 116:1017-1041.

51. Krumholz A, Weiss HD, Goldstein PJ, Harris KC: Evoked responses in vitamin B12 deficiency. *Ann Neurol* 1981; 9:407-409.

52. Lagueny A, Deliac MM, Deliac P, Durandeau A: Diagnostic and prognostic value of electrophysiologic tests in meralgia paresthetica. *Muscle Nerve* 1991; 14:51-56.

53. Lam A, Manninem P, Ferguson G, Natau W: Monitoring electrophysiologic function during carotid endarterectomy. *Anesthesiology* 1991; 75:15-21.

54. Leblhuber F, Reisecker F, Boehm-Jurkovic H: Diagnostic value of different electrophysiologic tests in cervical disk prolapse. *Neurology* 1988; 38:1879-1881.

55. Li C, Houlden DA, Rowed DW: Somatosensory evoked potentials and neurological grades as predictors of outcome in acute spinal cord injury. *J Neurosurg* 1990; 72:600-609.

56. Loftus CM, Traynelis VC: *Intraoperative Monitoring Techniques in Neurosurgery.* New York, McGraw-Hill Inc, 1994.

57. Louis AA, Gupta P, Perkash I: Localization of sensory levels in traumatic quadriplegia by segmental somatosensory evoked potentials. *Electroencephalogr Clin Neurophysiol* 1985; 62:313-316.

58. Lueders H, Dinner D, Lesser R, Morris H: Evoked potentials in cortical localization. *J Clin Neurophysiol* 1986; 3:75-84.

59. Lueders H, Lesser R, Hahn J, Dinner D, Klem G: Cortical somatosensory evoked potentials in response to hand stimulation. *J Neurosurg* 1983; 58:885-894.

60. Lutschg J, Pfenninger J, Ludin H: BAEPs and early SEPs in neurointensively treated comatose children. *Am J Dis Child* 1983; 137:421-426.

61. Machida M, Asai T, Sato K, Toriyama S, Yamada T: New approach for diagnosis in herniated lumbosacral disc. Dermatomal somatosensory evoked potentials (DSEPs). *Spine* 1986; 11:380-384.

62. Moglia A, Zandrini C, Alfonsi E, Rondanelli EG, Bono G, Nappi G: Neurophysiological markers of central and peripheral involvement of the nervous system in HIV infection. *Clin Electroencephalogr* 1991; 22:193-198.

63. Momma F, Wang A, Symon L: Effects of temporary arterial occlusion on somatosensory evoked responses in aneurysm surgery. *Surg Neurol* 1987; 27:343-352.

64. Nakamura R, Noritake M, Hosoda Y, Kamakura K, Nagata N, Shibasaki H: Somatosensory conduction delay in central and peripheral nervous system of diabetic patients. *Diabetes Care* 1992; 15:532- 535.

65. Nuwer M, Perlman S, Packwood J, Kark R: Evoked potential abnormalities in the various inherited ataxias. *Ann Neurol* 1983; 13:20-27.

66. Nuwer MR, Daube J, Fischer C, Schramm J, Yingling CD: Neuromonitoring during surgery. Report of an IFCN Committee. *Electroencephalogr Clin Neurophysiol* 1993; 87:263-276.

67. Olney RK, Aminoff MJ: Electrodiagnostic features of the Guillain- Barré syndrome: The relative sensitivity of different techniques. *Neurology* 1990; 40:471-475.

68. Parry GJ, Aminoff MJ: Somatosensory evoked potentials in chronic demyelinating peripheral neuropathy. *Neurology* 1987; 37:313-316.

69. Perlik S, Fisher MA, Dushyant VP, Slack C: On the usefulness of somatosensory evoked responses for the evaluation of lower back pain. *Arch Neurol* 1986; 43:907-913.

70. Perot PL, Vera CL: Scalp-recorded somatosensory evoked potentials to stimulation of nerves in the lower extremities and evaluation of patients with spinal cord trauma. *Ann NY Acad Sci* 1982; 388:359-368.

71. Restuccia D, Di Lazzaro V, Valeriani M, Aulisa L, Galli M, Tonali P, Mauguière F: The role of upper limb somatosensroy evoked potentials in the management of cervical spondylotic myelopathy: Preliminary data. *Electroencephalogr Clin Neurophysiol* 1994; 92:502-509.

72. Rodriguez AA, Kanis L, Rodriguez AA: Somatosensory evoked potentials from dermatomal stimulation as an indicator of L5 and S1 radiculopathy. *Arch Phys Med Rehabil* 1987; 68:366-368.

73. Rossini PM, Treviso M, DiStefano E, DiPaolo B: Nervous impulse propagation along peripheral and central fibers in patients with chronic renal failure. *Electroencephalogr Clin Neurophysiol* 1983; 56:293-303.

74. Rowed DW, McLean JAG, Tator CH: Somatosensory evoked potentials in acute spinal cord injury: Prognostic value. *Surg Neurol* 1978; 9:203-210.

75. Roy MW, Gilmore R, Walsh JW: Evaluation of children and young adults with tethered spinal cord syndrome. Utility of spinal and scalp recorded somatosensory evoked potentials. *Surg Neurol* 1986; 26:241-248.

76. Scarff TB, Dallmann DE, Toleikis JR: Dermatomal somatosensory evoked potentials in the diagnosis of lumbar root entrapment. *Surg Forum* 1981; 32:489-491.

77. Scarff TB, Toleikis JR, Bunch WH, Parrish S: Dermatomal somatosensory evoked potentials in children with myelo-meningocele. *Z Kinderchir Grenzgeb* 1979; 28:384-387.

78. Schimscheimer RJ, Ongerboer de Visser BW, Bour LJ: Digital nerve somatosensory evoked potentials and flexor carpi radialis H reflexes in cervical disc protrusion and involvement of the sixth or seventh cervical root: Relations to clinical and myelographic findings. *Electroencephalogr Clin Neurophysiol* 1988; 70:313-324.

79. Schramm J, Koht A, Schmidt G, Pechstein V, Taniguichi M, Fahlbusch R: Surgical and electrophysiological observations during clipping of 134 aneurysms with evoked potentials monitoring. *Neurosurgery* 1990; 26:61-70.

80. Schramm J, Oettle GJ, Pichert T: Clinical application of segmental somatosensory evoked potentials (SEP) - Experience in patients with non-space occupying lesions, in Barber C (ed): *Evoked Potentials.* Lancaster, MTP Press, 1980, pp 455-465.

81. Slimp JC, Janczakowski J, Seed MD, Kraft GH: Comparison of median and posterior tibial nerve somatosensory evoked potentials in ambulatory patients with definite multiple sclerosis. *Am J Phys Med Rehabil* 1990; 69:293-296.

82. Slimp JC, Kliot M: Electrophysiological monitoring: Peripheral nerve surgery, in Andrews RJ (ed): *Intraoperative Neuroprotection* Baltimore, Williams & Wilkins, 1996, pp 375-392.

83. Slimp JC, Rubner DE, Snowden ML: Dermatomal somatosensory evoked potentials: Cervical, thoracic, and lumbosacral levels. *Electroencephalogr Clin Neurophysiol* 1992; 84:55-70.

84. Snowden ML, Haselkorn J, Kraft GH, Bronstein A, Slimp J, Stolov W: Dermatomal somatosensory evoked potentials in lumbosacral spinal stenosis. *Muscle Nerve* 1992; 15:1036-1044.

85. Stechison MT: The trigeminal evoked potential: Part II, Intraoperative recording of short latency responses. *Neurosurgery* 1993; 33:639-643.

86. Stolov WC, Turella G, Slimp JC, Bigos SJ. Somatosensory evoked potentials (SSEPs) to mixed nerve and dermatomal stimulation and EMG in lumbar spinal stenosis. VII International Congress of Electromyography and Related *Clinical Neurophysiology* Sorrento, Italy, 1987.

87. Symon L, Momma F, Murota T: Assessment of reversible cerebral ischaemia in man: Intraoperative monitoring of somatosensory evoked response. *Acta Neurochir Suppl* 1988; 42:3-7.

88. Synek VM: Diagnostic importance of somatosensory evoked potentials in the diagnosis of the thoracic outlet syndrome. *Clin Electroencephalogr* 1986; 117:112-116.

89. Synek VM: Somatosensory evoked potentials after stimulation of digital nerves in upper limbs: Normative data. *Electroencephalogr Clin Neurophysiol* 1986; 65:460-463.

90. Takakura H, Nakano C, Kasagi S: Multimodality evoked potentials in progression of metachromatic leukodystrophy. *Brain Dev* 1985; 7:424-430.

91. Thomas PK, Jeffreys JGR, Smith IS, Loulakakis D: Spinal somatosensory evoked potentials in hereditary spastic paraplegia. *J Neurol Neurosurg Psychiatry* 1981; 44:243-246.

92. Tobimatsu S, Fukui R, Kato M: Multimodality evoked potentials in patients and carriers with adrenoleukodystrophy and adrenomyeloneuropathy. *Electroencephalogr Clin Neurophysiol* 1985; 62:18-24.

93. Tokuhashi Y, Santoh K, Funami S: A quantitative evaluation of sensory dysfunction in lumbosacral radiculopathy. *Spine* 1991; 16:1321-1328.

94. Tranier S, Durey A, Chevailler B, Liot F: Value of somatosensory evoked potentials in saphenous entrapment neuropathy. *J Neurol Neurosurg Psychiatry* 1992; 55:461-465.

95. Vajsar J, Taylor MJ, MacMillan LJ, Murphy EG, Logan WJ: Somatosensory evoked potentials and nerve conduction studies in patients with Guillain-Barré syndrome. *Brain Dev* 1992; 14:315-318.

96. Veilleux M, Stevens JC, Campbell JK: Value of somatosensory evoked potentials in the diagnosis of thoracic outlet syndrome. *Muscle Nerve* 1986; 9:655-662.

97. Walk D, Fisher MA, Doundoulakis SH, Hemmati M: Somatosensory evoked potentials in the evaluation of lumbosacral radiculopathy. *Neurology* 1992; 42:1197-1202.

98. Yamada S, Knierim D, Yonekura M, Schultz R, Maeda G: Tethered cord syndrome. *J Am Paraplegia Soc* 1983; 6:58-61.

99. Yiannikas C, Walsh JC: Somatosensory evoked responses in the diagnosis of the thoracic outlet syndrome. *J Neurol Neurosurg Psychiatry* 1983; 46:234-240.

100. Yiannikas C, Shahani BT, Young RR: Short-latency somatosensory evoked potentials from radial, median and ulnar peroneal nerve stimulation in the assessment of cervical spondylosis: Comparison with conventional electromyography. *Arch Neurol* 1986; 42:1264-1271.

101. Yu YL, Jones SJ: Somatosensory evoked potentials in cervical spondylosis correlation of median, ulnar and posterior tibial nerve responses with clinical and radiological findings. *Brain* 1985; 108:273-300.

102. Ziegler D, Muhlen H, Gries F: Tibial somatosensory evoked potentials at various stages of peripheral neuropathy in insulin dependent diabetic patients. *J Neurol Neurosurg Psychiatry* 1993; 56:58-64.

103. Ziganow S: Neuromatic evaluation of the cortical somatosensory evoked potential in acute incomplete spinal cord injuries. *Electroencephalogr Clin Neurophysiol* 1986; 65:86-93.

*Exhibit 26*

**DR. DARREN T. MOLLO, CHIROPRACTOR**
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210                                                  Page 1 of **5**

## INITIAL EXAMINATION

Patient: _____                                    Exam Date: _1/17/14_
DOB: _____
DOA: _1/16/14_

### HISTORY and ADL's (Activity of Daily Living)

The patient is a ( _40_ ) year-old (male/female) who presented to this office on ( _1/17/14_ ) for treatment of injuries due to a (motor vehicle/work related) accident on ( _1/16/14_ ). The patient was the (driver/front seat passenger/rear seat passenger/ on the right/ on the left/in the middle/ pedestrian/ bicyclist). The patient (was/was not) wearing a seatbelt. At the moment of impact, the patient (lost consciousness/dazed/confused/dizzy) the patient (did/did not) struck their (_____) against the (front seat/inside the car/steering wheel/front window/side window) the police (were/were not) on the scene. The patient was taken by (ambulance/private car) to ( _home_ ). The patient was (examined/treated/received x-rays of the _____, given medications/other) and (released/ admitted for observation and released on _____ ).

The patient states that following the incident on ( _1/16/14_ ) (he/she) immediately felt (head pain, neck pain, lower back pain, middle back pain, left/right shoulder pain, left/right knee pain, left/right ankle pain, left/right hand pain, left/right foot pain, left/right hip pain, other:_____ ).

### THE PATIENT IS CURRENTLY FEELING ON THE DATE F THIS EXAM:

- Constant/intermittent headaches rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) located by the patient pointing (globally, frontal, left/right temporal, left/right occipital, left/right parietal. Constant/intermittent facial pain rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain).
- Constant/intermittent jaw pain rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain).
- Constant/intermittent dizziness rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain).
- Constant/intermittent neck pain that is (stiff/stabbing/shooting/achy/sore) rated a _5_ on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent middle back pain that is (stiff/stabbing/shooting/achy/sore) rated a _4_ on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent lower back pain that is (stiff/stabbing/shooting/achy/sore) rated a _7_ on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent left/right hip/ thigh/ buttock pain that is (stiff/stabbing/shooting/achy/sore) rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent left/right arm/ hand/ leg/ ankle foot pain that is (stiff/stabbing/shooting/achy/sore) rated a ( _5_ ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent left/right shoulder pain that is (stiff/stabbing/shooting/achy/sore) rated a ( _3_ ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent numbness/tingling/weakness that rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) in the _____.
- Other:_____
- The patient denies/states they have bowel/bladder changes: _____

03042014

**DR. DARREN T. MOLLO, CHIROPRACTOR**

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210                                    Page 2 of 5

PAST MEDICAL HISTORY OF THE PATIENT INCLUDES:

Hypertension controlled with medication/uncontrolled:_____
Diabetes controlled with medication/uncontrolled:_____
Heart disease controlled with medication/uncontrolled:_____
_____ Cancer
Stroke:_____
High cholesterol controlled with medication/uncontrolled:_____
Prior injury in a motor vehicle accident on. _____
Other health condition: _____
Surgeries: _____
None

SOCIAL/WORK HISTORY INCLUDES:
The patient is single/married/divorced/widowed with _____children/no children The patient smokes _____ packs
per day/does not smoke and consumes alcohol/consumes alcohol socially/ never consumes alcohol. The patient lives in
a private house/ apartment with steps only/ apartment with an elevator.

The patient states that the injuries and conditions have affected their ability to (sleep, sit, stand, walk, lay down,
concentrate, get dressed, have intimate relations). The patient is unemployed/employed as a _____
and is currently working/not working due to the injuries and conditions and missed _____ days of work at the moment of
this exam. The patient's work duties include bending/lifting/standing/sitting/climbing/reaching/repetitive
movements/phone usage/desk work at a work station/other:_____

**PHYSICAL EXAMINATION**
THE FOLLOWING ORTHOPEDIC AND NEUROLOGICAL TESTS WERE POSITIVE:
Cervical ranges of motion were observed on ( 1/17/14 ) and were as follows:

|  |  | Results (% of Loss) |  |  |  | Location of Pain |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |  |
| Extension | WNL | 1-25 | 26-50 | 51-75 | 76-100 |  |
| Left Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 | (R) c/r |
| Right Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 | (R) c/s paraspinals |
| Left Lateral Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | pain between shoulders |
| Right Lateral Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |  |

Thoraco (T) – Lumbar (L) ranges of motion were observed ( 1/17/14 ) and were as follows

|  |  | Results (% of Loss) |  |  |  | Location of Pain |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| T-Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |  |
| T-Right Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 | (R) L c/s facet |
| T-Left Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 |  |
| L-Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | (R) paraspinals |
| L-Extension | WNL | 1-25 | 26-50 | 51-75 | 76-100 |  |
| L-Right Lateral Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |  |
| L-Left Lateral Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 |  |

Restricted/Painful extra-spinal joints at: _____

03042014

## DR. DARREN T. MOLLO, CHIROPRACTOR
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210                                      Page 3 of 5

### ORTHOPEDIC TEST (+= positive findings; - = negative findings)
- +/- Soto Hall R/L
- +/- Cervical compression on the left/right/bilateral radiating to _____ for L/R neck pain, L/R shoulder pain, other: _____
- +/- Maximum foraminal compression of the left/right/bilateral radiating to _____ for L/R neck pain, L/R shoulder pain, other: _____
- +/- Bakody's Sign Increase/Decrease neck pain, other: _____
- +/- Jackson's compression on the left/right/ bilateral radiating to _____ for L/R neck pain, L/R shoulder pain, other _____
- +/- Shoulder Depression R
- +/- George's test on the left/right/bilateral
- +/- Rautant's for arm swaying/body swaying
- +/- Kemp's test right/left/bilateral localized to L/R L 4/5 /radiating to:_____
- +/- Ely's on the left/right/bilateral for L/R low back pain/SI joint pain/other:_____
- +/- Nachlas on the left/right/bilateral for L/R low back pain/SI joint pain/other:_____
- +/- Yeoman's the left/right/bilateral for L/R low back pain/SI joint pain/other:_____
- +/- Left SLR at _____ degrees L/R low back pain/SI joint pain/other._____
- +/- Right SLR at _____ degrees L/R low back pain/SI joint pain/other:_____
- +/- R / L Patrick Fabres for L/R hip pain / low back pain/ other: _____

### POSTURAL FINDINGS:
- High Shoulder:      R      L          Level                   _____
- High Pelvis:       R      L          Level                   _____
- Head Carriage:     Ant-Trans    Post-Tans       Normal      _____
- Cervical:          Kyphotic     Lordotic                    _____
- Thoracic:          Kyphotic     Lordotic                    _____
- Lumbar:            Kyphotic     Lordotic                    _____
- Short Leg:         R      L                                  _____

### RESTRICTED JOINT MOTION:
C1  2  3  4  5  6  7  T1  2  3  4  5  6  7  8  9  10  11  12  L1  2  3  4  5  S1  LSI  RSI

### HYPERTONIC MUSCLES/TENDER/PAINFUL JOINTS:
| | | | | | | |
|---|---|---|---|---|---|---|
| Paraspinals | C | C | L | Trapezius | R  L | Other: |
| Gluteals | R  L | | | Quadratus Lumborum | R  L | |
| Iliopsoas | R  L | | | Levator Scapula | R  L | |
| TFL | R  L | | | Latissimus Dorsi | R  L | |

03042014

## DR. DARREN T. MOLLO, CHIROPRACTOR
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210                                      Page 4 of 5

**REFLEXES:**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bicep L | +1 | 2 | 3 | 4 | 5 | Bicep R | +1 | 2 | 3 | 4 | 5 |
| Tricep L | +1 | 2 | 3 | 4 | 5 | Tricep R | +1 | 2 | 3 | 4 | 5 |
| Radial L | +1 | 2 | 3 | 4 | 5 | Radial R | +1 | 2 | 3 | 4 | 5 |
| Patella L | +1 | 2 | 3 | 4 | 5 | Patella R | +1 | 2 | 3 | 4 | 5 |
| Achilles L | +1 | 2 | 3 | 4 | 5 | Achilles R | +1 | 2 | 3 | 4 | 5 |

Cranial Nerves I-XII: _____

Babinski Reflex: + / (-)        WNL        Hoffman's Test: + / (-)

**MUSCLE TESTING:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Arm Abd (C5/6) | R___ | L___ | Elbow Ext (C6/7/8) | R___ | L___ |
| Finger Abd (C8/T1) | R___ | L___ | Elbow Flex (C5/6) | R___ | L___ |
| Hip Flexion (L1-3) | R___ | L___ | Knee Ext (L2-4) | R___ | L___ |
| Leg Abd (L4-S1) | R___ | L___ | Foot Dorsiflex (L4/5) | R___ | L___ |
| Foot Plantar Flex (S1-2) | R___ | L___ | | | |

X-RAYS/MRI NEURODIAGNOSTIC TESTING/OTHER: _____ is attached.

**TREATMENT PLAN:**

1. Chiropractic manipulative therapy on the order of ( __3__ x's/week for __6-8__ weeks)
2. Re-examination following the above treatment protocol
3. Orthopedist consult for: _____
4. Neurologist consult for: _____
5. Primary care physician consult for: _Eval_
6. Other physician referral: _____
7. Soft tissue therapy on the order of (_____ x's week for _____ weeks)
8. Electrical muscle stimulation/ TENS/Interferential current/Heat/Ice
9. Therapeutic exercises for office and home as prescribed
10. Lumbar support orthotic for stabilization and support of the lumbar spine (see medical necessity letter)
11. Cervical collar for stabilization and support of the cervical spine
12. TENS unit for home use and instruction
13. Referral for **X-Rays** of the **C-Spine, T-Spine, L-Spine**, other: _____
14. Referral for **MRI** of the **C-Spine, T-Spine, L-Spine** to R/O discogenic injury if symptoms persist for 3-4 weeks
15. Referral for Doppler study of the (carotid arteries/vertebral arteries) due to positive objective findings of _____ _____ and symptoms of _____
16. Neuromuscular re-education of the _____
17. Small pain fiber studies of the cervical/lumbar spine to objectively evaluate for pathology to the A-delta, A-Beta, and C sensory nerve fibers.
18. Other: _____

05042014

**DR. DARREN T. MOLLO, CHIROPRACTOR**

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

Page 5 of 5

DIAGNOSIS:

| | | | |
|---|---|---|---|
| 307 81 | Tension Headache | 724.1 | Thoracic pain |
| 346.90 | Migraine Headache | 724.2 | Lumbago |
| 353.0 | Thor. Outlet Syndrome | 724.3 | Sciactic |
| 524.64 | TMJ sounds/opening and closing jaw | 724.4 | Lumbar radiculopathy |
| 718.45 | Contracture of joint pelvis/hip region | 724.8 | Facet syndrome |
| 719.40 | Pain in joint unspec. | 737.40 | Curvature of spine-unspec. |
| 719.51 | Pain in joint of the shoulder | 739.1 | Segmental joint dysfunction of the cervical spine |
| 719.61 | Other symptoms referable to shoulder region | 739.2 | Segmental joint dysfunction of the thoracic spine |
| 721 0 | Cervical spondylosis w/o myelopathy | 739.3 | Segmental joint dysfunction of the lumbar spine |
| 721.1 | Cervical spondylosis w/myelopathy | 739.5 | Segmental dysfunction of the hip/pelvis |
| 721 3 | Lumbar spondylosis w/o myelopathy | 756.12 | Spondylolithesis |
| 721.7 | Traumatic spondylosis | 780.4 | Dizziness |
| 722.0 | Cervical intervertebral disc displacement w/o myelopathy | 787.01 | Nausea/vomiting |
| 722 10 | Lumbar intervertebral disc displacement w/o myelopathy | 781.0 | Muscle spasm |
| 722.4 | Cervical disc degeneration | 847.0 | Cervical sprain/strain |
| 722.51 | Lumbar disc degeneration | 847.1 | Thoracic sprain/strain |
| 723.1 | Cervicalgia | 847.2 | Lumbar sprain/strain |
| 723.2 | Cervical cranial syndrome | 848.3 | Rib strain/sprain |
| 723.3 | Cervical brachial syndrome | 908.9 | Late effects of an injury |
| 723.4 | Cervical radiculitis | Other: | |
| 723.5 | Torticollis | | |

Today, 1/17/14 , treatment:

CMT to the above joint dysfunction regions:    1-2 Regions (98940)    3-4 Regions (98941)    5 Regions (98942)

Modality:  Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____

DISABILITY STATUS

The patient is currently **mildly/moderately/severely** disabled and is unable to perform normal work duties due to the injury sustained on _____ as a result of an automobile accident/work related accident.

PROGNOSIS:

The patient has suffered a (% from ROM's) loss of motion in the cervical spine and a (%) in the thoraco-lumbar spine that has affected the patient's ADL's. The patient's prognosis is **guarded/good/fair/poor** at this time.

Cordially,

CHIROPRACTOR

03042014

**DR. DARREN T. MOLLO, CHIROPRACTOR**
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

Page **1** of **5**

## INITIAL EXAMINATION

Patient: ▮▮▮▮▮▮▮▮▮

Exam Date: 1/24/14

DOB. ▮▮▮▮▮▮

DOA: 1/23/14

### HISTORY and ADL's (Activity of Daily Living)

The patient is a ( 19 ) year-old (male/female) who presented to this office on ( 1/24 ) for treatment of injuries due to a (motor vehicle/work related) accident on ( 1/23 ). The patient was the (driver/front seat passenger/rear seat passenger/ on the right/ on the left/in the middle/ pedestrian/ bicyclist). The patient (was/was not) wearing a seatbelt. At the moment of impact, the patient (lost consciousness/dazed/confused/dizzy) the patient (did/did not) struck their (_____) against the (front seat/inside the car/steering wheel/front window/side window) the police (were/were not) on the scene. The patient was taken by (ambulance/private car) to ( home ). The patient was (examined/treated/received x-rays of the _____, given medications/other) and (released/ admitted for observation and released on _____).

The patient states that following the incident on ( 1/24/14 ) (he/she) immediately felt (head pain, neck pain, lower) back pain, middle back pain, left/right shoulder pain, left/right knee pain, left/right ankle pain, left/right hand pain, left/right foot pain, left/right hip pain, other:_____.

### THE PATIENT IS CURRENTLY FEELING ON THE DATE F THIS EXAM:

- Constant/intermittent headaches rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) located by the patient pointing (globally, frontal, left/right temporal, left/right occipital, left/right parietal. Constant/intermittent facial pain rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain).
- Constant/intermittent jaw pain rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain).
- Constant/intermittent dizziness rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain).
- Constant/intermittent neck pain that is (stiff/stabbing/shooting/achy/sore) rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent middle back pain that is (stiff/stabbing/shooting/achy/sore) rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent lower back pain that is (stiff/stabbing/shooting/achy/sore) rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent left/right/ thigh/ buttock pain that is (stiff/stabbing/shooting/achy/sore) rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent left/right arm/ hand/ leg/ ankle foot pain that is (stiff/stabbing/shooting/achy/sore) rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent left/right shoulder pain that is (stiff/stabbing/shooting/achy/sore) rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) radiating to _____.
- Constant/intermittent numbness/tingling/weakness that rated a ( ) on a scale of 1-10 (1=minimal pain through 10 being severe pain) in the _____.
- Other: _____.
- The patient denies/states they have bowel/bladder changes: _____.

03052014

# Dr. Darren T. Mollo, Chiropractor

1786 Flatbush Avenue, Brooklyn, NY 11210

**Past Medical History of the Patient includes:**

Hypertension controlled with medication/uncontrolled:_____

Diabetes controlled with medication/uncontrolled:_____

Heart disease controlled with medication/uncontrolled:_____

_____ Cancer

Stroke._____

High cholesterol controlled with medication/uncontrolled:_____

Prior injury in a motor vehicle accident on: _____

Other health condition: _____

Surgeries: _____

None

**Social/Work History includes:**

The patient is single/married/divorced/widowed with _____ children/no children. The patient smokes _____ packs per day/does not smoke and consumes alcohol/consumes alcohol socially/ never consumes alcohol. The patient lives in a private house/ apartment with steps only/ apartment with an elevator.

The patient states that the injuries and conditions have affected their ability to (sleep, sit, stand, walk, lay down, concentrate, get dressed, have intimate relations). The patient is unemployed/employed as a _____ and is currently working/not working due to the injuries and conditions and missed ___1___ days of work at the moment of this exam The patient's work duties include bending/lifting/standing/sitting/climbing/reaching/repetitive movements/phone usage/desk work at a work station/other:_____

## PHYSICAL EXAMINATION

**The following Orthopedic and Neurological tests were positive:**

Cervical ranges of motion were observed on ( 1/24/14 ) and were as follows:

| | | Results (% of Loss) | | | | Location of Pain |
|---|---|---|---|---|---|---|
| Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |
| Extension | WNL | 1-25 | 26-50 | 51-75 | 76-100 | (C) C5-7 paul |
| Left Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |
| Right Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 | (L) c/s paraspinal |
| Left Lateral Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |
| Right Lateral Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |

Thoraco (T) – Lumbar (L) ranges of motion were observed ( 1/24/14 ) and were as follows

| | | Results (% of Loss) | | | | Location of Pain |
|---|---|---|---|---|---|---|
| T-Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |
| T-Right Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 | (L) L5/s, (L) SI PI |
| T-Left Rotation | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |
| L-Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | (L) c/s paraspinal |
| L-Extension | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |
| L-Right Lateral Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |
| L-Left Lateral Flexion | WNL | 1-25 | 26-50 | 51-75 | 76-100 | |

Restricted/Painful extra-spinal joints at. _____

## DR. DARREN T. MOLLO, CHIROPRACTOR

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210                                         Page 3 of 5

### ORTHOPEDIC TEST (+= positive findings; - = negative findings)

- +/- Soto Hall R/L
- +/- Cervical compression on the left/right/bilateral radiating to _____ for L/R neck pain; L/R shoulder pain, other: _____
- +/- Maximum foraminal compression of the left/right/bilateral radiating to _____ for L/R neck pain, L/R shoulder pain, other _____
- +/- Bakody's Sign Increase/Decrease neck pain, other:_____
- +/- Jackson's compression on the left/right/ bilateral radiating to _____ for L/R neck pain, L/R shoulder pain, other:_____
- +/- Shoulder Depression L
- +/- George's test on the left/right/bilateral
- +/- Hautant's for arm swaying/body swaying
- +/- Kemp's test right/left/bilateral localized to L/R  C4  /radiating to:_____
- +/- Ely's on the left/right/bilateral for L/R low back pain/SI joint pain/other:_____
- +/- Nachlas on the left/right/bilateral for L/R low back pain/SI joint pain/other:_____
- +/- Yeoman's the left/right/bilateral for L/R low back pain/SI joint pain/other:_____
- +/- Left SLR at _____ degrees L/R low back pain/SI joint pain/other: _____
- +/- Right SLR at _____ degrees L/R low back pain/SI joint pain/other: _____
- +/- R / L Patrick Fabres for L/R hip pain / low back pain/ other: _____

### POSTURAL FINDINGS:

- High Shoulder    R    L      Level                 _____
- High Pelvis:    R    L      Level                 _____
- Head Carriage:   Ant-Trans   Post-Tans    Normal     _____
- Cervical:        Kyphotic     Lordotic               _____
- Thoracic:        Kyphotic     Lordotic               _____
- Lumbar:         Kyphotic     Lordotic               _____
- Short Leg:      R    L                            _____

### RESTRICTED JOINT MOTION:

C1  2  3  4  5  6  7  T1  2  3  4  5  6  7  8  9  10  11  12  L1  2  3  4  5  S1  LSI / RSI

### HYPERTONIC MUSCLES/TENDER/PAINFUL JOINTS:

| | | | | |
|---|---|---|---|---|
| Paraspinals | C T L | Trapezius | R L | Other: |
| Gluteals | R L | Quadratus Lumborum | R L | |
| Iliopsoas | R L | Levator Scapula | R L | |
| TFL | R L | Latissimus Dorsi | R L | |

03052014

# DR. DARREN T. MOLLO, CHIROPRACTOR

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

Page 4 of 5

**REFLEXES:**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bicep L | +1 | 2 | 3 | 4 | 5 | Bicep R | +1 | 2 | 3 | 4 | 5 |
| Tricep L | +1 | 2 | 3 | 4 | 5 | Tricep R | +1 | 2 | 3 | 4 | 5 |
| Radial L | +1 | 2 | 3 | 4 | 5 | Radial R | +1 | 2 | 3 | 4 | 5 |
| Patella L | +1 | 2 | 3 | 4 | 5 | Patella R | +1 | 2 | 3 | 4 | 5 |
| Achilles L | +1 | 2 | 3 | 4 | 5 | Achilles R | +1 | 2 | 3 | 4 | 5 |

Cranial Nerves I-XII:

Babinski Reflex: + (-)                          Hoffman's Test: + /-

**MUSCLE TESTING:**                       WNL

| | | | | | | |
|---|---|---|---|---|---|---|
| Arm Abd (C5/6) | R___ | L___ | Elbow Ext (C6/7/8) | R___ | L___ |
| Finger Abd (C8/T1) | R___ | L___ | Elbow Flex (C5/6) | R___ | L___ |
| Hip Flexion (L1-3) | R___ | L___ | Knee Ext (L2-4) | R___ | L___ |
| Leg Abd (L4-S1) | R___ | L___ | Foot Dorsiflex (L4/5) | R___ | L___ |
| Foot Plantar Flex (S1-2) | R___ | L___ | | | |

**X-RAYS/MRI NEURODIAGNOSTIC TESTING/OTHER:** _____ is attached.

**TREATMENT PLAN:**

1. Chiropractic manipulative therapy on the order of (____3____ x's/week for __6-8__ weeks)
2. Re-examination following the above treatment protocol
3. Orthopedist consult for _____
4. Neurologist consult for: _____
5. Primary care physician consult for: __Eval_____
6. Other physician referral. _____
7. Soft tissue therapy on the order of (_____ x's week for _____ weeks)
8. Electrical muscle stimulation/TENS/Interferential current/Heat/Ice
9. Therapeutic exercises for office and home as prescribed
10. Lumbar support orthotic for stabilization and support of the lumbar spine (see medical necessity letter)
11. Cervical collar for stabilization and support of the cervical spine
12. TENS unit for home use and instruction
13. Referral for **X-Rays** of the C-Spine, T-Spine, L-Spine, other _____
14. Referral for **MRI** of the **C-Spine, T-Spine, L-Spine** to R/O discogenic injury if symptoms persist for 3-4 weeks
15. Referral for Doppler study of the (carotid arteries/vertebral arteries) due to positive objective findings of _____ _____ and symptoms of _____
16. Neuromuscular re-education of the _____
17. Small pain fiber studies of the cervical/lumbar spine to objectively evaluate for pathology to the A-delta, A-Beta, and C sensory nerve fibers.
18. Other: _____

## DR. DARREN T. MOLLO, CHIROPRACTOR

1786 FLATBUSH AVENUE, BROOKLYN, NY 11210

**DIAGNOSIS:**

| Code | Diagnosis | Code | Diagnosis |
|------|-----------|------|-----------|
| 307.81 | Tension Headache | 724.1 | Thoracic pain |
| 346.90 | Migraine Headache | 724.2 | Lumbago |
| 353.0 | Thor. Outlet Syndrome | 724.3 | Sciactic |
| 524.64 | TMJ sounds/opening and closing jaw | 724.4 | Lumbar radiculopathy |
| 718.45 | Contracture of joint pelvis/hip region | 724.8 | Facet syndrome |
| 719.40 | Pain in joint unspec. | 737.40 | Curvature of spine-unspec. |
| 719.51 | Pain in joint of the shoulder | 739.1 | Segmental joint dysfunction of the cervical spine |
| 719.61 | Other symptoms referable to shoulder region | 739.2 | Segmental joint dysfunction of the thoracic spine |
| 721.0 | Cervical spondylosis w/o myelopathy | 739.3 | Segmental joint dysfunction of the lumbar spine |
| 721.1 | Cervical spondylosis w/myelopathy | 739.5 | Segmental dysfunction of the hip/pelvis |
| 721.3 | Lumbar spondylosis w/o myelopathy | 756.12 | Spondylolithesis |
| 721.7 | Traumatic spondylosis | 780.4 | Dizziness |
| 722.0 | Cervical intervertebral disc displacement w/o myelopathy | 787.01 | Nausea/vomiting |
| 722.10 | Lumbar intervertebral disc displacement w/o myelopathy | 781.0 | Muscle spasm |
| 722.4 | Cervical disc degeneration | 847.0 | Cervical sprain/strain |
| 722.51 | Lumbar disc degeneration | 847.1 | Thoracic sprain/strain |
| 723.1 | Cervicalgia | 847.2 | Lumbar sprain/strain |
| 723.2 | Cervical cranial syndrome | 848.3 | Rib strain/sprain |
| 723.3 | Cervical brachial syndrome | 908.9 | Late effects of an injury |
| 723.4 | Cervical radiculitis | Other: | |
| 723.5 | Torticollis | | |

Today, **1/24/14**, treatment:
CMT to the above joint dysfunction regions:     1-2 Regions (98940)     3-4 Regions (98941)     5 Regions (98942)
Modality: Therapeutic exercise (97110)  Massage (97124)  Neuromuscular re-education (97112)  Other (97139): _____

**DISABILITY STATUS:**
The patient is currently **mildly/moderately/severely** disabled and is unable to perform normal work duties due to the injury sustained on _____ as a result of an automobile accident/work related accident.

**PROGNOSIS:**
The patient has suffered a (% from ROM's) loss of motion in the cervical spine and a (%) in the thoraco-lumbar spine that has affected the patient's ADL's. The patient's prognosis is (**guarded/good/fair/poor**) at this time.

Cordially,

CHIROPRACTOR

# *Exhibit 27*

# Electrodiagnostic Report

**Patient:** ▮▮▮▮   **Number:** ▮▮▮▮   **Date:** 5/27/2014

**Presumptive Diagnosis:** Pain associated with lumbosacral plexopathy (without motor deficit)

**Study: Electrodiagnostic Pain Fiber Nerve Conduction Study (pf-NCS) 95904**
Safety of spinal pain patients is significantly improved by pf-NCS since it identifies early and chronic nerve root injury with 100% peer-reviewed sensitivity.[1] Pf-NCS has been shown to correctly redirect spinal pain treatment in 56% of cases.[2] EMG-type tests cannot assess small pain fibers, and even in chronic large fiber pathology axon degeneration is confirmed only by the presence of obvious muscle atrophy[3] However, in early and chronic injury a reduction of glutamine neurotransmitters down-regulate A-delta fibers,[4] which is detectable by comparative amplitude measurements using the patient as his own control.

**Findings:**
**Higher than average measures – Deviation Index Mild (+1) to Very Severe (+5):**
   LEFT (L5) PERONEAL NERVE +1 MILD

**Lower than average measures:**
   RIGHT (S2) POST FEMORAL CUTANEOUS NERVE -1 HYPER
   LEFT (S2) POST FEMORAL CUTANEOUS NERVE -1 HYPER

**Diagnostic Summary:**
The most significant findings are in bold font above

**Interpretive Considerations:**
Lower than average measures suggest irritation which warrants investigation to detect possible concomitant pathology Chronicity is suggested when central disinhibition causes a hyper measure (low on graph) to be directly opposite of a rated down-regulated measure (high on graph) Normal findings do not rule out non-neurogenic pain generating etiologies, such as muscle or ligament strain Since pathology can influence adjacent nerve tracts, it is essential to correlate all findings before initiating or altering treatment

Sincerely,

Dr Darren T Mollo, D.C

UNADJUSTED EXAM DATA: (Amplitudes are represented by whole numbers for ease of comparison)
L1R / L1L -- 28 / 32; L2R / L2L -- 36 / 36, L3R / L3L -- 30 / 34, L4R / L4L -- 32 / 36, L5R / L5L -- 38 / 46, S1R / S1L -- 34 / 36, S2R / S2L -- 24 / 24

---

[1] Cork et al Predicting Nerve-Root Pathology *Journal of Anesthesiology* Vol. 2 No 6 2002
[2] Carney (Neurosurgeon) *Practical Pain Management* Vol 12 #5 June 2012
[3] Werner and Cavender *Physical Medicine & Rehabilitation* Vol 13, No 2 June 1999
[4] J Sandkuhler et al *Journal of Neuroscience* Vol 17 No 16 Pg 6483-6491, Aug 15, 1997

06092014



**Lumbosacral Plexus Graph**
Patient:
Date: 5/27/2014

06092014

# Electrodiagnostic Report

**Patient:** [redacted]   **Number:** [redacted]   **Date:** 10/2/2014

**Presumptive Diagnosis:** Sensory lumbar plexus disorder without symptoms/signs of motor deficit.

**Sensory NCS amplitude, velocity/latency and configuration of summation/recruitment**
Evidence based medicine and safety is maximized with Type III (A-delta) sensory NCS. Injury causes glutamine neurotransmitter depletion, which results in A-delta fibers requiring higher than average voltage to initiate threshold summation, which is detected by real-time mV measurements.[1] [2]Peer-reviewed statistical sensitivity approaches 100%[3] with published reports supporting improved treatment localization in 56% of cases.[4] Needle EMG is contraindicated in the absence of obvious muscle atrophy[5]. SSEP is a useful method of verification.

**Findings:**
**Higher than average measures – Deviation Index Mild (+1) to Very Severe (+5):**
RIGHT (L5) PERONEAL NERVE +3 MARKED
LEFT (L5) PERONEAL NERVE +3 MARKED
RIGHT (S1) SURAL NERVE +1 MILD

**Lower than average measures:**
LEFT (S2) POST. FEMORAL CUTANEOUS NERVE -1 HYPER

**Diagnostic Summary:**
The most significant findings are in bold font above.

**Interpretive Considerations:**
Lower than average measures suggest irritation which warrants investigation to detect possible concomitant pathology. Chronicity is suggested when central disinhibition causes a hyper measure (low on graph) to be directly opposite of a rated down-regulated measure (high on graph). Normal findings do not rule out non-neurogenic pain-generating etiologies, such as muscle or ligament strain. Since pathology can influence adjacent nerve tracts, it is essential to correlate all findings before initiating or altering treatment.

Sincerely,

DR. DARREN MOLLO, D.C.

UNADJUSTED EXAM DATA: (Amplitudes are represented by whole numbers for ease of comparison)
L1R / L1L -- 32 / 28; L2R / L2L -- 36 / 36; L3R / L3L -- 38 / 28; L4R / L4L -- 36 / 36; L5R / L5L -- 58 / 58; S1R / S1L -- 52 / 38; S2R / S2L -- 36 / 28

2                                                                                                  2



Lumbosacral Plexus Graph
Patient: ████████
Date: 10/2/2014

---

[1] R. Cork et al Predicting Nerve-Root Pathology *Journal of Anesthesiology* Vol. 2 No. 6 2002

[2] Hedgecock, *Textbook of Pain Electrodiagnosis*, 2nd Ed. 2013

[3] J. Sandkuhler et al *Journal of Neuroscience* Vol. 17 No. 16 Pg. 6483-6491, Aug. 15, 1997

[4] P. Carney (Neurosurgeon) *Practical Pain Management* Vol. 12 #5 June 2012

[5] Werner and Cavender *Physical Medicine & Rehabilitation* Vol. 13, No. 2 June 1999

*Exhibit 28*

**KSENIA PAVLOVA**

1 OF 6

Date: 9.18.14

Patient: [redacted]   Age: 22   Sex: F/M   D.O.A: 6.2.14

I. **HISTORY:** This report covers date of services from 9/18 to 9/18 . Secondary to an accident, injury(ies) to the C T L Spo (Shoulder was/were reported.

II. **LAST RECOMMENDATION/PLAN OF CARE:** On the last visit, the following recommendation(s) were made:
- ➤ Consult/Test Results: PT
- ➤ Treatment: ☑ Physical Therapy ☐ Medications ☐ Orthotics ☐ Chiropractic ☑ Acupuncture
- ➤ Status: ☐ No Improvement ☑ Moderate Improvement ☐ Marked Improvement

**HPI:**

| Subjective: MUSCULOSKELETAL PLAN | PAST MEDICAL HISTORY | ALLERGIES |
|---|---|---|
| ☑ Neck ☐ Radiating to:_____ ☐ Atrophy<br>☑ Back ☐ Radiating to:_____ ☐ Swelling<br>☐ Hand ☐ Wrist ☐ Elbow ☑ Shoulder<br>☐ Foot ☐ Ankle ☐ Knee ☐ Hip ☐ Tooth ☐ Jaw<br>☐ Other: _____ ☐ _____ | ☐ Asthma ☐ Dizziness<br>☐ Diabetes ☐ Type I<br>☐ Type II<br>☐ Osteoporosis<br>☑ Other: Denies | ☑ NKDA<br>☐ Local Anesthetic<br>☐ Corticosteroids<br>☐ Seasonal/Food<br>☐ Other: _____ |

**Pain:** ☐ Exacerbated   ☐ Same   ☑ Decreased   ☐ No Pain

**Pain Scale:**
☐ C spine 8/10   ☐ T spine 6/10   ☐ Shoulder R/L 10/10   ☐ L spine 8/10   ☐ Knee R/L_____

**Description:** ☐ Sharp ☐ shooting, ☐ stabbing, ☑ aching ☐ pulsating ☐ other_____

**Activity Level:** ☐ Unchanged   ☑ Diminished   ☐ Significantly restricted

**PHYSICAL EXAMINATION:** ☐ Ht 5'9   ☐ Wt 160   ☐ BP____   ☐ P 60   ☐ SpO2 96

| HEENT: | GU: |
|---|---|
| Skin: | Musculoskeletal: as below |
| Resp: | |
| Cardio: | Other: |
| GI: | |

Ⓛ Shoulder Tendinosis

**Radiology Results:** Disc Bulge C6-C7 L4-L5

**Objective:** Pt rest examined ⊕ tenderness of the lumbar spine (paraspinal muscles) ↓ ↓ ROM & multiple trigger points palpated.

**ASSESSMENT/DIAGNOSIS:** _____

10032014

**KSENIA PAVLOVA**

2 OF 6

The patient is: ☐totally disabled ☐ partially disabled ☒not disabled from previous work as a/an _____
Permanency is: ☐probable ☐ possible ☐ expected ☐total ☐ marked partial ☐ moderate partial ☐ mild partial

**NEW RECOMMENDED PLAN OF CARE:**

☑ The patient was informed in the use of over the counter **NSAID's**, and demonstrates a clear understanding of the indicated usage.

☑ The patient is advised to start on a course of **Therapeutics Injections**_____.

☐ The patient is advised to start on a course of **Platelet Rich Plasma Injections** _____.

☐ _____

Because of the above findings the following are necessary for proper management of the patient:

☐ Orthopedic Consultation        ☐ Neurological Consultation     ☐ Dental Consultation

☐ Internal Medicine Consultation   ☐ Ophthalmology Consultation   ☐ HEENT Consultation

☐ Chiropractor                   ☐ Acupuncture                 ☑ Pain Management

**/. AUTHORIZATION REQUEST (Workers Compensation Only):**
This is a formal **Authorization Request** for:
☐ MUA _____        ☐ EMG _____     ☐ MRI _____
☐ THEREPEUTIC INJECTIONS _____  ☐ PLATELET RICH PLASMA INJECTION_____

**TREATMENT:**
Patient rate average pain on a comfort level at: _____ base on a scale of 0 to 10. No comfort (zero) to well (ten).
The following treatment modalities are being applied individually of in combination to decreased pain and improve function and quality of life:

☐ Nerve Block Injections:        _____
☑ Trigger Point Injections:      _lumbar spine._____
☐ Facet Joint Injections:        _____
☐ Intra-articular Injections:    _____
☐ Platelet Rich Plasma Injections: _____

**USING:**
After obtaining verbal consent the patient received trigger point/nerve block injections to the following areas:
☑ Surface anatomy technique
☐ Radiologic anatomy technique (C-Arm)
**Using:** ☐ 1% Lidocaine  ☐ Depomedrol 40 mg/cc  ☑ 0.25% Marcaine  ☐ 0.25% Sensorcaine  ☐ 0.25% Bupivacaine

| Nerve Block administered to: | Trigger Point is administered to: |
|---|---|
| ☐ Thoracic C7-T1 | ☐ The following muscles: _____ |
| ☐ Lumbar paravertebral sympathetic nerve | ☐ Bilaterally    ☐ Unilaterally |
| ☐ Bilaterally ☐ Unilaterally | |

**Diagnostic Impression:**

10032014

# KSENIA PAVLOVA

3 OF 6

| | | | | |
|---|---|---|---|---|
| ☐ Headaches | 784.0 | ☐ Post Traumatic Cervico-Thoracic Myofascitis | 723.4 |
| ☐ Chest Pain | 786.50 | ☐ Acute Traumatic Cervical Radiculitis | 724.4 |
| ☐ Post Concussion Syndrome | 850.9 | ☐ Thoracic Sprain/Strain | 847.1 |
| ☐ Back Pain Unspecified | 724.5 | ☐ Acute Traumatic Lumbrosacral Radiculitis | 724.4 |
| ☐ Back Sprain/Strain | 847.9 | ☐ R/O Lumbar Disc Herniation | 722.73 |
| ☐ Cervical Derangement | 724.9 | ☐ Lumbar Derangement | 724.9 |
| ☐ Cervical Sprain/Strain | 847.0 | ☐ Post-Traumatic Lumbar Myofascitis | 724.2 |
| ☐ Cervicalgia | 732.1 | ☐ Lumbar Sprain/Strain | 847.2 |
| ☐ Acute Traumatic Cervical Radiculitis | 729.1 | ☐ Sacral Sprain/Strain | 847.3 |
| ☐ R/O Cervical Disc Herniation | 722.71 | ☐ Contusion Thigh/Hip | 924.0 |
| ☐ Hip Derangement | 718.95 | ☐ Shoulder Sprain/Strain | 840.8 |
| ☐ Hip Pain Unspecified | 719.45 | ☐ Ankle/Foot Derangement | 718.95 |
| ☐ Wrist Derangement | 718.93 | ☐ Foot Pain Unspecified | 719.47 |
| ☐ Elbow Derangement | 718.92 | ☐ Knee Derangement | 717.9 |
| ☐ Elbow Pain Unspecified | 719.42 | ☐ Knee Pain Unspecified | 717.46 |
| ☐ Hand Derangement | 718.92 | ☐ Knee Sprain/Strain | 844.9 |
| ☐ Hand Pain Unspecified | 729.5 | ☐ Anxiety, Tension and Street Reactive to pain | 308.0 |
| ☐ Shoulder Derangement | 718.91 | ☐ Elevated Blood Pressure | 796.2 |

Others:

## Treatment Plan and Recommendation:

__ Bed Rest

__ Avoid Physical Activity

__ Physical Therapy

__ The patient advised to attend a supervised physical therapy program on a regular scheduled basis 3-5 times a week

__ Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15 min.

| RT | LT | Head & Neck Muscles |
|---|---|---|
| | | Trapezius muscle |

10032014

# KSENIA PAVLOVA

|  |  | |
|---|---|---|
|  |  | Sternocleidomastoid muscle |
|  |  | Masserter muscle |
|  |  | Temporalis muscle |
|  |  | Medial (Internal) Pterygoid muscle |
|  |  | Lateral (External) Pterygoid muscle |
|  |  | Digastric muscle |
|  |  | Cutaneous II: Occipitofrontalis |
|  |  | Splenius capitis & splenius cervicis muscles |
|  |  | Posterior cervical muscle |
|  |  | Semispinalis capitis, Semispinalis cervicis & multifidi |
|  |  | Subocipital muscles |
|  |  | Recti capitis posterior major & major, obliqi inierior & superior |

| RT | LT | Lumbar Paraspinal Muscles |
|---|---|---|
| 2 | 2 | Erectors Spinalae |
|  |  | Iliocostalis thoracics |
| 2 | 2 | Iliocostalis Lumborum |
| 2 | 2 | Semispinalis |
| 2 | 2 | Multifidi muscles |
|  |  | Rotatores muscles |
|  |  | Gluterus muscle |
| 4 | 4 | Quadratus Lumborum |
| 2 | 2 | Longissimus |

| RT | LT | Elbow to Finger Muscles |
|---|---|---|
|  |  | Hand extensor & brachioradialis muscles |
|  |  | Finger extensor muscles |
|  |  | Extensor digitorum &extensor indicis |
|  |  | Supinator muscle |
|  |  | Palmaris Longus muscle |
|  |  | Hand & Finger flexors in the forearm |
|  |  | Flexores carpi radialis & ulnaris, flexores digitorum |
|  |  | Superficialis & profundus, flexor pollicis |
|  |  | Longus (pronator Teres) |
|  |  | Adductor & opponens pollicis muscles; trigger thum |
|  |  | Interrosseous muscles of the hand |

| RT | LT | Upper Back, Shoulder & Arm Muscles |
|---|---|---|
|  |  | Levator Scapulae muscle |
|  |  | Scalene muscles |
|  |  | Supraspinatus muscles |
|  |  | Infraspinatus muscle |
|  |  | Teres minor muscle |
|  |  | Latissimus dorsi muscle |
|  |  | Teres major muscle |
|  |  | Subscapularis muscle |
|  |  | Rhomboideus major & minor muscles |
|  |  | Deltoid muscle |
|  |  | Coracobrachialis muscle |
|  |  | Biceps brachii muscle |
|  |  | Brachialis muscle |
|  |  | Triceps brachii muscle |

| RT | LT | Torso Muscles |
|---|---|---|
|  |  | Pectoralis major muscle (subclavius muscles) |
|  |  | Pectoralis minor muscle |
|  |  | Sternalis muscle |
|  |  | Serratus Posterior superior muscle |
|  |  | Serratus Anterior muscle |
|  |  | Serratus Posterior inferior muscle |
|  |  | Thoracolumbar paraspinal muscles |
|  |  | Abdominal muscles |

# KSENIA PAVLOVA

Date: __10·3·14__

Patient [redacted] Age: __23__ Sex: F/(M) D.O.A: __3·20·14__

HISTORY: This report covers date of services from __10-3__ to __10·3__ . Secondary to an accident, injury(ies) to the __C/L SPINE__ was/were reported.

I. LAST RECOMMENDATION/PLAN OF CARE: On the last visit, the following recommendation(s) were made:
  ➤ Consult/Test Results: __TPT____IDrcakelon__
  ➤ Treatment: ☑ Physical Therapy ☐ Medications ☐ Orthotics ☑ Chiropractic ☐ Acupuncture

  ➤ Status: ☐ No Improvement ☐ Moderate Improvement ☐ Marked Improvement

HPI:

**Subjective:** MUSCULOSKELETAL PLAN

☐ Neck ☐ Radiating to: _____ ☐ Atrophy
☑ Back ☐ Radiating to: __Buttocks__ ☐ Swelling
☐ Hand ☐ Wrist ☐ Elbow ☐ Shoulder
☐ Foot ☐ Ankle ☐ Knee ☐ Hip ☐ Tooth ☐ Jaw
☐ Other: _____ ☐ _____

**PAST MEDICAL HISTORY**

☐ Asthma ☐ Dizziness
☐ Diabetes ☐ Type I
      ☐ Type II
☐ Osteoporosis
☐ Other: __CMS__

**ALLERGIES**

☑ NKDA
☐ Local Anesthetic
☐ Corticosteroids
☐ Seasonal/Food
☐ Other: ____

Pain: ☐ Exacerbated ☐ Same ☐ Decreased ☐ No Pain
Pain Scale:
☐ C spine __7/10__ ☐ T spine _____ ☐ Shoulder R/L_____ ☐ L spine __8/10__ ☐ Knee R/L_____
Description: ☐ Sharp ☐ shooting, ☐ stabbing, ☐ aching ☐ pulsating ☐ other_____

Activity Level: ☐ Unchanged ☐ Diminished ☐ Significantly restricted

II. PHYSICAL EXAMINATION: ☐ Ht __63__ ☐ Wt. __180__ ☐ BP_____ ☐ P __88__ ☐ SpO2 __98__

| HEENT: | GU: |
|---|---|
| Skin: | Musculoskeletal: _low back pain_ |
| Resp: | |
| Cardio: | Other: |
| GI: | |

Radiology Results: _____

Objective: __pt seen & examined, @ tenderness of the paraspinal musculature of the lumbar spine. ↓ ROM ℅ multiple palpable trigger points__

I. ASSESSMENT/DIAGNOSIS: __BL__

04072015

**KSENIA PAVLOVA**

The patient is: ☐totally disabled ☐ partially disabled ☑not disabled from previous work as a/an _____
Permanency is: ☐probable ☐ possible ☐ expected ☐total ☐ marked partial ☐ moderate partial ☐ mild partial

NEW RECOMMENDED PLAN OF CARE:
☑ The patient was informed in the use of over the counter NSAID's, and demonstrates a clear understanding of the indicated usage.
☑ The patient is advised to start on a course of **Therapeutics Injections**_____.
☐ The patient is advised to start on a course of **Platelet Rich Plasma Injections** _____.
☐ _____

Because of the above findings the following are necessary for proper management of the patient:

☐ Orthopedic Consultation                ☐ Neurological Consultation    ☐ Dental Consultation

☐ Internal Medicine Consultation         ☐ Ophthalmology Consultation ☐ HEENT Consultation

☐ Chiropractor                           ☐ Acupuncture                 ☐ Pain Management

√. **AUTHORIZATION REQUEST (Workers Compensation Only):**
This is a formal **Authorization Request** for:
☐ MUA _____        ☐ EMG_____        ☐ MRI _____
☐ THEREPEUTIC INJECTIONS _____  ☐ PLATELET RICH PLASMA INJECTION_____
_____

TREATMENT:
Patient rate average pain on a comfort level at: _____ base on a scale of 0 to 10. No comfort (zero) to well (ten).
The following treatment modalities are being applied individually of in combination to decreased pain and improve function and quality of life:
☐ Nerve Block Injections:
☑ Trigger Point Injections:            _____Lower Back_____
☐ Facet Joint Injections:              _____
☐ Intra-articular Injections:          _____
☐ Platelet Rich Plasma Injections:     _____
USING:
After obtaining verbal consent the patient received trigger point/nerve block injections to the following areas:
☑ Surface anatomy technique
☑ Radiologic anatomy technique (C-Arm)
Using: ☑ 1% Lidocaine  ☐ Depomedrol 40 mg/cc  ☐ 0.25% Marcaine ☐ 0.25% Sensorcaine ☐ 0.25% Bupivacaine

| Nerve Block administered to: | Trigger Point is administered to: |
|---|---|
| ☐ Thoracic C7-T1 | ☐ The following muscles: _____ |
| ☐ Lumbar paravertebral sympathetic nerve | ☐ Bilaterally    ☐ Unilaterally |
| ☐ Bilaterally ☐ Unilaterally | |

**Diagnostic Impression:**

04072015

## KSENIA PAVLOVA

| | | | |
|---|---|---|---|
| ☐ Headaches | 784.0 | ☐ Post Traumatic Cervical ~~Thoracic~~ Myofascitis ~~723.1~~ | |
| ☐ Chest Pain | 786.50 | ☐ Acute Traumatic Cervical Radiculitis | 724.4 |
| ☐ Post Concussion Syndrome | 850.9 | ☐ Thoracic Sprain/Strain | 847.1 |
| ☐ Back Pain Unspecified | 724.5 | ☐ Acute Traumatic Lumbrosacral Radiculitis | 724.4 |
| ☐ Back Sprain/Strain | 847.9 | ☐ R/O Lumbar Disc Herniation | 722.73 |
| ☐ Cervical Derangement | 724.9 | ☐ Lumbar Derangement | 724.9 |
| ☐ Cervical Sprain/Strain | 847.0 | ☑ Post-Traumatic Lumbar Myofascitis | 724.2 |
| ☐ Cervicalgia | 732.1 | ☐ Lumbar Sprain/Strain | 847.2 |
| ☐ Acute Traumatic Cervical Radiculitis | 729.1 | ☐ Sacral Sprain/Strain | 847.3 |
| ☐ R/O Cervical Disc Herniation | 722.71 | ☐ Contusion Thigh/Hip | 924.0 |
| ☐ Hip Derangement | 718.95 | ☐ Shoulder Sprain/Strain | 840.8 |
| ☐ Hip Pain Unspecified | 719.45 | ☐ Ankle/Foot Derangement | 718.95 |
| ☐ Wrist Derangement | 718.93 | ☐ Foot Pain Unspecified | 719.47 |
| ☐ Elbow Derangement | 718.92 | ☐ Knee Derangement | 717.9 |
| ☐ Elbow Pain Unspecified | 719.42 | ☐ Knee Pain Unspecified | 717.46 |
| ☐ Hand Derangement | 718.92 | ☐ Knee Sprain/Strain | 844.9 |
| ☐ Hand Pain Unspecified | 729.5 | ☐ Anxiety, Tension and Street Reactive to pain | 308.0 |
| ☐ Shoulder Derangement | 718.91 | ☐ Elevated Blood Pressure | 796.2 |

Others:
☑ lumbar disc herniation

**Treatment Plan and Recommendation:**

__ Bed Rest

__ Avoid Physical Activity

✓ Physical Therapy

✓ The patient advised to attend a supervised physical therapy program on a regular scheduled basis 3-5 times a week

__ Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15 min.

| RT | LT | Head & Neck Muscles |
|---|---|---|
| | | Trapezius muscle |

04072015

**KSENIA PAVLOVA**

| | | |
|---|---|---|
| | | Sternocleidomastoid muscle |
| | | Masserter muscle |
| | | Temporalis muscle |
| | | Medial (Internal) Pterygoid muscle |
| | | Lateral (External) Pterygoid muscle |
| | | Digastric muscle |
| | | Cutaneous II: Occipitofrontalis |
| | | Splenius capitis & splenius cervicis muscles |
| | | Posterior cervical muscle |
| | | Semispinalis capitis, Semispinalis cervicis & multifidi |
| | | Subocipital muscles |
| | | Recti capitis posterior major & major, obliqi injerior & superior |

| RT | LT | Lumbar Paraspinal Muscles |
|---|---|---|
| 2 | 2 | Erectors Spinalae |
| | | Iliocostalis thoracics |
| 2 | 2 | Iliocostalis Lumborum |
| 2 | 2 | Semispinalis |
| 2 | 2 | Multifidi muscles |
| | | Rotatores muscles |
| 2 | 2 | Gluterus muscle |
| 4 | 4 | Quadratus Lumborum |
| 2 | 2 | Longissimus |

| RT | LT | Elbow to Finger Muscles |
|---|---|---|
| | | Hand extensor & brachioradialis muscles |
| | | Finger extensor muscles |
| | | Extensor digitorum &extensor indicis |
| | | Supinator muscle |
| | | Palmaris Longus muscle |
| | | Hand & Finger flexors in the forearm |
| | | Flexores carpi radialis & ulnaris, flexores digitorum |
| | | Superficialis & profundus, flexor pollicis |
| | | Longus (pronator Teres) |
| | | Adductor & opponens pollicis muscles; trigger thum |
| | | Interrosseous muscles of the hand |

| RT | LT | Upper Back, Shoulder & Arm Muscles |
|---|---|---|
| | | Levator Scapulae muscle |
| | | Scalene muscles |
| | | Supraspinatus muscles |
| | | Infraspinatus muscle |
| | | Teres minor muscle |
| | | Latissimus dorsi muscle |
| | | Teres major muscle |
| | | Subscapularis muscle |
| | | Rhomboideus major & minor muscles |
| | | Deltoid muscle |
| | | Coracobrachialis muscle |
| | | Biceps brachii muscle |
| | | Brachialis muscle |
| | | Triceps brachii muscle |

| RT | LT | Torso Muscles |
|---|---|---|
| | | Pectoralis major muscle (subclavius muscles) |
| | | Pectoralis minor muscle |
| | | Sternalis muscle |
| | | Serratus Posterior superior muscle |
| | | Serratus Anterior muscle |
| | | Serratus Posterior inferior muscle |
| | | Thoracolumbar paraspinal muscles |
| | | Abdominal muscles |

04072815

Patient Name:_____ Date:_____

| CODE | Descriptions | RIGHT | LEFT |
|---|---|---|---|
| ☐ 64412 | Injection, anesthetic agent; spinal accessory nerve | | |
| ☐ 64413 | Injection, anesthetic agent; cervical plexus | | |
| ☐ 64405 | Injection, anesthetic agent; occipital nerve | | |
| ☐ 64450 | Injection, anesthetic agent; peripheral nerve or brunch | | |
| ☐ 64418 | Injection, anesthetic agent; suprascapular nerve | | |
| ☐ 64425 | Injection, anesthetic agent; ilioinguinal, iliohypogastric nerves | | |
| ☐ 64421 | Injection, anesthetic agent; intercostal nerves, multiple, regional | | |
| ☐ 20552 | Injection one or two muscles | | |
| ☐ 20553 | Injection three of more muscles | 7 | 7 |
| CODE | Descriptions | RIGHT | LEFT |
| ☐ 20999 | Dry Needling | 16 | 16 |
| ☐ | Ultrasound | | |
| ☐ | Platelet Rich Plasma Injection | | |
| ☐ 20605 | Intra Articular \Injection shoulder | | |
| ☐ 20610 | Intra Articular injection Knee | | |
| ☐ 64633 | C – Spine Facet joint injection single | | |
| ☐ 64634 | C Facet joint injection additional | | |
| ☐ 64633 | T- Facet joint injection single | | |
| ☐ 64634 | T Facet joint injection additional | | |
| ☐ 64635 | L- Facet joint injection single | | |
| ☐ 64636 | L Facet joint injection additional | | |
| ☐ 64635 | S- Facet joint injection single | | |
| ☐ 64636 | S Facet joint injection additional | | |
| ☐ | | | |

umber of cartridge injected

. sterile field was created over the regions to be injected. The skin was prepped with Betadine. The areas to be
ijected were cleaned with alcohol, the patient's skin was sprayed with topical anesthetic ethyl chloride, and
ich area/trigger point was injected with 0.5cc of 0.5% Marcaine via a 3cc syringe with a 1-1/2 x 25G sterile
rpodermic needle. Needling was performed to further breakup the trigger points.

☑ Patient tolerated the procedure well
☐ Patient developed a mild transient lightheadedness of a few minutes duration
☐ No complications, No complaints
☐ Other:_____

KSENIA PAVLOVA, D.O.

04072015

## KSENIA PAVLOVA

The p( ) Follow-Up in 2- 3-4 weeks

Prognosis: ___ Excellent; ___ Good; ___ Fair; ___ Poor; ___ Guarded

atient was instructed on post Injection care and reported some decreased muscle stiffness and some decreased pain following the procedure.

**DISABILITY & PROGNOSIS:**
It is my opinion, based on the history of the patient's symptoms, diagnosis and examination findings, that the above noted injuries were sustained/aggravated in the accident that occurred on ___5 · 10 · 19___, and the disability resulting from it is/maybe/ of a temporary/permanent nature. **The prognosis for a recovery is presently (cautiously optimistic/ guarded).**

Physician's Signature: _____
                              Ksenia Pavlova

04872015

**KSENIA PAVLOVA**

Date: 10·28·13                                          1 OF 6

Patient: [redacted]                    Age: 52   Sex: F/M   D.O.A: 9-1-13

**HISTORY:** This report covers date of services from 10·28·13 to 10·28·13. Secondary to an accident, injury(ies) to the Ys +/5 (B) hree. Head was/were reported.

**LAST RECOMMENDATION/PLAN OF CARE:** On the last visit, the following recommendation(s) were made:

➤ Consult/Test Results: TPT  Dry  needling

➤ Treatment: ☑ Physical Therapy  ☐ Medications  ☐ Orthotics  ☑ Chiropractic  ☐ Acupuncture

➤ Status: ☐ No Improvement  ☑ Moderate Improvement  ☐ Marked Improvement

**HPI:**

| Subjective: MUSCULOSKELETAL PLAN | PAST MEDICAL HISTORY | ALLERGIES |
|---|---|---|
| ☑ Neck ☑ Radiating to:_____ ☐ Atrophy<br>☑ Back ☑ Radiating to:_____ ☐ Swelling<br>☐ Hand ☐ Wrist ☐ Elbow ☐ Shoulder<br>☐ Foot ☐ Ankle ☑ Knee ☐ Hip ☐ Tooth ☐ Jaw<br>☑ Other: _____ (B) ☐ _____ | ☐ Asthma ☐ Dizziness<br>☑ Diabetes ☐ Type I<br>_____ ☐ Type II<br>☐ Osteoporosis<br>☑ Other: HTN | ☐ NKDA<br>☐ Local Anesthetic<br>☐ Corticosteroids<br>☐ Seasonal/Food<br>☑ Other: Celebra |

**Pain:** ☐ Exacerbated        ☑ Same        ☐ Decreased        ☐ No Pain

**Pain Scale:**
☑ C spine 6/10  ☐ T spine _____  ☐ Shoulder R/L _____  ☑ L spine 8/10  ☑ Knee R/L 8/10

**Description:** ☐ Sharp  ☐ shooting,  ☐ stabbing,  ☑ aching  ☑ pulsating  ☐ other _____

**Activity Level:** ☐ Unchanged        ☑ Diminished        ☐ Significantly restricted

II. **PHYSICAL EXAMINATION:** ☐ Ht 5'4  ☐ Wt 126  ☐ BP _____  ☐ P 70  ☐ SpO2 98

| HEENT: WDL | GU: WDL |
|---|---|
| Skin: WDL | Musculoskeletal: |
| Resp: WDL | |
| Cardio: HTN | Other: DM |
| GI: WDL | |

**Radiology Results:** (B) mri

**Objective:** Pt seen & examined c̄ (B) tenderness of the lumbar area Bil slight + in ROM especially seen when flexing the torso forward. (B) multiple trigger points located around the lumbar area

V. **ASSESSMENT/DIAGNOSIS:** _____ lumbar strain/strain

**KSENIA PAVLOVA**

2 OF 6

The patient is: ☐ totally disabled ☐ partially disabled ☐ not disabled from previous work as a/an _____
Permanency is: ☐ probable ☐ possible ☐ expected ☐ total ☐ marked partial ☐ moderate partial ☐ mild partial

### NEW RECOMMENDED PLAN OF CARE:

☐ The patient was informed in the use of over the counter **NSAID's**, and demonstrates a clear understanding of the indicated usage.
☐ The patient is advised to start on a course of **Therapeutics Injections**_____.
☐ The patient is advised to start on a course of **Platelet Rich Plasma Injections** _____.
☐ _____

Because of the above findings the following are necessary for proper management of the patient:

☐ Orthopedic Consultation          ☐ Neurological Consultation     ☐ Dental Consultation

☐ Internal Medicine Consultation   ☐ Ophthalmology Consultation   ☐ HEENT Consultation

☑ Chiropractor                     ☐ Acupuncture                  ☐ Pain Management

### AUTHORIZATION REQUEST (Workers Compensation Only):
This is a formal **Authorization Request** for:
☐ MUA _____   ☐ EMG_____   ☐ MRI _____
☐ THEREPEUTIC INJECTIONS _____   ☐ PLATELET RICH PLASMA INJECTION_____

### TREATMENT:
Patient rate average pain on a comfort level at: _____ base on a scale of 0 to 10. No comfort (zero) to well (ten).
The following treatment modalities are being applied individually of in combination to decreased pain and improve function and quality of life:
☐ Nerve Block Injections:          _____
☑ Trigger Point Injections:        _____
☐ Facet Joint Injections:          _____
☐ Intra-articular Injections:      _____
☐ Platelet Rich Plasma Injections: _____

### USING:
After obtaining verbal consent the patient received trigger point/nerve block injections to the following areas:
☐ Surface anatomy technique
☐ Radiologie anatomy technique (C-Arm)
Using: ☑ 1% Lidocaine  ☐ Depomedrol 40 mg/cc  ☑ 0.25% Marcaine  ☐ 0.25% Sensorcaine  ☐ 0.25% Bupivacaine

| Nerve Block administered to: | Trigger Point is administered to: |
|---|---|
| ☐ Thoracic C7-T1 | ☐ The following muscles: _____ |
| ☐ Lumbar paravertebral sympathetic nerve | ☑ Bilaterally    ☐ Unilaterally |
| ☐ Bilaterally ☐ Unilaterally | |

**Diagnostic Impression:**

11112013

**KSENIA PAVLOVA**

3 Of 6

| | | | |
|---|---|---|---|
| ☐ Headaches | 784.0 | ☐ Post Traumatic Cervico- Thoracic Myofascitis | 723.4 |
| ☐ Chest Pain | 786.50 | ☐ Acute Traumatic Cervical Radiculitis | 724.4 |
| ☐ Post Concussion Syndrome | 850.9 | ☐ Thoracic Sprain/Strain | 847.1 |
| ☐ Back Pain Unspecified | 724.5 | ☐ Acute Traumatic Lumbrosacral Radiculitis | 724.4 |
| ☐ Back Sprain/Strain | 847.9 | ☐ R/O Lumbar Disc Hemiation | 722.73 |
| ☐ Cervical Derangement | 724.9 | ☐ Lumbar Derangement | 724.9 |
| ☐ Cervical Sprain/Strain | 847.0 | ☑ Post-Traumatic Lumbar Myofascitis | 724.2 |
| ☐ Cervicalgia | 732.1 | ☑ Lumbar Sprain/Strain | 847.2 |
| ☐ Acute Traumatic Cervical Radiculitis | 729.1 | ☐ Sacral Sprain/Strain | 847.3 |
| ☐ R/O Cervical Disc Hemiation | 722.71 | ☐ Contusion Thigh/Hip | 924.0 |
| ☐ Hip Derangement | 718.95 | ☐ Shoulder Sprain/Strain | 840.8 |
| ☐ Hip Pain Unspecified | 719.45 | ☐ Ankle/Foot Derangement | 718.95 |
| ☐ Wrist Derangement | 718.93 | ☐ Foot Pain Unspecified | 719.47 |
| ☐ Elbow Derangement | 718.92 | ☐ Knee Derangement | 717.9 |
| ☐ Elbow Pain Unspecified | 719.42 | ☐ Knee Pain Unspecified | 717.46 |
| ☐ Hand Derangement | 718.92 | ☐ Knee Sprain/Strain | 844.9 |
| ☐ Hand Pain Unspecified | 729.5 | ☐ Anxiety, Tension and Street Reactive to pain | 308.0 |
| ☐ Shoulder Derangement | 718.91 | ☐ Elevated Blood Pressure | 796.2 |

Others:

**Treatment Plan and Recommendation:**

__ Bed Rest

__ Avoid Physical Activity

✓ Physical Therapy

✓ The patient advised to attend a supervised physical therapy program on a regular scheduled basis 3-5 times a week

__ Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15 min.

| RT | LT | Head & Neck Muscles |
|---|---|---|
| | | Trapezius muscle |

11112013

**KSENIA PAVLOVA**

4 OF 6

| | | |
|---|---|---|
| | | Sternocleidomastoid muscle |
| | | Masserter muscle |
| | | Temporalis muscle |
| | | Medial (Internal) Pterygoid muscle |
| | | Lateral (External) Pterygoid muscle |
| | | Digastric muscle |
| | | Cutaneous II: Occipitofrontalis |
| | | Splenius capitis & splenius cervicis muscles |
| | | Posterior cervical muscle |
| | | Semispinalis capitis, Semispinalis cervicis & multifidi |
| | | Subocipital muscles |
| | | Recti capitis posterior major & major, obliqi injerior & superior |

| RT | LT | Lumbar Paraspinal Muscles |
|---|---|---|
| 2 | 2 | Erectors Spinalae |
| | | Iliocostalis thoracics |
| 2 | 2 | Iliocostalis Lumborum |
| 2 | 2 | Semispinalis |
| 2 | 2 | Multifidi muscles |
| | | Rotatores muscles |
| 2 | 2 | Gluteus muscle |
| 4 | 4 | Quadratus Lumborum |
| 2 | 2 | Longissimus |

| RT | LT | Elbow to Finger Muscles |
|---|---|---|
| | | Hand extensor & brachioradialis muscles |
| | | Finger extensor muscles |
| | | Extensor digitorum &extensor indicis |
| | | Supinator muscle |
| | | Palmaris Longus muscle |
| | | Hand & Finger flexors in the forearm |
| | | Flexores carpi radialis & ulnaris, flexores digitorum |
| | | Superficialis & profundus, flexor pollicis |
| | | Longus (pronator Teres) |
| | | Adductor & opponens pollicis muscles; trigger thum |
| | | Interrosseous muscles of the hand |

| RT | LT | Upper Back, Shoulder & Arm Muscles |
|---|---|---|
| | | Levator Scapulae muscle |
| | | Scalene muscles |
| | | Supraspinatus muscles |
| | | Infraspinatus muscle |
| | | Teres minor muscle |
| | | Latissimus dorsi muscle |
| | | Teres major muscle |
| | | Subscapularis muscle |
| | | Rhomboideus major & minor muscles |
| | | Deltoid muscle |
| | | Coracobrachialis muscle |
| | | Biceps brachii muscle |
| | | Brachialis muscle |
| | | Triceps brachii muscle |

| RT | LT | Torso Muscles |
|---|---|---|
| | | Pectoralis major muscle (subclavius muscles) |
| | | Pectoralis minor muscle |
| | | Sternalis muscle |
| | | Serratus Posterior superior muscle |
| | | Serratus Anterior muscle |
| | | Serratus Posterior inferior muscle |
| | | Thoracolumbar paraspinal muscles |
| | | Abdominal muscles |

11112013

**KSENIA PAVLOVA**

## Injections:

| CODE | NERVE OR MUSCLE | RIGHT | LEFT |
|---|---|---|---|
| ☐ 64412 | Injection, anesthetic agent; spinal accessory nerve | | |
| ☐ 64413 | Injection, anesthetic agent; cervical plexus | | |
| ☐ 64405 | Injection, anesthetic agent; occipital nerve | | |
| ☐ 64450 | Injection, anesthetic agent; peripheral nerve or brunch | | |
| ☐ 64418 | Injection, anesthetic agent; suprascapular nerve | | |
| ☐ 64425 | Injection, anesthetic agent; ilioinguinal, iliohypogastric nerves | | |
| ☐ 64421 | Injection, anesthetic agent; intercostal nerves, multiple, regional | | |
| ☐ 20552 | Injection one or two muscles | | |
| ☑ 20553 | Injection three of more muscles | 5 | 5 |
| ✓ | Dry needling | 16 | 16 |
| ☐ 64633 | C – Spine Facet joint injection single | | |
| ☐ 64634 | C Facet joint injection additional | | |
| ☐ 64633 | T- Facet joint injection single | | |
| ☐ 64634 | T Facet joint injection additional | | |
| ☐ 64635 | L- Facet joint injection single | | |
| ☐ 64636 | L Facet joint injection additional | | |
| ☐ 64635 | S- Facet joint injection single | | |
| ☐ 64636 | S Facet joint injection additional | | |
| ☐ | Injection, anesthetic agent, steroid, | | |

**Number of cartridge injected** _____
A sterile field was created over the regions to be injected. The skin was prepped with Betadine. The areas to be injected were cleaned with alcohol, the patient's skin was sprayed with topical anesthetic ethyl chloride, and each area/trigger point was injected with 0.5cc of 0.5% Marcaine via a 3cc syringe with a 1-1/2 x 25G sterile hypodermic needle. Needling was performed to further breakup the trigger points.

☑  Patient tolerated the procedure well
☐  Patient developed a mild transient lightheadedness of a few minutes duration
☑  Other: _No complications /No complaints._

**KSENIA PAVLOVA**

6 OF 6

The p( ) Follow-Up in  2- 3-4 weeks

**Prognosis:** ___ Excellent; ___ Good; ___ Fair; ___ Poor; ___ Guarded

atient was instructed on post injection care and reported some decreased muscle stiffness and some decreased pain following the procedure.

**DISABILITY & PROGNOSIS:**
It is my opinion, based on the history of the patient's symptoms, diagnosis and examination findings, that the above noted injuries were sustained/aggravated in the accident that occurred on ___9 - 1 - 13___, and the disability resulting from it is/maybe/ of a temporary/permanent nature. **The prognosis for a recovery is presently (cautiously optimistic/ guarded).**

**Physician's Signature:** _____
                        Ksenia Pavlova

# RENEE ANN DENOBREGA, NP

## INITIAL EVALUATION

Re: ███████████

DOB: ████████

DOA: _12/24/16_

Date of Evaluation: _1/12/17_

## ACCIDENT HISTORY:

Type:   ☑MVA   ☐ Work Related   ☐ Slip and Fall   ☐ Other: _____
Where you:   ☐ Pedestrian   ☑Passenger   ☐ Driver
Traveling in the:   ☐ Front Seat   ☑ Rear Seat   Seat Belt: ☐Y   ☑N
Injury Happened:   ☐ At Work   ☐ At Home   ☑MVA   ☑ Exact.Location: _155th + 115th ave_
_Quens NY_
E R Treatment:   ☐Yes   ☑No   Hospital Name: _____
Date Admitted _____ Date discharged _____   ☐   Patient was treated and released
Has patient worked since accident? ☑No  ☐Yes,returned date: _____ ☐ Light Duty   ☐ Regular duty
Has patient been in a prior accident?  ☑No  ☐Yes, type & when: ☐MVA _____   ☐WC _____

_____
_____
_____

## PRESENT COMPLAINTS:

- Headache / Dizziness / Nausea / Vomiting / Insomnia / Nervousness / Anxiety / Depression / Blurring Vision / Balance Disturbance / Fever / Chills / Night Sweats / Weight Gains / Weight Loss / Others
  _____
- Chest Pain / Tenderness / Tingling
- Difficulty of Breathing
- ✓Neck pain with (✓) upper extremity radiating pain and parasthesia
- Tingling sensation in the right/left both arms/ foreams/ fingers
- Upper back pain
- ✓Low back pain with ( )~~lower extremity radiating pain and parenthesia~~
- Numbness / weakness / tingling to the right/ left/ both legs/ feet/ toes
- Pain in the scalp / Face / Chest / Abdomen / ( ) Shoulder / ( ) elbow / ( ) Wrist / ( ) Hand/ ( ) hip / ( ) Knee / ( ) Ankle / ( ) Foot / Other _____

**Pain Descriptive:**
_sharp; _stabbing; _shooting; _burning; _aching; _ tingling; _ numbness: _ pulsating;___ _tightness/stiffness_

_ constant; ✓intermittent; _ occasional

How many  hours per day patient has pain_____

How many days per week patient has pain _daily_

What activities are most affected by pain _bending_

01242017

Patient Name: _____   Date: _____

**Activity level is:**

_unchanged

✓diminished

_significantly restricted

_pain with manual labor

_unable to perform daily household chores

**Where is pain worst?**

_neck: _back: _R/L leg: R/L arm: _____
<div align="right">(other)</div>

Pain scale (1-10): 0-No pain: 1-3 Minimal: 4-6 Moderate ; 7-9 Intense: 10 Emergency

✓ Neck  7

✓ Back  9

Arm ___

Leg ___

**What makes pain worst?**

_standing: _lack of sleep _reaching overhead: _sitting: _laying down: _coughing: _walking: _lifting: _sneezing: ✓bending: _weather: _tension: _driving: Housework activity: _arising from chairs: _____other

Severe night time pain  YES/NO

Waking up in the middle of the night because of pain **YES/NO** if yes how many times ___

**PAST MEDICAL HISTORY:**

☑ There is no significant past medical history

☐ There is a history of (HTN, Diabetes, Asthma, Osteoarthritis) other: _____

☐ Medication _____

**PAST SURGICAL HISTORY:**

☑ There is no significant past medical history

☐ There is a history of _____

**Allergies:**   ☐ YES   ☑ NO

_____

**EMPLOYEMENT HISTORY:**

The patient had not been employed / The patient has been employed prior to the accident.

The patient has / has not been able to return to work.

*back Stiffness in AM*
*and neck pain*

**REVIEW OF SYSTEM:**

_Constitutional Symptoms

(_fever;_weight loss;other _____ )

_Eyes

_Ears ___; _Nose ___; _Mouth ___; _Throat

_Cardiovascular _____

_Gastrointestinal _____

_Genitourinary _____

_Musculoskeletal _____

_Integumentary (_skin _____; _breast _____)

_Neurological _____

_Psychiatric _____

_Endocrine _____

_Hematologic/Lymphatic _____

_Allergic / Immunologic _____

01242017

Patient Name: _____ Date: _____

## PHYSICAL EXAMINATION

VITAL SIGNS: BP:____ WT: *120 lbs* HT: *5'8* T°:____ RR: *18* PULSE:____ SPO2%:____

**HEENT:**
The head is normocephalic. There is full range of extra ocular muscle and a normal light reflex. No nystagmus is noted. External canals and tympanic membranes are normal. Hearing is normal. The tongue protrudes in the midline. He/She complains of headaches.

**SKIN:**
The skin is intact. No ecchymosis laceration or abrasions are noted.

**CHEST & LUNGS EXAMINTAION:**
The heart size seemed to be normal. The PMI was normal. No murmur, gallop, thrill or rub was noted. The rhythm was regular. Checked pulses were synchronous and equal bilaterally.

**ABDOMEN:**
The abdomen was flat. No scar was noted. Palpitation was normal, non-tender in all quadrants. No organomegaly was noted.

**EXAMINATION:**
**Cervical Spine**          ☐ NORMAL
Examination of the cervical spine showed loss of the normal lordosis. Tenderness, spasm and stiffness were noted on palpitation of the posterior occipital, paraspinals and trapezius muscle. Range of motion was limited, restricted and painful.

| Cervical ROM | Normal | Patient | Quantity |
|---|---|---|---|
| Flexion | 50° | 40 | Severe / Moderate |
| Extension | 60° | 50 | Severe / Moderate |
| Right Lateral Flexion | 45° | 35 | Severe / Moderate |
| Left Lateral Flexion | 45° | 40 | Severe / Moderate |
| Right Rotation | 80° | 70 | Severe / Moderate |
| Left Rotation | 80° | 70 | Severe / Moderate |

The points were also elicited at C3, C4, C5, C6, C7 levels. The soto hall (force flexion of the head and the neck upon the sternum) elicited pain. Cervical distraction test was positive indicating the presence of a spinal nerve root compression. Manual testing of muscle strength was positive. Pinprick and touch was abnormally decreased over the night left arm. The patient had difficulties looking up to the ceiling because of spasm and stiffness of the cervical musculature.

☐ Hypersensitive bundle/nodule present
☐ Pain elicited when palpated
☐ Radiation of pain when palpated
☐ "Jump Sign" when palpated
☐ Twitch response when palpated

01242017

Patient Name: _____ Date: _____

## THORACIC SPINE: ☑ NORMAL

There was pain/no pain on deep inspiration. Tenderness/no tenderness on palpation over the paraspinals and/or the angle of the ribs were noted. Range of motion was/was not limited.

- ☐ Hypersensitive bundle/nodule present
- ☐ Pain elicited when palpated
- ☐ Radiation of pain when palpated
- ☐ "Jump Sign" when palpated
- ☐ Twitch response when palpated

## LUMBAR SPINE: ☐ NORMAL

Muscle spasm was noted on palpation. Visualized muscle spasm and diffuse tenderness are noted over the paraspinal erector spinalea, iliocostalis lumborum, the multifundi the gluteus muscles and the lattissimus dorsi, radiating to the sciatic notches, the RIGHT/LEFT hip, THE LOWER EXTREMETIES, limiting the back range of motion more than __% of normal.

| Spinal ROM | Normal | Patient | Quantity |
|---|---|---|---|
| Pelvic Sacral Angle | 45° | 35 | Severe / Moderate |
| Flexion | 90° | 75 | Severe / Moderate |
| Extension | 30° | 15 | Severe / Moderate |
| Right Lateral Flexion | 35° | 25 | Severe / Moderate |
| Left Lateral Flexion | 35° | 30 | Severe / Moderate |

Tender appoints were elicited at L2, L3, L4, L5-S1 levels. Straight leg raising test was positive on the right/left/biterally.

- ☑ Hypersensitive bundle/nodule present
- ☑ Pain elicited when palpated
- ☐ Radiation of pain when palpated
- ☐ "Jump Sign" when palpated
- ☐ Twitch response when palpated

## SHOULDER: ☑ NORMAL

The left/right shoulder was painful, spastic and restricted on palpation and mobilization of the deltoid muscles and the AC joints. Crepitation was felt on palpation and mobilization of the acromioacetabular joints. Trigger points were elicited on palpation of the supraspinatus, infraspinatus deltoid, biceps brachii muscles causing severe limitation and pain on motion. The range of motion was limited and painful..

| Shoulder ROM | Normal | R | L | Quantity |
|---|---|---|---|---|
| Abduction | 180° | | | Severe / Moderate |
| Forward Flexion | 180° | | | Severe / Moderate |
| Extension | 60° | | | Severe / Moderate |
| Internal Rotation | 90° | | | Severe / Moderate |
| External Rotation | 90° | | | Severe / Moderate |

Hand to shoulder blade test was positive. Apley's scratch test was positive. The patient complains of shoulder pain on the left/right side was unable to reach behind to a back pocket and in front to comb hair or brush teeth.

Patient Name: _____   Date: _____

**ELBOW / WRIST / HAND:**       ☑ NORMAL

---

**HIP:**       ☑ NORMAL

Swelling, hematoma and bruises were noted over lateral/anterior aspect of the left/right thigh. Tenderness was also noted on palpation of the sacroiliacarea. Trigger points were elicited on palpation of the left/right gluteus medius. The range of motion was limited and painful. Ely's eel to buttock test was positive. Thomas test was positive.

| Hip ROM | Normal | R | L | Quantity |
|---|---|---|---|---|
| Flexion | 120° | | | Severe / Moderate |
| Extension | 35° | | | Severe / Moderate |
| Abduction | 50° | | | Severe / Moderate |
| Adduction | 30° | | | Severe / Moderate |
| Internal Rotation | 35° | | | Severe / Moderate |
| External Rotation | 45° | | | Severe / Moderate |

**KNEE:**       ☑ NORMAL

Swelling, hematoma and bruises were noted over anterior / posterior / lateral aspect of the left / right knee. Tenderness was also noted on palpation of the medial/lateral aspect. Range of motion was limited and painful.

| Knee ROM | Normal | R | L | Quantity |
|---|---|---|---|---|
| Flexion | 135° | | | Severe / Moderate |
| Extension | 10° | | | Severe / Moderate |
| Internal Tibial Rotation | 30° | | | Severe / Moderate |
| External Tibial Rotation | 45° | | | Severe / Moderate |

**ANKLE:**       ☑ NORMAL

Swelling, hematoma and bruises were noted over anterior / posterior / malleollar aspect of the left/right ankle. Tenderness was also noted on palpation of the medial/lateral aspect. Range of motion was limited and painful.

| Ankle ROM | Normal | R | L | Quantity |
|---|---|---|---|---|
| Dorsi Flexion | 20° | | | Severe / Moderate |
| Plantar Flexion | 50° | | | Severe / Moderate |
| Inversion | 15° | | | Severe / Moderate |
| Eversion | 15° | | | Severe / Moderate |

**FOOT:**       ☑ NORMAL

01242017

Patient Name: _____          Date: _____

**Diagnostic Impression:**

| | | | |
|---|---|---|---|
| ☐ Post-Traumatic Headache | G44.3 | ☐ Pain in Wrist | M25.53 |
| ☐ Acute Post-traumatic Headache | G44.31 | ☐ Pain in Knee | M25.56 |
| ☐ Chest Pain Unspecified | R07.9 | ☐ Pain in Ankle and Joints of Foot | M25.57 |
| ☐ Concussion Without Loss of | | ☐ Sprain of Shoulder Joint | S43.4 |
| Consciousness, Initial Encounter | S06.0X0A | ☐ Sprain of Collateral Ligament of Knee | S83.4 |
| ☐ Concussion With Loss of Consciousness | | ☐ Sprain of Cruciate Ligament of Knee | S83.5 |
| Of Unspecified Duration | S06.0X9 | ☐ Sprain of Other Specified Parts of Knee | S83.8 |
| ☐ Other Dorsalgia | M54.89 | ☐ Tear of Articular Cartilage of Knee, Current | S83.3 |
| ☐ Low Back Pain | M54.5 | ☐ Tear of Meniscus, Current Injury | S83.2 |
| ☐ Cervicalgia | M54.2 | ☐ Internal Derangement of Knee | M23 |
| ☐ Lumbago with Sciatica | M54.4 | ☐ Elevated blood-pressure reading, | |
| ☐ Sciatica | M54.3 | Without diagnosis of hypertension | R03.0 |
| ☐ Radiculopathy, Site Unspecified | M54.10 | ☐ Contusion of Right Thigh, Initial Encounter | S70.11XA |
| ☐ Radiculopathy, Cervical Region | M54.12 | ☐ Contusion of Left Thigh, Initial Encounter | S70.12XA |
| ☐ Radiculopathy, Cervicothoracic Region | M54.13 | ☐ Acute Stress Reaction | F43.0 |
| ☐ Radiculopathy, Thoracic Region | M54.14 | ☐ Other Cervical Disc Displacement, | |
| ☐ Radiculopathy, Thoracolumbar Region | M54.15 | Unspecified Cervical Region | M50.20 |
| ☐ Radiculopathy, Lumbar Region | M54.16 | ☐ Other Cervical Disc Displacement, | |
| ☐ Radiculopathy, Lumbosacral Region | M54.17 | High Cervical Region | M50.21 |
| ☐ Radiculopathy, Sacral and | | ☐ Other Cervical Disc Displacement, | |
| Sacrococcygeal Region | M54.18 | Mid-Cervical Region | M50.22 |
| ☐ Fusion of Spine, Cervical Region | M43.22 | ☐ Other Cervical Disc Displacement, | |
| ☐ Fusion of Spine, Cervicothoracic Region | M43.23 | Cervicothoracic Region | M50.23 |
| ☐ Fusion of Spine, Thoracic Region | M43.24 | ☐ Other Cervical Disc Degeneration | M50.3 |
| ☐ Fusion of Spine Thoracolumbar Region | M43.25 | ☐ Other Intervertebral Disc Displacement, | |
| ☐ Fusion of Spine, Lumbar Region | M43.26 | Thoracic Region | M51.24 |
| ☐ Fusion of Spine, Lumbosacral Region | M43.27 | ☐ Other Intervertebral Disc Displacement, | |
| ☐ Dorsopathy, Unspecified | M53.9 | Thoracolumbar Region | M51.25 |
| ☐ Sprain of Ligaments of | | ☐ Other Intervertebral Disc Displacement, | |
| Cervical Spine, Initial Encounter | S13.4XXA | Lumbar Region | M51.26 |
| ☐ Sprain of Ligaments of | | ☐ Other Intervertebral Disc Displacement, | |
| Thoracic Spines, Initial Encounter | S23.3XXA | Lumbosacral Region | M51.27 |
| ☐ Sprain of Ligaments of | | ☐ Other Thoracic, Thoracolumbar and | |
| Lumbar Spine, Initial Encounter | S33.5XXA | Lumbosacral Intervertebral | |
| ☐ Sprain of Other Parts of Lumbar Spine | | Disc Degeneration | M51.3 |
| and Pelvis, Initial Encounter | S33.8XXA | ☐ Other Synovitis and Tenosynovitis, | |
| ☐ Other Specific Joint Derangements | | Shoulder | M65.81 |
| of Shoulder, Not Elsewhere Classified | M24.81 | ☐ Other Synovitis and Tenosynovitis, | |
| ☐ Other Specific Joint Derangements | | Upper Arm | M65.82 |
| of Elbow, Not Elsewhere Classified | M24.82 | ☐ Other Synovitis and Tenosynovitis, | |
| ☐ Other Specific Joint Derangements | | Forearm | M65.83 |
| of Wrist, Not Elsewhere Classified | M24.83 | ☐ Other Synovitis and Tenosynovitis, Hand | M65.84 |
| ☐ Other Specific Joint Derangements | | ☐ Other Synovitis and Tenosynovitis, Thigh | M65.85 |
| of Hand, Not Elsewhere Classified | M24.84 | ☐ Other Synovitis and Tenosynovitis, | |
| ☐ Other Specific Joint Derangements | | Lower Leg | M65.86 |
| of Hip, Not Elsewhere Classified | M24.85 | ☐ Other Synovitis and Tenosynovitis, | |
| ☐ Other Specific Joint Derangements | | Ankle and Foot | M65.87 |
| of Ankle and Foot, Not Elsewhere Classified | M24.87 | ☐ Medial Epicondylitis | M77.0 |
| ☐ Pain in Hip | M25.55 | ☐ Lateral Epicondylitis | M77.1 |
| ☐ Pain in Shoulder | M25.52 | | |

0 1 2 4 2 6 1 7

Patient Name: _____   Date: _____

Others:

_____

**Treatment Plan and Recommendation:**
__Bed Rest
__Avoid Physical Activity
✓Physical Therapy
✓The patient advised to attend a supervised physical therapy program on a regular schedule basis 3-5 times a week
__Application of Synoptic NM Block, continues/reciprocal duration of the treatment 15mins
__Computerized ROM and MMT examination

**The patient advised to use at home:**

( ) Cervical Collar 2 pc.                    ( ) EMS unit+kit
( ) Cervical Traction Kit                    ( ) EMS Placement Belt
( ✓) Cervical Pillow                         (-) Electric Massager
( ) Advanced Cervical Collar                 ( ) Orthopedic Elbow Support L R
( ) Lumbosacral Orthosi                      ( ) Orthopedic Knee Support L R
( ✓) Lumbar Cushion                          ( ) Orthopedic Ankle Support L R
( ) Orthopedic Car Seat                      ( ) Orthopedic Wrist Support L R
( ✓) Orthopedic Bed Board                    ( ) Orthopedic Shoulder Support L R
( ✓) Eggcrate Mattress                       ( ) Infrared Heat Lamp
( ✓) Heating Pad                             ( ) Pelvic Traction
( ) Hydrotherapy                             ( ) Cane

**The patient is referred to:**

**X-Rays of the:**                           **MRI's of the:**
Indications: _____                Indications: _____
___ Cervical Spine                           ___ Brain
___ Thoracic Spine                           ___ Cervical Spine
___ Lumbar Spine                             ___ Thoracic Spine
___ Knee R  L                                ___ Lumbar Spine
___ Shoulder R  L                            ___ Knee R  L
___ Wrist R  L                               ___ Shoulder R  L
___ Ankle R  L                               ___ Wrist R  L
___ Hip R  L                                 ___ Ankle R  L
___ Elbow R  L                               ___ Hip R  L
                                             ___ Elbow R  L

Other:                                       01242017

Patient Name: _____   Date: _____

**The patient prescribed medication:**
_____ *Heart healthy diet encouraged* _____

**Consults:**

( ) EKG

**Indications:**

_____

( ) Neurology

**Indications:**

_____

( ) _____

**Indications:**

_____

( ✓ ) Follow-up in 3-4 weeks

**Prognosis:** ____Excellent;  ____Good;  ____Fair;  ____ Poor;  ✓ Guarded

**Disability:**
__Patient is partially disabled
__Mild 25-49%          __Moderate 50-74%          __Marked 75-99%
__Patient is totally disabled

**Casualty:**
According to my best judgment, the history given by the patient is accurate and the above mentioned accident seems to be causative factor of patient's symptomology.

**DISABILTY & PROGNOSIS:**
It is my opinion, based on the history of the patient's symptoms, diagnosis and examination findings that the above noted injuries were sustained/aggravated in the accident that occurred on __/__/__, and the disability resulting from it is/may be of a temporary/permanent nature. The prognosis for a complete recovery is presently **(cautiously optimistic/guarded).**

**DISCHARGE:**

The patient was discharged from treatment on _____ because

___ Patient's no-fault benefits was cut off

___ Patient has reached the medical maximum improvement

01242017

RENEE ANN DENOBREGA

Patient Name: _____   Date: _1/12/17_

**TREATMENT:**

Patient rate average pain on a comfort level at: _____ base on a scale of 0 to 10. No comfort (zero) to well (ten).

The following treatment modalities are being applied individually of in combination to decreased pain and improve function and quality of life:

❑ Nerve Block Injections:
Indications: _____

☑ Trigger Point Injections:
Indications: ____ (L) E.S. muscle TP elicited

☑ Dry Needling:
Indications: ____ diffuse tension/spasms/firmness C-spine + L-spine

❑ Facet Join Injections:
Indications: _____

❑ Platelet Rich Plasma Injections:
Indications: _____

❑ Epidural Injections:
Indications: _____

After obtaining verbal consent the patient received trigger point/nerve block injections to the following areas:

☑ Surface anatomy technique
❑ Radiology anatomy technique (C-Arm)

**USING:** ☑Lidocaine ❑Depomedrol 40 mg/cc ❑0.25% Marcaine ❑0.25% Sensorcaine ❑0.25% Bupivacaine

Patient Name: _____   Date: _____

| RT | LT | HEAD AND NECK MUSCLES |
|---|---|---|
| 2 | 2 | Trapezius Muscle |
| | | Sternocleidomastoid Muscle |
| | | Masseter Muscle |
| | | Temporalis Muscle |
| | | Media (Internal) Pterygoid Muscle |
| | | Lateral (External) Pterygoid Muscle |
| | | Digastric Muscle |
| | | Cutaneous II: Occipitofrontalis |
| 2 | 2 | Splenius Capitis & Splenius Cervicis Muscles |
| 2 | 2 | Posterior Cervical Muscle |
| 2 | 2 | Semispinal Capitis, Semispinalis Cervicis & Multifidus |
| 2 | 2 | Subocipital Muscles |
| | | Recti Capitis Posterior Major & Major, Obliqi Inferior and Superior |

| RT | LT | LUMBAR PARASPINAL MUSCLES |
|---|---|---|
| 2 | 2 | Erectors Spinale |
| 2 | 2 | Iliocostalis Thoracics |
| 2 | 2 | Illicostalis Lumborum |
| 2 | 2 | Semispinalis |
| 2 | 2 | Multifidi Muscles |
| 2 | 2 | Rotatores Muscle |
| 2 | 2 | Gluteus Muscles |
| 2 | 2 | Quadratus Lumborum |
| 2 | 2 | Longissimus |

| RT | LT | ELBOW TO FINGER MUSCLES |
|---|---|---|
| | | Hand extensor & brachioradialis muscles |
| | | Finger Extensor Muscles |
| | | Extensor Digitorum & Extensor Indicis |
| | | Supinator Muscle |
| | | Hand & Finger Flexors in the Forearm |
| | | Flexores Carpi Radialis & Ulnaris, Flexores Digitorum |
| | | Superficialis & Profundus, Flexor Pollicis |
| | | Longus (Pronator Teres) |
| | | Adductor & Opponens Pollicis Muscles; Trigger Thum |
| | | Interrosseous Muscles of the Hand |
| | | Hand extensor & brachioradialis muscles |

| RT | LT | UPPER, BACK, SHOULDER AND ARM MUSCLES |
|---|---|---|
| | | Levator Scapulae Muscle |
| | | Scalene Muscles |
| | | Supraspinatus Muscle |
| | | Infraspinatus Muscle |
| | | Teres Minor Muscle |
| | | Teres Major Minor |
| | | Latissimus Dorsi Muscle |
| | | Subscapularis Muscle |
| | | Rhomboideus Major&Minor Muscle |
| | | Deltoid Muscle |
| | | Coracobrachialis Muscle |
| | | Biceps Brachii Muscle |
| | | Brachialis Muscle |

| RT | LT | TORSO MUSCLES |
|---|---|---|
| | | Pectoralis Major Muscle (Subclavius Muscle) |
| | | Pectoralis Minor Muscle |
| | | Sternalis Muscle |
| | | Serratus Posterior Superior Muscle |
| | | Serratus Anterior Muscle |
| | | Serratus Posterior Inferior Muscle |
| | | Thoracolumbar Paraspinal Muscles |
| | | Abdominal Muscles |

Patient Name: _____   Date: _____

| CODE | DESCRIPTION | RIGHT | LEFT |
|------|-------------|-------|------|
| □ 64412 | Injection, anesthetic agent; spinal accessory nerve | | |
| □ 64413 | Injection, anesthetic agent; cervical plexus | | |
| □ 64405 | Injection, anesthetic agent; occipital nerve | | |
| □ 64450 | Injection, anesthetic agent; peripheral nerve or brunch | | |
| □ 64418 | Injection, anesthetic agent; suprascapular nerve | | |
| □ 64425 | Injection, anesthetic agent; ilioinguinal, iliohypogastric nerves | | |
| □ 64421 | Injection, anesthetic agent; intercostal nerves, multiple, regional | | |
| ✗ 20552 | Injection one or two muscles | | |
| □ 20553 | Injection three or more muscles | | |

| CODE | DESCRIPTION | RIGHT | LEFT |
|------|-------------|-------|------|
| ✗ 20999 | Dry Needling | 28 | 28 |
| □ 76942 | Ultrasound | | |
| □ | Platelet Rich Plasma Injection | | |
| □ 20610 | Intra Articular/Injection Shoulder | | |
| □ 20610 | Intra Articular Injection Knee | | |
| □ 64633 | C-Spine Facet Joint Injection Single | | |
| □ 64634 | C Facet Joint Injection Additional | | |
| □ 64633 | T-Facet Joint Injection Single | | |
| □ 64634 | T Facet Joint Injection Additional | | |
| □ 64635 | L-Facet Joint Injection Single | | |
| □ 64636 | L Facet Joint Injection Additional | | |
| □ 64635 | S-Facet Joint Injection Single | | |
| □ 64636 | S Facet Joint Injection Additional | | |
| ✗ 97026 | Application of a modality to 1 or more areas; Infrared | | |

RENEE ANN DENOBREGA, N.P.

Patient Name: _____   Date: _____

Number of cartridge injected:

A sterile field was created over the regions to be injected. The skin was prepped with Betadine. The areas to be injected were cleaned with alcohol, the patient's skin was sprayed with topical anesthetic ethyl chloride, and each area/trigger point was injected with 0.5cc of 0.5% Marcaine via 3cc syringe with a 1- ½ x 25G sterile hypodermic needle. Needling was performed to further breakup the trigger points.

- ☑ Patient tolerated the procedure well
- ☐ Patient developed a mild transient lightheadedness of a few minutes duration
- ☐ No complications, no complains
- ☐ Other: _____

Physician's Signature: _____

RENEE ANN DENOBREGA, N.P.

01242017

*Exhibit 29*

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE

NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW
VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
(This form is not for verification of hospital treatment)

STATE FARM
PO BOX 106107
ATLANTA GA  30348-6107

| date | policyholder | policy number | date of accident | claim number |
|------|--------------|---------------|------------------|--------------|
| 02/09/2015 | | | 08-24-2014 | 516 B592 |

Francis J. Lacina  M.D.
1786 Flatbush Ave
Brooklyn, NY  11210

KINDLY COMPLETE AND SUBMIT THIS FORM AS SOON AS POSSIBLE. PLEASE NOTE, THIS COMPLETED FORM MUST
BE SUBMITTED TO THE INSURER AS SOON AS REASONABLY POSSIBLE BUT NO LATER THAN 45 DAYS OR 180 DAYS
AFTER THE TREATMENT DATE, DEPENDING UPON THE POLICY ENDORSEMENT IN EFFECT AT THE TIME OF THE
ACCIDENT. IF YOU ARE UNSURE OF THE APPLICABLE TIME REQUIREMENT, KINDLY CONTACT THE CLAIMS
REPRESENTATIVE TO DETERMINE WHICH DEADLINE IS APPLICABLE TO THIS CLAIM.

IF YOU HAVE PREVIOUSLY SUBMITTED AN EARLIER REPORT ON THIS ACCIDENT, YOU NEED ONLY NOTE ANY CHANGES FROM THE
INFORMATION PREVIOUSLY FURNISHED AND ADDITIONAL CHARGES.

1. patient's name and address

| 2. date of birth | | 3. sex | 4. occupation (if known) |
|------------------|---|--------|--------------------------|
| 0 | | F | |

5. diagnosis and concurrent conditions
847.0   cervical sprain and strain
724.9   Lumbar Derangement
717.89  KNEE DERANGEMENT

| 6. when did symptoms appear | 7. when did patient first consult you for this condition? |
|------------------------------|-----------------------------------------------------------|
| date: 08/24/2014 | date: 01/22/2015 |

8. has patient ever had same or similar condition?

No                      If "Yes", state when and describe:

9. is condition solely a result of this automobile accident?

Yes                     If "No", explain:

10. is condition due to injury arising out of patient's employment?

No

11. will injury result in significant disfigurement or permanent disability?

Not Determinable at this          If "Yes", describe:
time

| 12. patient was disabled (unable to work) | 13. if still disabled the patient should be able to return to work on |
|-------------------------------------------|----------------------------------------------------------------------|
| from: through | date: Unknown |

NYS FORM NF-3 (Rev 1/2004)          (Chart: 2042)                    Page 1

02162015

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE

14. will the patient require rehabilitation and/or occupational therapy as a result of the injuries sustained in this accident?

**Yes**                          If "Yes", describe your recommendation below:

**Doctor**

15. report of services rendered--
*All procedures have been done at the following address:
**1786 FLATBUSH AVE - BROOKLYN - NY 11210**

| Date Of Service | Place Of Service Including Zip Code | Description of Treatment or Health Service Rendered | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|
| 1/22/2015 | Office | Office Visit for Established | 99244 | $236.94 |
| 1/22/2015 | Office | Ultrasonic Guidance for needl | 76942 | $262.91 |
| 1/22/2015 | Office | INJECTION THREE OF MORE MUSCL | 20553 | $119.10 |
| 1/22/2015 | Office | NEEDLING OF ILIOCOSTALIS LUMB | 20999 | $100 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF ILIOCOSTALIS | 20999.79 | $75 |
| 1/22/2015 | Office | NEEDLING OF MULTIFIDI MUSCLES | 20999 | $100 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF MULTIFIDI MU | 20999.79 | $75 |
| 1/22/2015 | Office | NEEDLING OF QUADRATUS LUMBORU | 20999 | $100 |
| 1/22/2015 | office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |

NYS FORM NF-3 (Rev. 1/2004)                    (Chart: 2042)                    Page 2

02162015

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE

| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
|---|---|---|---|---|
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |
| 1/22/2015 | Office | ADDL NEEDLING OF QUADRATUS LU | 20999.79 | $75 |

**Total Charges To Date:** $5,193.95

16. if treating provider is different than billing provider complete the following:

| Treating Provider's Name | Title | License or Certification No. | Business Relationship Check Applicable Box | | |
|---|---|---|---|---|---|
| | | | Employee | Independent Contractor | Other (specify) |
| FRANCIS J. LACINA M.D. | | 266071 | | | SELF |

17. If the provider of service is a professional service corporation or doing business under an assumed name (DBA).
List the owner and professional licensing credentials of all owners (Provide an additional attachment if neccessary)

FRANCIS J. LACINA M.D.      Medicine and Surgery

18. is patient still under your care for this condition?

Yes

19. estimated duration of future treatment:

Unknown

PATIENT: Your health provider may agree to accept payment for health services performed directly from your insurer (Authorization to Pay Benefits) so that you are not required to make payment to the health provider at the time of service. Such agreement is optional on the part of the health provider and must be signed by both patient and health provider. You may use the optional authorization language provided below, by checking off the designated spot in item 20 of this form.

20.____(IF YOU HAVE CHOSEN TO AUTHORIZE THE DIRECT PAYMENT OF BENEFITS BY CHECKING THIS OPTION, YOU MAY NOT ALSO ENTER INTO AN ASSIGNMENT OF BENEFITS CONTAINED IN #21)
AUTHORIZATION TO PAY BENEFITS:
I AUTHORIZE PAYMENT OF HEALTH BENEFITS TO THE UNDERSIGNED HEALTH CARE PROVIDER OR SUPPLIER OF SERVICES DESCRIBED BELOW. I RETAIN ALL RIGHTS, PRIVILEGES AND REMEDIES TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT PROVISION) OF THE INSURANCE LAW.

PRINT NAME _____ SIGNED _____

    PATIENT                       PATIENT         DATE

PATIENT: Your health provider may agree to have you assign your right to No-Fault benefits from your insurer directly to your health provider (Assignment of Benefits). If you and your health provider agree to an assignment of benefits, you must both sign the agreement contained in # 21 or the prescribed NF-AOB form or its equivalent. The language contained in the assignment of benefits is mandatory and may not be altered or avoided by any other language added to this agreement or other written agreement.

21._X_(IF YOU HAVE CHOSEN TO ASSIGN YOUR BENEFITS TO THE HEALTH PROVIDER BY CHECKING THIS OPTION, YOU MAY NOT ALSO ENTER INTO AN AUTHORIZATION TO PAY BENEFITS CONTAINED IN ITEM #20 ABOVE)
ASSIGNMENT OF NO-FAULT BENEFITS:
I HEREBY ASSIGN TO THE HEALTH CARE PROVIDER INDICATED BELOW ALL RIGHTS, PRIVILEGES AND REMEDIES TO PAYMENT FOR HEALTH CARE SERVICES PROVIDED BY THE ASSIGNEE TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT STATUTE) OF THE INSURANCE LAW. THE ASSIGNEE HEREBY CERTIFIES THAT THEY HAVE NOT RECEIVED ANY PAYMENT FROM OR ON BEHALF OF THE ASSIGNOR AND SHALL NOT PURSUE PAYMENT DIRECTLY FROM THE ASSIGNOR FOR SERVICES PROVIDED BY SAID ASSIGNEE FOR INJURIES SUSTAINED DUE TO THE MOTOR VEHICLE ACCIDENT, NOTWITHSTANDING ANY OTHER AGREEMENT TO THE CONTRARY. THIS AGREEMENT MAY BE REVOKED BY THE ASSIGNEE WHEN BENEFITS ARE NOT PAYABLE BASED UPON THE ASSIGNOR'S LACK OF COVERAGE AND/OR VIOLATION OF A POLICY CONDITION DUE TO THE ACTIONS OR CONDUCT OF THE ASSIGNOR

O2162015

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE

PRINT NAME ____[REDACTED]____
PATIENT (Assignor)

PRINT NAME ___FRANCIS J. LACINA M.D.___
PROVIDER OR HEALTHCARE SERVICE (Assignee)

SIGNED ___Signature on File___
PATIENT                                  DATE

SIGNED ___Signature on File___
PROVIDER OR HEALTHCARE SERVICE   DATE

HAS AN ORIGINAL AUTHORIZATION OR ASSIGNMENT PREVIOUSLY BEEN EXECUTED?          ☒ Yes  ☐ No

IS THE ORIGINAL SIGNATURE OF THE PARTIES ON FILE?          ☑ Yes  ☐ No

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR COMMERCIAL INSURANCE OR A STATEMENT OF CLAIM FOR ANY COMMERCIAL OR PERSONAL INSURANCE BENEFITS CONTAINING AANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, AND ANY PERSON WHO, IN CONNECTION WITH SUCH APPLICATION OR CLAIM, KNOWINGLY MAKES OR KNOWINGLY ASSISTS, ABETS, SOLICITS OR CONSPIRES WITH ANOTHER TO MAKE A FALSE REPORT OF THE THEFT, DESTRUCTION, DAMAGE OR CONVERSION OF ANY MOTOR VEHICLE TO A LAW ENFORCEMENT AGENCY, THE DEPARTMENT OF MOTOR VEHICLES OR AN INSURANCE COMPANY, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE VALUE OF THE SUBJECT MOTOR VEHICLE OR STATED CLAIM FOR EACH VIOLATION.

| Date | Provider's Signature | IRS / TIN  Identification No. | WCB Rating Code. If None, Specialty. |
|------|---------------------|------------------------------|--------------------------------------|
| 02/09/2015 | FRANCIS J. LACINA M.D. | 47-2761917 | |

* PLEASE MAKE CHECK PAYABLE TO:          Francis J. Lacina  M.D.

*Exhibit 30*

**JULES F. PARISIEN MD**
**LICENSE# 111735**
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210
TEL: 929-333-9955

**Patient's Name:** ▮▮▮▮▮▮▮▮▮▮           **DOA:** 8/18/2014

## MEDICAL SUPPLY PRESCRIPTION

☐ Ankle Support

☐ Arm Support

☑ Bed Board

☑ Cervical Collar, (2ps)

☑ Cervical Pillow

☐ Cold/Hot Pack

☐ Crutches

☐ Cane

☐ Car Seat

☑ Mattress

☐ Elbow Support

☐ E.M.S. Unit

☐ E.M.S. Belt

☐ Other: _____

☐ Infrared Heating Lamp

☐ LSO

☑ Lumbar Cushion

☑ LSO APL (Custom Fitted)

☐ Massager

☑ Knee Support

☐ K.O. (Custom Fitted)

☑ Shoulder Support

☑ Therapeutic Electric Heating Pad

☐ **Hydrotherapy**

☐ Wrist Support

_____
**JULES F. PARISIEN, M.D.**

_____
Date

09152014

# MADISON PRODUCTS OF U.S.A INC

747 3RD AVE FL 2 NEW YORK, NY 10017

## DELIVERY RECEIPT



PATIENT NAME: X ███████████████

DATE OF BIRTH: X ██████████

DATE OF ACCIDENT: X 8/1/14

ADDRESS: X ████████████████████████

|                | Number and Street | City | State | Zip Code |

## DELIVERY ORDER LIST

| 1 | CERVICAL COLLAR FOAM- 2 PIECES W/THOR |
|---|---|
| 1 | CERVICAL PILLOW |
| 1 | LSO |
| 1 | LUMBAR CUSHION |
| 1 | BED BOARD |
| 1 | THERMORPHORE- ELECTRICAL HEAT PAD MOIST |
| 1 | MATTRESS |

I have received equipments and supplies listed above along with instructions on use case of it. I indicate that **MADISON PRODUCTS OF USA INC** cannot be held responsible for any inappropriate use of this equipment or supplies.

X ████████████████
SIGNATURE OF PATIENT

X _____ 9/2/14
DATE OF SIGNATURE

# MADISON PRODUCTS OF U.S.A INC

747 3ᴿᴰ AVE FL 2 NEW YORK, NY 10017

## DELIVERY RECEIPT



PATIENT NAME:

DATE OF BIRTH:                  DATE OF ACCIDENT:

ADDRESS:

       Number and Street          City          State      Zip Code

## DELIVERY ORDER LIST

| 1 | ADVANCED CERVICAL COLLAR |
|---|--------------------------|
|   |                          |

I have received equipments and supplies listed above along with instructions on use case of it. I indicate that **MADISON PRODUCTS OF USA INC** cannot be held responsible for any inappropriate use of this equipment or supplies.



SIGNATURE OF PATIENT                       9/2/14     DATE OF SIGNATURE

### JULES F. PARISIEN MD
### LICENSE# 111735
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210
TEL: 929-333-9955

**Patient's Name:** ████████████         DOA: 2/8/4

## MEDICAL SUPPLY PRESCRIPTION

☐ Ankle Support                    ☐ Infrared Heating Lamp

☐ Arm Support                      ☐ LSO

☐ Bed Board                        ☐ Lumbar Cushion

☐ Cervical Collar, (2ps)           ☐ LSO APL (Custom Fitted)

☐ Cervical Pillow                  ☐ Massager

☐ Cold/Hot Pack                    ☑ Knee Support

☐ Crutches                         ☐ K.O. (Custom Fitted)

☐ Cane                             ☐ Shoulder Support

☐ Car Seat                         ☐ Therapeutic Electric Heating

  Mattress                           Pad

☐ Elbow Support                    ☐ Hydrotherapy

☐ E.M.S. Unit                      ☐ Wrist Support

☐ E.M.S. Belt

☐ Other: _____


_____          _____
JULES F. PARISIEN, M.D.                                    Date

# MADISON PRODUCTS OF U.S.A INC

747 3RD AVE FL 2 NEW YORK, NY 10017

## DELIVERY RECEIPT



PATIENT NAME: √

DATE OF BIRTH: √                          DATE OF ACCIDENT: ✗ 8/18/14

ADDRESS: √

| Number and Street | City | State | Zip Code |

## DELIVERY ORDER LIST

| 1 | ORTHOTIC KNEE SUPPORT / FITTED |
|---|---|
|   |   |

I have received equipments and supplies listed above along with instructions on use case of it. I indicate that **MADISON PRODUCTS OF USA INC** cannot be held responsible for any inappropriate use of this equipment or supplies.



✗_____
SIGNATURE OF PATIENT

✗ 9/2/14
DATE OF SIGNATURE

**JULES F. PARISIEN MD**
**LICENSE# 111735**
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210
TEL: 929-333-9955

**Patient's Name:** ▓▓▓▓▓▓▓▓▓▓▓▓   DOA: 8/18/2014

# MEDICAL SUPPLY PRESCRIPTION

| | |
|---|---|
| ☐ Ankle Support | ☐ Infrared Heating Lamp |
| ☐ Arm Support | ☐ LSO |
| ☐ Bed Board | ☐ Lumbar Cushion |
| ☐ Cervical Collar, (2ps) | ☐ LSO APL (Custom Fitted) |
| ☐ Cervical Pillow | ☐ Massager |
| ☐ Cold/Hot Pack | ☐ Knee Support |
| ☐ Crutches | ☐ K.O. (Custom Fitted) |
| ☐ Cane | ☐ Shoulder Support |
| ☐ Car Seat | ☐ Therapeutic Electric Heating Pad |
| ☐ Mattress | |
| ☐ Elbow Support | ☐ Hydrotherapy |
| ☐ E.M.S. Unit | ☐ Wrist Support |
| ☐ E.M.S. Belt | |
| ☐ Other: _____ | |

_JULES F. PARISIEN, M.D._ signature

_____
Date

09152014

# MADISON PRODUCTS OF U.S.A INC

747 3ᴿᴰ AVE FL 2 NEW YORK, NY 10017

## DELIVERY RECEIPT



PATIENT NAME: ✗ ▉▉▉▉▉▉▉▉▉

DATE OF BIRTH: ✗ ▉▉▉▉▉▉

DATE OF ACCIDENT: ✗  8/18/14

ADDRESS: ✗ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

| Number and Street | City | State | Zip Code |

## DELIVERY ORDER LIST

| 1 | LUMBAR SUPPORT ORTHOSIS APL CONTROL, CUSTOM FITTED |
|---|---|
|   |   |

I have received equipments and supplies listed above along with instructions on use case of it. I indicate that, **MADISON PRODUCTS OF USA INC** cannot be held responsible for any inappropriate use of this equipment or supplies.



✗ ▉▉▉▉▉▉▉▉▉▉▉▉▉
SIGNATURE OF PATIENT

✗  9-2-14
DATE OF SIGNATURE

# MADISON PRODUCTS OF U.S.A INC

747 3RD AVE FL 2 NEWYORK, NY 10017

DATE: _9-2-14_

PATIENT'S NAME: _α_

# CUSTOM LSO APL CONTROL SIZING CHART



SIGNATURE OF PATIENT

DATE OF SIGNATURE _9-2-14_

*Exhibit 31*

**JULES F. PARISIEN MD**
**LICENSE# 111735**
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210
TEL: 929-333-9955

Patient's Name: ▮▮▮▮▮▮▮▮▮▮▮▮▮     DOA: 8 | 18 | 2014

## MEDICAL SUPPLY PRESCRIPTION

☐ Ankle Support

☐ Arm Support

☐ Bed Board

☐ Cervical Collar, (2ps)

☐ Cervical Pillow

☐ Cold/Hot Pack

☐ Crutches

☐ Cane

☐ Car Seat

☐ Mattress

☐ Elbow Support

☑ E.M.S. Unit

☐ E.M.S. Belt

☐ Other: _____

☐ Infrared Heating Lamp

☐ LSO

☐ Lumbar Cushion

☐ LSO APL (Custom Fitted)

☑ Massager

☐ Knee Support

☐ K.O. (Custom Fitted)

☐ Shoulder Support

☐ Therapeutic Electric Heating Pad

☑ Hydrotherapy

☐ Wrist Support

_JULES F. PARISIEN, M.D._

Date

09182014

# MADISON PRODUCTS OF U.S.A INC

747 3ᴿᴰ AVE FL 2 NEWYORK, NY 10017

## DELIVERY RECEIPT

PATIENT NAME: ⅄ _____

DATE OF BIRTH: ⅄ _____     DATE OF ACCIDENT: ⅄ _____

ADDRESS: ⅄ _____
           Number and Street      City      State      Zip Code

## DELIVERY ORDER LIST

| 1 | Hydrotherapy |
|---|--------------|

I have received equipments and supplies listed above along with instructions on use case of it. I indicate that **MADISON PRODUCT OF USA INC.**, cannot be held responsible for any inappropriate use of this equipment or supplies.

_____     ⅄ 9-8-14 _____
    SIGNATURE OF PATIENT             DATE OF SIGNATURE

00182014

# MADISON PRODUCTS OF U.S.A INC

747 3ʳᵈ AVE FL 2 NEWYORK, NY 10017

## DELIVERY RECEIPT

PATIENT NAME:

DATE OF BIRTH: _____    DATE OF ACCIDENT: _____

ADDRESS: _____
Number and Street          City          State          Zip Code

## DELIVERY ORDER LIST

| 1 | MASSAGER |
|---|----------|
|   |          |

I have received equipments and supplies listed above along with instructions on use case of it. I indicate that **MADISON PRODUCT OF USA INC.**, cannot be held responsible for any inappropriate use of this equipment or supplies.

9-8-14

SIGNATURE OF PATIENT          DATE OF SIGNATURE

09182014

# MADISON PRODUCTS OF U.S.A INC

747 3ᴿᴰ AVE FL 2 NEWYORK, NY 10017

## DELIVERY RECEIPT

PATIENT NAME: █████████████████████

DATE OF BIRTH: ████████████    DATE OF ACCIDENT: 8/18/14

ADDRESS: ███████████████████████████████████
Number and Street          City          State          Zip Code

## DELIVERY ORDER LIST

| 1 | EMS UNIT |
|---|----------|
|   |          |

I have received equipments and supplies listed above along with instructions on use case of it. I indicate that **MADISON PRODUCT OF USA INC.**, cannot be held responsible for any inappropriate use of this equipment or supplies.

████████████████████         9-8-14
SIGNATURE OF PATIENT              DATE OF SIGNATURE

09182014

*Exhibit 32*

### JULES F. PARISIEN M.D.
### LICENSE# 111735
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210
TEL: 929-333-9955

Patient's Name: ███████████████   DOA: 08/13/14

## MEDICAL SUPPLY PRESCRIPTION

☑ Cervical Traction Unit                Pneumatic compressor

No Frame/No Stand                      Non-segmental, home

_F. Parisien MD_                       8/20/14

JULES F. PARISIEN, M.D.                Date

09302014

# Quality Custom Medical Supply, Inc.

33 Ave U
Brooklyn, NY 11223
Tel:  718-676 5092
Fax:  718-676 5093

## DELIVERY   RECEIPT

Patient Name: ▮▮▮▮▮▮▮▮▮▮

Address: ▮▮▮▮▮▮▮

Phone: ▮▮▮▮▮▮▮

**DOA:**  8/18/2014
Insurance Co:   State Farm Insurance Company
P.O. Box 106107  Atlanta, GA 30348

Claim#:   324V88507
Policy#:
PolicyHolder:

## Delivery Order List

| 1 | Cervical Traction Unit w/ pump |
|---|---|
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |

I have received equipments and supplies listed above along with  instructions on use case of it.
I indicate that Quality Custom Medical Supply, Inc. cannot be held responsible for any
inappropriate use of this equipment or supplies.

Signature ▮▮▮▮▮▮▮▮

Flatbush Ave   09502014

### JULES F. PARISIEN M.D.
### LICENSE# 111735
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210
TEL: 929-333-9955

Patient's Name: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮   DOA: 08/18/14

## MEDICAL SUPPLY PRESCRIPTION

Cervical Traction Unit                ☑ Pneumatic compressor

No Frame/No Stand                      Non-segmental, home

_JULES F. PARISIEN, M.D._

_8/20/14_

Date

09302014

# Quality Custom Medical Supply, Inc.

**33 Ave U**
**Brooklyn, NY 11223**
Tel:  718-676 5092
Fax:  718-676 5093

## DELIVERY   RECEIPT

**Patient Name:** ███████████

Address: ███████████

Phone: ███████████

**DOA:** 8/18/2014
Insurance Co:  State Farm Insurance Company
P.O. Box 106107 Atlanta, GA 30348

Claim#:  324V88507
Policy#:
PolicyHolder:

## Delivery Order List

| 1 | Pneumatic Compressor, Non-Segmental, Home |
|---|---|
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |
|   |   |

I have received equipments and supplies listed above along with  instructions on use case of it.
I indicate that Quality Custom Medical Supply. Inc. cannot be held responsible for any
inappropriate use of this equipment or supplies.

Signature____ ███████████

# *Exhibit 33*

**KSENIA PAVLOVA D.O**
license# 270110
1786 FLATBUSH AVENUE, BROOKLYN, NY 11210
TEL: 929-333-9955

**Patient's Name:** _____          **DOA:**_____

## MEDICAL SUPPLY PRESCRIPTION

☐ Ankle Support                    ☐ Infrared Heating Lamp

☐ Arm Support                      ☐ LSO

☑ Bed Board                        ☐ Lumbar Cushion

☑ Cervical Collar, (2ps)           ☑ LSO APL (Custom Fitted)

☐ Cervical Pillow                  ☐ Massager

☐ Cold/Hot Pack                    ☐ Knee Support

☐ Crutches                         ☐ K.O. (Custom Fitted)

☐ Cane                             ☐ Shoulder Support

☐ Car Seat                         ☑ Therapeutic Electric Heating

☑ Mattress                             Pad

☐ Elbow Support                    ☐ Whirlpool

☐ E.M.S. Unit                      ☐ Wrist Support

☐ E.M.S. Belt

☑ Other: _advanced   cervical   Collar_____

_____
**KSENIA PAVLOVA D.O**

_____
Date

03252014

# *Exhibit 34*

**Flatbush Medical Center**
**1786 Flatbush Ave**
**Brooklyn, NY 11210**
**Tel: (929)333-9955**

**LIC.# 111735**

Patient: ███████████
Claim: 52573V785
DOL: 12/15/2014
DOS: 12/29/2014

### LETTER OF MEDICAL NECESSITY

To whom it may concern:

This letter is in response to your request for justification of medical necessity for the prescribed durable orthopedic supportive devices and portable physiotherapeutic modalities. Patient named above has been under my care for injuries sustained in a motor vehicle related accident which occurred 12/15/2014.

The patient was started on complex physical therapy including heat modalities, Electrical stimulation, ultrasound, massage to the cervical and lumbar-sacral region. The patient has demonstrated some reasons to physiotherapy, however still experience pain. The patient has difficulty in performing many daily activities due to the neck and lower back pain.

Since our goal is to make patient functionally independent and decrease pain, I prescribed the following medical equipment:
*CERVICAL TRACTION UNIT - to alleviate compression of intervertebral roots by distracted vertebrae, to reduce pain and improve neuromuscular function and lubricate the joints.*

It is my statement that all of the described devices and equipment were prescribed by me personally to my patient ███████████. It is my professional opinion that all of the prescribed items should have benefit for the symptoms and pathology presented by the patient, and I hope that it will help to achieve full restoration of muscleskeletail neurological functions.

Should you have any further questions or require additional information, please do not hesitate to contact me at the telephone number listed above.

Sincerely,

Dr. Jules F. Parisien M.D.

02252015

**Flatbush Medical Center**
**1786 Flatbush Ave**
**Brooklyn, NY 11210**
**Tel: (929)333-9955**

**LIC.# 111735**

Patient: ████████████
Claim: 52573V785
DOL: 12/15/2014
DOS: 12/29/2014

## LETTER OF MEDICAL NECESSITY

To whom it may concern:

This letter is in response to your request for justification of medical necessity for the prescribed durable orthopedic supportive devices and portable physiotherapeutic modalities. Patient named above has been under my care for injuries sustained in a motor vehicle related accident.

The patient was started on complex physical therapy including heat modalities, Electrical stimulation, massage to the lumbar-sacral region. The patient has demonstrated some reasons to physiotherapy, however still experience pain. The patient has difficulty in performing many daily activities due to the lower back pain.

Since our goal is to make patient functionally independent and decrease pain, I prescribed the following medical equipment:

*PNEUMATIC COMPRESSOR   - Alleviates pressure on the compressed nerves. Helps muscles relax and reduces muscle spasms. Traction increases the space between vertebrae - reducing pressure on the intervertebral discs and nerve root.*

It is my statement that all of the described devices and equipment were prescribed by me personally to my patient ████████████ It is my professional opinion that all of the prescribed items should have benefit for the symptoms and pathology presented by the patient, and I hope that it will help to achieve full restoration of muscieskeletail neurological functions.

Should you have any further questions or require additional information, please do not hesitate to contact me at the telephone number listed above.

Sincerely,

*F Parisien m.d*

Dr. Jules F. Parisien M.D.

02252015

*Exhibit 35*

**Provider Lawsuits filed by Rybak Law Firm 2009-Mid 2019**

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| JULES FRANCOIS PARISEN, M.D. | 7994 | X | X |
| CHARLES DENG ACUPUNCTURE, P.C. | 3291 | | X |
| ACTIVE CARE MEDICAL SUPPLY CORP. | 3034 | X | |
| COMPASS MEDICAL, P.C. | 2856 | X | |
| KSENIA PAVLOVA, D.O. | 2729 | X | X |
| LONGEVITY MEDICAL SUPPLY INC | 2367 | | |
| ALLEVIATION MEDICAL SERVICES P.C. | 1831 | X | |
| HEALTH WAY MEDICAL CARE, P.C. | 1666 | X | |
| PIERRE J RENELIQUE MD, P.C. | 1566 | X | |
| ISLAND LIFE CHIROPRACTIC PAIN CARE , PLLC | 1515 | | X |
| NOEL E BLACKMAN , M.D. | 1451 | X | X |
| TAM MEDICAL SUPPLY CORP | 1354 | | |
| JPF MEDICAL SERVICES P.C. | 1342 | X | X |
| RIGHT AID MEDICAL SUPPLY CO. | 1250 | | |
| JFL MEDICAL CARE, P.C. | 1140 | X | X |
| NEW WAY MEDICAL SUPPLY , CORP | 1092 | X | |
| MARIA S MASIGLA, P.C. | 1077 | X | X |
| NATURAL THERAPY ACUPUNCTURE, P.C. | 1046 | X | |
| ACUPUNCTURE NOW, P.C. | 1042 | X | |
| GREAT HEALTH CARE CHIROPRACTIC , P.C. | 1007 | | |
| MAIGA PRODUCTS, CORP. | 980 | | X |
| VERASO MEDICAL SUPPLY, CORP | 978 | | |
| DARREN T. MOLLO, D.C. | 956 | | X |
| T & S MEDICAL SUPPLY CORP | 929 | | |
| UGP ACUPUNCTURE, P.C | 927 | X | |
| PFJ MEDICAL CARE P.C. | 919 | X | X |
| CHAPA PRODUCTS, CORP | 875 | | |
| ALLAY MEDICAL SERVICES P.C. | 850 | X | X |
| DAILY MED EQUIPMENT DISTRIBUTION CTR , INC. | 781 | | |
| HEALING ART ACUPUNCTURE, P.C. | 745 | | |
| SS MEDICAL CARE, P.C. | 725 | | |
| HEALTH NEEDLES ACUPUNCTURE, P.C. | 705 | | |
| RA MEDICAL SERVICES, P.C. | 692 | X | X |
| PERFORMANCE PLUS MEDICAL, P.C. | 657 | | |
| MADISON PRODUCTS OF USA INC. | 637 | | X |
| GL ACUPUNCTURE, P.C. | 624 | | |
| JAIME G. GUTIERREZ | 618 | X | |
| SOLUTION BRIDGE, INC | 598 | | |
| FLATBUSH CHIROPRACTIC, P.C. | 590 | X | |
| FJL MEDICAL SERVICES, P.C. | 585 | X | X |
| GREENWAY MEDICAL SUPPLY CORP. | 580 | X | |
| OCEAN VIEW MEDICAL CARE, P.C. | 569 | | |
| SAMA PHYSICAL THERAPY , P.C. | 569 | X | |
| LUQMAN DABIRI , MD | 566 | X | X |
| LIDA'S MEDICAL SUPPLY, INC | 549 | | |
| J. C. HEALING TOUCH REHAB, P.C. | 537 | | |
| DIRECT CHIROPRACTIC CARE, P.C. | 534 | | |
| ACTION POTENTIAL CHIROPRACTIC, PLLC | 533 | X | |
| ACUPUNCTURE HEALTHCARE PLAZA I, P.C. | 532 | | |
| GBI ACUPUNCTURE, P.C. | 530 | | |
| FRANCIS J. LACINA, M.D. | 529 | X | X |
| SB CHIROPRACTIC, P.C | 529 | X | |
| T & J CHIROPRACTIC, P.C. | 527 | X | |
| ZENAIDA A REYES- ARGUELLES , M.D. | 515 | X | |

**Provider Lawsuits filed by Rybak Law Firm 2009-Mid 2019**

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| JOHN A. NASRINPAY | 497 | | |
| LMS ACUPUNCTURE, P.C. | 478 | | |
| ACH CHIROPRACTIC, P.C. | 476 | X | X |
| ARGUELLES M.D., P.C. | 475 | X | |
| EMC HEALTH PRODUCTS , INC | 455 | | |
| SOVERA MEDICAL SUPPLY CORP | 453 | | |
| METRO PAIN SPECIALIST, P.C. | 447 | | |
| GENTLECARE AMBULATORY ANESTHESIA SERVICES | 444 | | |
| SK PRIME MEDICAL SUPPLY , INC | 426 | | |
| ADELAIDA M. LAGA, P.T. | 406 | X | |
| DELTA DIAGNOSTIC RADIOLOGY , P.C. | 399 | | |
| TRUE ALIGN CHIROPRACTIC CARE, P.C. | 379 | | |
| EXCEL PRODUCTS, INC | 377 | | |
| ADELAIDA PHYSICAL THERAPY, P.C. | 375 | X | |
| METRO HEALTH PRODUCTS , INC | 357 | | |
| JCC MEDICAL, P.C. | 350 | X | |
| MSB PHYSICAL THERAPY, P.C. | 334 | X | X |
| HARRY KEITH MONROE M.D. | 328 | | |
| ULTIMATE HEALTH PRODUCTS, INC. | 325 | | |
| BARAKAT P.T., P.C. | 314 | | |
| QUALITY HEALTH SUPPLY CORP | 312 | X | X |
| FIRST ALTERNATIVE PLM ACUPUNCTURE, P.C. | 302 | | |
| ART OF HEALING MEDICINE , P.C. | 300 | | |
| TOTAL CHIROPRACTIC, P.C. | 295 | | |
| HARMONY MEDICAL CARE, P.C. | 290 | | |
| WELL CARE MEDICAL EQUIPMENT LLC | 281 | | |
| JEAN CLAUDE COMPAS, MD | 279 | X | |
| ZG CHIROPRACTIC CARE , P.C. | 274 | | |
| FLATLANDS MEDICAL P.C. | 273 | | |
| SP ORTHOTIC SURGICAL & MEDICAL SUPPLY, INC. | 272 | | |
| WELLMAX PRODUCTS CORP | 266 | | |
| STARLITE ACUPUNCTURE, P.C. | 265 | | |
| ABSOLUTE MEDICAL SUPPLIES, INC. | 264 | | |
| HANDS ON PHYSICAL THERAPY CARE | 261 | | |
| PRAVEL, INC. | 260 | | |
| ELMONT REHAB P.T., P.C. | 256 | | |
| ABC PHYSICAL THERAPY, P.C. | 255 | | |
| R. E. CHIROPRACTIC SERVICES, PLLC | 251 | | |
| NYC ACUPUNCTURE, P.C. | 246 | | |
| COLUMBUS IMAGING CENTER LLC | 241 | | |
| TREKA MEDICAL , P.C. | 241 | | |
| CAREFUL COMPLETE MEDICAL, P.C. | 239 | | |
| PRO ADJUST CHIROPRACTIC, PC | 231 | | |
| VLADENN MEDICAL SUPPLY CORP | 228 | X | |
| AB QUALITY HEALTH SUPPLY CORP | 226 | X | X |
| SHAFAI ACUPUNCTURE, P.C. | 226 | | |
| CAUTIOUS CARE MEDICAL, P.C. | 219 | | |
| SHARA ACUPUNCTURE, P.C. | 218 | | |
| ENERGY CHIROPRACTIC, P.C. | 215 | X | X |
| FIRST SPINE CHIROPRACTIC OF NY, PC. | 211 | | |
| ULTIMATE CARE CHIROPRACTIC, P.C. | 210 | | |
| MAXFORD, INC | 207 | | |
| COMPREHENSIVE CARE PHYSICAL THERAPY, P.C. | 204 | | |
| NEW ROCHELLE MEDICAL, P.C. | 200 | | |

Provider Lawsuits filed by Rybak Law Firm 2009-Mid 2019

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| FLUSHING TRADITIONAL ACUPUNCTUR E , P.C. | 194 | | |
| AHMED MEDICAL CARE, P.C. | 193 | | |
| BURKE PHYSICAL THERAPY, P.C. | 192 | | |
| FAVORITE HEALTH PRODUCTS, INC. | 191 | | |
| MILKY WAY ACUPUNCTURE, P.C. | 184 | | |
| NOVA ACUPUNCTURE P.C. | 182 | | |
| NEW QUAILTIY MEDICAL, P.C. | 179 | | |
| AKNY PHYSICAL THERAPY, PLLC | 174 | | |
| KINGS REHAB ACUPUNCTURE, P.C. | 168 | | X |
| SEO HAN MEDICAL P.C. | 166 | | |
| BAYSHORE CHIROPRACTIC, P.C. | 165 | | |
| HARVARD MEDICAL , P.C. | 165 | | |
| ULTRA ORTHO PRODUCTS, INC. | 163 | | |
| MEDEX HEALTH SUPPLY, INC. | 162 | | |
| PT OUTCOME, P.T., P.C. | 161 | | |
| BROWNSVILLE MEDICAL, P.C. | 160 | | |
| YUMI ACUPUNCTURE, PC | 159 | | |
| RELIABLE PHYSICAL THERAPY, P.C. | 154 | | |
| VESPA SUPPLY, INC | 154 | | |
| FIRST CARE MEDICAL EQUIPMENT, LLC | 152 | | |
| REGAL ACUPUNCTURE, P.C. | 152 | | |
| RESTORATION CHIROPRACTIC, P.C. | 152 | | |
| UTICA COMPREHENSIVE MEDICAL, P.C. | 151 | | |
| NEW YORK MANUAL, P.T, P.C. | 149 | | |
| DSD ACUPUNCTUR E P.C. | 146 | | |
| GAO ACUPUNCTURE, P.C. | 144 | | |
| BRONX CHIROPRACTIC SERVICES, P.C. | 141 | | |
| BIG APPLE ORTHO PRODUCTS, INC. | 139 | | |
| JPC MEDICAL, P.C. | 137 | | |
| HU'S ACUPUNCTURE & MASSAGE, P.C., | 136 | | |
| M.H.Z. PHYSICAL THERAPY, P.C. | 136 | | |
| WAVE MEDICAL SERVICES, P.C. | 135 | | |
| OMPHIL CARE, INC. | 133 | X | |
| MORRIS PARK PRIMARY MEDICAL CARE, P.C. | 129 | | |
| SANFORD CHIROPRACTIC, P.C. | 129 | | |
| JAGA MEDICAL SERVICES , P.C. | 128 | | |
| PRIMAVERA PHYSICAL THERAPY, P.C. | 128 | | |
| MIND & BODY ACUPUNCTURE , P.C. | 127 | | |
| VINCENT MEDICAL SERVICES, P.C. | 123 | | |
| ADVANTAGE HEALTH MEDICAL, P.C. | 122 | | |
| SURE WAY NY INC | 121 | | |
| KJC CHIROPRACTIC, P.C. | 120 | | |
| NIDA AHMAD | 120 | X | |
| MIRA ACUPUNCTURE, P.C. | 114 | | |
| CITY CARE PHYSICAL THERAPY, P.C. | 113 | | |
| KP MEDICAL CARE, P.C. | 112 | X | X |
| HEALING HEALTH PRODUCTS, INC. | 111 | | |
| HORIZON P.T. CARE, P.C. | 111 | | |
| BURKE 2 PHYSICAL THERAPY, P.C., | 110 | | |
| GC CHIROPRACTIC P.C. | 110 | | |
| BREFNI CHIROPRACTIC DIAGNOSTICS P.C. | 109 | | |
| FAITH ACUPUNCTURE, P.C. | 109 | | |
| LORAC CHIROPRACTIC SERVICES, PC | 107 | | |
| BROOK CHIROPRACTIC OF NY, P.C. | 106 | | |

**Provider Lawsuits filed by Rybak Law Firm 2009-Mid 2019**

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| CANARSE CHIROPRACTIC, P.C. | 106 | | |
| BQE ACUPUNCTURE, P.C. | 104 | | |
| BRONX CHIROPRACTIC REHABILITATION, P.C. | 104 | | |
| EMPIRE STATE MEDICAL, P.C. | 104 | | |
| SUNNY MEDICAL CARE OF NY, PC | 104 | | |
| GREEN LAND ACUPUNCTURE | 103 | | |
| HET MEDICAL, P.C. | 100 | | |
| MMA PHYICAL THERAPY, P.C | 99 | | |
| MAXWELL CHIROPRACTIC, P.C. | 98 | | |
| TAO ACUPUNCTURE P.C. | 97 | | |
| BEACON ACUPUNCTURE, P.C. | 96 | | |
| J.C PHYSICAL THERAPY, P.C | 96 | | |
| AVM CHIROPRACTIC , P.C. | 95 | | |
| DOMNY MEDICAL SERVICES, P.C | 94 | | |
| FOUNTAIN DIAGNOSTIC MEDICAL, P.C. | 92 | | |
| MIDWOOD TOTAL REHAB MEDICAL, P.C. | 90 | | |
| LOGIC CHIROPRACTIC, P.C. | 87 | | |
| NY CHIROPRACTIC DIAGNOSTICS PLLC | 85 | | |
| ONE TO ONE REHAB PT P.C. | 85 | | |
| PERSONAL HOME CARE PRODUCTS CORP | 84 | X | X |
| DOCTOR GOLDSHTEYN CHIROPRACTI C, P.C. | 83 | | |
| PHYSICAL THERAPY OF QUEENS, P.C. | 83 | | |
| UNLIMITED PRODUCTS, LTD | 83 | | |
| REMEDY CHIROPRACTI C, P.C. | 81 | | |
| FAMILY MEDICAL PRACTICE, P.C | 80 | | |
| FREEDOM CHIROPRACTIC, P.C. | 80 | | |
| RECOVERY PT REHAB, P.C. | 80 | | |
| TRAPEZIUS DIAGNOSTIC CHIROPRACTIC, P.C. | 80 | | |
| TROY CHIROPRACTIC, P.C. | 80 | | |
| JY ACUPUNCTURE, P.C. | 79 | | |
| PRIME LEADER, P.T., P.C. | 78 | | |
| VSL ACUPUNCTURE, P.C. | 78 | | |
| MILABO ACUPUNCTURE , P.C. | 77 | | |
| KAZU ACUPUNCTURE, P.C. | 76 | | |
| ZZ ACUPUNCTURE, P.C. | 75 | | |
| MEDCARE SUPPLY, INC | 71 | | |
| CAMPUS MEDICAL, P.C. | 69 | | |
| INTERGRATED CHIROPRACTIC OF NY, PC. | 69 | | |
| SPRING VALLEY ACUPUNCTURE, P.C. | 69 | | |
| GLOBAL ACUPUNCTURE, P.C. | 68 | | |
| UNITED MEDICAL OFFICE OF LONG ISLAND, P.C. | 67 | | |
| NYS DIAGNOSTIC MEDICINE, P.C | 66 | | |
| QUALITY REHAB AND P.T, P.C | 66 | | |
| ANDREW NICHOLAS DEMAS | 65 | | |
| BENTO ORTHO INC. | 63 | | |
| LIBERTY CHIROPRACTIC , P.C. | 63 | | |
| RIDGEWOOD HEALTHCARE MEDICAL P.C. | 63 | | |
| NG ACUPUNCTUR E CARE, PC | 62 | | |
| MOHAMED ATTYA | 61 | X | |
| SASAN FAMILY CHIROPRACTI C, P.C. | 61 | | |
| AB MEDICAL SUPPLY, INC | 59 | | |
| VISS SUPPLY, INC | 59 | | |
| NORTHSIDE ACUPUNCTURE, P.C. | 58 | | |
| BORIS TSATSKIS, M.D. | 57 | | |

**Provider Lawsuits filed by Rybak Law Firm 2009-Mid 2019**

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| JJ Diagnostic Medical, P.C. | 55 | | |
| MOLLO CHIROPRACTIC, PLLC | 55 | | |
| OPTIMAL HEALTHCARE, LLC | 54 | | |
| NEW ROCHELLE MEDICAL CARE, P.C | 51 | X | |
| NL QUALITY MEDICAL , P.C. | 51 | | |
| J. WELLNESS ACUPUNCTURE, P.C. | 50 | | |
| NOVA MEDICAL DIAGNOSTIC, P.C | 50 | | |
| SIGNIFICANT CARE PT, P.C | 50 | | |
| ALL KIND PHYSICAL THERAPY, P.C., | 49 | | |
| JPM PHYSICAL THERAPY, P.C. | 49 | | |
| PENN CHIROPRACTIC, P.C. | 49 | | X |
| DR. JOSEPH J. MAZELLA, D.C. | 48 | | |
| HABIBA P.T., PC. | 47 | | |
| PALAFOX PT, P.C. | 45 | | |
| RALLY CHIROPRACTI C, P.C. | 45 | | |
| RDB MEDICAL CARE, P.C. | 45 | | |
| ROLAND CHIROPRACTIC, P.C. | 45 | | |
| APS CHIROPRACTIC SERVICES, P.C. | 44 | | |
| HEAVEN & EARTH ACUPUNCTURE, P.C. | 44 | | |
| LAWRENCE CHIROPRACTIC DIAGNOSTIC SERVICES, P.C | 43 | | |
| WELLNESS PLAZA ACUPUNCTURE, P.C. | 43 | | |
| AMEGA, INC | 42 | | |
| HEALTHY LIFE CHIROPRACTIC | 42 | | |
| FULL SPINE CHIROPRACTIC OF NY, P.C. | 41 | | |
| MERIDIAN CHIROPRACTIC, P.C. | 41 | | |
| ORIENTAL HEALTH ACUPUNCTURE , P.C. | 41 | | |
| VITAL MERIDIAN ACUPUNCTURE, P.C. | 41 | | |
| E AUGUST CHIROPRACTIC, P.C. | 40 | | |
| NEW YORK WELLNESS CHIROPRACTIC, P.C | 40 | | |
| NORTH CENTRAL CHIROPRACTI C, P.C., | 40 | | |
| PREFERRED ORTHO PRODUCTS, INC. | 40 | | |
| SUPREME HEALTH CHIROPRACTIC, P.C. | 40 | | |
| GREAT MEDICAL SERVICES, P.C. | 39 | | |
| PRIME DIAGNOSTIC MEDICAL , P.C. | 38 | | |
| MODERN CHIROPRACTIC SOLUTIONS, LLC | 37 | | |
| LEOMAX SUPPLIES, INC | 36 | | |
| RADWA PHYSICAL THERAPY, P.C. | 36 | | |
| RIGHT AID MEDICAL SUPPLY CORP | 36 | | |
| HEALTHWISE MEDICAL ASSOCIATES, P.C. | 35 | | |
| STRATEGIC MEDICAL INITIATIVES, P.C. | 35 | | X |
| UNIVERSAL MEDICAL OF NY, P.C. | 35 | | |
| INFIITE ORTHO PRODUCTS, INC. | 34 | | |
| JGG MEDICAL CARE , P.C. | 34 | | |
| NTT MEDICAL, P.C. | 34 | | |
| ALL ABOUT PHYSICAL THERAPY, P.C. | 33 | | |
| CENTRAL SUPPLIES OF NY, CORP | 33 | | |
| EAST ATLANTIC ACUPUNCTURE P.C. | 33 | | |
| DUBLIN MEDICAL, P.C. | 31 | | |
| ADJUST WITH CARE CHIROPRACTIC, P.C. | 30 | | |
| F.S. REHAB, P.T., P,C, | 30 | | |
| MAIN CARE PT, P.C. | 30 | | |
| MEIS ACUPUNCTURE, P.C. | 30 | | |
| AHMED, SHAIKH J. | 29 | | |
| EZRA SUPPLY, INC | 28 | | |

**Provider Lawsuits filed by Rybak Law Firm 2009-Mid 2019**

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| JEREMY M. WHITEFIELD, D.C. | 28 | | |
| KALI ACUPUNCTURE, P.C. | 28 | | |
| MILLDROP INC | 28 | | |
| NEW BEGINNING CHIROPRACTIC, P.C. | 28 | | |
| HEALTHYWAY MEDICAL CARE, P.C. | 27 | | |
| METROPOLITAN MEDICAL SUPPLIES, LLC | 27 | | |
| ARA MEDICAL CARE PC, | 26 | | |
| ERIE AGUSTIN, M.D., P.C | 26 | | |
| CORE REHAB & P.T., P.C. | 25 | | |
| PRO BALANCE CHIROPRACTIC, P.C. | 25 | | |
| AHMED MOHAMMED MOAMEN GHANEM | 24 | | |
| ANDRE JOCELYN DUHAMEL, M.D | 24 | | |
| NYC MADISON AVENUE MEDICAL, P.C. | 24 | | |
| STRAIGHT UP CHIROPRACTIC, P.C. | 23 | | |
| FIRST CARE CHIROPRACTIC, P.C. | 22 | | |
| UNITED SPECIALITY PHARMACY INC. | 22 | | |
| RIDGEWOOD MEDICAL DIAGNOSTIC, P.C. | 21 | | |
| LIBERTY PARK CHIROPRACTIC, P.C. | 20 | | |
| KONSTANTINO S ZARKADAS, M.D | 19 | | |
| NORTH EAST EMPIRE MEDICAL, P.C. | 19 | X | |
| ST. MARK'S MEDICAL HEALTH CARE, PLLC | 19 | | |
| EDUARD FUZAYLOV, M.D. | 18 | | |
| JAMAICA CARE CHIROPRACTIC, P.C. | 18 | | |
| QUALIFIED MEDICAL , P.C. | 18 | | |
| LK HEALTH CARE PRODUCTS, INC. | 17 | | |
| RWAN PT, P.C. | 17 | | |
| FORESIGHT ACUPUNCTURE, P.C. | 16 | | |
| FULL DIMENSION REHAB CARE P.T., P.C. | 16 | | |
| GREEN HEIGHTS PHYSICAL THERAPY, P.C. | 16 | | |
| IN MOTION CHIROPRACTIC, P.C | 16 | | |
| JAMES CREAMER, D.C. | 16 | | |
| MEADOWLAND S PARKWAY PHARMACY | 16 | | |
| MEGACURE ACUPUNCTURE, P.C. | 16 | | |
| BIO AND ZEN ACUPUNCTURE, P.C. | 15 | | |
| CHIROPRACTIC HEALTH ONE P.C. | 15 | | |
| EDWARD MILMAN M.D. | 15 | | |
| SKY LIMIT PHYSICAL THERAPY, P.C | 15 | | |
| BLANOMEDICAL, P.C. | 14 | | |
| KAI HONG QIU | 14 | | |
| SPIKE MEDICAL, P.C | 14 | | |
| CHARLES DENG | 13 | | X |
| ALL CITY FAMILY HELATH CARE CENTER, INC | 12 | | |
| AMBULATORY GENTLECARE ANESTHESIA SERVICES | 12 | | |
| GRAIG GRANOVSKY CHIROPRACTIC P.C. | 12 | | |
| GUY VILLANO, D.C. | 12 | | |
| REMEDIAL MEDICAL CARE , P.C. | 12 | | |
| SANTOS MASSAGE THERAPY, P.C. | 12 | | |
| AKAI ACUPUNCTURE, P.C. | 11 | | |
| PETER MARTIN THE CHIROPRACTIC, P.C. | 11 | | |
| PIONEERS STEPS REHAB, P.T., P.C. | 11 | | |
| HAMMOND CHIROPRACTIC, P.C. | 10 | | |
| BROAD STREET ACUPUNCTURE, P.C. | 9 | | |
| CENTRAL CHIROPRACTIC OF NY, P.C. | 9 | | |
| EPOCA CHIROPRACTIC CARE, P.C. | 9 | | |

**Provider Lawsuits filed by Rybak Law Firm 2009–Mid 2019**

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| HEIGHTS CHIROPRACTIC SERVICES, P.C. | 9 | | |
| PT HEALTH FIRST PT, P.C. | 9 | | |
| STONE CHIROPRACTIC, P.C. | 9 | | |
| COMMUNITY ACUPUNCTURE, P.C. | 8 | | |
| PRO-ALIGN CHIROPRACTI C, PC | 8 | | |
| ROCKAWAY FAMILY MEDICAL CARE, P.C. | 8 | | |
| YELLOW RIVER ACUPUNCTURE, P.C | 8 | | |
| ANATOLIY ABAKIN, D.C. | 7 | | |
| BRONX SERVICES CHIROPRACTIC, P.C. | 7 | | |
| DENG ACUPUNCTURE, P.C. | 7 | X | |
| E.G.E PT, P.C. | 7 | | |
| ENJOY REHAB P.T., P.C. | 7 | | |
| FL MEDICAL CARE, P.C. | 7 | | |
| HEALTH HEALING PRODUCTS, INC. | 7 | | |
| MOHAMMAD SHAMSHAD HUSSAIN | 7 | | |
| SALEM P.T., P.C. | 7 | | |
| UPTODATE MEDICAL SERVICES, P.C. | 7 | | |
| CARE MEDICAL SUPPLY, CORP | 6 | | |
| KATH MEDICAL, P.C. | 6 | | |
| LEFFERTS GARDENS CHIROPRACTIC, P.C. | 6 | | |
| LYUDMILA AVSHALUMOV A, L.AC | 6 | | |
| MICHELE B.GLISPY | 6 | | |
| MODERN CHIROPRACTIC P.C. | 6 | | |
| NATURAL ACUPUNCTURE, P.C. | 6 | | |
| PINNACLE CHIROPRACTIC, P.C. | 6 | | |
| SUNRAY ACUPUNCTURE, P.C | 6 | | |
| ZG CARE CHIROPRACTIC, P.C. | 6 | | |
| DR. JOSEPH STEPHAN, D.C., | 5 | | |
| EDWIN CASTILLO. LAC | 5 | | |
| JLS CHIROPRACTIC, P.C. | 5 | | |
| MARIA CIECHORSKA, M.D. | 5 | X | |
| NATIONAL RX CORP | 5 | | |
| NEW MILLENNIUM PSYCHOLOGICAL SERVICES, P.C. | 5 | | |
| WISE REHAB P.T., P.C. | 5 | | |
| WU XING ACUPUNCTURE PC | 5 | | |
| ZEN ACUPUNCTURE, PC | 5 | | |
| CENTRAL PARK PHYSICAL MEDICINE, P.C. | 4 | | |
| EGA GROUP, INC. | 4 | | |
| HEALTHY WAY ACUPUNCTURE PC | 4 | | |
| MD MEDICAL HEALTHCARE, P.C. | 4 | | |
| NJ NEURO AND PAIN PC | 4 | | |
| PROTECTION PHYSICAL THERAPY, P.C | 4 | | |
| ST. HERMINA, P.T. | 4 | | |
| ANCIENT & MODERN ACUPUNCTUR E, PC | 3 | | |
| BACK TO HEALTH CHIROPRACTIC, PC | 3 | | |
| C21 ACUPUNCTURE P.C., | 3 | | |
| CHIROPRACTIC CARE, P.C. | 3 | | |
| ELMONT HEALTH CARE MEDICAL, P.C., | 3 | | |
| GREAT CARE CHIROPRACTIC, P.C. | 3 | | |
| HEALTH PRODUCTS INC | 3 | | |
| HORIZON REHABILITATION P.T. CARE, P.C. | 3 | | |
| LEICA SUPPLY, INC. | 3 | | |
| POTENTIAL CHIROPTACTIC, PLLC | 3 | | |
| SHAPIRO DANIEL | 3 | | |

**Provider Lawsuits filed by Rybak Law Firm 2009-Mid 2019**

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| TRADITIONAL FLUSHING ACUPUNCTURE, P.C. | 3 | | |
| UPG ACUPUNCTURE, P.C., | 3 | | |
| UZMA NASIR PHYSICIAN, P.C., | 3 | | |
| VERTEBRAE CHIROPRACTIC CARE, P.C. | 3 | | |
| WAY MEDICAL SUPPLY, CORP | 3 | | |
| AZU AJUDUA, M.D | 2 | | |
| D & H REHABILITATION MEDICAL P C | 2 | | |
| DIAGNOSTIC DELTA RADIOLOGY , P.C. | 2 | | |
| DM CHIROPRACTIC, P.C., | 2 | | |
| FLJ MEDIAL SERVICES, P.C | 2 | | |
| JFL MEDICAL SERVICES, P.C | 2 | | |
| MORRIS RUBINTHE | 2 | | |
| NBC HEALTH PHYSICAL THERAPY, P.C. | 2 | | |
| NEEDLES ACUPUNCTURE, P.C. | 2 | | |
| NY DIAGNOSTICS CHIROPRACTIC PLLC | 2 | | |
| NYS ACUPUNCTURE, P.C. | 2 | | |
| OF HEALING MEDICINE , P.C. | 2 | | |
| PRECISE REHAB PT, PC | 2 | | |
| QUALITY MEDICAL, P.C. | 2 | | |
| RISE PHYSICAL THERAPY, P.C. | 2 | | |
| AHAVA DIAGNOSTIC, P.C., | 1 | | |
| AMXWELL CHIROPRACTI C, P.C. | 1 | | |
| ANDRIY KOZAKTHE | 1 | | |
| AT BAY CHIROPRACTIC, P.C | 1 | | |
| BARAKAT MEDICAL CARE, P.C. | 1 | | |
| BAY PLAZA CHIROPRACTIC, PC | 1 | | |
| BEAL-MEDEA PRODUCTS, INC., | 1 | | |
| BEST TOUCH PT P.C | 1 | | |
| BREFNI HERIQUEZ- NUNEZ | 1 | | |
| BRONX MEDICAL HEALTH PROVIDER, P.C | 1 | | |
| BRONX REHABILITATION CHIROPRACTIC, P.C. | 1 | | |
| CAPITAL ONE BANK (USA) N A | 1 | | |
| CHIROPRACTIC SERVICES, PLLC., | 1 | | |
| COMPLETE CAREFUL MEDICAL PC | 1 | | |
| DAIRYLAND INSURANCE COMPANY | 1 | | |
| DIRECT CARE CHIROPRACTIC, P.C. | 1 | | |
| DOYNA GENERAL DISTRIBUTORS -NY, INC | 1 | | |
| FLATBUSH MEDICAL CARE, P.C. | 1 | | |
| G GUTIERREZ | 1 | | |
| GENTLE AMBULAORY ANESTHESIA SERVICES | 1 | | |
| GHI ACUPUNCTURE, P.C. | 1 | | |
| GREAT HEALTHPOINT ACUPUNCTURE , P.C. | 1 | | |
| HEALING TOUCH REHAB, P.C. | 1 | | |
| HEALTH CARE CHIROPRACTIC, P.C | 1 | | |
| HEALTHCRAFT , P.T., P.C. | 1 | | |
| INFINITY HEALTH PRODUCTS, LTD | 1 | | |
| JAMAICA WELLNESS MEDICAL, P.C | 1 | | |
| JB HEALTH ACUPUNCTURE, P.C. | 1 | | |
| JPL MEDICAL SERVICES, P.C | 1 | | |
| KHAVA AGARUNOVA | 1 | | |
| LEONID KOMSKY | 1 | | |
| LOYAL ACUPUNCTURE P.C | 1 | | |
| LVOV ACUPUNCTURE, PC | 1 | | |
| MAJESTIC ACUPUNCTURE, PC | 1 | | |

Provider Lawsuits filed by Rybak Law Firm 2009-Mid 2019

| Plaintiff Standardized | No. of Lawsuits | 1468 Flatbush | 1786 Flatbush |
|---|---|---|---|
| MANLI LI, L.AC., | 1 | | |
| MANUAL, P.T.,P.C. | 1 | | |
| MARAT ZEYNUTDINOV | 1 | | |
| MED EQUIPMENT DISTRIBUTION CTR, INC. | 1 | | |
| MED EQUIPMENT SERVICE, INC. | 1 | | |
| MEDICAL, P.C | 1 | | |
| MEDIGNA INC | 1 | | |
| MEDMART OF NY, CORP | 1 | | |
| MEGA PRODUCTS CORP | 1 | | |
| MERIDIAN ACUPUNCTURE, P.C. | 1 | | |
| METRO PRODUCTS INC | 1 | | |
| MHZ PHYSICAL THE THERAPY, P.C. | 1 | | |
| MICHAEL R. SILVER, D.C., P.C | 1 | | |
| N L QUALTITY MEDICAL, P.C., | 1 | | |
| NASIRAH COLDING | 1 | | |
| NATURAL HEALING ACUPUNCTURE, P.C | 1 | | |
| NORTH AMERICAN PARTNERS IN ANESTHESIA , LLP | 1 | | |
| NTS ACUPUNCTUR E, P.C. | 1 | | |
| NVA ACUPUNCTUR E, P.C. | 1 | | |
| P.C. PHYSICAL THERAPY, P.C. | 1 | | |
| PHYSICAL M.H.Z.THERAPY, P.C | 1 | | |
| PRO EDGE CHIROPRACTI C, P.C | 1 | | |
| PRODUCTS EMC HEALTH INC | 1 | | |
| QUEENS DIAGNOSTIC RADIOLOGY, P.C. | 1 | | |
| RENELIQUE PIERRE J MD, P.C. | 1 | X | |
| SHANAYA COBY | 1 | | |
| SHAYRA COBY | 1 | | |
| SPINE CARE OF NJ, PC | 1 | | |
| THERAPEUTIC CHIROPRACTIC SEVICES, P.C | 1 | | |
| TRAVELERS INSURANCE COMPANY | 1 | | |
| UNION & EAST NEW YORK MEDICAL, P.C. | 1 | | |
| UNITED WELLNESS CHIROPRACTIC P.C | 1 | | |
| VICTOR SASSON, M.D., P.C. | 1 | | |
| WAKEFIELD CHIRORACTIC P.C. | 1 | | |

| | |
|---|---|
| Total No. of Lawsuits for 1468 and 1786 Providers | 51308 |
| Total No. of Lawsuits | 95859 |

# *Exhibit 36*

108056

SSF-11799

CIVIL COURT OF THE CITY NEW YORK
COUNTY OF KINGS
...................................................--X

MAIGA PRODUCTS, CORP.,
a/a/o APONTE JIMMY

    Plaintiff,

  -against-

STATE FARM MUTUAL AUTOMOBILE INS. CO.,

    Defendant
.................................................--X

**Index No.:**  33071/14

**Affidavit of Maiga
Borisevica in Support of
Plaintiff's Affirmation in
Opposition**

**STATE OF NEW YORK**  :
         : s.s.
**COUNTY OF KINGS**   :

  1.  The undersigned, MAIGA PRODUCTS, CORP., by and through its owner, Maiga Borisevica, being duly sworn, attests to the following under the penalty of perjury.

  2.  I submit this affidavit in further support of Plaintiff's Affirmation in Opposition to defendant's cross-motion for summary judgment, and I attest to the following based on my personal knowledge.

  3.  Throughout the entire period relevant to this matter and with regards to the bills submitted as part of this action, I have been the owner of Maiga Products, Corp.. As a part of my regular business duties, I am responsible for responding to defendant's verification requests that are received by Maiga Products, Corp., including having to appear for the EUOs.

  4.  As owner of Maiga Products, Corp. and because of my personal experience and daily job responsibilities, I have the requisite first-hand personal knowledge of the regular and ordinary course of business procedures and practices employed and instituted by me for data entry into the computer database, bill generation

108056

and replying to verification requests from the insurance carriers, and mailing procedure. This requisite first-hand personal knowledge also applies to having to appear at EUOs for Maiga Products, Corp.

5.      I reviewed the file pertaining to Aponte Jimmy and determined that this file has been created by Maiga Products, Corp., handled and stored by Maiga Products, Corp. in the regular and ordinary course of Maiga Products, Corp.'s business.

6.      My review of handwritten notes and computer records on the file indicate that I attempted to contact defendant regarding the allegedly scheduled EUO as indicated in defendant's letter to Maiga Products, Corp., but my attempts have, to date, been ignored.

7.      In fact, I have reviewed the false and venomous affidavit of defendant's alleged unlicensed and untrained SIU Investigator, Sean Ryan. Mr. Ryan's affidavit is nothing more than bold lies, and defendant's fabrications are unsupported by real evidence, much less circumstantial evidence, to substantiate any of the false and misleading allegations. Defendant's affidavit is designed and submitted for the sole purpose of engaging in fear mongering and scare tactics.

8.      The Ryan affidavit is outright cryptic. Ryan alleges in an opaque manner that defendant has been investigating Maiga Products, Corp. for unsupported allegations regarding fraudulent billing practices. Ryan never cites support for these baseless suspicions. Not having any real or circumstantial evidence directly implicating Maiga Products, Corp., defendant decided to engage in red-tape dilatory claims handling practices by requesting a variety of irrelevant corporate documents as well as my personal appearance at an EUO in bad faith.

9.      Defendant never specifically refers to any wrongdoing by Maiga Products, Corp. and instead engages in what can be termed as guilt by association theory, by

108056

referring to supposed activities by other individuals, providers and physicians. Thus, as can be seen, there is no good cause and objective reason (*see* 11 NYCRR 65-3.2(c) and 11 NYCRR 65-3.5(e)) for any investigation, much less the baseless EUO requests.

10.     Mr. Ryan alleges in an opaque manner that defendant began to "evaluate" Maiga Products, Corp.'s claims "because various facts and circumstances were identified that called into question the eligibility of Maiga Products, Corp. to collect no-fault benefits . . ." Mr. Ryan never explains what he means by "various facts and circumstances". Mr. Ryan attempts to explain what he means, by referring to the Plaintiff, Maiga Products, Corp., as "retailers like Maiga Products, Corp." He then proceeds to lump my company with other unidentified DME companies and wholesalers without explaining, how my company is in any way connected to any of these other companies or how my company's actions resemble actions of any other company. In fact, defendant operates on a novel theory, it is explained as throwing a substance against the wall in hopes that something will stick. Not having any real or circumstantial evidence directly implicating Maiga Products, Corp., defendant decided to engage in red-tape dilatory claims handling practices by lumping my company with a whole bunch of other retailers or wholesalers with whom I have no relationship or contact with. Mr. Ryan's affidavit also gives off-the-wall and irrelevant examples of pricing mechanisms. This shows the bad faith and the desperate nature of defendant and its counsel in hopes of making something up out of whole cloth.

11.     Ryan never refers to any specific wrongdoing by Maiga Products, Corp. but instead engages in what can be termed as guilt by association theory, by using generalities like, "retailer like", "DME retailers" "Retailers", "Generally", "certain retailers", and other similar words and phrases. As can be seen there is no good cause

108056

and objective reason (*see* 11 NYCRR 65-3.2(c) and 11 NYCRR 65-3.5(e)) for any investigation, much less the baseless EUO requests.

12.    As explained to me by my counsel, such allegations and exaggerations that permeate Mr. Ryan's affidavit are impermissible. This argument collapses on two logical points. First, the law has long since determined that so-called "guilt by association" is utter nonsense. Defendant's legal theory behind the frivolous and unfounded EUO requests (both lacking in good cause and objective reason – both violate the no-fault regulations and the applicable case law) and verification requests based on guilt by association was and is impermissible.[1] Secondly, Plaintiffs theoretical arrows of support are running in the wrong direction.

13.    Mr. Ryan then attempts to create an alleged justification (*see* ¶9) for his "ghost hunt" by alleging that Maiga Products, Corp. bills for DME items not covered by the fee schedule. However, this is a so what allegation, as both the no-fault regulations and various opinion of the Insurance Department, now Department of Financial Services, and case law, all permit the DME providers to bill for unlisted items, there is even a specific code assigned for this, E1399. This Healthcare Common Procedure Coding System Code is defined as "Durable medical equipment, miscellaneous" and is used for Carrier priced (e.g., not otherwise classified, individual determination, carrier discretion, gap-filled amounts). Durable Medical Equipment, Prosthetics, Orthotics, Supplies And Surgical Dressings.

14.    Mr. Ryan proceeds to incorrectly allege, he gives no legal or administrative justification for his own deranged conclusion, that in order to be reimbursed for the provided DME supplies, Maiga Products, Corp. was required to provide defendant with wholesale invoices, including the manufacturer information,

108056

make, or model and the alleged cost from the wholesaler. Mr. Ryan also incorrectly and falsely alleges that Maiga Products, Corp. submits "vague and generic" prescriptions. However, this allegation is absurd beyond cavil. Maiga Products, Corp. has no control or discretion over the treating provider and the way that provider decides to write the prescription. The individual to ask those questions would be the treating medical provider, and not Maiga Products, Corp. since Maiga Products, Corp.'s sole job and duty is to fill the prescription based on the prescription the way it is written and to the best of Maiga Products, Corp.'s abilities. The allegations of the failure to submit any of the alleged documents is simply bellied by the fact that no actual verification request were ever made by defendant in this case or any other case.

15.      Furthermore, Mr. Ryan's conclusion that the submitted documentation by Maiga Products, Corp. makes it impossible to determine if the item supplied by Maiga Products, Corp. is the item actually billed, and if the amount billed by Maiga Products, Corp. corresponds to the correct reimbursement amount is due to the fact that the employees of defendant charged with the review and analysis of the submitted claims are incompetent or lack the necessary qualifications and training to make the necessary determination based on the submitted documentation by Maiga Products, Corp. It is much easier for defendant to unjustly and improperly delay or better yet deny out right Maiga Products, Corp.'s claims than to hire competent claim adjusters to actually review the claims and recommend payment. In fact, if defendant would be asked, including its counsel, defendant in this case almost by rote engages in a systematic unjustified EUO protocol of Maiga Products, Corp. and many other similarly situated DME providers.

16.      As can be seen above, there is no substance to any of Ryan's allegations; thus, the whole premise of the EUO is a fiction. Even, if the Court is to consider the

---

[1] Ybarra v. Illinois, 444 U.S. 85, 91 (1979); People v. Ballejo, 114 A.D.2d 902, 904 (2d Dep't, 1985); People v. Chincillo, 120 A.D.2d 266 (3d Dep't, 1986); People v. St. Clair, 80 A.D.2d 691,

108056

basis for defendant's illegitimate request for an EUO, there are other issues that plague defendant's submission and which I want to clarify.

17.    I received the EUO request letters from defendant addressed to Maiga Products, Corp. The letters are attached to defendant's motion for summary judgment as Exhibit "A" and "C".

18.    The EUO request letter dated March 24, 2014 stated that I was to contact Mr. Sean Ryan, SIU Investigator, no later than seven (7) days prior to the scheduled EUO on May 7, 2014. On or about April 28, 2014, I called the number for Sean Ryan listed on defendant's EUO letter. The number rang several times. No one picked up the phone. On that same date, I left a message for Mr. Ryan at that number stating that May 7, 2014 was not a convenient date for me to attend an EUO and asked to further discuss the details of the EUO and related verification requests and to mutually agree on a new date. The unilateral date chosen by defendant was inconvenient for me. Moreover, the pretentious location of the EUO chosen by defendant was also inconvenient and improper. It is absolutely disingenous for defendant to schedule an EUO at their offices. Based on these issues, I called Mr. Ryan. Since my initial message, neither Mr. Ryan nor anyone from State Farm ever returned my call to reschedule the EUO.

19.    The EUO request letter dated May 8, 2014 similarly stated that I was to contact Mr. Ryan no later than seven (7) days prior to my scheduled EUO on May 28, 2014. Again, on or about May 18, 2014, I called the number listed for Mr. Ryan, but no one picked up the phone. Therefore, on that same date, I again left a message to obtain more information regarding the EUO and to reschedule an examination date. To date, no one from State Farm ever returned my second call.

20.    Thus, despite several of my good faith attempts to reach defendant to schedule EUOs and gather more information regarding defendant's verification requests,

108056

defendant has avoided cooperation and has intentionally ignored me. This is the type of behavior that defendant often engages in.

21.    Accordingly, I urge the Court to issue an order denying defendant's motion due to my good faith efforts to comply with outstanding verification and to schedule a convenient EUO date that have gone ignored by defendant. Defendant has failed to respond in any way to my objections to the date, time and location of the EUO and meaningfully communicate with me.

Maiga Products, Corp.

By: _____
Name: Maiga Borisevica
Title: Owner

State of New York)
                          )SS:
County of KINGS )

On this, 28 day of Nov, 2015, before me a notary public, the undersigned officer, personally appeared Maiga Borisevica, known to me (or satisfactorily proven to be) the person whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_____
Notary Public

OLEG RYBAK
NOTARY PUBLIC, State of New York
No. 02RY6207123
Qualified in Kings County
Commission Expires June 8, 20__

SSF-11760

106862

CIVIL COURT OF THE CITY NEW YORK
COUNTY OF KINGS
----------------------------------------------------X
MAIGA PRODUCTS, CORP.,
a/a/o GINETTE, LIGENE

           Plaintiff,

    -against-

STATE FARM MUTUAL AUTOMOBILE INS. CO.,

         Defendant
----------------------------------------------------X

Index No.:   28966/14

**Affidavit of Maiga
Borisevica in Support of
Plaintiff's Affirmation in
Opposition**

**STATE OF NEW YORK**  **:**
                   **: s.s.**
**COUNTY OF KINGS**  **:**

    1.   The undersigned, MAIGA PRODUCTS, CORP., by and through its owner, Maiga Borisevica, being duly sworn, attests to the following under the penalty of perjury.

    2.   I submit this affidavit in further support of Plaintiff's Affirmation in Opposition to defendant's motion for summary judgment, and I attest to the following based on my personal knowledge.

    3.   Throughout the entire period relevant to this matter and with regards to the bills submitted as part of this action, I have been the owner of Maiga Products, Corp.. As a part of my regular business duties, I am responsible for responding to defendant's verification requests that are received by Maiga Products, Corp., including having to appear for the EUOs.

    4.   As owner of Maiga Products, Corp. and because of my personal experience and daily job responsibilities, I have the requisite first-hand personal knowledge of the regular and ordinary course of business procedures and practices employed and instituted by me for data entry into the computer database, bill generation

106862

and replying to verification requests from the insurance carriers, and mailing procedure. This requisite first-hand personal knowledge also applies to having to appear at EUOs for Maiga Products, Corp.

5.    I reviewed the file pertaining to Ginette, Ligene and determined that this file has been created by Maiga Products, Corp., handled and stored by Maiga Products, Corp. in the regular and ordinary course of Maiga Products, Corp.'s business.

6.    My review of handwritten notes and computer records on the file indicate that I attempted to contact defendant regarding the allegedly scheduled EUO as indicated in defendant's letter to Maiga Products, Corp., but my attempts have, to date, been ignored.

7.    In fact, I have reviewed the false and venomous affidavit of defendant's alleged unlicensed and untrained SIU Investigator, Sean Ryan. Mr. Ryan's affidavit is nothing more than bold lies, and defendant's fabrications are unsupported by real evidence, much less circumstantial evidence, to substantiate any of the false and misleading allegations. Defendant's affidavit is designed and submitted for the sole purpose of engaging in fear mongering and scare tactics.

8.    The Ryan affidavit is outright cryptic. Ryan alleges in an opaque manner that defendant has been investigating Maiga Products, Corp. for unsupported allegations regarding fraudulent billing practices. Ryan never cites support for these baseless suspicions. Not having any real or circumstantial evidence directly implicating Maiga Products, Corp., defendant decided to engage in red-tape dilatory claims handling practices by requesting a variety of irrelevant corporate documents as well as my personal appearance at an EUO in bad faith.

9.    Defendant never specifically refers to any wrongdoing by Maiga Products, Corp. and instead engages in what can be termed as guilt by association theory, by

106862

referring to supposed activities by other individuals, providers and physicians. Thus, as can be seen, there is no good cause and objective reason (*see* 11 NYCRR 65-3.2(c) and 11 NYCRR 65-3.5(e)) for any investigation, much less the baseless EUO requests.

10.     Mr. Ryan alleges in an opaque manner that defendant began to "evaluate" Maiga Products, Corp.'s claims "because various facts and circumstances were identified that called into question the eligibility of Maiga Products, Corp. to collect no-fault benefits . . ." Mr. Ryan never explains what he means by "various facts and circumstances". Mr. Ryan attempts to explain what he means, by referring to the Plaintiff, Maiga Products, Corp., as "retailers like Maiga Products, Corp.". He then proceeds to lump my company with other unidentified DME companies and wholesalers without explaining, how my company is in any way connected to any of these other companies or how my company's actions resemble actions of any other company. In fact, defendant operates on a novel theory, it is explained as throwing a substance against the wall in hopes that something will stick. Not having any real or circumstantial evidence directly implicating Maiga Products, Corp., defendant decided to engage in red-tape dilatory claims handling practices by lumping my company with a whole bunch of other retailers or wholesalers with whom I have no relationship or contact with. Mr. Ryan's affidavit also gives off-the-wall and irrelevant examples of pricing mechanisms. This shows the bad faith and the desperate nature of defendant and its counsel in hopes of making something up out of whole cloth.

11.     Ryan never refers to any specific wrongdoing by Maiga Products, Corp. but instead engages in what can be termed as guilt by association theory, by using generalities like, "retailer like", "DME retailers" "Retailers", "Generally", "certain retailers", and other similar words and phrases. As can be seen there is no good cause

106862

and objective reason (*see* 11 NYCRR 65-3.2(c) and 11 NYCRR 65-3.5(e)) for any investigation, much less the baseless EUO requests.

12.    As explained to me by my counsel, such allegations and exaggerations that permeate Mr. Ryan's affidavit are impermissible.  This argument collapses on two logical points.  First, the law has long since determined that so-called "guilt by association" is utter nonsense.  Defendant's legal theory behind the frivolous and unfounded EUO requests (both lacking in good cause and objective reason -- both violate the no-fault regulations and the applicable case law) and verification requests based on guilt by association was and is impermissible.[1]  Secondly, Plaintiffs theoretical arrows of support are running in the wrong direction.

13.    Mr. Ryan then attempts to create an alleged justification (*see* ¶9) for his "ghost hunt" by alleging that Maiga Products, Corp. bills for DME items not covered by the fee schedule.  However, this is a so what allegation, as both the no-fault regulations and various opinion of the Insurance Department, now Department of Financial Services, and case law, all permit the DME providers to bill for unlisted items, there is even a specific code assigned for this, E1399.  This Healthcare Common Procedure Coding System Code is defined as "Durable medical equipment, miscellaneous" and is used for Carrier priced (e.g., not otherwise classified, individual determination, carrier discretion, gap-filled amounts).  Durable Medical Equipment, Prosthetics, Orthotics, Supplies And Surgical Dressings.

14.    Mr. Ryan proceeds to incorrectly allege, he gives no legal or administrative justification for his own deranged conclusion, that in order to be reimbursed for the provided DME supplies, Maiga Products, Corp. was required to provide defendant with wholesale invoices, including the manufacturer information,

106862

make, or model and the alleged cost from the wholesaler. Mr. Ryan also incorrectly and falsely alleges that Maiga Products, Corp. submits "vague and generic" prescriptions. However, this allegation is absurd beyond cavil. Maiga Products, Corp. has no control or discretion over the treating provider and the way that provider decides to write the prescription. The individual to ask those questions would be the treating medical provider, and not Maiga Products, Corp. since Maiga Products, Corp.'s sole job and duty is to fill the prescription based on the prescription the way it is written and to the best of Maiga Products, Corp.'s abilities. The allegations of the failure to submit any of the alleged documents is simply bellied by the fact that no actual verification request were ever made by defendant in this case or any other case.

15.     Furthermore, Mr. Ryan's conclusion that the submitted documentation by Maiga Products, Corp. makes it impossible to determine if the item supplied by Maiga Products, Corp. is the item actually billed, and if the amount billed by Maiga Products, Corp. corresponds to the correct reimbursement amount is due to the fact that the employees of defendant charged with the review and analysis of the submitted claims are incompetent or lack the necessary qualifications and training to make the necessary determination based on the submitted documentation by Maiga Products, Corp. It is much easier for defendant to unjustly and improperly delay or better yet deny out right Maiga Products, Corp.'s claims than to hire competent claim adjusters to actually review the claims and recommend payment. In fact, if defendant would be asked, including its counsel, defendant in this case almost by rote engages in a systematic unjustified EUO protocol of Maiga Products, Corp. and many other similarly situated DME providers.

16.     As can be seen above, there is no substance to any of Ryan's allegations; thus, the whole premise of the EUO is a fiction. Even, if the Court is to consider the

---

[1] Ybarra v. Illinois, 444 U.S. 85, 91 (1979); People v. Ballejo, 114 A.D.2d 902. 904 (2d Dep't, 1985); People v. Chincillo, 120 A.D.2d 266 (3d Dep't, 1986); People v. St. Clair, 80 A.D.2d 691,

106862

basis for defendant's illegitimate request for an EUO, there are other issues that plague defendant's submission and which I want to clarify.

17.   I received the EUO request letters from defendant addressed to Maiga Products, Corp. The letters are attached to defendant's motion for summary judgment as Exhibit "A" and "B".

18.   The EUO request letter dated January 22, 2014 stated that I was to contact Mr. Bryan Edgar, SIU Investigator, no later than seven (7) days prior to the scheduled EUO on March 4, 2014. On or about February 22, 2014, I called the number for Bryan Edgar listed on defendant's EUO letter. The number rang several times. No one picked up the phone. On that same date, I left a message for Mr. Edgar at that number stating that March 4, 2014 was not a convenient date for me to attend an EUO and asked to further discuss the details of the EUO and related verification requests and to mutually agree on a new date. The unilateral date chosen by defendant was inconvenient for me. Moreover, the pretentious location of the EUO chosen by defendant was also inconvenient and improper. It is absolutely disingenuous for defendant to schedule an EUO at their offices. Based on these issues, I called Mr. Edgar. Since my initial message, neither Mr. Edgar nor anyone from State Farm ever returned my call to reschedule the EUO.

19.   The EUO request letter dated March 6, 2014 stated that I was to contact Mr. Sean Ryan no later than seven (7) days prior to my scheduled EUO on March 25, 2014. Again, on or about March 17, 2014, I called the number listed for Mr. Ryan, but no one picked up the phone. Therefore, on that same date, I again left a message to obtain more information regarding the EUO and to reschedule an examination date. To date, no one from State Farm ever returned my second call.

692 (3d Dep't, 1981), *affd* 54 N.Y.2d 900 (1981).

106862

20.     Thus, despite several of my good faith attempts to reach defendant to schedule EUOs and gather more information regarding defendant's verification requests, defendant has avoided cooperation and has intentionally ignored me.  This is the type of behavior that defendant often engages in.

21.     Accordingly, I urge the Court to issue an order denying defendant's motion due to my good faith efforts to comply with outstanding verification and to schedule a convenient EUO date that have gone ignored by defendant.  Defendant has failed to respond in any way to my objections to the date, time and location of the EUO and meaningfully communicate with me.

Maiga Products, Corp.

By: _____
Name: Maiga Borisevica
Title: Owner

State of New York)
                    )SS:
County of KINGS )

On this, _____ day of _____, 2015, before me
a notary public, the undersigned officer, personally appeared Maiga
Borisevica, known to me (or satisfactorily proven to be) the person
whose name is subscribed to the within instrument, and acknowledged
that he/she executedthe same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_____
Notary Public

OLEG RYBAK
NOTARY PUBLIC, State of New York
No. 01RY6397123
Qualified in Kings County
Commission Expires June 8, 20__

SSF-11376

99251

CIVIL COURT OF THE CITY NEW YORK
COUNTY OF KINGS
------------------------------------X
CHARLES DENG ACUPUNCTURE, P.C.,
a/a/o JOSEPH, MACKENDY

               Plaintiff,

     -against-

STATE FARM MUTUAL AUTOMOBILE INS. CO.,

           Defendant
------------------------------------X

**Index No.:**   64768/13

**Affidavit of Charles Deng, L.Ac in Support of Plaintiff's Affirmation in Opposition**

**STATE OF NEW YORK**  :
                : s.s.
**COUNTY OF KINGS**    :

1.    The undersigned, CHARLES DENG ACUPUNCTURE, P.C., by and through its owner, Charles Deng, L.Ac being duly sworn, attests to the following under the penalty of perjury.

2.    I submit this affidavit in further support of Plaintiff's Affirmation in Opposition to defendant's motion for summary judgment and dismissal, and I attest to the following based on my personal knowledge.

3.    Throughout the entire period relevant to this matter and with regards to the bills submitted as part of this action, I have been the owner of Charles Deng Acupuncture, P.C.. As a part of my regular business duties, I am responsible for responding to defendant's verification requests that are received by Charles Deng Acupuncture, P.C., including having to appear for the EUOs.

4.    As owner of Charles Deng Acupuncture, P.C. and because of my personal experience and daily job responsibilities, I have the requisite first-hand personal knowledge of the regular and ordinary course of business procedures and practices employed and instituted by me for data entry into the computer database, bill generation

99251

and replying to verification requests from the insurance carriers, and mailing procedure. This requisite first-hand personal knowledge also applies to having to appear at EUOs for Charles Deng Acupuncture, P.C.

5.     I reviewed the file pertaining to Joseph, Mackendy and determined that this file has been created by Charles Deng Acupuncture, P.C., handled and stored by Charles Deng Acupuncture, P.C. in the regular and ordinary course of Charles Deng Acupuncture, P.C.'s business.

6.     My review of handwritten notes and computer records on the file indicate that I attempted to contact defendant regarding the allegedly scheduled EUO as indicated in defendant's letter to Charles Deng Acupuncture, P.C., but my attempts have, to date, been ignored.

7.     In fact, I have reviewed the false and venomous affidavit of defendant's alleged unlicensed and untrained SIU Investigator, Joseph Farrington.  Mr. Farrington's affidavit is nothing more than bold lies, and defendant's fabrications are unsupported by real evidence, much less circumstantial evidence, to substantiate any of the false and misleading allegations.  Defendant's affidavit is designed and submitted for the sole purpose of engaging in fear mongering and scare tactics.

8.     The Farrington affidavit is outright cryptic.  Farrington alleges in an opaque manner that defendant has been investigating Charles Deng Acupuncture, P.C. for unsupported allegations regarding its corporate structure and control by laypersons. Farrington never cites support for his baseless suspicions.  Not having any real or circumstantial evidence directly implicating Charles Deng Acupuncture, P.C., defendant decided to engage in red-tape dilatory claims handling practices by requesting a variety of irrelevant corporate documents as well as my personal appearance at an EUO in bad faith.

99251

9.      Defendant never specifically refers to any wrongdoing by Charles Deng Acupuncture, P.C. and instead engages in what can be termed as guilt by association theory, by referring to supposed activities by other individuals and providers located in the same building as Charles Deng Acupuncture, P.C. Thus, as can be seen, there is no good cause and objective reason (*see* 11 NYCRR 65-3.2(c) and 11 NYCRR 65-3.5(e)) for any investigation, much less the baseless EUO requests.

10.     As explained to me by my counsel, such allegations and exaggerations that permeate the Farrington affidavit are impermissible. First, the law has long determined that so-called "guilt by association" is utter nonsense. Defendant's legal theory behind the frivolous and unfounded EUO requests (both lacking in good cause and objective reason – both violate the no-fault regulations and the applicable case law), and verification requests based on guilt by association is impermissible.[1] Secondly, Plaintiffs theoretical arrows of support are running in the wrong direction.

11.     The Farrington affidavit states that "State Farm suspects Flatbush is truly owned by unlicensed laypersons," by making allegations against individuals who are not parties to this action and have nothing to do with the underlying claims at issue. Farrington also alleges certain connections between different providers at 1468 Flatbush Avenue that are unsupported by any documentary evidence. Lastly, Farrington, who has no medical expertise, herself, concludes that "Plaintiff is possibly providing unnecessary treatment." This Court should note that, to my knowledge, defendant never conducted its own IME or had a medical professional review the necessity of Charles Deng Acupuncture, P.C.'s course of treatment to make this conclusory allegation.

12.     As can be seen above, there is no substance to any of Farrington's allegations; thus, the whole premise of the EUO is a fiction. Even, if the Court is to

99251

consider the basis for defendant's illegitimate request for an EUO, there are other issues that plague defendant's submission and which I want to clarify.

13.    I received the EUO request letters from defendant addressed to Charles Deng Acupuncture, P.C. The letters are attached to defendant's motion for summary judgment as part of Exhibits "A" and "B."

14.    The EUO request letter dated February 28, 2013 stated that I was to contact Joseph Farrington, SIU Investigator, no later than seven (7) days prior to the scheduled EUO on March 21, 2013. On or about March 12, 2013, I called the number for Joseph Farrington listed on defendant's EUO letter. The number rang several times. No one picked up the phone. On that same date, I left a message for Joseph Farrington at that number stating that March 21, 2013 was not a convenient date for me to attend an EUO and asked to further discuss the details of the EUO and related verification requests and to mutually agree on a new date. The unilateral date chosen by defendant was inconvenient for me. Moreover, the pretentious location of the EUO chosen by defendant was also inconvenient and improper. It is absolutely disingenous for defendant to schedule an EUO at their offices. Based on these issues, I called Joseph Farrington. Since my initial message, neither Joseph Farrington nor anyone from State Farm ever returned my call to reschedule the EUO.

15.    The EUO request letter dated March 22, 2013 similarly stated that I was to contact Joseph Farrington no later than seven (7) days prior to my scheduled EUO on April 17, 2013. Again, on or about April 8, 2013, I called the number listed for Joseph Farrington, but no one picked up the phone. Therefore, on that same date, I again left a message to obtain more information regarding the EUO and to reschedule an examination date. To date, no one from State Farm ever returned my second call.

---

[1] Ybarra v. Illinois, 444 U.S. 85, 91 (1979); People v. Ballejo, 114 A.D.2d 902. 904 (2d Dep't, 1985); People v. Chincillo, 120 A.D.2d 266 (3d Dep't, 1986); People v. St. Clair, 80 A.D.2d 691,

99251

16.    Thus, despite several of my good faith attempts to reach defendant to schedule EUOs and gather more information regarding defendant's verification requests, defendant has avoided cooperation and has intentionally ignored me.  This is the type of behavior that defendant often engages in.

17.    Accordingly, I urge the Court to issue an order denying defendant's cross-motion due to my good faith efforts to comply with outstanding verification and to schedule a convenient EUO date that have gone ignored by defendant.  Defendant has failed to respond in any way to my objections to the date, time and location of the EUO and meaningfully communicate with me.

Charles Deng Acupuncture, P.C.

By: _____
Name: Charles Deng, L.Ac
Title: Owner

State of New York)

                                )SS:

County of KINGS )

On this, _____ day of _____ 2015, before me
a notary public, the undersigned officer, personally appeared Charles Deng,
known to me (or satisfactorily proven to be) the person whose
name is subscribed to the within instrument, and acknowledged that he/she
executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_____
Notary Public

OLEG RYBAK
NOTARY PUBLIC, State of New York
No. 02RYA207123
Qualified in Kings County
Commission Expires June 8, 20__

692 (3d Dep't, 1981), *affd* 54 N.Y.2d 900 (1981).

SSF-11135

96150

CIVIL COURT OF THE CITY NEW YORK
COUNTY OF QUEENS

Index No.: <u>716908/13</u>

------------------------------------X
CHARLES DENG ACUPUNCTURE, P.C.,
a/a/o ROMULUS, SEVENISE

              Plaintiff,

    -against-

STATE FARM MUTUAL AUTOMOBILE INS. CO.,

           Defendant
------------------------------------X

**Affidavit of Charles Deng, L.Ac in Support of Plaintiff's Affirmation in Opposition**

**STATE OF NEW YORK**   :
                 : s.s.
**COUNTY OF KINGS**   :

    1.    The undersigned, CHARLES DENG ACUPUNCTURE, P.C., by and through its owner, Charles Deng, L.Ac being duly sworn, attests to the following under the penalty of perjury.

    2.    I submit this affidavit in further support of Plaintiff's Affirmation in Opposition to defendant's motion for summary judgment and dismissal, and I attest to the following based on my personal knowledge.

    3.    Throughout the entire period relevant to this matter and with regards to the bills submitted as part of this action, I have been the owner of Charles Deng Acupuncture, P.C.. As a part of my regular business duties, I am responsible for responding to defendant's verification requests that are received by Charles Deng Acupuncture, P.C., including having to appear for the EUOs.

    4.    As owner of Charles Deng Acupuncture, P.C. and because of my personal experience and daily job responsibilities, I have the requisite first-hand personal knowledge of the regular and ordinary course of business procedures and practices employed and instituted by me for data entry into the computer database, bill generation

96150

and replying to verification requests from the insurance carriers, and mailing procedure. This requisite first-hand personal knowledge also applies to having to appear at EUOs for Charles Deng Acupuncture, P.C.

5.     I reviewed the file pertaining to Romulus, Sevenise and determined that this file has been created by Charles Deng Acupuncture, P.C., handled and stored by Charles Deng Acupuncture, P.C. in the regular and ordinary course of Charles Deng Acupuncture, P.C.'s business.

6.     My review of handwritten notes and computer records on the file indicate that I attempted to contact defendant regarding the allegedly scheduled EUO as indicated in defendant's letter to Charles Deng Acupuncture, P.C., but my attempts have, to date, been ignored.

7.     In fact, I have reviewed the false and venomous affidavit of defendant's alleged unlicensed and untrained SIU Investigator, Joseph Farrington.  Mr. Farrington's affidavit is nothing more than bold lies, and defendant's fabrications are unsupported by real evidence, much less circumstantial evidence, to substantiate any of the false and misleading allegations.  Defendant's affidavit is designed and submitted for the sole purpose of engaging in fear mongering and scare tactics.

8.     The Farrington affidavit is outright cryptic.  Farrington alleges in an opaque manner that defendant has been investigating Charles Deng Acupuncture, P.C. for unsupported allegations regarding its corporate structure and control by laypersons. Farrington never cites support for his baseless suspicions.  Not having any real or circumstantial evidence directly implicating Charles Deng Acupuncture, P.C., defendant decided to engage in red-tape dilatory claims handling practices by requesting a variety of irrelevant corporate documents as well as my personal appearance at an EUO in bad faith.

96150

9.      Defendant never specifically refers to any wrongdoing by Charles Deng Acupuncture, P.C. and instead engages in what can be termed as guilt by association theory, by referring to supposed activities by other individuals and providers located in the same building as Charles Deng Acupuncture, P.C. Thus, as can be seen, there is no good cause and objective reason (*see* 11 NYCRR 65-3.2(c) and 11 NYCRR 65-3.5(e)) for any investigation, much less the baseless EUO requests.

10.     As explained to me by my counsel, such allegations and exaggerations that permeate the Farrington affidavit are impermissible. First, the law has long determined that so-called "guilt by association" is utter nonsense. Defendant's legal theory behind the frivolous and unfounded EUO requests (both lacking in good cause and objective reason – both violate the no-fault regulations and the applicable case law), and verification requests based on guilt by association is impermissible.[1] Secondly, Plaintiffs theoretical arrows of support are running in the wrong direction.

11.     The Farrington affidavit states that "State Farm suspects Flatbush is truly owned by unlicensed laypersons," by making allegations against individuals who are not parties to this action and have nothing to do with the underlying claims at issue. Farrington also alleges certain connections between different providers at 1468 Flatbush Avenue that are unsupported by any documentary evidence. Lastly, Farrington, who has no medical expertise, herself, concludes that "Plaintiff is possibly providing unnecessary treatment." This Court should note that, to my knowledge, defendant never conducted its own IME or had a medical professional review the necessity of Charles Deng Acupuncture, P.C.'s course of treatment to make this conclusory allegation.

12.     As can be seen above, there is no substance to any of Farrington's allegations; thus, the whole premise of the EUO is a fiction. Even, if the Court is to

96150

consider the basis for defendant's illegitimate request for an EUO, there are other issues that plague defendant's submission and which I want to clarify.

13.   I received the EUO request letters from defendant addressed to Charles Deng Acupuncture, P.C.  The letters are attached to defendant's motion for summary judgment as part of **Exhibits "A" and "C."**

14.   The EUO request letter dated February 15, 2013 stated that I was to contact Joseph Farrington, SIU Investigator, no later than seven (7) days prior to the scheduled EUO on February 26, 2013.  On or about February 15, 2013, I called the number for Joseph Farrington listed on defendant's EUO letter.  The number rang several times.  No one picked up the phone.  On that same date, I left a message for Joseph Farrington at that number stating that February 26, 2013 was not a convenient date for me to attend an EUO and asked to further discuss the details of the EUO and related verification requests and to mutually agree on a new date.  The unilateral date chosen by defendant was inconvenient for me.  Moreover, the pretentious location of the EUO chosen by defendant was also inconvenient and improper.  It is absolutely disingenous for defendant to schedule an EUO at their offices.  Based on these issues, I called Joseph Farrington.  Since my initial message, neither Joseph Farrington nor anyone from State Farm ever returned my call to reschedule the EUO.

15.   The EUO request letter dated March 4, 2013 similarly stated that I was to contact Joseph Farrington no later than seven (7) days prior to my scheduled EUO on March 21, 2013.  Again, on or about March 12, 2013, I called the number listed for Joseph Farrington, but no one picked up the phone.  Therefore, on that same date, I again left a message to obtain more information regarding the EUO and to reschedule an examination date.  To date, no one from State Farm ever returned my second call.

---

[1] Ybarra v. Illinois, 444 U.S. 85, 91 (1979); People v. Ballejo, 114 A.D.2d 902. 904 (2d Dep't, 1985); People v. Chincillo, 120 A.D.2d 266 (3d Dep't, 1986); People v. St. Clair, 80 A.D.2d 691,

96150

16.     Thus, despite several of my good faith attempts to reach defendant to schedule EUOs and gather more information regarding defendant's verification requests, defendant has avoided cooperation and has intentionally ignored me.  This is the type of behavior that defendant often engages in.

17.     Accordingly, I urge the Court to issue an order denying defendant's motion due to my good faith efforts to comply with outstanding verification and to schedule a convenient EUO date that have gone ignored by defendant.  Defendant has failed to respond in any way to my objectiosn to the date, time and location of the EUO and meaninfully communcate with me.

Charles Deng Acupuncture, P.C.

By:
Name: Charles Deng, L.Ac
Title: Owner

Sworn to before me this

_____, 2014

Notary Public

OLEG RYBAK
NOTARY PUBLIC State of New York
No. 02RY6207123
Qualified in Kings County
Commission Expires June 8, 201___

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company,<br><br>*Plaintiff(s)*<br><br>v.<br><br>Francois Jules Parisien, M.D., Luqman Dabiri, M.D., Ksenia Pavlova, D.O., Noel Blackman, M.D., Frances Lacina, D.O., Allay Medical Services, P.C., et al. (See attached rider for complete caption)<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:18-cv-00289-ILG-ST

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* SEE RIDER

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
Christopher T. Cook, Esq.
KATTEN MUCHIN ROSENMAN LLP
575 Madison Ave, New York, NY 10022
212-940-8800

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DOUGLAS C. PALMER
*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 1:18-cv-00289-ILG-ST

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# RIDER

State Farm Mutual Automobile Insurance Company
and State Farm Fire and Casualty Company,

                                        Plaintiffs,

v.

Francois Jules Parisien, M.D.,
Luqman Dabiri, M.D.,
Ksenia Pavlova, D.O.,
Noel Blackman, M.D.,
Frances Lacina, D.O.,
Allay Medical Services, P.C.,
FJL Medical Services P.C.,
JFL Medical Care P.C.,
JPF Medical Services, P.C.,
KP Medical Care P.C.,
PFJ Medical Care P.C.,
RA Medical Services P.C.,
Darren Mollo, D.C.,
Darren Mollo D.C., P.C.,
ACH Chiropractic, P.C.,
Energy Chiropractic, P.C.,
Island Life Chiropractic Pain Care, PLLC,
Charles Deng, L.A.c.,
Charles Deng Acupuncture, P.C.,
David Mariano, P.T.,
Maria Masigla a/k/a Maria Shiela Buslon, P.T.,
MSB Physical Therapy P.C.,
Maiga Products Corporation,
Madison Products of USA, Inc.,
Quality Custom Medical Supply, Inc.,
Allan L. Buslon,
Quality Health Supply Corp.,
Personal Home Care Products Corp.,
AB Quality Health Supply Corp.,
Tatiana M. Rybak, and
Oleg Rybak,

                                        Defendants.

Francois Jules Parisien, M.D.,
329 Surrey Dr.
New Rochelle, NY 10804

Luqman Dabiri, M.D.,
535 Lisk Ave
Staten Island, NY 10303

Ksenia Pavlova, D.O.,
3000 Ocean Parkway
Apt. 8G
Brooklyn, NY 11235

Noel Blackman, M.D.,
c/o Moshannon Valley Correctional Institution
Register #89102-053
555 Geo Drive
Philipsburg, PA  16866

Frances Lacina, D.O.,
1645 Oakmonte Blvd.
Webster, NY 14580

Allay Medical Services, P.C.
1786 Flatbush Avenue
Brooklyn, NY 11210

FJL Medical Services P.C.
2609 E. 14th Street
Brooklyn, NY 11325

JFL Medical Care P.C.
2609 E. 14th Street
Brooklyn, NY 11325

JPF Medical Services, P.C.
329 Surrey Dr.
New Rochelle, NY 10804

KP Medical Care P.C.
3000 Ocean Parkway
Apt. 8G
Brooklyn, NY 11235

PFJ Medical Care P.C.
1786 Flatbush Avenue
Brooklyn, NY 11210

RA Medical Services P.C.
1645 Oakmonte Blvd.
Webster, NY 14580

Darren Mollo, D.C.,
59 Dorothy St.
Port Jefferson Station, NY 11776

Darren Mollo D.C., P.C.
59 Dorothy St.
Port Jefferson Station, NY 11776

ACH Chiropractic, P.C.
1786 Flatbush Avenue
Brooklyn, NY 11210

Energy Chiropractic, P.C.
1786 Flatbush Avenue
Brooklyn, NY 11210

Island Life Chiropractic Pain Care, PLLC,
59 Dorothy St.
Port Jefferson Station, NY 11776

Charles Deng, L.A.c.,
2070 W 7th Street
Floor 2
Brooklyn, NY 11223

Charles Deng Acupuncture, P.C.
254 Canal St., 4 FL
New York, New York

David Mariano, P.T.,
3957 65th Place 2 FL
Woodside, NY 11377

Maria Masigla a/k/a Maria Shiela Buslon, P.T.,
17757 SW 28th St.
Miramar, FL 33029

MSB Physical Therapy P.C.
1786 Flatbush Avenue
Brooklyn, NY 11210

Maiga Products Corporation,
100 Church Street 8 FL
New York, NY 10007

Madison Products of USA, Inc.,
747 Third Ave 2nd Floor
New York, NY 10017

Quality Custom Medical Supply, Inc.
33 Avenue U,
Brooklyn, NY 11223

Quality Health Supply Corp.,
546 Longacre Avenue,
Woodmere, NY 11598

Allan L. Buslon
17757 SW 28th St.
Miramar, FL 33029

Personal Home Care Products Corp.
300 Cadman Plaza Fl 12
Brooklyn, NY 11201

AB Quality Health Supply Corp.
2071 Flatbush Ave., Ste. 104
Brooklyn, NY 11234

Tatiana M. Rybak
4401 Collins Ave., Apt. 2812
Miami Beach, FL 33140

Oleg Rybak
2804 E 19th St Apt 4I
Brooklyn, NY 11235